UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci

          Debtors.

Chapter 7

Case No. 19-54531-lsg

Honorable Lisa S. Gretchko

_____/

Thomas T. Ritter

        Plaintiff,

v.

Joseph G. DuMouchelle and
Melinda J. Adducci

       Defendants.

Adversary Pro. No. 20-04381

_____/

**SECOND AMENDED COMPLAINT TO DETERMINE
NONDISCHARGEABILITY OF
INDEBTEDNESS UNDER 11 U.S.C. § 523**

Plaintiff Thomas T. Ritter ("Plaintiff"), by and through his attorneys, Taft,

Stettenius & Hollister, LLP brings this Second Amended Complaint to Determine

Nondischargeability of Indebtedness Under 11 U.S.C. § 523 (the "Complaint")

against Joseph G. DuMouchelle ("Joseph") and Melinda J. Adducci a/k/a Melinda

DuMouchelle ("Melinda") (Joseph and Melinda are collectively, the "Debtors") and

in support thereof, states as follows:

## Preliminary Statement

1.     This Second Amended Complaint seeks a determination that certain debts owed to Plaintiff by Debtors are non-dischargeable in the above-captioned bankruptcy case pursuant to section 523 of title 11 of the United States Code (the "Bankruptcy Code").

## Jurisdiction

2.     This Court has jurisdiction over the subject matter of this Second Amended Complaint pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Background

5.     Plaintiff is an individual who conducts business in Williams County, North Dakota.

6.     Joseph is an individual who previously conducted business at 251 E. Merrill Street, Suite 236, Birmingham, Oakland County, Michigan and who, according to the docket in this proceeding, resided at 1221 Bowers, #2595, Birmingham, Oakland County, Michigan. Joseph is now incarcerated in a federal prison.

7.     Melinda is an individual who previously conducted business at 251 E. Merrill Street, Suite 236, Birmingham, Oakland County, Michigan and who, according to the docket in this proceeding, resides at 1221 Bowers, #2595, Birmingham, Oakland County, Michigan.

8.     Joseph DuMouchelle Fine & Estate Jewellers, LLC ("DuMouchelle Jewellers") is a Michigan limited liability company which previously conducted business at 251 E. Merrill Street, Suite 236, Birmingham, Oakland County, Michigan.

9.     Joseph, Melinda, and DuMouchelle Jewellers shall be collectively referred to as "Borrowers."

## General Allegations

### The Notes

10.     Plaintiff and Debtors have had a long-standing personal relationship with Melinda's brother being Plaintiff's brother-in-law and Plaintiff having had a close friendship and business relationship with Melinda's father for at least 25 years before his passing.

11.     Debtors approached Plaintiff, requesting that Plaintiff loan funds to Debtors, to enable Debtors to acquire jewelry items, for resale.

12.    To that end, Debtors transmitted a letter to Plaintiff on January 20, 2014 affirming that they were in good financial standing and did not have any liens or judgments against them (the "January 2014 Financial Statement"). **Exhibit 24.**

13.    Based on the Debtors' business and financial records, together with Debtors' then ongoing business operations, the January 2014 Financial Statement was false when made. On and after publication of the January 2014 Financial Statement, Debtors' withheld payments to various customers whose consigned goods had, in fact, been sold, advising the customers the goods had not, in fact, been sold, in order to artificially prop up the Debtors' business operations and cash flow, or not making promised payments under promissory notes or other extensions of credit.

14.    In furtherance of this relationship, and in reliance on the January 2014 Financial Statement Plaintiff agreed to and did loan the Debtors $350,000.00.

15.    Debtors executed a Promissory Note, in favor of Plaintiff, dated February 12, 2014, in the principal amount of $350,000.00, which was executed by Debtors on February 19, 2014 (the "350,000 Note"). **Exhibit 1**.

16.    Per the terms of the $350,000 Note, in furtherance of the representation that the proceeds of the $350,000 Note would be used to purchase jewelry items, Debtors agreed, upon demand, to grant a lien on jewelry items purchased, equal to 150% of the $350,000 Note balance.

17.    Despite this agreement and request by Plaintiff for a lien, no lien was ever granted.

18.    Debtors, at the time of making this agreement, had no present intention of abiding by its terms.

19.    Per the terms of the $350,000 Note, the principal indebtedness due thereunder, together with accrued but unpaid interest, was due and payable on August 18, 2014.

20.    No payment was made on the $350,000 Note.

21.    In discussing the payment due under the $350,000 Note, Debtors represented that they had purchased and re-sold jewelry items in furtherance of the $350,000 Note transaction, resulting in an $80,000 "profit" to Plaintiff.

22.    Unable to pay the $430,000 then due to Plaintiff, Debtors represented that they could engage in further jewelry purchases, to which Plaintiff could receive a share of the profits, if Plaintiff "rolled over" the amounts then due to him.

23.    Debtors therefore requested that Plaintiff forgo payment under the $350,000 Note and the alleged $80,000 "profit" and roll the total sum of $430,000 into additional alleged purchases, to be represented in a new note.

24.    A new note dated for August 12, 2014 but executed on November 7, 2014 was executed by Joseph in favor of Plaintiff, in the principal amount of $430,000 (the "$430,000 Note"). **Exhibit 2**.

25.     In executing the $430,000 Note, Melinda was not relieved for her obligations under the $350,000 Note for both principal and interest.

26.     Debtors, at the time of proposing and entering into the $430,000 Note, had no present intention of acquiring jewelry items or otherwise abiding by the repayment terms of the $430,000 Note.

27.     Debtors negotiated for extensions of the principal payments due under the $430,000 Note twice yearly in 2015 through 2017 each with no present intention of abiding by the terms of the extensions, as is evident, by among other things, failure to have met the payment terms of each of these extension periods.

28.     On May 16, 2017, a Renewed and Extended Promissory was executed, with a due date of November 16, 2017 (the "May 16, 2017 Extension").

29.     A condition of the May 16, 2017 Extension was the payment of the principal amount of $430,000, plus interest of $64,500.00, on or before November 16, 2017 (the "May 16, 2017 Extension Payment").

