**EXHIBIT 6-C**

[DOCUMENTARY EXHIBITS

CONTINUED ATTACHED]

# EXHIBIT 4

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[PRESENTENCE OPINION]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                Case No. 20-20245

v.

                                HON. MARK A. GOLDSMITH

JOSEPH GREGORY DUMOUCHELLE,

      Defendant.

_____/

**OPINION & ORDER**
**REGARDING DEFENDANT'S OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT**

      Defendant Joseph DuMouchelle pleaded guilty to committing wire fraud, in violation of

18 U.S.C. § 1343.  Rule 11 Plea Agreement (Dkt. 14).  He filed 12 objections to the presentence

investigation report (PSR) (Dkt. 98).  These objections are summarized as follows:

- Objection No. 1: Regarding his history with T.R., DuMouchelle argues that he met first met Victim T.R. 20 years ago, not five or six years ago.

- Objection No. 2: Regarding the events that precipitated the Yellow Rose transaction, DuMouchelle argues that instead of contacting him about a debt that DuMouchelle owed, T.R. contacted DuMouchelle about opportunities for investment.

- Objection No. 3: Regarding the agreement for T.R. to buy the Yellow Rose, DuMouchelle asserts that T.R. promised to establish an escrow at J.P. Morgan Chase, but T.R. failed to do so.  T.R. also demanded the seller's bank information, which DuMouchelle did not want to do in order to (i) protect the seller's privacy and (ii) prevent T.R. from circumventing DuMouchelle as the middleman.  To make the sale, DuMouchelle provided T.R. with the seller's representative's information.  Further, DuMouchelle asserts, an appraisal was done by the seller, not DuMouchelle's wife, Melinda Adducci.

- Objection No. 4: Initially, T.R. was directed to wire funds to a FineMark Bank account.  DuMouchelle asserts that this account did not belong to him, as the PSR states, but, rather, belonged to his business.  Further, DuMouchelle states that he asked R.D. of Gemworld International, Inc. to act as "go-between" and to provide a market research document for T.R.  But DuMouchelle concedes that R.D. declined to receive the funds from T.R. and that "DuMouchelle deceived [T.R.] . . . by making it appear wire information was coming

from R.D. as the seller's representative when emails were in fact being sent by DuMouchelle."

- Objection No. 5: As for the reasons that the funds were rejected by FineMark Bank, DuMouchelle contends that the PSR erroneously states the reason as the funds being too large. Rather, according to DuMouchelle, the bank declined to be a "pass through" for funds that would then have to be transferred to the seller's account.

- Objection No. 6: DuMouchelle asserts that R.D. misspoke when he told FBI agents that he does not usually prepare reports like the one DuMouchelle requested for the Yellow Rose transaction. According to DuMouchelle, R.D.'s website indicates that his company has prepared thousands of appraisal assignments.

- Objection No. 7: DuMouchelle contends that the PSR misstates when and where DuMouchelle met W.N., the seller of the Yellow Rose. Further, DuMouchelle asserts that W.N. made several false statements, including that (i) he never authorized DuMouchelle to sell the Yellow Rose, (ii) he did not know that DuMouchelle had taken 29 items belonging to W.N., and (iii) DuMouchelle had $12.5 million worth of merchandise by the end of 2018. According to DuMouchelle, (i) he was authorized to sell the Yellow Rose, (ii) W.N.'s staff allowed DuMouchelle to take all items and sell them, and (iii) the value of the merchandise at the end of 2018 was $11,018,514.50.

- Objection No. 8: In regard to the PSR's description of DuMouchelle transferring $4.250 million to W.N. from the $12 million wire transfer from T.R. to DuMouchelle, DuMouchelle states: "As with almost all funds [in accounts, funds] in business accounts are commingled. This was the case with DuMouchelle's accounts. All funds were commingled."

- Objection No. 9: DuMouchelle again contends that W.N. falsely stated that he never sent the Yellow Rose to DuMouchelle and never authorized him to sell it. Further, DuMouchelle charges that he later learned that W.N. never had proper ownership of the Yellow Rose.

- Objection No. 10: DuMouchelle asserts that he "did not intend to rob anyone" and that W.N. "made many lies, misrepresentations and untruths that DuMouchelle depended upon."

- Objection No. 11: DuMouchelle objects to the PSR's statement that he admitted to a history of alcohol and substance use, stating: "DuMouchelle has no history of alcohol or substance abuse."

- Objection No. 12: DuMouchelle asserts that he "did not devise a 'scheme to defraud' or take money." He contends that the Yellow Rose transaction "was a legitimate business sale and transaction involving a rare diamond DuMouchelle had for sale in his business office," though he concedes that the Yellow Rose "was admittedly never produced by the

2

seller."  Further, while DuMouchelle seemingly concedes that he never paid T.R., he states that he "did not use the money for personal debts and expenses but for usurious high interest 'loan shark' business loans."

Objections 1 through 10 have no bearing on the calculation of the guidelines.  They are additional facts or characterizations of fact from DuMouchelle's perspective, but none is material for purposes of applying the guidelines.  The PSR will be modified to contain a statement that DuMouchelle makes the assertions set out in those objections, but that the Court makes no finding of fact about them.

As for objection 11, in which DuMouchelle contests the PSR's statement that he admitted to having a history of alcohol and substance abuse, it seems that DuMouchelle is now abandoning this objection, as reflected in his request for participation in a treatment program.  Def. Mem. at 54 (Dkt. 94).  The objection is overruled, as moot.

The Court overrules objection 12, in which DuMouchelle states that he "did not devise a 'scheme to defraud' or take money."  That objection conflicts with his Rule 11 plea agreement.  In his plea agreement, DuMouchelle admitted to committing wire fraud, which, as the plea agreement recites, includes the following element: "That the defendant knowingly devised and executed a scheme to obtain money and property by means of material false and fraudulent pretenses, representations, and promises[.]"  Rule 11 Plea Agreement at 2.  "A fact admitted to during a guilty plea cannot later be contested when it appears in the defendant's PS[R]."  United States v. Martinez, 584 F.3d 1022, 1027 (11th Cir. 2009); see also United States v. Jones, 823 F. App'x 837, 841 (11th Cir. 2020) (affirming district court's decision to overrule objections to PSR on the basis that the objections contradicted the defendant's plea agreement, and explaining that where a defendant has entered into a plea agreement, he cannot use objections to undercut his PSR; rather,

3

he has "only two options if he wanted a lower sentence: withdraw his plea or argue for a variance").

Therefore, objection 12 is overruled.

     SO ORDERED.


Dated:  July 27, 2022                      s/Mark A. Goldsmith
       Detroit, Michigan              MARK A. GOLDSMITH
                                 United States District Judge

# EXHIBIT 5

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[RESTITUTION ORDER]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                               Case No. 20-20245

v.

                               HON. MARK A. GOLDSMITH

JOSEPH GREGORY DUMOUCHELLE,

        Defendant.

_____/

**OPINION & ORDER**
**REGARDING THE AMOUNT OF LOSS AND RESTITUTION**

Defendant Joseph DuMouchelle is charged with committing wire fraud, in violation of 18 U.S.C. § 1343. Information (Dkt. 1). DuMouchelle pleaded guilty, see Rule 11 Plea Agreement (Dkt. 14), and he is to be sentenced on July 28, 2022. The amount of loss is relevant for purposes of calculating the sentencing guidelines and bears on restitution, as well. The plea agreement states the Government's position that the amount of loss in this case is within the range of $25 million to $65 million. Id. at 4. However, the parties agreed that DuMouchelle could argue that the amount of loss is within the range of $9.5 million and $25 million. Id. at 4–5. DuMouchelle did challenge the amount of loss and restitution, as well.

On June 22, 2022, the Court held a hearing to determine the amount of loss and restitution. The Court gave the parties an opportunity to submit post-hearing briefing on these issues, and the parties filed sentencing memoranda setting forth their respective positions. Gov't Mem. (Dkt. 81); Def. Mem. (Dkt. 94).

As explained below, the Court determines that the amount of loss is $25,308,216 and the amount of restitution is $25,206,401.

## I. BACKGROUND

Prior to his arrest in this case, DuMouchelle was involved in the fine jewelry business. He cheated investors and consignors out of a staggering sum of money and jewelry. The parties disputed whether this sum exceeds or falls short of $25 million.

At the June 22 hearing, the Government and DuMouchelle agreed that the loss amount totals $20,304,884 for the following first set of victims: J.R., M.H., T.G., T.R., Galaxy USA, S.R., E.C., P.Y., and W.R. Gov't Mem. at 16; Def. Mem. at 2.[1,2] Although DuMouchelle initially disputed the losses attributed to M.M., L.D., A.H., D.K., K.C., Y.F., and C.S.,[3] he has now abandoned these challenges in his sentencing memorandum. See Def. Mem. at 2.[4] The total loss amount for this second set of victims is $140,757, bringing the total non-disputed loss amount to $20,445,641.

The parties dispute the loss amount for the following victims: Precious Stones Company (Precious Stones), J.B., East Continental Gems, H.V., A-Ron Resources (A-Ron), LaLonde

---

[1] The Court refers to individual victims by initials to protect their identities. Because there are two individuals with the initials "L.B.," the Court refers to the first as "L.B. 1" and the second as "L.B. 2."

