# EXHIBIT 3

1          STATE OF MICHIGAN

2       IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

3

4    TEODOR GELOV, an individual,

5              Plaintiff,

6       vs.                  Case No. 2019-172619-CK

7

8    JOSEPH DUMOUCHELLE, an individual,

9    MELINDA ADDUCCI-DUMOUCHELLE,

10   an individual, and

11   JOSEPH DUMOUCHELLE FINE &

12   ESTATE JEWELLERS, LLC,

13   a Michigan limited liability company,

14              Defendants.

15   _____/

16   PAGE 1 TO 64

17

18       The Deposition of MELINDA ADDUCCI-DUMOUCHELLE,

19       Taken at 41000 Woodward Avenue,

20       Bloomfield Hills, Michigan,

21       Commencing at 3:06 p.m.

22       Friday, June 7, 2019,

23       Before Laurel A. Frogner, RMR, CRR, CSR-2495.

24

25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Page 2**

```
1   APPEARANCES:

2

3   MR. DEREK D. McLEOD (P66229) and

4   MR. DAVID W. WILLIAMS (P55611)

5   Jaffe, Raitt, Heuer & Weiss, P.C.

6   27777 Franklin Road

7   Suite 2500

8   Southfield, Michigan  48034

9   248-351-30000

10  dmcleod@jaffelaw.com

11  dwilliams@jaffelaw.com

12      Appearing on behalf of the Plaintiff

13

14

15  MR. DENNIS K. EGAN (P29116)

16  Kotz Sangster Wysocki PC

17  400 Renaissance Center

18  Suite 3400

19  Detroit, Michigan  48243

20  313-259-8300

21  degan@kotzsangster.com

22      Appearing on behalf of the Defendant

23      Melinda Adducci-DuMouchelle

24

25
```

