## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

**In the Matter of:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, | Bank. Case No. 19-54531-lsg |
| *Debtors.* | Chapter 7 |
| | Hon. Lisa S. Gretchko |
| THOMAS T. RITTER, | Adv. Pro. No. 20-04381-lsg |
| *Plaintiff,* | Hon. Lisa S. Gretchko |
| v. | |
| ~~JOSEPH G. DUMOUCHELLE, and~~ MELINDA J. ADDUCI, | |
| *Defendants.* | |

## DEFENDANT'S RESPONSE AND OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MELINDA ADDUCCI UNDER COUNTS III, V, AND VIII OF PLAINTIFF'S SECOND AMENDED COMPLAINT AND PLAINTIFF'S BRIEF IN SUPPORT OF THE SAME

**NOW COME** the Defendant, Melinda Adduci (*"Lindy"*), by and through her counsel, JOHN R. FOLEY, P.C., who hereby responds to Plaintiff, THOMAS RITTER (*"Plaintiff"*)'s *Motion For Summary Judgment Against Defendant Melinda Adducci Under Counts Iii, V, And Viii Of Plaintiff's Second Amended Complaint* (*"Motion"*) and Plaintiff's *Brief in Support* (*"Brief"*) of the same, as follows:

## Introduction

Plaintiff's Motion is short-form and relies entirely on the Brief which it incorporates. Therefore, from this point forward, any reference to the *"Motion"* should also be construed to include reference to the Brief, and in some instances,

may specifically mean provisions of the Brief.

## OVERVIEW OF MOTION

Plaintiff's Motion, while being brought under Fed.R.Civ.Pro 56(c), actually seeks the *legal* remedy of vicarious liability against Lindy, based on facts related to the actions of former co-defendant JOSEPH G. DUMOUCHELLE (*"Joe"*). This can be seen in the <u>Statement of Issues</u>, (*Brief*, Page ii), in which Plaintiff articulates that the only issue raised in the Motion is that of Lindy's alleged vicarious liability for Joe's actions.

## RESPONSE TO "I. INTRODUCTION" SECTION

The fact that the North Dakota Judgement exists, and is against Lindy and Joe and DuMouchelle Jewelers is not disputed. That, however, is where the *"no issue"* and *"undisputed"* ought to end. Lindy has always disputed, and continues to dispute, that Plaintiff's debt was incurred through any action on her part that would be deemed violative of 11 U.S.C. §523(a)(2), or (4) or (6).

Further, Lindy disputes that she was *"directly involved in the Yellow Rose Transaction"* as alleged by Plaintiff. (*Brief*, Page 1)

The contents of the North Dakota Judgment, (**Exhibit 1** to *Motion/Brief*), and the findings of fact associated therewith, not only <u>do not</u> support Plaintiff's contention that he is entitled to judgment as a matter of law against Lindy; but moreover, run directly against that concept, and in favor of Plaintiff's claims against

Lindy being dismissed altogether.

Plaintiffs' summary of the Counts of their own Adversary Complaint appear to be accurate.

## RESPONSE TO *"II BACKGROUND"* SECTION

Lindy does not dispute the existence of DuMouchelle Jewelers, nor that she was 10% member, nor that she was *"vice president."*

Contrary to Plaintiff's assertion, Lindy did not hold herself out publicly as a *"partner"* of DuMouchelle Jewelers, and the website, **Exhibit 5** to the *Motion*, (which is also hearsay within hearsay, without an exception) does not support that statement. She is not listed on the website as a *"partner"*, nor does the website state that she *"communicated with DuMouchelle Jewelers customers."* Further, the statements are irrelevant to this case or this motion. Nowhere in his Complaint does Plaintiff claim that he viewed or relied on the website of DuMouchelle Jewelers, or any statements thereon.

Plaintiff's assertions under the sections: *"Joseph's Criminal Information"* section (*Brief*, page 4), *"The Plea Agreement"* section (*Brief*, pages 5-6), *"The Guilty Plea Hearing"* section (*Brief*, pages 6-9), *"Findings in the Presentence Opinion"* section (*Brief*, pages 9-10), *"Findings in the Sophisticated Means Opinion"* section (*Brief*, page 10), *"Findings in the Forfeiture Order"* section (*Brief*, page 10) *"Findings in the Judgment"* section (*Brief*, page 11) appear to be

correct recitations of what transpired regarding Joe, based on the documents attached thereto in each section; however, they are not relevant to Lindy and Lindy does not stipulate to these statements.

### Response to "Melinda's Direct Role in the Yellow Rose Transaction Section"

Plaintiff's statements here can only be trusted to the extent that they are direct quotes from Lindy's discovery responses. For example, contrary to Plaintiff's false assertion, never did Lindy, *"admit[ed] that she moved Plaintiff's $12 million intended for the purchase of The Yellow Rose."* That is simply nowhere in the discovery responses. **Exhibit H.**

The remainder of the allegations in this section, (*Brief*, Pages 11-13), being quotations from Lindy's discovery, are accurate, although incomplete.

At least one clarification needs to be made. The first section of Lindy's response to Interrogatory #4, in her January 6, 2023 *Discovery Responses*, as corrected on November 9, 2023, states as follows:

> **Melinda Response:** I did not negotiate or have knowledge of the reasons or details of any of the transfers made. Joe negotiated/calculated/effectuated any transfers. My only involvement was one day, while I was already in Tucson, Arizona, for the AGA Gem Conference (Attachments 8 & 9) and Joe had missed the closing of the banks in Michigan, and the banks in Arizona were still open due to the time zone difference, Joe emailed the bank and setup the counter-checks/transfers (Attachments 1, 2, & 3) and called me and asked that I go to the bank and sign for them. (Attachments 4, 5, & 6). Joe simply asked me to go to the

bank and sign if needed, as the only other signer on the account. Again, I had no knowledge of what these transfers were for, why they were being made, etc. And none of that money came to me.

***Response to "The Bankruptcy Proceeding" Section (Page 13)***

Joe & Melinda did not file a voluntary petition for Chapter 7 bankruptcy relief; rather, they filed for Chapter 11, and were forced to agree to convert to a Chapter 7.

Melinda does not dispute that Plaintiff filed a Proof of Claim, and that they duly scheduled his claim on their schedules, as is required by law & rule.

## RESPONSE TO III. ARGUMENT

Plaintiff chooses to break his arguments into four Sections, namely:

A. Plaintiff is entitled to judgment as a matter of law for $16,414,214.61 million against Melinda where there are no genuine issues of material fact pertaining to her nondischargeable liability.

B. Plaintiff's claim against Melinda is nondischargeable under 11 U.S.C. §523(a)(2)(A) as a matter of law irrespective of her personal culpability due to Joseph's admissions in the Criminal Proceeding and her ownership and involvement in DuMouchelle Jewellers."

C. Plaintiff's claim against Melinda is nondischargeable under 11 U.S.C. §523(a)(4) as a matter of law irrespective of her personal culpability due to Joseph's admissions in the Criminal Proceeding and her ownership and involvement in DuMouchelle Jewellers."

D. Plaintiff is entitled to summary judgment in the full amount of the Yellow Rose Judgment Amount of $16,414,214.61.

Plaintiff's four sections of argument can be roughly described as follows.

In **Section A**, Plaintiff argues that 11 U.S.C. §523, on its face, means that Lindy cannot discharge Plaintiff's judgment. While Plaintiff does not discuss the case of *Bartenwerfer v. Buckley*, 143 S. Ct. 665, 676 (2023), Plaintiff's argument here was clearly prompted by a misreading of the *Bartenwerfer* opinion. This belief is bolstered by later analysis of *Bartenwerfer* made by Plaintiff in Sections B & C of the *Brief*.

In **Section B** of the Arguments, Plaintiff provides a thorough, although misguided, analysis of *Bartenwerfer*. Plaintiff argues to this Court that Lindy's debt to Plaintiff should be deemed non-dischargeable under 11 USC §523(a)(2)(A), on the misunderstanding that *Bartenwerfer* stands for the proposition that merely because Lindy and Joe were married, and both were members of an LLC, she may be held vicariously liable for Joe's actions. This interpretation is incorrect.

Plaintiff's **Section B** arguments are best summarized by two statements in the *Brief*:

    A. *"Thus, under the plain reading of Sec. 523(a)(2)(A) the fact that the $12 million was acquired through Joseph's admitted fraud, renders Plaintiff's claim against Melinda for that exact debt nondischargeable as a matter of law."* (Brief, Page 15)

    B. *"The standard of Bartenwerfer similarly applies to the question of nondischargeability of Plaintiff's claim against Melinda pursuant to Sec. 523(a)(2)(A). Just like Bartenwerfer, Melinda was in business with Joseph through their operation of DuMouchelle Jewellers."* (Brief, Page 18)

    C. *"Thus, the fact that through Joseph's admissions, guilty plea and*

determinations in the Criminal Proceeding, the debt owing to Plaintiff was conclusively a debt incurred through fraud and, therefore, it is a debt that is nondischargeable as to Melinda." (Brief, Page 19)

D. "The fact that Melinda is both Joseph's spouse and business partner mean that Joseph's admissions and the findings of fact in Joseph's Criminal Proceeding infer nondischargeability as to Melinda for amounts in connection with The Yellow Rose Judgment." (Brief, Page 20)

In **Section C**, Plaintiff's arguments are essentially an extension of the analysis of *Bartenwerfer* in **Section B**, but this time applied to 11 U.S.C. §523(a)(4).

Plaintiff's **Section C** arguments are best summarized by two statements in the *Brief*:

A. "Consistent with *Bartenwerfer*, the findings in Joseph's Criminal Proceeding can be imputed on Melinda." (Brief, Page 23)

B. "Even so, the debt as against Melinda is nondischargeable as a matter of law by the mere fact that the debt was incurred through Joseph's admitted larceny. Plaintiff is entitled to a judgment of nondischargeability as a matter of law on Count V of his complaint in the amount of The Yellow Rose Judgment Amount, $16,414,214.61." (Brief, Page 24)

Finally, in **Section D**, Plaintiff makes the astounding claim that because the Bankruptcy Trustee has not objected to Plaintiff's Proof of Claim in the bankruptcy case, Plaintiff is entitled to a full judgment of $16,414,214.61 against Joseph (not Lindy).

