# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

              Debtors.

_____/

Thomas T. Ritter,

              Plaintiff,

v.

Melinda J. Adducci,

              Defendant.

_____/

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

## PLAINTIFF'S MOTION TO (1) COMPEL PRODUCTION OF ESI RECORDS (2) REOPEN DISCOVERY AND (3) ADJOURN TRIAL

Plaintiff, Thomas T. Ritter ("Plaintiff"), by his undersigned counsel, hereby moves for entry of an order compelling Defendant's production of ESI Records, authorizing Plaintiff to reopen discovery and to adjourn trial and states as follows for his Motion:

## A. INRODUCTION

1.    Plaintiff and Defendant, Melinda Adducci ("Defendant"), through their respective counsel, held a meet and confer pursuant to Fed. R. Bankr. P.7037/Fed.

R. Civ. P. 37 on September 25, 2024 wherein Plaintiff requested the relief sought herein and Defendant declined Plaintiff's request for relief with respect to Plaintiff's request to compel production, request to depose additional witnesses and for additional time to depose Defendant.

2.      Plaintiff sought Defendant's production of electronically stored information ("ESI") on August 22, *2023* and Defendant has consistently delayed the production of ESI records that are in her possession, custody and control. To date, Plaintiff still has not received Defendant's complete production of ESI and Defendant has withheld hundreds of discoverable records that are relevant to Plaintiff's Adversary Proceeding claims. Therefore, Plaintiff requires an order compelling Defendant's production of ESI and by this motion, requests an adjournment of trial to allow Defendant to complete production of ESI records.

3.      In addition to withholding ESI records, Defendant has failed to make a complete disclosure of key witnesses for which she has a duty to disclose pursuant to Fed. R. Bankr. P.7026/Fed. R. Civ. P. 26. It was not until Defendant appeared for her deposition held in this Adversary Proceeding on September 23, 2024 (the "Adversary Proceeding Deposition") that Plaintiff learned of these witnesses. As a result, Plaintiff requires this court's approval to reopen discovery to depose these newly identified witnesses. Likewise, Plaintiff requires an adjournment of trial to

complete discovery as to the aforementioned witnesses Defendant first disclosed **7 days ago** and only 23 days prior to the anticipated trial date of October 16-17, 2024.

## B. RELEVANT BACKGROUND

### Relevant Factual Background

4.   This nondischargeability action arises out of business transactions that occurred between Plaintiff, Defendant, Defendant's spouse Joseph DuMouchelle ("Joseph") and Joseph DuMouchelle Fine & Estate Jewellers, LLC ("DuMouchelle Jewellers," and together with Joseph and Defendant, the "DuMouchelle Parties") in which Defendant and Joseph respectively held 10 percent and 90 percent membership interests.

5.   At the time of the business transactions at issue in this Adversary Proceeding, the DuMouchelle Parties had been in the business of acquisition, resale and auctioning of jewelry for over 15 years.

6.   Sometime in January 2019, the DuMouchelle Parties presented an opportunity to Plaintiff for investment in the purchase and resale of a 77.12 carat yellow diamond ring, coined "The Yellow Rose."

7.   Through a series of fraudulent representations, including that the DuMouchelle Parties had identified a buyer of The Yellow Rose, Plaintiff agreed to partake in the investment and resale of The Yellow Rose.

8.     In furtherance of the "investment" Plaintiff transmitted an email to Defendant and Joseph with a  proposed profit-sharing agreement wherein the parties would agree to the purchase of The Yellow Rose and a resale at a profit to be split between Plaintiff and the DuMouchelle Parties.

9.     Subsequently, a different version of the profit-sharing agreement was prepared and was entered into among Joseph on behalf of DuMouchelle Jewellers and Plaintiff as buyers of The Yellow Rose and the purported seller, Jennifer Rands, via her trustee, Sam Haggin.

10.    In furtherance of the transaction, Joseph transmitted an email to Plaintiff containing fabricated wire transfer instructions for Plaintiff to transmit the proposed $12 million purchase price to an account that Joseph represented belonged to the seller of The Yellow Rose. In fact, the account information was a Bank of America account in the name of DuMouchelle Jewellers (the "Bank of America Account").

11.    Thereafter, Plaintiff wired his $12 million to the Bank of America Account under the false belief that he was remitting payment for The Yellow Rose to the account that belonged to the seller of The Yellow Rose.

12.    Notably, on the day that Plaintiff wired his $12 million to the Bank of America account, Defendant, was the *only* authorized signatory for DuMouchelle Jewellers. The Bank of America account had been opened by Defendant on February 5, 2019, the day prior to Plaintiff's wire transfer into that account.

13.    Defendant opened the Bank of America account with the specific knowledge that it was to facilitate the receipt of the wire transfer of $12 million from Plaintiff.

14.    After Plaintiff's wire was completed the following day (February 6, 2019), Defendant personally completed a series of bank transactions on February 7, 2019, wherein she drew down more than $5 million of the Plaintiff's $12 million on deposit in the DuMouchelle Jewellers' Bank of America account.

15.    Ultimately, Plaintiff never received a return of his $12 million, never received The Yellow Rose, never received sale proceeds for a resale of The Yellow Rose, and The Yellow Rose was never purchased for Plaintiff's benefit.

16.    Prior to the filing of Joseph and Defendant's above captioned bankruptcy proceeding, Plaintiff obtained a civil judgment on default in North Dakota against each of the DuMouchelle Parties. The North Dakota court made findings of fact and conclusions of law that determined that the DuMouchelle Parties defrauded Plaintiff of his $12 million in connection with The Yellow Rose transaction.

17.    Moreover, as a result of The Yellow Rose transaction between the parties, Joseph was charged in Federal District Court with criminal wire fraud on June 16, 2020. Joseph pled guilty to all charges on September 14, 2020 and he is currently incarcerated in federal prison as a result of the criminal conviction.

18.   At issue in this Adversary Proceeding is the dischargeability of Plaintiff's claims based on Defendant's participation in the fraud committed against Plaintiff in connection with The Yellow Rose Transaction.

19.   Notwithstanding Defendant's admissions in her Adversary Proceeding Deposition, Defendant has pled ignorance and therefore her innocence for the fraud committed against Plaintiff.

### ESI Discovery Background

20.   On August 22, 2023 Plaintiff served his *Interrogatories (Second Set), Second Request for Production of Documents Defendants* [ECF No. 129] requesting production of Joseph and Defendant's ESI (the "ESI Discovery Request"). Plaintiff agreed to collect Defendant's ESI at his own expense.

21.   Plaintiff made this ESI Discovery Request because, despite Defendant's claimed ignorance of The Yellow Rose transaction, Plaintiff believes that there are ESI records that will demonstrate Defendant's knowledge of and participation in the fraud against Plaintiff. For example, email communications on Joseph's and Defendant's business email account are likely to shed light on Defendant's knowledge and involvement in presenting The Yellow Rose as an investment opportunity to Plaintiff. Moreover, these records and communications are likely to shed light on Defendant's knowledge of the use of Plaintiff's $12 million for purposes other than the acquisition of The Yellow Rose.

22.    On September 14, 2023, Defendant filed her *Motion for Protective Order* [ECF 136] ("<u>Protective Order Motion</u>") seeking to limit discovery in the present case in part requesting to prevent Defendant's deposition.

23.    On September 21, 2023, Defendant filed her response to the ESI Discovery Response and refused to turn over ESI [ECF No. 139], stating: "Lindy asserts her Fifth Amendment Privilege, her Attorney-Client Privilege, and her Marital/Spousal Privilege. Subject to and without waiving her privilege, Lindy responds: Lindy does not know this information. Lindy does not have these computers or servers, or any information about them." (the "<u>ESI Production Objection</u>") Notwithstanding this assertion, Defendant *did* have computers in her possession that contain ESI records that were responsive to Plaintiff's request.

24.    Plaintiff responded to Defendant's Protective Order Motion on September 29, 2023 and a hearing was held on November 3, 2023 at which the court permitted Plaintiff's deposition of Defendant and at the hearing the parties agreed to reach terms regarding the production of ESI discovery that was the subject of Defendant's ESI Production Objection.

