# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

Chapter 7

Joseph G. DuMouchelle and
Melinda J. Adducci,

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

        Debtors.

_____/

Thomas T. Ritter,

        Plaintiff,

v.

Melinda J. Adducci,

Adversary Pro. No. 20-04381

        Defendant.

_____/

## PLAINTIFF'S BRIEF (1) IN RESPONSE TO DEFENDANT'S ASSERTION OF SPOUSAL PRIVILEGE; AND (2) IN SUPPORT OF (a) DEFENDANT'S WAIVER OF SPOUSAL PRIVILEGE AND (b) WAIVER OF ATTORNEY CLIENT PRIVILEGE AND RESERVATION OF RIGHTS TO OBTAIN TESTIMONY OF DEFENDANT'S FORMER COUNSEL

Plaintiff, Thomas T. Ritter ("Plaintiff"), by his undersigned counsel, hereby submits his *Brief (1) in Response to Defendant's Assertion of Spousal Privilege; and (2) in Support of (a) Defendant's Waiver of Spousal Privilege and (b) Waiver of Attorney Client Privilege and Reservation of Rights to Obtain Testimony of Defendant's Former Counsel* (the "Brief"):

## I. INRODUCTION

This Brief is submitted under the *Stipulated Order Setting Schedule Regarding Privilege Issues Pertaining to Discovery of ESI* [ECF No. 215] (the "Discovery Dispute Scheduling Order"), and incorporates by reference the facts and arguments set forth in *Plaintiff's Motion to (1) Compel Production of ESI Records (2) Reopen Discovery and (3) Adjourn Trial* (the "Motion to Compel") [ECF No. 188].

The Parties have completed their respective review of the ESI Files[1] pursuant to the Discovery Dispute Scheduling Order. Plaintiff is seeking a determination that Defendant's assertion of spousal privilege, as to records that Defendant identified as business communications between her and Joseph is not applicable.

Second, Plaintiff is seeking a determination that the asserted spousal privilege does not attach to communications that were made in furtherance of a crime, and based on Joseph's criminal adjudication, ESI Files that relate to The Yellow Rose Transaction and other matters covered in the criminal adjudication are discoverable.

Third, Plaintiff seeks a determination that Defendant waived the attorney-client privilege as to her communications with her former counsel Dennis Egan and Joel Harris ("Former Counsel"), thereby permitting Plaintiff, at his discretion, to take

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion to Compel or the Discovery Dispute Scheduling Order.

deposition and trial testimony of Former Counsel regarding their knowledge of Defendant's involvement in matters pertinent to this adversary proceeding, including The Yellow Rose Transaction.

## II. ARGUMENT

### Choice of Law

Although state law may determine privilege applicability in federal court under certain circumstances, no such circumstances exist here. This Court is addressing a federal question pursuant to federal law and thus, federal common law governs privilege claims in this case.

Federal Rule of Bankruptcy Procedure 9017 provides that the Federal Rules of Evidence apply in a bankruptcy case.[2] Fed. R. Evid. 501 makes clear that "[p]rivileges in cases asserting federal law claims are governed by federal common law except as modified by the Constitution, federal statute, or a rule prescribed by the Supreme Court." *Wilcox v. Portfolio Recovery Assocs., LLC*, 2023 U.S. Dist. LEXIS 104151, *3 (referring to Fed. R. Evid. 501); *see Est. of Crookston v. United States*, 2023 U.S. Dist. LEXIS 226180, *8 (D. Utah Dec. 19, 2023) ("Federal law governs privilege claims where federal law provides the rule of decision."). However, Fed. R. Evid. 501 then provides "[b]ut in a civil case, state law governs privilege regarding a claim or defense *for which state law supplies the rule of*

---

[2] Fed. R. Bankr. P. 9017

*decision*."[3] (emphasis added). Michigan law does not supply the rule of decision in this case. The underlying fraud was federal wire fraud, tried in federal court under 18 U.S.C. § 1343, for which Joseph's criminality was adjudicated.

