In re:Joseph G. DuMouchelle and
Melinda J. Adducci,

          Debtors.

_____/

Thomas T. Ritter,

          Plaintiff,

v.

Melinda J. Adducci,

          Defendant.

_____/

Chapter 7 Bankruptcy
Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, Thomas T. Ritter ("**Plaintiff**") through his undersigned counsel submits as follows his trial brief in support of entry of a judgment of nondischargeability against Defendant, Melinda Adducci ("**Defendant**"):

### I.    Introduction and Relief Requested

This Adversary Proceeding involves a fraudulent scheme in which Plaintiff lost $12 million in connection with a proposed transaction involving a 77.12 carat fancy diamond ring coined "**The Yellow Rose.**" Defendant and her husband Joseph DuMouchelle ("**Joseph**") orchestrated the fraud through their business, Joseph DuMouchelle Fine & Estate Jewellers, LLC ("**DuMouchelle Jewellers**").

1

## II. Facts and Evidence to be Presented at Trial

The evidence, including stipulated exhibits and testimony, will show:

1. Defendant was the vice president and a 10 percent member of DuMouchelle Jewellers; Joseph was the 90 percent member and president.

2. Plaintiff had a longstanding personal relationship with Defendant since her childhood and Plaintiff knew her as a gemologist and appraiser associated with DuMouchelle Jewellers.

3. Before the Yellow Rose Transaction (defined below), Plaintiff loaned funds to Defendant, Joseph and DuMouchelle Jewellers, and received promissory notes, including a $350,000 note and a later $430,000 note incorporating amounts due under the first.

4. As a proposed way to repay the notes and generating profit, Defendant and Joseph presented an opportunity for Plaintiff to fund the purchase and resale of The Yellow Rose, with an anticipated $4 million profit (the "**Yellow Rose Transaction**").

5. On January 25, 2019, Defendant transmitted an email to Plaintiff containing information about The Yellow Rose (the "**Data Package Email**").

6. Around that time, in a phone call, Plaintiff asked Defendant whether the Yellow Rose transaction would be a good investment; Defendant answered "yes."

2

7. On January 31, 2019, Plaintiff emailed Defendant and Joseph a proposed purchase and resale agreement setting forth material terms, including that Plaintiff would pay $12 million directly to the seller to purchase The Yellow Rose (the "**Yellow Rose Purchase Agreement**").

8. Defendant consulted with her son about joining Joseph in the proposed agreement, however she never signed the Yellow Rose Purchase Agreement.

9. On or about February 5, 2019, Defendant opened an Bank of America business checking account in the name of DuMouchelle Jewellers (the "**BofA Account**") to receive Plaintiff's funds after FineMark Bank & Trust rejected Plaintiff's wire.

10. Just before Plaintiff's $12 million wire, the BofA Account balance was approximately $500.00.

11. On February 6, 2019, Plaintiff wired $12 million to the BofA Account; at that time, Defendant was the only authorized signer.

12. On February 7, 2019, Defendant wrote checks and made counter withdrawals from a Bank of America branch in Tucson, Arizona totaling approximately $5.1 million.

13. Over the remainder of February 2019, Defendant wrote additional checks on the BofA Account; by month's end, Defendant and Joseph had spent Plaintiff's entire $12 million.

14. None of Plaintiff's funds were used to purchase The Yellow Rose, and Plaintiff never received The Yellow Rose or any repayment of his $12 million after he wired his money to the BofA Account.

15. In April 2019, Joseph provided Plaintiff an April 12, 2019 letter agreement purporting to document a resale of The Yellow Rose for $16.5 million, with closing to occur by April 22, 2019 (the "**Yellow Rose Resale Agreement**")

16. The Yellow Rose Resale Agreement was a fictitious agreement.

17. In May 2019, Defendant and Joseph participated in at least one phone call with Plaintiff in which they represented that they would wire $2 million of sale proceeds to him; Plaintiff confirmed his discussion in a May 13, 2019 email. No such wire was received.

