**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

          Debtors.

_____/

Thomas T. Ritter,

          Plaintiff,

v.

Melinda J. Adducci,

          Defendant.

_____/

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Plaintiff, Thomas T. Ritter ("**Plaintiff**"), by and through his undersigned counsel, respectfully submits the following Proposed Findings of Fact and Conclusions of Law in support of entry of a judgment of nondischargeability against Defendant, Melinda J. Adducci ("**Defendant**"), pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) and vicarious nondischargeable liability.

1

## I. PROPOSED FINDINGS OF FACT

### A. The Parties and Their Relationship

1. Defendant and her husband, Joseph DuMouchelle ("**Joseph**"), were members of Joseph DuMouchelle Fine & Estate Jewellers, LLC ("**DuMouchelle Jewellers**"). Joseph was the 90 percent member and president of DuMouchelle Jewellers. Defendant held a 10 percent membership interest in DuMouchelle Jewellers and held the title of vice president.

2. Plaintiff had a longstanding personal relationship with Defendant dating back to her childhood. Plaintiff knew Defendant as a gemologist and appraiser associated with DuMouchelle Jewellers. Plaintiff's relationship with Defendant and his knowledge of her professional expertise were the primary reasons Plaintiff agreed to transact business with the DuMouchelle Parties.

3. Before the Yellow Rose Transaction (defined below), Plaintiff loaned funds to Defendant, Joseph, and DuMouchelle Jewellers. In connection with those loans, Plaintiff received promissory notes, including a $350,000 promissory note dated February 12, 2014, executed by Defendant and Joseph, and a subsequent $430,000 promissory note renewal dated November 16, 2017 signed by Joseph only, which incorporated amounts due under the prior note.

2

**B. The Yellow Rose Transaction**

4. As a proposed means of repaying the outstanding promissory notes and generating profit, Defendant and Joseph presented Plaintiff with an opportunity to fund the purchase and resale of a 77.12-carat fancy yellow diamond ring coined "**The Yellow Rose**," with an anticipated profit of $4 million above the $12 million purchase price (the "**Yellow Rose Transaction**").

5. On January 25, 2019, Defendant transmitted an email to Plaintiff containing a data package with information regarding The Yellow Rose (the "**Data Package Email**"). The Data Package Email was sent by Defendant to advance the Yellow Rose Transaction and created the impression that Defendant and Joseph had the ability to broker the Yellow Rose Transaction.

6. On January 28, 2019, Joseph sent Plaintiff what appeared to be an appraisal of The Yellow Rose.

7. Around the time of the Data Package Email, Plaintiff spoke with Defendant by telephone and asked whether the Yellow Rose Transaction would be a good investment. Defendant answered that it would be. Plaintiff relied on Defendant's affirmation in deciding to proceed with the Yellow Rose Transaction.

8. On January 31, 2019, Plaintiff and Joseph executed a purchase agreement (the "**Yellow Rose Purchase Agreement**") providing that Plaintiff would purchase The Yellow Rose for $12 million and that Joseph would facilitate

the resale of the diamond. On the same date, Plaintiff sent an email to both Defendant and Joseph attaching the executed Yellow Rose Purchase Agreement and asked whether Defendant should be included as a party.

9. Defendant consulted with her son about joining Joseph in the Yellow Rose Purchase Agreement. Defendant read the Yellow Rose Purchase Agreement to her son in seeking his advice. Defendant thus had access to the material terms of the Yellow Rose Transaction, including Plaintiff's $12 million purchase price. However, Defendant never signed the Yellow Rose Purchase Agreement.

### C. The Wire Transfer Attempts and the BofA Account

10. On January 31, 2019, Joseph sent Plaintiff an email requesting funds to purchase The Yellow Rose and providing wiring instructions to an account at MB Financial Bank in the name of "Highland Wealth Management" (the "**MB Financial Bank Account**"). The email represented that Highland Wealth Management was associated with the seller of The Yellow Rose. On February 1, 2019, Plaintiff initiated a wire transfer to the MB Financial Bank Account. MB Financial Bank did not accept the wire transfer.

