UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MICHIGAN

Case No. 19-54531

Adv. Case No. 20-04381

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

JOSEPH G. DUMOUCHELLE and MELINDA J. ADDUCCI,

      Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS RITTER,

         Plaintiff,

      v.

MELINDA J. ADDUCCI,

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

         Theodore Levin United States Courthouse

         211 W. Fort Street

         Detroit, MI 48226

         March 23, 2026

         10:09 a.m.

B  E  F  O  R  E :

HON LISA S.  GRETCHKO

U.S.  BANKRUPTCY JUDGE

ECRO: Karley Noble

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

HEARING re Trial

Transcribed by:  Sonya Ledanski Hyde

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A P P E A R A N C E S :


TAFT LAW FIRM

Attorney for Thomas Ritter

27777 Franklin Road, Suite 2500

Southfield, MI 478034


BY:  R. CHRISTOPHER CATALDO

KIMBERLY ROSS-CLAYSON


JOHN R. FOLEY, P.C.

Attorney for Melinda J. Adducci

18572 W. Outer Drive

Dearborn, MI 48128


BY:  PATRICK FOLEY

JESSE R. STEC

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

I N D E X

| WITNESSES: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|
| Thomas Ritter | 77 | 148 | | |

| EXHIBITS: | PAGE: |
|---|---|
| Joint Exhibits 1 to 50 | 9 |
| Plaintiff's Exhibit 1 | 15 |

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

P R O C E E D I N G S

CLERK: On Case Number 20-4381, Thomas Ritter v. Melinda Adducci.

THE COURT: The Court would like to take appearances first.

MR. CATALDO: Good morning, Your Honor. Christopher Cataldo and Kim Clayson for Thomas Ritter.

THE COURT: Good morning, Mr. Cataldo, Ms. Clayson.

MS. CLAYSON: And this is Mr. Ritter.

THE COURT: Mr. Ritter, please say your name for the record.

MR. RITTER: Thomas Ritter.

THE COURT: Thank you, sir.

MR. FOLEY: Good morning, Your Honor. Patrick Foley, P74323 on behalf of the Defendant Ms. Melinda Adducci. And with me also is...

MR. STEC: Good morning, Your Honor. Jesse Stec also on behalf of the Defendant Melinda Adducci.

THE COURT: All right, ma'am. I presume you're Ms. Adducci?

MS. ADDUCCI: I'm --

THE COURT: Please say your name for the record so the court reporter knows you're here.

MS. ADDUCCI: Melinda Adducci.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Thank you, ma'am. All right. Please be seated, Mr. Foley. The Court wants to handle a couple of housekeeping issues before we get started, if that's okay. Ms. Avery walked back to me the redline version of the edited joint final pre-trial statement containing initial okays from both Ms. Clayson and Mr. Foley. Do you recall doing that?

MR. FOLEY: Yes, Your Honor.

THE COURT: Ms. Clayson?

MS. CLAYSON: Yes.

THE COURT: Most of the changes were not substantive, but there was one, Mr. Gelov, as a may-call witness, and he's now been stricken as part of the resolution on a motion in limine, correct?

MS. CLAYSON: That's correct.

THE COURT: All right. So it's okay if the Court takes him out, right?

MS. CLAYSON: Yes. Thank you, Your Honor.

THE COURT: All right. That was, I think, the biggest change. So with these edits approved by the parties, at an appropriate time the Court's going to go through it one last time and proposes that it will sign the proposed joint final pre-trial order sometime today or tomorrow. Is there anything else that either party wants to raise for purposes of the joint final pre-trial order?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 7 of 220
212-267-6868   www.veritext.com   516-608-2400
Veritext Legal Solutions

MR. FOLEY: No, Your Honor. Not from defendant.

THE COURT: Not from the defendant. Ms. Clayson?

MS. CLAYSON: Nothing from the plaintiff.

THE COURT: Mr. Cataldo?

MR. CATALDO: Your Honor, I just wanted to be clear that joint exhibits are admitted in evidence, and we can treat them as admitted.

THE COURT: That was going to be my very next question. You were reading my mind, Mr. Cataldo. Because in my folder entitled, "Notes-Housekeeping," my next point is what are we doing with the exhibits. Did the parties wish to exhibit them -- or admit them one by one as to the joint exhibits?

The Court's thought was that since the parties worked so hard to get that list of joint exhibits and has agreed that they're admitted for all purposes -- actually, the language says, "The parties stipulate to admit the following exhibits for all purposes." Does someone want to move for their admission right now and then --

MR. CATALDO: Your Honor, I move for the admission --

THE COURT: You move for admission.

MR. CATALDO: -- right now of the joint exhibits.

THE COURT: That's J1 through J50, correct?

MR. CATALDO: Correct.

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

THE COURT: All right. Mr. Foley?

MR. FOLEY: No objection from the defendant.

THE COURT: No objection. All right. Exhibits J1 through J50 are admitted at approximately 10:13, Ms. Noble. So you've got the list from the proposed final pre-trial order, but all the joint exhibits have been admitted at about 10:13 a.m. today. Understood? By stipulation of the parties on the record. Anything more to do on that, folks? No?

(Joint Exhibits 1 through 50 entered into evidence.)

MR. CATALDO: No, Your Honor.

THE COURT: What are we doing with the P1 through 4 exhibits? Will those be admitted one by one as they come up?

MS. CLAYSON: Your Honor, we would like to request the admission of the video deposition, which I think is a plaintiff exhibit, of Ms. Adducci.

THE COURT: Okay.

MR. FOLEY: Your Honor, I renew the same objections that I put in my motion in limine that it contains the hearsay statements of Mr. Geloff, it is cumulative and best serves as impeachment rather than direct evidence. So I don?t stipulate to the entry of that.

THE COURT: All right. The Court previously

denied the defendant's motion in limine regarding his request to exclude the video within that deposition. The Court, since that time, has had additional days to think about it. The Court is going to allow the video to come in, and here's why. There could be relevant information in that video that the Court needs to see as to Ms. Adducci's reaction to hearing that video when it was played during the deposition.

The Court reread the deposition over the weekend and has reread the 23 pages of, you know, the words on the page. They say what they say, but the Court believes that there would be -- it's important for the Court to see, as the trier-of-fact, the -- whatever non-verbal communication might have occurred during that deposition regarding that video when it was played. I'm sorry, regarding that telephone call when it was played, and that can't be captured on the page. That's captured only via the video.

So, the Court overrules your objection, Mr. Foley, and this is consistent with the Court's ruling on the motion in limine. The Court also finds it's not cumulative. The Court has given the parties a whole week, Monday through Friday this week, five court days, which is a lot of time in court time, and no one's going to be pressured. You've told me previously at prior hearings it was going to take one day to put the case in, then two days, now we're up to three

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

days, and the Court's giving you five days.

So, whatever time inefficiency is caused by seeing the video is ameliorated by the length of time that the Court has afforded the parties to litigate this case, which is important to both sides, both the plaintiff and the defendant. So, the objection to the video is overruled, and the video comes in. And is there anything more than that parties need in terms of Court explanation on that? Any further questions on the video?

MR. CATALDO: No. So the video is deemed admitted as of right now.

THE COURT: Well, you've got to move -- are you moving --

MR. CATALDO: Move to admit the video, Your Honor.

THE COURT: Okay. Plaintiff has moved for the admission. Defendant has objected to the admission of the video. The Court has overruled the objection, so the video comes in. Now, this is P1 of the plaintiff's exhibit. It says, "Transcripts, written and video of deposition taken in the Ritter v. Adducci adversary proceeding," this case. Is that what we're talking about?

MR. CATALDO: Yes.

THE COURT: So you want all of P1 to come in, both the deposition transcript and the video portion --

MR. CATALDO: Correct.

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 11 of 220
212-267-6868                          www.veritext.com                          516-608-2400
Veritext Legal Solutions

THE COURT: -- of it. So, both the written and the video.

MR. CATALDO: Correct.

THE COURT: Okay. Mr. Foley, you understand that, correct?

MR. FOLEY: I do, Your Honor.

THE COURT: And your prior objection was to the video portion of it, which the Court overruled. And you understand now that the Court has ruled that all of P1 is coming in.

MR. FOLEY: Yes. My objection was to both the written and the video, but I understand --

THE COURT: As being cumulative of each other.

MR. FOLEY: And cumulative of the direct testimony Your Honor will receive, but I accept -- I understand the Court's ruling that --

THE COURT: The Court's ruling --

MR. FOLEY: -- they are both admitted.

THE COURT: The Court --

MR. FOLEY: And to be clear, we're dealing with a snippet, the designations -- the limited designation portion, which, given the Court's prior ruling in the motion in limine, we have looked at and I accepted the designations.

THE COURT: All right. The Court does not know

what those designations are, but the Court's ruling is that P1 is in. So if the plaintiff has determined to designate subsections of P1 to move things along more efficiently, that should ameliorate your concern about duplication or (indiscernible).

MR. FOLEY: My understanding is that the admission is only of the designations and the designated part of the video, that that's what was moved for admission.

MS. CLAYSON: No, Your Honor. We --

THE COURT: No. What was moved for admission was all of P1.

MS. CLAYSON: Yes.

MR. FOLEY: Oh. Well, okay. I mean, okay, I will renew my same objections because, after the Court's ruling on the motion in limine --

THE COURT: Mm-hmm.

MR. FOLEY: -- there was narrow discerned designations to which I agreed in light of the Court's ruling. Without waiving my objection, I agreed to those designations without expanding it, so I thought what we were admitting was the designations, and the video is limited to those designations as well.

THE COURT: The Court has not seen the designations. So the Court has the bigger pool of all of P1. And if the plaintiff -- which the Court has just ruled

all of P1 is admitted, okay, over your objection, Mr. Foley. If the plaintiff wishes during the course to -- of the trial to admit subsets of P1 to which you have agreed, because you've already seen them, that's the debtor's prerogative, I suppose. Ms. Clayson?

MS. CLAYSON: Your Honor, I just want to clarify that. We -- for the purposes of what is on the record at trial, we are admitting the whole thing, but the video will be a condensed version of the deposition. So it will be the designations that the Court will see in the courtroom, but we still wanted the whole entire video admitted. So, it'll be played in one full --

THE COURT: Swoop.

MS. CLAYSON: -- swoop, yeah. It'll all be there in one presentation.

THE COURT: Well, the other thing is that I presume in these very large binders there is the entirety of the written transcript of that deposition, correct?

MS. CLAYSON: That is correct.

THE COURT: So the whole P1 is in, in its entirety. I -- the Court's understanding is that these notebooks contain somewhere in there the entire, I think it's 184 pages, of Ms. Adducci's deposition transcribed into 184 pages in the written format. The video will be shown through at trial with designated portions. And -- but the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Court is ruling that it's all in, Mr. Foley.

(Plaintiff's Exhibit 1 entered into evidence.)

MR. FOLEY:  Understood, Your Honor.  Thank you.

THE COURT:  Okay.

MS. CLAYSON:  Thank you.

THE COURT:  Now, so the Court -- Ms. Noble, could we mark that at about 10:20 the Court admitted Exhibit P1?  Could you move for its admission right now --

MR. CATALDO:  Correct.

THE COURT:  -- Mr. Cataldo?  Now, we also have a housekeeping issue regarding P2, 3, and 4.  Does the plaintiff wish to admit those on an as-needed basis as you go along?

MR. CATALDO:  Yes, Your Honor.

THE COURT:  Okay.  So we're not admitting P2, P3, P4 just now.  You'll see if you need to as the case progresses.  Ms. Noble, are you able to -- does it make sense per your chart?

CLERK:  Yes.

THE COURT:  Okay.  It's important for the Court to keep official track of what's going on.  Mr. Cataldo, Ms. Clayson, are you also keeping track of the exhibits to make sure that the ones you need in are in?  Correct?

MR. CATALDO:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Foley, you're also keeping

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

track?

MR. FOLEY: Yes, Your Honor.

THE COURT: You are. Okay.

MR. FOLEY: Thank you.

THE COURT: All right. Now, are there any -- my next housekeeping issue is, are there any people in the courtroom who are non-parties but expected to be witnesses? And is there any request under Federal Rule of Evidence 615 for sequestration of witnesses? Can't sequester parties, but I can sequester non-parties if asked.

MR. CATALDO: Your Honor, I'm not aware of any person in the courtroom other than the parties who are in the court that would need to be sequestered.

THE COURT: Okay. Mr. Foley?

MR. FOLEY: The same, Your Honor.

THE COURT: All right. So there's been no request for sequestration of witnesses at this time. Watch the courtroom. If a person shows up who is not a party and who either side wishes to have sequestered, we can do that. But at this point, you're going to have to ask. Under Federal Rule of Evidence 615, a party needs to request it. The Court just thought in the interest of moving things along, it would add it to the list of housekeeping items at the outset.

MR. FOLEY: Understood.

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

THE COURT:  Understood?

MR. FOLEY:  Yes.  I just want to be clear that neither of the two gentlemen are potential witnesses.  In fact, they're out of --

THE COURT:  Well, the gentleman in the tan suit to the right is my law clerk.

MR. FOLEY:  Okay.

THE COURT:  I do not know the identity of the other.  This gentleman with the glasses over to the right is the IT person.  I don't know the others.  Oh, Peter Schneider.  Mr. Schneider is here from the U.S. Attorney's Office, and we have a female in the back of the courtroom.

MR. CATALDO:  That is Joe's sister.

THE COURT:  Okay, but Lauren --

MR. CATALDO:  But not a witness.  Not on the list.

THE COURT:  Lauren Lynch is not here.  I was --

MR. CATALDO:  That is not Ms. Lynch.

THE COURT:  And for everybody's information, the telephone line is turned off.  So if the need to sequester were to arise, and we have arrangements to sequester a witness, without a telephone line we were worried about someone being able to dial in and hear the testimony.  No telephone line is running.  Understood?  So -- all right.  Joint exhibits are in.  Let me see.  Incredibly, I'm done with my notes, so is there anything else that the parties

wish to address with the Court before we start?

MR. CATALDO: Not from the plaintiff.

THE COURT: Ms. Clayson, did your client mention something he wants us to look at before we start?

MS. CLAYSON: No, Your Honor.

THE COURT: All right. I don't want to intrude on the attorney-client privilege. Just want to make sure we cover all housekeeping issues at the outset. Mr. Foley, any housekeeping issues from your side?

MR. FOLEY: No, Your Honor. Thank you.

THE COURT: All right. We're ready to start. Opening statements, please.

MR. CATALDO: Thank you, Your Honor. Good morning, Your Honor.

THE COURT: Good morning, Mr. Cataldo.

MR. CATALDO: Your Honor, the Court has put a lot of time into this case. I know the Court is familiar with a lot of the facts, but I want to present a preview of what we believe the evidence is going to show.

THE COURT: I need to stop you right there. Do not ever let the Court's level of preparedness impinge upon what you want to tell the Court because the Court can read everything and come up with its own perspective. But it's so important for the parties to share with the Court your perspective. So you've got the time. I'm not rushing you.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Just because I've read, and I have read everything, just because I've read it, don't interpret that as shutting down any portion of your argument.

MR. CATALDO: Understood, Your Honor. I only meant that as a complement to the Court --

THE COURT: Thank you.

MR. CATALDO: -- because I know how much time and energy you've put into this and how important that is to Mr. Ritter. And I'd like to take this opportunity to formally introduce Mr. Ritter. I know you -- if he could just stand up again and just --

MR. RITTER: Good morning, Judge.

MR. CATALDO: This is --

THE COURT: Nice to meet you, sir.

MR. CATALDO: This is Judge Gretchko, and she's going to be deciding our case. And this is Thomas Ritter.

THE COURT: Thank you.

MR. CATALDO: Your Honor, unfortunately, this is not a happy story. It is not. There was a crime committed here. Mr. Ritter had $12 million stolen from him by Ms. Adducci and her husband, and we're going to prove that, that she was an integral, integral component of the crime that was committed.

MR. FOLEY: Objection, Your Honor.

MR. CATALDO: Joseph --

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

THE COURT: We're in closing -- I'm sorry, we're in opening argument. What's the objection?

MR. FOLEY: The characterization of this as a crime. My client has been not charged by the government.

THE COURT: Okay.

MR. FOLEY: It constitutes a --

THE COURT: Well, Mr. Foley --

MR. FOLEY: -- legal conclusion.

THE COURT: -- have a seat. The Court is fully aware of the fact that Joseph DuMouchelle has pled guilty to wire fraud and is incarcerated. He was sentenced to 151 months. This Court not being a jury has additional educational and professional experience and is able to sift through. This Court is well aware that Ms. Adducci is sitting here and she has not been incarcerated.

And the Court interprets the word "crime" as applying to Joseph DuMouchelle. So I'm -- you're not going to want to be interrupted during your opening by an objection, but that sort of objection, please recognize the Court as the trier-of-fact is able to sift through these words pretty carefully. But the Court is going to overrule the objection because you meant "crime" in the world of Mr. Joseph DuMouchelle admitted to committing wire fraud, correct?

MR. CATALDO: Correct, Your Honor, but the reason

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 20 of 220
Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

we're here --

THE COURT: Yes.

MR. CATALDO: -- as you know, is because we believe and the evidence is going to prove that Ms. Adducci was an integral part of that. And that's what the evidence is going to show, that being the crime that was committed. And the issue before this Court, obviously, is whether, within the definitions and language of the bankruptcy code, Ms. Adducci can escape responsibility for her participation in what happened.

Because we believe the evidence is going to show that but for her involvement, there would've been no crime. Mr. Ritter would have his $12 million today if it wasn't for Ms. Adducci. And we're going to prove that, Your Honor.

Now, there are really two components to Ms. Adducci's involvement in this, in the crime that was committed. And --

THE COURT: To be clear, you're not suggesting -- this is not a criminal proceeding.

MR. CATALDO: No, no.

THE COURT: And you're not saying that Ms. Adducci herself committed a crime.

MR. CATALDO: I don't know that -- the answer to that question because I'm saying is there was a crime. She enabled it. She participated in it. Whether that rises to

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 21 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

the level where the government would prosecute, that's not for me to say and we're not here for that. I'm here to talk about what happened within the structure of the bankruptcy code in trying to present the facts to the Court so the Court can make a determination within the bankruptcy code whether or not Ms. Adducci should have this debt discharged. That's why we're here, okay?

And I'm not accusing anyone of a crime. There was a crime. She participated. And I want to talk about her participation in what happened and how she enabled it within the meaning of the bankruptcy code for -- that would deny her the discharge. There are two ways -- and to use an analogy to Greek mythology, she effectively was the siren that lured Mr. Ritter into the trap. And we're going to explain exactly how that worked.

Then the second piece of this, Your Honor, is that the actual embezzlement of Mr. Ritter's money occurred in February of 2019 through a Bank of America account that Ms. Adducci opened and she withdrew at a minimum of $5 million from that account, maybe as much as 8 or 9, we'll look at that, the day after the wire hit that account. The day after it hit that account.

Now, to understand the first part of how Ms. Adducci induced Mr. Ritter into this, into the trap, you have to understand the relationship of these parcels. Ms.

Adducci and Mr. Ritter were not strangers. They both came from the same town in North Dakota. Their families knew each other. Ms. Adducci got her start in the jewelry business working for Mr. Ritter's brother in a jewelry store. Ms. Adducci's brother is married to Mr. Ritter's sister. Ms. Adducci's late father was a -- the word "partner" may not be the right word, but a business associate, a friend, and a trusted companion of Mr. Ritter for over 20 years in the oil business.

And you're going to hear all about that. You're going to hear about Mr. Ritter and his background. He is a landman, as the term is, from North Dakota. Hard-working, honest as the day is long. So was Ms. Adducci's father. Worked side by side with Mr. Ritter for years, and he believed that those qualities that her father had were in her. And that was a major piece of how he got roped into this.

Now, Ms. Adducci's second husband is Joseph DuMouchelle, the gentleman we've mentioned who is in federal prison. And he had -- and they had a jewelry business here in Michigan. At some point she leaves North Dakota, moves to Michigan, and they start the DuMouchelle Jewelry business here that's in Michigan. And at some point, Ms. Adducci introduces Jospeh to Mr. Ritter, but the relationship and the trust was between Mr. Ritter and Ms. Adducci. That's

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

the relationship. That was the trust factor.

Now, the Yellow Rose transaction that you've heard so much about begins with Mr. Ritter lending money to Ms. Adducci and her husband. And you're going to hear the details of those loan transactions, and many of the loans were repaid. But by late 2018, there was a significant loan balance that was owed. And Mr. Ritter, in the context of discussing repayment or trying to get repayment on what was owed, which was in the -- you'll hear the details of it, several hundred thousand dollars in late 2018, Joseph brings up the idea of saying, hey, there's this yellow diamond.

It can be bought for -- and the original price quoted was 12 and a half, but it's of great value. We believe we could sell it easily and very quickly, can flip it between 16 and 20. I can arrange all of this for you. We'll -- you'll get your money back, we'll split the profit, and this would be a way for -- to do the -- Ms. Adducci and her husband to get some of the money back to pay Mr. Ritter, and Mr. Ritter can make some nice money too. That's the origin of where The Yellow Rose transaction came from.

Now, Your Honor, was this a scam from the beginning? Was there ever an opportunity to buy The Yellow Rose? We don't know. We don't know. What we do know is what happened next. Mr. Ritter wants Ms. Adducci's involvement. He trusts her. He wants from her verification

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

that this diamond is what they say it is.  Can it really be bought for 12?  The number gets negotiated down from 12 and half to 12.  And is it really possible?  Is the value there to sell it quickly between 16 and 20?  He wants that verification from Ms. Adducci, not from John.  And he asks to have Ms. Adducci call him and talk to him about it, and she does.

Now, this conversation is not on the tape or not discussed on the tape, but you're going to hear about it from Mr. Ritter.  And during this conversation, she tells him she's seen the stone, it's the real deal, and verifies these values.  You're going to hear that testimony from Mr. Ritter.  And this is a really important piece of evidence that the Court will hear.  And because without that verification from Ms. Adducci, Mr. Ritter would not have done this.  He would not have put the money in.

Now, let's take a look at Exhibit J9.  Your Honor, it's in your materials, J9.  So, is there any way you can make the imagine bigger?

THE COURT:  I have it up here on a close screen, so I can see it real clearly.

MR. CATALDO:  Okay.  Now, note --

MR. FOLEY:  Your Honor?

THE COURT:  Excuse me?

MR. FOLEY:  I apologize, but I think I'm missing

the first page of J9.

MR. CATALDO:  Well, you can look at mine.

MR. FOLEY:  The -- that's on the screen, but there's -- the top of the email is gone.

MR. CATALDO:  So, Your Honor, what J9 is, is in a set of emails exchanged between Mr. Ritter and Ms. Adducci.  If you could -- John, you could make that...  So, this email -- and it's dated, and the dates are important here, Your Honor, January 25, 2019.  And note the email address Lindy@JosephDuMouchelle.com.  Because throughout the case Ms. Adducci will deny that various emails sent to her at that address that she's ever seen them.  Just take note of that email address.  There'll be more about that to come.

What's important -- and this email says, "Great talking with you."  So this is a phone conversation.  The chronology is important, Your Honor.  The conversation has taken place already between Ms. Adducci and Mr. Ritter.  "Attached are the photos in GIA monograph and comparables on fancy yellow diamonds.  Say hi to Carol."  Carol is Mr. Ritter's wife.

THE COURT:  Mr. Cataldo, what is a GIA monograph?

MR. CATALDO:  Well, I'm going to show you.

THE COURT:  Okay.

MR. CATALDO:  Let's go to the attachments, if you will.  So, here is essentially -- it's a valuation

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

information that Ms. Adducci provides to Mr. Ritter showing an insurance replacement value at over $30 million on this stone. Now, this is more than the values that they had discussed in the telephone call, but this is being provided by Ms. Adducci to Mr. Ritter to induce him into the transaction and convince him that these values are there.

Remember, she has already told him she has seen the stone, it's a legitimate stone, and the -- if he buys it at 12, it should be able to be sold very quickly in the 16-plus range. So he's going to make money, and she's providing that assurance. And that's why he's moving forward with this transaction, Your Honor.

Now, what happens next then is Mr. Ritter, based on these assurances and his reliance on Ms. Adducci, makes the decision he's going to move forward with this transaction. And he writes up a contract. And let's take a look at that. It's J10. It's in the exhibits. Now, this is dated January 30th, and during the direct we'll go through all of it in more detail.

And he sets forth the agreement, and the important points of this is, if you look here at this paragraph, all right -- clicker isn't working -- right here. "With your assistance, I, Thomas T. Ritter, intend to purchase The Yellow Rose Diamond for 12 million and then resell that diamond as soon as possible. You, Joseph DuMouchelle, have

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 27 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

estimated a resale price in the range of 16 to 20 million."

Now, those numbers had been verified in the phone call by Ms. Adducci.

It goes on to say there's going to be an escrow account at J.P. Morgan.  He's going to have insurance covering the diamond.  If we go to the next page, you'll see there's a percentage split for how the money will be divided up.  The paragraph above is really worth looking at too, this top one.  "As you might imagine, not doing this every day leaves me a bit out of my comfort zone.  So I will have to rely heavily on your guidance and advice.  You have indicated you have a couple of prospects lined up for a potential quick resale, and hopefully that will work out as planned.

"If not, you will continue to try and market the diamond on my behalf until such time as I determine it does not appear a profitable sale is likely, and that determination shall be my decision solely and shall not be questioned by you in any manner."

Important because Mr. Ritter, he hasn't done this before.  He is saying he's relying on -- now, this was directed to Joseph, right?  Then there is a paragraph on the profit split here.  And we'll cover that with Mr. Ritter during his direct.

MR. FOLEY:  Your Honor, I apologize for

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

interrupting, but while we're dealing with Exhibit J9, the PDF --

THE COURT: Right.

MR. FOLEY: -- while we're dealing with Exhibit J9 --

THE COURT: Yeah.

MR. FOLEY: -- the PDF that I reviewed before their firm printed this contained an extra two pages at the top. The printed document is missing those two pages. And you can see in J9 that the email header is cut off. There is supposed to be two additional pages in Exhibit J9.

MS. CLAYSON: They should be there. They're in there.

THE COURT: Now, Mr. Cataldo, we're going to have to deal with this issue regarding J9. On the Court's copy of J9 has --

MR. CATALDO: Your Honor --

THE COURT: -- an email at the top.

MR. CATALDO: -- I can deal with this during the break, and I'd appreciate if counsel doesn't raise these issues (indiscernible) --

MR. FOLEY: As long as it's preserved, I'll wait until the break. I'm not --

MR. CATALDO: Your Honor --

THE COURT: What's the issue, Mr. Foley? You want

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 29 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

to bring it up here and let the Court see what you're talking about?

