UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MICHIGAN

Case No. 19-54531

Adv. Case No. 20-04381

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

JOSEPH G. DUMOUCHELLE and MELINDA J. ADDUCCI,

      Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS RITTER,

          Plaintiff,

     v.

MELINDA J. ADDUCCI,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          Theodore Levin United States Courthouse

          211 W. Fort Street

          Detroit, MI 48226

          March 25, 2026

          10:42 a.m.

B E F O R E :

HON. LISA S. GRETCHKO

U.S. BANKRUPTCY JUDGE

ECRO: Erica Adams-Williams

212-267-6868        Veritext Legal Solutions      www.veritext.com      516-608-2400

**HEARING re Trial**

**Transcribed by:  Sonya Ledanski Hyde**

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

A P P E A R A N C E S :

TAFT LAW FIRM

    Attorney for Thomas Ritter

    27777 Franklin Road, Suite 2500

    Southfield, MI 478034

BY:  R. CHRISTOPHER CATALDO

    KIMBERLY ROSS-CLAYSON

JOHN R. FOLEY, P.C.

    Attorney for Melinda J. Adducci

    18572 W. Outer Drive

    Dearborn, MI 48128

BY:  PATRICK FOLEY

    JESSE STEC

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

I N D E X

WITNESSES:          DIRECT:    CROSS:     REDIRECT: RECROSS:

Melinda Adducci      5          63         153

EXHIBITS:                                             PAGE:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

P R O C E E D I N G S

THE CLERK: Calling case number 20-4381, Thomas Ritter v. Melinda Adducci.

MR. CATALDO: Good morning, Your Honor. Christopher Cataldo for Thomas Ritter, who's also in the courtroom with us here today.

MS. CLAYSON: Good morning, Your Honor. Kim Clayson for the plaintiff Thomas Ritter.

THE COURT: Good morning. Good to see all of you. Mr. Foley?

MR. FOLEY: Good morning, Your Honor. Patrick Foley on behalf of the defendant Ms. Adducci, who is also here.

THE COURT: Ms. Adducci, say your name, please.

MS. ADDUCCI: Melinda Adducci.

THE COURT: Thank you. Good to see everybody. Everybody have a seat. We are in the middle of Mr. Cataldo's examination. Ms. Adducci, please take your seat on the witness stand, ma'am. Mr. Cataldo, do you see any reason to re-swear the witness, or you're good?

MR. CATALDO: No, Your Honor.

THE COURT: Thank you.

MR. CATALDO: May I proceed?

THE COURT: Please.

DIRECT EXAMINATION OF MELINDA ADDUCCI

BY MR. CATALDO:

Q    Good morning, Ms. Adducci.  How are you today?

A    (Indiscernible), thank you.

Q    Ms. Adducci, yesterday you were telling us about a conference you attended in Tucson.  Do you remember talking about the conference?

A    Yes.

Q    Okay.  And it was called the 2019 Accredited Gemologists' Association Conference.  Is that right?

A    Yes.

Q    Okay.  And there was a conference that took place during the day where there were various presenters, and then there was a gala in the evening, right?

A    Correct.

Q    Okay.  Did you go to the gala?

A    Yes.

Q    So you didn't miss the gala.

A    No.

Q    Okay.

A    It wasn't a gala.  It was a -- they do awards presentation and a dinner, and then they do an auction.  So everyone gets together.

Q    Okay.

A    But I wouldn't call it like a gala like a dance or --

Q    So this was a one-day event.  It was the conference --

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 6 of 213
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    Correct.

Q    -- in the day, and then the gala at night --

A    Yes.  Yep.

Q    -- correct?

THE COURT:  Mr. Cataldo, could you repeat the name of the organization?

MR. CATALDO:  Yes.  The 2019 Accredited Gemologists' Association Conference.

THE COURT:  Yes.

MR. CATALDO:  Okay.

BY MR. CATALDO:

Q    And can you turn to Exhibit 30, please?  Are these the -- is this an article that's describing the conference?

A    Yes.  It looks like it.  Correct.

Q    And so -- and if we look at -- there's a second page, and then there are -- looks like pictures of three people who were presenters.  Is that right?

A    Yes.

Q    Okay.  And so if we look at this, it says the 2019 Accredited Gemologists' Association Conference in Tucson, Arizona took place 6 February and was attended by 138 people from nine countries, right?  That's what it says.  Okay. And then if we read further down, it says, "The day closed with the AGA gala and award presentations."

A    Yes.

20-04381-lsg    Doc 328    Filed 04/14/26    Entered 04/14/26 16:01:37    Page 7 of 213
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

Q    Right?  Okay.  And then if we look -- we go to the next page over these presenters, it says, "See what you missed on February 6, 2019."

A    Okay.

Q    Is that what it says?

A    Yes.

Q    So the conference was actually on the 6th of February, correct?

A    Yes.

Q    So when you went to the bank twice on the 7th, you didn't miss the conference, did you?  It was the day before, correct?

A    I guess.  I don't remember this.  From my memory.

Q    Okay.  So, let's go back to --

A    Maybe Joe asked -- maybe has (indiscernible) --

Q    Ms. Adducci --

A    -- on the 6th.

Q    -- there's no question pending, please.

A    I don't remember.  I guess I -- my memory's not --

Q    Ms. Adducci, yesterday we had talked about you filed a personal bankruptcy with your husband in October of 2019. Is that right?

A    Yes.

Q    Okay.  And do you remember that in connection with the bankruptcy, the bank also took your house through

212-267-6868          www.veritext.com          516-608-2400

foreclosure?

A     Yes.  I recall that.

Q     Yeah, I'm sure you would.

A     Yes.

Q     And you remember you defaulted on the mortgage?  It was April 1st of 2019 is the actual date of the default on your mortgage.  Does that sound right to you?

A     No.  I don't remember.

Q     You don't remember.  Okay.  Well, do you remember that as part of the bankruptcy, there was an adversary proceeding filed by William Noble that -- where he was trying to determine -- that company was trying to determine that there was a debt that was non-dischargeable similar to the adversary proceeding that brings us here today?  Do you remember that?

A     I do remember I was very surprised that it was.

Q     Okay.  And you were represented by counsel.  Same counsel here, right?

A     Yes.

Q     Okay.  And it was in front of this court, right?

A     Yes.

Q     Okay.  And that case was ultimately settled, was it not?

A     It was -- he -- I believe he was thrown out.  Just thrown out.

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

Q   So --

A   I don't know.

Q   Okay.  But --

THE COURT:  Excuse me.  Mr. Cataldo, could you give me the adversary proceeding number you're referring to?

MR. CATALDO:  20-04387.

BY MR. CATALDO:

Q   Do you recall that that case actually began by a law suit that was filed by William Noble Rare Jewels in Texas?

A   I later found -- I later discovered that.  I did not know that at the time.

Q   You remember that was filed in January of 2019?  You remember that?

A   I did not know that then.

Q   But you do know that now?

A   I've learned -- I've come to know that.  I didn't know that then.

Q   Okay.  And so yesterday, we looked at those cashier checks that you had printed out and you took with you when you left the bank on the 7th.  You remember talking about that yesterday?

A   Yes.

Q   And I want to turn back to that list of those checks, which was Exhibit 3 in your book.  Do you recall we talked about this yesterday?

212-267-6868                    www.veritext.com                    516-608-2400

A    Yes.

Q    Okay.  And one of the items on here, it's about the middle of the page down, John Regard (ph)?  I think I'm pronouncing that right.

A    Yes.

Q    I think you said yesterday that was your neighbor?

A    Yes.

Q    Why did you and/or Joe owe money to Mr. Ragard?  Am I pronouncing it right?  Is it Ragard?

A    Ragard.

Q    Ragard.  My -- okay.  Why did you owe money to Mr. Ragard?

A    I didn't know.  Joe had discussed opportunities with him, but I did -- I was not in discussion with him.  And I did not know what that was about.

Q    Okay.  Do you know today what it was about?

A    I don't really know exactly.

Q    Okay.  You just know this --

A    Some structure of whatever Joe had set up.  I don't know.

Q    But this was a -- right here, this was a payment 848,500 to your neighbor when he lived next door to you in Florida?

A    He lived across the street.

Q    Lived across the street.  Okay.  So, one of the emails

212-267-6868          www.veritext.com          516-608-2400

we looked at yesterday was Exhibit 43.

MR. CATALDO: And if you could -- John, bring that up a little bit.

BY MR. CATALDO:

Q   And you'll see that John Ragard is listed here. The email from Joe to the banker copied to you on the 7th showed that Mr. Ragard was going to get a check for 2,528,000. And then if we go back to Exhibit J3, the actual check that gets cut to Mr. Ragard is 848,500. Okay? And if you go back to -- so there's Exhibit 3. So how did the amount get changed from what Joe had emailed you and the banker in Exhibit 43 to the actual check amount?

A   I don't know.

Q   You don't know.

A   No.

Q   Okay.

A   Possibly Joe was on the phone. I -- Joe -- it was between Joe and the banker.

Q   So --

A   I did not direct any of this. At all.

Q   Okay. So do you know how much money in total Mr. Ragard claimed he was owed?

A   No.

Q   Okay. Do you remember that Mr. Ragard filed a claim in your bankruptcy?

212-267-6868                    www.veritext.com                    516-608-2400

A    I learned that later.

Q    Okay.  And so if we look at your bankruptcy schedules -- and you know what the schedules are, do you not?

A    Yes.

Q    Okay.  And you participated in the schedules for your personal bankruptcy, correct?  You told us that yesterday.

A    Yes.

Q    All right.  And so Exhibit 50 are your bankruptcy schedules that have been admitted into evidence.  And there is a section, and it begins on page -- if you look at the very bottom, there is a filing, like a computer filing, page 20 of 44.  If we could turn to that page if you could find that.  And it's called, yeah, Creditors Who Have Unsecured Claims.

A    Yes.

Q    Okay.  And then let's take a look at these.  If you go to the next page, it lists them.  And then the first three are American Express on page 21, and we're going to skip over those.  The next page we have Chase, Chase, and looks like Macy's Department Store.  Do you see that?

A    Yes.

Q    The next page we have a Discover card, and we have East Continental Gems.  What was that for?

A    I don't know.  Business that Joe had done with them.

Q    Then below that one, you see there's -- and again, I'm

Veritext Legal Solutions

on page 23.  There's John Ragard, $3,500,000.

A     Yes.

Q     Okay.  And so does this in any way refresh your memory on what Mr. Ragard was owed money for?

A     I did not know Joe had done anything with him.

Q     Okay.

A     And so at this time, Joe's dad died in the middle of May, and it was a very slippery slope all the way just hanging on.  And I have a lot of PTSD over it.

Q     Over what?

A     Over losing everything.  Over losing my house.  I know you're in this side of it, but I would like to see any one of you actually go through what I went through and survive because my faith is probably the only reason I'm sitting here.  I did not know Joe had done all of these transactions with these people.  And I didn't know how he had structured them.

Q     Okay.  But you knew --

A     I did not know.

Q     -- what he had done with Mr. Ritter.  You knew that. We --

A     That is the only thing I knew.  At that time, I didn't know about any of these others.

Q     All right.  Well, let's -- let me --

A     And I believed Joe and the stories that he was telling

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

me.  He was being deceitful and lying to me.  So just like
Mr. Ritter --

Q    Well --

A    -- is here, I am here.  I feel like a victim too, only
the other victim is after me now blaming me because I
couldn't control Joe.  And you know what?  No one can
control the other person.  That is --

Q    All right.  Well --

A    -- very -- it's very (indiscernible).

Q    -- let's go back to these schedules because I want to
finish this -- with this document and then we can move on,
okay?  So if you go to the page that's page 24, there's
Jonathan Bimba (ph) and J.B. International there --

A    Jonathan Birnbach.

Q    Birnbach.  I'm sorry, 3.4 million and change.  What was
that for?

A    I don't know.

Q    Okay.  The next one down is Marty Harrity.  What's that
one for?  900,000.

A    Another something Joe did, made a deal with him.

Q    Okay.

A    And I don't know -- I don't even know how he could have
all this money and what he would be doing with it.

Q    So then if we go, Nanette Poole, further down, she's
owed 30,000, right?

212-267-6868                    www.veritext.com                    516-608-2400

A    Yeah.  It's his sister.

Q    That's his sister.

A    She was in the courtroom the first day.

Q    Okay.  Then if we go to the next page, please, there's Synchrony Bank, and then it says Lowe's, and 1,298.  We'll skip over that one.  And then the next one is Teodor Gelov, 1,800,000.  You see that one?

A    Yes.

Q    And Mr. Gelov was the gentleman who was on the phone with you in that call that was recorded that we heard yesterday, correct?

A    Yes.  Mr. Gelov is the --

Q    Okay.  That -- it's all --

A    -- father of my nephews.

Q    Okay.  But that was the gentleman that we --

A    The father-in-law of my nephew.

Q    -- we heard on the call.

A    Yes.

Q    You were talking with Mr. Gelov yesterday about his -- that was -- he was asking you about where his money was, and you were talking to him yesterday.  That's what that was, correct?

A    Yes.

Q    And do you recall that that call was in first week of March of 2019?  Does that sound right?  Is that yes?  First

week of March of --

A   You have the date, so you tell me.

Q   I'm asking you.  You're the witness.

A   I believe.

Q   Okay.

A   My memory is -- it was a very hard time for me.

Q   Okay.

A   And anybody in my situation that lost everything, everything including their husband, would be like me.

Q   Okay.  Well...

A   I worked very hard to --

Q   Ms. Adducci, there's no question pending.  The next one is Mr. Ritter, whose 12 million, right?  That's why we're here today.  That this debt.

A   Yes.

Q   Okay.  Then the next page there's two more, and there is U.S. Bank, and U.S. Bank, and then if we flip to the next page 27 through 44, the total is about 22,637,000.  You see that?

A   Yes.

Q   Okay.  Now, I'm going to go back to Exhibit 3, if we could, that list of the checks.  Because there's a couple of other ones on here that I want to ask you about.  What's Abbott's Corporation?  It's the one, two, three, fourth one down, Abbott's Corporation.  What was that one for?

A    I don't know.

Q    Well, the one you mentioned yesterday you did know something about was Kwiat, K-W-I-A-T.

A    I didn't say I knew anything about it.  I know who they are.

Q    Who are they?

A    They're a diamond company in New York and they have a retail business.  But Sheldon Kwiat was one of the first people that Joe introduced me to because he went to school with him at GIA in the early -- in the 1980s.  So Joe was very close with the Kwiat family.  Personally very close.

Q    And who's David Husman?  He's the last one here.  He got a check for $1,091,769.44.  Who is he?

A    I don't know what this was for here because I did not participate in any borrowing money from him.  But David Husman was a very good buyer of ours at auction for probably 15 -- at least 15 years or more.  And his daughter is Lori Greiner on Shark Tank.

And Lori I sold a diamond to and worked with in New York while she -- I -- they -- we were very close to them. And he was a buyer of mine, and I worked with him as a buyer when he was buying at auction.  He would go through the catalog at auction.  So I never borrowed money from him, but I don't know what Joe did with him.  He also owned a bank, so...

20-04381-lsg    Doc 328    Filed 04/14/26    Entered 04/14/26 16:01:37    Page 18 of 213
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

THE COURT:  A point of clarification.  Who owned a bank?

THE WITNESS:  David Husman was involved in owning a bank.  Yeah, I don't know if -- I don't know what this is for, but Joe -- yeah, we were -- he's also Richard Drucker's cousin.  So -- but he's -- Lori Greiner on Shark Tank, it's his -- this is her dad.

BY MR. CATALDO:

Q    And so just to be clear, when you were there at the bank the second time, all right, you talked about earlier you went there in the morning on the 7th at about 11:00, right?  Remember that?

A    Yes.

Q    Then you left and came back.

A    Yes.

Q    All right.  And at -- and your second trip, the banker would've handed you this stack of checks, correct?

A    I don't think she -- I don't know if she handed me a stack.  I remember Joe being on the phone with her.

Q    But Joe was in Michigan.

A    Yes.  Joe did everything.  And I did go to a dinner that night, but I went with another group.  There was another group that I went with to dinner.  I --

Q    So the conference dinner was the night or the --

A    I was only --

Q    -- day before.

A    -- there until Saturday morning.  I flew out Saturday
morning.  Because there was another event Friday.

Q    Ms. Adducci, Joe was in Michigan.

A    Yes.

Q    Okay.

A    Directing all of this.

Q    But for these checks to get from Arizona to Michigan --

A    Yes.

Q    -- they had to go into your hands --

A    Yes.

Q    -- into a Federal Express envelope.

A    That I immediately would've sent to Joe.

Q    Which you sent to Joe.

A    Yes.

Q    Okay.

A    Yes.

Q    But for that, the checks couldn't have gotten to Joe
because you had to send them, right?

A    Did what he asked me to do because I didn't think there
was anything -- I didn't believe at the -- I didn't know at
the time that there was anything -- I thought what I was
doing -- I didn't think it was anything wrong or abnormal.

Q    So --

A    Although, yeah, I --

212-267-6868          www.veritext.com          516-608-2400

Q   Yeah, Ms. Adducci, you said also yesterday -- I just want to be clear about this.  You already had the Federal Express envelope --

A   I don't know.

Q   -- (indiscernible).

A   I could've.  I used to carry them around in a -- when I was going to a conference, I used to have them with me.  I always traveled with them because they were pre-printed.  But if I didn't have it, I would've filled out the account number.  I don't know.  I don't remember.

Q   So -- but then you would've had to drive to a Federal Express office --

A   Joe would've found for me.

Q   Okay, but you drove there, right?

A   Yes.

Q   And then you would have sent the package with the checks to Joe, right?

A   Just like I did a million times for other things (indiscernible).

Q   Ms. Adducci, if you'd just --

A   Yes.

Q   -- answer the question.  Please.  You'll have an opportunity when counsel is speaking with you to tell your story, but please just answer my question.  Okay?  So, one of the documents we looked at with Mr. Ritter we haven't

talked about with you yet is Exhibit 45. If you could turn to that. Now, this is an email that Mr. Ritter sent to you and to Joe on May 13 of 2019, correct?

A    Yes.

Q    Okay. And it's sent to you at Melinda Adducci lindy@josephdumouchelle.com, correct?

A    Yes.

Q    That's your business email, right?

A    Yes.

Q    Okay. That's the same email address we looked at yesterday that's on your signature block on Exhibit 9, right? Exhibit 9 has that.

A    Yes.

Q    Okay. And you told us yesterday when we looked at the bank statements, and remember in May of 2019 --

A    Yes.

Q    -- would you agree things were going poorly to say the least? You looked at, I think, 132 bounced checks out of that Bank of America account in May? Is that right? Okay? And at this point, there were numerous creditors that had brought law suits?

A    Yes.

Q    Okay. Do you remember how many different creditors have brought law suits?

A    No.

212-267-6868                    www.veritext.com                    516-608-2400

Q    There were -- but there were numerous law suits going on.

A    You tell me.

Q    No.

A    I don't know.

Q    Okay.  But you know there were law -- you were getting sued.

A    Dad died --

Q    Ms. Adducci --

A    -- about two days later.  And I asked Joe -- every time I would say to him -- and I don't recall seeing this email, so he -- I don't know what he did, but I was told not to answer anything legally with any legal things once the law suit came out.  But with Tom, Joe always told me that everything would work out.  He still would give me -- he still blamed everything on Bill Noble.

Q    But Ms. Adducci --

A    But I don't remember where --

Q    -- we went through the bank statements yesterday, right?

A    Yes.

Q    Mr. Ritter's money, that 12 million, was gone by the end of February, right?  We could look that up again, but --

A    Yes.  Now that I --

Q    -- it --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Not what I look back on it, yes.

Q    And we looked at that account, and it was negative in March, negative in April, negative in May, and there were a hundred-plus checks being bounced out of that account, right?  Okay?  So, is it that Joe would've told you not to --

A    No.

Q    -- respond to --

A    Well, he --

Q    -- to Mr. Ritter?

A    -- he -- I was told just -- I don't know.  I would've not known how to respond.  I -- this was Joe's -- Joe worked with Tom, and I -- Joe worked with Tom all the time even back in North Dakota.  And he didn't see me when he said he did.

Q    Ms. Adducci --

A    So --

Q    Ms. Adducci --

A    -- I would've asked Joe what is going on, and he was constantly lying to me and giving me answers.  But this time May, his dad died like --

Q    Ms. Adducci, we looked over yesterday that contract that you read to your son.  Remember that?  You read it out loud to your son.

A    I believe I read --

Q    Is that correct?

A    I believe I read that contract, but it also could've been the initial -- I don't know that I read that whole contract.  It could've also been an initial where they said there were two where they put it together and they both worked it together.

Q    Ms. Adducci --

A    It could've been that.  Now that I think about it --

Q    Ms. Adducci, are you --

A    -- it may not have been the contract.

THE COURT:  All right.

THE WITNESS:  The long --

THE COURT:  I'm going to intercede at this point.

THE WITNESS:  The longer that I remembered reading it --

THE COURT:  Ms. Adducci --

THE WITNESS:  Sorry.

THE COURT:  -- you're on the witness stand.  You have taken an oath to tell the truth.

THE WITNESS:  Okay.

THE COURT:  You must tell the truth, and you must answer the questions asked.  So if Mr. Cataldo asks you what time it is, do not tell him how to build a clock.  Answer his questions.

THE WITNESS:  Sorry.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: Okay. Mr. Cataldo.

MR. CATALDO: Thank you, Your Honor.

BY MR. CATALDO:

Q    Mr. Adducci, yesterday -- just this, are you changing the testimony --

A    No.

Q    -- that you gave us yesterday?

A    My memory is -- this was -- my memory is -- it's been a long time.

Q    But you also --

THE COURT: I -- wait, I have a clarifying question. I understand time has passed, but I've heard multiple references to your memory. Is there a condition that is impairing your memory and ability to recall events, ma'am?

THE WITNESS: I -- it -- I've been through -- I have a lot of PTSD over this.

THE COURT: Okay. Are you taking medication that impairs your memory? Okay.

THE WITNESS: I'm actually just taking supplements to try and help it.

THE COURT: Okay.

THE WITNESS: Because it's been a long time and these were very detailed things. And I am not used to a legal world like this of what I -- yeah, this --

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 26 of 213
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

THE COURT:  Okay.  But --

THE WITNESS:  I just trusted Joe all along.

THE COURT:  I understand.  And even in response to my questions you're having trouble staying on point.  It's really important that you answer Mr. Cataldo's questions.  He has the right to ask them, and your lawyer is going to ask you questions that he's been working on for days.  It'll -- when it's his turn.  Got to answer the questions.

BY MR. CATALDO:

Q    Ms. Adducci, yesterday you told us that you read the contract between Joe and Tom Ritter to your son Joey.  Remember telling us that?

A    Yes.

Q    And you did that -- you read it to him over the phone, right?

A    Yes.

Q    And you remember Joey's response was be really careful about this because Tom sues everybody.  Remember that?

A    Yes.

Q    Okay.  And that was back in January, very end of January 2019, right?

A    Yes.

Q    And so you were trying to be very careful about doing everything right on this transaction --

A    Yes.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 27 of 213
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

Q    -- weren't you?

A    I cared about Tom, yes.

Q    Okay.  So --

THE COURT:  I didn't hear that answer.  Careful --

THE WITNESS:  Yes, I cared for --

THE COURT:  Did you say careful with Tom?

THE WITNESS:  I cared about Tom.

THE COURT:  Okay.

THE WITNESS:  I really cared about -- that it --
and I turned in as --

THE COURT:  Yes.

BY MR. CATALDO:

Q    But Ms. Ritter -- Ms. Adducci.  I apologize.
Withdrawn.  Ms. Adducci, after --

MR. CATALDO:  Your Honor --

THE COURT:  My apologies.  I started it.

BY MR. CATALDO:

Q    After J45 was sent to you, did you pick up the phone
and just call Tom and say, Tom, things got out of control, I
am so sorry that this happened?

A    No.

MR. FOLEY:  Objection, Your Honor.

THE COURT:  Oh, okay.  Let's hear the objection.

MR. FOLEY:  It just appears we're repeating
testimony that was already --

MR. CATALDO: (Indiscernible) answer the question.

MR. FOLEY: Oh --

THE COURT: All right. The Court has -- thank you, Mr. Foley. The Court hears you but is going to overrule the objection because it's the Court's impression that Mr. Cataldo is asking a question to put a cap on it per subject, which is a technique that is well used. So go ahead, Mr. Cataldo. It's overruled. (Indiscernible).

MR. CATALDO: The witness already answered the question.

THE COURT: She answered, but her answer was no.

BY MR. CATALDO:

Q    Yesterday you heard Tom talk about the stress and anxiety he was under in having entrusted $12 million to you and your husband and getting no response from him. So my question is, why didn't you pick up the phone and call Tom and just be honest with him about all this?

A    Because I was -- well, this date in May, number one, I don't recall seeing this. So I don't know what Joe did. I don't know -- I don't remember.

