UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re: Joseph G. DuMouchelle    Bankruptcy Case No. 19-54531

And Melinda J. Adducci,  Chapter 7
Hon. Lisa S. Gretchko

Debtor(s)

_____

Thomas Ritter

Plaintiff,

v.                              Adv. No. 20-4381

Melinda J. Adducci,
Defendant.

_____

GRETCHKO_20260326-mp3
DATE: 3/26/2026
TIME:
10:00 AM
JUDGE: Lisa S. Gretchko
RECORDER: Erica Adams-Williams

HEARING TYPE:   .In-Person

.   Remote (MS TEAMS AUDIO CONFERENCE)
.   Video (WebEx)

IN RE:    Trial

APPEARANCES:
R. Christopher Cataldo
For Thomas Ritter
27777 Franklin Road, Suite 2500
Southfield, MI 48034

Thomas Ritter
Plaintiff
1221 Bowers #2595
Birmingham, MI 48012

Kimberly Ross Clayson
For Thomas Ritter
27777 Franklin Rd., Suite 2500
Southfield, MI 48034

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400

Patrick Foley

For Defendant Melinda J. Adducci 18572 W. Outer Drive

Dearborn, MI 48128

Melinda Adducci Defendant

1221 Bowers, #2595

Birmingham, MI 48012

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

P R O C E E D I N G S

THE COURT:  Calling case number 2004381, Ritter v. Adducci.

MR. CATALDO:  Good morning, Your Honor. Christopher Cataldo, Kim Clayson for the plaintiff, and Mr. Ritter is here in the Courtroom with us again today.

THE COURT:  Good morning.  Good to see you all. Sir.

MR. FOLEY:  Good morning, Your Honor.  Patrick Foley on behalf of the defendant, Ms. Adducci, and Ms. Lindy Adducci is here in the Courtroom as well.

THE COURT:  Good to see you.

MR. FOLEY:  Thank you, Your Honor.

THE COURT:  All right.  The Court entered the order denying the motion under Federal Rule 52.  Just entered it before coming out here.  So Mr. Foley, it is now your turn.

MR. FOLEY:  Thank you, Your Honor.  The defense calls the defendant, Ms. Adducci.

THE COURT:  Ms. Adducci, you remember when the Court swore you in before?

MS. ADDUCCI:  Yes.

THE COURT:  I'm going to swear you in again because it's for the defense case, just for good measure. Do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 3 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

truth?

MS. ADDUCCI: I do.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. FOLEY:

Q    Lindy, good morning.

A    Good morning.

Q    Can you pull the microphone close and make sure that you can sort of hear yourself --

A    I'm short, my feet.

Q    All right.

A    Yes.

THE COURT: Mr. Foley, can you do likewise?

MS. ADDUCCI: Maybe I should raise my chair.

MR. FOLEY: Yes. Can the Court hear me okay?

MS. ADDUCCI: I'm going to raise my chair.

MR. FOLEY: Even closer? I don't want to be too loud into the mic, but--

THE COURT: There you go. Does that help?

MS. ADDUCCI: I'd be better if I'm up. There we go.

THE COURT: Oh, good.

MS. ADDUCCI: My feet don't touch.

THE COURT: Do you have everything you need, Ms. Adducci, water?

212-267-6868          Veritext Legal Solutions          516-608-2400
www.veritext.com

MS. ADDUCCI: Yes. Thank you.

THE COURT: All right. Sir.

MR. FOLEY: Thank you, Your Honor.

BY MR. FOLEY:

Q    Can you please state your full name for the record?

A    Melinda Jean Adducci.

Q    Ms. Adducci, in what state do you currently live?

A    Florida.

Q    How did you first come to know Joseph DuMouchelle?

A    I met him in the early 1990s.

Q    So as of 2019, how long had you known him?

A    Over 25 years.

Q    And when did the two of you get married?

A    In 1999.

Q    What did you observe about the relationship between Mr. Ritter and Joseph DuMouchelle before you were married to Joe?

A    They had -- they did business deals in oil, and he dealt with investments with him, and they went flying in his airplane. They went to lunches. They got together without me, mostly.

Q    And that was all before you were even married?

A    Before we were married, yes.

THE COURT: Could I ask you -- I need you to speak up because ---

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

MS. ADDUCCI: Okay, I'm sorry.

THE COURT: I'm not picking up your words. Could I ask you to repeat that answer?

MS. ADDUCCI: My kids tell me I'm too loud sometimes. Sorry.

THE COURT: You're not too loud here. Don't worry about that.

MS. ADDUCCI: They had business dealings with each other. Joe did investments with Tom in oil investments. He flew to Montana. They had a relationship outside of mine, and I didn't always know that Joe was -- over the years, over the many years, I did not know always when Joe would go and meet with Tom. But I found out later when he flew with him in his airplane, I said, "You did that and you didn't tell me?" I was with my mother, who's in her 90s, and my sister-in-law, his sister. Yes. So many business dealings.

THE COURT: I have a clarifying question. Were any of these prior business dealings regarding jewelry?

MS. ADDUCCI: No. No.

BY MR. FOLEY:

Q    What kind of specific things do you recall Mr. Ritter and Joe doing business together regarding?

A    Joe participated in at least two that I remember, drilling oil wells that Joe -- that he was putting together, groups of people, and I believe maybe my dad and my brother,

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

I'm not sure. But Joe participated in those, and he enjoyed learning about it from what I could tell.

Q   Were you here in the courtroom when I asked Mr. Ritter about a hot tub and a bathing suit story?

A   Yes.

Q   Okay. What do you -- do you recall any specific stories that are indicative of how they had spun off onto their own friendship?

A   I would say the airplane ride. The fact that --

THE COURT: I didn't hear the question, Mr. Foley. You're going too fast. You need to enunciate. Get that microphone up toward -- if you're going to face the witness, put the microphone up so that I'm able to hear you. I'm not able to hear you.

MR. FOLEY: Ms. Adducci, do you recall any --

MR. CATALDO: Can we have one moment? Mr. Ritter's having trouble hearing.

THE COURT: The Court is too.

MR. RITTER: My phone and my hearing aids are not connecting today, so I can't turn this volume up, and I'm having a lot of trouble hearing. So if they could --

THE COURT: Can we go off the record for a minute --

MR. FOLEY: Certainly.

THE COURT: Ms. Adams Williams? Are we off?

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 7 of 255
212-267-6868          Veritext Legal Solutions          516-608-2400
www.veritext.com

THE COURT CLERK:  Yes.

THE COURT:  We're off.  Mr. Ritter –

MR. CATALDO:  Is it working?

MR. RITTER:  No, it was turning on.  I'm just trying --

THE COURT:  It takes a minute.

Okay.  Can you hear me?

MR. CATALDO:  Yes, I think I can.

THE COURT:  You got it?

MR. CATALDO:  Yes.

THE COURT:  Okay.  It's working?  Okay.

MR. FOLEY:  I think a good test is can you hear me?  Can you hear me?

MS. CLAYSON:  Talk into the microphone.

MR. FOLEY:  Can you -- I don't think it's broadcasting.

MS. CLAYSON:  Oh, they're not on right now.

THE COURT:  Adams Williams, could we go back on the record now?

MR. FOLEY:  Thank you, Your Honor.  Are we back on the record?

MR. CATALDO:  Tom, can you hear now?

MR. RITTER:  I can.

MR. CATALDO:  Okay.  Thank you, Your Honor.  That did the trick.

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

THE COURT:  Thank you.

MR. FOLEY:  May I proceed, Your Honor?

THE COURT:  Please.

MR. FOLEY:  Thank you.

BY MR. FOLEY:

Q    Ms. Adducci, prior to 2008, how would you describe your relationship with Mr. Ritter in those years?

A    I would see him casually at, maybe at family functions or just -- but casually in passing.

Q    In the time period between 2008 and 2019, how would you describe your relationship with Mr. Ritter?

A    We rarely saw each other, maybe once.

THE COURT:  What's this time period again?  You're going a little fast for me.

MR. FOLEY:  I apologize, Your Honor.  The time period referenced in the question was between 2008 and 2019.

THE COURT:  Okay.

BY MR. FOLEY:

Q    And Ms. Adducci, can you answer again, how would you describe your relationship in the time period between 2008 and 2019 with Mr. Ritter?

A    I rarely saw him.  2008 was when my dad passed away, and I rarely saw him, maybe once.

Q    During that time period, did you have -- how many times did you see him in person?

A    Maybe once.

Q    When you say "maybe once", are you thinking of a particular event?

A    I may have.  Not really.  Just maybe once.  It's a lot of years.

Q    What about telephonic contact during those -- during the time period 2008 to 2019?

A    Just the time that Joe put me on the phone.

Q    Did you speak regularly on the phone with him during that time?

A    No.

THE COURT:  I need a clarifying question here.

MR. FOLEY:  Yes.

THE COURT:  So is the Court to understand that the only time you spoke to Mr. Ritter between 2008 and 2019 was that time that Joe DuMouchelle put you on the phone to speak with Tom Ritter during a call that Joe was already having --

MS. ADDUCCI:  Yes.

THE COURT:  --- with Mr. Ritter.  And that occurred in Sanibel?

MS. ADDUCCI:  Yes.  From my memory, yes.

THE COURT:  That's the only phone call you had during the period from 2008 and 2019 with Mr. Ritter?

MS. ADDUCCI:  Yes.

THE COURT:  Okay.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

BY MR. FOLEY:

Q     During that same time period, 2008 to 2019, how would you compare your relationship with Mr. Ritter to Joe's relationship with Mr. Ritter?

A     My relationship would have been still from family, you know, from knowing family for a long time.  And if I saw him, I would -- but I don't recall that we saw each other whenever I went back.  It was very limited.

Q     Versus Joe's relationship?

A     Joe was seeing Tom every time -- I believe every time we went back in the summer, I now am understanding because I've asked him this, he was seeing Tom when I didn't know he was getting together with Tom, and I was always with my mom and my family directly, and my sister-in-law, his sister, and --

MR. CATALDO:  I'm going to object.  This is hearsay.  She's basing this on what Joe supposedly told her.

MS. ADDUCCI:  No, this is fact.

MR. FOLEY:  Hey, Lindy, you're not allowed to respond.

THE COURT:  Ms. Adducci, stop.  We have an objection.

MR. FOLEY:  Your Honor, I would respond by saying we are not offering it for the truth of the matter asserted, but rather for Ms. Adducci's understanding of the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

relationship.

THE COURT: Well, hang on a second. If it's for Ms. Adducci's understanding of the relationship, presumably, that's inherent and it being a true statement by Joe, correct?

MR. FOLEY: No. I don't think it matters if it's true or not. It's what Lindy believed at the time.

THE COURT: Okay. Mr. Cataldo?

MR. CATALDO: She just said she's explaining the relationship as Joe just recently explained it to her. If that's not for the truth of the matter asserted, then it's not relevant at all. I mean, it's not, you know -- what other purpose would there be? She's describing the relationship using that as a factual premise for it.

THE COURT: Mm-hmm.

MR. CATALDO: So, Your Honor, this is improper hearsay.

THE COURT: All right. The objection is sustained. Mr. Foley, move on.

BY MR. FOLEY:

Q    Ms. Adducci, when Mr. Ritter has used the word "family" here in court to describe his relationship with you, referring to you as family, what did that family relationship actually look like in practice between you and Mr. Ritter?

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

A    We were family through his sister and my sister-in-law and my brother and -- but I didn't see him at family functions that I was at with them, so it was limited of what I would see him.

THE COURT:  I need you to keep your voice up.  You were out of -- okay.  Wait.

BY MR. FOLEY:

A    No. I would see him.  It was -- it was limited, but we were, you know -- we were family from my sister-in-law and from the long relationship of us all being around each other.

Q    But in practical reality, what did that translate into in terms of contact between 2008 and 2019?

A    We did not contact each other.  My contact was always with his sister, always.

Q    Do you remain friends with his sister to this day?

A    I'm -- She is like my sister.  I speak to her weekly.

Q    What was your role at DuMouchelle Jewelers?

THE COURT:  You mean the LLC?

MR. FOLEY:  I'll be more specific, Your Honor. Thank you.

BY MR. FOLEY:

Q    At the colloquially called DuMouchelle Jewelers, but the entity known as Joseph DuMouchelle Fine and Estate Jewelers, LLC.

Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400

A    Right.

Q    What was your role?

A    I was a gemologist.  I was asked to be an expert, went to look at stones and look at jewelry coming in, mainly to go to auction or to be resold.  But I would -- gemological skills.  And I was -- I was an auctioneer, but very, very limited in my auction skills.  And I also, you know, worked in New York meeting with the industry buyers, dealers, very -- I had to be the -- they were experts.  I had to be -- I had to know my business because they were -- they knew sometimes the same or more, so --

Q    So we're talking about three different areas.

A    Yes.

Q    Gemology, appraisals, and auctioneering.  Let's focus first on gemology.  What does that mean?  What are you doing practically?

A    You're looking at jewelry and items coming in, and you're inspecting them for their -- for the quality of the gemstones, for they had -- you know, if they did not have a lab report for treatments, I would suggest treatments, you know, or to go and get a lab report from one of the major labs like GIA or AGL, so that the items could be presented properly and sold properly to the next buyer.  I would look at them to make sure that if items were gold, you know, that the metals, everything about a piece of jewelry, that's what

212-267-6868                 www.veritext.com                 516-608-2400

-- that's what the gemology -- so that you present it properly for all parties.

Q    Is that the same as appraising?

A    No. It's a -- it's a part of an appraisal and a part, but you know, authentication, certification, all of those can be included in an appraisal, but they're not, you know, they're all part of it.

THE COURT:  All right.  Now I'm confused.  Is authentication, and what was the other thing you said?

MS. ADDUCCI:  Authentication means that you're basically, you're --

THE COURT:  Seeing the stone is what it purports.

MS. ADDUCCI:  Well, actually, I'm saying more like, let's say it was Tiffany and Company or Cartier, and it was a vintage piece.  Then authentication would be trying to make sure that you can find out that that really is a piece from Tiffany, that's an old piece, and getting it --

THE COURT:  As opposed to what?

MS. ADDUCCI:  They have authentication areas that you work with their specialists.  So that's a big part of it.

THE COURT:  Okay.  But I don't know which bucket we're in.  Is it -- And Mr. Foley, you need to be specific.  You've got three buckets:  gemology, appraisal, auctioneer.  Which is this authentication function?

MS. ADDUCCI: I would say that's part of the appraisal.

THE COURT: Okay. So are we done with the gemology part?

MR. FOLEY: I'd like to step back, Your Honor.

THE COURT: Okay.

BY MR. FOLEY:

Q   Confined to the area of gemology --

A   Yes.

Q   Can you describe what that work is and what the result is, what you're doing?

A   You're identifying the gemstone to make sure that it's real and make sure that it's, you know, what is the item.

Q   And with respect to determining authenticity --

A   Yes.

Q   Of a jewelry piece --

A   Yes.

Q   The entire piece, not just the stone?

A   Yes.

Q   Can you describe what that -- is that part of the appraisal process?  And if so, what part?

A   It's not- it's not needed for every appraisal.  It's not needed for every item.  But if someone -- there's a little bit.  You know, you need to be able to say if someone says it's Cartier and you're -- you're reselling an item.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 16 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

So just because, you know, you have to make sure before you say it's Cartier, that it really is a Cartier item and not -- that's part of it.

Q    Now, in terms of doing your own appraisals --

A    Yes.

Q    Do you recall when you actually became an appraiser capable of doing your own appraisals?

A    Because we were so busy with the auction business, I did very limited reports.  I would do insurance statement replacements sometimes for if I sold an engagement ring.  If I was involved in an engagement ring, then I would do my own to help, you know, them get insurance on it.  But as far as the estate appraisals, and I was referring that -- always, I was referring that through the years off to other appraisers in the Detroit Metro area, or if they were out of state and I knew if, you know, we were called in, we were doing business in other states, I would refer them off to other people that were specifically doing independent just appraisals.  And so I -- But it was a goal of mine to become an appraiser at some point as I, you know -- that was always a goal eventually, as my kids got older and got out of college and I could do this.  So it took a lot of work though, the designation, to take the classes and do that, so.

Q    Now, we're going to talk about the auctioneering part.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Yes.

Q     With respect to auctioneering --

A     Yes.

Q     Can you describe for me, in the years leading up to the transactions with Mr. Ritter --

A     Yes.

Q     What sort of deals you had been able to witness where this occurred?  Just explain to me your experience with auctioneering.  Not necessarily you being the auctioneer, but just your experience --

A     With the auctions?

Q     With auctions.

A     We had many, many successes for people.  Our goal was to have an estate come in, and instead of just buying it, you know, we would put -- we would work hard for both parties, the buyer and the seller, so that at auction, you could do record prices and you could get -- you could really help both parties get more.  And it was very successful, which is why we were.  I mean, I had people tell me in New York that we were -- And in fact, we were on the cover of Rappaport Magazine, where there were -- they put our pieces on the cover, and they were called -- you know, we were the smaller auction houses, but we were doing the -- we had the clients and the business of the big auction houses, Christie's.

212-267-6868          Veritext Legal Solutions    www.veritext.com          516-608-2400

THE COURT: I have a clarifying question.

MS. ADDUCCI: Mm-hmm.

THE COURT: Ms. Adducci, you said to help buyer and seller --

MS. ADDUCCI: Yes.

THE COURT: Get the maximum -- Not in the same deal, right?

MS. ADDUCCI: No, a --

THE COURT: Is a buyer --

MS. ADDUCCI: Well, a consignment. You know, someone -- So if you came to me and you said, you know, "Here is -- I would like to, you know, sell my piece," most people buy -- they just buy them outright, and then they make their profit and go on, or whatever. And what's great about -- what was great about the auction portion of it is you could have a reserve and a minimum, but then you could present it to a bigger audience, like in New York, or, you know, we actually had buyers in Hong Kong. We had buyers all over the world, Singapore, and, you know, we had an online portal. So where we were doing -- putting it up, I mean, sometimes there was a yellow diamond ring from somebody in Michigan from a very well-known estate, and we had to cash out -- well, we had offers going in. You kind of have to figure out where your market is starting. And then the top, there is no limit. The top is where buyers

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

decide where they're going to -- what they're going to pay. And this yellow diamond ring, we started out at $200,000, and we got over a million for them, and --

THE COURT: I understand, but --

MS. ADDUCCI: That happened often.

THE COURT: Your testimony earlier was that you helped buyers and sellers get the best --

MS. ADDUCCI: Well, it's -- that's specifically at auction. That's just specifically an auction transaction.

THE COURT: No, no.

MS. ADDUCCI: Yes.

THE COURT: Please. Wait for me.

MS. ADDUCCI: Okay.

THE COURT: Not in the same deal. You wouldn't represent the buyer and the seller --

MS. ADDUCCI: No.

THE COURT: On the same piece, right?

MS. ADDUCCI: Well, no, the buyer --

THE COURT: How do you help buyers get the best price?

MS. ADDUCCI: So there's a preview process where they have a chance to come and look. They do their own independent evaluation. So they independently, they decide how much they want to pay at auction. They don't -- We don't assist in that. We start with a reserve for the

seller.

THE COURT:  What is the best price for a buyer?

MS. ADDUCCI:  That's up to them.

THE COURT:  It's a lower price.

MS. ADDUCCI:  Well, there's numerous markets for that.  There's numerous markets of buyers and reasons why they buy, and they're not all the same.

THE COURT:  Okay.  All right.  Fair enough.

BY MR. FOLEY:

Q    During the same time period -- actually, strike that.  I apologize.  I want to hone in on something you said.  You mentioned something about when people would normally -- when people would come in with consignments, some jewelers would just buy it outright.  Can you explain to me what you meant by that versus what Joe DuMouchelle Fine and Estate Jewelers LLC did when somebody came in looking to sell a piece on consignment?

A    We -- we -- Our goal was to help that person sell the item for as much as we could help them sell it for.

Q    And how does that compare with what you had observed other jewelers would do when offered a consignment piece?

A    Other jewelers would buy the piece, many of them, and then they would give it to an auction house to sell because we had jewelers that would beg us to take their items because we were able to get it to a higher market.

212-267-6868                    www.veritext.com                    516-608-2400

Q    Well, what was the difference between what other jewelers were doing and what you were doing in terms of who got the profit on the deal?

A    The profit went to the seller -- the seller.

Q    No, but what was the difference --

A    The signer.

Q    If somebody does it the way that you described?

A    Oh, the profit.  There was no -- There was no limit to -- That was the beautiful thing, is there was -- when we set the record on the emeralds, there was no limit to the high end.

Q    No, Lindy, I understand.  I'd like you to focus in on this.

A    Okay.

Q    You described a process that other jewelers would do when somebody came to them with consignment stones.  Who made the money when they did it their way?

A    The jeweler.

Q    And who made the money when you did it your way?

A    We made a portion, but then the person giving it to us, selling it, made their portion.

        THE COURT:  I have a clarifying question.  You used the phrase "auction house" before.  Isn't the LLC, though an auction company as well?

        MS. ADDUCCI:  Yes, we did.  Yes.

212-267-6868              www.veritext.com                 516-608-2400

THE COURT: But you don't consider the LLC to be an auction house?

MS. ADDUCCI: You know, the word "house" anymore, like. the way they used to say it can be like now an online, but it was evolving of we were a smaller entity that we were able to -- you know, we didn't -- Like, some of the big auction houses, they had big physical houses like Joe's family. We had our office, and we had preview, but we -- if we needed more space, we would go to a location for more like -- you know, for more space for people to preview, to be able to accommodate.

THE COURT: So you would consider --

MS. ADDUCCI: An auction house, I mean --

THE COURT: An auction boutique, perhaps.

MS. ADDUCCI: Yes. And in the --

THE COURT: Boutique auction house.

MS. ADDUCCI: In the Rapaport Magazine, after our -- we had a huge auction in 2011, and they put us a huge spread, there were four auction houses, and we were in with Doyle's and some of the smaller -- They considered Christie's and Sotheby's to be the big ones. And we were in with -- There were four of us, and we were included in those four.

THE COURT: Okay.

BY MR. FOLEY:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q   During the same time period, in the late 20-teens what kind of work was Joe handling for the business?  And from now on, when I use the term "the business", I mean Joseph DuMouchelle Fine and Estate Jewelers LLC.  What kind of work was Joe doing?

A   Joe structured all of the business dealings.  He structured the banking.  He was overseeing the finances.  He was -- I was the nerd doing the gemology work.  He was doing.  That was the work that he did, was he would -- he structured the business.  I didn't really even know auction until I met him, so he was -- that was his --

Q   In particular, when it came to structuring large deals --

A   Yes.

Q   What one might call flips of jewelry --

A   Yes.

Q   Who handled that type of work?

A   That would be Joe.

Q   Do you recall --

THE COURT:  I have a clarifying question.

MS. ADDUCCI:  Yes.

THE COURT:  You said he structured the business side.

MS. ADDUCCI:  Yes.

THE COURT:  Did that include the banking?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MS. ADDUCCI: Yes.

BY MR. FOLEY:

Q When you say that Joe would handle the banking, in response to The Dudge's question --

A Yes.

Q Does that mean you never wrote checks?

A No, that doesn't mean I never wrote checks.

Q Okay. Does that mean that you never made transactions from the bank account?

A No, I would -- I mean, I would -- After an auction, Joe would meet with our staff, and I did not -- unless I was asked to by him, but always they would make the payments out to the -- to those people. But they worked with Joe. That was something that they did. My portion was to, in New York, to stay, like I said before, to try and help, you know --

Q So in these years --

A Yes.

Q -- when you would come back from Sanibel and observe the business --

A Yes.

Q -- which at that point, was it in Birmingham?

A Grosse Pointe, and then it went to Birmingham. I'm trying to think of what year it went to Birmingham, maybe.

Q I don't need a specific answer, Lindy.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

A     Okay.

Q     I'm just asking for this.

A     Yes.

Q     Can you sort of describe the business, the employees, what you saw, what you observed --

A     Yes.

Q     -- when you were back?

A     They were -- They were doing the normal daily routine activities of receiving merchandise when it came in.  They met with customers.  They tagged it.  They put it in the safe.  They were doing the normal daily activities.  They took the mail in.  They took -- You know, they were doing filing, all of that.  Shipping off to GIA to a lab if it needed to go.  They were receiving, they were shipping items back to people after auction.

Q     This wasn't just Joe and you in the --

A     No. No.

Q     -- office?

A     That office was running on its own without me.

Q     Okay.

A     Sometimes I didn't even go in there because I would go straight for -- I would -- Tired, I would go from -- After New York, I was so tired, I'd go from New York to Florida.

Q     When do you remember first becoming aware of the Yellow Rose diamond?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     2018.   It would have been Labor Day weekend, and I guess I either saw it the end of August or the beginning.  I don't know.  Labor Day is usually what, September?  So either late -- right in that area.

Q     What do you remember thinking of it when you first saw it?

A     That it was amazing.

Q     Just generally, what about it made it amazing?

A     The size, the monograph book that came with it.  It came -- GIA does not do -- I had never seen.  Well, I had seen, but the monograph book on a really important stone, they rarely do those books.  And those books are --

THE COURT:  Who's the "they"?

MS. ADDUCCI:  The Gemological Institute of America, GIA.

THE COURT:  So GIA did the book on --

MS. ADDUCCI:  Well, the -- Yeah.  Whoever first probably pulled the diamond out of the mine and had it cut, which they would have --- What you do first is to get -- The cutters usually do this with the lab, and the lab used to be just in New York and California, but now it's all over the world.  But the main lab on diamonds is in New York.  So I don't know where this one was done.  It doesn't matter.  But it was a big, thick book, and it also included a GIA report, but it went into detail about where this was mined and just

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

the importance of the size of the stone, you know, what mine it came out of. And it was really impressive.

BY MR. FOLEY:

Q    What did you understand or what did you observe Joe was doing with the stone between late 2018 and we'll say the time of the Ritter transaction?

A    He was working with staff, and they were -- they were -- I mean, I was, again -- So I wasn't in the office all the time, but I did see when I would come back, there were -- they had a book put together, their own book put together that they showed -- they showed the diamond in. They were, his sisters, you know, they had bigger clients from art gallery. They were all trying to help. You know, they were finding buyers, and they were showing it.

Q    And did you have a chance to personally observe the Yellow Rose diamond during this time?

A    Yes.

Q    What about anything that you observed during that time seemed unusual to you?

A    Nothing.

Q    When did you first learn that Mr. Ritter would be involved in the Yellow Rose deal?

A    Early 2019.

Q    What was your reaction when you learned that Mr. Ritter would be part of the deal or was a potential buyer?

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    Well, it made it more personal for me because I knew him on a personal level.

THE COURT:  I need you to stop.  I missed that answer.  When did you first become aware that Mr. Ritter was involved?

MS. ADDUCCI:  Early 2019.

MR. FOLEY:  And then should I just repeat the last question after that?

THE COURT:  Please.  Yeah.

BY MR. FOLEY:

Q    What was your reaction when you learned that Mr. Ritter would be part of this deal?

A    It made it more personal for me because -- and it made it more legitimate because I didn't know that he would be that level of a buyer, so I guess I was excited for him.  I was -- But I, you know -- It just made it more real.

Q    What beliefs did you have regarding how Joe would deal with Mr. Ritter?

THE COURT:  I didn't catch that word.  I need you to first -- We have Mr. Cataldo standing up.

MR. CATALDO:  Your Honor--

THE COURT:  I didn't even hear the question.  So could we ask Mr. Foley to repeat the question?

MR. FOLEY:  Lindy, there's probably going to be an objection, so just let me ask the question.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 29 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

THE COURT: Ms. Adducci, hold on. You can direct it to me at this point.

MR. FOLEY: Oh, okay. The question to the witness was, or was going to be, what beliefs did you hold when you learned that regarding how Joe would handle the transaction when you learned that Mr. Ritter was the buyer?

MR. CATALDO: Your Honor, my objection is, this is really calling for speculation. And, I mean, her subjective beliefs, frankly, as to how they would deal, I don't know that's relevant anyway. This is not -- She's here as a fact witness, and so I'm not sure how this belief as to how Tom and her husband would deal with each other, how would she even know what that is? So, Your Honor --

THE COURT: Well, Mr. Cataldo, I think Mr. Foley is asking, what were you thinking? What did you think when you heard of this? Is that a correct synopsis of the question? It's a long question.

MR. FOLEY: Yes, Your Honor.

MR. CATALDO: I don't have a problem with your question, Your Honor.

THE COURT: Ask my question, please. Objection is sustained. I don't understand your question. Why don't you ask it this way, and I think you'll solve Mr. Cataldo's issue with your proposed question.

MR. FOLEY: Thank you.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  Okay.

BY MR. FOLEY:

Q    When you learned that Joe would be dealing with Mr. Ritter, what did that make you think?

A    I thought that he would be extra careful with making sure that everything was perfect with it, in my opinion.

Q    Do you remember sending the email, we'll call it now, with the information to Mr. Ritter?

THE COURT:  Is that the data package email?

MR. FOLEY:  The data package email.

THE COURT:  Okay.

BY MR. FOLEY:

A    I remember -- You know, I remember because I did it, but I -- Do I specifically remember?  Yes.  I mean, yes, I remember it.

Q    Okay.

A    There was --

Q    I'm not asking if you remember the details --

A    That's what I'm saying.

Q    Or what computer you were at, just do you deny that you sent the email?

A    No, because it's a normal routine for what we do on every single item we had in our -- that we would ever get in on a major piece, especially that one.  For auction, for any kind of buy, you would -- even a GIA report, you would

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

present people with that if a potential buyer, you know, needed to know what information do you have before.

Q    Lindy.

A    That's what we would send.  And so --

THE COURT:  Ms. Adducci, I'm going to ask you to limit your question --

MS. ADDUCCI:  Okay.

THE COURT:  Your response to the question asked.

MS. ADDUCCI:  Okay.

THE COURT:  Again, when Mr. Foley asks you what time it is, don't tell him how to build a clock.  If he wants to know how to build a clock, he'll ask you that in a different question.

MS. ADDUCCI:  Okay.

THE COURT:  All right?  And count to three before you answer, just to give plaintiff's counsel a chance to process the words and raise an objection if they have one.

MS. ADDUCCI:  Okay.

THE COURT:  Okay?

MS. ADDUCCI:  Yes.

BY MR. FOLEY:

Q    How is it that you came to send that email to Mr. Ritter?

A    It was at Joe's request.

Q    At the time of sending that email, what did you believe

212-267-6868                 www.veritext.com                 516-608-2400
Veritext Legal Solutions

about the Yellow Rose diamond?

A     For it to be a legitimate deal.

Q     Not the transaction, the diamond itself.

A     That it was an amazing ring and stone.

Q     And what did you believe about the transaction at that time?

A     For it to be a legitimate deal.

Q     What parts of that -- of the process of this transaction were you not responsible for?

A     The structuring, the discussions before going into it, any discussions before going into it, before I was put on the phone at the request of my opinion of the--

THE COURT:  I need to stop you right there.

MS. ADDUCCI:  Yes.

THE COURT:  Mr. Foley, you are going so fast.  I write real quickly.  I can't keep up with you.  So if you're expecting this to be an effective examination of the witness, it's not effective if I can't keep up with you.

MR. FOLEY:  Understood.

THE COURT:  I need you to back up and slow down. Okay?  I got that Ms. Adducci believed the Yellow Rose diamond was an amazing stone, but you asked another question about the transaction, and I didn't get the answer.

MR. FOLEY:  Understood, Your Honor.

THE COURT:  What was the question?  And ask it

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

again, and let's get the answer again. And slow it down.

The pace of your exam, you've rehearsed it presumably, or, you know, not rehearsed it, but you've gone over the testimony with your client, so it's going quick for you, but you want the Court to be able to hear it and process it, sir. Okay?

MR. FOLEY: Yes, Your Honor. Thank you.

THE COURT: All right.

MR. FOLEY: Ms. Adducci, at the time of sending the email to Mr. Ritter at Joe's request --

THE COURT: The data package email.