30.     Following the May 16, 2017 Extension, Debtors' made a single payment of $64,500.00 on September 26, 2017.

31.     The September 26, 2017 payment of $64,500.00 was the last payment the Debtors ever made on the $430,000 Note.

32.     Debtors defaulted in their payment of the May 16, 2017 Extension Payment.

33.     Debtors had no present intention, when made, of abiding by the May 16, 2017 Extension or to make the May 16, 2017 Extension Payment.


34.     On or about January 17, 2018, Joseph executed and delivered to Plaintiff a Renewed and Extended Promissory Note, effective November 16, 2017, in the amount of $430,000 plus accrued but unpaid interest (the "January 17, 2018 Extension"). **Exhibit 3**.

35.     A condition of the January 17, 2018 Extension was the payment of the principal amount of $430,000, plus accrued interest, on or before May 16, 2018 (the "January 17, 2018 Extension Payment").

36.     Debtors had no present intention, when made, of abiding by the January 17, 2018 Extension or to make the January 17, 2018 Extension Payment.

37.     Defaults continued to arise under the terms of the January 17, 2018 Extension and the $350,000 Note, which remained uncured.

38.     Debtors never produced any evidence to Plaintiff that any jewelry items had been acquired with the proceeds loaned to Debtors under the $350,000 Note.

39.     Debtors never produced any evidence to Plaintiff that jewelry items had been re-sold, resulting in an alleged $80,000 "profit" to Plaintiff.

40.     Debtors never produced any evidence to Plaintiff that any jewelry items had been acquired and/or re-sold, as contemplated under the $430,000 Note, the May 16, 2017 Extension or the January 17, 2018 Extension.

41.     Plaintiff initiated suit against Debtors in the Williams County District Court, Northwest Judicial District, State of North Dakota, on September 16, 2019, styled as *Thomas T. Ritter v. Joseph DuMouchelle, Melinda Adducci a/k/a Melinda DuMouchelle and Joseph DuMouchelle Fine & Estate Jewellers, LLC,* Case No. 53-2019-CV-01186 (the "North Dakota Suit").

42.     In the North Dakota Suit, the Court issued Findings of Fact, Conclusions of Law, and Order for Judgment on September 16, 2019 (the "North Dakota Judgment"). **Exhibit 4**.

43.     Per the North Dakota Judgment, judgment was entered against Debtors in the amount of $725,817.01, representing the principal and interest unpaid and owing under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, as of September 11, 2019 (the "North Dakota Note Judgment Amount"). *Id.*

**The Yellow Rose**

44.     In early 2019, while communicating with Debtors regarding amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and

the January 17, 2018 Extension, Debtors informed Plaintiff of a possible new "investment opportunity."

45.     Specifically, Debtors stated that there was an estate sale pending in Texas that included a 77.12 carat yellow diamond ring, coined "The Yellow Rose."

46.     Prior to January 25, 2019, Melinda mailed to Plaintiff a "data package" with pictures and information related to The Yellow Rose.

47.     Melinda provided Plaintiff with photos and descriptive information of The Yellow Rose, by email, on January 25, 2019 (the "January 25, 2019 Email"). **Exhibit 5**.

48.     Melinda, also pursuant to the January 25, 2019 Email, provided Plaintiff with photos and information of comparable diamonds, to support the alleged valuation of The Yellow Rose. *Id.*

49.     On January 28, 2019, Joseph sent to Plaintiff an email, proposing that The Yellow Rose be purchased for $12,500,000 and be sold to a private buyer within the next week to ten days for $16,500,000. *Id.*

50.     On January 28, 2019, Plaintiff requested by email an appraisal of The Yellow Rose. *Id.*

51.     On January 28, 2019, Plaintiff was sent via email an alleged January 31, 2011 "appraisal" of The Yellow Rose. *Id.*

52.     Melinda was asked by Plaintiff whether Melinda felt The Yellow Rose transaction would be a way for both Plaintiff and Debtors to make some good money, to which Melinda responded with a positive "yes."

53.     Pursuant to a letter agreement dated January 31, 2019, Plaintiff and Joseph agreed that Plaintiff would be the purchaser of The Yellow Rose, in his name, from the seller, for $12 million and Joseph would facilitate the subsequent sale of The Yellow Rose on Plaintiff's behalf (the "Yellow Rose Purchase Agreement"). **Exhibit 6**.

54.     Per the Yellow Rose Purchase Agreement, an escrow account was to be established at Plaintiff's bank by Plaintiff, into which the $12 million would be funded and from which the purchase price of The Yellow Rose would be paid, by Plaintiff, upon receipt by Joseph, as agent for Plaintiff, of The Yellow Rose. *Id*.

55.     Per the Yellow Rose Purchase Agreement, upon receipt of The Yellow Rose, Joseph, as Plaintiff's agent, represented that he would store The Yellow Rose at a Brinks facility in Detroit, Michigan and obtain insurance over the same. *Id*.

56.     The Yellow Rose Purchase Agreement stated that the profit from the sale was to be divided between Plaintiff and Joseph, per a sliding scale. *Id*.

57.     Debtors had no present intention of abiding by any of the agreements of Debtors set forth in the Yellow Rose Purchase Agreement, at the time they were made.

58.     In the course of returning the Yellow Rose Purchase Agreement to Debtors on January 31, 2019, Plaintiff sent a cover email to both Joseph and Melinda, inquiring whether Melinda should be added as a party to the Yellow Rose Purchase Agreement; that if a correction was needed, to advise Plaintiff; and that it was not Plaintiff's intention to leave Melinda out or lessen her part in the transaction, as Plaintiff knew Melinda's skill and expertise in the gemology field was at the top. **Exhibit 7**.

59.     Pursuant to an email dated January 31, 2019, Joseph represented that proceeds were needed to purchase The Yellow Rose (the "January 31, 2019 Email") (**Exhibit 8**) and provided the following wiring information:

| | |
|---|---|
| Bank Name: | MB Financial Bank |
| Account Name: | Highland Wealth Management |
| Bank Routing Number: | 071001737 |
| Account Number: | XXXXX79802 |

60.     Joseph represented in the January 31, 2019 Email that Highland Wealth Management was the seller of The Yellow Rose. *Id.*

61.     On February 1, 2019, Plaintiff initiated a wire transfer to the MB Financial Bank account noted, on behalf of Highland Wealth Management.