[2] The individual loss amount attributed to each of these victims is as follows: J.R. ($4,500,000), M.H. ($900,000), T.G. ($1,800,000), T.R. ($12,000,000), Galaxy USA ($1,019,840), S.R. ($1,500), E.C. ($15,044), P.Y. ($13,500), and W.R. ($55,000). This totals $20,304,884. However, the Government's sentencing memorandum erroneously concludes that the total loss and restitution amount for these victims is $20,249,939. Gov't Mem. at 16.

[3] Whereas the Government and DuMouchelle agree that the loss of C.S. is $5,000, the presentence investigation report (PSR) (Dkt. 98) attributes a loss of $6,230 to C.S. The Court uses the figure agreed to by the parties.

[4] The individual loss amount attributed to each of these victims is as follows: M.M. ($14,637), L.D. ($42,162.50), A.H. ($45,500), D.K. ($10,457.50), K.C. ($6,000), Y.F. ($17,000), and C.S. ($5,000).

2

Jewelers (LaLonde), L.B. 1, and G.A. and L.B. 2. Gov't Mem. at 16.[5] DuMouchelle asserts that the loss for this third set of victims is $2,923,160. Def. Mem. at 2. Meanwhile, the Government asks the Court to find that the total loss for this second set of victims is $5,161,200. See Gov't Mem. at 16.

As a result, the Government contends that DuMouchelle is responsible for a total loss of $25,606,841. Gov't Mem. at 16.[6] DuMouchelle maintains that the loss amount is $23,368,801. Def. Mem. at 3.

As for restitution, the Government concedes that two of the victims have recovered a collective total of $101,815. Id. at 17. Deducting this amount from the Government's loss figure of $25,606,841 results in restitution of $25,505,026. Id.[7] DuMouchelle does not explicitly state a position on the total restitution.

---

[5] DuMouchelle's sentencing memorandum references another set of victims (the "Noble victims"), and asserts that the Government sought to attribute $1,949,039 in loss to these victims. See Def. Mem. at 2. This is incorrect. The Government neither presented proofs regarding losses suffered by these victims nor included these victims in its post-hearing briefing on the amount of loss and restitution. And at the June 22 hearing, the Government's witness testified that the loss attributed to the Noble victims were not used in calculating the loss caused by DuMouchelle. Hr'g Trans. at 17 (Dkt. 73). Accordingly, the Court does not consider the Noble victims in calculating the loss or restitution.

[6] The Government miscalculates the total loss attributable to the victims for whom DuMouchelle does not contest the amount of loss. As a result, the Government misstates its position on the overall amount of loss as $25,551,896. Gov't Mem. at 16. Based on the loss it attributed to each victim, it is evident that the Government intended to state the total amount of loss as $25,606,841. This summation error does not affect the Government's position on the calculation of DuMouchelle's offense level, as any amount exceeding $25 million warrants a 22-level increase in the defendant's offense level. U.S.S.G. § 2B1.1(b)(1)(L). However, because the Government calculates the total restitution by subtracting the recovered amounts from the overall loss amount, the Government's summation error led it to misstate its position on the total restitution owed.

[7] Due to the Government's miscalculation described above, it erroneously states that its position on the amount of restitution as $25,450,081. Gov't Mem. at 17.

3

FBI Special Agent Christine Taylor, the lead agent in this case, testified at the June 22 hearing regarding the disputed amount of loss.  Agent Taylor based her testimony on information obtained from DuMouchelle's proffer sessions as well as other sources, which are described in further detail below.

## II.  ANALYSIS

### A.  Amount of Loss

Section 2B1.1 applies to offenses such as wire fraud.  See U.S.S.G. § 2B1.1.  This section states that a defendant's offense level should be increased by 20 levels if the amount of loss exceeds $9.5 million, and by 22 levels if the amount of loss exceeds $25 million.  Id. § 2B1.1(b)(1)(K)–(L).  Typically, "[t]he government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 . . . by a preponderance of the evidence." United States v. Freund, No. 03-20004, 2008 WL 4601802, at *7 (E.D. Mich. Oct. 14, 2008) (citing United States v. Finkley, 324 F.3d 401, 403 (6th Cir. 2003)).[8]  Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," U.S.S.G. § 2B1.1(b)(1), cmt. 3(C), a district court's findings regarding the amount of loss "are not to be overturned unless they are clearly erroneous."  United States v. Triana, 468 F.3d 308, 321 (6th Cir.

---

[8] Per his plea agreement, DuMouchelle agreed that the calculation of Guidelines range of 121–151 months' imprisonment is based on the Government's loss calculation of $25 million to $65 million. Rule 11 Plea Agreement at 4.  However, under the plea agreement, DuMouchelle "can argue that the loss is within the sentencing guideline loss range of between $9,500,000 and $25,000,000." Id. at 5.  The plea agreement does not clearly shift the burden of proving the amount of loss to DuMouchelle.  Because the Government should be held "to a greater degree of responsibility than the defendant for any imprecision in a plea agreement, so that ambiguities are construed against the Government," United States v. White, 628 F. App'x 848, 851 (4th Cir. 2015) (punctuation modified), the burden remains with the Government.  In any case, the question of who bears the burden of proving evidence by a preponderance "only matters in narrow class of cases where proof is in equipoise."  United States v. Davis, No. 4:18-cr-35, 2021 WL 5025105, at *3 (E.D. Tenn. Sept. 17, 2021) (punctuation modified).  This is not such a case.

4

2006).  To show clear error, a defendant must show the calculation "was not only inexact but outside the universe of acceptable computations."  United States v. Martinez, 588 F.3d 301, 326 (6th Cir. 2009).

"The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he fair market value of the property unlawfully taken."  U.S.S.G. § 2B1.1(b)(1), cmt. 3(C)(i).  Ultimately, "[t]he court need only make a reasonable estimate of the loss," meaning that the estimate need not be determined with precision.  Id. § 2B1.1(b)(1), cmt. 3(C); see also Triana, 468 F.3d at 320.

DuMouchelle points out that the United States Court of Appeals for the Sixth Circuit "'has observed [that] fair market value is the price a willing buyer would pay a willing seller at the time of the crime.'"  Def. Mem. at 5 (quoting United States v. Simpson, 538 F.3d 459, 463 (2008)); see also United States v. Goldman, 953 F.3d 1213, 1223 (11th Cir. 2020) (defining "fair market value" as "'[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect'") (quoting Value, Black's Law Dictionary (11th ed. 2019)).  However, DuMouchelle asserts that what the "particular seller/victim would agree to accept" (what DuMouchelle refers to as the "reserve value") should be used to determine the amount of loss.  Def. Mem. at 5.  In other words, DuMouchelle claims that any minimum sale prices that victims conveyed to DuMouchelle would be acceptable for consigned items should govern the loss calculation.  But the lowest price a seller would theoretically be willing to accept for an item before going into the market is not necessarily "the point at which supply and demand intersect."  Value, Black's Law Dictionary (11th ed. 2019). The Court, therefore, will use the reserve amount only if better approximations of fair market value—such as appraisals or agreements stating the value of the jewelry at issue—are unavailable.

With this framework in mind, the Court assesses the evidence regarding the amount of loss attributable to each of the victims for whom the parties disputed the amount of loss.

### i. Victim Precious Stones

Precious Stones consigned several jewelry items to DuMouchelle to sell, the profits of which Precious Stones and DuMouchelle agreed to split. Precious Stones never received any profits for these items, nor did it ever receive the items back from DuMouchelle.

Agent Taylor testified that $421,600 in loss is attributable to Precious Stones. Hr'g Trans. at 46. This calculation is supported by a memorandum dated July 7, 2020 and authored by Precious Stones reflecting that it consigned items worth $301,600 in November 2016, and an item worth $120,000 in July 2019. Gov't Ex. 23. Further, the Government submitted a document dated July 26, 2018 and signed by DuMouchelle's wife Melinda Adducci—who had significant involvement in DuMouchelle's jewelry business—listing the items consigned by Precious Stones and stating the value of these items as $404,600. Gov't Ex. 24. Agent Taylor explained that $404,600 represents the reserve amount of the items—i.e., the minimum amount that a consigning client will accept for sale of the item—not the actual value of the items. Hr'g Trans. at 48. The Government asserts that the actual value—not the reserve amount—should be used. Gov't Mem. at 10. However, as Agent Taylor testified, even if $404,600 is attributed to Precious Stones—rather than $421,600—the total amount of loss in this case still exceeds $25 million. Hr'g Trans. at 48. Agent Taylor further suggested that $421,600 is a more appropriate figure in light of the fact that the document signed by Adducci mentions an additional $100,000 deposit from Precious Stones to DuMouchelle, which was not included in the Government's calculation of loss attributed to Precious Stones. Id. at 49.

6

DuMouchelle asserts that the loss attributable to Precious Stones is $250,000.  Def. Mem. at 6.  In support of his position, DuMouchelle points to emails sent from Benjamin Zucker of Precious Stones to DuMouchelle.  Def. Ex. B.  In the email sent on February 4, 2019, Zucker recounts various sales that DuMouchelle said had gone through but the deposits from the sales had not been made.  Id.  Specifically, Zucker recounts two sales where the "net" for Precious Stone was $80,000 and $100,000, respectively.  Id.  Zucker asks DuMouchelle to send the total $180,000 to a third party to whom Zucker apparently owed a debt.  Id.  Zucker also recounts that DuMouchelle had said that he had received an offer for two rings that Zucker had consigned, and that Zucker had instructed DuMouchelle not to accept less than $70,000 for the two rings.  Id.  Zucker asked DuMouchelle to confirm that he agreed to the terms outlined in the email.  DuMouchelle apparently did not do so, prompting Zucker to send another email on February 5, 2019 asking once again for DuMouchelle to confirm the terms.