**Page 3**

```
1   APPEARANCES (Continued):

2

3   MR. GEORGE B. DONNINI (P66793)

4   Butzel Long PC

5   41000 Woodward Avenue

6   Stoneridge West Building

7   Bloomfield Hills, Michigan  48304

8   248-258-1616

9   donnini@butzel.com

10      Appearing on behalf of the Defendants

11

12

13

14              * * * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1               TABLE OF CONTENTS

2   Witness                                 Page

3   EXAMINATION BY MR. McLEOD                  5

4   EXAMINATION BY MR. EGAN                   62

5

6

7               INDEX TO EXHIBITS

8           (Exhibit attached to transcript)

9

10  Exhibit                                 Page

11  M. ADDUCCI DEPOSITION EXHIBIT NUMBER 21,  61

12  5/29/10 HANDWRITTEN ORDER,

13  WAS MARKED BY THE REPORTER FOR IDENTIFICATION

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 5**

1     Bloomfield Hills, Michigan

2     Friday, June 7, 2019

3     About 3:06 p.m.

4     MELINDA ADDUCCI-DUMOUCHELLE,

5 having first been duly sworn, was examined and

6 testified on her oath as follows:

7 EXAMINATION BY MR. McLEOD:

8 Q. Thank you. Good afternoon, everyone. Derek McLeod

9    for the plaintiff, Ted Gelov.

10     Miss Adducci, can you please state your

11    full name for the record.

12 **A. Melinda Adducci -- you want middle name? Melinda**

13 **   Jean Adducci.**

14 Q. Thank you. And you're here today pursuant to a court

15    order and a renotice of deposition, right?

16 **A. Yes.**

17 Q. And have you ever had your deposition taken before?

18 **A. Yes.**

19 Q. Really? How many times?

20 **A. I would say under three.**

21 Q. Okay.

22 **A. Maybe one, I don't remember. I remember being in**

23 **   court for appraisals.**

24 Q. Oh, as an expert?

25 **A. As an expert, and I've also done depositions for**

1 appraisals, I believe. I don't remember what it was
2 for. It was appraisal-related, I'm sure.
3 Q. So it was work-related?
4 A. Yeah, yes.
5 Q. And you were retained to give --
6 A. Yes.
7 Q. -- an opinion?
8 A. Yes.
9 Q. No other experience as a --
10 A. No.
11 Q. Well, I'll just give you a quick refresher on some of
12 the ground rules. You'll be asked questions and
13 you'll be given a chance to answer, of course. The
14 woman sitting to your left is taking down everything
15 said here today on the record, and everything that is
16 said on the record may be used for any and all
17 purposes authorized by the Michigan Court Rules.
18 It's important, therefore, that you and I
19 don't speak over each other. It's important that you
20 give audible responses to the questions. A head
21 shake up and down or side to side doesn't read on the
22 transcript.
23 A. Okay.
24 Q. And the same way, "yes" or "no" is great; "uh-huh" or
25 "um-hum" doesn't read --

1 A. Okay.
2 Q. I'm sure at some point I'll ask you a question that
3 is confusing or inartful, and when I do that, you
4 know, I'm happy to re-ask it if you don't understand.
5 A. Okay.
6 Q. If you answer my question, I'll assume that you
7 understood it.
8 A. Okay.
9 Q. Okay. All right. Miss Adducci, what did you do to
10 prepare for today's deposition?
11 A. Met with my attorney, attorneys.
12 Q. Did you review any documents?
13 A. No.
14 Q. So you didn't bring any documents with you today?
15 A. No.
16 Q. And you know the plaintiff, Ted Gelov, right?
17 A. Yes.
18 Q. How do you know him?
19 A. He is my nephew's father-in-law.
20 Q. Okay. And you wanted to buy some jewelry, 16 items
21 identified on Exhibit A to the promissory note that
22 you signed?
23 MR. EGAN: Objection. When you say you
24 wanted, explain who you're questioning about who was
25 buying what.

1 BY MR. McLEOD:
2 Q. Sure. Why don't we -- it's Exhibit 2.
3 Miss Adducci, you've been handed what's
4 been marked as Joseph DuMouchelle Deposition Exhibit
5 Number 2. Please take an opportunity to review it.
6 When you're done let me know, and I'll have some
7 questions for you.
8 A. Okay.
9 Q. Okay. And you've seen that document before?
10 A. I don't remember reading it, I don't know.
11 Q. So do you remember seeing this document before I
12 just -- it was just handed to you?
13 A. I don't remember.
14 Q. Okay. Well, let's back up, then. In or around late
15 July, early August, 2016, did you or Joe or the
16 company, Joseph DuMouchelle Fine & Estate Jewellers,
17 LLC, want to or endeavor to acquire 16 items of
18 jewelry identified on Exhibit A to that promissory
19 note?
20 A. I don't know.
21 MR. EGAN: I'm going to object to the form
22 of the question because you've got -- if you ask them
23 one at a time I don't have an issue with the
24 question, but to ask her -- she can't answer this
25 question in the sense without stating regarding who

1 she's answering.
2 THE WITNESS: I don't know.
3 BY MR. McLEOD:
4 Q. Okay. Miss Adducci, if you will please turn to
5 Exhibit A, which is Page 4 to the note. Do you
6 recognize this document, this Exhibit A?
7 A. No. I did not see that.
8 Q. What do you mean that you did not see it? You did not see
9 it before today?
10 A. No.
11 Q. Okay. Are you aware that Joe asked Ted for a loan to
12 buy these 16 items of jewelry?
13 A. Well, if I signed it -- no, I did not know he took
14 the loan to buy that jewelry. I don't know what it
15 was for because I was not involved in any of this.
16 Q. Okay. I think my question was did you know Joe asked
17 Ted for a loan to buy these 16 items of jewelry.
18 A. No.
19 Q. Do you know if Ted has any expertise in the purchase
20 and sale of any jewelry?
21 A. I don't know.
22 Q. Do you know why Joe would ask Ted for a loan to buy
23 any jewelry?
24 A. No, I mean I don't know. I can't answer for Joe,
25 so -- and I didn't -- this was not my deal, so I

1    don't know.
2  Q.  Have you ever asked Ted Gelov for a loan to --
3  A.  No.
4  Q.  -- purchase any jewelry?
5  A.  No.
6  Q.  You're an officer of Joseph DuMouchelle Fine & Estate
7      Jewelry, right?
8  A.  10 percent.
9  Q.  10 percent?
10 A.  Right.
11 Q.  Member or officer?
12 A.  Member and officer 10 percent.  I mean I'm not sure
13     of the difference.  I'm a 10 percent person.
14 Q.  You own 10 percent of the units in the company?
15 A.  I mean I guess that's how it's -- yeah, yes.
16 Q.  And how long have you been a member of the company?
17 A.  Well, I had my own appraisal business and I started
18     helping, so I don't know the exact answer, but I
19     would say in the '90s.  I'm not exactly sure.
20 Q.  Okay, but before 2018, certainly?
21 A.  Yes, yes.
22 Q.  When did you become an officer in the company?
23 A.  I don't know.  I think whenever you become a
24     member -- I don't know the answer to that.
25 Q.  Okay.

1  A.  I don't know the officer -- exactly what that has to
2      do with the LLC.
3  Q.  Do you have a title with the company?
4  A.  Vice-president.  I can use -- I can use partner, I
5      can use -- they've said whatever, doesn't matter, I
6      guess, the accountants have said.
7  Q.  Other than you, who else owns an interest in the
8      company, and when I say the company, I'm referring to
9      one of the defendants in the case, Joseph DuMouchelle
10     Fine & Estate Jewelry.
11 A.  I don't know it anybody else.
12 Q.  It's just you?
13 A.  It's just me that's an officer?
14 Q.  No, that owns --
15 A.  A partner, yeah.  He's 90, I'm 10 percent, yes.
16 Q.  So it's you and your husband 90/10?
17 A.  Yes.
18 Q.  And you're an officer in the company.  Joe is an
19     officer in the company.  Anyone else?
20 A.  No.
21 Q.  Does the company -- before 2018 has the company
22     entered into any promissory notes to --
23 A.  I don't know.  Not that I've done.
24 Q.  Okay.
25 A.  Not that I've been involved in.

1  Q.  But as an officer and owner in the company, you don't
2      know if the company enters into promissory notes to
3      obtain loans to buy?
4  A.  I don't know.  That's Joe's side of the business.  I
5      don't -- that's not something I go out and seek.
6      It's not my side of the business.
7  Q.  Okay.  But you see money coming in the door?
8  A.  If I make a sale on a diamond ring for an engagement
9      ring, yes.  If I do an appraisal, I would receive the
10     money.
11 Q.  As an owner and officer in the company, do you have
12     check-writing power?
13 A.  Yes.
14 Q.  And do you --
15 A.  I can sign a check.
16 Q.  Do you review bank statements?
17 A.  I can give them to our accountants, but I don't
18     review them.
19 Q.  On an annual basis or on a monthly basis, anything?
20 A.  Not on a monthly, but if I need to answer questions
21     from an accountant if they ask us, I can review it.
22 Q.  And what about the, I mean --
23 A.  Anything to do with a promissory note I would not
24     answer.  That would not be something I would -- that
25     would be Joe with our accountants.

1  Q.  What about payroll, you oversee payroll?
2  A.  Payroll is done by QuickBooks, and our accountants
3      work with that.  And the employees would give their
4      payroll to me or -- and I would give it to the
5      accountants or, you know, it's like a five-second
6      thing because it's done through QuickBooks payroll,
7      so they give their hours.
8  Q.  Okay.  And then as an owner and officer in the
9      company, do you want to make sure that there's enough
10     money to pay bills, pay employees?
11 A.  Of course.
12 Q.  So do you look at that kind of information,
13     balance -- account balances?
14 A.  No, not on a regular basis.  That's Joe's -- he looks
15     at the account balances.  I don't look at them.
16 Q.  Have you looked at the account balances for the
17     company since this litigation was commenced on
18     March 19th?
19 A.  No.
20 Q.  Why not?
21 A.  Because my father-in-law's been sick I've had -- I'm
22     trying to run the company and, you know, trying to
23     work with people calling and my sales and appraisals,
24     and I just haven't.
25 Q.  Take a quick break.

1     (A short recess was taken.)
2  BY MR. McLEOD:
3  Q.  Miss Adducci, you're in the jewelry business, right?
4  A.  I guess you can say that, jewelry-related business,
5     yes.
6  Q.  Well, what business would you say you're in?
7  A.  The jewelry business.
8  Q.  Okay.
9  A.  Gemology.
10  Q.  So you buy and sell jewelry?
11  A.  I'm a gemologist, so I do appraisals.
12  Q.  Okay.
13  A.  And I can buy jewelry and I can sell jewelry.
14  Q.  Okay.  And a gemologist, what is a gemologist?
15  A.  It's an education in gemology.
16  Q.  And do you have any certifications or designations in
17     gemology?
18  A.  I'm a graduate gemologist, a G.G.
19  Q.  And what are your responsibilities at Joseph
20     DuMouchelle Fine & Estate Jewelry, LLC?
21  A.  I'm an appraiser, gemologist, I take out the garbage,
22     I meet with customers, I work preview.
23  Q.  I'm sorry, work --
24  A.  Pretty much everything and anything I can -- you
25     know.  I'm there so I -- currently or in the past 25

1     years?
2  Q.  Currently, in the past 12 months.
3  A.  I do appraisals, I work preview -- as a preview.
4  Q.  What kind of back-room stuff do you do, back of the
5     house?
6  A.  Appraisals, e-mails, customers e-mailing questions
7     about I have this to sell, a question I can answer.
8     I can set up an appointment if I need to.  I can
9     direct them to the right place if an e-mail lands in
10     my lap.
11  Q.  Do you pay bills?
12  A.  I can write a check.
13  Q.  But do you pay bills, do you write checks?
14  A.  I said I did write checks.  I don't pay all the
15     bills, but I can pay a bill if I'm asked to.
16  Q.  You only pay company bills if you're asked to?
17  A.  What other bill would there be?
18  Q.  Well, if the rent bill has to be paid, does Joe --