## <u>RESPONSE TO ARGUMENTS, COMBINED</u>

Defendant responds to all of Plaintiff's four argument sections together in the following analysis.

### Plaintiff Makes 2 Wrong Arguments Regarding *Bartenwerfer*

Plaintiff's entire instant Motion is premised upon Plaintiff's misreading of the *Bartenwerfer* opinion, and Plaintiff's attempts to wrongly apply those misinterpretations here. Plaintiff incorrectly interprets *Bartenwerfer* in two ways.

First, in Section A of his arguments, Plaintiff argues that SCOTUS has now rendered 11 U.S.C. §523 so broad that any time any person obtained money or property by action(s) which, under 11 U.S.C. §523(a)(2)(A) would render that debt non-dischargeable with respect to that debtor, each and every one of their co-debtors are now automatically unable to discharge that same debt. This interpretation is incorrect.

Second, in Sections B & C of his arguments, Plaintiff tries to proverbially *"fit the square beg in the round hole."* Plaintiff attempts to argue that *Bartenwerfer* applies here, merely because Joe and Lindy were married, or alternatively, because they were members in the same LLC. These arguments fail.

**Response to Plaintiff's First Line of Argument**

With respect to Plaintiff's first line of argument, that *Bartenwerfer* rendered 11 U.S.C. §523 so broad that every co-debtor is automatically liable for the fraud of another co-debtor: nothing could be further from the truth. Contrary to Plaintiff's arguments regarding the scope of 11 U.S.C. §523, SCOTUS made it clear that the imposition of vicarious liability for fraud upon an innocent co-debtor is entirely based upon underlying state law. In *Bartenwerfer*, SCOTUS relied on California law

regarding liability of partners in a general business partnership. It was <u>not</u> the fact that the parties were married; it was specifically because the parties were in a general partnership (not, for example, co-members of an LLC), construed so under California law, that enabled the SCOTUS to say that vicarious liability was appropriate, <u>due to state law</u>. Specifically, SCOTUS stated in the *Bartenwerfer* opinion as follows:

> It also bears emphasis-because the thread is easily lost in *Bartenwerfer*'s argument-that §523(a)(2)(A) does not define the scope of one person's liability for another's fraud. That is the function of the underlying law-here, the law of California. Section 523(a)(2)(A) takes the debt as it finds it, **so if California did not extend liability to honest partners, §523(a)(2)(A) would have no role to play.** *Bartenwerfer*'s fairness-based critiques seem better directed toward the state law that imposed the obligation on her in the first place.

> (bold/emphasis added)

Therefore, *Bartenwerfer* does not stand for the proposition that suddenly, in any bankruptcy case, one debtor can now be held liable under §523(a)(2)(A) for the debts of another.

This first line of argument requires no further argument.

**Response to Plaintiff's Second Line of Argument**

Plaintiff's second line of argument is that somehow *Bartenwerfer* is applicable to this case, merely because Lindy and Joe were members of the same LLC, and were married. This argument is equally non-meritorious.

Frankly, Plaintiff likely understands that *Bartenwerfer* speaks about California partnership law, not about 11 U.S.C. §523 generally, nor about any other kind of business relationship, because Plaintiff makes the following misstatement: *"Furthermore, Melinda was Joseph's spouse, his business partner in DuMouchelle Jewellers, and a co-obligor under the exact debt that was the subject of Joseph's criminal conviction."* (*Brief*, Page 15). This simply is simply not true. Rather, this appears to be a misuse of the colloquial term "partner" in a business, where Lindy's interest is legally defined as a *"membership interest"*, in order to argue that this Court should also so-conflate the terms, and apply thus *Bartenwerfer* to this case.

As Plaintiff himself points out (*Brief*, Page 3): Lindy was a 10% member of a Michigan Limited Liability Company (Joseph DuMouchelle Fine & Estate Jewelers, LLC). <u>Lindy was and is not Joe's business partner in a general partnership</u>. This is important, because the ruling in *Bartenwerfer* is based upon California law which attributes vicarious liability to partners in a general partnership. Michigan law on limited liability companies, and the liability of the members thereto, is quite the opposite. In fact, MCL §450.4501(4) states, *"Unless otherwise provided by law or in an operating agreement, a person that is a member or manager, or both, of a limited liability company is not liable for the acts, debts, or obligations of the limited liability company."*

Additionally, Plaintiff makes a few factual mistakes in his arguments, that

need to be addressed:

For example, Plaintiff states that Lindy was *"co-obligor under the exact debt that was the subject of Joseph's criminal conviction."* Contrary to this, the very documents and emails that Plaintiff attaches to their First Amended Complaint, attached here as **Exhibits 6-A to 6-E**, show that the dealings were entirely between Joe and Plaintiff, <u>not</u> with Lindy, and that Plaintiff particularly took the time to send an email acknowledging that Lindy was NOT party of the deal. **Exhibit B**.

Additionally, Plaintiff states: *"Melinda, admittedly, the only signer on the Bank of America Account where Plaintiff's money was held, moved Plaintiff's money from the Bank of America Account to pay other business and personal debts. Exhibit 17."* (*Brief*, Page 19). This is also false.   Lindy was <u>*not*</u> the only signer on the account, nor did she state that in her discovery responses. Rather Lindy, in her discovery response, stated, *"Joe simply asked me to go to the bank and sign if needed, as the only* **other** *signer on the account. Again, I had no knowledge of what these transfers were for, why they were being made, etc. And none of that money came to me."* (**Plaintiff's** *Motion/Brief*, **Exhibit 17, Page 4 of 16**) (bold/emphasis added).

### Conclusion RE Response to Argument RE Bartenwerfer

With it clarified that: (A) *Bartenwerfer* does not stand for the proposition that 11 U.S.C. §523(a)(2)(A) is now per se applied to all co-debtors of a fraud-related

debt; and (B) that *Bartenwerfer* is not applicable in this case, we turn our attention to what is lacking in Plaintiff's claims against Lindy.

## **FURTHER ARGUMENTS**

**Plaintiff Should Not Be Granted Summary Judgment under 11 U.S.C §523(a)(2)(A), and Defendant Should be Granted Summary Judgment in Her Favor**

Plaintiff is required to prove five (5) elements to succeed on a claim under 11 U.S.C §523(a)(2)(A), namely:

(1) The debtor made false representations;
(2) The debtor knew such representations to be false at the time they were made;
(3) The representations were made with the intent to deceive the creditor;
(4) The creditor relied on the representation; and
(5) The creditor's loss was the proximate result of the misrepresentation having been made.

*Kille v. Rudski (In re Rudski)* 357 B.R. 121, 125 (Bankr. N.D. Ohio 2006) (citing *Rembert v AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.1998)).

"For the purposes of § 523(a)(2)(A), false representations and pretenses encompass statements that falsely purport to depict current or past facts. False pretenses involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a false representation which is an express misrepresentation." *Haney v Copeland (In re Copeland),* 291 B.R. 740, 760

(Bankr. E.D. Tenn. 2003) (citations and internal quotation marks omitted).

According to Michigan law, if a material representation in question relates to a future promise, the plaintiff's cause of action lies in contract, not fraud. *Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336 (1976).

Pursuant to Fed. R. Civ. P.9(b), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7009, *"*[a]verments of fraud must be stated with particularity [and] the threshold test is whether the complaint places the defendant on 'sufficient notice of misrepresentation,' allowing the defendant to 'answer, addressing in an informed way plaintiffs (sic) claim of fraud.'*" In re LTV Steel Co., Inc.,* 288 B.R. 775, 780 (Bankr. N.D. Ohio 2002) (quoting *Coffey v Foamex L.P.,* 2 F.3d 157, 162 (6th Cir. 1993)).

*"*As is the case with a claim under § 523(a)(2)(A) based on a false representation, a creditor making a false pretenses claim under § 523(a)(2)(A) must also establish materiality; intent; justifiable reliance; and causation.*" Lenchner v. Korn (In re Korn)*, 567 B.R. 280 (Bankr. E.D. Mich. 2017), referencing *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, at 379 (Bankr. E.D. Mich. 2012) (relying in part on *Brann v. Oxford (In re Oxford)*, 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010) ).

*"*[W]e hold that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance.*" Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), citing

*In re Vann*, 67 F.3d 277 (CA11 1995); *In re Kirsh*, 973 F.2d 1454 (CA9 1992). However, *"It should go without saying that our analysis does not relegate all reasoning from a negative pregnant to the rubbish heap, or render the reasonableness of reliance wholly irrelevant under § 523(a)(2)(A)." Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

Simply stated, Plaintiff has not alleged a single way in which Lindy made a false representation to him, nor that he reasonably or justifiably relied upon it, nor has Plaintiff demonstrated, with respect to Lindy, any "materiality; intent; justifiable reliance; and causation."

The sum total of Plaintiff's arguments is:

A. that Lindy once forwarded him a third-party's report (from the GIA, a nationally known and respected gemological association) regarding the Yellow Rose Diamond, and

B. that Lindy, *at the instruction of her husband,* (while actually being annoyed with him for interrupting her trip), signed for counter-checks totalling about $5 million dollars, that Joe had arranged.

Conversely, the facts established regarding Ritter's interaction with Joe, established by Plaintiff's own North Dakota *Findings of Fact and Conclusions of Law*, **Exhibit G**, are as follows:

> [33] By a letter agreement dated January 31, 2019, Ritter
> and DuMouchelle entered into an agreement that Ritter

would purchase The Yellow Rose from the seller for $12 million, and DuMouchelle would then facilitate the subsequent sale on Ritter's behalf. Based on the amount of profit, the money was to be divided between Ritter and DuMouchelle.

[34] Between January 31, 2019, and February 5, 2019, DuMouchelle, by email, directed Ritter to wire money to purchase The Yellow Rose to various accounts, which DuMouchelle represented and Ritter believed was the account of the seller of The Yell ow Rose.

[35] Ritter ultimately completed a wire transfer on February 6, 2019, to the Bank of America account of Fine & Estate Appraisers, LLC.

[36] DuMouchelle later provided Ritter with a Receipt from Joseph DuMouchelle International Auctioneers dated February 6, 2019, for purchase of The Yell ow Rose for $12 million.

[37] In March 2019, DuMouchelle represented to Ritter he had a buyer interested in purchasing The Yellow Rose from Ritter. Ritter expected he would sell The Yellow Rose to the buyer and the buyer would transmit the purchase funds directly to Ritter. Ritter emailed a draft agreement in conformity with this understanding to DuMouchelle on March 21, 2019.