25.    After several weeks of negotiations, on December 19, 2023, Defendant finally agreed to entry of a stipulated *Protective Order Governing Imagining And Inspection Of Defendant Melinda Adducci And Former Defendant Joseph Dumouchelle's Relevant Electronic Devices And Protection Of Confidential And*

*Privileged Information And Preservation Of Privilege In The Event Of Inadvertent Production Of Privileged Material* [ECF No. 165] (the "<u>Stipulated Protective Order</u>") which was entered by the court on December 21, 2023.

26. Pursuant to the Stipulated Protective Order, the parties mutually selected ESI vendor, Archer Hill (formerly Vestige). Plaintiff emailed Defendant and Archer Hill and requested Defendant complete the ESI production by January 8, 2024. Defendant first initiated contact with Archer Hill on January 3, 2024 to make arrangements regarding the specifications of the two laptop computers (the "<u>Laptops</u>")[1] that contained responsive records. Thereafter, on January 10, 2024, Archer Hill shipped out equipment to Defendant necessary to complete the production. Upon information and belief, the production to Archer Hill was not complete on Defendant's part until the end of January. Thereafter, upon information and belief, in February or March of 2024, Archer Hill produced to Defendant two spreadsheets that were a listing of all of the artifact and content data ("<u>Contents</u>") contained in each of the Laptops.

27. Then, it was not until May 22, 2024, that Defendant produced a redacted list of Contents to Plaintiff in which Defendant proposed to withhold nearly all of files that comprised the Contents. Defendant's production to Plaintiff was not

---

[1] The Laptops in Defendant's possession each respectively belonged to Defendant and her spouse and former defendant in this Adversary Proceeding, Joseph DuMouchelle ("<u>Joseph</u>").

a proper privilege log wherein it did not contain any information that would allow Plaintiff to ascertain the contents of the documents and whether the Defendant properly withheld files. Apparently, Defendant's counsel did not realize that Defendant was not required to undertake a privilege review of the all Contents, but rather should have simply confirmed to Plaintiff that contents were available so that the parties could then craft a list of search terms to distill the contents of the Laptops to a smaller set of discoverable records and records that may have been subject to Defendant's assertion of privilege.

28.     Thereafter, on June 5, 2024 Plaintiff and Defendant held a discovery conference pursuant to Fed. R. Bankr. P.7037/Fed. R. Civ. P. 37 in order to address Defendant's blanket non-production in which Plaintiff explained to Defendant that Defendant had not properly completed the privilege review because the parties had not agreed to search terms by which the Contents could be searched.[2] The parties then agreed to compile the search terms list to accommodate Plaintiff's discovery request and Defendant's privilege assertions.

29.     At the time of the parties' discovery conference, trial was scheduled to take place in July 2024. However, the parties agreed to entry of a stipulation to

---

[2] Generally speaking, after ESI is collected, litigants are required to establish a set of search terms to narrow the for the parties to complete discovery of ESI that is relevant to the litigation at issue as well as to identify potentially privileged materials.

request a status conference with the court in order to adjourn trial to allow the completion of the ESI discovery and thereafter, Defendant's deposition.

30.     Then on June 10, 2024 the Court held status conference in which the court approved the adjournment of trial to October 16-17, 2024 in order to allow completion of the outstanding discovery tasks, including Defendant's deposition. At the status conference, the Court requested that the parties submit a proposed timeline for ESI in order to assist the court in understanding what steps were necessary to complete ESI discovery.

31.     Following the hearing, on the same day, Plaintiff sent an email to Defendant that proposed timeline for the completion of ESI discovery together with Plaintiff's proposed search terms. After several email and text exchanges, Plaintiff finally obtained Defendant's consent to entry of a stipulation on June 26, 2024.

32.     Plaintiff's proposed search terms, which were accepted by Defendant, were designed to promote the retrieval of Contents on the Laptops that were relevant to, among other things, Defendant's involvement and knowledge of (a) The Yellow Rose, (b) Jennifer Rands the purported purchaser of The Yellow Rose, (c) Sam Haggin, the purported trustee of the Jennifer Rands Trust, (d) the Bank of America Account, (e) Plaintiff's $12 million wire transfer to the Bank of America Account and (f) Plaintiff's communications to the DuMouchelle Parties ("Relevant Data") –

all matters at issue for Plaintiff to establish Defendant's knowledge and/or involvement in The Yellow Rose fraud.

33.    In turn, Defendant proposed search terms of the Relevant Data likely to identify potentially privileged communications and work product to expedite Defendant's privilege review.

34.    Thereafter, Archer Hill transmitted 4 new spreadsheets to Defendant comprised of (1) Joseph's Data – Privilege Items – Responsive to Ritter Terms – Metadata.xlsx; (2) Joseph's Data – Responsive to Ritter Terms – Metadata.xlsx; (3) Melinda's Data – Privilege Items – Responsive to Ritter Terms – Metadata.xlsx; (4) Melinda's Data – Responsive to Ritter Terms – Metadata.xlsx; (collectively, the "ESI Logs") in order for Defendant to undertake a final privilege review before authorizing Archer Hill to produce records to Plaintiff.

35.    The privilege-reviewed ESI Logs were then due from Defendant to Plaintiff on July 21, 2024. Nonetheless, Plaintiff did not receive the ESI Logs until August 2, 2024 wherein Defendant proposed to withhold nearly all responsive contents of the Laptops.

36.    According to Defendant's notations contained in the ESI Logs, Defendant has determined to withhold production of hundreds of documents that met the parties agreed ESI search terms from Defendant's and Joseph's Laptops which were catalogued in the ESI Logs on the following grounds:

a. Irrelevance – Outside Relevant Timeframe of January 1, 2018 – October 11, 2019
b. Irrelevance – Does not Meet Search Criteria
c. Irrelevance without explanation
d. Spousal Privilege
e. Attorney-Client Privilege – Melinda
f. Attorney-Client Privilege – Joseph

37.     On August 9, 2024, Plaintiff requested release of additional records which were initially withheld on the grounds of relevance. Defendant agreed to do so, however, when the parties consulted with Archer Hill about the further production, the parties learned that the further documents to be produced were grouped with related files ("Families") that Defendant sought to withhold on privilege grounds. Thereafter, on September 10, 2024 Defendant received the Families of documents to review but as of the date of this motion, Defendant still has not authorized the release of any further documents.

38.     During the parties September 25, 2024 discovery conference, Plaintiff also informed Defendant of the inapplicability of spousal privilege for communications among spouses related to business transactions. Defendant has not authorized a release of these communications withheld on spousal privilege grounds.

39.     Moreover, at the discovery conference, Plaintiff asserted that Defendant waived her attorney client privilege during the Adversary Proceeding Deposition when she invoked the advice of prior counsel. Defendant has not

authorized a release of communications withheld on attorney-client privilege grounds.

## 2. Defendant's Adversary Proceeding Deposition Testimony

40. Despite Defendant's incomplete ESI production, Plaintiff held the Adversary Proceeding Deposition on September 23, 2024 with the aim of maintaining the current trial schedule.