Furthermore, this Court is adjudicating Defendant's dischargeability in a bankruptcy proceeding which is a federal question governed by 11 U.S.C. § 523 of the Bankruptcy Code. And while bankruptcy courts deciding 523 actions have reached into state law to provide meaning for terms not defined under federal law, this Court need not do so here. *See In re Mitchell*, 2019 Bankr. LEXIS 658, *18, 2019 WL 1054715 (Bankr. Dist. Idaho March 5, 2019) ("While the issue of dischargeability under § 523(a)(9) is exclusively a question of federal law, state law may provide the meaning of some terms that are not defined under federal law, such as 'intoxication' and 'motor vehicle'. *See In re Henney*, 451 B.R. 724, 737–38 (D. W.D. Mich. 2011) ("a federal court applying section 523(a)(9) should adopt the definition of 'intoxication' or 'intoxicated' which is supplied by the relevant State's law."). There is no outstanding element of fraud that must be proven. No word that must be defined. The only question for the Court is the extent of Defendant's role in the fraud—which is question of fact—further indicating the necessity to produce all ESI Files withheld on the grounds of privilege.

---

[3] Fed. R. Evid. 501.

Even if this Court determined state law was applicable, the Notes of Committee on the Judiciary for Fed. R. Evid. 501 clarify "[i]n any case, the statute or *rule which favors the reception of the evidence governs* and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made."[4] (emphasis added). Restated in terms of this case, if Michigan common law were to govern privilege and if the enforcement of Michigan law disfavored reception of evidence that would otherwise be admitted under federal common law, pursuant to Fed. R. Evid. 501, federal common law would govern as it would be the most convenient method for evidence to be received.

Courts have also reinforced this position. *See United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y. 1977) ("A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges *where this can be accomplished at no substantial cost to federal substantive and procedural policy."* (emphasis included in original); *see also Bulow v. Bulow,* 811 F.2d 136, 140 (2d Cir. 1987) ("The evidence sought … is relevant to both the federal and state claims. In such situations courts consistently have held that the asserted privileges are governed by the principles of federal law.").

This Court is one of federal jurisdiction governed by the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. A nondischargeability action in a

---

[4] Notes of Committee on the Judiciary, Senate Report No. 93-1277

bankruptcy case is a federal question governed by federal statute. There are nondischargeability actions which involve questions of state law where state common law may apply. Conversely, here the underlying fraud involving The Yellow Rose for which Joseph was convicted was a federal question subject to federal laws. Accordingly, federal common law governs privilege in this case.[5]

## Federal Common Law Privilege Exceptions

It is well accepted that all evidentiary privileges should be narrowly construed in the interest of justice. *See EEOC v BDO USA, L.L.P.,* 876 F.3d 690 (5th Cir. 2017); *In re Northwest Senior. Hous. Corp.*, 2023 Bankr. LEXIS 331 (Bankr. N.D. Tex. Feb. 6, 2023); *In re Regan*, 2023 Bankr. LEXIS 302 (Bankr. N.D.N.Y. Feb. 1, 2023); *In re Energy Conservation Devices, Inc.*, 659 B.R. 103 (Bankr. E.D. Mich. 2024) ("Courts apply [attorney-client] privilege only when 'necessary to achieve its purpose' and only to protect legal disclosures that 'might not have been made absent the privilege.'") *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976)"); *United States v. Marashi*, 913 F.2d 724, 730 (9th Cir. 1990) ("we have emphasized that we will narrowly construe the marital communications privilege because it obstructs the truth-seeking process.").

---

[5] Notably, Defendant's assertions of privilege lack any reference to state or federal common law.

## A. Spousal Privilege Does Not Apply to the Business Documents and Business Communications Between Spouses

Communications between spouses are discoverable to the extent that the contents of their communications were communications in furtherance of their business and business-related transactions.