18. Plaintiff sent follow-up emails on June 10 and June 21, 2019 seeking information and payment.

19. On June 27, 2019, Defendant and Joseph spoke with Plaintiff by phone and represented that Plaintiff would receive full payment by July 2, 2019.

20. On July 2, 2019, when Plaintiff did not receive the promised wire, he transmitted an email to Defendant and Joseph and asked about the status of funds. Neither Defendant nor Joseph responded, and they did not remit payment to him.

21. After June 27, 2019, Plaintiff never heard from Defendant again.

4

22.     In the federal criminal case filed against Joseph in the Federal District Court for the Eastern District of Michigan, he pleaded guilty to criminal wire fraud arising from the scheme to defraud Plaintiff of his $12 million under the guise of the Yellow Rose Transaction and is now serving a sentence in federal prison.

## III.     Cases and Authority

Defendant's own admissions, together with the evidence to be admitted at trial, will demonstrate that Defendant was an active participant in a scheme to defraud Plaintiff of $12 million. Plaintiff's claims as against Defendant are nondischargeable pursuant to (1) 11 U.S.C. §523(a)(2)(A) – false pretenses, false representation, and/or actual fraud; (2) 11 U.S.C. §523(a)(4) – embezzlement or larceny; (3) 11 U.S.C. §523(a)(6) – willful and malicious injury, and (4) finally through her vicarious liability with Joseph.

The legal authority supporting each of these theories is outlined below. Following the outline of authority, this Trial Brief will provide a discussion of how each of the stipulated facts and evidence to be presented at trial supports a nondischargeability judgment in favor of Plaintiff.

### (1) 11 U.S.C. §523(a)(2)(A) – False Pretenses, False Representation, Actual Fraud.

Under §523(a)(2)(A), a debt is nondischargeable to the extent it was obtained by "false pretenses, a false representation, or actual fraud" other than a statement respecting the debtor's or an insider's financial condition. Plaintiff need only prove

5

either Defendant's false pretenses, false representation or actual fraud. In this Adversary Proceeding, the evidence at trial will support the court's finding that Plaintiff lost his money at Defendant's hands through actual fraud. Since Defendant perpetrated actual fraud against Plaintiff, it does not matter whether Defendant precisely made a false representation to Plaintiff. Notwithstanding, the facts will also support a finding that Defendant obtained Plaintiff's money through false pretenses and false representations.

### *(a) Actual fraud*

"Clearly, the Bankruptcy Code did not intend to protect property obtained by 'deceit, artifice, trick [or] design.'" *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987) (quoted by *Landmark Credit Union v. Reichartz (In re Reichartz)*, 529 B.R. 696, 699-700 (Bankr. E.D. Wis. 2015)). "[F]raud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or suppression of truth." *Id.* (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), *see also Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)). Actual fraud within the meaning of §523(a)(2)(A) "encompasses 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Vitanovich,* 259 B.R. at 877 (also quoting *McClellan*).

### *(b) False representation*

In addition to demonstrating actual fraud, Plaintiff can also prevail under the false representation or false pretenses element of §523(a)(2)(A). *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 364 (Bankr. E.D. Mich. 2012) sets forth each of the elements required to establish nondischargeability on false representation grounds. It requires that Plaintiff demonstrate that Defendant (1) made a material misrepresentation; (2) at the time the material misrepresentation was made, Defendant knew it to be false or Defendant made the material misrepresentation with gross recklessness as to its truth; (3) Defendant intended to deceive Plaintiff; (4) Plaintiff justifiably relied on the false representation; and (5) Plaintiff's its reliance was the proximate cause of loss. (Citing *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998).

A false representation can be ascertained from a party's silence, a spoken or written statement is not required for a false representation. "Mere silence regarding a material fact may constitute a false representation." *Redmond v. Finch (In re Finch)*, 289 B.R. 638, 643 (Bankr. S.D. Ohio 2003) (internal citations omitted). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression."

*Muhammad v. Reed (In re Reed),* 542 B.R. 808, 813 (Bankr. N.D. Ill. 2015) (internal citations omitted).