11. In an email dated February 1, 2019, Joseph directed Plaintiff to wire $12 million to an account at FineMark Bank & Trust in the name of "Fine & Estate Appraisers, LLC" (the "**FineMark Account**"). On February 4, 2019, Plaintiff initiated a wire transfer to the FineMark Account. FineMark Bank & Trust did not

4

accept the wire transfer and the funds were returned to Plaintiff on February 5, 2019. The FineMark Account was not the bank account of the seller of The Yellow Rose.

12. On or about February 5, 2019, Defendant opened a Bank of America business checking account in the name of DuMouchelle Jewellers (the "**BofA Account**") to receive Plaintiff's funds after the prior wire attempts had been rejected. Defendant knew that the BofA Account was opened to receive Plaintiff's money in connection with the Yellow Rose Transaction.

13. Just before Plaintiff's $12 million wire, the balance of the BofA Account was approximately $500.00.

14. On February 6, 2019, Joseph sent Plaintiff an email directing Plaintiff to wire $12 million to the BofA Account, which was described as being in the name of "Fine & Estate Appraisers, LLC." On the same date, Plaintiff initiated a wire transfer of $12 million to the BofA Account (the **"$12 Million Transfer"**). Bank of America accepted the $12 Million Transfer. At the time of the $12 Million Transfer, Defendant was the only authorized signer on the BofA Account. The BofA Account was an account of DuMouchelle Jewellers, not the account of the seller of The Yellow Rose. Joseph provided Plaintiff with a receipt dated February 6, 2019 purporting to evidence the purchase of The Yellow Rose (the "**Yellow Rose Purchase Receipt**").

5

### D. Defendant's Disburses Plaintiff's Funds

15. On February 7, 2019, Joseph sent three emails to Bank of America representatives (the "**BofA Emails**") with payment instructions regarding the BofA Account. Defendant's was an email recipient on two of the three BofA Emails.

16. On February 7, 2019, Defendant was in Tucson, Arizona attending a gemology conference. On that same date, Defendant wrote checks and made counter withdrawals from a Bank of America branch in Tucson, Arizona totaling approximately $5.1 million from the BofA Account (the "**Bank Transactions**").

17. The Bank Transactions included payments to numerous third parties, none of which constituted payment for the purchase of The Yellow Rose.

18. Over the remainder of February 2019, Defendant wrote additional checks on the BofA Account. By the end of February 2019, Defendant and Joseph had spent Plaintiff's entire $12 million. Defendant signed many of the checks on the BofA Account after February 7, 2019.

19. None of Plaintiff's funds were used to purchase The Yellow Rose. Plaintiff never received The Yellow Rose. Plaintiff never received repayment of the $12 Million Transfer after it was wired into the BofA Account. Richard Drucker was not the seller of The Yellow Rose.

20. Neither Defendant, Joseph nor DuMouchelle Jewellers purchased The Yellow Rose.

### E. Post-Transfer Conduct and Cover-Up

21.     Sometime in March 2019, Joseph represented to Plaintiff that The Yellow Rose would be moved from the Brinks depository in Texas to the Brinks depository in Michigan. Plaintiff prepared a proposed resale agreement for The Yellow Rose and emailed that draft agreement to Joseph on March 21, 2019.

22.     In April 2019, Joseph signed the draft resale agreement on April 12, 2019 for the resale of The Yellow Rose for $16.5 million (the "**April 12, 2019 Letter Agreement**"). The April 12, 2019 Letter Agreement contemplated a closing date of April 22, 2019.

23.     On April 22, 2019, Plaintiff traveled to Detroit on Joseph's invitation in order to view The Yellow Rose at the Brinks depository. When Plaintiff arrived in Detroit, Joseph did not show him The Yellow Rose indicating that the Brinks depository was closed that day. The April 12, 2019 Letter Agreement was a fictitious agreement.

24.     In May 2019, Plaintiff addressed Defendant and Joseph regarding a telephone call in which it was represented that Plaintiff would receive a wire of $2 million of sale proceeds to Plaintiff. Plaintiff confirmed his discussion in a May 13, 2019 email sent to both Defendant and Joseph. No such wire was received by Plaintiff.

25. Plaintiff sent follow-up emails on June 10 and June 21, 2019 to Defendant and Joseph seeking information and payment.