MR. FOLEY:  Yes, Your Honor.  The PDF that we exchanged multiple times starts at --

THE COURT:  How about look at the paper?

MR. FOLEY:  The --

THE COURT:  You've got it in your book.

MR. FOLEY:  Yes, Your Honor.

THE COURT:  Look at --

MR. FOLEY:  That starts at --

THE COURT:  -- mine.

MR. FOLEY:  -- at Ritter Number -- at the Bates number 27.

THE COURT:  Aren't you looking at Number 9?  Does he have a tabbed copy?

MR. FOLEY:  J9.  I do, Your Honor.  I'm looking at it.

MS. CLAYSON:  Your Honor --

MR. CATALDO:  I don't know what the issue is.

MS. CLAYSON:  -- the -- we sent a PDF with all of the documents to Mr. Foley, and then once he approved it, that's what was sent to the printer.  So, I?m not sure -- and I don't know -- this -- there are two other pages on this, but Mr. Foley approved this without those two additional pages.  We have no objection to putting them back

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

in, but they were never there when this was approved. So we're on page -- according to the Bates number, it should start at 195. J9-195.

MR. FOLEY: Right, which is pulled from separate Bates numbers, but on the J9 that we hadn't been exchanging, it starts at 026 -- I'm sorry, at 024 and contains emails from Joe above that after that. Those have been removed.

MS. CLAYSON: I'm not sure how that would've happened, but if you want those -- that portion of it admitted, then we can print it and add it. You can send us what you want added to that exhibit. We have no objection with adding the rest. I don't know how it --

THE COURT: I need to -- the Court's going to need a complete copy of everything, though, and where we have to -- well, I don't want oral -- I don't want opening argument interrupted for logistical issues such as this.

MR. CATALDO: We'd appreciate you not interrupting.

THE COURT: Either side. So --

MR. FOLEY: I'm not talking to you. I?m talking to the judge.

THE COURT: Excuse me.

MR. FOLEY: He addressed me directly.

THE COURT: Okay. Okay.

MR. FOLEY: Don't try to get big with me.

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

MR. CATALDO: Do not --

MR. FOLEY: I will address the judge, you address the Court.

MR. CATALDO: Your Honor, would you --

THE COURT: Mr. Foley, sit down.

MR. FOLEY: Your Honor, I'm not --

THE COURT: Now. Now.

MR. FOLEY: I'm sitting. Mr. Cataldo turned to me, and I'm not going to have an attorney --

THE COURT: Mr. Foley --

MR. FOLEY: -- wave a finger in my face.

THE COURT: -- if the Court needs to, we'll get a security officer. Ms. London, notify the court security office that we could use someone sitting in the back. The Court does not want further interruptions of opening regarding these logistical issues but will direct the parties to handle them at the first break and try and work through them.

We've already got an admission of the joint exhibits on a joint stipulation of the parties. So, the Court is wondering what happened here, but deal with it at the first break. And I would like -- Mr. Foley, you're not going to like it if Mr. Cataldo starts interjecting in your opening statement. Let's let him finish his out of common courtesy. All right, sir?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Thank you, Your Honor.

THE COURT: Thank you, Mr. Cataldo.

MR. CATALDO: So, the date is important. This is January 30th. If we could go back to that, the front page, just to see the date.

THE COURT: January 30th.

MR. CATALDO: January 30. Now, let's look at our next Exhibit J11. Your Honor, this is a very important email, and it's the next day. And this is an email that is sent by Mr. Ritter to both Joe and Melinda, and it reads as follows.

"I was considering adding Lindy's name to the agreement but didn't know if you guys wanted it that way since, in the past, you chose not to. If you wish to have me correct that, please let me know. It was not my intent to leave you out or lessen your part in this as I know your skill and expertise in the gemology field is at the top."

This is a very important email, and I'll tell you why. He is saying -- he's giving Ms. Adducci the opportunity to be a party to the contract, but he's also saying, "or to lessen your part in this." Remember, her part in this was enormous. It is her blessing that has enabled this to move forward, and he wants her to get credit for that because he doesn't know the financial arrangement between her and Joe.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 33 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

And her skill and expertise in the gemology field is what had and what he was relying on to move forward with this. So he is offering her the opportunity to join the contract, but it's also confirming his reliance on her. And you'll hear more about that when you hear Mr. Ritter's testimony.

Now, what happens next is very interesting, and you're going to hear about this when you hear the tape. Ms. Adducci says on the tape that she takes the contract that Tom had prepared and she reads it to her son. So that means she has the contract in her hand, and she is literally reading line by line of the contract to her son. Now, when you hear the tape and you hear what's going on, you're going to ask many, many different questions about why that is.

I mean, we'll talk more about that in the closing argument, but there's no question that, as of late January, the very end of January, Ms. Adducci knows exactly what's going on, that Mr. Ritter's going to be putting up $12 million.

The purpose of it is to buy this gem that she has told him is a great deal for him. He's going to make money. It's for the purpose of reselling it. She knows all of that. So, she knows it from the phone conversation. She knows it because she read the contract to her son. Now, she decides she doesn't want to be a part of it. She says that

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

on her tape.

Now, Your Honor, Mr. Ritter decides he's moving forward with this.  He's going to put up the $12 million. And Joseph gives him direction to send a wire transfer for the 12 million telling Mr. Ritter that he's actually paying the seller of the stone, but there are a series of bank accounts that it -- he's told to send to.  The first few don't work out because the banks reject the wire because of the size.

And what you're going to hear about is an account called FineMark.  And the FineMark account was the one that immediately preceded the Bank of America account.  Ms. Adducci talks about it on the tape that she knows that Mr. Ritter's money was supposed to be going to the FineMark account, and then the Bank of America account is to take the place of the FineMark account.

Now, the Bank of America account where the actual embezzlement of Mr. Ritter's funds takes place is opened on February 5th of 2019 by Ms. Adducci.  She is in Florida in Sanibel, and that's where she actually opens the account. She goes into a branch --

THE COURT:  Not Tucson?

MR. CATALDO:  Tucson comes later.

THE COURT:  Okay.

MR. CATALDO:  I'll tell you about Tucson.  So, if

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

we could look at J4, please. The name on the account is Joseph DuMouchelle Fine and Estate Jewelers, LLC. And if we go to the very bottom, you'll see there's the signature of Ms. Adducci, February 5, 2019.

THE COURT: Financial Center, Sanibel.

MR. CATALDO: If we can go back up to the top, you'll see this account number, which you're going to see -- go back further up, John, if you could. There. This 0585 account. And you're going to see that account in a number of places.

So, the day it's opened up, Ms. Adducci is the only signatory to the account. February 5th. The events of this first week of February are very important to what's happened. Now, Joe DuMouchelle directs Tom to wire the 12 million to this account. Please bring up J15. Now, unfortunately the account numbers have been redacted. If you go down below.

THE COURT: But the last four digits are there.

MR. CATALDO: 0585. Here's the bank of -- so the routing number, account number are provided by Joe DuMouchelle to... If you go up, you'll see that this is actually transmitted on February 6th. So --

THE COURT: What exhibit number is this again?

MR. CATALDO: This is Exhibit 15.

THE COURT: J15?

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 36 of 220
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

MR. CATALDO: J15. Now, Your Honor, what happens next -- okay, so -- is Mr. Ritter sends the wire for the 12 million to this account on the 6th shortly after getting this email from Joseph. Now, Ms. Adducci opened the account while she's in Sanibel, Florida, and between the 5th and the 7th she travels to Arizona for a conference that's going on. And the account statement for this account is very revealing.

THE COURT: Very what?

MR. CATALDO: Revealing.

THE COURT: Revealing?

MR. CATALDO: Revealing.

THE COURT: Okay.

MR. CATALDO: Okay? So let's bring up Exhibit 5.

THE COURT: This is J5?

MR. CATALDO: Yes. So here is the bank statement for J5. And Your Honor, the account's opened February 5th, zero balance. There are a total deposits to the account in February of 12,855,000. End of the month negative 60. Mr. Ritter's money is gone by the end of the month.

Now let's go to the next page. You're going to see -- go to the next page, please. And if you take a look up here, you'll see here's Mr. Ritter's wire hitting the account on the 6th. They -- looks like it was opened with a counter-credit of $500 on the 5th. There is an entry on the

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

8th for a counter-credit of 854.

THE COURT: That's 854,500, right?

MR. CATALDO: Correct. But then you'll see legal orders. We're not clear what that is. Could be garnishments. We don't really know what those are. We don't have the backup for those. You'll see there are Arizona teller transfers. There's one, two, three. About 4.4 million comes out on the 7th for these transfers, and Ms. Adducci is in Arizona.

Joseph, her husband, is in Michigan. And then you're going to see there are customer withdrawal image about 5.1. There's a 4,041,000; 1,091,000; and 39,000. Now, this is all coming out of the account the next day, right? Mr. Ritter put the wire in on the 6th, and by the 7th you can see right here there's excess of $9 million of his money is being taken out of the account. Now --

THE COURT: I have a question. That AZTLR transfer lines, there's three of them, those are...

MR. CATALDO: Your Honor, we don't have backup on those.

THE COURT: Okay.

MR. CATALDO: We subpoenaed Bank of America. They did not provide backup for those transactions. We believe it means Arizona teller transfer to checks.

THE COURT: And the 4,250,000 is the amount that

went to William Noble Rare Jewels, correct?

MR. CATALDO:  We don't know where that went.

THE COURT:  Okay.

MR. CATALDO:  What we do know is we have the backup for these three right here, these customer images (indiscernible) that was provided by the bank.  And if you could bring up Exhibit Number -- well, before that, before I want to get to that, because one of the -- I want to talk about the tape a little bit.  You're going to hear about Ms. Adducci and why we're playing the tape.  Because there's a lot of things you're going to hear on the tape that, frankly, the Court I believe will find don't make sense, contradict the written record, contradict what you're going to hear from Mr. Ritter.

But there are a number of key admissions that Ms. Adducci makes on the tape, which is why we want the Court to hear it.  And one of those, I'm going to play one of those admissions right now from the tape.  This is part of the tape that has been admitted.  If you could bring up clip number 3, please.  So, this is from that tape.

(Audio played.)

BY UNIDENTIFIED SPEAKER 1:

Q    So you knew that you were trying to get (indiscernible) DuMouchelle Jeweler was trying to get 12 million from Tom Ritter (indiscernible) was accepted, and --

A     (Indiscernible) --

UNIDENTIFIED SPEAKER 2:  Objection.

UNIDENTIFIED SPEAKER 1:  No, no, no.

UNIDENTIFIED SPEAKER 2:  Objection.  That's not all she testified.

MS. ADDUCCI:  (Indiscernible) --

UNIDENTIFIED SPEAKER 2:  That's not what (indiscernible) --

MS. ADDUCCI:  -- what did you --

UNIDENTIFIED SPEAKER 2:  Lindy --

MS. ADDUCCI:  -- (indiscernible) --

UNIDENTIFIED SPEAKER 2:  -- Lindy, stop talking when I make an objection.  Understood?

MS. ADDUCCI:  Okay.  Yeah.

UNIDENTIFIED SPEAKER 1:  I haven't finished my question.

UNIDENTIFIED SPEAKER 2:  Yes, but that's the second time that you made a misleading rehash.  So I'm listening carefully to it, and I will object that it's not based on her prior testimony here today.

UNIDENTIFIED SPEAKER 1:  Please don't coach the witness.  She can say (indiscernible).

UNIDENTIFIED SPEAKER 2:  There's no coaching.  Don't use the word "coaching".

UNIDENTIFIED SPEAKER 1:  All right.  Well, you

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 40 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

give an accurate recitation before you try to feed her lines. That's not coaching. I heard what you did. It's pretty obvious, and it's obvious on the transcript if you'd like to take it to the judge.

BY UNIDENTIFIED SPEAKER 1:

Q    At the time you opened the Bank of America account, were you aware that Tom Ritter was attempting to wire money in to (indiscernible)?

A    Yes. I was told that by Joe. That's how I was aware because Joe told me I believe. From my memory, from my recollection I believe.

(Video stopped.)

MR. CATALDO:  Your Honor, Ms. Adducci -- now, first of all, she's the signatory on the account. She can get the statements from the bank at any time. You saw the statement that shows that it's Mr. Ritter's $12 million that went into the account, but she admitted she knew it. And look what happens to that money, Your Honor. Let's bring up J2.

Now, these are the withdrawal slips signed by Ms. Adducci. Now she's in Arizona. She has traveled from Florida to Arizona. And so we see here, there's her signature. This is on the 7th. This is the day after. This one is $39,000 she's withdrawing from the account.

Let's go to the next page. This is J2. Go to the

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 41 of 220
Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

next page, please.  Here is another withdrawal.  This one, signed by Ms. Adducci, $1,091,769 February 7th.  Go to the next one.  We already saw that one.  Flip to the next one.  There's $4,041,925 signed by Ms. Adducci.  There's $5.1 million that Ms. Adducci takes out of that account the day after Mr. Ritter puts it in and she knows it's his money.

Now, where does this money go?  Well, let's take a look at Exhibit 3, please.  So, what happens is Bank of America cuts a series of cashier's checks.  Physical checks are cut.  Yes.  And I'll tie the numbers out in just a moment.  So if you look here at Exhibit 3 -- and John, could you pull this up?  Because here's the 4,041,925.  Yeah, there are all the checks that went into that 4,041,000.  It was cut up into all of these checks.

And you can see, the Court can read them all, none of those are going to Mr. Ritter, and none of those are going to buy The Yellow Rose Diamond.  So, then, if you look at the bottom of the page -- and John, could you blow it up?  There's the 1,091,000 there that tied back to what I just showed you, and this is going to David L. Hussman, 1,091,000.  And then if you look further in the exhibit, you'll see the actual copies of the checks.

This is number 3.  Now, where'd the checks go?  Well, if you could play clip number 5.

(Video played.)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY UNIDENTIFIED SPEAKER 1:

Q    Have you ever seen Exhibit (indiscernible)?

A    No.

Q    Do you have a recollection that there was a series of cashier's checks that were prepared by the bank on (indiscernible)?

A    Possibly.  I don't...  I don't remember.

Q    Do you remember walking out with...

A    I don't remember the checks.  I don't remember if Joe asked me to FedEx him.  I think that's what he did, but I don't remember.  I think he asked me to FedEx stuff to him that the bank gave him.  But I didn't know -- I don't know any of this.  This is nothing that I had planned with him or knew about prior to him asking me.

(Video stopped.)

MR. CATALDO:  So, what we believe happens is the bank cuts -- and if you count the number of checks, it's quite a stack of checks, that the bank would've given them to Ms. Adducci, who would have, in some manner, FedExed them back to Joe, who was in Michigan.  Remember, she's in Arizona getting all of these checks cut conveniently forgetting that she had driven to a FedEx office to have a slip to have these checks FedExed to Joseph, who is in Michigan.

But the person who is in Arizona taking Tom

212-267-6868                    www.veritext.com                    516-608-2400

Ritter's money out of the account is Ms. Adducci.  And we know from these exhibits, minimum $5 million, 5.1 million, and probably if you look at those other transfers, $9 million is taken by Ms. Adducci herself.  She's the one that does it.  Now -- and we saw from J5, the bank statement, all of the money is gone.  All of Mr. Ritter's money is gone by the end of February.

Now, Mr. Ritter is still under the belief that Ms. Adducci and her husband are buying this stone for him, and you're going to hear about what happens to him after.  And there are actually fake documents that Joe sends him.  He sends him an actual receipt showing that the diamond had been bought and sold.  I mean, things of that nature, which obviously ended up with Joe being in jail.  There were fake documents that were created to deceive Mr. Ritter.

He finally -- you're going to hear more of the details.  He finally figures out, because he keeps getting the runaround, the runaround, that by April of 2019 that he's been had, that there's no Yellow Rose transaction, that his money didn't go to buy the stone.  It was just spent by Mr. DuMouchelle and Ms. Adducci for paying their other creditors is what they did with his money.

Now, the next part of this, it really is kind of sad and distressing to look at what happens next.  But if you could bring up, let's say, J45, please.  So, you start -

- you see a series of communications from Mr. Ritter to Joseph and Melinda. Now, this is now three months later, right? He put up the money in February. He sends this email to both Joe and Lindy.

"On more than one occasion, you stated you had wired the initial two million to me." What had happened was Joe had told Mr. Ritter, oh, yeah, I -- we've sold it, and you're going to get your money, and I'm going to send you $2 million, which he never got, okay? So -- but the Court can read this email, and there are others in here that we're going to go through. But he's letting them know he's upset. He's -- he hasn't got the two million. He's out 12 million.

Let's bring up Exhibit 46. Here's another one. This is on June 10th now. This is about three weeks later.

"Joe and Lindy, your lack of response to my repeated inquiries to the status of the deal and requests for payment of proceeds from the sale of the caption leaves me more than a little concerned about what is going on. I?m totally mystified that you would choose to put me in this stressful situation. Pursuant to our discussions, this was never intended to go on this long. I have other obligations that I need these funds for. Please make arrangements to get me paid." No response.

Exhibit 47. This is now a week later. "Joe and Lindy, for the life of me I can't understand what you're

doing and why.  I have a major part of my life savings tied up in this deal.  I never gave a thought that you would not follow through with your agreement given the family and personal history that we have.  You must be aware of the emotional stress and strain that this is causing me and my family.  Please reconsider your actions and transfer these funds back to my account as you have promised to do many times.  Please let me know what is going on and why you have chosen not to wire these funds to me."  No response.

Let's go to J48.  Again, sent to the same email addresses.  Ms. Adducci, this is the same one, the one that she used to send the packet of information to Mr. Ritter.  It's the same email address.  Now, there had been a phone conversation that's referenced in here where they were promising payment to him to give him his money back.  No payment was ever made.  Nothing.

Now, this is now July.  Mr. Ritter has no choice.  He files suit thereafter in North Dakota against Ms. Adducci and her husband.  They don't defend.  They just let it go to default.  They're served, and they're defaulted, and the Court has the judgment.  It's in the papers.  We've admitted -- also you're going to see the bankruptcy schedules that were filed when Ms. Adducci and her husband filed bankruptcy.  There's 22 million of debt on the schedules that they had personally.

And when you -- we're going to go through Exhibit 5, the remaining months, and you're going to just see a series of bounced checks, bounced checks that -- what was going on was they were in real financial straits, and they had embezzled Tom's money to pay other creditors is what was going on. The company ultimately files bankruptcy as well. That case was also assigned to you, in a business -- an enormous amount of debt on the schedules of the company as well.

And so, that's why we're here, Your Honor. And that brings us to, you know, this case. And in closing, we're going to talk more about the specific provisions of the code and how, frankly, I think you're going to have a hard time if you had to only pick one provision of the code for -- that would prevent a discharge. It's a good thing the Court can apply many of them because there's so many different ones apply under these facts. I mean, it's extraordinary what's happened here.

And so, the defense you're going to hear, Your Honor, is a combination of, well, Joe did everything. Joe did a lot. No question about it. That's why he's in jail. You're going to hear a lot of, "I didn't know what I was doing." For example, like in the bank, she's -- gee, I didn't know when I walked out with a stack of $8 million worth of cashier's checks what I was doing with all of that.

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 47 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

And I don't really remember going to the FedEx office and sending it.

You're going to hear a lot of incredible things, like those kind of things, where you're going to hear, oh, I don't remember getting these eight emails, or whatever the number is, from Mr. Ritter. You're going to hear a lot of things like that. And obviously, Judge Gretchko, you know you are the trier-of-fact. And that means you're going to hear Tom Ritter. You're going to hear Ms. Adducci. You are going to look at the evidence, and you get to call the balls and the strikes on who is, telling the truth and who is not telling the truth.

And Your Honor, the two things to focus on, the events of that first week of February, on all the details of what happened. We've summarized a lot of them right now, but that shows directly Ms. Adducci's hand in Mr. Ritter's pocket. It's her that takes his money. She's going to go, oh, Joe told me to do it.

Her inducing him into the deal, please pay attention to the conversation you'll hear about from Mr. Ritter that preceded the email of the 25th of January. Really important piece of evidence as well. Your Honor, I thank you for your time, and I know the Court's going to reach the right decision on this case. Thank you.

THE COURT: Thank you, Mr. Cataldo. Mr. Foley,

would you like to go now, or did you wish to take a little break?  The Court will do whatever you wish.

MR. FOLEY:  I'll go now, Your Honor.

THE COURT:  Say again?

MR. FOLEY:  I'll go now, Your Honor.

THE COURT:  You'll go now?

MR. FOLEY:  Thank you.

THE COURT:  Mr. Cataldo, does anyone need a personal break right now?  We're all good?  All right.  Mr. Foley?

MR. FOLEY:  Thank you, Your Honor.  Your Honor, with respect to the J9 issue, I'm not going to address that now in closing, but I hope before we begin testimony we'll have a moment to address that.

THE COURT:  All right.  I need you to speak up just a little bit.  Pull the microphone more close to you. It's got a cover.

MR. FOLEY:  I apologize, Your Honor.  I -- the issue surrounding Exhibit J9 I'm not going to address presently, but I hope we can take a moment before testimony begins to sort out the J9 issue.

THE COURT:  The Court expects to take a break before testimony begins because your opening statement is approximately the length of plaintiff's opening statement. That'll take us right to about the lunch hour.  So, the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Court can't see the clock, but I have a little watch here, so...

MR. FOLEY: Thank you, Your Honor. I doubt it will be that long of an opening statement.

THE COURT: All right.

MR. FOLEY: Because to be honest, I don't think that long of an opening statement is needed. I think that it was used by plaintiff's counsel by the plaintiff because they lack an evidentiary foundation to their case. And when you don't have the evidence, the best you can hope for is to convince the judge through your words that more exists than actually exists.

I'm going to take a moment after my prepared opening statement to address some of the points that Mr. Cataldo made. But Your Honor, I'll begin with this. What happened to Mr. Ritter is serious. He did lose a very large amount of money. We're not here to minimize that. We're not here to deny that.

But what the evidence will show is that Joseph DuMouchelle defrauded Mr. Ritter. He admitted that in federal court. He pled guilty to wire transfer arising from this very transaction. That was after Mr. Ritter made a conscious effort, the evidence will show, to get the government to include Lindy. The evidence will show that Mr. Ritter, when he initially contacted the federal

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

government regarding this, in the more truthful version of events, wrote something regarding -- wrote an information of some kind to them that focused on Joe and Joe only. Only later did he do a second writing to the federal government attempting to include Lindy.

THE COURT: What difference does that make for purposes of this civil, non-dischargeability action?

MR. FOLEY: Because it shows that even Mr. Ritter knows that it was Joseph, not Lindy, that defrauded him. It goes to his credibility, and this court should factor that in quite heavily, actually, when it now hears contrary to position that he initially took when contacting the federal government, and contrary to the position that he took in his own deposition, Exhibit J49 in the Noble v. -- in the Stevenson v. Noble case.

In that exhibit, Your Honor, we'll see that Mr. Ritter, frankly, was quite dismissive of Lindy's involvement beyond mere referencing to saying, oh, I trusted them. He explicitly details what Joe did to defraud him. So, Your Honor, a crime was committed, and that crime was committed by Joseph DuMouchelle, who pled guilty, and who was dismissed from this adversary proceeding after waiving his discharge under 727.

THE COURT: On mootness grounds. He was dismissed on mootness grounds.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

MR. FOLEY: Yes.

THE COURT: So the Court made no finding on the merits because the court lost jurisdiction based on constitutional mootness.

MR. FOLEY: Yes. And that's why I made clear and will reiterate --

THE COURT: Okay.

MR. FOLEY: -- after waiving his discharge.

THE COURT: After Mr. --

MR. FOLEY: Waiving his discharge.

THE COURT: -- DuMouchelle waives his discharge. Okay.

MR. FOLEY: Those facts are not in dispute regarding Joe, but that's not the question before the Court today. The question before this Court is narrowing, and under the bankruptcy code, it must be narrower. The question is whether plaintiff can prove by a preponderance of the evidence that Melinda Adducci herself committed conduct that makes this debt non-dischargeable as to her specifically under each separate statute that plaintiff invokes.

Under the joint final pre-trial order and submitted to you even as amended, there is no dispute. That means that he must prove false pretenses, false representation, or actual fraud under 532(a)(2)(A);

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

embezzlement or larceny under 523(a)(4); and/or willful and malicious injury under 526(a)(6). Plaintiff has withdrawn the partnership theory but continues to seek imputation of Joe's actions on my client through a theory of agency or civil conspiracy.

THE COURT: You're speaking now of the vicarious liability assertion?

MR. FOLEY: Yes, Your Honor. In plaintiff's opening, they did exactly what, frankly, I expected them to do. They took a terrible fraud committed by Joseph and asked this court to fill in evidentiary gaps in their case by inference, association, hindsight, and emotion. Mr. Cataldo speaks about trust between the plaintiff and Ms. Adducci, speaks about family history, speaks about how she opened a bank account, how she signed checks, and how she later went silent.

But none of those labels or actions standing alone or even stacked together satisfy the statutory elements that the Court must decide. What the law requires for 523(a)(2)(A) is that plaintiff must prove that Lindy made a materially false representation or engaged in conduct amounting to false pretenses or actual fraud that caused plaintiff to part with his money.

Plaintiff must prove that my client intended to deceive her. Plaintiff must prove that my client relied

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

upon -- that plaintiff must prove that he relied upon Ms. Adducci's statements or pretenses, and that that reliance was justifiable given the circumstances. And finally, he must prove causation related to Ms. Adducci directly.

For 523(a)(4), plaintiff's must -- plaintiff must prove embezzlement or larceny because they have abandoned the fraud in the fiduciary capacity originally brought in the complaint. That means that they must prove that Mr. Ritter entrusted money to my client, and that my client fraudulently appropriated or embezzled that money wrongfully taking it -- for a larceny, wrongfully taking it with the necessary intent.

For 523(a)(6), plaintiff must prove willful and malicious injury by this debtor, by Ms. Adducci in particular. Not carelessness, not association, not should-have-known-in-hindsight, but intent to injure the plaintiff or that injury was -- and/or a belief that injury was substantially certain. Substantially certain.

If plaintiff wants to impute Joseph's fraud to Lindy, the joint final pre-trial order says he prove a recognized basis for agency or civil conspiracy. They are not proceeding on the partnership theory anymore. That is what is required. And now I ask the Court to compare that to what they actually have.

They do not have an exhibit where Ms. Adducci

212-267-6868                    www.veritext.com                    516-608-2400

sends wiring instructions to Mr. Ritter. They do not have an exhibit in which Ms. Adducci tells Mr. Ritter that the Bank of America account belongs to the seller. They do not have an exhibit where Ms. Adducci represents that the diamond will be or has been purchased. They do not have an exhibit in which Ms. Adducci in any way negotiates the transaction or its structure.