Q    I'm not asking what Joe did. I'm asking what you did.

MR. FOLEY: Your Honor, I am going to object to the interjection and the answer. She must have seen the email in order to take action on it, and she just said she doesn't recall seeing the email. I think that's a valid

part of an answer to the question.

THE COURT:  Mr. Cataldo?

MR. CATALDO:  I'll rephrase.

THE COURT:  All right.

BY MR. CATALDO:

Q    Were you still getting business emails in May of 2019?

A    I don't know.  I don't know.

Q    Was the business closed at this point?

A    It was sliding downhill.  At some point our office was closed and we had moved out of it.

Q    Okay.  Do you recall when it was you stopped getting emails at lindy@josephdumouchelle.com?

A    I don't recall.

Q    Okay.  So -- but it's your testimony you didn't see J45.

A    I don't remember ever seeing that.

Q    Is it possible you saw it and made a conscious decision --

A    No.

Q    -- that you don't want to talk to Tom?

A    No.  Joe could've --

Q    I'm just asking what you did, Ms. --

A    No.

Q    Okay.

A    I don't believe so.

Q    So, then we looked at J46 yesterday, and this is another email.  It's from Mr. Ritter to Joe and yourself, same email address.  It's dated June 10 of 2019.  Did you see this email?

A    No.

Q    And then there's J47 we looked at.  There's another email.  This is from Tom to Joe and yourself, same email address.  This one is June 21.  It's your testimony that you didn't see this one either.

A    I do not recall seeing this email.

Q    Okay.  Then J48, another email from Joe -- I'm sorry, from Tom to both Joe and yourself, same email address.  This one's July 2nd.  I'm assuming your testimony is you didn't see this one either, right?

A    I don't recall.

Q    Okay.

          THE COURT:  I have a clarifying question.  Ma'am, you testified earlier that you were uncertain whether you were still getting business emails in May of 2019, but... No, I'm not going to ask it.  I'm sorry.  When did the office close?

          THE WITNESS:  Timeline is -- the timeline is in my head.  It would've been the Merrillwood.  Merrillwood.

          THE COURT:  But even if the office closed, ma'am, there could be --

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

THE WITNESS:  Right.  There could be email.

THE COURT:  -- you could still be receiving email. So the Court's not understanding.  Could you clarify the connection between the office closing and the ability to receive emails?

THE WITNESS:  Without the office being there, the business would've been doing down to nothing.  And my attorneys told me to not answer, you know, anyone if I -- I don't know.  I don't -- this is -- it's very vague.  After his dad died and in the middle of us with our house and everything, it's -- it was a very hard time.  And Joe kept going --

THE COURT:  I want to focus on whether the emails came through.

THE WITNESS:  Yeah.  I -- the --

THE COURT:  The closing of the -- and these are clarifying questions, Mr. Cataldo, because I need a better understanding.

THE WITNESS:  Yeah.

THE COURT:  One can close a physical office, ma'am -- my turn.  One can close a physical office, but emails could still be received because they're coming through on the computer.

THE WITNESS:  Yes.

THE COURT:  Okay.  You understand that.

THE WITNESS:  Yes.

THE COURT:  Correct?  Is that what happened here?  The office closed but emails were still coming through on the computer?

THE WITNESS:  Well, they could've still come through, but Joe could've put this into a different box.  He could've moved these from me seeing them.

THE COURT:  So your testimony is that you didn't see.

THE WITNESS:  I do not recall seeing these.

THE COURT:  You don't recall seeing these.

THE WITNESS:  I don't recall seeing these.

THE COURT:  Okay.

THE WITNESS:  I don't think I ever saw these or read these.  I don't recall.

BY MR. CATALDO:

Q    Do you recall the FBI going into the office at the time Joe was --

A    No.

Q    -- arrested in the fall --

A    No.

Q    -- of '21?

A    I didn't.  No.

Q    2019?

A    No.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 33 of 213
212-267-6868                          www.veritext.com                          516-608-2400
Veritext Legal Solutions

Q    So, all right.  I'm going to --

A    I don't believe I was there.

Q    I want to change subjects then.

          MR. CATALDO:  Your Honor, bear with me.  I'm having trouble finding an exhibit.

          THE COURT:  No worries.

BY MR. CATALDO:

Q    Exhibit 34.  In Exhibit 34 is Joe's plea agreement.  Do you know what a plea agreement is?

A    I know.

Q    Your husband pled guilty to wire fraud, correct?

A    Yep.  Yes.

Q    Okay.  And in connection with the $12 million taken from --

A    Yes.

Q    -- from Tom Ritter, right?  And this is the actual written agreement regarding that plea, correct?

A    Yes.

Q    And you can see that on the first page of Exhibit 34, defendant will enter a plea of guilty to one count of the information which charges wire fraud 18 U.S.C. Section 1343, right?  Correct?  What's what that says?

A    Yes.

Q    Then the next page says the elements of one count -- I'm sorry, elements of Count 1 are as follows, and then it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

lists three points.  The defendant knowingly devised and executed a scheme to obtain money and property by means of material, false, and fraudulent pretenses, representations of promises that the scheme included material misrepresentations, or the concealment of a material fact that the defendant used or caused the use of a wire communication in interstate commerce in furtherance of the scheme, correct?

A    Yes.

Q    All right.  And then the next section talks about the factual basis for the guilty plea, okay?  And then if we look down, wire fraud Count 1.  And the plea uses initials instead of full names.  You understand that?  So you understand that in this document, T.R. is Tom Ritter.  Okay.

THE COURT:  Was that a yes, ma'am?

BY MR. CATALDO:

Q    Okay.  "In late 2018, T.R. contacted DuMouchelle attempting to collect a 430,000 debt DuMouchelle owed him.  In order to convince T.R. into believing that the debt would be paid, T.R. offered" -- I'm sorry, Ms. -- my bad.  "DuMouchelle offered T.R. an investment opportunity, which DuMouchelle promised would be more than paid back -- would more than pay back his debt."  Did I read that correctly?

A    Yes.

Q    Okay.  "DuMouchelle told T.R. he had an opportunity to

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

buy The Yellow Rose diamond and would be able to sell lit for much more than he paid for it." That's what that says, correct? And The Yellow Rose is what we've been spending three days talking about here in this case, right?

A     Yes.

Q     "DuMouchelle promised," and go to the next page, "that if T.R. bought The Yellow Rose, DuMouchelle would resell it and would split the profits 70/30 with T.R.," correct?

A     Yes.

Q     And in fact, that agreement is what we looked at, Exhibit 10, that you -- that's the contract you read to your son Joey over the phone, right?

A     Yes.

Q     Okay. "DuMouchelle, to obtain money by means of false and fraudulent material promises and representations, instructed T.R. to wire transfer 12 million for the purchase of The Yellow Rose. T.R. agreed to the terms, but insisted that the money be transferred to the seller's account or a representative of the seller, but not to DuMouchelle's account.

"With intent to obtain T.R.'s money by means of material, false, and fraudulent promises, pretenses, and representations, DuMouchelle falsified documents and emails making it appear that the account the money would be wired to was the seller's or the seller's representative." Did I

read that correctly?

A    Yes.

Q    Okay.  And yesterday, we looked at, for example, the signature card signed by you, Exhibit 4, that opened up the bank account at Bank of America, the one you told us about when you were in Florida -- I'm sorry, Florida, Sanibel, account number 0585, correct?

A    Yes.

        THE COURT:  Excuse me.  What exhibit is this?

        MR. CATALDO:  This is Exhibit 4.

        THE COURT:  Okay.

BY MR. CATALDO:

Q    And the name on the account was Joseph DuMouchelle Fine and Estate Jewelers, LLC, correct?

A    Yes.

Q    Then we also looked at yesterday Exhibit 15, which was the wire transfer information that Joseph sent to Mr. Ritter on the 6th to get him to send the wire of 12 million to the account that you had set up with that account number 0585, correct?

A    Yes.

Q    And in fact, Mr. Ritter sent that wire transfer to that bank account, correct?

A    Yes.

Q    And the information for the account number 0585 was in

212-267-6868          www.veritext.com          516-608-2400

your possession on the 5th when you opened up this account, right?

A    Yes.

Q    And you would've called your husband and told him I have opened the account, here's the number, correct?

A    No, I don't know.  I don't remember calling him.

Q    Okay.

A    He could've gotten it another way I believe.

Q    Okay, but he could've also gotten it from you.

A    Possibly, yes.

Q    Okay.  So you may have provided him the number or the information to use, and you've told us you knew the purpose of that account was to get the wire transfer from Tom Ritter, correct?  $12 million, right?

A    For -- the purpose of the account was also because we were having problems with FineMark Bank.

Q    But you --

A    We were going to also have it be our bank account.

Q    Okay.  But we know from the bank statements, Ms. Adducci, that when that account got set up, the only money in it was $500 plus Mr. Ritter's 12 million, right?  Is that correct?

A    Yes.

Q    Okay.  So let's go back to the guilty plea, Exhibit 34.  "Also with the intent to obtain money by means of false and

212-267-6868          www.veritext.com          516-608-2400

fraudulent" -- I'm reading in the middle of the page on page 3 -- "also with the intent to obtain money by means of false and fraudulent material promises and representations, DuMouchelle sent the false information to T.R. with directions to wire the money to the account with a notation that it was for the benefit of R.D. In fact, the wire transfer directions DuMouchelle sent T.R. were for DuMouchelle's Bank of America account ending 0585, and there was no actual buyer for The Yellow Rose." Did I read that correct?

A    Yes.

Q    And that 0585, that's the account you set up in the name of your company account, correct?

MR. FOLEY:  Objection, Your Honor.  Asked and answered now about five times.

MR. CATALDO:  Not in the context of this document, Your Honor.

MR. FOLEY:  Your Honor, in response, it's not a jury trial.  The point has been made.  It has been admitted. I don't know what it's being played to, but it's not necessary.  It's been answered over and over, and at this point it feels like just badgering.

MR. CATALDO:  Your Honor, this is an important part of the case.  This is pulling together --

THE COURT:  The Court's going to allow it because

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

the Court wants to make sure as the trier-of-fact that it understands the arguments, you know, how the counsel for the parties are connecting the dots so to speak. So the Court's going to allow it.

BY MR. CATALDO:

Q   Ms. Adducci, I'm going to try that one again since you may not remember the question. You read this sentence here in the plea agreement that references the wire transfer directions DuMouchelle sent T.R. were for DuMouchelle's Bank of America account ending 0585 and there was no actual buyer for The Yellow Rose. Did I read that correctly?

A   Yes.

Q   And that 0585 Bank of America account is the account you had set up on Sanibel Island on the 5th of February, correct?

A   Yes.

Q   In the name of your company, correct?

A   Yes.

Q   All right. Going to the next paragraph, "Convinced that DuMouchelle was telling the truth on February 6, 2019, T.R. wired 12 million to DuMouchelle's DFE account at Bank of America." And we look at that on Exhibit 5, the bank statement. If you'd go to the next page, please. There we go. There's the wire transfer hitting the account on the 6th, correct?

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A     Yes.

THE COURT:  What exhibit is this, Mr. Cataldo?

MR. CATALDO:  It's Exhibit 5, Your Honor.  That's the Bank of America bank statement.

BY MR. CATALDO:

Q     And you knew when you set up that bank account that the purpose of that account was to get that wire transfer from Mr. Ritter, correct?

A     And also to open -- yes, and to open another business account, banking account that we needed that was a larger bank.

Q     Okay.  But there never was any -- well, let's keep going.  We'll get to that.  The next sentence of the -- going back to 24 reads -- I'm sorry, 34, "After receiving the funds and in effort to lull T.R. into believing the purchase of The Yellow Rose was legitimate, DuMouchelle sent T.R. a fraudulent receipt making it appear that T.R. had purchased The Yellow Rose."  You see that?

A     Yes.

Q     And in fact, we looked at that fraudulent receipt yesterday, and that was Exhibit 17.  Correct?  Okay.  The next paragraph goes on, "The balance in DuMouchelle's Bank of America account before T.R.'s 12 million was deposited was $500."  Correct?  We looked at the bank statement.  We can bring that up again.  There was only $500 in that

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

account.  There was never any money from FineMark that was moved into that account, was there?

A    Not at that time.

Q    Ever, was there?  Was there ever any money from FineMark?

A    I don't know.

Q    You don't know.  Okay.

A    I assume so.

Q    But then it says -- well, we have the statements.  We went through them.  Certainly in February there was no money from FineMark moved into that account, was there?

A    I was not looking at the (indiscernible) --

THE COURT:  Ma'am, I can't hear your voice.

THE WITNESS:  I was not looking at the online statements.

BY MR. CATALDO:

Q    Can you just answer my questions?

MR. FOLEY:  Your Honor, can we just ask my client to pull the mic a little closer?

THE COURT:  Oh, please.

MR. FOLEY:  It might make things easier.

THE COURT:  Pull the microphone closer.  I want to hear everything.

MR. FOLEY:  You can pull it down too, Lindy, so your mouth's a little closer.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 42 of 213
212-267-6868          Veritext Legal Solutions          516-608-2400
www.veritext.com

THE COURT: There you go. So to be clear, the Court -- for the witness to say there was no money from FineMark in the Bank of America account ending in --

MR. CATALDO: That was the question.

THE COURT: -- 0585.

MR. CATALDO: There was never a deposit.

THE WITNESS: This time, no.

THE COURT: At what time?

THE WITNESS: At this time you're asking -- we're looking at.

THE COURT: Which is February of 2019?

THE WITNESS: Right.

THE COURT: Okay.

THE WITNESS: I don't -- what does a counter-credit mean? Is that a check, or was that a FineMark check? Or was that a --

BY MR. CATALDO:

Q    You tell us.

A    I don't remember.

Q    Okay. So that -- the next sentence reads, "Immediately after the deposit, DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." That's an element of what your husband pled guilty to, correct?

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   All right.  But then let's go back to Exhibit Number 5 because we talked about this yesterday quite a bit.  What happened on the 7th?  We looked at -- there were actually six withdrawals from that account on the 7th.  That's the day after the 12 million went in, okay?  You see that?  We looked at that yesterday.

A   Yes.

Q   The three were those inter-bank transfers that you had authorized, two to Bill Noble and one to -- there was another company.  Remember that yesterday?  Was that...

A   Yes.

Q   Okay.  And then three that ended up being the cashier's checks that were taken out that are referenced and that we've looked at yesterday where you signed the actual withdrawals, correct?

A   Yes.

Q   For that $5 million.

A   At the direction of Joe.

Q   But you were the one who actually withdrew the money from the account for which --

A   But I didn't --

Q   -- Joe pled guilty for.

A   -- know.  I didn't think anything was going --

Q   Ms. Adducci --

A   I didn't know at the time --

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

Q    Ms. Adducci --

A    -- anything was wrong.

Q    -- (indiscernible) my question to you.

A    I didn't --

Q    Did you --

A    -- think there was any fraudulent activity.

Q    Wait.  Ms. Adducci --

A    I didn't know.

Q    Ms. Adducci --

          THE COURT:  Ms. Adducci, I'm going to caution you.

          THE WITNESS:  Yeah.

          THE COURT:  Answer the question.

          THE WITNESS:  Okay.

          THE COURT:  You're telling him --

          THE WITNESS:  Yes.

          THE COURT:  -- how to build a clock and right now
he hasn't even asked yet.

          THE WITNESS:  Yes.

BY MR. CATALDO:

Q    Okay.  You talked about this yesterday.  You knew it
was Tom Ritter's money in that account, right?

A    Yes.

Q    Okay.  And you took out either through cashier's checks
that you signed for or electronic transfers that you
approved about nine and a half million dollars the next day,

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

correct?
A Yes.
Q And if we go back to the guilty plea, your husband, he pled guilty to a crime based on that nine and a half million dollars that you took out of the account, right?
A Yes.
Q Okay. Now, do you recall that when Joe was sentenced, the sentencing was in front of the federal judge. His name was Mark Goldsmith. You remember that?
A Yes.
Q Were you there that day?
A No.
Q Do you recall that Judge Goldsmith made a determination to apply something called a sophisticated means enhancement?

MR. FOLEY: Objection, Your Honor. Any questioning regarding this after she's testified she wasn't present is irrelevant.

THE COURT: Well, I'm going to --

MR. CATALDO: It's in evidence, Your Honor.

MR. FOLEY: And that's exactly my point. It is in evidence.

THE COURT: I -- here's my question. Mr. Cataldo, if you're asking for if she observed that that happened from being present in the courtroom, Mr. Foley's objection is sustained. But if you're asking it -- if she has knowledge

of it from -- that she would've gotten other than from being there, then the objection's overruled. And Mr. Foley, I think that's simply what you're saying.

MR. FOLEY: Yes, Your Honor.

MR. CATALDO: Let me try it a different way.

THE COURT: Okay. Wait, was that a yes?

MR. FOLEY: Yes, Your Honor.

MR. CATALDO: Okay.

BY MR. CATALDO:

Q   Part of our -- it's already in evidence is Exhibit 25.

THE COURT: A joint exhibit.

MR. CATALDO: It's a joint exhibit. It's been admitted.

BY MR. CATALDO:

Q   And do you see that this is something -- it's an opinion and order regarding application of the sophisticated means enhancement. Okay? Does this refresh any -- your memory that there was a sophisticated means enhancement (indiscernible) --

MR. FOLEY: Objection to the form of the question.

THE COURT: Woah, woah, woah, woah. I --

THE WITNESS: I've seen this.

THE COURT: I didn't hear the question. I heard there was an objection and an answer. So what was the question, Mr. Cataldo?

212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO:  I just asked her if this refreshed her recollection about there being a sophisticated means enhancement in connection --

THE COURT:  Okay.  Hang a second.  Ms. Adducci, your lawyer has objected.  Mr. Foley?

MR. FOLEY:  Objection to the form of the question. There was no question to which she said she didn't recall, that she testified she wasn't present.  So I'm objecting to the form of the question.  He asked her if it refreshes her recollection regarding the --

THE COURT:  Oh.

MR. FOLEY:  -- application of the (indiscernible) --

THE COURT:  So you're saying the predicate isn't there.  Mr. Cataldo --

MR. FOLEY:  Yes.

MR. CATALDO:  I'll try to get it a different way. Okay.  It's in evidence.  I'm entitled to ask the witness about it.

THE COURT:  You are.

MR. CATALDO:  Okay.

BY MR. CATALDO:

Q    So, I want you to take a look at the first page.  It says, "Defendant Joseph DuMouchelle is charged with committing wire fraud in violation of 18 U.S.C. --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

DuMouchelle pleaded guilty, see Rule 11 plea agreement, and is to be sentenced July 28, 2022."

THE COURT:  July 28, 2022.

MR. CATALDO:  You are correct, Your Honor.  Thank you for helping me out.

BY MR. CATALDO:

Q    That plea agreement is what we just looked at a minute ago.  Do you recall that at all?

A    Yes.

Q    Okay.  So if we go to the next page, the court talks about once again the whole Yellow Rose transaction and copies a lot of the things out of the guilty plea agreement that we just talked about regarding The Yellow Rose.

At -- I'm not going to cover those items again because it's already been covered in the plea agreement, but I'm interested about page 4 of this enhancement document.  At the top it says, "In addition to his scheme in which DuMouchelle" --

THE COURT:  It says, "this scheme".

BY MR. CATALDO:

Q    -- "to this scheme in which DuMouchelle admitted his involvement, the government contends that DuMouchelle participated in multiple other fraudulent transactions."  Then it goes on to say, "As examples, it points to transactions involving T.G. and J.R."

It goes on to say, "DuMouchelle and T.G. entered into a contract in which they agreed they would each invest 1.8 million to be used to purchase jewelry. DuMouchelle would auction off the jewelry, and DuMouchelle and T.G. would split the profits.

"T.G. wired 1.8 million to DuMouchelle, which DuMouchelle used to pay his personal and business expenses rather that to purchase and auction off the jewelry. However, DuMouchelle told T.G. that he used the money to purchase the jewelry and was preparing the jewelry for auction.

"After a few months passed, DuMouchelle told T.G. that the jewelry had sold and that DuMouchelle was just waiting for the sale to close. DuMouchelle also sent T.G. a screenshot of DuMouchelle's bank account showing what he falsely purported to be the funds of the sale." Okay? Did I read that correctly?

A     Yes.

Q     Okay. So, do you know anyone with the initials T.G. that claimed they were owed $1.8 million of you and --

A     To Ted Gelov.

Q     -- your husband?

A     Ted Gelov.

Q     Ted Gelov. Okay. And am I correct that the conversation where Mr. Gelov was told that the jeweler is --

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

jewelry was sold and that DuMouchelle was just waiting for the sale to close was that very conversation we heard in the tape yesterday? Correct?

A    Yes.

Q    Okay. So -- and then I want to have you turned to page 9 for what Judge Goldsmith found. "In sum, DuMouchelle's offense conduct clearly rose above the garden variety level of wire fraud." And then he cites -- makes a citation. "The Court, therefore, will increase his offense level by two levels." See USSG Section 2B.(1)(b)(10)(C).

And then it says, "Conclusion for the foregoing reasons, the Court will apply the sophisticated means enhancement in calculating DuMouchelle's sentence." Did I read that correctly?

A    Yes.

Q    Is that yes?

A    Yes.

Q    And that was based upon that conversation that was on the tape yesterday, right?

A    Yes.

Q    Okay.

MR. CATALDO: Your Honor, I may be prepared to pass the witness if I may have just a moment to review my notes?

THE COURT: Of course. Would now be a good time

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

to take a little break to look at --

MR. CATALDO:  Well, Your Honor, it is almost noon.

THE COURT:  Want to take a lunch break now?  You can talk to --

MR. CATALDO:  That would --

THE COURT:  -- your colleagues.

MR. CATALDO:  -- be my preference to do that, and then we could come back and --

THE COURT:  Make your final decision?

MR. CATALDO:  Make our final decision.

THE COURT:  Mr. Foley raised his hand.  Sir?

MR. FOLEY:  I was just going to say if counsel's about to wrap up, we could just let him talk to the table for a little bit and see if he's included before lunch, meet in the next 10 minutes, and then --

THE COURT:  That --

MR. FOLEY:  -- go to lunch knowing that I'm going to come back and have my client --

MR. CATALDO:  Your Honor, I'd prefer that we take the lunch break now.  We could --

THE COURT:  I'm -- why don't you all take a lunch break?  Mr. Foley, I think you can anticipate that --

MR. FOLEY:  In short order I will lead.

MR. CATALDO:  In short order he'll be (indiscernible).

212-267-6868          www.veritext.com          516-608-2400

THE COURT:  It's your turn.  Okay.  And what time should we plan to return from lunch?

MR. CATALDO:  1:00?

MR. FOLEY:  1:00.

THE COURT:  Works for everybody.

MR. FOLEY:  Thank you, Judge.

MR. CATALDO:  Thank you, Judge.

THE COURT:  Thank you.  Thank you all.

THE CLERK:  All rise.  Court is in recess until 1:00.

(Recess)

THE COURT:  Ms. Adducci, please retake your spot on the witness stand, and you are under oath.

THE WITNESS:  Yes.

THE COURT:  Hang on one second.  All right. Before we -- did you have any follow-up questions for --

MR. CATALDO:  I do, Your Honor.  Just a few more.

THE COURT:  And the Court has a couple of clarifying questions.  Would you like the Court's questions first?

MR. CATALDO:  I will defer to the Court.

THE COURT:  All right.  The Court's going to ask a couple of follow-up questions for clarifying purposes.  Ms. Adducci, you spoke earlier about the emails from Mr. Ritter that Mr. Cataldo talked about.  I think it's J46, J47, and

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

J48.  Those were emails from Mr. Ritter.  Do you recall him mentioning those?

THE WITNESS:  Yes.

THE COURT:  And you said you didn't recall seeing them.

THE WITNESS:  No.  That's correct.

THE COURT:  That's correct.

THE WITNESS:  I did not recall seeing them.

THE COURT:  All right.  And later you testified that at some point the Merrillwood office in Birmingham for the LLC was in the process of shutting down around that time.  You weren't exactly sure on dates, correct?

THE WITNESS:  I'm not exactly sure.

THE COURT:  Okay.  But that -- your testimony was that it was in that time vicinity that the office was shutting down.

THE WITNESS:  Yes.

THE COURT:  Okay.  Here's my question.  Did you get business emails on your phone?

THE WITNESS:  Yes.

THE COURT:  Did you continue to get business emails on your phone after the office shut down?

THE WITNESS:  I don't remember.  Yes, I believe.

THE COURT:  For how long?

THE WITNESS:  I don't know.  Sorry.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: The Court wanted clarification on --

THE WITNESS: I believe so, but I don't remember.

THE COURT: Can you -- the Court doesn't want you to out and out guess, but can you give an estimate? Was it a day after the office closed that you stopped getting emails on your phone? A month? You know, three years?

THE WITNESS: I don't remember.

THE COURT: You don't remember even among a day, a month, or three years?