MR. FOLEY: Data package email. What did you believe about the transaction at that time?

MS. ADDUCCI: I believed it to be a legitimate deal.

THE COURT: I have a clarifying question. What does "legitimate deal" mean in this context?

MS. ADDUCCI: I thought there was nothing wrong with it. I didn't think there was any reason for me -- there was no reason for me at that time to believe this was outside of our normal business.

THE COURT: And what month was the data package email sent?

MR. FOLEY: January, Your Honor.

MR. CATALDO: January 2019.

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

THE COURT: Was the stone still at the LLC's office in January 2019, the ring?

MR. FOLEY: My understanding is that it was, but I don't think there's been direct testimony as to whether or not it was at that particular time.

THE COURT: Mm-hmm.

BY MR. FOLEY:

Q    Ms. Adducci, what, if anything, had you observed of the Yellow Rose diamond before you sent the January 2019 data package email to Mr. Ritter?

A    I observed that they were working on -- I observed normalcy of this transaction -- or, you know, of what was going on.

Q    Had you seen the Yellow Rose?

A    Yes.

Q    Do you know if at the moment of sending that email, the Yellow Rose was still in the offices of the business?

A    I don't know that I was asked to go and get it.  I didn't have to go and physically see it because I didn't -- every morning, if I was in the office, which I don't believe in January, I would have wanted to be in Florida and not up in the office.  But I remember when I left in December, it was there.  So you know, I was in Florida in January.  In our office, you know, again, I could work remote and send that from a remote packet.  Yeah.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Regarding the phone call --

A    Mm-hmm.

Q    -- on which you spoke to Mr. Ritter, do you remember

speaking with Mr. Ritter on the phone at some point?

A    Yes.

Q    You don't deny that?

A    No.

Q    What was he asking you about on that phone call?

        THE COURT:  Wait, which phone call are we about

now?

        MR. FOLEY:  The last question I had asked, Your

Honor, I asked her if she recalled the singular phone call

with Mr. Ritter that has been the subject of this case.  And

she responded that she does remember the call and does not

deny being on the call.

        THE COURT:  When was it?

BY MR. FOLEY:

Q    Do you remember when that call was?

A    I would say it would be January of 2019.

Q    And this was the call prior to the wire transfer?

A    Yes.

Q    Yes.

        THE COURT:  A clarifying question, was it before

or after you sent the data package email?  Was this call

before or after you sent the email containing the data

212-267-6868                    www.veritext.com                    516-608-2400

package?

MS. ADDUCCI: It would have been before. The phone call would have been before.

BY MR. FOLEY:

Q On that phone call, what was Mr. Ritter asking you about?

A What I thought of the diamond ring and the diamond.

Q And what did you tell him about the diamond and the ring?

A That it was an amazing piece.

Q What were your beliefs about the diamond and the ring at the time that you had that phone call with him?

A That it was an amazing piece.

Q What did you not discuss on that phone call with him during that conversation?

THE COURT: Okay, wait a minute. Mr. Cataldo, I'll let you -- Sorry. I forgot my role for a second.

MR. CATALDO: Your Honor, I have so many different objections that I'm having trouble finding the most appropriate one. That is a --

THE COURT: Mr. Foley.

MR. FOLEY: It's an improper question.

THE COURT: It's an improper question. When you ask what you didn't discuss, you know --

MR. CATALDO: We'll be here a while.

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

THE COURT: World War II history, that the sky is blue, the space shuttle program. There could be a literal universe of things that someone didn't discuss on that call. It's an improper question, overly broad, irrelevant to the extent you're asking for things like, "What's the weather today?" Objection sustained. Sorry, Mr. Cataldo, I'll try to remember better my role.

MR. CATALDO: Thank you, Your Honor.

BY MR. FOLEY:

Q    Ms. Adducci, have you been in the courtroom for this entire trial?

A    Yes.

Q    You heard Mr. Ritter testify?

A    Yes.

Q    Is there anything that you heard Mr. Ritter testify occurred on that phone call that you dispute?

A    That I discussed the deal. That I discussed the deal.

THE COURT: Meaning -- Clarifying question. Meaning the ability to sell the Yellow Rose diamond ring --

MS. ADDUCCI: I did not discuss --

THE COURT: Well, hang on. Are you saying you're denying - while sitting here today, you're denying that you discussed with Mr. Ritter the ability to acquire the Yellow Rose diamond ring for $12 million and sell it for $16 million or perhaps more?

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

MS. ADDUCCI: I discussed the diamond ring.

THE COURT: Did you --

MS. ADDUCCI: I did not discuss the other portion that you're saying.

THE COURT: Meaning the --

MS. ADDUCCI: Meaning the values and where it could go. Yeah. Because my normal part of anything I do is I let the buyer or someone who's brokering or buying and they're going to be that next person, I let them determine that. That's their -- at auction, that's always someone who -- that's up to a buyer if they want to, you know, negotiate and pay. But I did not discuss those negotiations.

THE COURT: Okay.

MS. ADDUCCI: I didn't discuss --

THE COURT: I have a clarifying question based on your prior testimony about --You have skills as an appraiser, ma'am, correct?

MS. ADDUCCI: Yes.

THE COURT: Okay. And authentication would be required, I suppose, for this piece?

MS. ADDUCCI: This is identification.

THE COURT: Identification because of the gemstone involved.

MS. ADDUCCI: Yes.

THE COURT: Authentication is for fabricated

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

jewelry like Cartier --

MS. ADDUCCI: Authentication would be -- yes, for provenance, it would be there's different portions of what you can bring in. You don't bring in all of those on everyone. Provenance would be if you're going to say, "Belonged to Matilda Dodge Wilson," you have to prove that. Like how -- You can't just say, "Oh, this belonged to, you know, Napoleon." Everybody says this, "Oh, this ring was, you know, Marie Antoinette," or -- you can't just say that came down through the family --

THE COURT: Understood.

MS. ADDUCCI: Yes.

THE COURT: But I guess my question is --

MS. ADDUCCI: Authentication is more Cartier, Tiffany, yeah.

THE COURT: But you've testified earlier your email block has gemology, authentication, and appraiser as those initials after your name, correct?

MS. ADDUCCI: Yes. Not authentication, but --

THE COURT: I'm sorry, gemology, appraiser and auctioneer --

MS. ADDUCCI: Yes.

THE COURT: -- in your name. Okay. And yet you're saying now that when you were on the call with Joe DuMouchelle and Tom Ritter, you were conveying just your

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

impressions about how nice the stone was --

MS. ADDUCCI: Yes.

THE COURT: And you didn't get into anything else?

MS. ADDUCCI: Tom asked --

THE COURT: Wait. Wait. Let me finish. Regarding a number, not structure of the deal, but a number?

MS. ADDUCCI: No, because I -- especially being fresh out of taking USPAP and all of Uniform Standards of Professional Appraisal Practice and all of that, especially coming right out of that because that is grueling to go through all of that. With the Appraisal Foundation, I flew to New York, I took these classes in person. You -- I -- He - First of all, I didn't initiate the phone call, so Joe said, "Tom wants to know your opinion of what you think of this diamond. " And I said, "Okay. " So it's a -- it's an amazing stone, but that's why they called me in to show the other person where you saw the photos, is people like to know my opinion of the diamond, of jewelry, of these pieces when they come in. But the buyer, I refused to appraise it, and I specifically said, "Go out and get an independent appraisal. I am not going to be the appraiser on this. It's a conflict." If they submitted -- -f they had in our package somebody else's report, you know, we -- this is something that at auction, if a piece of jewelry comes in from another appraiser and people want to know before they

212-267-6868            www.veritext.com            516-608-2400

make their decision all of that information from another appraiser, even if it was an old appraisal, but it -- let's say it was grandma's and, you know, she had an appraisal done, insurance appraisal, with an old GIA report, they try to give the potential buyer as much information as they can and then let them make the decision. So a prudent buyer would make that decision on their own.

MR. FOLEY: Thank you, Your Honor. May I continue?

THE COURT: Mm-hmm. Please.

BY MR. FOLEY:

Q   Over your years in the jewelry business, did you have -- what kinds of large transactions, if any, had you observed even if you weren't the one structuring them?

A   We sold million-dollar pieces.

Q   Did you only observe transactions at the business?

A   I observed transactions in every area of the industry.

Q   And how many years had you been in the industry at this point?

A   My entire life, probably. Well, not my entire life. I started working in high school at 15.

Q   What would be --

THE COURT: Jewelry business?

MS. ADDUCCI: For his brother.

THE COURT: Okay.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MS. ADDUCCI: Two brothers.

THE COURT: Mr. Ritter's brother?

MS. ADDUCCI: Yes.

BY MR. FOLEY:

Q    What had you observed about the way large jewelry transactions can sometimes be structured or paid out?

A    There are numerous parties involved in buying a large item.

Q    Okay. What kinds of people or entities might be involved in a large transaction like that?

A    People in the jewelry business, in the industry. There could be financial people involved that are looking -- everyone wants to think they're, you know, coming in, they're excited and interested in jewelry. Consumers. But dealers, diamond dealers, they come in together. They buy, they -- this is what they do, but there's also other parties that have money that come in and buy together. So there -- I didn't always know all of them, but I would find out, you know, that there were -- that there were numerous parties, and then they would resell it.

Q    From your perspective, at the time, or in particular on February 7th of 2019, what did the existence of multiple outgoing payments suggest to you at that time?

A    I didn't think of it -- twice of it because I didn't know what the structure of the deal was. So these were --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

you know, they were names that could have potentially been a portion of that structured deal. But, you know, because I wasn't involved in that, I didn't question it.

THE COURT: Okay. A clarifying question. You didn't know, though, that the names on the checks that were going out were in fact --

MS. ADDUCCI: No.

THE COURT: -- participants in a structure to purchase this ring?

MS. ADDUCCI: No.

THE COURT: You didn't know? And you didn't --

MS. ADDUCCI: No, I didn't know.

THE COURT: And you didn't ask, right?

MS. ADDUCCI: I didn't ask.

THE COURT: Okay.

BY MR. FOLEY:

Q    What about the payments that you signed for that day looked improper to you, if anything?

THE COURT: I didn't hear the bottom. You got to keep up your voice.

BY MR. FOLEY:

Q    What about the payments going out that day, February 7th, that you signed for, looked improper to you, if anything?

A    I don't recall that day thinking there was anything

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

improper.

Q   One of the larger payments --

A    I didn't think Joe would ask me to do something improper either.

THE COURT:  I'm not hearing this, ma'am.

MS. ADDUCCI:  I didn't think my husband would ask me to do something improper because at that moment, I had been around him for a long time, so I --You know, going to the bank and over all of the years that we were around, I didn't question it.  I didn't question it.

THE COURT:  I have a clarifying question.

MS. ADDUCCI:  Yes.

THE COURT:  But he normally handled the banking, correct?

MS. ADDUCCI:  He did.

THE COURT:  So it was unusual for you to handle checks of this size, correct?

MS. ADDUCCI:  Yes, because he was the one that would typically initiate payments to people.

THE COURT:  Mm-hmm.

MR. FOLEY:  May I continue, Your Honor?

THE COURT:  Please.

BY MR. FOLEY:

Q   One of the larger payments shown in the records was to Bill Noble.  At the time, what did the payment to Bill Noble

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

-- what impact did the fact that Bill Noble was being paid have on your thoughts about the transactions you were signing for, if any?

A     Well, I knew he was --

MR. CATALDO:  Leading.

THE COURT:  Yes.  Objection sustained.

MR. FOLEY:  May I respond?

THE COURT:  I'm sorry.  Go ahead and respond.  But -- I keep forgetting that part.  My apologies.

MR. FOLEY:  Your Honor, I don't see any part of this question that's --

THE COURT:  You didn't ask if it had an impact.

MR. FOLEY:  Oh, just this -- Okay.

THE COURT:  So sustained.

MR. FOLEY:  I'll rephrase.  Ms. Adducci, did the fact that Mr. Noble was one of the parties being paid in this transaction have an impact on your thoughts about the validity of the transactions?

MR. CATALDO:  Your Honor, that still is leading.

THE COURT:  Wait a minute.  Don't answer.  Say the question again.

MR. FOLEY:  I asked her if the existence of Mr. Noble as one of the payees had an impact on her thought process regarding the validity of the transactions.

THE COURT:  Mr. Cataldo, why is it leading?

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 46 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

MR. CATALDO: He's clearly suggesting the basis for the question and the answer.

THE COURT: Sustained.

MR. FOLEY: Your Honor, the fact that Mr. Noble was paid in this transaction has been openly discussed. My first question that I asked was not leading. Your Honor's response was that it lacked a foundation because I hadn't asked if it had an impact. But then I would like to go back to the question as I phrased it, which is non-leading, and I can repeat it because it feeds no information to my client in any way, shape, or form beyond what's already been openly discussed here. The question, as I had phrased it, is, one of the larger payments shown in the records was to Bill Noble. At that time, what did a payment to somebody like Mr. Noble mean to you? Like, what did it add to your thought process?

THE COURT: But the reason that I believe Mr. Cataldo is saying it's leading is because it implies that it did have some implication.

MR. CATALDO: There's lots of ways. He can get to this by asking a non-leading question. It's not my job to give him legal advice, but --

THE COURT: I'm sustaining the objection.

MR. CATALDO: -- there are plenty of ways to ask -- to get there.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY MR. FOLEY:

Q   Can you briefly summarize for the Court what thoughts, if any, you had about Mr. Noble being one of the payees?

A   If I had -- the only thought I would have had would have been that I knew that William Noble was involved with the Yellow Rose, from what I understood.  But I -- because I didn't structure the deal, I didn't know.  I just saw a familiar name.

Q   From your perspective at the time, what did the idea of multiple large outgoing payments -- strike that.  Did the idea of multiple large outgoing payments make you believe something fraudulent was occurring?

THE COURT:  Whoa, whoa, whoa.  Sorry, Mr. Cataldo.

MR. CATALDO:  It's leading.

THE COURT:  Could you explain why?

MR. CATALDO:  He's basically just laid out a series of assumptions and asking her to agree to it.

THE COURT:  Mr. Foley?

MR. FOLEY:  I don't see any assumptions in my question.

THE COURT:  Fraudulent, not an assumption?  The Court sustains the objection.  It's leading.  This is your case, your witness.

BY MR. FOLEY:

Q   Did the multiple large transactions going out of the

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

account that day -- what, if any, concerns did the multiple

large transactions going out of the account that day raise

for you?

A     They didn't, because I didn't question Joe's requests

for them.  He had never done anything to make me question

what he asked the bank to do.  He asked them to do.

Q     At the time in question, what did the phrase "Bill

Noble was the seller" mean to you in terms of how money

might move in this transaction?

THE COURT:  Wait.  Wait.  Wait.  Mr. Cataldo,

state your objection, please.

MR. CATALDO:  It's leading.

THE COURT:  How?

MR. CATALDO:  Again, it's just -- it's laying out

information and asking her to agree to it.

MR. FOLEY:  I can repeat the question to Your

Honor in detail.

THE COURT:  Please.

MR. FOLEY:  At the time of this transaction, what

did the expression "Bill Noble is the seller" mean to you,

if anything, in terms of how money might move in the

transaction?

THE COURT:  Oh, okay.  It's sustained because it's

a leading question.  You're coming up with your theory of

the case and asking the witness to say presumably something.

212-267-6868                    www.veritext.com                    516-608-2400

So --

MR. FOLEY: Your Honor --

THE COURT: It's leading. Rephrase the question, sir.

MR. FOLEY: May I respond?

THE COURT: Oh, sorry. Why isn't it leading?

MR. FOLEY: Well, I'll start with the most basic premise, that it doesn't call for a yes/no answer.

THE COURT: Well, but doesn't it suggest an answer?

MR. FOLEY: No. What, at that time, did the phrase "Bill Noble is the seller" mean to you, if anything, in terms of how money might move in the transaction? That suggests no answer. It's not a yes/no question. It's asking her for what that meant to her. I don't think there's any other way to make that non-leading, and it's certainly something I'm entitled to ask.

MR. CATALDO: There's lots of ways to make it non-leading.

MR. FOLEY: Then give me an example, please, because I don't have it. And I'm not asking you to do my job for me, Your Honor. What I am saying is that is not a leading question. It's open-ended. It calls for her to say what beliefs, if any, she held about that, what it meant to her and how she thought.

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

THE COURT: Try breaking it up, but the objection is sustained. As you've written it, you've got -- that question has multiple parts, taken together form a leading question. The Court suggests you perhaps try breaking up the question.

BY MR. FOLEY:

Q You've testified that you understood Mr. Noble to be the seller of the diamond?

A Yes.

Q What did that mean to you in terms of the payment flow you expected to see on this deal?

A That it assisted with -- whatever the transaction, however it was structured, that it assisted with it.

THE COURT: Wait, I don't -- could you clarify that answer? I don't know what you --

MS. ADDUCCI: Seeing his name -- seeing his name there, he was the one that had sent that diamond to the office. So just his involvement -- again, without structuring and knowing what Joe had structured, I really -- I saw his name. It wasn't a red flag for me.

THE COURT: It wasn't what?

MS. ADDUCCI: Was not a red flag for me.

THE COURT: Okay.

BY MR. FOLEY:

Q What about the multiple large payments that you signed

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

for coming out of the account?

A    Again, they were not red flags in that I really just did not know the details of what Joe had structured with people.

THE COURT:  But to clarify, your belief was that Bill Noble was the seller of the Yellow Rose diamond?

MS. ADDUCCI:  I believe that he owned it originally.  But then again, you know, with -- I believe that he -- he sent it to us, and he claimed on his memos that he -- from what I saw, that he owned it.  You don't send -- you don't send something -- you don't send something to somebody unless you have the right to send it to them.

MR. FOLEY:  May I continue, Your Honor?

THE COURT:  Sure.

BY MR. FOLEY:

Q    In your experience in the jewelry industry, what have you observed about payouts on large transactions, on purchases?

A    That there can be numerous parties involved.

THE COURT:  Clarifying question, how many is numerous?

MS. ADDUCCI:  On an estate, there could be --

THE COURT:  On one piece.  This is not an estate.

MS. ADDUCCI:  Yeah, on one piece.

THE COURT:  One piece.

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

MS. ADDUCCI: On one piece, there can be numerous parties.

THE COURT: Okay. How many is numerous, ma'am?

MS. ADDUCCI: It could be four to six. It could be many.

THE COURT: Well, in the context of an estate, it could be to multiple beneficiaries of the estate?

MS. ADDUCCI: Correct.

THE COURT: Okay. But this wasn't an estate selling the Yellow Rose diamond, correct?

MS. ADDUCCI: Correct.

THE COURT: Okay. So in this situation, your testimony is that you believed Bill Noble to be the seller of the Yellow Rose diamond based on the memorandum in the LLCs office, correct?

MS. ADDUCCI: Based on how it came in, yes.

THE COURT: All right. So because it's not an estate situation, in this situation --

MS. ADDUCCI: No.

THE COURT: -- you wouldn't have expected multiple parties to receive --

MS. ADDUCCI: May I clarify?

THE COURT: I'm asking, please.

MS. ADDUCCI: Okay. So for instance, the yellow diamond that we sold --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Yeah.

MS. ADDUCCI: The other big one for --

THE COURT: The other big one, not this one.

MS. ADDUCCI: Yeah.

THE COURT: Yeah.

MS. ADDUCCI: The one that we sold for the estate in Michigan.

THE COURT: Mm-hmm.

MS. ADDUCCI: That initially was entered in at starting out bids maybe at, like, 350,000 and reached over a million. And we were told again, we set a record. That actually went to -- I was told later, four or six buyers.

THE COURT: Okay. But how was this relevant?

MS. ADDUCCI: And then it got --

THE COURT: I'm asking about this diamond.

MS. ADDUCCI: Yes, this diamond. But I did not know. Again, at that time -- at that time, I did not know -- I did not structure the deal.

THE COURT: Oh, my clarifying question is this. You knew that Bill Noble was the seller of the Yellow Rose diamond because of the memorandum that was in the LLCs office, correct?

MS. ADDUCCI: Yes.

THE COURT: Okay. And you knew that an estate was not the seller of the Yellow Rose diamond. Correct?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. ADDUCCI: Yes.

THE COURT: Okay. And because it wasn't an estate that was the seller of the Yellow Rose diamond, you wouldn't have expected --

MS. ADDUCCI: Well, not just --

THE COURT: -- multiple checks?

MS. ADDUCCI: I mean, not just an estate. I'm trying to think of other scenarios, but there -- we make out -- we made out numerous -- they made out payment -- numerous payments to parties all the time. Whatever people asked for, they would do. You know, if you had -- if you had different jewelers or different -- it was not uncommon to make out checks to numerous people.

THE COURT: Of this size?

MS. ADDUCCI: Well, this was Joe's -- again, of this size, I was not involved in this, but in this size, you would -- I mean, I'm not, you know, an investment person where there could be numerous -- I don't know. Because Joe put this together. So again, this is his deal. It's not my deal.

MR. FOLEY: May I continue, Your Honor?

THE COURT: Please.

BY MR. FOLEY:

Q   Speaking now of February 7th and signing those transfers, what, if anything, in the documents that you were

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 55 of 255
212-267-6868                      www.veritext.com                      516-608-2400
Veritext Legal Solutions

presented and signed with or that you signed at the bank that day raised a red flag for you that anything improper was happening?

A    Nothing.

Q    If the situation had appeared to you improper on February 7th at that time, what would you have done?

A    I wouldn't have gone to the bank.  I would've -- I've replayed that in my mind a million times.  I would have not gone.

THE COURT:  Clarifying question.  Which time?  You went twice.

MS. ADDUCCI:  I wouldn't have gone -- well, the first time, the opening of the bank account, that was to receive the wire, because I was told we needed it because of the other bank, but we also -- I mean, I just remember that we were looking for a larger bank for our business.  So that part of it, I don't know that I would -- I want to say, Annabelle, I guess if I -- I was frustrated with -- we were very frustrated with FineMark at that time, so --

BY MR. FOLEY:

Q    Let me take this one by one.

A    Yeah.  Okay.

Q    If on February 5th, you knew that Mr. Ritter intended to send the money to the seller and not to you, or not to the business, would that have changed the way -- would you

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 56 of 255
Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

have gone to the bank that day?

A    No.

Q    Okay.  If on the morning of February 7th, you knew that you were signing a signature card to wire funds out of the -- or to send funds out of the account, if at that point, you knew that Mr. Ritter had thought that his money was going to the seller or had gone to the seller, would you have gone there to fill out a signature card?

THE COURT:  Okay.  I'm objecting to that question on behalf of all of us.  I can't follow that question.  It's got --

MR. CATALDO:  And it's also leading.

THE COURT:  It's leading, but it's got, like, multiple subparts.  Keep it simple.  I've been doing this a long time, if I can't follow the question, I'm concerned the witness can't either.

MR. FOLEY:  Your Honor, I was only attempting to provide some clarification for --

THE COURT:  It wasn't clarifying.  Break it up.

MR. FOLEY:  I'll move on anyways.

BY MR. FOLEY:

Q    What did you believe in early February, throughout all of this, regarding the transaction?

A    That everything was okay.  That it was legitimate and okay.

Q    Saving redirect, Your Honor.  Nothing further.

THE COURT:  I have a clarifying question.  So Mr. Foley, come back to the podium.

MR. FOLEY:  I'm here.

THE COURT:  Mr. Foley, you said, if on February 5th, the defendant knew that Mr. Ritter was going to pay the seller, and then the answer from Ms. Adducci was, she would not have opened the Bank of America account.  Did I get that question right?

MR. FOLEY:  If she had known at that time that Mr. Ritter had intended to send his money to the seller, not to --

THE COURT:  As opposed to the LLC?

MR. FOLEY:  As opposed to the LLC.

THE COURT:  Okay.  All right.  Thank you.

MR. FOLEY:  Thank you, Your Honor.

THE COURT:  Mr. Cataldo?

CROSS-EXAMINATION

BY MR. CATALDO:

Q    Ms. Adducci, you understand that when you give depositions, just like when you're here in a courtroom, you testify under oath?  You understand that?

A    Yes.

Q    And you understand that lying under oath is a serious matter?  You understand --

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

MR. FOLEY: Objection, Your Honor. Argumentative.

THE COURT: Mr. Cataldo, I should let you respond, I suppose.

MR. CATALDO: I think it's appropriate to establish a foundation of her knowledge of the seriousness of testifying under oath.

THE COURT: Ms. Adducci, it's a serious matter. The Court's swore you in. You looked into my eyes. You can ask the question and get an answer. Make sure --

MR. CATALDO: Okay.

THE COURT: -- Ms. Adducci understands.

BY MR. CATALDO:

Q    Do you understand that when you are testifying under oath, it's a serious matter?

A    Yes.

Q    Okay. And as we heard in the tape that was played, you acknowledge you lied in one of your depositions about the Yellow Rose, right?

MR. FOLEY: Objection, Your Honor.

THE COURT: Okay. Mr. Cataldo, what are you referring to?

MR. CATALDO: All right. Tell you what. Let's play the clip that's part of the tape.

MR. FOLEY: I object to playing --

MR. CATALDO: See if I can refresh her memory.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY:  She's never said that her memory is not refreshed.

THE COURT:  She doesn't say she didn't remember. So I'm -- Mr. Foley, what's your objection to the question?

MR. FOLEY:  Overly broad, vague, argumentative, lacks a foundation.  All of those.

THE COURT:  All right.  Mr. Cataldo, could you clarify the question?

MR. CATALDO:  Okay.  Sure.

THE COURT:  You used the word lying, which is a potent word.

MR. CATALDO:  All right.

THE COURT:  You connect it to a topic?

MR. CATALDO:  I can.

BY MR. CATALDO:

Q    Do you recall in your deposition that you testified, and this was in the clip, that your lawyer had instructed you to lie in a deposition?  Do you remember that?

A    Yes.  I misunderstood.

Q    Okay.  And let's play the clip, if we could, so we have a context for it.

THE COURT:  This is not at all part of the telephone call, part of the deposition.

MR. CATALDO:  This was before the telephone call.

MR. FOLEY:  Your Honor, when we say the clip,

could we have a specific reference to what exhibit's being played?

THE COURT: It's going to be P1?

MR. FOLEY: This is the recording that was previously played in the courtroom?

THE COURT: Yeah. Isn't it P1?

MR. FOLEY: I just want to make sure it's not something different.

MR. CATALDO: No, it was part of what was played.

MS. CLAYSON: This is on the September 23rd (indiscernible) 24th deposition, page 30, line 10.

THE COURT: And it's marked as P1?

MS. CLAYSON: Correct. And it's through line 16.

MR. CATALDO: All right.

BY MR. CATALDO:

Q    We're going back to your deposition, September 3rd, 2019, page 134, question, "Ms. Adducci, what is the Yellow Rose diamond?" Answer, "I don't know."

A    Right. That was probably Dennis Egan telling me not to say that. I had no idea what was going on at the time of what -- why they were saying to say that.

Q    So you acknowledge you lied under oath because your lawyer told you to, right?

A    No. I acknowledge that I misunderstood. They did not want me to discuss the details of the Yellow Rose, is what

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

I'm understanding now, possibly. But I literally looked to him and looked to the other attorney, and when I looked to him like, "What are you --" He goes, "Just say it." But I don't know that he intended -- I don't know what he intended then. So I'm not lying, but I was -- I was directed by my attorney and to see -- I was directed. He said, "You don't know anything about the Yellow Rose." And I'm -- possibly that he didn't want -- he wanted me to say, "You don't know anything about the structuring of it." But I literally looked at him when he said that to me, and I had another attorney sitting beside me, and I said --

THE COURT: So I have a clarifying question.

MS. ADDUCCI: (indiscernible) Clarified what that was.

THE COURT: I'm going to ask a clarifying question.

MS. ADDUCCI: Yeah.

THE COURT: Is it your testimony that you weren't lying because a lawyer told you to say something?

MS. ADDUCCI: Oh, I didn't -- I misunderstood how they were -- how they were instructing me. They were instructing me, I believe now, I'm hoping, because they're attorneys, and I want to believe in attorneys, but I found attorneys to not all be truthful either. He instructed me, and he got -- he's a very big guy, and he got in my face on

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 62 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

it, and he said, "Just say it, you know, this is what you're going to say." And so am I standing by that?  Absolutely. Because there was another attorney sitting on the other side when he said that to me.

BY MR. CATALDO:

Q    Okay.  So in your view, if someone tells you to say something under oath that isn't true, it's okay.

A    It was the structuring of the deal that I did not know about.

Q    Okay.  So but you understand the seriousness here of telling the truth, do you not?

A    Yes.  Yes.

Q    Okay.  And is it your testimony under oath that on January 25th of 2019, you did not call Tom Ritter?

A    I did not call Tom.

Q    Absolutely unequivocally --

A    From my memory, from recollection, that was seven years ago, I do not recall calling Tom.

THE COURT:  What's the date again, Mr. Cataldo?

MR. CATALDO:  January 25th, 2019.

BY MR. CATALDO:

Q    So Ms. Adducci, if you could turn to Exhibit 3.  And this was the list of those cashier's checks you walked out of the bank on February 7th of 2019.  So you see the first one, Jean R.  Kaslo DBA Kaslo IOLA account.  What did

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 63 of 255
212-267-6868                         www.veritext.com                         516-608-2400
Veritext Legal Solutions

they have to do with the Yellow Rose?

A    I don't know who they are.

Q    Okay.  And how about Aaron Resources?  What did they have to do with the Yellow Rose?

A    I don't know that they had anything to do with it.

Q    And then Canadian Gemmological Association?  That was a licensing fee for you, wasn't it?

A    No, that would have been for Joe.  He was part of -- he lectured with them, so that might have --

Q    Okay.  So what does that have to do with the Yellow Rose?

A    Well, the bank account -- I knew the bank account was also for -- also for our banking, and I didn't -- I don't know.  Nothing, I guess.

Q    Okay.  So then Abbott's Corporation, what did they have to do with the Yellow Rose?

A    I don't know.

Q    Okay.  How about Kwiat?

A    Kwiat?

Q    Yeah.  What did they have to do with the Yellow Rose?

A    I don't know.

Q    Diamond Opportunities, what did they have to do with the Yellow Rose?

A    I don't know.

Q    And you told us, John Regard, that's your neighbor,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

right?

A    Yes.

Q    What did he have to do with the Yellow Rose?

A    I don't know.

Q    JB International, what do they have to do with the Yellow Rose?

A    I don't know.

Q    Peter Indorf, what did he have to do with the Yellow Rose?

MR. FOLEY:  Your Honor, I'm going to object to the continued line of questioning, as my client's already testified that she was unaware she hadn't structured the deal and had no reason to know where the money was going or why.

THE COURT:  Mr. Cataldo.

MR. CATALDO:  All right.  It's cross-examination. She has testified under direct exam she didn't see anything unusual about this.  I'm entitled to explore that, Your Honor.

THE COURT:  The objection is overruled.  The Court notes that the witness also testified that in these sale transactions, sometimes there are multiple parties involved in the sale.  And so for this additional reason, the Court is overruling the objection, Mr. Foley.

Mr. Cataldo, continue.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Can I ask you, sir, Mr. Cataldo?  The Court's keeping up as fast as it can, but watch your pace.  Okay.

MR. CATALDO:  Agreed.

THE COURT:  If I don't understand it, it's not real helpful, is it?

MR. CATALDO:  Agree.

BY MR. CATALDO:

Q    Merrillwood Collection, what do they have to do with the Yellow Rose?

A    I don't know.

Q    FEI, what do they have to do with the Yellow Rose?

A    I do not know.

Q    Howard S.  Durman, what did he have to do with the Yellow Rose?

A    I do not know.

Q    David Hussman, what did he have to do with the Yellow Rose?

A    I don't know.

Q    So then if you go to the next page, and we discussed this yesterday, you left and came back to take more money out of the account on the 11th.  Do you recall that?