62.     The wire transfer was not accepted into the MB Financial Bank account.

63.     The MB Financial Bank account was not the bank account of the seller or of the seller representative of The Yellow Rose.

64.     Highland Wealth Management was not the seller or the seller representative of The Yellow Rose.

65.     Pursuant to an email dated February 1, 2019 (the "February 1, 2019 Email") (**Exhibit 9**), Joseph directed Plaintiff to wire the $12 million to the following new account of the seller (the "FineMark Account"):

Bank Name:                    FineMark Bank & Trust
Account Name:                 Fine & Estate Appraisers, LLC
Bank Routing Number:          067016231
Account Number:               XXXXX46380

66.     Joseph represented that the FineMark Account was the account of Fine & Estate Appraisers, LLC, with the wiring instructions being provided by the seller or the seller agent of The Yellow Rose, Richard Drucker, based on the February 1, 2019 Email containing the above information under an email allegedly authored by Richard Drucker and forwarded to Joseph. *Id.*

67.     On February 4, 2019, Plaintiff initiated a wire transfer to the FineMark Account.

68.     Plaintiff was advised that FineMark Bank could not accept a wire of that size and the funds were remitted back to Plaintiff on February 5, 2019.

69.     The FineMark Account was not the bank account of the seller or of the seller representative of The Yellow Rose.

70.     Richard Drucker was not the seller or the seller representative of The Yellow Rose.

71.     Fine & Estate Appraisers, LLC, was not the seller or the seller representative of the Yellow Rose.

72.     Pursuant to an email dated February 6, 2019 (the "February 6, 2019 Email") (**Exhibit 10**), Joseph directed Plaintiff to instead wire the $12 million to the following new account of the seller of The Yellow Rose (the "Bank of America Account"):

| | |
|---|---|
| Bank Name: | Bank of America |
| Account Name: | Fine & Estate Appraisers, LLC |
| Bank Routing Number: | 0260009539 |
| Bank Account Number: | XXXXX60585 |

73.     Joseph represented that the Bank of America Account was the account of Fine & Estate Appraisers, LLC, with the wiring instructions being provided by the seller or of the seller agent of The Yellow Rose, Richard Drucker allegedly of Gemguide, based on the February 6, 2019 Email containing the above information under an email allegedly authored by Richard Drucker of Gemguide and forwarded to Joseph. *Id.*

74.     On February 6, 2019, Plaintiff initiated a wire transfer to the Bank of America Account in reliance on Joseph's false representations about the name of the account owner.

75.     The Bank of America Account was not the bank account of the seller or of the seller representative of The Yellow Rose.

76.     Richard Drucker was not the seller or the seller representative of The Yellow Rose.

77.     The Bank of America Account was not the account of Fine & Estate Appraisers, LLC. *See*, Bank of America Account Statement. **Exhibit 11**.

78.     The Bank of America Account was the account of DuMouchelle Jewellers. *Id*.

79.     The wire instructions set forth on Exhibits 9 and 10, containing forwarding information from Richard Drucker were fictitious emails, created by Debtors.

80.     Joseph provided Plaintiff with a receipt from Joseph DuMouchelle International Auctioneers, dated February 6, 2019, allegedly evidencing the purchase of The Yellow Rose for $12 million (the "The Yellow Rose Purchase Receipt"). **Exhibit 12**.

81.     The Yellow Rose Purchase Receipt was a fictitious document, created by Debtors.

82.     The $12 million wired into the Bank of America Account was not used to purchase The Yellow Rose. Instead, the proceeds were disbursed as follows:

### Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 02/06/19 | Legal Order, LTS D020519000761 | -375.00 |
| 02/06/19 | Legal Order Fee,LTS D020519000761 | -125.00 |
| 02/07/19 | Legal Order, LTS D020519000761 | -178,277.71 |
| 02/07/19 | AZ TLR transfer to CHK 9238 | -4,250,000.00 |
| 02/07/19 | AZ TLR transfer to CHK 4272 | -150,000.00 |
| 02/07/19 | AZ TLR transfer to CHK 9238 | -117,000.00 |

| | | |
|---|---|---|
| 02/07/19 Customer Withdrawal Image | | -4,041,925.00 |
| 02/07/19 Customer Withdrawal Image | | -1,091,769.44 |
| 02/07/19 Customer Withdrawal Image | | -39,000.00 |
| 02/08/19 Legal Order, LTS D020819000362 | -651,169.26 | |
| 02/08/19 WIRE TYPE:WIRE OUT DATE:190208 TIME: | -4,920.00 | |
| 1141 ET TRN:2019020800254267 SERVICE | | |
| REF:007173 BNF:STEVE OLSON ID:374889 BNF BK:LEGACY | | |
| BANK ID:10 2103106 PMTDET:GDR6C52GF Goods | | |
| 02/08/19 MI TLR transfer to CHK 3693 | | -100.00 |
| 02/12/19 WIRE TYPE:WIRE OUT DATE:190211 TIME:0521 ET | -2,114,765.00 | |
| 02/12/19 CHECK #0000000000 | -180,000.00 | |
| 02/12/19 WIRE TYPE:WIRE OUT DATE:190211 TIME:1032 ET | -25,912.19 | |

Exhibit 11.

83.   On February 7, 2019, Melinda, under her signature, caused "Out of State Counter Withdrawals" to occur, in the amounts of $39,000.00, $1,091,769.44 and $4,041,925.00 each (a total of $5,172,694.44) as indicated on the documents attached as **Exhibit 13.**

84.   Just prior to the $12 million wire transfer into the Bank of America Account, the Bank of America Account balance was $500. Exhibit 11.

85.   Based on The Yellow Rose Purchase Receipt, Plaintiff was induced by Debtors to believe that Debtors had purchased The Yellow Rose and that they were holding it for the benefit of Plaintiff.

86.   Joseph represented to Plaintiff that The Yellow Rose would be moved from the Brinks depository in Texas to the Brinks depository in Michigan, to be held in the joint names of Plaintiff and Joseph, although at all times owned by Plaintiff.

87.   Debtors' representation that a transfer of The Yellow Rose occurred between the Brinks depository in Texas and the Brinks depository in Michigan was false, as The Yellow Rose had never been acquired.