The Court concludes that the Government has proven by a preponderance that the loss attributable to Precious Stones is $421,600.  DuMouchelle's evidence does not undercut this conclusion, as the emails are not compelling evidence of the value of jewelry that Precious Stones lost.  Significantly, the fact that Zucker's "net" for the two sales of jewelry was $180,000 means that the overall sale price of the jewelry was greater than $180,000, as DuMouchelle and Precious Stones had agreed to split the sale price.  This is confirmed by the July 2018 document signed by Adducci, which reflects, for instance, that the sold jewelry that resulted in a $80,000 net to Precious Stones had a higher value of $120,000.  Def. Ex. 24.  Further, the emails submitted by DuMouchelle—sent in February 2019—predate the July 2020 memorandum that reflects a post-February 2019 consignment of jewelry worth $120,000.  The full value of Precious Stones' loss, therefore, is not reflected in the February 2019 emails.

### ii. Victim J.B.

J.B. entered into an agreement with DuMouchelle under which J.B. would give money to DuMouchelle to purchase items at estates sales, DuMouchelle would resell the items, and the profits would be split between J.B. and DuMouchelle. J.B. gave DuMouchelle a large sum of money, but it was never repaid in full.

Agent Taylor attributed a loss of $2,789,785 to J.B. Hr'g Trans. at 20. This conclusion was supported by, among other things, the FBI's interview of J.B., Gov't Ex. 8; a police report filed by J.B.'s business, Gov't Ex. 9; a judgment entered by a New York state court in a civil lawsuit brought by J.B.'s business against DuMouchelle, Gov't Ex. 10; a letter regarding a settlement reached in the lawsuit, Gov't Ex. 11; and Agent Taylor's own review of bank records. By signing the letter, DuMouchelle agreed that he owed $3,279,785 to J.B.'s business. Gov't Ex. 11. Agent Taylor testified that, after reviewing relevant bank records, she discovered $500,000 in payments that DuMouchelle made to J.B. earlier in their relationship. "Even though most of those payments were made before the fraud scheme began, Agent Taylor gave Dumouchelle credit for them," resulting in the Government's final calculation of J.B.'s loss as $2,789,785. Gov't Mem. at 6 n.2.

DuMouchelle asserts that the loss attributable to J.B. is $2,111,785—which is $678,000 less than the Government's estimate—because "there is a deposited check in the amount of $678,000 that should be credited against the loss amount advanced by the Government." Def. Mem. at 7 (citing Def. Ex. M). During the June 22 hearing, defense counsel cross examined Agent Taylor as to her knowledge of a $678,000 payment made by DuMouchelle to J.B. in February 2019. See Hr'g Trans at 103. Agent Taylor did not know whether J.B. had received this payment. Id. The Government represents that, following the June 22 hearing, it confirmed that "the

$678,000 check was dated in February 2019," but "in March and July 2019, after the check was negotiated, both Dumouchelle and [J.B.] . . . agreed that Dumouchelle owed $3,279,785." Gov't Mem. at 7; see also Gov't Ex. 11. And on October 24, 2019, DuMouchelle and Adducci signed under oath and filed in their bankruptcy case a document listing their 20 largest creditors (the "bankruptcy document"). See Gov't Ex. 38. This bankruptcy document lists J.B. as one of their largest creditors, with an outstanding debt of $3,403,214.54, and the document reflects that the claim is not disputed. Id. at 4.[9] Accordingly, the Government maintains—and the Court is satisfied—that the $678,000 payment should not be deducted from the amount of loss attributable to J.B.

The Court, therefore, finds that the Government proved by a preponderance that the loss attributable to J.B. is $2,789,785.

### iii. Victim East Continental Gems

East Continental Gems gave DuMouchelle a ring to sell for it. When East Continental Gems did not receive payment for the ring, it asked for the ring back, but DuMouchelle never returned it.

Agent Taylor attributed $810,000 in loss to East Continental Gems. Hr'g Trans. at 30. This conclusion was supported by, among other things, the FBI's interview of the owner of East Continental Gems, Gov't Ex. 14; a police report, Gov't Ex. 15; a civil complaint filed by East Continental Gems against DuMouchelle in the United States District Court for the Eastern District of New York, Gov't Ex. 16; and a default judgment entered in the civil action, Gov't Ex. 17. The police report includes a memorandum reflecting East Continental Gems and DuMouchelle's

---

[9] The document contains boxes to indicate whether a claim is "contingent," "unliquidated," "disputed," or "none of the above apply." DuMouchelle and Adducci checked the "none of the above apply" box for the $3,403,214.54 claim. Gov't Ex. 38 at 4.

agreement that the ring was worth $810,000. Gov't Ex. 15 at 9. The judgment entered in the civil action, which ordered DuMouchelle to return the ring to East Continental Gems, likewise states the ring's value as $810,000. Gov't Ex. 17 at 2. Further, DuMouchelle and Adducci listed East Continental Gems in the bankruptcy document with an outstanding debt of $810,000. Gov't Ex. 38.

DuMouchelle contends that East Continental Gems did not suffer any loss. Def. Mem. at 2. He suggests that the sole measurement of the $810,000 value came from East Continental Gem's owner sworn testimony in the civil action. Id. at 7. In other words, DuMouchelle asserts that the $810,000 was a unilateral, unsubstantiated estimation of the fair market value of the ring. Not so. As noted above, DuMouchelle and Adducci listed East Continental Gems in the bankruptcy document with an outstanding debt of $810,000, and they indicated that this claim was not disputed. Gov't Ex. 38 at 3. This evinces DuMouchelle's assent to the $810,000 estimate of the ring's value.

Accordingly, the Court finds that the Government's evidence proves by a preponderance that the loss attributable to East Continental Gems is $810,000.

### iv. Victim H.V.

H.V. and DuMouchelle entered into an agreement for DuMouchelle to sell a ring that H.V. owned. After H.V. died, his estate reached out to DuMouchelle about the ring. DuMouchelle told the estate that the ring had sold, but he never sent any profits of the purported sale to H.V.'s estate. DuMouchelle also never returned the ring to the estate.

Agent Taylor attributed $191,000 in loss to H.V. Hr'g Trans. at 36. This conclusion was supported by, among other things, a police report, Gov't Ex. 18; a bailment agreement signed by H.V. and DuMouchelle, Gov't Ex. 19; an activity log for H.V.'s estate, Gov't Ex. 20; and an

appraisal for the ring, Gov't Ex. 21.  The police report, bailment agreement, and appraisal all list

the ring's worth as $191,500.  During the June 22 hearing, the Court questioned Agent Taylor

about why the Government was attributing only $191,000—not $191,500.  Hr'g Trans. at 132.[10]

Agent Taylor did not know the reason.  Id.

DuMouchelle attributes a loss of $100,000 to H.V., because this is the lowest price for

which H.V. was theoretically willing to sell the ring.  Def. Mem. at 9 (referencing Gov't Ex. 20 at

4 (reflecting H.V.'s instruction to DuMouchelle that "[i]f [DuMouchelle] . . . cannot sell the entire

ring for 100k he is to return the ring on his next visit")).  As stated above, the reserve amount is

used to estimate the fair market value only where no better evidence exists.  In H.V.'s case, both

a bailment agreement and appraisal listed the ring's worth as $191,500.  The Court, therefore,

declines to use the reserve amount in calculating the loss attributable to H.V.

The evidence establishes by a preponderance that the value of the ring is $191,500.  But

because the Government seeks to hold DuMouchelle responsible for only a loss of $191,000, the

Court determines that the loss attributable to H.V. is $191,000.

### v. Victim A-Ron

A-Ron had a business relationship with DuMouchelle pursuant to which A-Ron would give

money to DuMouchelle to purchase jewelry that would then be sold, and DuMouchelle and A-Ron

would split the profits.  The Government requested loss information from A-Ron, on which basis

the Government provided a spreadsheet documenting A-Ron's losses.  See Gov't Ex. 22.  Agent

Taylor testified that, based on this spreadsheet, the Government initially attributed $2,450,000 to

A-Ron.  Hr'g Trans. at 43.[11]  After discussions with DuMouchelle's counsel about this loss

---

[10] The PSR attributes a loss of $191,500 to H.V.

[11] On cross-examination, the defense suggested that the $2,4500,000 loss figure derived from a civil complaint filed by A-Ron against DuMouchelle in a California state court.  Def. Ex. F.

amount, the Government decided to give DuMouchelle "every benefit of the doubt" and hold DuMouchelle accountable only for $643,000 attributable to A-Ron,[12] which represents "the amount outstanding and owed to A-Ron during the scheme to defraud" minus the "profits Dumouchelle promised A-Ron."  Gov't Mem. at 9; see also Hr'g Trans at 43–45.

DuMouchelle asserts that the loss attributable to A-Ron is $454,375.[13]  Def. Mem. at 2.  He states that "[t]he issue of A-RON's loss is one of credibility": "[t]he Government did not call any witnesses associated with A-RON or provide the Court with an affidavit.  Instead, a portion of a spreadsheet (essentially a list of items) was submitted."  Id. at 9 (referencing Gov't Ex. 22).  Further, "[c]ountering the item spreadsheet . . . is the civil complaint filed by A-RON in California against Mr. DuMouchelle," which was "filed subject to California's Code of Civil Procedure's rules on truthful pleading" and "identifies the loss as being only $454,375."  Id. (citing Def. Ex. F ¶¶ 21, 32, 36).