19  A.  I could write a check if he said write a check.
20     Usually I look to Joe for the finances.  If he says
21     "Hey, Lindy, will you write a check," I could write a
22     check.
23         But on the other hand, we leave checks that
24     are signed behind for -- you know, if I'm gone and
25     I'm traveling, which I'm often traveling, if he said

1     to somebody, you know, here's a check, make it out,
2     take it over to the landlord, that wouldn't be me.
3     Someone else could do that in our business, an
4     employee could do it.
5  Q.  So you have checks that are sort of precut?
6  A.  Yes, and there's a log, there was a log.
7  Q.  A check log?
8  A.  Yes.
9  Q.  So you might -- before you leave do you physically
10     sign this log?
11  A.  Yes.  I could do it, Joe could do it, anybody that
12     was on the account to sign.  And we've had other
13     people on the account to sign.  So anybody that was
14     on the account to sign could leave them, yes, but do
15     I only do them, no.
16  Q.  Where is this check account log?
17  A.  There isn't one anymore.  That's -- you know.
18  Q.  I don't.  Where is it?
19  A.  There's no check account log.  A log would only be if
20     you sign checks and you're not there, so there's no
21     log because it's just for us internally just to make
22     sure that we can account if a check is, you know --
23     we never worried about a check.  I don't know where
24     you're going with this.
25  Q.  Well, I'm --

1  A.  There's no check log.  There's no formal check log.
2     If we left behind five checks and we went to New York
3     and we left five checks, and they said it was just
4     more to make sure that if someone -- you know, that
5     someone would take the check over where we wanted it
6     for rent or wherever.
7  Q.  So you would sign checks, but these wouldn't be blank
8     checks, or they were blank checks?
9  A.  They could be.  They could be.  If he thought there
10     was a bill, Joe could co-sign a blank check, yes.
11     Where would the log be?  There's no logs.  They would
12     have been shredded probably because there's no --
13     it's not like a formal log that -- we never
14     questioned a check.  Nothing was ever missing.  I
15     don't know.
16  Q.  Okay.  So when's the last time -- I mean you said
17     there's a log, and now you're saying there's not a
18     log.  It was shredded?
19  A.  Well, you asked me a question over 25 years.
20  Q.  Okay.
21  A.  Recently there's no log.  Since Gelov there's no log.
22  Q.  Since Gelov?
23  A.  There is no log.  I mean it would have been something
24     where we would be working with someone and then
25     wanted a check.  There's no formal log.

Page 18

1 Q.  Okay.  So since Gelov there's no log.  What does that
2    mean exactly?
3 A.  If I had someone who I wanted -- it doesn't mean
4    anything specifically to Gelov.  If I, let's say, a
5    year and a half, if I had like, for instance, when I
6    had a previous employee who doesn't work for us, I
7    would sign some checks and say okay, Laura, and just
8    to make sure that they were accountable for the
9    check.  And if Joe asked them to write it or, you
10   know, said, hey, then they could do it.  But they
11   would only do it if he said it was okay.  But we
12   don't have that log anymore.
13 Q.  Okay.  So when did you stop using this log?
14 A.  Probably two or three years ago.  But again, it's a
15   manila piece of paper where we would just -- it
16   wasn't like a formal logbook that we would keep.  It
17   was just a random, hey, we're going to leave three
18   checks behind, so we put them with the checks.
19 Q.  You write a check, you sign your name, it leaves an
20   impression?
21 A.  No.
22 Q.  That's not what that is?
23 A.  No.
24 Q.  Okay, so what was it?
25 A.  A yellow piece of paper like that.

Page 19

1 Q.  With checks?
2 A.  With three checks.  We sign these, here they are,
3    yeah.  If we ever question -- yeah, we never had any
4    -- yeah.
5 Q.  Okay.  But going back to since Gelov, there's no log?
6    I mean --
7 A.  Well, you're making something out of this log.
8    Forget -- I don't know what this log means.  It's
9    just you asked me a question about checks, if I
10   signed a check, who co-signed a check, who could
11   write a check.
12       I'm not in charge of the finances, but I
13   would make sure that if I was going to sign a check
14   for me, if I was going to sign a check for me, I
15   would put down some numbers, leave it behind, and
16   then if for some reason I ever -- anybody ever
17   questioned me about it, I would make sure that I'd
18   say to that employee or whoever was there where did
19   that go, but I never had to do that so --
20 Q.  Okay.
21 A.  It's kind of irrelevant.
22 Q.  And you said the logs were shredded?
23 A.  If I went in the office and I was cleaning up when I
24   came in or something, and I -- and it was old.
25 Q.  So it wasn't done on a regular basis; it was --

Page 20

1 A.  No.
2 Q.  -- when you were cleaning up?
3 A.  No, this is -- yeah.
4 Q.  And there was no log, and nothing was shredded
5    relating to this check log?
6 A.  No.
7 Q.  For since when, last -- in 2016?
8 A.  Two years ago, three years ago, I don't know.
9 Q.  Okay.
10       MR. EGAN:  Don't talk at the same time he
11   does.  She'll throw something at you.
12       THE WITNESS:  Okay.
13 BY MR. McLEOD:
14 Q.  Mrs. Adducci, I want to bring your attention back to
15   the exhibit in front of you, Deposition Exhibit 2.
16   I'd like you to turn to Page 3.
17 A.  Okay.
18 Q.  And please confirm that that is your signature that
19   appears under the borrower designation beneath Joseph
20   DuMouchelle.  There's Melinda Adducci-DuMouchelle.
21   Can you please confirm that that's your signature?
22 A.  It looks like it's my DocuSign signature.
23 Q.  And what is DocuSign?
24 A.  An electronic signature.
25 Q.  Okay.

Page 21

1 A.  If I'm not -- that you could go online and log in and
2    do.
3 Q.  I think your testimony is it looks like your
4    signature, so did you sign this or no?
5 A.  I don't remember signing it, but --
6 Q.  But you could have signed it?
7 A.  I could have.  I don't remember every DocuSign.
8 Q.  And do you know what this -- it looks like an
9    electronic signature.  It says 1E08A67C695D431
10   ellipses.  Do you see that?
11 A.  Yes.
12 Q.  Do you know what that number is?
13 A.  No.
14 Q.  Are you aware that Ted wired $1.8 million into the
15   company's JP Morgan account on or about August 3,
16   2018?
17 A.  I don't know because I didn't handle -- I didn't
18   handle it.
19 Q.  So you're not aware of that?
20 A.  I'm not aware of it.
21 Q.  If you could flip back over to Page 4 of the note,
22   the Exhibit A.  Did Joe buy the jewelry items
23   identified on this Exhibit A?
24 A.  I don't know.
25 Q.  Did you?



1  A.  No.
2  Q.  Did the company?
3  A.  I don't know.
4  Q.  Have you asked Joe if he bought these items on
5      Exhibit A?
6  A.  No.
7  Q.  You haven't asked him?
8  A.  No.
9  Q.  Why not?
10 A.  Because this is his deal, not mine.
11 Q.  Have you had any communications with Ted Gelov since
12     August 3rd, 2019 -- excuse me, '18?
13 A.  No.
14 Q.  You've had no --
15 A.  Not that I remember.
16 Q.  You could have?
17 A.  I don't think so.
18 Q.  No e-mails?
19 A.  No e-mail.
20 Q.  No texts?
21 A.  No text.
22 Q.  Phone calls?
23 A.  No phone calls.
24 Q.  Who is Sue Lynch?
25 A.  My sister-in-law, Joe's sister.

1  Q.  And have you spoken to Sue about this --
2  A.  No.
3  Q.  -- litigation?
4  A.  Why would Sue -- no.
5  Q.  Have you and Joe and Sue talked about this litigation
6      at all?
7  A.  No, but I think Sue was here the first time with you.
8      But I have not talked with Sue about this with Joe,
9      but Sue was here with you, so you know that Sue --
10     you're asking me a question about Sue.  I have
11     nothing to do with Sue on this.
12 Q.  So your testimony is you have not talked to Sue Lynch
13     ever about this lawsuit?
14 A.  I wouldn't say ever, she's my sister-in-law.
15     Randomly, it's family.  I mean have I talked about
16     the case about the jewelry, no, I have not talked
17     about this with her.  But I know that she came and
18     spoke with you and was here the first time, but I did
19     not have anything to do with that.
20 Q.  Okay.  So your testimony is you haven't talked to Sue
21     about this litigation?
22         MR. EGAN:  If you know.
23         THE WITNESS:  It sounds like a trick
24     question to me.  Have I talked to Sue about this?  I
25     have not talked to Sue.  Does Sue know that we came

1      to court?  Yes.  Okay.  Then yes, Sue knows because
2      Sue was here.  So I know that Sue was here, but did I
3      try to get Sue to come here?  I have talked to Sue.
4      Have I had phone calls with Sue, no, I don't talk to
5      Sue about the case, about what's going on.  I don't
6      do that.  This is not my deal.  This is Joe's deal.
7      If Joe's talked to her I don't know, but I don't talk
8      to her.
9  BY MR. McLEOD:
10 Q.  Do you know why Sue came to court --
11 A.  No.
12 Q.  -- with Joe?
13 A.  No, it's her brother.  She loves him.
14 Q.  You were -- you're named as a defendant in this
15     lawsuit and you didn't come to court.
16 A.  I didn't know I had to.
17         MR. EGAN:  Just for the record, she did
18     come to court at least once when she was ordered to,
19     and I don't think your client's been here once.
20         MR. McLEOD:  He hasn't been ordered to.
21         MR. EGAN:  And she wasn't prior.  You just
22     asked a general question had she been at court, and
23     she was here when she had to be but she wasn't here
24     when she didn't have to be, just like your client.
25         THE WITNESS:  It's not my deal.

1          MR. McLEOD:  Dennis, I'm going to have the
2      witness look at some exhibits that were previously
3      marked.  Can I hand them to her?
4          MR. EGAN:  It'll be easier if you hand them
5      and George will get me the copies.  That will
6      probably be the fastest.  That's 1.
7  BY MR. McLEOD:
8  Q.  The witness has been handed Exhibit 1, prior
9      deposition.  Please take a moment to review, and when
10     you're finished I'll have some questions.
11 A.  Okay.
12 Q.  Miss Adducci, are you aware that Joe sent Ted this
13     e-mail --
14 A.  No.
15 Q.  -- dated August 1, 2018?
16 A.  No.
17 Q.  If you flip over to the promissory note, there's a
18     blank promissory note.  Have you ever seen that
19     document ever?
20 A.  No -- well, is it -- what's over here?
21 Q.  No.
22 A.  Okay, then no?
23 Q.  We're staying on that.  It's the blank one.
24 A.  No.
25 Q.  It doesn't have any names.  You've never seen this

1    document?
2  **A.  I've never seen this document.**
3  Q.   Okay.  We're going to go to Exhibit 3 which I'm
4       handing the witness.
5  **A.  Do I give this back to you?**
6  Q.   Sure.  This exhibit was previously marked Deposition
7       Exhibit 3.  It's an e-mail string starting -- it's a
8       five-page document, but the e-mail string runs from
9       the dates August 2nd, 2018 to August 21st, 2018.
10      Please take as much time as you need to review it.
11      Let me know when you're ready, and I'll have a couple
12      questions.
13 **A.  I'm ready.**
14 Q.   Have you seen any of these e-mails?
15 **A.  No.**
16 Q.   You didn't see the August 2nd, 2018 e-mail from
17      2:04 --
18 **A.  No.**
19 Q.   -- where Joe writes, "Hi, Ted, I'm reviewing the
20      document now.  I have added our wiring instructions
21      below" --
22 **A.  No.**
23 Q.   Ever seen that document?
24      MR. EGAN:  Wait till he's done with the