[38] DuMouchelle, as agent for Ritter, entered into a Letter Agreement dated April 12, 2019, for the subsequent sale of The Yellow Rose for $16.5 million with Sam Haggin, Trustee of the Jennifer H. Rands Trust, which was signed by Sam Haggin on April 19, 2019.

[39] The agreement provided that payment for The Yellow Rose was to be made in full by wire transfer within ten (10) days of signing the agreement, which was executed on April 19, 2019.

[40] Ritter has received neither The Yell ow Rose nor the proceeds from any sale of The Yellow Rose.

That "Letter Agreement" is between Plaintiff and Joe personally, not between Plaintiff and Joseph DuMouchelle Jewellers, nor is Lindy a party to that agreement at all. **Exhibit A**.

The email evidence shows that Ritter <u>knew and intended that Lindy was **not a part of this deal**</u>. **Exhibit B**.

Lindy had no reason to suspect that Joe was doing anything other than the usual good business he had, at that point, been successful and esteemed at for at least two decades. (Plaintiff's *Motion*, **Exhibit 2**).

In January and February of 2019, Plaintiff exchanged at least 3 emails with Joe (<u>not Lindy, and Lindy was not even CCed on them</u>), in which Joe sent the wire instructions to Plaintiff. **Exhibits 6-C, 6-D, 6-E**.

Joe was prosecuted by the federal government for his involvement in this transaction; Joe pleaded guilty; and Joe is doing 12 years in prison as a result. Plaintiff, not Defendant, attaches numerous documents to their *Motion*, which explain exactly how Joe interacted with Plaintiff to bring this about. *See* Plaintiff's *Motion,* **Exhibits 6, 7, 8, 9, 10, 11, 12, 13.**

Based on the foregoing, Plaintiff does not have a claim against Lindy which rises even remotely to the level of evidence required to maintain a claim against Lindy under 11 U.S.C. §523(a)(2)(A), and Lindy should be granted summary judgment in her favor on all counts related to §523(a)(2)(A).

**Plaintiff Should Not Be Granted Summary Judgment under 11 U.S.C §523(a)(4), and Defendant Should be Granted Summary Judgment in Her Favor**

Section 523(a)(4) of the Bankruptcy Code states that *"[a] discharge under section 727... of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"* 11 U.S.C. § 523(a)(4).

*"*This section essentially contains two different exceptions—one for fraud or defalcation while acting in a fiduciary capacity and another for embezzlement or larceny while acting in any capacity.*"* *Kriescher v. Gibson (In re Gibson)*, 521 B.R. 645, 655 (Bankr. W.D. Wis. 2014), citing *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 133 S.Ct. 1754 1760, 185 L.Ed.2d 922 (2013).

The term *"fiduciary capacity"* in § 523(a)(4) has a special, narrow meaning:

> A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss. *Bd. of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir.2007). In *Davis* [v. Aetna Acceptance Co. , 293 U.S. 328, 331, 55 S.Ct. 151, 79 L.Ed. 393 (1934)], the Supreme Court instructed that the term *"fiduciary capacity"* is **narrower here than it is in some other contexts**: section 523(a)(4) covers only *"express"* or *"technical trusts"* and not trusts arising out of *"the very act of wrongdoing."* 293 U.S. at 333, 55 S.Ct. 151. These *"constructive trusts,"* which arise ex maleficio (at the time the wrong is done), do not satisfy the *"fiduciary capacity"* requirement because the debtor was not *"a trustee before the wrong."* *Id.* Establishing an *"express"* trust is straightforward. The creditor must demonstrate: *"*(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.

*Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009) (**emphasis** added) (citation omitted); see also *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir. 2005) (citation omitted) (*"[T]he defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor."*).

Moving on, *"[i]n section 523(a)(4), the term 'while acting in a fiduciary capacity' does not qualify the words 'embezzlement' or 'larceny.' Therefore, any debt resulting from embezzlement or larceny falls within the exception of [§ 523(a)(4)]."* 4 Collier on Bankruptcy ¶ 523.10[2], at 523–76 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016) (citations omitted); see also *Powers v. Powers (In re Powers )*, 385 B.R. 173, 178 (Bankr. S.D. Ohio 2008).

Plaintiff has no argument that, has not avered that, and has no evidence to support any claim that Lindy was ever in a fiduciary capacity with respect to him; therefore, the first half of a claim under §523(a)(4) is not viable, and summary Judgment should be granted to Lindy at least eliminating any such arguments/claims.

Federal law defines *"embezzlement"* under section 523(a)(4) as *"the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."* A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor

appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir. 1996).

There really are no arguments that Lindy was ever entrusted with the money or that it came into her hands; however, any such argument under §523(a)(4) would fail because if Joe obtained the money fraudulently, there can be no argument that it "lawfully" came into Lindy's hands. Therefore, Lindy should be granted summary judgment in the §523(a)(4) claims against her as it related to "embezzlement."

Regarding "larceny", the contrast between embezzlement and larceny is best summarized as follows:

> Larceny is different [from embezzlement] in that the original taking must have been unlawful, and is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner."

*Williams v. Noblit (In re Noblit),* 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005) (quoting *Graffice v. Grim (In re Grim),* 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003)).

Here, again, Plaintiff caused and assisted in Joe being criminally prosecuted for fraudulently obtaining Plaintiff's money. Plaintiff, again, attaches to his motion a mountain of evidence about how Joe wrongfully obtained this money from Plaintiff, not Lindy. *See* Plaintiff's *Motion,* **Exhibits 6, 7, 8, 9, 10, 11, 12, 13.** Plaintiff cannot now come to this Court and argue that it was Lindy, not Joe, who

wrongfully obtained money from Plaintiff.

All of the above means one thing: Plaintiff has no argument, and has offered no apparent argument, supporting his request for judgment against Lindy under 11 U.S.C. §523(a)(4) based upon either *"fraud or defalcation while acting in a fiduciary capacity"*, nor upon *"embezzlement"* nor *"larceny."*

## Summary Judgment to the Non-Moving Party

This Court may grant summary judgment to the non-moving party. *Lisle v. Metro. Gov't of Nashville and Davidson County, Tenn.*, Nos. 01-6049, 02-5706., 73 Fed. Appx. 782, 791 (6th Cir. July 9, 2003) (unpublished); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (district court may enter summary judgment sua sponte, "so long as the losing party was on notice that she had to come forward with all her evidence."); *In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) (holding summary judgment was appropriate in favor of the non-moving party where the parties fully briefed the determinative issue).

**WHEREFORE**, Defendant, Melinda Adducci, respectfully requests that this Honorable Court deny Plaintiff's *Motion for Summary Judgment Against Defendant Melinda Adducci Under Counts III, V, And VIII of Plaintiff's Second Amended Complaint* (*"Motion"*) and instead, grant summary judgment in her favor.

Respectfully Submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

Dated: November 9, 2023    By: /s/ Patrick A. Foley
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
Phone: (313) 274-7377
Email: pafoley@jrfpc.net

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

**In the Matter of:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, | Bank. Case No. 19-54531-lsg |
| *Debtors.* | Chapter 7 |
| | Hon. Lisa S. Gretchko |

| | |
|---|---|
| THOMAS T. RITTER, | Adv. Pro. No. 20-04381-lsg |
| *Plaintiff,* | Hon. Lisa S. Gretchko |
| v. | |
| ~~JOSEPH G. DUMOUCHELLE, and~~ MELINDA J. ADDUCI, | |
| *Defendants.* | |

## <u>PROOF OF SERVICE</u>

Patrick A. Foley hereby certifies that on November 9, 2023 he did serve a copy of the foregoing *Response and Objection to Motion for Summary Judgment*, upon the following parties via the Court's CM/ECF e-Filing system:

- Kimberly Ross Clayson     kclayson@taftlaw.com, ttorni@taftlaw.com
- Jay L. Welford     jwelford@taftlaw.com, ttorni@taftlaw.com

Respectfully Submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

Dated: November 9, 2023     By: /s/ Patrick A. Foley
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
Phone: (313) 274-7377
Email: pafoley@jrfpc.net

Exhibit A



**MEMBER**
**A.A.P.L.**

# Ritter, Laber & Associates, Inc.

P.O. BOX 2138 • 409 MAIN STREET
WILLISTON, NORTH DAKOTA 58802-2138
Email: ritterlaber@gmail.com
*Contract Land, Lease and Title Service*
*Oil, Gas and Coal Properties*

TELEPHONE
(701) 774-0314

FAX
(701) 774-0315

Tom Ritter, President

January 30, 2019

Joseph DuMouchelle
~~17 Kercheval Ave.~~          251 E. Merrill Street, Ste 236
~~Cross Pointe, WI 48230~~       Birmingham, MI 48009

Re: Letter Agreement
    Purchase of The Yellow Rose Diamond

Dear Joe:

Pursuant to our discussion regarding the captioned. I would like to set forth our agreement as I understand it.

This letter ("Letter Agreement") sets forth the terms of the agreement by which Thomas T. Ritter will purchase The Yellow Rose Diamond and the guidance resell the captioned with, expertise and assistance Joseph DuMouchelle, his agents, contacts and associates resell same.

In consideration of Ten and more Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged by both of the undersigned.

This agreement is by and between Thomas T. Ritter and Joseph DuMouchelle.

With your assistance, I (Thomas T. Ritter), intend to purchase The Yellow Rose Diamond (The Diamond) for Twelve Million and NO/100 Dollars ($12,000,000.00) (the FUNDS) and then resell the Diamond as soon as possible. You (Joseph DuMouchelle) have estimated a resell price in the range of $16 - $20 Million dollars.

I will establish an escrow account at JP Morgan Chase, the fees for which shall be split equally between the Seller and the Buyer. I will wire the FUNDS from my bank into this account and subject to the terms of the escrow agreement between the parties being met, the funds will be released to the Seller upon receipt of the Diamond by you on my behalf.

You have indicated that you have insurance covering the value of Diamond for loss or theft while in your possession. I would wish to see something to verify that to my satisfaction. Once you have possession of the Diamond, you will transport it back to Detroit, where it will be placed with Brinks at one of their secure locations for safekeeping and viewing by potential purchasers as the case may be.