41. During the Adversary Proceeding Deposition, Defendant testified and admitted as follows:

> **a.** That at her September 3, 2019, in the *Gelov v. Adducci et al* suit in Oakland County Circuit Court (the "<u>September 2019 Deposition</u>") her counsel told her "just say you don't know anything about the Yellow Rose."[3] **Exhibit A**, Adversary Proceeding Deposition Transcript, Page 28. Defendant testified that the discussion with her counsel is the reason that she denied any knowledge of The Yellow Rose or any of the transactions details, during the September 2019 Deposition. This was completely false testimony. In fact, according to Defendant's Adversary Proceeding Deposition testimony, she was well aware of the

---

[3] Incredibly, Defendant testified that she received her instruction from attorney Dennis Egan, yet, Dennis Egan was not her counsel of record at the September 2019 Deposition. Rather, Joel Harris was Defendant's counsel of record at that deposition.

existence of The Yellow Rose. More specifically, Defendant admitted (1) that Defendant may have supplied background information on it to Plaintiff and spoken with Plaintiff about it, before Plaintiff remitted his funds, a contention she has up until now denied, **Exhibit A**, page 102; (2) that Defendant was aware of The Yellow Rose transaction with Plaintiff and the use of the Bank of America Account to deposit Plaintiff's funds and had opened the Bank of America account to specifically facilitate receipt of Plaintiff's $12 million wire transfer, **Exhibit A,** page 42; (3) that Defendant withdrew from the Bank of America Account, the day after receipt of Plaintiff's $12 million, more than $5 million of Plaintiff's funds, to pay creditors of DuMouchelle Jewellers, none of which was used to purchase The Yelllow Rose; and (4) the identity of her voice on an audio recording captured by Teodor Gelov wherein she referenced Plaintiff in exact detail (a family friend from North Dakota, etc.), as the buyer of *Teodor Gelov's* collateral (**Exhibit A**, page 171).

**b.** Moreover, during the Adversary Proceeding Deposition, Defendant testified that she sought her son's advice about entering into Plaintiff's proposed draft profit-sharing agreement regarding The Yellow Rose. **Exhibit A**, page 96.

42. As a result of Defendant's testimony at her Adversary Proceeding Deposition, for the first time in the history of the parties' litigation regarding The Yellow Rose, Defendant has identified at least three fact witnesses who Defendant never disclosed in name or identity[4]: her son; and prior counsel, namely, Dennis Egan and Joel Harris.[5]

43. Based on Defendant's own testimony, each of these fact witnesses likely have knowledge or information about Defendant's knowledge and/or involvement

---

[4] In Defendant's last-filed Initial Disclosures on June 3, 2022 at ECF No. 40, Defendant generically referenced as witnesses: "Family members of the Plaintiff(s) and/or the Defendant(s) who have knowledge of the facts of this proceeding, the financial interactions between the parties, and/or of any other form of reimbursement or compensation that Plaintiff(s) have received or demanded related to the loss claimed Plaintiff in this proceeding." Plaintiff's December 13, 2022 Interrogatory No. 7 at ECF No. 67 requested Defendant to "Identify all communications (name of person, whether by email, text or phone and the substance of each communication) between either of Defendants and any family members of Defendants (including children, in-laws, sisters, brothers and parents) related to or touching upon the transactions by and between either of Defendants and Plaintiff." Defendant's responded at ECF No. 69 and objected to the request as overly broad, vague, ambiguous and unduly burdensome. However she then responded "None that I can recall or currently have in my possession. Except that I know I spoke to, and or texted/emailed with Joe, regarding having me sign for the transfers/counter-checks that in s [sic] Tucson. I have attached emails that are evidence of this." Never once had Defendant identified her son as a family member with whom she specifically discussed The Yellow Rose transaction until her Adversary Proceeding Deposition.

[5] Defendant waived her attorney-client privilege as to her communications with her prior counsel when, during her Adversary Proceeding Deposition, she testified that she was following counsel's advice to lie about her knowledge of The Yellow Rose. Therefore, Plaintiff is entitled to obtain former counsels' testimony as to Defendant's knowledge and involvement in The Yellow Rose transaction.

in The Yellow Rose fraud. For example, if she reviewed Plaintiff's proposed profit-sharing agreement for The Yellow Rose, and asked for her son's advice about whether to participate in the investment with Plaintiff, how could she claim ignorance of her wrongdoing now? Moreover, if one or both of her attorneys told her to plead ignorance to The Yellow Rose, what do they know about her involvement in defrauding Plaintiff?

## A. ARGUMENT

### 1. Motion to Compel

44.     Plaintiff is entitled to an order of this court to compel production of all records withheld on any relevance objection wherein the documents described in the ESI Logs are documents whose contents matched to the relevant search terms that the parties stipulated to and agreed upon.

45.     The records described in the ESI Logs are at the core of Plaintiff's ability to test the veracity of Defendant's asserted defenses – her lack of knowledge of Joseph's misuse use of Plaintiff's money, and therefore innocence of the nondischargeability claims.

46.     Furthermore, this court should grant Plaintiff's motion to reopen discovery wherein as a result Defendant's recent testimony there are newly discovered witnesses that Plaintiff was not able to ascertain but for Defendant's testimony at her Adversary Proceeding Deposition.

47. Defendant's newly identified witnesses are likewise crucial to testing Defendant's asserted lack-of-knowledge defenses. Defendant only last week indicated that she shared Plaintiff's draft purchase agreement regarding The Yellow Rose with her son. If that is the case, Defendant's son is a direct witness to what Plaintiff knew or should have known at the time of Plaintiff's transactions with Defendant and DuMouchelle Jewellers. Moreover, Defendant now as of a week ago, pointed to advice of prior counsel as the reason she testified to her lack of knowledge of Plaintiff's transactions with DuMouchelle Jewellers and the The Yellow Rose. Defendant's own testimony points to her former counsel as persons with direct knowledge of Defendant's knowledge and/or involvement in the transactions at issue in the instant litigation.

48. Finally, with a trial date set for October 16-17, 2024, Plaintiff does not anticipate he will be able to complete discovery and review all ESI information not yet produced, in time to be ready for trial in a few short weeks. Therefore, Plaintiff requests this court adjourn trial for a period of time sufficient for Plaintiff to complete outstanding discovery of newly identified witnesses, to review the ESI documents and if necessary, depose Defendant as to the contents of the yet to be disclosed ESI documents.

### a. This court should compel Defendant's production of all ESI documents that Defendant seeks to withhold on relevance grounds.

49. "Under Rule 26, '[p]arties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.' Fed. R. Civ. P. 26(b)(1). If relevant and proportional, then the party that objects to the discovery must establish that the request should be denied. With respect to ESI, to avoid production in response to a 'motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.' Fed. R. Civ. P. 26(b)(2)(B)." *Thomas v. City of N.Y.*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020) (internal citations omitted).

50. Defendant fails to meet this burden as grounds for withholding the subject records on relevancy grounds, first the ESI Logs contain records that were the result of the parties' mutually agreed upon search terms which were calculated to limit production of records to those records that are relevant to Plaintiff's claims and Defendant's defenses.

51. Second, the records identified in the ESI Logs are readily accessible and are presently being held by Archer Hill and are able to be produced whether upon Defendant's authorization or court order. Third, there is no burden or cost to Defendant in completing production due to the fact that Plaintiff has agreed to, and has in fact, borne the cost for hosting and production of ESI.

52. Moreover, Defendant arbitrarily defined the "relevant time period" to January 1, 2018 – October 11, 2019, a date range that neglects the fact that the

business relationship between Plaintiff, Defendant, Joseph and DuMouchelle Jewellers preceded The Yellow Rose Transaction. Defendant has denied any involvement in business with Plaintiff. However, the prior business transactions regarding the promissory notes issued by Defendant and Joseph as early as February 12, 2014 remains a topic of this Adversary Proceeding (see Counts I, II, IV and VIII of Plaintiff's adversary proceeding complaint [ECF No. 91]). Thus any documents that matched the parties' agreed ESI search terms should be produced and at least those records that were created at least from January 2014 through current.

53.     Furthermore, any documents withheld on general relevance grounds should be produced wherein the documents Defendant seeks to withhold matched to the parties' agreed search terms and therefore are likely to be relevant to or may lead to relevant evidence regarding Defendant's participation in and knowledge of the fraud perpetrated against Plaintiff.

54.     In fact, some of the documents Defendant has withheld on general relevance grounds described communications or transactions with (1) Jennifer Rands; (2) Sam Haggin and (3) Bill Noble. Sam Haggin and Jennifer Rands were named in Plaintiff's complaint as having some connection to The Yellow Rose. William Noble is a litigant known to this Court as having been a potential recipient of Plaintiff's proceeds. Moreover, in Defendant's Adversary Proceeding Deposition, she testified on several occasions to William Noble's involvement with The Yellow

Rose. **Exhibit A**, pages 17, 20, 22, 24, 29, 33, 45, 48, 59, 65, 91 and 92. To the extent that Relevant Data involves Defendant's communications with or records pertaining to any of these particular individuals, the Relevant Data is likely to reveal Defendant's involvement in and/or knowledge of the fraud on Plaintiff.