"There are two marital privileges recognized by the federal common law. The first, usually called the 'adverse spousal testimony' privilege, allows a spouse to refuse to testify adversely to his or her spouse. The second, usually called the 'marital communications' privilege, protects from disclosure private communications between spouses. *Griffin*, 440 F.3d at 1143–44 (citations omitted). As in *Griffin*, it is only the second that is at issue in this case." *Veracities PBS v. Strand*, 602 F. Supp. 3d 1354, 1358 (D. Or. 2022). Here, it is also only marital communications at issue but Defendant designated those marital communications as business communications. Marital communications are considered innately privileged and thus are subject to protections. *See generally United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992) ("The marital communications privilege exists 'to ensure that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law.'") (citation omitted); *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) ("information privately disclosed between husband and wife in the confidence of the marital relationship -- once described by this Court as 'the best solace of human existence.'") (citation omitted).

In contrast, business communications between spouses are not innately privileged and "[s]uch communications generally do not fall within the marital privilege." *Strand*, 602 F. Supp. 3d at 1357 ("The Court has identified many cases applying the law of various states and holding that business communications are not subject to marital privilege. *See, e.g., G--Fours, Inc. v. Miele*, 496 F.2d 809, 811 (2d Cir. 1974) (concluding that communications relating solely to business matters are not covered by the marital privilege because the information is not confidential." (citations omitted); *Est. of Crookston v. United States*, 2023 U.S. Dist. LEXIS 226180, *7 ("federal courts have recognized a federal common law exception to marital privilege for business communications, on the theory that such communications are not intended to be confidential.").

Communications between spouses regarding "business matters are not subject to the privilege unless circumstances show the conversations to have been confidential in nature. . . . . It would be improper to shield non-confidential conversations between 'business associates' about business matters solely based on the fact that the 'business associates' are also married." *S. Air Transp., Inc. v. SAT Grp., Inc. (In re S. Air Transp., Inc.)*, 255 B.R. 706, 713 (Bankr. S.D. Ohio 2000) (citing *Hanger Orthopedic Group, Inc. v. McMurray*, 181 F.R.D. 525, 530 (M.D. Fla. 1998); 81 Am. Jur. 2d, *Witnesses*, § 336). It is appropriate to conclude that since business communications between two non-spousal parties conducting

their business together would not be subject to privilege, business communications of spouses who are in business together should not be subject to privilege simply because they are married. Accordingly, the business communications between Joesph and Defendant should not be subject to spousal privilege.

In *Veracities PBS v. Strand*, the U.S. District Court for Oregon tackled the question of whether there is a federal common-law business communication exception to marital communications. *See Strand*, 602 F. Supp. 3d 1354. The *Strand* Court addressed whether a defendants'—husband and wife (the "<u>Strands</u>")—could protect communications that were subject to discovery requests as part a lawsuit against their business Strand Squared LLC.  Strand Squared LLC, and the Strands personally, were accused of, *inter alia*, fraud. *See id*. The Strands attempted to withhold more than 10,000 documents from production under the marital communications privilege. *Id*. at 1355. Relying on other courts' decisions and analyses, the *Strand* Court "agree[d] that there exists a federal common law exception to the marital communications privilege for ordinary business communications. Such communications generally do not fall within the marital privilege because they are not intended to be confidential." *Id*. at 1358. The court in *Strand* further relied the court in *Hanger Orthopedic Group*, reasserting:

> The fact that the communication relates to business transactions may show that it was not intended as confidential. Examples are statements about business agreements between the spouses, or about business matters transacted by one spouse as agent for the other, or

about property or conveyances. Usually such statements relate to facts which are intended later to become publicly known. To cloak them with privilege when the transactions come into litigation would be productive of special inconvenience and injustice.

*Id.* at 1358–59 *(citing Hanger Orthopedic Group*, 181 F.R.D. at 530).