### *(c) False Pretenses*

The evidence will show that Defendant was involved in obtaining Plaintiff's money through false pretenses. "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 18-19 (Bankr. D. Mass. 2014) (quoting *Old Rrepublic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 482 B.R. 15, 28 (Bankr. D. Mass. 2012) *aff'd*, CIV.A. 12-12414-DPW, 2013 U.S. Dist. LEXIS 77604, 2013 WL 2436688 (D. Mass. June 3, 2013) *aff'd*, 737 F.3d 814 (1st Cir. 2013). Also see *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 505-06 (Bankr. E.D. Tenn. 2018) which indicated that false pretenses "has also been described as 'usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction. . . .'" (citing *Evans v. Dunston* (*In re Dunston*), 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992).

### (d) Intent to Deceive (false representation or false pretenses)

Under §523(a)(2)(A), false representation and false pretenses each require establishing a debtor's fraudulent intent. "As a debtor will rarely, if ever, admit to acting with an intent to deceive, 'the court may infer fraudulent intent from the totality of the circumstances.'" *Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431, 445 (B.A.P. 1st Cir. 2017) (internal citations omitted). *Zutrau* also quoted *Palmacci v. Umpierrez*, 121 F.3d 781, 792 (1st Cir. 1997) which held that "'[s]ubsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made[.]'" *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 815 (B.A.P. 1st Cir. 2005) (quoting *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996)); *see also Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 855 (Bankr. N.D. Ohio 2002) circumstantial evidence of a defendant's intent "may also include any subsequent conduct, to the extent that such conduct provides an indication as to the debtor's state of mind at the time of the actionable representations.") (Internal citations omitted).

### (e) Plaintiff's reliance on Defendant's false representations were justified (false representation or false pretenses).

As to false representation or false pretenses, "the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." *In re Holly Diane Bolling,* 600 B.R. 838, 851 (Bankr. D. Colo. 2019) (internal citations omitted). "[I]n

9

determining whether a creditor's reliance was justifiable, courts should examine 'the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [apply] a community standard of conduct to all cases.'" *Id.* (citing *Field v. Mans,* 516 U.S. 59, 71 (1995). "The justifiable reliance standard does not impose a duty on the plaintiff to investigate a representation of fact, 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.*

### (f) Defendant's false representations were the proximate cause of Plaintiff's loss (false representation or false pretenses).

"[P]roximate causation encompasses two elements, 'causation in fact' and 'legal causation.' 'Causation in fact' requires that a debtor's misrepresentations be a 'substantial factor in determining the course of conduct that results in [the] loss.'" *Tweedie v. Hermoyian (In re Hermoyian),* 466 B.R. 348, 370 (Bankr. E.D. Mich. 2012) (citing *In re Creta*, 271 B.R. 214, 219 which quoted *Restatement Second of Torts* (1976) §§546 and 548A) (other citation omitted). "Proximate cause is established where the misrepresentation is a substantial factor in the loss and where the loss may be reasonably expected to result from reliance." *Wings & Rings, Inc. v. Hoover (In re Hoover),* 232 B.R. 695, 700 (Bankr. S.D. Ohio 1999).

### (2) §523(a)(4) – Embezzlement or Larceny

In *Kim v. Sun (In re Sun)*, 535 B.R. 358, 368 (B.A.P. 10th Cir. 2015), the appellate court upheld the bankruptcy courts findings that the Suns' misuse of the

10

Kims' money was either embezzlement or larceny. The bankruptcy court mainly focused on the inferences from the facts that the Suns' intended to permanently deprive the Kims' of their property. This was supported by the Suns' continued after-the-fact substitution of property that made up the value of the Kims' initial investment. However the opinion glossed over whether the Suns lawfully or unlawfully obtained the Kims' money and simply held that in either case, "the facts support a conclusion that the debt was nondischargeable under §523(a)(4)." *Id.*