26. Plaintiff transmitted a fourth email to Defendant and Joseph on July 2, 2019, following up on a telephone call that occurred on or about June 27, 2019 in which Plaintiff was told he would receive payment in full for the resale of the Yellow Rose. Neither Defendant nor Joseph responded, and they did not remit payment to Plaintiff. After June 27, 2019, Plaintiff never heard from Defendant again. Defendant ceased all communications with Plaintiff after June 27, 2019.

**F. The North Dakota Judgment and Bankruptcy Filing**

27. After filing suit against the DuMouchelle Parties, including Defendant, in connection with the promissory notes and the Yellow Rose Transaction, on September 12, 2019, Plaintiff obtained a default judgment against the DuMouchelle Parties, including Defendant, in the total amount of $17,140,031.62 (the "**North Dakota Judgment**").

28. The North Dakota Judgment is comprised of (1) $16,414,214.61 in connection with the Yellow Rose Transaction, calculated as (i) $12 million of Plaintiff's money that was intended for the purchase of The Yellow Rose, (ii) $4 million for a purported commission that would have been due to Plaintiff had the Yellow Rose Transaction actually occurred, and (iii) judgment interest, and (2)

8

$725,817.00 related to promissory notes by the DuMouchelle Parties that predated The Yellow Rose Transaction.

29. Thereafter, Defendant and Joseph commenced the above-captioned bankruptcy case (the "**Bankruptcy Case**") on October 11, 2019 (the "**Petition Date**") by filing a voluntary Chapter 11 bankruptcy petition. The case was converted to a Chapter 7 bankruptcy in December 2019, after a motion was filed by the United States Trustee seeking conversion.

30. Plaintiff commenced this Adversary Proceeding in the Bankruptcy Case against Defendant and Joseph seeking to except his claims represented by the North Dakota Judgment from Defendant and Joseph's bankruptcy discharge pursuant to §§ 523(a)(2), (4), (6) to both debtors and on vicarious liability grounds as to Defendant.

### G. Joseph's Criminal Conviction

31. On June 16, 2020, while this Adversary Proceeding was pending, the United States of America filed an Information (the "**Information**") against Joseph in the United States District Court for the Eastern District of Michigan, Southern Division, styled as United States of America v. Joseph Gregory DuMouchelle, Case No. 20-20245 (the "**Criminal Proceeding**"), in connection with The Yellow Rose Transaction.

32.     The Information alleged, among other things, that Joseph "by means of false and fraudulent material promises, pretenses and representations" instructed Plaintiff to transfer $12,000,000 for the purchase of The Yellow Rose, falsified documents and emails making it appear that the account the money would be wired to was in fact the seller's, sent false information to Plaintiff with directions to wire the money, sent Plaintiff a fraudulent receipt making it appear that The Yellow Rose had been purchased, and caused the transmission of wire communications in interstate commerce in the form of an interstate wire transfer of $12,000,000 from Plaintiff's bank account to the BofA Account.

33.     On September 14, 2020, Joseph appeared for a guilty plea hearing, wherein he testified before the District Court regarding his criminal fraudulent conduct. Joseph attested that he committed acts that satisfied each of the elements of criminal wire fraud. Joseph admitted to causing Plaintiff $12 million in damages due to his criminally fraudulent conduct. Joseph pleaded guilty to criminal wire fraud arising from the scheme to defraud Plaintiff of his $12 million under the guise of the Yellow Rose Transaction and is now serving a sentence in federal prison.

34.     On July 17, 2023, the Court dismissed Joseph from this Adversary Proceeding on mootness grounds following his waiver of his bankruptcy discharge in the Bankruptcy Case.

## II. PROPOSED CONCLUSIONS OF LAW

### A. Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). No party contests this Court's jurisdiction.

### B. Burden of Proof

Plaintiff bears the burden of proving each element of nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). As set forth below, Plaintiff has met this burden under each of the asserted theories of nondischargeability.

### C. Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)

Under 11 U.S.C. § 523(a)(2)(A), a debt is nondischargeable to the extent it was obtained by "false pretenses, a false representation, or actual fraud," other than a statement respecting the debtor's or an insider's financial condition. Plaintiff may prevail if he proves that the alleged debt was obtained through false pretenses, false representation, or actual fraud. The evidence establishes each of these grounds as to Defendant.