THE COURT: I'd like you to repeat those for me again. I want to make sure I got down -- I got like four of them. I think I've written down two. You're alleging the plaintiff does not have an exhibit showing...

MR. FOLEY: That Ms. Adducci sends wiring instructions.

THE COURT: Yep.

MR. FOLEY: That was number one. That she tells Mr. Ritter that the Bank of America account belongs to the seller. That's number two.

THE COURT: Okay. Mm-hmm. What's number three?

MR. FOLEY: They do not have an exhibit in which Ms. Adducci says that the diamond has been purchased or will be purchased.

THE COURT: And what's number four?

MR. FOLEY: They do not have an exhibit in which Ms. Adducci negotiates the transaction or its structure. And I have about three more. They do not have an exhibit in

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

which Ms. Adducci signs a purchase agreement or any deal with Mr. Ritter. Number six, they do not have an exhibit in which Ms. Adducci sends a receipt to Mr. Ritter for the purchase of The Yellow Rose or representing that it had been purchased. And finally --

THE COURT: Hang on. Number six is there's no exhibit regarding defendant sending plaintiff a receipt that The Yellow Rose Diamond had been purchased?

MR. FOLEY: Yes.

THE COURT: And what's the last one?

MR. FOLEY: And number seven, they don't have an exhibit in which Ms. Adducci tells Mr. Ritter how his money will be held, where it will go, or how it will be protected.

THE COURT: Okay. Give me those three subsets. Where the money will be held, where it will go, and how it will be protected?

MR. FOLEY: Yes. Your Honor, by its very nature, I could go on with an infinite list of the things that they do not have. But what ties those seven things together is that they have all of those from Joseph DuMouchelle in the joint exhibits. They don't have them against Ms. Adducci, not because discovery in this case was limited. This case went through extensive discovery, including ESI litigation, full download of both Joseph's and Ms. Adducci's computers.

Review of that by a digital expert hired by

plaintiff's counsel brought in and referenced during the SI proceedings that Your Honor can take note is not on the witness list for today. Because after that, after motions to compel, relevance disputes, privilege disputes, spousal privilege disputes, discovery being reopened, and the court ruling that they had all of that information, they did not get a single document that they have added to this list that in any way ties my client to knowingly or intentionally being part of what they allege now in hindsight was a grand conspiracy to take Mr. Ritter's money.

They don't have that document. They don't have a document, and plaintiff had every opportunity to find the Lindy document, the Lindy email, the Lindy text, or the Lindy instruction, or the Lindy communication showing the before or leading up to this wire transfer that she knew this transaction as fraudulent or that she in any way misled Mr. Ritter or that he would've relied on her. No such exhibit --

THE COURT: Those things and that she... I need those three things again. New transaction was fraudulent. What's the other?

MR. FOLEY: I'm sorry, Your Honor. I ad-libbed there and it's not in my written statement. I don't remember exactly what I said.

THE COURT: Hang on a second. Ms. Noble, can you

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 57 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

read back?

(The reporter read back the requested portion of the record.)

THE COURT:  Do you want to try again?

MR. FOLEY:  Do you want me to -- I can reread the paragraph I just spoke.

THE COURT:  Reread the paragraph.

MR. FOLEY:  Thank you, Your Honor.  Plaintiff had every opportunity --

THE COURT:  I got that part.  What are the three things that you say they don't have.

MR. FOLEY:  A text -- an email, a text, an instruction or a communication showing that before or leading up to the wire transfer from Mr. Ritter that she knew this transaction to be fraudulent.  They do not have that, Your Honor.  Not because it was cleverly hid, but because it doesn't exist.

What the documents will show in this case, the 50 stipulated exhibits, are something very different.  They will show that on January 25th, Lindy sent a data package containing photographs and information about The Yellow Rose.

THE COURT:  What date?  What date?

MR. FOLEY:  January 25th.  And Your Honor, you will see in the evidence presented in this case that Mr.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Ritter was well aware that Ms. Adducci forwarded that email to him at Joe's request after Joe's conversation with Mr. Ritter. Joseph DuMouchelle himself contacted Mr. Ritter, set up this transaction, and in passing, asked Ms. Adducci to send the data package to Mr. Ritter as she had done -- as he had done or other people in the office had done, including her, to many other potential purchasers of The Yellow Rose Diamond.

THE COURT: I must ask, what do you mean by "in passing"? For a $12 million --

MR. FOLEY: Casually and without --

THE COURT: -- transaction.

MR. FOLEY: Casually and without much thought. That it was simply easier for him to say, Lindy, can you please send him that data package that you have. That email did not contain wiring instructions, did not contain escrow instructions, did not contain any instruction to transfer funds. It did not contain her opinion of its value. It did not contain an appraisal of the diamond.

It did not say plaintiff's funds would be wired to a seller-owned account. It did not say that she controlled the structure of the transaction. The operative communications came later, and they were between Joseph and Mr. Ritter. That is exactly how the documents in this case line up. The evidence will show that the January 30th

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

letter agreement on Mr. Ritter's letterhead and drafted by Mr. Ritter was between Thomas Ritter and Joseph DuMouchelle, not Lindy.

The agreement states in itself the plaintiff would rely heavily on Joseph DuMouchelle's guidance and advice, not Lindy. It assigns to Joseph the responsibility for obtaining possession of the diamond, transporting it, marketing it, and reselling it, not Lindy. The evidence will show that Joseph sent the January 31st wiring instructions. Joseph sent the February 1 wiring instructions. Joseph sent the February 6th wiring instructions to the Bank of America account.

Joseph transmitted the purported receipt. Joseph authored the communications that actually caused the wire transfer to happen. That matters because the money was obtained when plaintiff wired funds on February 6th, not by the time a February 7th banking activity occurred. By the time of that February 7th banking activity, the money had already left plaintiff's control after the instructions and under the inducement of Joseph DuMouchelle. When plaintiff tries --

THE COURT: Excuse me. It is stipulated, though, that the defendant signed those checks.

MR. FOLEY: It is stipulated that in Arizona my client went to the bank. You have also the stipulated

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

emails from Joseph arranging that transaction and that she signed what she was asked to by Joseph to sign in the bank in Arizona.

THE COURT: I don't -- we don't have a stipulation. I'm sorry. We don't have an email from Joseph to the banker.

MR. FOLEY: Yes, we do.

THE COURT: Oh, we do?

MR. FOLEY: It's in the joint exhibits.

THE COURT: Okay.

MR. FOLEY: But we not only have one, Your Honor, we have three.

THE COURT: Okay. But she was the sole signatory on the account at the time the checks were pulled out.

MR. FOLEY: We actually don't agree to that. The -- in the emails, Your Honor will see Mr. DuMouchelle writes, "I have already gone to the bank and signed a signature card."

THE COURT: I see.

MR. FOLEY: Unfortunately, it's not uploaded yet. Therefore, I'm sending Lindy, whose signature card is there. The signature cards that are part of the joint exhibits are both dated February 7th. The evidence will show --

THE COURT: I need you to hang on one second, please. What exhibits are you referring to?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: One moment, Your Honor. The emails, Your Honor, listed at Exhibits J42 through J44.

THE COURT: But this -- okay. I'll get into it during the case. Continue.

MR. FOLEY: What the documents show matters. Because plaintiff is trying to convert post-transfer account activity into proof that Lindy herself obtained money through her own fraud. He is asking this Court to collapse time, collapse sequence, and collapse the statutory elements in a way that the statute does not provide.

Plaintiff spent a great deal of time on the Bank of America account. And frankly, that's because plaintiff had to. Plaintiff will point out that Lindy opened the account, that she was the sole signer, and that she signed checks and counter-withdrawals totaling about $5.1 million on February 7th.

But even there, the contemporaneous bank emails matter, the exhibits that we just spoke about. Those emails show Joseph selecting the recipients and amounts and sending directions to the bank.

THE COURT: But it's stipulated her signature's on those checks.

MR. FOLEY: Yes. That is not in dispute.

THE COURT: Okay.

MR. FOLEY: She will testify to, she has admitted

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

in prior deposition she was in Tucson for a gemological institute event. Joseph, frankly, was supposed to join her there the following day.

THE COURT: And didn't.

MR. FOLEY: And didn't.

THE COURT: Mm-hmm.

MR. FOLEY: The timing of the emails shows the timing of the entire sequence of events, which Your Honor can see from those emails is not Ms. Adducci, as it was implied in plaintiff's case, traveling to Arizona for some nefarious purpose, that Joseph's in Michigan and Lindy's there. Lindy is there, and quite frankly, she's going to tell you that she was annoyed and angry at her husband --

THE COURT: The Court read her transcript of her deposition, so the Court understands all of that.

MR. FOLEY: The evidence will show Joseph directing the disbursements and Joseph running the transactions. After that --

THE COURT: But she could've said no.

MR. FOLEY: Pardon me, Your Honor?

THE COURT: She did not say no.

MR. FOLEY: She did not say no.

THE COURT: Okay.

MR. FOLEY: I guess I would say this. If that's the implication that the mere act of saying yes is Your

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

Honor's going to hear evidence that after that time in 2019, 20 years of marriage, and 20 years of knowing her husband to run a successful jewelry business with not a single case against them, without any legal activity, Ms. Adducci had zero reason to believe that anything was nefarious in what Joe was doing.

In fact, you will hear testimony from Ms. Adducci that because it was Mr. Ritter that Joe was dealing with, she assumed and believed and had been reassured that Mr. DuMouchelle was being more, not less, careful with the transaction.

THE COURT: Assured by Mr. DuMouchelle himself?

MR. FOLEY: Pardon me?

THE COURT: Who assured her of this?

MR. FOLEY: It's my understanding it was Mr. DuMouchelle himself.

THE COURT: If she had said no, the money would still be there, correct?

MR. FOLEY: No. Absolutely not.

THE COURT: Or --

MR. FOLEY: If she had said no --

THE COURT: And Joe would've waited until he became a signatory and he would've pulled the money out.

MR. FOLEY: Some minutes to hours to at most 24 hours later.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: But then she wouldn't be here today, would she?

MR. FOLEY: True. And as you can imagine, that has created some marital issues as all of this came to light.

THE COURT: Mm-hmm.

MR. FOLEY: To be clear, the parties are still married. But Your Honor, that's something that my client herself struggles with.

THE COURT: Okay.

MR. FOLEY: After discussing the Bank of America documents, plaintiff's counsel turns his attention to a later period well after the transaction, well after Mr. Ritter's transfer of money, and well after the distributions from the Bank of America account to a period of April, May, June, and July of 2019. Plaintiff talks about fake resale document. He doesn't mention in his opening that the fake resale document was prepared by Joseph, sent by Joseph with no involvement by Lindy.

He brings up a $2 million promise of some partial repayment. He doesn't mention that that was made by Joseph, not by Ms. Adducci. And then he brings silence as though silence after being sued by Mr. Ritter in June of 2019 is somehow indicative of guilt. Mr. Ritter brought a lawsuit --

THE COURT: Okay. This is a civil proceeding. Guilt -- I mean, you can talk about liability --

MR. FOLEY: Apologize.

THE COURT: -- or non -- but it's a civil proceeding.

MR. FOLEY: Indicative of culpability.

THE COURT: Okay.

MR. FOLEY: Under 523. Your Honor, that's not the way, as this Court knows, that the law works. Plaintiff's opening statement, Mr. Cataldo's arguments, and they are nothing but that, they are arguments in an opening statement, may sound powerful, but later complaints and later promises do not relieve plaintiff of proving what he must prove at the time that he wired the $12 million.

The later self-serving emails authorized by plaintiff after the transfer reflect his assertions and demands for payment, repayment. Nothing more. They do not transform Joseph's pre-wire conduct into Lindy's pre-wire fraud. Plaintiff's own filings make plain that this is exactly the inferential move that plaintiff wants this Court to make.

Plaintiff asked this Court to use later conduct as circumstantial proof of earlier intent. But even taken at face value, later silence does not substitute for a pre-wire misrepresentation, a pre-wire false impression attributable

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

to Lindy, or proof that Lindy knowingly or intentionally herself obtained the money through fraud.

THE COURT: Does it impact the other non-dischargeability sections? You've just recited 523(a)(2)(A), but what about (a)(4), (a)(6) --

MR. FOLEY: Just about to go through those --

THE COURT: Okay.

MR. FOLEY: -- in a minute. So, Your Honor, when the noise of this case is stripped away, what remains? What remains is a real loss, a proven and pleaded-to fraud by Joseph DuMouchelle and a record that does not establish the debtor's specific elements against Ms. Adducci. On 523(a)(2)(A), plaintiff has to prove that Lindy made a false representation, created a false impression, or committed the actual fraud by which the money was obtained.

But the operative agreement, the operative wire instructions, and the purported receipt all came from Joseph, specifically not Lindy. The documents do not show that Lindy did anything to induce Mr. Ritter into this transfer. On 523(a)(4), plaintiff has to prove embezzlement or larceny as to Lindy in particular, including the necessary fraudulent intent. But signing checks on a business account --

THE COURT: Does the fraudulent intent count for both embezzlement and larceny?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 67 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: Yes. Intent is required for both. I don't believe there's a disagreement to that. Signing checks on a business account after Joseph had set the transaction in motion and directed those very disbursements is not by itself proof that she intentionally fraudulently misappropriated entrusted property in the required state of mind. In fact, Your Honor, the evidence will show that that was not at all her intent or state of mind.

THE COURT: But she could've said no.

MR. FOLEY: I simply don't understand the Court's implication --

THE COURT: All right.

MR. FOLEY: -- by that.

THE COURT: Continue.

MR. FOLEY: On 523(a)(6), plaintiffs must prove that Lindy intended to injure him or believe that it was substantially certain. Not that she was around, not that she was married to the wrongdoer, not that she held a title or an interest in the business, not that she signed checks. He must prove that she willfully and maliciously injured Mr. Ritter.

And finally on the issue of imputation, plaintiff cannot simply say, as they attempted to already in this case once the Bartenwerfer decision came down, that Joseph committed fraud, and therefore, Lindy loses discharge to --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: We already had a summary judgment motion on that, and the Court denied summary judgment.

MR. FOLEY: Yes.

THE COURT: Okay.

MR. FOLEY: Under the joint final pre-trial order, plaintiff must prove agency or civil conspiracy.

THE COURT: You're saying marriage isn't enough.

MR. FOLEY: Not even close.

THE COURT: Okay. Got it.

MR. FOLEY: At the end of this trial, the Court will have no problem finding that fraud occurred, but that's not enough. It's not what the law requires. The law requires more. It requires proof as to this defendant. Proof of what she said, proof of what knew, proof of what she intended --

THE COURT: For vicarious liability?

MR. FOLEY: For all of the claims, Your Honor.

THE COURT: Okay. I thought you were just onto the vicarious liability part.

MR. FOLEY: No, Your Honor. I'm sorry. I've moved past going through each of the particular elements. Ultimately, plaintiff must provide to this court, it is plaintiff's burden to carry, proof of what makes this debt non-dischargeable as to Ms. Adducci in particular under each subsection plaintiff has chosen to plead. And when the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

evidence is measured against those elements, plaintiff's case against Lindy comes up short and will come up short.

The evidence will show fraud committed by Mr. Joesph DuMouchelle, not by Ms. Adducci. The evidence will show that Ms. Adducci herself trusted in her husband of 20-plus years, trusted in the business he ran for 20-plus years without a single lawsuit or anything of remotely the kind that transpired here.

What the evidence will not show, however, is what's important. It will not show that Ms. Adducci made the requisite false representations, created the requisite false pretenses, or committed the actual fraud by which the money was obtained, nor that she committed embezzlement or larceny with the required intent, nor that she intended a willful or malicious injury to the plaintiff.

In other words, the evidence will show the plain and simple truth of this matter recognized on the court -- the docket of the United States District Court for the Eastern District of Michigan that Joe, not Lindy, defrauded Mr. Ritter. For those reasons, Your Honor, after the evidence is in, judgment should enter in favor of Ms. Adducci.

THE COURT: Thank you.

MR. FOLEY: Thank you.

THE COURT: Thank you, Mr. Foley. All right. We

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 70 of 220
Veritext Legal Solutions
212-267-6868                                    www.veritext.com                              516-608-2400

are now at 5 minutes to 12, and it seems an appropriate time to take a break for lunch.  So, how long would the parties like for the lunch break?

MR. CATALDO:  Your Honor, one hour?

THE COURT:  Mr. Foley, does that work for you?

MR. FOLEY:  No objection to one hour.  Thank you, Your Honor.

THE COURT:  All right.  Ms. London, Ms. Noble, will that work?

THE CLERK:  That'll work.

THE COURT:  All right.  We'll take a one-hour break.  Ms. London, why don't -- well, we'll reconvene at 1:00, which is one hour and five minutes from now.

MR. FOLEY:  Thank you, Judge.

THE COURT:  All right.

MR. CATALDO:  And Your Honor, may we leave our things in the courtroom?

THE COURT:  We're not going to sell them, so, yes, you may leave them in the courtroom.

THE CLERK:  All rise.

THE COURT:  Thank you.

THE CLERK:  Court is in recess.

(Recess)

THE CLERK:  All rise.  Court is back in session for the Honorable Lisa S. Gretchko.

THE COURT:  Be seated.

THE CLERK:  Do you want me to recall the case, Judge?  Recalling Case Number 20-4381, Thomas Ritter v. Melinda Adducci.

THE COURT:  Mr. Cataldo, Ms. Clayson?

MR. CATALDO:  Good afternoon, Your Honor.  Mr. -- Christopher Cataldo, Kim Clayson for the plaintiff.

MR. FOLEY:  And good afternoon, Your Honor. Patrick Foley and Mr. Jesse Stec on behalf of the defendant.

THE COURT:  All right.  And the Court notes that Ms. Adducci and Mr. Ritter are both also in the courtroom. All right.  Have a seat and we'll proceed.

MS. CLAYSON:  Your Honor, before we call our first witness, we just wanted to make an amendment to Exhibit J9.

THE COURT:  Mm-hmm.

MS. CLAYSON:  And there's just two additional pages that we need to add to the top of J9, and we'd like to move for those to be admitted.  We have copies of them to be provided to everybody, and I think that was at Mr. Foley's request that we amend that exhibit.

MR. FOLEY:  Kim, it's three pages.

THE COURT:  All right.

MS. CLAYSON:  Or three pages.

THE COURT:  Mr. Foley?

MR. FOLEY:  Yes, Your Honor.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: What do the two pages consist of?

MR. FOLEY: The three pages consist of the correspondence between January 25th and January 28th that came after the correspondence in J9, and that's reflected in the description of the Exhibit J9 in the joint final pre-trial order. This is the correspondences from January 25th through 28th.

MS. CLAYSON: Yeah.

MR. FOLEY: It appears to me, Your Honor, it was simply -- there was a large process of honing down duplicative exhibits.

MS. CLAYSON: And they're out of order. They go from latest date to the earlier date, and that's why it's confusing because the later dates would go on top.

THE COURT: Right. Okay. So how do you propose to handle this? The Court would need additional -- the additional pages to J9 given to the Court for all of its sets of documents, correct?

MS. CLAYSON: That is correct. And we do have copies. I just need to have Mr. Foley verify that we have all of the -- of its pages that he wants to have added to J9. And if he does, we can provide those to the Court. We have them printed already.

THE COURT: All right. So at the next break, will the two of you perhaps have an opportunity to meet and

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

confer on that?

MR. FOLEY: Yes, Your Honor.

MS. CLAYSON: Yes.

THE COURT: All right. And at that time, you'll present the Court with its additional pages. But this does not change the admission of Exhibits J1 through J50 that happened very early.

MS. CLAYSON: That's correct, Your Honor. It just adds more pages to J9.

THE COURT: All right. And Mr. Foley, once you agree to the specific pages being added, that's your understanding as well?

MR. FOLEY: Yes, Your Honor.

THE COURT: All right. So with that stipulation on the record that additional pages need to be added to J9, this issue is resolved. The Court has previously admitted J9 as part of the admission of Exhibits J1 through J50. And so from a court housekeeping issue, there's nothing really to be done from the Court's perspective except to receive the additional pages, which the Court will look forward to as soon as the parties have had a chance to meet and confer and make sure it's the exact right pages, correct? It's about three pages, Mr. Foley?

MR. FOLEY: It's exactly three pages.

THE COURT: All righty.

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

MR. FOLEY:  Thank you.

MS. CLAYSON:  If the Court is ready, we'll -- the plaintiff will call the first witness, and we are calling the plaintiff Mr. Thomas Ritter.

THE COURT:  Okay.  Mr. Ritter, remain standing in the witness box so I can administer the oath, okay?

MR. RITTER:  Okay.

THE COURT:  Please --

MR. RITTER:  I may have to grab my phone and turn my hearing aids up a little bit.

THE COURT:  Go ahead.  Do you need your phone?

MR. CATALDO:  Here you go.

MR. RITTER:  I'm sorry.  Go ahead.

THE COURT:  Please raise your right hand, sir.  Do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Thank you, sir.  Have a seat.  Is that buzzing from your phone connected to your hearing aids?

THE WITNESS:  I beg your pardon?

THE COURT:  Is that buzzing from your phone connected to your hearing aids?

THE WITNESS:  Yes.

THE COURT:  Is -- are you able hear the Court okay?

THE WITNESS: Well, yeah. Am I able to hear what?

THE COURT: Oh, oh.

THE WITNESS: The Court okay?

THE COURT: Yes.

THE WITNESS: Yes.

THE COURT: It's important that you hear -- do we need to redo the oath?

THE WITNESS: Yeah, I'll turn this off so I'm not disturbing (indiscernible).

THE COURT: Yeah, your phone needs to be turned off. Or silenced. It doesn't need to be turned off, just silenced. Okay. Do I need to readminister the oath? I'm going to do it again just to make sure you heard it, okay?

THE WITNESS: I did hear the oath, and --

THE COURT: Do you solemnly swear or affirm -- raise your right hand, please. I'm going to redo the oath just to make sure you heard --

THE WITNESS: You want me to repeat it?

THE COURT: No, I just want to make sure you heard it.

THE WITNESS: I did hear it, and I -- yes, I do.

THE COURT: That you're affirming that the testimony you're about to give is the truth, the whole truth, and nothing but the truth.

THE WITNESS: Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: All right. Have a seat.

THE WITNESS: Thank you.

THE COURT: Please let me know if I?m not speaking loudly enough for you. And Ms. Clayson, speak right into the microphone. That will enhance the chance of Mr. Ritter or any person wearing a hearing aid --

MS. CLAYSON: Mm-hmm.

THE COURT: -- hears every syllable, which is important.

MS. CLAYSON: Okay.

THE COURT: Okay?

DIRECT EXAMINATION OF THOMAS RITTER

BY MS. CLAYSON:

Q    Mr. Ritter, can you hear me okay?

A    I can.

Q    Okay. When did you get into town for this hearing?

A    Yesterday, I believe.

Q    And how did you get here?

THE COURT: Okay. I -- stop. I want to move his microphone closer.

MS. CLAYSON: To him.

THE WITNESS: Thank you. I flew in yesterday from Arizona.

BY MS. CLAYSON:

Q    Okay. Before we go further, can you please state your

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

name for the record?

A    Thomas T. Ritter.

Q    Okay.  And you're the plaintiff in this matter?

A    I am.

Q    Okay.  So you flew in yesterday.  Where did you fly in from?

A    Arizona, Phoenix.

Q    You live in Arizona?

A    Part time.

Q    Okay.  Are you married?

A    I am.

Q    And what's your wife's name?

A    Carol.  Carol Ritter.

Q    How long have you been married?

A    About 46 or 7 years.

Q    Do you and Carol have kids?

A    We do.  We have two boys.

Q    And how old are they?

A    Well, one was born in 1980.  He's 46.  There other in '87.  He's about 38.

Q    Okay.  Mr. Ritter, can you -- we're going to talk -- I just want to hear a little bit about your background.  Can you tell us about where you're from and what your education is?

A    Where I'm from and what?

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

Q     Your education.

A     Okay.  I was born and raised in Williston, North Dakota.  I went to the public schools there, graduated from Williston High School in 1967.  I went on to get a degree in natural sciences from the University of North Dakota at Grand Forks, North Dakota.  And then I went on and got a degree in pharmacy from North Dakota State University in Fargo, North Dakota.

I came back to Williston and interned for a year there, passed my boards, and started practicing pharmacy, and just really didn't like it very much.  I couldn't see myself doing that for the rest of my life, and this was in '75, '76.  There was an oil embargo going on at the time.  The price of oil had come up a bit, and it looked like an interesting field to get into.

My dad was a dentist in town and had some extra money on occasion.  And he would get landmen coming to the house to sell minerals or see if he was interested in the oil business.  And I happened to be at the house one day when one of those fellows stopped by.  And I started chatting with him and asked if there was a way he could teach me this business.  And he said --

THE COURT:  Ms. Clayson, the Court doesn't understand what a landman is, and I --

MS. CLAYSON:  Okay.  Sure.

THE COURT: -- apologize for that having watched the TV show. Could you help me to understand what is a landman?

THE WITNESS: A landman is an individual that goes into the courthouse, runs the records to identify who owns the mineral and royalty estate under a piece of land, and who owns the surface estate. And generally then, they report back to who that -- whoever their client is, what they find, and that client will send them an outline then of the area they want checked.

And we would run all the records within that area, send back the results, and then they would send us parameters to buy oil and gas leases there. If they got enough oil and gas leases in that area, they would go about drilling wells. Usually we didn't get involved until after their geologist had indicated that there was a pretty high propensity for oil to be in that area. And basically then we would go out to each of the mineral owners, either by phone or in person, and try to negotiate an oil and gas lease for that oil company.

THE COURT: Mineral owners only, or the surface owners as well?

THE WITNESS: Well, the mineral estate has been, I guess, adjudicated to superior to the surface estate. So we would talk to the mineral owners and buy leases from them.

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

If we got enough for a drill site and the company wanted to drill, we would then contact the surface owner and negotiate a settlement with them for a specific area to set the rig and tank battery, et cetera.  Then the equipment would be moved in, the location built, the equipment moved in.  Geologist, a well site geologist would be hired, and drilling would begin.

If after testing it looked like it would be a productive well, you'd run casing.  And the good wells just flowed oil to the surface.  You'd set up a tank battery and a heater treater, they're called.  It separates the oil and water and gas, and it would divert the oil to a series of tanks and the water to a tank, and then the gas would be flared off initially.  And if there wasn't a pipeline nearby that would take it to a gas plant, you would have to limit production until that was done so you didn't get a lot of gas into the atmosphere.

THE COURT:  Okay.