THE WITNESS: I don't know that they would've shut down the office emails. I don't know if they would've. I don't know how that process went. I know that our business was declining, and we were declining business. We just weren't -- you know, there wasn't business going on. And I was told not to answer legal situations from our attorneys. And I was also having emotional difficulty with all of it.

THE COURT: Understood.

THE WITNESS: Trying to figure out --

THE COURT: So --

THE WITNESS: -- what was going on and how to answer anything.

THE COURT: The Court's question, though --

THE WITNESS: Yes.

THE COURT: -- is for how long did business emails continue to come through on your phone.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

THE WITNESS:  I do not know that.

THE COURT:  Not even --

THE WITNESS:  I don't know.

THE COURT:  -- an estimate.  Okay.

THE WITNESS:  I don't know.  And I assume they did.  They do and -- you know, I get work emails now, but I believe I did back then.  That was seven years ago, so I think I could've.

THE COURT:  You talked about the business declining.  For clarity, the business filed a voluntary Chapter 11 case.  Do you remember that?

THE WITNESS:  That was in -- a voluntary?

THE COURT:  It was a voluntary bankruptcy filed by the business, correct?

THE WITNESS:  What date was that?  I'm sorry.

THE COURT:  I don't know.  I'm not --

THE WITNESS:  Okay.

THE COURT:  -- asking about the date.  I'm asking --

THE WITNESS:  Yeah.

THE COURT:  -- about the fact that the business filed its own Chapter 11 case.

THE WITNESS:  Yes.

THE COURT:  Okay.  And then it was the U.S. trustee that moved to convert it and get a trustee

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

appointed.  Do you remember that?

THE WITNESS:  Yes, and I remember begging her not to do it.

THE COURT:  Okay.  It's actually -- let me take that back.  It was an involuntary Chapter 11 that was filed, but it was a Chapter 11.

THE WITNESS:  Yes.

THE COURT:  I'm sorry.  It wasn't a --

THE WITNESS:  That Chapter 7 was --

THE COURT:  -- voluntary.

THE WITNESS:  -- involuntary.

THE COURT:  What was voluntary and what was involuntary?  Ms. Clayson, do you know?

MS. CLAYSON:  Your Honor, I'd have to look again. I thought that the 11 was an involuntary.

THE COURT:  The 11 I thought was an involuntary.

MS. CLAYSON:  And then it did convert to 7 at some point in the course --

THE COURT:  Okay, but the individual cases -- my apologies.  I would have to --

MS. CLAYSON:  Doesn't 11 involuntary mean -- involuntary means that we were forced to do an 11.

THE COURT:  Creditors.  All right.  The record is what it is.

MS. CLAYSON:  Okay.

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

THE COURT: The Court apologizes for muddying the waters here. My real questions, though, were about the emails coming through at a cell phone and for what period of time.

MR. FOLEY: Your Honor?

THE COURT: Mm-hmm.

MR. FOLEY: If I may, I just looked up the docket for the business case. It is --

THE COURT: Yes.

MR. FOLEY: -- an involuntary Chapter 11. There was an involuntary --

THE COURT: The business case was an involuntary Chapter 11?

MR. FOLEY: Yes.

THE COURT: Okay. And -- but the personal cases, Mr. Foley, were filed as?

MR. FOLEY: Voluntary.

THE COURT: Voluntary. Which chapter?

MR. FOLEY: And actually, I'm sorry, Your Honor. I may have misspoke. It was definitely involuntary. I see that petition, but what I need to sort out is whether it was a Chapter 11 originally. I too remember there being a conversion, but -- no, the business was an involuntary Chapter 7 case right away.

THE COURT: All right. Where did the trustee

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

bring a motion to convert?

MS. CLAYSON:  Your Honor, the individual bankruptcy was filed as a Chapter 11 and then was converted to a Chapter 7.

THE COURT:  Ah.  So the individuals filed a Chapter 11 voluntarily --

MS. CLAYSON:  Yes.

THE COURT:  -- Ms. Clayson?  And then there was a motion to convert.  Okay.  The LLC was subjected to an involuntary, and it was -- is a 7, Mr. Foley?

MR. FOLEY:  Yes, Your Honor.  It's says docket entry ECF Number 1 is Chapter 7 involuntary petition --

THE COURT:  All right.

MR. FOLEY:  -- against non-individual.

THE COURT:  All right.  Thank you.  Mr. Cataldo?

MR. CATALDO:  Just a few more questions.

BY MR. CATALDO:

Q   Ms. Adducci, if you could go back to Exhibit 5.  I'm going to ask you a couple more questions.  I know we've spent a lot of time on the bank statements for the 0585 account.  And let's take a look at the very --

MR. CATALDO:  Go to the next page, John, if you could.

BY MR. CATALDO:

Q   You'll see that on the 5th, the counter-credit $500.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Did that money come from the FineMark account?

A    I don't know.

Q    Might have?

A    I don't know.  Might have.  I don't know.

Q    So, we've talked a lot about the events on the 7th, but there's some other large transfers that are down farther on the page.  You'll see there's a wire out on the 12th of 2.1 million and change.  Do you know anything about that?

A    No.

Q    Okay.  And then on the 12th, there's 180,000 withdrawal.  Do you know anything about that?

A    No.

Q    Okay.  Well, that one we actually have some backup documents on when we subpoenaed Bank of America.  If we could go back to Number 3, please.  So, you talked about the fact that you went to Arizona somewhere on the 5th, conference was on the 6th --

A    The 5th or the 6th.

Q    Okay.  There was a --

A    But the --

Q    The two trips to the bank were on the 7th that we talked about yesterday.

A    Yes.

Q    When did you come back to Michigan?  Or --

A    I don't think --

212-267-6868            www.veritext.com            516-608-2400

Q    -- (indiscernible)?

A    -- I went back to Michigan.

Q    Oh, so you think you went back to Florida?

A    No, I went to Florida.  Yes.

Q    Okay.  Got it.  All right.  So where were you on the 11th and the 12th?  Were you back in Florida?

A    I believe.

Q    Okay.  And where was Joe?

A    I don't know.  I don't remember.

Q    All right.  Well, going back to Exhibit 3, if we could just take a look at page 2, and on page 2 there are two $90,000 checks that are referenced here that are withdrawals from the 0585 account.  The first one is to Marcella G. Rabinovich, PLLC, attorney trust account.  Do you know anything about that?

A    No.

Q    Okay.  And then the second one below it was actually to Joseph DuMouchelle Fine and Estate Jewelers, LLC, which was a -- obviously your company name, right?

A    Yes.

Q    Okay.  And you don't know anything about any of these.

A    I don't recall.

Q    All right.  Well, let's take a look at -- it's in Exhibit 3.  It's toward the end, and I want to make I give you the correct page.  And it is the page -- in the bottom

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

the Bates number is TTRITT560. Okay? And if you go to the top, you'll see this is also a Bank of America withdrawal slip. It's dated February 11, 2019. Does any of your handwriting appear on this document?

A     Yes.

Q     Which is your handwriting?

A     The signature on the right.

Q     The signature. So this is a withdrawal for 180,000, from the 0585 account, right?

A     Yes.

Q     So why did you take out this 180,000 on February 11th?

A     I do not recall.

THE COURT: Mr. Cataldo, what page are you referring to?

MR. CATALDO: So, Your Honor, if the Court --

THE COURT: Benson 560?

MR. CATALDO: Yeah. Exhibit 3 there's a Bates number in the lower right corner. It ends in 560. And if you look at the -- and if you go to Exhibit 15, and it's actually --

MS. CLAYSON: Of that exhibit.

MR. CATALDO: Yeah, Exhibit 15 of that exhibit --

THE COURT: Mm-hmm.

MR. CATALDO: Does the Court have the page?

THE COURT: Got it.

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

MR. CATALDO: Okay.

BY MR. CATALDO:

Q     So you signed this withdrawal slip, did you not?

A     Yes.

Q     So if you go to the next page, you'll see here's a check cut from the Bank of America account made payable to the order of Marcella G. Rabinovich, Attorney, for $90,000. And on the next page is also a check for 90,000 also made payable to -- this one's made payable to Joseph DuMouchelle Fine and Estate Jewelers, LLC, correct?

A     Yes.

Q     So you have no memory of what you did with these two checks for $90,000 after you signed this withdrawal to take the money out of the account, right?

A     No.  Yes, I have no recollection.

Q     And as best you can recall, you would've been in Florida at the time you signed that withdrawal slip, correct?

A     Yes.

Q     All right.

MR. CATALDO: Your Honor, I have nothing further. I pass the witness.

THE COURT: Thank you.  Mr. Foley?

MR. FOLEY: Thank you, Your Honor.

CROSS-EXAMINATION OF MELINDA ADDUCCI

212-267-6868                  www.veritext.com                  516-608-2400
Veritext Legal Solutions

BY MR. FOLEY:

Q    Good afternoon, Lindy.  How are you?

A    Good.

THE COURT:  I need you both to keep your voices up.

THE WITNESS:  Yes.  Fine.  Thank you.

BY MR. FOLEY:

Q    Lindy, can you hear me okay?

A    Yes.

Q    Okay.

THE COURT:  Mr. Foley --

THE WITNESS:  Can you hear me?

THE COURT:  -- pull that microphone towards you.
Do this thing.  The stem.

MR. FOLEY:  Lower?

THE COURT:  Lower or higher so it grabs your voice.

MR. FOLEY:  Okay.

THE COURT:  Okay.

MR. FOLEY:  I think we've got it.  Thank you, Your Honor.

BY MR. FOLEY:

Q    Ms. Adducci, can you please turn your book to Exhibit J9?  And can you please flip to the page that says in the bottom right corner 00026?  And above it, it says page 4 of

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

7.

A     Yes.  I'm there.

Q     And I apologize.  I misdirected you.  Can you flip one more page to the page that says 195 in the bottom right corner?

A     It says -- which page?

Q     Page 5 of -- well, it says page 5 of 7, and then at the very bottom right --

THE COURT:  Hang on one second.

THE WITNESS:  I have 002 --

THE COURT:  Ms. Adducci, hang on one second.  I know it's an unorthodox request, but we're dealing with the joint exhibits.  Mr. Cataldo, Ms. Clayson, does it make sense for the gentleman here with the technology to help out Mr. Foley by putting the exhibits on the screen?

MR. CATALDO:  If that is what the Court is requesting us to do, then we will do so.

THE COURT:  The Court would like that because -- simply for the ease.  The purpose of that technology is it makes it easy to make sure the witness is looking at exactly what the questioner wants the witness to look at.

MR. CATALDO:  Then of course.

THE COURT:  I know your first name, Jonathan. I've forgotten your last name.  My apologies.

MR. SCHMITZER:  Schmitzer, Your Honor.

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

THE COURT: Schmitzer. Mr. Schmitzer, I'm asking since you're here and these are the joint exhibits, Mr. Foley, would it be helpful to you if they were flashed up on the screen?

MR. FOLEY: Yes, Your Honor. I appreciate that.

THE COURT: Thank you, Ms. Clayson. So we're on J9.

MR. FOLEY: We need to turn something on over here.

THE COURT: J9 -- Bates stamp ending in --

MR. FOLEY: Oh, Bates stamp.

THE COURT: -- 195.

MR. FOLEY: Yes.

THE COURT: There we go.

BY MR. FOLEY:

Q    Ms. Adducci, is that what you have? It should be --

A    No.

Q    -- right after page 024. If you keep flipping.

A    I have it double. 06 is -- 04 is after 06. My pages are not in order.

Q    Can I see your binder really quick?

A    I have 4 and then I go to page 2.

MR. FOLEY: For the record, Your Honor, it looks like somehow the pages got slightly out of order.

THE COURT: This is the exhibit to which a few

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

pages were added?

MS. CLAYSON: That's correct.

MR. FOLEY: Just to be clear on the record, I remember during my exam of Mr. Ritter I asked if they had been inserted into the binder, and they apparently had not. And so I inserted three pages. It appears they were already in that binder. So what I've done is I've removed one set of three pages, which is the exact same 024, 025, 026. I'm going to set it off to the side. I'm going to put in order back 024, 025, and 026, which are the first three pages of that exhibit.

THE COURT: Let Ms. Clayson have a look.

(Counsel confer.)

MS. CLAYSON: I accept Mr. Foley's amendment.

THE COURT: Thank you, Ms. Clayson.

BY MR. FOLEY:

Q    Now, Lindy, you see 024 in the bottom right corner?

A    Yes.

Q    Please flip to 25, 26, and then right after that, you'll see 000195.

A    Yes.

Q    That January 25, 2019 email, you don't deny sending that to Mr. Ritter, correct?

A    No.

Q    Okay. Did you send that at Joe's request?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A      Yes.

Q      Had you sent this package to other people at Joe's request?

A      Either I did or other people did.  If we were requested to do it --

Q      Let me clear.

A      -- it was sent.

Q      Did you personally -- do you recall sending this to anyone else at Joe's request?

A      Not this specific one, but anything like this, we would send out.  It was normal course of business to send out GIA reports with any -- that we had filed on each item that we had in our office.  And if someone --

Q      Understood.

A      -- said send a file, we would send a file with everything included in the file.

Q      Was it out of the usual, I guess is my question, for Joe to ask you to send a data package to somebody?

A      No.

Q      Okay.

            MR. CATALDO:  Your Honor, before we started today, there was a discussion about leading questions, and the Court was going to give that some additional thought.  And my question is, before I start objecting to these leading questions, where we landed on that.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Well, the Court, thanks to its very talented law clerks, has done some research on this. So, Mr. Cadaldo, do I take this to be the plaintiff's objection to leading questions?

MR. CATALDO: Yes.

THE COURT: Okay. But to substantive leading questions, not to the procedural ones like were you here yesterday.

MR. CATALDO: Correct.

THE COURT: Okay. So -- and your concern is, I want to make sure I understand it --

MR. CATALDO: Well, for example, these are now substantive leading questions. This isn't the -- if you remember, we talked about Exhibit 7 yesterday and things of that nature. Now we're actually -- he's suggesting answers to the witness for her to agree with his statements or not. Those are -- this is text book leading of your own client, and that's -- that was what we talked about this morning, whether we were going to permit that or not.

THE COURT: Okay. Mr. Foley?

MR. FOLEY: Your Honor, it's not to suggest answers to my own client. It is a cross-examination --

THE COURT: Of your own client.

MR. FOLEY: -- of my own client. Rule 611 says that leading questions are appropriate on cross-examination,

212-267-6868          www.veritext.com          516-608-2400

and I am on cross-examination.  I do acknowledge and agree that on my direct examination in my case-in-chief that I will have to ask direct questions, but in the context of cross-examination and its purpose as limited in scope to the direct examination taken by the plaintiff of my client in this case, who chose to call her as a witness in their own case-in-chief, I believe I'm entitled to ask leading questions on cross-examination even though it's my own client on the stand.

THE COURT:  All right.  The Court has had a brief opportunity to look at the law on this, and has broad discretion here, but the Court is -- there are countervailing concerns.  One is the expeditious use of court time and trial time and everybody's time, and leading questions tend to promote that expeditious use of time.

However, on balance, the Court is concerned about the possibility of suggesting answers to this witness who, on many occasions, has said she cannot recall.  We've heard that more than once.  And therefore, Mr. Cataldo, the Court is going to require you to object to the leading questions that you find objectionable.  And I think after this discussion, we're not going to need to have a long, drawn-out objection as to why it's a leading question.

The leading question can be as -- it needs to contain what you want it to preserve for the record.  The

Court's not going to, you know, say you're limited to four words, but hopefully it would be a succinct objection. And Mr. Foley, the Court would encourage you to ask the question in a way that's not leading.

The Court is concerned about the possibility of -- the issue with this witness is whether there's the possibility of suggestion, as it is with any witness. Not this particular witness, but from based on what the Court has heard so far, the Court is worried that the substance outweighs the desire for moving through things speedily. Mr. Cataldo, you raised the objection, and it's probably going to be to the substantively leading questions --

MR. CATALDO: Right.

THE COURT: -- as opposed to the ones, you know, were you here yesterday. And the Court would hope that that's where it breaks down. So, in this scenario, no, this is a friendly -- this is your client, Mr. Foley, so the Court is not prepared to give a blanket ruling that you desire saying that you may lead. You're going to have your chance to put Ms. Adducci on the stand for your case-in-chief.

And your cross is limited to the extent of what Mr. Cataldo has done with this witness and his examination. So you understand those parameters. And has the Court answered your question sufficiently?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: The Court has, Your Honor.

THE COURT: Thank you, sir. Mr. Foley?

MR. FOLEY: Thank you, Your Honor.

THE COURT: All right.

BY MR. FOLEY:

Q   Ms. Adducci, did you independently decide to send that email to Mr. Ritter?

MR. CATALDO: Your Honor, that's a leading question.

THE WITNESS: No.

THE COURT: Wait.

MR. FOLEY: You can't --

THE COURT: You do not answer a question, ma'am, until the -- you've been on the witness stand for hours. When an objection is lodged in court, it's not your time to talk. That's between the lawyers and the Court. Objection sustained. Mr. Foley, please rephrase.

MR. FOLEY: Your Honor, I'm not -- that was my rephrase from an otherwise very leading question. I didn't -- I need just a moment. I'm going to go through here and...

THE COURT: Every question change of mindset.

BY MR. FOLEY:

Q   How is it that you came to send that email to Mr. Ritter?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    At the request of Joe.

Q    Had you prepared and created the materials that were attached to that email?

A    No.

Q    Can you please flip to the page Bates stamped 000198? Is that part of the email package that was sent?

A    Yes.

Q    Is there a date on that document?

A    January 31, 2011.

Q    And what was the date that this was sent?  What was the year that this was sent to Mr. Ritter?

A    2019.

Q    So approximately -- and that date, was that on the document as it was sent to Mr. Ritter?

A    Yes.

Q    Approximately how many years old was that valuation at the time that it was sent?

A    Eight years.

Q    Did Mr. Ritter hire you as an independent appraiser?

A    No.

Q    Were you paid by him to perform an appraisal?

A    No.

          MR. CATALDO:  These are leading questions.

          THE COURT:  Okay.  So we have an objection, leading.

MR. FOLEY: Your Honor, I would propose that they're not. A leading question, by way of example, might be, "You were not hired by Mr. Ritter to perform an appraisal, correct," versus -- that is a mere question, "Were you hired?"

THE COURT: On that one -- well, she already testified she was not hired, and this was -- Mr. Cataldo has objected to the follow-up question, which was what?

MR. FOLEY: In its original form, it would have been --

THE COURT: Give us what you asked --

MR. FOLEY: Well, "you were not paid to perform an appraisal, correct," and I changed that question to --

THE COURT: Were you.

MR. FOLEY: -- "Were you paid to perform an appraisal?"

THE COURT: Okay. That objection, Mr. Cataldo, is overruled. Ms. Adducci, the question at hand is, were you paid to perform an appraisal of The Yellow Rose diamond?

THE WITNESS: No.

BY MR. FOLEY:

Q    Did you ever communicate to Mr. Ritter in any form that you had independently verified the value of the diamond?

THE COURT: Wait.

MR. CATALDO: This is leading.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 74 of 213
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

MR. FOLEY: I think, Your Honor, there's a --

THE COURT: No, that is leading. Objection's sustained, Mr. Foley. Please rephrase.

MR. FOLEY: May I respond briefly?

THE COURT: Oh, sorry. Yeah.

MR. FOLEY: The -- there is such a thing as a non-leading question that still results in a yes/no answer. I think what is driving Mr. Cataldo's objections, understandably, is that some of these result in a yes/no answer, but I don't think there's another way to ask --

THE COURT: A leading question is one that suggests the answer --

MR. FOLEY: And I don't think that's --

THE COURT: -- irrespective of whether it's a yes or no that you get for the answer. That one's -- if it's not there, it's really close to the line. Please rephrase the question. There's a relatively simple way to rephrase that question.

MR. FOLEY: I've never held myself out to be legally brilliant. I will think for a moment.

THE COURT: Take your time. And don't sell yourself short, sir.

BY MR. FOLEY:

Q    Did you have any communications with Mr. Ritter regarding an independent evaluation of the diamond?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    No.

Q    Looking at J9, can you please flip back to the page that ends in 0026?  And Ms. Adducci, I apologize for the spacing of these emails, but look at the bottom of 0026, which says "from" and "sent".  And do you see where it says page 4 of 7?

A    Yes.

Q    Then flip to the top of the next page.  Are the two lines at the bottom of page 00026 connected to the email block at the top of 000195?

A    Yes.

Q    So now we flip to page 00025 in the bottom half of that email.  Do you see a place where it says --

A    00 --

Q    -- January --

A    -- 05?

Q    Yep.  Oh, no, just 00025.

A    Where?

Q    In J9.  It's about the second page of the exhibit.

A    25.  Okay.

Q    Do you see where it says on January 28, 2019 at 1:42 p.m., Joseph DuMouchelle wrote, "Hi Tom, per our conversation today," and then it goes on?

A    Yes.

Q    Okay.  And is it your understanding that that's an

212-267-6868                    www.veritext.com                    516-608-2400

email from Joe to Tom?

A     Yes.

Q     Okay.  Now, above it, do you see an email from Mr. Ritter?

A     Yes.

Q     Can you read me what that email says?

A     "Who did the most recent appraisal/evaluation?  And what was the result?  And do you have a copy of that?"

Q     Is your email listed there?

A     No.

Q     Now, on the page before that, 00024, do you see an email on that page?

A     Yes.

Q     Who does it appear to be authored by?

A     Joe

Q     And who does it appear to be sent to?

A     Tom Ritter.

Q     Is your email address included on there?

A     No.

Q     And can you read the substance of what Joe is writing there?

A     "Hi Tom, attached is the appraisal copy I just received.  I will call you in a few minutes to confirm you have received this.  Thanks, Tom.  Sincerely, Joe."

Q     Had you performed an appraisal --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    No.

Q    -- on this?  So, could that have been your appraisal?

A    No.

Q    Thank you.  Can you please flip to Exhibit J29?

MR. CATALDO:  I'm sorry.  What exhibit?

MR. FOLEY:  J29.

MR. CATALDO:  29.

THE COURT:  28 or 29?

MR. FOLEY:  I'm sorry, 29, two nine.

BY MR. FOLEY:

Q    Do you see that there are three photos of The Yellow Rose there?

A    Yes.

Q    Okay.  I believe, correct me if I'm wrong, that when you were testifying, you said the first photo you don't recognize, but the second two, those are you in the photo?

A    Well, the first photo I can't tell if that's me holding it.

Q    Could it be your hands or fingers?

A    Could be --

Q    Okay.

A    -- someone else's, but the second two are me.

Q    These two photos of you with The Yellow Rose --

A    Yes.

Q    -- where would they have been taken?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A     In the office in Birmingham.

Q     Do you know if they would've been taken before or after

Mr. Noble - I'm sorry, Mr. Ritter transferred his money?

A     Possibly.  I don't know when he --

Q     Would it have been before or after?  Do you have any

idea?

A     I don't remember.  It was for a customer that came in

to look at it for purchase.

Q     Well, Lindy, do you recall testifying about the timing

of when the diamond arrived at the Birmingham shop?

A     Yes.

Q     Okay.  When was that?

A     Around Labor Day.  So it was either August or -- you

know, I didn't -- I wasn't there to receive it.  I --

Q     August or what?

A     August or September.

Q     Of what year?

A     Of 2018.

Q     Okay.  Did you ever see The Yellow Rose diamond in

February, March, or April of 2019?

A     I don't remember.

Q     Okay.

A     I don't remember.  I don't recall the exact dates.  I

know I saw it more than once in that office.

Q     Okay.

212-267-6868                  www.veritext.com                  516-608-2400
Veritext Legal Solutions

A    I traveled in.

Q    These photos, did you ever send them to Mr. Ritter?

A    No.

Q    Okay.

A    No.

Q    Were these your own photos that you had?

A    These photos were taken -- someone else could've sent them.  I didn't send them.  Joe -- these were my photos taken because I thought it was -- I was there, and I thought, well -- I just took it because I thought it was just interesting that I was handling it.  And it -- they asked me to go into this little room where we have a microscope and --

Q    Lindy, respectfully --

A    Sorry.

Q    -- I don't need the whole story.

A    Okay.

Q    Did you just say that they were never sent to Mr. Ritter?

A    I don't know.  I didn't send them.

Q    Okay.

A    That I remember.  I don't believe I did, no.

Q    Let's look to the Exhibit --

A    I didn't --

Q    -- J11 --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    -- have communication --

Q    -- Ms. Adducci.

A    -- with him.  J what?

Q    Can you flip to Exhibit J11?

A    J11.

Q    Could you describe for me just generally what that is and who's sending it to who?

A    That's an email from Tom Ritter to Joe and myself.

Q    The -- in the body of the email on the second line down about halfway across, there is a sentence that starts after a period.  And it says, "It was not my intent."  Can you read me that sentence all the way to the end?

A    "It was not my intent to leave you out of -- out or lessen your part in this as I know your skill and expertise in gemology field is at the top -- your skill and expertise in the gemology field is at the top."