A    I do because you've shown me.  I don't remember doing that.  But if you've shown me that I did, I guess I --

Q    So Marcella Rabinovich, PLLC, attorney trust account, what did that have to do with the Yellow Rose?

212-267-6868          www.veritext.com          516-608-2400

A     I don't know.

Q     And then you were taking another 90,000 payable to Joseph DuMouchelle Fine & Estate Jewellers, LLC.  What did that have to do with the Yellow Rose?

A     I'm assuming maybe he put that into another account, but I don't know.  If that went back over into FineMark, I don't know.

THE COURT:  Mr. Cataldo, I have a question --

MR. CATALDO:  Yes.

THE COURT:  -- for clarification.  The February 11th withdrawals, you asked the witness, you know, said that she testified earlier that she took it out.  Where in the record do we have evidence that she did that as opposed to Joseph DuMouchelle?

MR. CATALDO:  Your Honor, great question.  We did look at that yesterday.  If you follow down in Exhibit 3.  So it's Exhibit 15 and Exhibit 3 is the signature card.  I'm sorry, not the signature.  It's the withdrawal slip signed by Ms. Adducci on February 11th --

THE COURT:  I've got it.

MR. CATALDO:  -- with a 180,000 that makes up those two checks, 90 and 90.

THE COURT:  Not only did I have it, I have a sticky on it.  I just needed you to connect up for the Court.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO:  Okay.

BY MR. CATALDO:

Q    So we talked about -- you also made -- on the 7th, there were three transfers that went from bank to bank.  I'm sorry, internal bank transfers, if you go to Exhibit 3.  I'm sorry.  You're right.  Exhibit 5.  My mistake.  Exhibit 5 is the bank statement.  And we followed these through the other day.  And the 4.25 million, that was paid to Mr. Noble's company, there's an additional 117 paid to Mr. Noble's company, and then a 150,000 that was paid to a different company that is on Exhibit 42, Ryan & Rodney Diamonds Inc. Remember that?

A    Yes.

Q    What did Ryan & Rodney Diamonds Inc.  have to do with the Yellow Rose?

A    I don't know.

THE COURT:  Mr. Cataldo, I need to slow you down. J42, I understand, but in J3, what page are you looking at for the Arizona teller transfers?

MR. CATALDO:  So I apologize.  I said 3, but it's actually Exhibit 5.

THE COURT:  Okay.  but what page within it?

MR. CATALDO:  If you go to the 3rd page.

THE COURT:  Yes.

MR. CATALDO:  We saw there were the three inter-

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

bank transfers that were authorized by her on --

THE COURT: And where --

MR. CATALDO: February 7th.

THE COURT: And where are the -- where's her signature on the authorization for those?

MR. CATALDO: You don't have a signature, but the witness testified that she authorized these because Joe was not yet on the account on the 7th.

THE COURT: And she just testified that she knew some money was going to William Noble Rare Jewels. Okay. On the right side of the screen is Exhibit 42.

MR. CATALDO: Yeah. So that's the... The right side of the screen is Exhibit 42, and if you -- the Court will recall that these numbers here tie -- There's that one, and then if you -- Noble Jeweler 9238 ties to (indiscernible)

THE COURT CLERK: Can you repeat that because it didn't come up on the --

MR. CATALDO: Oh, I'm sorry. Okay.

THE COURT: Can you speak to the mic?

BY MR. CATALDO:

Q    So the William Noble Rare Jewels 9238 ties to the 9238 here and here. Ryan and Rodney Diamonds 4272 ties to the 4272 here for this transfer. Now let's talk about William Noble Rare Jewels. Am I correct that the LLC had a

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

consignment agreement with William Noble Rare Jewels?

MR. FOLEY:  Objection, Your Honor.  That's beyond the extent of my direct exam.

MR. CATALDO:  Your Honor, they said, "To the effect the witness had an understanding that Mr. Noble had some involvement in the Yellow Rose," and I'm trying to explore that with the witness.

THE COURT:  The testimony was that she knew Mr. Noble had some involvement in the Yellow Rose because of a memorandum.  The Court's concern is the use of the word consignment, which may have a legal impact that in addition to whatever other objections Mr. Foley has, this witness may not be able to distinguish.

MR. CATALDO:  Okay.  I can rephrase.

MR. FOLEY:  Your Honor, I --

THE COURT:  Mr. Foley.

MR. FOLEY:  To be more specific, I believe the testimony being referred to about prior items and all that was yesterday's cross-exam with Ms. Adducci (indiscernible)

THE COURT:  No, it was today.

MR. CATALDO:  It was today.  Unambiguously today.

THE COURT:  I was taking note.  No looking.  No looking.  Look at me, please.

MR. FOLEY:  Your Honor, my questions regarding Mr. Noble was a singular question today, or two.  One was "the

Noble is seller," and the other one was what that meant to my client. That was it.

THE COURT: Okay. You're writing down the questions, I'm writing down the answers. She mentioned a memorandum, and when -- that she knew that the Yellow Rose diamond was in the LLC's Birmingham office, and was there on a memorandum from William Noble.

MR. CATALDO: That's what she said, and I'm trying to explore that.

THE COURT: So the question is not beyond the scope of your direct.

MR. FOLEY: Question, if it refers to a different consignment agreement altogether, that would be beyond the scope of my direct?

THE COURT: I'm not going to give an advisory ruling, but I believe the question refers to the Yellow Rose diamond transaction, Mr. Cataldo?

MR. CATALDO: Absolutely.

THE COURT: Okay.

MR. FOLEY: Then can I ask that the question --

THE COURT: It does now.

MR. FOLEY: -- be made that specific?

THE COURT: Okay.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Mr. Cataldo is going to rephrase the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

question anyway.

BY MR. CATALDO:

Q    I'm going to try to make it easier for you.  You told us that in Labor Day of 2018, the Yellow Rose was in the office in Birmingham, right?

A    Yes.

Q    And there are pictures of you with it on your hand, right?

A    Not from that first -- not from the first time I saw it.  Those were taken in November.

Q    In November?

A    Yes.

Q    Okay.  So, and it was -- you said it was your understanding that William Noble was either owning or representing the Yellow Rose diamond?  Is that what you said?

A    Yes.  When items come -- from our office staff, when items come in, Mr. Noble had been sending items in for a couple of years, and when items -- whenever items come in, the office staff -- I didn't see a memo, but the office staff, they have to have paperwork of some kind that accompanies something coming in from someone in the industry.  They don't just send it with no paperwork of their intent of what they're doing.  So --

Q    Okay.  And the intent was what?  That --

212-267-6868                    Veritext Legal Solutions                516-608-2400
www.veritext.com

A     Well, I assume --

Q     -- your company was going to sell it, and would be, some money would be paid to Mr. Noble under this consignment agreement?

A     I didn't see the paperwork.

Q     Okay.  So you don't know the actual legal relationship between the DuMouchelle Jewelry company that you've been calling, you, you've been using the plural our or we, and Mr. Noble's company?

A     I know what -- I know what --

MR. FOLEY:  Objection, Your Honor.  My client during direct exam at no point used the expression our or we.  In fact, I in particular defined the entity as business, the business, and then referred to it after that as the business.  It's simply an improper characterization of my client's testimony, and it has consequences.

THE COURT:  But what's the basis of the -- of your objection?

MR. FOLEY:  That it's an improper mischaracterization of my client's testimony on cross-examination.

MR. CATALDO:  Your Honor.

THE COURT:  Mr. Cataldo.

MR. CATALDO:  That's exactly what she said during her examination earlier, and this continued interference by

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Counsel has to stop. These are not proper objections, none of them.

THE COURT: One second. Is there a basis in the law, sir, for your objection?

MR. FOLEY: A lack of foundation for his question. It's a mischaracterization of what she said in his question. He said the business that you've referred to a lot as we and our, that's nowhere on the record.

MR. CATALDO: That's not a proper --

MR. FOLEY: That is a valid objection.

THE COURT: Mr. Foley, the objection is overruled. Have a seat. Mr. Cataldo.

BY MR. CATALDO:

Q    Thank you. So is it your testimony you don't know the legal relationship between DuMouchelle Jewelers and Mr. Noble's company as it pertains to the sale of the Yellow Rose?

A    I don't know the details.

Q    Okay. So was the Yellow Rose diamond in the office of DuMouchelle Jewelers at any time in the year, calendar year 2019?

A    I don't know.

Q    Okay. So at the time DuMouchelle Jewelers filed bankruptcy, was the Yellow Rose diamond in the office of DuMouchelle Jewelers?

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

A    I don't know.

Q    So you've testified it was in the DuMouchelle Jewelers office at one point.  You saw it, it was on your hand.  When did it leave?

A    The last that I knew that it left was before in December of 2018, because at Christmas, we went to Florida for Christmas.  And I believe that William Noble wanted to -- he said he wanted to show it to somebody, is what I was told.

Q    Okay.  And so it's your understanding --

A    I was told this by the staff.

Q    Your understanding is after December of 2018, the Yellow Rose was sent back to Mr. Noble?

A    Yes.

Q    Is that right?

A    Yes.

Q    Okay.  And after it was sent back to Mr. Noble in December of 2018, did you ever see it in the DuMouchelle office ever again?

A    Not that I recall, but I didn't -- not that I recall, but I -- You know, I didn't -- every time

Q    Just answer the question, please.

A    I didn't go in the safe every time I came in the office.  I didn't look through everybody's iteMs. I mean --

Q    So --

212-267-6868              www.veritext.com              516-608-2400

A    The book was still there.  That monograph was still there.

Q    Your Honor, move to strike as non-responsive.  I just asked her if the stone was still there, and she's volunteering all this information about the book and things that I didn't ask her about.

THE COURT:  I'm not going to strike that, and I have a clarifying question to ask, if I may.  Ms. Adducci, you said earlier that the book goes with the diamond.

MS. ADDUCCI:  Right.

THE COURT:  So why was the monograph still --

MS. ADDUCCI:  Because I remember the book was still there.  I remember they had it sitting on -- it was such a big book, they had it sitting on the counter.

THE COURT:  So the diamond -- is it your testimony that the diamond was sent back to Mr. Noble, you believe in December of 2018?

MS. ADDUCCI:  Yes.

THE COURT:  Not the monograph?

MS. ADDUCCI:  Yes.  It was over the holidays. Yes.  Because everybody had a scanned copy of the -- and it was my -- it was my understanding that it was coming back.

BY MR. CATALDO:

Q    Well, isn't it true that Mr. Noble terminated his relationship with DuMouchelle Jewelers sometime at the end

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

of 2018?

A    I've never had a conversation with William Noble.  I've never met him.  I don't know --

Q    Okay.

A    -- any details of that.

Q    Were you aware that on January 9th of 2019, Mr. Noble filed -- Well, not Mr. Noble personally, but his company filed a lawsuit against DuMouchelle Jewelers in Texas, claiming they were owed $7 million?

A    I didn't.  I was not aware of that.  I've come to know that now, but I did not know that -- I did not know that for a long, long time.

Q    Okay.  So --

THE COURT:  What's the date on that, the termination?

MR. CATALDO:  It's January 9th.  It's in the Proof of Claim that Mr. Noble's company filed.

THE COURT:  In this case?

MR. CATALDO:  Yes.

THE COURT:  Okay.  But-

MR. CATALDO:  January 9th, 2019.

THE COURT:  Is that -- is that the date of the lawsuit or the date of terminating the relationship?

MR. CATALDO:  That was the date of the lawsuit.

THE COURT:  So presumably the termination of the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

relationship occurred before.

MR. CATALDO: Correct.

THE COURT: Excuse me. Thank you.

BY MR. CATALDO:

Q So when the conversation came up about -- let me -- let me try it this way. You recall, we looked at J10, in this case, which is the contract that was signed between Mr. Ritter and your husband relating to the Yellow Rose, correct?

MR. FOLEY: Objection, Your Honor.

THE COURT: Wait, I didn't even hear the question. Mr. Cataldo, keep your voice up.

MR. CATALDO: I asked her if she remembered Exhibit J10.

MR. FOLEY: Your Honor --

THE COURT: Mr. Foley.

MR. FOLEY: -- it exceeds the scope again of my direct, my cross-examination. At no point did we --

MR. CATALDO: He has tried to get the witness to say that there was nothing unusual about this transaction. I'm entitled to explore that with the witness.

MR. FOLEY: She didn't testify that -- I didn't try to get her to say that there was nothing unusual generally about the transaction. My line of questioning specifically related to the time she opened the bank account

212-267-6868                    www.veritext.com                    516-608-2400

and the time that she made the transfers.  We didn't delve into Exhibit J10 or anything about the relationship with Joe.

THE COURT:  You asked her a question about the money coming to the LLC directly.  And this is a question to explore along that line.  You asked her the question on your direct, if the money was going to the seller directly, would she have opened the Bank of America account?  And I believe her answer was no. Do you remember that, Mr. Foley?

MR. CATALDO:  Yes.

THE COURT:  Okay.  So this explores the contours of that, like where the money is going.  The Court's going to allow the question.  The objection is overruled.

BY MR. CATALDO:

Q    Ms. Adducci, you recall you read this to your son.  Is that right?

A    I recall I read something that looked like this, but now that I think of it, this would have been -- this was the final rendition, and even Tom Ritter said himself, he and Joe were putting together.  He would send Joe something, and then Joe would send it back.  I remember reading one page to my son.  This has two pages, and this has Joe's signature. I did not read -- this is the final one because they signed this, so I couldn't have seen this because this was done at the end.  So I saw something that talked about --

212-267-6868                    www.veritext.com                    516-608-2400

Q    You're changing your testimony from what you said the other day.

A    Well, you know, my memory of seeing something that they talked about it's -- this is a long time ago, so to remember every, exact thing of the way you saw it, it, it's -- I remember reading something about what-- and I remember Tom had sent it, so Tom has sent this.  And I remember reading it and asking Joey, you know, "What did you think?" But this is the final one, so this has to be -- I couldn't have read this to him because I didn't read it to him after it was all over.  This is their final agreement.

Q    Okay.  Is there some other agreement in the exhibits that your Counsel has?

A    No, but I'm just -- you know --

Q    Yes.

A    -- I'm really just telling the truth of I saw a -- I just remember it being one page.  But it could have been -- it could have included all this.  I don't know.  I just remember that I asked him, and he just said, "Just make sure, mom." So I turned to Joe and I said, "Is there anything wrong with this that I should be worried about?" And he said, no.

Q    So who was the actual seller in January of 2019 of the Yellow Rose?

A    I didn't know.  I don't know.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    So you never said to your husband, when you saw Exhibit 10, "Who are you buying it from for 12 million?"

A    I assumed William Noble.  I didn't -- They were -- I didn't ask him.  William Noble was still emailing Joe after he was sentenced and texting him and calling him and trying to -- during COVID, I was -- Yeah.  That's a whole another story.  William Noble's a whole another story.  I didn't -- I didn't think about that part.  I was thinking about the diamond, and I was thinking -- I really didn't go into the details of how they were structuring it, except that I knew that I saw there was an escrow account.  So if I had been handling this, I would've -- But I asked Joe, "Why is it not going into an escrow account?" He said, "Because Tom doesn't want it to." That was his --

THE COURT:  Mr. Cataldo, I have a couple of clarifying questions, if I may.

MR. CATALDO:  Go ahead.  Sure.

THE COURT:  Okay.  So Ms. Adducci, you just said that no matter what version --

MS. ADDUCCI:  Yeah.

THE COURT:  -- of this contract-

MS. ADDUCCI:  Yeah.

THE COURT:  -- you read to your son, Joey Adducci --

MS. ADDUCCI:  Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: -- you knew that you saw a reference to an escrow account, correct?

MS. ADDUCCI: Yes.

THE COURT: Okay.

MS. ADDUCCI: Yes, I do remember an escrow account being discussed, and this must have been where I saw it.

THE COURT: In the version of---

MS. ADDUCCI: Must have been --

THE COURT: Okay.

MS. ADDUCCI: -- because I don't know where else I would have seen that, but I was -- I overheard that, and I felt comfortable that it was going in an escrow.

THE COURT: All right. I have another question. With whatever version of the contract you read to your son, Joe Adducci, were you aware at that moment, of the $12 million purchase price?

MS. ADDUCCI: I believe so, yes.

BY MR. CATALDO:

Q   So going back to Exhibit 10, this also says, "The funds will be released to the seller upon receipt of the diamond by you on my behalf." Isn't that what it says?

A   Yes.

Q   Okay. So on February 7th, when the money was being taken out of the Bank of America account, did DuMouchelle Jewelers have the diamond, the Yellow Rose?

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

A    I don't know.  I didn't know at that time.  These were strings of things that were -- threads of things that were happening.  But because I wasn't directly involved with each of these situations and setting them up, I was doing my own business with my own customers of our normal business.  I didn't have to worry about Joe before.

Q    So did you ever ask Joe --

THE COURT:  Wait.  Excuse me, Mr. Cataldo.  I didn't hear that last part.

MS. ADDUCCI:  I didn't -- I didn't -- You know, in the 25 years, Joe was always the one that crossed his T's and dotted his I's, and I didn't worry about it.  If he -- I -- you know, he was that person that -- and it was hard also because I was married to him, so I trusted him.  There's a trust factor on both levels.

BY MR. CATALDO:

Q    So during your direct by Counsel, you said you were excited for Tom and you wanted -- you wanted to be extra careful for Tom, right?

A    Yes.

Q    Okay.  So when you saw the list of all of these different people that were getting Tom's money, there's got to be 13 -- plus 13 checks.  Now we've got the two interbank transfers.  There's those 15 different people.

THE COURT:  Three interbank transfers.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 83 of 255
212-267-6868                Veritext Legal Solutions               516-608-2400
www.veritext.com

BY MR. CATALDO:

Q    Three interbank, but they're two different -- because two were to Noble.

A    Right.

Q    Did you think, "Hmm, boy, I need to be careful.  I'm going to call Tom and ask him if this is all on the up and up." Did you do that?

A    I did not do that at that time.

Q    And can you tell us why there was such a rush on the 7th of February to get all this done that day?

A    I don't know why.  I don't know -- for me, I know to go to the bank, I was -- I mean, I was at a conference.  I wasn't there to do this.  I was there for other reasons.

Q    So did DuMouchelle Jewelers ever have the right to sell the Yellow Rose diamond in calendar year 2019?

A    I don't know.

Q    So, is it your testimony under oath that you think that Joe, your husband, did something to your email account to prevent you from getting copies of Exhibits 45, 46, 47, and 48, from Mr. Ritter?

THE COURT:  Hold on, Mr. Adducci.  We have an objection from Mr. Foley.

MR. FOLEY:  Just an objection that it exceeds the scope of my direct examination.

THE COURT:  Sustained.  Mr. Cataldo, that was not

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

in --

MR. CATALDO: Okay. All right

THE COURT: -- his direct exam. I apologize. I should have asked you if you had a response, but The Court was listening very carefully.

MR. CATALDO: Your Honor, can I suggest we take our lunch break now, and I'll continue thereafter? This would be a good time for that.

THE COURT: Perfect. And when would you like to return?

MR. CATALDO: 1:00?

THE COURT: Mr. Foley, what do you think about that?

MR. FOLEY: I would be happy to just continue with her examination --

THE COURT: But the staff needs to eat, so we need to take a lunch break. They work very hard, and Ms. Adams Williams needs to keep up her strength to do her job. So we're --

MR. FOLEY: Understood, Your Honor

THE COURT: -- going to take a break.

MR. FOLEY: Thank you.

THE COURT: And thank you, Ms. Adams Williams, for putting up with us. So we'll reconvene at 1:00 Okay?

MR. FOLEY: Thank you, Judge.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT CLERK: All rise. Court is in recess until 1:00.

(Back on the record.)

All rise. Court is back in session for the Honorable Lisa S. Gretchko.

THE COURT: Please be seated.

THE COURT CLERK: Recalling case number 2004381, Ritter v. Adducci.

MR. CATALDO: Christopher Cataldo, Kim Clayson for the plaintiff.

MR. FOLEY: And good afternoon, Your Honor. Patrick Foley on behalf of the defendant.

THE COURT: And let the record show that Mr. Ritter and Ms. Adducci are in the courtroom.

All right, Mr. Cataldo.

MR. CATALDO: Thank you, Your Honor. Recalling Ms. Adducci.

THE COURT: Ms. Adducci, you're still under oath, ma'am.

MS. ADDUCCI: Yes.

CROSS-EXAMINATION

BY MR. CATALDO:

Q    So, Ms. Adducci, I'm going to ask you some questions about your testimony that you didn't see anything out of unusual about the transactions on February 5thand February

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

7th of 2019.  Ms. Adducci, did the LLC, the jewelry company, did it set up trust accounts to hold customer deposits?

A    Not that I know of.

Q    Okay.  So it would be normal --

THE COURT CLERK:  One second, Judge.  We're having a problem with the audio.  One second.

THE COURT:  One second.

MR. CATALDO:  Okay.

THE COURT:  We're having a technical issue.

THE COURT CLERK:  We're all set.

THE COURT:  Okay.

BY MR. CATALDO:

Q    Okay.  So Ms. Adducci, are you saying it would be the normal practice for the LLC to commingle customer deposits with the money in operating accounts where the LLC was paying its expenses?

A    I don't really understand the question.

Q    Okay.  So you understand that the company had bank accounts that it used to pay its expenses, right?

A    Yes.

Q    Okay.  And you've talked about how from time to time, you even wrote checks on the Bank of America account, right?

A    Yes.

Q    Okay.  So and you knew the company has bills it has to pay, right?

212-267-6868          www.veritext.com          516-608-2400

A    Yes.

Q    It has electric bills, payroll, whatnot, and it has --
it had operating accounts from time to time, right?

A    What is an operating account?  What do you mean?

Q    Account where you're paying your -- your normal
everyday expenses.

A    A bank account.  Yes.  Yes.

Q    And are you -- is it your testimony that it was the
normal practice for DuMouchelle Jewelers, LLC, to take
customer deposits and commingle them into those operating
accounts where you were also paying the company expenses?

A    With the -- Over the years, Joe was handling those
accounts at that time, but over the years, we had always
had, like, two bank accounts, a smaller bank and a larger
bank.

Q    So what was the smaller bank for?

A    Smaller bank was just to be able to talk to the bankers
and to be able to -- you know, they were like a closer bank.

Q    Okay.  Well, you're not really answering my question.
My question was, was it the normal practice when customers
would put a deposit up to buy a piece of jewelry or for
whatever, to take their money and deposit it into bank
accounts where that bank account is also being used to pay
the company's payroll and utilities?

A    Yes.  Yes.

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

Q    It was.  See, that would be the normal practice to commingle customer deposits.  That's your testimony?

A    Yes.  I mean the word commingle I'm not a fan of, but we didn't -- we were not a huge company.  We had -- right, we had a couple of checking accounts and bank accounts.

Q    So it's your testimony you didn't see anything wrong with taking Mr. Ritter's $12 million deposit for the purchase of the Yellow Rose and depositing into a bank account where you're going to be using that to pay other expenses.

MR. FOLEY:  Objection, Your Honor.  The question assumes facts not on the record.

THE COURT:  Mr. Cataldo, you're --

MR. CATALDO:  I don't think it -- I think it's a completely accurate question.  I don't know what he's talking about.

MR. FOLEY:  I can specify if the Court would like.

THE COURT:  Okay.

MR. FOLEY:  He used the phrase, "Taking his money and depositing it into the account." That is not an accurate description of what transpired.

MR. CATALDO:  It is exactly what transpired, and these are not proper objections.

MR. FOLEY:  But there can't be --

THE COURT:  Okay.  okay.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: -- a more proper objection than that.

THE COURT: Everyone look at me. I think the objection is to the word taking his money. And is that correct, Mr. Foley?

MR. FOLEY: And making a deposit. That it was a wire transfer.

MR. CATALDO: They did take his money into that account.

THE COURT: Okay.

MR. CATALDO: They did take his money.

THE COURT: Can you --

MR. CATALDO: Okay.

THE COURT: Can you rephrase the question, Mr. Cataldo, please?

MR. CATALDO: All right.

THE COURT: Objection sustained.

BY MR. CATALDO:

Q    So you didn't see any problem with having Mr. Ritter's deposit go into the bank account that the company was going to use to pay operating expenses?

A    With the knowledge that I had at that time, there were -- there were no red flags that I -- that I knew about or that I saw at that time. With the knowledge that I had of what was going on, I didn't see a red flag.

Q    Okay. Thank you.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    And I was not structuring the deal, so I didn't know the details.

Q    But you had -- you had read the contract though, correct?  Correct?

A    I don't know if I'd read that contract, but I had read a contract.

MR. CATALDO:  Okay.  Thank you.  Nothing further.

MR. FOLEY:  Let me just a few quick redirect questions.

REDIRECT

BY MR. FOLEY:

Q    The contract that Mr. Cataldo just referenced, the one that's been on the screen in this courtroom.

A    Yes.

Q    Do you recall what it says regarding who is to establish what kind of account?

A    That Tom was to establish an escrow account.

Q    What do you recall of your participation in changing his mind from establishing an escrow account?

A    Repeat that question.

Q    What do you recall of your participation in changing his mind to not establishing an escrow account?

THE COURT:  Okay.  Stop.

MR. CATALDO:  Leading.

THE COURT:  Don't answer.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Leading, and also assumes facts not in evidence. There was no testimony that Mr. Ritter's mind was changed on that point.

THE COURT: I don't even know who the his is. Could you explain?

MR. FOLEY: I'll first clarify the question. What do you recall of your participation in changing Mr. Ritter's mind about depositing his money into an escrow account that he created?

THE COURT: Okay. Stop. Wait for the objection, Mr. Cataldo.

MR. CATALDO: This fact's not in evidence, and it's also leading.

MR. FOLEY: Your Honor --

THE COURT: it's leading, and it assumes facts in evidence because there's been no testimony that it was Mr. Ritter who changed his mind. The testimony was that Joe told Ms. Adducci that there had been a change, but there's been no testimony from Mr. Ritter that he ever changed his mind.

MR. FOLEY: Yes, there was. Mr. Ritter specifically testified that he decided that he didn't want that and that he didn't want to -- that he wanted to wire directly to a seller.

MR. CATALDO: Not accurate.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: We can go back to the transcript. He --

THE COURT: Not to the out -- he never changed his mind to the effect of saying he wanted to wire to the LLC, and that's what Ms. Adducci's testimony earlier, yesterday, she testified that Joe DuMouchelle told her that Mr. Ritter changed his mind and wanted the money to flow through the LLC or words to that effect. Do you remember that, Mr. Foley?

MR. FOLEY: I do remember that.

THE COURT: Great. So you're assuming facts not in evidence in your question.

MR. FOLEY: Did Mr. Ritter testified that he decided to no longer set up an escrow account and to wire the money directly to the seller. We acknowledge he didn't wire the money to the seller, but that requires a change of his mind.

THE COURT: Ms. Clayson is standing.

Ma'am?

MS. CLAYSON: Yes, Your Honor. Mr. Ritter testified that he changed the direction of the money because of Joseph DuMouchelle. He never testified that it had anything to do with Melinda Adducci changing his mind.

THE COURT: Right. So, Mr. Foley, your question assumes facts not in evidence, and it's leading. So please

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

-- the objection is sustained.  Please try again.

MR. FOLEY:  I'll move on.

BY MR. FOLEY:

Q   Ms. Adducci, if you knew at the time of the transactions, and let me be clear about that, on February 5th when you opened the bank account, on February 7th when you signed a signature card, on February 7th when you signed the checks, and on February 7th when you presumably FedEx those checks back down to back up to Joe.  If you knew then what you know now, what impact would that have had on what you did that day?

A   I wouldn't have done them.  I wouldn't have -- I wouldn't have-

THE COURT:  I can't hear your answer, ma'am.

MS. ADDUCCI:  Sorry, you know, my throat.

I wouldn't have done them.  I would have not -- I would have not done them.

THE COURT:  What's to them?  You wouldn't have done what?

MS. ADDUCCI:  I wouldn't have done any of what he just listed.

THE COURT:  Okay.

BY MR. FOLEY:

Q   And if after you had done it, immediately after you had learned what you know today, what would you have done?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    I would've called Tom, and I would've done what everybody in this courtroom says I should have done, and I would've tried to stop -- stop what Joe was doing.

MR. FOLEY:  Thank you, Your Honor.  No further questions.

THE COURT:  Hang on, I'm making a note.

My apologies.

Okay.  There are no further questions, apparently, for this witness?

MR. FOLEY:  No, Your Honor.

THE COURT:  All right.  Ms. Adducci, you may stand down.

MS. ADDUCCI:  Thank you.

THE COURT:  Thank you.

MR. FOLEY:  And, Your Honor, defense rests.

THE COURT:  Defense rests.

MR. FOLEY:  Thank you.

THE COURT:  Just a second.

MS. CLAYSON:  Your Honor, the plaintiff would like to put on a short rebuttal if that would be okay with the Court.

THE COURT:  I was going to ask, does the plaintiff have any rebuttal?

MS. CLAYSON:  Yes.

THE COURT:  Yes.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MS. CLAYSON: Your Honor, I'd like to call Mr. Thomas Ritter back to the stand.

THE COURT: So for rebuttal, correct?

MS. CLAYSON: What was that?

THE COURT: For this rebuttal?

MS. CLAYSON: For this rebuttal. Thank you.

MR. FOLEY: Your Honor, can we have a specific description of what is being rebutted?

THE COURT: I suppose we get to listen to the questions. What are you talking about, Mr. Foley?

MR. FOLEY: In order to call a rebuttal witness, I believe they have to identify what they're rebutting. They've noted nothing in particular during my client's testimony that required rebuttal.

THE COURT: First --

MR. FOLEY: And they've offered nothing.

THE COURT: -- the Court to a rule that requires this?

MR. FOLEY: Your Honor, I'm sorry, I don't have the rules open in front of me right now.

THE COURT: Ms. Clayson, are you aware of a rule?

MS. CLAYSON: I'm not aware of a rule that would require us if there's an objectionable question that then Mr. Foley can raise his objection during the testimony.

THE COURT: Mr. Cataldo, are you aware of a rule

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

along the lines of what Mr. Foley is telling the court?

MR. CATALDO: I am aware of no such rule.

THE COURT: The Court is not aware of a rule that requires the caller of a rebuttal to give you an outline or preview of the issues to be discussed. But, of course, you have your right to object to questions.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Ritter, it's been a few days, so I'm going to ask you to raise your right hand. Sir, do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

MR. RITTER: I do.

THE COURT: Thank you. Please be seated.

DIRECT EXAMINATION

BY MS. CLAYSON:

Q    Good afternoon, Mr. Ritter.

A    Good afternoon.

Q    You heard Ms. Adducci's testimony this morning, correct?

A    Yes, I did.

Q    And did you hear what she said about your relationship with Joseph DuMouchelle?

A    I did.

Q    And do you recall doing oil business with Mr.

212-267-6868                         www.veritext.com                         516-608-2400

Veritext Legal Solutions

DuMouchelle?

A    I really don't recall doing any oil business with him. I may have, and briefly, I know he had -- I don't know how to put it, bought leases from a lot of minerals that either the Hegge family or maybe the Adducci families too had, and participated in wells with them.  I did drill two wells in the 90s, if I had offered through Ruben had -- Ruben Hegge, Lindy's father might have mentioned something to Joe, and Joe may have wanted to participate, and if so, I would have sent him something, and if he did, it happened, but I don't really recall.

Q    Do you recall flying in an airplane with Mr. DuMouchelle?

A    I don't recall boarding an airplane at all.

THE COURT:  Wait, I didn't understand that question.  I need you to speak up.  Pull the microphone towards you.

MS. CLAYSON:  Sorry, Your Honor.

THE COURT:  Can you speak directly into the microphone?

BY MS. CLAYSON:

Q    Do you recall flying in an airplane with Mr. DuMouchelle?

A    I do not.

Q    Do you recall spending time in a hot tub with Mr.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

DuMouchelle?

A    I don't really recall any of that, If I had I'm sure Lindy would've been there as well, but I just -- I don't recall those.