88.     Notwithstanding the lack of acquisition of The Yellow Rose, Joseph represented that Joseph and Melinda were actively promoting the sale of The Yellow Rose. The Debtors went as far as to say that the intended purchaser of The Yellow Rose would be professional boxer Floyd Mayweather, Jr.

89.     In March, 2019, Joseph represented to Plaintiff that he had found a buyer interested in The Yellow Rose, that the buyer would purchase The Yellow Rose and that the proceeds of the sale of The Yellow Rose would be transmitted directly to Plaintiff.

90.     Based on this representation, Plaintiff prepared a draft agreement in conformity with this understanding and sent the same to Joseph on March 21, 2019 (the "Draft Sale Agreement"). **Exhibit 14**.

91.     Joseph, as agent for Plaintiff, entered into a letter agreement date April 12, 2019, for the subsequent sale of The Yellow Rose for $16.5 million to Sam Haggin, Trustee of the Jennifer H. Rands Trust, which was signed by Joseph, with Debtors impersonating and providing the forged signature of a fictitious person, Sam Haggin, on April 19, 2019 (the "April 12, 2019 Letter Agreement"). **Exhibit 15**.

92.     Per the April 12, 2019 Letter Agreement, the sale was to be consummated by April 22, 2019.

93.     The April 12, 2019 Letter Agreement was a forged and fictitious document.

94.     The Jennifer H. Rands Trust never agreed to purchase The Yellow Rose.

95.     Sam Haggin never signed the April 12, 2019 Letter Agreement.

96.     The Yellow Rose was never sold to the Jennifer H. Rands Trust, as it had never been purchased by Debtors.

97.     On April 21, 2019, the day before the alleged closing under the April 12, 2019 Letter Agreement, Plaintiff traveled to Detroit, in order to view The Yellow Rose at the Brinks depository on April 22, 2019, where it allegedly resided pending the closing and transfer to the Jennifer H. Rands Trust.

98.     Joseph represented that his contact at the Brinks depository was on vacation and that he therefore could not gain access to show Plaintiff The Yellow Rose on April 22, 2019.

99.     In an email dated February 7, 2019, Joseph made false representations suggesting that The Yellow Rose was transferred from a Brinks facility located in Texas the Detroit Brinks facility for storage and that access was not available on April 22, 2019. **Exhibit 16**.

100.    The Brinks depository was open on April 22, 2019 and anyone could have provided access, had The Yellow Rose actually existed at the Brinks depository.

101.    Debtors have failed to return any portion of the $12 million to Plaintiff.

102.   After Debtors' supposed resale of The Yellow Rose, Debtors each participated in a continuing scheme to conceal (a) the true disposition of the $12 million, (b) that the Plaintiff's funds were never used to purchase The Yellow Rose, and (c) that Debtors never resold The Yellow Rose for $16.5 million.

103.   In May of 2019, Debtors both participated in several phone conversations with Plaintiff wherein they promised to wire an initial $2 million of The Yellow Rose sale proceeds received (the "May, 2019 Discussions").

104.   These discussions were confirmed in an email from Plaintiff to Joseph and Melinda, dated May 13, 2019 (the "May 13, 2019 Email").  **Exhibit 17**.

105.   Neither Joseph nor Melinda initiated the promised $2 million wire payment to Plaintiff.

106.   The representations made to Plaintiff by Debtors with respect to the forwarding of the first $2 million of The Yellow Rose proceeds were false when made.

107.   After the May 13, 2019 Email, Debtors ignored all inquiries by Plaintiff, by phone, as to the status of remittance of The Yellow Rose sale proceeds.

108.   Plaintiff's inquiries are confirmed in emails from Plaintiff to Joseph and Melinda, dated June 10, 2019 (the "June 10, 2019 Email") and June 21, 2019 (the "June 21, 2019 Email").  **Exhibit 18** and **Exhibit 19.**

109.   Subsequently, Debtors each ignored Plaintiff's June 2019 emails inquiring about his investment in The Yellow Rose.

110.   On June 27, 2019, Plaintiff had a telephone call with Debtors, wherein Debtors represented that full payment would be made to Plaintiff by July 2, 2019 (the "June 27, 2019 Phone Call").

111.   This is confirmed in an email from Plaintiff to Joseph and Melinda dated July 2, 2019 (the "July 2, 2019 Email").  **Exhibit 20**.

112.   The representations made to Plaintiff by Debtors as to full payment by July 2, 2019 were false when made.

113.   As part of the North Dakota Action, Plaintiff sought judgment against Debtors related to The Yellow Rose transaction.

114.   Pursuant to the North Dakota Judgment, judgment was entered against Debtors and DuMouchelle Jewellers, jointly and severally, in the amount of $16,413,214.61, representing the original $12 million plus costs, commission and interest (the "North Dakota Yellow Rose Judgment Amount").

115.   In rendering the North Dakota Yellow Rose Judgment, the following findings of fact were made:

[¶14] Defendant Adducci, who is DuMouchelle's spouse, also spoke to Ritter regarding purchase of The Yellow Rose and indicated it would be a lucrative investment for all of the parties.  Defendant Adducci provided Ritter with photos and appraisal information regarding The Yellow Rose by email on January 25, 2019. Compl., ¶ 16.

[¶22] . . . The Defendants have further refused to communicate truthfully with Ritter regarding the location of The Yellow Rose or any details regarding the purchase and subsequent sale of The Yellow Rose or provide an accounting detailing the specific use of the funds transmitted by Ritter. *Id*.

Exhibit 4.

116.   In rendering the North Dakota Judgment, the following conclusions of law were made:

[¶32] Defendant Adducci also spoke to Ritter regarding purchase of The Yellow Rose and indicated it would be a lucrative investment for all of the parties. Defendant Adducci provided Ritter with photos and appraisal information regarding the Yellow Rose by email on January 25, 2019.

[¶41] . . . The Defendants have further refused to communicate truthfully with Ritter regarding the location of The Yellow Rose or any details regarding the purchase and subsequent sale of The Yellow Rose or provide an accounting detailing the specific use of the funds transmitted by Ritter.

*Id*.

117.   Debtors failed to defend the North Dakota suit, so the above findings of fact and conclusions of law are binding on Debtors and specifically, Melinda.