As DuMouchelle points out, A-Ron's spreadsheet and civil complaint provide conflicting measurements of its loss.  Because the civil complaint, unlike the spreadsheet, is subject to truthful pleading requirements, the Court determines that the civil complaint provided a more trustworthy estimation of the loss.  The Court, therefore, concludes that the loss attributable to A-Ron is $454,375.[14]

---

[12] The PSR likewise attributes a loss of $643,000 to A-Ron.

[13] DuMouchelle misstates the Government's position as to the loss attributable to A-Ron as $818,000.  Def. Mem. at 2.  Although the Government at one point sought to hold DuMouchelle responsible for this amount, at the June 22 hearing, it clarified that it had altered its position and sought to attribute a loss of only $643,000 to A-Ron.  Hr'g Trans. at 43–45.

[14] Even though the Court does not adopt the Government's estimation of the loss attributable to A-Ron, the Court still finds that the total amount of loss exceeds $25 million.

12

### vi. Victim LaLonde

LaLonde entered into an agreement with DuMouchelle for DuMouchelle to sell a series of diamonds valued at $95,815. Hr'g Trans. at 50. DuMouchelle sold the diamonds but initially did not pay LaLonde in accordance with their agreement. Id. This prompted LaLonde to file a police report on October 11, 2018, see Def. Ex. O (Dkt. 94-3), which in turn prompted DuMouchelle to pay LaLonde on October 12, 2018, see Def. Ex. P (Dkt. 94-4); Hr'g Trans. at 50–51. As a result, the Government attributed a loss of $95,815 to LaLonde, but because LaLonde has already received this sum, the Government contends that the amount should not be included in restitution. Gov't Mem. at 11.

DuMouchelle argues that "the Government is correct that the payment was made after the police report was made," but "the fact that it occurred one day later (and without any evidence that Mr. DuMouchelle was aware of the report or was contacted the police), it is equally (if not more) plausible that the delay in repaying in this instance was caused by business issues (not fraud)." Def. Mem. at 6. He concludes that there is no loss attributable to LaLonde.

The Court finds DuMouchelle's argument unpersuasive. The police report reflects that LaLonde's owner told police that over the course of multiple weeks, "[DuMouchelle] told [the owner] . . . that some of the diamonds were sold, but [DuMouchelle] . . . kept making excuses as to why [the owner] . . . wasn't receiving payment and appeared to be stalling." Def. Ex. O at 3. "At some point while on rapnet.com ([w]ebsite used by diamond dealers to buy/sell diamonds), [the owner] . . . noticed that his 2.94 carat cushion cut diamond was listed for sale by Solomon Cohen Diamond Co. out of New York City . . . ." Id. at 3–4. The police spoke with Solomon Cohen, "who state[d] he received the diamond from David Tennenbaum." Id. at 4. The police then spoke to Tennenbaum, "who state[d] he bought two diamonds from Joseph Dumouchelle,"

13

and told the police that he had sales slips that confirmed the transactions.  Id.  This evidence demonstrates that DuMouchelle's delay in paying LaLonde was, in fact, the product of a fraudulent scheme.

The Court determines that the Government established by a preponderance that the loss attributable to LaLonde is $95,815.

### vii.  Victim L.B. 1

L.B. 1 consigned items of jewelry to DuMouchelle, but L.B. 1 was never paid for these items.  L.B. 1 also never received the items back from DuMouchelle.

Agent Taylor attributed a loss of $100,000 to L.B. 1.  Hr'g Trans. at 80.  This calculation is supported by a complaint filed by L.B. 1 with the New York attorney general, which asserts that the jewelry was appraised over $100,00.  Gov't Ex. 35.  The complaint further states that two of the items were auctioned off; DuMouchelle wrote an insufficient funds check for $7,125 for these two items.  Id. at 2.

DuMouchelle claims that the loss attributable to L.B. 1 is $7,000, representing the approximate amount of the check DuMouchelle wrote.  Def. Mem. at 10.  According to DuMouchelle, because L.B. 1 "accepted the check without protest and attempted to cash it, this seems to be clear evidence that $7000 was acceptable as the value of the item at issue."  Id.  In other words, DuMouchelle attempts to argue that $7,000 was the reserve amount that should be used to calculate the loss attributable to L.B. 1.  The Court finds several fatal issues with this argument.  First, it is unreasonable to assume that L.B. 1's attempt to cash the $7,125 check is tantamount to an agreement to accept this amount as sale price for the jewelry.  The more reasonable interpretation is that L.B. 1 attempted to cash this check to try to recover some of the money that he was owed.  Second, as the Court stated above, the reserve amount is an appropriate

estimation of the fair market value only in the absence of better approximations.  In L.B. 1's case, there is a complaint filed with the New York attorney general stating that the jewelry was appraised over $100,000.  Gov't Ex. 35.  L.B. 1 verified in that complaint his understanding that "[a]ny false statement made in this complaint are punishable as crimes," thereby enhancing the trustworthiness of his statements in the complaint.  Id.

For these reasons, the Court concludes that the Government proved by a preponderance that the loss attributable to L.B. 1 was $100,000.

### viii.  Victims G.A. and L.B. 2

G.A.[15] and L.B. 2 consigned jewelry items to DuMouchelle that were owned by their clients.  DuMouchelle promised to wire transfer $110,000 of the $125,750 he owed to G.A. and L.B. 2.  However, he never did so.

Agent Taylor attributed a loss of $110,000 to G.A. and L.B. 2.  Hr'g Trans. at 82–83; 123–124.[16]  This calculation is supported by email communications between G.A. and L.B. 2 and DuMouchelle.  Gov't Ex. 36.  In an email sent from L.B. 2 to DuMouchelle on October 26, 2018, L.B. 2 reiterates DuMouchelle's promise to pay $110,000, states that this wire transfer was never received, and asks DuMouchelle to either wire the full amount of $125,750 or return the jewelry items.  Id. at 1.

DuMouchelle argues that no loss is attributable to G.A. and L.B. 2.  Def. Mem. at 11.  He asserts that although the email referenced a past due invoice, this invoice was not introduced into

---

[15] The Government initially attributed a loss of $30,000 to G.A. and a loss of $110,000 to G.A. and L.B. 2.  Upon realizing that the two G.A.s were likely the same person, see Hr'g Trans. at 123–124, the Government decided to seek to hold DuMouchelle accountable for only the $110,000 loss, see Gov't Mem. at 16.

[16] The PSR likewise attributes a loss of $110,000 to G.A. and L.B. 2.

evidence, and, therefore, the amount of the past due invoice was not corroborated.  Id.  He also argues that "the email does not suggest any fraudulent conduct or misrepresentation."  Id.

The Court agrees with DuMouchelle.  It is tempting to infer fraud in G.A. and L.B. 2's case based solely on DuMouchelle's repeated pattern of failing to pay other victims.  But the emails alone do not prove fraudulent conduct by a preponderance.  Further, as DuMouchelle points out, the emails contain unilateral assertions of the value of the jewelry that are neither corroborated by additional evidence nor made under penalty of criminal punishment or subject to truthful pleading requirements.

As a result, the Court does not attribute any loss to G.A. and L.B. 2.[17]

### ix.  Conclusion Regarding Amount of Loss

As stated above, the parties agree that the loss in this case totals, at a minimum, $20,445,641.  The Court is satisfied that the Government proved by a preponderance of evidence an additional loss amount of $4,862,575, thereby establishing a total loss amount of $25,308,216.  Because this loss amount exceeds $25 million, the Court will increase DuMouchelle's offense level by 22 levels.  U.S.S.G. § 2B1.1(b)(1)(L).

### B.  Restitution

For any offense committed by fraud, a court must order the defendant to make restitution to the victim of the offense in the full amount of the victim's loss.  18 U.S.C. §§ 3663A(a)(1), 3663A(c), 3664(f)(1)(A).  Restitution shall be equal to the greater of (i) the value of the property on the date of the damage, loss, or destruction or (ii) the value of the property on the date of sentencing, minus the value (as of the date it is returned) of any part of the property that is returned.

---

[17] Even though the Court does not adopt the Government's estimation of the loss attributable to G.A. and L.B. 2, the Court still finds that the total amount of loss exceeds $25 million.

18 U.S.C. § 3663A(b)(1)(B).  "Unlike the loss calculation under U.S.S.G. § 2B1.1, which can be based on intended loss, the restitution calculation can only be based on actual loss." <u>United States v. Healy</u>, 553 F. App'x 560, 567 (6th Cir. 2014).  The Government has the burden of establishing the amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).

As stated above, the Government established by a preponderance that the total loss amount is $25,308,216.  However, as the Government concedes, $101,815 of this amount has been returned to the victims; specifically, LaLonde received payment of $95,815, and K.C. received his ring, which is valued at $6,000.  Accordingly, the Court concludes that restitution is $25,206,401.