25      question.

1  BY MR. McLEOD:
2  Q.   What about the wire transfer information, Chase
3       account number 362160024, routing number 072000326.
4       Are you familiar with that banking information?
5  **A.  No.**
6  Q.   Do you deny that it's the company's banking
7       information?
8  **A.  I don't have our account memorized, so if it is, I
9       don't know.**
10 Q.   Did the company bank at Chase in or around
11      August 2018?
12 **A.  We had an account at Chase.**
13 Q.   Does the company still have an account at Chase?
14 **A.  No.**
15 Q.   When did it close?
16 **A.  I don't know.**
17 Q.   Before the end of '18?
18 **A.  I don't know.**
19 Q.   No idea?
20      MR. EGAN:  Objection, she said no.
21      **THE WITNESS:  I don't know.**
22 BY MR. McLEOD:
23 Q.   Miss Adducci, have you ever seen the Tuesday,
24      August 21st, 2018 e-mail time stamped 1:24 p.m. from
25      Joe to Ted which says, "Per our conversation, I'm

1    confirming that we have completed the purchase of the
2    items in the note dated 8-2-2018"?
3  **A.  No.  I've never seen any of these e-mails.**
4  Q.   Did Joe tell you he purchased 16 items --
5  **A.  No.**
6  Q.   -- of jewelry --
7  **A.  No.**
8  Q.   -- on or around August 21st --
9  **A.  No.**
10 Q.   -- 2018?  I'm now handing the witness the exhibit
11      marked Number 4.  It's a single e-mail dated
12      October 31st, 2018 at 11:42 a.m., from Joe to Ted
13      wherein it states in part, "Per our conversation,
14      attached is the first group of photos.  I will send
15      the balance when they come in."  Ever seen that
16      e-mail?
17 **A.  No.**
18 Q.   Okay.  Attached to this e-mail are seven copies of
19      seven photographs.  Please take a moment to review.
20 **A.  I saw them.**
21 Q.   Have you ever seen these photographs before?
22 **A.  No.**
23 Q.   Have you ever seen any of the jewelry items depicted
24      in any of these seven photographs?
25 **A.  Well, first of all, they're not great photos so, but,**

1    no, not that I -- I don't think so.
2  Q.   So you didn't take these photos?
3  **A.  No.**
4  Q.   You haven't seen --
5  **A.  No.**
6  Q.   -- these jewelry items?
7  **A.  No, I can't tell from these photos.  These are bad
8       photos.  But I did not take these photos, no, I've
9       not seen them.**
10 Q.   I'm now handing the witness the exhibit marked number
11      5.  This is a single e-mail as well from Joe to Ted
12      dated November 21, 2018.  Miss Adducci, have you ever
13      seen this e-mail?
14 **A.  No.**
15 Q.   I'm now handing the witness Exhibit 6.  This is a
16      document entitled Proposal 2018 -- sorry,
17      November 2018 proposal.  Miss Adducci, have you ever
18      seen this document?
19 **A.  I don't know, not -- no, I mean I don't know.**
20 Q.   Does the company publish brochures -- I don't know
21      what to call this.  It was in a PDF.
22 **A.  I've never seen this, I don't know.  This is not my
23      deal, so I was not involved in this.**
24 Q.   Okay.  Have you seen the item of jewelry on that
25      cover page before?

1  A.  No.

2  Q.  If you would, please flip to the third page.

3  A.  Okay.

4  Q.  And it's, yes, the Table of Contents.

5  A.  Okay.

6  Q.  And there's a reference to a Yellow Rose 77.12

7      carat -- it says Yellow Rose 77.12 Carat Natural

8      Fancy Vivid Yellow Asscher cut diamond.  Do you see

9      that?

10 A.  Yes.

11 Q.  Have you ever seen that item?

12 A.  No.

13 Q.  You're not aware that it was purchased or up for

14     sale?

15 A.  This was not my deal, so if someone's -- it would be

16     like you being in another law office.  It's not --

17     this is not my -- what I am.  I don't do this.  This

18     is not my deal.  So have I ever seen it?  Maybe.  It

19     could have been laying on a desk.  Did I handle this?

20     No, this is not me.

21 Q.  And just for the record, that item identified, the 77

22     Yellow Rose 77.12 Carat Natural Fancy Vivid Yellow

23     Asscher Cut Diamond is not even among the 16 listed

24     on Exhibit A.

25 A.  Then why are you asking me about -- what does it have

1      asking me about, the e-mails.

2  Q.  I'm now showing the witness what's been marked

3      Deposition Exhibit 8.  This exhibit -- I mean please

4      take a look and let me know when you're ready.

5          MR. EGAN:  What was 8?

6          MR. McLEOD:  8 is the December 21, 2018

7      e-mail string.

8          MR. EGAN:  I know what this is.

9  BY MR. McLEOD:

10 Q.  Miss Adducci, have you ever seen prior to now Joe's

11     e-mail to Ted from December 21st, 2018 at 9:20 a.m.?

12 A.  No.

13 Q.  This is the first time you've seen this?

14 A.  Yes.

15 Q.  Let me back up.  When you were served with -- you

16     were served with a copy of the summons and complaint

17     in this case, weren't you?

18 A.  Yes.

19 Q.  I mean the process server came and handed you court

20     papers --

21 A.  Yes.

22 Q.  -- do you recall that?

23 A.  Yes.

24          MR. EGAN:  Please wait until the end of

25     each question.

1      to do with anything, then?  This is not --

2  Q.  I'm sorry.  You said this wasn't your deal, referring

3      to the --

4  A.  This is not -- this is not my project.  Joe handles

5      his own clients and his own items.  So I did not

6      handle this.  I did not -- I was not involved in

7      this.

8  Q.  This -- okay.

9          MR. EGAN:  Whatever "this" is.

10         THE WITNESS:  This yellow diamond, this is

11     not -- this is Joe's.  He has his customers; I have

12     my customers.

13 BY MR. McLEOD:

14 Q.  Okay.  And Ted's not your customer?

15 A.  No, he's not my customer, no, he's not.  I've never

16     spoken to him about any of this.

17 Q.  You've never spoken to Joe about what?

18 A.  I've never spoken to Ted about any of this.  I've

19     never e-mailed him, I've never spoken to him.

20 Q.  I'm sorry.  Your testimony is you've never spoken to

21     Ted?

22 A.  Regarding any of this.

23 Q.  "This" meaning the lawsuit or the note or failure to

24     pay under the note?

25 A.  Any -- of the jewelry, of the sale, of what you're

1  BY MR. McLEOD:

2  Q.  When you received a copy of the summons and

3      complaint, did you read the documents?

4  A.  No, not totally.

5  Q.  Did you read -- I mean what exactly did you read?

6  A.  I don't remember.

7  Q.  Okay.  So this -- a copy of this document, this

8      Deposition Exhibit 8 was attached as an exhibit to

9      the complaint, but you don't recall now seeing this?

10 A.  No, because I wondered why I was receiving it.

11 Q.  Okay.  Receiving the complaint or --

12 A.  Receiving anything, receiving -- being served.

13 Q.  Okay.  Turning back to this December 21st e-mail, did

14     Joe tell you that he had sold 15 items in December

15     2018, the 15 items identified in this e-mail?

16 A.  No.

17 Q.  He didn't tell you that?

18 A.  No.

19 Q.  Let me ask you this.  If Joe had made a sale --

20     excuse me -- 15 sales for these 15 items, would you

21     have known that this --

22 A.  I don't know.

23 Q.  Sorry, let me finish -- would you have known that the

24     sales were made?

25 A.  No.

1  Q.  Would you have known if payment was made --

2  A.  No.

3  Q.  -- let me finish my question -- if payment was made

4      for one or all 15 or something in the middle of these

5      items, would you know when payment hit the company's

6      bank accounts?

7  A.  No.

8  Q.  Why not?

9  A.  Because I have my own customers and I can barely keep

10     up with the work that I do; appraisals, insurance

11     appraisals, estate appraisals, engagement ring sales.

12 Q.  So if almost $6 million in sales came into the

13     company's coffers, you wouldn't know about it?

14 A.  No.

15         MR. EGAN:  Objection, asked and answered

16     emphatically.  I mean how many times are you going to

17     ask her the same question?  She's explained it's two

18     businesses.  I don't object to you asking the

19     questions once; I object to asking them five times.

20     Go through the exhibits, she'll answer them.

21 BY MR. McLEOD:

22 Q.  Miss Adducci, what's the average -- in the last 12

23     months, what's the average net sales?

24 A.  I don't know.

25         MR. EGAN:  Well, with what?

1          MR. McLEOD:  For the company.

2          THE WITNESS:  I don't know.

3          MR. McLEOD:  The defendant in the lawsuit,

4      Joseph DuMouchelle Fine & Estate Jewellers, LLC.

5          MR. EGAN:  Which company?

6          THE WITNESS:  I don't know in the last five

7      years.

8  BY MR. McLEOD:

9  Q.  In the last five years what's the biggest month of

10     sales the company has done?

11 A.  I don't know.  In five years?

12 Q.  In the last five years just.

13 A.  Pick a month?  I don't know.  Joe handles the

14     finances.  He would work with -- I don't know.

15 Q.  In March 2019 did the company have a Business

16     Advantage checking account at Bank of America ending

17     0585?

18 A.  We have a Bank of America account.  I don't know, I

19     don't know.

20 Q.  You don't know what?

21 A.  We have a Bank of America account.  I don't know if

22     that's the number and I don't know if we had it at

23     that date.

24 Q.  Okay.  Do you think it may have been closed or not

25     yet open in --

1  A.  I don't know a date, I don't remember.

2  Q.  Okay.  I'm showing the witness Deposition Exhibit 10.

3      This is a screen shot of text messages exchanged

4      between Ted and Joe on or about March 2nd, 2019.  And

5      you'll see that there's a screen shot from a Bank of

6      America Business Advantage checking account ending

7      0585 with a balance summary of $6,145,064.71

8      available as of today 3-2-2019.  You see that?

9  A.  Yes.

10 Q.  Would that be typical for the company to have 6.1 --

11 A.  I don't check the balances.  I told you, I don't

12     check the balances of these accounts, so I don't

13     know.

14 Q.  So let me finish my question.  So you don't know if

15     it would be typical for the company to have

16     $2.614 million in available balance in its business

17     checking account at Bank of America in March 2019?

18 A.  I don't know.  It's not -- this is not what I do.

19 Q.  I'm sorry, I think I said 2.614.  To correct it, it's

20     6.145 million.

21         Ms. Adducci, who's Jamie Barker?

22 A.  I don't know.  I've never heard of the name.

23 Q.  If I said she were a Bank of America employee in Cape

24     Coral, Florida, would that refresh your memory at

25     all?

1  A.  No, I've never heard her name.

2  Q.  I think your testimony is that you have your own

3      customers and Joe does, Joe has his own customers.

4      Are there any other employees at Joseph DuMouchelle

5      Fine & Estate Jewellers, LLC?

6  A.  Well, we use contract labor.

7  Q.  Okay.

8  A.  So we use seasonal employees all the time.

9  Q.  Okay.  And in August 2018, who were your seasonal

10     employees?

11 A.  I don't remember.  I don't know.

12 Q.  Laurie Tobin?

13 A.  Laurie Tobin.

14 Q.  Lauren?

15 A.  Lauren Tobin, yes.

16 Q.  Okay.  Morgan Lynch?

17 A.  Yes.  Actually, I don't know if Morgan was there in

18     August.  I don't know.

19 Q.  But Lauren was?

20 A.  Yeah.  Morgan's worked for us part-time for

21     probably -- I don't know, her whole childhood, five

22     years, 10 years, she's -- yeah.  I don't know if she

23     was there.

24 Q.  So Lauren was working for the company in August 2018?

25 A.  Yes.

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1  Q.  Is she still working with the company?
2  A.  No.
3  Q.  When did she separate?