You, your agents or assigns or your Company will then go to work on reselling the Diamond for the best price possible above the purchase price. It is my understanding that you are working through the agent of the Seller to purchase the Diamond on my behalf and if there any finders fees or commissions paid to you, your agents, assigns, or your company, they remuneration shall

be considered part of the profit picture of this transaction and be declared by you immediately if being considered or being paid.

It is late in the day today and I have been unable to reach anyone at JP Morgan Escrow in Houston, TX, but should hear back first thing tomorrow. I will need contact information for the Seller or their representative so the Bank can contact them and get them to sign off on the escrow agreement and get their banking information for the release of FUNDS. As you are all in Houston, you may wish to do the transaction right at the escrow Bank and have a certified check issued instead of a wire transfer, if the bank will do that. I have also asked the private banking department at JPM if there is a better way to this and they will also get back to me.

As you might imagine, not doing this everyday leaves me a bit out of my comfort zone, so I will have to rely heavily on your guidance and advice. You have indicated you have a couple of prospects lined up for a potential quick resale and hopefully that will work out as planned. If not, you will continue to try and market the Diamond on my behalf until such time as I determine it does not appear a profitable sale is likely, and that determination shall be my decision solely and shall not be questioned by you in any manner. At that point I will be free to try any other avenues available to me for the sale of the Diamond and our association and terms of this agreement shall be terminated.

If the sale of the Diamond by you is successful and the profit is $4 million dollars or more, then we shall split the profit 25% to you and 75% to me. If the profit is $3 million but less than $4 million, the split shall be 80% for me and 20% for you. If $2 million but less than $3 million, 85% to me and 15% to you. If less than 1 million, then 95% to me and 5% to you. Any finders fees or commissions to others who may help facilitate the sale of the Diamond shall come out of your share of the profit

Your travel costs, transport insurance expenses for the Diamond and Brinks costs shall be borne by you. I will cover the cost of the escrow.

If you are in agreement, please sign below where indicated, scan and email a copy back to me as soon as possible.

Respectfully Submitted,

Thomas T. Ritter

The undersigned hereby agree to the terms of this Letter Agreement as set forth above.

Name: Thomas T. Ritter
Date:

Name: Joseph DuMouchelle
Date: Jan 31, 2019

Exhibit B

 Gmail

**Tom Ritter <ritterlaber@gmail.com>**

___

## Agreement

___

**Tom Ritter** <ritterlaber@gmail.com>                                                     Thu, Jan 31, 2019 at 8:40 AM
To: Joseph DuMouchelle <joe@josephdumouchelle.com>, Melinda Adducci <lindy@josephdumouchelle.com>

Joe and Lindy:

I was considering adding Lindy's name to the agreement but didn't know if you guys wanted it that way since in the past you chose not to.. If you wish to have me correct that please let me know. It was not my intent to leave you out or lessen your part in this as I know your skill and expertise in the gemology field is at the top.

Best Regards,

Tom

—
Thomas T. Ritter, President
Ritter, Laber & Associates, Inc.

Mailing Address:
Ritter, Laber & Associates, Inc.
P.O. Box 2138
Williston, ND 58802-2138

Physical Address for Direct Delivery such as Fed Ex etc.:
Ritter, Laber & Associates, Inc.
409 Main Street
Williston, ND 58801

Ofc. Ph:  701-774-0314
Fax: 701-774-0315
Cell: 701-570-6646

Exhibit C

 Gmail

**Tom Ritter <ritterlaber@gmail.com>**

## Wire information
2 messages

---

**Joseph DuMouchelle** <Joe@josephdumouchelle.com>                  Thu, Jan 31, 2019 at 9:18 PM
To: Tom Ritter <ritterlaber@gmail.com>

Hi Tom,

The wire information is as follows:

Account Name:   Highland Wealth Management

Bank:               MB Financial Bank

Bank Routing #:   ███████

Account #:        ███9802

Please let me know that you have received this information.

Thanks Tom.

Sincerely,

Joe

*Joseph DuMouchelle, G.G.*

*Estate Buyer -Appraiser – Auctioneer*

*Graduate Gemologist*

joe@josephdumouchelle.com

Direct (313) 300-9166; Michigan 313-884-4800

Toll free 800-475-8898;  NY 212-819-1899

www.josephdumouchelle.com

Exhibit D



**Joseph DuMouchelle <Joe@josephdumouchelle.com>**       Feb 1, 2019,
                                                           2:08 PM

to me

Hi Tom,

The wiring information is:


*Joseph DuMouchelle, G.G.*
*Estate Buyer -Appraiser – Auctioneer*
*Graduate Gemologist*
joe@josephdumouchelle.com

Direct (313) 300-9166; Michigan 313-884-4800
Toll free 800-475-8898;  NY 212-819-1899
www.josephdumouchelle.com

*Confidentiality Notice:  This email may contain confidential and legally privileged information that is intended only for the individual named.  If you are not the intended recipient, you are herby notified that any disclosure, copying, distribution, or reliance upon the contents of this message is strictly prohibited.  If you have received this transmission in error, please reply to the sender, so that proper delivery can be arranged, and please delete/discard this transmission.*

**From:** Richard Drucker <rdrucker@gemguide.com>
**Sent:** Friday, February 1, 2019 3:58 PM
**To:** Joseph DuMouchelle <Joe@JosephDumouchelle.com>
**Subject:** report


## WIRE TRANSFER INFORMATION

**FineMark Bank & Trust**
Account # ██████6380
Routing # ██████████
Account: Fine & Estate Appraisers, LLC

# Exhibit E



## Joseph DuMouchelle <Joe@josephdumouchelle.com>

Wed, Feb 6,
9:57 AM

to me

Hi Tom,

The information is below.

Thank you.

Sincerely,

Joe

*Joseph DuMouchelle, G.G.*
*Estate Buyer -Appraiser – Auctioneer*
*Graduate Gemologist*
joe@josephdumouchelle.com

Direct (313) 300-9166; Michigan 313-884-4800
Toll free 800-475-8898;  NY 212-819-1899
www.josephdumouchelle.com

*Confidentiality Notice:  This email may contain confidential and legally privileged information that is intended only for the individual named.  If you are not the intended recipient, you are herby notified that any disclosure, copying, distribution, or reliance upon the contents of this message is strictly prohibited.  If you have received this transmission in error, please reply to the sender, so that proper delivery can be arranged, and please delete/discard this transmission.*

**From:** Richard Drucker <rdrucker@gemguide.com>
**Sent:** Monday, February 4, 2019 12:58 PM
**To:** Joseph DuMouchelle <Joe@JosephDumouchelle.com>
**Subject:** report

To Confirm the wiring information is below.  Please confirm receipt.

## WIRE TRANSFER INFORMATION

**Bank of America**
Routing # ██████████
Account # ██████0585

Exhibit F

STATE OF NORTH DAKOTA                    IN DISTRICT COURT

COUNTY OF WILLIAMS             NORTHWEST JUDICIAL DISTRICT

| | |
|---|---|
| Thomas T. Ritter,<br><br>           Plaintiff,<br><br>vs.<br><br>Joseph DuMouchelle,<br>Melinda Adducci a/k/a Melinda DuMouchelle,<br>and Joseph DuMouchelle Fine &<br>Estate Jewellers, LLC,<br><br>           Defendants. | Civil No.: 53-2019-CV-01186<br><br><br>**COMPLAINT** |

[¶1]    Plaintiff Thomas T. Ritter ("Ritter"), for his causes of action against Defendants Joseph DuMouchelle ("DuMouchelle"), Melinda Adducci, a/k/a Melinda DuMouchelle ("Adducci"), and Joseph DuMouchelle Fine & Estate Jewellers, LLC ("Fine & Estate"), states and alleges as follows:

[¶2]    Ritter, an individual, is a resident of Williams County, North Dakota.

[¶3]    On information and belief, Defendant Joseph DuMouchelle is a resident of the State of Michigan.

[¶4]    On information and belief, Defendant Melinda Adducci, is a resident of the State of Michigan.

[¶5]    Defendant Fine & Estate is a Michigan limited liability company. Fine & Estate has registered numerous assumed names with the State of Michigan including but not limited to Joseph DuMouchelle International Auctioneers and Joseph DuMouchelle.

## FACTS
## FEBRUARY 2014 PROMISSORY NOTE

[¶6]    Ritter, DuMouchelle and Adducci have a long-standing personal and professional relationship. Ritter, as a North Dakota resident, has periodically loaned money to Defendants to purchase and sell jewelry items.

[¶7]    Defendants DuMouchelle and Adducci entered into a Promissory Note with Ritter dated February 12, 2014, which was executed by DuMouchelle and Adducci on February 19, 2014. The purpose of the Promissory Note was to purchase and resell jewelry. The Note provides:

> At any time after the date of this Note until all amounts due hereunder are repaid in full, [Plaintiff] reserves the right to demand security from [Defendants DuMouchelle and Adducci] for the repayment of this Note.

The Note further provided Ritter with a first priority security interest in collateral valued in aggregate at 150% of the outstanding balance.

[¶8]    The Note was to be interpreted according to the laws of North Dakota and specifically granted jurisdiction to this Court as follows:

> **11. Governing Law and Venue**: This Note is executed in, constitutes a contract under and should be construed in accordance with the laws of the State of North Dakota. Any dispute arising under or in connection with this Note shall come within the jurisdiction of the state and/or federal courts within Williams County, North Dakota and the Western District of North Dakota.

[¶9]    The Promissory Note provides that upon default, Ritter may declare the entire unpaid principal balance of the loan and all interest immediately due and payable. The Note further provides Defendants DuMouchelle and Adducci shall be responsible for all costs, including court costs and reasonable attorney's fees, incurred as a result of default under the Note. A copy of the Promissory Note is attached as Exhibit A.

[¶10]   The Promissory Note was renewed and extended.

[¶11]   On or about January 17, 2018, DuMouchelle executed and delivered to Ritter a Renewed and Extended Promissory Note effective November 16, 2017, in the amount of $430,000.00, plus interest as provided for therein.

[¶12]   The Renewed and Extended Promissory Note was to be paid in full on or before May 16, 2018. A copy of the Renewed and Extended Promissory Note is attached as Exhibit B.

[¶13] Defendants defaulted under the terms and conditions of the Renewed and Extended Promissory Note.