55.    Defendant's refusal to release the subject records is therefore unwarranted and all ESI documents withheld on any relevance grounds are discoverable and are readily available for production, therefore should be produced.

**b. Spousal privilege does not apply to the business documents and business communications between spouses, therefore Defendant has improperly withheld documents on the grounds of spousal privilege and all such documents should be produced.**

56.    Communications between spouses are discoverable to the extent that the contents of their communications were communications in furtherance of their business and related business transactions.

57.    Communications between spouses regarding their personal affairs "should remain confidential. However, any ordinary conversations regarding business matters are not subject to the privilege unless circumstances show the conversations to have been confidential in nature. . . . . It would be improper to shield non-confidential conversations between 'business associates' about business matters solely based on the fact that the 'business associates' are also married." *S. Air Transp., Inc. v. SAT Grp., Inc. (In re S. Air Transp., Inc.)*, 255 B.R. 706, 713 (Bankr.

S.D. Ohio 2000) (citing *Hanger Orthopedic Group, Inc. v. McMurray*, 181 F.R.D. 525, 530 (M.D. Fla. 1998); 81 Am. Jur. 2d, *Witnesses*, § 336).

58.    Emails exchanged between Defendant and Joseph regarding The Yellow Rose Transaction that Defendant seeks to withhold on spousal privilege grounds should be produced.

59.    The communications that Defendant and Joseph had that are pertinent to The Yellow Rose are likely to show the extent to which Defendant had knowledge of or participated in the fraud against Plaintiff.

60.    Moreover, it is undisputed that Defendant was the vice president of DuMouchelle Jewellers and that Joseph and Defendant were the only two members of the company. The Yellow Rose transaction with Plaintiff was contemplated in connection with their business. Emails exchanged among the parties were exchanged on their respective DuMouchelle Jewellers business email accounts. Moreover, the Bank of America Account where Plaintiff's $12 million was transferred was a DuMouchelle Jewellers bank account. Hence any records or communications that Defendant has withheld on spousal privilege, that match Plaintiff's search terms tailored to address The Yellow Rose transaction were made in the transacting of business together and were never personal in nature. Moreover, the communications between Joseph and Melinda will establish the extent of Defendant's knowledge of and/or participation in the DuMouchelle Parties' fraud against Plaintiff.

61.     Records that Defendant withheld on spousal privilege and that match Plaintiff's search terms that were calculated to uncover Defendant's participation in the fraud are discoverable and Defendant should be compelled to produce the same.

**c. Defendant waived her attorney client privilege, therefore testimony and documents withheld by Melinda on her assertion of Attorney Client privilege, are now discoverable.**

62.     Defendant waived her privilege as to prior counsel, therefore Plaintiff should be granted leave to take depositions of Dennis Egan and Joel Harris.

63.     "[T]hat assertion of the advice of counsel defense waives the attorney client privilege with respect to communications between counsel and client with respect to the subject matter of the advice being sought but does not necessarily fully waive the opinion work product immunity." *JJK Min. Co., LLC v. Swiger,* 292 F.R.D. 323, 329 (N.D.W. Va. 2013).

64.     During the Adversary Proceeding Deposition, Defendant invoked the advice of former counsel as the reason for her contradictory testimony during her September 2019 Deposition. **Exhibit A**, pages 28, 30 and 171.

65.     While Defendant indicated it was her counsel who advised her about how to testify, and that she should testify that she knew nothing about The Yellow Rose, her counsel is likely to have knowledge and information about the extent of Defendant's knowledge of and involvement in the fraud against Plaintiff.

66.     Defendant indicated it was Dennis Egan who advised her in this way when in reality, she was represented by Joel Harris during the September 2019 Deposition. Thus, it is appropriate for the court to grant Plaintiff the opportunity to depose both attorneys about their advice to Defendant and what they knew about Defendant's involvement in The Yellow Rose transaction with Plaintiff.

67.     Defendant waived her attorney-client privilege and Plaintiff should be granted leave to take her former attorneys' depositions.

### d. Defendant waived any applicable spousal privilege during the Adversary Deposition.

68.     To the extent that any discoverable communications are deemed personal marital communications, Defendant waived her spousal privilege when she testified regarding the direction she received from Joseph in transferring more than $5 million of Plaintiff's money to payment of expenses that did not involve The Yellow Rose.

69.     "The marital privilege for confidential communications no longer protected those conversations from disclosure since the plaintiff himself disclosed them." *Bila v. RadioShack Corp.,* No. 03-10177-BC, 2004 WL 2713270 *16 (E.D. Mich. Nov. 22, 2004); *see United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974)(noting that "[a]ny marital privilege that may have existed was waived when Appellant introduced his wife's statements during cross-examination of the Government witnesses.")

70.     On at least four occasions during Defendant's Adversary Proceeding Deposition, she testified regarding what Joseph told her about Plaintiff and the transactions that are the subject of this Adversary Proceeding and the transactions involving Teodor Gelov. Remarkably, she testified:

> Joe came to me and he said, Tom -- this is what Joe told me -- Tom said that he has an extra 20,000 -- $20 million dollars laying around, he's doing really well, he wanted to know if there's anything that he could buy. I think I'm going to show him the Yellow Rose.· They had already been showing it in our office, he'd been already showing it to people. And I said, oh, wow, okay.

**Exhibit A**, page 96 (also see pages 50, 174 and 179).

71.     As is reflected in her testimony regarding conversations with Joseph, Defendant has waived any applicable spousal privilege.

72.     The communications and records between and among Joseph and Defendant regarding her knowledge of and involvement in The Yellow Rose fraud are necessary for Plaintiff to establish that his claims against Defendant should be excluded from dischargeability.

73.     The court should compel Defendant to produce all ESI records she has withheld on the grounds of spousal privilege *if* applicable.

**2.  Motion to Reopen Discovery**

74.     As a result Defendant's newly revealed witnesses, Plaintiff seeks relief to reopen discovery to take a deposition of her son and prior counsel to determine what communications were exchanged regarding Defendant's knowledge of The

Yellow Rose and the transactions involving The Yellow Rose and Plaintiff's money. This testimony is central to Plaintiff's nondischargeability claims wherein these witnesses can attest to Defendant's knowledge of and/or participation in the fraudulent misappropriation of Plaintiff's $12 million. Plaintiff also seeks to re-open discovery as to matters disclosed in the ESI not yet produced.

75.     A "scheduling order 'may be modified only for good cause and with the judge's consent.' FED. R. CIV. P. 16(b)(4). 'Good cause comes into play 'in situations in which there is no fault—excusable or otherwise [and] [i]n such situations, the need for an extension is usually occasioned by something that is not within the control of the movant.'" *Donehue v. Apache Corp.,* No. CIV-21-710-D, 2024 U.S. Dist. LEXIS 107874, at *6-7 (W.D. Okla. June 18, 2024) (citing *Bishop v. Corsentino*, 371 F.3d 1203, 1207 (10th Cir. 2004)).

76.     "Further, '[g]ood cause' also 'obligates the moving party to provide an adequate explanation for any delay.'" *Id.* (quoting *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) which quoted *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1020 (10th Cir. 2018)).

77.     The delay here is caused by Defendant's neglect of her ongoing duties under Fed. R. Bankr. P.7026/Fed. R. Civ. P. 26. Only Defendant knew that she had conversations with her son and her lawyers regarding The Yellow Rose transaction and Plaintiff's profit-sharing proposal. Notwithstanding, Defendant failed to

expressly identify her son as a witness until her Adversary Proceeding Deposition. Moreover, despite Defendant's right to withhold her communications regarding The Yellow Rose with prior counsel on privilege grounds, Defendant, on her own accord, decided to testify about her communications with her lawyers thereby making her lawyers key witnesses whose testimony Plaintiff is now entitled to seek.