To withhold the ESI Files that Defendant attempts to cloak with privilege, "would be productive of special inconvenience and injustice." *Id*. It is undisputed that Defendant was the vice president of DuMouchelle Jewellers and that Joseph and Defendant were the only two members of the company. The Yellow Rose transaction with Plaintiff was contemplated in connection with their business. Emails exchanged among the parties were exchanged on their respective DuMouchelle Jewellers business email accounts. Moreover, the Bank of America Account where Plaintiff's $12 million was transferred was a DuMouchelle Jewellers bank account. Hence any records or communications that Defendant has withheld on spousal privilege but that Defendant identified as business-related, were never personal in nature. Furthermore, the communications between Joseph and Defendant will establish the extent of Defendant's knowledge of and/or participation in the DuMouchelle Parties' fraud against Plaintiff.

### B. The Joint Participant Exception to Marital Communications Privilege Avoids Defendant's Assert Privilege

Even if Defendant can guard her business communications with Joseph on the grounds of spousal privilege, spousal privilege does not apply to communications in

the furtherance of a crime. Joseph's adjudication of criminality means that the ESI Files that represent communications between Defendant and Joseph in connection with The Yellow Rose Transaction and other matters in the criminal proceeding should be produced.

Every United States circuit court—including the Sixth Circuit—recognizes the "joint participant exception" or "crime-fraud exception" and "that the marital communications privilege does not apply to communications having to do with present or future crimes in which both spouses are participants." *United States v. Marashi*, 913 F.2d 724, 730–31 (9th Cir. 1990) ("We have emphasized that the policies underlying the marital communications privilege pale in the face of public concerns about bringing criminals to justice."); *see United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985) ("where spouses engage in conversations regarding joint ongoing or future patently illegal activity does the public's interest in discovering the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage.").

The joint participant exception can apply equally to civil and criminal cases despite most often being asserted in criminal proceedings. *See Fid. Nat'l Title Ins. Co. v. APM Mgmt. Service's LLC*, 669 F. Supp. 3d 773, 778 (E.D. Mo. 2023) ("the joint participant exception to the marital communications privilege may apply to a civil case, if the Court finds that the facts of that case and the communications

support finding that the public's interest in marital privacy is less than its interest in ascertaining the truth of a crime."); *see also Cooksey v. Hilton Int'l Co*., 863 F. Supp. 150, 151 (S.D.N.Y. 1994) (finding "intentional torts moored in fraud can trigger the crime-fraud exception."). At issue in this Adversary Proceeding is to what extent did the Defendant participate in the criminal fraud committed by Joseph.  The facts here fit squarely into the *Sims* Court's description where the "public's interest in discovering the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage." *United States v. Saine*, 2024 U.S. App. LEXIS, *5 (citing *Sims*, 755 F.2d at 1243).

Emails exchanged between Defendant and Joseph (that "hit" on Plaintiff's allowed ESI search terms) have the propensity to be relevant to The Yellow Rose Transaction and other crimes at issue in this case. Joseph's criminal case was adjudicated as a criminal fraud against Plaintiff. Therefore, all email communications that have been withheld on spousal privilege grounds should be produced because any such communication is likely to have "[had] to do with present or future crimes in which both spouses [were] participants." *Marashi*, 913 F.2d at 730. If the court does not find that the business communication exception applies, the Defendant should be compelled to produce all ESI Files withheld on spousal privilege grounds under the joint participant exception.

## C. Defendant Waived Any Applicable Spousal Privilege During the Adversary Proceeding Deposition

In addition to the inapplicability of spousal privilege to the ESI Files at issue, Defendant waived her spousal privilege when she testified regarding the direction she received from Joseph in transferring more than $5 million of Plaintiff's money to payment of expenses that did not involve The Yellow Rose.

"The marital privilege for confidential communications no longer protected those conversations from disclosure since the plaintiff himself disclosed them." *Bila v. RadioShack Corp.,* No. 03-10177-BC, 2004 WL 2713270 *16 (E.D. Mich. Nov. 22, 2004); *see United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974) (noting that "[a]ny marital privilege that may have existed was waived when Appellant introduced his wife's statements during cross-examination of the Government witnesses.").