### (a) *Embezzlement*

Under §523(a)(4), a debt is nondischargeable to the extent it arises from "embezzlement." With respect to §523(a)(4), the elements of embezzlement include that "(1) [a claimant] 'entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Contemporary Imps., Inc. v. Morrow (In re Morrow)*, 563 B.R. 272, 280 (Bankr. E.D. Tenn. 2017) (internal citations omitted). Put another way, embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted *or into whose hands it has lawfully come.*" (emphasis added) *Rice v. Morse (In re Morse)*, 524 B.R. 774, 793 (Bankr. E.D. Tenn. 2015); *see also Reyes v. Ranciato (In re Ranciato)*, 638 B.R. 275, 287 (Bankr. D. Conn. 2022), "Different than larceny, to constitute embezzlement, the original taking of the property must be lawful, or, with the

consent of the owner." (quoting 4 *Collier on Bankruptcy* ¶ 523.10 (16th)). "It is the character of the debt rather than the character of the debtor that determines whether the debt is nondischargeable under § 523(a)(4)." *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 351 (5th Cir. 2017) (internal citations omitted).

### (b) Larceny

Pursuant to §523(a)(4), larceny is the fraudulent and wrongful taking and carrying away of the property belonging to Plaintiff "with intent to convert such property to the taker's use without the consent of the owner." *Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630, 652 (Bankr. E.D.N.Y. 2020) (internal citations omitted). Differing from embezzlement, Plaintiff must prove that Defendant "possess the unlawful intent at the time of the original taking." *Id.*

### (3) § 523(a)(6) – Willful and Malicious Injury

Section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." "'[W]illful' means 'voluntary,' 'intentional,' or 'deliberate.'" *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999) (citing in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998). Malicious means that "'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it.'" *Id.*

(quoting Restatement (Second) of Torts § 8A, at 15 (1964)). Put another way, a "wrongful act, (2) done intentionally by the debtor; (3) which causes injury to the creditor; (4) is done without just cause or excuse." *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 511 (Bankr. N.D. Ill. 2002) (citing *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994)).

"[T]he 'willful' requirement of 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Kraus Anderson Capital, Inc. v. Bradley (In re Bradley)*, 507 B.R. 192, 201 (B.A.P. 6th Cir. 2014). "Under §523(a)(6), the business person is held to a higher standard as a business person who is more knowledgeable of the natural consequences of his acts. *Id.* at 203 (citing *Trust Co. Bank v. Ricketts* (*In re Ricketts*), 16 B.R. 833, 834-35 (Bankr. N.D. Ga. 1982)). Although "'subjective mind set is central to the inquiry,' the focus is not on whether a debtor intended to repay the debt eventually. Rather, the focus is on 'whether debtor acted deliberately in knowing disregard of a creditors' rights in property.'" *Id.* at 204.

Malicious "means a deliberate or intentional act in which the debtor knows his act would harm the creditors [sic] interest and proceeds in the fact of the knowledge. The debtor's knowledge may be inferred from his experience in business, his concealment of the sales, his admission that he had read the security

13

agreement which forbid the sale or that he understood what was meant by the term security agreement and collateral used as security." *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (N.D. Ill. 1983).

### (4) Vicarious Nondischargeability

#### (a) Agency

Vicarious nondischargeable liability can be imputed on Defendant because "[w]hen spouses have a business relationship . . . . many courts have applied some variety of agency law to impute fraudulent intent under 11 U.S.C. § 523(a)(2)." *See In re Holly Diane Bolling*, 600 B.R. 838, 849 (Bankr. D. Colo. 2019) (internal citations omitted) *Bolling* also cited to *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989) which held that the debtor's husband's fraudulent used-car sale was imputable to her, because the dealership license was in her name and her signature was required on business checks. *Bolling* also cited to *W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305, 307 (Bankr. S.D. Fla. 1982) which, according to *Bolling* held that "although the wife may have lacked actual knowledge that her husband submitted a false financial statement on behalf of corporation, she had intent to deceive under 11 U.S.C. § 523(a)(2)(B) because of her role as corporate secretary." *Id.* (citing *Medow*).

*Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703 (B.A.P. 6th Cir. 2012) offers facts similar to this Adversary Proceeding. In *Cottingham*, Mrs. Cottingham

was convicted of embezzlement as a result of having embezzled funds from her employer. Both of the Cottinghams filed for bankruptcy and Mrs. Cottingham's former employer sued the both of them to oppose dischargeability of the embezzled funds. The facts showed that Mrs. Cottingham set up the entire fraudulent scheme and Mr. Cottingham merely made use of the embezzled funds when they were deposited into their joint account. Notably, Mr. Cottingham had access to the family's bank accounts during the time that his wife was depositing the embezzled money into the accounts. The bankruptcy court did not find Mr. Cottingham's feigned ignorance credible and concluded "[h]e was an active participant in the conversion of the stolen funds and property." *Id. See also*, *Kim* at 362, there was little distinction between the actions of each of the §523 defendants, Mr. and Mrs. Sun. Mr. Sun was the primary driver of the fraud. However, the court only discussed a single link to Mrs. Sun – her direction to the Kims to deposit their initial investment to the Suns' personal account under the guise of it being a corporate account and misuse of those funds thereafter.

### (b) Civil conspiracy

Defendant may also be held responsible on a nondischargeability judgment on civil conspiracy grounds. A civil conspiracy is "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Gidelski v. Anton (In re Anton),* Nos. 08-64144,

09-04344, 2013 Bankr. LEXIS 1715, at *1, 2013 WL 1747907, at *4 (Bankr. E.D. Mich. Apr. 12, 2013) (quoting *Kasey, Inc. v. Alpine Realty Now, Inc.*, 2012 Mich. App. LEXIS 3, 2012 WL 10998 (Mich. App. 2012).

### IV. Application of Facts to Cases and Authority

In this Adversary Proceeding, facts and evidence to be presented at trial will demonstrate (1) Defendant obtained Plaintiff's money through actual fraud, false pretenses or false representation within the meaning of §523(a)(2)(A); (2) Defendant either embezzled or stole Plaintiff's money, either way, Defendant intended to permanently deprive Plaintiff of his money or knew that his loss was substantially certain to occur within the meaning of §523(a)(4); and (3) Defendant intentionally and deliberately misled Plaintiff and she knew that her actions and the misuse of Plaintiff's money would cause significant damage to him; (4) in the alternative, Defendant's role in the Yellow Rose Transaction and her participation improperly dissipating Plaintiff's funds will be sufficient to hold her vicariously liable for defrauding Plaintiff.

**(1) Defendant obtained Plaintiff's $12 million within the meaning of 523(a)(2)(A).**

There is no dispute in the fact that on February 6, 2019, Plaintiff wired his $12 million to the BofA Account. The BofA Account signature cards will show that at that time, Defendant was the only authorized signer on the account. Only one day after that, on February 7, 2019, Defendant signed checks and counter withdrawals

16

that depleted $5.1 million of his money on purposes that did not include purchase of The Yellow Rose. The BofA Account records will show that thereafter, all of Plaintiff's money was spent within the month of February 2019 and that Defendant signed many of the checks on the BofA Account after February 7, 2019. None of Paintiff's money went to purchase The Yellow Rose. Thus, Defendant obtained Plaintiff's money.

**(a) The $12 million was obtained through Defendant's actual fraud, false representations OR false pretenses within the meaning of 523(a)(2)(A).**

The facts and evidence to be presented at trial will show that Defendant was as much a participant in the actual fraud, false representations or false pretenses as Joseph was. Consistent with *Caspers* (sec. III(1)(a) *supra*), Defendant committed actual fraud because she participated in creating a "false suggestion" about the Yellow Rose Transaction when she transmitted the Data Package Email. This left Plaintiff' with the false impression that Defendant and Joseph had the ability to broker the Yellow Rose Transaction. In fact, the Yellow Rose Transaction never occurred and immediately upon receipt, Defendant misused Plaintiff's money, an indication that she committed actual fraud.

Actual fraud, false representation or false pretenses also follows from Plaintiff's telephone conversation with Defendant that occurred prior to Plaintiff's wire transfer, Defendant continued the "false suggestion," or as in her silence

regarding a material fact" which constitutes a false representation" per *Redmond* (sec. III.(1)(b) *supra*) because she confirmed that the Yellow Rose Transaction was a good investment.