11

### 1. Actual Fraud

"Actual fraud" within the meaning of § 523(a)(2)(A) encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). As the Supreme Court held in *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355, 360 (2016), "actual fraud" encompasses forms of fraud beyond affirmative misrepresentations, so long as the debt is "obtained by" the debtor's fraudulent conduct.

Defendant committed actual fraud by participating in a scheme to create a false impression that she and Joseph had the ability to broker the Yellow Rose Transaction. Defendant transmitted the Data Package Email, affirmed the investment by telephone, opened the BofA Account to receive Plaintiff's funds, and—as the sole authorized signer—disbursed $5.1 million of Plaintiff's funds the day after receipt for purposes entirely unrelated to the purchase of The Yellow Rose. In fact, none of Plaintiff's $12 million was used to purchase The Yellow Rose and the DuMouchelle Parties never sold the Yellow Rose for Plaintiff. Defendant's conduct including her after-the-fact conduct constituted a "deceit, artifice, trick, or design" used to circumvent and cheat Plaintiff of his $12 million. Defendant thereby

obtained Plaintiff's money through actual fraud within the meaning of § 523(a)(2)(A).

### 2. False Representation

To establish nondischargeability on false representation grounds, Plaintiff must demonstrate that Defendant (1) made a material misrepresentation; (2) at the time the material misrepresentation was made, Defendant knew it to be false or made it with gross recklessness as to its truth; (3) Defendant intended to deceive Plaintiff; (4) Plaintiff justifiably relied on the false representation; and (5) Plaintiff's reliance was the proximate cause of loss. *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). A false representation can be ascertained from a party's silence; "[m]ere silence regarding a material fact may constitute a false representation." *Redmond v. Finch (In re Finch)*, 289 B.R. 638, 643 (Bankr. S.D. Ohio 2003).

Defendant made material misrepresentations to Plaintiff. Defendant transmitted the Data Package Email, which created the impression that the Yellow Rose Transaction was legitimate and that Defendant and Joseph could broker the transaction. Defendant verbally represented to Plaintiff in a telephone conversation that the Yellow Rose Transaction was a good investment. Defendant knew, or was

13

grossly reckless in not knowing, that these representations were false, as evidenced by her immediate disbursement of Plaintiff's funds for purposes unrelated to the purchase of The Yellow Rose upon receipt. Defendant's silence regarding the true nature of the transaction and the disposition of Plaintiff's funds constituted additional false representations. Defendant intended to deceive Plaintiff, as demonstrated by the totality of the circumstances, including her post-transfer conduct, and her complete cessation of communication with Plaintiff after June 27, 2019.

### 3. False Pretenses

"[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression." *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 18-19 (Bankr. D. Mass. 2014). False pretenses have been described as "usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction." *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 505-06 (Bankr. E.D. Tenn. 2018). Defendant's series of conduct, acts, and omissions—including transmitting the Data Package Email, affirming the investment by telephone, opening the BofA Account, disbursing Plaintiff's funds for unauthorized purposes, allowing Plaintiff to believe The Yellow Rose had resold and ceasing all

14

communications with Plaintiff created the product of fraud that caused Plaintiff his $12 million loss. Defendant obtained Plaintiff's money through false pretenses within the meaning of § 523(a)(2)(A).

### 4. Justifiable Reliance

"[T]he inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." *In re Holly Diane Bolling*, 600 B.R. 838, 851 (Bankr. D. Colo. 2019). Courts should examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Field v. Mans*, 516 U.S. 59, 71 (1995). "The justifiable reliance standard does not impose a duty on the plaintiff to investigate a representation of fact." *Id.* Plaintiff's reliance on Defendant's representations was justified. Plaintiff had a longstanding personal relationship with Defendant dating back to her childhood. Plaintiff knew Defendant as a gemologist, appraiser, and vice president of DuMouchelle Jewellers. Plaintiff would not have engaged in the Yellow Rose Transaction but for his relationship with Defendant and what he believed to be her role in the business and her gemology expertise. Defendant traded her longstanding relationship with Plaintiff to lure him into the fraud. Plaintiff held a significant level of trust in Defendant based on his long-time relationship with her, Defendant's close family connection, and Defendant's expertise in her field to believe that the Yellow Rose Transaction was

legitimate. Plaintiff's reliance on Defendant's express and implied representations was justified.