THE WITNESS:  And --

THE COURT:  Okay.

THE WITNESS:  -- that's kind of how the landmen start.  That's a little different than what you see Billy Bob doing on the Landman show.  That's a pretty colorful portrayal of the business, but a lot of it is very true.

THE COURT:  Okay.  Thank you.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE WITNESS:  Mm-hmm.

BY MS. CLAYSON:

Q    And Mr. Ritter, how long did you work as a landman?

A    I'm still working as a landman, but for different companies.  This fellow Eugene Hamuseck (ph) was his name, he worked for a fellow by the name of Harmon Peg, big oil company out of Sidney, Montana.  They put me on at no wage until I could run records on my own and do the work, but he taught me pretty much the basics.  And then Harmon's sister Velma Wood came out from Mount Vernon, Illinois, and she was a very experienced abstractor from out there.  And she continued to teach me that part of the business.

And I worked for him for, oh, two, two-and-a-half years.  And then I got a job back in Williston, my hometown, with a company Norman Jessen and Associates.  And I was just working as a landman there and doing the same thing.  And then in about 1980 or '81, I took a partner and we opened a company called Ritter Labor and Associates and basically started our own brokerage firm doing that type of work for various companies.

At the same time, I was -- this Mr. Hamuseck had told me everything's going to just quit one day.  And I couldn't really figure out why, but I thought, well, I can get around that.  I'll just start drilling my own wells and stuff and keep going when landmen are out of work.  Well, the part I

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

didn't understand was it happened because oil got so low you couldn't -- it would pay for the operation.  And -- but anyway, I did start drilling wells.  In '79, my dad and I put together a prospect, got some investors, and drilled a well, dry hole.  And I guess I just loved the business, so I would take courses in contract law, travel down to Denver.

Contract law, oil and gas law, geology, and just learn everything I could about the business because I wanted to be in this business and further my education any way I could. I don't know where I'm going to go with all this, but --

Q    Well, Mr. Ritter, I can ask another question.  Do you know who Reuben Hegge is?

A    I do know Reuben Hegge.  He's Lindy's father.  And my sister and Reuben's son Carroll Hegge dated in high school, and I think went to college together for a while and then got married.  And that's kind of how I met Reuben and his family and Lindy.

But Reuben was very interested in oil and gas as well. He was a farmer northwest of Williston in Bone Traill Township, I believe.  And when we'd get together, we'd talk about oil and gas, and he was what was known as a water witcher or a dowser, an individual that either using metal L-rods or a willow stick can go out and kind of divine for water or oil.

Reuben's brother Johnny was also really good at that.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

I think Johnny was the first one that was doing that, and then Reuben learned it as well. And I just asked Reuben, do you think you can teach me that? And he said, well, I learned it, I'm sure you can learn it too. So, we became very good friends. We went all over North Dakota. Just spent literally hundreds of days together I think over time driving down the back roads of North Dakota with our willow sticks or rods just looking for oil.

And if we'd find something, we'd try to buy minerals, or we put together a couple of prospects that looked good. And I'd put some money in, Reuben put some money in, and we'd get investors and drill. We made -- one well, the first one we did together, wasn't the best well, and that kind of hit Reuben hard. He was having hard times in the 'Sc with the farm. There was a lot -- a lot of farmers went broke in the Sc, and I believe Reuben lost his farm in the Sc.

But he continued on and invested. He bought minerals on his own. And Carroll, his son, ultimately also became a landman after I was in the business. I didn't train him or anything.

THE COURT: Carroll is someone's son?

MS. CLAYSON: Yeah. So there's a Carol --

THE COURT: A man?

BY MS. CLAYSON:

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 84 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Can you spell Carroll's --

A    Carroll is Lindy's brother.

THE COURT:  How -- is that --

THE WITNESS:  My sister are husband and wife.

THE COURT:  Okay.  So your wife is named Carol.

THE WITNESS:  My wife is Carol, and my brother-in-law is Carroll.

THE COURT:  Brother-in-law.  And they're spelled differently?  Your wife is --

THE WITNESS:  Right.

THE COURT:  -- C-A-R-O-L?

THE WITNESS:  Carroll the boy has two Rs and two Ls, and my wife has one R and one L.

THE COURT:  Okay.  And this long-term friendship, I just need a couple of clarifying questions, Ms. Clayson.

MS. CLAYSON:  Sure.

THE COURT:  The long-term friendship, Mr. Ritter, is between you and Reuben, or you and Reuben's son?

THE WITNESS:  Myself and Reuben became very close friends.  I've known Carroll my whole life, and I'd consider him a friend of mine as well.

THE COURT:  Okay.

THE WITNESS:  You know?

BY MS. CLAYSON:

Q    How long were you friends with Reuben Hegge?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 85 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    Until the day he died from the late, I suppose, '70s or early 'Sc until the day he died in I believe September of '08, 2008.

Q    Did you attend Mr. Hegge's funeral?

A    Pardon?

Q    Did you attend Mr. Hegge's funeral?

A    I did.

Q    And do you know who Melinda Adducci is?

A    I do.

Q    Who is that?

A    She's sitting right here.

THE COURT:  Let the record reflect that Mr. Ritter has identified Ms. Adducci.

BY MS. CLAYSON:

Q    And you call her Lindy?

A    I call her Lindy, yes.

Q    Okay.  And how do you know Ms. Adducci?

A    Well, I met her probably in the late 70s when my sister and her brother were dating and then got married.  And I think in that same timeframe, the late 70s, she may have gone to work at my brother's jewelry store.  I don't remember in what capacity, but I remember she was working there.  And then I remember -- I don't know if Tim sent her to some kind of a gemology school or she went on her own, but I know (indiscernible) spent some time working there.

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

And then --

Q    Mr. Ritter, I'm sorry to interrupt, but when you refer to Tim, is that your brother?

A    Tim Ritter is my brother.  Tim and my brother Steve had opened a jewelry store called Ritter Brothers Jewelry in Williston.  And that's where I believe she was employed for a while.

THE COURT:  I need to -- someone to tell me again the date that Mr. Ritter first met Ms. Adducci.  Late 70s, early Sc?

BY MS. CLAYSON:

Q    You met Ms. Adducci in the late 70s?

A    Yes.

Q    Okay.

A    Mid to late 70s.  Somewhere in there.

Q    And did you stay in touch with Ms. Adducci while she worked at your brother's jewelry store?

A    I would see her on the floor there.  I was busy trying to build my business, so I didn't spend a lot of time in the jewelry store.  But at some point in time, I understand she got married to -- I can't remember if it was Greg Adducci or Joe Adducci.  I think it was Greg Adducci.  His father was a pretty well-known and well-respected obstetrician-gynecologist in Williston, an MD.  And I think after that, they moved somewhere.  Maybe out here to Michigan.  He was

212-267-6868                Veritext Legal Solutions                516-608-2400
www.veritext.com

in law enforcement, I believe.  And -- well, I didn't see her for a while then, and sometime in -- boy, I don't even remember when, back in Williston, they -- she and Mr. Adducci must have gotten divorced because at some point in time she was back in town with Joseph DuMouchelle.

And I don't know if he was her husband at that time or a boyfriend, but I had met them I think over at the house or maybe even at the funeral and probably talked a little bit.

THE COURT:  I have a clarifying question.  Mr. Adducci, who is the defendant's former spouse, did you say he was in law enforcement?

THE WITNESS:  That was my understanding.

THE COURT:  Okay.  And his father was the obstetrician?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  Good family.  Good name.  Hard-working folks.

BY MS. CLAYSON:

Q    So you indicated you at some point met Joe DuMouchelle. And how did that come about that you were in touch with Lindy --

A    No, I --

Q    -- and Joe?

A    -- can't even remember the occasion.  I just -- like I

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

said, it could've been at the funeral, but I don't know if it was then or at a later date. But I'm sure I was introduced by Lindy at some point when we were somewhere and saw them. And...

Q   From that point, did you stay in touch with Lindy?

A   Well, they would come to Williston on occasion. And generally all -- well, I wouldn't say all the time, but once in a while I'd get a call to meet either both of them for lunch or one of them for lunch, and we would go out for lunch. And I don't think that was more than two or three times.

But I remember then at one of those meetings we must have discussed investment in jewelry because I recall getting emails from Lindy after that of their catalogs and then emails with specific pieces to see if I not only would be interested in investing but in buying some jewelry for my wife. And we had looked at a few pieces, and I think she mailed some out one time. We looked at them and Carol just decided they weren't really for her. So we sent them back, and --

Q   Mr. Ritter, did you ever buy jewelry from Lindy or Joe?

A   What was that?

Q   Did you ever buy jewelry from Lindy or Joe?

A   I don't believe we ever did buy anything, no. And that progressed then. In 2014, I was approached to invest in

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

buying certain gems -- excuse me, gems or jewelry pieces, reselling, and the splitting the profits.

Q    Who approached you?

A    Well, I don't recall exactly who did, but I would presume it was probably both of them because I had agreed that I would be interested in doing that and signed a promissory note or agreement with both Joe and Lindy, Joe DuMouchelle and Lindy, on that premise.  And --

Q    So you loaned money to them for this idea of purchasing jewelry.

A    Yes.

Q    Did you ever get repaid on your notes?

A    That note was never repaid in full and still outstanding.  I did receive a couple of payments for the -- it was set up such that it would either be interest or profit splitting if it wasn't paid back right away.  And I got a few payments that were either profit sharing or interest.  And I think at the end, that thing was still like, I don't know, 4 to $600,000 in arrears.

Q    Before we go too far into talking about the notes, I just want to ask do you know anybody else from Ms. Adducci's family?

A    Well, I know their grandson just briefly.  Joey or Joe Adducci.

Q    A grandson or -- you're talking about Lindy's grandson?

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

A    It would be Dr. Adducci's grandson.

Q    Okay.  But Lindy's --

A    Melinda's son.

Q    Okay.  And how do you know Joey Adducci?

A    Well, Lindy had sent me an email or called or both and asked -- she had mentioned that Joey was graduating from a geology school in Michigan here, I think, then was going to be looking for work.

Q    When was that?

A    Gee, I don't remember.  Maybe 2017.  Just -- I'm trying to recall the emails.  But I think I said I wasn't that connected to the geology group.  I had my own geologist, and then we did use a group called Neset Consulting.  And so I said I'd just check around, and I ended up getting on the phone and calling Kathy Neset, the president of Neset Consulting over in Tioga, North Dakota and said I'd had a call from a friend of mine whose son was graduating from geology school.

And good hard-working family, good name, do you think you might have a place for him?  And she said, well, maybe. Have him give me a call and we'll see what his background is and if he'd fit in.  Lindy had given me Joey's phone number, so I believe I called Joey and talked to him a little bit and gave him Kathy's name and number and has him call her. And I believe he did that, and he was hired there, and went

212-267-6868          www.veritext.com          516-608-2400

to work there, and I believe he's still working there today.

THE COURT: I have a clarifying question. Going back to the meetings that you had early on with --

THE WITNESS: Once more?

THE COURT: Going back to the meetings that you had early on with Joe DuMouchelle and the defendant, was that in around 2008? I'm not clear on the timeframe. Before the first promissory note, but I need to know the timeframe, I think.

BY MS. CLAYSON:

Q    Do you recall --

A    The promissory note was signed, I think, February of 2014.

THE COURT: Right, but when did the -- those meetings occur where they went to --

THE WITNESS: Between 2008 and 2012 we must have met, you know, just very briefly in Williston. Two or three times it would've been. Yeah. No more than that, I don't believe. And then I don't recall what prompted the emails being sent from Lindy with the catalogs and then the follow up with the pictures of different specific pieces for Carol. But that must have been a conversation she and I had. But the specific -- I think those were in 2012, that she sent those out for Carol to look at and that we chose not to buy.

BY MS. CLAYSON:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Mr. Ritter, what do you know about Lindy's professional background?  Do you know anything about...

A    Well, just, you know, like I said, I hadn't followed that very closely.  I knew she had gone on to get certified in a lot of the -- with the gemology certifications required to be an appraiser, et cetera, and had a pretty high regard in the industry.  Partly through Joe, and partly through my brother Tim.  But you know, specifically, I don't know that much about that industry, so -- but I knew she was in the appraisal end of it.

Q    Okay.  Thank you.  We'll put -- we'll start with -- let's see.  Bear with me for a minute here.  Exhibit J7.  Mr. Ritter, I am showing you what's been admitted as Joint Exhibit 7.  There's also a book in front of you if it's helpful to you.  You can take your time to get there.

A    Did you say J7 or F7?

Q    J7.

A    How does that differ from F7?

Q    There shouldn't be an F7.

        MS. CLAYSON:  May I approach the witness just to get him there?

        THE COURT:  Please.

        THE WITNESS:  Oh, I'm just looking at Exhibit 1, I guess.  I'm sorry.

BY MS. CLAYSON:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    There is a cover page to this exhibit, and so if you look at the second page, then you're on the --

A    Yes.

Q    Mr. Ritter, what is this document?  Are you familiar with it?

A    This looks like the first time we did business together in February of 2014 where I agreed to send them $350,000 to buy jewelry and sell it and split the profits.

Q    Okay.  When you say "them", are you referring to --

A    Joseph and Melinda, yes.

Q    Okay.  And if you look at Page 3 of 3 of the promissory note?

A    Yes.

Q    Are those -- do you recognize those signatures above Joseph DuMouchelle and Melinda Adducci?

A    Well, they appear to be Joseph DuMouchelle and Melinda Adducci's signatures with a notary confirming them.

Q    Okay.  And so this is one of those promissory notes you were speaking of where you loaned some money --

A    Yes.

Q    -- (indiscernible) jewelry?

A    Yes.

Q    And then I'll have you move to Joint Exhibit 31, so it's a big page flip to Tab 31.

A    31.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    And it's also up on the screen.

A    Yes.  Another note.  This was basically an extension of that first note.

Q    So this is a promissory note as well?

A    Yes.

Q    Okay.  And it's dated for August 12, 2014?  Is that right?

A    Yes.

Q    Okay.  So tell us what this was about.

A    Well, this -- the timeframe on the first note had expired and it was never fully paid.  So we did an extension, and Joe signed this one.  I don't really know why Lindy didn't, whether it was just an error on my part not listing her on there.  But it was simply an extension with the accrued interest added on.

Q    And then if you look at Page 3 of 3 of the note, you recognize that to be Mr. DuMouchelle's signature?

A    It looks just like the other one, yes.

Q    And the idea with this note, if we look at the second paragraph of the note...

A    Yes.

Q    So this -- was this -- what was this contemplating where it starts with, "That along with the accrued interest"?  What was the idea that you -- if you look at that?

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 95 of 220
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

A     Could you say that again?

Q     What was your intention with the payment terms on this note?  Take your time to read it if you need to.

A     Well, it was a six-month note it looks like.

Q     Okay.  And then I'll have us go to Joint Exhibit 8.

A     Which exhibit?

Q     8.

A     8?

Q     Yep.

A     I'm sorry.  I'm just really at a loss on here, and... Okay.

Q     And what does this represent?

A     It must be another extension of the same note.

Q     With the 430,000?

A     Yes.

Q     Okay.  Did you get repaid on this note?

A     No.  I got some small interest payments along the way either concurrent with the extensions I think or maybe just the interest was paid up and the note was extended.  But the principal was never paid.

Q     What did you do --

        THE COURT:  Ms. Clayson, the Court's confused.

        MS. CLAYSON:  Yes.

        THE COURT:  It appears that J31 and J8 are the same --

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 96 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

MS. CLAYSON: Are they the same? I --

THE COURT: -- promissory note. They're both dated --

MS. CLAYSON: You know what, Your Honor? I think you're right. I?m so sorry for the confusion. I thought there was two notes, two different dates, but you're correct.

THE COURT: There's a prior note, J7 --

MS. CLAYSON: Yes.

THE COURT: -- is the February note, but J31 and J8 appear to be the same note. Do you want to take a look at that?

MS. CLAYSON: Yeah, I will strike that line of questioning. These are the same note, so the line of questioning regarding J8 I can strike and we'll -- because it was authenticated with J31. So that's fine. I apologize to the Court. I thought they were different dates.

THE COURT: Mr. Foley, do you see that also?

MR. FOLEY: Your Honor, I agree that J8 and J31 are the same exhibit. I don't think there's any need to strike testimony.

MS. CLAYSON: Yeah.

MR. FOLEY: I mean, it's just -- it's the same exhibit.

THE COURT: It's just an error --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON: It's the same exhibit.

THE COURT: -- in the listing of the exhibits that we got twice?

MR. FOLEY: Your Honor --

MS. CLAYSON: That is correct. And there still are some duplicates in there, and we try to do our best to take them out, but there are still a couple of duplicates.

MR. FOLEY: This was the refinement process that we were going through in the week leading up to this related to the need to supplement J9. We have been going through and pulling out exhibits that were duplicates and attempting to work on that.

THE COURT: Okay.

BY MS. CLAYSON:

Q    So, Mr. Ritter, though, so did you -- you said you never got repaid the principal on this note. What did you -- did you do anything to try to collect on that?

A    Well, over the years I talked to Joe many times because he was the one I was mainly dealing with on these. But asking when they're going to be repaid, when are these going to be repaid? In about sometime in 2018, maybe December, I was doing some estate planning and trying to clean up outstanding notes, et cetera. And I called Joe, and I said, you know, we need to get this taken care of once and for all.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

And there were other -- lots of other notes in between that -- well, yeah, there were lots, that were taken out and repaid in full.  But this one just sat there.

Q    So --

A    I was pressing him on that a little bit and in one of those conversations later on, I think he -- that was when he suggested possibly investing in this $12 million Yellow Rose Diamond.

Q    That was late 2018?

A    Yes.  Late 2018.

Q    What was his pitch?

A    Well, he said there is this estate -- an estate that needed to get this diamond sold.  They were kind of under the gun and could probably buy it for 12 and a half million and probably pretty easily sell it for somewhere between 16 and 20 million and make that kind of a profit.  And would I be interested in looking at something like that.

And I'm basically trying to get these notes paid off, and I thought, well, if that could work out, it would give me some money and give him some money and get me taken care of and we'd be done with this.  So, that was appealing to me at that point in time.

Q    Did you only talk to Joe about this?

A    No, Joe said -- so I said, well, what do you know about it?  And I don't know if -- I think he just said, well, I'll

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

have Lindy call you and then have her send you some stuff out. And she did call me, and we talked about this stone a little bit. She had seen it before. It had been in their office. And so she described it in detail and confirmed it was a substantial gemstone.

And I'm sure at the same time I asked her about the relative values of it. And she gave me kind of I think what was in her paperwork there, the 30 million appraised. But I also said could -- you know, if this could be bought for 12 or 12 and a half, is there a market for the 16? And she confirmed that.

Q    Okay.

A    So I said, well, yeah, send that stuff out. Let me take a look at it.

Q    Okay.

A    So she did.

Q    And how did she send it to you?

A    Well, I got an email from her sometime in January. I also got some paper literature. I don't know when that came, before or after. It must have been after.

Q    Okay.

A    But it was email for the most part in January.

Q    Okay. And we'll take a look at Exhibit J9. Are you familiar with what this document is, Mr. Ritter? Take your time.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 100 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Yes.  Yes, I am.

Q    Okay.  It looks like it's a part of an email chain.  Is that correct?

A    Yes.

Q    But if we look at the second line starting at Friday, January 25, 2019, do you see that?  It's just on the first page there.

A    What did you ask?

Q    Do you see it where it's stated January 25, 2019?

A    January 25, 2019.

Q    Okay.  And this is from who?

A    This was from Lindy.

Q    What's the email address?

A    Lindy@josephdumouchelle.com.

Q    And she mentions -- she says, "It's great talking with you."  What was that about?

A    Well, that was the conversation I referenced, and this was the follow up.

Q    Okay.  So you received some documents.  It looks like it says, "Attached are the photos and the GIA monograph."  Is that correct?

A    Photos, and, yeah, appraisal, I think.

Q    And regarding Fancy Vivid Yellow diamonds?

A    What was that?

Q    Regarding Fancy Yellow --

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

THE COURT:  Ms. Clayson, if you're going to read, you've got to read the whole thing.

MS. CLAYSON:  Okay.

THE COURT:  "Attached are the photos and GIA monograph and comparables on Fancy Vivid Yellow diamonds."

THE WITNESS:  Yes.

BY MS. CLAYSON:

Q   And high --

A   She sent me some comparables to look at relative to that stone and the relative values of the others to give me an idea of what gemstones of that quality and size were worth.  The GIA monograph, as I understand it, is a book that was made -- I don't know if was made by the gemological institute or for them, but I saw a copy of this book, and they had told me that it traveled with the diamond.

And it was a hardbound book, and there was a big medallion or something that went with it.  And I actually had seen that in April when I went out there to look at the diamond.  But I hadn't seen it at this time, and I didn't know what it was at this time.

Q   And then it says, "Hi to Carol."  Is Carol your -- that's referring to your wife?

A   My wife Carol, yes.

Q   And it's signed by Lindy, correct?

A   Pardon?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 102 of 220
212-267-6868          Veritext Legal Solutions          516-608-2400
www.veritext.com

Q    It's signed by Lindy?

A    Yes.

Q    And do you see what -- next to her name there's some letters.  Do you know what those are related to?  The signature block.

A    Well, I'm sure those are her certifications or various credentials in gemology in the appraisal business.

Q    Okay.  We're going to stay with this exhibit, and I'm going to have you flip three pages in.  The numbering that will help you is the Bates numbering.  You're going to look for the bottom right corner.

THE COURT:  Hang on.  Ms. Clayson, before you go from that page, go back to the previous page you were on.  Okay.  At the top it says, "Relieved and will review and get back to you."  Is the -- were you planning on asking about -- is it relieved or received?

THE WITNESS:  It should've been received.  That's a typo.

THE COURT:  Okay.  All right.  Does it make sense to get the other pages to J9 ready now so we can review them all even if they're just in paper?

MS. CLAYSON:  We can review them now.  They weren't a part of what we were going to cover, but we can certainly provide them to the Court right now if that would be preferable.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: The Court would like to see the whole of J9 all at once. Mr. Foley, do you have a problem with that?

MR. FOLEY: No objection, and it'll be a quick review.

THE COURT: Say again?

MR. FOLEY: No objection, Your Honor, and it'll be a quick review if they hand me those three pages. Your Honor, for the record, I've reviewed the three pages. They have at the bottom Bates stamps 24, 25, and 26. These are the accurate first three pages to Exhibit J9.

MS. CLAYSON: And Your Honor, the Bates numbering is off because this email was produced multiple times.

THE COURT: Earlier, right.

MS. CLAYSON: So the numbering is a little off, but we don't dispute that these are the same corresponding pages.

THE COURT: All right. Please give a set to Mr. Ritter on the stand and give a set also to Ms. London so that I can see it. Okay. Please continue, Ms. Clayson.

BY MS. CLAYSON:

Q  Okay. So now we're going to look at the part of this exhibit that ends in 198. So it's about four pages in.

A  Okay.

Q  And is -- what is this document?

20-04381-lsg  Doc 327  Filed 04/13/26  Entered 04/13/26 16:25:11  Page 104 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Well, it looks like it's an appraisal with a $30 million insurance replacement value and a picture of the ring on the finger of somebody.  And I think Lindy might've told me that was a picture of her wearing that ring, but I don't recall 100 percent.  But I know she had seen the diamond.  She told me she'd seen the diamond, had it on her finger, and it was a remarkable gemstone.

Q    So after this email, did you talk to Lindy about this appraisal?

A    I called her.  Well, I had said I'll get -- I'll review and get back to you.  And I called and I left a message, and I said I'm just calling to confirm that you agree the value is in the stone.  If we can buy it for this, it should be easily sold for 16 to 20 million.  I left that phone message.

Q    Did you ever speak to her about it?

A    Pardon?

Q    Did you ever speak to her after that?

A    She called me back or -- and I believe just left a text message that said simply, "Yes, it is."  That was it.

Q    Okay.

A    And after that, I don't recall if we spoke much or not, you know?  She would be in the background once in a while, "Hi, Tom," when I would call the office if Joe was there, but we didn't speak specifically about this anymore to my

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

knowledge.  I had had the answers I wanted.  She confirmed that.  I trusted Lindy.  I know her family like my own.  They are my own.  They are our family.  And...

Q    How important was it for you to hear about the value from Lindy?

A    Pardon?

Q    How important was it to you to hear about the value from Lindy?

A    Oh, very much so.  You know, I didn't know Joe very well.  And I knew Lindy just through the association of the family and that.  It -- just whether it'd be transference, but I trusted her simply because of the family history and the family familiarity.  And I knew she had the credentials to really verify one way or the other is this going to work or not work.  And she basically confirmed that, and that was good enough for me.

I was -- this whole deal kind of -- was out of context from anything I did.  And being that it was a family situation, my guard was down.  I wasn't looking like I normally would on an investment.  I mean, this was something that was involving family members, and you just approach it differently.  You're not as suspect of issues and my guard was down, and that was that.  I didn't look much further than that.

Q    So --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  Listen, I have a couple of clarifying questions.  Mr. Ritter said he called to confirm the value of the stone and left a voicemail?  Is --

THE WITNESS:  I got Lindy's voicemail.

THE COURT:  And so you left her substantive voicemail --

THE WITNESS:  I did.

THE COURT:  -- asking her to confirm the value of the stone, correct?

THE WITNESS:  Yes.

THE COURT:  And then Ms. Adducci texted back --

THE WITNESS:  She either texted or called and basically confirmed it.  Just a very short verbal confirmation.

THE COURT:  Okay.

THE WITNESS:  And that was that.  I had tried --

THE COURT:  The confirmation was --

THE WITNESS:  I tried calling her after that and just wasn't getting through.

THE COURT:  But the confirmation was as to --

THE WITNESS:  Oh, it was affirmative.

THE COURT:  As to what?  Affirmative as to --

THE WITNESS:  The value and the deal, yeah.

THE COURT:  Okay.  When you say "the deal", what does that mean?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE WITNESS:  Well, that we can buy the stone for 12, 12 and a half million and sell it for 16 to $20 million.

THE COURT:  Okay.

BY MS. CLAYSON:

Q    So what steps did you take after you confirmed the value with respect to The Yellow Rose?

A    Say again, please?

Q    What steps did you take after you confirmed the value of The Yellow Rose?  Did you go forward with the transaction?

A    Well, then Joe kind of -- Joe DuMouchelle stepped in and we talked a little more.  We exchanged some more emails. I know we had emails where it appeared that setting up the escrow wasn't going to work.

Q    Well, we'll get to that, but just --

A    Okay.

Q    -- if you can tell me, did you write up an agreement or something?