Q    Okay.  Now, do you recall on direct exam being ask questions about your signature block?

A    Yes.

Q    Okay.  And your signature block said something about auctioneer?

A    Yes.

Q    Does it say that?

A    Yes.

Q    Did it say something about appraiser?

212-267-6868          www.veritext.com          516-608-2400

A     Yes.

Q     Okay.  And did it say something about gemology?

A     Yes.  Graduate gemologist.

Q     Well, what is gemology?

A     A gemologist would be a person that would -- an expert that would study gem stones, the identification, the treatments, the gem stones themselves.

Q     Okay.  Is a gemologist automatically an appraiser?

A     No.

Q     Does this email say anywhere in it that you are appraising the diamond?

A     No.

Q     Does it say that he's trusting your skill and expertise as an appraiser?

A     No.

Q     Does it say anywhere in this email that he's -- we're trusting your ability to structure this deal?

        MR. CATALDO:  Your Honor, this is --

        THE WITNESS:  No.

        MR. CATALDO:  -- leading.

        THE COURT:  Objection.  Okay.  Hang on, Ms. Adducci.  Yeah.  It's leading.  Objection sustained.  Please rephrase the question, Mr. Foley.

        MR. FOLEY:  Your Honor, may I respond to the objection?

212-267-6868          www.veritext.com          516-608-2400

THE COURT: Oh, sorry. Yes, sir.

MR. FOLEY: I believe this is, again, that type of question that, while the defendant -- while it calls for a yes/no answer, it does not suggest that answer to the witness.

THE COURT: Hang on. Mr. Cataldo?

MR. CATALDO: May the Court -- that's easy. Asking her -- I mean, the email says what it says. He's asking her if it says -- and she's agreeing with his interpretation of what it says. Unequivocally leading.

MR. FOLEY: I will note that that's the key right there. It's not my interpretation. It is simply phrased as a question. If I had said, "It does not contain it, correct," then I've indicated a preference for an answer. But if I say, "Does the document contain," I've not indicated a preference of an answer even though it's a yes/no question.

THE COURT: The way you phrased the question does indicate the response, so the Court is ruling it's a leading question. Please rephrase it.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Objection's sustained.

MR. FOLEY: Thank you.

MR. CATALDO: Thank you.

BY MR. FOLEY:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    With respect to the concept of managing the transaction, or the flow of the finances, or who the buyer was, or who the seller was, does the email contain any language related to that regarding you?

A    No.

MR. CATALDO:  Your Honor, first of all, she didn't write the email.  The email says what it says.  Mr. Ritter, who's already written -- he testified about what this language has meant, she would have no way of knowing the answer to these questions.

THE COURT:  So you're -- okay.  A couple of points.  Ms. Adducci?

THE WITNESS:  Yes.

THE COURT:  How about you count to three before you give an answer to any question?  That will give the lawyers an opportunity to think for half a minute --

THE WITNESS:  Okay.

THE COURT:  -- or less and decide if they're going to object.  All right?  See, I'm -- you're counting to three now, and it may add a little more time that we're all together, count to three before answering.  Mr. Foley --

MR. FOLEY:  Yes.

THE COURT:  -- how do you respond?

MR. FOLEY:  Oh, to that objection?

THE COURT:  Yes.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: I don't believe that objection even called it a leading question, and I am not being snarky or sarcastic. But I mean this sincerely --

THE COURT: But think it was also --

MR. FOLEY: -- if the standard -- if the --

THE COURT: -- leading in there. Lack of foundation. You were asking what Mr. -- you were asking Ms. Adducci what Mr. Ritter meant by the words on the page, were you not?

MR. FOLEY: No. No. And Your Honor, I -- two separate responses. I -- and I can't -- if the standard -- part of what Mr. Cataldo said was, I mean, the exhibit is what it is. It's been stipulated, and it's in. If that were the gold standard, we would not have just spent an hour with Mr. Cataldo reading word for word from Joseph DuMouchelle's criminal plea that was not signed by Lindy and him asking her questions about that. It is part of developing the record for the document, and --

THE COURT: Wait a minute.

MR. FOLEY: -- the second part --

THE COURT: The Court has a response on the context of that. Mr. Cataldo was permitted by this Court to ask leading questions of Ms. Adducci because the Court had given him the permission insofar as she is your client, and therefore adverse, and it's customary to ask leading

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

questions to an adverse witness. Leading. But this is your witness, okay? It's your client. And you're going to have a chance on your case-in-chief to ask her questions.

MR. FOLEY: Your Honor, I can't think of another way, I mean that sincerely, to ask if the email contains a statement, then asking if it contains the statement. I just don't know a way around that. I must, of course, be able to ask her if it contains that statement as part of developing the factual record.

THE COURT: Mr. Cataldo?

MR. CATALDO: It's, again, suggesting his interpretation of this email and just asking the witness to agree or not agree.

MR. FOLEY: Your Honor, I think that distinction --

MR. CATALDO: And there's lot of ways --

THE COURT: Okay.

MR. CATALDO: -- if he wants to get into --

THE COURT: There's lots of ways to do this.

MR. CATALDO: -- it in a non-leading way if he wanted to.

THE COURT: The non-leading way might be -- Mr. Cataldo could correct the Court if the Court gets it wrong. Where does it say here that you were involved in the structure of the transaction? Where does it say here that

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

you were involved in the appraisal? You could -- would those be non-leading questions? I mean --

MR. CATALDO: Your Honor, I could -- you should examine this witness.

MR. FOLEY: Your Honor, I will adopt what the Court has just said. I stand by my stance that to ask somebody whether or not something's in a document without the suggestive, "that's not in there, correct," that is suggestive and thus leading. But to simply say, "Is it in there," is not leading. But with what Your Honor just said, "where in it is this," let him proceed on that format.

THE COURT: Okay. Would that satisfy your objection, Mr. Cataldo? Ameliorate it?

MR. CATALDO: It would certainly be an improvement, and I'd certainly like to hear the question exactly asked. But --

THE COURT: Is there a better way?

MR. CATALDO: -- heading in the right -- we're moving in the right direction.

THE COURT: Is there a better way to go about it?

MR. CATALDO: Your Honor, frankly, I'm not sure what's even the point of this.

THE COURT: Well, Mr. Foley does correctly note that we've spent a fair amount of time with you going through exhibits.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO: But we have the author here who wrote it who's explained what it meant. Now, "If he wanted to ask her what did it mean to you," okay. I'm not sure if that's relevant or not, but that would be a non-leading question and he could certainly ask that question, and it would certainly -- at least there would be a foundation for it, and the Court can weigh whatever -- you want to accept her substantive or subjective belief is in what this email is and what it means. That would certainly be a much greater improvement over what we're doing here now and spending time on. So that would be my suggestion. Just ask her that question.

MR. FOLEY: I --

THE COURT: Mr. Foley, do you have enough ideas? The Court's going to sustain the objection. The Court is very worried, very concerned about suggesting -- again, it's your witness and the Court has not given you permission to lead your witness.

MR. FOLEY: I understand.

THE COURT: You're at the cross-section, and you're going to have a whole -- an opportunity to examine Ms. Adducci in your --

MR. FOLEY: But not prior to the close of plaintiff's case-in-chief, which is --

THE COURT: I see.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: -- I am entitled to correct the record via cross-examination --

THE COURT: Right.

MR. FOLEY: -- I understand Your Honor has ruled no leading questions on cross. The -- I'm going to proceed --

THE COURT: No leading questions on cross of your own client.

MR. FOLEY: That's of my own client. I'm going to proceed in the format that Your Honor just suggested before. The -- may I have a 30-second recess to go into the gallery for two seconds and I'll be right back?

THE COURT: Of course.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Can the Court just wait here though?

MR. FOLEY: We don't even need to go off the record.

THE COURT: Thirty seconds? Okay.

MR. FOLEY: Thank you. Thank you very much, Your Honor.

THE COURT: Thank you, sir.

BY MR. FOLEY:

Q    Ms. Adducci, where in this email does it say that Mr. Ritter is relying on your valuation of the diamond?

A    It does not.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Ms. Adducci, where in this email does it to refer to
evaluating The Yellow Rose diamond?

A    It does not.

Q    Where in this email does it say -- does it refer to
reliance on your structuring of the finances of this deal?

A    It does not.

Q    Where in this email does it say that Mr. Ritter
respects or that he knows your skill and expertise in the
appraisal business?

A    It does not.

Q    Thank you, Ms. Adducci.  Who handled -- who first
reached out to Mr. Ritter regarding The Yellow Rose diamond?

A    Joe.

Q    Who handled the negotiations with Mr. Ritter regarding
The Yellow Rose diamond?

A    Joe.  Joe.

Q    Who set up the structure of the transaction with Mr.
Ritter regarding The Yellow Rose diamond?

A    Joe.

Q    Were you here when Mr. Ritter testified that at Joe's
request you had given him a call on the phone?

A    Yes.

Q    Is that what transpired?

A    No.

Q    What transpired?  Well, first of all, did you end up at

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

some point on the phone with Mr. Ritter?

A    Yes.

Q    Okay.  And what is your recollection of how that happened?

A    That Joe brought me in on a conversation they were already having.

Q    Physically where were you?

A    From my memory, we were in Florida.  It was at my kitchen table.

Q    Sanibel?

A    Yeah, Sanibel.

Q    And Joe was with you?

A    And Joe was with me.

          THE COURT:  I didn't hear that last part.  From --

          THE WITNESS:  On Sanibel, and Joe was with me.

BY MR. FOLEY:

Q    Do you have any recollection of giving Mr. Ritter a phone call independently of Joe?

A    No.

Q    Can you flip to Exhibit J10?  Do you recall testifying that at some point you called your son to read -- Joey to read through and discuss the deal between Joseph DuMouchelle and Mr. Ritter?

A    Yes.

Q    Are you 100 percent sure that it was Exhibit 10 here

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

that you had read on the phone with Joey?

A    No.

Q    To the best of your recollection, what had occurred that gives you uncertainty that it was this particular document?

A    From my memory, it was one page.  Not this detailed.  And it was from Tom.

THE COURT:  I didn't hear that last part.

THE WITNESS:  It was from Mr. Ritter.  It was from Tom Ritter.

THE COURT:  Isn't this from Mr. Ritter?

MR. FOLEY:  It is.

THE COURT:  Okay.

MR. FOLEY:  I think that was just a clarification that it wasn't not from Mr. Ritter.

THE COURT:  I'm clear.

BY MR. FOLEY:

Q    The -- where on this document on either page can you -- on either page, can you -- are you at J10 right now?

A    Yes.

Q    Where on this document is your name?

A    It's not on there.

Q    Whose letterhead is at the top of that?

A    Ritter Labor and Associates.

Q    Is that what you understand to be Mr. Ritter the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

plaintiff here?

A    Yes.

Q    Can you go down to the -- you see the first paragraph under, "Dear Joe," where it says, "Pursuant to your -- our discussion"?

A    Yes.

Q    Can you go down from that one, two, three --

A    Yes.

Q    Hold on, four -- the fourth paragraph that starts, "With your assistance," do you see that?

A    Yes.

Q    Okay.  Working from the end of that backwards, do you see the last sentence of that paragraph that starts, "You (Joseph DuMouchelle)"?

A    Yes.

Q    Can you read that exact sentence for the Court?

A    "You (Joseph DuMouchelle) have estimated a resale price in the range of 16 to $20 million."

Q    Are you Joseph DuMouchelle?

A    No.

Q    Can you flip to Exhibit J4, Ms. Adducci, please?  J4, the various signature cards in that exhibit, were those the documents that opened the bank account, or is that a separate type of document?

A    I believe this to be the business signature card

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

document.

Q   Okay.  Is that an account application?

A   No.

Q   I'd like you to flip, please, to the third page of that exhibit.  What signatures are on the bottom of that?

A   Mine, Melinda Adducci, and Joseph DuMouchelle.

Q   What's the date next to your signature?

A   February 7, 2019.

Q   What about the date next to Joe's signature?

A   February 7, 2019.

Q   Do you recall in your testimony being asked in the style of leading questions whether or not you were the only signer?  Or isn't it true that you were the only signer on the account on February 7th?

A   Yes.  I remember the question.

Q   Do you remember how you responded?

A   I don't know.  I didn't know --

Q   Well --

A   -- who it was.

Q   In response to the leading question, didn't you say, "Yes, I was the only signer"?

A   I didn't see this before.  I didn't -- yeah, I don't remember.

Q   Can you state with certainty that you were the only signer on the account as of February 7th?

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 94 of 213
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    I was not the only signer.

Q    Okay.  The -- during your direct examination but via leading question by Mr. Cataldo, there were a lot of questions that referenced this, the Bank of America account ending in 0585 as, "your account"?  Do you recall that?

A    Yes.

Q    Okay.  What is the actual entity that owns this account?

A    Joseph DuMouchelle Fine and Estate Jewelers, LLC.

Q    By the way, is that a fictitious name that you created?

A    No.

Q    Is that -- when did Joseph DuMouchelle start this business?

A    In, I believe, 1996.

Q    Was that, to the best of your recollection, the name that had always been used?

A    I don't know.  It could've been Joseph DuMouchelle Auctioneers, but maybe he -- you know, it was one of those, but I'm pretty sure our attorneys made sure that it was -- that it could be -- you know, if he shortened it and it was the business name or a -- yeah.  It's misspelled, though.  It's -- it should be D-U-M-O-U-C-H-E-L-L-E up there.

Q    Did -- what was your understanding of the problem with FineMark Bank that led to opening a Bank of America account?

A    That we were having banking issues with FineMark.

212-267-6868                  www.veritext.com                  516-608-2400

Q    Describe for me, please, the nature of those issues just briefly.  Like what kind of issues?

A    We would use them -- they were a small bank, and we would use them similar to the private bank, which we had in Michigan before.  We always had a smaller bank and a larger bank.  And the smaller bank, they were very -- an older bank, but they were much older than the private bank in their online portals and the way that they would receive checks and communicate with us.

We were just having trouble with -- they can't -- they sought our business out.  And then when we tried to use them more, we found it troublesome after an auction.  The girls would try to find out if something cleared, and they would call and they would say we can't get through, and no one's replying back to us.

Q    Okay.  At the time that you opened the Bank of America account --

A    Yes.

Q    Did you have any inkling of any kind that your -- that Joe DuMouchelle Fine and Estate Jewelers was financially on the decline or running out of money or anything of that nature?

A    No.

Q    Okay.  When you were later -- we'll get there.  You -- were you aware -- I'll strike that.  No, that's a fair

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 96 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

question. Were you aware when opening the account that Mr.
Ritter had endeavored to send $12 million to FineMark and it
had been rejected and sent back?

A     Well, I found out through Joe because he told me, and I
don't know how close to this time period it was. But I
think it was close to this time period of opening this
account.

Q     Okay. In fact, was that one of the reasons that this
account was opened?

A     Yes.

Q     Okay. In your direct exam by the plaintiff, there was
much ado about the fact that the agreement, Exhibit J --
pardon me, J10 -- you don't even have to flip to it. That's
the Ritter agreement we looked at, right?

A     Yes.

Q     That that called for something to happen, but that
instead Mr. Ritter was wiring money into an account of the
business Joseph DuMouchelle Fine and Estate Jewelers, LLC.
Do you recall those questions?

A     Yes.

Q     Okay. Now please do look back at J10. Are you on J10?

A     Yes.

Q     Okay. Can you read the paragraph right after the one
we have just been discussing? There's the, "with your
assistance," paragraph, but then the next one. What does

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

that paragraph say?

A    "I will establish an escrow account at JP Morgan Chase the fees for which shall be split equally between the seller and the buyer.  I will wire funds from my bank into this account.  And subject to the terms of the escrow agreement between the parties being met, the funds will be released to the seller upon receipt of the diamond by you on my behalf.

Q    To the best of your knowledge sitting here today, did Mr. Ritter ever open that escrow account?

A    No.

Q    Okay.  When the FineMark wire and rejection happened, did there come a time where you asked Joe why Ritter would be wiring you money -- I mean, not you personally, but Joe with the business money instead of the escrow account and the agreement?

A    Yes.  I --

MR. CATALDO:  (Indiscernible) --

THE COURT:  Hang on.  Wait.

MR. FOLEY:  Wait.  That's not --

THE COURT:  Little more -- a little more, Mr. Cataldo?

MR. CATALDO:  He's again suggesting the answer to the witness.  He's asked a very specific question and asking her to agree with his statement on these details.

MR. FOLEY:  And response, Your Honor?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Yep.

MR. FOLEY: I did no such thing at all. I didn't suggest an answer. I certainly didn't ask for agreement. I said did the come a point in time when you had a discussion with Mr. DuMouchelle about this transaction. They can be nothing less leading than that. So to elicit that information, there isn't an alternative. You had a conversation with him, did you? That's a leading question. Asking if a conversation occurred is not, especially when it doesn't end with any suggestion of what the answer should be.

THE COURT: Do you have your question written down there?

MR. FOLEY: No, because this is honestly something I'm recalling as we're going through this. So it -- but, yeah, the exact objection that was made was leading because I'm giving her my narrative of what happened and suggesting that she agree with me. Neither of those two things just transpired.

THE COURT: The objection is overruled. I'm going to take an answer on this one. Go ahead, Mr. -- and Ms. Adducci, please count to three. You were doing really well there for a while. I need you to count to three to give the lawyers' brains a chance to process what they've just heard before the answer comes out, okay?

212-267-6868                     www.veritext.com                     516-608-2400
Veritext Legal Solutions

MR. FOLEY: Your Honor, if I may for a brief moment? Seriously.

BY MR. FOLEY:

Q    Like deep breath in, out --

A    Yeah.

Q    -- wait, all right? Nobody's timing us. In fact, the judge gave us five days for a trial, and we're only on day three, and we're nearing the end of plaintiff's main case, okay, Lindy? Okay. After the FineMark money was wired in and then rejected, was there ever a point in time that you had conversation with Joe about why the money would be wired to Joe and/or the business instead of what it says in the agreement?

A    Yes.

Q    Okay. What were you told?

A    Well, I can tell you what I -- and what I asked him.

Q    I'm just wanted -- how did Joe explain it to you?

A    He called me and said that the wire into FineMark had been rejected. And I said to him I thought you were doing an escrow account. I thought you were putting the money into an escrow. Why are you trying -- why are you doing a wire?

Q    What did Joe tell you was why it was coming to him and not an escrow account?

A    Because he told me that Tom did not want it to go into

an escrow account.

Q   Okay.  Did he explain that --

THE COURT:  I have a clarifying question.  When did this conversation occur?

THE WITNESS:  Right away when Joe told me that the wire -- of the problems with the FineMark wire.

THE COURT:  So right away means before the --

THE WITNESS:  Probably --

THE COURT:  -- Bank of America account was opened.

THE WITNESS:  Yes.

THE COURT:  Correct?  Okay.

THE WITNESS:  Yes.

BY MR. FOLEY:

Q   Once you had learned -- well, strike that.  Did Joe give any explanation of where Mr. Ritter wanted -- that Mr. Ritter wanted to wire the money to him, to Joe?

A   No.  Explanation as to why he changed it from the --

Q   No, not explanation as to Ritter.

A   I'm not understanding.

Q   Where did Joe tell you that Mr. Ritter wanted the money to flow?

A   To us directly.

Q   Okay.  I'd like you to flip to Exhibit --

THE COURT:  One clarifying question.  When you say, "to us directly," Ms. Adducci, you mean to the LLC?

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

THE WITNESS:  To the Joseph DuMouchelle LLC, yes.

THE COURT:  But not to --

THE WITNESS:  Not to us personally.

THE COURT:  Not to you and --

THE WITNESS:  Not to us.

THE COURT:  -- Joe personally.

THE WITNESS:  Yeah.

THE COURT:  But to the LLC directly.

THE WITNESS:  Yes.

BY MR. FOLEY:

Q    Can you flip to Exhibit J19 please?  I apologize. That's not the correct exhibit.  One moment.  Exhibit J11, please.  And then after that, Exhibit J12.  Are you on J12?

A    J11 or 12?

Q    J12.

A    J12, okay.  Yes.

Q    During the course of your examination, you were shown Exhibit J12, J13, and J14 and J15.  Do you see those emails?

A    Yes.

Q    Okay.  Who was the sender of each of those emails?

A    Joe.

Q    Okay.  Where in those emails is your email address? Are you a sender or a receiver?  Or a recipient.  Pardon me.

A    It's not there.

Q    Okay.  On February 7th -- strike that.  On February 5th

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 102 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

when you were opening the bank account, were you aware of these emails from Joe to Mr. Ritter?

A    No.

Q    Okay.  As you sit here today in the year 2026, looking at these emails, do you reach any conclusion about the truthfulness of Joe's statement to you that Mr. Ritter wanted the money wired to Joseph DuMouchelle Fine Estate Jewelers?  Phrased another way, was Joe telling the truth when he told you that?

A    No.

Q    You testified that when you opened the Bank of America account, part of the impulse to do that or part of Joe's reason in saying we need to open a new account was that the business needed to receive Ritter's wire, yes?

A    Yes.

Q    And at the time that you opened it, you were aware that Mr. Ritter had attempted once already to wire money into the FineMark account, yes?

A    Yes.

Q    Okay.  Did you, either on February 5th when you opened the account, or on February 7th when you went to the bank at Joe's request, after Joe had lined up a bunch of things to write out, did you have any reason to believe that Mr. Ritter's money wasn't supposed to be in your account?

A    No.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Clarification question. Mr. Foley, when you say, "your account" --

MR. FOLEY: They make the --

THE COURT: -- you mean the Bank of America account ending in -- with 0585?

MR. FOLEY: Thank you, Your Honor. I made the exact same mistake that I --

THE COURT: Okay.

MR. FOLEY: -- was pointing out earlier. Into the account of Joseph DuMouchelle Fine and Estate Jewelers ending in 0585 at Bank of America.

BY MR. FOLEY:

Q    Did you have any reason to believe that the money there was there improperly?

A    No.

Q    Okay. When you arrived -- let's go back to the timeline of your time in Tucson. Did you have an opportunity between testifying this morning and now to look at a blank calendar but a calendar that lays out the days of February 2019?

A    Yes.

Q    I want you to take your time and be careful with this because I'm not leading you through this. Can you please give the Court an understanding of the timeline and events in Arizona and how it relates to various communications you

20-04381-lsg    Doc 328    Filed 04/14/26    Entered 04/14/26 16:01:37    Page 104 of 213
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

received from Joe throughout that time?

THE COURT: Could I ask for a moment, and give you a moment? The Court wants to pull up a calendar on its own to see what that week looked like. I apologize. It's --

MR. FOLEY: That activity seems to be quite helpful.

THE COURT: Except I've now gone back to 1997. All right. I'm in February of 2019. Ms. Adducci, do you need to take a minute, ma'am?

THE WITNESS: Yeah, I do.

THE COURT: You do? All right.

THE WITNESS: Thank you.

THE COURT: We're going to take a brief recess because Ms. Adducci would like a little bit of time. And what do you think, ma'am, 15 minutes and we'll reconvene at 2:30? Do you have Kleenex there, ma'am? Okay.

THE WITNESS: Sorry.

THE COURT: We're going to take a recess until 2:30.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Thank you.

THE CLERK: All rise. Court is in recess until 2:30.

(Recess)

MR. FOLEY: -- exact make an appearance in the

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 105 of 213
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

case.  He was here on Monday.

THE COURT:  Mr. Stuck?

MR. STUCK:  Hi.  Good afternoon, Your Honor.
Jesse Stuck appearing on behalf of the defendant Melinda
Adducci.

THE COURT:  Thank you, sir.  Please be seated,
everybody.

MR. FOLEY:  Your Honor, first, thank you for
giving my client a break on the witness stand.  May I
proceed with the question?

THE COURT:  Yes.

MR. FOLEY:  Thank you.

THE COURT:  Ms. Adducci, you're still under oath,
ma'am.

THE WITNESS:  Yes.

THE COURT:  And do you have what you need at the
witness box?  You've got water, Kleenex?

THE WITNESS:  Yes, thank you.

BY MR. FOLEY:

Q    Ms. Adducci, I think where we left off was this.  Were
you able over lunch and looking at a calendar to reconstruct
the timeline of that February Tucson trip and what
transpired?

A    Yes.

Q    Can you please tell me what happened?  And by that, I

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

mean in terms of the opening of the bank account, the flight, the order of events in Tucson, any contact from Joe, any going to the bank.

A     So, from my memory on the 5th, I opened the Bank -- I was asked to open the Bank of America account by Joe, which I did.

Q     Where were you at that time?

A     On Sanibel.

Q     Okay.

A     In Florida.

Q     And what happened next?

A     And then sometime between the 5th and the 6th, I made my way to Arizona.

Q     By "made your way", did you fly or drive?

A     Flew.  I flew.  I don't know if I flew that night or in the morning.

Q     Okay.

A     I would've done either one back then.  And then --

Q     Now we're on Wednesday the 6th.