Q    Okay.  And what was the source of your relationship to Joe?

A    It was solely based on my relationship with Lindy.  She introduced him to me as her husband at some point, and I think while Ruben was still living, there was probably some communication about oil and gas.  Not a lot, because I only saw Joe briefly a few times.  And in the '90s I was working for a company, so my time wasn't my own.  So it was just a very brief relationship.  When they were in town together, I would see him maybe once.  And in total, I don't think they -- I saw them maybe three or four times, that would be about it, up until 2008.

Q    Thank you.  And do you recall some discussion about January 25th, 2019 between you and Ms. Adducci?  Who called who?

MR. FOLEY:  Objection, Your Honor.

MR. RITTER:  I do recall that --

THE COURT:  Okay.  Stop.  Mr. Ritter, we need to deal with the objection, sir.

MR. FOLEY:  Just objection as leading.

THE COURT:  The objection is that it's leading

what?  She asked if he recalled.

MR. FOLEY:  It was a yes/no question feeding the witness specific dates of the call, and then at the end even saying, "And who called who?"

MS. CLAYSON:  Your Honor, this was a foundational question just to see if Mr. Ritter recalled testimony that was discussed about the phone call related to the January 25th, 2019 email.  It was simply trying --

THE COURT:  Wasn't that a package email?

MS. CLAYSON:  That's correct.  And it was simply trying to bring the witness up to speed as to that testimony.

THE COURT:  One second.  Mr. Foley, why do you think that's leading?

MR. FOLEY:  Your Honor, I believe it's leading because it specifically suggested the information to the witness and called for a yes/no conclusion -- a yes/no answer.

THE COURT:  the Court disagrees with you, sir. The objection is overruled.

Please continue, Ms. Clayson.

MS. CLAYSON:  Mr. Ritter, do you need me to restate the question?

THE COURT:  I think we all do.

MS. CLAYSON:  Okay.

Veritext Legal Solutions
212-267-6868                           www.veritext.com                           516-608-2400

MR. RITTER: Please repeat.

MS. CLAYSON: Sure.

BY MS. CLAYSON:

Q   Do you recall testimony that you heard about a January 25th, 2019 phone call, and who called who?

A   I do recall that.  I believe you're asking about my testimony or Lindy's testimony.

Q   I believe it was Ms. Adducci's testimony that you called her --- I'm sorry, that, yeah, that you called her.

A   I do recall that, yes.

Q   And did you do anything after you heard that testimony?

THE COURT:  I have a clarifying question.

MS. CLAYSON:  Sure.

THE COURT:  Ms. Adducci's testimony was that Mr. Ritter called Joe, and Joe got her on the line.

MS. CLAYSON:  Yes.  Thank you.

THE COURT:  I would like to be real clear here.

MS. CLAYSON:  You are correct, Your Honor.

THE COURT:  All right.

BY MS. CLAYSON:

Q   So you heard Ms. Adducci say that you called Joe, do you recall that?

A   I do recall that, but I don't believe that's correct.

Q   Okay.  And that Joe put Lindy on the phone with you.  Is that what you recall hearing?

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 101 of 255
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    I recall hearing that as well, and I don't believe that's correct either.

Q    And what did you do to determine that that's not correct?

A    Well, in my testimony earlier, opposing counsel asked me if I had checked my phone records, and at the time, I had not.  And thereafter, I called my office administrator --

MR. FOLEY:  Objection, Your Honor

MR. RITTER:  -- and asked her --

THE COURT:  Okay.  Mr. Ritter.  What's the objection, Mr. Foley?

MR. FOLEY:  The response is going to call for hearsay and reference to an exhibit not in evidence here today, which document would constitute hearsay even if it had been presented.

MS. CLAYSON:  Your Honor, if we're presenting an exhibit, which we intend to do, it's a rebuttal exhibit.

THE COURT:  It's a rebuttal exhibit.  And is it a business record?

MS. CLAYSON:  It would be a business record.  It's the billing information from the telephone company that would show incoming and outgoing calls.

THE COURT:  Well, it's in -- okay.  Well, your question is -- your objection is what, Mr. Foley?

MR. FOLEY:  Is getting to the fact that he went

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

and apparently pulled his phone records during the hour of lunch --

THE COURT: What's the problem with that question?

MR. FOLEY: The question is eliciting an answer that is hearsay.

THE COURT: No. The hearsay might be, maybe, is what did they say? But the fact that he might have looked for his phone records, that's an activity that Mr. Ritter personally engaged in in looking for or obtaining phone records. Is it not?

MR. FOLEY: It is. I think --

THE COURT: All right

MR. FOLEY: -- we're allowed to see where the answer is going, and he was heading in that direction. But I'll wait then and make my objection on the next question.

THE COURT: All right. The objection is overruled. Please proceed.

BY MS. CLAYSON:

Q    So Mr. Ritter, you said you looked at your telephone records?

A    Yes. This wasn't over lunch. The day that I testified and opposing counsel asked me that question, that evening, I called my secretary to look for that billing information if it came in, and she did so and sent it to me.

Q    Okay. And are the -- is the billing record or the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

billing and phone records something you regularly keep in your business?

A    We didn't have them in the business.  And as I testified, I think I believe I said I tried to get them and hadn't.  And they came in, and then I had that record.

Q    And did that tell you anything about who called who?

A    It did.

Q    What did you learn?

MR. FOLEY:  Objection, Your Honor.  Hearsay.  The answer inherently calls for Mr. Ritter to testify on what he read on a hearsay document.

THE COURT:  On an out-of-court document?

MR. FOLEY:  An out-of-court document.

THE COURT:  Okay.  Ms. Clayson?

MS. CLAYSON:  Your Honor, it -- I mean, it's

THE COURT:  You want to take a minute?

MS. CLAYSON:  Yeah.

THE COURT:  Why don't you take a minute?

MS. CLAYSON:  Okay.  Your Honor, I believe I can lay a foundation on business records.  I still need to do that, but I believe I can do that.

THE COURT:  Well, if it's business record or records of a regularly conducted activity.

MS. CLAYSON:  Yeah.

THE COURT:  Is that -- you're saying that it would

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

qualify for an exception to the hearsay rule, and you're focused on Federal Rule of Evidence 803?

MS. CLAYSON: That's correct, Your Honor, and it would require further foundation, which I can do that before Mr. Ritter testifies to what it says.

THE COURT: Mr. Foley is still standing.

Sir?

MR. FOLEY: Your Honor, she already elicited the testimony if it was a regularly kept record, and his response was, no, that he had to go and look for it and had to find it.

THE COURT: That doesn't mean it's not regularly kept. It just means he didn't have it at his fingertips, sir.

MR. FOLEY: Okay. We're five years into discovery in this case, and this document hasn't been produced.

THE COURT: Mr. Foley, objection's overruled. Have a seat, sir.

MR. FOLEY: Understood, Your Honor. Thank you.

THE COURT: Thank you.

BY MS. CLAYSON:

Q    And are the phone records something that you know that are regularly kept by the phone company?

A    Oh, they are, yes.

Q    And that contains a log of information about who called

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

in and who called out.  Is that correct?

A     Well, my understanding of it is that that does show up, yes.

Q     Okay.

A     I didn't know it at the time, but --

Q     Okay.  So you do have that record that you were able to obtain?

A     Yes.

Q     And Mr. Ritter, when you reviewed that record, what did it tell you about your phone calls on January 25th, 2019, with respect to phone calls with Melinda Adducci and Joseph DuMouchelle?

A     It shows, as I testified earlier, that I called Joseph DuMouchelle, spoke with him.  He said he'd have Lindy give me a call.  Lindy did give me a call about 35, 40 minutes later, and we spoke for about 22 minutes.

        THE COURT:  Hang on.  I need to make a note.  How many minutes did you speak?  For how many minutes did you speak, Mr. Ritter?

        MR. RITTER:  Twenty-two.

        THE COURT:  Okay.  And what's the date of this phone call?

        MR. RITTER:  I didn't hear, please.

        THE COURT:  What is the date of this call?

        MR. RITTER:  January 25, 2019.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON: And Mr. Ritter --

Is the Court ready? I don't --

THE COURT: Yeah.

MS. CLAYSON: Okay.

BY MS. CLAYSON:

Q    Mr. Ritter, how do you know that you received a call from Melinda Adducci that day, based on the phone record?

A    That phone record contained a notation, "incoming call".

Q    And what else? Was there a phone number or some other indication?

A    Lindy's phone number that I had in my phone, which she had given me, was the number referenced by that incoming call.

MS. CLAYSON: Your Honor, can I approach the witness with the proposed rebuttal exhibit?

THE COURT: You have to give it to Opposing Counsel.

MS. CLAYSON: I can do that as well.

THE COURT: Please, and one for the Court, please.

MR. FOLEY: Your Honor, I am going to object to the document being offered.

THE COURT: I haven't even seen it yet.

MS. CLAYSON: Would the Court like to see it?

THE COURT: Yes.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 107 of 255
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

MS. CLAYSON: May I approach? Thank you.

THE COURT: Please.

MR. FOLEY: For the record, I have page 18 only in my hand. That's what I've been handed.

MS. CLAYSON: Your Honor, we're only seeking to admit page 18.

THE COURT: Hang on one second, please. Okay. So you move to -- Ms. Clayson, you move to admit this page that you've handed me, which is page 18 of a paper that purports to be a Verizon bill for the billing period of January 4, 2019, to February 3, 2019.

MS. CLAYSON: That's correct, Your Honor.

THE COURT: Okay, it's got an account number, oh boy, of 380600816-00001? Right?

MS. CLAYSON: Yes, that's correct, Your Honor.

THE COURT: Mr. Foley, your objection?

MR. FOLEY: Thank you, Your Honor. I object on several grounds. First of all, the witness identified it as his telephone records, but it has at the name -- the top, the name Carol Ritter. Second, the document itself constitutes hearsay without exception. Third, it was not disclosed in trial exhibits. This Court made clear in the process of preparation of the joint final pretrial order that it expected no trials by surprise and that it expected any document to be used to be disclosed. And lastly, and I

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

think more importantly, this document would have been responsive to multiple discovery requests that I issued in this case to the plaintiff, and they failed to disclose this document in response to my discovery, and this document would have been available at the time of the discovery responses.

THE COURT: Which discovery request?

MR. FOLEY: This would be the February 27th, 2023, plaintiff's response to defendant's first set of discovery requests to plaintiff, that included both interrogatories and requests for the production of documents.

THE COURT: Give me the request.

MR. FOLEY: Thank you.

THE COURT: And what docket number is it?

MR. FOLEY: ECF number -- let's see here. Your Honor, we don't have the ECF number listed on the joint exhibit. I can look it up in a moment if I can look at the case docket.

MS. CLAYSON: Your Honor, the discovery responses aren't a filed document in this court. They're something that are served unless it's a request to admit. Therefore, they were served on Mr. Foley, but they were not filed with the Court.

THE COURT: In the request?

MS. CLAYSON: The response to the requests.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: But the request was served, so (indiscernible) --

MS. CLAYSON: The request was served. You're right. I'm sorry, Your Honor. Thank you.

THE COURT: Mr. Foley.

MR. FOLEY: Thank you, Your Honor. I'm just looking at the docket for a moment. Your Honor, the requests would be ECF number 69, served on January 27th, 2023.

THE COURT: Hang on. I have to access -- this case is voluminous.

MS. CLAYSON: Can you show -- Mr. Foley, can you show me which request you're referring to?

MR. FOLEY: I'm referring to --

THE COURT: The item is interrogatories request for production of documents. Joseph DuMouchelle and Melinda DuMouchelle, filed by plaintiff Thomas Ritter. That would be Mr. Wolford's filing.

MR. FOLEY: Yeah. Your Honor, I'm looking at ECF number 69 as filed by Patrick Foley on January 27th.

THE COURT: I thought you said 67. So which question?

MR. FOLEY: Your Honor, several questions. First, in response to the interrogatory number four, which requests that the plaintiff describe in detail each false pretense or

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

false representation that he relied on, the response to interrogatory number four contains no mention of the phone call.  Next, and specifically with respect to --

THE COURT:  But we're talking about who called who.  There's no dispute here that the they talked to each other on that date.  We're simply talking about who initiated the call.  You get that, Mr. Foley, don't you?

MR. FOLEY:  Yes, Your Honor.

THE COURT:  Okay, so why would they have to give you that in response to number four, which goes to the substance of the false pretenses and/or false representation?  The objection that Ms. Clayson seeks to admit is a telephone bill that does not contain substantive information about any false representation.  Would you agree, sir?

MR. FOLEY:  Your Honor, yes.  Now onto the request for production of documents.

THE COURT:  Okay.

MR. RITTER:  May I speak to my counsel?

THE COURT:  Not right now, Mr. Ritter.

Okay.

MR. FOLEY:  Your Honor, request for production number two calls for "a copy of any and all documents or communications or correspondence between you and any third parties from the past six years prior to the petition,

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 111 of 255
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

excluding any such correspondence with any licensed attorney who was retained as your attorney at the time you were consulting, which in any way relates to or discusses either of the defendants or the facts, happenings -- facts, events, or happenings giving rise to your complaint against the defendants." Interrogatory number four requests all documents evidencing or contradicting the allegations described in your complaint.

THE COURT:  Again, this isn't a substantive document, Mr. Foley.  The page 18 is a phone bill.  You were expecting to receive a phone bill in response to your discovery request?

MR. FOLEY:  If they intended to rely on a phone call as a means of saying that my client defrauded Mr. Ritter --

THE COURT:  We're only talking about who called whom at this point

MR. FOLEY:  -- but it's still in reliance of his allegation that there was a phone call, and that -- Whether it was him or --

THE COURT:  It's undisputed that there was a phone call, is it not?

MR. FOLEY:  It is undisputed, but it's --

THE COURT:  Great.  Then what are you talking about?

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

MR. FOLEY: -- being presented to you right now.

THE COURT: Pardon?

MR. FOLEY: Because they're attempting to introduce evidence that was not produced in response to discovery where it belonged, was not produced in the joint final pretrial order, has the wrong name on it, and is hearsay.

THE COURT: Are you done?

Ms. Clayson.

MS. CLAYSON: So Your Honor, first, with respect to the request to produce, we did lodge an objection to that request to produce. There was never a motion to compel or any other effort made. No specific request was ever made for a phone record. And as the Court has recognized, it is stipulated too that there was a telephone conversation on that day, and the complaint alleges that there was a phone call on that day, or around about that day. There's no specific request to produce to prove that that phone call occurred and who called who.

THE COURT: Wait. See, oh, there's no --

MS. CLAYSON: There's no request

THE COURT: -- specific discovery request?

MS. CLAYSON: That's correct.

THE COURT: But that's why you're seeking to admit page 18, is to show who called who as rebuttal to Ms.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Adducci's testimony, so the Court understands it?

MS. CLAYSON: And I know the -- and I just want to respond to the discussion about this is a rebuttal exhibit. We had several conversations with the Court in preparing the joint final pretrial order that we would not need to produce or identify rebuttal exhibits.

THE COURT: Well I'm not sure I recall all of that, but the rule says, "Only listed exhibits will be considered for admission, except for rebuttal exhibits that could not reasonably -- could not be reasonably anticipated before trial or except for good cause shown." So in that context, I recall now that we had a brief discussion. I must admit, a fair amount of time has passed and details have mounted up. The question for the Court is whether this rebuttal exhibit should be admitted, and the standard would be, could it be reasonably anticipated before trial, or is there good cause? Mr. Foley raises another point, which is that Carol Ritter's name appears on this page.

MS. CLAYSON: Yes. That -- Your Honor, I think with testimony, we can identify whose number is here and why the name Carol Ritter appears at the top of the bill.

THE COURT: All right. the Court will note that my telephone -- the bill for my telephone shows up in my husband's name.

MS. CLAYSON: Yeah.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: It just does. But the Court -- Mr. Foley, the name Carol Ritter on the page doesn't render this page for the wrong -- necessarily for the wrong person, and again, my personal cell phone -- the bill has my husband's name on it, not mine.

MR. FOLEY: Your Honor, I think authentication is also an issue.

THE COURT: Well, he'll authenticate it in a minute.

MS. CLAYSON: Yeah.

THE COURT: Why don't we try and authenticate it first? I need to know it's the correct phone number. I don't want to later find out that we've gone through all this to admit it, and then in fact, that is Carol Ritter's phone number, and then she picked up the phone and called Melinda. So let's get context. Have a seat, Mr. Foley. We're going to do some authentication.

MR. FOLEY: Your Honor, may I just ask then if we're going to proceed, can we have the full phone bill so that we can see the cover of it and who it's addressed to and sent to, if it has multiple lines on it, et cetera?

THE COURT: Why is that important, sir?

MR. FOLEY: Because it would help identify whether or not this is Carol's phone bill or Mr. Ritter's phone bill, and it would be the complete evidence instead of one

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

page from the phone statement.

THE COURT: Have a seat, Mr. Foley. Let's see if we can authenticate it first with the information on this page.

MR. CATALDO: Your Honor, we have the full month bill, so --

THE COURT: You've got the whole bill? Okay

MR. CATALDO: We can do that if that will help the situation.

THE COURT: Okay.

MR. CATALDO: -- and here, I'm going to --

MS. CLAYSON: I will say though, Your Honor, I mean, I think, you know, we're just trying to focus on what happened on January 25th in terms of the calls. We're not trying to prove the whole entire phone record, but just the phone record that occurred on January 25th, which begins and ends --

THE COURT: Mr. Foley has asked for the whole phone bill.

MS. CLAYSON: Sure.

THE COURT: Mr. Cataldo has handed it to him.

MS. CLAYSON: Okay.

THE COURT: If it's available, in the interest of completeness and to assuage Mr. Foley's concerns, do you have a problem giving him the whole phone bill?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON: Well, Your Honor, I would just simply ask that Mr. Foley not utilize the information other than for the evidentiary purpose today. There's many phone numbers on the phone record. So I would only ask that it be for limited purposes of the evidence today.

MR. FOLEY: Again, in response to my interrogatory number nine where I asked for all documents evidencing any communications or correspondence between the plaintiff and the defendant, if they had filed a motion for protective order --

THE COURT: They objected. She said they objected

MR. FOLEY: They incorporated general objections and then reserved the right to amend.

MS. CLAYSON: We didn't just do general objections. We did include general objections, but we also indicated a specific objection that this was overly broad and unduly burdensome.

THE COURT: And what is that --

MS. CLAYSON: There was no --

MR. FOLEY: These are phone records, Your Honor, that are personal and not business.

THE COURT: What difference does it make?

MR. FOLEY: Regularly kept business records.

THE COURT: And there's other exceptions to hearsay. Have you read rule -- the Rule 803?

MR. FOLEY:  Too many times in my life, but I don't have it in front of me.

THE COURT:  Okay, great.  Have a seat.  Ms. Clayson?

MS. CLAYSON:  May I proceed?

THE COURT:  Yes.

MS. CLAYSON:  Thank you very much.

BY MS. CLAYSON:

Q    Mr. Ritter, who is the name of your phone records kept in?

A    Please repeat, I didn't hear.

Q    Whose name are your phone records kept in?

A    We have a Verizon account in my wife's name, and it contains her phone, one of my son's phones, one of my iPads, and my telephone, which is the 6646 number.

Q    So do you recognize this to be the phone record related to your phone?

A    Absolutely.

THE COURT:  I need to know what devices you just said again.

BY MS. CLAYSON:

Q    What device is this on?  What device is reflected on this invoice?

A    This one right here?

Q    Yeah.  If you look at the top under your wife's name

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

and your -- next to your phone number, what device is identified?

A    iPhone 6s, which is laying on the desk over there.

Q    So you still have that telephone today?

A    Yeah.

Q    Okay.  And --

A    Oh.

Q    Maybe not?

A    I don't know if it's an iPhone 6s.

Q    Okay.

A    It might be a newer model.  I don't know.

Q    Okay.  But at the time, you --

A    It's the same telephone that goes to that phone sitting right there that I've used for decades.

Q    Okay.

          THE COURT:  It might be an iPhone 6.

          MR. RITTER:  Could I clarify a point?

          THE COURT:  Not yet, sir.

BY MS. CLAYSON:

Q    Mr. Ritter, can you just read your full phone number? Read the full phone number on the record.

A    701-570-6646.

Q    And is that your telephone number?

A    Yes.

          MS. CLAYSON:  Your Honor, with that, I would ask

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 119 of 255
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

to move for admission of the rebuttal exhibit as P2.

MR. FOLEY: And Your Honor, I object on all the same grounds.

THE COURT: Well, the completeness of the phone bill should have gone away now, because you've got a complete phone bill now, correct?

MR. FOLEY: Yes.

THE COURT: All right, so that objection has fallen away. So the objections that I've heard about are that the name Carol Ritter appears on the page, that this is hearsay, and that you're surprised, and it should have been produced sooner. the Court --

MR. FOLEY: And authentication.

THE COURT: He just authenticated.

MR. FOLEY: Well, the keeper of records from Verizon has not authenticated. We went through an extensive process of stipulating to joint exhibits to avoid authentication of records, but there's no stipulation on this.

THE COURT: Want to ask another question there?

BY MS. CLAYSON:

Q   Mr. Ritter, is this a part of your telephone record?

A   This record, I did not have when I was testifying on, whenever it was, Monday or Tuesday.

Q   Mr. Ritter, can you just answer my question, though?

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 120 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Is -- does this reflect your telephone record?  Is this your telephone record?

A     This does reflect my telephone record for those days, yes.

MS. CLAYSON:  Thank you.

THE COURT:  All right.  Anything more from you, Ms. Clayson?

MS. CLAYSON:  Nothing further, Your Honor.  I mean, I've already pointed out that there is a specific objection.  There was no telephone record specifically requested.  There was no motion to compel or otherwise an attempt to try to get us to produce additional documents over our objections.

THE COURT:  The Court is looking for a minute in the docket sheet.  Where did you file -- You didn't file the responses to interrogatories because they don't need to be filed unless it's with a motion to compel?

MS. CLAYSON:  That's correct.

THE COURT:  We'll need just a minute to double-check a couple of court rules.  So stand by.

All right.  Currently, the Court is being asked to permit the plaintiff to admit a phone bill that appears to be from Verizon for the billing period from January 4, 2019, to February 3, 2019.  The stated purpose of this is to rebut the defendant's testimony about a phone call that everyone

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 121 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

acknowledges occurred on, what, January 25, 2019?  Is that the date?

MS. CLAYSON:  Yes, Your Honor.

THE COURT:  So everyone knows the call occurred. We're literally spending all this time on who called whom. And because Ms. Adducci said that she did not call Mr. Ritter, and Mr. Ritter believes that to not be the case. Mr. Foley has objected on the grounds that Carol Ritter's name is on the bill.  But the witness, Mr. Ritter, has already explained that in his household, Carol Ritter's name is connected with the Verizon account and that the number, the telephone number that appears on the bill is his cell phone number.  The Court is cognizant of the fact that often in families, the bill comes in the name of the one person associated with the account, and the other devices are on it.  The Gretchko family would be no different on that.  So that objection is overruled.  The hearsay is -- we'll get to the hearsay objection in a moment because the Court is going to make you figure out which objection to hearsay it is.  So the question before the Court right now is, will the Court permit it to be used as a rebuttal exhibit, assuming that the hearsay objection can be overcome?  Our local Rule 7016-1B, subsection 9 says, "Only listed exhibits will be considered for admission, except for rebuttal exhibits that could not reasonable -- could not be reasonably anticipated

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 122 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

before trial or except for good cause shown." the Court finds good cause shown here, because there's no dispute that the conversation occurred. We're spending all this time to figure out who called who and when. But substantively, it's undisputed that the call occurred and occurred on that day. We just are figuring out who initiated the call and perhaps the length of time of the call. So for that, the Court finds there's good cause shown here. And really, the Court did not think it would -- it's reasonably anticipated for this to have become as granular as it has apparently become. But it's a proper rebuttal subject because Ms. Adducci was very clear in her testimony about her one and only call with Mr. Ritter being when Mr. Ritter called Joseph and Joe got her on the line. So the Court's going to permit it because until you heard that testimony, you wouldn't have known that this was a logical thing to produce as an exhibit. However, the Court is going -- the Court's not admitting it without -- the hearsay objection still stands, so explain why it's an exception to the hearsay rule.

MS. CLAYSON: Your Honor, we already addressed the hearsay exception, I believe, because we have laid the foundation that this is a business record that was kept with respect to the phone records are kept and that this is the phone -- Mr. Ritter's phone record. And the Court had already ruled before I -- we even --

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 123 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: I didn't rule.

MS. CLAYSON: I believe you did.

THE COURT: I did not rule --

MS. CLAYSON: Okay.

THE COURT: -- Ma'am. Okay, whose business? There's -- Mr. Foley says there's no one from Verizon here to say it's their bill. Is there another --

MS. CLAYSON: Then it would be the regularly conducted -- a record of regularly conducted activity. And Your Honor, I don't have the Rule 803 in front of me, so --

THE COURT: How do you not? It's in the bankruptcy code. It's at the bank --

MS. CLAYSON: I just don't have it physically in front of me right now, Your Honor.

THE COURT: How about getting a copy?

MS. CLAYSON: It's not -- is it in here, though?

THE COURT: Don't know. We're at a trial, Ms. Clayson. It's got to come with the rules of evidence. One is the code and one is the rules.

MS. CLAYSON: Okay. I found it, Your Honor. Bear with me. Okay. Your Honor, it would be an exception under Rule 803-6. First, based on the record itself, it was made at or near the time that the phone call occurred.

THE COURT: All right.

MS. CLAYSON: I do need to establish that Mr.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 124 of 255
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

Ritter uses this phone for his business, which I can do through testimony. And he's already testified that this is a phone record that's kept -- well, I guess I do need to have some further establishment that this --

THE COURT: How do you mean D?

MS. CLAYSON: So Your Honor, it's a record that he didn't have it immediately with him, but it was a record that he was able to obtain in his business records.

THE COURT: He's not a custodian or another qualified witness, is he?

MS. CLAYSON: He is not the --

THE COURT: Not the custodian of Verizon's records.

MS. CLAYSON: That's correct. And then as to the last one, though, the opponent, there's no -- it does not show that the source of information or method or circumstances indicate a lack of trustworthiness. This is a Verizon phone record. Mr. Ritter has testified that it is the--

THE COURT: It's conjunctive. There's an and.

MS. CLAYSON: Yes.

THE COURT: Between D and E.

MS. CLAYSON: Right.

THE COURT: So you have to meet all of them. All right. While the Court acknowledges that several of Mr.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Foley's objections are not applicable here, and while the Court was willing, under our Local Rule 7016-1B9 to permit this, the Court finds you can't get around the hearsay objection.

MS. CLAYSON: Understood, Your Honor.

THE COURT: Therefore, the exhibit is not going to be admitted.

MS. CLAYSON: Okay.

THE COURT: And for that reason -- However, you've got the witness on this.

MS. CLAYSON: Yes. I have another way to get there.

THE COURT: So we've spent a lot of time here, and the Court seriously wonders if you -- this is not being admitted.

MS. CLAYSON: Understood.

THE COURT: And I think you can just move along. Thank you, Mr. Foley.

MS. CLAYSON: That's true.

THE COURT: Your objection is sustained. Thank you, Your Honor.

MS. CLAYSON: Mr. Foley shared the rule with me. Thank you, Mr. Foley.

THE COURT: Yeah. Mr. Foley, thank you. Are the rules of evidence in the back of the bankruptcy code?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON:  They are.  That's the good news.  I just -- I thought they were in my regular code book, and they're not.  So, thank you, Your Honor.

MR. FOLEY:  And Your Honor, I'll be honest, most people from my generation aren't used to opening the book for the rules.

THE COURT:  The phones.  Yeah.

BY MS. CLAYSON:

Q   Mr. Ritter, I just want to ask you, do you recall on January 25th, 2019, who called you about the Yellow Rose?

A   As I testified earlier, I called Joe.  I asked him to have Lindy call me, and she did.

Q   And what was discussed when Lindy called you?

A   We spent a fair amount of time discussing the diamond itself.  She gave me her thoughts on it.  We talked about the deal, the relative value of that stone, whether it could be -- if it could be purchased at the 12, 12.5, if it would be plausible to get a $16 million to $20 million sale on it.  She confirmed all of that willingly.  I guess we just talked about the diamond and the deal pretty much for 20-some minutes.

Q   Okay.  Your Honor, I have nothing further, other than a redirect.

THE COURT:  I need that answer repeated so I can get it down.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON:  Okay.

THE COURT:  You had several subparts in there.  I want to make sure that I've noted each of the topics you talked about.  I know -- I have the same thing, Mr. Ritter.  So

MS. CLAYSON:  Mr. Ritter --

THE COURT:  Yeah, go ahead.  Ask again.

MS. CLAYSON:  The Judge has asked you to break down each of the components of that phone call for her.

MR. RITTER:  Well, I think initially, you know, again, this was some time ago, but I know when I'm entering into something like this, and I had a specific reason for wanting to speak with Lindy, I was aware of her expertise as an appraiser and a gemologist, both just through family talk and my brother Tim telling me that she was above his grade even.  And my brother Tim is pretty good in jewelry.  But anyway.  So she described the stone and could say only good things about it.  That it's a beautiful stone, remarkable.  WE talked about the color a little bit and size, that it was one of the very largest yellow diamonds.  And I asked her about yellow and white, and she says, "Well, white's one category, but yellow is also a category of its own." I don't know -- I don't think she'd call it a colored stone, but it was a white or a yellow diamond.

THE COURT:  A what kind of stone?

MS. CLAYSON: A colored stone.

MR. RITTER: I think those are like emeralds and stuff like that. But again, I'm not a jeweler or a gemologist. But she just gave me her opinion on the value of the stone, that she had seen it. It was gorgeous and remarkable in its own right. And then I said, "You know, Joe has mentioned doing this deal where you guys had the stone, and it's for sale. He could buy it for -- he said it's could probably be bought for between 12 and 12 and a half. And he thinks he has a pretty good ready market at between 16 and 20 million." And she said, "Yes, from -- "

THE COURT: Excuse me, he said or she said?

MS. CLAYSON: Well, he said that, and then --

BY MS. CLAYSON:

Q    But you were reiterating this on your phone call with Ms. Aducci, which --

A    Yes, I'm discussing this with Lindy.

Q    About what Joe told you.

A    In the context of this phone call.

Q    Okay.

A    Yes. And she basically verified those values, that, yes, the stone's worth all of that from what she's seen on it. And essentially confirmed what Joe had told me, and that it would be a good deal if we could get it, you know. And I relied on that information to tell Joe to go ahead and

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

let's do the deal.

MS. CLAYSON: Okay. Your Honor, was that sufficient for the Court? Okay. I have nothing further, other than a redirect, if necessary.

THE COURT: Mr. Foley, the telephone bill is not in, so --

MR. FOLEY: Understood.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. FOLEY:

Q     Sir, good afternoon.

A     Pardon?

Q     Good afternoon, sir.

A     Good afternoon.

Q     After you ended the call, or after the call with Ms. Adducci concluded, you still knew you had to do other due diligence on this diamond, right?

A     I really didn't do any other due diligence. I trusted Lindy as part of my family. That connection was firm. And she was going to send me a data package with supportive material, which she did, in the email generated the same date. And that pretty much verified everything she had discussed about the diamond with me. And I don't know where else I would turn to get further information on it. I mean, it's a trusted family member. Why would --

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 130 of 255
Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

Q    Thank you, sir

A    -- I want something further?

Q    Thank you, sir.  No further questions.

A    Okay.

MS. CLAYSON:  Your Honor, we have no redirect.  We rest the rebuttal case.  The plaintiff rests the rebuttal case.

THE COURT:  Thank you.  Mr. Foley?

MR. FOLEY:  Nothing further from the defense, Your Honor.

THE COURT:  Magic words.  Defense rest.

MR. FOLEY:  Pardon me, Your Honor?

THE COURT:  Does the defense rest?

MR. FOLEY:  Oh, defense had already rested.