## The Criminal Action

118.   On June 16, 2020, a Criminal Information was filed against Joseph (the "Information"), relating to The Yellow Rose transaction, in the United States District Court for the Eastern District of Michigan, Case No. 2:20-cr-20245 (the "Criminal Proceeding"). **Exhibit 21**.

119.  On September 14, 2020, pursuant to a Rule 11 Plea Agreement, Plaintiff entered a plea of guilty as to Count 1 of the Information. **Exhibit 22**.

120.  Per Count 1 of the Information, Joseph "by means of false and fraudulent material promises, pretenses and representations:" "instructed [Plaintiff] to transfer $12,000,000 for the purchase of the Yellow Rose", "falsified documents and emails making it appear that the account the money would be wired to was in fact the seller's", "sent the false information to [Plaintiff] with directions to wire the money to the account with a notation that it was for the benefit of the seller represented by [Richard Drucker]", "sent [Plaintiff] a fraudulent receipt making it appear that the Yellow Rose had been purchased" and "caused the transmission of wire communications in interstate commerce in the form of an interstate wire transfer of funds in the amount of $12,000,000 from [Plaintiff's] bank account in Chandler, Arizona (sic) Dumouchelle's Bank of America account in Bloomfield Hills, Michigan." Exhibit 21.

121.  On July 28, 2022, the court issued its Judgment in a Criminal Case against Joseph, under which a criminal monetary penalty in favor of Plaintiff was assessed in the amount of $12 million, restitution in this same amount was ordered in favor of Plaintiff, Joseph was ordered to pay a forfeiture money judgment to the United States in the amount of $12 million and Joseph was sentenced to 151 months of incarceration. **Exhibit 23**.

**Count I – 11 U.S.C. §523(a)(2)(A)**
**False Pretenses, False Representations and Actual**
**Fraud Regarding The $350,000 Note, the $430,000 Note, the**
**May 16, 2017 Extension and the January 17, 2018 Extension**

122.   Plaintiff incorporates the provisions of paragraphs 1 through 116 above, as if specifically set forth herein.

123.   Debtors induced Plaintiff to enter into the $350,000 Note and make the initial advance of $350,000.00 thereunder under false pretenses.

124.   Debtors had no present or future intent, at the time of entering into the $350,000 Note, of repaying the obligations thereunder.

125.   Debtors had no present or future intent, at the time of entering into the $350,000 Note, of granting a lien on any jewelry items, as collateral security for the obligations owing under the $350,000 Note, having failed to grant such a lien.

126.   Debtors represented that they had purchased and re-sold jewelry items, resulting in an $80,000 "profit" to Plaintiff, when, in fact no jewelry items had been purchased and no $80,000 "profit" had been realized in connection with the $350,000 Note.

127.   Debtors represented to Plaintiff that the fictitious $350,000 of sale proceeds and alleged $80,000 "profit" should be rolled into a subsequent note, in order to permit Debtors to generate additional "profit" for Plaintiff and Debtors, when in fact the $350,000 had been utilized for other purposes and no $80,000 "profit" existed.

128.   Debtors' inducement in causing Plaintiff to enter into the $430,000 Note was based on Debtors' fraud.

129.   At the time of proposing and entering into the $430,000 Note, Debtors had no present intention of acquiring jewelry items for the benefit of Plaintiff or otherwise abiding by the repayment terms of the $430,000 Note.

130.   Debtors' negotiations of extensions of the payments due under the $430,000 Note twice yearly in 2015 through 2017 were undertaken with no present intention of abiding by the terms of the extensions.

131.   Debtors' inducement in causing Plaintiff to enter into the January 17, 2018 Extension was based on Debtors' fraud.

132.   At the time of proposing and entering into the January 17, 2018 Extension, Debtors had no present intention of acquiring jewelry items for the benefit of Plaintiff or otherwise abiding by the repayment terms of the January 17, 2018 Extension.

133.   Debtors never produced any evidence to Plaintiff that any jewelry items had been acquired with the proceeds loaned to Debtors under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension or the January 17, 2018 Extension.

134.   Debtors never produced any evidence to Plaintiff that jewelry items had been re-sold, resulting in an alleged $80,000 "profit" to Plaintiff.

135.   The foregoing actions preclude a discharge of the North Dakota Note Judgment Amount and amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, pursuant to 11 U.S.C. §523(a)(2)(A), on the basis that the funds advanced and the extensions granted were money, property, services, or an extension, renewal or refinancing of credit obtained by false pretenses, false representations, and actual fraud, other than statements regarding Debtors' financial position.

### Count II – 11 U.S.C. §523(a)(2)(B)
### False Pretenses, False Representations and Actual
### Fraud Regarding The $350,000 Note, the $430,000 Note, the
### <u>May 16, 2017 Extension and the January 17, 2018 Extension</u>

136.   Plaintiff incorporates the provisions of paragraphs 1 through 130 above, as if specifically set forth herein.

137.   The January 2014 Financial Statement was a statement in writing with respect to the Debtors' financial condition.

138.   According to the Debtors' financial records, together with Debtors' then ongoing business operations, the January 2014 Financial Statement was materially false when made.

139.   Plaintiff relied on the 2014 Financial Statement when he agreed to the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension.

140. The Debtors caused the 2014 Financial Statement to be made with intent to deceive Plaintiff.

141. The Debtors' 2014 Financial Statement induced Plaintiff into extending credit to the Debtors under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension.

142. The Debtors are liable under the $350,000 Note, the $430,000 Note and the North Dakota Note Judgment Amount.

143. The foregoing actions preclude a discharge of the North Dakota Note Judgment Amount and amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, pursuant to 11 U.S.C. §523(a)(2)(B), on the basis that the funds advanced were money, property, services, or an extension, renewal or refinancing of credit obtained by use of a writing respecting Debtors' financial condition, that was materially false, upon which Plaintiff relied and that Debtors caused to be made and/or published with the intent to deceive Plaintiff.

### Count III – 11 U.S.C. §523(a)(2)(A)
### False Pretenses, False Representations
### and Actual Fraud Regarding The Yellow Rose

144. Plaintiff incorporates the provisions of paragraphs 1 through 138 above, as if specifically set forth herein.

145. Debtors' representation that they could purchase The Yellow Rose for $12 million was false, upon which Plaintiff relied, causing damages to Plaintiff.