### III. CONCLUSION

For the foregoing reasons, the Court determines the amount of loss to be $25,308,216 and, as a result, 22 levels will added to DuMouchelle's offense level.  The Court further determines the amount of restitution to be $25,206,401.  The amount of restitution owed to each victim is as follows:

- Precious Stones Company: $421,600
- J.R.: $4,500,000
- M.H.: $900,000
- T.G.: $1,800,000
- L.D.: $42,162.50
- J.B.: $2,789,785
- A.H.: $45,500
- E.C.: $15,044
- T.R.: $12,000,000
- Galaxy U.S.A.: $1,019,840
- East Continental Gems: $810,000
- D.K.: $10,457.50
- M.M.: $14,637
- Y.F.: $17,000
- C.S.: $5,000
- P.Y.: $13,500
- H.V.: $191,000

- A-Ron Resources: $454,375
- W.R.: $55,000
- S.R.: $1,500
- L.B. 1: $100,000

The probation officer is directed to correct the PSR based on the Court's findings.

SO ORDERED.

Dated:  July 27, 2022                    s/Mark A. Goldsmith
    Detroit, Michigan                 MARK A. GOLDSMITH
                                       United States District Judge

18

# EXHIBIT 6

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[SOPHISTICATED MEANS OPINION]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                                      Case No. 20-20245

v.

                                        HON. MARK A. GOLDSMITH

JOSEPH GREGORY DUMOUCHELLE,

          Defendant.

_____/

## OPINION & ORDER
## REGARDING APPLICATION OF THE SOPHISTICATED MEANS ENHANCEMENT

      Defendant Joseph DuMouchelle is charged with committing wire fraud, in violation of 18 U.S.C. § 1343.  Information (Dkt. 1).  DuMouchelle pleaded guilty, see Rule 11 Plea Agreement (Dkt. 14), and is to be sentenced on July 28, 2022.  The Government asks the Court to apply the sophisticated means sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), to add two levels to DuMouchelle's offense level.  Gov't Resp. (Dkt. 71).  The Probation Department likewise supports application of the enhancement.  Revised Presentence Investigation Report (PSR) at ¶¶ 52, 71 (Dkt. 98).  DuMouchelle opposes application of this enhancement.  Def. Mem. (Dkt. 69).[1] For the reasons set forth below, the Court concludes that the enhancement should be applied in calculating DuMouchelle's sentence.

---

[1] The parties agreed that no hearing was needed to resolve whether the sophisticated means enhancement is applicable.  Accordingly, the Court resolved the issue based on the parties' briefing.

## I. BACKGROUND

Prior to his arrest in this case, DuMouchelle was involved in the fine jewelry business.  The Government alleges that DuMouchelle portrayed as legitimate various jewelry transactions that were, in fact, fraudulent.  Gov't Resp. at 5.

DuMouchelle pleaded guilty to committing wire fraud in connection with one of these transactions.  That transaction arose because DuMouchelle owed money to a victim, T.R.  Rule 11 Plea Agreement at 2; Gov't Resp. at 5.[2]  As a purported means to repay his debt, DuMouchelle proposed the following transaction: T.R. would purchase a diamond, the "Yellow Rose," for $12 million; DuMouchelle would resell the Yellow Rose for a profit; and DuMouchelle and T.R. would split the profits.  Rule 11 Plea Agreement at 2–3.  T.R. agreed to the arrangement, but said that he would only send the money directly to the seller—i.e., he would not send the money to DuMouchelle.  Id. at 3.

DuMouchelle sent an email to T.R. that contained "what appeared to be an email forwarded from an employee . . . of [the purported seller,] Gemworld International, Inc."  PSR at ¶ 16.[3]  The forwarded email "provided wire instructions to [a] FineMark Bank and Trust [account] . . .," and directed T.R. to wire $12 million to this account.  Id.; Rule 11 Plea Agreement at 3.  This bank account actually belonged to DuMouchelle and his wife, Melinda Adducci.  PSR ¶ 16; Rule 11 Plea Agreement at 3.[4]  Based on the representations and instructions in the email forwarded by

---

[2] The Court refers to victims by their initials to protect their identities.

[3] The Court cites to the PSR for a more detailed description of the transaction involving T.R.  But even looking at just the factual allegations that DuMouchelle agreed to in his Rule 11 plea agreement, the Court would still apply the sophisticated means enhancement.

[4] DuMouchelle objects to the PSR's statement that the FineMark Bank account belonged to him and his wife; rather, he states, the account belonged to his business, Joseph DuMouchelle Fine & Estate Jewelers, LLC.  Addendum to PSR at A-2–A-3 (Dkt. 98).  Whether the account belonged

2

DuMouchelle, T.R. initiated the wire transfer, which was subsequently declined by FineMark Bank.  PSR ¶ 17.  DuMouchelle told T.R. that "the wire transfer was denied by FineMark Bank because the dollar amount was too large."  Id.[5]

DuMouchelle then sent T.R. another email that contained "what appeared to be an email purportedly from a Gemworld International employee . . . with new wire instructions for [a] Bank of America account . . . ."  Id. ¶ 18.  T.R. paid the $12 million via wire transfer.  Id. ¶ 19.

A few days later, DuMouchelle sent T.R. another email.  Id.  This email purported to attach the receipt for the sale of the Yellow Rose.  Id.  The receipt attached to the email reflected the Yellow Rose had sold for $12 million.  Id.  This receipt was fake; DuMouchelle made it to convince T.R. that he had purchased the Yellow Rose.  Rule 11 Plea Agreement at 4.

A couple of months later, DuMouchelle sent T.R. another email, this time attaching what DuMouchelle purported to be a copy of the contract for the purchase and sale of the Yellow Rose.  PSR ¶ 21.  The attached contract purported to show that the Yellow Rose was sold to an individual residing in Bloomfield Hills, Michigan, for $16.5 million.  Id.  In reality, the Yellow Rose was never sold; DuMouchelle pocketed the $12 million from T.R. and used the majority of this money to pay his personal and business debts and expenses.  Rule 11 Plea Agreement at 4.[6]

_____

to DuMouchelle or his business, the result remains the same: DuMouchelle took steps to make it falsely appear that the account belonged to the seller of the Yellow Rose.

[5] DuMouchelle objects to the PSR's statement that the wire transfer was rejected as too large. Addendum to PSR at A-3.  Regardless of the reason for the wire transfer being denied, the ultimate point is unchanged: DuMouchelle used a falsified email to get T.R. to transfer $12 million to a bank account that belonged to DuMouchelle or his business, and when this did not work, DuMouchelle used another falsified email to get T.R. to wire the funds to another bank account held by DuMouchelle.

[6] DuMouchelle objects to the PSR's statement that he used the money to pay his "personal debts and expenses," stating that he used the funds for business loans.  Addendum to PSR at A-8. Whether DuMouchelle used the funds for personal and business expenses or just his business expenses does not matter; either way, DuMouchelle used the funds for his own purposes.

In addition to this scheme in which DuMouchelle admitted his involvement, the Government contends that DuMouchelle participated in multiple other fraudulent transactions.[7] As examples, it points to transactions involving T.G. and J.R.  Gov't Resp. at 6–7.  DuMouchelle and T.G. entered into a contract in which they agreed that they would each invest $1.8 million to be used to purchase jewelry, DuMouchelle would auction off the jewelry, and DuMouchelle and T.G. would split the profits.  Id. at 6.  T.G. wired $1.8 million to DuMouchelle, which DuMouchelle used to pay his personal and business expenses rather than to purchase and auction off the jewelry.  Id.  However, DuMouchelle told T.G. that he used the money to purchase the jewelry and was preparing the jewelry for auction.  Id. at 7.  After a few months passed, DuMouchelle told T.G. that the jewelry had sold and that DuMouchelle was just waiting for the sale to close.  Id.  DuMouchelle also sent T.G. a screenshot of DuMouchelle's bank account showing what he falsely purported to be the funds of the sale.  Id.

As for J.R., DuMouchelle solicited and received from him a loan of $4.5 million.  Id. DuMouchelle falsely told J.R. that the loan would be secured by DuMouchelle's home and that his home was unencumbered.  Id.  DuMouchelle has not repaid the $4.5 million to J.R.  Id.

## II. ANALYSIS

Section 2B1.1 applies to offenses such as wire fraud.  See U.S.S.G. § 2B1.1.  It states that a defendant's offense level should be increased by two levels "[i]f . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct

---

[7] DuMouchelle points out that, other than the transaction involving T.R., "[t]he Rule 11 does not include any factual admissions or agreement to any other specific criminal activity."  Def. Mem. at 2.  At the same time, DuMouchelle does not directly challenge the accuracy of the Government's factual allegations regarding T.G. and J.R.  Even if the Court were to only consider the transaction involving T.R., application of the sophisticated means would still be warranted.  As explained below, DuMouchelle used sophisticated means like fake emails and fake receipts to execute and conceal the fraudulent transaction involving T.R.

4

constituting sophisticated means." <u>Id.</u> § 2B1.1(b)(10)(C).  Typically, "[t]he government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 . . . by a preponderance of the evidence."  <u>United States v. Freund</u>, No. 03-20004, 2008 WL 4601802, at *7 (E.D. Mich. Oct. 14, 2008) (citing <u>United States v. Finkley</u>, 324 F.3d 401, 403 (6th Cir. 2003)).[8]

The sophisticated means enhancement is appropriate if the offense conduct was "more intricate than that of the garden-variety offense."  <u>United States v. Sethi</u>, 702 F.3d 1076, 1079 (8th Cir. 2013) (punctuation modified); <u>see also</u> <u>United States v. Benchick</u>, 725 F. App'x. 361, 369 (6th Cir. 2018) (rejecting the defendant's argument that "his offenses were no more sophisticated than those in any bank or wire fraud scheme" and explaining that the enhancement was warranted because the defendant "used corporate entities in furtherance of his criminal activities") (punctuation modified); U.S.S.G. § 2B1.1(b)(10), cmt. 9(B) (defining "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense").  The commentary to § 2B1.1(b)(10) provides a list of examples of conduct that ordinarily constitutes sophisticated means, including "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."