4  A.  When Joe's dad got ill.  I would say probably after
5      Christmas.
6  Q.  So not since then?
7  A.  No.
8  Q.  Did Lauren work with --
9  A.  Well, I don't know.  She worked into part of 2019,
10     but I was traveling a lot to Florida and New York,
11     and I don't know when -- I don't remember when she --
12     her last day was.
13 Q.  But approximately late '18, early '19?
14 A.  Yeah.
15 Q.  So did Lauren work with Joe and his customers?
16 A.  Yes.
17 Q.  Okay.  Did Lauren work with Joe's customers more than
18     you worked with Joe's customers?
19 A.  Yes.
20 Q.  What about Morgan?
21 A.  I think -- I think she did.  I mean I would assume.
22     Did Morgan?  I don't know.  Morgan is really
23     part-time.  She worked at DuMouchelle back and forth
24     a couple times.  I think she was let go.  She came
25     back and she's worked auctions for us, you know,

1      randomly, but I wasn't there when she was working
2      auctions.  So we're talking probably her whole life,
3      I mean since she was probably in high school, so I
4      don't remember.
5  Q.  Okay.  But Morgan does work with Joe and his
6      customers?
7  A.  Did she?  Maybe, I don't know.
8  Q.  Does Morgan -- I'm sorry if I asked this, but I don't
9      remember it.  Does Morgan still work for the company?
10 A.  No.
11 Q.  Not now?
12 A.  No.
13 Q.  Did she separate about the same time Lauren did?
14 A.  Yes, I would think so.
15 Q.  Let's talk about auctions for a minute.  How does
16     Joseph DuMouchelle Fine and Estate Jewellers LLC, how
17     do they sell jewelry that they own or hold on
18     consignment?
19 A.  There can be a number of ways.
20 Q.  What are they?
21 A.  At auction online, they can sell private sale, they
22     can sell wholesale, they can sell -- you know, it can
23     be just a sale.
24 Q.  And the auctions take place monthly, bi-monthly,
25     every quarter?

1  A.  They've changed over the years.
2  Q.  In the last 12 months, approximately?
3  A.  What was it?  Repeat the question.
4  Q.  Sure.  How often does the company hold auctions in
5      the last 12 months?
6  A.  They can go as often as we have merchandise to sell
7      and we can put them together.  You know, the whole
8      auction world is changing, so it's not about us.
9      It's about the whole industry is changing to more of
10     an online including Christie's, Sotheby's.  Everybody
11     is changing because the online world is changing.
12 Q.  And these auctions, are they -- I mean just give me a
13     sketch.  Do they have -- there's a time, there's an
14     expiration, and sort of the high bid at the time?
15 A.  Traditional auction mixed with new.  We've done every
16     method.
17 Q.  Okay.  Do you know if the company held an auction in
18     December 2018?
19 A.  Yes, I believe we did.
20 Q.  And --
21 A.  We typically do in December.
22 Q.  For the holidays probably?
23 A.  Well, sometimes.  I mean I remember the year before
24     we had November, so I believe, yes.
25 Q.  And the company keeps records on these auctions?

1  A.  What do you mean records?
2  Q.  I mean what was listed for sale, what things sold
3      for, what things didn't sell.  I'm sure there are
4      threshold --
5  A.  I mean I don't know what you're asking.
6  Q.  Does the company keep regular business records?
7  A.  Well, I think a company has to keep some records.  I
8      mean if you're asking what does Joe do with the
9      records, I'm not in charge of the auction records.
10 Q.  I'm not asking that.  I'm just asking does Joseph
11     DuMouchelle Fine and Estate Jewellers keep business
12     records?
13 A.  Business records, that's a broad -- yes.
14 Q.  Okay.  What kind of records are kept?
15 A.  On auctions specifically?
16 Q.  No, for the business.
17 A.  I don't know.  You know, I don't know.  We're a small
18     company.
19 Q.  Okay.
20 A.  I'm not going to list here -- I don't know.  I'm not
21     in the office all the time, so I keep appraisal
22     records.  For my appraisals I have to keep my records
23     five to seven years.  It depends on how long.  I keep
24     written ones.  I know what records I keep.
25 Q.  Okay.

Page 42

1  A.  I was never in charge of the auction records and
2      keeping them and filing them, and I don't know what
3      they've done with these records.
4  Q.  "They" being?
5  A.  How they keep it.  I don't know how they've got them
6      kept.  This is not my area so I don't know.
7  Q.  But when you say how they're, they are --
8  A.  Well --
9          MR. EGAN:  Just wait for his question.
10     That isn't a question.
11 BY MR. McLEOD:
12 Q.  So when you say I don't know how they keep them,
13     you're referring to Joe or Joe and someone else or
14     Joe and others?
15 A.  Joe would be in charge of how the auction records are
16     kept.
17 Q.  Okay.  How about general business records, is Joe in
18     charge of those, too?
19 A.  Yes, I mean -- yes.
20 Q.  Okay.  So if Joe keeps auction records -- well,
21     if the company keeps auction records, then the
22     company has those records?
23 A.  I don't know what you're asking.  If Joe's in charge
24     of those records, you should ask Joe for the records,
25     not me.

Page 43

1  Q.  We have.
2  A.  Okay.  Well, I don't know what you're saying.
3  Q.  Does the company have a --
4  A.  I don't want to be caught in something that I'm
5      not -- this is not my -- you know, if I'm not in
6      charge of those records.  Don't try to pin me into a
7      spot on a record that I'm not --
8  Q.  Does the company have a document retention policy?
9  A.  No.
10 Q.  Why not?
11 A.  I don't know.
12 Q.  Does the company --
13 A.  I have one for my appraisals.
14 Q.  Why do you have one for your appraisals?
15 A.  Because I belong to organizations that if I do
16     appraisals at the IRS for estates, and they're going
17     to go through tax, I mean I know how long I have to
18     keep them.  It's just what I have to be knowledgeable
19     about.
20 Q.  Do you think the company might have similar
21     obligations to retain records?
22 A.  I don't know.
23 Q.  Does the company have an IT staff person?
24 A.  No.
25 Q.  Are computers sort of serviced off-site or is there a

Page 44

1      main server?
2  A.  I don't deal with that, either.  That's not my -- I
3      don't know.
4          MR. McLEOD:  I need to take a short break.
5          (A short recess was taken.)
6  BY MR. McLEOD:
7  Q.  Ms. Adducci, I'm handing you what's been marked
8      Deposition Exhibit 15 entitled "Plaintiffs First Set
9      of Interrogatories and First Set of Requests For
10     Production of Documents Directed to Defendants."
11     Please have a look.  When you're ready, I will ask
12     you some questions.
13 A.  Okay.
14 Q.  Have you ever seen this document before?
15 A.  I don't remember.
16 Q.  Okay.  So the Court has ordered that Defendants
17     answer these interrogatories and produce documents,
18     but Defendants have failed to do so.  So what I'd
19     like to do is go through each interrogatory.  I'd
20     like you to read it and then I'll ask you a question.
21     So Interrogatory Number 1 is on Page 7.
22 A.  Okay.  So I have to read this whole thing, each one?
23 Q.  You have to read number 1.
24 A.  Out loud?
25 Q.  No, to yourself.

Page 45

1  A.  I thought you said out loud.
2  Q.  No, I'm sorry.  And when you're finished just let me
3      know.
4  A.  Okay.
5  Q.  Can you answer this question?
6  A.  No.
7  Q.  Do you have any information that could help you
8      answer it?
9  A.  No.
10 Q.  Okay.  Go to Number 2, please read to yourself.  When
11     you've read it, please let me know.
12 A.  No.
13 Q.  I'm sorry, can you answer this?
14 A.  No.
15 Q.  Question Number 2?
16 A.  No.
17 Q.  Do you have any information that could help you
18     answer it?
19 A.  No.
20 Q.  Same for number 3.
21 A.  (Witness shakes head from side to side.)
22 Q.  Can you answer this question?
23 A.  No.
24 Q.  Do you have any information that would help you
25     answer it?



1 A. No.
2 Q. Same with Number 4, please.
3     MR. EGAN: Did you just ask her -- 3.
4  Excuse me.
5 BY MR. McLEOD:
6 Q. Have you finished?
7 A. No -- yes.
8 Q. You cannot answer that question?
9 A. No.
10 Q. You don't have any information that would help you
11   answer?
12 A. No.
13 Q. All right. Same for number 5.
14 A. Same answer, no.
15 Q. You cannot answer and you don't have information that
16   would help you answer?
17 A. No.
18 Q. 6, please.
19 A. No.
20 Q. You can't answer and you don't have information --
21 A. No.
22 Q. -- that would help you answer?
23 A. No.
24 Q. Same with number 7? Can you answer?
25 A. No.

1 Q. Do you have any information that would help you
2   answer?
3 A. No.
4 Q. Please read 8. Can you answer? Do you have any
5   information that would help you answer that question?
6 A. No.
7 Q. Please read 9.
8 A. No. Ask your question, I guess.
9 Q. Can you answer this question?
10 A. No.
11 Q. Do you have any information that would help you
12   answer this question?
13 A. No.
14 Q. Please read 10. Can you answer?
15 A. No.
16 Q. Do you have any information that would help you
17   answer?
18 A. No.
19 Q. Please read 11. Can you answer?
20 A. No.
21 Q. Do you have any information that would help you
22   answer Number 11?
23 A. No.
24 Q. Please read 12. Can you answer?
25 A. No.

1 Q. Do you have any information that would help you
2   answer?
3 A. No.
4 Q. Please read 13. Can you answer?
5 A. No.
6 Q. Do you have any information that would help you
7   answer?
8 A. No.
9 Q. Please read 14. Can you answer that question?
10 A. No.
11 Q. Do you have any information that would help you
12   answer that question?
13 A. No.
14 Q. Please read 15. Can you answer that question?
15 A. No.
16 Q. Do you have any information that would help you do
17   so?
18 A. No.
19 Q. Please read 16. Can you answer that question?
20 A. No.
21 Q. Do you have any information that would help you do
22   so?
23 A. No.
24 Q. Please read 17. Can you answer that question?
25 A. No.

1 Q. Do you have any information that would help you do
2   so?
3 A. No.
4 Q. Please read 18. I'm sorry, you've already answered
5   that question and 19.
6 A. And 20.
7 Q. We'll move to 21. Please read and I'll ask you a
8   question. Can you answer that question?
9 A. No.
10 Q. Do you have any information that would help you do
11   so?
12 A. No.
13 Q. How about Number 22?
14 A. (Witness shakes head from side to side.)
15 Q. Can you answer that question?
16 A. No.
17 Q. Do you have any information that would help you do
18   so?
19 A. No.
20 Q. 23, please. Can you answer that question?
21 A. No.
22 Q. Do you have any information that would help you do
23   so?
24 A. No.
25 Q. Please read 24. Can you answer that question?



1  A.  No.
2  Q.  Do you have any information that would help you do
3      so?
4  A.  No.
5  Q.  Please read 25.  Can you answer that question?
6  A.  No.  Outside of this one, right, these are outside of
7      this?
8  Q.  Well, these -- 25 asks to identify all judgments and
9      awards entered against any defendant in any legal
10     proceeding.  No judgment or award has entered in this
11     one.
12 A.  So no.
13 Q.  Do you have any information that would help you?
14 A.  No.
15 Q.  Please read 26.
16 A.  No.
17 Q.  No information?
18 A.  No.
19 Q.  Nothing that would help you answer this question?
20         Ms. Adducci, have you done any
21     investigations to answer any of these questions?
22 A.  No.
23 Q.  You haven't done any?
24 A.  No.
25 Q.  Have you asked Joe about any of these

1      interrogatories?
2  A.  No.
3  Q.  Any of the subjects of these interrogatories?
4  A.  No.
5  Q.  But you've been a part of this lawsuit since March,