## THE YELLOW ROSE

[¶14] In early 2019, while communicating with DuMouchelle regarding the Renewed and Extended Promissory Note, which was now in default, DuMouchelle informed Ritter of a possible investment opportunity. DuMouchelle indicated there was an estate sale pending in Texas that included a 77.12-carat yellow diamond ring, coined "The Yellow Rose." DuMouchelle, an expert in the field of gemstones, explained he could purchase the ring for $12.5 million from the estate sale and subsequently sell the ring for approximately $16 million to $20 million.

[¶15] Ritter and DuMouchelle agreed that Ritter would be the purchaser of The Yellow Rose diamond and DuMouchelle would be involved as an agent in a later sale of The Yellow Rose for Ritter.

[¶16] Defendant Adducci, who is DuMouchelle's spouse, also spoke to Ritter regarding purchase of The Yellow Rose and indicated it would be a lucrative investment for all of the parties. Defendant Adducci provided Ritter with photos and appraisal information regarding The Yellow Rose by email on January 25, 2019.

[¶17] By a letter agreement dated January 31, 2019, Ritter and DuMouchelle entered into an agreement that Ritter would purchase The Yellow Rose from the seller for $12 million, and DuMouchelle would then facilitate the subsequent sale on Ritter's behalf. Based on the amount of profit, the money was to be divided between Ritter and DuMouchelle. A copy of the January 31, 2019, Letter Agreement is attached as Exhibit C.

[¶18] At all times, Ritter expected he would purchase The Yellow Rose diamond for himself and the purchase funds would be transmitted from Ritter directly to the seller.

3

[¶19] By email dated January 31, 2019, DuMouchelle provided Ritter with the following wiring information:

| | |
|---|---|
| Bank Name: | MB Financial Bank |
| Account Name: | Highland Wealth Management |
| Bank Routing Number: | 071001737 |
| Account Number: | XXXXX79802 |

[¶20] DuMouchelle represented this was the account of the seller of The Yellow Rose.

[¶21] On February 1, 2019, Ritter initiated a wire transfer request with his bank to this account to purchase The Yellow Rose. This wire transfer was not completed.

[¶22] Thereafter, DuMouchelle, by emails on February 1, 2019, and February 4, 2019, directed Ritter to wire the $12,000,000 to a new account:

| | |
|---|---|
| Bank Name: | FineMark Bank & Trust |
| Account Name: | Fine & Estate Appraisers, LLC |
| Bank Routing Number: | 067016231 |
| Account Number: | XXXXX46380 |

[¶23] DuMouchelle again represented this was the account of the seller of The Yellow Rose.

[¶24] On February 4, 2019, Ritter attempted to wire the $12,000,000 funds to Fine & Estate Appraisers, LLC.

[¶25] Ritter was informed the FineMark Bank could not accept a wire of that size and the funds were returned to Ritter on February 5, 2019.

[¶26] DuMouchelle next directed Ritter to wire the funds to:

| | |
|---|---|
| Bank Name: | Bank of America |
| Account Name: | Fine & Estate Appraisers, LLC. |
| Bank Routing Number: | 026009593 |
| Bank Account Number: | XXXXXXX60585 |

4

[¶27] Ritter completed the wire transfer to the account of Fine & Estate Appraisers, LLC with Bank of America on February 6, 2019. At all times Ritter believed the wire transfer funds were being transmitted directly to the seller of The Yellow Rose.

[¶28] The wiring information including bank, routing number and account number provided to Ritter and referred to in Paragraphs 22 and 26 above were instructions contained within an email from Richard Drucker and transmitted to Ritter by DuMouchelle.

[¶29] DuMouchelle later provided Ritter with a Receipt from Joseph DuMouchelle International Auctioneers dated February 6, 2019, for purchase of The Yellow Rose for $12 million.

[¶30] It was Ritter's belief that he had purchased The Yellow Rose and DuMouchelle was holding it for the benefit of Ritter. DuMouchelle represented to Ritter The Yellow Rose would be moved from the Brinks depository in Texas to the Brinks depository in Detroit, MI to be held in the names of both DuMouchelle and Ritter although at all times owned by Ritter.

[¶31] DuMouchelle represented he was actively promoting sale of The Yellow Rose Diamond for the benefit of Ritter.

[¶32] In March 2019, DuMouchelle represented to Ritter he had a buyer interested in purchasing The Yellow Rose from Ritter. Ritter expected he would sell The Yellow Rose to the buyer and the buyer would transmit the purchase funds directly to Ritter. Ritter emailed a draft agreement in conformity with this understanding to DuMouchelle on March 21, 2019.

[¶33] DuMouchelle, as agent for Ritter, entered into a Letter Agreement dated April 12, 2019, for the subsequent sale of The Yellow Rose for $16.5 million with Sam Haggin, Trustee of the Jennifer H. Rands Trust, which was signed by Sam Haggin on April 19, 2019. A copy of the April 12, 2019, letter agreement is attached as Exhibit D.

[¶34] The agreement provided that payment for The Yellow Rose was to be made in full by wire transfer within ten (10) days of signing the agreement, which was executed on April 19, 2019.

[¶35]   Ritter has not received any funds from the purported April 2019 sale.

[¶36]   Ritter has since learned that his wire transfer to Bank of America on February 6, 2019, did not go to any account controlled by the seller of The Yellow Rose, but was transferred to an account controlled by Defendants.

[¶37]   Ritter has regularly communicated with DuMouchelle trying to secure information regarding his money and the location of The Yellow Rose. Ritter also traveled to Detroit, Michigan on April 21, 2019, in order to meet with DuMouchelle on April 22, 2019, and view The Yellow Rose at the Brinks depository. DuMouchelle wrongfully reported to Ritter the Brinks depository was closed and they were unable to view The Yellow Rose. Ritter later confirmed the Brinks depository was open on April 22, 2019.

[¶38]   Defendants have refused to return Ritter's funds or any profit earned on the subsequent sale and refused to truthfully communicate the whereabouts of The Yellow Rose or any specific details of the purchase and subsequent sale of The Yellow Rose.

## COUNT I
## BREACH OF CONTRACT

[¶39]   Ritter realleges and reincorporates the preceding paragraphs.

[¶40]   Ritter and DuMouchelle entered into an enforceable contract in which Plaintiff agreed to advance funds in the amount of $12 million to purchase The Yellow Rose and DuMouchelle agreed to negotiate and facilitate a subsequent sale of The Yellow Rose at a profit.

[¶41]   Ritter provided $12 million to purchase the Yellow Rose to DuMouchelle through a wire transfer.

[¶42]   Defendants have refused to return Ritter's $12 million, have not provided Ritter with The Yellow Rose, nor have Defendants shared any of the profits from the subsequent sale of The Yellow Rose.

[¶43]   Defendants' refusals are a material breach of contract.

6

[¶44] Ritter is entitled to damages for the payment advanced and expected profit from the sale of The Yellow Rose plus any and all other damages caused by the breach of contract.

## COUNT II
## PROMISSORY ESTOPPEL

[¶45] Ritter realleges and reincorporates the preceding paragraphs.

[¶46] In exchange for Ritter fronting the initial $12 million to purchase The Yellow Rose, DuMouchelle promised to return Ritter's $12 million and provide a share of the profit from the subsequent sale.

[¶47] Ritter substantially changed his position by wiring $12 million to secure the purchase of The Yellow Rose.

[¶48] Ritter reasonably relied on DuMouchelle's promise when he provided the $ 12 million to purchase the Yellow Rose.

[¶49] Injustice can only be avoided by enforcing Defendants' promise to return the $12 million and/or Ritter's share of the profits from the sale of The Yellow Rose.

## COUNT III
## UNJUST ENRICHMENT

[¶50] Ritter realleges and reincorporates the preceding paragraphs.

[¶51] Defendants were enriched by Ritter wiring $12 million to purchase The Yellow Rose and by the subsequent sale of The Yellow Rose for a profit.

[¶52] Ritter has been impoverished by at least $12 to $14 million.

[¶53] Ritter's impoverishment and Defendants' enrichment are connected in that Ritter only provided the $12 million wire transfer to Defendants with the understanding Defendants would in turn (1) buy The Yellow Rose; (2) sell The Yellow Rose at a profit of approximately $4 million; and (3) return Ritter's initial payment and provide a share of the profit from the sale of The Yellow Rose.

[¶54] There is no justification for Defendants' enrichment to the detriment of Ritter.

7

[¶55]   As a result of Defendants' unjust enrichment, Ritter has been damaged in the amount of at least $12 million.

## COUNT IV
## EQUITABLE ESTOPPEL

[¶56]   Ritter realleges and reincorporates the preceding paragraphs.

[¶57]   Defendants falsely represented to Ritter that upon purchase of The Yellow Rose the ring would be sold at a profit and that Ritter would then be provided with a return of his initial investment plus a share of the profit.

[¶58]   Defendants misrepresented the identity of the owner of the account to which Ritter wired the initial $12 million. Defendants intentionally misled Ritter to believe the account was owned by the seller of The Yellow Rose when the account was actually owned by and under the control of the Defendants.

[¶59]   Based on these misrepresentations, Ritter unknowingly provided funds directly to Defendants instead of paying the seller for The Yellow Rose.

[¶60]   Ritter has been damaged by Defendants' false representations in an amount not less than $12 million.

## COUNT V
## FRAUD

[¶61]   Ritter realleges and reincorporates the preceding paragraphs.

[¶62]   DuMouchelle promised Ritter that if Ritter paid $12 million for purchase of The Yellow Rose that the ring could be sold for $16 to $20 million. Defendants promised Ritter he would get a return of his $12 million and plus a share of the profit from the subsequent sale of The Yellow Rose.

[¶63]   Defendants made these promises to Ritter to induce him to enter into the contract. Upon entering the contract, Defendants made false representations and induced Ritter to wire $12

8

million to account controlled by the Defendants instead of an account controlled by the seller of The Yellow Rose.

[¶64]   Defendants made these false statements and representations to Ritter knowing them to be false or without any intention of performing. Defendants committed other acts of deceit to induce Ritter to wire $12 million to an account controlled by the Defendants.

[¶65]   Defendants' committed fraud to the detriment of Ritter by making material representations and omissions to Ritter regarding the purchase and potential sale of The Yellow Rose.

[¶66]   When Defendants made such misrepresentations, they knew that the misrepresentations were false and the omissions material.