78. Defendant's delayed disclosures regarding key witnesses and her ongoing delay in completing production of ESI records has impaired Plaintiff's ability to seek the truth and establish Defendant's knowledge of and/or participation in the fraud against Plaintiff. Plaintiff should not be prejudiced by Defendant's delay in making a full and complete disclosure of witnesses and production of discoverable evidence.

### 3. Motion for Adjournment of Trial

79. Adjournment of trial is appropriate wherein Defendant has identified new witnesses and has not completed production of ESI Records necessary for trial.

80. "In determining whether there is good cause to allow amendment of the scheduling order, courts focus on the diligence of the lawyer seeking the change and possible prejudice to the party opposing the modification. Also, while a pretrial order defines a lawsuit's boundaries in the trial court, 'total inflexibility is undesirable.'. The 'decision to exclude evidence' at trial is also 'a drastic sanction.'" *Id.* (also see *Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 430 (6th Cir. 2006) which

remanded the case in order to reopen discovery where new fact issues were introduced through defendant's affidavit.)

81.    Good cause exists for trial to be adjourned. Plaintiff has diligently worked to resolve objections and issues regarding production of the ESI records with Defendant. Notwithstanding, Defendant has not timely completed production and has withheld substantial records on arbitrary relevance grounds that should have been produced.

WHEREFORE, Plaintiff prays that this court enter an order (1) directing Debtor to produce records withheld (2) authorizing the reopening of discovery in order for Plaintiff to take the depositions of Joseph Adducci, Dennis Egan, Joel Harris and Defendant (regarding ESI to be produced) (3) adjourning trial to allow Plaintiff sufficient time to complete discovery requested herein.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By:  /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*

Dated:  September 30, 2024

# EXHIBIT 1

## (Proposed Order)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

                Debtors.

_____/

Thomas T. Ritter,

        Plaintiff,

v.

Melinda J. Adducci,

        Defendant.

_____/

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

### *PROPOSED*
### ORDER (1) COMPELLING DEFENDANT'S PRODUCTION OF ESI RECORDS (2) AUTHORIZING PLAINTIFF TO REOPEN <u>DISCOVERY AND (3) ADJOURNING TRIAL</u>

THIS MATTER came before the court on the Motion of Plaintiff Thomas T.
Ritter entitled *Plaintiff's Motion to (1) Compel Production of ESI Records (2)
Reopen Discovery and (3) Adjourn Trial* [ECF No. __] (the "Motion"). The Motion
together with a brief in support of the Motion was served on the Defendant together
with Plaintiff's Notice to Defendant of Opportunity to Respond, Defendant has

failed to timely respond. The Court has reviewed the Motion and brief in support of the Motion and based thereon, finds cause to enter this Judgment.

NOW THEREFORE IT IS HEREBY ORDERED Archer Hill shall produce all ESI records responsive to Plaintiff's discovery request that Defendant has withheld on any of the following grounds:

   a. Irrelevance – Outside Relevant Timeframe of January 1, 2018 – October 11, 2019
   b. Irrelevance – Does not Meet Search Criteria
   c. Irrelevance without explanation
   d. Spousal Privilege
   e. Attorney-Client Privilege – Melinda, as to records and communications involving Defendant and Dennis Egan or Joel Harris

IT IS FURTHER ORDERED that discovery shall be reopened and Plaintiff is granted leave to continue the deposition of Defendant and to take the deposition of Defendant's son, Joseph Adducci, and Defendant's former counsel, Dennis Egan and Joel Harris.

IT IS FURTHER ORDERED that trial shall be adjourned and counsel for Plaintiff and Defendant shall appear before this court on _____, 2024 at __:__ a/p.m. for the purpose of a pretrial status conference for further scheduling.

**EXHIBIT 2**

**(Notice – NA)**

**EXHIBIT 3**

**(Brief)**

In re:

Chapter 7

Joseph G. DuMouchelle and
Melinda J. Adducci,

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Debtors.

_____/

Thomas T. Ritter,

Plaintiff,

v.

Melinda J. Adducci,

Adversary Pro. No. 20-04381

Defendant.

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO
(1) COMPEL PRODUCTION OF ESI RECORDS (2) REOPEN
<u>DISCOVERY AND (3) ADJOURN TRIAL</u>**

Plaintiff, for his Brief in Support of the *Plaintiff's Motion To (1) Compel
Production Of ESI Records (2) Reopen Discovery And (3) Adjourn Trial,* relies on
the facts and arguments set forth in the Motion.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*

Dated: September 30, 2024

**EXHIBIT 4**

**(Certificate of Service)**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

                                         Chapter 7

Joseph G. DuMouchelle and
Melinda J. Adducci,                        Case No. 19-54531-lsg

                                           Hon. Lisa S. Gretchko

                  Debtors.
_____/

Thomas T. Ritter,

                  Plaintiff,

v.

Melinda J. Adducci,                       Adversary Pro. No. 20-04381

                  Defendant.
_____/

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on September 30, 2024, my office served a copy of the foregoing *Plaintiff's Motion To (1) Compel Production Of ESI Records (2) Reopen Discovery And (3) Adjourn Trial* by ECF notification to all parties who have filed an appearance in the above-captioned adversary proceeding.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*

Dated: September 30, 2024

**EXHIBIT 5**

**(Affidavit – NA)**

# EXHIBIT 6

## (Documentary Exhibits – EXHIBIT A)

1            UNITED STATES BANKRUPTCY COURT

2            EASTERN DISTRICT OF MICHIGAN

3                SOUTHERN DIVISION

4   In re:                Chapter 7

5   Melinda J. Adducci,       Case No. 19-54531-lsg

6         Debtor.        Hon. Lisa S. Gretchko

7   _____/

8   Thomas T. Ritter,

9         Plaintiff,

10      -vs-

11  Joseph G. DuMouchelle     Adversary Pro. No. 20-04381

12  and Melinda J. Adducci,

13         Defendants.

14  _____/

15  PAGE 1 TO 185

16

17     The Videotape Deposition of MELINDA ADDUCCI,

18     Taken Via Hanson Remote

19     Commencing at 9:29 a.m.,

20     Monday, September 23, 2024

21     Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

22

23   Court reporter, attorneys & witness appearing remotely.

24

25

1   APPEARANCES:

2

3   JAY L. WELFORD P34471

4   KIMBERLY R. CLAYSON P69804

5   Taft Stettinius & Hollister, LLP

6   27777 Franklin Road, Suite 2500

7   Southfield, Michigan 48034

8   (248) 727-1466

9   jwelford@taftlaw.com

10  kclayson@taftlaw.com

11       Appearing on behalf of the Plaintiff.

12

13  PATRICK A. FOLEY P74323

14  John R. Foley, PC

15  18572 Outer Drive

16  Dearborn, Michigan 48128

17  (313) 274-7377

18  pafoley@jrfpc.net

19       Appearing on behalf of Melinda Adducci.

20

21  ALSO PRESENT:      Marc Myers - Videographer

22

23                *       *       *       *

24

25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com    313.567.8100

1    do with it?

2  A.  I don't -- I don't know.  I don't know.

3  Q.  Did they put it on their finger, did you put it on your

4     finger, did you put it under a microscope, did you --

5     what did you do?

6  A.  So it was in the office, it was in the Michigan office,

7     which Bill Noble lied to the FBI and said they never had

8     it there.  And when I told them yes, we did, they said

9     no, you didn't, and I said, yes, we did.  And then he

10    said -- and then they went back to Bill Noble, and he

11    was allowed to change his statement apparently.  But it

12    was there for a long time, for, like, four to six

13    months.  And I don't know, I -- they -- long before Tom,

14    from my memory -- I didn't work with Bill Noble, ever.