"A waiver of the marital communications privilege can occur if the spouse claiming the privilege herself discloses, or allows the other spouse to disclose, the contents of a particular marital communication." *Jones-Mcnamara v. Holzer Health Sys.*, 2014 U.S. Dist. LEXIS 136132, *6 (S.D. Ohio Sept, 26, 2014). The waiver is limited to "'all communications on the same subject matter.' *Knepp v. United Stone Veneer, LLC*, 2007 U.S. Dist. LEXIS 65423, 2007 WL 2597936, *5 (M.D. Pa. Sept. 5, 2007). As the court stated in *Lien v. Wilson & McIlvaine*, 1988 U.S. Dist. LEXIS 9199, 1988 WL 87067, *2 (N.D. Ill. Aug. 12, 1988), '[w]hen a party freely and

voluntarily discloses that it had some privileged confidential conversations, the party cannot assert the privilege as grounds for refusing to identify other occasions when *the same subject matter* was discussed confidentially' (emphasis supplied)." *Id.*

"[T]he marital communications privilege is similar to the attorney-client privilege, which is also subject to waiver through voluntary disclosure of a privileged communication;' *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 256 (6th Cir. 1996)." *Holzer Health Sys.*, 2014 U.S. Dist. LEXIS 136132, *7. Thus, since Defendant testified regarding the instructions she received from Joseph about the transfer of $5 million of Plaintiff's money (that Plaintiff intended would go to purchase The Yellow Rose) all spousal privilege protections with respect to The Yellow Rose Transaction were waived.

On at least four occasions during Defendant's Adversary Proceeding Deposition, she testified regarding what Joseph told her about Plaintiff and the transactions that are the subject of this Adversary Proceeding and the transactions involving Plaintiff. Remarkably, she testified:

> Joe came to me and he said, Tom -- this is what Joe told me -- Tom said that he has an extra 20,000 -- $20 million dollars laying around, he's doing really well, he wanted to know if there's anything that he could buy. I think I'm going to show him the Yellow Rose. They had already been showing it in our office, he'd been already showing it to people. And I said, oh, wow, okay. [**p. 96**]

*******

**Mr. Welford**: At the time you opened the Bank of America account, were you aware that Tom Ritter was attempting to wire money to DuMouchelle Jewelers?

**Defendant**: Yes.  I was told that by Joe.  That's how I was aware, because Joe told me, I believe.  From my memory, from my recollection, I believe. [**p. 50**]

\*\*\*\*\*\*\*\*

**Mr. Welford**: Where was the Yellow Rose stored?

**Defendant**: From what I was told, it was stored at Brink's.  That's what Joe told me. [**p. 179**]

\*\*\*\*\*\*\*\*

**Mr. Welford**: When you saw it where was it stored?

**Defendant**: I mean we had it for at least four to six months in the office.  And this is what I was told by Joe.  I was told that Bill Noble wanted to see it again, that he might possibly have a client that was going to buy it.  That's what I was told.  And that's why they shipped it out. That's what I was told. [**p. 179**]

**Exhibit A**, *Transcript for Defendant's Adversary Proceeding Deposition*, pages 96, 50, and 179, respectively.

As is reflected in her testimony regarding conversations with Joseph, Defendant has waived any applicable spousal privilege in the context of The Yellow Rose Transaction.

The communications and records between and among Joseph and Defendant regarding her knowledge of and involvement in The Yellow Rose Transaction are necessary for Plaintiff to establish that his claims against Defendant should be

excluded from dischargeability. The court should compel Defendant to produce all ESI Files she has withheld on the grounds of spousal privilege *if* applicable.

### D. Defendant Waived the Attorney-Client Privilege

The attorney-client privilege is an important and integral piece of United States jurisprudence but as with marital communications it may be waived. This privilege may be implicitly waived when a party voluntarily discloses information that would otherwise be protected by attorney-client privilege. *See In re United Shore Fin. Servs., LLC*, 2018 U.S. App. LEXIS 138, at *3–4 (6th Cir. Jan. 3, 2018) ("The district court correctly concluded that the attorney-client privilege can be implicitly waived."). The Sixth Circuit went on to clarify that the waiver occurred when a party asserting attorney-client privilege '"attempted to prove a defense by disclosing or describing the attorney-client communications.' *See In re G-I-Holdings, Inc.*, 218 F.R.D. 428, 433 (D.N.J. 2003). Once waived, the privilege is waived with respect to all communications involving the same subject matter. *Id*."" *Id*.