Then, the series of Defendant's conduct, acts and omissions of fact constitute "the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction. . . .'" per *Lansden* (sec. III.(1)(c) *supra*). For instance, based on Defendant's prior testimony she knew Plaintiff's intentions for the Yellow Rose Transaction because she had received Plaintiff's proposed Yellow Rose Purchase Agreement which contained all of the material terms of the transaction. More specifically, Defendant knew Plaintiff intended to use $12 million to purchase the Yellow Rose. Incredibly however, Defendant will ask the court to believe that she merely took orders and asked no questions of Joseph about the reasons for writing $5.1 million in checks in one day on the day after Plaintiff's money was wired to the BofA Account.

### (b) Plaintiff's reliance on Defendant's false representations or false pretenses was justified.

Defendant's long-standing relationship with Plaintiff and what Plaintiff knew to be Defendant's expertise as a gemologist and appraiser were each the core reasons Plaintiff agreed to enter into the Yellow Rose Transaction. Plaintiff would have never engaged in the a transaction with Joseph and DuMouchelle Jewellers were it not for his relationship to Plaintiff and what he believed to be her role in the business

18

and her gemology expertise. Defendant traded on Plaintiff's long-standing relationship to bring Plaintiff along in the fraud.

### (c) Defendant intended to deceive Plaintiff

Defendant's participation in the after-the-fact telephone calls are an indication of her intent to defraud Plaintiff. Defendant joined Joseph and spoke to Plaintiff in at least two phone calls following the supposed April 22, 2019 resale of The Yellow Rose. In those calls, Defendant participated in affirming to Plaintiff that The Yellow Rose had sold and that an initial $2 million was paid and would be wired to Plaintiff. Plaintiff never received a $2 million wire. Plaintiff sent emails to Defendant and Joseph confirming those calls and received no response. In fact after June 27, 2019, Defendant never communicated with Plaintiff again. Her complete silence with Plaintiff after these calls speaks the loudest to her intent to participate in the scheme of the Yellow Rose Transaction.

### (d) Defendant's actual fraud, false representations or false pretenses were the proximate cause of Plaintiff's loss of $12 million.

Plaintiff wired his $12 million to the BofA Account on the false notion that he was transferring his money to purchase The Yellow Rose. Defendant on her own signed the series of checks that depleted Plaintiff's $12 million once it reached the BofA Account. Plaintiff did not receive repayment of his $12 million and he did not

19

receive The Yellow Rose. This puts Defendant squarely at the proximate cause of Plaintiff's $12 million loss.

### (2) Embezzlement or Larceny

Plaintiff lawfully parted with his money under the false perception that he had wired his money, and therefore entrusted his money, to an account owned by The Yellow Rose seller. Instead, without his knowledge, it was wired to the BofA Account that belonged to DuMouchelle Jewellers. Based on Plaintiff's intent, he voluntarily parted with his money the BofA Account.

Even if it is "the character of the debt rather than the character of the debtor" (*Cowin* at III.(2)(a) *supra*), that indicates whether a defendant committed larceny or embezzlement, there are facts unique to this Defendant that may support a finding that she committed larceny. The reason for this is that irrespective of whether or not Defendant lawfully obtained use of Plaintiff's money, she knew the purpose of the BofA Account and Plaintiff's $12 million was to purchase The Yellow Rose. However, as soon as she had control of Plaintiff's money, she used it without Plaintiff's consent, for reasons other than purchasing The Yellow Rose.

Next, as to both embezzlement and larceny, the next element for each requires that acted to permanently deprive Plaintiff of the benefit of his $12 million or the Yellow Rose without just cause or excuse. In fact, Defendant personally spent Plaintiff's most, if not all, of $12 million on other purposes, leaving no funds with

which to repay Plaintiff or to purchase The Yellow Rose. Therefore, her use of funds was without just cause or excuse.