### 5. Proximate Cause

"Proximate cause is established where the misrepresentation is a substantial factor in the loss and where the loss may be reasonably expected to result from reliance." *Wings & Rings, Inc. v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr. S.D. Ohio 1999). Plaintiff wired his $12 million to the BofA Account on the false notion that he was transferring his money to purchase The Yellow Rose. Defendant, participated in the pre-transaction false pretenses and, on her own, signed the series of checks that depleted Plaintiff's $12 million once it reached the BofA Account. Plaintiff did not receive repayment of his $12 million and he did not receive The Yellow Rose. Defendant's actual fraud, false representations, and false pretenses combined with her misuse of his money were the proximate cause of Plaintiff's $12 million loss.

### 6. Intent to Deceive

"As a debtor will rarely, if ever, admit to acting with an intent to deceive, 'the court may infer fraudulent intent from the totality of the circumstances.'" *Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431, 445 (B.A.P. 1st Cir. 2017). "'[S]ubsequent

16

conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made.'" *Palmacci v. Umpierrez*, 121 F.3d 781, 792 (1st Cir. 1997); see also *In re Burwell*, 276 B.R. 851, 855 (Bankr. N.D. Ohio 2002). Defendant pallowed Plaintiff to believe that The Yellow Rose had sold and that an initial $2 million would be wired to Plaintiff. No such wire was received. Plaintiff sent emails to Defendant and Joseph confirming his conversations about repayment and received no response. After June 27, 2019, Defendant never communicated with Plaintiff again. Her complete silence, combined with her prior conduct in disbursing Plaintiff's funds for unauthorized purposes, knowing the BofA Account was opened for Plaintiff's money and knowing Plaintiff's purpose of purchasing The Yellow Rose for $12 million demonstrates her intent to participate in the fraudulent scheme.

### D. Nondischargeability Under 11 U.S.C. § 523(a)(4) — Embezzlement or Larceny

#### 1. Embezzlement

Under § 523(a)(4), the elements of embezzlement require that (1) a claimant entrusted his property to the debtor, (2) the debtor appropriated the property for a use other than that for which it was entrusted, and (3) the circumstances indicate fraud. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996). Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Rice v.*

17

*Morse (In re Morse)*, 524 B.R. 774, 793 (Bankr. E.D. Tenn. 2015). Plaintiff lawfully parted with his $12 million under the false perception that he was wiring his money to an account associated with the seller of The Yellow Rose. Instead, without his knowledge, the funds were wired to the BofA Account belonging to DuMouchelle Jewellers—an account that Defendant opened for the purpose of receiving Plaintiff's funds. Defendant, as the sole authorized signer, appropriated Plaintiff's funds for uses entirely inconsistent with the purchase of The Yellow Rose. By the end of February 2019, Defendant and Joseph had spent Plaintiff's entire $12 million, leaving no funds with which to repay Plaintiff or to purchase The Yellow Rose. The circumstances indicate fraud, as outlined in the findings regarding Defendant's actual fraud, false representations, and false pretenses. Defendant's conduct constitutes embezzlement within the meaning of § 523(a)(4).

### 2. Larceny

Pursuant to § 523(a)(4), larceny is the fraudulent and wrongful taking and carrying away of property belonging to Plaintiff "with intent to convert such property to the taker's use without the consent of the owner." *Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630, 652 (Bankr. E.D.N.Y. 2020). Irrespective of whether Defendant lawfully obtained use of Plaintiff's money, she knew the purpose of the BofA Account and that Plaintiff's $12 million was intended to purchase The Yellow Rose. However, as soon as she had control of Plaintiff's

money, she used it without Plaintiff's consent for reasons other than purchasing The Yellow Rose. Defendant's disbursement of Plaintiff's funds for purposes other than the purchase of The Yellow Rose indicates her intention to permanently deprive Plaintiff of his money or property. Defendant's conduct constitutes larceny within the meaning of § 523(a)(4). See *Kim v. Sun (In re Sun)*, 535 B.R. 358, 368 (B.A.P. 10th Cir. 2015) (upholding finding that misuse of funds constituted either embezzlement or larceny where facts supported intent to permanently deprive).