A    Well, I wrote up a sales agreement for Joe and Lindy, or for Joe I guess initially, and sent that out.

Q    We'll look at Exhibit J10.  So you wrote up an agreement?  Is that right?

A    Between Joe and I, yes.  Joe had a format that I didn't like.  He kind of just read to me and I took kind of the high points he liked and redrafted it into this.  I think he

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 108 of 220
Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

got back to me on a couple of things that we changed, and then this was the final iteration. And I think the last thing he sent was an email. When he sent this back, it was attached to an email saying something like I made one final change on this, and that was it. The address.

Q    Okay.  So in this agreement --

A    I beg your pardon?

Q    I didn't say anything.  If you can go down to the fifth paragraph where it starts, "With your assistance."

A    Do you want me to read that paragraph?

Q    If you'd like, I could read it to you if you?d prefer.

A    I can read it.

Q    Okay.  Go ahead and read that out loud.

A    What?

Q    Go ahead then.

A    "With your assistance, I, Thomas G. Ritter, intend to purchase The Yellow Rose Diamond, the diamond, for $12 million, the funds, then resell the diamond as soon as possible.  You, Joseph DuMouchelle, have estimated a resale price in the range of 16 to $20 million."

Q    Okay.

A    Do you want me to continue?

Q    Well, go to the next paragraph.  If you can read the next paragraph.

A    "I will establish an escrow account at JP Morgan, the

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 109 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

fees for which shall be split equally between seller and buyer.  I will wire the funds from my bank into this account and, subject to the terms of the escrow agreement between the parties being met, the funds will be released to the seller upon receipt of the diamond by you on my behalf."

Q    Okay.  I'm going to stop you there.  Did you ever set up an escrow account at JP Morgan Chase?

A    We didn't.

Q    Why not?

A    I don't really recall why we didn't.  It just didn't seem that it was going to work well to do it that way physically.  In your mind, it looked like a great way to go, but Joe was explaining to me that he would have to have access to the diamond.  And then we had communications that I communicated to him.  I wanted this money to go directly to the seller, and we have communications substantiating that.  And he said no problem, we'll do that.  And --

Q    Okay.

A    -- that's kind of how that came about.

Q    And then I'll direct you to the last paragraph on this page if you can read that for us.

A    "You, your agents, or assigns, or your company will then go to work on reselling the diamond for the best price possible above the purchase price.  It is my understanding that you are working through the agent of the seller to

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

purchase the diamond on my behalf, if there are any finder's fees or commissions paid to you, your agents, assigns, or your company, renumeration shall be considered part of the profit picture of this transaction and be declared by you to -- by you immediately as being considered or being paid."

Q    Okay.  And if you can read the -- not the next paragraph, but the subsequent paragraph.  "As you might imagine..."

A    "As you might imagine, not doing this every day leaves me a bit out of my comfort zone.  So I will have to rely heavily on your guidance and advice.  You have indicated you have a couple of prospects lined up for a potential quick resale and hopefully that will work out as planned.

"If not, you will continue to try to market -- to try and market the diamond on my behalf until such time as I determine it does not appear a profitable sale is likely, and that determination shall be my decision solely and not be questioned by you in any manner.  At that point, I will be free to try any other avenues available for me for the sale of the diamond and our association and terms of this agreement shall be deemed terminated."

Q    Okay.  And then the next paragraph you walk through a -- some sort of split of the profits.  Help me understand that.

A    Well, again, I was just using his projected profit

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

margin.  If we could get the four million, there'd be a million for them, three million for me.  I thought that was fair putting up the 12 million, and he agreed.  And it just went on down from there.  If the price got less and less, the split would be greater on my part and lesser on theirs.

Q    And what was the purpose of this profit split?

A    Well, again, hoping to get a profit from me, but also getting a profit to them so they could take care of the note that was outstanding.

Q    And then did you sign this agreement?

A    I did.

Q    Would you have entered into this agreement if you hadn't had Lindy's blessing?

A    You know, without Lindy's blessing and involvement, I wouldn't have touched this agreement because I don't know Joe that well.  I do know Lindy that well.  Or felt I did.

Q    If we can turn to Exhibit J11.  Mr. Ritter, are you familiar with this document?

A    I am.

Q    What is this?

A    This was an email I sent to Joe and Lindy on January 31st just with some thoughts I had about including Lindy in writing in the agreement because she was a large part of my decision to do it.  I didn't know the financial arrangements between her and Joe at the time.  I didn't know if she was

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

part of the company or not. And I was trying to look out for her best interests, and I guess make sure she was compensated for the part she played.

Q   Okay.  Can --

A   Read it?  I --

Q   Yes, please do.

A   "Considering adding Lindy's name to the agreement but didn't know if you guys wanted it that way since in the past you chose not to."  And that's reference to some of the other notes that were signed.  "If you wish to have me correct that, please let me know."

    And this I directed pretty much to Lindy, "It was not my intent to leave you out or lessen your part in this as I know your skill and expertise in the gemology field as at the top."  And that was really just paraphrasing my general feelings of the family connection and the understanding with the background she brings to the agreement, my trust in the Hegge family.  And I guess my association with her started as Lindy Hegge, and that's kind of where that originated from.

Q   Okay.  And this is addressed to both joe@josephdumouchelle.com and Melinda Adducci at lindy@josephdumouchelle.com?

A   Yes.

Q   Okay.  What -- did anything come of this email about

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

adding Lindy?

A    Well, somebody -- well, I'm going to presume Lindy got back to me because if I'd have heard just from Joe, I'd have asked to hear it from Lindy (indiscernible) I had sent it. So, at the time, I got a negative response.

          THE COURT:  Excuse me.  A clarifying question. From whom was the negative response?

BY MS. CLAYSON:

Q    Who told you that she would not be added?

A    Like I said, I don't recall if it was Joe or Lindy. I'm going to presume it was Lindy because if Joe had told me no, I would've asked to speak to Lindy to confirm it. Because this was directed mainly to Lindy.  So I'm presuming at some point she got back to me as well.

Q    So after you signed this agreement, did you initiate a transaction for the $12 million?

A    Yes.

Q    So how did that come about?  You agreed to go ahead with $12 million.  How did that start?

A    Well, I got an email from Joe with a wiring instructions purported to be from the representative of the seller of this diamond, and I proceeded to try and wire $12 million to that account.

Q    Okay.  So we'll look at that.  Can you turn to Exhibit J12?  Mr. Ritter, are you familiar with this document?

A    Yes.

Q    And this is an email from Joe DuMouchelle to you.  Is that correct?

A    Yes.

Q    And it's dated for January 31, 2019, correct?

A    Pardon?

Q    It's dated for January 31st --

A    Yes.

Q    Okay.  And what did you believe this to be?

A    I believe this to be the bank account of the representative of the seller of The Yellow Rose diamond.

Q    Did you wire your funds to the MB Financial Bank in the name of Highland Wealth Management?

A    What was that?

Q    Did you, after this, attempt to wire your $12 million to this bank account?

A    I did.

Q    What happened?

A    It was returned.  They couldn't accept it because the amount was too large.

Q    Was that a red flag for you?

A    It really wasn't.  In my business, we deal with large sums of money.  I'd had this happen to me on more than one occasion, both with people wiring money in to us, where my bank couldn't accept it and where I would wire money out and

212-267-6868                              Veritext Legal Solutions                    516-608-2400
www.veritext.com

their bank couldn't accept it.  There are some kind of banking regulations.  With certain sized banks where, if the deposit is over a certain amount, it raises their base cash or funds on hand over a certain amount, they can't take the money.

Q    Okay.  And so after that, did you try to wire your money again?

A    He sent me another account --

Q    Okay.

A    -- to do that, and I did.

Q    Let's look at Joint Exhibit 13.

A    Well, 13 -- oh.  Okay.

Q    Are you -- okay.  You're there?

A    I'm at 13.  This is another email on February 1 from Joseph with a forward from Richard Drucker, whom he indicated was the representative of the seller of the diamond with the wire transfer information.

Q    And this was at FineMark Bank and Trust?

A    Yes.

Q    And did you attempt to wire your $12 million to FineMark Bank and Trust?

A    I did.

Q    What happened?

A    Same thing.

Q    What's that?  It bounced back?

Veritext Legal Solutions
212-267-6868                         www.veritext.com                        516-608-2400

A    Money was returned or not accepted.

Q    Was that a red flag for you?

A    No.

Q    Why not?

A    Same reason.

Q    What's that?

A    The deposit was too large for the bank to accept based on their regulations.

Q    And so did you try to wire your $12 million again?

A    I did.

Q    Okay.  So we'll look at Joint Exhibit 14.

MS. CLAYSON:  Well, you know what?  I'm sorry, Your Honor.  It should be Joint Exhibit 15.

MR. FOLEY:  That's 14, right?

MS. CLAYSON:  No.

MR. FOLEY:  Oh.

THE WITNESS:  Where are we at?

BY MS. CLAYSON:

Q    This is Joint Exhibit 15.

A    Exhibit 15?

Q    Yes.

A    I think that's incorrect because that was the earlier exhibit with Highland Wealth Management.

Q    Yeah, we looked at Highland Wealth Management.  Then we looked at FineMark Bank, and now this one should be dated --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A      This was where the first --

Q      This is with the -- this one's dated for February 6th, this email.

A      Okay.  All right.  I'm there.

THE COURT:  (Indiscernible) with a duplicate between --

THE WITNESS:  Sorry.

THE COURT:  -- (indiscernible) and J --

MS. CLAYSON:  Yes.

THE COURT:  This -- it's --

MS. CLAYSON:  I know.

THE COURT:  For all the time spent on this, this is tedious and frustrating to the Court.

MS. CLAYSON:  Understood.

THE COURT:  Why so many duplicates?

MS. CLAYSON:  Your Honor, we tried our best to pull them out.  I don't know why there are still some duplicates in there, and I apologize.

THE COURT:  So J14 is a duplicate of J12?

MS. CLAYSON:  Yes.

THE COURT:  Mr. Foley, do you agree?

MR. FOLEY:  J14 is a duplicate, Your Honor, of which one?

THE COURT:  J12.  That neither of you caught.

MR. FOLEY:  Yes, Your Honor.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY MS. CLAYSON:

Q    So we're at J15?

A    What was that?

Q    So are you looking at J15 now and the --

A    I'm looking at -- yes.

Q    Okay.  And this is --

A    15.

Q    This is dated for February 6th and it's from Joe DuMouchelle.  Is that correct?

A    Yes.

Q    Okay.  And what's in this email?

A    Pretty much the same thing.  Just a different bank, another forward from an email of Richard Drucker, again purported to be the representative of the seller of the stone.

Q    And this is a Bank of America account?

A    It is.

Q    And it ends in 0585?

A    That's what it looks like, yep.

Q    Okay.  And did you wire your $12 million to this Bank of America account?

A    I did.

Q    And what happened after that?

A    I didn't hear anything for quite a while.  I don't know.  The wire went through.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  Did you receive any records back from Joe or Lindy regarding the purchase of The Yellow Rose?

A    It got a receipt back at some point.

Q    Okay.  So --

A    That basically indicated they bought the stone.

Q    Okay.  So we're going to move to Joint Exhibit 17.

THE COURT:  Okay.  Hang on one second.

MS. CLAYSON:  Sure.

THE WITNESS:  J17.  This is a receipt from Joseph DuMouchelle International Auctioneers.

BY MS. CLAYSON:

Q    Okay.  And the amount is for $12 million?

A    $12 million, yes.

Q    And this is for The Yellow Rose.

A    Yes.

Q    So this -- what was this -- what did this indicate to you?

A    That the purchase had been completed for The Yellow Rose with the GIA monograph book.

Q    And after this, what did you do next?  Did you hear anything from Lindy or Joe?

A    Well, not immediately I don't think.  I don't know.  I knew they had to get after selling it.

Q    Did you get any report back on the progress on them selling?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    I may have gotten back some intermittent reports.  I know I would call them on occasion, call Joe at the office to see how the sale was going because I knew he was handling the resale of the gemstone.  And so I'd call, how's that going, and oh, this and that.  Oh, we can't get ahold of him, he's out of town.

He was talking about initially selling this to I think it was Floyd Mayweather, a boxer of some kind, that collected gems.  He said he'd sold them before, but as time went on, he indicated that he wasn't going to be buying this.  He was not interested at that point in time or something.  I don't know.  But he says we have other prospects we're showing it to and, you know, just putting me off, I guess.

Q    At some point --

THE COURT:  Ms. Clayson, I need to interrupt --

MS. CLAYSON:  Okay.

THE COURT:  -- for a clarifying question about J17.

MS. CLAYSON:  Yes.

THE COURT:  The wording said, "Receipt for the purchase of one natural fancy vivid yellow emerald cut diamond," and then it goes on.

MS. CLAYSON:  Yes.

THE COURT:  The witness, I thought, said that this

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

was confirmation that the purchase had occurred and the Court is confused. Because this says receipt for the purchase. What did the witness understand? And is it different from what's on this page?

BY MS. CLAYSON:

Q    What did you understand -- if we're looking at J17 again, when you received this receipt, what was your understanding that this represented?

A    The diamond had been purchased.

Q    For you?

A    Well, of course. Yeah. That's why they sent it to me and they said the remaining balance is zero. I don't owe them anymore money. Paid in full.

MS. CLAYSON: Your Honor, do you need more clarification?

THE COURT: No. The first line says, "Receipt for the purchase." Is that the same as confirmation that the purchase has occurred?

BY MS. CLAYSON:

Q    Mr. Ritter, what was your understanding? Do you believe that the purchase --

A    My understanding is the diamond was purchased. The diamond is accompanied by a GIA monograph book.

Q    So in your mind, this meant that the diamond had been purchased.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    And it was in his possession, and it was confirmed by phone conversations as well.

THE COURT:  What phone conversation then?

BY MS. CLAYSON:

Q    Who was the phone conversation with that confirmed the purchase?

A    What was that?

Q    Who confirmed that the purchase had taken place?

A    Well, I'm sure we had more than one.  Basically, he said the diamond was at the Brink's depository.

Q    Joe told you that.

A    Yeah.

Q    Okay.

A    That it had been purchased, was being transferred from the Brink's depository in maybe Texas to the Brink's depository in Michigan.

Q    At some point, did you -- were you informed that a sale of the -- a resale of The Yellow Rose would take place?

A    I was.

Q    Do you recall when that was, or do you need a document to refresh your memory?

A    I'm thinking it was probably early April.

Q    Okay.  Who did you hear from that The Yellow Rose -- that there would be a sale of The Yellow Rose?

A    Who contacted me and notified me?  Joseph, I'm sure.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Q   So we'll look at Joint Exhibit 21.  Are you familiar with this document?

A   Yes.

Q   And this is dated for April 12, 2019?

A   Yes.

Q   And it's signed a Sam Hagen.  Is that correct?

A   Yes.

Q   And what did you believe this document to represent?

A   That they bought this diamond from Joe on my behalf for $16,500,000.

Q   Did you get any money following the execution of this document?

A   No.  I did not.  Not a penny.

Q   In April of 2019, what did you do to follow up about the sale?

A   Well, I talked to him numerous times.  I said, where's the money?  He had emailed that out to him or wire transfer it.  Oh, we're having trouble getting it.  This and that and every excuse in the world.

Q   Did you ever try to see The Yellow Rose?

A   I did on, I believe, April 22nd.  I flew out there.

Q   Here to Detroit?

A   I flew here to Detroit.  And I was picked up at the airport by Joe, taken to their office downtown, and said I'd like to see this.  And I also said I'd like to see Lindy,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

and he said, well, she's out on an appraisal, can't see you. But -- because I was at that point already getting more than a little bit suspicious about this whole thing. And -- but anyway, so he took me to the office, and he said, well, it's over at the Brink's depository. So I said, well, call them. Let's head on over. And he left the -- his office had a bunch of little spaces in it, and I was in one of them. And he went out of the room and he said, I'll go call them. And he said, I'll go to my office. So he came back and he said, well, my contact there is out of town.

Q    At Brink's?

A    What was that?

Q    His contact at Brink's?

A    His contact at the Brink's depository was out of town and they would not be able to show him that diamond that day. And I said that's ridiculous. And he said, no, they're -- you have a real, kind of like a client relationship. And I was pretty suspicious of that, but what do you say?

So he brought out the book and medallion associated with this diamond. And I don't know if I read something that said there is this book and this medallion and there's -- I travels with the diamond and there is only one. So he brought that out as kind of proof that they had possession of the diamond. This was here, but the diamond is at the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

depository. Well, I had a plane to catch that afternoon. I got in early and I had to get back to the airport. So we talked and piddled around, but -- so I think I took a picture or two of the book or whatever. I don't remember exactly, but you can't get blood out of a turnip, so I was at a stalemate. So he took me back to the airport.

At the airport, I actually got my phone out and called the Brink's depository here in Michigan and got them on the line. And I asked him. I said, do you have a parcel or a -- or something on deposit for a Joseph DuMouchelle or Thomas Ritter. And they said, well, let me look, and they went and looked and they said no. And I said you're sure of that. And said, yeah. I'm very confident we don't have anything under those two names.

I said, DuMouchelle Jewelers, any of that? No, nothing with either of those last names. So I got on my plane, flew home, and I'm pretty sure I talked to Joe the next day saying that they don't show they have anything, and he gave me some excuse, well, it's there. I don't know what it was. But I kind of at that point I knew something was not right.

And then he started saying, well, we'll wire you the two million to -- we'll wire the -- they sent us an initial deposit of two million and we will wire that --

Q    Is that --

A    -- to you today. So he said we did that. And sent me

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 126 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

an email, and I sent an email back the next day.  Well, it

did not come.  You didn't wire the two million.

Q    Mr. Ritter, here.  Can I ask you some questions to

touch on that?  So you're saying that Mr. DuMouchelle told

you the buyer was going to wire $2 million to you?

A    No, Joe was going to wire two million that the buyer

paid him even though the buyer was supposed to pay me

directly.

Q    Okay.

A    I just don't recall exactly, but --

Q    Did you try to follow up at all with Lindy?

A    Oh, I called many times, emailed many times.  I called

Lindy many times, never got an answer.  Never

Q    Did you ever hear from Lindy after January 25th about

how the sale was going, anything about the transaction?

A    No.

Q    I'd like to turn you --

A    I would leave messages, you know, expressing my anxiety

over this thing.

Q    You left messages with Lindy?

A    On her phone specifically.  Never got a call back.

Q    Okay.  And so you mention you'd sent some follow-up

emails, so we'll take a look at one of those follow-up

emails.  If you could turn to Exhibit J45.  Is this one of

the emails you sent on May 13, 2019?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    That appears to be that.

Q    And you sent this to joe@josephdumouchelle.com.  And did you also send it to Melinda Adducci at lindy@josephdumouchelle.com?

A    Yes.

Q    And who's Rosey Gustefski (ph)?  Who's Rosie?

A    I did.

Q    Who is Rosie?

A    Oh, Rosie.  I'm sorry.  I don't hear worth a hoot, but anyway Rosie is my -- at that time the secretary.  Now she's my executive assistant.

Q    Okay.  And you wrote this email and sent it?

A    I did.

Q    And did you get any kind of email bounce back or any indication that this didn't go through?

A    This is in May.  At this point in time, communication was pretty sparse.  I don't believe I got much of a response at all, if any.

Q    Okay.  So you wrote to Joe and Lindy on this, and you said -- would you like to read it, or would you like me to?

A    I'll go ahead.

Q    Okay.

A    I can read it.

Q    Okay.

A    "Last week on more than one occasion, you stated that

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 128 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

you had wired the initial $2 million to me.  And since it has not shown up in my bank, obviously you did not do that and are being quite honest with me."  I suppose I want -- or was going to say, "are not being quite honest" or "dishonest".  But when I write these, I was pretty emotional because I knew I'd been had.

"I put a lot of faith and trust in you, in you and Lindy, in proceeding with this deal from the onset, it sounded like a fun idea and an opportunity for all of us to make some money.

"At this point, I don't know what to think.  I have always considered you and Lindy to be part of our family through the common marriage.  Your actions do not reciprocate that.  Your refusal to let me know what is really going on here leaves me at a loss.

"This is a huge investment for me, and I'm really struggling to understand what exactly your intent is here. I would appreciate a phone call from you to inform me of your intentions and bring me up to date on what I can expect from you as far as following through with our agreement and what the current and true status is."

Q    After you sent this email, did Lindy call you back?

A    No.

Q    Did Joe call you back?

A    I don't think so, but I don't remember.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 129 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    And you talk about that you spoke with them.  Do you recall if Lindy was in a phone conversation with you?

A    I don't know.  I'm sure a lot of them she's in the office.  Before when I'd call, she'd be in the background and pop in with a, "Hi, Tom," when I was talking to Joe on something, but -- so I don't know if she was there or not.

Q    Okay.

THE COURT:  I have a clarifying question.  He said, "before", meaning before he wire-transferred the 12 million she would pop and say hi, or at what point in time?

THE WITNESS:  Well, this could've been in the years leading up to this transaction, but -- and it could've been early on, you know, before this.  But --

BY MS. CLAYSON:

Q    Before this email or before the $12 million was wired?

A    Before the $12 million was wired.

Q    And I'd like to turn you to Exhibit J46.  And is this an email that you wrote?

A    It is.

Q    You sent it to joe@josephdumouchelle.com as well as lindy@josephdumouchelle.com?

A    I did.

Q    And this is dated for June 10, 2019.  Is that right?

A    Yes.

Q    Okay.  And can you read this email for the Court?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    "Your lack of response to my repeated inquiries into the status of this deal and requests for payment of proceeds from the sale of the caption leaves me more than a little concerned about what is going on and totally mystified that you would choose to put me in this stressful situation.

"Pursuant to our discussions and agreement, this was never intended to go on this long.  I have other obligations that I need these funds for.  Please make arrangements to get me paid.  I have a great deal of money involved here with you.  I would appreciate the courtesy of a response."

Q    Was there any indication that this email bounced back or didn't go through?

A    No, it went through.

Q    Did you receive a phone call from Lindy after this email?

A    No.  I don't think I got a call from either of them.

Q    I'm going to turn you to a Joint Exhibit 47.  And this is an email dated for June 21, 2019.  And did you write this email?

A    I did.

Q    Did you send it?

A    I did send it.

Q    You sent it to joe@josephdumouchelle.com and lindy@josephdumouchelle.com.  Is that right?

A    Yes.

Q   And you again write to Joe and Lindy, and please read us this email.

A   Pardon?

Q   Please read us this email.

A   Okay.  "Joe and Lindy, for the life of me, I can't understand what you are doing and why.  I have a major part of my life savings tied up in this deal.  I never gave a thought that you would not follow through with our agreement given the family and personal history we have.

"You must be aware of the emotional stress and strain this is causing me and my family.  Please reconsider your actions and transfer these funds back to my account as you have promised to do so many times.  Please let me know what's going on and why you have chosen not to wire these funds to me.  Sincerely, Tom."

And you can see just from the wording this is directed more so at Lindy than at Joe --

Q   You said that --

A   -- simply because she is my comfort zone and connection in this whole deal.

Q   And you said, "I never gave a thought that you would not follow through."  Why did you say that?

A   Well, again, I mean, you're dealing with someone that's part of your family, literally an extension of your family.  And I just -- even when I considering this deal it never

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

entered into me.  Just our family history.  Her dad Reuben, hard-working guy.  Her brother Carroll, hard-working guy. Her brother Kenny, same thing.  Hard-working and honest as the day is long.  Every one of them.  Unbelievable.  I don't know.

THE COURT:  I have a clarifying question.

MS. CLAYSON:  Sure.

THE COURT:  It says in the second paragraph -- third paragraph, "Please reconsider your actions and transfer these funds back to my account as you have," here's the good part, "promised to do so many times."  When? Because the Court previously heard the calls weren't getting returned.  So when were those alleged promises made?

THE WITNESS:  I had talked to Joe on the phone numerous times about this, just even the $2 million wire. And never came, never came.  And I would call him back.  You know, it's not just emails.  There were phone calls exchanged.  And more than one.  And it just -- I don't know at what point they -- neither of them would answer.

Because I would call Lindy directly.  I would call Joe on whatever phone numbers I had for him.  And pretty soon neither of them were getting back to me.  Well, at that point, I knew that something -- well, I was had, and that was the end of it.  So...

THE COURT:  Could we have some clarification on

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 133 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

when the defendant stopped returning the phone calls?

MS. CLAYSON: Sure.

BY MS. CLAYSON:

Q    Do you recall when you stopped hearing back from Lindy specifically?

A    I didn't really hear back from Lindy almost from the date that I wired the money.  She would not respond either to the emails or the phone calls and phone messages that I left.

Q    So she never followed up to find out how the transaction went or --

A    No contact that I'm aware of.

Q    She never followed up to tell you that your money was on its way?

A    She didn't, no.  She knew it wasn't coming.  She spent it.

Q    And then I'd like you to look at Joint Exhibit 47. Nope, I'm sorry.  Joint Exhibit 48.  We already looked at 47.  Okay.  This is an email dated for July 2, 2019.  Do you see that?

A    Yep.

Q    And did you write this email?

A    I'm sure I did.

Q    And you sent it to joe@josephdumouchelle.com and lindy@josephdumouchelle.com.  Is that right?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 134 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Yes.

Q    And if you can read this email for the Court.

A    I can.  "Joe and Lindy, after my telephone discussion with you on Thursday last week where you again promised payment would be made in full to my account by today, Tuesday, I'm again thoroughly disappointed and disgusted that no payment has been made and you, again, have just plain lied to me.

"I can't believe that you two continue with this.  At some point, your actions cease to be a civil matter and cross over to a criminal act.  I honestly believe that point has come.  I can't believe you would risk your reputations and good name in your industry and that of your family by doing what you are.

"I've worked tirelessly in my industry to make a decent living for my family and provide funds for a nice retirement, and you are essentially destroying that dream.  You must understand that.  I implore you to please do what is right and pay me what you owe me so I can get on with my life.  Please call me and get this settled.  Thank you, Tom."

Q    Okay.  And the telephone discussion, do you recall who was on that telephone call?

A    I'm sure it was Joe.

Q    You don't --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    But I again included Lindy on the email because I know she got them and she was my contact point, comfort point to no avail.

Q    Did Lindy call or contact you after this email?

A    Nope.

Q    Did you have any indication that this email didn't get through and get sent?

A    No.

Q    Did you ever get repayment of your $12 million after that email?

A    No.

Q    What steps did you take after this?  Did you file a lawsuit?

A    Well, I did file a lawsuit.  I'm not quite -- I don't quite remember what date --

Q    Sir --

A    -- but I also contacted the FBI.

Q    Okay.  So do you recall -- did you get a judgment on your lawsuit in --

A    I did get a judgment.  Nobody came to defend it.