A     And then on Wednesday the 6th, I arrived in Arizona and...

Q     What was going on?  What was the event that day?

A     The Accredited Gemologists Association.

          THE COURT:  I have a clarifying question.  Ms. Adducci, you just said on the morning of the 6th you arrived

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

in Arizona --

THE WITNESS: Yes.

THE COURT: -- but you flew the night of the 5th.

THE WITNESS: The night of the 5th, yes.

THE COURT: So is it clearer to say that on the morning of February 6, 2019 --

THE WITNESS: Yes.

THE COURT: -- you were in --

THE WITNESS: Yes.

THE COURT: -- Arizona?

THE WITNESS: I was in Arizona, yes.

BY MR. FOLEY:

Q    Does that mean affirmatively you recall now that you flew in the evening of the 5th?

A    I -- that -- I don't remember the flight is what I'm saying, the exact flight.

Q    Okay.

A    Do I need to have the specific time of the flight?

Q    There is no need. There's -- I want you to answer truthfully.

A    Okay.

Q    Do you remember if you flew the night of the 5th or the morning of the 6th?

A    I would assume I flew the 5th.

Q    Okay.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Because I wanted to be there for the Wednesday.

Q    And what was the first part of your answer?  You were going to assume?

A    That I flew there the 5th.

Q    Okay.

A    It would be -- it's hard to get -- because of the time change.

Q    Does whether you flew in the night of the 5th or the morning of the 6th make any impact on the rest of the timeline of what transpired?

A    No.

Q    Okay.  But by the morning of the 6th, the weekend, say, you were in Arizona.

A    Yes.

Q    Okay.  Describe that day for me as it relates to this case.

A    I would've gone to the Accredited Gemologist's Association.  I don't know if I made it to the conference or not.  That's what I'm wondering if that part of it -- I just remember being frustrated with changes because Joe asked me to go to Bank of America.  I remember --

Q    That day on the 6th?

A    No, on the 5th, but I remember that I was frustrated. I didn't plan on opening a bank account.  I didn't plan on what he had asked me to do.  And our plans -- he was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

supposed to meet me and he was changing things, and they weren't making sense.

Q   Let's slow it down.  Slow it down.

A   Okay.

Q   Was there an event the night of the 6th?

A   Yes.

Q   What was that?

A   That was the Accredited Gemologists Association --

THE COURT:  What is the name?  Accredited --

THE WITNESS:  It's called -- it's shortened for AGA, and it's called the Accredited Gemologists Association.

THE COURT:  Is this the gala?

THE WITNESS:  Yes.  One of them.  The first one.

THE COURT:  That's the night of February 6th.

THE WITNESS:  Yes.  And Joe was supposed to be an auctioneer for their -- they have items that they sell on behalf of scholarships, and he's done this before.  And he used to be the president of that group, and --

BY MR. FOLEY:

Q   That's enough.  I --

A   That's enough?  Okay.

Q   Okay.

A   And I --

Q   Looking at the timeline still, Lindy.

A   Yeah.  Yeah.  And so I did go to that event, and I

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 110 of 213
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

remember I did auctioneer, but he wasn't there.

Q    Okay.  Did Joe contact you on the 6th at all?

A    I'm sure he did.  I'm sure he did, yes.

Q    Was he supposed to be there that night?

A    Yes.  He was supposed to be there.

Q    Was he there that night?

A    No.

Q    Had he communicated that to you?

A    Yes.

Q    Okay.  Did that happen on the 6th?

A    No.  The communication?

Q    Yeah.

A    Or the flight?  Or him coming?

Q    The communication with you that he wasn't coming.

A    Yes, that happened.

Q    On?

A    On the 6th.

Q    Okay.  Were you happy about that happening?

A    No.

Q    Okay.  On the night of the 6th, who held the auction?

A    I was the auctioneer.

Q    You were the auctioneer.

A    I was the auctioneer.

Q    Who normally would have been the auctioneer?

A    Joe.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q     Were you happy about that?

A     No.

Q     Okay.  February 7th, tell me what that day, what it looked like and did look like.

THE COURT:  Woah, woah, woah.  What's the difference between would've looked like and did look like?

MR. FOLEY:  I'm trying to not ask -- this is a result of me trying to avoid a leading question, but I'll say this.  Did you have -- I can rephrase, Your Honor, if that's what --

THE COURT:  Fine.

BY MR. FOLEY:

Q     Did you have plans on February 7th, Thursday?

A     I would've in between.  From all the years past, and I know that this -- I would've wanted to go to the -- there's a trade show, many trade shows, but there's specifically higher-end trade shows that I would've gone to.

But every year for the past 20 years I had gone to, and I would see colleagues and gem stones, and it was where I would go to get gemological information.  Every year.  And updates.  And so I would've -- I wanted to go to the show. I knew that I wanted to go to the show, and I didn't go that year, I don't believe.

Q     Why?  What transpired on the 7th that led to you not being able to go to those shows?

212-267-6868                    www.veritext.com                    516-608-2400

A    Because Joe asked me to go and do this for him.  To go to Bank of America.

Q    Okay.  Once or more than once did you have to go to Bank of America?

A    More than once.

Q    Okay.  Did you have to make any stops after Bank of America?

A    Yes.

Q    If you had to roughly approximate the time period of your day that was eaten up by the first trip, the second trips, the -- whatever you went to after that, what hours are we talking?

A    I'm an early-morning riser, so I would want to get it done as soon as possible.  And I was staying far out, so -- I was staying far out.  So, I would've probably stopped and got coffee and, you know, I slowed down --

Q    Do you recall on your direct examination --

A    Yeah.  Yeah.

Q    -- being asked if you went to the bank at about 11 a.m. to the first trip?

A    I believe so, yes.

Q    Do you recall on your direct exam being asked about a time period around 4:30 p.m. Arizona time for --

A    Yes.

Q    -- (indiscernible)?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Yes.

Q    Do you recall the documents showing that you were probably there for about an hour at the bank the second time?

A    Yes.

Q    And then you said you went somewhere afterwards.  Where would you have gone right after that?

A    So, on Thursday nights every year --

Q    Not nights.

A    Okay.

Q    Right after the bank.

A    Right after the bank I went to FedEx.

Q    Okay.

THE COURT:  Which time?  After the 11:00 visit to the bank, or the 4:30, or both?

THE WITNESS:  The 4:30.

THE COURT:  Okay.

THE WITNESS:  I don't know.  Possibly both.  I don't know that.  That's a good question.

BY MR. FOLEY:

Q    Did you have anything to FedEx in the morning after signing the signature card at the bank?

A    No, but it wasn't the signature.  Or did I do transactions in the morning?

Q    That's not for me to answer.

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

A   You're talking --

Q   Do you recall --

A   No, we're talking about the --

Q   You went to the bank several times, yes?

A   Yes.

Q   Okay.  Do you remember what the first time you went to the bank was for?

A   No.

Q   Okay.  The -- when you back to the bank in the afternoon, was there a signature card already on file for you?

A   Yes.

Q   Okay.  Was it dated February 7th?

A   Yes.

Q   Okay.  Do you have any idea --

        THE COURT:  I didn't hear the answer.

        MR. FOLEY:  Pardon me?

        THE COURT:  I didn't hear the answer.

        MR. FOLEY:  Oh, the answer was yes, she did.

        THE WITNESS:  Yes.

BY MR. FOLEY:

Q   Do you have any idea what you did at the bank the morning of February 7th?

A   I signed the signature card.  It sounds like I signed it.

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

THE COURT: I have a clarifying question. There was already a signature card with Ms. Adducci's signature from February 5th.

BY MR. FOLEY:

Q   Ms. Adducci, do you know why you would've had to sign a February 7th signature card when we already have in evidence that you had signed a February 5th signature card on Sanibel Island?

A   I don't know. I can guess. I can figure out that it possibly had to do with Joe.

Q   Okay. So now you get out of FedEx. You're done with Bank of America.

A   Yes.

Q   During this time, are you -- what sort of emotions are you feeling towards Joe?

A   Very angry.

Q   Okay.

A   I went -- may I go on?

Q   No. Was there an event Thursday night?

A   Yes.

Q   What was Thursday night?

A   A dinner with a group of colleagues that we all get together. And a friend of mine in the industry has a dinner, and it's an invitation-only. And I was with a group of friends and colleagues at that dinner.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 116 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Were you able to make that dinner --

A    Yes.

Q    -- to the best of your recollection?

A    Yes, but I was very frazzled and they all noticed it.

Q    Now let's go to Friday.

A    Yeah.

Q    Any events on Friday?

A    Yes.

Q    What even on Friday?

A    The Gemological Institute of America, GIA Alumni Association Fundraiser Auction.

Q    Is that different than the AGA event from Wednesday?

A    Yes, it's a bigger event.

Q    Okay.  Is there an auction held at the Friday, February 8, 2019 event?

A    Yes.  A large auction.

Q    Who would traditionally auction -- be the auctioneer at that auction?

A    Joe

Q    Did Joe go to that?

A    No.

Q    During your initial testimony on direct exam, you testified to receiving a call from Joe having to go to the bank, being frustrated, missing the gala event type thing. Or you actually testified that you would -- that you made it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

to the gala event, but that you were annoyed that you had to do this sort of in between. Do you recall that?

A   Yes.

Q   Is it possible that over the years you've conflated multiple days into one day?

A   Yes.

Q   When you went to Bank of America to open the account, did you choose which branch to go to?

THE COURT:  Now, which day are we talking about, Mr. Foley?

MR. FOLEY:  February 5th.  I apologize, Your Honor.  I'll clarify that.

BY MR. FOLEY:

Q   On February 5th, while you were still on Sanibel, how was it that you came to know where to go and how to open the account?

A   Joe asked me.

Q   On February 7th when you went to Bank of America, how was it that you came to -- and FedEx, how was it that you came to know where to go to the bank, who to talk to, and what checks ultimately to sign?

A   Joe directed me.

Q   When you were in the bank, were you communicating to the teller I need a check to X person or Y person?

A   No.

Veritext Legal Solutions
212-267-6868                                www.veritext.com                                516-608-2400

Q    Did you observe anything about how the teller was receiving the information to fill out the checks?

A    I believe she was on the phone with Joe.

Q    What gave you reason to believe she was on the phone with Joe?

A    I remember --

Q    Okay.

A    -- that she was on the phone.

Q    On your direct exam, counsel made a very big issue of the fact that the total of your withdraws were $9.5 million approximately.  Do you remember that?

A    Yes.

Q    Was there a total of about 4.5 million that went to Mr. Noble?

A    Yes.

Q    Okay.

THE COURT:  The record shows it's 4,250,000.

MR. FOLEY:  I thought there was a second transaction for another --

THE COURT:  Of 117,000 I believe.

MR. FOLEY:  I rounded 4.35 up to 4 and a half.

THE COURT:  I think.

BY MR. FOLEY:

Q    I want to be very clear about this.  As of that moment in time, February 7th, did you in any way think that what

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

you were being asked to do was shady, deceitful, wrong, anything?

A   No.

Q   What was your biggest concern mentally?  I don't mean what's the -- in hindsight what's the most appropriate thing to be concerned about, but that day when you were there, what were -- what was the biggest concern on your mind?

A   That Joe wasn't showing up, and he was leaving me to do things that I hadn't planned to.  And he wasn't showing up for events that he had promised and committed to.

Q   How long had you been married to Joe?

A   Since 1999.

Q   How long had you dated him before that?

A   While we were in business, I was around his -- the business probably since 1993.

Q   In all that time, to the best of your knowledge, was Joe ever accused of defrauding anyone in the jewelry business?

A   No.  In fact, people -- no.  People turned us -- I -- we turned people down constantly that tried to give us merchandise.

Q   In the years leading up to this 2018 -- you know, The Yellow Rose arrives and 2019, this transaction, was there any big event that made you think that your business was doing well?

A    Quite a few.

Q    Well, can you describe some of those for me?

A    In 2017, we hit a record price, and I was told it was a world-record price, on selling an emerald, a 3-karat emerald, and we hit over $100,000 a karat. And I didn't realize -- I knew it was a high price, but I didn't realize it was a very rare Columbian emerald, and I -- from a collector. And I didn't realize that we had hit a record price until I went to a trade show in Las Vegas, and I had -- and New York.

And the dealers, the emerald dealers, came to me, buyers, and they said we're upset with you. And I said, why? And they said because you just upped the game of the level. This is what you did. And I said, really? I didn't realize that we had hit this. And then the same thing happened when I went to Las Vegas. I had people from labs telling me that they were -- wow, that we had hit this price. And then there were other events that we -- we did entire auctions for estates and collections. But we had very good years.

Q    Did you do any law firm work?

A    Yes.

Q    What law firm entrusted you with their business?

A    Jaffe.

Q    Is that Jaffe Heuer and Raitt?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Yes.

Q     Southfield, Michigan?

A     Yes.

          THE COURT:  I believe it's Jaffe Raitt and Heuer and Weiss.

          MR. FOLEY:  Thank you, Your Honor.

BY MR. FOLEY:

Q     The -- what type of work did you handle for them?

A     Well, the last thing that we did for them was an estate.  It was for Richard Coon, and his wife Linda passed away.  And we were brought in to -- we did an entire catalogue on her jewelry and did very well.  Sold some big pieces.  And I believe that was 2015 maybe or '16.  '16.  I think it was '16.

     And also, Mr. Coon asked Joe -- he had a huge collection of Lionel trains, like little collectable Lionel trains.  He had a big collection.  And he really wanted -- he was very happy with the jewelry, the success of the jewelry.  And he really wanted Joe to handle to do a single sale.  But the logistics of doing it, because it wasn't our specialty, although Joe crossed into other specialties, just to get people to work it and how to do it, he -- I think he referred it off to someone else eventually.

     But he also -- Joe also knew Ira Jaffe, and he, Mr. Jaffe, took him to lunch in Naples.  And he was at his -- I

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

believe his condominium down there, and he asked him to come and look at all the artwork in his condo.  And they had lunch afterwards with -- so Joe had a relationship with him. I did a -- I specifically remember going to the law firm and doing appraisal work on a couple of different times for attorneys back over -- we're talking, you know, over the years.  There were a lot of years in between, but yes.  I had been there many times for --

Q    In the 2010s there.

A    Yes.

Q    By that I mean --

A    In the 2010s yes.

Q    I don't know if that's a question.  Let's start a new question.

A    Yeah.

Q    In the 2010s, the 20 teens --

A    Yes.

Q    -- were your revenues on the decline?  How were your revenues doing?

THE COURT:  LLC revenues?

MR. FOLEY:  Yes.  I'm sorry.

BY MR. FOLEY:

Q    The -- how were the revenues of the LLC?

A    I mean, we came out of 2000 like eight, nine, ten really tough times.  But in 2011, we had a huge estate that

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

we hit record prices on everything.  And that --

Q    Yeah, and I don't want to cut you off.

A    Yeah, that auction --

Q    (Indiscernible) the details.  I --

A    That auction alone brought in four million.

Q    How were your revenues leading up to 2018 and 2019?

A    Well, they were great.  From what I believe they were great.

Q    Everything you just described in testimony, did any of that indicate to you that Joe had reason to defraud your family?

A    No.

Q    When you learned that Joe was going to do a deal with Mr. Ritter, and then your son Joey told you Ritter sues everybody, you communicated that to Joe?

A    Yes.

Q    Okay.

A    I turned right to him and said -- asked --

Q    Did you think that Joe was going to be more or less careful in dealing with Mr. Ritter and his money?

A    More careful.

Q    Which leads us to the multiple different payments coming out of that $12 million first.  Do you recall being asked, again on leading questions, that it was your understanding the only way -- that the only money that

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

could've been in that account was the 12 million and the 500 that was the initial deposit? Do you remember being asked that?

A    Yes.

Q    Do you remember answering in the affirmative, yes, that's -- that would be the only money?

A    Yes.

Q    Was there anything that you had forgotten or that in your mind could have or would have contributed to the money in that account?

A    Our business. Our normal business later.

Q    Let me be clear.

A    I'm not understanding the question.

Q    Let's go back. In very simple terms --

A    Yes.

Q    -- why did you need to open a Bank of America account?

A    Well, at the time that I did it when Joe asked me, it was for the money for -- to come into the account.

Q    Okay.

THE COURT: Wait. Say that again?

THE WITNESS: Well, the -- he -- when he had me go and do it at that moment before Tucson, it was to receive the money, the wire. But I also, you know, knew that we needed -- I believed -- I mean, I like having a large bank also. It -- but I mean, that was the specific reason he had

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 125 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

me go over there.

BY MR. FOLEY:

Q    Okay.

A    On Sanibel.

Q    Had you had a Chase account in the past?

A    Yes.

Q    Was that your big bank in the past?

A    Yes.

Q    And then at the time that you were operating on FineMark, before Bank of America, did you at that time have a big bank, or no?

A    FineMark?

Q    Yeah.

A    I believe we had Chase.

Q    At the time -- did you have Chase at the time you opened the Bank of America account?

A    No.

Q    Okay.  So at the time you were dealing with FineMark as a bank --

A    Yes.

Q    -- leading up to your opening the Bank of America account --

A    Yes.

Q    -- did you have a big banking place at the time?

A    No.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    What was your belief with respect to -- let me put the -- did you open the Bank of America account only for Ritter's money to come in?

A    No.

Q    Okay.  So, what did you expect would become of the Bank of America account going forward and its use?

A    That it would be able to handle the transactions better than FineMark for auctions and for business in our account.

Q    Okay.

A    They were --

Q    Can you flip back please to Exhibit J5?  Looking at the very first page of the exhibit, not counting the 12 million, right, from Mr. Ritter, doing simple math and rounding to the nearest thousandth, how much extra money came into the account in addition to Mr. Ritter's 12 million?

A    855,000.

Q    Thank you.  Can you flip to the next statement?  Not the next page.  About halfway down it should say for business advantage checking for March 1st to March 31st.  Do you see that?

A    What page are you on?

Q    The page numbers are difficult, but since they (indiscernible) --

A    Oh, I found it.  Okay.  Mine are out of order again a little bit, but --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   It should say 1 of 12.

A   Yeah, 1 of 12.  I found it.

Q   Okay.  How much money flowed into the account that month?

A   $636,011.24.

Q   Okay.  Did you have online access to this account?

A   No.

Q   Okay.

THE COURT:  Clarifying question.

MR. FOLEY:  Yes.

THE COURT:  The difference between online -- having online access and using online access, as a signatory on the account, she may have had online access.  Did she use it?

MR. FOLEY:  Fair enough.  I understand Your Honor's -- I'll make this distinction.

BY MR. FOLEY:

Q   Do you agree that as a signatory on the account, you would've had the ability to create an online account?

A   Yes.

Q   Okay.  And did you ever create an online account?

A   No.

Q   Okay.  The -- and thus, did you ever log in and access the account electronically?

A   No.

Q    Okay.  So with that statement, can you flip to page 8 of 12?  Do you see the checks?  And it says total checks?

A    Yes.

Q    What's that number?

A    Eleven.

Q    I'm sorry.

A    Oh.

Q    Total of the -- not total number of checks, total checks above that.

A    $177,623.75.

Q    Okay.

        THE COURT:  Negative.  The number is negative.

        THE WITNESS:  Negative.  Exactly.

BY MR. FOLEY:

Q    Because those are withdrawals/deductions from the account, yes?

A    Yes.

Q    Okay.  Can you flip to page 11, please?  We referred before -- so, you referred to a signature stamp.  Do you remember that?

A    Yes.

Q    That they had a -- you had a signature stamp?

A    Yes.

Q    You're not talking about -- well, let me correct.  Were you talking about the bank had a stamp or the girls back at

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

DuMouchelle Jewelers had a stamp?

A    The girls in the office had a stamp.

Q    And just for purposes of clarity, the -- that stamp, was it literally meant to look like your signature?

A    Yes.

Q    Okay.  Any of these checks here, do they appear to you -- look carefully -- to have been the result of that stamp?

A    Possibly a few of them.

Q    Okay.  But overall, let me ask you this.

A    Yes.

Q    Are you denying to the Court that you wrote checks on that account?

A    No.

Q    Okay.  In your mind, had this transitioned to be the account of the business that you were using?

A    Yes.

Q    Okay.  So you wrote $177,000 of checks.  One of them has like a bank statement on it.  That's not your stamp.  That's a bank stamp.  But total roughly, you wrote about $177,000 in checks?

A    Yes.

Q    In an account that had 636,000 flow into it?

A    Yes.

Q    Okay.  The -- when you were writing checks, tell me what your business was like at that time.  Why would you

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

have been writing checks? And like to who? To what kind of vendor, supplier? What was the nature of what you were doing?

A     Well, the top two Kathleen Brooker was our -- she was our website developer.

Q     Okay.

A     And where it says on these others, where it says -- City of Birmingham was a license. And then where it has client and receipt, there were -- every customer had a client number.

Q     No.

A     No?

Q     No, I just said yes. Go ahead.

A     Oh, yes. And then your client number, you could either be a buyer or a seller. So the receipt would've been how it pertained to that transaction.

Q     Yeah, but are these -- were you brokering large deals flipping diamonds?

A     No.

Q     What was the nature of your work? If it wasn't administrative like running -- you know, just from keeping the business running --

A     Right.

Q     -- what was the nature of what you were out there doing?

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

A    These were -- these would've been customers that were -- we were selling at auction -- items at auction and sometimes a diamond sale or an engagement ring sale or...

Q    To the best of your recollection during the month of March, did you receive any bounce-back checks or anyone calling you saying, hey, our checks bounced, what's the problem?

A    No.

Q    Okay.  Did Mr. Gelov sue you during the month of March?

A    Yes.

Q    Okay.  At that point, was there an attorney involved in your life?

A    Yes.

Q    At that point, did Joe come clean to you and say here's what I did, I really screwed up, and I included you in it?

A    No.

Q    Okay.  In fact, in March with $600,000 flowing into the bank account, and you not hearing of any bounced checks yet, did you have any reason yet to think there was a severe financial problem, or Joe had done something wrong?

A    No.  He kept blaming it on Bill Noble.

Q    What did Joe tell you as to why all of a sudden Gelov -- that phone call with Gelow, was that March 7th?

A    I believe so.

Q    Okay.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  Is that of 2019?

MR. FOLEY:  I'm sorry, yes.

BY MR. FOLEY:

Q    Was that March 7th of the year 2019?

A    Yes.

Q    Was that about a month after the transfer was made on the Ritter case?

A    Yes.

Q    Because those were February 7th?

A    Yes.

Q    Okay.  During the playing of the video of your deposition, you could hear the entire Gelov call, yes?

A    Yes.

Q    Okay.  What you were saying on that call at the time, did you believe it to be true?

A    Yes.

Q    In fact, did you actually have -- were there banks rejecting transfers?

A    Yes.

Q    Did you believe that to be the cause of the problems with Mr. Ritter?

A    Yes.  We had had that happen with our customers with our customers had had that happen in New York.

Q    Let's be clear --

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    -- actually.

A    Yes.  Banking was --

Q    On that call --

A    Yes.

Q    -- you described not a problem with Mr. Ritter, but simply an example of a bank giving you problems with banking.

A    Because --

MR. CATALDO:  Leading question.

THE COURT:  Wait, wait, wait.

THE WITNESS:  Yeah.

MR. CATALDO:  Leading question.

THE COURT:  Leading question.

MR. FOLEY:  Agreed and withdrawn.

THE COURT:  Objection sustained.  Objection sustained.

MR. FOLEY:  Withdrawn.  I apologize.

BY MR. FOLEY:

Q    What explanation -- so you get a law suit sometime in March from Mr. Gelov, yes?

A    Yes.

Q    Did Joe give you any explanation about that?

A    He said that Ted offered to give him -- yes, yes, he did give me an explanation, like a --

Q    What was it?

20-04381-lsg    Doc 328    Filed 04/14/26    Entered 04/14/26 16:01:37    Page 134 of 213
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A   -- a couple of them.  He told me that Ted -- that Mr. Gelov offered to -- number one, that he had offered to extend the loan, and that he would give him more time if he needed.  And then all of a sudden, he decided to not.

Q   Were you aware at that time that your signature, electronic signature was allegedly on the Gelov loan document?

A   No.

Q   Okay.  So a month after --

A   Yes.

Q   -- in March --

THE COURT:  A month after what, Mr. Foley?

MR. FOLEY:  I apologize.

BY MR. FOLEY:

Q   A month after the February 7th transfers regarding Mr. Ritter, the cashier's checks out of the account, what was your belief as to the financial state of your business, the business, Joseph DuMouchelle Fine and Estate Jewelers -- which by the way, what percentage do you hold in that business?

A   Ten percent.

Q   Okay.  What was your belief as of, let's say, March 7th, not regarding banking issues, but regarding the financial health of your business?

A   I still believed it was healthy.  I still -- I didn't

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

-- I still believed in it, that it was healthy.

Q    In fact, throughout March, you were writing checks out of the bank account, a bank account that had another 600,000 flow into it that month, yes?