THE COURT:  Oh, you already rested.

MR. FOLEY:  Yes.

THE COURT:  Sorry.  Rebuttal rest?  All right.  We go into closing argument now, or did you want to take a break?

MR. FOLEY:  Can we please take a break?

MR. CATALDO:  Yeah.  If you could have five minutes or so.

THE COURT:  Oh, I think a longer break than five minutes.

MR. CATALDO:  How about 10?

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

THE COURT: How long is --

MR. CATALDO: Fifteen? Fifteen it is.

MR. FOLEY: Turn it 2:15?

THE COURT: 2:15.

MR. FOLEY: We even talk about -- we can do 2:30 at this point.

THE COURT: If you need longer, take longer. How much are you anticipate -- First of all, who's going first on closing? Defendant goes first, or?

MR. CATALDO: Believe the plaintiff goes first.

THE COURT: I thought plaintiff always wanted the last word.

MR. CATALDO: Plaintiff is entitled to reserve some time for rebuttal.

THE COURT: Okay. Rebuttal closing?

MR. CATALDO: Yes.

THE COURT: Okay.

MR. CATALDO: You're excused.

THE COURT: Oh, I'm sorry. Mr. Ritter, you may step down. You are excused as a witness, sir. Thank you. Thank you for reminding me. You could've been up there for quite a while. All right. So Mr. Cataldo's going to go first and reserve rebuttal remarks. Mr. Foley, then you're going to go in between.

MR. FOLEY: I understand. Can I have a moment --

Veritext Legal Solutions

like, when we come back from the break, if I have any objection to that format, can I raise it then? There's just something I'd like to look into over the next 15, 20 minutes.

THE COURT: All right. So you're asking the Court to be flexible before it sets the choreography for the closing arguments?

MR. FOLEY: Yes, Your Honor.

THE COURT: Should we set a timeline for the closing arguments?

MR. CATALDO: Your Honor, I would like to be done today.

THE COURT: Okay.

MR. CATALDO: the Court would probably prefer that as well. So I'm prepared to keep in total for my -- with my reserving 10 minutes for rebuttal to no more than an hour, and I would hope that will get us done.

THE COURT: So one hour including rebuttal?

MR. CATALDO: Right.

THE COURT: Mr. Foley?

MR. FOLEY: Certainly, I can keep to an hour as well, Your Honor.

THE COURT: Okay. Now, the Court may have questions during -- you know, on TV shows where it's a jury trial, the jury never asks any questions. But this is

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

bankruptcy court, and I may have -- I have some questions. So your timing, the Court's questions may skew your asserted timing, and we're going to have to be flexible there.  But the Court has a few questions and wants to listen very carefully to the answers.  Okay?

MR. CATALDO:  Thank you.

THE COURT:  All right.  2:15 -- well, at this point, we've used a couple minutes.  2:20, we're coming back.  Ms. Adams-Williams?

THE COURT CLERK:  All rise.  Court is in recess until 2:20 p.m.

(Brief recess.)

(Back on the record.)

THE COURT CLERK:  All rise.  Court is back in session for the Honorable Lisa S.  Gretchko.

THE COURT:  Please be seated.

THE COURT CLERK:  Calling case number 20-04381, Ritter v. Adducci.

MR. CATALDO:  Good afternoon, Your Honor. Christopher Cataldo for the plaintiff.

MS. CLAYSON:  Good afternoon, Your Honor.  Kim Clayson for the plaintiff.  And Mr. Ritter, the plaintiff, is in the courtroom still with us today.

THE COURT:  Thank you.

MR. FOLEY:  And good afternoon again, Your Honor.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Patrick Foley for the defendant, Ms. Adducci, who is also present here to my right.

THE COURT: Thank you. All right. Mr. Foley wanted to talk a little bit about choreography before we get started.

MR. FOLEY: Your Honor, I was unable to find any rule on point governing the order of closing, and I understand it to be within the Court's discretion. For that reason, while I'd like to object and have the final word. I understand it's quite customary for counsel to be able to reserve some time to respond to me.

THE COURT: Wait, you were saying what?

MR. FOLEY: I understand it's -- I said, while I would like to object and say the plaintiff must go and then defendant, I am not. I also understand it to be customary that plaintiff can reserve time from their opening to respond in rebuttal. I would only ask that the Court, to avoid the issues that we had during opening, keep the closing arguments well-bounded to the facts as now proven, and that the rebuttal after the reserved rebuttal time be only for rebuttal and not for an expanded closing argument.

THE COURT: Okay. The Court has discretion on how to conduct closing argument. And the Court's inclination is that it ought to be an opportunity for each side to tell the Court what the Court has just seen. And the Court, unlike

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

direct and cross and re-cross examinations, closing argument is a different thing in this Court's impression. And the Court is not inclined to constrain the parties. I mean, we're not going to be here till 8:30 tonight, I assume. But I think we get on with it. I would hope there wouldn't be objections to closing argument statements. Each party is going to have, I can see it right now, having read your briefs, you're both going to have a very different view of the case, to the point where having reread the briefs last night and this morning, I wondered if we were both in the same case. You're both in the same case. You just see the facts line up differently to each of you. That doesn't make one side right. That doesn't make one side wrong. This Court will rule on how the law applies to the facts presented. But each of you get to present a closing argument. And the fact that, Mr. Foley, that Mr. Cataldo may see things totally differently than the way you see them doesn't mean there's an objectionable comment on his part. It just is plaintiff's argument as to how this Court should see it. This is your chance to persuade me of whether to look at things your way. Mr. Cataldo is going to want to persuade me to look at things his way, and with that, persuade away.

MR. CATALDO: Your Honor.

THE COURT: Your closing.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 136 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Thank you, Your Honor. Your Honor, I want to begin by thanking the Court on behalf of myself, Mr. Ritter, and Ms. Clayson for the incredible, incredible experience it's been trying a case in front of you. The Court's attention to detail, the Court's preparation, the Court's infinite patience has been enormously appreciated. This case is so important to Mr. Ritter. It was a heartbreaking thing for him to have lost $12 million to someone he trusted, somebody who knew better, somebody who came from a good family, and knew right from wrong and just didn't do it. You may be asking or want to ask the question, why did we play the tape of the phone conversation that Ms. Adducci was doing most of the speaking on with Mr. Gelov? Why did we play that? Good question. That was on March 7th of 2019, about a month after the Ritter transaction. And as the Court undoubtedly knows, what was happening at that time, Mr. Ritter -- Mr. Ritter had put in his money. Mr. Gelov was owed 1.8 million.

And as the Court heard, he was being told by Ms. Adducci primarily on that call why he wasn't getting his money. Melinda Adducci on that tape that you heard was confident, knowledgeable, had details, knew every aspect of the business of what was going on. It was not the same Melinda Adducci you heard here yesterday or in actually the deposition where she didn't know, she didn't remember, what,

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 137 of 255
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

you know -- it's almost like two different people. The real Ms. Adducci, and you heard a little bit of her today when she began talking about the gemstones and the valuation and those credentials. Make no mistake, this is a really, really smart lady who knew everything about everything, okay? Number one. Because for you to accept their story, it's almost as if you have to believe that any time Mr. Ritter became involved, she turned her brain off, and so didn't know, doesn't know anything about anything, all of a sudden. That's a story made up. That was number one reason we played that tape, so you could see the real Melinda Adducci.

Two, the second reason. There's -- she is doing probably 90% of the talking on that tape. It's -- in fact, you don't even hear Joe until you're like two-thirds of the way in, okay? And the enthusiasm with which she is delivering to Mr. Gelov that made-up story about why he wasn't getting his money. Wanted the Court to hear that. You don't pick that up just reading the transcript, okay? This whole situation that they were telling him this made-up story that his diamonds had sold and the bank had held up the money, it didn't happen. But she was telling him. She's the one that had made up this story and was telling him. It wasn't Joe. It was her.

Three, when you hear that tape, there's no

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

question that there was total, complete united front between Lindy and Joe.  Joe was not a one-man band.  If anything, the person in control was Ms. Adducci, not Joe.  She was running things.  It wasn't the other way around.  But at a minimum, a minimum, it shows they were in lockstep.  They both were singing the same song.  And that was happening with Mr. Ritter, too.  Everything that happened, the two of them were in complete, total unison.

Now, the final thing, as Ms. Adducci admitted on the stand yesterday, and we looked at that sentence enhancement document for the conviction and that call where 85%, 90% whatever it is, of the talking was being done by Ms. Adducci, Joe took the fall for that.  His sentence is getting upped two levels because of what she was saying.  He took the fall.  And the same thing when we looked at this sentence -- I'm sorry, the plea agreement, Exhibit 34.  The paragraph in the plea -- let's go to the next page.  The part where there's the withdrawal of the money from the account.  Go to the next page.

THE COURT:  Go back.  "After receiving the funds." It's the last sentence.

MR. CATALDO:  Okay.

THE COURT:  Mm-hmm.

MR. CATALDO:  It says, "DuMouchelle withdrew the money from the account." Go to the next page.  It's page

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 139 of 255
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

four, if you could pull up page four, the first full paragraph there. Second full paragraph. Go to the next one. Okay. We're on number 34, page four. The paragraph that says, "The balance." Yes, there it is. I'm sorry. "DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." We know from this case it was Ms. Adducci withdrew that money. And why is that important? And because during openings, counsel made a big point, well, Ms. Adducci didn't get charged, Joe got charged. But Joe's taking the fall, including the things that Ms. Adducci did. Now, we don't know, and we'll never know if part of the plea involved some sort of an agreement that Joe would accept the plea, but they not charge Ms. Adducci. We don't -- we'll never know, okay? But my point to you is Mr. DuMouchelle taking the fall for what his wife was doing, at least in part, if that's not concert of action, I don't know what is.

Now, credibility. Big issue. This Court, not a summary disposition motion, this is trial. The Court is the determiner. I'm not sure that's the right word, but --

THE COURT: The decider?

MR. CATALDO: Decider. The decider of what testimony you want to accept, what testimony you don't find credible, who's telling the truth and who's not. And that's a big issue in this case, because we've had some conflicting

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

testimony. And one of the telling pieces, Your Honor, was this morning when we brought out how Ms. Adducci lied in her deposition about something so obvious, saying she doesn't know anything about the yellow -- I mean, we saw the pictures on her finger. We saw -- we've been hearing about it for days, and yet in the deposition, their first strategy was just deny everything. Deny everything. Say you don't know anything about it. And she went along with it. So, Your Honor, there are multiple examples I can give you of how her story, I think evolved would be a kind word to use. Okay? That would be a kind word. So like, one of the -- I thought one of the more interesting ones was how during the cross-examination, she was adamant she was at this conference on the 7th and she had to get to the gala, and you even asked her, "Were you wearing your evening gown?" And guess what? There wasn't a gala on the 7th. It was on the 6th. It was the day before. The whole story changed. And there were -- there are multiple examples of that, Your Honor. I'm not going to go through them. You heard them all. You're the one who gets to call the balls and the strikes on this one. And between Ms. Adducci and Mr. Ritter, there's obviously, I think, a difference, and that -- the Court, that's your prerogative. Who are you going to believe and who's not? Take this issue with the phone call. There was a phone call. But the defense wanted to maintain

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

this story that Ms. Adducci didn't interject herself into this transaction and make the phone call to Mr. Ritter. That was their whole point. "No, she was being acted upon. She was not an actor. She didn't make the call."

We know that's not true. She did. What happens -- does Joe make the first contact to Mr. Ritter? Yes. And there's a telling moment. It's on the tape. And it's the moment the conspiracy begins where Ms. Adducci, and if the Court plays the tape back again, you'll hear it where she says that Joe's came to her and said, "Tom has an extra $20 million laying around. I'm going to sell him the Yellow Rose." That's the moment the conspiracy begins. It's like me saying, "I'm going to sell you the Ambassador Bridge." Right? That's what -- that's when it begins. So --

THE COURT: Who's -- who made that statement?

MR. CATALDO: Ms. Adducci is attributing that to Joe. He's telling her, "Tom has an extra $20 million, so I'm going to sell him the Yellow Rose." So the events then, Mr. DuMouchelle reaches out and admittedly makes the first contact to Mr. Ritter. No dispute about that. That's where it began. Mr. Ritter then said, "I need to hear from Lindy about this. I need to know this is on the up and up. I want to see -- you know, hear about the stone. I want to know if the values are really there. If you're going to be buying this for 12, you can sell it between 16 and 20,"

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

that's a flip of between $4 and $8 million like that, right? Can this really happen? There's an implied, if not express, representation being made by someone with these credentials that, yes, this stone is available. You can buy the stone. We know or have knowledge or information about it, and it's available for sale, and that these resales are achievable. That's the pitch. That's Ms. Adducci pulling in Mr. Ritter. That was, as I used in my opening, the siren song.

THE COURT: The lure.

MR. CATALDO: Pardon me.

THE COURT: I think you said the lure and --

MR. CATALDO: The lure.

THE COURT: Yeah.

MR. CATALDO: The lure.

THE COURT: Mm-hmm.

MR. CATALDO: Right? That's the, got the fish on the line, I'm going to lure him in. Joe set -- put out the hook. She's reeling him in.

THE COURT: And this was done at a time when the Yellow Rose diamond was no longer with the LLC, it was somewhere else.

MR. CATALDO: You heard no evidence that DuMouchelle Jewelers had the right to sell it, that they had it. You didn't hear any of that. Okay? Nothing. And we know today, it didn't. We know that today for a whole

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

variety of reasons. And in fact, at the time, Noble had already filed a lawsuit against the business claiming he was owed $7 million.

THE COURT: What's the date of Noble's lawsuit?

MR. CATALDO: January 9th, 2019. It's in the proof of claim that was filed in this case.

THE COURT: Thank you.

MR. CATALDO: Now, Ms. Adducci, who knows everything about everything else, that's one of those, "I don't know anything about that." Okay? Maybe the Court believes that, maybe you don't. But there is certainly an express, if not implied, representation made to Mr. Ritter on January 25th, that the transaction is legitimate, meaning that DuMouchelle Jewelers has the right to this diamond, can acquire this diamond, and these sale results are achievable. How could you not interpret that conversation to be anything but that? And Mr. Ritter was undeniably relying on the fact -- you heard what he thought of her father and how one of his trusted business partners and friends for decades -- you heard all that. I'm not going to repeat all that. That he thought of her as family. I mean, it would be different if someone walked up to you on the street and said, "Hey, this was Louis IV's pen. Would you like to buy this?" And I don't even have the pen, but I'm just saying, "I can get Louis IV's pen for 12 million, and we can sell it for 20."

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 144 of 255
Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

You'd say to me, "You're out of your mind." But it was an expert gemologist, someone who he absolutely trusted, and he got lured into an obvious scam.

Now, she sends him that insurance appraisal document that was in the data package after the call. Call comes first, then this. So they made a lot of time -- made a big point of, well, she didn't do the appraisal. Okay?

THE COURT: That's the one from 2011?

MR. CATALDO: Correct. But she still sends that document with a value on it to Mr. Ritter. Okay? With her credentials, sending that out to someone is just further representation that this whole transaction is legitimate. The values are there when they're not. Now, the only agreement that was ever produced or was ever been known to exist is Exhibit 10. And I'm not going to take the time to read it. I know the Court's already read it. But Exhibit 11. Wait, so Mr. Ritter sends off the agreement --

THE COURT: I need to stop you one second.

MR. CATALDO: Sure.

THE COURT: You said something really important. I didn't get the end of it down. You said that Ms. Adducci sending the data package, which included the $30 million valuation from 2011, you said that was something. What is that? Because of her level of expertise and her designation.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Yes. With her level of expertise.

THE COURT: What is that?

MR. CATALDO: Being a gemologist appraiser.

THE COURT: Oh, I know that. Yeah.

MR. CATALDO: Yes. But sending a document with a value on it to Mr. Ritter, you know, that's just a further representation of the validity of the transaction, validity of the diamond. Effectively -- I mean, she'll quibble and say, "Oh, that's not a formal opinion," but to a layperson, it is. The fact that she's giving him this document that has an insurance replacement value on it, in his mind would be, "Here's this expert, daughter of my best friend and longtime business partner, giving me something I can rely on to move forward." Which brings us to J11. Now, you got to stop and think about this for a minute, right? So the deal, Mr. Ritter is going to put up 12, and it's going to get flipped for between 16 to 20 in a short period of time, a 24 and $8 million profit on this thing, right? That's the deal that she's just given her blessing on. So he sends this email.

And what he's saying is, and what he -- how we explained this, he's giving her an opportunity. He's not asking her to put money in. He's saying, "I'm going to give you a piece of these 8 million bucks." That's what he's offering her, a piece of the $8 million here, right? He

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 146 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

wants her to share in this. "Hey, you've made this possible for me." Now, if this is on the up and up, right, you would think she'd be jumping in, "Where do I sign? I'll take my share of the $4 to $8 million." But no, she runs the other way. Gift of prophecy? Court has to make your own determination. Does she know what's going to happen? And here's the other thing that's really bizarre about this. She reads the contract to her son. And the conversation then is, "Watch out. Tom Ritter sues everybody." Why would she be worried about Tom Ritter suing her at the end of January? He doesn't ask her to put up any money. What is she worried about? Well, I can tell you what, he did sue her for something. I mean, she knows what's going to happen. She knows there's no sale, and she doesn't want to sign on to it. It's like, you know -- it'd be like having your fingerprints on the murder weapon. She's not going to have any part of this. She knows what's going to happen.

So now, strange events keep getting stranger. She's in Florida, Joe's in Michigan. They need to get this account open because there are several attempts that fail for the wire to go through. And it's Mr. Ritter's $12 million wire, is what we're talking about. Right? So on the 5th, and she told us how irritated she was because she's trying to get on the plane to get to Tucson, Joe tells her, "No, I need you to go to the bank and open up an account at

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Bank of America." Okay. Now why they're doing that? Why isn't Joe doing it? No, that's never been explained. And why Bank of America? Well, probably because Bank of America, they owed Noble that money, and he had his accounts at Bank of America, and it would really be easy to do the inter-bank transfer if this account -- if Ritter's money is going into the same account that Noble, where he has the same bank, they can pay Noble faster.

THE COURT: So you're suggesting that there was credit pressure from Noble?

MR. CATALDO: Oh my. He'd already sued them.

THE COURT: Well, and the Court has already written an opinion on this.

MR. CATALDO: I've read your opinion.

THE COURT: The case of Stevenson versus Noble.

MR. CATALDO: And the judge --

THE COURT: Judge Stephen Murphy --

MR. CATALDO: Murphy.

THE COURT: He accepted the Court's report and recommendation. And so what you're saying here is that there may be a connection as to --

MR. CATALDO: It wasn't a coincidence that Bank of America and Bank of America. That didn't just happen, that they opened the phone book and said, "Let's go to this bank. Oh, there it is, Bank of --" No. There was a reason they

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

went to Bank of America.

THE COURT: But Ms. Adducci testified they needed a bigger bank because FineMark had rejected the wires. It's possible two different things are at play at once.

MR. CATALDO: Possible two different things. That FineMark rejected it, there was an existing account, now they need a new one. "Hey, we got to pay Noble anyway." So J12, one of the documents mentioned in the plea agreement, and Ms. Adducci goes to Sanibel branch of Bank of America, opens up the account on the 5th. And we looked at the signature card, J4, with the 0585 bank account number on it. And she's the only signatory on this account this day. And unquestionably, she has in her possession the account number, easy access to get the routing number. You can just ask the teller for it, as she even mentioned, you can get it online. She had to have -- I mean, the whole idea that she wouldn't have told her husband, her husband, her business partner, "Hey, the account's opened. Here's the account number, here's the routing number," that she didn't do that, THAT he would have called the bank and talked to some teller and had to go through six different -- I don't really -- if you call your bank, I don't -- when I call my bank, getting somebody on the phone can take you an hour. Do you think that really happened or do you think Ms. Adducci gave him the routing information to put on this document, Exhibit 12,

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 149 of 255
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

to send to Mr. Ritter?

THE COURT: What more is there in terms of routing besides the account number?

MR. CATALDO: Well, the bank routing number?

THE COURT: Uh-huh.

MR. CATALDO: So typically, each branch will have its own routing number. So, for example, every -- at this branch of Bank of America, every account would have the same routing number. The routing number, like if you have checks, it'll be at the bottom of your check, and it's a specific number for your bank. It tells the Federal Reserve to go to -- the money goes to this branch of this bank.

THE COURT: Mm-hmm.

MR. CATALDO: Then you just need that routing number and that account number to do wires. That's all you need.

THE COURT: But the routing number is not on Exhibit number 4.

MR. CATALDO: It was. It's been redacted because these were filed publicly.

THE COURT: Because they're publicly --

MR. CATALDO: And the full account number was on here as well.

THE COURT: Mm-hmm. Okay. Okay.

MR. CATALDO: I'm sorry. It's Exhibit 15. I

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

believe I may have said 12.

THE COURT: Fifteen.

MR. CATALDO: And there's some duplication between the two. So then Ms. Adducci flies to Phoenix, or maybe Tucson. I'm sorry. Tucson. And then we have the strange events of the 7th. Mr. Ritter has wired his money into the account on the 6th. We know that from the bank statements, Exhibit 5. We know the only other money in this account at that time is something called counter credit, $500 shown on the account. See, it's Exhibit 5. Now, Ms. Adducci is the signatory on this account. All she has to do is say to the teller, "Hey, did Mr. Ritter's wire come in? Is that $12 million? What's the balance on the account?" She's going to go in there and withdraw millions of dollars. You'd think she would have asked to confirm that Mr. Ritter's money is in the account, because otherwise, she's not going to be able to do all these withdrawals.

THE COURT: The testimony was that she didn't ask.

MR. CATALDO: Okay.

THE COURT: Are you disputing that?

MR. CATALDO: I'm saying the logical thing is when she gets to the bank branch, and she knows she's there to take out millions and millions of dollars, she would have to ask the teller what's in the account. Is this -- are these checks going to clear? I'm going to ask you to write me $5

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

million of cashier's checks and do $4 million of interbank transfers. Are the funds there to do it?

THE COURT: So are you saying --

MR. CATALDO: She had to have.

THE COURT: This goes to her credibility? The Court heard her to say that she didn't ask. Did I misunderstand that?

MR. CATALDO: I'm not disputing she said the words.

THE COURT: Okay. Correct.

MR. CATALDO: Same way she said the words --

THE COURT: You're saying it defies --

MR. CATALDO: -- she didn't know what the Yellow Rose was. She said those words too.

THE COURT: You're saying it defies logic?

MR. CATALDO: Defies logic. She had to have. She had to have said, "Is Mr. Ritter's wire in the account? Is that $12 million there? How much is here?" Had to have. So then, we have the six transfers, three of them intercompany transfers. We spent a lot of time on these. Then we have these other three. Those were the ones where there's actual withdrawal slips signed by Ms. Adducci. And those tie to Exhibits 42 and 43 that we spent a lot of time on. And the interesting thing about those exhibits that I want to point out to the Court, Mr. DuMouchelle is copying Lindy on the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

emails. He's not hiding anything from her. I mean, this isn't like he's doing the secret thing over here, and she doesn't know. They're doing it together. They've obviously talked because this is the email where, you know, he's telling the banker, "She's going to be there in four minutes."

This is 4:16, and he's telling her, "She'll be at your location at 4 p.m." They're obviously talking together. They're obviously working this out together. And, you know, she had to leave. Now, was she annoyed that day? Probably. You know, she had to go back and do it again. I don't doubt that, that she really was annoyed. Is that a defense? Is her state of mind in any way a defense? Of course, it isn't. She knows which money is in the account. The whole -- the account got set up for Mr. Ritter's wire. The fact that they're going to commingle with other money, I mean, it's just almost unfathomable that they would be doing that, but that's what she said they're going to be doing. And then you have -- the word I'm--

THE COURT: Let me stop you right there. Why is it unfathomable? We heard that there was no trust document for this money to come in.

MR. CATALDO: Commingle the customer deposits --

THE COURT: Yeah. I want to know why you say it's unfathomable. I just want you to connect it for me.

20-04381-lsg Doc 329 Filed 04/20/26 Entered 04/20/26 12:31:16 Page 153 of 255
Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

MR. CATALDO: Okay. If -- like, I think I made this comment yesterday. If I did that, I'd lose my license.

THE COURT: Mm-hmm.

MR. CATALDO: And the fact that they have this supposedly very sophisticated high-end jewelry business where they're auctioning -- they're taking money from customers, customer deposits, and then just commingling it in their operating funds and then paying the electric bill and paying their Visa bill and whatever they want with customer money.

THE COURT: But the money from Mr. Ritter was not wired in trust. It didn't go into an escrow account.

MR. CATALDO: It did not.

THE COURT: It's possible, Mr. Cataldo, that the defendant will say, "Well, -- " the testimony from Ms. Adducci was that Joe told her that despite what was in that contract regarding paying the seller directly, Mr. Ritter wanted the money to flow through the LLC. I think those were the words. Do you remember that?

MR. CATALDO: I recall her saying those words.

THE COURT: Flow through the LLC.

MR. CATALDO: The Court has the discretion whether you want to believe them or not. She said that. Why would Mr. Ritter ever say that?

THE COURT: When the contract says -- well, says,

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

"I believe he would set up an escrow," meaning Mr. Ritter, and but the next sentence says that his money is to be paid only to the seller of the Yellow Rose diamond.

MR. CATALDO: Yes. And when she knows this is supposed to be done, dotting all the I's and crossing all the T's. Right? Didn't she say that before? "Because this is Mr. Ritter, and everything has to be done just right."

THE COURT: I's and T's were her reference to how Joe did business, which hindsight being 20/20, we know that might be her perception back then, but probably was inconsistent with the reality of what was going on in Mr. DuMouchelle's life even at that time. Her testimony, she didn't know. That's where the I's and T's came in. But the testimony from Ms. Adducci was that, especially in light of Joey Adducci's statement that Mr. Ritter sues everybody, she wanted to be especially careful on this deal.

MR. CATALDO: Yes. That was kind of my point. So then --

THE COURT: And you're saying, and she knew this was Mr. Ritter's $12 million coming in?

MR. CATALDO: She knew it was Mr. Ritter's $12 million. And so then we have Exhibit J3 and then the bank statements which show all of these checks going out, and I was trying to think of the word that I would use, and I'm not sure if it's really a word, but I was thinking of like

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 155 of 255
Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

they were shotgunning his money out, right?  They're spraying --

THE COURT:  Spewing.

MR. CATALDO:  -- spewing his money out.  And what they're obviously doing -- and remember, the urgency it had to be done that day?  There were probably creditor demands.  Who knows?  Noble may have been, you know -- Noble had sued them.  Who knows?  He was threatening -- but they're putting out fires.

THE COURT:  Well, Noble had sent personnel.  If you read Stevenson versus Noble --

MR. CATALDO:  Yes.

THE COURT:  -- in January, he had sent personnel up to pay a visit to Joe Dumouchel, and I don't think it was a friendly one.

MR. CATALDO:  Probably weren't having tea and crumpets.

THE COURT:  Right.  So I suspect there was significant pressure being brought to bear.

MR. CATALDO:  And so that -- this has every indication now, they're putting out fires with this money.  They've got Mr. Ritter's money in.  They've got enormous creditor pressure.

THE COURT:  There's also merchant cash advances we saw.  Do you have anything to say about those?  We haven't

talked about it in the --

MR. CATALDO: We haven't talked about it, but I think the Court's well aware because you've seen the scenario where businesses go into the death spiral and how -- you know how those fit into that. That's not the sign of a healthy, prospering business. It's the opposite.

THE COURT: Yeah.

MR. CATALDO: And Ms. Adducci does those three interbank transfers that we looked at for about $4.4 million, then walks out of the bank with cashier's checks in her hand for over $5 million to all of these people and companies. And the idea that she could have had any reasonable belief that any of this money, let alone all of this money, was going to go to pay for the Yellow Rose when there was no testimony at all that, "Oh, yeah, I had seen the DuMouchelle consignment addendum to buy it, that I had --" because there wasn't any -- we know from all of the findings that made by the Courts, the criminal plea, there was never a sale. There was never -- it was just a made-up contrivance to get the money. And she had to have known when she went in that day. She had to have known.

THE COURT: I got a question for you. I've been thinking about this, and I asked it of Mr. Foley, and I remember being jarred by his answer. But on reflection, I believe it to be an appropriate answer. I asked, would

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 157 of 255
212-267-6868                     www.veritext.com                          516-608-2400
Veritext Legal Solutions

there be a 523 action against Ms. Adducci if she had told Joe, "No. Joe, I opened the account. That's Tom's $12 million. I'm not doing what you ask." Would we be here today?

MR. CATALDO: You'd still have the issue of, like, when did she find that out and those representations that she made to get him into this mess, and had he already put up the $12 million?

THE COURT: The inbound obtaining?

MR. CATALDO: Yeah, the inbound obtaining would be --

THE COURT: What about the outbound? But --

MR. CATALDO: Well --

THE COURT: That --

MR. CATALDO: There's no question that if she hadn't -- if she had said those words to Joe that day, like, "Joe -- "

THE COURT: If she hadn't moved any of the money out --

MR. CATALDO: "I'm not doing it. I'm not doing this, Joe. I'm walking – I'm running --

THE COURT: Would we do -- would we be here?

MR. CATALDO: We might be on the inbound piece, but the case would be very different.

THE COURT: Not on the outbound piece?

MR. CATALDO: Oh, absolutely not. It's her signature taking the money out. And I think I was light when I said 9.5, it's probably a little closer to 10. And you can add it up, because then she goes back. Don't forget, she goes back on the 11th and takes more.

THE COURT: Mm-hmm, $180,000.

MR. CATALDO: And then there's another wire transfer on the 11th, and we don't know who initiated it.

THE COURT: We don't know if it's --

MR. CATALDO: It could have been her.

THE COURT: Joe was a signatory on the account.

MR. CATALDO: Got added on the 11th. So we don't know. It could've been her, it could've been Joe. But they're -- They finished the looting of the account by the 11th. The money's gone, okay? It isn't coming back. I mean, so you'd -- what you didn't hear either from -- is, like, "Oh, yeah, you know, we had other things in the work. We knew we had the funds coming in, so we could -- we'd be able to get Mr. Ritter his money back, or we'd be able to complete the -- " you didn't hear anything like that because all you heard was one conclusory statement, "I thought this was reasonable -- " that was -- that's their whole defense, is to just have somebody say those words when their conduct is inexplicable and excusable and obviously improper. I could use words besides improper, but I think for this

purpose and in meeting, the terms of the bankruptcy code when we get to that piece of this -- it's a good thing the Court doesn't only have to pick one of the grounds because you'd probably have a hard time picking which one is the best one because they all apply with equal vigor.  All the different grounds that we've laid out under which you could find this debt is not dischargeable.

But another thing that I wanted to comment on that -- you know, Mr. Ritter sends, you know -- you have to feel terrible for the guy.  He's been robbed by someone he trusted, and he sends those four emails:  45, 46, 47, and 48.  Ms. Adducci doesn't respond to them.  Now, yesterday, counsel got up here and said, "Oh, Joe must have been, like, accessing her emails and deleting her emails." Right? That's the explanation.  So let's think about that for a minute.  So the first of those is May 13th, and the last of them is July 2nd, six weeks.  There's four emails over six weeks.  So their explanation would be that Joe, for a six-week period, is sitting, watching her email 24 hours a day, so he can delete anything that comes in from Tom Ritter. That's their explanation.  Okay.  Let's put that over here and say that's explanation one.

Explanation two, maybe she saw all of these, and she knew that Mr. Ritter wasn't getting his money back because she's the one that took it.  And what is she going

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 160 of 255
Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

to say to him at that point, other than we could have another Ted Gelof call where she's making up, you know, more stories or that explanation? And the Court can decide. Which do you think is the one that's more likely than the other, that Joe is sitting there deleting each email as they come in for six weeks, or the one I just described?

THE COURT: She also may have been getting the emails on her phone.

MR. CATALDO: I mean, the company doesn't get shut down till well after this.