146. Debtors' representation that they could sell The Yellow Rose for between $16 million and $20 million was false, upon which Plaintiff relied, causing damages to Plaintiff.

147. Debtors' representation that Plaintiff would be the purchaser of The Yellow Rose was false, upon which Plaintiff relied, causing damages to Plaintiff.

148. Debtors' representation that Joseph would act as an agent in arranging for the purchase of The Yellow Rose was false, upon which Plaintiff relied, causing damages to Plaintiff.

149. Melinda's representations that the purchase of The Yellow Rose and its subsequent sale would be a lucrative investment for all parties was false, upon which Plaintiff relied, causing damages to Plaintiff.

150. Melinda's act of providing Plaintiff with photos and appraisal information of The Yellow Rose was undertaken with the intent to induce Plaintiff into entering into a transaction related to The Yellow Rose, upon which Plaintiff relied, causing damages to Plaintiff.

151. The Yellow Rose Purchase Agreement was drafted and presented to Plaintiff with the intent to induce Plaintiff into entering into The Yellow Rose Purchase Agreement, upon which Plaintiff relied, causing damages to Plaintiff.

152. Debtors had no present or future intent, at the time of entering into the Yellow Rose Purchase Agreement of ever purchasing or reselling The Yellow Rose.

153. The January 31, 2019 Email contained fictitious information, delivered with the intent that Plaintiff rely on upon it, upon which Plaintiff relied, causing damages to Plaintiff.

154. Joseph's representation that the MB Financial Account was the account of the seller of The Yellow Rose was a false statement, upon which Plaintiff relied, causing damages to Plaintiff.

155. The February 1, 2019 Email contained fictitious information, delivered with the intent that Plaintiff rely upon it, upon which Plaintiff relied, causing damages to Plaintiff.

156. The February 4, 2019 Email contained fictitious information, delivered with the intent that Plaintiff rely upon it, upon which Plaintiff relied, causing damages to Plaintiff.

157. Debtors falsely represented that the FineMark Bank Account was the bank account of the seller of The Yellow Rose, upon which Plaintiff relied, causing damages to Plaintiff.

158. Joseph's direction to Plaintiff to wire transfer funds to the Bank of America Account was undertaken with the intent to cause harm to Plaintiff, upon which Plaintiff relied, causing damages to Plaintiff.

159.    Debtors misrepresented that the Bank of America Account was the bank account of the seller of The Yellow Rose, upon which misrepresentation Plaintiff relied, causing damages to Plaintiff.

160.    Debtors misrepresented that the Bank of America Account was the bank account of Fine & Estate Appraisers, LLC, when it was, in fact, the bank account of DuMouchelle Jewellers, upon which Plaintiff relied, causing damages to Plaintiff.

161.    The Richard Drucker Email was a fictitious email, created by Debtors, with the intent that Plaintiff would rely upon the same, upon which Plaintiff relied, causing damages to Plaintiff.

162.    The Yellow Rose Purchase Receipt was a fictitious document, created by Debtors with the intent that Plaintiff would rely upon the same, upon which Plaintiff relied, causing damages to Plaintiff.

163.    The $12 million wired into the Bank account of Plaintiff, contrary to Debtors' representations, was not used to purchase The Yellow Rose, upon which Plaintiff relied, causing damages to Plaintiff.

164.    Plaintiff was induced by Debtors to believe that Debtors, in fact, had purchased The Yellow Rose, when in fact they had not, causing damage to Plaintiff.

165. Joseph represented that The Yellow Rose had been transferred from the Brinks depository in Texas to the Brinks depository in Detroit, which representation was false, upon which Plaintiff relied, causing damages to Plaintiff.

166. Joseph's representation that Debtors had found a buyer for The Yellow Rose, that the buyer would purchase The Yellow Rose and that the proceeds resulting from the sale of The Yellow Rose would be transmitted to Plaintiff were false, upon which Plaintiff relied, causing damages to Plaintiff.

167. Based on Debtors' representations, Plaintiff was induced into drafting the Draft Sale Agreement (which, in fact, was unnecessary, as there was no purchaser for The Yellow Rose), upon which Plaintiff relied, causing damages to Plaintiff.

168. The April 12, 2019 Letter Agreement was a fictitious document, presented to Plaintiff to represent that the Yellow Rose had been sold, when, in fact, it had not, upon which Plaintiff relied, causing damages to Plaintiff.

169. The April 12, 2019 Letter Agreement was a forgery, created by Debtors.

170. The Jennifer H. Rands Trust never agreed to purchase The Yellow Rose.

171. Sam Haggin never signed the April 12, 2019 Letter Agreement.

172. Joseph's representation on April 22, 2019 that The Yellow Rose was stored at the Brinks facility in Detroit, that access could not be provided to Plaintiff for inspection purposes because Debtors' contact was on vacation were false, upon which Plaintiff relied, causing damages to Plaintiff.

173. The May, 2019 Discussions, the May 13, 2019 Email, the June 10, 2019 Email, the June 21, 2019 Email, the June 27, 2019 Phone Call and the July 2, 2019 Email all represent actions taken by Debtors, to withhold and falsify information, create forbearances, defraud, influence adversely and otherwise deter Plaintiff from taking action to recover amounts due to him by Debtors.

174. The foregoing actions preclude a discharge of the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(2)(A) on the basis that per the above described facts, the funds advanced and the extensions granted were money, property, services, or an extension, renewal or refinancing of credit obtained by false pretenses, false representations, and actual fraud, other than statements regarding Debtors' financial position.

## Count IV – 11 U.S.C. §523(a)(2)(B)
### False Pretenses, False Representations
### and Actual Fraud Regarding The Yellow Rose

175. Plaintiff incorporates the provisions of paragraphs 1 through 169 above, as if specifically set forth herein.

176.   The January 2014 Financial Statement was a statement in writing with respect to the Debtors' financial condition.

177.   According to the Debtors' financial records The January 2014 Financial Statement was materially false when made.

178.   Plaintiff relied on the 2014 Financial Statement when he agreed to enter into The Yellow Rose transaction with the Debtors.