---

[8] DuMouchelle states that "the Rule 11 and the plea colloquy raise a question as to whether Mr. DuMouchelle was accepting the burden of disproving the government's guideline calculations." Def. Mem. at 3.  DuMouchelle is referring to the fact that in his plea agreement, he agreed to the Government's recommended Guidelines range of 121–151 months' imprisonment, which incorporates the sophisticated means sentencing enhancement.  <u>See</u> Rule 11 Plea Agreement at 5; Worksheet A to Plea Agreement (Dkt. 14).  However, the plea agreement does not clearly shift the burden of proving the applicability of the sophisticated means enhancement to DuMouchelle. Because the Government should be held "to a greater degree of responsibility than the defendant for any imprecision in a plea agreement, so that ambiguities are construed against the Government," <u>United States v. White</u>, 628 F. App'x 848, 851 (4th Cir. 2015) (punctuation modified), the burden remains with the Government.  In any case, the question of who bears the burden of proving evidence by a preponderance "only matters in narrow class of cases where proof is in equipoise."  <u>United States v. Davis</u>, No. 4:18-cr-35, 2021 WL 5025105, at *3 (E.D. Tenn. Sept. 17, 2021) (punctuation modified).  This is not such a case.

U.S.S.G. § 2B1.1(b)(10), cmt. 9(B).  The fact that a single step in a scheme, in isolation, is non-complex, is not dispositive; the relevant inquiry is whether the conduct, taken as a whole, constitutes sophisticated means.  See United States v. Tandon, 111 F.3d 482, 491 (6th Cir. 1997).

DuMouchelle argues that "the government cannot prove any fictious entities, shells or accounts." Def. Mem. at 5.  The Court rejects DuMouchelle's position that the enhancement is inapplicable to offense conduct that is not listed in the commentary to § 2B1.1(b)(10).  The commentary's list of examples of sophisticated means conduct is "not exhaustive." United States v. Redman, 887 F.3d 789, 792 (7th Cir. 2018).  In fact, § 2B1.1(b)(10)(C) and its commentary "reflect[] that a wide range of criminal conduct," i.e., conduct going beyond mere misrepresentations, "might be deemed sophisticated." Id. (punctuation modified).

As for his offense conduct, DuMouchelle asserts that "[t]he only thing alleged to be fictious was the initial representations (or omissions) made by Mr. DuMouchelle to ultimately acquire the monies used to pay pre-existing business debts." Def. Mem. at 5.  That is incorrect.  According to the plea agreement, the PSR, and the Government's uncontested allegations, DuMouchelle did more than just misrepresent the nature and purpose of his transactions.  For instance, to induce T.R.'s participation in the fraudulent Yellow Rose transaction, DuMouchelle sent T.R. fake emails and wire transfer instructions.  Rule 11 Plea Agreement at 3; Gov't Resp. at 5.  DuMouchelle also attempted to make it look like the transactions with T.R. and T.G. had actually gone through, sending a fake receipt and fake contract to T.R. and a misleading bank account screenshot to T.G. Rule 11 Plea Agreement at 4; Gov't Resp. at 5–7; PSR ¶ 21.

Courts have consistently held that the creation and use of such falsified documents warrants the sophisticated means enhancement.  See, e.g., United States v. Ramdeo, 682 F. App'x 751, 760 (11th Cir. 2017) (applying enhancement in sentencing defendant for wire fraud and

money laundering where defendant, among other things, created a fake email for a fictitious company); <u>United States v. Allan</u>, 513 F.3d 712, 716 (7th Cir. 2008) (applying enhancement where defendants' conduct included doctoring fax headers and fashioning phony e-mail addresses to resemble legitimate contact information); <u>United States v. Bin Wen</u>, Nos. 6:17-CR-06173 EAW & 6:17-CR-06174 EAW, 2018 WL 6715828, at *15 (W.D.N.Y. Dec. 21, 2018) (applying enhancement where defendants put signatures of fictitious individuals on shell company letterhead, misappropriated individuals' names and credentials, and "created false email addresses, phone numbers, and fax numbers to perpetuate their fraud").

DuMouchelle likens his case to <u>United States v. Brown</u>, 877 F. Supp. 2d 736 (D. Minn. 2012), arguing that his fraudulent conduct, like the <u>Brown</u> defendant's, was "'easily detectable'" and, therefore, non-sophisticated. Def. Mem. at 6 (quoting <u>Brown</u>, 877 F. Supp. 2d at 752). In <u>Brown</u>, the district court declined to apply the sophisticated means enhancement, reasoning that although the defendant created an LLC and opened bank accounts to orchestrate the fraudulent scheme, he "did not create fictitious entities, corporate shells, or offshore financial accounts for . . . [fund] assets, but rather opened readily identifiable accounts at local banks." <u>Brown</u>, 877 F. Supp. at 752. DuMouchelle suggests that his fraud was easily detectable because "[e]very bank used Mr. DuMouchelle's individual or corporate name on the account," and "many of the victims knew [the numbers of these accounts]." Def. Mem. at 14.

The Court concludes that DuMouchelle's reliance on <u>Brown</u> is problematic for two reasons. As a preliminary matter, <u>Brown</u>, an out-of-circuit district court opinion, is at odds with precedent of the United States Court of Appeals for the Sixth Circuit, which this Court is bound to follow. Specifically, <u>Brown</u> supports the view that creation of an entity or account does not warrant application of the sophisticated means enhancement unless the entity or account is

fictitious—a view the Sixth Circuit rejects.  See Benchick, 725 F. App'x at 379 (finding that a defendant's "use of companies . . . as conduits for the proceeds of his schemes justifies the application of the enhancement" and explaining that the defendant's "retort that the companies were more than mere 'shells' because he and his father had conducted legitimate business through them for years prior to the events of this case misses the point.  The fact remains that the court had clear evidence that [the defendant] . . . used corporate entities in furtherance of his criminal activities.").  Brown, therefore, is neither binding nor persuasive authority.

Even if Brown were persuasive, DuMouchelle's offense conduct is distinguishable because it was not "easily detectable."  DuMouchelle's suggestion that his victims could have easily detected his fraud because they "knew" his bank account numbers is premised on the unreasonable assumption that his victims should have had his lengthy bank account numbers memorized such that they would recognize the numbers as belonging to DuMouchelle upon seeing the numbers. People do not typically memorize the bank account numbers of others.  Thus, DuMouchelle's victims would not have been prompted to cross-check the account numbers unless they had reason to believe that DuMouchelle was lying about the ownership of the bank accounts.  DuMouchelle went to great lengths to keep his victims from having any such suspicions.  DuMouchelle utilized techniques beyond mere misrepresentation that made it difficult to detect his fraud, such as sending emails to T.R. containing what appeared to be (i) a forwarded email from the seller of the Yellow Rose with wire instructions to a bank account belonging to the seller, (ii) an authentic receipt from the sale of the Yellow Rose to T.R., and (iii) a real contract for the resale of the Yellow Rose from T.R. to a buyer in Bloomfield Hills.  In fact, these were all fraudulent, but a customer receiving such emails and attachments would not be able to easily detect that something was awry.

In sum, DuMouchelle's offense conduct clearly rose above the "garden-variety" level of wire fraud.  See Sethi, 702 F.3d at 1079.  The Court, therefore, will increase his offense level by two levels.  See U.S.S.G. § 2B1.1(b)(10)(C).

### III.  CONCLUSION

For the foregoing reasons, the Court will apply the sophisticated means enhancement in calculating DuMouchelle's sentence.

SO ORDERED.

Dated:  July 27, 2022                                    s/Mark A. Goldsmith
      Detroit, Michigan                          MARK A. GOLDSMITH
                                United States District Judge

# EXHIBIT 7

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[ORDER OF FORFEITURE]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                                  Case No. 20-cr-20245

           Plaintiff,

                                  Honorable Mark A. Goldsmith

vs.

Joseph Gregory Dumouchelle,

           Defendant.

_____/

## ORDER (1) GRANTING THE GOVERNMENT'S APPLICATION TO AMEND THE PRELIMINARY ORDER OF FORFEITURE (DKT. 100) AND (2) AMENDING THE PRELIMINARY ORDER OF FORFEITURE (DKT. 41)

On December 15, 2021, this Court entered a preliminary order of forfeiture against defendant Joseph Gregory Dumouchelle, the terms of which are incorporated herein by reference. The preliminary order of forfeiture provided for a forfeiture money judgment in an amount to be determined at sentencing. (ECF No. 41). Prior to sentencing, the United States filed an application for entry of amended preliminary order of forfeiture.  (ECF No. 100).

Based on the United States' application, the record in this case, the representations made at the June 22, 2022 evidentiary hearing, and under 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2(e)(1),

the preliminary order of forfeiture entered against defendant Joseph Gregory

Dumouchelle on December 15, 2021 is hereby amended as follows:

1.      The amount of the forfeiture money judgment against defendant

Joseph Gregory Dumouchelle is $12 million dollars.