6      and what have you done to educate yourself about the
7      nature of the claims involved?
8  A.  This is his business dealings.  When he has something
9      in business that he deals with, he deals with it.
10 Q.  In other words, you haven't made any attempt to
11     locate --
12 A.  No, I --
13         MR. EGAN:  Wait till you hear his question.
14     We don't even know what the question is.
15         THE WITNESS:  Okay.
16 BY MR. McLEOD:
17 Q.  So you have not made any attempt to locate any of the
18     16 items identified on Exhibit A --
19 A.  No.
20 Q.  -- to the promissory note?
21 A.  No.
22 Q.  And you haven't made any attempt to locate the
23     proceeds --
24 A.  No.
25 Q.  -- from the sale of any of those 16 items?

1  A.  No.
2  Q.  Who's Rusty White?
3  A.  I don't know.
4  Q.  You never heard the name?
5  A.  I don't recall.
6  Q.  How about the Robb Report.  Have you ever heard of
7      that?
8  A.  Yes, of course.
9  Q.  And what's the Robb Report?
10 A.  It's a magazine that my daughter actually now works
11     for the company that owns it, digital.
12 Q.  So you've never met Robert White or Rusty?
13 A.  Never met Robert White.
14 Q.  Okay.  Ms. Adducci, are you aware of a lawsuit
15     pending in Texas against Joe and the company filed by
16     William Noble Jewelers?
17 A.  I'm aware that there is something going on.  Have I
18     ever been involved in it?  No.
19 Q.  You haven't asked Joe about it?
20 A.  No.
21 Q.  How about a lawsuit filed by Joseph Gaylor in Wayne
22     County?
23 A.  No.
24 Q.  How about a lawsuit filed against Joe and the company
25     by Jonathan Birnbach and J.B. International, LLC?

1  A.  No.
2  Q.  You're not aware that Joe entered into a settlement
3      agreement on behalf of himself and the company on or
4      around March 1st, 2019?
5  A.  No.
6  Q.  Are you aware of a litigation matter pending in New
7      York against Joe and the company filed by Gold
8      Jewelry Co., Ltd.?
9  A.  No.
10 Q.  How about a lawsuit in New York filed against Joe and
11     the company by M -- I'm going to spell this
12     A-h-r-a-o-n-o-f-f Co., Inc.?
13 A.  No.
14 Q.  How about a lawsuit filed in the Southern District of
15     New York against Joe and the company by East
16     Continental Gems, Inc.?
17 A.  No.
18 Q.  I'm now showing the witness Deposition Exhibit 16.
19     This is a document entitled Affidavit of Confession
20     of Judgment filed in the Supreme Court of the State
21     of New York, County of Erie, by Business Merchant
22     Funding.  Please take a moment to review this
23     document and I'll ask you some questions.
24 A.  I'm ready.
25 Q.  All right.  Have you ever seen this document before?

1  A.  No.
2  Q.  Have you ever talked to Joe about Business Merchant
3      Funding?
4  A.  I don't even know who they are.
5  Q.  I'll take that back.  Thank you.  I'm now handing the
6      witness Deposition Exhibit 17, which is a
7      Satisfaction of Judgment filed in the Supreme Court
8      of the State of New York, County of Oneida, by Chrome
9      Capital.  Have you ever heard of Chrome Capital,
10     Ms. Adducci?
11 A.  No.
12 Q.  Were you aware that a judgment against Joe and the
13     company entered in January of 2019 for $169,105.31?
14 A.  No.
15 Q.  Were you aware that Joe and/or the company fully
16     satisfied that judgment --
17 A.  No.
18 Q.  -- on or around February 25th, 2019?
19 A.  No.
20 Q.  I'll take that back.  Thank you.  I'm now handing the
21     witness Exhibit 17 -- or 18, excuse me.  This is a
22     Satisfaction of Judgment filed in the Supreme Court
23     of the State of New York, County of Queens, Green
24     Capital Funding, LLC.  Have you ever seen this
25     document before, Ms. Adducci?

1  A.  No.
2  Q.  Were you aware that in January of 2019 a judgment
3      entered against Joe and the company for $227,835.48?
4  A.  No.
5  Q.  Were you aware that Joe and/or the company satisfied
6      that judgment --
7  A.  No.
8  Q.  -- on March 26, 2019?
9  A.  No.
10 Q.  Do you know how that judgment could have been
11     satisfied?
12 A.  No.
13 Q.  Was there money to satisfy that judgment?
14 A.  I don't know.
15 Q.  What about Chrome Capital?  Do you know how that
16     judgment could have been satisfied?
17 A.  I don't know anything about any of these.
18 Q.  Okay.  Thank you.  I'm handing the witness Deposition
19     Exhibit 19.  This is a merchant agreement that Joe
20     signed as guarantor and on behalf of the company with
21     New Chance Capital, LLC.  Have you ever seen this
22     document, Ms. Adducci?
23 A.  No.
24 Q.  You don't know?  Have you ever heard of New Chance
25     Capital, LLC?

1  A.  No.
2  Q.  I'm now handing the witness Deposition Exhibit 20.
3      This is an Affidavit of Confession of Judgment filed
4      by New Chance Capital, LLC in the Supreme Court of
5      the State of New York, County of Ontario.  Have you
6      ever seen this document, Ms. Adducci?
7  A.  No.
8  Q.  Do you know -- well, I already asked you.  Thank you.
9      Miss Adducci, are you aware of any criminal
10     investigations pending against the company or Joe?
11 A.  No.
12 Q.  Are you aware whether Joe and/or the company paid a
13     Mr. William H. Adams approximately $37,500 in March
14     of this year?
15 A.  No.
16 Q.  Do you know how --
17 A.  I've never heard that name.
18 Q.  Are you aware that Martha Mast was paid by Joe and/or
19     the company $14,637 by wire transfer on or around
20     March 18th of this year?
21 A.  (Witness shakes head from side to side.)  No.
22 Q.  No?  And how about were you aware that Kenneth
23     Kajoyan (sic) was paid approximately $50,000 by Joe
24     and/or the company on or around March 2019?
25 A.  No.

1  Q.  Have you ever heard of Mr. Kajoyan?
2  A.  I've heard of him.  I did an appraisal for him.
3  Q.  Okay.  Do you know if this payment had anything to
4      do --
5  A.  That's not my area, so I wouldn't have been involved
6      in that part.
7  Q.  When did you do the appraisal?
8  A.  The appraisal was probably done for the estate -- I
9      don't remember, maybe December, November.
10 Q.  Of '18?
11 A.  I don't remember, though.  I don't remember exactly.
12 Q.  Not in the last six months?
13 A.  No, no.
14 Q.  Okay.
15 A.  I think the appraisal was for his mother, though.
16 Q.  All right.  Ms. Adducci, are you aware that on -- by
17     the way, I'm handing the witness Exhibit 12.  This is
18     an order entered by Judge Jarbou in this case on
19     April 11th, 2019.  Please take a moment to review,
20     and then I'll ask you a couple questions.
21 A.  Okay.
22 Q.  Ms. Adducci, have you seen this order before?
23 A.  I don't think so.
24 Q.  Are you aware that in this order the court ordered
25     that Defendants -- that's the company, Joe and you --

**Page 58**

1  wire approximately $600,000 on deposit at Wells Fargo
2  to the Butzel Long Client Trust Account?
3  A. (Witness shakes head from side to side.) I don't
4  know this. I don't remember.
5  Q. Okay. Does the company have a Wells Fargo account or
6  did it in April of --
7  A. I don't know. I'm not a signer, so I don't know.
8  I'm not a signer on a Wells Fargo account so I can't
9  answer.
10 Q. You don't know if --
11 A. I don't know. I don't know.
12 Q. Okay. All right. I'm showing the witness now
13 Exhibit 14. And this is a document identified as a
14 send money confirmation that Joe presented through
15 counsel to the court on April 24th. Have you ever
16 seen this document before?
17 A. No. I don't know if you guys showed it to me in the
18 last --
19 Q. I'm sorry?
20 A. I don't know if you showed it to me in the last --
21 the last time we met. I think you put it across the
22 counter to me the last time we met --
23 Q. Okay.
24 A. -- but other than that, no.
25 Q. Not previously?

**Page 59**

1  A. And I don't have anything to do with Wells Fargo.
2  I'm not a signer. I don't --
3  Q. So you didn't --
4  A. No, I haven't.
5  Q. -- attempt to effectuate any wire transfer --
6  A. No.
7  Q. -- of money from Wells Fargo --
8  A. No.
9  Q. -- to the Butzel Long client --
10 A. I've never been to Wells Fargo, never talked to them.
11 Q. Okay. Has Joe ever been to Wells Fargo?
12 A. I don't know.
13 Q. Do you know if Joe flew to -- is it Fort Myers?
14 Where does he fly into?
15 A. When?
16     MR. EGAN: Referring to what?
17     THE WITNESS: When? I mean --
18 BY MR. McLEOD:
19 Q. After April 11th.
20 A. I don't know. I don't keep track of his --
21 Q. Showing the witness Deposition Exhibit 13. This is a
22 document Defendants filed with the Court titled
23 Defendants' Notice of Progress in respect to the
24 Court's April 11, 2019 order.
25     Please take a moment to review this, and

**Page 60**

1  I'll ask you a couple questions.
2  A. Okay.
3  Q. Okay. I just want to point your attention to Exhibit
4  B. It's the last two pages of this exhibit, and it
5  appears to be a screen shot of a flight itinerary for
6  Joe.
7  A. Okay.
8  Q. Do you recall whether Joe flew to Fort Myers on or
9  about April 12th, 2019?
10 A. I don't know.
11 Q. I don't think I have a lot more, but I need to take a
12 quick break.
13     MR. EGAN: That's fine.
14     MR. McLEOD: Thanks.
15     (A short recess was taken.)
16 BY MR. McLEOD:
17 Q. Ms. Adducci, are you aware that on March 20th, soon
18 after this lawsuit was filed, that the court entered
19 an order sort of to maintain the status quo?
20 A. No.
21 Q. Okay. Handing the witness what has been marked as
22 Exhibit 11. Please take a look. It's an Order to
23 Appear and Answer Verified Motion. Have you seen
24 this order before, Ms. Adducci?
25 A. No.

**Page 61**

1  Q. And we've just discussed the April 11th order from
2  the Court that is Exhibit 12 requiring Defendants to,
3  among other things, wire the $600,000. Do you recall
4  reviewing that? Just now today we discussed that.
5  A. Right, we discussed it, yes.
6  Q. And then I would like to mark this.
7     M. ADDUCCI DEPOSITION EXHIBIT NUMBER 21,
8     5/29/10 HANDWRITTEN ORDER,
9     WAS MARKED BY THE REPORTER
10     FOR IDENTIFICATION
11 BY MR. McLEOD:
12 Q. Miss Adducci, you've been handed Deposition
13 Exhibit 21, and this is an order that the Court
14 entered on May 29th. I just want to point you to the
15 final substantive paragraph that reads "Defendants
16 shall produce all documents." Can you just please
17 read that paragraph? You can read the entire order
18 but --
19 A. "Defendants shall provide all documents responsive to
20 Plaintiff's discovery requests by noon" --
21 Q. You don't have to read it aloud, I'm sorry. My
22 question is have you taken any steps personally, not
23 Joe, not the company, but have you personally taken
24 any steps to comply with any of these three orders?
25 A. No, because I wouldn't know how to.



1  Q.  Ms. Adducci, does the company have any money?
2  **A.  I'm not in charge of our financial or our bank**
3      **records, so if I -- I don't know.**
4  Q.  You don't know if it does?
5  **A.  No, I don't know.**
6  Q.  If it has any money, what bank is it kept in?
7  **A.  I don't know.  Bank of America, I guess.  I don't**
8      **know.**
9  Q.  Okay.  That's all the questions I have at this time.
10     I would just say for the record that I consider this
11     deposition open until the Defendants produce
12     documents pursuant to the order.
13        At this time I have no further questions.
14     MR. EGAN:  I don't have any.
15 EXAMINATION BY MR. EGAN:
16 Q.  I just have one question, just to clarify.  If we go
17     back to -- I think she sort of qualified it but in
18     the wrong place.  I want her to go back to
19     Exhibit 15, discovery requests.
20     MR. McLEOD:  Yes.
21 BY MR. EGAN:
22 Q.  And I'd like you to look at Interrogatory 24.
23 **A.  Me?**
24 Q.  Yeah.  Look at Interrogatory 24.
25 **A.  Way back here?**

1  Q.  Identify legal proceedings of any kind.  Do you
2      remember this question?
3  **A.  Yeah.**
4  Q.  You're aware of this lawsuit, right?
5  **A.  Yes.**
6  Q.  Okay.  That's all I want.
7  **A.  But he said it didn't include this one.  He was**
8      **talking about the other ones.**
9  Q.  I was just trying to make sure --
10 **A.  Yeah, this one, and I mentioned that, but not the**
11     **other ones, no.**
12 Q.  Okay.  No more questions.
13     MR. McLEOD:  Nothing further at this time.
14     Thank you.
15        (The deposition was concluded at 4:59 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 64

1           CERTIFICATE OF NOTARY
2
3  STATE OF MICHIGAN      )
4                         ) SS
5  COUNTY OF OAKLAND      )
6      I, Laurel A. Frogner, Certified Shorthand
7  Reporter, a Notary Public in and for the above county
8  and state, do hereby certify that the above
9  deposition was taken before me at the time and place
10 hereinbefore set forth; that the witness was by me
11 first duly sworn to testify to the truth, and nothing
12 but the truth, that the foregoing questions asked and
13 answers made by the witness were duly recorded by me
14 stenographically and reduced to computer
15 transcription; that this is a true, full and correct
16 transcript of my stenographic notes so taken; and
17 that I am not related to, nor of counsel to any
18 party, nor interested in the event of this cause.
19
20
21         *Laurel Frogner*
22         Laurel A. Frogner, CSR-2495, RMR, CRR
23         Notary Public,
24         Oakland County, Michigan
25         My Commission expires:  4-22-2022

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

## $

**$1.8** 21:14

**$14,637** 56:19

**$169,105.31** 54:13

**$2.614** 36:16

**$227,835.48** 55:3

**$37,500** 56:13

**$50,000** 56:23

**$6** 34:12

**$6,145,064.71** 36:7

**$600,000** 58:1 61:3

## 0

**0585** 35:17 36:7

**072000326** 27:3

## 1

**1** 25:6,8,15 44:21,23

**10** 10:8,9,12,13,14 11:15 36:2
37:22 47:14

**11** 47:19,22 59:24 60:22

**11:42** 28:12

**11th** 57:19 59:19 61:1

**12** 15:2 34:22 40:2,5 47:24 57:17
61:2

**12th** 60:9

**13** 48:4 59:21

**14** 48:9 58:13

**15** 33:14,15,20 34:4 44:8 48:14
62:19

**16** 7:20 8:17 9:12,17 28:4 30:23
48:19 51:18,25 53:18

**17** 48:24 54:6,21

**18** 22:12 27:17 38:13 49:4 54:21
57:10

**18th** 56:20

**19** 38:13 49:5 55:19

**19th** 13:18

**1:24** 27:24

**1E08A67C695D431** 21:9

**1st** 53:4

## 2

**2** 8:2,5 20:15 45:10,15

**2.614** 36:19

**20** 49:6 56:2

**2016** 8:15 20:7

**2018** 10:20 11:21 21:16 25:15
26:9,16 27:11,24 28:10,12
29:12,16,17 32:6,11 33:15 37:9,
24 40:18

**2019** 5:2 22:12 35:15 36:4,17
38:9 53:4 54:13,18 55:2,8 56:24
57:19 59:24 60:9

**20th** 60:17

**21** 29:12 32:6 49:7 61:7,13

**21st** 26:9 27:24 28:8 32:11 33:13

**22** 49:13

**23** 49:20

**24** 49:25 62:22,24

**24th** 58:15

**25** 14:25 17:19 50:5,8

**25th** 54:18

**26** 50:15 55:8

**29th** 61:14

**2:04** 26:17

**2nd** 26:9,16 36:4

## 3

**3** 20:16 21:15 26:3,7 45:20 46:3

**3-2-2019** 36:8

**31st** 28:12

**362160024** 27:3

**3:06** 5:3

**3rd** 22:12

## 4

**4** 9:5 21:21 28:11 46:2

**4:59** 63:15

## 5

**5** 29:11 46:13

**5/29/10** 61:8

## 6

**6** 29:15 46:18

**6.1** 36:10

**6.145** 36:20

## 7

**7** 5:2 44:21 46:24

**77** 30:21

**77.12** 30:6,7,22

## 8

**8** 32:3,5,6 33:8 47:4

**8-2-2018** 28:2

## 9

**9** 47:7

**90** 11:15

**90/10** 11:16

**90s** 10:19

**9:20** 32:11

## A

**A-H-R-A-O-N-O-F-F** 53:12

**a.m.** 28:12 32:11

**account** 13:13,15,16 16:12,13, 14,16,19,22 21:15 27:3,8,12,13 35:16,18,21 36:6,17 58:2,5,8

**accountable** 18:8

**accountant** 12:21

**accountants** 11:6 12:17,25 13:2, 5

**accounts** 34:6 36:12

**acquire** 8:17

**Adams** 56:13

**added** 26:20

**Adducci** 5:10,12,13 7:9 8:3 9:4 14:3 20:14 25:12 27:23 29:12,17 32:10 34:22 36:21 44:7 50:20 52:14 54:10,25 55:22 56:6,9 57:16,22 60:17,24 61:7,12 62:1

**Adducci-dumouchelle** 5:4 20:20

**Advantage** 35:16 36:6

**Affidavit** 53:19 56:3

**afternoon** 5:8

**agreement** 53:3 55:19

**aloud** 61:21

**America** 35:16,18,21 36:6,17,23 62:7

**and/or** 54:15 55:5 56:12,18,24

**annual** 12:19

**answering** 9:1

**anymore** 16:17 18:12

**appears** 20:19 60:5

**appointment** 15:8

**appraisal** 10:17 12:9 41:21 57:2, 7,8,15

**appraisal-related** 6:2

**appraisals** 5:23 6:1 13:23 14:11 15:3,6 34:10,11 41:22 43:13,14, 16

**appraiser** 14:21

**approximately** 38:13 40:2 56:13, 23 58:1

**April** 57:19 58:6,15 59:19,24 60:9 61:1

**area** 42:6 57:5

**asks** 50:8

**Asscher** 30:8,23

**assume** 7:6 38:21

**attached** 28:14,18 33:8

**attempt** 51:10,17,22 59:5

**attention** 20:14 60:3

**attorney** 7:11

**attorneys** 7:11

**auction** 39:21 40:8,15,17 41:9 42:1,15,20,21

**auctions** 38:25 39:2,15,24 40:4, 12,25 41:15

**audible** 6:20

**August** 8:15 21:15 22:12 25:15 26:9,16 27:11,24 28:8 37:9,18, 24

**authorized** 6:17

**average** 34:22,23

**award** 50:10

**awards** 50:9

**aware** 9:11 21:14,19,20 25:12 30:13 52:14,17 53:2,6 54:12,15 55:2,5 56:9,12,18,22 57:16,24 60:17 63:4

## B

**back** 8:14 15:4 19:5 20:14 21:21 26:5 32:15 33:13 38:23,25 54:5, 20 62:17,18,25

**back-room** 15:4

**bad** 29:7

**balance** 13:13 28:15 36:7,16

**balances** 13:13,15,16 36:11,12

**bank** 12:16 27:10 34:6 35:16,18, 21 36:5,17,23 62:2,6,7

**banking** 27:4,6

**barely** 34:9

**Barker** 36:21

**basis** 12:19 13:14 19:25

**behalf** 53:3 55:20

**belong** 43:15

**beneath** 20:19

**bi-monthly** 39:24

**bid** 40:14

**biggest** 35:9

**bill** 15:15,17,18 17:10

**bills** 13:10 15:11,13,15,16

**Birnbach** 52:25

**blank** 17:7,8,10 25:18,23

**Bloomfield** 5:1

**borrower** 20:19

**bought** 22:4

**break** 13:25 44:4 60:12

**bring** 7:14 20:14

**broad** 41:13

**brochures** 29:20

**brother** 24:13

**business** 10:17 12:4,6 14:3,4,6,7 16:3 35:15 36:6,16 41:6,11,13, 16 42:17 51:8,9 53:21 54:2

**businesses** 34:18

**Butzel** 58:2 59:9

**buy** 7:20 9:12,14,17,22 12:3 14:10,13 21:22

buying 7:25

---

### C

call 29:21

calling 13:23

calls 22:22,23 24:4

Cape 36:23

Capital 54:9,24 55:15,21,25 56:4

carat 30:7,22

case 11:9 23:16 24:5 32:17 57:18

caught 43:4

certifications 14:16

chance 6:13 55:21,24 56:4

changed 40:1

changing 40:8,9,11

charge 19:12 41:9 42:1,15,18,23 43:6 62:2

Chase 27:2,10,12,13

check 12:15 15:12,19,21,22 16:1, 7,16,19,22,23 17:1,5,10,14,25 18:9,19 19:10,11,13,14 20:5 36:11,12

check-writing 12:12

checking 35:16 36:6,17

checks 15:13,14,23 16:5,20 17:2, 3,7,8 18:7,18 19:1,2,9

childhood 37:21

Christie's 40:10

Christmas 38:5

Chrome 54:8,9 55:15

claims 51:7

clarify 62:16

cleaning 19:23 20:2

client 24:24 58:2 59:9

client's 24:19

clients 31:5

close 27:15

closed 35:24

co-sign 17:10

co-signed 19:10

coffers 34:13

commenced 13:17

communications 22:11

company 8:16 10:14,16,22 11:3, 8,18,19,21 12:1,2,11 13:9,17,22 15:16 22:2 27:10,13 29:20 35:1, 3,10,15 36:10,15 37:24 38:1 39:9 40:4,17,25 41:6,7,18 42:21, 22 43:3,8,12,20,23 52:11,15,24 53:3,7,11,15 54:13,15 55:3,5,20 56:10,12,19,24 57:25 58:5 61:23 62:1

company's 21:15 27:6 34:5,13

complaint 32:16 33:3,9,11

completed 28:1

comply 61:24

computers 43:25

concluded 63:15

Confession 53:19 56:3

confirm 20:18,21

confirmation 58:14

confirming 28:1

confusing 7:3

consignment 39:18

Contents 30:4

Continental 53:16

contract 37:6

conversation 27:25 28:13

copies 25:5 28:18

copy 32:16 33:2,7

Coral 36:24

correct 36:19

counsel 58:15

counter 58:22

County 52:22 53:21 54:8,23 56:5

couple 26:11 38:24 57:20 60:1

court 5:14,23 6:17 24:1,10,15,18, 22 32:19 44:16 53:20 54:7,22 56:4 57:24 58:15 59:22 60:18 61:2,13

Court's 59:24

cover 29:25

criminal 56:9

customer 31:14,15

customers 14:22 15:6 31:11,12 34:9 37:3 38:15,17,18 39:6

cut 30:8,23

---

### D

dad 38:4

date 35:23 36:1

dated 25:15 28:2,11 29:12

dates 26:9

daughter 52:10

day 38:12

deal 9:25 22:10 24:6,25 29:23 30:15,18 31:2 44:2

dealings 51:8

deals 51:9

December 32:6,11 33:13,14 40:18,21 57:9

defendant 24:14 35:4 50:9

defendants 11:9 44:10,16,18 57:25 59:22 61:2,15,19 62:11

Defendants' 59:23

Dennis 25:1

deny 27:6

depends 41:23

depicted 28:23

deposit 58:1

deposition 5:15,17 7:10 8:4 20:15 25:9 26:6 32:3 33:8 36:2 44:8 53:18 54:6 55:18 56:2 59:21 61:7,12 62:11 63:15

depositions 5:25

Derek 5:8

designation 20:19

designations 14:16

desk 30:19

diamond 12:8 30:8,23 31:10

difference 10:13

digital 52:11

direct 15:9

Directed 44:10

discovery 61:20 62:19

discussed 61:1,4,5

District 53:14

document 8:9,11 9:6 25:19 26:1, 2,8,20,23 29:16,18 33:7 43:8 44:14 53:19,23,25 54:25 55:22 56:6 58:13,16 59:22

documents 7:12,14 33:3 44:10, 17 61:16,19 62:12

Docusign 20:22,23 21:7

door 12:7

duly 5:5

Dumouchelle 8:4,16 10:6 11:9 14:20 20:20 35:5 37:4 38:23 39:16 41:11

---

**E**

e-mail 15:9 22:19 25:13 26:7,8, 16 27:24 28:11,16,18 29:11,13 32:7,11 33:13,15

e-mailed 31:19

e-mailing 15:6

e-mails 15:6 22:18 26:14 28:3 32:1

early 8:15 38:13

easier 25:4

East 53:15

educate 51:6

education 14:15

effectuate 59:5

EGAN 7:23 8:21 20:10 23:22 24:17,21 25:4 26:24 27:20 31:9 32:5,8,24 34:15,25 35:3 42:9 46:3 51:13 59:16 60:13 62:14, 15,21

electronic 20:24 21:9

ellipses 21:10

emphatically 34:16

employee 16:4 18:6 19:18 36:23

employees 13:3,10 37:4,8,10

end 27:17 32:24

endeavor 8:17

ending 35:16 36:6

engagement 12:8 34:11

entered 11:22 50:9,10 53:2 54:13 55:3 57:18 60:18 61:14

enters 12:2

entire 61:17

entitled 29:16 44:8 53:19

Erie 53:21

estate 8:16 10:6 11:10 14:20 34:11 35:5 37:5 39:16 41:11 57:8

estates 43:16

exact 10:18

EXAMINATION 5:7 62:15

examined 5:5

---

exchanged 36:3

excuse 22:12 33:20 46:4 54:21

exhibit 7:21 8:2,4,18 9:5,6 20:15 21:22,23 22:5 25:8 26:3,6,7 28:10 29:10,15 30:24 32:3 33:8 36:2 44:8 51:18 53:18 54:6,21 55:19 56:2 57:17 58:13 59:21 60:3,4,22 61:2,7,13 62:19

exhibits 25:2 34:20

experience 6:9

expert 5:24,25

expertise 9:19

expiration 40:14

explain 7:24

explained 34:17

---

**F**

failed 44:18

failure 31:23

familiar 27:4

family 23:15

Fancy 30:8,22

Fargo 58:1,5,8 59:1,7,10,11

fastest 25:6

father-in-law 7:19

father-in-law's 13:21

February 54:18

filed 52:15,21,24 53:7,10,14,20 54:7,22 56:3 59:22 60:18

filing 42:2

final 61:15

finances 15:20 19:12 35:14

financial 62:2

fine 8:16 10:6 11:10 14:20 35:5 37:5 39:16 41:11 60:13

finish 33:23 34:3 36:14

---

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

finished 25:10 45:2 46:6

five-page 26:8

five-second 13:5

flew 59:13 60:8

flight 60:5

flip 21:21 25:17 30:2

Florida 36:24 38:10

fly 59:14

Forget 19:8

form 8:21

formal 17:1,13,25 18:16

Fort 59:13 60:8

Friday 5:2

front 20:15

full 5:11

fully 54:15

Funding 53:22 54:3,24

**G**

G.G. 14:18

garbage 14:21

Gaylor 52:21

Gelov 5:9 7:16 10:2 17:21,22
18:1,4 19:5 22:11

gemologist 14:11,14,18,21

gemology 14:9,15,17

Gems 53:16

general 24:22 42:17

George 25:5

give 6:5,11,20 12:17 13:3,4,7
26:5 40:12

Gold 53:7

Good 5:8

graduate 14:18

great 6:24 28:25

Green 54:23

ground 6:12

group 28:14

guarantor 55:20

guess 10:15 11:6 14:4 47:8 62:7

guys 58:17

**H**

half 18:5

hand 15:23 25:3,4

handed 8:3,12 25:8 32:19 61:12

handing 26:4 28:10 29:10,15
44:7 54:5,20 55:18 56:2 57:17
60:21

handle 21:17,18 30:19 31:6

handles 31:4 35:13

HANDWRITTEN 61:8

happy 7:4

head 6:20 45:21 49:14 56:21
58:3

hear 51:13

heard 36:22 37:1 52:4,6 54:9
55:24 56:17 57:1,2

held 40:17

helping 10:18

hey 15:21 18:10,17

high 39:3 40:14

Hills 5:1

hit 34:5

hold 39:17 40:4

holidays 40:22

hours 13:7

house 15:5

husband 11:16

**I**

idea 27:19

IDENTIFICATION 61:10

identified 7:21 8:18 21:23 30:21
33:15 51:18 58:13

identify 50:8 63:1

ill 38:4

important 6:18,19