[¶67]   Ritter has been damaged in an amount not less than $12 million as a result of the fraud perpetuated by Defendants.

**COUNT VI**
**ACCOUNTING**

[¶68]   Ritter realleges and incorporates the preceding paragraphs.

[¶69]   By the actions described above, Defendants have been unjustly enriched. Plaintiff is entitled to an accounting of all amounts by which Defendants may have been unjustly enriched, and an order requiring that those amounts be disgorged to Plaintiff.

**COUNT VII**
**BREACH OF CONTRACT – PROMISSORY NOTE**

[¶70]   Ritter realleges and incorporates the preceding paragraphs.

[¶71]   Defendants entered into a Renewed and Extended Promissory Note and were obligated to pay the sums owed on or before May 16, 2018.

[¶72]   Defendants failed to pay in accordance with the Renewed and Extended Promissory Note.

9

[¶73] Default has occurred under the terms and conditions of the Renewed and Extended Promissory Note as the Defendants have failed, neglected, and refused to make the payments therein provided and Ritter elects and declares the whole amount of the unpaid sums, and interest thereon, to be due and owing

[¶74] Ritter is entitled to recover from the Defendants the amounts of principal and interest provided for in the Renewed and Extended Promissory Note.

[¶75] **WHEREFORE,** Plaintiff prays for relief against Defendants as follows:

[¶76] Determining and adjudging the amount due to Plaintiff under the terms and conditions of the Notes, including principal, interest, and costs and disbursements of the action;

[¶77] For judgment against the Defendants in an amount not less than $12 million;

[¶78] For reasonable attorney's fees, costs, disbursements, and interest provided at law and by the agreements between Plaintiff and Defendants; and

[¶79] For whatever further relief this Court deems just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

[¶80] Plaintiff demands a jury trial on all issues so triable with the greatest number of jurors allowed by law.

Dated: June 27, 2019

Ronald H. McLean (#03260)
Kasey D. McNary (#06590)
SERKLAND LAW FIRM
10 Roberts St | PO Box 6017
Fargo, ND 58108-6017
Telephone: 701.232.8957
rmclean@serklandlaw.com
kmcnary@serklandlaw.com
ATTORNEYS FOR PLAINTIFF
THOMAS T. RITTER

10

Exhibit G

| | |
|---|---|
| Thomas T. Ritter,<br><br>                   Plaintiff,<br><br>     vs.<br><br>Joseph DuMouchelle,<br>Melinda Adducci a/k/a Melinda DuMouchelle,<br>and Joseph DuMouchelle Fine & Estate<br>Jewellers, LLC,<br><br>                   Defendant. | Court File No.: <u>53-2019-CV-01186</u><br><br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER FOR JUDGMENT** |

[¶1]     This matter is before the Court on Plaintiff Thomas T. Ritter's ("Ritter") Application for Judgment by Default. The Court, now being fully advised, hereby finds:

## **FINDINGS OF FACT**

[¶2]     This action was commenced by personal service of a Summons and Complaint upon attorney David de Reyna who was duly authorized to accept service of the Summons and Complaint for Joseph DuMouchelle ("DuMouchelle") and Melinda Adducci a/k/a Melinda DuMouchelle ("Adducci") and executed an Admission of Service. See Admission of Service (Doc. ID #7). At the same time, the Summons and Complaint was personally served on David de Reyna, as the Registered Agent of Joseph DuMouchelle Fine & Estate Jewellers, LLC on July 10, 2019. See Affidavit of Service (Doc. ID #8).

[¶3]     More than twenty-one (21) days have elapsed since service of the Summons and Complaint upon Defendants and Plaintiff did not receive an Answer from Defendants nor did Defendants make an appearance with the Court.

[¶4]     All of the allegations as contained in Plaintiff's Complaint (Doc ID# 1) are hereby declared true and correct.

[¶5]     Defendants DuMouchelle and Adducci entered into a Promissory Note with Ritter dated February 12, 2014, which was executed by DuMouchelle and Adducci on February 19, 2014. The purpose of the Promissory Note was to purchase and resell jewelry. The Note provides:

> At any time after the date of this Note until all amounts due hereunder are repaid in full, [Plaintiff] reserves the right to demand security from [Defendants DuMouchelle and Adducci] for the repayment of this Note.

The Note further provided Ritter with a first priority security interest in collateral valued in aggregate at 150% of the outstanding balance. Compl., ¶ 7.

[¶6]     The Note is to be interpreted according to the laws of North Dakota and specifically granted jurisdiction to this Court as follows:

> **11. Governing Law and Venue**: This Note is executed in, constitutes a contract under and should be construed in accordance with the laws of the State of North Dakota. Any dispute arising under or in connection with this Note shall come within the jurisdiction of the state and/or federal courts within Williams County, North Dakota and the Western District of North Dakota.

Compl., ¶ 8.

[¶7]     The Promissory Note provides upon default, Ritter may declare the entire unpaid principal balance of the loan and all interest immediately due and payable. The Note further provides Defendants DuMouchelle and Adducci shall be responsible for all costs, including court costs and reasonable attorney's fees, incurred as a result of default under the Note. Compl., ¶ 9. A copy of the Promissory Note was attached to the Complaint as Exhibit A. (Doc. ID #3).

[¶8]     Interest on this Note in the amount of $80,000 plus the original amount of $350,000 were combined for a new Note totaling $430,000, which was dated August 12, 2014. Ritter Aff. ¶ 6. This Note, in the principal amount of $430,000 was renewed and extended many times for six (6) month terms with all principal and interest due on May 16 and November 16 of each year. Id.

[¶9]     On November 16, 2017, a Renewed and Extended Promissory Note effective May 16, 2017, came due requiring payment of the principal amount of $430,000 plus accrued interest of $64,500. While negotiating an extension for the principal, DuMouchelle and Adducci agreed to pay the existing accrued interest of $64,500. Ritter Aff. ¶ 7. Despite their promises, DuMouchelle and Adducci failed to pay the interest due on November 16, 2017, in the amount of $64,500. Ritter Aff. ¶ 9.

[¶10]     On or about January 17, 2018, DuMouchelle executed and delivered to Ritter a Renewed and Extended Promissory Note effective November 16, 2017, in the amount of $430,000.00, plus interest as provided for therein. Compl., ¶ 11.

[¶11]     The Renewed and Extended Promissory Note was to be paid in full on or before May 16, 2018. Compl., ¶ 12. A copy of the Renewed and Extended Promissory Note was attached to the Complaint as Exhibit B. (Doc. ID #4)

[¶12]     Defendants defaulted under the terms and conditions of the Renewed and Extended Promissory Note. Compl., ¶ 13.

[¶13]     In early 2019, while communicating with DuMouchelle regarding the Renewed and Extended Promissory Note, DuMouchelle informed Ritter of a possible investment opportunity. DuMouchelle indicated there was an estate sale pending in Texas that included a 77.12-carat yellow diamond ring, coined "The Yellow Rose." DuMouchelle, an expert in the field of gemstones, explained he could purchase the ring for $12.5 million from the estate sale and subsequently sell the ring for approximately $16 million to $20 million. Compl., ¶ 14.

[¶14]     Defendant Adducci, who is DuMouchelle's spouse, also spoke to Ritter regarding purchase of The Yellow Rose and indicated it would be a lucrative investment for all of the parties. Defendant Adducci provided Ritter with photos and appraisal information regarding The Yellow Rose by email on January 25, 2019. Compl., ¶ 16.

[¶15] By a letter agreement dated January 31, 2019, Ritter and DuMouchelle entered into an agreement that Ritter would purchase The Yellow Rose from the seller for $12 million, and DuMouchelle would then facilitate the subsequent sale on Ritter's behalf. Based on the amount of profit, the money was to be divided between Ritter and DuMouchelle. Compl., ¶ 17. A copy of the January 31, 2019, Letter Agreement was attached to the Complaint as Exhibit C. (Doc. ID #5).

[¶16] Between January 31, 2019, and February 5, 2019, DuMouchelle, by email, directed Ritter to wire money to purchase The Yellow Rose to various accounts, which DuMouchelle represented and Ritter believed was the account of the seller of The Yellow Rose. Compl., ¶¶ 19-26.

[¶17] Ritter ultimately completed a wire transfer on February 6, 2019, to the Bank of America account of Fine & Estate Appraisers, LLC. Compl., ¶ 27.

[¶18] DuMouchelle later provided Ritter with a Receipt from Joseph DuMouchelle International Auctioneers dated February 6, 2019, for purchase of The Yellow Rose for $12 million. Compl., ¶ 29.

[¶19] In March 2019, DuMouchelle represented to Ritter he had a buyer interested in purchasing The Yellow Rose from Ritter. Ritter expected he would sell The Yellow Rose to the buyer and the buyer would transmit the purchase funds directly to Ritter. Ritter emailed a draft agreement in conformity with this understanding to DuMouchelle on March 21, 2019. Compl., ¶ 32.

[¶20] DuMouchelle, as agent for Ritter, entered into a Letter Agreement dated April 12, 2019, for the subsequent sale of The Yellow Rose for $16.5 million with Sam Haggin, Trustee of the Jennifer H. Rands Trust, which was signed by Sam Haggin on April 19, 2019. Compl., ¶ 33. A copy of the April 12, 2019, letter agreement was attached to the Complaint as Exhibit D. (Doc. ID #6).

[¶21]   The agreement provided that payment for The Yellow Rose was to be made in full by wire transfer within ten (10) days of signing the agreement, which was executed on April 19, 2019. Compl., ¶ 34.

[¶22]   Ritter has received neither The Yellow Rose nor the proceeds from any sale of The Yellow Rose. Defendants have refused to return Ritter's funds or any profit earned on the subsequent sale of The Yellow Rose. Ritter Aff. ¶ 29. The Defendants have further refused to communicate truthfully with Ritter regarding the location of The Yellow Rose or any details regarding the purchase and subsequent sale of The Yellow Rose or provide an accounting detailing the specific use of the funds transmitted by Ritter. Id.

[¶23]   **NOW, THEREFORE,** based upon the foregoing Findings of Fact, the Court hereby makes the following:

## CONCLUSIONS OF LAW

[¶24]   This Court has jurisdiction over the parties and the subject matter of this action.