15    I've never spoken to him.  I don't -- I never dealt with

16    him, I've never spoken to him, I never met him, but he

17    -- Joe had met him a few years before, which he also

18    lied about.  They were working on -- when I say they, it

19    was not including me -- they were working, they had a

20    book put together, they were working -- Joe's sisters,

21    our staff, they were all working.  They had names of

22    people that they work with, you know, they have a lot of

23    clients that I don't have privy to that are high-end

24    clients.  I'm not going to say their names right now,

25    but they're very well-known people in the world, and

1  A.  Used my loop and my eye.  I'm nearsighted, so I can look

2      at pieces like this and I can see close up that other

3      people cannot see.  We also had the GIA report, so you

4      just look to match -- it was normal routine things that

5      you do.  We had the GIA report, the book, everything

6      that went with it.

7  Q.  Where did you get the GIA report from?

8  A.  I don't know.  I -- I wasn't dealing with Bill Noble.

9      Ask Joe that question.

10 Q.  I'm asking you whether you know the source of the book.

11          MR. FOLEY:  And she's answered that question.

12 BY MR. WELFORD:

13 Q.  You didn't procure it?

14 A.  When you have a GIA -- when you have a diamond come in,

15     you have a -- you have reports come in with the stone.

16     So Bill Noble, I assume, would be the only person that

17     could have sent that book in.  It had a book, it had a

18     -- I mean, it was written up.  It had a book, it had GIA

19     reports, it had more than the normal.

20 Q.  Do you recall what wedding you were in for?

21 A.  A family wedding.  I don't know.  It was one of -- Ryan

22     McCarren maybe.

23 Q.  And who's Ryan McCarren?

24 A.  Joe's sister's son.

25 Q.  And do you know when that wedding was?

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

 1  A.    It's a GIA report.

 2  Q.    GIA report?

 3  A.    Um-hum (affirmatively).  Gemological Institute of

 4        America report that all diamonds of size have to have if

 5        you're going to sell them.

 6  Q.    And did you see that report?

 7  A.    Yes.

 8  Q.    Was there ever an appraisal of the Yellow Rose that you

 9        ever saw?

10  A.    I think I saw an appraisal that Bill Noble did on it.

11  Q.    And where would you have seen that?

12  A.    I don't remember.  That would have been -- I don't

13        remember.

14  Q.    Did you ever acquire in your name the Yellow Rose?

15  A.    Never.

16  Q.    Did Joe acquire the Yellow Rose in his name?

17  A.    I can't speak for Joe.  I don't know what Joe did or why

18        he did or what -- I don't know what Joe does or did.  I

19        can't --

20  Q.    To your knowledge, did Joe acquire the Yellow Rose in

21        his name?

22  A.    What do you mean by the word acquire?

23  Q.    Buy it.

24  A.    I don't know.  I don't know what Joe did.

25  Q.    You don't know whether he bought it or didn't buy it?

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1  A.   Okay.  So did I personally.  No.  Joe -- Joe worked on

2       -- Joe worked on everything with the Yellow Rose.  I was

3       -- if he asked me -- I have my own customers that I work

4       with, and William Noble was not my customer that I

5       worked with, and neither was Tom Ritter.

6  Q.   Did DuMouchelle Jewelers ever sell the Yellow Rose?

7  A.   I don't know.  I would think so.  I mean, I didn't see

8       the transactions, but I -- that's what I believe

9       happened.  But I don't know.  I didn't see it.  I don't

10      know.  I mean, I believe it happened because Joe worked

11      on it, but I, again, I guess if he received money, then

12      yes, he did sell the Yellow Rose.

13 Q.   Why do you believe he sold the Yellow Rose?

14 A.   Because why else would he receive money for it?

15 Q.   Who did he receive money for it from?

16 A.   Tom Ritter.

17 Q.   And did he -- what else did he do with respect to the

18      sale of the Yellow Rose to Tom Ritter?

19 A.   I don't know the details of --

20            MR. FOLEY:  Objection, overly broad; calls for

21      a narrative.

22            THE WITNESS:  I don't know their details.  I

23      didn't -- I wasn't --

24            MR. FOLEY:  Lindy, when I make an objection,

25      don't talk until we resolve it.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    out?  It's -- there -- I didn't -- there's many things

2    that Joe was doing that I didn't know about.  But I

3    don't -- I don't recall answering it that way.  I don't

4    remember.

5  Q.  How did you become aware of it now?

6  A.  I don't know.  I don't know how to answer you.  I don't

7    -- you know, I don't know how to answer you, that you're

8    -- I don't recall answering it that way, is what I'm

9    saying.  I don't recall answering it that way.

10 Q.  That's not my question.  My question is, how do you know

11   about it now?

12 A.  Because -- because I -- I don't recall answering it that

13   way.  I really don't.  I know there was one time when

14   there was a deposition that -- and I had no idea what

15   was going on or why, and the attorney that was next to

16   me was Dennis Egan, and Joe didn't warn me I was going

17   in for the deposition.  I came in, Dennis turned to me,

18   and there was another attorney on the other side, George

19   somebody, and before I gave my deposition, Dennis said,

20   just say you don't know anything about the Yellow Rose.

21   And I said, what do you mean?  And he said, just say you

22   don't know anything about it.  I don't know if that was

23   a deposition, but there was another deposition where you

24   did ask me questions about -- about the wires.  I -- I

25   don't know how to answer this.  I -- I got really angry

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1      with the attorney at the time and said why did you --

2      because to me that was in counsel, counsel telling you

3      something like that.  I had never -- I haven't been

4      through this before, I've never been sued before.  In

5      all my years.  And this was Joe's doing.  So for them to

6      bring me in and try to pin all this on me, when I had --

7      I would never hurt family, I would never

8      intentionally -- I've never -- my -- I get up every

9      morning and pray that I do a good job with my customers.

10     So I don't know how to answer your question.  I'm aware

11     of it now.

12  Q.  How did you become aware of it now?

13  A.  I don't know.  I've known or been aware of it for, what,

14     the last four years, five years.

15          MR. FOLEY:  That's the last third time asking

16     it.  I'm not going to stand for -- she's answered it now

17     three times.

18          THE WITNESS:  I don't know.  I don't know.

19     There's no specific time right now that I can figure out

20     to say, oh, this is when I -- I'm aware of it.  I guess

21     I became aware of it through everything Joe went

22     through, through everything that went on, through -- I

23     -- nothing was pre-planned.  I had no idea.  I didn't

24     ever meet Bill Noble.  I didn't work with Tom on this.

25     I was -- Tom asked -- Tom asked, from my recollection,

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    to get on the phone, and he wanted to ask me if the

2    diamond was -- what I thought of it, and I told him I

3    thought it was great.  And they asked me to appraise it

4    and I said no, there's a conflict of interest, I'm not

5    going to appraise something.  So I don't know when I

6    learned of it.  I don't know.  But I -- it was not my --

7    I was doing my own thing.  I stay in my own lane and do

8    my own thing with business.  I don't --

9  BY MR. FOLEY:

10 Q.   All right.  Going back to your deposition, September

11      3rd, 2019, page 134:

12           "Q.  Ms. Adducci, what is the Yellow Rose diamond?

13           A.  I don't know."

14 A.   Right.  That was probably Dennis Egan telling me not to

15      say that.  I had no idea what was going on at the time

16      of what -- why they were saying to say that.  But I

17      actually got really mad at him and angry afterwards and

18      said, to me that was what I could go after him for that,

19      for telling me, for advising me at a time when I had not

20      been through depositions or been sued before, and he

21      came back and said that to me?  He got really angry, he

22      goes -- he said, just say it, he yelled at me.  So there

23      you go, that's my answer.  Let's go ask him.  Let's ask

24      Dennis Egan why he said that.  Great legal advice,

25      right?  But I since did not -- when you came back and

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    and he's very -- very highly -- you know, he does

2    statistics, he runs a publication, he has -- they do

3    data research.  That his area of specialty.  And I don't

4    know if I recommended his name or what, but I

5    definitely -- you know, I just didn't have time to do it

6    either.  It takes a lot of time.  Appraisals are, the

7    research, if you're going to do it right on something

8    big like that, your level of research.  But he -- but

9    Rich Drucker would have had all of that, he could have

10   found that easily because he has the database for that.