Defendant waived her attorney-client privilege as to her communications with her Former Counsel when, during her Adversary Proceeding Deposition, she testified that she was following counsel's advice to lie about her knowledge of The Yellow Rose. Defendant testified:

> **A.** I came in, Dennis turned to me, and there was another attorney on the other side, George somebody, and before I gave the deposition,

Dennis said, just say you don't know anything about the Yellow Rose. [**p.28**]

*********

**A.** Right.  That was probably Dennis Egan telling me not to say that. [**p. 30**]

*********

**A.** So there you go, that's my answer.  Let's go ask him.  Let's ask Dennis Egan why he said that.  Great legal advice right? [**p. 30**]

**Exhibit A**, *Transcript for Defendant's Adversary Proceeding Deposition*, pages 28 and 30, respectively

Therefore, Plaintiff is entitled to obtain Former Counsels' testimony as to Defendant's knowledge and involvement in The Yellow Rose Transaction.

Plaintiff addresses attorney-client privilege by simply stating no records were designated as communications involving Former Counsel. However, because Defendant waived her attorney-client privilege at the Adversary Proceeding Deposition as to her communications with Former Counsel, Plaintiff seeks this court's authority to take depositions and trial testimony of both Dennis Egan and Joel Harris at Plaintiff's discretion.

## III.  <u>CONCULSION</u>

For the reasons set forth in this Brief, Defendant should be compelled to produce all communications withheld on the grounds of spousal privilege. Spousal privilege does not apply to the ESI Files that Defendant designated as business

communications between her and Joseph. Even if spousal privilege is applicable to her business communications with Joseph, it does not extend to communications in furtherance of a crime or fraud. Finally, even if spousal privilege applies to business communications and communications in furtherance of a crime or fraud, Defendant waived spousal privilege during her Adversary Proceeding Deposition.

Furthermore, as set forth above, Defendant waived her privilege as to communications she had with Former Counsel about The Yellow Rose Transaction, therefore Plaintiff is entitled, within his discretion, to take depositions and elicit testimony at trial from Former Counsel.

WHEREFORE, Plaintiff prays that this court enter an order (1) directing Defendant to produce ESI Files withheld on spousal privilege grounds and (2) authorizing Plaintiff's to depose and/or compel testimony at trial of Defendant's Former Counsel, Dennis Egan and Joel Harris.

**\*\*SIGNATURE ON NEXT PAGE\*\***

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*

Dated: January 24, 2025

# EXHIBIT 1
## (Certificate of Service)

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

                 Debtors.
_____/

Thomas T. Ritter,

                 Plaintiff,

v.

Melinda J. Adducci,

Adversary Pro. No. 20-04381

                 Defendant.
_____/

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2025, my office served a copy of the foregoing *Brief (1) in Response to Defendant's Assertion of Spousal Privilege; and (2) in Support of (a) Defendant's Waiver of Spousal Privilege and (b) Waiver of Attorney Client Privilege and Reservation of Rights to Obtain Testimony of Defendant's Former Counsel* by ECF notification to all parties who have filed an appearance in the above-captioned adversary proceeding.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*