Finally, in each of embezzlement or larceny, Defendant's conduct must indicate fraud. As outlined in IV(1)(a) *supra*, all of Defendant's representations, omissions and conduct add up to fraud.

**(3) Defendant willfully and maliciously caused injury to Plaintiff within the meaning of §523(a)(6).**

Similar to *Kraus* and *United Bank of Southgate* (sec. III(4) *supra*), this Defendant, who was in business with Joseph through DuMouchelle Jewellers should be held to a higher standard of knowledge regarding her acts and conduct. Defendant admitted in prior testimony to knowing that the BofA Account was intended to accept Plaintiff's money. Defendant also admitted that she knew that Plaintiff intended to be a participant in the Yellow Rose Transaction. Notwithstanding, Defendant was primarily responsible for misusing Plaintiff's $12 million. Despite all that she knew, she either knew she would permanently deprive Plaintiff of his $12 million or had to know that Plaintiff's $12 million loss was substantially certain to occur.

**(4) Vicarious nondischargeable liability.**

Although Defendant's direct conduct alone supports nondischargeability, her liability is further established through agency and civil conspiracy principles. Additionally, as a business owner, Defendant is subject to heightened scrutiny

because she was a member and served as an officer of DuMouchelle Jewellers. Defendant could not merely bury her head in the sand and ignore the realities of Joseph's unlawful conduct. Moreover, she was the very person that signed the checks that deprived Plaintiff of his use and enjoyment of his $12 million. Read together, the court can draw the reasonable inference that Defendant is responsible for Plaintiff's $12 million loss through fraud.

### (a) Agency

Defendant is expected to testify that she opened the BofA Account at Joseph's direction and that she took his direction in each part of her role in the transaction. If that is the case, then, Defendant was authorized and consented to act for or on behalf of Joseph in connection with the Yellow Rose Transaction. When Plaintiff's money reached the BofA Account she was the sole account signer which is why, the day after the wire reached the account, Defendant issued checks to third parties for the first $5.1 million of Plaintiff's money in a single day. She is expected to testify that she engaged in the transactions at Joseph's instruction. Thus she was continuing to act on Joseph's behalf to defraud Plaintiff of all of his money. After the first day of spending, Defendant continued to spend Plaintiff's money with in the same month, until the funds were fully depleted. To make matters worse for Defendant, she joined Joseph in the after-the-fact cover up by joining and participating in phone calls that affirmed to Plaintiff that the Yellow Rose had resold.

22

### (b) Civil conspiracy

Alternatively, Defendant participated in a civil conspiracy to defraud Plaintiff of his $12 million. Defendant joined Joseph in the concerted action, creating a false perception for Plaintiff that he would be able to enter into the Yellow Rose Transaction. Defendant and Joseph participated in the scheme together. Without dispute, Defendant's misuse of Plaintiff's funds was an unlawful act, resulting in Joseph's criminal conviction. Defendant was involved in creating the false perception that the Yellow Rose Transaction was legitimate throughout the entire scheme and even in the after-the-fact cover up. Through all of her representations, withholding of material information and other conduct, she should be held responsible.

## VIII. Conclusion

For all the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in his favor and:

1. Determine that the debt arising from the Yellow Rose transaction—at least $12 million, or any other amounts as the Court may determine—constitutes a nondischargeable debt of Defendant under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6) directly or vicariously; and

2. Grant such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**TAFT STETTINIUS &
HOLLISTER, LLP**

Dated: February 23, 2026

/s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Jay L. Welford (P34471)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
jwelford@taftlaw.com

*Counsel to Plaintiff, Thomas T. Ritter*

24

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

        Debtors.

_____/

Thomas T. Ritter,

     Plaintiff,

v.

Melinda J. Adducci,

     Defendant.

_____/

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 23, 2026, my office electronically filed *Plaintiff's Trial Brief* with the Clerk of the Court which sends notices by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

                Respectfully submitted by:

**TAFT, STETTINIUS & HOLLISTER, LLP**

Dated: February 23, 2026

By: /s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
kclayson@taftlaw.com

*Counsel to Plaintiff, Thomas Ritter*