### E. Nondischargeability Under 11 U.S.C. § 523(a)(6) — Willful and Malicious Injury

Section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." To establish willful injury, Plaintiff must prove that the debtor acted with the intent to cause injury or with the belief that injury was substantially certain to result from the debtor's conduct. *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 583 (6th Cir. 2001). To establish malice, Plaintiff must prove that the debtor's actions were taken in conscious disregard of one's duties or without just cause or excuse. *Initial Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710, 721 (Bankr. E.D. Mich. 2016). "[T]he 'willful' requirement of 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Kraus Anderson Capital, Inc. v. Bradley (In re Bradley)*, 507 B.R. 192,

19

201 (B.A.P. 6th Cir. 2014). A business person is held to a higher standard as one who is more knowledgeable of the natural consequences of her acts. *Id.* at 203.

Defendant, who was in business with Joseph through DuMouchelle Jewellers, should be held to a higher standard of knowledge regarding her acts and conduct. Defendant admitted in prior testimony to knowing that the BofA Account was intended to accept Plaintiff's money. Defendant also admitted that she knew that Plaintiff intended to be a participant in the Yellow Rose Transaction. Notwithstanding this knowledge, Defendant was primarily responsible for disbursing Plaintiff's $12 million for purposes unrelated to the purchase of The Yellow Rose. Defendant either willfully ignored the BofA Account balance when she wrote checks on the account or she knew exactly what she was doing, spending Plaintiff's money on other debts. Despite all that she knew, or should have known, Defendant either knew she would permanently deprive Plaintiff of his $12 million or had to know that Plaintiff's $12 million loss was substantially certain to occur. Defendant's actions were taken without just cause or excuse and in conscious disregard of Plaintiff's rights. Defendant's conduct constitutes willful and malicious injury within the meaning of § 523(a)(6).

### F. Vicarious Nondischargeable Liability

Although Defendant's direct conduct alone supports nondischargeability, her liability is further established through agency and civil conspiracy principles. As a

business owner, Defendant is subject to heightened scrutiny because she was a member and served as an officer of DuMouchelle Jewellers.

### 1. Agency

Vicarious nondischargeable liability can be imputed on Defendant because "[w]hen spouses have a business relationship . . . many courts have applied some variety of agency law to impute fraudulent intent under 11 U.S.C. § 523(a)(2)." *In re Holly Diane Bolling*, 600 B.R. 838, 849 (Bankr. D. Colo. 2019). See also *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703 (B.A.P. 6th Cir. 2012) (finding spouse who participated in conversion of stolen funds liable despite feigned ignorance). *Bartenwerfer v. Buckley*, 143 S. Ct. 665 (2023), held that § 523(a)(2)(A) "takes the debt as it finds it" and that vicarious liability may be established through agency or any other qualifying relationship under applicable nonbankruptcy law. Critically, an agent who participates in a principal's tortious or fraudulent conduct is not shielded from personal liability by virtue of the agency relationship. As the Michigan Court of Appeals held in *Magley v. M & W Inc.*, 325 Mich. App. 307, 313-14, 926 N.W.2d 1 (2018), "an agent may be held personally liable for his or her own tortious conduct, even when acting on behalf of a principal," and "[a]n agent is subject to liability to a third party harmed by the agent's tortious conduct." *Id.* at 314 (quoting 2 Restatement Agency, 3d, § 7.01). Moreover, "a defendant who wrongfully exerts dominion over property is not shielded from liability on the basis

21

that the action was undertaken in good faith on behalf of a third party." *Id*. at 314-15. Good faith, mistake, and ignorance are not defenses to such claims. *Id.* at 315. Thus, even if Defendant acted at Joseph's direction, her personal participation in the fraudulent scheme renders her independently liable.