Q    Well, we'll take a look at that really quickly.

THE COURT:  I didn't hear the last part of the witness' response.

THE WITNESS:  Oh.  I did --

THE COURT:  File a lawsuit.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 136 of 220
212-267-6868                Veritext Legal Solutions              516-608-2400
www.veritext.com

THE WITNESS: -- start a lawsuit. I think it was a litigation just for a judgment for the $12 million and for the outstanding note. And no one came to defend it. Not Joe, not Lindy, or any representative. So by default I was granted the judgment.

THE COURT: Okay.

BY MS. CLAYSON:

Q    Okay. And if we can take a look at Joint Exhibit 6.

A    Okay. I'm on Joint -- J6.

Q    Okay. Let's give the Court some time because it's a lot to flip through. I apologize. Okay. And this -- is this the judgment in North Dakota that you obtained against Joseph DuMouchelle, Melinda Adducci, and Joseph DuMouchelle Fine and Estate Jewelers, LLC?

A    Appears to be so. Yes. Oh, here's the date. September, yeah.

Q    All right. And you mentioned you also went to the FBI. Can you tell us a little bit about what else you did to seek recourse?

A    I actually went to the FBI fairly early on, I think shortly after I flew out here in April. I called the -- I think I first called the Detroit Police Department to make a complaint and explained to them what was going on, and I was hoping maybe they could get to the bottom of it. And the guy listened to me, and he said, you know, I don't think

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 137 of 220
Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

this is our jurisdiction. You need to call the FBI. And I said, oh really? And I said, do you have a number for the FBI? And he says, well, I can get you one, and he did. And I called that number, and I don't recall right offhand now who I spoke to. But I told them -- I pretty much outlined what had happened, and he said, okay, I've got this down. I will have somebody contact you.

And that would've been probably very late April or early May. And in May, I was back in Arizona, and we were getting ready to leave, go back north for the summer. We usually headed up in June, so I think in May sometime I just got tired of waiting because the FBI never called me back. I couldn't believe it. I mean, you call the FBI on a $12 million issue, you'd think you'd hear back, and nothing.

And it was driving me crazy. So I looked up if they had a field office for the FBI in Arizona, and I found one at the north end of the Phoenix valley. We live in the south end. So I gathered up all my papers one day relative to this case, it must have been stacked 10 inches high and drove up to their facility. And I got there, and it's a big building right in the middle of a -- like a fortress, a will around it with a gatehouse.

And there's a parking area. I parked my car, and I went over to the gatehouse, and there was a guy in there, and kind of explained to him what I wanted. And he said,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

well, you need an appointment.  You can't just walk in here.
And I said, well, listen, I've been waiting for a callback
from these guys for over a month and I haven't gotten one
and I need to see somebody today because I'm leaving.  And I
said I have all my things with me.  Call up somebody and let
them know I'm here and I need to talk to somebody.

Well, he was kind enough to do that, and they
apparently said yes, send him up.  So, anyway, he made me go
back to my car and get everything I wanted.  I had to leave
my watch, everything.  The only thing -- he scanned
everything I wanted to take with me, all the paperwork had
to go through a scanner like at the airport.  My phone,
wristwatch, any electronics, I don't even think he let me
take a pen or pencil with me.  I had to leave it all with
him.

And he sent me up this walkway maybe 100 meters up to
the building.  And I went inside, and it's just a huge room
with a little -- some seating in the middle and then glassed
enclosures around it.  And he said somebody will meet you.
Well, there wasn't anybody in there, so I just kind of stood
around and waited.  I figured they could see I was there.
And pretty soon somebody did come out.

And he introduced himself as an agent, and we talked.
I explained why I was there and what it was about.  And he
said, okay, go over to that window over there and sit down

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 139 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

and I'll be over there to meet with you.  And so he went over there, and he pushed out a big drawer like they have at the bank drive-throughs.  And he said put your paperwork in there, and I did.  And he took that, and I -- and then we went through the whole story.

And he said, okay, let me make copies of this.  And then somebody will contact you.  That -- and I said, can I get your name?  No.  Wouldn't give me any names.  Wouldn't give me a contact name.  So there I sit again.  So I did all that, and that was it.  I went back to my car and picked up my stuff and drove home.  And I didn't hear anything from those guys again for months.  I couldn't believe it.

And then I finally heard that maybe Joe had been arrested or I don't even know how I found out what was going on.  I may have finally gotten a call from somebody at the FBI, but it was months after that.  And things started falling into place with this prosecution, but...

Q   Have you heard from Lindy at any time since that conversation with the FBI?

A   Had I what?

Q   Heard from Lindy since that conversation at the FBI?

A   No.  No, no, none of them.

Q   Do you recall if you saw Lindy at any of Joe's --

A   I think after June or July or whenever I never heard from either of those two again.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    And we're talking 2019?  2019.  Mr. Ritter, I'm going to have you just look at an exhibit that was brought up during Mr. Cataldo's opening statements.  This is Exhibit J3.  Take your time.  So, Mr. Ritter, looking at J3, these were apparently all of the transactions that were made out of the Bank of America account with your $12 million.  Do you see that?

A    I see it.

Q    Did you approve of any of these transactions?

A    Obviously not.  I didn't even know about them.

Q    I'm just going to skip back a little bit.  I just want to spend a little bit more time understanding your conversation with Ms. Adducci, with Lindy when she sent you the appraisal on January 25, 2019.  Can you share anything else you recall about your conversations with her at that time?

        MR. FOLEY:  Your Honor, objection just as to the form of the question.  Counsel asked when my client sent an appraisal to him on January 25th.  That's not what the record shows.  There was no appraisal sent to that email.

BY MS. CLAYSON:

Q    So you received an email on January 25th from Lindy with documents regarding --

        THE COURT:  Ms. --

        MS. CLAYSON:  Mm-hmm.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

THE COURT: Are you -- do you want the Court to rule on the objection, or do we --

MS. CLAYSON: Well, I'm -- I apologize.

THE COURT: -- are we going to have argument on the objection? Tell me -- well, Mr. Foley, Ms. Clayson, tell me what you're -- you want to rephrase the question?

MS. CLAYSON: I can rephrase the question. I apologize. I should've let the Court rule, but yes. No, I'll rephrase it.

THE COURT: Okay.

MS. CLAYSON: Okay.

BY MS. CLAYSON:

Q    So, you recall the January 25th email that Lindy sent to you with some attachments, correct?

A    I do.

Q    Okay. Can you share a little bit more about your conversations before and after that email was sent?

THE COURT: No, one second. Is that the data package email?

MR. FOLEY: Yes, Your Honor.

THE COURT: That the parties have stipulated --

MS. CLAYSON: Yes.

MR. FOLEY: Yes.

THE COURT: -- to. Okay. So we're talking about the same -- the data package email. Okay.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON:  That's correct.

BY MS. CLAYSON:

Q    So, can you just tell us a little bit more about those conversations you had with Ms. Adducci before and after that January 25th email?

A    Yeah.  Well, again, when I was talking to Lindy, I was looking for, you know, verification that the deal was structured so that it would realize the profit that Joe had indicated it would.  And the reason I wanted to talk to Lindy was, again, my family connection.  I trusted her more than I -- I didn't really know Joe that well.  I'd met him, you know, on a few occasions, and we'd done some business long distance.  But my comfort level was with her, and I was relying on her to kind of make me believe that that was okay.

This -- the value was in this stone.  If we bought it for 12 million or 12.5 or whatever we had agreed on, there's a market that would support a sale at 14 to $16 million.  And I believe that today.  Problem is the deal was never true.  So, with -- you know, you can get all the comfort zone and confirmations you want, but if the deal doesn't go through, you never get anything, and that's exactly what happened.  There was no deal.  To me, I think it was just a big scam to pay their bills.

Q    Thank you.

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

A     You know, I believed her at the time.  She said yeah.
And she had the credentials to back it up.  Why would I
doubt that?

Q     How important was it for you to hear from Lindy?

A     I relied on her expertise and on my comfort with that
family connection.  Period.

Q     Okay.  Mr. Ritter, we're here today -- why are we here
for this adversary proceeding today?

A     Well, I guess we're here because Lindy wants her debt
under the judgment, I don't know what the word is, abolished
or not confirmed, and I want it to be non-dischargeable,
that it sticks.

I still believe there's a possibility that they have a
bunch of gemstones socked away somewhere and there might be
some money coming about here.  And I guess we're trying to
prove her involvement here to get a non-dischargeable
judgment so if some money arises down the road, I might have
a chance to recover a small part of what I lost.

Q     How important is this litigation to you?

A     $12 million is a lot of money.  I had to make $24
million to get $12 million.  And I worked hard in my
industry.  Years.  Years and years.  And it wasn't all easy.
This oil industry is ups and downs, and ups and downs.  And
there were lean years.  There were years I had to do -- go
away.  I took a year down in Mississippi that I didn't see

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

my family in 1996 just to pay the bills.

And just because you have money, I guess it makes you a mark, but that money doesn't come easy to people. They have to earn that money. And I didn't start out with money. And I've made a fair living for my family and my kids. Couldn't be prouder of them.

And the relationship I have with the Hegge family is the same way. Her dad was ultimately one of my best friends. I can't tell you the time we would spend just driving around North Dakota. The two of us dreaming about drilling oil wells and making good money on a well. That never came to fruition for Reuben. It did for me.

MR. FOLEY: Your Honor, I'm going to object that the answer is becoming in a narrative and goes beyond the scope of the question asked.

THE COURT: Ms. Clayson, would you like to ask a follow-up question that meets Mr. Foley's objection? The Court's overruling the objection. The Court's find the narratives helpful but would encourage Ms. Clayson to ask a question that connects more directly with the witness' testimony.

THE WITNESS: I'm sorry I'm rambling. I don't know.

THE COURT: Do you want to take a break, Mr. Ritter? This is powerful information, and the Court is

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

happy --

THE WITNESS: No, I'm good. Let's get done.

THE COURT: Okay.

MS. CLAYSON: Your Honor, I don't have any further questions. I think Mr. Ritter just said everything he needed to say for the Court. And that concludes our direct, Your Honor. Thank you.

THE COURT: All right. Well, it's now 10 minutes to 3. We've been going at this for almost two hours, so we're going to take a break to, Ms. London, 3:05, 3:00?

MR. CATALDO: Yes, Judge.

THE COURT: I want to take a 10-minute break until 3:00.

MR. FOLEY: Your Honor, could I ask the Court --

THE COURT: Excuse me?

MR. FOLEY: -- for 15 minutes on that break? I'm --

THE COURT: Excuse me?

MR. FOLEY: May I ask the Court for 15 minutes on that break to 3:05?

THE COURT: Certainly.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Fifteen minutes, 3:05. Okay.

THE CLERK: All rise. Court is in recess.

(Recess)

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 146 of 220
Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

THE CLERK:  All rise.  Court is back in session for the Honorable Lisa S. Gretchko.

THE COURT:  Please be seated.

THE CLERK:  We just took a break.  That's all right, right?

THE COURT:  No need to recall the case.  We just took a short break.  Before we get started again, is there anything we ought to consider regarding the J9 extra pages?

MR. FOLEY:  Your Honor, we were just given an explanation that the three pages will be added to J9, and it will be deemed admitted with those first three pages.  That's what --

THE COURT:  That's what you'll stipulate to, that they'll just be added to the J9.

MR. FOLEY:  That is the --

THE COURT:  You've agreed to the --

MR. FOLEY:  -- front three pages.

THE COURT:  -- three pages.

MR. FOLEY:  Yes.

THE COURT:  They'll get added to the top of J9 and admitted --

MR. FOLEY:  That is part of J9.

THE COURT:  -- as part of J9.  Ms. Clayson, does the plaintiff agree with that?

MS. CLAYSON:  Yes, we agree with that.  Thank you.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  All right.  Then those extra three pages of which the Court has copies will be deemed admitted. Mr. Cataldo, anything from you on that?

MR. CATALDO:  I'm letting Ms. Clayson handle that.

THE COURT:  Okay.

MR. CATALDO:  I'm good.

THE COURT:  Okay.  So, Mr. Ritter, you're still under oath, sir.

THE WITNESS:  Yes.

THE COURT:  All right.  Mr. Foley?

MR. FOLEY:  Thank you, Your Honor.

CROSS-EXAMINATION OF THOMAS RITTER

BY MR. FOLEY:

Q    Mr. Ritter, good afternoon.

A    Once more?

Q    Good afternoon.

A    Good afternoon.

Q    Mr. Ritter, if I told you that my client started dating Joseph DuMouchelle in the early 1990s and was married in 1999, would that comport with your understanding of the timeframe of when you came to meet Joseph DuMouchelle?

A    I really didn't have any understanding of it.  I know that they were probably married at the time of Reuben's passing in 2008, but I didn't see them or hear much about them prior to that.

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 148 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    In fact, prior to 1999, hadn't you met Mr. Joseph DuMouchelle in a hot tub at a New Year's Eve party at your house along with other people?

A    I don't recollect that.

Q    You don't recollect him borrowing your bathing suit?

A    No.

Q    Okay.  When Reuben was still alive, you and Reuben and Joe did several oil investments together before even 1999. Isn't that correct?

A    You'd have to mention which ones exactly because I don't recall any of them, no.

Q    Well, you would've flown out to Montana with Reuben and Joe to actually go see the well that Joe invested in.  Do you remember that?

A    That Joe invested in?

Q    Yes.

A    When we flew out there?  I don't recall that either, no.

Q    Okay.  Mr. Ritter, the person that pitched you the investment into The Yellow Rose Diamond was Joseph DuMouchelle, correct?

A    Correct.

Q    He was the one that first told you there was an opportunity regarding The Yellow Rose?

A    Yes.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    In fact, Joe was the one that told you there was a family in Texas that wanted to sell it.  Isn't that correct?

A    Correct.

Q    Joe was the one that told you there was already a buyer lined up?  Is that correct?

A    I don't recall that, no.

Q    Okay.  Joe told you there could be a substantial profit on the deal?

A    Yes.

Q    Joe was the one who handled the purchase side of the transaction with you, correct?

A    Well, there wasn't a purchase, but he's the one that was going to handle it if there had been.

THE COURT:  Mr. Ritter, I have to ask you to keep up your voice so we can --

THE WITNESS:  Pardon me?

THE COURT:  Please keep up your voice and speak into the microphone.

THE WITNESS:  I'm sorry.  I will do that.

THE COURT:  Thank you.

BY MR. FOLEY:

Q    And Joseph DuMouchelle was the person with whom you entered into a written contract, correct?

A    Yes.

Q    That was a contract drafted on your letterhead?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Yes.

Q    That you drafted after receiving a contract from Joseph that was not to your satisfaction.

A    Yes.  Well, the resulting contract was kind of a compromise of the two.

Q    You drafted it to be a compromise.

A    Yeah.

Q    Okay.

A    With input from Joe.

Q    In fact, the January 31st purchase agreement was signed by you and Joe, not Lindy, correct?

A    Yes.

Q    And before you wired the money, you did not insist that Lindy be added to that contract, did you?

A    I didn't insist, but I asked because of her involvement in it.  I thought she was due compensation on her part, and that's why I sent that email.

Q    But in fact, you had done business with Joe and not Lindy before, right?

A    I had done business with both Joe and Lindy before.

Q    But you had a habit of entering into contracts with just Joe, not Lindy, correct?

A    For the most part.

Q    That's why in your email you write, "As in the past, it's just Joe that I'm entering into a contract with."

20-04381-lsg    Doc 327    Filed 04/13/26    Entered 04/13/26 16:25:11    Page 151 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    As in the recent past, yes.  Mm-hmm.

Q    And in fact --

A    There weren't that many notes with them.  Only three.

Q    In fact, in 2014, the notes were no longer with them. They were with Joe, correct?

A    2014 the note was with both Joe and Lindy.  In 2016, the extension of that original note was with just Joe, and the subsequent two notes were with just Joe, notes and extensions.  There were only three loans that I made to Lindy and Joe, the first one in 2014 and then subsequently I loaned -- well, I was always presuming Joe and Lindy, but Joe two other times loaned money on transactions.

Q    You say you were presuming, but in, by your testimony, 2016 you signed a promissory note with just Joe --

A    Right.

Q    -- gathering all those loans together, adding on your profit, and increasing the principal balance.

A    Correct.

Q    Okay.

THE COURT:  Mr. Foley, is there a document you're referring to here?

MR. FOLEY:  Yes, Your Honor.  Exhibit J8, the November 16, 2017, $430,000 promissory note renewal.

THE COURT:  I have that.

THE WITNESS:  What are we looking at?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 152 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY MR. FOLEY:

Q    Exhibit J8, but you've already testified the judge was just looking for what exhibit it was.

THE COURT:  I believe, though, that Mr. Ritter's prior testimony was that that was an extension of a prior exhibit note.

MR. FOLEY:  It was, yes.  But at that point, he had rolled them all into -- J8 on its face says that it rolls the prior notes in and the anticipated profit or interest from that into a new increased balance of 430,000.

THE COURT:  What are you referring to, sir?

MR. FOLEY:  The "whereas" paragraph.  The second full paragraph under, "For value received," which starts the note.

THE COURT:  "Together with any accrued and unpaid interest thereon," meaning on the unpaid portion of the note that predates this note.

MR. FOLEY:  Your Honor, I'm sorry.  I see one that says, "That, along with accrued interest of $80,000 due Thomas T. Ritter on August 12, 2014."

THE COURT:  Second paragraph.  This note has nothing to do with The Yellow Rose transaction, correct?

MR. FOLEY:  No, it was simply brought up in the direct exam, and I'm explaining as an example that as of this promissory note dated November of 2014, notarized

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

November of 2014, and signed only by Joseph in 2014, Mr. Ritter was doing business only with Mr. DuMouchelle.

THE COURT: Well, this is a different type of business than The Yellow Rose transaction, correct?

MR. FOLEY: I'm not sure. He testified that it was to be used for jewelry. I feel like that's an argument for patient's counsel to make if they wanted, but --

THE COURT: Okay.

MR. FOLEY: -- they brought it in through exhibits. They admitted it and then relied on it in their examination of Mr. Ritter. And Mr. Ritter's taken the position now that he only would've done business because Lindy was involved. Yet, five years prior, he was doing business with just Joseph.

THE COURT: I think you're mischaracterizing his testimony but continue.

BY MR. FOLEY:

Q    Joe, and not Lindy, sent you the wiring instructions. Is that correct?

A    That's correct.

THE COURT: What are we talking about? Wiring instructions for what?

MR. FOLEY: The wiring instructions related to the purchase of The Yellow Rose diamond.

THE WITNESS: I received those wiring instructions

Veritext Legal Solutions
212-267-6868                           www.veritext.com                           516-608-2400

from Joseph, yes.

BY MR. FOLEY:

Q     Thank you.  Joseph sent you the first set of wiring instructions that didn't work out, correct?

A     Correct.

Q     Joseph sent you the second set of wiring instructions that didn't work out?

A     Correct.

Q     And Joseph, not Lindy, sent you the third set of wiring instructions that didn't work out, yes?

A     That is correct.

Q     Okay.  And when the money finally did go out of your account and into another account, that was based on the wiring instructions provided by Joe.  Is that correct?

A     Correct.

Q     Yeah.  Joseph also sent you a receipt for The Yellow Rose diamond purchase, yes?

A     Correct.  Well, it was from the company, not -- he emailed it, but it was on their company letterhead.

Q     I'm going to ask you to turn to Exhibit J17.  Can you read the name of the company on the top of the letterhead of the receipt that you received?

A     Joseph DuMouchelle International Auctioneers.

Q     Is that, to your knowledge, the name of the company that is partially owned by my client or that you sued --

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 155 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    I really --

Q    -- in North Dakota?

A    -- don't know one way or the other.

Q    You don't.  Okay.  I'm going to ask you to flip to Exhibit J6.

A    Once more?

Q    J6, please, sir.

A    6, thank you.  Okay.

Q    This is from the law suit that you initiated in North Dakota.  Is that correct?

A    I don't know.  This is?  I...

Q    You don't know whether or not that document is from your law suit in North Dakota?

A    What did you -- repeat the question, please.

Q    Is the document marked as Exhibit J6 --

A    Well, if it is from that law suit, I'm not familiar with it.  My attorneys handled it and I didn't see everything that went through there for exhibits.

Q    Did you verify the complaint that was filed?

A    I would think I had seen it, but I generally allow the attorneys to handle what they need to.

Q    Did you sign off on the complaint?

A    Did I sign off on what?

Q    The complaint to start the law suit.

A    Oh, I'm sure I did.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  So, if you signed off on it, does the caption on Exhibit J6 look like the caption on the law suit that you brought in North Dakota?

A    What -- Joseph DuMouchelle, account number, and that? I don't know.  Maybe I'm missing something.

Q    Can you read me the parties listed as defendants?

A    I'm on the wrong page.  I'm sorry.

Q    J6.

A    Okay.  Okay, sure.  Go ahead.

Q    Is that from the law suit that you filed in --

A    It appears it is, yes.

Q    Okay.  Can you please read me the names of each of the three defendants that you sued?

A    Joseph DuMouchelle, Melinda Adducci a/k/a Melinda DuMouchelle, and Joseph DuMouchelle Fine and Estate Jewelers, LLC.

Q    Okay.  So that's the company that you sued in 2019, yes?

A    Yes.

Q    Okay.  I would ask you please to flip back to Exhibit J17.

A    Did you say J7?

Q    J17.

A    Oh, 17.

Q    Yes, sir.

Veritext Legal Solutions
212-267-6868                     www.veritext.com                    516-608-2400

A     Okay.

Q     So, again, can you read me the name at the top of that receipt?

A     Joseph DuMouchelle International Auctioneers. Different name.

Q     Okay.  Did you understand yourself to be dealing with Joseph DuMouchelle International Auctioneers as a company?

A     Not really.  I -- all I saw is Joseph DuMouchelle.  I don't know.

Q     Okay.  And who again sent you this receipt?

A     Pardon?

Q     Who again sent you this receipt?  Who emailed this to you?

A     Joe DuMouchelle did, I believe.

Q     All right.  Thank you.  It was also Joseph DuMouchelle that sent you the supposed resale paperwork on the diamond, correct?

A     Correct.

Q     It is Joseph DuMouchelle that you corresponded with over an alleged resale agreement?  Is that correct?

A     Correct.

Q     Can you please turn to Exhibit J19, sir, after your water?  Take your time.  I'm going to have a water as well. Mr. Ritter, are on Exhibit J19 now?

A     Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   Do you recognize the emails that comprise the first three pages of Exhibit J19?

A   What did you ask, please?

Q   Do you recognize those emails?

A   Yeah, kind of.

Q   Do you see Lindy Adducci copied on any of those emails?

A   Not on this one.

Q   Let's go to the second page, Mr. Ritter, halfway down the page to the forwarded message that says, "From Thomas Ritter," and then your email address, date Thursday, March 21, 2019.  Can you read me the first -- the introduction and the first line of that email?

A   "Pursuant to our telephone conversation earlier today, I've prepared a rough draft of the agreement that should suffice for the sale of the diamond."

Q   So, the line above that says what?  Does it say, "Hi, Joe"?

A   It says, "Hi, Joe," yeah.

Q   You're writing to Joe, not Lindy.  Is that correct?

A   Yeah.

Q   And you didn't copy Lindy on this email, right?

A   Not on this one.

Q   And you drafted the resale agreement?

A   With input from Joe, yeah.

Q   So Joe was on the phone providing you with information

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

about a potential seller?

A     Yeah.

Q     And that was happening in -- on March 21st.

A     In March, yes.

Q     A month and two or three weeks after you had wired the funds into the account, correct?

A     That's correct.

Q     Okay.

A     Obviously a bogus conversation because there wasn't any money.

Q     A bogus conversation.  Did Lindy write this email to you?

A     No.

Q     Joe did.  Is that right?

A     That is correct.

Q     Okay.  Could you go up to the email above it, please, on the first page?

A     Okay.

Q     Do you see about halfway down the page there's a little right-facing arrow, and it says, "On March 24, 2019, at 8 p.m., Joseph wrote"?

A     Yes.

Q     Okay.  It says, "Hi, Tom.  Per our conversation earlier today, the buyer's information to be inserted in the agreement provided is the Jennifer H. Ranz (ph) trust,"

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

yada, yada, yada.  Do you see that email?

A     I see that.

Q     Do you agree that's written from Joe to you?

A     Yes.

Q     Do you agree that's not written by Lindy?

A     Correct.

Q     Okay.  And finally, you write back above that on March 24th, "To Joe.  Joe, if you look at that letter, it sets up communication by phone and email.  Please give me both your and their phone number, email address, and fax number to complete this letter.  Thank you, Tom."  Yes?

A     Yep.

Q     Did you copy Lindy on that email?

A     I did not.

Q     Did you write to Lindy saying, hey, Lindy, I've only entered into this deal because of you, and I don't think Joe's giving me the right information?

A     This was long past that point.

Q     Long past that point.

A     Now the point --

Q     You were already --

A     -- and prior to the deal that I needed confirmation --

Q     I just want to make sure I --

A     -- from Lindy, not at this point.  The money was gone at this point.  It didn't matter.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   Did you know the money was gone at this point?

A   I suspected it.

Q   You suspected it as of March 24th?

A   Something was up, yeah.

Q   Okay.  After Lindy forwarded you the email on January 25th, you no longer spoke to her at all again, correct?

A   Not in person, no.  I had sent her a -- I had called her and left a phone message, and she responded with a phone message.

Q   Earlier you testified it was a text message or a phone message.  Are you now convinced --

A   Well it's one or the other.

Q   -- (indiscernible) message?

A   Yeah.

Q   Okay.

A   I couldn't find the text, so I'm presuming it's a phone.

Q   Did you bring a recording of that phone message here?

A   I don't have a recording of it.

Q   Did you bring a --

A   I don't think she has a recording of mine.

Q   Okay.  So it's your testimony, though, that she called you back and said precisely what?

A   Well, she just said absolutely, yes, it's a good deal.  We can make that money.

Q    So, what is it?  Is it, "it's a good deal," or "it's a good deal, we can make money"?

A    I don't recall the exact phraseology.

Q    Okay.  Other than that, you had no contact with Lindy after January 25th?

A    No.  She gave me the initial kind of go-ahead in the first conversation.  It was confirmed again in the second, and that satisfied what I needed at that point.  Then the deal was rolling.

Q    As to Lindy before the money was -- before you wired the money --

A    Yep.

Q    -- on January 25, 2019, Lindy sent you the data package, the email that we've discussed, right?

A    Correct.

Q    Okay.  You agree that does not contain an appraisal.

A    It did contain an appraisal.

Q    Did it?

A    Well, it said an insurance value $30 million.