A    Yes.

Q    Okay.  Do you know if Joe was controlling transfers coming out of that account?

A    Yes.

Q    Okay.  Let's flip to the next page for April.  How much money during April on the line, "Deposits and other additions," flowed into the account in April?

A    $622,554.89.

Q    Okay.  Let's look back at the checks at the end of that statement.  That would be the page labeled 9 of 10.  Are there a bunch of checks with your signature on it?

A    Yes.

Q    Are there a couple of checks with Joe's signature on them?

A    Yes.

Q    When you flip back a page -- actually, let's go back to two pages, to page 7 of 10, what does it say is the total dollar value of the checks written out of the account?

A    Page 2 you said, right?

Q    No, page 7 of 10.

A    The total amount of the checks.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Yep.

A    $203,940.70.

Q    Okay.  Now, can you please go back to page 9 of 10 and find check number 13970, the second one down on the left. Who signed that check?

A    Joseph DuMouchelle.

Q    Okay.  And what's the amount?  Let's round it.  Does it say $24,000 roughly?  23,749?

A    Yes.

Q    Okay.  And then to the top right of that check, 13967, can we round that one down to 2,000?  $2,250?

A    Yes.

Q    And that's signed by Joe as well?

A    Yes.

Q    Okay.  So, 24 plus 22, is that $26,000 written by Joe?

A    Yes.

Q    So going back to Page 7 of the 203,000 that you wrote out of the account, 26,000 was for Joe?  Is that fair?

A    Yes.

Q    So roughly, just roughly, order of magnitude, 175,000 from you?

A    Yes.

Q    Okay.  And again, how much had flowed into the account that month?  That's on page 1 of 10.

A    $622,354.89.

Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400

Q   Notice that it says the account started with a negative balance of negative 34,493?

A   Yes.

Q   And do you notice that it says that it has an ending balance of negative 22,301?

A   Yes.

Q   That is actually a lower negative number.  Is that correct?

A   Yes.

Q   Okay.  Now, let's flip the page.  Looking through the pages 4 of 10 where it starts with draws and other debits, going through page 5 of 10 and all the way down to 6 of 10, do you see any NSF charges from the bank?  Insufficient funds charges?

        MR. CATALDO:  They're on a different page, counsel, if you need to see them.

BY MR. FOLEY:

Q   Do you see any in there?

A   I see a return of posted check.  Is that the same?

Q   No, that's different.  Within the pages I described --

A   Yes.

Q   -- page 4 through 6, do you see any insufficient fund charges, NSF?  Lindy?

A   No.

Q   Okay.  Now flip to page 8.  Do you see insufficient

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

fund charges on -- fund -- NSF charges on that page?

A     Yes.

Q     Okay.  Flip back to page 1 of the statement.  Does it appear that even though the account balance started negative and ended negative, that the bank honored checks coming out of the account?  And you've got basically an overdraft fee, NSF, but the money was allowed to flow out.

A     Yes.

Q     Okay.  So during this month of April, do you remember receiving any calls from any customers saying, hey, our checks bounced?

A     No.

Q     Okay.  In April, what was your belief as to how Joseph DuMouchelle Fine and Estate Jewelers was doing?

A     Still doing business.

Q     Okay.  Right.  The --

A     Yeah.

Q     Did you -- had you in April received a phone call from Mr. Ritter saying, hey, where's my money?  Where's my diamond?  Where's my money?

A     No.

Q     Okay.  Flip to J45, please.  So, by the way, was there any large life events that occurred in May of 2019?

A     Yeah.  Joe's dad passed away.

            THE COURT:  What month?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  May of 2019.

THE WITNESS:  Of cancer.

BY MR. FOLEY:

Q    How did Joe's dad appear in the end near May?

A    Emaciated.  Very skeletal.

Q    And how was Joe dealing with that at the time?

MR. CATALDO:  Your Honor, this is irrelevant.

THE COURT:  I'm going to sustain the objection. Mr. Foley, this is so far afield.  This is cross-examination of Ms. Adducci, who was called in the plaintiff's case-in-chief.  You are limited to what was covered on direct. That's the purpose of cross.  You're going to have a whole other chance to put in your direct case with Ms. Adducci. We're going to grow old together at this pace.  So the Court is cautioning you.  Stick to relevant questions. Objection's sustained.

MR. FOLEY:  May I at least put my response on the record?

THE COURT:  Yes.

MR. FOLEY:  Thank you, Your Honor.  I'm simply asking because it goes to her frame of mind and belief regarding the business at the time of the checks and the emails that they did address on their direct exam with her. They used it to basically say you should've been aware that your business was gone to hell at this point.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 140 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: All right. Mr. Cataldo?

MR. CATALDO: Your Honor, we did not ask about her frame of mind. Frankly, it's utterly irrelevant.

THE COURT: Well, the way that the -- Mr. Adducci's father -- I'm sorry, Mr. DuMouchelle's father looked at the time prior to his death is certainly irrelevant. Whether he looked emaciated or puffy is irrelevant to what's going on in this case, Mr. Foley. That was not asked on Mr. Cataldo's -- the Court was listening real carefully and no one asked what Mr. DuMouchelle's dad looked like, okay?

MR. FOLEY: I don't disagree, Your Honor.

THE COURT: Well, I -- keep it limited.

MR. FOLEY: I'll move on.

THE COURT: Any idea how much longer?

MR. FOLEY: The -- Your Honor, I don't remember how long ago I started, but I don't feel like it's been that long.

THE COURT: Oh, hang on. The Court knows.

MR. FOLEY: I mean, the direct exam lasted all of yesterday afternoon and all of this morning into this afternoon into lunch.

THE COURT: You're going to get another chance with the witness, Mr. Foley. Hang on. Mr. Cataldo, can you help me out here? I thought I wrote it down.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO: Your Honor, we came back at 1:00. I took 20 minutes with the witness. I ended at 1:20, passed the witness at 1:20. I think we did take a break to 1:30, so he's been going just a hair under two hours now.

THE COURT: All right. Well, continue Mr. -- oh, cross-examination of Ms. Adducci started at 1:15. Mr. Foley, you've been up there since 1:15. That is two hours and we've taken a couple of breaks.

MR. FOLEY: Yes.

THE COURT: (Indiscernible). All right. Continue, but remember you will have your chance to put on your case --

MR. FOLEY: Your Honor --

THE COURT: -- with this witness if the Court -- I realize there may be a motion after the close of the plaintiff's case.

MR. FOLEY: Oh, not that, Your Honor. I want to assure the Court I have questions about their background, their marriage, the rest that weren't asked that I'm going to do during my direct. I'm --

THE COURT: Good. You're not doing it now.

MR. FOLEY: Yesh, I'm not. That's why I'm --

THE COURT: Okay.

MR. FOLEY: I have narrowed this down on cross. I believe the question I asked went to her state of mind at

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

the time.  I understand Your Honor has overruled that.  I will move on.  I'm not trying to fight with the Court in any way, but it wasn't --

THE COURT:  I sustained the objection as to the appearance --

MR. FOLEY:  Yes.

THE COURT:  -- of Mr. DuMouchelle's father in May of 2019 before his death.  Tragic.  It's always sad to lose a parent, but his physical appearance is simply not relevant to this case at all.

MR. FOLEY:  Thank you.

BY MR. FOLEY:

Q    So through March and throughout April, as we've just seen in the statements, money's flowing in and you're continuing to conduct business, yes?

A    Yes.

Q    It was --

THE COURT:  Uh-huh.

MR. FOLEY:  Excuse me?

THE COURT:  Careful on the leading.  Mr. Cataldo --

MR. FOLEY:  I was just --

THE COURT:  -- I'm listening.

MR. CATALDO:  Leading.

THE COURT:  It was a yes at the end.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: He will always have an opportunity.

THE COURT: Ms. Adducci, count to three before you answer. Mr. Foley, you've been told before careful on the leading. And --

MR. FOLEY: Your Honor, that was --

THE COURT: -- give her -- all right.

MR. FOLEY: -- merely a re-summary question of prior testimony given through non-leading questions to restart after the objection.

THE COURT: Go ahead, sir.

MR. FOLEY: Thank you.

BY MR. FOLEY:

Q On your direct exam you were asked about these emails from Mr. Ritter, J45, J46, J47, and J48, yes?

A Yes.

Q Okay. Do you recall testifying that you don't recall seeing them?

A Yes.

Q Do you understand that there's a legal distinction between not remembering and not recalling and the like?

THE COURT: Wait. Stop. Now, say the question again?

MR. FOLEY: Whether she understands that there's a legal distinction between "I don't recall" and "I don't remember"?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Okay. That -- the Court doesn't even know what that question means or pretends to ask, but it is leading.

MR. FOLEY: Okay.

THE COURT: Objection sustained.

BY MR. FOLEY:

Q    Did you see any of these emails?

A    No.

Q    Do you have a suspicion as to why you didn't see these emails?

A    Yes.

Q    And what is that?

A    That Joe hid them from me.

THE COURT: Excuse me. I didn't hear the answer.

THE WITNESS: That Joe hid them from me.

BY MR. FOLEY:

Q    Did Joe have access to your emails?

A    Yes.

Q    Do you recall being asked repeatedly on your direct exam whether or not you, "Could have said no to the transfers out of the Bank of America account?"

A    Yes.

Q    Did you have any reason to say no at the time?

A    No.

Q    Do you remember being asked, "Well, you could've

stopped and not mailed the checks back to Joe"? Do you remember that?

A    Yes.

Q    Did you have any reason besides your own fury at him to not mail the checks back to him?

A    No.

Q    Do you remember being called --

A    He had never given me a reason before.

Q    Do you remember being asked why in the days that followed you didn't pick up the phone and call Ritter say -- well, actually one of the questions was to call Joe and say, hey, this is wrong, we shouldn't spend Ritter's money on other stuff? Do you remember that?

A    Yes.

Q    When you were signing the checks at the bank, did you believe that it was not part of appropriate, normal, continuing business?

A    I believed it was part of a normal business.

Q    Okay. In Tucson on the second or third day of your trip, having been called into the bank --

THE COURT: You want to rephrase that? Called into the bank?

BY MR. FOLEY:

Q    Having been asked by Joe to go to the bank --

THE COURT: Yes.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 146 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE WITNESS:  Yes.

BY MR. FOLEY:

Q     Were you on guard mentally about what Joe was doing with Mr. Ritter's money?

MR. CATALDO:  Leading.

THE COURT:  Okay.  Don't answer.

MR. CATALDO:  Irrelevant.

THE COURT:  Mr. Foley?

MR. FOLEY:  Super not irrelevant, since their case --

THE COURT:  Is that a base -- is that a new term I'm not aware of?  Super --

MR. FOLEY:  Not -- no, just very, very --

THE COURT:  -- not irrelevant?

MR. FOLEY:  -- not irrelevant.

THE COURT:  So, wait, wait.  Are you saying it's super relevant?

MR. FOLEY:  Yes.

THE COURT:  Help me to understand.

MR. FOLEY:  There argument is that she had knowledge and intent at the time that she was transferring the money incorrectly.

THE COURT:  Well, that's the relevance objection, perhaps.  What about the leading part?

MR. FOLEY:  I don't believe it's leading.  I asked

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 147 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

what was your frame of mind.

THE COURT: No, that's not how you phrase the question. Because Mr. Cataldo --

MR. FOLEY: Well, did --

THE COURT: -- wouldn't not have objected.

MR. FOLEY: May I ask if I didn't? It's easy to laugh and say that's not what he asked.

THE COURT: No, no -- I apologize. We shouldn't be making light of this.

MR. CATALDO: You're right.

THE COURT: That's -- okay.

MR. CATALDO: I apologize.

THE COURT: No one --

MR. FOLEY: I don't think Mr. Cataldo -- I'm not trying to be argumentative -- can even say what he thinks I said. He made an objection. He heard Your Honor go, "That's not what you said," and he goes, "Ha, ha, that's not what he said." What does he think I said? Because I did say that.

THE COURT: Mr. Cataldo?

MR. CATALDO: He gave a very specific description and asked her to agree with it. So he completely and totally suggested the answer to the witness and just said, "Isn't that what you were thinking?"

MR. FOLEY: Your Honor --

Veritext Legal Solutions
212-267-6868                     www.veritext.com                      516-608-2400

THE COURT: The Court interprets it the same way as plaintiff's counsel. So the objection is sustained on the leading part. As to the relevance, I'm going to -- it could be -- the frame of mind, we've got 523(a)(2), (4), and (6), and these are known colloquially as the intentional reasons for non-dischargeability. So the Court's going to -- the relevance objection is overruled, but rephrase the question, Mr. Foley.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Well, what was --

BY MR. FOLEY:

Q    Were you focused at that time on the thought of Joe misappropriating the money?

THE COURT: Don't answer. Same objection. It's leading.

MR. FOLEY: How is it? How is that --

THE COURT: Do you want to take a minute and look at your questions?

MR. FOLEY: No, your --

THE COURT: How about asking the witness what she was thinking at that time?

MR. FOLEY: I will do that, Your Honor. Thank you.

THE COURT: How about that?

MR. FOLEY: Question withdrawn.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Mr. Cataldo, will that satisfy your leading question objection?

MR. CATALDO: It will.

THE COURT: Thank you.

BY MR. FOLEY:

Q    What were you focused on at the time you went into the bank and were signing these checks or slips or whatever you were signing?

A    To do a business, you know, situation and get to Tucson.

Q    No, not opening the account. While you were in Tucson.

A    Oh, to get to go to the events. To go and do what I was there for initially. Why I flew there. It was not -- I didn't fly there to do these banking transactions. I flew there to go to a conference and to go to events that I went to every year.

Q    If you had believed Mr. Ritter's money was being misused that day, would you have signed the checks?

A    No.

THE COURT: That was leading. Wait, wait, wait, wait. Ms. Adducci --

THE WITNESS: Count to three.

THE COURT: I know you know how to do it because you were doing it really well for quite a period of time, ma'am. Mr. Foley -- well, Mr. Cataldo state your objection

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

for the record, please. Why is it leading? I'm sorry, you're Mr. Cataldo.

MR. CATALDO: Because once again he has provided a detailed description of his characterization, and he's asking her --

THE COURT: To verify it.

MR. CATALDO: -- (indiscernible) adopt it.

THE COURT: Mr. Foley?

MR. FOLEY: Your Honor, I will repeat the question slowly.

THE COURT: Okay.

BY MR. FOLEY:

Q    Had you believed at the time that Mr. Ritter's money was being misused? Right there. (Indiscernible). If you had believed that, would you have signed the documents converted from, you wouldn't have signed the documents, right?

THE COURT: Oh, it's much better than, "you wouldn't have signed".

MR. CATALDO: It's still leading.

THE COURT: It's still leading.

MR. FOLEY: I don't --

THE COURT: It's leading in a less malignant way than your first incantation of the, "you wouldn't have, would you?" But it's still leading because it suggests the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

response.  And the Court's been pretty clear in this case that the Court's worried about your ideas being put into the mouths of your witness and coming out as testimony.  And that's why the Court is proceeding carefully as it is here. So rephrase the question.  The Court is confident you can do this.  You've done it for -- well, all afternoon.

BY MR. FOLEY:

Q    With the benefit of hindsight as you sit here today, would you have done anything differently on that day?

A    Yes.

Q    And what's that?

A    I would've not gone to the bank.

THE COURT:  Would've what?

THE WITNESS:  I would not have gone to the bank.

THE COURT:  A clarifying question.  On February 5th or February 7th or both?

THE WITNESS:  No, I -- the Bank of America account I believe needed to be opened.  We needed a larger bank and we had discussed that.

THE COURT:  So it's the February 7th date that you say --

THE WITNESS:  Yes, in Tucson I would not have gone.

MR. FOLEY:  Thank you, Your Honor.  With all rights reserved for my direct examination, I believe I'm

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

concluded with my cross-examination.

THE COURT: Thank you, Mr. Foley.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Incredibly, Ms. Adducci, Mr. Cataldo gets the right to ask you more questions. So this is what we call the redirect. Are you okay? Or do you need a little break?

THE WITNESS: Maybe in a little bit.

THE COURT: Okay. You let me know.

THE WITNESS: Okay.

THE COURT: All right?

REDIRECT EXAMINATION OF MELINDA ADDUCCI

BY MR. CATALDO:

Q   Ms. Adducci, you've been saying how wonderfully you thought the business was doing in 2019. Can you explain how it ended up with $29 million of debt on its schedules then?

MR. FOLEY: Objection, Your Honor. Argumentative and badgering.

MR. CATALDO: Your Honor, he's been getting the witness to say how wonderfully they were doing. Perhaps the witness can then explain how you go from that to $29 million of debt on your schedules.

MR. FOLEY: Objection to the mischaracterization.

THE COURT: Wait. Hang on a second. Which schedules are we talking about?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: The company's schedules.

THE COURT: The company's bankruptcy schedules that were filed in what month?

MR. FOLEY: The company's bankruptcy schedules aren't evidence in this case.

MR. CATALDO: But we -- in the court record, it's public record, there's --

THE COURT: It's public record.

MR. CATALDO: -- $29 million of debt on the schedules.

MR. FOLEY: Your Honor was --

MR. CATALDO: So I'm trying to find out how we go from their making money hand over fist to $29 million of debt on the schedule.

THE COURT: I'm going to allow the question, Mr. Foley. I -- your objection is noted. I don't believe it's argumentative, and it does go to -- it's within the scope of what you were talking about when reviewing J5 and the statements for March and April which the witness --

MR. FOLEY: And Your Honor, I accept the Court's ruling. I do have one further objection.

THE COURT: Okay.

MR. FOLEY: It's a mischaracterization of the testimony that I elicited. At no point did I testify -- did she testify on my redirect or my cross that the business was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

doing wonderfully. In fact, she testified that the account went from negative to slightly less negative. And she testified to exact numbers. There was never a characterization given that the business was doing wonderfully. And while that type of questioning --

MR. CATALDO: That's right.

MR. FOLEY: -- smacks well for a jury, I don't believe it's appropriate in a bench trial with an already fragile witness that's been doing her best to do this. Nor I do think it's necessary, which is why my objection is it's argumentative.

THE COURT: All right.

MR. FOLEY: And misstates --

THE COURT: Mr. -- and Mr. --

MR. FOLEY: And misstates the --

THE COURT: All right. Mr. Cataldo, the Court is going to instruct you to rephrase the question --

MR. CATALDO: Okay.

THE COURT: -- to keep it within the contours of what Mr. Foley just explained.

MR. CATALDO: I'm going to ask it a little different.

BY MR. CATALDO:

Q   Can you explain then how the company, Joseph DuMouchelle Fine and Estate Jewelers, LLC ended up with $29

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

million of debt on your schedule?

MR. FOLEY:  Objection.  Assumes facts not on the record and not in evidence.

THE COURT:  You're going to make the Court look up the schedules and take judicial notice of the schedules, Mr. Foley?

MR. FOLEY:  Your Honor, I believe we were under strict instructions that the only documents being used were what on the joint final pre-trial order.

THE COURT:  Are you trying to eclipse the Court's ability to take judicial notice under Federal Rule of Evidence 201?

MR. FOLEY:  No, but the witness would then have to be instructed as to the amount, which is not -- never been made evidence in this case.

THE COURT:  How about we do it this way?  Mr. Cataldo, can we use the word "millions"?

MR. CATALDO:  Okay.  Let's do that.

THE COURT:  I don't --

MR. CATALDO:  Does the Court --

THE COURT:  -- Mr. Foley, if we -- if -- the Court is able to sift through the back-and-forth here by using judicial notice and looking in the record.  So, Mr. Foley, the -- you understand that, of course.  But if Mr. Cataldo uses the word "millions", will that satisfy your concern?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: I'm going to accept it because it's better than nothing, Your Honor. But it's one thing to come out and ask for a realistic explanation of something, right? How did it end up in bankruptcy? Why was a bankruptcy filed? Then --

THE COURT: It was an involuntary for the LLC.

MR. FOLEY: Another question, right? But --

THE COURT: All right. We have Mr. Cataldo --

MR. FOLEY: -- why was it $29 million in debt?

THE COURT: Mr. Cataldo has been advised that the better term to use is "millions". Because on the records and papers in this case, I don't think there's any dispute. And noticing that J50 is the personal bankruptcy schedules, and a lot of the -- apparently a lot of the business debts carried over into the personal bankruptcy schedules, as reflected in the Exhibits, I don't know, J5, J15, the ones showing the money outgoing, those same creditors show up on J50. So use the term "millions", Mr. Cataldo, please.

MR. CATALDO: Thank you, Your Honor.

BY MR. CATALDO:

Q    Ms. Adducci, can you explain how the business ended up with millions of dollars of debt on its schedules?

A    I can now after. I couldn't have back then, but I can now after. That's why my husband's in prison because he was deceitful to everyone, including myself.

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

Q    Well, we looked at the guilty plea, and the only people he was deceitful --

MR. FOLEY:  Objection, Your Honor.  I didn't address guilty plea on my cross-examination at all.

MR. CATALDO:  Your Honor, she --

THE COURT:  Woah, woah, woah, woah, woah.  Thank you, Ms. Adducci, for not responding.  Take a breath.  This is between them and the Court.  What's the objection, Mr. Foley?

MR. FOLEY:  That his redirect is limited to my cross, and I didn't address that guilty plea on my cross at all.  And now he's going back into the guilty plea document.

MR. CATALDO:  The witness just said the reason the company went bankrupt is because Mr. DuMouchelle was dishonest as to everyone and that's why he was in jail.  Whereas we just looked at the guilty plea, the only one that he was dishonest as to is Mr. Ritter.  That's according to the guilty plea.  So, Your Honor, I was just following up on the comment the witness just made in response to my question.  Just because she says something, she volunteered that.  I can follow up on that.

MR. FOLEY:  Your Honor, I respectfully disagree.  The witness' answer does not invite material unrelated to my direct examination.  To do so would allow him to elicit questions and responses in order to endlessly expand the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

scope of his redirect. She said he pleaded guilty. That's true. She didn't comment on the interior details of that plea or any of the specifics. He asked why the company went bankrupt, and she said, "By now I can answer that."

THE COURT: Right, and she's trying to answer it. The objection is overruled, Mr. Foley. Continue, Mr. Cataldo.

BY MR. CATALDO:

Q    Ms. Adducci, we looked at the guilty plea this morning, correct?

A    Yes.

Q    So the guilty plea is related to dishonesty that your husband committed with respect to Mr. Ritter, correct?

A    Yes.

Q    Okay. Now, we looked at the sentence enhancement, which included Mr. Gelov in the conversation you were part of. You remember we looked at that as well this morning, correct?

A    Yes.

Q    Okay. So, have you finished your answer? Have you any other explanation for how the company ended up with millions of debt on its schedules besides what you've just told me?

A    No.

Q    So, I want to comment on questions counsel asked about the signature cards and let's see if we can figure out what

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

happened with these signature cards. Because I think there's an explanation. So if we go to Exhibit 4, the first page is the signature card you opened up in Florida, your signature dated February 5, 2019, correct?

A     Yes.

Q     So this is the card that actually opened the account, right?

A     It's a signature card, yes.

Q     Okay. But this is dated February 5, 2019, and we know that's the date that the account was opened for the Bank of America, right?

A     I believe that to be true, yes.

Q     Okay. Now, we've had this mystery of why you went to the bank twice on the 7th, and I think I have an answer that we'll talk about right now. So let's turn to the next page, and you'll see there's another signature card only signed by you, and this one is dated --

MR. CATALDO:  Judge, if you go to the bottom.

BY MR. CATALDO:

Q     -- this one's dated the 7th, correct?

A     Yes.

Q     Now, the 7th you're in Tucson, right?

A     Yes.

Q     The conference had been on the 6th. This is the next day the 7th, right?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Yes.

Q     Okay.  And if you look up at the top of the page, do you agree with me that the word "DuMouchelle" in Joseph DuMouchelle Fine Estate Jewelers is misspelled?

A     Yes.

Q     Okay.  And do you recall that when you went to the bank the first time in Tucson on the 7th, you signed this document with the misspelled name?

A     How do I know that?

Q     Well --

A     Because I was in Tucson.

Q     Because you were in Tucson.

A     Okay.

Q     Does that sound right?

A     Yes.  It says Financial Center Sanibel at the bottom.

Q     I know it says it, and that's where the account's opened.

A     Yeah.  Okay.

Q     But you were in Tucson the 7th.  We agreed on that, right?

A     Yes.

Q     You didn't fly back to Sanibel.

A     No.

Q     You were still in Tucson, right?

A     Yes.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q   Okay.  So, Joe is up in Michigan.  We talked about that yesterday on the 7th, correct?

A   Yes.

Q   And if you -- let's look at the next page.  If you recall what happened is the document that had your signature, the signature card, got scanned and sent up to a branch in Michigan, a Bank of America, for your husband to sign.

A   Okay.

Q   Okay.  So because now this page, if you go to the third page, here it is.  We've got the misspelled Joseph DuMouchelle, and it's got both your name and Joseph's name, your signature and Joseph's signature on it.  Do you see that?