THE COURT: Yeah.

MR. CATALDO: You know, so they're still --

THE COURT: The bankruptcy was in the fall.

MR. CATALDO: October.

THE COURT: Okay.

MR. CATALDO: October 19th, I think, is the petition, and so --

THE COURT: Do we know when the company stopped doing business? Well, it was an involuntary --

MR. CATALDO: It was an involuntary. It was actually even later than the personal.

THE COURT: Yeah. Personal was, I think, in September, maybe.

MR. CATALDO: So, you know, Your Honor, the whole idea that Ms. Adducci did not know of the serious financial

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

problems that this company was facing is -- again, that's another one for the Court. We know on the company schedules there's $29 million. The personal schedules for Joe and Lindy was $22 million. You know, and the Court obviously can look at what claims were, you know, the -- I believe the Noble claim for $7 million. I don't think that's on the schedules. There's some overlap between the schedules in terms of debt. Like, for example, Mr. Ritter's 12 is on both sets of the schedules.

THE COURT: Well, isn't that because the individuals wished to discharge whatever their personal obligation might have been on that debt --

MR. CATALDO: Of course.

THE COURT: -- irrespective of whatever the LLC's destiny was?

MR. CATALDO: That was --

THE COURT: So that's why you put it on the schedules, to try and discharge it, right?

MR. CATALDO: So yes, of course. But my point is, the hole that they were in --

THE COURT: She had to have known.

MR. CATALDO: Had to be north of 30, 40. I don't know the exact number, but it's big. And that doesn't -- that doesn't happen overnight. Okay? You don't just go from making millions of dollars hand over fist, and then the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

next day, you've got $30 million. This had to be coming for a while. And as the Court knows, when it's coming for a while, you have garnishments, you've got lawsuits, you've got problems that are coming. And obviously, going back to that Exhibit 3, I mean, that's a list of the creditors. They're putting out fires that day with all of that money.

THE COURT: When did the merchant cash advances start?

MR. CATALDO: Well, the first ones show up -- they're not in there February, because remember, they only opened this account in February. They're not on there because they've got Mr. -- they're spending Mr. Ritter's money like the drunken sailors in February. I believe they start in March. And then what happens then with the bounced checks, too, on that account was really pretty interesting. Bank of America was kind of letting them almost, like, run it like a line of credit. They were letting them -- they were honoring checks. You know, that account was going negative $50,000.

THE COURT: Mr. Foley pointed out that in one month, they were less negative at the end than they were at the --

MR. CATALDO: Congratulations. My point is, the checks go from -- bounced checks go from a trickle to a flood.

THE COURT: But Ms. Adducci testified that she didn't set up online banking. She wasn't watching this.

MR. CATALDO: But these account statements come in the mail. Even if -- you get your statements in the mail even if they're not online. You can go into the bank at any time and find out what's going on. But the fact that they're -- we counted them out, if the Court will recall, in the month of May.

THE COURT: The bank statements, the address to which they're being sent is in Sanibel. Is that the DuMouchelle home?

MR. CATALDO: Yes. Yes.

THE COURT: So the bank statements are coming to the home in which Ms. Adducci lives in Florida?

MR. CATALDO: Right. So then -- I just have to mention it because in May, we saw that there's 132 bounced checks. Now that's hard to do. I mean, just do the math. That's four a day, every day, including weekends. So that's a lot of bounced checks. So there's no way that Ms. Adducci did not know that the ship -- that the Titanic had hit the iceberg.

THE COURT: But May is after February.

MR. CATALDO: It is. There's no question. But this whole thing, as the Court pointed out, they had big guys showing up at the office.

Veritext Legal Solutions
212-267-6868                           www.veritext.com                           516-608-2400

THE COURT: I don't know the size. I just know it's stated in the opinion in Stevenson versus Noble that in January, Mr. Noble sent personnel up to Detroit. That was the record in that case, which is that case, and we're in this case.

MR. CATALDO: So Judge, I'm running short on my time, so I'm going to only -- I know we're going to brief the sections of the code and provide the Court with --

THE COURT: Oh, I have a couple of questions

MR. CATALDO: -- more details, but let me answer your questions and then --

THE COURT: And then see where you end up.

MR. CATALDO: Where I end up.

THE COURT: And the Court is -- everyone's going to have time. It's only 3:15, and it's important that we close this today. So let me ask you. We heard you -- and I've read the defendant's trial brief. The defendant talks about the word obtaining, and says that because of the word obtaining, the plaintiff cannot make out their case. Mr. Foley, I'm pretty sure I'm characterizing it correctly.

MR. FOLEY: Amongst other arguments, yes, Your Honor.

THE COURT: Okay. That's the -- but the -- we'll call it the obtaining argument.

MR. FOLEY: Yes, Your Honor.

THE COURT: Okay. So tell me, what does obtaining mean for purposes of 523(a)(2)(A)? If you can today, if you want to brief it, just tell me that.

MR. CATALDO: Your Honor, I would prefer to -- I mean, I would -- my argument right now would be there's -- you have the express and implied representations that Ms. Adducci made when we talked about --

THE COURT: The inbound.

MR. CATALDO: But that is -- would meet that test, the implied. I mean, those are all made with the intent to pull in the money. That's obtaining, in my opinion. And then walking into a bank and saying, "Hey, give me these $5 million of checks," that's obtaining.

THE COURT: Well, that's the point. I think Mr. Foley is saying obtaining is limited to what you would call the lure, the inbound, the $12 million coming in.

MR. CATALDO: I think we'd like to brief that, Your Honor.

THE COURT: The Court wonders, and Mr. Foley and I talked about that a little bit yesterday. Doesn't the word obtaining also -- there's obtaining the inbound that you say Ms. Adducci was part of, but certainly Joe plead guilty to wire fraud on, so we know he's a part of. He's admitted it. And then we've got -- the Court's question is whether obtaining also applies to the outbound.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 166 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: I would argue it does, but I'd like to brief that issue.

THE COURT: Okay. So it's a concept --

MR. CATALDO: It's both --

THE COURT: -- of either obtaining or obtaining control.

MR. CATALDO: You're obtaining it, in effect, two different ways.

THE COURT: Two different obtainings. The way 523(a)(2)(a) is structured, it says, "An individual may not discharge a debt," it's in the preamble. Ms. Clayson, I see you writing this down. Mr. Foley, you should write it down, too. Debt is in the preamble.

MR. CATALDO: Mm-hmm.

THE COURT: And then you get into the substance of two, and the operative words would be, in this context, I think, but you'll teach me in your briefs what the Court was looking at. So a debt, and then two, for money --

MR. CATALDO: Mm-hmm

THE COURT: "To the extent obtained by." So debt is in the preamble.

MR. CATALDO: Mm-hmm.

THE COURT: "Money to the extent obtained by" is in the body of 523(a)(2)(A).

MR. CATALDO: So I would argue it's both pieces

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

because it's talking about the reason Ms. Adducci owes the $12 million. Right?

THE COURT: Say again?

MR. CATALDO: The debt is the $12 million Ms. Adducci owes to Mr. Ritter.

THE COURT: It's not the 9.5 that she took out, or 9.6?

MR. CATALDO: It's the whole 12.

THE COURT: It's the whole 12. Why?

MR. CATALDO: That's the full judgment amount that --

THE COURT: That's the lure?

MR. CATALDO: Correct. Correct.

THE COURT: So in order for the whole 12 to be non-dischargeable, the Court would have to find that she's part of the fraud that lured in the money.

MR. CATALDO: Or caused all the 12 to be removed from the account, full loss.

THE COURT: Well, but we've talked a lot with the exhibits that she personally signed to extract about 9.5, 9.6.

MR. CATALDO: It's probably a little closer to 10, and then there's that additional two.

THE COURT: But we don't know who took that out.

MR. CATALDO: Don't know who took --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: From the 12

MR. CATALDO: The other -- we don't know that.

THE COURT: And you've got the burden of proof. If that's what it is, you're -- in order to get to the Court has to find 523(a)(2)(A) is met with respect to Ms. Adducci on the inbound, which was 12, correct?

MR. CATALDO: You know, Your Honor, there's just something doesn't seem right about that.

THE COURT: Okay.

MR. CATALDO: Which is that she's caused this whole thing to be -- to happen, and I -- that's why I'd like to brief it.

THE COURT: I'm going to brief it because the Court is wondering about that. I saw that you'd asked for the full 12, but we've talked about a, frankly, slightly lesser amount that was withdrawn. I mean, 9.6 million is a big percentage of the 12, and that was what you've explored through the exhibits and her testimony as being done at her hand directly. Correct? On the --

MR. CATALDO: Under that --

THE COURT: That's on --

MR. CATALDO: Yes.

THE COURT: That's on the outbound.

MR. CATALDO: On the outbound for only under that section, because I think you get to the 12 under these other

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 169 of 255
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

sections.

THE COURT: Under the other sections.

MR. CATALDO: Easily. And also on the inbound too. I think that --

THE COURT: Okay.

MR. CATALDO: Unquestionably. You get to the 12.

THE COURT: Okay.

MR. CATALDO: Any other questions the Court has, because --

THE COURT: I do

MR. CATALDO: I don't want to --

THE COURT: Well, it's okay. I'll give Mr. Foley additional time as well. Sorry about that. Okay. Well, for 523(a)(4), you're not pursuing the fiduciary duty parts of that. I see Ms. Clayson shaking her head sideways.

MR. CATALDO: We are not. We're doing the --

THE COURT: You're doing larceny and embezzlement?

MR. CATALDO: Correct.

THE COURT: So here's the Court's question.

MR. CATALDO: Mm-hmm.

THE COURT: In Stevenson versus Noble, the Court already found that there wasn't a taking of Mr. Ritter's $12 million. Instead, he voluntarily -- no one put a gun to his head, so that the inbound was assuredly under false pretense.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

MR. CATALDO: Well, that's the term that was used in the false pretense.

THE COURT: We used false pretense.

MR. CATALDO: Correct.

THE COURT: But no one --

MR. CATALDO: Right there.

THE COURT: Put a gun to his head and grabbed $12 million out of --

MR. CATALDO: Right

THE COURT: -- his wallet. Okay. So that impacts whether larceny works here or embezzlement, or does it? Again, we've got the inbound --

MR. CATALDO: Because I think --

THE COURT: And the outbound. On the outbound, that's -- the Court, perhaps mistakenly, and the Court's going to need help from both sides on the post-trial briefs. The Court views this as perhaps multiple fraud situations or improper conduct.

MR. CATALDO: Well, we fully agree with the Court on that.

THE COURT: With the inbound and the outbound?

MR. CATALDO: Yeah.

THE COURT: In Stevenson versus Noble, we had a different set of facts, and we're dealing with Noble as a downstream transferee. And, you know, the fact that the

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

wire came into an LLC account, but the trustee for the individuals was pursuing.

MR. CATALDO: And the issue was whose title was it to the funds? Whether the trustee could recover those funds and get them back --

THE COURT: It was an issue

MR. CATALDO: -- or whether Noble, who was viewed, I think, as an innocent, you know, third-party recipient and was owed the money --

THE COURT: I'm not sure --

MR. CATALDO: Could be entitled to keep --

THE COURT: Innocent is appropriate because I think we've heard some testimony that there may have been something going on with Mr. Noble, and the Court's not prepared to go there on the record it has. Okay? I just don't know one way or the other. So, but here's my question, did the LLC have to receive Mr. Ritter's money in trust in order for 523(a)(4) to apply for the larceny and the embezzlement portions? Because in his trial brief, Mr. Foley focused on the word "entrusted," E-N-T-R-U-S-T-E-D. He said it has to be entrusted. I'm not sure how that works when we're applying 523(a)(4) without the fiduciary part. Clearly, if it's the, you know, a trust fiduciary who defalcates and walks off with the money, yeah, you've got issues.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO: Much easier case.

THE COURT: Much easier case. This case is a little different because the money did not come in trust and was, in fact, commingled with the other monies for the LLC and used to pay LLC creditors.

MR. CATALDO: But I would argue, that's why I asked those questions today, because customers put up deposits on money all the time. And that money, I don't believe, and I'd like to brief this too, that it would have to be in a formal escrow account to be entrusted. It was still entrusted --

THE COURT: That's my question

MR. CATALDO: -- to DuMouchelle that was going to be used in the circumstances. And you look at the agreement that everyone -- I mean, it's clear. Mr. Ritter is saying, "You're going to only use my money to buy this stone for me."

THE COURT: Does entrusted have its meaning in normal parlance?

MR. CATALDO: I think it does, and that's what --

THE COURT: As opposed to an actual trust agreement, formal trust agreement?

MR. CATALDO: Right. It's a trust with a little T, not the capital T.

THE COURT: Or with a little E for entrusted, not

some sort of --

MR. CATALDO: Exactly.

THE COURT: It's not in trust, I-N, new word, T-R-U-S-T. It's entrust, E- N, small E. I mean, is there a difference under 523(a)(4), and how does it impact this case?

MR. CATALDO: That's an issue obviously we want to brief, and obviously the Court's --

THE COURT: The Court wants --

MR. CATALDO: -- concerned about it. The embezzlement part, I think is very clear that -- and that may be an easier determination, because I think with the facts that we've presented, that that one is -- I don't even think there's any argument why that wouldn't be embezzlement. That for them to take the money and use it for a purpose --

THE COURT: Misappropriate

MR. CATALDO: Misappropriated.

THE COURT: Now we heard testimony about the fact. Well, let me ask you this question because it's haunting the Court. If the LLC had eight bank accounts, eight other bank accounts --

MR. CATALDO: Mm-hmm.

THE COURT: -- each with 10 million in them, and it was going to consolidate all of those into the Bank of

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

America account, we might have a different story.

MR. CATALDO: Probably wouldn't be here.

THE COURT: Okay. But on the facts of this case, where we heard that there was just the FineMark account I believe we heard testimony, only the FineMark account.

MR. CATALDO: There was no mention of any other accounts.

THE COURT: No other account, and in fact, mention was -- testimony was that FineMark was a small bank with perhaps outdated access to its portal and had rejected Mr. Ritter's wire. It was time to move, according to the LLC and Ms. Adducci's testimony. And so they opened -- she opened the Bank of America account. The Court didn't hear anything about a multitude of other accounts with sufficient funds that were to be moved into the Bank America account so as to cover. You understand what the Court's asking?

MR. CATALDO: Perfectly.

THE COURT: Okay. Does that make a difference? Money is fungible.

MR. CATALDO: Money is fungible. I think to answer your question, if there was a bank account, or let's say even a different account at Bank of America or at Chase that had 30 million cash sitting in it, one, obviously, we wouldn't be here. But two, it -- I think it goes to the issue of intent. Because when you have no other money to

pay it, and you take Mr. Ritter's money, if they had the 12 in cash somewhere else, and this was a legitimate transaction, and they had actually bought the diamond with different money --

THE COURT: Yeah.

MR. CATALDO: Okay? We probably wouldn't be here. The transaction would have happened. Money is fungible.

THE COURT: Mm-hmm.

MR. CATALDO: But we know it didn't happen. We know they were underwater. They didn't have any other money.

THE COURT: Do we know that the 854,000 that made its way into the Bank of America account came from FineMark?

MR. CATALDO: We don't know where that came from. We don't know anything about it other than what's on there, on that statement. And the other thing that's really interesting, too, that's on that statement, your Honor, is all those legal orders --

THE COURT: Yeah.

MR. CATALDO: -- are on that account. Almost from the moment it's opened, okay, that -- we think those are garnishments hitting that account. I can give you my theory why they're hitting this account this fast, because remember, take a look at how fast those garnishments are hitting that account. So I can tell you my theory, it's

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

just a theory why those are there that quickly.

THE COURT: Uh-huh.

MR. CATALDO: Because it was in the tape. Ms. Adducci had said that they had a prior account at Bank of America. She didn't like Bank of America. They had closed that account, and then there was some progression where they ended up at FineMark. My theory, and this is a theory, because I don't know this, is that with all of these creditor claims, Bank of America had garnishments sitting there.

THE COURT: Sort of like arrest warrants that stay in the system for forever.

MR. CATALDO: Exactly. That when this account gets opened, boom --

THE COURT: Boom.

MR. CATALDO: -- Bank of America immediately applies them. And my guessing, one of the other reasons they needed to get out of FineMark is probably they were getting garnished too. But I don't know that. We don't have any statements on FineMark.

THE COURT: We don't have evidence on that.

MR. CATALDO: I'm speculating. I want that to be clear in the record. I don't know that. Don't know that. But I just know that all the money, including that 850, was gone by the end of February. That's on the statement, too.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

And then that account stayed negative and never went above water. It was always negative. So I hope I've answered the Court's questions.

THE COURT: One more. You used the word "intent". Intent means different -- the case law says there's different flavors of intent --

MR. CATALDO: Mm-hmm.

THE COURT: -- if you will, for 523(a)(2)(A), (a)(4), and (a)(6). Is intent synonymous with knowledge in these? I mean, it's not like murder, which my father always taught me requires malice aforethought.

MR. CATALDO: Correct.

THE COURT: What is standard of intent?

MR. CATALDO: And we talked about this a little bit yesterday in the directed verdict because the intent is to cause the injury. And that's where I think we got a little bit --

THE COURT: Tangled.

MR. CATALDO: -- difference than counsel, because it's not viciousness, it's not spitefulness. The intent is just that you cause the consequence of your action.

THE COURT: That's for 523(a)(6)?

MR. CATALDO: Yes.

THE COURT: How about for (a)(4) and (a)(2)?

MR. CATALDO: I think it's the same.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: So part of it sort of runs off of -- it's connected to knowledge as a concept rather than viciousness?

MR. CATALDO: No question about it. It's not that Ms. Adducci, like, she hated Tom Ritter, and she was getting even with him. The intent is only to cause -- the harm being taking the money. That's the harm.

THE COURT: Substantially knowing what's happening and substantially certain that that bad things will result.

MR. CATALDO: That bad. Well, because it's bad for him, she may have, you know, "Look, I have no choice because we've got all these creditors. I got to take his money." You know, she may have felt terrible about it, but that's not relevant. She was -- The intent is just, did she intend to take Tom Ritter's money? Yes. The harm is taking the money.

THE COURT: Okay, so the intent --

MR. CATALDO: It is not. That's --

THE COURT: It's not malice or forethought?

MR. CATALDO: Not in that sense.

THE COURT: Right.

MR. CATALDO: You know, whereas, you know, for first-degree murder, you know, I intend, I'm going to take my gun and shoot someone as opposed to --

THE COURT: Please don't --

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

MR. CATALDO: I'm not going to, just using that. But as opposed to, I didn't know and I started a fire and someone died because I was careless. I didn't mean to hurt someone. That's a whole different standard. Maybe I intended to start the fire that spread. And, you know, that's obviously a whole other conversation to have. But I mean, for this purpose, did she intend the acts resulting in the loss of the money? And that's the intent. Whether she did it viciously or spitefully, doesn't matter.

THE COURT: Okay. The Court encourages you to look carefully --

MR. CATALDO: Mm-hmm

THE COURT: At the case law that describes those different types of intent --

MR. CATALDO: We will be sure to do that

THE COURT: -- sections. Okay.

MR. CATALDO: And with that, Your Honor, I'm going to turn the floor over to Mr. Foley, unless the Court has --

THE COURT: You want 10 minutes rebuttal or thereabouts?

MR. CATALDO: I would like that very much. Thank you.

THE COURT: Thank you. Mr. Foley, your turn, sir.

MR. FOLEY: Thank you, Your Honor. I'll take all my stuff.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 180 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Hang on one second. Ms. Williams, are you okay?

THE COURT CLERK: Mm-hmm.

THE COURT: Okay. Whenever you're ready, sir.

MR. FOLEY: Thank you, Your Honor. Your Honor, in my opening arguments, I argued to this Court that the evidence ultimately, when all of it was laid before this Court, would not be sufficient to sustain any of the claims, 523(a)(2)(A).

THE COURT: I think you focused on the documentary evidence in your opening.

MR. FOLEY: I did, but also the testimony given to you. And I will renew here that neither the documentary evidence nor the testimony presented is sufficient for plaintiff to prevail upon a claim under either 523(a)(2)(A) or 523 (a)(4) or 523(a)(6). And in particular, what I said in my opening statement was that in the end, after the dust settled, plaintiff's case would come down to asking Your Honor to take the benefit of hindsight and apply post-transfer actions, well post-transfer actions. And when I say transfer, I'm using the term encompassingly to cover the period between February 5th to February 7th or 11th of 2019. The Court -- the plaintiff is asking you both to take the benefit of hindsight, to use post-transfer activities, and then collapse time and collapse the elements. And by doing

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

that, attribute to Ms. Adducci a knowledge, an intent that is simply not present at the time of her actions.  And I submit to Your Honor --

THE COURT:  Stop you right there.  We all watched the video, and it had the telephone call from March of 2019, like a month after the February 5th activities that we focused on so intently.  Do you remember that?

MR. FOLEY:  Yes.

THE COURT:  Okay.  And the plaintiff has asked this Court to consider Ms. Adducci's demeanor and her voice and her enthusiasm in that telephone call.  And that was the reason, according to plaintiff's counsel, they wanted the video played, which is because the level of enthusiasm and, for lack of a better term, put-togetherness of the remarks are a little more difficult to grab from the written word on the page.

MR. FOLEY:  I ask the Court --

THE COURT:  That's not later in time.  I mean, that's not seven years later.  That's sort of in the zone of time, is it not?

MR. FOLEY:  I don't think it's in the zone of time.  But --

THE COURT:  You think the zone of time is just February 5th?

MR. FOLEY:  Yes.  And I'll explain why.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Okay.

MR. FOLEY: But I'll also ask you to do the same thing the plaintiff does --

THE COURT: Mm-hmm (affirmative).

MR. FOLEY: -- with that Gelov clip. And my proposition to you is simple. I believe the Gelov clip -- I don't know if Your Honor remembers when we were objecting to the deposition transcripts. I don't expect you to. You have many cases. But in our pre-fighting over the motion in limine, Mr. Cataldo made some argument, like, "Well, of course, defendant wants to keep out things that are bad for their case." And I said to Your Honor, this is back in the record, "Your Honor, I have a duty as an attorney to protect the record for my client. I don't necessarily think that is bad for my client." And it was in particular that that I'm talking about -- was talking about at that time. I would ask Your Honor to look at the very same composure, enthusiasm, overly talkative gabbiness of my client --

THE COURT: Careful.

MR. FOLEY: I'm not being mean. Ms. Adducci knows how I feel -- on that call, and see if that, to you, is somebody that is worried that they're in the middle of a gigantic fraud scheme. I don't think it does. I think what it shows, Your Honor, when you look carefully at it, is somebody that believes that their life is normal --

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

THE COURT: Okay.

MR. FOLEY: -- their business is fine, and they're having banking issues, and is extremely apologetic to the person that they're speaking to on the phone call, not the defendant in this case. And importantly, making statements that if you think your world is about to collapse, you wouldn't make. She's saying -- she's describing in particular the very banking incident that we know from the documentary record here did happen. A wire rejected, a delay, a new bank. She's talking about having talked to other people about it. There is nothing in there that says this is somebody that is -- even as of March 7th, thinking to themselves, "I did a really bad thing a month ago, and I should shut up about what I did. I'm worried about that." Even a month later, my client was still openly going, "I had to set up a bank account. These people rejected my money. I'm so sorry. We're going to get you that money. It's coming." You know, she's essentially witnessing for Joe what she knows in a conversation, of course, truncated in the, you know, what was played at the deposition and thus allowed in here. But that's the sum of it. And then I would ask, Your Honor, to listen even more carefully to that recording as you listen, and listen at the end for what you hear in the background on that recording, which is, Mr. Gelov saying to somebody, "Should we tell him?" That's the words I heard,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Your Honor.

THE COURT: The words I heard were, in part, "I don't know what the hell she's talking about." Sorry for the record, but I did hear that utterance.

MR. FOLEY: Yes.

THE COURT: You heard that one too?

MR. FOLEY: I think that was about halfway through the call.

THE COURT: Okay.

MR. FOLEY: He palmed the phone and turned to somebody. So Mr. Gelov, at that point, and we know that later on March, I believe it was 17th --

THE COURT: Sued.

MR. FOLEY: -- he sued.

THE COURT: So it was, "Should we tell her?" Like, that we've called, Counsel, is your presumption.

MR. FOLEY: That we're doing this.

THE COURT: Okay.

MR. FOLEY: And, Your Honor, that type of behavior you have in this case as well. You have in the emails starting at J48, one of them, as I pointed out during testimony, Mr. Ritter was obviously already in communication with an attorney and sent an email and copied his attorney on that email, blind copied.

THE COURT: So?

MR. FOLEY: Because what you have, Your Honor, is this.

THE COURT: Wait. If it was blind copied --

MR. FOLEY: Actually, Your Honor, may I do this? I do want to address that, but I don't want to get distracted from where we're at. It was like the second or third email. I think it's the -- in June, not May and not July.

THE COURT: If it was blind copied to the lawyer, how would we see that?

MR. FOLEY: Because Mr. Ritter printed his emails. So we get to see what Mr. Ritter sees, not what the recipient sees.

THE COURT: The BCC is Tom Ritter on J47, and the BCC is -- I see. The lawyer -- I got it. Okay.

MR. FOLEY: Yes.

THE COURT: It's on 46.

MR. FOLEY: And, Your Honor, that's -- I'm not suggesting that for anything super-duper important in this case. It is relevant, but this is not a key point of mine.

THE COURT: I'm sorry. I distracted you.

MR. FOLEY: No. And I will get back on --

THE COURT: Please continue with your close. Yeah.

MR. FOLEY: The reason that I bring that up is you

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

have the same sort of behavior of somebody at the time of sending at least that email, and presumably then the ones after that email, that's already in contact with a lawyer building a case narrative including Lindy. But I digress, because what we were talking about is --

THE COURT: Wait. I have to stop. Are you suggesting that the emails were sent in order -- as a setup for your client?

MR. FOLEY: I believe they were sent by somebody saying, "Boy, I signed a deal with Mr. Ritter. I put in that document that Mr. --" I'm sorry, "With Mr. DuMouchelle. I put in that document that I'm relying on Mr. DuMouchelle. There were instructions on me," meaning Mr. Ritter, "that I'm supposed to open a trust account and the rest. I've been dealing with Joe this whole time." Because remember, at that point, the defendant wouldn't even be aware that Ms. Adducci had opened the Bank of America account or what was going on.

THE COURT: He didn't know what was going on with the bank account, did he?

MR. FOLEY: Right. But I ask, Your Honor, in the work that you privately do, and I know you read a lot of this, to please carefully really parse through those emails. Because what Your Honor will see is an email, and I think we brought this out a little bit on the stand, in which the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

nature of what's communicated inside the body of the email says, "You and Lindy. I relied so much on you and Lindy." So the you he's addressing is Mr. DuMouchelle.

THE COURT: Right.

MR. FOLEY: And then in the -- to line, not, you know, the dear line, he puts, "Dear Joe and Lindy." I think Your Honor can reasonably infer, and this isn't a big ask, that at that time as those emails are being sent, Mr. Ritter is simply trying to build. I'm not saying that he caused Lindy to do the bank stuff. I am saying Joe did that. Not that Ritter did, Mr. Ritter. I am saying that at that point in time, one, it's irrelevant. It's months after the transaction.

THE COURT: So those emails are irrelevant.

MR. FOLEY: Yes, and I've argued that since the beginning. The emails that Mr. Ritter sends, I believe I referred to them in my brief as self-serving or something like that. And I think, Your Honor, can see, especially with having an attorney, that that's what they were. But I have gotten massively off point, and I will return now. I was in the process of saying that, as I'd indicated, Your Honor, they would be asking you to take future time, future actions, and collapse them into a time period to which they don't apply, and to rely on emotion in deciding this case. And --

20-04381-lsg    Doc 329    Filed 04/20/26    Entered 04/20/26 12:31:16    Page 188 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Rely on what motion?

MR. FOLEY: Emotion.

THE COURT: Emotion.

MR. FOLEY: Emotion. And, Your Honor --

THE COURT: So you're saying that the plaintiff is asking me to use 20/20 hindsight --

MR. FOLEY: Yes.

THE COURT: -- o interpret Ms. Adducci's behavior?

MR. FOLEY: Yes. And --

THE COURT: And credibility?

MR. FOLEY: Yes. And I think that too is important, but we can address them --Let me put it this way. In the broader form of making decisions and rulings in this case here at trial --

THE COURT: Mm-hmm.

MR. FOLEY: -- the plaintiff is saying, "Look at what transpired, what we know now sitting here post-discovery, post-ESI, post-laying everything out." Much of which my client herself learned during the course of 2019, then 2020, then her husband being criminally charged, and then pleading guilty to those charges. And I think Your Honor had a small but very truthful moment that Your Honor should keep in mind. Now, you had many truthful moments anytime my client was on the witness stand, but what I mean is this. When my client was on the witness stand on cross-

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

examine -- actually on direct exam under leading questions by plaintiff during their case in chief, there was an email shown where it said at the bottom that the transfer, I think, was Raygard. It was allegedly an email from Raygard. And her brain was still confused. She still was saying something like, "Oh, no, that's Raygard forwarding that email." And that is, to me, exactly what I want Your Honor to understand. I obviously couldn't have set that up or scripted that in any way. It was out in the middle of their questioning. In her brain, she still, to this day, has some shred. I know she gets it and sees it, but has some shred of belief that somehow Noble did bad things that led to what happened to Joe. And I think that with -- I think Joe's plea was a huge moment in some clarity to her, but I -- I still think to this day, in the back of her mind is a little, like, glimmer of hope that Joe didn't do everything that Joe did, obviously, to the rest of us third-party observers in this case, that he pled guilty to it. And I think that's been so, you know, beaten down by reality now at this point that we are down to something as small and ridiculous as for a momentary second --

THE COURT: So what impact -- Let me go where you are now.

MR. FOLEY: Yeah.

THE COURT: What is the impact on this case of the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

fact that right or wrong, realistically or unrealistically, Ms. Adducci has a glimmer of hope that Mr. DuMouchelle is not such a bad guy as everyone says? How does that impact this case --

MR. FOLEY: Yes

THE COURT: Against her?

MR. FOLEY: I'll explain it to you right now.

THE COURT: Okay, good.

MR. FOLEY: You have a 25-year, roughly, up-ramp to 2019. She testified sometime early to mid-90s they started dating, '99 married, '2019 these events, 20 years of marriage. Twenty to 25 years of trust built, of none of this, of running a business, of frankly having a good life. One doesn't maintain a home in Grosse Pointe or Sanibel and the rest without -- There was success in the business. It's there.

THE COURT: Or as Mr. Cataldo would have the Court believe, this had been going on for a long year, a long time, and they had amassed some $30 million to $40 million in amounts owing to other people because this had been going on systematically-Over a long period of time.

MR. FOLEY: I'm glad Your Honor raised that point.

THE COURT: Okay.

MR. FOLEY: Because Mr. Cataldo raised that point, and he raised that point in a way that would give Your Honor

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 191 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

quite a suspicion.  It was -- it was a good job of addressing it.  I think it even happened on the witness stand.  How -- How did you suddenly get to $22 million in debt?  Because that's what the schedules say.  The schedules list $22.6 million.  I am rounding.  It was $22.6 million and some change, 43, 53, but --

THE COURT:  Million?

MR. FOLEY:  22.6 million.  Look, let's back off some numbers.  $12 million to Ritter brings that down to $10 million and some change.  Gelov, $1.8 million, brings that down to $8.8 million.  And then you have three creditors, again using round -- rounded to the nearest 100,000.

THE COURT:  Say again.  Three what?

MR. FOLEY:  Three creditors.

THE COURT:  Yeah.

MR. FOLEY:  Rounded to the nearest 100 million. I'm sorry, rounded to --

THE COURT:  (indiscernible)

MR. FOLEY:  -- the nearest hundred thousand.  And these names will sound familiar to you, Your Honor.

THE COURT:  Mm-hmm.