179.   The Debtors caused the 2014 Financial Statement to be made with intent to deceive Plaintiff.

180.   The Debtors' 2014 Financial Statement induced Plaintiff into entering into The Yellow Rose transaction with the Debtors.

181.   The Debtors are liable for The Yellow Rose Judgment Amount that resulted from The Yellow Rose transaction.

182.   The foregoing actions preclude a discharge of the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(2)(B), on the basis that per the above described facts, the funds advanced were money, property, services, or an extension, renewal or refinancing of credit obtained by use of a writing respecting Debtors' financial condition, that was materially false, upon which Plaintiff relied and that Debtors caused to be made and/or published with the intent to deceive Plaintiff.

**Count IV – 11 U.S.C. §523(a)(4)**
**Fraud or Defalcation While**

**Acting in a Fiduciary Capacity, Embezzlement and**
**Larceny Regarding the $350,000 Note, the $430,000**
**Note, the May 16, 2017 Extension and the January 17, 2018 Extension**

183.     Plaintiff incorporates the provisions of paragraphs 1 through 167 above, as if specifically set forth herein.

184.     Under the terms of the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, Debtors agreed to undertake certain fiduciary duties to Plaintiff, including using the proceeds advanced under the foregoing documents to purchase to be identified pieces of jewelry, upon which a lien would be granted in Plaintiff's favor and to otherwise abide by the duties imposed upon them as fiduciaries under the terms of the foregoing documents.

185.     Debtors breached each and every one of the fiduciary duties imposed on them under the terms of the foregoing documents, including, but not limited to, in failing to use the proceeds advanced under the foregoing documents to purchase to be identified pieces of jewelry, upon which a lien would be granted in Plaintiff's favor, in diverting the proceeds advanced under the foregoing documents for their own personal benefit and purpose and in failing to account and repay Plaintiff and to  otherwise abide by the duties imposed upon them as fiduciaries under the terms of the foregoing documents.

186.     Debtors engaged in embezzlement and larceny, in taking the proceeds advanced under the foregoing documents and using them for purposes other than as

specified under the terms of the foregoing documents, with a present and continuing intent to do so, in order to convert the same for their own personal benefit and purpose.

187.   The foregoing actions preclude a discharge of the North Dakota Note Judgment Amount and amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2017 Extension, pursuant to 11 U.S.C. §523(a)(4), on the basis of fraud and defalcation while acting in a fiduciary capacity, embezzlement and larceny.

### Count V – 11 U.S.C. §523(a)(4)
### Fraud or Defalcation While Acting in a Fiduciary
### Capacity, Embezzlement and Larceny Regarding The Yellow Rose

188.   Plaintiff incorporates the provisions of paragraphs 1 through 172 above, as if specifically set forth herein.

189.   With respect to The Yellow Rose transaction, Debtors agreed to undertake certain fiduciary duties to Plaintiff, including, but not limited to, acquiring The Yellow Rose, placing title to The Yellow Rose in Plaintiff's sole name, using the proceeds loaned by Plaintiff solely for the purchase of The Yellow Rose, storing The Yellow Rose, undertaking to sell The Yellow Rose and transferring the proceeds of sale of The Yellow Rose to Plaintiff and to otherwise abide by the duties imposed upon them as fiduciaries, as more fully set forth in oral representations of Debtors and in the January 25, 2019 Email, the Yellow Rose Purchase Agreement, the

January 31, 2019 Email, the February 2, 2019 Email, the February 4, 2019 Email, the Richard Drucker Email, The Yellow Rose Purchase Receipt, the April 12, 2019 Letter Agreement, the May, 2019 Discussions, the May 13, 2019 Email, the June 10, 2019 Email, the June 21, 2019 Email, the June 27, 2019 Phone Call and the July 2, 2019 Email.

190.   Debtors breached each and every one of the fiduciary duties imposed on them under the terms of the foregoing representations and documents, including, but not limited to, in failing to use the $12 million to purchase The Yellow Rose and to otherwise abide by the duties imposed upon them as fiduciaries under the terms of the foregoing representations and documents.

191.   Debtors engaged in embezzlement and larceny, in taking the $12 million and using it for purposes other than as specified under the terms of the oral representations and written agreements, with a present and continuing intent to do so, in order to convert the same for their own personal benefit and purpose.

192.   The foregoing actions preclude a discharge of the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(4), on the basis of fraud and defalcation while acting in a fiduciary capacity, embezzlement and larceny.

### Count VI – 11 U.S.C. §523(a)(6)
### Willful and Malicious Injury
### <u>to Plaintiff and to Plaintiff's Property Regarding the Note</u>

193. Plaintiff incorporates the provisions of paragraphs 1 through 177 above, as if specifically set forth herein.

194. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension constitute willful acts.

195. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension constitute malicious acts.

196. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension caused willful injury to Plaintiff.

197. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension caused malicious injury to Plaintiff.

198. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension constituted willful injury to Plaintiff's property.

199. Debtors' above-described acts regarding the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension caused malicious injury to Plaintiff's property.

200. The foregoing actions preclude a discharge of the North Dakota Note Judgment Amount and amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, pursuant to 11 U.S.C. §523(a)(6), on the basis of willful and malicious injury to Plaintiff and to Plaintiff's property.

### Count VII - 11 U.S.C. §523(a)(6)
### Willful and Malicious Injury to Plaintiff
### and to Plaintiff's Property Regarding The Yellow Rose

201. Plaintiff incorporates the provisions of paragraphs 1 through 185 above, as if specifically set forth herein.

202. Debtors' above-described acts regarding The Yellow Rose constitute willful acts.

203. Debtors' above-described acts regarding The Yellow Rose constitute malicious acts.

204. Debtors' above-described acts regarding The Yellow Rose caused willful injury to Plaintiff.

205. Debtors' above-described acts regarding The Yellow Rose caused malicious injury to Plaintiff.

206. Debtors' above-described acts regarding The Yellow Rose constituted willful injury to Plaintiff's property.

207. Debtors' above-described acts regarding The Yellow Rose caused malicious injury to Plaintiff's property.

208. The foregoing actions preclude a discharge of the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(6), on the basis of willful and malicious injury to Plaintiff and to Plaintiff's property.