2.      The money judgment may be satisfied, to whatever extent possible,

from any property owned or under the control of defendant. To satisfy the money

judgment, any assets that the defendant has now, or may later acquire, may be

forfeited as substitute assets under 21 U.S.C. § 853(p)(2).

3.      The United States is permitted to undertake whatever discovery is

necessary to identify and locate property subject to forfeiture and substitute assets,

pursuant to Fed. R. Crim. P. 32.2(b)(3).

4.      This amended preliminary order of forfeiture shall become the final

order of forfeiture at the time of sentencing and shall be made part of the sentence

and included in the judgment.

5.      No ancillary proceeding is required as the forfeiture consists solely of

a money judgment. Fed. R. Crim. P. 32.2(c)(1).

6.      The Court shall retain jurisdiction to enforce this order and to amend

it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

SO ORDERED.

Dated: July 28, 2022                s/Mark A. Goldsmith
                                    Honorable Mark A. Goldsmith
                                    United States District Court Judge

3

# EXHIBIT 8

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[CRIMINAL JUDGMENT]

# UNITED STATES DISTRICT COURT
### Eastern District of Michigan

| | |
|---|---|
| UNITED STATES OF AMERICA | § **JUDGMENT IN A CRIMINAL CASE** |
| | § |
| v. | § |
| | § Case Number: 0645 2:20CR20245 (1) |
| **Joseph Gregory DuMouchelle** | § USM Number: 57969-039 |
| | § **Gerald J. Gleeson II** |
| | § <small>Defendant's Attorney</small> |

## THE DEFENDANT:

| | | |
|---|---|---|
| ☒ | pleaded guilty to count(s) | **1 of the Information** |
| ☐ | pleaded nolo contendere to count(s) which was accepted by the court | |
| ☐ | was found guilty on count(s) after a plea of not guilty | |

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18 U.S.C. § 1343, Wire Fraud | 2/1/2019 | 1 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 28, 2022
<small>Date of Imposition of Judgment</small>

**s/ Mark A. Goldsmith**
<small>Signature of Judge</small>

The Honorable Mark A. Goldsmith
United States District Judge
<small>Name and Title of Judge</small>

July 28, 2022
<small>Date</small>

AO 245B (Rev. 09/18) Judgment in a Criminal Case                                      Judgment -- Page 2 of 8

DEFENDANT:          Joseph Gregory Dumouchelle
CASE NUMBER:        0645 2:20CR20245 (1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**151 months. The Court waives the imposition of a fine, costs of incarceration and the costs of supervision due to defendant's lack of financial resources.  While in custody, the defendant shall participate in the Inmate Financial Responsibility Program (IFRP). The Court is aware of the requirements of the IFRP and approves the payment schedules of this program and hereby orders the defendant's compliance.**

☒   The court makes the following recommendations to the Bureau of Prisons: **The defendant is designated to FCI Miami.**

☒   The defendant is remanded to the custody of the United States Marshal.
☐   The defendant shall surrender to the United States Marshal for this district:

   ☐   at                          ☐   a.m.    ☐   p.m.    on

   ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on
   ☐   as notified by the United States Marshal.
   ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:


    Defendant delivered on  to


at, with a certified copy of this judgment.


                                                  UNITED STATES MARSHAL

                                                         By
                                                  DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/18) Judgment in a Criminal Case                                                     Judgment -- Page 3 of 8

DEFENDANT:          Joseph Gregory Dumouchelle
CASE NUMBER:        0645 2:20CR20245 (1)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of**: 3 years.**

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☒ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. (*check if applicable*)

4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (*check if applicable*)

5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable*)

6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. (*check if applicable*)

7. ☐ You must participate in an approved program for domestic violence. (*check if applicable*)

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

AO 245B (Rev. 09/18) Judgment in a Criminal Case                                                                    Judgment -- Page 4 of 8

DEFENDANT:          Joseph Gregory Dumouchelle
CASE NUMBER:        0645 2:20CR20245 (1)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature  _____     Date  _____

AO 245B (Rev. 09/18) Judgment in a Criminal Case

Judgment -- Page 5 of 8

DEFENDANT:        Joseph Gregory Dumouchelle
CASE NUMBER:      0645 2:20CR20245 (1)

## SPECIAL CONDITIONS OF SUPERVISION

Due to the instant offense and the defendant's mental health history, the following special conditions may be ordered:

> You must submit to a psychological/psychiatric evaluation as directed by the probation officer, if necessary.

> You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

> You must take all mental health medications that are prescribed by your treating physician.

Due to the defendant's restitution owed, the Court may consider the following special conditions to ensure repayment:

> If the judgment imposes a financial penalty, you must pay the financial penalty in accordance with the Schedule of Payments sheet of the judgment. You must also notify the court of any changes in economic circumstances that might affect the ability to pay this financial penalty.

> You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

> You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

> You must complete a debtor's exam while on supervision as recommended by the probation officer.

AO 245B (Rev. 09/18) Judgment in a Criminal Case                                                Judgment -- Page 6 of 8

DEFENDANT:            Joseph Gregory Dumouchelle
CASE NUMBER:          0645 2:20CR20245 (1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $100.00 | Not applicable | Waived | $25,206,401 |

☐  The determination of restitution is deferred until  An *Amended Judgment in a Criminal Case (AO245C)* will be entered after such determination.

☒  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

   Precious Stones Company: $421,600
   J.R.: $4,500,000
   M.H.: $900,000
   T.G.: $1,800,000
   L.D.: $42,162.50
   J.B.: $2,789,785
   A.H.: $45,500
   E.C.: $15,044
   T.R.: $12,000,000
   Galaxy U.S.A.: $1,019,840
   East Continental Gems: $810,000
   D.K.: $10,457.50
   M.M.: $14,637
   Y.F.: $17,000
   C.S.: $5,000
   P.Y.: $13,500
   H.V.: $191,000
   A-Ron Resources: $454,375
   W.R.: $55,000
   S.R.: $1,500
   L.B. 1: $100,000

☒  Restitution amount ordered pursuant to plea agreement $25,206,401.00
☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).
☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:
   ☒  the interest requirement is waived for the      ☐  fine          ☒  restitution
   ☐  the interest requirement for the                ☐  fine          ☐  restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/18) Judgment in a Criminal Case

Judgment -- Page 7 of 8

DEFENDANT:     Joseph Gregory Dumouchelle
CASE NUMBER:   0645 2:20CR20245 (1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payments of $100 is due immediately.

    ☐  not later than _____ , or

    ☐  in accordance  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐  C,  ☐  D, or  ☐  F below); or

**C**  ☐  Payment in  equal  *(e.g., weekly, monthly, quarterly)* installments of $ over a period of
    *(e.g., months or years)*, to commence  *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal  *(e.g., weekly, monthly, quarterly)* installments of $ over a period of
    *(e.g., months or years)*, to commence  *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within  *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time;
    or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
    Restitution is joint and several with the following co-defendants and/or related cases, in the amount specified below:

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

    ☐ Defendant shall receive credit on «dft_his_her» restitution obligation for recovery from other defendants who contributed to
    the same loss that gave rise to defendant's restitution obligation.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/18) Judgment in a Criminal Case                                          Judgment -- Page 8 of 8

DEFENDANT:         Joseph Gregory Dumouchelle
CASE NUMBER:       0645 2:20CR20245 (1)

# ADDITIONAL FORFEITED PROPERTY

Pursuant to 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c), Defendant shall pay a $12,000,000.00 forfeiture money judgment to the United States. The Preliminary Order of Forfeiture and the Amendment to Preliminary Order of Forfeiture are incorporated by reference.

# EXHIBIT 9

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[APPEAL]

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

D-1  JOSEPH GREGORY DUMOUCHELLE,

      Defendant,

Case No. 20-cr-20245

Hon. Mark A. Goldsmith

---

## **NOTICE OF APPEAL**

Notice is hereby given that the Defendant, Joseph Gregory DuMouchelle, hereby appeals to the United States Court of Appeals for the Sixth Circuit from the Judgment in a Criminal Case pronounced on July 28, 2022.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:  s/Gerald J. Gleeson, II
      Gerald J. Gleeson, II (P53568)
      840 West Long Lake Road, Suite 150
      Troy, Michigan 48098
      Telephone: (248) 267-3296
      gleeson@millercanfield.com
      *Counsel for Defendant*

Dated: July 29, 2022

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2022, I electronically filed the foregoing document, with the Clerk of the court using the ECF system which sent notification of such filing all counsel of record.

By:   s/Gerald J. Gleeson II
          Gerald J. Gleeson, II (P53568)
          Miller, Canfield, Paddock and Stone, PLC
          840 West Long Lake Road, Suite 150
          Troy, Michigan 48098
          Telephone: (248) 267-3296
          gleeson@millercanfield.com

39380471.1/144604.00033

# EXHIBIT 10

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[APPELLATE JUDGMENT]

## United States Court of Appeals for the Sixth Circuit

**U.S. Mail Notice of Docket Activity**

The following transaction was filed on 02/14/2023.

**Case Name:**   USA v. Joseph Dumouchelle
**Case Number:**   22-1669

**Docket Text:**
ORDER filed: We GRANT counsel's motion to withdraw [6905339-2] and AFFIRM the district court's judgment. Decision not for publication, pursuant to FRAP 34(a)(2)(C), Mandate to issue;. Ralph B. Guy, Jr., Circuit Judge; Karen Nelson Moore, Circuit Judge and Raymond M. Kethledge, Circuit Judge.