impression 18:20

inartful 7:3

include 63:7

including 40:10

industry 40:9

information 13:12 27:2,4,7 45:7,
17,24 46:10,15,20 47:1,5,11,16,
21 48:1,6,11,16,21 49:1,10,17,
22 50:2,13,17

instance 18:5

instructions 26:20

insurance 34:10

interest 11:7

internally 16:21

International 52:25

interrogatories 44:9,17 51:1,3

interrogatory 44:19,21 62:22,24

investigations 50:21 56:10

involved 9:15 11:25 29:23 31:6
51:7 52:18 57:5

irrelevant 19:21

IRS 43:16

issue 8:23

item 29:24 30:11,21

items 7:20 8:17 9:12,17 21:22
22:4 28:2,4,23 29:6 31:5 33:14,
15,20 34:5 51:18,25

itinerary 60:5

---

**J**

---

**J.B.** 52:25

**Jamie** 36:21

**January** 54:13 55:2

**Jarbou** 57:18

**Jean** 5:13

**Jewelers** 52:16

**Jewellers** 8:16 35:5 37:5 39:16 41:11

**jewelry** 7:20 8:18 9:12,14,17,20, 23 10:4,7 11:10 14:3,7,10,13,20 21:22 23:16 28:6,23 29:6,24 31:25 39:17 53:8

**jewelry-related** 14:4

**Joe** 8:15 9:11,16,22,24 11:18 12:25 15:18,20 16:11 17:10 18:9 21:22 22:4 23:5,8 24:12 25:12 26:19 27:25 28:4,12 29:11 31:4, 17 33:14,19 35:13 36:4 37:3 38:15 39:5 41:8 42:13,14,15,17, 20,24 50:25 52:15,19,24 53:2,7, 10,15 54:2,12,15 55:3,5,19 56:10,12,18,23 57:25 58:14 59:11,13 60:6,8 61:23

**Joe's** 12:4 13:14 22:25 24:6,7 31:11 32:10 38:4,17,18 42:23

**Jonathan** 52:25

**Joseph** 8:4,16 10:6 11:9 14:19 20:19 35:5 37:4 39:16 41:10 52:21

**JP** 21:15

**Judge** 57:18

**judgment** 50:10 53:20 54:7,12, 16,22 55:2,6,10,13,16 56:3

**judgments** 50:8

**July** 8:15

**June** 5:2

---

**K**

---

**Kajoyan** 56:23 57:1

**keeping** 42:2

**Kenneth** 56:22

**kind** 13:12 15:4 19:21 41:14 63:1

**knowledgeable** 43:18

---

**L**

---

**labor** 37:6

**landlord** 16:2

**lands** 15:9

**lap** 15:10

**late** 8:14 38:13

**Laura** 18:7

**Lauren** 37:14,15,19,24 38:8,15, 17 39:13

**Laurie** 37:12,13

**law** 30:16

**lawsuit** 23:13 24:15 31:23 35:4 51:5 52:14,21,24 53:10,14 60:18 63:4

**laying** 30:19

**leave** 15:23 16:9,14 18:17 19:15

**leaves** 18:19

**left** 6:14 17:2,3

**legal** 50:9 63:1

**life** 39:2

**Lindy** 15:21

**list** 41:20

**listed** 30:23 41:2

**litigation** 13:17 23:3,5,21 53:6

**LLC** 8:17 11:2 14:20 35:5 37:5 39:16 52:25 54:24 55:21,25 56:4

**loan** 9:11,14,17,22 10:2

---

loans 12:3

**locate** 51:11,17,22

**log** 16:6,7,10,16,19,21 17:1,11, 13,17,18,21,23,25 18:1,12,13 19:5,7,8 20:4,5 21:1

**logbook** 18:16

**logs** 17:11 19:22

**long** 10:16 41:23 43:17 58:2 59:9

**looked** 13:16

**lot** 38:10 60:11

**loud** 44:24 45:1

**loves** 24:13

**Lynch** 22:24 23:12 37:16

---

**M**

---

**made** 33:19,24 34:1,3 51:10,17, 22

**magazine** 52:10

**main** 44:1

**maintain** 60:19

**make** 12:8 13:9 16:1,21 17:4 18:8 19:13,17 63:9

**making** 19:7

**manila** 18:15

**March** 13:18 35:15 36:4,17 51:5 53:4 55:8 56:13,20,24 60:17

**mark** 61:6

**marked** 8:4 25:3 26:6 28:11 29:10 32:2 44:7 60:21 61:9

**Martha** 56:18

**Mast** 56:18

**matter** 11:5 53:6

**Mcleod** 5:7,8 8:1 9:3 14:2 20:13 24:9,20 25:1,7 27:1,22 31:13 32:6,9 33:1 34:21 35:1,4,8 42:11 44:4,6 46:5 51:16 59:18 60:14, 16 61:11 62:20 63:13

meaning 31:23

means 19:8

meet 14:22

Melinda 5:4,12 20:20

member 10:11,12,16,24

memorized 27:8

memory 36:24

mentioned 63:10

merchandise 40:6

merchant 53:21 54:2 55:19

messages 36:3

met 7:11 52:12,13 58:21,22

method 40:16

Michigan 5:1 6:17

middle 5:12 34:4

million 21:14 34:12 36:16,20

mine 22:10

minute 39:15

missing 17:14

mixed 40:15

moment 25:9 28:19 53:22 57:19
59:25

money 12:7,10 13:10 55:13
58:14 59:7 62:1,6

month 35:9,13

monthly 12:19,20 39:24

months 15:2 34:23 40:2,5 57:12

Morgan 21:15 37:16,17 38:20,22
39:5,8,9

Morgan's 37:20

mother 57:15

Motion 60:23

move 49:7

Myers 59:13 60:8

**N**

named 24:14

names 25:25

Natural 30:7,22

nature 51:7

nephew's 7:19

net 34:23

Noble 52:16

noon 61:20

note 7:21 8:19 9:5 12:23 21:21
25:17,18 28:2 31:23,24 51:20

notes 11:22 12:2

Notice 59:23

November 29:12,17 40:24 57:9

number 8:5 21:12 27:3 28:11
29:10 35:22 39:19 44:21,23
45:10,15,20 46:2,13,24 47:22
49:13 61:7

numbers 19:15

**O**

oath 5:6

object 8:21 34:18,19

Objection 7:23 27:20 34:15

obligations 43:21

obtain 12:3

October 28:12

off-site 43:25

office 19:23 30:16 41:21

officer 10:6,11,12,22 11:1,13,18,
19 12:1,11 13:8

Oneida 54:8

online 21:1 39:21 40:10,11

Ontario 56:5

open 35:25 62:11

opinion 6:7

opportunity 8:5

order 5:15 57:18,22,24 59:24
60:19,22,24 61:1,8,13,17 62:12

ordered 24:18,20 44:16 57:24

orders 61:24

organizations 43:15

oversee 13:1

owner 12:1,11 13:8

owns 11:7,14 52:11

**P**

p.m. 5:3 27:24 63:15

pages 60:4

paid 15:18 56:12,18,23

paper 18:15,25

papers 32:20

paragraph 61:15,17

part 28:13 38:9 51:5 57:6

part-time 37:20 38:23

partner 11:4,15

past 14:25 15:2

pay 13:10 15:11,13,14,15,16
31:24

payment 34:1,3,5 57:3

payroll 13:1,2,4,6

PDF 29:21

pending 52:15 53:6 56:10

people 13:23 16:13

percent 10:8,9,12,13,14 11:15

person 10:13 43:23

personally 61:22,23

phone 22:22,23 24:4

photographs 28:19,21,24

photos 28:14,25 29:2,7,8

**physically** 16:9

**Pick** 35:13

**piece** 18:15,25

**pin** 43:6

**place** 15:9 39:24 62:18

**plaintiff** 5:9 7:16

**Plaintiff's** 61:20

**Plaintiffs** 44:8

**point** 7:2 60:3 61:14

**policy** 43:8

**power** 12:12

**precut** 16:5

**prepare** 7:10

**presented** 58:14

**Pretty** 14:24

**preview** 14:22 15:3

**previous** 18:6

**previously** 25:2 26:6 58:25

**prior** 24:21 25:8 32:10

**private** 39:21

**proceeding** 50:10

**proceedings** 63:1

**proceeds** 51:23

**process** 32:19

**produce** 44:17 61:16 62:11

**Production** 44:10

**Progress** 59:23

**project** 31:4

**promissory** 7:21 8:18 11:22 12:2,23 25:17,18 51:20

**proposal** 29:16,17

**provide** 61:19

**publish** 29:20

**purchase** 9:19 10:4 28:1

**purchased** 28:4 30:13

**purposes** 6:17

**pursuant** 5:14 62:12

**put** 18:18 19:15 40:7 58:21

---

**Q**

**qualified** 62:17

**quarter** 39:25

**Queens** 54:23

**question** 7:2,6 8:22,24,25 9:16 15:7 17:19 19:3,9 23:10,24 24:22 26:25 32:25 34:3,17 36:14 40:3 42:9,10 44:20 45:5,15,22 46:8 47:5,8,9,12 48:9,12,14,19, 24 49:5,8,15,20,25 50:5,19 51:13,14 61:22 62:16 63:2

**questioned** 17:14 19:17

**questioning** 7:24

**questions** 6:12,20 8:7 12:20 15:6 25:10 26:12 34:19 44:12 50:21 53:23 57:20 60:1 62:9,13 63:12

**quick** 6:11 13:25 60:12

**Quickbooks** 13:2,6

**quo** 60:19

---

**R**

**random** 18:17

**randomly** 23:15 39:1

**re-ask** 7:4

**read** 6:21,25 33:3,5 44:20,22,23 45:10,11 47:4,7,14,19,24 48:4,9, 14,19,24 49:4,7,25 50:5,15 61:17,21

**reading** 8:10

**reads** 61:15

**ready** 26:11,13 32:4 44:11 53:24

**reason** 19:16

**recall** 32:22 33:9 52:5 60:8 61:3

**receive** 12:9

**received** 33:2

**receiving** 33:10,11,12

**Recently** 17:21

**recess** 14:1 44:5 60:15

**recognize** 9:6

**record** 5:11 6:15,16 24:17 30:21 43:7 62:10

**records** 40:25 41:1,6,7,9,12,13, 14,22,24 42:1,3,15,17,20,21,22, 24 43:6,21 62:3

**reference** 30:6

**referring** 11:8 31:2 42:13 59:16

**refresh** 36:24

**refresher** 6:11

**regular** 13:14 19:25 41:6

**relating** 20:5

**remember** 5:22 6:1 8:10,11,13 21:5,7 22:15 33:6 36:1 37:11 38:11 39:4,9 40:23 44:15 57:9, 11 58:4 63:2

**renotice** 5:15

**rent** 15:18 17:6

**Repeat** 40:3

**Report** 52:6,9

**REPORTER** 61:9

**requests** 44:9 61:20 62:19

**requiring** 61:2

**respect** 59:23

**responses** 6:20

**responsibilities** 14:19

**responsive** 61:19

**retain** 43:21

**retained** 6:5

**retention** 43:8

**review** 7:12 8:5 12:16,18,21 25:9
    26:10 28:19 53:22 57:19 59:25

**reviewing** 26:19 61:4

**ring** 12:8,9 34:11

**Robb** 52:6,9

**Robert** 52:12,13

**Rose** 30:6,7,22

**routing** 27:3

**rules** 6:12,17

**run** 13:22

**runs** 26:8

**Rusty** 52:2,12

---

**S**

---

**sale** 9:20 12:8 30:14 31:25 33:19
    39:21,23 41:2 51:25

**sales** 13:23 33:20,24 34:11,12,23
    35:10

**Satisfaction** 54:7,22

**satisfied** 54:16 55:5,11,16

**satisfy** 55:13

**school** 39:3

**screen** 36:3,5 60:5

**seasonal** 37:8,9

**seek** 12:5

**sell** 14:10,13 15:7 39:17,21,22
    40:6 41:3

**send** 28:14 58:14

**sense** 8:25

**separate** 38:3 39:13

**served** 32:15,16 33:12

**server** 32:19 44:1

**serviced** 43:25

**set** 15:8 44:8,9

**settlement** 53:2

**shake** 6:21

**shakes** 45:21 49:14 56:21 58:3

**she'll** 20:11 34:20

**short** 14:1 44:4,5 60:15

**shot** 36:3,5 60:5

**showed** 58:17,20

**showing** 32:2 36:2 53:18 58:12
    59:21

**shredded** 17:12,18 19:22 20:4

**sic** 56:23

**sick** 13:21

**side** 6:21 12:4,6 45:21 49:14
    56:21 58:3

**sign** 12:15 16:10,12,13,14,20
    17:7 18:7,19 19:2,13,14 21:4

**signature** 20:18,21,22,24 21:4,9

**signed** 7:22 9:13 15:24 19:10
    21:6 55:20

**signer** 58:7,8 59:2

**signing** 21:5

**similar** 43:20

**single** 28:11 29:11

**sister** 22:25

**sister-in-law** 22:25 23:14

**sitting** 6:14

**sketch** 40:13

**small** 41:17

**sold** 33:14 41:2

**someone's** 30:15

**sort** 16:5 40:14 43:25 60:19
    62:17

**Sotheby's** 40:10

**sounds** 23:23

**Southern** 53:14

**speak** 6:19

**specifically** 18:4 41:15

**spell** 53:11

**spoke** 23:18

**spoken** 23:1 31:16,17,18,19,20

**spot** 43:7

**staff** 43:23

**stamped** 27:24

**started** 10:17

**starting** 26:7

**state** 5:10 53:20 54:8,23 56:5

**statements** 12:16

**states** 28:13

**stating** 8:25

**status** 60:19

**staying** 25:23

**steps** 61:22,24

**stop** 18:13

**string** 26:7,8 32:7

**stuff** 15:4

**subjects** 51:3

**substantive** 61:15

**Sue** 22:24 23:1,4,5,7,8,9,10,11,
    12,20,24,25 24:1,2,3,4,5,10

**summary** 36:7

**summons** 32:16 33:2

**Supreme** 53:20 54:7,22 56:4

**sworn** 5:5

---

**T**

---

**Table** 30:4

**taking** 6:14

**talk** 20:10 24:4,7 39:15

**talked** 23:5,8,12,15,16,20,24,25
    24:3,7 54:2 59:10

**talking** 39:2 63:8

**tax** 43:17

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Ted** 5:9 7:16 9:11,17,19,22 10:2 21:14 22:11 25:12 26:19 27:25 28:12 29:11 31:18,21 32:11 36:4

**Ted's** 31:14

**testified** 5:6

**testimony** 21:3 23:12,20 31:20 37:2

**Texas** 52:15

**text** 22:21 36:3

**texts** 22:20

**thing** 13:6 44:22

**things** 41:2,3 61:3

**thought** 17:9 45:1

**threshold** 41:4

**throw** 20:11

**till** 26:24 51:13

**time** 8:23 17:16 20:10 23:7,18 26:10 27:24 32:13 37:8 39:13 40:13,14 41:21 58:21,22 62:9,13 63:13

**times** 5:19 34:16,19 38:24

**title** 11:3

**titled** 59:22

**Tobin** 37:12,13,15

**today** 5:14 6:15 7:14 9:9 36:8 61:4

**today's** 7:10

**told** 36:11

**totally** 33:4

**track** 59:20

**Traditional** 40:15

**transcript** 6:22

**transfer** 27:2 56:19 59:5

**traveling** 15:25 38:10

**trick** 23:23

**Trust** 58:2

**Tuesday** 27:23

**turn** 9:4 20:16

**Turning** 33:13

**typical** 36:10,15

**typically** 40:21

---

**U**

**uh-huh** 6:24

**um-hum** 6:25

**understand** 7:4

**understood** 7:7

**units** 10:14

---

**V**

**Verified** 60:23

**Vice-president** 11:4

**Vivid** 30:8,22

---

**W**

**wait** 26:24 32:24 42:9 51:13

**wanted** 7:20,24 17:5,25 18:3

**Wayne** 52:21

**ways** 39:19

**Wells** 58:1,5,8 59:1,7,10,11

**when's** 17:16

**White** 52:2,12,13

**wholesale** 39:22

**William** 52:16 56:13

**wire** 27:2 56:19 58:1 59:5 61:3

**wired** 21:14

**wiring** 26:20

**woman** 6:14

**wondered** 33:10

**words** 51:10

**work** 13:3,23 14:22,23 15:3 18:6 34:10 35:14 38:8,15,17 39:5,9

**work-related** 6:3

**worked** 37:20 38:9,18,23,25

**working** 17:24 37:24 38:1 39:1

**works** 52:10

**world** 40:8,11

**worried** 16:23

**write** 15:12,13,14,19,21 18:9,19 19:11

**writes** 26:19

**written** 41:24

**wrong** 62:18

---

**Y**

**year** 18:5 40:23 56:14,20

**years** 15:1 17:19 18:14 20:8 35:7,9,11,12 37:22 40:1 41:23

**yellow** 18:25 30:6,7,8,22 31:10

**York** 17:2 38:10 53:7,10,15,21 54:8,23 56:5

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100