[¶25]   Defendants DuMouchelle and Adducci entered into a Promissory Note with Ritter dated February 12, 2014, which was executed by DuMouchelle and Adducci on February 19, 2014. The purpose of the Promissory Note was to purchase and resell jewelry.

[¶26]   The Promissory Note provides that upon default, Ritter may declare the entire unpaid principal balance of the loan and all interest immediately due and payable. The Note further provides Defendants DuMouchelle and Adducci shall be responsible for all costs, including court costs and reasonable attorney's fees, incurred as a result of default under the Note.

[¶27]   On November 16, 2017, a Renewed and Extended Promissory Note effective May 16, 2017, came due requiring payment of the principal amount of $430,000 plus accrued interest of $64,500. An extension was negotiated in which DuMouchelle and Adducci agreed to pay the

existing accrued interest of $64,500. DuMouchelle and Adducci failed to pay the accrued interest of $64,500 as promised.

[¶28] On or about January 17, 2018, DuMouchelle executed and delivered to Ritter a Renewed and Extended Promissory Note effective November 16, 2017, in the amount of $430,000.00, plus interest as provided for therein.

[¶29] The Renewed and Extended Promissory Note was to be paid in full on or before May 16, 2018.

[¶30] Defendants defaulted under the terms and conditions of the Renewed and Extended Promissory Note.

[¶31] In early 2019, while communicating with DuMouchelle regarding the Renewed and Extended Promissory Note, which was now in default, DuMouchelle informed Ritter of a possible investment opportunity. DuMouchelle indicated there was an estate sale pending in Texas that included a 77.12-carat yellow diamond ring, coined "The Yellow Rose." DuMouchelle, an expert in the field of gemstones, explained he could purchase the ring for $12.5 million from the estate sale and subsequently sell the ring for approximately $16 million to $20 million.

[¶32] Defendant Adducci also spoke to Ritter regarding purchase of The Yellow Rose and indicated it would be a lucrative investment for all of the parties. Defendant Adducci provided Ritter with photos and appraisal information regarding The Yellow Rose by email on January 25, 2019.

[¶33] By a letter agreement dated January 31, 2019, Ritter and DuMouchelle entered into an agreement that Ritter would purchase The Yellow Rose from the seller for $12 million, and DuMouchelle would then facilitate the subsequent sale on Ritter's behalf. Based on the amount of profit, the money was to be divided between Ritter and DuMouchelle.

[¶34] Between January 31, 2019, and February 5, 2019, DuMouchelle, by email, directed Ritter to wire money to purchase The Yellow Rose to various accounts, which DuMouchelle represented and Ritter believed was the account of the seller of The Yellow Rose.

[¶35] Ritter ultimately completed a wire transfer on February 6, 2019, to the Bank of America account of Fine & Estate Appraisers, LLC.

[¶36] DuMouchelle later provided Ritter with a Receipt from Joseph DuMouchelle International Auctioneers dated February 6, 2019, for purchase of The Yellow Rose for $12 million.

[¶37] In March 2019, DuMouchelle represented to Ritter he had a buyer interested in purchasing The Yellow Rose from Ritter. Ritter expected he would sell The Yellow Rose to the buyer and the buyer would transmit the purchase funds directly to Ritter. Ritter emailed a draft agreement in conformity with this understanding to DuMouchelle on March 21, 2019.

[¶38] DuMouchelle, as agent for Ritter, entered into a Letter Agreement dated April 12, 2019, for the subsequent sale of The Yellow Rose for $16.5 million with Sam Haggin, Trustee of the Jennifer H. Rands Trust, which was signed by Sam Haggin on April 19, 2019.

[¶39] The agreement provided that payment for The Yellow Rose was to be made in full by wire transfer within ten (10) days of signing the agreement, which was executed on April 19, 2019.

[¶40] Ritter has received neither The Yellow Rose nor the proceeds from any sale of The Yellow Rose.

[¶41] Defendants have refused to return Ritter's funds or any profit earned on the subsequent sale of The Yellow Rose. The Defendants have further refused to communicate truthfully with Ritter regarding the location of The Yellow Rose or any details regarding the purchase and subsequent sale of The Yellow Rose or provide an accounting detailing the specific use of the funds transmitted by Ritter.

[¶42]   Defendants have breached their agreements with Plaintiff regarding the purchase and subsequent sale of The Yellow Rose.

[¶43]   Plaintiff Thomas T. Ritter shall be declared the prevailing party and is entitled to ~~attorney's fees,~~ costs, and disbursements.

## ORDER FOR JUDGMENT

[¶44]   IT IS HEREBY ORDERED:

[¶45]   Plaintiff's Application for Default Judgment is hereby GRANTED.

[¶46]   Defendants have breached their agreements with the Plaintiff regarding the purchase and sale of The Yellow Rose and are hereby ordered to pay Plaintiff his damages totaling $16,414,214.61 for the original purchase costs, commission and interest.

[¶47]   Defendants defaulted on the Renewed and Extended Promissory Note and Plaintiff is awarded his principal and interest due, which totals $725,817.01 as of August 31, 2019.

[¶48]   Plaintiff shall be declared the prevailing party and entitled to recover his costs and disbursements as allowed.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this _____ day of _____, 2019.

Signed: 9/12/2019 11:32:54 AM

BY THE COURT:                                    Kirsten Sjue

_Kirsten M. Sjue_
Judge of the District Court

# Exhibit H

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

**IN THE MATTER OF:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, | Bankruptcy Case No. 19-54531 Hon. Lisa S. Gretchko Chapter 7 |
| *Debtors.* | |

| | |
|---|---|
| THOMAS T. RITTER, *Plaintiff,* | Adv. Pro. No. 20-04381-pjs Hon. Lisa S. Gretchko |
| v. | |
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, *Defendants.* | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S DISCOVERY REQUESTS

**NOW COME** the Defendants, JOSEPH G. DUMOUCHELLE ("Joe") and

MELINDA J. ADDUCCI ("Melinda") (collectively "Defendants"), by and through

their counsel, JOHN R. FOLEY, P.C., who, in response to the Discovery Requests

propounded by the Plaintiff, THOMAS T. RITTER, hereby state as follows:

## PRIVILEDGE / OBJECTIONS

Joe and Melinda are both the subject of actual or potential criminal

proceedings. Joe has actually been prosecuted, but that litigation continues, and

therefore, he asserts his Fifth Amendment Privilege in response to all requests made

by Plaintiff herein. Further, with respect to any request that may call for documents

or communication between he and Melinda (his wife), Joe asserts Marital/Spousal

Privilege, and with respect to any request that may call for documents or communications between he and his attorney, Joe asserts Attorney-Client Privilege.

Melinda has sought assurances, through her counsel, repeatedly, that she is not being pursued for prosecution. Melinda asserts her Fifth Amendment Privilege, and does not waive the same by answering these requests. Further, with respect to any request that may call for documents or communication between her and Joe (her husband), Melinda asserts Marital/Spousal Privilege, and with respect to any requests that may call for documents or communications between she and her attorney, Melinda asserts Attorney-Client Privilege. However, in an effort to be responsive, to move this case along, and to show that she did not participate in any fraudulent conduct as alleged, Melinda has provided responsive answers and documents. These responses are provided without wavier of her Fifth Amendment Privilege, her Attorney-Client Privilege, or her Marital/Spousal Privilege. and specific preservation of the same.

## **INTERROGATORIES**

1. Provide the names of all current and prior members and officers (including their titles) of DuMouchelle Jewellers, the date of admission of each member and the term of each officership.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

    b. **Melinda Response**: Joe was always a 90% member and I was a 10%



member. Joe served as President. Melinda served as VP. I do not recall what date this was established on.

2. Provide a description of each expenditure, transfer and/or withdrawal made (including the name and address of the recipient, the amount paid to such recipient and the assets received or the liability paid in exchange therefor), utilizing the proceeds received from Plaintiff with respect to the $350,000 Note and the alleged $80,000 profit realized on such proceeds.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

   b. **Melinda Response**: I have no knowledge of these things. All funds would have gone in and out the bank account, and those statements, which can be obtained from the business case trustee, provide this information.

3. Provide a description of each expenditure, transfer and/or withdrawal made (including the name and address of the recipient, the amount paid to such recipient and the assets received or the liability paid in exchange therefor), utilizing the $12 Million.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

   b. **Melinda Response**: All funds would have gone in and out the bank account, and those statements, which can be obtained from the business case trustee, provide this information. Further, I have attached hereto

the copies of the counter-checks that were issued to certain clients/customers/vendors following the referenced deposit.

4. For each of the expenditures, transfers and/or withdrawals identified in your response to Interrogatory Nos. 2 and 3, identity which of Defendants initiated, caused, signed for or otherwise participated in each and which Defendants had contemporaneous and/or after the fact knowledge of each.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

   b. **Melinda Response**: I did negotiate or have knowledge of the reasons or details of any of the transfers made. Joe negotiated/calculated/ effectuated any transfers. My only involvement was one day, while I was already in Tuscon, Arizona, for the AGA Gem Conference (*Attachments 8 & 9*) and Joe had missed the closing of the banks in Michigan, and the banks in Arizona were still open due to the time zone difference, Joe emailed the bank and setup the counter-checks/transfers (*Attachments 1, 2, & 3*) and called me and asked that I go to the bank and sign for them. (*Attachments 4, 5, & 6*). Joe simply asked me to go to the bank and sign if needed, as the only other signer on the account. Again, I had no knowledge of what these transfers were for, why they were being made, etc. And none of that money came to me.

      i. Per Exhibit 12 of your Complaint, the BOA bank statement

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

(*Attachment 5*) there are three "Customer Withdraw Transactions" on 2/7/2019:

| | | | |
|---|---|---|---|
| 2/7/2019 | Customer Withdrawal Image | $ | (4,041,925.00) |
| 2/7/2019 | Customer Withdrawal Image | $ | (1,091,769.44) |
| 2/7/2019 | Customer Withdrawal Image | $ | (39,000.00) |

ii.  Also per Exhibit 13 of your Complaint, (*Attachment 6*) my signature are on these three withdraws.

iii.  The attached photos of the counter-checks (*Attachment 4*) show exactly where this money went:

| Payee | Check | |
|---|---|---|
| | | |
| Merrill Wood Collection | $ | 6,000.00 |
| Peter Indorf | $ | 1,500.00 |
| JB International | $ | 678,000.00 |
| John Ragard | $ | 848,500.00 |
| Diamond Opportunities | $ | 33,500.00 |
| Kwiat | $ | 204,225.00 |
| Abbotts Corp | $ | 1,104,750.00 |
| Aron Rescources | $ | 236,450.00 |
| Candaian Gemmological Ass. | $ | 1,500.00 |
| Gene Kazlow | $ | 450,000.00 |
| Howard Derman | $ | 200,000.00 |
| FEI | $ | 277,500.00 |
| | $ | 4,041,925.00 |
| | | |
| Paul Haig | $ | 39,000.00 |
| | | |
| David L. Husman | $ | 1,091,769.44 |

iv.  As I said, I had no idea of the reasons why these transfers were being made. Rather, I did these at Joe's request, and as I said, NONE of the money came to me.