11   So that's why I referred it off.

12 Q.   Did you ever see an appraisal of the Yellow Rose?

13 A.   **You asked me that question already.**

14 Q.   And the answer again is?

15 A.   **I believe I did.  I believe I saw one that Bill Noble**

16      **did.**

17 Q.   All right.  Let's pull up Exhibit 2, please.

18                    ADDUCCI EXHIBIT 2

19                    Out of State Counter Withdrawals

20                    WAS MARKED BY THE REPORTER

21                    FOR IDENTIFICATION

22 BY MR. WELFORD:

23 Q.   If you could open those up, please.

24 A.   **Let me try here.  I don't think it -- I think I have to**

25      **lower my screen here to --**

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    because the FineMark Bank rejected it, he told me, but I
2    said why don't you just have -- put it in an escrow
3    account, and he said Tom Ritter doesn't want it in an
4    escrow account.  So a day -- a day or two before I was
5    leaving for Tucson, which I was trying to get ready to
6    go to the show, which I went every year and I was going
7    to do the educational conference, he asked me to go and
8    open a bank account that had to be a bank account that
9    could be accessed from Florida, New York, and Michigan,
10   which is why we had Chase because you had to be able to
11   go to different banks.  And paid Bank of America, we had
12   him before, we had him for our personal and I didn't --
13   you know, I didn't really care for them, so I was kind
14   of angry about that.  So he had me go open the account.
15   But I had no warning when he asked me to do that.  I was
16   frustrated.  He said that FineMark turned -- or I don't
17   know, he said FineMark after having the wire for a
18   couple days decided to turn it away or something because
19   banks actually have done that.  You know, like Chase,
20   Chase now doesn't want anybody in the jewelry industry.
21   And that was going on at that time.  So I thought it was
22   just another bank thing where they, you know, I don't
23   know, they're a small bank, but they said they didn't
24   want business banking -- this is what he told me, I
25   never spoke to them myself directly.  So this is

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    fact, that night I went to dinner with Rich Drucker and

2    a whole bunch of colleagues, because these are all top

3    people in our industry that I have great respect for,

4    and they respected us, we came every year, we had a

5    great reputation until we met Bill Noble, who's a

6    complete con artist, and basically I -- they said what's

7    wrong, we went to dinner, and I said, I don't know, I

8    said, Joe's acting really strange.  And they said, do

9    you think he's having an affair?  And I said, I don't

10   know.  I don't know what's going on.  I said, maybe -- I

11   think it's just his dad, his dad has cancer and his

12   sisters are calling him, I said, but I don't know, I

13   said, but he's just acting really weird.  And then he

14   told me the next morning -- oh, he had told me that

15   afternoon he wasn't coming to be the auctioneer for the

16   alumni auction.  And I said, you've got to be kidding

17   me.  And so I had to do -- I had to auctioneer, which I

18   do fill in if someone has to go to the bathroom, he has

19   to go, whatever.  Joe's the main auctioneer.  I would

20   always help spot, but we donated our time and we did

21   that auction in front of top people in the industry, and

22   I had to -- I had to do the auction.  And I was really,

23   really angry at him for that.  So none of this was

24   planned.  I knew none of this was going to go on.  And

25   he left me in Tucson alone, basically I went there

1   account, ever.  And I cried when I found out he had not

2   -- I did not know that he had not been paid.  I was

3   excited because this was a beautiful piece, and it

4   should have -- the sale should have been a very joyful

5   thing and they should have been able to make a lot of

6   money.  And that is -- yeah.  I've never -- this has

7   never happened.

8                    First of all, Bill Noble -- people don't send

9   jewelry to people and leave it with them for up to six

10  months and without the intention of selling it.  That

11  does not go on in our industry.  And you can talk to

12  everybody and anybody that's -- I have diamond dealers

13  calling me from New York saying, Lindy, you know, you

14  can come back here, you know, we all know that you had

15  nothing to do with this.  You have no idea how many

16  people have called and said that.  So this is my wrath

17  of my venting.  Because you can tell Tom that.  I would

18  -- I would never -- first of all, why would I throw

19  myself into a blender?  To hurt family?  To wreck my

20  career that I've worked my entire life that I started

21  with his twin brother?

22  Q.  So you knew that you were trying to get $12 million --

23      DuMouchelle Jewelers was trying to get 12 million from

24      Tom Ritter, FineMark wouldn't accept it, and --

25  A.  Well, I was told that by Joe --

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1    was around him for 25 years.  He's very he good at

2    business.  I -- until Bill Noble showed up.

3 Q.  Where did the 1,091,769.44 number come from?

4 A.  I don't know.

5 Q.  You did not provide that number to the bank?

6 A.  No.  I've already told you, everything, everything came

7    from Joe emailing or communicating or talking to the

8    banker.  He had already -- I don't know.

9 Q.  And the 4 million number -- 4,041,925?

10 A.  Did not come from me.  Nothing came from me.  Those were

11   all Joe's transactions that he should have handled back

12   in Michigan.

13 Q.  After you signed these counter check withdrawals, what

14   did you receive in exchange?

15 A.  I don't know.  I wasn't involved in them.  This wasn't

16   my -- like I told you, I don't know what it was for.  I

17   didn't -- this was Joe asking me to go and do this.  If

18   I -- I don't know.  I wasn't involved in his business.

19   This was Joe's business.

20 Q.  Did you receive cash?

21 A.  No, not that I recollect.

22 Q.  You were withdrawing money from an account.  Where did

23   the money go?

24 A.  I don't know.  I don't know.

25        MR. FOLEY:  No, objection.  Assumes a fact not

1    right now.  I'm going to a conference.  There was

2    nothing planned, I didn't get any emails, I had no

3    previous knowledge of anything he was doing.  I don't

4    even know why he did what he did.  I don't even know.  I

5    still don't.  I still don't know why he -- I still don't

6    understand what went on.

7    Q.   Do you know why a cashier's check would have been

8         written to Gene R. Kaslow?

9    A.   No.

10   Q.   How about Aron Re --

11   A.   I don't even know who -- I don't know who they are.

12   Q.   Do you know who Aron Resources is?

13   A.   Yes.  Aron, Joe -- we went to Aaron Mendelson's son's

14        wedding in Malibu because his son invited us.  We were

15        -- Aaron Mendelson from Aron is the one that referred

16        Bill Noble -- Joe to Bill Noble, to go pick up items for

17        him.  Because he was an investor and he worked with Bill

18        Noble and he wanted Joe to go pick up items.  That's how

19        Joe met Bill Noble.  Apparently because Aaron sent him

20        there to pick up items that he wanted him to take and

21        sell at auction for him because he -- because Bill

22        Noble, he wanted to go get them from him.  He wasn't

23        happy with Bill Noble.  But that's how Joe met.  And Joe

24        did business with Aron for a long time, so they did a

25        lot -- I don't know what they did.  I also was not

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1     where we talked about the North Carolina litigation?

2  A.  North Carolina?

3  Q.  I mean North Dakota litigation with Tom Ritter and you.

4  A.  I didn't -- I didn't -- if we were doing one, I didn't

5     know that it was for that.  I didn't know that I was

6     personally -- I know that he's suing over this, or he's

7     doing a -- but I didn't -- no, I didn't know there was a

8     lawsuit.  No, I didn't understand that.  No one

9     explained that to me.

10 Q.  Did you know that you had, prior to the Yellow Rose 12

11    million, engaged in other loans?

12 A.  No, no, no.  I still -- no, I did not know that.  No.

13    And I still can't believe that.  I don't know how that

14    happened.  Like, I have no idea how that happened.

15    Because -- I have no idea.  That's, like, a complete --

16    like, how did that happen?  I don't know who he got

17    involved with, I don't know what went on, but from other

18    people in our office have told me he started doing

19    business with Bill Noble.  I don't know -- I don't

20    understand it.  How do you go from a business that we

21    had a really good business for many years, I great

22    successful business, how does that happen?  I would like

23    to ask Joe that question, and I still don't know and we

24    haven't had that -- we haven't had that conversation.