Dated:  January 24, 2025

**EXHIBIT 2**

**(Adversary Proceeding Deposition Excerpts – EXHIBIT A)**

1     UNITED STATES BANKRUPTCY COURT

2     EASTERN DISTRICT OF MICHIGAN

3      SOUTHERN DIVISION

4 In re:      Chapter 7

5 Melinda J. Adducci,  Case No. 19-54531-lsg

6    Debtor.   Hon. Lisa S. Gretchko

7 _____/

8 Thomas T. Ritter,

9    Plaintiff,

10  -vs-

11 Joseph G. DuMouchelle Adversary Pro. No. 20-04381

12 and Melinda J. Adducci,

13    Defendants.

14 _____/

15 PAGE 1 TO 185

16

17  The Videotape Deposition of MELINDA ADDUCCI,

18  Taken Via Hanson Remote

19  Commencing at 9:29 a.m.,

20  Monday, September 23, 2024

21  Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

22

23 Court reporter, attorneys & witness appearing remotely.

24

25



```
 1   APPEARANCES:

 2

 3   JAY L. WELFORD P34471

 4   KIMBERLY R. CLAYSON P69804

 5   Taft Stettinius & Hollister, LLP

 6   27777 Franklin Road, Suite 2500

 7   Southfield, Michigan 48034

 8   (248) 727-1466

 9   jwelford@taftlaw.com

10   kclayson@taftlaw.com

11        Appearing on behalf of the Plaintiff.

12

13   PATRICK A. FOLEY P74323

14   John R. Foley, PC

15   18572 Outer Drive

16   Dearborn, Michigan 48128

17   (313) 274-7377

18   pafoley@jrfpc.net

19        Appearing on behalf of Melinda Adducci.

20

21   ALSO PRESENT:      Marc Myers - Videographer

22

23                *         *         *         *

24

25
```

1    out?  It's -- there -- I didn't -- there's many things

2    that Joe was doing that I didn't know about.  But I

3    don't -- I don't recall answering it that way.  I don't

4    remember.

5  Q.  How did you become aware of it now?

6  A.  I don't know.  I don't know how to answer you.  I don't

7    -- you know, I don't know how to answer you, that you're

8    -- I don't recall answering it that way, is what I'm

9    saying.  I don't recall answering it that way.

10 Q.  That's not my question.  My question is, how do you know

11   about it now?

12 A.  Because -- because I -- I don't recall answering it that

13   way.  I really don't.  I know there was one time when

14   there was a deposition that -- and I had no idea what

15   was going on or why, and the attorney that was next to

16   me was Dennis Egan, and Joe didn't warn me I was going

17   in for the deposition.  I came in, Dennis turned to me,

18   and there was another attorney on the other side, George

19   somebody, and before I gave my deposition, Dennis said,

20   just say you don't know anything about the Yellow Rose.

21   And I said, what do you mean?  And he said, just say you

22   don't know anything about it.  I don't know if that was

23   a deposition, but there was another deposition where you

24   did ask me questions about -- about the wires.  I -- I

25   don't know how to answer this.  I -- I got really angry

HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100
20-04381-lsg   Doc 220   Filed 01/24/25   Entered 01/24/25 13:24:23   Page 26 of 30

1      to get on the phone, and he wanted to ask me if the

2      diamond was -- what I thought of it, and I told him I

3      thought it was great.  And they asked me to appraise it

4      and I said no, there's a conflict of interest, I'm not

5      going to appraise something.  So I don't know when I

6      learned of it.  I don't know.  But I -- it was not my --

7      I was doing my own thing.  I stay in my own lane and do

8      my own thing with business.  I don't --

9  BY MR. FOLEY:

10 Q.   All right.  Going back to your deposition, September

11      3rd, 2019, page 134:

12          "Q.  Ms. Adducci, what is the Yellow Rose diamond?

13          A.  I don't know."

14 A.   Right.  That was probably Dennis Egan telling me not to

15      say that.  I had no idea what was going on at the time

16      of what -- why they were saying to say that.  But I

17      actually got really mad at him and angry afterwards and

18      said, to me that was what I could go after him for that,

19      for telling me, for advising me at a time when I had not

20      been through depositions or been sued before, and he

21      came back and said that to me?  He got really angry, he

22      goes -- he said, just say it, he yelled at me.  So there

23      you go, that's my answer.  Let's go ask him.  Let's ask

24      Dennis Egan why he said that.  Great legal advice,

25      right?  But I since did not -- when you came back and

1     you aware that Tom Ritter was attempting to wire money

2     in to DuMouchelle Jewelers?

3  A.  Yes.  I was told that by Joe.  That's how I was aware,

4     because Joe told me, I believe.  From my memory, from my

5     recollection, I believe.