Defendant, vice president of DuMouchelle Jewellers, opened the BofA Account at Joseph's direction and took his direction in each part of her role in the transaction. Defendant was authorized and consented to act for or on behalf of Joseph in connection with the Yellow Rose Transaction. As the sole account signer, Defendant issued checks to third parties for the first $5.1 million of Plaintiff's money in a single day, acting on Joseph's behalf to defraud Plaintiff. Defendant continued to spend Plaintiff's money within the same month until the funds were fully depleted. Thereafter, Defendant enabled Plaintiff to believe that The Yellow Rose had been resold. Defendant's conduct as Joseph's agent renders her vicariously liable for the fraud, conversion of Plaintiff's money and for willful and malicious injury.

### 2. Liability as Officer and Check-Signer

Defendant's vicarious liability is further reinforced by principles of imputed embezzlement. *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010), addressed the imputation of embezzlement liability to a participant in the conversion of entrusted funds. The court explained that embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of

22

it," *Id.* (quoting *United States v. Young*, 955 F.2d 99, 102 (1st Cir. 1992)), and that what renders conversion fraudulent, and thus embezzlement, is the perpetrator's knowledge that the use of entrusted funds is "devoid of authorization." *Id.*; see also *Palmacci* at 786. In *Sherman*, the court found that a principal's position in the company "necessarily gave [him] power over its actions," and that the absence of any objection or distancing from the unauthorized course of action fairly demonstrated that the principal was "directly involved" in the conversion. *Id.* Far from objecting or distancing herself from the fraudulent course of action, Defendant, vice president of DuMouchelle Jewellers and sole check-signer during the February 7, 2019 transactions, was the instrumentality through which the conversion of Plaintiff's money was accomplished. Defendant knew that Plaintiff's funds were deposited to the BofA Account and intended for the Yellow Rose Transaction. The disbursements she authorized (by signing the checks) were made without Plaintiff's consent. Defendant's scienter and direct participation in the conversion of Plaintiff's entrusted funds establish her imputed liability.

### 3. Civil Conspiracy

A civil conspiracy is "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Gidelski v. Anton (In re Anton)*, Nos. 08-64144, 09-04344, 2013 Bankr. LEXIS 1715, at *1 (Bankr. E.D. Mich. Apr. 12, 2013). Under Michigan law,

23

civil conspiracy is not an independent cause of action but requires an underlying actionable tort. *Early Detection Ctr., PC v. New York Life Ins. Co.*, 157 Mich. App. 618, 632, 403 N.W.2d 830 (1986). "The gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is alleged to have been done pursuant to the conspiracy." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313, 486 N.W.2d 351 (1992). As set forth in the Proposed Findings of Fact and the foregoing Conclusions of Law, Defendant and Joseph engaged in concerted action to accomplish the underlying torts of actual fraud, false representation, and false pretenses (Section II.C, supra),[1] embezzlement and larceny (Section II.D, supra), and willful and malicious injury (Section II.E, supra). These underlying torts constitute the unlawful purposes accomplished through the concerted action of Defendant and Joseph, the unlawfulness of which is confirmed by Joseph's criminal conviction for wire fraud. Defendant is therefore liable on civil conspiracy grounds for the underlying tortious conduct committed pursuant to the conspiracy.

## III. CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court adopt the foregoing Proposed Findings of Fact and Conclusions of Law and enter judgment in Plaintiff's favor as follows:

---

[1] Section 523(a)(2)(A) is a codification of federal common law torts as to actual fraud, false pretenses or false representation. *Field v. Mans*, 516 U.S. 59, 70, 116 S. Ct. 437, 444 (1995).

Determine that the debt arising from the Yellow Rose Transaction—at least $12 million, or any other amounts as the Court may determine—constitutes a nondischargeable debt of Defendant under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), directly or vicariously; and grant such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

Dated: March 12, 2026

**TAFT STETTINIUS & HOLLISTER, LLP**

/s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
jwelford@taftlaw.com
ccataldo@taftlaw.com

*Counsel to Plaintiff, Thomas T. Ritter*

25

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

     Debtors.
_____/

Thomas T. Ritter,

    Plaintiff,

v.

Melinda J. Adducci,

    Defendant.
_____/

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 12, 2026, my office served *Plaintiff's Proposed Findings of Fact And Conclusions of Law* with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)

Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
jwelford@taftlaw.com
ccataldo@taftlaw.com

*Counsel to Plaintiff, Thomas T. Ritter*