Q    Was that your understanding at the time was that you had an appraisal by virtue of that email?  That Lindy had provided you with an appraisal?

A    Yes.

Q    Okay.  Was it your understanding that Lindy had done an appraisal, that she was providing you with her appraisal?

A    She did an appraisal on it earlier on 2018.

Q    And she -- in 2018.

A    That's what I was told.

Q    And she gave it to you?

A    She didn't give it to me, no.  She said -- somewhere I said she had a conflict of interest, so it wasn't coming to me, but she had done one.  That's my understanding.

Q    In fact, sir, actually, you asked her to do an appraisal, and she declined to do so because she said to you, "It would be a conflict for me, an appraisal of something that Joe is selling," correct?

A    No.  My understanding is they had that stone in the office to do an appraisal on it, and she did.  She couldn't send that to me because it would be a conflict of interest.  So, this was supplied in lieu of that, but she verified the value --

Q    And that's --

A    -- on the phone conversation.

Q    Okay.  And that's what you relied on in entering into this deal.

A    Look, I trusted Lindy.  Without her, I wouldn't be in this deal.  I relied on her expertise and her judgment to bring my comfort level up to do the deal.  I didn't know Joe that well.  I mean, you do a couple of deals, that's fine.  But I got emails from Lindy jokingly, "Well, you know Joe.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 164 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Ha, ha, no, you don't really know Joe."

Q   You have those emails with you in your exhibits here today?

A   I do not have them in the exhibits, but I read them just recently.

Q   I just want to make sure I understand.

A   Yeah.

Q   What you're saying here under oath and to the Court is that in terms of the value of this diamond, you were relying on what Lindy gave you as the value.

A   Absolutely.

Q   Okay.  You didn't feel the need to question that?

A   You know, she is part of my family.  I didn't need to go beyond that in my mindset at that time.  Now, I suspect I should've.

Q   Okay.

A   At that time, no, I didn't need it.  The relationship I had with that family was pretty close.

Q   And so --

A   And I guess by transference or whatever, I felt the same way about Lindy.  And I never had any cause to think differently.

Q   You had no reason to think --

A   No.

Q   -- that you should obtain a separate appraisal.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     No, I did not.

Q     Because you trusted Lindy.

A     Absolutely.

          MR. FOLEY:  Okay.  Have the additional three pages been added to Exhibit 5 in this book?

          MS. CLAYSON:  No, you'll need to...

          MR. FOLEY:  Thank you.

BY MR. FOLEY:

Q     And sir, I'm going to ask you to look, please --

          MR. FOLEY:  Your Honor, may I approach the witness to put these pages in the book of J9?

          THE COURT:  J9?

          MR. FOLEY:  Thank you.

BY MR. FOLEY:

Q     Okay.  May I see that book, sir?

A     Absolutely.

Q     Thank you.

          MS. CLAYSON:  He's putting them in the witness book.

          MR. CATALDO:  I see.

          MS. CLAYSON:  Yeah, can you put them...

          MR. FOLEY:  Your Honor, for the record, I've inserted the first three pages that we spoke about in our stipulation with Bates numbers ending in 24, 25, and 26. The first three pages of Exhibit J9.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 166 of 220
212-267-6868                    www.veritext.com                         516-608-2400
Veritext Legal Solutions

THE COURT:  Thank you.

BY MR. FOLEY:

Q    Mr. Ritter, can you turn to Exhibit J9 please?

A    What was that?

Q    Can you please turn to Exhibit J9, sir?

A    Is that what you just inserted?

Q    Yep.

A    That's where I am.

Q    Yeah.  Can you turn to the third page that on the bottom right corner has a 00026 at the corner of it?

A    Okay.

Q    Actually, let's go one page before that.  Do you see the page ending in 000195?  It's behind.

A    Okay.

Q    Okay.  Back to this email that we talked about before, January 25th.

A    Okay.

Q    It says, "Hi, Tom.  Great talking with you.  Attached are the photos and GIA monograph and comparables on fancy vivid yellow diamonds.  Hi to Carol, Lindy."  You recognize that?

A    I do.

Q    And you recognize above it writing back, "Relieved," but that's meant to say, "Received and will review and get back to you," correct?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Yes.

Q     And you've previously testified here today you are aware that that was sent by Lindy at Joe's request, correct?

A     Well, the way it went down, I talked -- Joe pitched me this thing and he said I will have Lindy give you a call. She called, we discussed this diamond.  And she said Joe did ask me to send you this stuff and I'll be sending it.  But we talked about that diamond in that phone conversation. This was a follow-up to confirm that.  Okay?

Q     In fact, actually --

A     Pardon?

Q     In fact, actually, you and Mr. DuMouchelle had been on the phone, and he put Lindy on the phone with you.  Isn't that correct?  It wasn't a separate phone call?

A     No, I don't believe that's the case.

Q     Did you bring here phone records showing you had a separate phone call with Ms. Adducci?

A     No, I did not.  Did you?

Q     In the course of the five -- I wouldn't have them, sir. They're your phone records.

A     I beg --

Q     In the course of -- I wouldn't have them, sir.  They're your phone records.

A     Say again?

Q     In the course of the five years of this case, did you

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

produce phone records to show independent phone calls with Ms. Adducci?

A No. I did not. And I tried to get them, but I could not.

Q So now let's now go to that page marked 026 in the bottom right corner. And then, unfortunately, let's flip one page before that to the page marked 025. Slightly more than halfway down the page, do you see where it says, "On January 28, 2019, at 1:42 p.m., Joseph DuMouchelle wrote"?

A Yep.

Q Okay. And he says, correct me if I'm wrong anywhere here, "Hi, Tom. Per our conversation today in regards to the purchase of the 77.12 karat Yellow Rose vivid diamond, we are proposing as follows. Purchase the 77.12 karat diamond at 12.5 million, sell the diamond to a private buyer at 16,500,000 within a few days to 10 days.

"The percentage of post-purchase split would be determined by you. Upon receipt of the funds, they would be disbursed to you. Please let me know your thoughts. If you have any additional questions, please contact me. Thank you. Sincerely, Joe." Do you see that email?

A I do.

Q Okay.

THE COURT: Mr. Foley, why is it you're not reading the emails verbatim?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  I believe I was.

THE COURT:  No, you were not.

MR. FOLEY:  Did I miss a word?

THE COURT:  Several.  It reads, "Per our conversation today in regards to the purchase of the 77.12 karat Yellow Rose vivid diamond, we propose," not we are proposing, "we propose the following.  Purchase the 77.12 karat diamond at 12,500,000, sell the diamond to a private buyer at 16,500,000 within the next week to 10 days."  You had different words in there.  But it says, "within the next week to 10 days."  If you're going to read from an exhibit, read it exactly, sir.

MR. FOLEY:  Thank you, Your Honor.  I will endeavor to do so.  I apologize.

THE COURT:  Not endeavor, you will.

MR. FOLEY:  There is no try, there is only do.  I will do it.

THE COURT:  Thank you.

THE WITNESS:  Could I update an answer I gave you a little earlier?

BY MR. FOLEY:

Q    I'd actually like to ask you a question, Mr. Ritter.  Can you read the email above that to me?

A    Yeah.  It says, "Who did the most recent appraisal evaluation and what was the result?  And do you have a copy

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

of that?"  And that appears to be after I got that from --
the email from Lindy on the 25th.

Q    Thank you.  And then can you flip back a page before
that even?

A    What's that?

Q    Can you flip back a page before that to the email above
that sent in response to that?  Can you read that email to
me?

A    "Hi, Tom.  Attached is the appraisal copy I just
received.  I will call you in a few minutes to confirm you
have received this."  And I don't know that I did get that.

Q    You're denying --

A    It's saying who did the most recent appraisal.  Well,
if it's attached, I don't see the attachment on the email,
but is it there?

Q    So the fact of the matter is, sir, you did ask for an
appraisal in addition to Lindy's.  You asked for it from Joe
and was provided that appraisal by Joe, correct?

A    Well, I was asked -- I got the one from Lindy.  I don't
know what I got from Joe, to be honest with you, because I
haven't seen this before until now.  And I don't really see
an appraisal attached to it.

Q    You don't see it here in the exhibits that you
produced?

A    I don't see it attached to this.  I don't know if this

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

was my exhibit or your exhibit or whose.

Q    It was from you and your counsel.

A    Okay.

Q    Okay.

A    I just -- I mean, I don't see it -- generally, when there's an attachment to an email, you see a little logo on it.

Q    Unless it's been forwarded multiple times, such as to an attorney and then cut-and-pasted into evidence.  Now, let me ask you this.

MS. CLAYSON:  That's calling for speculation.

THE COURT:  Sustained.

BY MR. FOLEY:

Q    Mr. Ritter, do you deny that you received an appraisal from Joe DuMouchelle?

A    I may have, but I don't recall.  I'm sure I did.  An appraisal on top of what Lindy sent me, but I don't recall that appraisal.

Q    And to be clear, you're not alleging that Lindy did an appraisal for you.  In fact, you testified --

A    Lindy didn't do --

Q    -- that she didn't.  Okay.

A    -- an appraisal for me, no.

Q    Lindy didn't send you a purchase agreement, did she?

A    She did not.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Lindy didn't sign that purchase agreement?

A    She did not.

Q    Lindy didn't send you any wire instructions?

A    She did not.

Q    Lindy did not tell you to wire money to Highland Wealth Management, did she?

A    She did not.

Q    Lindy didn't tell you to wire money to FineMark Bank, did she?

A    She did not.

Q    She didn't tell you to wire money to Bank of America, did she?

A    She did not.

Q    Okay.  Do you recall being deposed in the case of Stevenson v. Noble?

A    It was a while back, but I suppose I was, yes.

Q    Do you recall testifying that the account -- you were asked who told you that the account was the seller's account, and your answer was that Joe told you?

A    Yeah.  Well, I had an email from Joe with that on --

Q    Telling you that it was the seller's account.

A    Well, yeah.

Q    Not from Lindy.

A    That's correct.

Q    Okay.  Lindy never identified the seller to you by name

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

before you wired the funds.

A   Correct.

Q   In fact, you didn't know the seller's identity before you wired 12 million, correct?

A   I don't know the seller's identity to this day.

Q   And that's because Joe sent you fake emails?

A   Possibly.

Q   Okay.

A   I don't know.

Q   Possibly?

A   Yeah.

Q   Okay.

A   I don't know.

Q   If you wired money and you don't know who the seller is, how do you explain not knowing --

A   That was the seller's rep.  He -- Richard Drucker from the forward of the emails was presented -- represented to be representing the seller.

Q   And who made that representation to you?

A   Joe.

Q   Okay.  Lindy's not the one that gave you the bill of sale from the seller before the wire, did she?

A   No.

Q   Or after the wire?

A   No.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   As you sit here today, you still cannot identify any specific pre-transfer statement by Lindy giving you the seller's name.  True?

A   I never got the seller's name from anybody.  Lindy or anybody else.  Okay?

Q   As you sit here today, you can't identify any communication from Lindy giving you the account to wire money into or who the owner of that account was, correct?

A   No.  I cannot.

Q   As you sit here today, you can't identify any specific pre-transfer statement by Lindy telling you the Bank of America account was the seller's account, true?

A   Say that question again?

Q   As you sit here today, you cannot identify any specific pre-transfer statement by Lindy telling you that the Bank of America account was the seller's account.

A   Correct.

Q   Is that correct?  Okay.  Nor did she tell you that Highland Wealth Management was the seller's account?

A   Correct.

Q   Nor did she tell you that Fine and Estate Appraisers was the seller?

MS. CLAYSON:  Your Honor, I'm going to object here.  These -- this is the third time that we've asked the same questions about who the seller's account is, and Mr.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Ritter has answered consistently throughout.  I don't think we need to continue to ask the same questions.

THE COURT:  Sustained.  Mr. Foley, move it along.

BY MR. FOLEY:

Q    This was an impulsive $12 million spend by you, wasn't it?

A    I wouldn't call it really impulsive, no.  I had been trying to collect my debt from Joe and Lindy on this thing for a number of years, and I was at a point where I needed to get this taken care of.  I had contacted Joe back in maybe November or even before on this and communicated through the end of the year and into the new year.  And this was a debt, again, that originated to both Joe and Lindy.  That's the note.  And --

Q    Can you flip back to Exhibit J --

A     -- I had the money in the bank at the time.  This seemed -- I trusted Lindy, and through Lindy I trusted Joe to do the right thing.  It was obviously misguided, but I weighed -- I just weighed the deal and the decision and decided to go ahead and do it.  I wouldn't call it impulsive.  I mean, it was over a period of two months, three months almost.

Q    Can you please, sir, flip to Exhibit J49 in your book?  Can you please flip to Page 61 of that exhibit?  Can you please me from line 8 to 10 of the question that was posed

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

to you?

A    What was that?

Q    Can you please read the question that was posed to you at lines 8 through 10?

A    Line 8?

Q    Yep.

A    "Okay.  So I mean this is a $12 million outlay by you.  Is that something you typically do in your business, spend 12 million in one deal?"

Q    And can you read me the entirety of your answer?

A    It says, "No, it isn't.  It was kind of an impulsive thing.  Well, the history behind it was I trying to clear up another note that he owed me on, and he pitched me this deal, and again" --

Q    Can you stop right there for a moment?  We'll go back to reading.

          MS. CLAYSON:  Your Honor, I think he should be able to complete the statement.

          THE COURT:  Complete the whole answer, please.  Mr. Foley -- Mr. Ritter, please read the whole entirety of your answer to that question on Page 61.

          MR. FOLEY:  I -- just for the record, I intend to have him finish it.  There was something I wanted to ask him about.

          THE COURT:  Let's finish it right now.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  Okay.

BY MR. FOLEY:

Q    Please go ahead.

A    Continuing on line 14, "And again, this is my -- these guys are family.  I trusted them, so I thought it would be an easy way for them to make some money, me to make some money.  That's the way it was pitched, and so I was just trying to get some background on it, and that's how this thing transpired."

And I correct my other answer.  If this means it was impulsive, I do spend this kind of money in the oil and gas industry and more with no more notice than this.

Q    Okay.

A    So if you want to call that impulsive, I'm used to making large amounts of money on decisions.  I spent $20 million on one well.

Q    Okay.  But yet here in this testimony, when asked, "Is that something you typically do in your business, spend 12 million on one deal," you said, no, it isn't.  So it is or it isn't.

A    Typically not on --

Q    I'm confused.

A    -- this kind of deal.  Yeah.

Q    This kind of deal --

A    No, I did say that.  Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  So I'm just trying to understand.

A    That's fine.

Q    You do --

A    If it makes a difference --

Q    -- occasionally spend big sums of money --

A    -- call it an impulsive deal.

Q    -- or you don't.

THE COURT:  Okay.  You're both talking over each other.  Mr. Ritter --

THE WITNESS:  I'll correct my prior answer.  Was it impulsive?  Possibly a little bit.

BY MR. FOLEY:

Q    Let's keep reading from that answer.  We're going to go back.  You say, "Well, the history behind it was I was trying to clear up another note that he owed me."  You don't say "they".

A    Well --

Q    So you recognize that at that time, only Joe owed you money under promissory note.

A    I don't believe that.  I never -- Lindy has no satisfaction of that note, of her prior note.  There is no relief, no satisfaction.

Q    Except for you rolled it into a brand-new note owed only by Joseph DuMouchelle.

MS. CLAYSON:  Objection.  He's asking for a legal

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

conclusion.

THE COURT:  Well, sustained.  And moreover, that's not part of the -- those claims have been removed from the complaint.  Mr. Foley, what are you doing?

MR. FOLEY:  Ah, I'll tell you what I'm doing, Your Honor.  I didn't want these exhibits in, but they insisted on being in and I stipulated to them, and then they used it as part of their direct exam.  And then they're claiming that Mr. Ritter --

THE COURT:  Your cross can only go to the extent of direct.  So what exactly did they use for part of their direct exam that you want to talk to the witness about?

MR. FOLEY:  Both of these notes, the second being J9, they put in during their direct, J9 in particular, they focused on.  More importantly --

THE COURT:  Is J9 actually a note?

MR. FOLEY:  I'm sorry, J8.  I said J9.  It's J8. I'm looking at the wrong tab.

THE COURT:  All right.  It's the August 12, 2014 note.

MR. FOLEY:  Your Honor, by way of response, Mr. Ritter has taken the position today that all of a sudden, he only did business because of Lindy, and it was just reliance on Lindy.  We have a promissory note from five years before that where he was doing business with just Joe.  We have a

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 180 of 220
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

deposition where he states that he did this whole deal to clear up the money that he, Joe, owes him.  Now today he claims that he things Lindy still owes me money.  There's a signed written contract to that effect.  That's all that I'm exploring with him.

THE WITNESS:  I have a judgment that says Lindy owes me money.

THE COURT:  But to be clear, the promissory notes are not part of the law suit anymore.  So the plaintiff is not seeking to have those amounts determined non-dischargeable.

MR. FOLEY:  Yes.

THE COURT:  All right.

MR. FOLEY:  Very much understood.

THE COURT:  Okay.

MR. FOLEY:  But as it relates to his indication that he was only doing business because of Lindy, which is the key to this case, his reliance on Lindy --

THE COURT:  But --

MR. FOLEY:  -- that's one of the main elements he's claiming now that he fully relied, yet that's not what the claim was in the past.

MS. CLAYSON:  Your Honor, I'm -- he's mischaracterizing his testimony.

THE COURT:  Right.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MS. CLAYSON: He certainly said he relied on Lindy. He didn't say he only relied on Lindy. There were components that he relied on related to Lindy. There were components that he relied on related to Joe.

THE COURT: And there were multiple transactions. There's the promissory note and there's The Yellow Rose diamond transaction. They are two separate -- or they're not all -- I realize they're connected insofar as the plaintiff was hoping that a successful Yellow Rose diamond transaction would satisfy the notes.

But it's entirely possible, Mr. Foley, that he looked to Mr. DuMouchelle regarding the notes, but he was looking to the defendant and her appraisal skills regarding The Yellow Rose diamond transaction and the quality of the stone. That's the testimony the Court heard earlier.

MR. FOLEY: Well, I hope the Court also heard the testimony where he claimed that he had received an appraisal from Lindy, then had to admit that he didn't.

THE COURT: Wait. Say again?

MR. FOLEY: He claimed he had received an appraisal from Lindy.

THE COURT: Oh, he construed the replacement insurance value -- or the replacement insurance value or just replacement value at about 30 million. The testimony from the witness was that he considered that to be in the

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

nature of an appraisal, but then he told you today he didn't receive an actual appraisal from the defendant. Did I mishear it?

MR. FOLEY: No, he -- we went through the email.

THE COURT: Is that -- wait, Ms. --

MS. CLAYSON: Yeah. No, that sounds correct. I mean, in the sense that he received this copy of an appraisal from Ms. Adducci, that's -- he -- but there was no testimony that this was Ms. Adducci's appraisal. We don't know whose it was.

MR. FOLEY: There was no testimony that my client ever forwarded him an appraisal. Not her own, not anybody else's. There are emails in the exhibits --

THE COURT: What's in the data package?

MR. FOLEY: The -- exactly what was shown on the big screen, the gemological printout, the book that he says followed the diamond around. Not an appraisal.

THE COURT: All right. So --

MR. FOLEY: There's also testimony that my --

THE COURT: -- what is it that you're getting to --

MR. FOLEY: -- client didn't --

THE COURT: -- on the note. We're not at closing. Be careful not the mischaracterize the defendant -- I'm sorry, the plaintiff's testimony, okay?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: I will, Your Honor. The -- I just don't -- I don't believe it was a mischaracterization what we had just gone over, but Your Honor, I'll move on.

BY MR. FOLEY:

Q    Mr. Ritter, can you please turn to page 60 of Exhibit J49?

MR. FOLEY: Your Honor, I'm going to read accurately.

BY MR. FOLEY:

Q    Starting on line 3, do you see:

"Q    Just for the record, to make sure we can identify this properly, this is an email string that begins on January 28th from Joseph with an email from Joseph DuMouchelle to you?

Answer from you, "Yes."

"Q    So this reflects an appraisal copy.  Do you recall receiving an appraisal?

"A    I'm sure I probably did.

"Q    All right.  Do you still have a copy of that appraisal?

"A    That I don't know.  If we've got -- you know, it's digital, so I'm sure it's attached to this email somewhere?

"Q    But you didn't look for that at all in -- with respect to this litigation, right?

"A    No."

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 184 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

So, four years ago you testified you had received an appraisal from Joe.  Is that correct?

A    I basically gave you the same answer I gave here that I probably did.  Do I have a copy?  I don't know.  I?m just basing it on what the email said.

Q    Then I'll ask you one more time.  Do you deny receiving an appraisal from Joe?

A    I don't know.

Q    You didn't really do any due diligence on this transaction, did you?

A    Do what?

Q    Any due diligence?

A    My due diligence was with Melinda for the most part, with Lindy.  She was a certified gemologist.  I honestly thought she'd have my back on this.  Obviously, she didn't. That was my due diligence.

Q    You didn't independently verify the seller's identity?

A    No.  I had no idea who it was.

Q    You didn't independently verify ownership of the diamond itself?

A    I relied on Joe and Lindy to handle that, and I think that's right in this same document here.

Q    You mean the contract with Joe only that you signed where you said I'm going to rely on Joe to do both of these things?

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

A    Well, he was handling that part of it, and Lindy was handling the verification part of it.

Q    The verification?  Okay.  Let's flip back to Exhibit J10, please.  And please --

A    Which one?

Q    Can you please flip to J10, sir?

A    J --

Q    Exhibit J-1-0.  J10.

A    I am there.

Q    Okay.  Can you please flip to page 2 of that document where the signatures are?  Do you agree this email on page 1 is addressed, "Dear Joe"?  Correct?

A    It what?

Q    Just want to make sure you agree this email on the first page is addressed, "Dear Joe"?

A    It's addressed to Joseph --

Q    Okay.

A    -- DuMouchelle, yeah.

Q    So on that second page --

THE COURT:  For the record, it's a letter.  It's not an email.

MR. FOLEY:  Thank you, Your Honor.

BY MR. FOLEY:

Q    On page 2 of this letter there is a paragraph, the second full paragraph down, and it reads, "As you might

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 186 of 220
Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

imagine, not doing this every day leaves me a bit out of my comfort zone, so I will have to rely on your guidance and advice." Right? Do you see that?

THE COURT: You left out a word, Mr. Foley. It says, "So I will have to rely heavily on your guidance and advice."

MR. FOLEY: Didn't I say "heavily"?

THE COURT: No, you didn't.

MR. FOLEY: I may have --

THE COURT: Read the words --

MR. FOLEY: -- a reading problem.

THE COURT: -- on the page, sir.

MR. FOLEY: Trust me, I'm trying, Judge.

THE COURT: Well, the one...

MR. FOLEY: Well, "heavily" helps me. I wouldn't leave it out intentionally.

BY MR. FOLEY:

Q   Mr. Ritter, did you put in here I am relying on Lindy for due diligence, I am relying on Lindy for valuation of the diamond, I am relying on Lindy's stated value?

MS. CLAYSON: Objection, Your Honor. I don't even know if this is the contents of the agreement. The decision was already made to purchase it. This agreement is talking about relying on the guidance for a resale. This is contemplating what will happen in a resale of The Yellow

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Rose.

MR. FOLEY:  Your Honor, this is the operative controlling document of the entire transaction, and I'm just asking if Mr. Ritter put anywhere in here that he was relying on Lindy, that Lindy was a part of this, that her value was necessary, or if he just signed a deal with Joe. That's all I'm asking for an answer.

THE COURT:  Well, wait a minute.

THE WITNESS:  Point in time --

THE COURT:  Wait a minute.  The Court's not going to let this witness draw legal conclusions for what it means, but the witness can certainly answer what the words on the page say.

MR. FOLEY:  Thank you, Your Honor.

THE WITNESS:  Repeat the question, please.

BY MR. FOLEY:

Q   Do you put in this agreement anywhere, this letter agreement two pages long, do you state that you're relying on Lindy for valuation or appraisal, or that you have relied on Lindy for valuation or appraisal?

A   At the time that I drew this contract up, I had already gotten the information from Lindy to get my comfort level to a point where I could do this based on relying on her expertise and her information.

Q   So it's --

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 188 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    I didn't need to put it in here.  This is the result of that.

Q    One single email forwarding a gemological institution report.

A    Absolutely.

Q    Okay.

A    You know, listen, you don't understand family connections and the relationship I have with the Hegge family.

Q    I understand family connections.  You're right.  I don't understand wiring $12 million with zero due diligence.  You're right about that.

MS. CLAYSON:  Objection, Your Honor.  This is argumentative.

THE COURT:  Yeah, this is argumentative, Mr. Foley.  Keep it to question-and-answer form.  You know.

BY MR. FOLEY:

Q    Did Joe ever send you a bill of sale from the seller before you sent in the money?  Did Joe ever send you a bill of sale from the seller before you sent in the money?

A    Well, no.

Q    Did he send you any copy of an agreement that he had to buy the diamond before you wired him $12 million?

A    He had to buy it?

Q    No, did he send you a copy of a document saying, here,

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

I've lined up a deal by which I'm going to buy this for 12 million?  Did he send you a copy of that document?

A     No.  He just told me that.

Q     So you took Joe at his word on that?

A     I took Joe and Lindy's word on that.

Q     Well, that wasn't Lindy's word, right?

A     She confirmed it.

Q     She --

A     She said if you can buy this for $12 million --

Q     You were on the phone --

A     -- (indiscernible) --

Q     -- with her?  I just want to make sure I understand.

A     -- both of them.

THE COURT:  Uh-huh.  Okay.  Stop.  Both of you.  There will be a question-and-answer format.  The witness was still answering.  Don't interrupt the witness while he's answering, sir.  Mr. Ritter, please continue.

THE WITNESS:  Where are we?

MS. CLAYSON:  I think we need a repeat of the question.

THE COURT:  Repeat the question, sir, Mr. Foley.

BY MR. FOLEY:

Q     Are you saying that you were on the phone with Lindy in late -- in early February to confirm that Joe was selling the diamond?

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

A    I'm not saying that, no.

Q    So when you say you relied on her words, that has nothing to do with whether or not you were shown a purchase contract by Joseph DuMouchelle, correct?

A    In my mind when I'm dealing with Joe and Lindy, it is Joe and Lindy.  It's not Joe separate.  These contracts might say Joe, but that's --

            MR. FOLEY:  Your Honor, it's been objected to.

            THE WITNESS:  -- the connection.  They're husband and wife.  They're business partners.  I talked to both of them on this deal.  You know, if you want to split hairs and say this and that, that's fine, but that's not the way I viewed it.