A   Yes.

Q   Now, you're in two different cities halfway across the country, right?

A   Yes.

Q   You couldn't have been in the same place at the same time, right?

A   Right.

Q   So -- and if you look at your signature, it's identical on the second page and third page.  Meaning the third page is a scan of the second page.  It gets sent up to Michigan, and now Joseph signs it, right?

A    Yes.

Q    Okay.  But Joseph DuMouchelle is misspelled, and that doesn't match.  Let's take a look.  The third -- the spelling on the third page doesn't match the spelling of Joseph DuMouchelle on the first page, the first page being the signature card you signed to open the account on the 5th, right?

A    Right.

Q    Okay.  And so do you recall then what happened was Bank of America wouldn't accept the signature card with the misspelling on it?  Do you recall that?

A    No.

Q    All right.  Well, do you recall Exhibit 42 that we spent a lot of time on yesterday where Joe sends this email copying you to the bankers.  And it says, "I was hoping to do this, but the -- my signature card that was signed earlier today is not uploaded yet."

A    Uh-huh.

Q    Do you see that?

A    Yes.

        MR. FOLEY:  Objection, Your Honor.

        THE COURT:  Wait.  Hang on a second.

        MR. FOLEY:  You know, I'll withdraw the objection.  I'll wait to see where this goes.

BY MR. CATALDO:

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 163 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    So remember yesterday even on the tape, you had said in your deposition there was a problem with the signature that Joe -- signature card that Joe signed on the 7th.  Remember saying that?

A    I remember saying that Joe needed to sign a signature card and it wasn't uploaded yet.

Q    Okay.

A    That was --

Q    But didn't just a few minutes ago during examination by counsel you note -- you made the mention of the fact that there was a misspelling on the signature card that you had signed?

A    I brought -- I didn't think it had to do with -- I didn't -- I mean, because I caught my own -- I don't know.

Q    Okay.  Well --

A    I'm still confused.

Q    Do you remember the reason you had to go back to the bank the second time was because on the 7th, the bank, Bank of America, had not accepted Joe's signature card, and you were still the only authorized signatory on the account, correct?

MR. FOLEY:  Objection, Your Honor.

THE COURT:  Okay.  Ms. Adducci, stay quiet for a minute.  Mr. Foley?

MR. FOLEY:  The question as phrased assumes not in

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

evidence.  The email from Joe -- for example, a proper phrasing would be, "You had to go to the bank because Joe represented that this signature card was not uploaded."  By the very evidence that Mr. Cataldo is using, the signature card with both signatures on February 7th, which is the third page of Exhibit 4, has a February 7th scanned time of 11:55 a.m.  Joe's email is at 6:16 p.m. Eastern Time, which we all agree would be 4:16 p.m. Central Time.  So the phrasing --

THE COURT:  The Court's been looking at this. 11:55, so roughly noon Tucson time is 2:00 Michigan time --

MR. CATALDO:  Correct.

THE COURT:  -- on February 7th.  But look at page number 2 in Exhibit J4.  And the scan time there is February 7th at 11:09 a.m. as if to indicate, at least to the Court, that the signature time that Ms. Adducci signed on February 7th containing the misspelling of the LLC name, she signed that card, it was scanned up to -- presumably to Mr. DuMouchelle, and he signed it and scanned it back presumably around noon on -- Tucson time, which would be 2:00 Michigan time.

And then someone in the bank's compliance department noted what Ms. Adducci noted on the witness stand today.  Oops, the name is misspelled, the LLC's name.

MR. FOLEY:  Your Honor, that's -- that -- I agree

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

with everything up until there. I'm not contesting that obviously it must have been scanned --

THE COURT: Yeah.

MR. FOLEY: -- once.

THE COURT: Because it's --

MR. FOLEY: Transactions transpired on the 7th, and the correct card, of which there are issues that I'll address on direct exam, but doesn't occur until the 11th. So we have no evidence in this case that, in fact, Ms. Adducci was the sole signer on the account, which is -- leads to my objection to the question.

THE COURT: But we do have evidence that she walked away with checks and maybe -- with testimonial evidence. So the Court's going to overrule the objection.

MR. FOLEY: Isn't the phrasing that -- because it's asking her to confirm that she was, in fact, the sole account signer. And she even believed it. Joe had told her it --

THE COURT: Right. Mr. Cataldo asked what she believed. Thank you, Mr. Foley. So objection's sustained.

MR. FOLEY: Your Honor, I'm not trying to be (indiscernible). Obviously, this is --

THE COURT: Sit down, Mr. Foley, now.

MR. FOLEY: He just turned around to me again.

MR. CATALDO: Your Honor --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  Judge, he just did it again.

MR. CATALDO:  He's been consistently interfering with my examination of the witness.

MR. FOLEY:  I --

MR. CATALDO:  And I think it's deliberate.  I really do.

MR. FOLEY:  (Indiscernible) my God, on my two-hour limited --

MR. CATALDO:  (Indiscernible) --

MR. FOLEY:  -- cross-examination, they objected 15 times.

MR. CATALDO:  Your --

MR. FOLEY:  I raise a valid objection over a limited --

MR. CATALDO:  He's raising (indiscernible) --

MR. FOLEY:  -- factual misstatement.  And you know what I didn't do when he raised objections was turn around and get in his face.

THE COURT:  Okay.

MR. FOLEY:  He does it, not me.

THE COURT:  We're going off the record again and into chambers again, Mr. Foley, Mr. Cataldo.  Ms. Clayson, you may join us if you wish.

(Recess)

THE COURT:  Ms. Williams, could we go back on the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

record, please?

THE CLERK:  Court is back in session for the Honorable Lisa S. Gretchko.

MR. CATALDO:  May I proceed, Your Honor?

THE COURT:  Yes, sir.

BY MR. CATALDO:

Q    Ms. Adducci, we were talking about the signature cards, okay?  And we were talking about the fact that you made two trips to the Bank of America branch in Tucson on the 7th, correct?

A    Yes.

Q    Okay.  And we were looking at one, two, third page of Exhibit 4, correct?

A    Yes.

Q    And this is the document, this is page.  It has both your signature on it dated the 7th and your husband's signature on it dated the 7th, correct?

A    Yes.

Q    It has the misspelling of the name Joseph DuMouchelle Fine Estate Jewelers, LLC, correct?

A    Yes.

Q    Okay.  Was it your understanding either from the bank or your husband that there was a problem with the bank accepting this signature card with both of your signatures dated the 7th?

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 168 of 213
Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

A    I do not remember.

Q    Okay.  But you do remember you had to go back to the bank on the 7th, correct?

A    Yes.

Q    And you do remember your husband's email, Exhibit 42, saying there was -- we looked at this earlier.  "I was hoping to do this myself, but my signature card that was signed earlier today is not uploaded yet."  Okay?  That's what your husband said in the email, right?

A    Yes.

Q    Okay.  And you don't recall yesterday in the deposition that was played that you also made mention of the fact that there was a problem with the signature card that was submitted by both you and Joseph on the 7th?  You don't remember saying that?

A    I really don't, okay?  I really don't.

Q    But you do recall you went back to the bank and that's when you filled out those three withdrawal slips that we looked at yesterday, right?  That's what you said earlier.  I'm not going to go through that whole thing.  We looked at the three withdrawals, correct?

A    Yes.

Q    And also, then you were the one that authorized the three inter-bank transfers that we looked at yesterday as well, the two to the Bill Noble Company, and then there was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

a third one to another company that we looked at yesterday as well, correct?

A    Yes.

Q    Okay.  And if we go to the last page of Exhibit 4, you will see now there's another signature card.  This one has the correct --

A    No.

Q    -- spelling of Joseph --

A    No.

Q    This isn't it.

A    It's in (indiscernible) the second to last page.

Q    Yeah, it's the second to last page.  This one has the correct spelling of Joseph DuMouchelle Fine and Estate Jewelers, LLC.  And if you go onto the bottom, this one has your name, Joseph's name, the signatures, and is dated the 11th, correct?

A    Yes.

Q    Okay.  So is it fair that you and Joseph were not both signatories on the Bank of America account until the 11th of February?  Is that correct?

A    Yes.

Q    Okay.

A    That doesn't look like Joe's signature.  It's really weird.  Mm-hmm.

Q    So do you --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    This signature doesn't look like it ever looked.

Q    Is it your signature on this document?

A    No.  I would never -- no, that's not, but that's a really weird signature.

Q    Okay.

A    I've never seen his signature look like that.  Ever.

Q    Did you --

THE COURT:  Clarify, ma'am.  Is that your signature on there?

THE WITNESS:  Yes, but I've never seen his signature to look like that.

BY MR. CATALDO:

Q    Is it possible you signed Joseph's --

A    No.  No.

Q    So is it possible that --

A    No, it's possible --

Q    -- Joe never signed the signature --

A    I don't know what it is.  I'm just pointing out that it looks -- it does -- it looks strange.

Q    Okay.  Well --

A    He could've been sick.  I don't know what he had going on, so it just -- I'm pointing it out.

Q    So then before -- it may have been right after lunch, we looked at Exhibit J3, and...

MR. FOLEY:  Objection, Your Honor.  My cross-exam

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

did not go into Exhibit J3 at all.

MR. CATALDO: Well, he did go into --

THE COURT: Why don't we wait and hear what the rest of the question?

MR. FOLEY: Yes.

MR. CATALDO: So he did go into, and he raised this issue, that both she and Joseph had signed a signature card on the 7th. I'm just trying to make the point that that signature card on the 7th was not valid, and she was still taking action on this account through the month of February. So --

THE COURT: Where is J -- what does J3 tell us? Oh.

MR. CATALDO: Well, J3 --

THE COURT: I've got it. It's the list.

MR. CATALDO: -- Your Honor, if we take a look, the point -- if you go to the second page, there are two $90,000 withdrawals adding up to 180,000 on the...

THE COURT: 11th.

MR. CATALDO: The 11th.

BY MR. CATALDO:

Q    And the signature card for the withdrawal for those was Exhibit 15 we looked at signed by you on the 11th. Correct?

A    Yes.

THE COURT: Signed by what?

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

MR. CATALDO: It's signed by Ms. Adducci.

THE COURT: Okay. Is there a question?

BY MR. CATALDO:

Q    We looked at -- do you remember looking at this earlier?

THE COURT: Was it during Mr. Foley's cross?

MR. CATALDO: I'll -- it was not.

THE COURT: All right.

MR. CATALDO: So I'm going to then -- I think we've made the point about the signature card. And with that, Your Honor, I'm concluding.

THE COURT: Thank you, Mr. Cataldo. When you say concluded, you're concluded with this witness?

MR. CATALDO: Yes, Your Honor.

THE COURT: All right. Ms. Adducci, these are going to be happy words for you. You get to step down now. Mr. Cataldo?

MR. CATALDO: The plaintiff rests.

THE COURT: Thank you.

MR. FOLEY: Thank you, Your Honor.

THE COURT: You're welcome.

MR. FOLEY: Your Honor, at this time, defendant moves the Court for a judgment on partial findings pursuant to Rule 52(c). Your Honor, as the Court is no doubt aware, under Rule 52(c), once a party has been fully heard, the

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 173 of 213
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Court may enter judgment where a claim cannot be maintained without a necessary finding. And the Court, as factfinder, may weigh the evidence and determine where the preponderance lies. Your Honor, I submit to the Court that even taking plaintiff's evidence at its highest, the required elements have not been established as to this defendant.

With respect to 11 U.S.C. 523(a)(2)(A), the plaintiff must prove that this defendant made a materially false representation that caused the transfer to occur. It caused Mr. Ritter to part with his money. The record is clear and the evidence shows that the agreement was between plaintiff and Joseph DuMouchelle, that the wire instructions came from plaintiff to Joseph DuMouchelle without copy to my client, that the communications with Mr. Ritter regarding the entire transaction came from Mr. DuMouchelle to plaintiff and vice versa.

THE COURT: Let me ask you something, Mr. Foley. May I ask some questions?

MR. FOLEY: Yes.

THE COURT: All right. You're saying that the plaintiff did not cause Mr. Ritter to part with his money, but you're looking, speaking colloquially, at only the inbound. What about the outbound? We've spent a long time listening to the withdrawals from the Bank of America account. With respect to the defendant, doesn't that

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

outbound constitute also obtaining?

MR. FOLEY: No, Your Honor.

THE COURT: Why not?

MR. FOLEY: The money flowed from Mr. Ritter into an account of Joseph DuMouchelle Fine and Estate Jewelers, and it did so as noted in the criminal documents as well and as pled to by Joe because of the fraud committed by Joseph in convincing Mr. Ritter to release and relinquish control of his money to an account. It was an account that Mr. Ritter believed to be that of the seller. It was, in fact, that of Joseph DuMouchelle Fine and Estate Jewelers. At that point, the fraud and the parting of the money had already occurred.

THE COURT: What the Court is suggesting is, wouldn't there be a separate fraud committed by, potentially, if it's the -- who's -- bear it out, potentially committed by the defendant and moving out the money so that the money was there and moved it out?

MR. FOLEY: No, Your Honor.

THE COURT: Why?

MR. FOLEY: Because --

THE COURT: (Indiscernible)?

MR. FOLEY: -- in every definition that I have read of the fraud, the fraud involves active representation, misrepresentation, or pretenses with and respect to and in

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

communication --

THE COURT: Well, actual fraud.

MR. FOLEY: The -- yes, but, Your Honor, I believe case law -- and I believe this is in my brief, narrows actual fraud to still involve the initial obtaining of the money from the debtor, not a post-parting transfer.

THE COURT: Two different defendants though. Joe may have done something regarding the inbound, but with respect to the outbound, Ms. Adducci is here now.

MR. FOLEY: With respect to the outbound --

THE COURT: Yep.

MR. FOLEY: -- I don't believe it's in any way covered --

THE COURT: It's debt for -- to the extent of money obtained by false pretenses, false representations, or actual fraud. But it's debt.

MR. FOLEY: Debt for money obtained --

THE COURT: Okay.

MR. FOLEY: -- by --

THE COURT: So if the money hadn't been moved out and was still in the account, would there be any cause of action against Ms. Adducci?

MR. FOLEY: The --

THE COURT: Yes or no?

MR. FOLEY: Would there be any -- no, but I'm also

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

suggesting that her moving of the money isn't her obtaining the money. The money sat in her business account and went to other participants. There has been zero evidence presented to this court that my client directly obtained money from the transfers that she made. She acknowledges making the transfers, but she didn't obtain that money.

THE COURT: But it's the debt to the extent of money obtained by -- I'm going to read it, hang on, once I get there. A discharge does not discharge an individual from any debt for money to the extent obtained by false pretenses, false representation, or actual fraud. Those are the operative words that we're dealing with in 523(a)(2)(A), right?

MR. FOLEY: Yes.

THE COURT: So the first step is a debt, and then it's for money obtained by. And my question to you is the way the statute is structured, doesn't it also cover the outbound?

MR. FOLEY: I don't believe it does, Your Honor.

THE COURT: Okay.

MR. FOLEY: Because I believe that word "obtained" is what focuses --

THE COURT: No, it's debt.

MR. FOLEY: But it's debt for money obtained by.

THE COURT: Well, but you would agree that if Ms.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Adducci had never let that money leave that account, she wouldn't be sitting here today, correct?

MR. FOLEY:  Certainly

THE COURT:  Okay.  And I think I asked --

MR. FOLEY:  I don't read an adverse implication --

THE COURT:  My turn.  I think I asked earlier would the money still be there if Ms. Adducci hadn't move it out, and your response, I remember, you said, well, of course not, Joe would've done it.

MR. FOLEY:  Yes.

THE COURT:  Okay.  We're here today about what Ms. Adducci's exposure is.  And if she hadn't moved out the money, it would still be there.  And she -- it wouldn't have been moved out on her action or conduct, correct?

MR. FOLEY:  Yes.

THE COURT:  All right.  It might not still be there.  I mean, Joe might've done what --

MR. FOLEY:  I think we could assume Joe likely would have, not just may have --

THE COURT:  Okay.

MR. FOLEY:  -- but likely would have.

THE COURT:  Okay.  But we're talking about Ms. Adducci.  And you're saying that there's no way that plaintiff can make a case under 523(a)(2) for the outbound, that the way the statute is written, it's a debt, okay, for

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 178 of 213
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

money to the extent obtained by false pretenses and false representation or actual fraud. You're saying that there's no way that that could cover the outbound.

MR. FOLEY: Because there's no obtaining. Yes.

THE COURT: Well, it's -- okay.

MR. FOLEY: The -- Your Honor, in addition to those arguments, the plaintiff has provided the Court with no evidence of Lindy providing wiring instructions to Mr. Ritter, for identifying any account to Mr. Ritter, of restructuring the transaction with Mr. Ritter, or causing Mr. Ritter to transfer the funds in the first place, to clarify with respect to the discussion we just had.

THE COURT: Give that to me again? Defendant didn't provide what?

MR. FOLEY: Wiring instructions to Mr. Ritter.

THE COURT: Mm-hmm.

MR. FOLEY: Did not identify any account to Mr. Ritter. Did not structure the transaction with Mr. Ritter.

THE COURT: Mm-hmm.

MR. FOLEY: And did not cause Mr. Ritter to transfer the funds into the DuMouchelle -- Joseph DuMouchelle Fine and Estate Jeweler's account.

THE COURT: You're saying that one or more of those would be required to satisfy the obtaining?

MR. FOLEY: Yes, that she had added obtaining with

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

respect to part one.

THE COURT: Give me that last one again. I didn't get it. The last one. Did not structure the transaction and what else?

MR. FOLEY: She in no way caused him to transfer the funds into the account. And Your Honor --

THE COURT: Well, what about the testimony that he relied on her judgment and would not have done the deal without her?

MR. FOLEY: I think Your Honor can give the zero weight to that testimony.

THE COURT: The fact that it goes to weight at all, doesn't that mean that a directed verdict, speaking colloquially, which is a Rule 52 --

MR. FOLEY: I understand.

THE COURT: -- finding in your finding, would be inappropriate if we're getting into weight?

MR. FOLEY: No, Your Honor. Not where you have a signed written agreement of the debtor in particular stating that he is relying on Joseph DuMouchelle himself, which was presented in the evidence and not where you have a --

THE COURT: So you're telling me I -- for purposes of your oral motion, I should disregard the testimony of Mr. Ritter saying he relied on Ms. Adducci's --

MR. FOLEY: Well, and that's --

Veritext Legal Solutions
212-267-6868                           www.veritext.com                           516-608-2400

THE COURT: -- admitted gemological expertise and her expertise as an appraiser and everything else.

MR. FOLEY: Well, because he never says that he relied on her -- I mean, he does in testimony now.

THE COURT: He does in testimony, but are you saying that a motion for -- a Rule 52 motion requires everything be in the evidence -- I'm sorry, in the documentary evidence and that the Court should just ignore the testimony?

MR. FOLEY: No, but I'm suggesting that there's a unique situation here where his testimony is directly contradicted by his latter email requesting an appraisal and then obtaining an appraisal from somebody else and by his own draft in which he acknowledges that he drafted agreement stating that he is relying on Joe for the valuation, that the Court need not give that weight, and can make that finding now because there is such a dearth of evidence to support his current allegation that he relied on Ms. Adducci in any way in effectuating this transaction.

THE COURT: He testified that he wouldn't have done it without her saying it was a good deal.

MR. FOLEY: And she testified that she didn't say it was a good deal. But --

THE COURT: That goes to weight, correct?

MR. FOLEY: Yes, Your Honor.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  Okay.

MR. FOLEY:  Your Honor, the...

THE COURT:  That's -- you're -- so far focus on 513(a)(2)(A).

MR. FOLEY:  I am.

THE COURT:  Okay.

MR. FOLEY:  The plaintiff has not presented you with evidence of any misrepresentation of false pretenses of my client related to the transfer of the money from Mr. Ritter into the accounts of Joseph DuMouchelle Fine and Estate Jewelers.  Accordingly, we request judgment as a matter of law on 523(a)(2)(A).

THE COURT:  Mm-hmm.

MR. FOLEY:  With respect to 11 U.S.C. 523(a)(6), plaintiff must prove that Lindy acted with subjective intent to injure.  There is no such evidence.  They didn't tell us --

THE COURT:  What does that mean to you?  Because the case law has refined what that means.  A long time ago I participated in a panel for the ABI that we called What Were You Thinking?  And it was called -- you focus on what intent is required for 523(a)(2), (4), and (6) because it's different for each of them.  So what kind of intent is required for (a)(6)?  It's not -- it doesn't require, you know, intent.  It doesn't require vicious intent, correct?

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 182 of 213
Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

MR. FOLEY: Well, it need not be vicious, but it does require intent to injure separate from intent to do the act. I think every piece of case law that I read on the subject makes that clear. And here, they have offered you zero evidence of intent to injure.

THE COURT: Well, the case law says willful and voluntary, intentional, or deliberate. Are you suggesting that --

MR. FOLEY: I'm on the "and malicious" part.

THE COURT: Okay. You're on the malicious part. So you acknowledge there's willfulness within voluntary, intentional, or deliberate. No one kidnapped Ms. Adducci, put a gun to her head, and made her do these things, correct?

MR. FOLEY: Well, we're not stipulating that it was willful.

THE COURT: Okay. I --

MR. FOLEY: Not -- we're -- not in light of the Joe circumstances.

THE COURT: Okay. But you're saying --

MR. FOLEY: But I think that they fail inherently on a lack of evidence related to the malicious part.

THE COURT: But the malicious means that the act or desire to cause the consequences of the act, and that's where you're going. But there's an "or". Or believes that

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 183 of 213
Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

the consequences are substantially certain to result from it.  You're saying there was no belief?

MR. FOLEY:  No, and there's been no testimony presented as to that.

THE COURT:  Really?

MR. FOLEY:  Yes.

THE COURT:  Okay.

MR. FOLEY:  I can't think of a single -- Mr. Ritter can't testify to a subjective state of mind.  He did make one offhanded comment in his testimony like, oh, she knew, or something, but that doesn't meet any evidentiary burden.  He can't testify to her frame of mind.

THE COURT:  What about the documents showing that about nine and a half million dollars of the money was taken out of the Bank of America account on or about February 7th?

MR. FOLEY:  I don't know if Your Honor's asking if that's a totality argument.

THE COURT:  Debt.

MR. FOLEY:  The -- even with the totality argument, they must have something more than merely that the money was removed.  That she removed the money has been admitted in discovery in this case since I think 2022.  It's never been a contention that she moved the money.  The -- there is unrebutted evidence that she moved the money on account of Joe.  We have the emails to the bank and the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

rest.

THE COURT: The plaintiff's brief cites to the Bombardier Capital case, which I recall reading a while ago. It's In re Dobeck. And if it's done without just cause or excuse, doesn't that get you then there, the plaintiff? We've heard a bit about what was going on, on that day on February 7th, and we've heard about Ms. Adducci's state of mind on that date, how angry she was. But are you -- you're saying that's not enough.

MR. FOLEY: I don't think they've gotten to -- I don't think they've done anything to rebut the reason that she was there without just cause or excuse. She was asked by Joe. She had no reason to believe that there was anything suspicious about the request. She complied with that request.

THE COURT: But she testified that she knew it was Mr. Ritter's money.

MR. FOLEY: Yes. And she was honest about that as well, but that doesn't mean that the transfer of the money she knew to be wrong in any way. And in fact, there's been no evidence presented to Your Honor that she knew that the transfer was wrong. There was a bunch of questions trying to get her to say that, trying to get her to admit that she knew the transfers were wrong, but she didn't --

THE COURT: She --

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

MR. FOLEY: -- do that.

THE COURT: -- testified that she knew the transfers went to either 5 people, depending upon which exhibit we look at, either 5 people or about 15 people, and the -- there were not either 5 or 15 sellers of The Yellow Rose diamond. Do you remember her testimony on that?

MR. FOLEY: No, but I do remember her --

THE COURT: You don't remember that?

MR. FOLEY: I remember her testifying -- I mean, we went through all the money multiple times --

THE COURT: Yeah.

MR. FOLEY: -- and she doesn't dispute where the money went. But I also remember her testifying that it's not abnormal to have multiple people related to the sale of a diamond.

THE COURT: That many.

MR. FOLEY: Pardon me?

THE COURT: Okay.

MR. FOLEY: I -- but --

THE COURT: But her -- when asked, there weren't that many sellers of The Yellow Rose diamond, her answer was no.

MR. FOLEY: Okay. I don't think that that rises to the level of --

THE COURT: Okay, of what they (indiscernible).

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: -- malicious intent beyond making the transfers. I think the malicious intent here where it's not a physical injury --

THE COURT: Right. No one got physically hurt.

MR. FOLEY: Nobody got physical. It is premised on that it must be an intentional act with malice towards the act of intending to cause harm to Mr. Ritter, and I don't think there's been a shred of evidence presented to Your Honor that she intended to cause harm to him. So I would ask the Court --

THE COURT: So are you saying that a person can defend a 523(a)(6) action by simply saying the words, "Oh, I didn't mean it"?