MR. FOLEY:  Raygard, 3.5 million.

THE COURT:  Mm-hmm.

MR. FOLEY:  Bernbach, 3.4 million, and Harrity, 900, 000.  Now, plaintiff didn't address Bernbach or Harrity

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

in their case, but they did bring up Raygard, and therefore, I responded on Raygard. And what was Lindy's testimony about Raygard? That she had no idea that Joe was doing business with them. And so what really happens here? When you subtract Raygard, Bernbach, and Harrity, you're basically at zero. You're at, I think, less than half a million dollars? I'm pausing because I see the Court has a calculator.

THE COURT: I want to run the numbers here. 21.6 million. So you're saying, playing Mr. Cataldo here, you're saying, "Oh, well, great. You only took money from five creditors to the tune of $22 million."

MR. FOLEY: No, Your Honor, we were on the --

THE COURT: But it was only five.

MR. FOLEY: Oh, we were on the discussion of timing, right? And you were in particular, Your Honor, had asked the question to me that, what do I mean by, I mean that --

THE COURT: Let's go.

MR. FOLEY: -- seven years after the drop that she still has this, this glimmer left in her. Not a -- I mean, obviously, she's a rational human being, sees things, right? I'm just suggesting that little mistake of like --

THE COURT: Wait, don't use little and mistake in the same sentence in this case, Sir. It wasn't little.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: No, no, no. Little mistake, meaning when she was on the witness stand and for a brief moment saw that exhibit of, I think it'll -- it purported to be. It was Joe forwarding an email to Mr. Ritter saying, "Here are the sellers' wire instructions."

THE COURT: That wasn't a little mistake. He's in jail?

MR. FOLEY: But my client wasn't on that email. I mean, she didn't send that email. That evidence shows that she had nothing to do with it. When I say little mistake, just my client for a brief moment going, "Oh no, wait, but that's Raygard's bank account, right? The last four -- it's been redacted, but the last four digits are the Bank of America account." Now, remember, she didn't see that email. I'm not making some grand admission. I'm saying in her mind --

THE COURT: It wasn't Raygard's bank account, was it?

MR. FOLEY: No. And for a brief second there, despite everything, she go, "Wait. No, that was Raygard. How could that be my bank account? It was Raygard forwarding an email to Joe." And what I'm saying is, again, obviously unscripted in the middle of their thing, it didn't amount to anything. I just think, Your Honor, has a glimpse that this was a 25-year lead up. And Your Honor had

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

responded to that and said, "Well, what do you make of Mr. Cataldo's argument that suddenly they're in?" It is suddenly. It is. Ritter and Gelov, the Court is all too familiar with, and what transpired and all the rest. You have Raygard, Bernbach, and Harrity, and one of those, my client has clearly testified she has no idea that Joe was doing business with. So what I do propose, Your Honor, is in very rapid succession, something happened with Joe, and he got himself in enough problems that, as the Court noted here, taking judicial note from the other cases, Mr. Noble was sending gentlemen to his door, right? And so whatever Joe --

THE COURT: Personnel.

MR. FOLEY: Personnel. Personnel. The size of whom we don't know, right? But in rapid succession, we tack on to, call it normal operating debt, 3.5, 3.4 and 9. You're getting up near, what is that? 7 million roughly, right? In rapid succession, there's a $12 million and a $1.8 million problem added to that. And at a point in time when my client has clearly testified, and there is no reason to doubt, that she was running her business, doing her stuff, mostly in Florida, coming back here from time to time. She shows up to the office, she sees the Yellow Rose, she's giddy about the Yellow Rose. She took pictures that we put in evidence with her and the Yellow Rose. The girls

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

working at the office are talking about the Yellow Rose. It's not her deal. It's really not her deal because it's never been the kind of work that she does. She is a gemologist. She became, shortly before this, an appraiser -- an appraiser. The Court can -- no, not something -- and she testified to this, that there's a lot of hard work and time that went into that, but that's not something suddenly someone does. My friend's getting married this weekend. I'd like to go online and become a minister so I can do something.

THE COURT: No, the Court's aware of how long it takes to do this.

MR. FOLEY: So she's doing this work while Joe is, as the expression goes, shaking two hands at once and kissing babies, right? He is --

THE COURT: I don't --

MR. FOLEY: Glad-handing.

THE COURT: Glad-handing.

MR. FOLEY: He's getting around. He's meeting people. He's calling people. And he calls Mr. Ritter. Mr. Ritter, I hope Your Honor notices on the rebuttal, didn't give rebuttal to the fact that he hadn't spoken to Lindy in, like, 10 years. He gave rebuttal to the fact that Joe and the bathing suit and the hot tub and the rest, fine, he doesn't remember it. But he didn't rebut also that they had

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

this oil well relationship. He now kind of says, "Well, I don't recall it, but there may have been these two wells. I did dig them." This was a thing. He had met Joe in the 90s.

THE COURT: Well, he did rebut that Joe -- Ms. Adducci testified that Joe participated directly with Mr. Ritter in some of the wells, and the rebuttal testimony from Mr. Ritter was that Joe may have participated with members of the Hegge family in their participation in some wells. Right? A little bit different.

MR. FOLEY: Fair.

THE COURT: There's an indirectness.

MR. FOLEY: Fair. And I'll be the first to jump on, it's a different kind of business.

THE COURT: Yeah.

MR. FOLEY: But to come in here and say that he was lured into this by Ms. DuMouchelle -- I'm sorry, by Ms. Adducci, and that he's only here because of his deep relationship with Ms. Adducci, which is actually a point I was going to save for dramatics at the end.

THE COURT: Well, let me -- Okay. And the Court appreciates the dramatics on both sides. It makes this case really interesting, actually. And I'm not kidding around. Everyone's done a nice job, by the way, in case I didn't say that sooner. But here's my issue. You're objecting to the characterization of your client as the lure, right?

MR. FOLEY: As having any part of the lure, especially on what you're calling the transaction in.

THE COURT: But what about the outbound?

MR. FOLEY: That she has never denied. In her initial discovery responses, she says, "I went to the bank."

THE COURT: Did it.

MR. FOLEY: "I was in her -- I did it." This is --

THE COURT: So the outbound situation is going to turn on the legal issue of the meaning of the word obtained, I suppose?

MR. FOLEY: Obtained, intent, entrustment, as Your Honor duly pointed out before. And I just don't see those elements here, plain and simple. Because you haven't been presented --

THE COURT: Intent --

MR. FOLEY: -- with evidence of her intent. That's just not --

THE COURT: You will agree that it doesn't require malice aforethought like for first-degree murder, right?

MR. FOLEY: No -- Yes, in a degree. I don't -- I don't agree. I agree that it does not require malice aforethought in the heavy sense of pre-planning on a murder.

THE COURT: Premeditated.

MR. FOLEY: I think. Yes, murder one requires premeditation.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Mm-hmm.

MR. FOLEY: But I think Mr. Cataldo's explanation of it is -- I, somewhat ironically, exactly what the case law says, well, that's a floor that you're not under. Which is intent of action equals intent to injure. That's basically what Mr. Cataldo said that. She merely had to intend to do the act, and that's the intent to injure. The case law makes it very --

THE COURT: Know that the act was substantially certain to cause injury.

MR. FOLEY: Yes.

THE COURT: That's what he said.

MR. FOLEY: Your Honor, there is the --

THE COURT: And know -- so knowledge gets woven into the concept of intent. Would you agree, sir?

MR. FOLEY: Yes.

THE COURT: And know that the act was substantially certain to cause injury. So 12 million of Mr. Ritter's money hit the Bank of America account, and the next day or two, she moves out $9.5 million of it. No one held a gun to her head to say, "Go to the bank, take out the money," right?

MR. FOLEY: Yep.

THE COURT: Okay. And she acknowledges that she did it. Are you saying she lacked knowledge that it was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

substantially certain to injure Mr. Ritter?

MR. FOLEY:  Yes.

THE COURT:  You're challenging that.  Okay.

MR. FOLEY:  She has said that repeatedly.

THE COURT:  Okay, but how?  She thought that he would just laugh it off and say, "Oh, yeah, fine.  Take my 9.5 million."

MR. FOLEY:  Because of the exact explanation that she was finally able to give today.

THE COURT:  Which is?

MR. FOLEY:  Which is that it was not at all uncommon for deals like this to involve multiple transfers out.  The plaintiff's counsel has done a fantastic job of convincing this Court that because my client had a general understanding that Noble was the seller.  That's why I endeavored to ask about that phrase.  Noble is the seller, right?  That doesn't mean in her mind there's going to be a clean-cut $12 million moves to Mr. Noble.  And if I don't see that, I should be on super high alert.

THE COURT:  She didn't know the identity of the parties, 18 or so parties, to whom the cashier's checks had been cut.  She knew that about $4.4 million was transferred by interbank transfer to Mr. Noble --

MR. FOLEY:  Yes.

THE COURT:  -- and his company.  That long list

Page 201

that's in one of the exhibits, I think maybe J3 maybe, she didn't know who those people were or what --

MR. FOLEY:  Well, no, she did.  She absolutely knew them.  She testified --

THE COURT:  A couple of --

MR. FOLEY:  That she knew a bunch of them.

THE COURT:  No.

MR. FOLEY:  Business that they were doing with sometimes.

THE COURT:  I'm sorry.  Kwiat, she knew, but she said she didn't -- I took good notes for that, and I'm going to go back.  She didn't know what their connection was to the Yellow Rose diamond.  And Mr. Cataldo went line by line.

MR. FOLEY:  I won't even make you find it.  Stipulated.  She did not know their connection to the Yellow Rose other than the Noble name.

THE COURT:  Well, shouldn't she have known?

MR. FOLEY:  No.

THE COURT:  Why?

MR. FOLEY:  Because this is where the circumstances come into play.

THE COURT:  9.5 million is a circumstance.

MR. FOLEY:  Yes, but the more particular circumstances of that day and the history of the marriage and the history of the business and who structured the deal.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 201 of 255

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: What are the circumstances? That she was hoping to get to a party quickly?

MR. FOLEY: Yes. And I understand how that can seem callous in the face of a --

THE COURT: Well, just excuse comes in without just excuse is a factor under 523(a)(6). Correct, sir?

MR. FOLEY: Yes. And so, Your Honor, I think this is where it's very appropriate to bring up what I was going to. I'd like Your Honor for a brief moment to picture those quirky little desk gold statues of Lady Justice holding the scales that lawyers in the 80s and 90s kept on their desk.

THE COURT: Yes.

MR. FOLEY: Okay. Plaintiff says to you, "She was family. I relied on her. I put my trust in her, and I transferred $12 million," and that's the end of it. Because of that, she's liable because I don't have a -- I don't have a document. I didn't put her on the deal. I do have a signed document where I expressly say, "I'm relying on Joe and Joe's value. I'm relying on Joe and Joe's work." Right? That's all in the contract that was given to you.

THE COURT: But we have testimony from Mr. Ritter that he relied on Lindy's expertise as a gemologist --

MR. FOLEY: Yes.

THE COURT: -- and also her testimony that her email signature block includes a lot of letters after it

designating her various levels of expertise as a gemologist, as an appraiser, and an auctioneer. Correct?

MR. FOLEY: Yes.

THE COURT: You remember that?

MR. FOLEY: Yes.

THE COURT: And Mr. Ritter's testimony, even if the Court were to discount -- Let's say they were total strangers, okay? Frankly, the family is perceived differently by different people. They didn't have dinner together every Sunday night. Some people think that's required.

MR. FOLEY: They didn't have dinner together every five years.

THE COURT: I get that.

MR. FOLEY: Right.

THE COURT: So let's say there is -- that family was out of the picture. What about all the letters after her name and the testimony of Mr. Ritter saying that he wanted her to opine, is it real? Is it what it purports to be? What do you think?

MR. FOLEY: Well, he may have wanted that, but she didn't.

THE COURT: She did on the telephone call. She was giddy about the ring.

MR. FOLEY: No, he says that she did. She says,

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 203 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"I testified, I talked to him about the stone."

THE COURT: Okay. And she likes it, good stone.

MR. FOLEY: She admits she sent a nine-year-old insurance appraisal document that was tucked into the same PDF of the -- the GIA report.

THE COURT: Why'd she send it?

MR. FOLEY: Pardon me?

THE COURT: Why'd she send that? Because Joe told her to.

MR. FOLEY: Yeah. But she also said this wasn't uncommon in the business. "Hey, somebody's interested. Send them the package."

THE COURT: But is it -- is it customary to send them the package without looking to see what's in it?

MR. FOLEY: I don't think there was any testimony whether she did or didn't. In fact, given her detailed descriptions of what's in it --

THE COURT: I think she did say she didn't look at what's in it.

MR. FOLEY: I don't -- I don't recall that, but I remember that she was on the stand and said, "This thing was impressive. This was like a bigger book for this diamond than anyone would do."

THE COURT: It's the monograph. The monograph.

MR. FOLEY: Those are the same things.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: That was in the data package?

MR. FOLEY: The data package was one email with one PDF. And literally, think of how documents get tucked in the first pages.

THE COURT: Do I have the whole thing here?

MR. FOLEY: Yes. You have --

THE COURT: The monograph?

MR. FOLEY: Two pages with the insurance replacement and then the monograph behind it.

THE COURT: Okay. I'll see now.

MR. FOLEY: And that's --

THE COURT: I've seen the insurance replacement page. Okay.

MR. FOLEY: Yes. Dated 2011.

THE COURT: I know.

MR. FOLEY: But, Your Honor, I'm back to the --

THE COURT: With a $30 million value.

MR. FOLEY: Yep. In 2011. I have -- we're back to the scales -- the lady with the scales on her desk.

THE COURT: Yes. Help me to understand that part.

MR. FOLEY: Plaintiff's whole case is that it was justifiable for him to rely on her because family. We now know that's not quite what it was.

THE COURT: Right. And the Courts will --

MR. FOLEY: -- with some initials.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

THE COURT: Some initials?

MR. FOLEY: Some initials.

THE COURT: She worked hard for those initials. She said -- She said so.

MR. FOLEY: Okay. Mr. Ritter said she worked very hard for those initials.

THE COURT: Hang on a second. Mr. Foley, do you have initials JD after your name?

MR. FOLEY: Yes.

THE COURT: Are we supposed to ignore those?

MR. FOLEY: Good example. If you come and retain me --

THE COURT: We're supposed to rely on those if I come and retain you.

MR. FOLEY: Yeah.

THE COURT: Yeah.

MR. FOLEY: Look, here's what you don't have in documents here, a retainer for an appraisal, an email saying, "Hey, Lindy, please do my appraisal," an email from my client saying, "Here's the appraisal." What you do have is an email right after the GIA monograph email saying, "Hey, Joe." Lindy's not copied on it at this point because he was doing business with Joe. He takes it, reply, cuts her off the reply all, and replies to Joe saying, "Hey, Joe, who did the most recent appraisal on this thing? Do you

have a copy of it, and what's the value at?" Extinguish all testimony that he says, "I relied solely on Ms. Adducci and the 30 million from the 2011 report." He immediately turned around and was asking Joe where the appraisal was. But take the sum of everything that plaintiff says to you about why his -- they have to argue this. They are arguing to you that is justifiable reliance.

And they are simultaneously arguing to you that my client, relying on her husband of 25 -- of 20 years at that point, 25 years knowing him in this business without these problems, knowing him to do successful deals, knowing like -- in the same way that -- I'm sure you have friends that you work with. They're respected within their community for what they do. That's the husband that my client knew when she went to Tucson in the middle of a days of event and which they make a bit of a big deal of, that she collapsed the timeline on that. It is difficult for me to remember with accuracy the exact events of days from last week, yet alone seven years ago. There is no doubt that she was physically in Tucson, that this event was going on --

THE COURT: May I ask you something?

MR. FOLEY: -- and Joe didn't come.

THE COURT: Where in 523 is there an element of the defendant's justifiable reliance? Justifiable reliance is an element of the plaintiff's case. You're collapsing it

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 207 of 255
212-267-6868          Veritext Legal Solutions          516-608-2400
www.veritext.com

and saying that it's -- I'm putting words in your mouth, but correct me if you will. It's hypocritical for the plaintiff to argue justifiable reliance under 523(a)(2) for them -- for Mr. Ritter to have relied on the compendium or the --

MR. FOLEY: The GIA.

THE COURT: -- the aggregated information statements, whatever was sent to him.

MR. FOLEY: Yes.

THE COURT: But the hypocrisy is for the plaintiff to say that it was unrealistic or unjustified --

MR. FOLEY: My client to rely on --

THE COURT: Your client to rely on her husband.

MR. FOLEY: You're asking where the --

THE COURT: But here is my question.

MR. FOLEY: -- where's reliance?

THE COURT: Who cares? Where is her justifiable reliance at all? An element of the equation that the Court needs to consider.

MR. FOLEY: The intent element of each and every cause.

THE COURT: Excuse me?

MR. FOLEY: The intent element.

THE COURT: Where is that?

MR. FOLEY: What do you mean? Whether it's 523(a)(4) --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT:  I know the intent

MR. FOLEY:  Fraudulent intent or 523(a)(6)--

THE COURT:  So you're saying that because --

MR. FOLEY:  (indiscernible)

THE COURT:  -- her husband told her to do it, that negates her intent?

MR. FOLEY:  No, I'm saying the totality of the circumstances with respect to that is huge.  It's not something that the Court can ignore, and it's not even a stretch.  Where somebody's saying to you, "I put $12 million of faith into this person that really I call family, but it was my friend's daughter that I had last seen," by his own testimony, I think in '08 at her father's passing.  Okay. So then my client comes to you and says, "This was my successful husband of 20 years in the jewelry business that had brokered deals.  We had had some bang-up years with great auctions.  We were respected.  Law firms were using us to evaluate their things." That is her frame of mind.  That is her frame of mind when her husband is telling her, "I'm about to do a killer deal," with a diamond she physically saw and had on her hand in the office and was excited about. And then he calls her in the middle of an event day, says, "Go to the bank." Right?  "Get to the bank." Obviously, as plaintiff's counsel pointed out, obviously he had spoken to her and then fired off the email.  So he calls Lindy.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Wait, say again.

MR. FOLEY: Counsel had pointed out in his closing that obviously because the email says she will be there at 4:20, that he had spoken to her.

THE COURT: Yeah. Had to know where she was.

MR. FOLEY: He calls Lindy and says, "Lindy, I need you to go back to the bank." You can imagine in your own daily life how you'd -- first, you've been called to go to the bank. You're annoyed. Now you've been called to go back. And --

THE COURT: Well, at this point, she's five minutes from the bank. So presumably there was a call prior because she said she was staying far out.

MR. FOLEY: Yeah. Yeah, so he must have called, sat down and said, "Ugh, okay, she said yes. All right, like she's going." Because I got to be honest, I'm already divorced, but when I was married, if I had pulled this with my wife, I'd be divorced earlier. So you know he wasn't sure that she was coming. And so he calls her. I can't imagine what she had to say to him before she ultimately said yes to going, but she says yes. And it takes him some time, obviously, to type out the email because he is going to jam in everything that he can jam in. And you know what? He didn't even do a great job of it because it took him two more emails after that. And so the plaintiff's side is

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

looking at you going, "How could she possibly not have known $9.5 million out?" I come to you with a smaller dollar amount, 12 million reliance on somebody you hadn't seen or talked to more than once in a decade, $9.5 million of reliance --

THE COURT: There's another question here, though, going to totality of the circumstances, this was really done in a rush. She opens the account on February 5th, gets on a plane, flies to Tucson on February 7th. She's at the bank around 11:00. Later that day, she draws out 9.5 million, saying her husband told her to do so. She had already said no to him when he asked her to do the appraisal because that would violate the code of conduct for certified appraisers. And this was kind of a rush, and she was rushing to be somewhere else. She didn't want to be doing this. She made that very, very clear.

MR. FOLEY: Yes.

THE COURT: So why the rush? And how does the rush play into the totality of circumstances? One could wonder, "Huh, just wait till I get back. Joe, why is there such a rush?"

MR. FOLEY: Okay.

THE COURT: That's the question the Court --

MR. FOLEY: I'm actually pleased the Court asked it. And I think I'm going to rephrase it back for a second

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

because I think what the Court is arguing, you have -- in politics, sometimes they talk about the horseshoe. You can go so far left that it becomes almost right, so far right that it becomes almost left. Right? You can be so liberal that you are libertarian, which is almost back to being full circle to the right.

THE COURT: I get it.

MR. FOLEY: What you're -- what I think Your Honor is saying to me is, "Okay, Patrick, you say she was in a hurry, annoyed, and therefore shouldn't be culpable for this. But isn't, in fact, the fact that she was in a hurry and did it in a hurry --

THE COURT: I'm asking --

MR. FOLEY: -- does that make her culpable?"

THE COURT: Is it a part of the totality of circumstances for the Court to consider?

MR. FOLEY: Yes. And I think the Court should consider it in exactly the way that I've described, which now leads all the way back to the question which brought us into this line of conversation. Patrick, what is seven years later the fact that she still makes a -- you know, has that glimmer of hope, as I called it, right? And I want to be very clear, I'm not talking about some genuine hope. She sees the pleadings. But that little, "Wait, you know, Raygard had sent that email."

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Which email are you referring to?

MR. FOLEY: The exhibit where Joe had obviously just created an email from Raygard saying, "This is my -- I'm buying the diamond, and here's my seller instructions." I think it was the third one that Joe forwarded, right?

THE COURT: Someone's going to have to help me with what you're talking about.

MR. FOLEY: Oh, it's the wiring instruction email identified as J13, the February 1st, 2019 wiring information email from Joseph to DuMouchelle.

THE COURT: Why is that a bogus email?

MR. CATALDO: Oh, Drucker.

MR. FOLEY: I said Raygard, Your Honor. I apologize.

THE COURT: Sorry, did you mean Drucker?

MR. FOLEY: I meant Drucker. I apologize.

THE COURT: But that was -- in response to that email, Mr. Ritter wired the money a second time.

MR. FOLEY: Yes.

THE COURT: Correct? And it was not accepted. Correct? It bounced back. That's the second wire, right?

MR. FOLEY: I think Drucker was the final one. That was the one that went through to Bank of America.

THE COURT: Well, this one, J13, is to an account at FineMark.

MR. FOLEY: You're right, Your Honor. That wasn't the final one. The final one was J14, which ends in 9802, I believe.

THE COURT: That's 15.

MR. CATALDO: I think it's 15.

MR. FOLEY: Thank you. 15. So by this point, J15, Joe has switched back again to providing Richard Drucker.

THE COURT: Okay.

MR. FOLEY: Now, again, this is not an imperative point, so I don't want to belabor it, but that's seven years after the event. That is Lindy slowly unbelieving that she works for, or was married to and worked with somebody that wasn't a completely legitimate jeweler. It goes exactly to what I'm asking you to interpret that rush that day as. Because when you have the utmost faith in your spouse, when you have no reason to think that they're up to anything shady, when you have reason, in fact, to believe that they're going to be more delicate because you just got done saying, "You know, I spoke to my son. The one thing he had to say about this was, 'Be careful because Ritter sues people.'" You presume your husband is going to be acting in the utmost of care with this transaction. So when he calls you and says, "Go to the bank, I need to get this done," I don't think the rush of we need to get this done --

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

THE COURT: She didn't ask, "Why now?" She was trying to get to a party. She didn't say, "Hey, Joe. Enough already. Why now? You deal with it." She didn't do any of that. Instead, she went -- she wasn't happy. She went twice on February 7th and walked out with a stack of checks to about 18 -- 15 to 18 people --

MR. FOLEY: Yep.

THE COURT: -- worth millions, put them in a FedEx envelope and sent them back to Joe without ever asking.

MR. FOLEY: Back to Joe, by the way, Your Honor.

THE COURT: So?

MR. FOLEY: Sent them back to Joe.

THE COURT: And she never got on a plane, a red light -- Oh, sorry, a redeye special and intercepted the checks with, you know, feeling, "Oh my God, what have I done?" Hopped on a plane to intercept the checks when --

MR. FOLEY: No, because --

THE COURT: -- delivered

MR. FOLEY: -- she didn't have the feeling, "Oh my God, what have I done?"

THE COURT: But that's the question. Why?

MR. FOLEY: Because she didn't know she had done anything wrong.

THE COURT: Why?

MR. FOLEY: Because she trusted her husband of 20

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

years.

THE COURT: I understand the trust part. But the rush of this, the not even asking if there was money in the account to cover the checks she was drawing out, she didn't ask. Why?

MR. FOLEY: Your Honor, that point in particular was one that was interesting to me on plaintiff's closing multiple times with the, "She didn't even ask."

THE COURT: She didn't. Did she?

MR. FOLEY: If your husband -- Right. Not you, Your Honor. If one's husband writes to them to take money out, and there is not a history of financial problems, overdrafts, a belief that something's wrong, you assume that they're having you write something out of the bank that is meant to be there, and they make a big deal of the email and the cell phone --

THE COURT: Mr. Foley, I've been married for 35 years to my current husband.

MR. FOLEY: You've done better than me.

THE COURT: Every month when there's a stack of checks that need to be signed, you know what my first question is? And it's every time, "Honey, do we have enough money in the account to cover the checks?" That's a logical question. And in anticipation that this was going to come up today, I polled the people in my staff. I said, "What do

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

you do? You come home, there's a stack of checks for you to sign. What do you do?" Without hesitation, "I asked whoever wrote that, 'is there money in the account to cover the checks?'"

MR. FOLEY: What do you do --

THE COURT: As a human, from the Court's rather informal research, but from my experience as an older person, isn't that the more typical human response?

MR. FOLEY: Sitting at a table with a stack of checks to pay bills the old-fashioned way? Yes. Running in a foreign city to a foreign bank at the request of your husband who, and this explains the relevancy of why this was up, whose father is actively dying.

THE COURT: So?

MR. FOLEY: Joe was -- because Joe was a disaster. She was already used to doing the emotional --

THE COURT: But she was still trusting him to make business decisions to the tune of who -- him instructing her to withdraw 9.5 million from the account if he was under that kind of stress? Totality of the circumstances --

MR. FOLEY: Yes.

THE COURT: -- does go into the mix.

MR. FOLEY: Yes, she did because she was already doing the emotional labor. She was already running all over the place doing what she could. It's what led to February

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

5th. He's about to caught to what she thinks is the biggest legit deal of his life. There's no indication, plaintiff has given you no indication as to why my client, at that point in time, would already be suspicious of her husband. I didn't -- Oh, okay. And, Your Honor --

THE COURT: Her father died three months later. His father died three months later.

MR. FOLEY: I had asked at one point on the cross about how he looked --

THE COURT: We talked about that.

MR. FOLEY: Yeah.

THE COURT: Yeah.

MR. FOLEY: It wasn't good. It's what impacted her. It's like she -- I understand again in the benefit of hindsight, but let me put it this way. Had these transactions not been -- and I can say these things because they are established facts. Had the transactions not been wrong, wrong in the sense of they didn't go to -- they ended up not producing the diamond appearing for Mr. Ritter. Had they not been arranged by Joe to be wrong for reasons that Joe understood to people that in some way benefited Joe, not my client. So Joe sets this up. If all of that had happened, nobody would be looking saying, "Why did you listen to your husband?" It's only the later understanding that what Joe had done was in fact wrong that now makes it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

look absurd to have -- to have just run to the bank and signed what he asked for.

THE COURT: That's my point. Is it? Doesn't the fact of the rush, open the account on February 5th. Joe knows she's hopping on a plane to get to Tucson. And then, for lack of a better word, bugging her while she's at this conference she so looks forward to, making her go to the bank twice on the 7th. Okay? The rush of it all. And her testimony was that he did the banking, and he handled the large checks, and suddenly, she's got to do this work. Doesn't that -- that doesn't conflate relationships or time or family or trust, just -- you talked about the zone of being on February 5th. Let's look at that zone. Doesn't the rush of events on February 5th focus the Court in a direction -- ought to focus the Court in a different direction than what you're suggesting? And if not, why not?

MR. FOLEY: Because this. Because what you're saying is, shouldn't that rush have given her pause?

THE COURT: Yes.

MR. FOLEY: And it obviously didn't.

THE COURT: But should it have?

MR. FOLEY: But Your Honor, saying should it have. It didn't. So now we go back --

THE COURT: Oh, wait. So just anyone can say, "Oh, well, Joe told me, and it didn't, and so I'm off the

hook." That's Mr. Cataldo's argument from yesterday if someone says, "Please, go rob the liquor store for me," and you don't question it.

MR. FOLEY: No. But here's the key difference between rob the liquor store, and it's the key difference between this being a just taking orders defense and not. The key difference is knowledge of what -- what you are doing is wrong. Rob a liquor store, pretty patently obvious that you're not supposed to do that.

THE COURT: Taking Tom Ritter's $12 million, shouldn't she have known that was wrong?

MR. FOLEY: Didn't understand that what she was doing in doing that was dispersing Mr. Ritter's money to people that weren't supposed to receive it.

THE COURT: Oh --

MR. FOLEY: That is the key of this case.

THE COURT: Really?

MR. FOLEY: Yes. Your Honor --

THE COURT: Her testimony was that she just --

MR. FOLEY: Emphatically is --

THE COURT: Wait a minute. Wait. Her testimony was that about $5.1 million went out in cashier's checks to a litany of people that Mr. Cataldo explored one by one today, and according to Ms. Adducci, she did not know what they had to do with the Yellow Rose transaction.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. FOLEY: Yes.

THE COURT: And you're saying that that's okay?

MR. FOLEY: Your Honor, I think it's a line that has likely become a nuisance to this Court but really matters. Lindy didn't structure this deal. And that it is -- that's not -- it's not just a case -- it's not a theme. The theme of plaintiff's case is, "You ought to feel really bad for Mr. Ritter. He was devastated when this happened." This is not a theme of my case. It's a factual reality. The factual reality is that Lindy didn't get it. Now -- now I ask you to analyze in a different -- from a different corner of the block, so to speak. Walk around the object to a different perspective.

THE COURT: How do you harmonize with this -- with the Ms. Adducci that we saw on the video?

MR. FOLEY: Exactly, from the Gelov phone call? Right. You have a Ms. Adducci. You have proof a month later of her still buying into Joe's story.

THE COURT: Oh, she seemed pretty much in control.

MR. FOLEY: Yes.

THE COURT: You're telling me that she really didn't know, but in listening to that video, it was not the recital of a person who didn't know.

MR. FOLEY: Didn't know what?

THE COURT: Her business. I mean, this whole

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

story.  The enthusiasm with which she uttered the words in the Gelov telephone conversation, Mr. Cataldo has asked the Court to focus on that, and so the Court's going to ask you, doesn't that go to her involvement?  What she knew as being wrong at the time?  Why was she saying all those things?

MR. FOLEY:  First of all, let's -- it's kind of funny, but no. Let's say by March 7th, by the time of that call, she had learned that things were wrong.  That is not relevant to what she knew on February 5th, 6th, and 7th.

THE COURT:  Okay.

MR. FOLEY:  It's a month later.

THE COURT:  All right.

MR. FOLEY:  But instead, I posit to you, Your Honor, and I'm sure you're going to listen to it 100 times, but --

THE COURT:  I don't know that I can.  It's not -- I can only -- has it been filed in a way I can listen to?  I don't think so.

MR. FOLEY:  It was submitted as an exhibit.

THE COURT:  No, because it wasn't a standalone exhibit.  You took it out as a standalone exhibit.

MR. CATALDO:  You'd have to listen to the whole tape.

THE COURT:  The whole tape of the whole trial proceedings?

MR. CATALDO:  No, no, no. Of the video.  Just that exhibit.  And --

THE COURT:  All I have is the exhibit book, which has the transcript.

MS. CLAYSON:  Right.

MR. FOLEY:  Hold on, Your Honor.  Then read it. This is my point.

THE COURT:  I've read it twice.

MR. FOLEY:  My point is --

THE COURT:  Three times.

MR. CATALDO:  We can get the Court its own copy of the video.

THE COURT:  I would like it filed as a trial exhibit.