### Count VIII
### Melinda's Vicarious Liability under 11 §§523(a)(2)(A), (a)(2)(B), (4), (6) and (13) Regarding The Yellow Rose and the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension

209. Plaintiff incorporates the provisions of paragraphs 1 through 193 above, as if specifically set forth herein.

210. Melinda knew or should have known that the above-described acts of Joseph and/or DuMouchelle Jewellers were fraudulent and criminal.

211. Melinda deliberately participated in and/or knew or should have known Joseph's conduct to obtain $12 million from Plaintiff for the purported purchase of The Yellow Rose was fraudulent and criminal when she sent an email to Plaintiff with photos, an appraisal and information related to The Yellow Rose, in conjunction with the potential investment opportunity.

212. Melinda was a signatory on the Bank of America account of DuMouchelle Jewellers.

213. Melinda deliberately participated in and/or knew or should have known Joseph's conduct was fraudulent and criminal when she withdrew at least

$5,172,694.44 of Plaintiff's $12 million from the Bank of America Account a day after the Debtors induced Plaintiff to wire $12 million to the account under false pretenses.

214. Melinda deliberately participated in, and/or knew or should have known, Joseph's above-described conduct was fraudulent and criminal when she participated in phone calls with Plaintiff and Joseph, wherein the parties discussed the investment opportunity in the purchase and resale of The Yellow Rose.

215. Melinda deliberately participated in, and/or knew or should have known, Joseph's above-described conduct was fraudulent and criminal when she participated in phone calls where she either actively misled or allowed Joseph to mislead Plaintiff to believe a resale of The Yellow Rose actually took place, including, but not limited to, the May, 2019 Discussions, the June 27, 2017 Phone Call and as evidenced by Melinda's receipt and failure to respond to communications from Plaintiff, including, but not limited to, the May 13, 2019 Email, the June 20, 2019 Email, the June 21, 2019 Email and the July 2, 2019 Email.

216. Melinda's refusal to testify under oath as to Joseph's fraudulent and criminal conduct evidences that Melinda knew or should have known Joseph's above-described conduct was fraudulent and criminal.

217. As to Melinda, the foregoing actions vicariously preclude a discharge of the North Dakota Note Judgment Amount, amounts due under the $350,000 Note,

the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension as well as the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §§523(a)(2), (4), (6) and (13).

218.   As to Melinda, the foregoing actions vicariously preclude a discharge of the North Dakota Note Judgment Amount, amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension as well as the North Dakota Yellow Rose Judgment Amount pursuant to 11 U.S.C. §523(a)(2)(A), on the basis that per the above described facts, Melinda knew or should have known that the funds advanced and the extensions granted were money, property, services, or an extension, renewal or refinancing of credit obtained by false pretenses, false representations, and actual fraud, other than statements regarding Debtors' financial position.

219.   As to Melinda, the foregoing actions vicariously preclude a discharge of the North Dakota Note Judgment Amount, amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension as well as the North Dakota Yellow Rose Judgment Amount pursuant to 11 U.S.C. §523(a)(2)(B), on the basis that per the above described facts, Melinda knew or should have known the funds advanced were money, property, services, or an extension, renewal or refinancing of credit obtained by use of a writing respecting Debtors' financial condition, that was materially false, upon which Plaintiff relied

and that Debtors caused to be made and/or published with the intent to deceive Plaintiff.

220. As to Melinda, the foregoing actions vicariously preclude a discharge of the North Dakota Note Judgment Amount, amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension as well as the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(4), where Melinda knew or should have known Joseph had was engaging and had engaged in fraud and defalcation while acting in a fiduciary capacity, embezzlement and larceny.

221. As to Melinda, the foregoing actions vicariously preclude a discharge of the North Dakota Note Judgment Amount, amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension as well as the North Dakota Yellow Rose Judgment Amount, pursuant to 11 U.S.C. §523(a)(6) where Melinda knew or should have known that Joseph was engaging in and had engaged in willful and malicious injury to Plaintiff and to Plaintiff's property.

222. As to Melinda, the foregoing actions vicariously preclude a discharge of $12 million as a matter of law pursuant to 11 U.S.C. §523(a)(13) where Melinda knew or should have known that she and Joseph engaged in criminally fraudulent conduct which has become subject to a criminal conviction of Joseph and a

restitution liability determination in favor of Plaintiff, in the amount of $12 million.

WHEREFORE Plaintiff respectfully requests that the Court enter an Order: (i) finding the North Dakota Note Judgment Amount, amounts due under the $350,000 Note, the $430,000 Note, the May 16, 2017 Extension and the January 17, 2018 Extension, the North Dakota Note Judgment Amounts as well as the North Dakota Yellow Rose Judgment Amount are nondischargeable as to each of Debtors and vicariously nondischargeable as to Melinda, under section 523 of the Code and (ii) grant Plaintiff all other relief that it deems appropriate.

Respectfully submitted by:

**TAFT STETTENIUS & HOLLISTER, LLP**

Dated:  March 6, 2023      By:  /s/ Jay L. Welford
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Counsel to Plaintiff
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci

Chapter 7

Case No. 19-54531-lsg

Honorable Lisa S. Gretchko

Debtors.

_____/

Thomas T. Ritter

Plaintiff,

v.

Joseph G. DuMouchelle and
Melinda J. Adducci

Adversary Pro. No. 20-04381

Defendants.

_____/

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2023, my office caused to be served a copy

of the *Second Amended Complaint To Determine Nondischargeability Of*

*Indebtedness Under 11 U.S.C. § 523* and this *Certificate of Service* using the Court's

electronic filing system which will send notice to all ECF participants registered to

receive notice.

Respectfully submitted by:

**TAFT STETTENIUS & HOLLISTER, LLP**

Dated:  March 6, 2023    By:  /s/ Jay L. Welford
                                Jay L. Welford (P34471)
                                Kimberly Ross Clayson (P69804)
                                Counsel to Plaintiff
                                27777 Franklin Road, Suite 2500
                                Southfield, Michigan 48034
                                Phone: (248) 351-3000
                                jwelford@taftlaw.com
                                kclayson@taftlaw.com