**The following documents(s) are associated with this transaction:**
Document Description:   Order

**Notice will be sent to:**

Mr. Joseph Gregory Dumouchelle
Livingston County Jail
150 S. Highlander Way
Howell, MI 48843

**A copy of this notice will be issued to:**

Ms. Kinikia D. Essix
Mr. Steven S. Nolder
Ms. Karen L. Reynolds

**<u>NOT RECOMMENDED FOR PUBLICATION</u>**

No. 22-1669

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<div style="border: 1px solid black;">

**FILED**

Feb 14, 2023

DEBORAH S. HUNT, Clerk
</div>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JOSEPH GREGORY DUMOUCHELLE, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

O R D E R

Before: GUY, MOORE, and KETHLEDGE, Circuit Judges.

Joseph Gregory DuMouchelle appeals his conviction and 151-month sentence for wire fraud. This case has been referred to a panel of the court that, upon examination, unanimously agrees that oral argument is not needed. *See* Fed. R. App. P. 34(a).

DuMouchelle waived indictment and pleaded guilty to an information charging him with wire fraud, in violation of 18 U.S.C. § 1343. The plea agreement provided that DuMouchelle waived his right to appeal his conviction and, if his sentence did not exceed 151-months of imprisonment, his right to appeal his sentence.

A year after DuMouchelle entered his guilty plea and days before his scheduled sentencing, his appointed counsel filed a motion to withdraw. The district court granted the motion after a hearing, and new counsel, Gerald J. Gleeson II, was appointed to represent DuMouchelle. Three months after Gleeson entered his appearance and the day before a filing deadline, Gleeson also filed a motion to withdraw. The district court conducted a hearing and subsequently denied Gleeson's motion.

The parties disputed whether the loss amount in the case exceeded $25 million.  *See* USSG § 2B1.1(b)(1)(L).  The district court conducted an evidentiary hearing as to the amounts of loss and restitution, and the parties submitted post-hearing briefs.  DuMouchelle ultimately maintained that the loss amount totaled $23,368,801.  After considering the evidence presented at the hearing and the parties' arguments and concessions, the district court concluded that the government had established by a preponderance of the evidence that the loss amount totaled $25,308,216 and that, based on the government's concession that $101,815 had been returned to the victims, the restitution amount totaled $25,206,401.

In the meantime, DuMouchelle filed pro se requests for Gleeson's withdrawal and replacement and, through counsel, a motion to withdraw his guilty plea.  After a hearing, the district court denied DuMouchelle's requests for replacement counsel and also denied his motion to withdraw his guilty plea.

Prior to sentencing, the district court issued orders addressing DuMouchelle's objections to the presentence report.  The district court also invited the parties to brief whether DuMouchelle should receive a reduction for acceptance of responsibility under USSG § 3E1.1.  At sentencing, the district court denied any reduction for acceptance of responsibility and calculated the guidelines range as 135 to 168 months of imprisonment based on a total offense level of 33 and a criminal history category of I.  After a thorough review of the sentencing factors under 18 U.S.C. § 3553(a), the district court sentenced DuMouchelle to 151 months of imprisonment followed by three years of supervised release.  The district court ordered DuMouchelle to make restitution in the total amount of $25,206,401 in accordance with its prior ruling and to pay a $12 million forfeiture money judgment to the United States.

This timely appeal followed.  This court granted Gleeson's motion to withdraw and appointed new counsel to represent DuMouchelle on appeal.  DuMouchelle's new counsel has filed a brief and a motion to withdraw in accordance with *Anders v. California*, 386 U.S. 738 (1967), and Sixth Circuit Rule 12(c)(4)(C), asserting that he conscientiously reviewed the record and found nothing to support a reasonable argument on appeal.  Counsel's thorough *Anders* brief addresses DuMouchelle's appeal waiver, his guilty plea, his motions to withdraw his guilty plea

and to compel the government to file a motion under USSG § 5K1.1, and his sentence. Counsel concludes that there are no meritorious issues for appeal. Because counsel has filed an adequate *Anders* brief and our independent review of the record reveals no arguable issues, *see Penson v. Ohio*, 488 U.S. 75, 82-83 (1988), we grant counsel's motion to withdraw and affirm the district court's judgment.

We review de novo the validity of DuMouchelle's guilty plea. *See United States v. Dixon*, 479 F.3d 431, 434 (6th Cir. 2007). A guilty plea is constitutionally valid if it is voluntary, knowing, and intelligent. *Brady v. United States*, 397 U.S. 742, 748 (1970); *Dixon*, 479 F.3d at 434. In accordance with Federal Rule of Criminal Procedure 11, the district court "must verify that 'the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged.'" *Dixon*, 479 F.3d at 434 (quoting *United States v. Webb*, 403 F.3d 373, 378-79 (6th Cir. 2005)). A review of the record demonstrates that the district court fully complied with Rule 11 and that DuMouchelle was actively engaged in the plea colloquy. Under the circumstances, DuMouchelle's guilty plea was voluntary, knowing, and intelligent. *See United States v. Gardner*, 417 F.3d 541, 544 (6th Cir. 2005). And by entering a valid and unconditional guilty plea, DuMouchelle waived his right to appeal any non-jurisdictional defects in the pre-plea proceedings. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *United States v. Kirksey*, 118 F.3d 1113, 1115 (6th Cir. 1997).

We review de novo DuMouchelle's waiver of his appeal rights. *See United States v. Detloff*, 794 F.3d 588, 592 (6th Cir. 2015). "It is axiomatic that as part of a valid plea agreement, criminal defendants may 'waive many of [their] most fundamental' legal rights, including their right to appeal." *United States v. Milliron*, 984 F.3d 1188, 1192-93 (6th Cir.) (alteration in original) (quoting *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995)), *cert. denied*, 141 S. Ct. 2653 (2021). "A waiver provision is binding and forecloses appellate review if (1) the defendant's claim falls within the scope of the appeal waiver provision; and (2) the defendant 'knowingly and voluntarily' agreed to the plea agreement and waiver." *Id.* at 1193 (citing *United States v. Toth*, 668 F.3d 374, 377-78 (6th Cir. 2012)).

DuMouchelle's plea agreement stated:  "The defendant waives any right he may have to appeal his conviction on any grounds.  If the defendant's sentence does not exceed **151 months**, the defendant also waives any right he may have to appeal his sentence on any grounds." DuMouchelle's broad appeal waiver encompasses any issues related to his conviction, including the denial of his post-plea motions for new counsel and to withdraw his guilty plea.  *See Toth*, 668 F.3d at 378-79; *United States v. Lujan*, 536 F. App'x 820, 822 (10th Cir. 2013) (per curiam).  And because DuMouchelle's sentence did not exceed 151 months of imprisonment, his appeal waiver also encompasses any issues related to his sentence, including the restitution order.  *See United States v. Grundy*, 844 F.3d 613, 614-17 (6th Cir. 2016); *United States v. Winans*, 748 F.3d 268, 271-72 (6th Cir. 2014).

Under Rule 11, the district court "must inform the defendant of, and determine that the defendant understands, . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence."  Fed. R. Crim. P. 11(b)(1)(N).  During the plea hearing, the district court confirmed that DuMouchelle understood that he was giving up his right to appeal his conviction on any grounds and that, if his sentence did not exceed 151 months of imprisonment, he was also giving up his right to appeal his sentence on any grounds.

The record demonstrates that DuMouchelle knowingly and voluntarily waived his right to appeal any issues related to his conviction and sentence.  DuMouchelle's appeal waiver is valid and precludes us from reviewing his conviction and sentence.  *See United States v. McGilvery*, 403 F.3d 361, 363 (6th Cir. 2005).

Accordingly, we **GRANT** counsel's motion to withdraw and **AFFIRM** the district court's judgment.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

# EXHIBIT 11

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AGAINST JOSEPH DUMOUCHELLE UNDER COUNTS III, V,
AND VII OF PLAINTIFF'S SECOND AMENDED COMPLAINT

[WIRE FRAUD JURY INSTRUCTION]

**10.02 WIRE FRAUD (18 U.S.C. § 1343)**

(1) Count ____ of the indictment charges the defendant with wire fraud. For you to find the defendant guilty of wire fraud, you must find that the government has proved each and every one of the following elements beyond a reasonable doubt:

(A) First, that the defendant [knowingly participated in] [devised] [intended to devise] a scheme to defraud in order to deprive another of money or property, that is _____ [*describe scheme from indictment*];

(B) Second, that the scheme included a material misrepresentation or concealment of a material fact;

(C) Third, that the defendant had the intent to defraud; and

(D) Fourth, that the defendant [used wire, radio or television communications] [caused another to use wire, radio or television communications] in interstate [foreign] commerce in furtherance of the scheme.

(2) Now I will give you more detailed instructions on some of these terms.

(A) A "scheme to defraud" includes any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.

(B) The term "false or fraudulent pretenses, representations or promises" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth. They include actual, direct false statements as well as half-truths and the knowing concealment of material facts.

(C) An act is "knowingly" done if done voluntarily and not because of mistake or some other innocent reason.

(D) A misrepresentation or concealment is "material" if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension.

(E) To act with "intent to defraud" means to act with an intent to deceive or cheat for the purpose of depriving another of money or property.

(F) To "cause" wire, radio or television communications to be used is to do an act with knowledge that the use of the communications will follow in the ordinary course of business or where such use can reasonably be foreseen.