5. Provide the names and last known addresses of each employee of DuMouchelle Jewellers from January 1, 2017 through present date, including Lauren Tobin, Olivia Rosema, Morgan Lynch, and Kevin Lynch, the term of their employment and a summary of their job responsibilities.

    i. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

    ii. **Melinda Response**:

        1. Lauren Tobin, 1290 Roslyn Rd., Grosse Pointe Woods, MI 48236, Phone: 313-310-4516, who was employed at Joseph Dumouchelle Fine & Estate Jewellers LLC, during time periods relevant to the facts of the situation giving rise to the Complaint, and can testify to the same.

        2. Olivia Rosema, Phone: 313-770-7225, who was employed at Joseph Dumouchelle Fine & Estate Jewellers LLC, during time periods relevant to the facts of the situation giving rise to the Complaint, and can testify to the same.

        3. Morgan Lynch, 25545 Packard St., Roseville, MI 48066, Phone: 313-404-1316, who was employed at Joseph Dumouchelle Fine & Estate Jewellers LLC, during time periods relevant to the facts of the situation giving rise to the Complaint, and can testify to the same.

4. With respect to Kevin Lynch: Kevin was, to the best of my recollection, never an "employee" of DuMouchelle Jewelers. Rather, on various, very limited occasions, Kevin would help his uncle (Joe) by assisting with auctions and moving boxes. I do not know if he was even paid for this, and if he was, it likely less than the $600 1099 requirement.

5. Additional Employees: I recall that DuMouchelle Jewellers had several additional employees, years ago; however, I do not have access to the records, and therefore, cannot recall the names of these people.

6. Identify all documents to which you referred, or will rely upon at the time of trial, in support of any denials contained in your answer to Plaintiff's Amended Complaint.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

   a. **Melinda Response**: All such documents are in possession of the bankruptcy trustees of the two (2) bankruptcy cases (our personal case and the business case), or the FBI. My attorney will need to obtain these through discovery. I intend to use any documents attached to pleadings in this case, (which are all accessible via CM/ECF), and/or any

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

produced during initial disclosures, and/or any produced in response to these discovery requests (which I have attached), or later, if I locate any further responsive or relevant documents or obtain any such documents via discovery.

7. Identify all communications (name of person, whether by email, text or phone and the substance of each communication) between either of Defendants and any family members of Defendants (including children, in-laws, sisters, brothers and parents) related to or touching upon the transactions by and between either of Defendants and Plaintiff.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

   b. **Melinda Response**: Melinda objections to this request as Overly broad, Vague, Ambiguous, and unduly burdensome as it is not limited in time scope. Subject to and without waiving her objections, Melinda states: None that I can recall or currently have in my possession. Except that I know I spoke to, and or texted/emailed with Joe, regarding having me sign for the transfers/counter-checks that in s Tucson. I have attached emails that are evidence of this.

8. Identify the exact location, description and value of all assets of Defendants and of DuMouchelle Jewellers not within the custody of the trustees in Defendants' or DuMouchelle Jewellers bankruptcy cases, in existence as of

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

the date of filing of Defendants' and DuMouchelle Jewellers' bankruptcy proceedings, including all cash, certificates of deposit, jewelry, gems, gemstones, real property, personal property, stocks, bonds, mutual funds, cash, debit cards, crypto currencies, gift cards, and/or other cash equivalents and safety deposit boxes and safes.

a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

b. **Melinda Response**: All of my assets, and I believe all of those of Joe as well, and of the company (DuMouchelle Jewellers) were laid out in the bankruptcy case schedules and statements. Some were taken as non-exempt by the trustees of the 2 cases. All of the business assets were taken by the trustee in that case. I believe all real property was sold. I currently have minimal personal property that I own, including miscellaneous items of clothing, costume jewelry, and the standard household items like furnishing and kitchen wares, at the home where I live, which were either exempt in our personal bankruptcy case, or which we settled with the Trustee to allow us (now just me) to have, or which I have acquired since the bankruptcy filing, from my own earning.

9. State the complete name and address of the person who affixed the signature of Sam Haggin to the document containing the alleged signature of Sam

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

Haggin.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

    b. **Melinda Response**: Objection: this interrogatory is overly broad, vague, and ambiguous, since the Plaintiff fails to attach the document in question. Subject to and without waiving her objection(s), Melinda states: I do not know what document you are referencing. I have no knowledge about this. However, if there is a document that has Sam Haggin's signature, my first presumption would be that she signed it. If the implication of this question is that she did not sign it, I truly have no idea about this.

## RESPONSES TO REQUESTS TO PRODUCE

1. Produce the Operating Agreement and all amendments to the same of DuMouchelle Jewellers.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

    b. **Melinda Response**: Any such documents would currently be in the possession of the Trustee of the bankruptcy case of that entity.

2. Produce all personal diaries of either of Defendants for the calendar years 2018-2022.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege and Spousal Privilege.

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

b. **Melinda Response**: Melinda asserts Spousal Privilege but, without waiving said objection states: None exist.

3. Produce all physical calendars, daytimers or other writings evidencing the activities of either of Defendants for the calendar years 2018-2022.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege and Spousal Privilege.

   b. **Melinda Response**: Melinda asserts Spousal Privilege but, without waiving said objection states: None exist. Further, the office computers had a app called ACT that kept track of these things, but these computers were taken by the business case trustee.

4. Produce copies of all handwritten correspondence from either of Defendants to any third party for the calendar years 2018-2022.

   a. **Joe Response**: Joe asserts his Fifth Amendment Privilege and Spousal Privilege.

   b. **Melinda Response**: Melinda asserts Spousal Privilege but, without waiving said objection states: None exist.

5. Produce all documents referenced in the "briefcase" of documents Defendant Joseph intended to share with his criminal counsel, but never reviewed, alleged to have existed in the filings made by Joseph in his criminal proceeding.

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege and

        Attorney-Client Privilege.

    b. **Melinda Response**: Melinda states: I do not know anything about this.

6. Produce the signature cards to the Bank of America Account.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege.

    b. **Melinda Response**: I do not have any of these. They can be obtained

        from Bank of America.

7. Produce all documents you intend to rely upon at the time of trial.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege, and also

        relies on Melinda's response.

    b. **Melinda Response**: All such documents are in possession of the

        bankruptcy trustees of the two (2) bankruptcy cases (our personal case

        and the business case), or the FBI. My attorney will need to obtain these

        through discovery. I intend to use any documents attached to pleadings

        in this case, (which are all accessible via CM/ECF), and any produced

        during initial disclosures, and any produced in response to these

        discovery requests (***Attachments 1 – 9 hereto***), or later, if I locate any

        further responsive documents or documents relevant to my defense or

        obtain any such documents via discovery.

8. Produce all communications in Defendant's possession between Plaintiff and

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

either of Defendants.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege. Joe further objects to this request as Overly broad, Vague, Ambiguous, and unduly burdensome as it is not limited in scope of time.

    b. **Melinda Response**: Melinda objects to this request as overly broad and unduly burdensome as it is not limited in scope of time. However, subject to and without waiving her objections, Melinda states: To the best of my current knowledge, I do not have any access to any emails between Plaintiff and me. However, I do not believe, using the time frame 2018-2022 (as limited in other requests), that I had any direct communication between me and Plaintiff, other than the email attached to your Complaint.

9. Produce all documents referenced or relied upon in preparing your responses to the Interrogatories.

    a. **Joe Response**: Joe asserts his Fifth Amendment Privilege and Attorney-Client Privilege and Marital/Spousal Privilege, to the extent that any communication between her and her attorney, or her and her husband, could be deemed to have been "relied on" in preparation of these responses.

    b. **Melinda Response**: Melinda asserts Attorney-Client Privilege and

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

Marital/Spousal Privilege to the extent that any communication between her and her attorney, or her and her husband, could be deemed to have been "relied on" in preparation of these responses. Subject to and without waiving those privileges, Melinda states: All relevant business documents were taken by the Trustee of the Business Case. The minimal documents I do have, to the extent responsive hereto, or relevant to this case (and to the extent not yet obtained from other third parties), I have produced either in my initial disclosures, or attached to pleadings in this case, or I have attached them to these responses.

---

## **VERIFICATION**

By signing below, I swear and affirm that the foregoing responses to discovery are true and accurate to the best of my knowledge, information, and belief.

DocuSigned by:

_863CED7389DE460..._

Melinda ADDUCCI
*as to her answers/responses only.*

1/26/2023
_____
Date

---

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendants*


By: /s/Patrick A. Foley
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
Phone: (313) 274-7377
Email:  pfoley@jrfpc.net

**Dated**: January 26, 2023

DocuSign Envelope ID: 272B38F3-978C-489B-A973-0599729C90D1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, | Bankruptcy Case No. 19-54531 Hon. Phillip J. Shefferly Chapter 7 |
| *Debtors.* | |

| | |
|---|---|
| THOMAS T. RITTER, *Plaintiff,* | Adv. Pro. No. 20-04381-pjs Hon. Phillip J. Shefferly |
| v. | |
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, *Defendants.* | |

## PROOF OF SERVICE

Patrick A. Foley hereby certifies that on January 26, 2023 he did serve a copy of the foregoing discovery responses, upon counsel for the Plaintiff, THOMAS R. RITTER by emailing a copy of the same, via the Court's CM/ECF e-Filing System to:

Attorney Jay L. Welford  - Email: jwelford@jaffelaw.com

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendants*

By: /s/Patrick A. Foley
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
Phone: (313) 274-7377
Email:  pfoley@jrfpc.net

**Dated**: January 26, 2023