25    We haven't been able to have that conversation.  Because

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1    through everything going on, all he would say to me is,

2    if you don't know it by now I'm not going to tell you

3    and that way you won't know.  Because I kept saying to

4    him, Joe, what went on, why did -- what -- I'm not going

5    to tell you right now because you don't know.  So if I

6    tell you, then you'll know and you'll say -- so I still

7    don't understand what he was doing.  But isn't that why

8    he's in prison, obviously?  I mean, isn't that why he's

9    there, I mean, because something went wrong?  In my

10   opinion, Bill Noble should be there.  Sorry.  We never

11   had any issues until Bill Noble, who is a scam, and

12   everybody in New York has told me, he committed

13   insurance fraud.  There's people in New York telling me,

14   why didn't Joe ask before he did business with him.

15   Everybody there knows the guy is a con, except Joe, who

16   thinks that everybody is nice like he is.

17 Q.   What does Bill Noble have to do with $12 million being

18      taken out of --

19 A.   He gave the diamond to Joe.  He did business with Joe.

20      Joe -- he -- I don't know.  Ask our staff.  I wasn't

21      there.  I wasn't in Michigan.  These were years where I

22      wasn't there.  I would come in for a wedding or

23      whatever, I would go to -- from preview in New York, I

24      would work with the buyers and the people previewing, I

25      would stay there after the auction.  Joe would fly back

20-04381-lsg   Doc 188   Filed 09/30/24   Entered 09/30/24 17:40:59   Page 56 of 61
HANSON RENAISSANCE
COURT REPORTERS & VIDEO        hansonreporting.com
                               313.567.8100

1          Do you see that?

2   A.   I do.

3   Q.   And the Court made that finding.

4          MR. FOLEY:  Objection, to the extent that's a

5   question, that calls for a legal conclusion.

6          THE WITNESS:  Appraisal information.  What

7   does that mean?  Does that mean the GIA report?  Does

8   that mean Bill Noble's -- Joe would have asked me to

9   send photos.  I didn't -- you know, I didn't -- I didn't

10  go to Tom.  When Joe -- Joe came to me and he said, Tom

11  -- this is what Joe told me -- Tom said that he has an

12  extra 20,000 -- $20 million dollars laying around, he's

13  doing really well, he wanted to know if there's anything

14  that he could buy.  I think I'm going to show him the

15  Yellow Rose.  They had already been showing it in our

16  office, he'd been already showing it to people.  And I

17  said, oh, wow, okay.  And then when the contract came on

18  it and Joe said, what do you think of this, I said --

19  and I didn't sign it, and I said, I'm going to show my

20  son.  So I showed my son, Joey.  And my son Joey said,

21  mom, you better ask Joe if this is -- there bet -- like,

22  the sale should be a good sale because Tom sues

23  everybody.  And just make sure that, you know -- so I

24  went to Joe and I said, is there anything, like, that I

25  should know about this sale, like, is everything okay.

1    doing my own stuff.  I was working on my own stuff.

2    Everyone's trying to drag me into this.  There was so --

3  Q.  Do you dispute that you had a discussion with Tom

4    Ritter?

5  A.  Yeah.  But I -- but it was a -- this --

6  Q.  No, no.  Do you dispute -- do you dispute --

7  A.  No.  No.  I've already told you I had a discussion with

8    him.  I don't like the part where I indicated it would

9    be lucrative.

10  Q.  Okay.

11  A.  It --

12  Q.  And did you provide him with photos of the Yellow Rose?

13  A.  I -- I don't know if they -- I don't remember that.

14    Maybe I emailed it, but it would have only been -- we

15    had -- we had photos, we had the whole GIA document.  I

16    had -- everybody had that.  We had all that stuff.  So

17    Joe could have said, hey, email this or -- I mean, why

18    wouldn't I?  If somebody wants something, I'm willing to

19    do it, but I -- but I didn't do it, like, because I was

20    trying to go and -- I was trying to be helpful.  If Tom

21    was going to buy this, I would have wanted it to be a

22    great sale.  I would have tried to be helpful, not to be

23    deceitful.

24  Q.  Okay.  Let's look at finding 41 on page 7.

25  A.  I do this for everybody in our business.  I did it for

1      Ted, we promise.

2              MR. GELOV:  Okay.

3              MS. ADDUCCI:  Thank you for your patience.  We

4      appreciate it.

5              MR. GELOV:  Thanks.  Bye."

6                      *     *     *     *

7                  (End of Audio Recording)

8  BY MR. WELFORD:

9  Q.  Ms. Adducci, did you hear all that?

10 **A.  Yes, I did.**

11 Q.  That's you on the tape, is it not?

12 **A.  Yes.**

13 Q.  And at your previous deposition you said it may not in

14     fact have been you.  Why did you change your testimony?

15 **A.  I don't remember saying that.**

16 Q.  Okay.

17 **A.  Because my attorney advised me?  I don't know.  Why**

18 **would I say that?**

19 Q.  I'm asking you.

20              Was that Joe on the call?

21 **A.  Yes.**

22 Q.  And that was Ted Gelov on the call?

23 **A.  I would -- I'm assuming.  I don't know Ted well enough**

24 **to know his voice.**

25 Q.  Well, you referred to him as Ted.

1    didn't know -- if Joe said there was money to pay him, I

2    didn't -- I was not aware that there wasn't enough money

3    to pay Ted, so I was ranting.  I can tell by listening

4    to it.

5  Q.   Did you know Ted was owed money?

6  A.   Joe told me he took out a loan, so -- and then he said

7       Ted said he'd give me more time.  And so the way Joe

8       made it sound, like it was no big deal, can you just

9       tell him that we just had a auction, it's going to be a

10      little -- no.  Yeah, but not -- I didn't think there was

11      an issue paying him.  Because obviously, I wasn't

12      keeping track of the bank account, so I didn't -- I

13      didn't know -- I took in checks during an auction, which

14      was a big deal.  If somebody gave us checks or if I had

15      to call a bank and say -- like, private bank, I had to

16      confirm, you know, with the girls, we all worked on it,

17      but it could have been Joe or myself, Joe can check on

18      it, too, for them to release items.  But I think it was

19      right after an auction.  And he just said, talk to Ted.

20      He didn't give me, like, hey, this is what he -- you

21      know, so I was just telling Ted, like I do, like he was

22      a friend.  I mean, why would I not explain somebody --

23      somebody else's business.  He says he's never had those

24      issues, but I can tell you that I know a lot of people

25      that have had all those same exact issues, so -- with

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1  Q.   Did not see him, did not talk to him?

2  A.   Did not see him, did not talk to him, and even said to

3       Patrick, probably yesterday, I don't know why Tom

4       wouldn't just fly in to see the Yellow Rose.

5  Q.   Where was the Yellow Rose stored?

6  A.   From what I was told, it was stored at Brink's.  That's

7       what Joe told me.

8  Q.   When you saw it where was it stored?

9  A.   Where was it stored when we -- well, we had it -- it

10      went back and forth a couple times, from what my

11      knowledge, but, again, I wasn't in the office, I wasn't

12      the one sending it in or -- my knowledge was we got it

13      in in -- like, around Labor Day, I think, was when I saw

14      it, that wedding, I don't know, somewhere in that time

15      frame.  I mean, we had it for at least four to six

16      months in the office.  And this is what I was told by

17      Joe.  I was told that Bill Noble wanted to see it again,

18      that he might possibly have a client that was going to

19      buy it.  That's what I was told.  And that's why they

20      shipped it out.  That's what I was told.

21 Q.   Shipped it out from where?

22 A.   From the Michigan office.  Because Lauren, I remember

23      her saying -- I think we all said why are you shipping

24      it out, why are you -- why are you shipping it out?  And

25      Joe said Bill -- this is what I remember, that Bill

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100