6  Q.  All right.  Let's go back to this exhibit.

7  A.  And one more thing, now that I remember.  I didn't think

8     the money was going to go anywhere right away.  I

9     actually -- or any of it.  I actually thought the

10    Merrill Lynch Group talked to me about -- I thought I

11    was -- I thought there was going to be profit for us.  I

12    just didn't understand what was going on.  I actually

13    talked to the Merrill Lynch people about not having it

14    just sit there because I thought it might be there for,

15    you know, sometimes piece -- things would be there for a

16    couple weeks or -- I didn't know, I wasn't involved in

17    what was going to happen with it, but I knew that if you

18    had that much money back in the early days, way back

19    when we had Chase or NBD bank or whatever in Plymouth,

20    you know, we would -- after an auction we would move

21    money over for, you know, three weeks or whatever, or a

22    month until you paid people out or whatever it was, if

23    you had a large amount sitting, 700,000, a million,

24    you're not going to just let it sit there before you pay

25    people.  But you have to make sure there are no returns

HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100
20-04381-lsg   Doc 220   Filed 01/24/25   Entered 01/24/25 13:24:23   Page 28 of 30

1              Do you see that?

2   A.   I do.

3   Q.   And the Court made that finding.

4              MR. FOLEY:  Objection, to the extent that's a

5        question, that calls for a legal conclusion.

6              THE WITNESS:  Appraisal information.  What

7        does that mean?  Does that mean the GIA report?  Does

8        that mean Bill Noble's -- Joe would have asked me to

9        send photos.  I didn't -- you know, I didn't -- I didn't

10       go to Tom.  When Joe -- Joe came to me and he said, Tom

11       -- this is what Joe told me -- Tom said that he has an

12       extra 20,000 -- $20 million dollars laying around, he's

13       doing really well, he wanted to know if there's anything

14       that he could buy.  I think I'm going to show him the

15       Yellow Rose.  They had already been showing it in our

16       office, he'd been already showing it to people.  And I

17       said, oh, wow, okay.  And then when the contract came on

18       it and Joe said, what do you think of this, I said --

19       and I didn't sign it, and I said, I'm going to show my

20       son.  So I showed my son, Joey.  And my son Joey said,

21       mom, you better ask Joe if this is -- there bet -- like,

22       the sale should be a good sale because Tom sues

23       everybody.  And just make sure that, you know -- so I

24       went to Joe and I said, is there anything, like, that I

25       should know about this sale, like, is everything okay.

1  Q.  Did not see him, did not talk to him?

2  A.  Did not see him, did not talk to him, and even said to

3      Patrick, probably yesterday, I don't know why Tom

4      wouldn't just fly in to see the Yellow Rose.

5  Q.  Where was the Yellow Rose stored?

6  A.  From what I was told, it was stored at Brink's.  That's

7      what Joe told me.

8  Q.  When you saw it where was it stored?

9  A.  Where was it stored when we -- well, we had it -- it

10     went back and forth a couple times, from what my

11     knowledge, but, again, I wasn't in the office, I wasn't

12     the one sending it in or -- my knowledge was we got it

13     in in -- like, around Labor Day, I think, was when I saw

14     it, that wedding, I don't know, somewhere in that time

15     frame.  I mean, we had it for at least four to six

16     months in the office.  And this is what I was told by

17     Joe.  I was told that Bill Noble wanted to see it again,

18     that he might possibly have a client that was going to

19     buy it.  That's what I was told.  And that's why they

20     shipped it out.  That's what I was told.

21 Q.  Shipped it out from where?

22 A.  From the Michigan office.  Because Lauren, I remember

23     her saying -- I think we all said why are you shipping

24     it out, why are you -- why are you shipping it out?  And

25     Joe said Bill -- this is what I remember, that Bill

HANSON RENAISSANCE  hansonreporting.com
313.567.8100
COURT REPORTERS & VIDEO
20-04381-lsg   Doc 220   Filed 01/24/25   Entered 01/24/25 13:24:23   Page 30 of 30