BY MR. FOLEY:

Q    Sir, my question was only this.  You couldn't possibly have relied on a statement of Lindy regarding Joe having lined up to buy this diamond because she didn't make any such statement to you, correct?

A    That would be correct.

Q    Thank you.

            THE COURT:  Wait.  I didn't hear the answer.

            MR. FOLEY:  He said that would be correct.

BY MR. FOLEY:

Q    Can you re-answer?

A    That would be correct.  I did not rely on a phone call

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

from Lindy that Joe had lined up a sale for this diamond.

THE COURT:  Thank you.

BY MR. FOLEY:

Q    You didn't see Lindy open the Bank of America account, correct?

A    I didn't see her?

Q    Yes.

A    I don't know what you mean.

Q    Did you have knowledge prior to wiring the money that Lindy had opened the Bank of America account for the business?

A    No.

Q    Did you know you were wiring money to Joseph DuMouchelle Fine and Estate Jewelers, LLC business account?

A    No, I did not.

Q    Okay.  Did Lindy make you wire that money there?

A    No, but she didn't tell me not to either.

Q    Okay.  Do you have reason to think she knew that you were wiring the money that day?

A    I presume she did.  She opened the account for it.  She knew what was going on.

Q    So it's your testimony that you believe she opened the account just for your money.

A    Absolutely.

Q    Had there been --

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 192 of 220
Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

A    I know that.

Q    You know that?

A    Well, the other two accounts refused to accept it.  Why else were they opening the account?

Q    So, if Ms. Adducci were to say, for example, that they were having banking problems and funds were getting rejected, that would be a truthful statement.

A    What do you mean?

THE COURT:  That's a hypothetical, sir, and this witness is a fact witness.  Why are you asking a hypothetical to a fact witness?

MR. FOLEY:  Because he testified -- I'll leave it alone.

BY MR. FOLEY:

Q    Explain your understanding of why you were part of the lawsuit to recover $4.25 million from Mr. Noble.

A    From whom?

Q    Mr. Noble.

A    Why I was part of the law suit.

THE COURT:  Excuse me.  Are we way beyond the scope of direct at this point?  Is there -- was there any direct questioning on this?

MS. CLAYSON:  There wasn't any direct.

THE COURT:  Mr. Foley, this is cross-examination. You can call him as a witness on your own case if you'd

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

like, but I always thought the cross-examination was supposed to be limited to what was discussed on direct. Mr. Cataldo, it's a little quiet.

MR. CATALDO: Your Honor, we don't object if he asks this question.

THE COURT: You don't objection? Okay.

MR. CATALDO: Yeah.

THE COURT: Go ahead.

BY MR. FOLEY:

Q   So I'll break it down into simpler questions. Did $4.25 million of your money end up with Mr. Noble?

A   Did it what?

Q   Did $4.25 million of your money get transferred to Mr. Noble?

A   That is my understanding that $4.2 million of my money got transferred to Mr. Noble.

Q   And when we say your money, we mean from the $12 million that was wired into the Bank of America account.

A   Exactly.

Q   Okay. Did you recover anything?

A   Nothing.

Q   Not from that case at all?

A   Nope.

Q   Okay. You testified earlier that you communicated with the FBI in 2019. Is that correct?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 194 of 220
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Yes.

Q    And during your deposition in the Noble case, you were showing two different June 2019 FBI emails that you had sent.  Is that correct?  Do you recall that?

A    I don't know.

Q    Do you recall that one -- do recall emailing the FBI?

A    I emailed a couple of different people at the FBI on different occasions, yes.

Q    Do you recall that the first of your emails to the FBI focused solely on Joe's criminal activity?

A    Probably.  That was my main focus at that point in time.

Q    And that version didn't reference Lindy at all.

A    What was that?

Q    That version didn't reference Lindy at all.  Isn't that correct?

MS. CLAYSON:  Your Honor, I'm going to object.  I don't --

THE WITNESS:  I don't know.

THE COURT:  Woah, woah, woah, wait.  We have an objection.

MS. CLAYSON:  I object because I don't know what we're referring -- what document or email we're looking at or referring to.

MR. FOLEY:  I established that he had sent 2019

emails to the FBI.

THE COURT: Are they in our exhibit book?

MR. FOLEY: No, they're just part of his testimony.

THE COURT: His testimony.

MR. FOLEY: He was asked on direct about contacting the FBI, and then remember he told the story about driving all the way across town and --

THE COURT: I remember.

MR. FOLEY: -- waiting at the -- but that was prompted by emails. Those are the emails I'm asking about in particular.

THE WITNESS: I didn't see --

THE COURT: Wait, wait, wait. Mr. Ritter, just a second, please.

THE WITNESS: Sorry.

THE COURT: Have those emails been shared with your opposing counsel?

MR. FOLEY: I don't have those emails. I have a deposition where he discusses those emails.

MS. CLAYSON: Your Honor, they may have been produced. I know there is an exhibit that's in here that's an email that Mr. Ritter sent to the FBI at some point, but this was not a part of the exhibits that were agreed to.

THE COURT: I think the question can be phrased in

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

a way --

MS. CLAYSON:  Yes.

THE COURT:  -- that unlinks it from the exhibits, which appear to be mysterious to the plaintiff's side.  The question could be phrased --

MR. FOLEY:  Yes.

THE COURT:  -- without reference to the exhibits.  Correct, Mr. Foley?

MR. FOLEY:  Yes.  No reference to the exhibits.  I?m asking him about prior testimony.  Do you have it?  I'm back.

BY MR. FOLEY:

Q    Do you admit that your first communications with the FBI were focused on Joe and not Lindy?

A    No.  I believe they were focused on both of them, and that, as the FBI got involved in this, they focused on Joe.  My initial inquiries involved both Joe and Lindy, both when I called the Detroit Police, the FBI in Detroit, and the FBI up at that facility in Arizona.

Q    Your testimony earlier was that Lindy told you this was a great deal for you in that initial phone call.  Is that correct?

A    I may have been paraphrasing, but yes to that degree.

Q    Without paraphrasing, what do you recall her telling you?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 197 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A   Well, I know she talked about the diamond in detail explaining how for its class as a yellow diamond was one of the largest of its kind, you know, the second or third largest, that it was a brilliant stone, I think.  And I'm not very well-versed in gemological jargon, so I don't know, but she said the value is -- it's -- the value is definitely above the selling price that we were looking at for 16.5 if it was a hurried sale.  And that if a guy could buy it for the 12.5 -- I mean, she knew the parameters of the deal because we talked about them.

Q   Who talked about it?

A   Lindy and I did.

Q   When?

A   When we spoke prior to sending me the data package.

Q   It's your testimony now that you spoke to Lindy about the contents of the deal with Joe?

A   We did, yeah.

Q   Okay.

A   I mean, I had that information that day.

Q   You sure you weren't talking to Joe about that and then Joe --

A   I was talking --

Q   -- brought Lindy on the phone?

A   -- to both of them.

Q   Okay.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 198 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    I mean, I was trying to get relative values out of Lindy.  She's the --

Q    Did she --

A    She's the appraiser.  She's the one that can confirm that, and that's what I was looking for, her confirmation, and that's what I relied on in moving forward.

Q    I appreciate that you were trying to get those values out of her, but my question remains.  You testified earlier that she clearly told you she could not send you an appraisal.

MS. CLAYSON:  Objection, Your Honor.

THE WITNESS:  She sent me an appraisal --

MS. CLAYSON:  This has been --

THE COURT:  Woah, woah, woah.

THE WITNESS:  -- for $30 million.

THE COURT:  Stop.  We have an objection.  Mr. Foley, Mr. Ritter, hang on just a second.

THE WITNESS:  I'm sorry.

THE COURT:  Ms. Clayson?

MS. CLAYSON:  This is a question that's been asked and answered.

MR. FOLEY:  If it's been asked and answered, I?m still confused because he's still claiming now that my client sent him an appraisal.

THE COURT:  No, he's not.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 199 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  He just did.

THE WITNESS:  What?

THE COURT:  What?

MR. FOLEY:  He literally just did.  He just testified.  That's what he was just saying when Your Honor stopped him --

THE COURT:  No.

MR. FOLEY:  -- because there was an objection.

THE COURT:  Ms. --

THE WITNESS:  Whatever I got appeared to be an appraisal with a $30 million value.

MS. CLAYSON:  That's his perception, Your Honor.

THE COURT:  It's his perception, Mr. Foley.

MR. FOLEY:  May I continue on there from then?  I'll just move onto the next question.

THE COURT:  As to his perception.

MR. FOLEY:  Yeah.

THE COURT:  Yeah.

BY MR. FOLEY:

Q    That's your perception.  Then why did you go on to ask Joe for a copy of an appraisal?

A    Because the talk was there were a couple of appraisals, okay?  That was one.  And then he had referenced another one, and I said, well, send it to me.

Q    He had referenced it, or you had emailed him

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

specifically saying as in the exhibit who did the most recent appraisal and do you --

A    He probably --

Q    -- have a copy of it?

A    -- referenced it in a phone conversation and then I asked for it in an email.

Q    You said probably.  I mean, are you testifying that you remember that?

A    Probably or I wouldn't have asked for it if I didn't see it before.

          THE COURT:  Okay.  Mr. Foley, let's try not to argue with the witness.  Just ask the questions and receive the answers.

BY MR. FOLEY:

Q    During your direct exam, you testified that they were promising to return your money.  That they were.  In fact, you never had a communication with Lindy in which she promised you were getting your money back.  Is that correct?

A    She never did, but all of my emails were directed to both of them, and she had to get them and read them.  And that -- this deal for me, my perception was always with Joe and Lindy.  Always.

Q    And you were sending --

A    That's why everything that I sent her was Joe and Lindy.  If the contract got made with Joe, well, so it did.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Regardless, she was cognizant of the whole thing, involved in it.  I was looking for her to prod him to do the right thing, and it never happened.

Q    When you were sending those emails -- I think there are three emails that you sent out after the transfer.

A    At least.

Q    Were you operating in good faith?

A    Absolutely.

Q    Your impression --

THE COURT:  Wait.  Wait, wait, wait, wait, wait. Good faith, is that not a legal conclusion?

MR. FOLEY:  I'll rephrase.

THE COURT:  Doesn't the Court determine --

MR. FOLEY:  I'll withdraw and rephrase, Your Honor.

THE COURT:  -- what good faith is, Mr. Foley? Don't put that on a witness.

MR. FOLEY:  I'll withdraw and rephrase.

THE COURT:  Thank you.

BY MR. FOLEY:

Q    What was your hope as you sent those emails?

A    Oh, I was hoping that Lindy -- obviously, Joe wasn't responding.  I was hoping Lindy would prod Joe, like I said, to do the right thing.  But as it got later in the game, I think I finally came to the realization these guys have

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

taken the money or done something, I don't know what.  But I've got no diamond and I'm out $12 million.  And --

Q    Can you flip to Exhibit --

A    -- (indiscernible) get it back.

Q    Can you flip to Exhibit J45, sir?

A    Go ahead.

Q    What's the date of that email?

A    May 13.

Q    You emailed both Joe and Lindy's email addresses, correct?

A    Yes.

Q    Did you ever receive confirmation from Lindy that she had received this or read it?

A    I didn't get confirmation from either of them.

Q    In fact, you intended this email just for Joe but added Lindy on later.  Isn't that correct?

A    No, I purposely intended the email for both of them.

Q    Okay.  I'd like you to read the first -- the introduction, "Hi, Joe and Lindy," and then the next two paragraphs after that, please.

A    "Last week" -- or "Hi, Joe and Lindy.  Last week on more than one occasion that you stated that you had wired the $2 million to me.  And since it was not -- has not shown up in my bank, obviously you did not do that and are being quite honest with me."  Typo.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Next paragraph.

A    Pardon me?

Q    Next paragraph, please, sir.

A    "I put a lot of faith and trust in you and Lindy in proceeding with this deal from the onset.  It sounded like a fun idea and an opportunity for all of us to make some money."

Q    In that second paragraph, why do you say, "you and Lindy"?

A    Because it was both them.

Q    Who was the "you" that you're addressing?

A    Pardon me?

Q    Who's the "you" that you're addressing in that email?

A    Joe.

Q    You.  Okay.  So it's Joe.

         THE COURT:  Are you going to wait for an answer, Mr. Foley --

         THE WITNESS:  He's a --

         THE COURT:  -- or just continue to badger the witness?

         MR. FOLEY:  I wasn't badgering, Your Honor.

         THE COURT:  Yeah, you were.  You ask a question, you wait for an answer, you don't argue with the witness.  It needs to stop now, sir.

BY MR. FOLEY:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q     Mr. Ritter, in the first paragraph of that email, you state, "On more than one occasion that you stated that you had."  Now I understand that one of those "that's" is a typo but reading it for what I think it's supposed to mean, "Last week on more than one occasion, you stated that you had wired the initial two million to me."  Do you agree that's what that email says?

A     It says that.

Q     Okay.  But you've admitted you didn't speak to Lindy, and Lindy didn't say that to you, correct?

A     Correct.

Q     Okay.  So on May 13th in that email, the "you" you're talking about is Joe, correct?

A     Yep.

Q     Okay.  Which is why later you say, you and Lindy because you're talking to Joe in this email.

A     I'm talking to Joe and Lindy in this email trying to get them to do the right thing.  At this point, I knew Joe was a crook.  I was hoping she had a little bit of fiber left in her to do the right thing.

Q     In fact, sir, you were sending these emails knowing that they were going to be used in litigation.  You were building a narrative.  Isn't that correct?

A     No, I didn't.  At this point, I didn't know that.

Q     No?

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 205 of 220
Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

A    No.

Q    When did you decide?  When did you think I'm going to get an attorney involved?

A    I think at the end of May I went to the FBI.

Q    Did you get an attorney involved then?  Your own?

A    I don't know when I got an attorney involved.

Q    Did an attorney -- strike that.  You didn't send these just to build a narrative up for litigation?

MS. CLAYSON:  Your Honor, I'm going to object to this.

THE WITNESS:  No, I was trying to get a --

MS. CLAYSON:  This --

THE WITNESS:  -- response --

THE COURT:  Oh, wait, wait.

THE WITNESS:  -- and get my money.

THE COURT:  Mr. Ritter, Mr. Ritter, stop.  We have an objection.  Objection sustained.

MS. CLAYSON:  Thank you.

MR. FOLEY:  I didn't get to respond.  I don't even know what the objection was.

THE COURT:  Say the objection again.  We'll do it again.

MS. CLAYSON:  The question was asked twice and --

THE COURT:  Mr. Foley?

MS. CLAYSON:  -- and it was answered.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY:  Asked and answered?

MS. CLAYSON:  Yes.

THE COURT:  Asked and answered.

MR. FOLEY:  I'll move on.

BY MR. FOLEY:

Q   Can you please, sir, flip to Exhibit J46?

A   Did you ask me to read it?

Q   Nope.  What I'd like you to do is read the BCC line of that email.

A   The what?

Q   The blind copy line.  The one that says BCC.

A   I see that.  It says ritterlabor@gmail.com and something (indiscernible) law.com.  That's -- that is my attorney's firm.

Q   Okay.

A   That's June, yep.

Q   So you were blind-copying your counsel on these emails by this time?

A   This one I did, yeah.  At that time, I must've contacted him.  But that's in mid-June.

Q   You state in this email, "I have other obligations that I need these funds for."  What were those obligations?

A   Like to take care of my family and my business.

Q   You testified on direct exam...  You testified on your direct exam that this put you under real financial distress.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Is that true?

A    If you lost 12 million, wouldn't you be under financial distress?

Q    I don't have the ability to lose 12 million.  So --

A    Yes, I was under financial distress because I just lost $12 million.

Q    What was your net worth at the time of the loss?

MS. CLAYSON:  Objection, Your Honor.  This is --

THE COURT:  No, no, wait.

THE WITNESS:  That's none of your --

THE COURT:  Mr. Ritter --

THE WITNESS:  -- damn business.

THE COURT:  -- don't answer.  Mr. Ritter --

MS. CLAYSON:  As --

THE COURT:  -- let's --

MS. CLAYSON:  -- Mr. Ritter eloquently stated, this is outside the scope of the direct exam and is not relevant to this litigation.

THE COURT:  Mr. Foley?

MR. FOLEY:  Not when he claims that he -- it is absolutely relevant when he claims that it put him under financial distress and that he needed the money to carry on his business and support his family.  He's made it --

THE COURT:  Objection --

MR. FOLEY:  -- relevant.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Objection sustained. This was way beyond the scope of direct. There was nothing about Mr. Ritter's net worth on direct.

MR. FOLEY: That exact statement that this put him under financial --

THE COURT: The Court has ruled. The objection's sustained. And we're talking $12 million, Mr. Foley, not $12.

MR. FOLEY: But see, I don't know what that means. If he has a billion dollars, 12 million is the same as $12 to me. It is relative, and it goes to exactly his position. First, he took the position that this was not impulsive --

MS. CLAYSON: Your Honor, I object.

THE COURT: The Court has ruled.

MR. FOLEY: -- (indiscernible) that it was.

THE COURT: The Court has ruled.

MS. CLAYSON: He's not on trial.

THE COURT: Continue.

BY MR. FOLEY:

Q    Between 2008 when Lindy's father passed away or about that time and 2019, did you see Lindy in person at all?

A    I don't recall.

Q    Okay. Did you speak regularly to her on the telephone? Let's say before --

A    No.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

Q    -- September of 2018?

A    No, I don't -- didn't.

Q    Okay.  And you're indirectly related.  What was it again just so I can remember?  Her brother's married to your sister?  Is that how it works?

A    Her brother is married to my sister.

Q    So you're not doing family events together.

A    Not that I'm aware of.  We ran in different social circles in town.  We would do --

Q    But you --

A    We would do some things together.  We owned a cabin together.  We still do.

Q    Okay.  But you hadn't seen her physically in ten years.  You didn't speak --

A    Who, Lindy?

Q    Lindy.

A    That's possible.

Q    You didn't speak regularly to her on the phone.

A    No.

Q    Okay.  Yet it's your testimony to this Court that you put all your faith and confidence in her?

A    Apparently, I did.  And absolutely, yes.

Q    And that seems reasonable to you?

A    To me it does, yes.  I mean, her father was my mentor.  There was a connection.  You may not understand that.  I

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 210 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

don't know what your relationship is with a family, but mine was.

Q    Well, some of them are good, some of them are bad.

A    Okay.

Q    You testified on direct exam, sir, didn't you, that this was a major portion of your life savings?

A    What did you say?

Q    You testified on direct exam that this was a major portion of your life savings, didn't you?

A    I think it might've been in one of these emails.

Q    Was it, in fact, a major portion of your life savings?

A    Absolutely.

Q    Okay.  When did you first make contact with Mr. Gelov?

        MS. CLAYSON:  Your Honor, I'm going to object. This is not a part of the direct examination here.  And so if Mr. Foley wants to do a direct of Mr. Ritter, he can absolutely do that on his case.

        THE COURT:  Mr. Foley?

        MR. FOLEY:  I'll withdraw the question.

        THE COURT:  Say --

        MR. FOLEY:  I'll withdraw the question and move on.

BY MR. FOLEY:

Q    Has Lindy ever told you that she wanted to harm you?

A    Pardon?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Has Lindy ever told you that she wanted to harm you?

A    That I what?

Q    That she wanted to harm you.

A    Harm me.

Q    Harm, hurt.  Has Lindy ever said that to you?

MS. CLAYSON:  Your Honor, objection.  Again, this is --

THE WITNESS:  Why would she?

THE COURT:  Wait, Mr. Ritter.  We've got an objection on the floor.

MS. CLAYSON:  Again, this is outside the scope of direct exam, and none of his testimony talked about Lindy wanting to harm him.

MR. FOLEY:  I don't think --

THE COURT:  Mr. Foley?

MR. FOLEY:  Your Honor, I don't think it gets that narrow in considering what can be brought up on cross.  What was brought up was the nature of the communications between Mr. Ritter and my client.

THE COURT:  The Court disagrees with you and sustains the objection.

MR. FOLEY:  Okay.

BY MR. FOLEY:

Q    After you wired the $12 million, what was the first point in time when you began to fear that something was

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 212 of 220
212-267-6868            www.veritext.com            516-608-2400
Veritext Legal Solutions

wrong?

A     Well, it's been a while, and I can't really recall exactly when, but I'm going to presume it was sometime in March or April when things just had not happened.

Q     Previously, you testified that on March 24th is when you began to suspect that something was wrong.  Is that correct?

A     Well, if you have something that indicates that, maybe it is.  I don't remember.

Q     You don't remember testifying to that here today?

A     I don't.

Q     Okay.

A     It's been a long day.

Q     Would you agree that each of the four emails that you sent that are exhibits that you sent to Joe and Lindy that we just went through --

          THE COURT:  Do you have exhibit numbers for us, Mr. Foley?

          MR. FOLEY:  J45, J46, J47, and J48.

BY MR. FOLEY:

Q     Would you agree each of those emails are after you made --

A     Huh?

Q     You agree each of those emails, Exhibits J45 through J48 in your book, were sent after you had transferred the

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 213 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

money into the Bank of America account.  Do you agree?

A     45, 46, 47, 48.

Q     Yes, sir.

A     Yeah, they're all dated after --

Q     Okay.

A     -- February.  So, yes.

Q     They're all, in fact, dated after you had already become concerned about this deal, yes?

A     Yeah, I think they are.  Yes.

Q     And before the time of the July email, Exhibit J48 --

A     With (indiscernible) on it.

Q     Well, no.  To be clear, that's Exhibit J46 sent on June 10th.

A     Okay.

Q     So by that time, you had obviously contacted a lawyer.  Yes?

A     That was in June, I think.  Yep.

Q     And by the end of June before July, you had already filed suit in North Dakota, yes?

A     If that's when it was, yes.  I don't recall the date.

Q     So it's fair to say nobody's going to directly communicate to you once a law --

A     Nobody's going to what?

Q     It's fair to say that nobody's going to directly communicate to you once you've filed a law suit against

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

them?

MS. CLAYSON: I'm going to object. This calls for speculation.

THE COURT: Mr. Foley?

MR. FOLEY: It calls for the witness' reasonable understanding and his expectation of a response to his emails that he has said is indicative to him that there was bad action by my client.

THE COURT: Okay. Stop a minute. Mr. Ritter, don't answer. The Court's going to sustain the objection. Because stranger things have happened that law suits get settled because parties actually pick up the phone and talk to each other. So, you are presuming a pattern of behavior that may or may not exist in this case, and because of that, it's speculation, and the Court sustains the objection.

MR. FOLEY: Thank you, Your Honor. I'll move on.

BY MR. FOLEY:

Q    Your law suit in North Dakota sought to recover money damages. Is that correct?

A    I guess that's it, yes.

Q    And in fact, judgment was entered for breach of contract? Is that correct?

A    If that's what it said, yes. I'm not a legal guy. I just let the attorneys handle that. But I know it was a judgment for dollars, yes.

20-04381-lsg   Doc 327   Filed 04/13/26   Entered 04/13/26 16:25:11   Page 215 of 220
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    What was it that convinced you to finally bring the North Dakota law suit?  Either cumulatively --

A    Well, just because I knew I wasn't getting anywhere. No response, no money.  I had to figure something was going on.  I didn't know any -- I didn't know anything about this money being out the door the day it got here.  I mean, it's just ludicrous.  But why it took me, what, seven or eight months to figure it out?

Q    Wouldn't the -- you --

A    What's that?

Q    You wired the money on February 7th?

A    February, yeah.

THE COURT:  February 6th.

BY MR. FOLEY:

Q    February 6th.

A    So, five months.  I don't know why it took so long.

Q    April, May --

A    A slow learner, I guess.

Q    Did you file the law suit in late June?  So it's just four months.

A    I don't recall what date it was, but if that's -- if you know that.

Q    I'm just saying I don't think you're that slow of a learner.  It was only four months.  During that time, what was it that finally put you over?  Was it the silence?

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

A    Well, I wasn't getting paid after getting indications that this diamond had been sold.  If it sold, where's my money?  Something's up.

Q    Did you want to sue Lindy?

A    Did I what?

Q    Did you want to sue Joe and Lindy?

A    Did I what?

Q    Did you want to -- you testified earlier that this has been emotional.  Did it bring you joy to sue Joe and Lindy?

A    Shit.  What kind of question is that?

Q    A real question.

A    Did it bring me joy to sue them?

Q    Yeah.

A    I was just trying to get something moving to find out what was going on since they weren't responding.  What else could I do?

Q    When you wired the $12 million into ultimately what would later be shown to be Joseph DuMouchelle Fine and Estate Jewelers' Bank of America account, was it your intention to wire that money directly to Joseph via Joseph DuMouchelle Fine and Estate Jewelers or to wire it to a seller?

A    I testified previously that it was always my intention to wire it directly to the seller or the seller's representative, and that's what that bank was purported to

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

be.

Q    And Joe lied to you.  Is that correct?  Joe lied to you in telling you that --

A    Apparently.

Q    -- was the seller's account?

MR. FOLEY:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Foley.  Redirect, or do you want to pick it up tomorrow?

MS. CLAYSON:  I think we might want to pick it up tomorrow.  It's been a long day.

THE COURT:  It's been a real long day.  Is there any objection, Mr. Foley, to having redirect pick tomorrow morning?

MR. FOLEY:  No.

THE COURT:  Okay.

MR. FOLEY:  It just leaves -- it leaves a lot of time, but I'm going to deal with that.  It's okay.  So, redirect tomorrow.

THE COURT:  Right.  It does what to a lot of time?

MR. FOLEY:  Leaves a lot of preparation time.

THE COURT:  In what way?

MR. FOLEY:  Witness preparation time.

THE COURT:  I don't understand.  What are you talking about?

MR. FOLEY:  It leaves a lot of preparation time

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

instead of going into it right now.  It leave counsel 12 hours.

THE COURT:  Oh, them, not yours.

MR. FOLEY:  Yeah.

THE COURT:  Okay.  Well, it is what it is.  It's 25 minutes to 5.  We've been at it since 10:00 in the morning with just a one-hour break and two 15-or-so-minute breaks.  I think it's appropriate.  I think the witness is tired from watching his demeanor, and he's an older gentleman.  And the Court wants to be respectful of everybody's energy and resources here.  It's a lot to pay attention to for all of you, Mr. Stec, Ms. Adducci, yourself, Mr. Foley, Ms. Clayson, and Mr. Cataldo, and the technologist.  So we're going to pick it up again tomorrow 10:00.  Ms. --

MR. CATALDO:  Thank you, Your Honor.

THE COURT:  Thank you.  Ms. London?

THE CLERK:  All rise.  Court is adjourned.

(Whereupon these proceedings were concluded at 4:38 PM)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

CERTIFICATION

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: April 13, 2026

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400