MR. FOLEY: No, because there can be other evidence of intent, sure. And it --

THE COURT: You're saying that's not present here.

MR. FOLEY: That other evidence is not present here.

THE COURT: Either in writing or in testimony?

MR. FOLEY: Yes. Mr. Ritter can't testify to her intent, which leaves her -- and I've been present for her exam since yesterday, and at no point have I heard any reason given. And beyond that, even motivation for such a reason.

THE COURT: Have you ever known a witness to take

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

the stand and admit wrongful intent?  I haven't.

MR. FOLEY:  No.

THE COURT:  I've been practicing -- did it for 42 years before taking this job five years ago.  I've never known a witness to take the stand and say, oops, yeah, I did it.

MR. FOLEY:  But I've also never seen a plaintiff premise the totality-of-the-circumstances argument on only the act.  So where they had five years to look into any other documentation to provide to this Court, any evidence of bad blood, of malice, of anything, they come to you with the most bare-bones intentional argument, which is look where the money was moved.  Therefore, malice.

It is entirely within the scope of the transaction itself that they seek to call the totality of the circumstances, and I just simply don't believe that it comes anywhere near establishing giving to you the evidentiary basis necessary to sustain a 523(a)(6) claim.

THE COURT:  Okay.  But I heard you just say totality of the circumstances.  You acknowledge, don't you, that that is something the -- that's part of the Court's job in evaluating a 523(a)(6), correct?

MR. FOLEY:  I acknowledge that the Court may look to the totality in evaluating intent.

THE COURT:  Okay.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: But there must be evidence presented as to that totality, and no such evidence is here.

THE COURT: Wait. Say again?

MR. FOLEY: There must be evidence presented as to the totality of those circumstances, and there are none -- no such evidence was presented here.

THE COURT: Outside -- you said outside of the operative transaction?

MR. FOLEY: Outside of the transaction itself. Nothing to show that Ms. Adducci would have bad blood with Mr. Ritter. Nothing to show why she would intend to injure him, and that is part of the totality. Why would my client seek to injure her own family in a transaction where there was basically no recourse out of it once $12 million was obtained from Mr. Ritter?

THE COURT: What about in the Bombardier case? It said it's done without just cause or excuse. How does that factor in? Because we heard a lot about Ms. Adducci's frame of mind being asked to do things that were unplanned. She didn't get to do that which she wanted to do and looked forward to doing while in Tucson, and she used the words "angry at Joe" herself. How does that factor into the without-just-cause-or-excuse?

MR. FOLEY: That Joe went to lengths to defraud -- to lie to my client herself, which has been testified to.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

That the documentary evidence in the case shows that were he called here to testify, he would testify that he hid this from Ms. Adducci.

THE COURT: Wait, wait, wait. That's your offer of proof contained in your pre-trial disclosure filed about 30 days ago?

MR. FOLEY: The -- pardon me?

THE COURT: You put an offer of proof somewhere in pleading.

MR. FOLEY: With respect to Joe.

THE COURT: Yeah.

MR. FOLEY: Yes.

THE COURT: Okay. We're not going there now, sir.

MR. FOLEY: But Your Honor, I -- here, I'll take a bigger step back.

THE COURT: Okay.

MR. FOLEY: Plaintiff's counsel has done a very good job of within the very, very, very light documentary evidence that they have intentionally making mountains out of molehills. That is their job. They've drawn the Court's focus into a small box and said, look, Your Honor, this box is filled.

But in this case, the Court should, and I think would, expect a lot more evidence for the heavy nature of the allegation being leveled. They are asking Your Honor to

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

believe that my client, with no previous bad blood with Mr. Ritter, intentionally acted to injure him. It's not intentional to take the money. It's that she wanted to cause him injury by taking his $12 million. And given extensive discovery rights -- I don't say that flippantly. I -- in fact, at this point in trial, I'm almost glad the Court didn't give them extensive discovery rights. They've had years to find any shred of evidence to support the idea that Ms. Adducci would have any reason to want to.

THE COURT: Now, they've gotten you to focus on a small box that as well was their justifiable excuse, but it's without justifiable excuse. It's that she acted with malice and intent to injure without justifiable excuse. There's no intent to injure. The totality of the circumstances --

THE COURT: Well, intent --

MR. FOLEY: By way of brief --

THE COURT: What about believes that the consequences are substantially certain to result from? You're saying Ms. Adducci had no belief that pulling nine and a half million dollars out of the account -- and that's the figure plaintiff is using. The Court wants that clear on the record because I haven't pulled out my calculator and done the math independently. But you're saying that --

MR. FOLEY: No. Not even remotely. I think the greatest thing plaintiff did for their case was exactly what

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

I'm saying, to fuel this on.  Look, you can find everything you need within the bounds of the transaction.  A single tiny square on the chess board.

THE COURT:  Okay.

MR. FOLEY:  The -- what you already -- even within that tiny square, what you have is my client, who has explained that nothing out of this deal seemed abnormal to her, that nothing of these requests seemed abnormal to her.

THE COURT:  And she was just following Joe's orders.

MR. FOLEY:  But it's not a just-following-orders defense.  It's much more than that.  If there were -- if the -- she testified that every name on that list -- or the majority of those names, the big transactions made sense to her, that William Noble in part of the transaction made sense to her, that she didn't have any part of structuring the deal and so had no reason to think that anything that Joe was doing was wrong.  And a big part of this --

THE COURT:  She testified that she knew it was Mr. Ritter's money and it was going to buy The Yellow Rose diamond.

MR. FOLEY:  No, she didn't testify that she didn't know it was -- that she knew it wasn't going to buy The Yellow Rose.  Absolutely not.  In fact, her testimony was that she believed what she was transferring was part of the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

purchase of The Yellow Rose.

THE COURT: That all those people that they -- I believe the testimony was when she was asked, you knew all of those people were not sellers of The Yellow Rose diamond, and her answer was yeah.

MR. FOLEY: I mean, that may be correct, but --

THE COURT: It is correct, isn't it, Mr. Cataldo?

MR. CATALDO: Yes, Your Honor.

THE COURT: Thank you.

MR. FOLEY: Okay. Well, obviously, I still have my direct case, but --

THE COURT: Okay.

MR. FOLEY: -- the -- I --

THE COURT: So you're asking for a Rule 52 motion to be granted on 523(a)(2)(A) and 523(a)(6)?

MR. FOLEY: (a)(2)(A), (a)(6), and now I am asking on (a)(4), Your Honor, and I'll run through my arguments. Your Honor, as to 523(a)(4), plaintiff must prove that Ms. Adducci knowingly and fraudulently appropriated funds for an unauthorized purpose.

THE COURT: Where are you reading this?

MR. FOLEY: From just my arguments that I scripted yesterday.

THE COURT: Sorry. I didn't mean to laugh at you, but you're not reading from the bankruptcy code at the

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

moment.

MR. FOLEY: No, Your Honor.

THE COURT: Oh, okay. My apologies. I didn't mean to laugh.

MR. FOLEY: I know it's -- I mean, I know it's --

THE COURT: It's been a long day.

MR. FOLEY: Your Honor, the 523(a)(4) claim turns specifically in the February 27th transactions.

THE COURT: Okay.

MR. FOLEY: But I submit to the Court that the legal question is not merely whether or not she acted but turns on what did she know at the time that she acted. And on that point, plaintiff has failed to provide this Court, even taking evidence in the light most favorable to plaintiff, that there is no evidence that Lindy knew the funds were being misused at the time.

There is no evidence that she determined that the receipts or amounts sent out, and there is no evidence that she designed or controlled the transaction. The evidence shows that the transactions were directed by Joseph, and that is insufficient to establish fraudulent intent under 523(a)(4).

THE COURT: Anything else?

MR. FOLEY: No, Your Honor. The defendant requests partial findings that plaintiff has failed to meet

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

the burden on any of the three counts and judgment in favor of Ms. Adducci.

THE COURT: What about the vicarious?

MR. FOLEY: Oh, I'm sorry.

THE COURT: Do you think that can go forward?

MR. FOLEY: No, Your Honor. I -- under the theory of vicarious liability, I don't think there's been any evidence presented that would show that Ms. Adducci was acting in intentional concert with Mr. DuMouchelle knowingly and voluntarily.

THE COURT: Following his direction at every turn doesn't satisfy that, sir?

MR. FOLEY: No. Because agency theory works upwards, to put it simply. She -- acting at his request on this when she believed what she was doing was correct and not fraudulent does not impose Joseph's liability down onto her. He would be, under a theory of agency, liable if she had been acting intentionally, willfully, or maliciously wrong, but not the reverse.

THE COURT: Okay. That's your position?

MR. FOLEY: Yes.

THE COURT: And the Court says, okay, I'm just acknowledging that's its heard --

MR. FOLEY: Understood.

THE COURT: -- what your position is.

20-04381-lsg   Doc 328   Filed 04/14/26   Entered 04/14/26 16:01:37   Page 195 of 213
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Plaintiff for your response?

MR. CATALDO:  Yes, Your Honor.  Your Honor, I think it's helpful to mention the standard.  I know the Court probably is very well aware of the standard for directed verdict, but I'll cite Littlejohn v. Rose, a 6th Circuit case, 768 F.2d 765.

THE COURT:  Hang on one second.  Hopefully those are the ones I have here.  I have different ones.  Okay.  Give me your cases.

MR. CATALDO:  Littlejohn v. Rose, 768 F.2d 765.  Stands for the proposition that the directed verdict is proper only if reasonable minds could come to a single conclusion against the non-movant without considering the credibility or weight of the evidence.

I would then cite Lolli v. Zaller, 894 F.2d 1336, another 6th Circuit case stating that the evidence has to be viewed in a light most favorable to the plaintiff if all reasonable inferences drawn in the plaintiff's favor.  And the court cannot weigh credibility or weight of the evidence.  So, Your Honor, I'm going to start with the (a)(6), if I may.  And I think counsel is confusing malice under the bankruptcy code with spite.

THE COURT:  Or viciousness.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Or viciousness, right? I mean, because remember the injury to establish willful injury -- the injury we're talking about is simply depriving Mr. Ritter of his money. Okay? That's the injury. She didn't have to do it because she didn't like Mr. Ritter or thought he was a bad or any -- those are -- that's not what needs to be proven.

Malice, as defined under the statute and the case law, and it's the joint final pre-trial order, the defendant's actions taken in conscious disregard of one's duties without just cause or excuse. And that she acted with intent to cause injury. The injury is to deprive Mr. Ritter of his money, or with the belief that injury was substantially certain from her acts.

And I think the Court is already mentioned the fact that we spent all this time on the account, and she set up the account. The purpose of it was to accept Mr. Ritter's money.

THE COURT: What purpose? She said there was another.

MR. CATALDO: Perhaps, but construing the evidence in the light most favorable some (indiscernible) --

THE COURT: Okay.

MR. CATALDO: -- and based on what we heard on the tape yesterday, the only purpose, frankly, based on the tape

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

--

THE COURT: The what?

MR. CATALDO: The only purpose in the tape was to accept the wire transfer from Mr. Ritter. She knew the terms of -- she didn't have to arrange it but knew the purpose of that money. She had read the contract and knew it was to pay for The Yellow Rose diamond.

She then went to the bank on the 7th, and maybe she was rushing to get to a dinner. Maybe she was distracted. She went twice that day, and maybe she was doing what her husband told her, take Mr. Ritter's money and we're going to spend it on other things. I mean, that's all you need to establish the injury was depriving Mr. Ritter of his money.

And by simply withdrawing the money, she would have known that injury was going to be the substantial result for taking the money. It's really quite simple. Malice means a conscious disregard of one's duties or without just cause or excuse. And then to say, well, in their business, they routinely take the money of one client and apply it to another, which I think is kind of what they're almost saying here. Boy, if a lawyer did that, the lawyer would not be a lawyer very long.

THE COURT: Lawyers have done that, and they've lost their license.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: That's absolutely right. And so to say or to try to diminish that, Your Honor, construing that in favor of the non-moving party, we think that one is fairly clear that a directed verdict should be denied.

Vicarious liability, again, we're not -- we know Joe did some terrible things. We know that. There's an enormous amount of evidence that they were working together to accomplish the same thing. Ms. Adducci made representations to Mr. Ritter on the value knowing he was relying on her expertise. The family trust.

Doesn't matter if she didn't do the appraisal. She sent valuation information to him leading him to believe this was a legitimate transaction. There is significant evidence in the record that would indicate that she knew it wasn't at the time, and we can get into that during the closing that, you know, there never was a purchaser. We know that from the findings from the criminal case.

There never was a sale. There has been nothing presented why, other than Joe saying that, she would've believed that this was a legitimate transaction at any time. But aside from that, let's look what happened. She opened the account. She had to have provided the account number to her husband. That would be the most likely, construing the evidence, you know, that he would have called his wife, hey, is the account open? What's the number?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

He's not going to call a banker.  He's not even there.  He would call his wife.  So the evidence, construing it in favor of us, would be she provided the information knowing that that account was going to be accepting the wire transfer.  They had to get the wire transfer information --

THE COURT:  I don't think there's any dispute on that.

MR. CATALDO:  No dispute.

THE COURT:  She acknowledged that she knew Mr. Ritter's money was coming into that account, and that was --

MR. CATALDO:  And that --

THE COURT:  -- a reason why it was opened.

MR. CATALDO:  And she was facilitating that.  She had to have been through providing that account number to her husband.  It's Exhibit J15.  The next day, the money hits the account on the 6th.  There's $500 from somewhere else in that account.  The next day, she goes to the bank not once, but twice, withdraws nine and a half million dollars of Mr. Ritter's money that Mr. Ritter never sees again.

There's further transfers on that account later in the month, and then it's a negative account balance by the end of the month.  So, significant evidence before the Court that they were working together and in concert.  And that would certainly establish --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: She relied -- her testimony was that she relied on him.

MR. CATALDO: That she relied on?

THE COURT: What Joe told her. How does that --

MR. CATALDO: But Your Honor --

THE COURT: -- factor into the vicarious liability, if at all?

MR. CATALDO: They want directed verdict. I mean, if this was a closing argument, it's a little different standard.

THE COURT: Different standard, yeah.

MR. CATALDO: So -- but construing it -- but there's still -- that's kind of a -- if he had asked her to go rob a bank argument too, oh, Joe told me it's okay to go, you know, hold up that liquor store, you would be saying to me, come on. No way. Right? How is this really any different?

Joe is saying to her take Tom Ritter's money to pay all these other creditors. How is it any different really other than there's no, you know, gun or knife involved or anything like that. But there -- it's the same thing.

And I mean, she knew right from wrong. She knew that was Mr. Ritter's money and he was never going to see it again, which he didn't. It's the fact that her husband told

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

her to do it. I mean, that's kind of -- boy, you can get away with a lot then if that's the standard. If someone told me to go do something that we know is improper, unethical, like I just said -- if someone said to me, hey, Chris, can you take money from Client A and pay it over to spend it myself? And I said, well, this other person told me to do it. I mean, I wouldn't get very far, would I? So, I mean, she took the money.

THE COURT: What about 523(a)(4) and 523(a)(2)(A)?

MR. CATALDO: (a)(4) is probably the easiest one. They're all actually pretty easy, but (a)(4), embezzlement or larceny. Wow. To establish embezzlement, plaintiff must prove that he entrusted property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, the circumstances indicate fraud. We just talked about all those things.

THE COURT: Is this embezzlement or larceny or is that line blurry?

MR. CATALDO: I think it's both. It really is. It would -- it's both.

THE COURT: The money lawfully came into the account, but then there was a taking perhaps? That's what you're thinking?

MR. CATALDO: How is it not taken? I mean, when she went in and signed all the withdrawals and authorized

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

those transfers, if that's not taking money --

THE COURT:  All right.  But let's talk about --
the Court had a colloquy with Mr. Foley, who is focused on
523(a)(2)(A) and the word "obtained" in the statute.  And he
says "obtained" means incoming.  The Court pushed back and
said what about outgoing.  Is that obtaining money?

MR. CATALDO:  Well --

THE COURT:  Did you understand the Court's issue?

MR. CATALDO:  I think there is --

THE COURT:  First, did you understand what the
Court was asking?

MR. CATALDO:  I did.

THE COURT:  Okay.

MR. CATALDO:  And I think it's both, and I know
the Court was focusing on the outgoing, but you'd have to
look at that whole thing about that account got set up.  She
sets it up, sends the information to her husband for the
wire transfer, the money comes into the account, then she
takes it.

So, with respect to the incoming, again, I think
the Court alluded to this.  We have the representations made
by the plaintiff -- I'm sorry, by Ms. Adducci relied on by
Mr. Ritter.  He's known her his whole life.  She has that
expertise.  She did provide evaluation documents.  She
certainly induced in him a belief that this was a legitimate

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

transaction.

So -- and he has said I would not have done this but for that blessing because I didn't really know Joe that well. It was her who -- in the J11 email, he offers her the opportunity to participate so that she could get a piece of it. You know, if there's -- this is really going to make some money, and he doesn't want to cut her out, and he wants to offer it to her. He's -- and because of her role in this, he says it. He says it right in there.

And so have to construe, again, all the evidence in the light most favorable to the non-moving party. And respectfully, Judge, we think we've satisfied all of these in the case here before you.

THE COURT: All right. Well, the Court was anticipating this, and therefore, the Court is ready to rule. This matter now comes before the Court on the defendant's motion under Rule 52 seeking dismissal or a judgment of dismissal on partial findings. Used to be called as a directed verdict or something like that. Now it's judgment on partial findings under -- and Rule 52 governs this because it's a non-jury trial.

The standard that the Court saw in doing its research is that a motion under Rule 52(c) has to be denied unless, viewed in the light most favorable to the non-moving party, which would be the plaintiff, the evidence presented

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

points to one possible conclusion, that the judge -- it says, "or reasonable juror" on the page I'm reading -- could reach. So it's saying it's a high standard. There has to be no way for the plaintiff to prevail on any of the counts 523 -- I mean, it could be handled with respect to each of the counts separately, but there has to be no way that the plaintiff can prevail now that it's presented its case.

The Court, through opening statement, noted the focus of defense counsel on the documentary exhibits as containing holes in the debtor's required proofs. And then in the motion for directed verdict, the Court heard defense counsel to say that plaintiff's counsel has drawn the Court into a small box of documents and questions and what have you.

But this Court has the discretion. This Court is not granting a motion for partial findings under Rule 52(c) on any of the counts. Mr. Foley, this case needs to go forward. The Court cannot at this moment -- first of all, the Court has to view everything in the light most favorable to the plaintiff as the non-moving party. And we do not have a situation where the evidence points to only one possible conclusion, and that being that plaintiff can't make out its causes of action.

The Court read with great interest all of the proposed findings of fact and conclusions of law from both

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

parties and all of the trial briefs, and it has now engaged in a couple of -- now three days of trial. This case is going forward because the Court finds that it would be inappropriate at this stage to grant the motion. And the Court concludes in the Court's discretion that the appropriate course of action applying the standard for a Rule 52 motion, the appropriate thing to do here is for the Court to deny the motion. And the Court will deal with the whole case when the whole case is presented.

But the Court is not dismissing any or certainly not all of the counts. And that's the Court's ruling. Do the parties wish the Court to enter a written order, or is the oral ruling on the record sufficient? Mr. Foley, the case is going forward.

MR. FOLEY: Yes, I think a simple written order for the reasons stated on the record.

THE COURT: Mr. Cataldo?

MR. CATALDO: That's fine, Your Honor.

THE COURT: All right.

MR. CATALDO: I'm just going to say the verbal order is sufficient for my purpose.

THE COURT: The oral order.

MR. CATALDO: Oh, yeah.

THE COURT: Yeah.

MR. CATALDO: Oral.

THE COURT: I mean, written or spoken as verbal.

MR. CATALDO: Uh-huh.

THE COURT: You can thank Dennis Case for that. When I would say verbal, he used to say it's opposed to pantomime. So I'll do a simple order reflecting that the defendant made the motion with respect to each of which counts it was and that for the reasons stated on the record the Court denies the motion.

So we're now at 10 to 5. And Mr. Foley, have you given thought? The case is now yours.

MR. FOLEY: Yes.

THE COURT: To proceed with defense's presentation. Have you given thought to witnesses for tomorrow?

MR. FOLEY: We are prepared to move forward with tomorrow. I have given some thought. I'd like to speak to my client this evening before I make a final call on who I'm going to call to the stand.

THE COURT: Okay. And the sequence of it. Mr. Ritter, even though it's the defendant's case, you're actually listed as a may-call witness in their case. So I do realize that the plaintiff's case has rested, but there's more to come, if you will, to listen to the defense case. And the Court -- I know it's taking you away from your work for a whole week, but the Court does expect you to be here

20-04381-lsg    Doc 328    Filed 04/14/26    Entered 04/14/26 16:01:37    Page 207 of 213
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

because you're listed as a may-call witness.  You do understand that, sir, correct?

MR. RITTER:  Thank you, Judge.  I do understand --

THE COURT:  Okay.  Good.

MR. RITTER:  -- and I will be here.

THE COURT:  All right.  Is there anything more that we ought to address today?

MR. CATALDO:  No, Your Honor.

THE COURT:  All right.

MR. CATALDO:  We are for (indiscernible).  We're just to get an --

THE COURT:  Sure.

MR. CATALDO:  -- idea of an approximate amount of time for tomorrow.  I think we'd certainly like to be able to get through their case.  I just don't know how he wants to handle this.

THE COURT:  I'm not sure.  Mr. Foley, any time estimates, or is it too fluid a situation for you to guess?  The good news is we have Friday.

MR. FOLEY:  Too fluid, Your Honor, at this point.

THE COURT:  Too fluid.  And the Court is laughing inwardly at the concept of this taking one day, Mr. Cataldo.  So it -- but it must finish on Friday for reasons we discussed before we began this morning.  And if it doesn't finish on Friday, we'll find you other trial days, but they

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

won't be Monday. It won't be next week. And so the Court perceives this case as in a position. Mr. Foley, do you anticipate we'll finish on Friday?

MR. FOLEY: I don't see why we would go past Friday.

THE COURT: It will be a significant scheduling issue if it goes past Friday, and the Court will leave it there. Okay?

MR. CATALDO: We're certainly hopeful (indiscernible).

THE COURT: Well, hope springs eternal.

MR. FOLEY: Well, Your Honor, we're on the end of day three, and it's been plaintiff's case-in-chief. That leaves me two days. I -- to their three, but I do still hope to finish up my case by Friday, Your Honor.

THE COURT: Well, the good news is that that little box that you accused the plaintiff's counsel of focusing me upon is -- the -- we all sort of know what's out there and -- in the little box, right, Mr. Foley?

MR. FOLEY: I think there's much more facts for the Court to hear in my case.

THE COURT: Okay, but they're not evidentiary exhibits. They're not in the joint exhibits, correct?

MR. FOLEY: No. No.

THE COURT: Okay. And you're not -- you're

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

certainly not presenting more paper exhibits, right?

MR. FOLEY: No.

THE COURT: Oh, okay. So it's just testimony, which is very important. I don't mean "just". I'm trying to get a handle on what to expect tomorrow.

MR. FOLEY: Yes.

THE COURT: Primarily.

MR. FOLEY: We're going to go through some of the documents, but --

THE COURT: Well, no, we do that.

MR. FOLEY: -- it's going to be testimony from my client and probably Mr. Ritter as well.

THE COURT: All right. Mr. Cataldo, even though your case has rested, as a courtesy to the Court, would it be possible for your terrific technology advisor to be here tomorrow and to help us through?

MR. CATALDO: Yes.

THE COURT: Was he planning on it anyway? Because...

MR. CATALDO: He can be here tomorrow.

THE COURT: Well, because you're going to take, what --

MR. CATALDO: Hopefully we can even get through closings tomorrow, so --

THE COURT: Good, but --

MR. CATALDO: -- it'll be easier.

THE COURT: -- he's going to have to be here anyway because whatever testimony Ms. Adducci puts forth on Mr. Foley's direct, you're going to want to do a cross, correct?

MR. CATALDO: Yes.

THE COURT: And the cross might involve the documents, correct?

MR. CATALDO: Correct.

THE COURT: And therefore, you would want Jonathan, whose last name, apparently, I have forgotten again --

MR. SCHMITZER: Schmitzer.

THE COURT: -- Schmitzer to be in the room to help. Okay. So, we're all going to be back tomorrow starting at 10:00. Anything more to address today?

MS. CLAYSON: Nothing further, Your Honor.

MR. CATALDO: Nothing further.

THE COURT: All right. Thank you all.

MS. CLAYSON: Thank you.

MR. CATALDO: Thank you.

THE CLERK: All rise. Court is adjourned.

(Whereupon these proceedings were concluded)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

I N D E X


RULINGS

|  | Page | Line |
|---|---|---|
| Defendant's Motion for Judgment | 206 | 10 |

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

CERTIFICATION

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: April 14, 2026

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400