MR. CATALDO:  We will do that.  We will do that.

THE COURT:  Is there any objection to it being filed as a trial exhibit?  Because the -- it's a joint exhibit.  What would be filed would be what?  The whole of the deposition or just the excerpts used?

MR. FOLEY:  My only objection Judge, is it's not a joint.  It just P1.  And --

THE COURT:  Oh, sorry.  It's P1.

MR. FOLEY:  But I specifically --

THE COURT:  But the Court already admitted P1.

MR. FOLEY:  I specifically ask that if we were

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

going to admit P1 in video form, that we not spend two hours sitting here watching it because --

THE COURT: I'm not asking you to.

MR. FOLEY: No, I'm sure we already did now, and --

THE COURT: We already did now.

MR. FOLEY: So we want to also now give it to the Court. Please have it.

THE COURT: Okay. There's no objection. Please --

MR. FOLEY: I want to make it clear --

THE COURT: Upload the whole thing, and the Court may want to take the two hours to watch it all.

MR. FOLEY: Your Honor, I want to make it clear.

THE COURT: Yes.

MR. FOLEY: When I say please have it, I had filed a motion in limine to exclude it.

THE COURT: And the Court --

MR. FOLEY: Your Honor has already ruled that it's been admitted.

THE COURT: Denied. Right.

MR. FOLEY: I didn't know Your Honor didn't have, like a USB copy of that video. So --

THE COURT: Do not.

MR. FOLEY: So be it. But then if you have it,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

please listen to it. Listen, not just read, listen to it a couple times.

THE COURT: Okay.

MR. FOLEY: Because when I first listened to it, I cringed for a second. I did. But I listened to it a second time, and what I realized is that is not a Lindy that thinks something's wrong. It has -- it doesn't have the indicia of that. Not at all. That is a Lindy that thinks there were banking issues and is telling Mr. Gelov we had banking issues. You're not -- you're going to keep saying the things she said in that video if you or that call recording with -- please remember, with Mr. Gelov, not Mr. Ritter. That's not somebody that thinks all of a sudden there's about to be no money. That's somebody who thinks the bank is holding up money because they're saying banking issue's going to get resolved, we're going to get you your money.

THE COURT: Or someone who, speaking colloquially, is drinking the Kool-Aid.

MR. FOLEY: Yes. That's different than -- drinking the Kool-Aid that's being given to you is different than mixing the Kool-Aid and handing it to somebody else. Joe mixed the Kool-Aid here. Joe mixed the Kool-Aid. And you're right, my client drank it. She had every reason to. She trusted him to pour any glass that he poured for her for 25 years of dating and marriage.

THE COURT: But she was handing it out to others. When she got on that video and what was --

MR. FOLEY: If we're getting technical, she was handing it to Joe.

THE COURT: Well, and to Gelov in that telephone call.

MR. FOLEY: Oh, you're talking about the information. I thought you meant the wire, the checks.

THE COURT: No. Well --

MR. FOLEY: As plaintiff says, by the way, my client didn't send those checks out to other people. My client threw them in --

THE COURT: She authorized them being issued to other people, and then she sent them to Joe by FedEx. But going back to the video, Ms. Adducci, if she was drinking the Kool-Aid that Joe was giving her, I mean, plaintiff has argued she was part and parcel of Joe's fraudulent conduct.

MR. FOLEY: We have no evidence of that. You have been given no evidence of that, Your Honor.

THE COURT: And the video doesn't do that?

MR. FOLEY: No. And even if you looked at that video, and you come to a different conclusion, and you know, by March, she knew. And even if the -- even if you looked at that video and you come to a different conclusion, and you, you know, by March, she knew.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Oh, she did know?

MR. FOLEY: No, no. I'm saying, let's say you come to that conclusion.

THE COURT: Okay. Okay.

MR. FOLEY: Your Honor looks at it and comes to the complete opposite conclusion of me. You know, by March 7th, she knew. Okay, if that's your conclusion, that's still not February 7th. And that is the -- I'm completely off script. But the mantra of my script was --

THE COURT: (indiscernible)

MR. FOLEY: -- going to be that you have not been provided evidence. This is what I meant in my opening, and I remain in my closing. You are asked to being -- to condense later actions and pull them onto the February 7th. That is their earliest piece of indication because Ritter's -- Mr. Ritter's self-serving emails begin in May, two months later. So the earliest piece of evidence they have, if Your Honor construes it that way -- I think if Your Honor listens to that, you will see what I mean, which is that no, as of March 7th, my client still very much thought these were banking issues. But even if you determine it the reverse, that's not February 5th, that's not February 7th, and this is the sort of collapsing that doesn't work. Plaintiff in their own case really didn't even know where to stop with going, "But you did this thing wrong, and so this means back

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

on February." They got all the way up to basically the filing of the bankruptcy, right? That you should have seen. Well, look, the business started failing, and people started going, and it was an involuntary case. Months after, yes, Ms. Adducci's world fell apart after the transaction, sizably after the transaction.

As we showed on the Bank of America statements, she was writing normal business checks in the amount of, like hers totaled roughly a little over 100,000 on revenues of 600,000 to 700,000 coming into the account, and they were processing through.

THE COURT: Well, I'm not sure why they were processing through when there was a negative balance in the months later. But it's undisputed that she opened the Bank of America account, correct?

MR. FOLEY: Yes.

THE COURT: And that she knew Tom Ritter's -- Mr. Ritter's $12 million got wired in there, correct?

MR. FOLEY: Yep. Which by the way, again, to the question of why didn't she ask, "Is the money in there?" She testified she knew the 12 million was in there.

THE COURT: Okay. Hear me out. She also knew that the LLC didn't have 30 other bank accounts and, you know, 80 million lying around that they could use to repay Mr. Ritter's 12 million if she pulled out 9.5 million. She

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

knew that the only other account they had at that time was the FineMark account, correct?

MR. FOLEY: FineMark and revenues. And as Mr. Cataldo has pointed out, a $500 opening initial deposit.

THE COURT: Okay. Good.

MR. FOLEY: Right.

THE COURT: She knew that there wasn't sufficient other money that the LLC had. If money's fungible, she knew there wasn't -- there weren't other dollars to get Mr. Ritter's money to him once she spent it. That it would be gone, unable to be used for the Yellow Rose diamond and unable to be returned to him, correct?

MR. FOLEY: Slightly different than how Your Honor phrased it. She knew, quote, unquote, "in her mind" that she had just effectuated a bunch of transactions necessary for the Yellow Rose transaction.

THE COURT: How did she know they were effectuated for the Yellow Rose transaction? She testified that all those line items of people that the 5.1 million in cashier's checks, she didn't know their connection to the Yellow Rose diamond.

MR. FOLEY: Because she -- just because she didn't structure the deal doesn't mean that her belief at the time wasn't, "My husband, again, who has given me no reason to distrust him over 20 years, just received Ritter's $12

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

million and is telling me, 'I got to get to the bank and get these checks out.'"

THE COURT: It's undisputed she didn't ask.

MR. FOLEY: I don't know if it's undisputed that she didn't ask.

THE COURT: Did she ask? She said no.

MR. FOLEY: I don't remember that testimony coming from her one way or the other, but we can ask.

THE COURT: We'll see it soon enough.

MR. FOLEY: But Your Honor --

THE COURT: So you're saying she thought she would -- you said she knew she just effectuated withdrawals to buy the Yellow Rose diamond. That's what --

MR. FOLEY: I said this is integral --

THE COURT: Mm-hmm.

MR. FOLEY: because I want Your Honor to hear this. No part of our case is, she sent this money, but don't worry, Judge, she thought other money was coming in to cover it.

THE COURT: Okay.

MR. FOLEY: Not what she said.

THE COURT: She knew there was no cover.

MR. FOLEY: Yeah, because she didn't think there needed to be cover. That's the link here. She didn't think there needed to be. She didn't think this wasn't what was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

supposed to happen with the money.  Not saying she knew.

THE COURT:  Right.  She didn't think what was -- wait.

MR. FOLEY:  The transfers.  The checks --

THE COURT:  She didn't think that the check she was writing is what was supposed to happen with Mr. Ritter's money?

MR. FOLEY:  She didn't think it was what was not supposed to happen.

THE COURT:  Okay.

MR. FOLEY:  And again, this is where I say, Your Honor, truly, plaintiff is asking you to collapse hindsight.  Why?  Because as I was saying before, I ask you --

THE COURT:  Plaintiff's asking me to determine credibility of the witnesses.

MR. FOLEY:  Different.  Yes, of course.

THE COURT:  Exactly.

MR. FOLEY:  That's what you do in a trial, but I picture kind of like the silver bean in downtown Chicago.  You're standing here.  I'm asking you to look at the same object, but just go to a different corner and look at it here.

THE COURT:  Perspective.  Mm-hmm.

MR. FOLEY:  Why would my client move $9.5 million that she believed, if she believed, not that, if she

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

believed that it wasn't effectuating the transaction for her own family and that there was zero of that coming back? That meaning she -- there's been no evidence presented to you that my client was busy going, "Ooh, ooh, Joe's got this. Don't worry, this is going--"

THE COURT: Told us.

MR. FOLEY: What?

THE COURT: Because Joe told her to.

MR. FOLEY: Yes. Yes. That's the key. That's the only reason why, because Joe said, "Go and move it," and she had no reason not to think that. Because what you are being asked to accept, on the other hand, is that my client went --

THE COURT: Well, she's invoking the I trusted my spouse defense.

MR. FOLEY: Yeah. Every time you rephrase like that or the just taking orders defense is a massive underselling of what she's delivered to Your Honor.

THE COURT: That's for the Court to decide.

MR. FOLEY: The me to argue. But Your Honor, from the other perspective, right? the Court must ask itself, what then did she think was going to happen? If you adopt plaintiff's point of view, that with zero evidence of motive, I know we're not in a criminal case, but motive would speak highly to intent, right?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: But wait, for 523, you don't need that vicious malice aforethought.

MR. FOLEY: Oh, no.

THE COURT: Okay.

MR. FOLEY: But for every element, you need intent.

THE COURT: But intent for 523(a)(2), (4) and (6), it's different for each of those sections, knowledge --

MR. FOLEY: Right. But let's take (a)(6) --

THE COURT: -- within there?

MR. FOLEY: -- just for an example. Just (a)(6).

THE COURT: Full and malicious. Yeah.

MR. FOLEY: Yeah. And actually, no, I want to be clear. The. I'm speaking of a slightly different intent. The idea here is you're -- this is really going to come down to the moment, right? The moment -- some period of time capped off by, "I signed the checks." I'm not talking about if they're still arguing that somehow my client induced him to send the money. I get it. I think it's a failing argument. We have somebody that pled guilty to that. We have my client that sent one email, and we have a plethora of evidence to the contrary of that. I'm not talking about Mr. Ritter sending the money in. With respect to the money out.

THE COURT: Outbound.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: The outbound. It comes down to, Your Honor, defining a moment of time where Lindy's knowledge and intent is relevant in that -- that period of time.

THE COURT: Mm-hmm.

MR. FOLEY: And I --

THE COURT: We're now at 4:40.

MR. FOLEY: Yeah.

THE COURT: So you've been going for I think about an hour and 15 minutes. Is it about right, Mr. Cataldo?

MR. FOLEY: Your Honor, I'll --

THE COURT: Are we almost done?

MR. FOLEY: I'll stop, Your Honor. I'll just say this rather than going through each of them. Your Honor, because we have briefs, I would ask Your Honor to look at what evidence you don't have. In a case with five years of discovery and detailed review of all of the communications between these parties, you don't have a single message between Joe and Lindy. They have every message between Joe and Lindy, you don't have a single one of them presented to you as evidence.

THE COURT: Married couples tend to talk and not write things down, especially those that trust each other, correct?

MR. FOLEY: When they're living in Florida and Michigan, you would expect there to be email communications.

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 234 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: No. Pick up the phone and call.

MR. FOLEY: Text messages, anything. They don't -- there's nothing presented to you physically backing the claim that my client --

THE COURT: All right. Anything else?

MR. FOLEY: Just this, literally last sentence. Nothing, no written evidence presented to you establishing any sort of scheme, conspiracy, or knowing and voluntary participation by my client in the same.

THE COURT: Okay.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Mr. Cataldo.

MR. CATALDO: Very brief, Your Honor. Point one, Mr. Gelov's money was not being held up by banking issues. They'd spent it. That whole story was made up, and it was Ms. Adducci that was telling that, Your Honor.

MR. FOLEY: I'm sorry to interrupt. These are not facts and evidence in this case.

MR. CATALDO: These are facts and evidence, Counsel, and please don't interrupt me.

MR. FOLEY: They're not facts in evidence.

THE COURT: Sit down, Mr. Foley.

MR. CATALDO: I didn't understand the logic behind that whole, "Let's deduct Mr. Ritter's $12 million from the money on the schedules to show the hole wasn't as deep as we

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

thought," because we saw all those other people getting paid, right? That 17, 18 other people are getting paid. Let's suppose Mr. Ritter never put up the 12. You'd just have different people on the schedules, okay? Because those people are all paid with his money. The hole is -- you haven't made the hole smaller, okay? So then this whole argument, I'm sitting there listening to the explanation, it just defies common sense. It defies how people would operate, that there's this fire drill going on, that --

THE COURT: You mean the rush -- the rush?

MR. CATALDO: -- and that she never said to her husband, "Why are we doing this?" You think that's possible that never happened? "How much is in the account? Who are these people? Who are these 15 people that I have to go get checks for? And what are they -- " Do you think that's realistic that that never happened? I know that's what she said. She was just sort of with these blinders on.

THE COURT: Maybe she trusted her husband.

MR. CATALDO: Maybe she trusts her husband. You know, it's almost like I was listening to this thinking like there's -- they're sort of advocating there's, like, a one-bite rule. Like, you know, you have for vicious dogs, you get one bite.

THE COURT: Free dog bite.

MR. CATALDO: There's a one-bite rule for fraud.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

So if your lawyer, who's been your lawyer your whole career, says, "I want you to lie." "Oh, he's never told me to lie before, so I get one free lie under oath."

THE COURT: Not how it works.

MR. CATALDO: Or, "Because my husband, he's telling me to go embezzle Mr. Ritter's money. He's never told me to do that before. This is my -- I'm going to use my one free embezzlement here." I mean, she's in the business. She knows how this works. She's taking Mr. Ritter's money and dispersing it to all these people and then just say, "Well, I don't really know who they are, but so therefore, it's okay." Doesn't she have some -- I mean, just apply common sense. People don't operate that way. They don't.

THE COURT: Even people who trust their spouses?

MR. CATALDO: Even who trust their spouses. And let me tell you, if I called my wife when she's at a conference and said, "I need you to go to the bank --"

THE COURT: It's not going over well.

MR. CATALDO: It would not go well. Believe me, I would be like, "What and why are you -- I got to do this why?" You know.

THE COURT: Why now?

MR. CATALDO: And why this -- and we still, you know -- there is still no explanation for that, and I'm sure

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

that was talked about with them at the time.  She didn't acknowledge that, "Why today?"

THE COURT:  Well, she acknowledged how furious she was --

MR. CATALDO:  Oh, yeah.

THE COURT:  -- with him.

MR. CATALDO:  Yeah, she didn't say, "Why today?"

THE COURT:  Mm-hmm.  So we got the emotional reaction without the substance of what went on between them, but they're married, so there are -- we're not going to see everything in writing, are we, between spouses?

MR. CATALDO:  The phrase I would use is, do the circumstances indicate fraud?  And they clearly do.

THE COURT:  They what?

MR. CATALDO:  And they clearly do, okay?

THE COURT:  Mm-hmm.

MR. CATALDO:  That this emergency, we got to get these people paid right this minute.  That's the emergency. This list of all these people --

THE COURT:  That's right at the time zone that Mr. Foley wants us to focus on.

MR. CATALDO:  Yeah.  So this is why, you know, Lindy is speeding to get to the bank in four minutes and she doesn't know why she's going.  You know, that just -- it just doesn't -- it just defies common sense to think that

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

she didn't ask anything about any of this.  That, "Why am I opening this account?  Why are we using Mr. Ritter's money to pay all these people?  Why does this have to be done today?" I mean, it just defies common sense that that wouldn't have happened, Your Honor.  And so, that's why it comes back to what I've been saying.  Of course, she knew.  She knew about -- she was helping with Gelov.  She was in on it with Gelov.  She was in on it with Ritter.  She was in on the whole thing.

THE COURT:  Okay.

MR. CATALDO:  Thank you.

THE COURT:  All right.  So closing arguments are concluded, which means the case is over.  The record is submitted.  The trial record is submitted, and now we get into the post-trial festivities, if you will.  We talked about this briefly before we started yesterday.  And before we go any further, the Court really appreciates your kind remarks, Mr. Cataldo.  It has been a true highlight of my career so far as a judge and my career as a lawyer to get to participate in a case that was tried well on both sides.  On plaintiff's side and defense side, both sides did a really nice job.  The facts, of course, are interesting.  I'll leave it there.  There are facts that there are two perspectives on, and each of you did a great job in presenting.  The trial went pretty smoothly for this number

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 239 of 255
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

of exhibits, and the Court is very grateful.  It's hard to believe that four days have gone by.  It seems more to the Court like about a day and a half.  So that's always the mark of you all did a great job, and thank you.  It was a true honor to get to preside over such professional presentation of a case, both sides.  It had its moments of aggravation on both sides, but everyone recovered nicely, and that's what the Court looks at ultimately.  So thank you.

MR. FOLEY:  Thank you, Your Honor.

THE COURT:  Mr. Foley.

MR. CATALDO:  Your Honor, thank you.

THE COURT:  Mr. Cataldo.

MR. CATALDO:  And I really do appreciate that compliment from the Court.

THE COURT:  It was -- it's terrific.  Now, post-trial briefs.  The Court is going to want you to cover a couple of issues, and we need to talk about timing and choreography.  Do you want to do that now, or do you want to breathe and set a telephonic status conference to discuss this?  Ms. Clayson?

MS. CLAYSON:  Yeah.  So, Your Honor, I think it would be smart to do this by a telephonic status conference because we need to kind of get an understanding of how many days the transcript will take to order.  There's different

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 240 of 255
Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

price points depending on --

THE COURT: It depends how much you want to pay.

MS. CLAYSON: Exactly.

THE COURT: You could have it all tomorrow if you really want. It depends.

MS. CLAYSON: Yeah, we could. We could. And so I think if we could have some time just to sift through that and get that resolved so we can agree on the number of days we want to have the transcript turned around, and then we'll be able to have clearer answers for the Court as to how long we'll need to complete briefing.

THE COURT: Mr. Foley, what do you think?

MR. FOLEY: Completely agreed. And we also need to talk about the finances of ordering that many transcripts.

MS. CLAYSON: Yeah.

MR. FOLEY: So I need to have a time to talk --

THE COURT: Well, that's not something you're going to want to talk about on the record.

MS. CLAYSON: Yes. So --

THE COURT: We all know -- Ms. Clayson and Mr. Cataldo can tell you how -- informally, how that goes.

MR. FOLEY: For sure. Thank you.

THE COURT: Okay. But you probably already know. So what were you thinking about for how long until we have

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

this?  You probably have another thing, another case or two to work on, and we're -- I'm still waiting to hear from both of you on the Gelov settlement.  I forget --

MR. FOLEY:  That is on me.  But I -- with the preparation for this, I haven't looked at it.  We got the final thing put together.

THE COURT:  I know.

MR. FOLEY:  I will sit with my client.  Actually, you're still in town tomorrow?  We will meet tomorrow to review it in person, live, and --

THE COURT:  So the Court is looking at its schedule, and --

MS. CLAYSON:  I will say, Your Honor, that I know that the plaintiff will be anxious to get the ball rolling.  So the soonest the Court is next available.  I know you have some days off next week.

THE COURT:  Yeah.  Ms. London is listening.  You can't see her here.  Would April 2nd in the -- we could do it in the late morning?

MS. CLAYSON:  Your Honor, that would work for myself.

MR. FOLEY:  Your Honor, April 2nd at 11:00 a.m., I'm supposed to be in Judge Hoxill's courtroom for a joint final pretrial conference.  But I understand there was a ruling in the case today.  I'm just not sure what it was

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 242 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

because I sent an associate to receive the verbal oral ruling. That could work.

THE COURT: But you don't know if it was --

MR. FOLEY: I don't know yet.

MR. CATALDO: Your Honor, I have another proceeding on the 2nd, and I do want to participate in this call.

THE COURT: Okay.

MR. CATALDO: So perhaps could we do it on the following Monday?

THE COURT: The 6th is an interesting day because I'll be participating in court at Cass Tech. At the --

MS. CLAYSON: Your Honor, I would love to go. My daughter goes to the school, so I would love to be there for that.

THE COURT: Well, it's in the morning. Talk to Judge Randan's staff. He's holding court at Cass Tech.

MS. CLAYSON: Oh, he's holding court. Okay. Oh, okay. So that's --

THE COURT: It's court.

MS. CLAYSON: It's Judge Randan that will be there.

THE COURT: Thank you.

MS. CLAYSON: Okay.

THE COURT: Judge Randan is holding court at Cass

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Tech to try -- those are such important days for the students.

MS. CLAYSON: Yes.

THE COURT: So the Court has hearings at 2:30, 3:00, and 3:30. Initial scheduling conferences, there's four of them, on Monday afternoon. So I'm not available in the morning. I don't know what time I'm going to get back from Cass Tech, which is why we set things for 2:30.

MR. FOLEY: Your Honor, afternoon 7th? With a question mark.

THE COURT: Question mark for you?

MR. FOLEY: No, for the Court. I mean, I was asking Your Honor if that works, not instructing.

THE COURT: Ms. Clayson, does that work for you?

MS. CLAYSON: The 7th would work for me.

MR. CATALDO: 7th is good.

THE COURT: Ms. London, are we able to do the 7th? We don't have a telephone line, so she's going to type to me. Yes. Okay. And so it's going to be telephonic on the 7th. And what time would you all like? You want to do 11:00, 10:00?

MS. CLAYSON: 10:00 would be --

MR. CATALDO: 10:00 is good.

THE COURT: 10:00?

MR. CATALDO: This will be telephonic, right?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Telephonic.

MR. CATALDO: Telephonic.

MS. CLAYSON: Oh, telephonic.

THE COURT: I don't know how much we'll all miss each other --

MS. CLAYSON: Yes. We're so used to --

THE COURT: -- (indiscernible) experience. But it's going to be telephonic April 7th at 10:00.

MS. CLAYSON: Okay.

THE COURT: And between now and then -- I need to write it down. "April 7th, 10:00. Telephonic." You'll see, I believe it's going to be a notice of telephonic status conference or a minute entry that maybe says, "Trial concluded. Noted. You know, telephonic status conference April 7th, 10:00 to discuss post-trial briefing." And the Court has already expressed its issues, including, would there be a 523 case at all against Ms. Adducci if she had told Joe no and left the money in the account? That's number one.

MR. FOLEY: Your Honor, are we still on the record to decide?

THE COURT: Yes.

MR. FOLEY: Okay, good. This will be in the transcript.

THE COURT: Yeah, you can pick it up at the end of

Veritext Legal Solutions
212-267-6868                           www.veritext.com                           516-608-2400

the record.  Number two, what does "obtaining" mean?  Is it the inbound only, or is it the inbound and the outbound?  Am I making sense with that?

MR. FOLEY:  Yes.

THE COURT:  You both understand?

MR. CATALDO:  Mm-hmm.

THE COURT:  Three, if the LLC had to receive Mr. Ritter's money, and did the LLC have to receive Mr. Ritter's money in trust in order for 523(a)(4) to apply when you're not using the fiduciary parts of 523(a)(4), Ms. Clayson?

MR. CATALDO:  Mm-hmm.

THE COURT:  Or because you're not asserting the fiduciary parts of that section, does that mean that there didn't have to be a formal trust?  And the sub-question there is, what does entrusted mean, E-N-T-R-U-S-T-E-D?  That's an issue from defendant's trial brief.  Then I want you also to consider -- another thing is, is intent the same as knowledge?  You'll probably both get into that when you go through the elements.  You'll have, I suspect, different perspectives.  But that's one of the Court's questions.  All right.  You'll need to figure out how quickly transcripts can be done.  Depends how much the parties wish to pay for the transcript pages.  And give some thought before the status conference on what the choreography ought to be.  Are we going to have simultaneous briefs?  Both sides submit

20-04381-lsg   Doc 329   Filed 04/20/26   Entered 04/20/26 12:31:16   Page 246 of 255
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

them, and responses to the opponent's briefs due simultaneously on a later date?  And how much time do you need to do this?  This was a relatively long trial.  Four days full is a long trial, I think.  Or are you going to want one party to go first, another party to go second?  The Court's current thought is that simultaneous makes sense, but the Court is open on this.

MR. CATALDO:  I would agree with that.  I would propose we do simultaneous briefs, simultaneous responses, and then --

THE COURT:  That's it.

MR. FOLEY:  I don't have any problem with that.  In the --

THE COURT:  Great.

MR. FOLEY:  -- initial ones it made sense, but here all -- it's all on the table now.

THE COURT:  It's everything's out.  We all know all the dots.  It's been a shared learning experience for everybody, and the question is what you're -- how you're going to fashion it in your post-trial briefs.  Mr. Cataldo, is it customary to have a page limit on post-trial briefs?

MR. CATALDO:  Yes.

THE COURT:  What is it?

MR. CATALDO:  Well, it depends on the court.  I mean, the state court and federal court are entirely

Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400

different.  But since we're in federal, 25 pages.

THE COURT:  Can you do it in 25 pages?

That's exclusive of exhibits.

MR. CATALDO:  Exclusive of exhibits.  That's only --

THE COURT:  You might attach -- not deposition, transcript pages.  Think about --

MR. CATALDO:  Okay.

THE COURT:  -- how much you're going to need.

MR. CATALDO:  Okay.

MS. CLAYSON:  Yes.  We can answer that.

THE COURT:  Because the Court -- the Court's never had an -- I've never dealt with post-trial briefs as a judge.  I did as a lawyer.

MS. CLAYSON:  Mm-hmm.

THE COURT:  And sometimes in very large cases, I would ask for a relaxation of the page limit.

MS. CLAYSON:  We can --

THE COURT:  Okay.

MS. CLAYSON:  Yeah.  We'll provide an answer then.

THE COURT:  Give the Court some guidance.  If you don't need it, then the Court -- then there's not going to be an ask.  I'm going to leave that to your collective judgment.  Each side, tell me what you think you need, and then the Court will try and figure out the best thing to do,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

and we'll hopefully be able to get there.  All right.
Anything else we ought to discuss today?

MR. CATALDO:  One very brief point.

THE COURT:  Yep.

MR. CATALDO:  In terms of the video --

THE COURT:  Yeah.

MR. CATALDO:  -- that the Court has asked for, we have the ability to put it on a thumb drive, provide it to the Court, send the Court a link, or both.  So whatever the Court prefers in terms of how you think it would be best so you can view that video.

THE COURT:  Ms. Clayson, if it's filed, it needs to come with an exhibit sheet and a, you know, and a cover sheet for the case so it doesn't get stricken.  And would it be, what, a hyperlink right in, like a page with a hyperlink?

MS. CLAYSON:  That could --

MR. CATALDO:  We could do that.

MS. CLAYSON:  That could work really well.  So yeah, we can --

MR. CATALDO:  We could do that.

THE COURT:  And then it would be available because it would be filed.  At the top page would be the cover -- you know, the pleading cover sheet.

MS. CLAYSON:  Mm-hmm.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT:  And then page number two would be, you know, hyperlink, you know, see link for video.  And then put the hyperlink in there.  And then we could all see it.  Mr. Foley?

MR. FOLEY:  Two points.  One, that sounds fantastic as long as I'd get a copy.  I would ask for a copy in the same form, of course.

MR. CATALDO:  Of course.

MS. CLAYSON:  It'll be publicly filed.

MR. FOLEY:  Right.

THE COURT:  It's going to be publicly filed.

MR. FOLEY:  The second point was a bit of a tech nerd point.  If the Court is, no offense, sorry, was looking to make sure, like to preserve a record, the link only will work as long as a backend server is holding that file up, which means a couple years from now, that link might not work.  Right?  If the --

THE COURT:  Oh.

MR. FOLEY:  -- so if it's attached --

THE COURT:  Also -- please also -- please also deliver a flash drive of it to the Court.

MR. CATALDO:  Yes.

MR. FOLEY:  Oh, Your Honor, if --

THE COURT:  And say so in the exhibit, you know -- say so somewhere that concurrently a flash drive of this has

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

been delivered to the Court, and we'll hold it for safekeeping.

MR. FOLEY: Oh, no, I'm not worried about that. I just mean, I know the Court wants to keep record, right? And if it's attached to a PDF in the way that the Court outputs its recordings from each day, a PDF with an audio file attached. That will then stay part of the record on the Court's servers. I don't know if that matters. I just --

MS. CLAYSON: I don't think we can do it that way, but Mr. Schmitz says that we can --

THE COURT: A video file cannot be put on the Court's docket. Ms. Landon is telling me this now.

MS. CLAYSON: Yeah.

THE COURT: So what are our choices? Ms. London, I know you're listening, and now she's typing again. Perhaps just use it -- deliver a USB to chambers. Does that make sense?

MS. CLAYSON: We can do that.

MR. CATALDO: We'll do that.

THE COURT: I can barely use a cell phone, so we're way above --

MR. CATALDO: Yeah, we can do that.

THE COURT: -- technology. And --

MR. CATALDO: And we'll provide a copy to Counsel

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

as well.

THE COURT:  Please.  And if you want to file an exhibit, you know, a declaration saying you provided the USB of this, and maybe a certificate of service that you served it --

MS. CLAYSON:  We can do that.

THE COURT:  -- on the other side and delivered it to the Court, that would be a way to handle this.

MS. CLAYSON:  Okay, we can do that.  And, Your Honor, I just want to make sure I'm clear.  You want just the portion of the video that was played in Court or the whole entire video transcript?

THE COURT:  Well, I've only seen the part that's been played in Court.

MS. CLAYSON:  Okay, so we'll provide that --

THE COURT:  So Mr. Cataldo, what do you think?

MR. CATALDO:  That was the -- we played the exhibit.

THE COURT:  Just the -- because that you all agreed on --

MS. CLAYSON:  That portion.

THE COURT:  Yeah.  And then you should file an affidavit, Ms. London is teaching me.  There should be an affidavit filed stating that you all provided the USB to chambers and also to Mr. Foley.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MS. CLAYSON: Okay. I can do that. Thank you.

THE COURT: And of what it is. The USB is of the excerpts -- the excerpts of Ms. Adducci's video transcript that were played in Court on Monday.

MR. CATALDO: Your Honor, can I release my client to go use the restroom?

THE COURT: Oh, of course. Of course.

MS. CLAYSON: Yeah.

THE COURT: Ms. Adducci, thank you very much. Mr. Ritter, I know for both of you it was hard, but thank you for being here. It meant a lot for the Court to be able to see you in real time, in real life. I know this was an unpleasant experience all around for you both. Thank you.

MR. RITTER: Thank you.

THE COURT: Anything more today?

MR. FOLEY: No, Your Honor. Thank you.

THE COURT: All right. You, it's 4:59. Today, you take your things. We'll let the CSOs know that you're on your way out, okay?

MR. FOLEY: Thank you.

THE COURT: So they'll probably be down there when you leave, I hope.

MS. ADDUCCI: Okay.

THE COURT: If you have any trouble, just buzz back into chambers. We'll get you out of here.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MS. ADDUCCI:  Okay.  Thank you very much.

THE COURT:  Thank you.

Mr. Schmitz, do you have -- Ms. Adams-Williams, we can be off the record now.  Are we off?

THE COURT CLERK:  All rise.  Court is adjourned.

(Whereupon these proceedings were concluded at 4:59 PM)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

**C E R T I F I C A T I O N**

I, Elias Musalia, certified that the foregoing transcript is a true and accurate record of the proceedings.

Elias Musalia

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  April 18, 2025

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400