UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MICHIGAN

Case No. 19-54531

Adv. Case No. 20-04381

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

JOSEPH G. DUMOUCHELLE and MELINDA J. ADDUCCI,

       Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS RITTER,

         Plaintiff,

      v.

MELINDA J. ADDUCCI,

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         Theodore Levin United States Courthouse

         211 W. Fort Street

         Detroit, MI 48226

         March 24, 2026

         10:04 a.m.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

B E F O R E :

HON LISA S. GRETCHKO

U.S. BANKRUPTCY JUDGE

ECRO: Karley Noble

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

**HEARING re Trial**

**Transcribed by:  Sonya Ledanski Hyde**

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

APPEARANCES:

TAFT LAW FIRM

Attorney for Thomas Ritter

27777 Franklin Road, Suite 2500

Southfield, MI 478034

BY:  R. CHRISTOPHER CATALDO

KIMBERLY ROSS-CLAYSON

JOHN R. FOLEY, P.C.

Attorney for Melinda J. Adducci

18572 W. Outer Drive

Dearborn, MI 48128

BY:  PATRICK FOLEY

JEFFREY RYAN GLAVIN

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

INDEX

| WITNESSES: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|
| Thomas Ritter | | | 7 | |
| Melinda Adducci | 87 | | | |

212-267-6868                Veritext Legal Solutions                www.veritext.com                516-608-2400

P R O C E E D I N G S

CLERK: Calling Case Number 20-4381, Thomas T. Ritter v. Melinda J. Adducci.

THE COURT: The Court will take appearances, please.

MR. CATALDO: Good morning, Your Honor. Christopher Cataldo, Kim Clayson for the Plaintiff, Thomas Ritter.

THE COURT: Good to see you.

MS. CLAYSON: And Mr. Ritter is here in the courtroom with us.

THE COURT: Good to see you all again.

MR. FOLEY: Good morning, Your Honor. Patrick Foley, P Number 74323, on behalf of the Defendant, Ms. Adducci. And with me is…

MR. GLAVIN: Good morning, Your Honor. Ryan Glavin, P-87824, on behalf of Ms. Adducci as well.

THE COURT: All right. And Ms. Adducci, if you could say your name.

MS. ADDUCCI: Melinda Adducci.

THE COURT: Good to see you all. All right, everyone, have a seat. We're starting today with the redirect of Mr. Ritter.

MR. CATALDO: Your Honor, may we call Mr. Ritter to the stand?

212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Please. Mr. Ritter, you understand you're still under oath? Mr. Cataldo, do you wish for me to re-administer the oath?

MR. CATALDO: No, Your Honor.

THE COURT: No, okay. You're still under oath, sir. Please have a seat.

REDIRECT EXAMINATION OF THOMAS RITTER

BY MS. CLAYSON:

Q     Good morning, Mr. Ritter.

A     Good morning.

Q     Can you remind us who introduced you to Joseph DuMouchelle?

A     I would presume it was Melinda.

Q     Did you know Melinda Adducci to be an expert in fine jewelry and gem appraisals?

A     That was always my understanding.

Q     I'm going to have you turn to Joint Exhibit 9. The portion -- are you looking at the portion dated for Friday, January 25th, 2019?

THE COURT: Excuse me one second. I can't read this.

MS. CLAYSON: It's blurry.

THE COURT: I don't know what -- there we go.

MR. CATALDO: There we go. Thank you.

THE WITNESS: What date am I looking for?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 7 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

BY MS. CLAYSON:

Q   January 25th.  It's about a quarter of the way down the page.  If you look at the bottom corner, it should be Page 195.

A   Okay, that's helpful.  Thank you.  I'm there.

Q   Okay.  You're there?

A   Yes.

Q   So that Friday, January 25th, 2019 email, who sent that to you?

A   Melinda Adducci.

Q   Did you speak with Melinda Adducci before she sent this email to you?

A   I did.

Q   What was your understanding from that conversation?

A   My recollection is we spoke about the diamond and the relative value of it and potential resale value of it, and basically just confirming what Joe had proposed on the purchase and resale of the diamond, The Yellow Rose Diamond. If we could buy it at $12- to $12.5 -- I guess $12.5 was quoted at the time -- and resell it for $6 something, between $16- and $20-, if that was feasible and reasonable, and she confirmed those and I basically relied on that.

Q   If you can turn about three pages in, the bottom corner will say 198.  Was this the start of the documents that were sent with that January 25th email from Melinda Adducci?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 8 of 252
212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

A     Yes.

Q     What was your understanding of the significance of this first page dated for January 31st, 2011?

A     Well, I guess I'd looked at that and presumed that was an appraisal, that was my understanding, with the $30 million referenced in it.

Q     At the time of this email, did you know --

THE COURT:  Wait.  I didn't hear the last part of the answer.  Mr. Ritter, I need you to keep your voice up to make sure that I hear everything.

THE WITNESS:  Okay, I'm sorry.  I thought I was speaking into there, but I'll try to be more deliberate.

THE COURT:  You're doing a great job.  I didn't -- that last answer.

BY MS. CLAYSON:

Q     Okay.  So can you explain what your understanding of this first page was?

A     Well, I thought that was an appraisal of the diamond as it describes it in detail and gives a value at the bottom.

THE COURT:  To clarify the record, Ms. Clayson, is that the first page or the third page?

MS. CLAYSON:  It's the first page of attachments after the email, so that's 198 at the bottom.

THE COURT:  I'm unable to find it.

MS. CLAYSON:  Oh, it should be -- I see what page

212-267-6868            www.veritext.com            516-608-2400

Veritext Legal Solutions

you're on, Your Honor. It should be just before that. There you go.

THE COURT: Okay.

BY MS. CLAYSON:

Q    At the time that you received this email, do you know who authored this page?

A    I do not and I didn't then.

Q    At the time that this email was sent, did you know any difference between an appraisal or a GIA report?

A    No.

Q    What were you relying on to affirm the resale value of The Yellow Rose?

A    Well, I got all this data and just looked at it and it's all pretty, shiny stuff and values recited. I just presumed that was the value of it and Melinda basically confirmed that in our phone conversations, so I really had no reason to doubt that.

Q    Mr. Ritter, if you can turn to Joint Exhibit 11. And this was an email you sent to Melinda Adducci?

A    It is.

Q    And you said in the second -- I'm sorry -- the third sentence, you said, "It was not my intent to leave you out or lessen your part in this, as I know your skill and expertise in the gemology field is at the top." And what was her part in The Yellow Rose transaction?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Well, for me, my understanding of her background was --
I think my brother even said she probably has better
credentials now than I have.  So I relied pretty much solely
on her -- our discussion where she described it and
confirmed that the value is there, the diamond was a
remarkable piece, and the sale, if we could buy it as
described between $12- and $12.5- and sell it between $16-
and $20-, we would make a good profit and all of us could
make some money on it.

Q     And after you wired your $12 million to that Bank of
America account, did Melinda Adducci ever reach out to you
to ask how The Yellow Rose transaction went?

A     Never.

Q     And then we're just going to look at a few last
exhibits here.  If you can start with Joint Exhibit 45.  So
the next four exhibits -- 45, 46, and 47 and 48 -- these all
occurred in May, these emails -- I'm sorry.  These emails
were transmitted in May, two in June, and one in July; is
that right?

A     Yes.

Q     Based on what you know today, when you sent these
emails, where was your $12 million?

A     Well, I didn't really know because nobody had given me
any straight answers, so I was pushing to get answers from
any source that I could.  I was hoping Lindy would either

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

push Joe to answer me honestly or maybe she would tell me, but I got nothing more from anybody as to where my money was.

Q    And I just want to clarify.  So since -- at the time that you -- knowing what you know now as a result of this litigation, where was your $12 million actually at this time?

A    It was down the road immediately, I guess.  It never -- there was never a chance that the stone was purchased and there was never a chance I'd get any money back.

Q    Would you have ever entered into The Yellow Rose transaction without Lindy's guidance?

A    I would not have.

          MS. CLAYSON:  I have nothing further.  Thank you, Your Honor.

          THE COURT:  Thank you, ma'am.  I'm just making notes.

          MR. FOLEY:  Your Honor, will the Court allow a brief redirect -- I'm sorry -- recross?

          THE COURT:  No.

          MR. FOLEY:  Thank you, Your Honor.

          THE COURT:  On what basis?  It goes direct, cross, redirect.  Ms. Clayson?

          MS. CLAYSON:  Your Honor, I believe we are done with the testimony of Mr. Tom Ritter.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: On the Plaintiff's case.

MS. CLAYSON: On the Plaintiff's case, that's correct.

THE COURT: All right. I suppose you can call Mr. Ritter as part of your case, Mr. Foley.

MR. FOLEY: Thank you, Your Honor.

THE COURT: Okay. Mr. Ritter, you're free to step down now. Thank you.

MR. RITTER: Thank you, Judge.

MR. CATALDO: Your Honor, we would now like to play the video excerpts, P-1. We're going to play the video now.

THE COURT: P-1?

MR. CATALDO: The long-awaited video.

THE COURT: Oh, the P-1, yes. Are the excerpts tabbed to deposition pages by chance?

MS. CLAYSON: So, Your Honor, the video will have -- we can kind of slow it down, but the video tell you where in the deposition page number. It'll come up with a screen that shows page number and line, and we can pause it long enough to allow you to get there if you would like.

THE COURT: Not to -- I just want to write it down for my notes. I'm doing --

MR. CATALDO: Your Honor, we can pause it any time you'd like.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Okay. I mean, judges do trial notes, so, you know, we're up here taking notes.

MR. CATALDO: So it'll run along and you'll see the page and line will run along with the transcription, almost like closed caption that I use at all home all the time. It's exactly like that, but even better because it has the page and line.

THE COURT: Perfect.

MR. CATALDO: But if the Court would prefer us to -- at any point, we can pause it to make sure you have those specific places.

THE COURT: Having read the deposition, I just want to jot down the page and line, so I can remember what was shown here and look back at the video transcript -- I'm sorry, the deposition.

MR. CATALDO: We're happy to pause at any time the Court would like.

THE COURT: Thank you so much.

MR. CATALDO: May we begin?

THE COURT: Sure.

(Video playback begins)

"Q  Explain your relationship to Tom Ritter, please.

"A  Well, I've known Tom since I was probably --

(Video playback concluded)

THE COURT: Okay. I need you to pause it. I

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

don't see page numbers.

MR. CATALDO:  Your Honor, if you look…

THE COURT:  Page 11, okay.

MR. CATALDO:  Your Honor, if we go back on, I'll show you the page and line.  So if I may, may I?

THE COURT:  1112, 1113.  It's Page 11, Line 12 and Page 11, Line 13?  Okay, thank you.

(Video playback begins)

"Q   What is your relationship with Tom Ritter?

"A   Well, I've known Tom since I was probably 6 years old.  My oldest brother -- I have three older brothers, and my oldest brother is married to Tom's -- or my oldest brother is married to Tom's sister and his only sister and they dated in high school.  So I've known -- we used to go over to their house for Christmas Eve dinner.  They had an open house.  His dad was my dentist.  His twin brother and his other brother, who is now deceased, I worked for them when I was starting at 15 years old and that's how I got into the jewelry industry.  I worked in high school and I worked all through GIA before I got married.

"Q   Are your parents still alive?

"A   Yes, my mom.  She's 93.

"Q   Does she still have a relationship with the Ritter family?

"A   Well, we all have a relationship with Pam.  She's

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

my sister-in-law. She's my sister. I don't have a sister and she doesn't have a sister; she's my sister. I've known her since I was 7. I am very close to her.

"Q And does your mother live a street away from where Tom and Carol Ritter --

"A Yes, two streets.

"Q Two streets.

"A And my sister-in-law lives one street the other direction.

(Video playback concluded)

MR. CATALDO: It was September 3rd, 2019, Page 102, and I just read from Lines 22 through 25.

(Video playback begins)

"Q All right. Go ahead, Lindy.

"A Well, it was asked about our business and our business and the Joseph DuMouchelle business. Was it asked in that context? No. I didn't -- I didn't personally do any business with Tom Ritter personally. Joe did. I was asked questions, but I didn't do it. Tom and I did not do business. I did not go and see Tom. I never called Tom. I never saw him when he went back to North Dakota to try to do business with him.

He called and asked apparently my opinion on something. He wanted to talk to me, but I did not -- me personally? He was not my -- I did not go and try to do

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

business with him.  He was doing it with Joe, so that was my answer of no.

"Q   So you've never borrowed money from him, from Tom Ritter?

"A.  Me personally?

"Q   Yes.

"A   No.  I haven't borrowed money from anyone except my mother through all of this.  I don't borrow money from people.  That's not what I -- I've gone to a bank to get loans before in our business, but I'm not someone that goes to borrow money.  Joe would have borrowed money.  I had no -- if Joe borrowed money from Tom, it's not something that I -- that he made me aware of.

"Q   I'm asking what you had done.

"A   No, I have not.  No, I've never called Tom and asked him to borrow --

MR. FOLEY:  Lindy, stop.

"Q   Have you ever heard of The Yellow Rose?

"A   Yes.

"Q   When did you first hear of The Yellow Rose?

"A   When I -- when it came in the office.  It was shipped to our office in Michigan.  I wasn't there when it came in, but when I came in, everybody was excited, the staff and they showed it to me.  I want to say maybe a family wedding that was going on, and I happened to be in

the office.  I flew in for the wedding.

"Q   You flew into what office?

"A   I don't know.  I don't have a memory of -- I don't remember how I got there.  I wasn't -- I was living in Florida and I would work in New York, but I wasn't always in Michigan.  So I know that I came in for a wedding, my daughter flew in for a wedding, you know, a family wedding and that is the first time that I saw it and everyone was excited about it.

"Q   It was in the office where, in Birmingham?

"A   In Birmingham, yeah, and -- yeah, yup.

"Q   Who had it?

"A   The office.

"Q   Well, the office --

"A   The safe.  It was in the safe.  It was in the safe.  They pulled it out.  My office wasn't in the same room as where everything was at, but it was in the safe apparently.  That's where they would keep everything.

"Q   Did someone pull it out of the safe to show it to you?

"A   I didn't pull it out of the safe, yeah.

"Q   No.

"A   I wasn't the keeper of everything in the safe, so…

"Q   How did you come -- did you see The Yellow Rose in the office in Birmingham?

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

"A   Yes.

"Q   How did -- who took it from the safe and showed it to you?

"A   I don't know.  I don't know.  I don't remember.  I don't remember.

"Q   Can you exclude people?  Was it Joe?

"A   I don't know who brought it out, whoever was working in the office at the time could have, anybody could have pulled it out and shown it.

"Q   And when you said they showed it to you, what did they do with it?

"A   I don't know.

"Q   Did they put it on your finger?  Did you put it on your finger?  Did you put it under a microscope?  Did you -- what did you do?

"A   So it was in the office.  It was in the Michigan office, which -- they all lied to the FBI and said they never had it there.  And when I told them yes, we did, they said, no, you didn't, and I said, yes, we did.  And he said -- and then they went back to (indiscernible) was allowed to change his statement apparently.  But it was there for a long time, for like four to six months, and I don't know.

They -- long before Tom, from my memory, that I didn't work with Bill Noble ever.  I've never spoken to him.  I don't -- I never dealt with him, I never spoke to him.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

I've never met him, but he -- Joe had met him a few years before, which he also lied about. They were working on -- when I say they, it was not including me. They were working. They had a book put together. They were working at Joe's sister's, our staff, they were all working. They had names of people that they worked with, you know, they have a lot of clients that I don't have privy to that are high-end clients. I'm not going to say their names right now, but they're very well-known people in the world, and they were showing it.

And the one time that I had it on my hand, which you probably saw, I was asked to go in. There's a very well-known -- again, I don't want to throw names out there unless Patrick tells me I can -- a very well-known name in Birmingham in the Birmingham Bloomfield Hills area and she's very wealthy. And Joe -- one of Joe's sisters, she's a buyer downtown at DuMouchelle's and one of Joe's sisters had contact with her and she actually came over and looked at it, and I didn't set up the meeting. I was asked -- I was in my office and because I'm very knowledgeable -- I'm a master gemologist appraiser. I'm a senior appraiser, I've been -- I'm a gemologist. So whenever anyone asked me to look at something for knowledge or, you know, to try and explain it.

But they asked me if I would go in there and talk

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

to her. I thought it was a very cool piece. There was no reason not to be excited about it. But Tom Ritter was not --

"Q (indiscernible).

"A Yeah. Tom's not the first one. I don't think -- yeah, I don't know, yeah.

"Q I think the question was, did you put it on your finger or did you --

"A Yes, I think I did. I don't know. I think -- I mean, I think everybody did in the office. I think everybody put it on their finger. It was a fun -- it was a fun piece to have, I guess. I don't know. They were excited about it.

"Q Did you photograph it when it was on your finger?

"A I think I photographed it because I thought it was very cool and, at that time, I was doing some of the social posts and the Instagrams and the whatever. But I didn't -- I didn't post it because -- I don't know. I don't remember, but I didn't post it. But I took all the photos for, you know, for our Instagram and for plugging for social media, which we do on Facebook and we would get buyers that would come in.

MR. FOLEY: Just answer the question.

"A Yeah, I think so. Yeah, I believe I did. I thought it was very cool. Why wouldn't we do that? I mean

--

MR. FOLEY: Lindy, it's not an accusation. Just answer the questions.

"Q   Did you examine it as a gemologist?

"A   Yes.

"Q   What did you do to examine it as a gemologist?

"A   Used my loop and my eye. I'm nearsighted, so I can look at pieces like this and I can see close up that other people cannot see. We also have the GIA report, so you just look to that. It was normal routine to say that you do. We had the GIA report, the book, everything that went with it.

"Q   Where did you get the GIA report from?

"A   I don't know. I wasn't dealing with Bill Noble. Ask Joe that question.

"Q   I'm asking you whether you know the source of the book.

MR. FOLEY: And she's answered that question.

"Q   You didn't procure --

"A   When you have a GIA -- when you have a diamond come in, you have reports come in with the stone. So Bill Noble, I assume, would be the only person that could have sent that book in. They had a book, it had a -- I mean, it was written up. It had a book, it had a GIA report. It had more than the normal.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 22 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"Q   So you saw The Yellow Rose.  You saw the -- is this, you call it an appraisal or what is the documentation that accompanies it?

"A   It's a GIA report.

"Q   GIA report?

"A   Mm-hmm, Gemological Institute of America report that all diamonds of size have to have if you're going to sell them.

"Q   Did you see that report?

"A   Yes.

"Q   Was there ever an appraisal of The Yellow Rose that you ever saw?

"A   I think I saw an appraisal that Bill Noble did on it.

"Q   And where did you see that?

"A   I don't remember.  It would have been -- I don't remember.

"Q   Did you ever acquire in your name The Yellow Rose?

"A   Never.

"Q   Did Joe acquire The Yellow Rose in his name?

"A   I can't speak for Joe.  I don't know what Joe did or why he did or what.  I don't know what Joe does.  I can't --

"Q   To your knowledge, did Joe acquire The Yellow Rose in the industry?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"A    What do you mean by the word acquire?

"Q    Buy it.

"A    I don't know.  I don't know what Joe did.

"Q    You don't know whether he bought it or didn't buy it.

"A    Typically, when an item comes in to the office from an industry person, like someone that's in the industry like a -- we call them a dealer, but they're like a diamond dealer or a jeweler or whatever.  Typically, if they send it to someone, they send it on memorandum, which means they're sending it to you with a price on it and this is what we're looking; otherwise, no one sends anything to anyone unless they have the intent to sell.  You don't send, especially an expensive diamond ring like that, you don't send it for fun.

"Q    Again, my question is, to your knowledge, did Joe individually purchase The Yellow Rose?

"A    I don't know that answer.

"Q    Did DuMouchelle Jewelers ever purchase The Yellow Rose?    "

"A    I don't know that answer.

"Q    To this day, you do not believe it.

"A    I don't know the answer.

"Q    Did you personally purchase The Yellow Rose?

"A    No.

MR. FOLEY:  Objection.  Asked and answered.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"Q   To your knowledge, direct knowledge, did you ever sell The Yellow Rose to anyone?

"A   Okay.  So did I personally?  No.  Joe -- Joe worked on -- Joe worked on everything with The Yellow Rose. I was -- he asked me -- I have my own customers that I work with and William Noble was not my customer that I worked with and neither was Tom Ritter.

"Q   Did DuMouchelle Jewelers ever sell The Yellow Rose?

"A   I don't know.  I would think so.  I mean, I didn't see the transactions, but that's what I believe happened, but I don't know.  I didn't see it.  I don't know.  I mean, I believe it happened because Joe worked on it.  But I -- again, I guess if he received money, then, yes, he did sell The Yellow Rose.

"Q   Why do you believe he sold The Yellow Rose?

"A   Because why else would he receive money for it?

"Q   Who did he receive money for it from?

"A   Tom Ritter.

"Q   In your previous deposition, Page 103, you were asked, Line 7.

'Q   Do you recall the company receiving a $12 million wire deposit from the Ritters earlier this year?

'A   No.

Is that still your testimony?

Veritext Legal Solutions
212-267-6868               www.veritext.com               516-608-2400

"A   I don't -- yeah, I don't remember saying that.  So I believe there was a wire received, yeah.  I don't remember answering that way.

"Q   There was no context.  The question was at that time, September 3rd of 2019:  'Do you recall the company receiving a $12 million wire deposit from the Ritters earlier this year.  Answer, no.'  Was that true at the time you responded?

"A.  I don't know.  I don't remember.

"Q.  'Q   Ms. Adducci, what is The Yellow Rose Diamond?

'A   I don't know.

"A   Right.  That was probably Dennis Eagan telling me not to say that.  I had no idea what was going on at the time, of what -- why they were saying to say that.  But I actually got really mad at him and angry afterwards and said, to me, that was what I could go after him for that for telling me, for advising me at a time when I -- when I had not been through depositions or been sued before and he came back and said that to me?  He got really angry and he goes -- and he said just say it, and he yelled at me.  So there you go, that's my answer.  Go ask -- let's go ask him.  Let's ask Dennis Eagan why he said that.  Great legal advice, right?  What I sent did not -- when you came back and gave me a deposition later, I don't recall being that way, so it was really horrible advice that he gave me.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 26 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

"Q   Why was giving Tom an appraisal of The Yellow Rose a conflict of interest?

"A   Because an appraisal should be an independent opinion of valuation.  And if we -- when I do an appraisal if we've sold something, I'd call it a statement of replacement; it's a document for insurance.  But if you're going to do a confirmation of purchase price or a market comparison, whatever -- depending on -- depending on the reason that person is going to use that appraisal for whatever reason they need it for.

But I told Joe, I was in the middle of -- when all of this was going on, I had my -- I had been working for four years, maybe five years prior to that flying and attending classes for the American Society of Appraisers.  I flew to Boston.  I flew to -- back when my kids were little back earlier, I always wanted the designation of American Society of Appraisers, and I kept referring (indiscernible) people and for appraisal.

And it was a goal of mine that I was going to get this title and I went after it and I was working really hard on all my reports, so you know, it was all very fresh in my mind.  And I said, Joe, for me to do this, I'm too close to the scenario.  I don't -- so he referred it off to -- you know, he asked me who and I -- you know, I don't know that I even gave him a name, but I said I'm not doing it because I

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

don't -- if we're involved in a sale and somebody wants research, it's better -- and for Tom, it's better to go and get an independent opinion outside of mine. And I just didn't want to do it because, you know, it was a big project and there was no reason other than I think of an appraiser, it's what I tell people now even.

"Q I'm directing you to Number 2, the first page. Does this appear --

"A There's only -- yeah, there aren't two pages; there's only one. Oh, there are two pages? Okay.

"Q I'm on page -- the end of BOA 000006, $839,000.

(Video playback concluded)

MR. CATALDO: Your Honor, we paused it because the deposition exhibits and the trial exhibits are numbered differently. So right now, the document that the witness is talking about is our trial exhibit -- it is the first page of Exhibit -- this one happens to line up; it's Exhibit 2 in the trial exhibits.

THE COURT: J2?

MR. CATALDO: J2, Your Honor.

THE COURT: Thank you.

(Video playback begins)

"A Yes, I see that.

"Q Yes. Is everything on that page in your handwriting?

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

"A    Yes -- not the amount, not the amount.

"Q    Not the amount.

"A    No.

"Q    Everything but the amount.

"A    Right.

"Q    Your signature is your signature.

"A    Yes, it looks like it is, yes.

"Q    Who inserted the amount?

"A    I don't -- it would have been a bank teller.  I don't know.  That's not my handwriting.  I don't know.

"Q    How would the bank teller know how much to insert?

"A    I don't know.  I don't remember this.

"Q    Do you mind --

"A    I've been going to Tucson, Arizona for over 30 years to the gem show.  I go there for educational conferences to the Accredited Gemologist Association.  Every year I go there and I sit through classes and there's an auction.  The Accredited Gemologist Association is a group of advanced gemologists and every year, we would go there.  Joe was at one time the president.  I was the one time -- it's associated with the Gemological Association of Great Britain.  It's where we get our education for advanced knowledge.  It's where the people from the labs come and lecture.  And then he also was the auctioneer for GIA for the alumni, which is a very big auction that he did for

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

over, I would say, 20 years.

"Q   So your recollection is that you do not know where you were when you filled out this form?

"A   Well, I'm looking at -- I'm looking at that part and this must be when Joe didn't warn me, didn't tell me anything and said, can you go to the bank, I need you to go to the bank, and I was supposed to go to a conference.  He was supposed to fly in and meet me.  I had -- I had no idea any of this was going to happen.  I had no -- and I was very angry at him because I was in Florida, from my recollection, he was in Michigan.

And, first of all, just opening that bank account, I didn't -- I didn't know why he was asking me, but I said why don't you -- I think it was for the money to transfer because the FineMark Bank rejected it, he told me.  But I said why don't you just have -- put it into an escrow account, and he said Tom Ritter doesn't want it in an escrow account.

So a day -- a day or two before I was leaving for Tucson, which I was trying to get ready to go to the show which I went to every year and I was going to do the educational conference, he asked me to go and open a bank account, that it had to be a bank account that could be accessed from Florida, New York, and Michigan, which is why we had Chase because you had to be able to go to different

banks. And -- hated Bank of America, we had them before. We had them for our personal and I didn't -- you know, I didn't really care for them, so I was kind of angry about that, so he had me go open the account.

But I had no warning when he asked me to do that, I was frustrated. He said that FineMark turned -- I don't know. He said FineMark, after having the wire for a couple of days, decided to turn it away or something because they had actually done that, you know, like Chase. Chase now doesn't want anybody in the jewelry industry and that was going on at that time. So I thought it was just another bank thing where they, you know -- I don't know. They're a small bank, but they said they didn't want business banking. This is what he told me. I never spoke to them myself directly. So this was something he asked me to do and I -- nothing planned that I did, nothing that I had planned to go and do, you know, but I…

So then in Tucson, he was supposed to fly in and meet me and he called me, I believe that morning, and I was getting ready to go to the educational conference through the AGA and he said can you stop at the bank. And I said, well, yeah, but I'm going to be late for my class because the conferences start at 8:30. And he said, you know, I really, really need you to do this and I said okay. You know, I didn't know -- I didn't know why he wanted me to go

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

there.  I had no warning of why he wanted me to go and do this.

"Q    So --

"A    But in business, I will tell you, back in 2008/'09/'10, when the whole banking thing happened, this is all I could think of it was that there was something going on with FineMark because we had the Private Bank in Grosse Pointe.  There was also a location up on Troy, I believe, Birmingham or Troy or Bloomfield.  And we had to move money out because there was a run on that bank and we moved it.  We had just had a big auction and we had -- we had a couple million in there and it wasn't our money.  It was a customer's money and we had to set up to have that money moved over to Chase because the Private Bank was going under and someone gave us that tip and said you need to get your money out of there fast.

And so, I just -- I didn't know what was going on with FineMark Bank, but I knew that we were trying to do business with them.  They wanted to do business with us.  We actually did a lecture at their bank.  We went to their bank and actually did a lecture for their clients and did a night where we did a favor for them and looked at things and, you know, we were on very good terms with them.  But I -- but I know everybody in the office was frustrated with them because they weren't very quick at telling, like, if

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

somebody -- if you put -- I don't know if someone wired money or something there. I don't know. I didn't -- they didn't -- they didn't respond because they didn't have the staff quick enough.

So I didn't know why I was doing this. I didn't understand. I had no idea why he asked me to go there, except that he asked me to go there and I said okay and I was pissed at him. But I didn't do any of the -- the communication that went on from my memory now, the communication that went on there was with the bank teller and Joe on the phone and not me, so this is not something I planned at all. I was angry and mad at him.

And then after that, later that day -- in fact, that night, I went to dinner with Rich Drucker and a whole bunch of colleagues because these are all top people in our industry that I have great respect for and they respected us -- we came every year. We had a great reputation until we met Bill Noble, who's a complete con artist. And basically, they said what's wrong -- we went to dinner -- and I said I don't know. I said, Joe's acting really strange. And they said, you think he's having an affair and I said, I don't know. I don't know what's going on. I said, maybe -- I think it's just his dad. His dad has cancer and his sisters are calling him, I said, but I don't know. I said, but he's just acting really weird.

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

And then he's talking the next morning, oh, he had told me that after he wasn't coming to be the auctioneer for the alumni auction. And I said, you got to be kidding me. And so, I had to do -- I had to auctioneer, which I do fill in if someone has to go to the bathroom, he has to go, whatever. Joe's the main auctioneer. I would always help spot, but we donated our time and we did that auction in front of top people in the industry and I had to -- I had to do the auction and I was really, really angry at him for that. So none of this was planned. I knew none of this was going to go and he left me in Tucson alone, basically I went there alone. I was really pissed.

"Q   Now let's go back to Exhibit 2. So you said that this account was opened by you because the FineMark --

"A   Because he asked me to open it last minute before I left for Tucson because he said it needed to be a bank that was in -- then why didn't he open it? I don't know why he didn't open it. I don't remember that. I don't remember why I had to open it.

"Q   Where did you open this?

"A   I believe on Sanibel. Why would -- maybe it had something to do with FineMark or checks or something? I don't know why he had -- I don't know.

"Q   And you had mentioned that you were expecting a wire from Tom Ritter and that you had to get it --

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"A   I will tell you this, and I hope you tell Tom this because I care about him.  I care about the whole family. When the FBI told me what happened, I didn't know that Tom had not received his money.  I wasn't in charge of the bank account at that time, and I never had an online access to the Bank of America account ever.  And I cried when I found out he had not.  I did not know that he had not been paid.

I was excited because this was a beautiful piece and it should have -- the sale should have been a very joyful thing and they should have been able to make a lot of money and that is -- yeah, this has never happened.  First of all, Bill Noble, people don't send jewelry to people and leave it with them for up to six months without the intention of selling it; that does not go on in our industry and you can talk to everybody and anybody.  I have diamond dealers calling me from New York saying, Lindy, you know, you can come back here, you know.  We all know that you had nothing to do with this.  I have -- you have no idea how many people have called and said that.

So this is my wrath of my venting because you can tell Tom that.  I would never -- first of all, why would I throw myself into a blender, to hurt family, to wreck my career that I've worked my entire life that I'd started with his twin brother?

"Q   So you knew that you were trying to get $12

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

million -- DuMouchelle Jewelers was trying to get $12 million from Tom Ritter; FineMark wouldn't accept it.

"A   Well, all that --

MR. FOLEY:  That's not (indiscernible).  Lindy, Lindy.

"Q   At the time you opened the Bank of America account, were you aware that Tom Ritter was attempting to wire money in to DuMouchelle Jewelers?

"A   Yes.  I was told that by Joe; that's how I was aware, because Joe told me, I believe.  From my memory, from my recollection, I believe.

"Q   All right.  Let's go back to --

"A   And one more thing now that I remember.  I didn't think the money was going to go anywhere right away.  I actually -- or any of it.  I actually thought -- the Merrill Lynch group talked to me about -- I thought I was -- I thought there was going to be profit for us.  I just didn't understand what was going on.  I actually talked to the Merrill Lynch people about not having it just sit there because I thought it might be there for -- you know, sometimes things would be there for a couple of weeks.  I didn't know.  I wasn't involved in what was going to happen with it.  But I knew that if you have that much money back in the early days, way back when we had Chase or MTB Bank or whatever in Plymouth, you know, after an auction, we would

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

move money over for, you know, three weeks or whatever, a month, until you paid people out or whatever it was.

If you had a large amount sitting -- $700,000, a million -- you're not going to just let it sit there before you pay people, but you have to make sure there are no returns or anything that go on.  So none of this was anything planned to hurt anyone.  I was asked by Joe to do this stuff, not planned out by me.

"Q   Have you ever seen Exhibit 3 before?

"A   No.

(Video playback concluded)

MR. CATALDO:  Your Honor, we want to direct the Court to the Deposition Exhibit 3 so the Court can follow along.

THE COURT:  Hang on one second.  The Court's making notes.  Thank you.

MR. CATALDO:  Your Honor, our understanding is Deposition Exhibit 3 and Trial Exhibit 3 are the same.

THE COURT:  Thank you.

(Video playback begins)

"Q   You have a recollection, ma'am, there were this series of cashier's checks that were prepared by the bank on the same date that you did the counter withdrawals.

"A   Possibly.  I don't -- I don't remember.

"Q   Do you remember walking out with any of those

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 37 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

checks?

"A    I don't remember if Joe asked me to FedEx him.  I think that's what he did, but I don't remember.  I think he asked me to FedEx stuff to him that the bank gave him.  But I didn't know -- I don't know any of this.  This was nothing that I had planned with him or knew about prior to him asking me.  I think it was FedExed back to him.

"Q    Did you provide the bank with any information that would allow the bank to create a cashier's check?

"A    No.

"Q    So they had no --

"A    Did I provide them?  I showed up.  I showed up because he asked me, so I guess I can't say did I provide them with anything.  But I didn't -- the communication, Joe worked with the bank teller, not me.  I didn't give any numbers.  I didn't give any communication.  I had no knowledge of what he was doing, except he asked me to show up.  Can you show up and help -- I don't know.  I need you to go to the bank; that's all he asked me to do.

"Q    So you took direction from the banker?

"A    I took direction from whatever, the two of them were working.  From my recollection, the two of them were working.  I had no -- no email that came to me.  I had no -- it happened between Joe and the banker, as I've already said.

"Q   So you didn't direct them, did you?

"A   No, no.

"Q   Your testimony is you showed up, you said I'm here, they said great.  Here's what you need to sign.

"A   No.  The banker and Joe were on the phone when I was there.  She worked with him because he was emailing.  I think from my recollection when I first got there, I think he was trying to do wires or something.  I don't know.  I showed up.  He asked me because he couldn't sign everything back in Michigan.  That was the thing, that he couldn't get the signature card done because I said, why do you need me to go do this right now, I'm going to a conference.

There was nothing planned.  I didn't get any emails.  I had no previous knowledge of anything he was doing.  I don't even know why he did what he did.  I don't even know.  I still don't.  I still don't know why he -- I still don't understand what went on.

"Q   Were any of these checks made payable to Tom Ritter?

"A   Well, is that a rhetorical question?  I mean…

"Q   No.

"A   Well, I don't see Tom's name on it; do you?

"Q   So none were made out to Tom Ritter.

"A   I don't see Tom's name on there.

"Q   None were made out to Ted Gelov, correct?

212-267-6868                      www.veritext.com                      516-608-2400

"A   I don't see Ted's name on there.

"Q   How did you know what money was in the account?

"A   I didn't.  I didn't even have an online access to the account.  I never had an online access to the Bank of America account.

"Q   Well, what was your knowledge that the account contained --

"A   There wasn't.  Joe asked me to go there.  The only knowledge I had was when he asked me to go set up the bank account so that the FineMark money could be moved over there because he said he needed to move it over there.  But I didn't know what he did with any other business that we had if he moved -- I didn't know.  I didn't know if he moved other money from FineMark.  I don't know what he did.

This was not my doing; this is Joe's doing. Strictly because Joe asked me to go over there and I trusted him because I never had any reason not to trust him because he had never done anything to give me a reason to not trust him like this.  You would have gone too.  Anybody would have gone.  I was leaving for a meeting to go to a show, a trade show that I really wanted to go to and I was really angry with him that I couldn't go to my conference because I look forward to it every year and I got extra -- I got my continuing credit to go to these conferences.

"Q   When you were at the bank, was there any

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

discussion between you and any bank employee over the balance in the account?

"A    No, not that I recall.

"Q    And it's your testimony you didn't know what money was in this account?

"A    I don't recall.  I didn't ask.

"Q    Was Tom Ritter's money in this account?

"A    I assume.  I guess.  I don't know what other money, though, from other bank accounts.  I didn't -- I wasn't thinking of it that far along.  I was just trying to get out of there.  I didn't want to go do this.  I was kind of forced to do it.  I was really pissed at him.  I was forced, I was mad.  It was a very hard time for me because I wanted to go to the conference and I was mad that he wasn't coming in.  And I was mad at him for everything because he was supposed to show up and be there, and then he didn't tell me until the end that he wasn't coming.

"Q    Why did he tell you he was not coming?

"A    I don't remember, something to do with his dad.  I don't know.  I don't know, I was angry at him.

"Q    All right.  Let's go to Exhibit 4, please.

(Video playback concluded)

THE COURT:  Can we pause it so I can know what exhibit?

MS. CLAYSON:  Yes.  Your Honor, this will

correspond to Joint Exhibit 4.

THE COURT:  We're doing well with this.

MS. CLAYSON:  We got lucky.

THE COURT:  You got lucky.

(Video playback begins)

"A    Okay.

"Q    I'd like you to go to the last page.

(Video playback concluded)

MS. CLAYSON:  Your Honor, just to clarify.  This was sequenced from the later date to the earlier date.  It's now sequenced from the earlier date to the later date, so this should be the first page now.

(Video playback begins)

"Q    At the bottom, it says BOA000275.

"A    Right.

"Q    You see that.

"A    Right.

"Q    This is a business signature card with substitute Form W-9.  Do you see that at the top?

"A    Right.

"Q    Can you see that it has a timestamp of 2/6/2019?

"A    Right.

"Q    At 10:39:51 a.m.

"A    Right.

"Q    Central time.

"A   I see it.

"Q   Does any of your handwriting appear on this document?

"A   It looks like my handwriting down below, name.

"Q   So where it says printed name, Melinda Adducci, Title VP, signature and date is your handwriting.

"A   Correct.

"Q   All right.  Do you remember filling out or signing this signature card?

"A   I remember this is the reason, and you can see by the date, this is how close to Tucson it was he had me go to the bank.  He asked me to go to the Bank of America to set up an account because he -- I don't know why he asked me to do it.  Some -- I don't know.

"Q   Where did you set this up?  Were you in Florida?

"A   Sanibel, yeah.  Well, that's where I was, I was in Florida.

"Q   And do you know whose handwriting appears at the top?

"A   No.  I'm assuming that's -- I would say that's the banker.  That's not Joe's handwriting.

"Q   All right.  And you dated this February 5, 2019, correct?

"A   It says --

"Q   At the bottom opposite your signature.

212-267-6868                    www.veritext.com                    516-608-2400

"A   Yeah, well, that's -- again, that's what it says. I don't remember any of this, but that's what it says.

"Q   All right.  And let's go to the page prior to that.  This is a Bank of America business signature card with substitute Form W-9, correct?

"A   Yes.

"Q   And this has really two date stamps on it.  Here at the top, it says February 7, 2019 at 11:09:25 a.m. Central.  Do you see that?

"A   Yeah.

"Q   And then directly below that to the left, it says February 7, 2019, it says 7 at 2019, 11:31:28 a.m.

"A   Right.

"Q   See that?

"A   I do.

"Q   Is the handwriting at the top of this document the account number for the account title your handwriting?

"A   No.

"Q   But this is for Account 0585, correct, ending in 0585?

"A   Yes.  I don't -- I don't recall that account number because I never really worked in it.  After this, Joe was -- Joe handled this account.

"Q   And at the bottom, is that all your handwriting?

"A   It looks like it.  I mean, I…

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"Q   Do you know why you signed a second signature card --

"A   No.

"Q   -- with the date of February 7th instead of --

"A   No.

"Q   -- (indiscernible)?

"A   No, I don't know why.  No.  I don't remember any of this.

"Q   Now going to the page prior to that, BOA000273. Do you see that?

"A   Mm-hmm, mm-hmm.

"Q   Does any of your handwriting appear at the top?

"A   No.

"Q   Does any of your handwriting appear at the bottom?

"A   It looks like my signature is there.

"Q   How about the printed name Melinda Adducci?

"A   It looks like it could be.  I can't really tell. It looks like it.

"Q   And vice president looks like your handwriting?

"A   It looks like this.

"Q   And the date looks like your handwriting.

"A   Yes.

"Q   Let's look at finding Number 14.

(Video playback concluded)

THE COURT:  Are we in an exhibit here?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 45 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO: Yes, Your Honor.

MS. CLAYSON: The Joint Exhibit 6.

(Video playback begins)

"Q   Page 3.  Do you see that?

"A   Yeah.

"Q   It says Defendant Adducci, who is DuMouchelle's spouse, also spoke to Ritter regarding the purchase of The Yellow Rose and indicated it would be a lucrative investment for all parties.  Defendant Adducci provided Ritter with photos and appraisal information regarding The Yellow Rose by email on January 25, 2019.  Do you see that?

"A   Appraisal information; what does that mean?  Does that mean the GIA report?  Does that mean Bill Noble's -- Joe would have asked me to send photos.  I didn't -- you know, I didn't go to Tom.  When Joe came to me and he said, Tom -- this is what Joe told me -- Tom said that he has an extra $20 million laying around.  He's doing really well. He wanted to know if there's anything that he could buy.  I think I'm going to show him The Yellow Rose.  They had already been showing it in our office.  He'd been already showing it to people.  And I said, oh wow, okay.

And then when the contract came on it and Joe said, what do you think of this, I said I didn't sign it, and I said I'm going to show my son.  So I showed my son, Joey, and my son, Joey, said, Mom, you better ask Joe if

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

this is -- like, the sale should be a good sale because Tom sues everybody, and just make sure that, you know… So I went to Joe and I said, is there anything like that I should know about this sale, like, is everything okay. He said, no, yeah, it's fine, yeah, it's great, it's fine.

This was not me that went to Tom and, okay, whatever report. Appraisal information? I didn't do an appraisal. If there was any information -- and email. God, maybe Joe asked me -- again, Joe -- but I do know this, Tom did ask to talk to me and Tom said get on the phone, you know, what do you think of it. Who doesn't think this was a great piece? Everybody thought it was a great piece. Anything like this would be a great piece. I had no other reason. I didn't put anymore thought into it. I let somebody do the appraisal. I didn't want to do it.

You know, Joe asked me -- Joe had asked this to everybody's email and everybody. He oversaw everybody's computer. He set them up, he did all of it all the time. I'm somewhat -- have learned from him, but I don't -- I didn't -- this is not something I ever, would never -- would never hurt Tom and Carol. I would never hurt them. I would never go into it if I knew what I know now, if I knew any of it. Even Bill Noble said he would be a shyster and say that he never gave approval to sell it. I would never have been involved in it. I would have ran like crazy.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

So you can try and blame me, but I am -- I did not -- I am as much in the dark as they are, probably more so because I was right next to Joe and it really hurts me. This is a husband who didn't tell me the truth, so I'm having to deal with that, too.

"Q    You made mention that you saw an agreement that you showed to your son.

"A    Well, I called him.  I didn't show my son.  I called him and I said, Joey, you know -- I just wanted another opinion.  I wanted to know -- and he goes, well, yeah, he goes, this isn't a very good deal for Joe.  He goes -- and he kept saying we all would say Joe because it wasn't, I mean, really nice that Joe drug me into everything.  What, because maybe I'm a more trustworthy person?  I don't know why did he do that to me.  I'm his wife.  Who hurts somebody that they love?  He hurt me.  He hurt me.

"Q    When did you discuss --

"A    He threw me under the bus.  He threw me under the bus, okay?  None of this --

"Q    I understand this.  What is it that you discussed with your son?  I don't understand --

"A    I said to my son, I said -- I read the contract that Tom -- I read it to him.

"Q    What contract are you talking about?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"A    Tom had some contract with Joe.

"Q    To?

"A    I don't know.  I mean I --

"Q    A contract to sell.

"A    Right?  I don't know.  I don't remember.  I just remember it was something with Joe and Joe showed it to me and he goes, what do you think, and I said I don't know, I'll ask Joey.  And Joey, I read it to Joey and he goes, I don't know, Mom, he goes.  You just better make sure that, you know, nothing goes wrong --I think it was a sale or something -- nothing goes wrong because Tom sues everybody.  And I turn to Joe and I said, is there anything that -- the sale is fine, right?  Everything is -- Joey says Tom sues everybody.

And he's suing his twin brother and sister right now, okay?  He's sued so many people in my hometown that my sister-in-law couldn't get an attorney, okay?  This is who you're dealing with.  I worked for his twin brother.  I just -- I just saw them, okay?  You know, this is family for me too.  It really hurts.  But Joe -- I did not do this with Tom; Joe did.  Joe is in prison.  I am going to stand up --

"Q    You just said that you provided him photos and appraisal information.

"A    I didn't initiate sending him stuff.

"Q    Not my question.  My question is --

Veritext Legal Solutions
212-267-6868                                        www.veritext.com                                        516-608-2400

"A    I don't know.  Joe -- you know, I don't remember sending him.  Joe could have -- Joe could have used my computer and sent it or he could have said, here, send this to Tom.  But I didn't put this much -- just so you know, I didn't put this much thought into it.  And as far as it being a lucrative investment, those are not my words.  I did not -- those are words that somebody put in.  You can't -- this is what I tell everyone.  You're not supposed to take jewelry and use the word investment without being able to -- I've never used that word, so those are not my words.  I don't -- though somewhat indicated.  Indicated is like I indicated?  That's somebody perception or interpretation of what I said.

I only spoke to Tom because Tom told Joe he wanted my opinion.  Why, so he could drag me into it?  Like, why, why do I have to be drug into something they were doing?  This is not -- I was doing my own stuff.  I was working on my own stuff.  Everyone's trying to drag me into this.

"Q    Do you dispute that you had a discussion with Tom Ritter?

"A    Yeah, but it was just --

"Q    Do you dispute -- do you dispute that --

"A    No.  No.  I've already told you I had a discussion with him.  I don't like the part where I indicated it would be lucrative.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"Q   Okay.  And did you provide him with photos of The Yellow Rose?

"A   I don't know if they -- I don't remember that. Maybe I emailed it, but it would have only been -- we had photos.  We had the whole GIA document.  I had -- everybody had that.  We had all that stuff.  So Joe could have said, hey, email this or -- I mean, why wouldn't I?  If somebody wants something, I'm willing to do it.  But I didn't do it like because I was trying to go and -- I was trying to be helpful.  If Tom was going to buy this, I would have wanted it to be a great sale.  I would have tried to be helpful, not to be deceitful.

(Video playback concluded)

THE COURT:  I need you to pause for one second.

MS. CLAYSON:  Sure.

THE COURT:  The Court needs clarification, Mr. Cataldo.  At this segment of the deposition where Ms. Adducci is being questioned about did she send the photos, would these be what's included in what's become known as the data package?

MR. CATALDO:  Yes, Exhibit 9.

THE COURT:  And the data package has been stipulated to in the joint final pretrial order under Section 4, stipulation of facts and law, Paragraph C says, "On January 25, 2019, Defendant sent Plaintiff an email

212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

containing a data package with information regarding a diamond known as The Yellow Rose," and then we called that the data package email.

So this is what is being stated on the video, but it's a stipulated fact per the joint final pretrial orders. Things evolve, the Court understands that. Okay.

MR. CATALDO: Correct, Your Honor. And so, we're going to get to Exhibit 7 there, I believe is Exhibit 9 in the Court's…

THE COURT: Exhibit 9 with the extra three pages at the beginning.

MR. CATALDO: Yes.

THE COURT: Is that the data package one?

MR. CATALDO: Correct.

THE COURT: With the picture?

MR. CATALDO: Correct.

THE COURT: All right.

(Video playback begins)

"REPORTER: Marked as Exhibit 7.

"A    Sorry, you're looking -- where do you want me to be on this one?

"Q    On the fourth page.

"A    Okay, I see it.

"Q    The bottom of it says, BCRITT000027.

"A    Okay, I see it.

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

(Video playback concluded)

MS. CLAYSON: Your Honor, can I -- I just want to explain to you the Bates numbering. As indicated yesterday on the record, this email was produced twice, so it ended up with Bates stamp numbering twice. So the numbers that are on the screen right now correspond to the added pages, but this is also Bates number 195. And this -- okay, thank you.

THE COURT: Thank you.

(Video playback begins)

"Q    Okay. You see here at the top, it says on Fri. January 25, 2019 at 9:51 a.m., Melinda Adducci wrote: 'Hi, Tom. Great talking with you. Attached are the photos and GIA monograph and comparables on fancy blended yellow diamonds. Hi to Carol. Lindy.'"

"A    So I guess Joe asked me to email him. I -- you know, again, I'm not -- this is nothing that I didn't do for every other -- if they asked me to send something, photos and a report, I do this all the time for everybody and I did it all the time. It was a routine thing in our office. If somebody said, hey, can you send photos and -- why would I think that it was a sale? I was trying to help.

"Q    Why don't you flip back down two pages, starting with -- it says at the bottom 000030, and look at these pages and tell me if this is what you sent to Tom Ritter.

(Video playback concluded)

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 53 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

THE COURT: I need you to pause, please. Ms. Clayson, what pages am I looking at?

MS. CLAYSON: So this should be 198.

(Video playback begins)

"A   I don't remember. I do remember that he wanted -- Tom was -- I don't know, maybe this is the one from Bill Noble. Tom asked -- Joe was telling me that Tom was trying to find out who the seller of the diamond was, the ring was, and we never give out the names of -- if somebody memorandums in the industry, you don't give out the name of who it came from because then they would just go right to them, so no one does that.

So I remember there was an appraisal by Bill Noble that Joe had access to from Bill, Bill gave it to him, and he didn't want -- he wanted to take off the name. But this is not -- I didn't put this together; this is not my work. So if I emailed that, it would be something Joe would have saved in a spot like a folder or something and he would have said, you know, send him this or something, but I did not put this together.

"Q   I'm not asking if you put it together.

"A   Yeah.

"Q   If you sent --

"A   I don't remember, possibly, possibly. But again, it would have been something Joe -- I don't know. I was

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

trying to help. I was trying to help. I would have given this to anybody if they asked me to do it, but there's nothing on here that, you know -- this is -- whoever put this together, this is probably Bill Noble. I don't know.

"Q With them, not the question about who put it together.

"A Yeah. I don't remember. I don't recall. I don't recall. I don't recall. I know there was one that had Bill Noble and I know they took the name off and that, I remember. You know, they just didn't want to give out who previously had it. But I was just trying to help. If I was asked to help, I would help.

"Q They took the name Noble off of what? The page with 00- --

"A Joe, somewhere when Joe was first starting to work with Tom, he wanted to know who had the diamond. I said to Joe, why don't you just put this in escrow. He goes, he -- I'm late to the party, sorry. I don't understand why this would be abnormal. If someone had information on something, there was a book put together where The Yellow Rose was in it. They had all kinds of other pieces that Joe was working with our staff, which I didn't work on.

(Video playback concluded)

THE COURT: Pause it for one minute, please.

MS. CLAYSON: Sure.

THE COURT: Mr. Ritter, it's fine for you to sit right next to your counsel.

MS. CLAYSON: He's trying to watch the video.

THE COURT: Okay.

(Video playback begins)

"A   If Joe -- he must have asked me. I don't know why he asked me, hey, can you send -- can you send Tom a copy of this. I didn't think there was anything wrong with it. So I don't remember this; it's possible, but I don't remember where it came from. But it's possible that this is the one that had Bill Noble put together. Why don't you ask Bill Noble this?

"Q   Well, this came from you. It didn't come from Bill Noble.

"A   That is -- I don't know where this came from. I didn't -- this is something that was obviously probably in our records in our information, like our server, but this was somebody else's report because it's done. I would say this is probably Bill Noble's report, but Joe -- I don't know why there isn't a name on it, but I'm thinking it's -- well, there we go, see what it says at the bottom. I don't know. Why don't you go and find out if Bill Noble produced this report. And basically --

"Q   Not my question. The question is --

"A   I don't know. I don't remember it. I don't

212-267-6868                   Veritext Legal Solutions                   516-608-2400
www.veritext.com

recall.  I don't recall, but I would have and the second that Joe turned to me and said, hey, can you send this, then maybe I had the copy or something.  Maybe I just turned and grabbed and, like, sent it or he -- I don't remember.  I don't recall this.

"Q   All right.  When did you discuss with Tom Ritter; did you call him or did he call you?

"A   Oh, he called -- he called Joe and Joe put him on speakerphone and made me talk to him.  Oh, Tom wants to ask this.  He didn't call me.  I've never -- Tom never called me.  I never had conversations.

"Q   You were on the speakerphone with Joe and Tom.

"A   In my recollection.  And again --

"Q   Where were you?

"A   I think we were in Florida.  I think we were in Florida.

"Q   Where in Florida, in an office or your home?

"A   In our home.  We didn't really go to that office very often.  I mean, I went there more to meet people for appraisals, but yeah.

"Q   Was it day or night?

"A   I don't remember.

"Q   Was anyone else at the home besides you and Joe?

"A   No.

"Q   And it was on speakerphone.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

"A    I think so, yeah.

"Q    What was said?  What did Tom ask and what did you --

"A    From my recollection, Joe -- again, you know, he's my husband.  He was my business partner for a long time.  I trusted him.  We had a really successful business, so I trusted him.  If he asked me to say to somebody what I thought was great -- obviously this other person doing this appraisal thought this was a great diamond too -- I would tell him what I think.  It was a rare, large stone.  It was beautiful.

"Q    I'm not asking you what you thought you told him. I'm asking --

"A    I don't know.  I don't remember.

"Q    -- (indiscernible) entering the conversation.

"A    I don't remember, but it was nice.  I don't remember.

"Q    What was nice?

"A    What we're talking about.

"Q    The stone was nice, the transaction was nice, or you're nice?

"A    Not the transaction, the diamond ring.  The diamond ring, yeah.

"Q    Was nice.

"A    I don't know.  Forget the word nice.  I don't know

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

what I said. I don't recall. I don't remember. Tom wanted to ask me questions about it. It's a beautiful ring. I was asked stuff in Michigan, not planned again, by Joe to go to a very well-known person up there. Could you go in there and show them and explain what you know about yellow diamonds. We have sold big yellow diamonds before for over a million, many. Like, this is not -- this might have been a big diamond, but small, whether it's a carat or larger, they still have the same grading done. So I'm a knowledgeable expert in the grading and that is, you know, I don't know -- if I'm asked to do something, I do it. Joe asked me to do it, so I guess I talked to Tom. I didn't call Tom. I didn't say, hey, let me get on the phone and talk to Tom. None of that.

It was kind of like the banking transaction. He just, hey, Joe wants -- Tom wants to ask you a few questions. I had no reason to think that there was anything -- that the sale was not going to be a great sale. I believed it was going to be a great sale.

"Q  And what did you do to verify the stats on The Yellow Rose to make sure it wasn't fake, the one that you had; did you do anything?

"A  Looked at it. Looked at it. If I can't -- I can't be a master gemologist appraiser if I don't have the skills right now to look at a diamond and see -- I can

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 59 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

actually see the report number that's on the girdle of the stone with my loop.  No, you can tell -- you can't tell a lab grown now.  Lab growns are out there, but they weren't of this size at that time.  And, no, it was in a mounting, it was in a very intricate mounting.

"Q    Do you do any independent diligence to determine what it could sell for or what it should be purchased?

"A    That was the appraisers; that would be -- that's why I referred off to somebody else.

"Q    And who did you refer it to?

"A    I didn't refer it.  I just gave Joe -- I told Joe I wouldn't do it.  I said find somebody else.  I might have given him names.  I might have said, you know, Richard Drucker, I might have said him.  I might have said some other people, but I told him I wouldn't do it.  Somebody independent should --

"Q    Do you know if anyone else did an appraisal?

"A    I think Richard Drucker did one, I think, I believe.  I think they paid him to do one, didn't -- I think Tom -- I don't know.  I think Tom paid him to do it, not that I recall.

"Q    We're going to go to Exhibit 15, please.

(Video playback concluded)

MR. CATALDO:  Your Honor, we're pausing it.  It is in your trial exhibits as J17, which she's going to be

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

referring to now.

        THE COURT:  Thank you.

        (Video playback begins)

"Q    Have you reviewed it?

"A    I don't remember seeing this.

"Q    Did you ever prepare a receipt for DuMouchelle
Jewelers?

"A    Ever in 25 years?  Yes.

"Q    How many?

"A    In 25 years?

"Q    Yes.

"A    Thousands?

"Q    Do you recognize the format of this receipt?

"A    It looks like a standard receipt.

"Q    You, at the time, were the vice president of
DuMouchelle Jewelers, correct?

"A    I'm a member-at-large.  And if you want to use the
vice president, as our attorney said, whatever -- it doesn't
really matter.  I had to be a member-at-large when we opened
up our business, so that means nothing.  This is not -- I
have not seen this before.

"Q    Do you deny that you were the vice president of
DuMouchelle Jewelers?

"A    No.  I mean, I used many different titles, member-
at-large; there were many different things, whatever.  I

Veritext Legal Solutions
212-267-6868      www.veritext.com      516-608-2400

wasn't the sole -- I wasn't the main person.

"Q   You were also (indiscernible), correct?

"A   Because the LLC had to have two members.

"Q   So the answer is yes.

"A   Yes.

"Q   Let's go to Exhibit 22, please.  This is --

(Video playback concluded)

MS. CLAYSON:  Your Honor, this is Joint Exhibit 47.

(Video playback begins)

"Q   -- email entitled Yellow Rose payment.  Do you see that?

"A   Yeah.

"Q   And it's dated Friday, June 21, 2019?

"A   Yeah.

"Q   At 6:06 p.m.

"A   Yeah.  I never saw this email.

"Q   And it's address to others, including you, correct?

"A   Yeah.

"Q   And you've never seen it.

"A   No.  I didn't know Tom had not -- I didn't know that there were any issues, really issues with Tom until they arrested Joe.

"Q   All right.  Let's go to Exhibit 27, which is an

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 62 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

audio tape of a conversation.

(Audio playback begins)

"MS. ADDUCCI: Another person (indiscernible) and we're not going to take this. You're, like, wait a minute, you already accepted it. And, you know, I could go on about this, but it's kind of story that gets, believe it -- honestly, the longer it goes, the more I'm like, yes, probably should sue them because, you know, who wants to go through that because where's your life at the end of that? I mean, you know…

"MR. DUMOUCHELLE: (Indiscernible) said the other day, Lindy, that had they accepted it and left things alone.

"MS. ADDUCCI: Oh my god.

"MR. DUMOUCHELLE: (Indiscernible) two weeks ago.

"MS. ADDUCCI: None of this would have even -- this wouldn't even be a discussion. You know, the decision to not be that way because we've pretty much our whole lives in business since 1994, we have gotten through dealing with people and with their issues. And usually it's fake people selling, so I always tell Joe, you know, when you're dealing with somebody getting married, it's happy. I've worked with the retail side. It's happy, happy people and the buyers are always happy. But the sellers come in,

212-267-6868                    www.veritext.com                          516-608-2400

they've got, you know, they've got…

(Audio playback concluded)

THE COURT:  I'm going to ask you to pause it for one minute.  Is there any way to enlarge the picture of Ms. Adducci?

MS. CLAYSON:  Your Honor, this is the way that the video transcription came back to us, so I think this is the product of the transcriber.

THE COURT:  This is the best we can get of -- okay, I'll just look.  Okay, thank you.

(Audio playback begins)

"MS. ADDUCCI:  So they're 50/50.  Some are okay, they're happy when they get them.  But some of them even to get them too much money, they come up and they're upset about some stupid little photo fee just because they're just not happy anyway.  So, you know, it's part of the business.  But this side of it, we've been able to still always get through with our -- you know, we've had the same law firm since like -- always got through it in a very calm, you know, let's work this out fashion and taking care of everybody.

So when the bankers -- I mean, we were just literally -- like, I was supposed to get on a plane to go to Tucson.  I was just literally like what, this is not something I'm even hearing.  How can they do this?  I have

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

another friend who's a banker who said they can't do it, like, they can't do this. But, you know, I mean, I guess looking back, I don't know. You want to fire (indiscernible) and I'm, like, yup (indiscernible).

"MR. GELOV: What was the problem? They didn't like the sender?

"MS. ADDUCCI: It was a big amount. It was a big amount. They think it was too much of an amount that they pretty much -- okay. So we had used a larger bank and then a different bank that we weren't really happy with, so they were going to switch everything over to this Florida bank, FineMark.

"MR. GELOV: (Indiscernible) that they didn't like his business?

"MS. ADDUCCI: Yeah, you know, well, they did kind of want to tell them -- they were always -- when there were ACHs and stuff when we used Chase, the ACHs and everything were really easy and fast, you know. But Chase has had issues with our industry for a long time and slowly, they've been getting rid of people in the jewelry industry because -- and they started about two years ago. I noticed some of my best clients in New York would come in and they would say, you know -- I'm, like, aren't you using them anymore and they were like, no, because they got rid of me. So they rid of most of the diamond dealers. They just

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

didn't -- it probably had to do with them because they were under scrutiny from The Patriot Act.

So we have a smaller bank. We had one called the Private Bank in Michigan; they went under in 2010. They were gobbled up by another bank in Chicago. So we had moved our money over to Chase, but we still -- you know, we need that one-on-one sometimes relationship with the smaller banks. So a friend of ours in Florida gave us this other FineMark Bank, so we started working with them. Well, they pretty much used -- they have all people and they work within all states.

So I would do ACHs, and I would try -- like, at December's auction, I just decided to use them and I would ask them for an ACH, you know, which normally I'd just process and you have to get approval from your buyer to say I hereby authorize. I had the girls -- you know, they had set up specific emails. But it had been commonplace and then they have in writing, they had to say I authorize, you know, so and so to do a process an ACH from me to collect the money like a check. And they flipped out and they would make the process go lengthy and they also didn't have the staff, so they would come back to you and say can you forward that email from the customer. Well, Chase never did that, so there were just dumb, little issues that took 10 times as long.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 66 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

So we decided to do -- and then they would come -- you know, I would have one ACH from a customer be for, like, $100,000, and they would come and say, well, your limit is $50,000 a day, you can't receive that money. And I said, wait a second, I can't -- $50,000? I'm going to blow through $50,000 in five minutes, like, you have to give me a higher amount. You're not going to let me collect more than $50,000 in a day? So we started having everybody do layers.

And the day came and kind of said to Joe one little comment in January, but we didn't -- he didn't really -- I mean, we're busy. I think it was December. And they said, well, maybe you guys, you have so much business that maybe you guys want to, you know, think about using a bigger bank and think about it. That's what he said, not to me, but to Joe. They never put it in an email, they never sent us a letter or anything.

So, you know, when you go in there, like I walk in now, I've gone in, they have one person or two people at the bank. There's really not -- it's not really like a bank, you know, where you would walk in a bigger bank. I don't know what it is anymore because they can't figure that out either, but it's pretty much all automated. But they're kind of saying, like, you know, you guys are too much work for us, you know, because they work with older people in Florida, they work with Arizona. And then they

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

don't really have people in there that are staffed and they don't give you the options like online like Chase. They don't give you, like, really quick options for, you know, processing payments from people.

So well, that was just like mind blowing. And then when this happens with the all end of January/early February is when they hit us with this because we have not done a sale for three to four months. So we worked so hard on this sale; it went through. There were some other issues that went on with the person that was working with the item, which was also another sort of tangle nothing to do with us, you know. But as far as the buyer, there was no issue because it's actually someone that I grew up with, so I know very, very well (indiscernible) that was not an issue. It was starting to kind of get, like, well, who's this person and what are they -- and we're like, well, it's someone that we know, you know.

And it was no big deal if he was -- (indiscernible) and he has a lot of money and it was (indiscernible) the bank and he was in Phoenix part time, so it was a bank that refused or whatever. There was literally -- it couldn't have been a better transaction as far as who we knew and what they were selling. There were nothing shady about it at all. But they decided -- and we don't -- we still don't know why, except that we've been told that

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

they have to get the insurance to take it in if they do, you know.

And then also, you know, right away when we got the money when it came in because I was leaving from Tucson, I started sending out some wires on my end, you know, make some payments because I was dealing. And I think, like, the president, we're going to tell you, Joe, that maybe he didn't want you to pass the money through his bank, which is not what we were doing. We had just decided to try and use them, you know. In December, we made a commitment, let's try and use this smaller Florida bank more because we want to work Florida more.

So it's just, you know, now I'm working with Bank of America and I'm pulling my hair out. I give up. I give up on these banks. I'm like this is something that other people do business when you, you know. Once we get through with Bank of America, we can go to this thing called First Trust, I think, and you have a specific person. But Bank of America, I mean, they don't even have reps that you can really talk to, you know, like two people like last year. It's frustrating.

"MR. DUMOUCHELLE: So the money has now been wired in to Bank of America; is that right?

"MS. ADDUCCI: Yeah, but they're holding it. They've let out part of it, but they're holding -- they're

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

holding it.

"MR. DUMOUCHELLE: Okay.

"MS. ADDUCCI: Which is a period of -- yeah, which again, I'm pulling my hair out on that one. They're holding it for something. Joe had another small something that he did in December or whatever Joe (indiscernible), but there's no issue. They keep saying, hey, it should be released any moment. We're like, okay, really, you know? It's like eternity when you're trying to tell people and it sounds like a big stupid story. But it messed up my payroll. It messed up -- it really literally -- it messed up everything.

"MR. DUMOUCHELLE: All of the auto payments, like insurance. Just all the things you don't put out on, but all the things you had just scheduled that have to be rescheduled.

"MS. ADDUCCI: You know, one day the banker called, the younger or the son who actually opened the account for me. He called me with -- because I sent an email out and he called me, along with his wife, who said she would accept the wire; that Joe talked to him for three days (indiscernible). And I broke down and I started crying and I said, you know what, I said, your system does not -- not only my life and said you can't do this. Like, what did you think was going to happen when you did this to us?

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Like, how -- they went quiet, they were completely quiet, and I said, you know, I can't talk about this right now. And I usually don't break down and cuss, but I guess it all just kind of came up.

And she sent me an email later, and they actually have -- they have actually -- I think they know because Joe had one other client who -- I can't really say who it is, but it's a person who is very -- her father is somebody very well-known and if they knew -- and he used to have a bank in Chicago and he basically screamed at them and said you cannot do this to them. Like, more than one person -- well, we've just been a reaction (indiscernible).

"MR. DUMOUCHELLE: Is there any way that I could talk -- is there any way that I could talk to them and they could tell us that, you know, when they're going to release it and knowing that they're holding something up on my end; is there anything like that?

"MS. ADDUCCI: That's for you, Joe, because you talk to them more than me.

"MR. DUMOUCHELLE: Well, I had a note, as I mentioned, yesterday. I've gotten different peoples' names from Bank of America to talk to. I mean, to get through to these people is --

"MS. ADDUCCI: Yeah, to get through to them is like pulling hair. You can't even --

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 71 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"MR. DUMOUCHELLE: I've never seen anything like it. And then there's another group --

"MS. ADDUCCI: Try to get them to reply.

"MR. DUMOUCHELLE: There's another group that we've been assigned that they have (indiscernible) --

"MS. ADDUCCI: The first --

"MR. DUMOUCHELLE: For us, right, until next week. But at the moment maybe you have them, see if they can get involved and maybe help us earlier. Again, I think the name of the gal that I talked to at the bank, I'm telling you, the one gal that I tried to get ahold of, I've tried to call her four times. I've left four messages. I just have not heard a darn thing.

"MR. GELOV: And what's her name and what branch is she in?

"MR. DUMOUCHELLE: It is --

"MR. GELOV: And then you guys had this kind of arrangement with a different investor before and like kind of like what we did here. How did all that work? You mentioned who that was, but I forget; who was that?

"MR. DUMOUCHELLE: I mean, we've worked with them before. But, you know, in the long run when we had anything that was -- I mean, if it was -- I don't know, even if it was -- I don't know, say Montreal, but even if something was at an auction or maybe it took an extra week

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 72 of 252
212-267-6868                          www.veritext.com                          516-608-2400
Veritext Legal Solutions

or two, I mean, we just added on the interest difference, so we never really had an issue with it.

"MR. GELOV: And then you guys --

"MR. DUMOUCHELLE: If there was something that ever came up, we just said, listen, I was always trying to be fair about that.

"MR. GELOV: What was his name, though? You mentioned his name to me before and I forget.

"MR. DUMOUCHELLE: Hold on. I've got -- it was Rusty White.

"MR. GELOV: Rusty White, yeah.

"MR. DUMOUCHELLE: So I apologize.

"MR. GELOV: No worries.

"MR. DUMOUCHELLE: Initially, I reached an office. I came in this morning unexpectedly, just decided we had some clients that wanted to meet with us. So now, I've got some people here that are (indiscernible), and I've also got to get out there and do the appraisals, so I apologize.

"MR. GELOV: No, no worries. And then this gal's name that we can call?

"MR. DUMOUCHELLE: Well, you can call her. Again, I've talked to a Jeannie Barker, B-A-R-K-E-R.

"MR. GELOV: And is she at a particular branch?

212-267-6868                 www.veritext.com                 516-608-2400

"MR. DUMOUCHELLE:  It's a gal.

"MR. GELOV:  Yeah.

"MR. DUMOUCHELLE:  I talked to her.  She's in the Cape Coral branch in Florida.

"MR. GELOV:  Okay.

"MR. DUMOUCHELLE:  And I've got a phone number.

"MR. RITTER:  Okay.

"MR. DUMOUCHELLE:  239-673-3008.  And then as I say, I did ask Lindy to -- I'm going to get the information to these people that are supposed to working with us next week to expedite all of these things.  I guess we'll have a team (indiscernible) before.  But if we want to send a letter, we just call them.  We don't need to go into our office.

"MR. GELOV:  And this gal is -- she's been approved to talk to me, like you give her that permission to talk to me?

"MR. DUMOUCHELLE:  Lindy (indiscernible).  You asked me who've I've spoken with in the past and she's been somebody I've spoken with in the past.

"MS. ADDUCCI:  They don't even want to see us in the bank unless we make an appointment.  If I walk in, they'll say you need an appointment to come in and see them.  They're like so understaffed, it's ridiculous.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

"MR. GELOV:  Okay.  So when do you -- so just -- and on the jewelry itself, did the client that bought -- so explain that to me so I understood.  So the clients bought the jewelry.  When did they buy it and when did they pick it up?

"MR. DUMOUCHELLE:  I mean, everything's been paid for.  And so, from our standpoint, it's just a matter of freeing up the funds to pay you; that's all we're waiting for.  Everything's been paid for in full.

"MR. GELOV:  Okay.  And did I get the full – just so I understand those pieces.  Did I get -- because, you know, we have a security interest in those pieces and I don't know that I've gotten the full catalogue photographs when you bought those.  You gave me the itemized list and you gave me some photographs, but I didn't get -- I didn't get them all.  Could you send me the photographs of the items?

"MR. DUMOUCHELLE:  Yeah.  I think you did, but I'll doublecheck that and I'll make sure you get everything, yes.

"MR. GELOV:  Okay, that'd be great.

"MS. ADDUCCI:  I apologize.  I have to tell you because when I talked to Jess, you know, I know she's young too, but we would never, ever, ever, ever want to involve (indiscernible).  I mean, we're not -- that was the

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

first thought about -- and I guess I'm assuming that -- because Lauren doesn't understand any of this stuff that goes on. And I'm assuming that she must have talked to Kevin and said this and this and this, but she doesn't understand that side of business when you go through certain things. There was some things that we've gone through. Nothing was anything other than what we've done in the jewelry industry, except she didn't understand when certain things backfire on you, you know -- anyway, that's all I have to say. You know, I feel bad because, of course, we would never do that. We've planned to follow through.

"MR. GELOV: No. I mean, Kevin and Jess just adore you guys and they're --

"MS. ADDUCCI: We adore them too and you're family. I mean, we have deep respect. I feel bad.

"MR. GELOV: They have sleepless nights now. I mean, I'll just tell you Kevin is just -- he's ready to throw up. I mean, every day, he's like I'm going to throw up, today I'm going to throw up and he just needs to focus on hockey. But they're dead in the water right now, so they are sick. I mean, they are absolutely sick.

"MS. ADDUCCI: We'll get it taken care of and then we can, you know, move on because that's -- you know, it's bad timing. It's bad timing. I don't understand it. I keep saying to Joe I don't know why -- you know, why did

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 76 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

this -- this is like just weird.  It's completely a weird thing with the bank.  I think back and, you know, well, I won't go back on all that because…

"MR. GELOV:  Yeah, no, no, no.

"MS. ADDUCCI:  I don't want to go in that direction, so, you know, so I guess I would, but in a lawsuit, so…

"MR. GELOV:  Yeah.  Well, I mean, we're going to have to get this taken care of, so I'm going to -- I'm going to need to know when -- you know, when you think it'll be set and when it'll be set.  It can't drag on that long. I mean, otherwise, I mean, you should be able to pull your money out.  I don't understand how anybody can tie up your money.

"MS. ADDUCCI:  Right.  Are you still there, Joe?

"MR. DUMOUCHELLE:  Yeah.  I (indiscernible) and I've already talked -- notes and I've already talked. And honestly, you know, there's a sense of discomfort.  I understand.  I thought -- if I ever thought I would go through this, I would I guess, planned it a completely different way and opened up a bank account well ahead of time.  I've probably had seven/eight different times that the day the lawyer came in when I called him to get a permit, they must have had seven or eight different times

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

where they could have said, geez, we don't like the sound of this or we don't want to decide, but we're just not going to accept it.  They knew exactly what was coming.

"MS. ADDUCCI:  They knew what was coming, we told them; that's where --

"MR. DUMOUCHELLE:  I told them enough times, so I don't believe having -- I mean, obviously, whatever I say, you know, Ted obviously needs to talk with Kevin, something more comfortable, you know, so if I planned on going on through this.  As I said, if they had left everything alone, I mean, this would have been done two weeks ago.

"MR. GELOV:  Okay.  Well, all right, well, so what is the next step?

"MS. ADDUCCI:  Why don't we touch base or why don't we just touch base --

"MR. DUMOUCHELLE:  I'm going to reach out in the meantime to this crew that's supposed to be helping us starting next week to see if they can expedite things just so we can start working for us now.

"MS. ADDUCCI:  I sat on a bank teller yesterday, I sat on a call for a half an hour just to try and get through to somebody, a half an hour as a business customer.  I was just -- and they won't let me walk into the bank because they're busy and, you know, I can't take up the

Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

seasons, so I can't take up their time and they only have three people in the branch here. Like, I'm ready to pull my hair out on this side, which is why I went to the other bank.

But it seems like banks right now, they don't even have people in there to even staff their -- you know, in New York, Chase, when I go into the Madison Avenue branch, I used to go in all the time. They would say to me, you know, oh, we want you to go to the teller machine. Well, then the teller machine, I put a check in, it goes out of Boston and they would reject it if the name wasn't made out perfectly. I don't know if you go through any of this at all in your business; you probably don't.

"MR. GELOV: No, I don't. I mean, honestly, that's what I'm saying, is that I have never experienced this in my life. And, I mean, I do business with -- I do business with probably every -- almost every bank in the land. I mean, we have people at Bank of America, you know, everywhere and, you know, I have not heard this.

"MS. ADDUCCI: Well, it might be our industry. It might be the Patriot Act in our industry really. I don't know.

"MR. DUMOUCHELLE: I mean, as I just said, we had checks (indiscernible) to the same company, the same --

"MS. ADDUCCI: Yeah.

"MR. DUMOUCHELLE: -- (indiscernible), the same client. We've bought the (indiscernible) for 25 years. And recently, they said we're going to hold this check for three weeks and I said why? You've accepted this check for the last 25 years. It just made no sense.

"MS. ADDUCCI: They said because we think it's a possible fraud, but that was Bank of America over to Chase and that was in Manhattan. And I basically went back to my client and said, you know, because I won't release the goods and he said -- it was a $96,000 check and he basically wired us and got rid of the check because he said that's ridiculous, I'll just wire you guys, but that's what they told me.

And then also because the name of the business, if the checks aren't made out perfect in New York, they'll actually reject it and tell me that they can't take it because they think it's a -- you know, somebody just writes Joseph DuMouchelle and they don't write exactly the way it is on the name, they'll turn it… It started happening like about a year and a half ago because (indiscernible) customers and all of them -- I'm not topping his story, I can't make it up. It's just the truth, so, you know, it was a bad fricking deal.

And FineMark, with the wires, all we did through December, it was part of it. I don't understand it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

because it's a small bank. You'd think they'd want the business, but they just don't want -- they don't want any headache of -- I guess they don't want us to call them and touch base with them, you know? They want to not talk to us. They want us to do whatever kind of banking doesn't require their people's time is what they want. So I guess we're high maintenance somewhat, so…

"MR. GELOV: Yeah, so --

"MR. DUMOUCHELLE: Ted, I'm going to reach out to his team and see if they'll start with us early.

"MR. GELOV: Yeah.

"MR. DUMOUCHELLE: See if they can somehow assist us. I'm going to do that now.

"MR. GELOV: Yeah. Okay, all right. Well, I still have a lot of questions. I'll look forward to talking to you tomorrow and we'll --

"MS. ADDUCCI: We'll get through it. We'll get our --

"MR. GELOV: Okay. All right.

"MR. DUMOUCHELLE: I mean, if you have questions, do you want to ask them now because I know Lindy, tomorrow is going to be with her mother in San Diego.

"MS. ADDUCCI: My daughter. Yeah, my daughter is flying in tomorrow.

"MR. DUMOUCHELLE: Her daughter may be

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

flying. But did you have other questions, do you just want to ask them now?

"MR. GELOV: No. I'm just -- no, I'm good. Thanks. All right. We'll just talk tomorrow.

"MS. ADDUCCI: All right. We'll get through it, Ted. I promise.

"MR. GELOV: Okay.

"MS. ADDUCCI: Thank you for your patience. We appreciate it.

"MR. GELOV: All right.

(Audio playback concluded)

"Q   Lindy, did you hear all that?

"A   Yes, I did.

"Q   That's you on the tape, is it not?

"A   Yes.

"Q   And at your previous deposition, you said it may not have been you, but why did you change here?

"A   I don't remember saying that.

"Q   Okay.

"A   Because my attorney advised me? I don't know. Why would I say that?

"Q   Was that Joe on the call?

"A   Yes.

"Q   And that was Ted Gelov on the call?

"A   I'm assuming. I don't know him well enough to

know his voice.

"Q    Well, you referred to him as Ted.

"A    Then it would have been Ted.

"Q    So why were you speaking to Ted Gelov?

"A    Because Joe came over and asked me, said Ted wants to talk to -- wants to talk to us.  He didn't warn me and he came and he said last minute, Ted wants to talk to us, he's getting his wife Angie on too, and we're going to all talk and I said okay.

"Q    What else did he tell you, Joe.

"A    I don't remember.  I don't recall.

"Q    Did he give you any background on why you were having a phone call?

"A    No.  No.  He -- no.  From what I think, it was -- I don't remember.  He didn't warn me.  He came to my desk, from what I think I remember, to my desk and said Ted wants to talk to us.  He didn't warn me and I was annoyed at that too and I said okay.  Obviously, I was venting about things going on.  I don't know why I would have said all that, except that I was venting.  I believe…

"Q    All right.  Your understanding of this call was that Ted was looking to be paid money, correct?

"A    Right, right.

"Q    And he was looking to be paid money because he had made an investment with you, Joe DuMouchelle Jewelers, and

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

was looking to be repaid?

"A   That's the way it appears, yes.

(Video playback concluded)

THE COURT:  I need you to pause one second.

MS. CLAYSON:  Okay.

THE COURT:  Okay.

(Video playback begins)

"Q   So what was the reference to someone you know very well from North Dakota?

"A   That having an issue with the bank.  I was probably just explaining some of our problems with the bank; those things happened.  My father-in-law used to have it happen.  It's not -- banking is -- ever since 2008/'09/'10, banking is not always that easy, 25 years of banking.  We had our line of credit pulled in 20- -- I don't know, the Private Bank and it was like 2010, we had our line of credit.  We paid it off every month, every other -- we paid it off and we paid it off and they pulled it from us.

And we found out later the reason they pulled it from it is because they were no longer giving -- someone came back and tried to get our business later and the guy from Michigan told Joe the rep for the bank said the reason they pulled it is because they were no longer giving loans out to small businesses.  They don't ever want to deal with small banks -- or small businesses.  And then they decided

212-267-6868                    www.veritext.com                    516-608-2400

Veritext Legal Solutions

that was a mistake, so they wanted to get our business back and Joe said, you know, it was a Private Bank and he said not interested. So I just thought this was all some of that same thing going on.

(Video playback concluded)

MR. CATALDO: Your Honor, that is the end of the tape.

THE COURT: Mr. Cataldo?

MR. CATALDO: Your Honor, our next witness will be Ms. Adducci. But given the time, could we perhaps discuss the schedule for today?

THE COURT: We could. The Court has a docket in Chapter 13 cases, two cases, commencing at 2:00; it will be telephonic. I expect it's going to take roughly half an hour. I've already prepared the cases. I kind of know how it's going to turn out.

So the staff, of course, I was thinking to go for another hour and then break at 1:00 and you could come back at 2:35. Ms. London, do you think that will work?

CLERK: Yes, Judge.

THE COURT: All right, because I think the two Chapter 13 matters I think will be done by 2:30. We're going to take a quick break now, though, if everyone needs to hydrate and do whatever. So, Ms. London, how about if we call a break until 12:15 and the Court would suggest we go

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

until 1:00 and then break at that time.  You'll have time for a long lunch, the staff will have time for a one-hour lunch.

(Recess)

CLERK:  All rise.  Court is back in session for the Honorable Lisa S. Gretchko.

THE COURT:  Please be seated.  Mr. Cataldo.

MR. CATALDO:  Your Honor, we call Ms. Adducci to the stand, please.

THE COURT:  Melinda Adducci, please raise your right hand.  Do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

MS. ADDUCCI:  I do.

THE COURT:  Please be seated.

DIRECT EXAMINATION OF MELINDA ADDUCCI

BY MR. CATALDO:

Q    Good afternoon, Ms. Adducci.  Nice to see you again. Ms. Adducci, did I hear correctly from your attorney in opening statements that you are still married to Joe today?

A    I am.

Q    So I want to talk about a document we've seen many times.  It was talked about in your deposition and, here, it's been marked Exhibit J9 if you could bring that up for us.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 86 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Is this a copy right here?

Q    There should be a binder in front of you that has all of the documents.

THE COURT:  Can mine be a little larger?  Great.

THE WITNESS:  So does J9 mean that I go to 9?  How do I --

MR. CATALDO:  Go to Number 9, that's exactly right.

THE COURT:  Ms. Adducci, so that you understand a little better, J describes the fact that both parties have agreed that this exhibit is admissible.

THE WITNESS:  Oh, okay.

THE COURT:  Okay?  So that's -- it's a joint exhibit.

THE WITNESS:  Okay.

THE COURT:  That's what the meaning of J is.  It has no meaning beyond that.

THE WITNESS:  Okay.  Thank you.

THE COURT:  But we didn't have tabs that said J9, so we just use 9.

BY MR. CATALDO:

Q    So, Ms. Adducci, we're looking at J9.

A    Yes.

Q    And I want to ask you about -- there's a signature block on this document.  Do you see this?  This is an email

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

that you sent on January 25th of 2019 to Tom Ritter.  Do you see that?

A    Yes.

Q    Okay.  And do you see that there is a signature block, right?  You see that on the email, it has a signature block for you?

A    Yes.

Q    And you used that professionally for all of your emails when you were working with --

A    Yes.

Q    -- DuMouchelle Jewelers, right?

A    Yes.

Q    Until the bankruptcy was filed, right?

A    It would have been automatically in our email.

Q    Right.  Automatically on the email --

A    Automatically on the email.

Q    You stopped using this email signature when the bankruptcy was filed to DuMouchelle Jewelers; is that fair?

A    I don't recall that specifically.

Q    You do recall DuMouchelle Jewelers filed bankruptcy though, right?

A    Yes.

Q    Okay.

         MR. FOLEY:  Objection, Your Honor, to the leading questions.

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

MR. CATALDO: She's an adverse witness, Your Honor.

THE COURT: We have an adverse witness on the stand. Do you want to ask permission, Mr. Cataldo, to ask her leading questions; would that help?

MR. CATALDO: May I ask your permission, Your Honor.

THE COURT: Yes, permission granted to ask leading questions to the adverse witness.

MR. FOLEY: Thank you, Your Honor.

MR. CATALDO: Thank you, Your Honor.

THE COURT: Thank you, Mr. Foley. The record is now real clear.

BY MR. CATALDO:

Q   So, Ms. Adducci, do you see on your signature block, there is an email address that's listed for you that you were using professionally?

A   Yes.

Q   What is that; what is the email address?

THE COURT: Ms. Adducci, I need you to keep your voice up.

THE WITNESS: Okay.

THE COURT: Thank you.

THE WITNESS: Lindy@josephdumouchelle.com.

BY MR. CATALDO:

Q    Okay.  And this is the same email address, if you look at the top, where it says on Friday, January 25th, 2019 at 9:51 a.m., Melinda Adducci, Lindy@josephdumouchelle.com wrote.  Those email addresses match, did they not?

A    Yes.

Q    Okay.  And then if you go to the email above, you'll see that there's an email sent to you from Mr. Ritter.  It's also to that same email address, Lindy@josephdumouchelle.com, right?

A    Okay.  So when I'm in this -- are there a bunch of things under that?

Q    I'm just asking if those are all the same email addresses.

            THE COURT:  She may not be on the same page.

            THE WITNESS:  Are there different pages in here?

            MR. CATALDO:  You are on the same page.

            MR. FOLEY:  She hasn't been instructed to what page to go to.

            THE COURT:  Okay.  Mr. Cataldo, this is the exhibit to which three pages were added to the top of J9.

BY MR. CATALDO:

Q    The page we're looking at right now, which is the one that has the sticker J9 on it, there is an email address that is highlighted at the very top and then in the middle of the page and those are the same, correct?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 90 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A     Yes.

Q     Okay.  And those are the same that match --

MR. CATALDO:  John, if you could pull it up…  Pull it up.  Other way.  Other direction.  There we go.

BY MR. CATALDO:

Q     And it matches the same one that's part of your signature block, correct?

A     Yes.

Q     Okay.  Then also under your signature, it says graduate gemologist appraiser-auctioneer; is that correct?

A     Yes.

Q     And that was part of the professional credentials you used while Joseph DuMouchelle Jewelers was in business, correct?

A     Yes.

Q     Okay.  So what is a graduate gemologist appraiser-auctioneer; what is that?

A     Three different things.

Q     Okay.  Please tell us what those things are.

A     Graduate gemologist would be from -- mine is from the Gemological Institute of America, and it's a course that I took back in 1982-'83, and got my graduate gemology degree, which is not appraisal degree.  It's identifying -- it's basically like a geology degree in college, only it's gemology, and you learn how to identify and separate

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

gemstones.

Q    But there is also the word appraiser.

A    Right.  An appraiser means that that could be a title that I could hold.

Q    Okay.

A    And then auctioneer, also I could auctioneer.  I just was stating…

Q    Well, I looked up the definition on the Internet.  I'm going to read you the definition I found for a graduate gemologist appraiser, and I want to see if you agree with this definition.

MR. FOLEY:  Objection, Your Honor.  Reading a document printed off the Internet that's not an exhibit would constitute hearsay.

MR. CATALDO:  Your Honor, this is my cross examination.  These are not proper objections.  I'm asking the witness if she's going to agree with the definition.  If she doesn't agree, she can say she doesn't agree.

MR. FOLEY:  But he's indicated he's reading a document obtained from the Internet that's not been made an exhibit.

MR. CATALDO:  I can read anything I want, frankly, Your Honor.  It's not an objection.

THE COURT:  Objection is overruled.  We'll let him do this.  Mr. Cataldo.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY MR. CATALDO:

Q    Okay.  So the definition I found said that a graduate gemologist appraiser is: "A highly trained professional, often with a diploma from the Gemological Institute of America, specializing in identifying, grading, and valuing diamonds, colored stones, and pearls.  They provide unbiased, expert opinions for insurance, estate, and resale purposes.  These experts are considered the industry's standard for accurate, ethical, and detailed jewelry evaluations."

Do you agree that that definition would apply to your credentials?

A    It could.  It's the way that it's worded is not how I would word it.

Q    How would you word it?  Please tell us how you would word it.

A    I just told you.

THE COURT:  Please answer the question, Ms. Adducci.

THE WITNESS:  I would word it that graduate gemologists are identifying; appraiser is a role that means many things.

BY MR. CATALDO:

Q    What does it mean?

A    It means you could be doing insurance appraisals, it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

means you could be evaluating something, and yeah. A highly -- a specialist would be you're doing -- you're pulling both of those in. But I just didn't like the wording specifically that the first -- the way you worded everything in the first one, I didn't -- I'm not looking at that on here. But if I were looking at that wording, I would dissect it.

Q    Okay.

A    Because there are parts of it I didn't agree with how I heard it, but, yes, an expert.

Q    So do you consider yourself an expert?

A    I do.

Q    What are you an expert in?

A    I'm a master gemologist appraiser now. I wasn't at that time, but I was working towards it.

THE COURT:  What time are we talking about for clarity in the record?

BY MR. CATALDO:

Q    So at the time, this would have been January of 2019.

A    Oh, actually, I was on there, yeah, master gemologist appraiser. Yeah, I'm sorry. I saw the senior AGA member, yeah. I had gotten that title. I had worked for that title, so I had it at that time, yes.

Q    So were you a master -- I'm sorry -- strike that. Were you an expert in providing valuations on diamonds in January

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

of 2019?

A    Yes.  Yes.

Q    You were.

A    Yes.

Q    And you held yourself out as an expert in --

A    Yes.

Q    -- providing valuations on diamonds, correct?

A    Yes.

Q    So if Mr. Ritter was relying on that expertise, that would be consistent with all of your professional credentials, correct?

A    Yes.

Q    So we've looked -- you sent this email to Mr. Ritter and you attached, if you could flip it down this page, and this is…

THE COURT:  Okay.  Mr. Cataldo, you need to tell her which page to look at in J9.

MR. CATALDO:  Okay.

BY MR. CATALDO:

Q    It should be in your book at the bottom and it should have TTRITT198.

A    So am I going -- am I in this section?  Oh, 198, okay.

Q    Just keep flipping pages until you get to one that has 198.

A    Right.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: Ms. Adducci, do you see it there?

THE WITNESS: I do, yes.

THE COURT: Thank you.

BY MR. CATALDO:

Q    Okay.  And this was part of the package you sent to Mr. Ritter, correct?

A    Yes.

Q    Okay.  And this has a -- actually, what it says is an insurance replacement value, $30,045,000.  Am I reading that correctly?

A    Yes.

Q    And I understand you didn't prepare this valuation, but you did send this document with this page to Mr. Ritter, correct?  You sent it to him.

A    Yes.

Q    Okay.  And I think we heard on the tape of your deposition testimony, you knew that Tom Ritter wanted your professional opinion on The Yellow Rose stone, correct?

A    Yes.

Q    Okay.  So this replacement valuation document is dated January 31 of 2011; is that correct?

A    Yes.

Q    So this would have been approximately eight years prior to the date you sent it to Mr. Ritter, right?

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   Okay.

THE COURT:  Wait.  Where is that date?  Oh, at the upper right, okay.

BY MR. CATALDO:

Q   So, Ms. Adducci, I'm going to ask you to turn to, in your book, Exhibit J29.

MR. CATALDO:  John, can you bring up J29, please?

BY MR. CATALDO:

Q   And there are a series of -- there are three photographs of what appears to be a large yellow diamond. And then on the second and third pages, there appears to be a woman holding that diamond in the first picture and then with the diamond now on her hand in the third picture.  Do you see those?

A   Yes.

Q   Are you in any of these pictures?

A   Yes.

Q   Which ones?

A   The ones with my photo.

Q   And that would be the second and the third?

A   Yes.

Q   Do you know who is holding this diamond in the first picture?

A   No.

Q   And are these pictures of The Yellow Rose Diamond?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Well, I assume they are.  The first -- it appears to be, yes.

Q    Do you know where these pictures were taken?

A    In the Michigan office after -- when I was asked to go in and show it to the person that was referenced previously from Birmingham Bloomfield area, and they asked me to go in and that she was coming over and Joe asked me if I would just go in and talk to her about diamonds.

Q    Do you know the --

A    And afterwards, I --

Q    Answer my question.  I just asked you where these were taken.  Okay.  Do you know the year --

A    I don't know where this first one was taken.  That one, I don't know if that's my hand.

Q    Do you know what year these photographs were taken?

A    I don't.  I don't.  It could have been 2018.

Q    So how long prior to the discussions with Tom Ritter about The Yellow Rose sale were these taken, to the best of your recollection.

A    I don't remember.

Q    Okay.  So we also looked at -- and I think you've seen, you were here during the testimony -- Exhibit Number 10, if you could turn to that in your book.  And Exhibit 10 was the contract; it's dated January 30th, 2029 (sic).  And if you look at the second page, you'll see the two signatories are

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Thomas Ritter and Joseph DuMouchelle; is that correct?

A    Yes.

Q    And we heard from the clip of your deposition that you actually read this contract to your son, Joey; is that correct?

A    Yes.

Q    Okay.  So where was Joey when you read the contract to him?

A    I don't -- I don't remember.

Q    Okay.  Was it over -- I mean, was he in a different place?

THE COURT:  Excuse me.  I didn't hear the answer to that question.

THE WITNESS:  I don't remember.

THE COURT:  Okay.

THE WITNESS:  I do not recall.

BY MR. CATALDO:

Q    Were you in the same room with Joey?

A    No.

Q    Okay.  Was it -- so it was over the telephone?

A    I believe so, from my memory, yes.

Q    Okay.  And so, you obviously had a copy of Exhibit 10 in your possession to be able to read it to Joey, right?

A    Yes.  I believe I was standing next to Joe; he showed it to me.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Q   So you had also seen, had you not -- take a look at Exhibit 11 -- and this was an email that had been sent to you and Joe from Tom Ritter and I'll read it to you.  It says: "Joe and Lindy, I was considering adding Lindy's name to the agreement, but didn't know if you guys wanted it that way since, in the past, you chose not to.  If you wish to have me correct that, please let me know.  It was not my intent to leave you out or lessen your part in this, as I know your skill and expertise in the gemology field is at the top.  Best regards, Tom."  Did I read that correctly?

A   Yes.

Q   And you understood that Tom was giving you an opportunity, if you wanted, to join the contract and sign it as a party, right?

A   Yes.

Q   Okay.  And you chose not to do that, right?

A   That is correct.

Q   But you -- before you made that decision, you actually read the contract to your son, right?

A   I believe I did, yes.

Q   Okay.  So you actually then spoke the words that were written on the page so he could hear all of them, right?

A   I believe I did.

Q   Okay.  And so, part of what you read -- and we'll go back to Number 10, please -- and in the middle of the page,

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

you'll see there's a paragraph that says: "With your assistance, I, Thomas T. Ritter, intend to purchase Yellow Rose Diamond, the diamond, for $12 million and no one hundred dollars," and then it has the number $12 million in parathesis, "(the funds) and then resell the diamond as soon as possible. You, Joseph DuMouchelle have estimated a resale price in the range of $16- to $20 million." Do you see that?

A     Yes.

Q     So you would have read those words out loud to your son, correct?

A     Yes.

Q     Okay. And then the next paragraph says, "I will establish an escrow account at JPMorgan Chase, the fees for which shall be split equally between the seller and the buyer. I will wire FUNDS -- capitalized -- from my bank into this account and, subject to the terms of the escrow agreement between the parties being met, the funds will be released to the seller upon receipt of the diamond by you on my behalf." Did I read that correctly?

A     Yes.

Q     So you would have read that paragraph to Joey, right?

A     Yes.

Q     Okay.

          THE COURT: Do you mean Joey or Joe?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO:  Joey.  Her son is named Joey.

BY MR. CATALDO:

Q    Did I get that right, your son is Joey?

A    Yes.

Q    Okay.  And Joe is your husband; he doesn't go by Joey, does he?

A    No, my son's name is also Joseph, but he goes by Joey.

Q    He goes by Joey.  So when you and I are going to talk about your son, we'll call him Joey and we'll talk about your husband as Joe; is that fair?

A    Yes.

Q    So you clearly understood when you read this that Mr. Ritter was going to put up $12 million to purchase The Yellow Rose Diamond, correct?

A    Yes.

Q    And you understood from the second paragraph that the purpose of the $12 million was to buy The Yellow Rose and it wasn't supposed to be released to anyone but the seller upon the receipt of the diamond by your husband, correct?

A    Yes.

Q    Okay.  And you would have read also the remaining paragraphs of Exhibit 10 to Joey, right?  You didn't just read those two paragraphs; you read the whole thing.

A    I don't know if I read the whole thing.  I don't remember.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 102 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Okay.  So is it fair to say you read it to Joey as part of your evaluation of whether you wanted to sign Exhibit 10, to be a party to it?

A    Not as to whether I wanted to sign.

Q    Okay.  So why did you read this contract to Joey?

A    Because, like Tom, he's related to family, I care -- care about him, and I wanted to make sure everything was okay.  And I was asking Joe -- I said to Joe when he asked me, you know, what do you think, and I said I don't know.  I don't structure these deals.  This is not something that I -- the conversation that Joe had was always with Tom; it was not me, and I -- as far as structuring and their conversations with business.  And so, I wanted to make sure I felt comfortable and I felt comfortable that Joey -- if I asked Joey what he thought, he would, you know, come back and tell me that maybe it would help me -- yeah, because this is not something I -- the structuring is not something I normally would do with contracts.

Q    So what you said on the tape was that Joey, his advice to you was Tom sues everybody.  You remember saying that?

A    Yeah.  I don't mean to say that in a really harsh way, but yes, I did.  Yeah, Joey did say that because he --

Q    Well, here's my question.  Were you worried that Tom was going to sue you if you signed this document?

A    I immediately -- after I spoke to Joey, I turned and I

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

looked to Joe and I said, Joe, you know, Joey said this better be airtight -- or maybe he didn't say airtight. But, you know, basically, this -- airtight is not a word -- I take that back. It needs to be, do you see anything wrong with it; that's what I said to him, is there anything wrong. Joey said -- so I asked Joe and Joe said no, this is -- everything is fine, it's great. So I relied on Joe and I -- I relied on Joe.

When Joey said Tom sues people, he has knowledge of what goes on in the oil industry and I don't -- I'm not someone who researches all of that, and he knew much more about the legal information that he still does than I do, and so, I didn't mean that in a negative. I meant it more just, you know, that -- I care about Tom. I care about our family. This is my family that you're now bringing it in. Is everything okay and Joe said yes.

Q    So you weren't worried in January that Tom was going to sue you?

A    No, because I trusted my husband.

MR. FOLEY:  Objection.  Asked and answered.

THE WITNESS:  And Tom.

THE COURT:  Excuse me.  There was an objection, Mr. Cataldo, Ms. Adducci.  Say the objection again.

MR. FOLEY:  Asked and answered.  The question as to whether or not she was concerned that she would

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

personally be sued by Mr. Ritter was already asked and she already answered it in the negative.

THE COURT: All right. Mr. Cataldo, your response?

MR. CATALDO: The question was specific as to the date, the prior one was not.

THE COURT: Correct. The objection is overruled. One had a date in it.

BY MR. CATALDO:

Q   Can you answer the question?  So you -- let me re-ask it.  So you're saying you weren't worried in January of 2019 that Tom was going to sue you.

A   No.

Q   But after you read it, after you read the contract, you made the decision you were not going to sign as a party, right?

MR. FOLEY: Objection, Your Honor.

THE COURT: On what basis?

MR. FOLEY: Vague and assumes facts not in existence.  There's been no contract presented that ever called for her signature and no evidence presented that her signature was ever requested on the document.

THE COURT: Okay.

MR. CATALDO: Your Honor, that's not correct.

Exhibit 11 asks her if she wants to be a party to it.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 105 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: He added to it, but he's asking about her signing the contract as though it has a blank signature block.

THE COURT: Mr. Foley, the objection is overruled. The Court has reviewed the exhibits and it's within the bounds of proper questioning. Mr. Cataldo.

BY MR. CATALDO:

Q   Am I correct, Ms. Adducci, that after you read the contract to your son Joey, you made the decision you were not going to sign as a party, right?

A   When did that email come?

Q   It came, the date is the 31st of January 2019.

THE COURT: Are you referring to J11?

MR. CATALDO: J11.

THE WITNESS: It wasn't that I didn't make the decision. It's that I was never part of the structuring. This was between Joe and Tom. And for Tom to say that, I was never -- I was never asked that by Joe and that was not my intent. When I looked at this, it was not my intent that…

BY MR. CATALDO:

Q   Okay. The answer is no, you didn't.

A   No.

Q   Okay, it's fine. So let's change subjects and let's talk about the Bank of America account. All right?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Okay.

Q    Am I correct, you were in Sanibel, Florida when you opened up a bank account at Bank of America.

A    Yes, I believe that to be true.

Q    Okay.  And the account -- and if we could take a look at J4 -- the account was opened up in the name of Joseph DuMouchelle Fine and Estate Jewelers, LLC, correct?

A    Yes.

Q    And you signed the signature card, Melinda Adducci, VP, you printed your name, then you signed your name; it was dated February 5th of 2019, correct?

A    Yes.

Q    And who wrote in -- you'll see above there, there's a -- looks like employer identification number?

A    I don't know.

Q    Did you have the employer identification number with you to open the account?

A    I don't recall.

Q    So this is the signature card that opened the Bank of America account that we've been talking about in this case, correct?

A    Yes.

Q    And at the time you opened it, you were the only signatory on the account, right?

A    I believe so.

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 107 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    All right.  And you stated and we heard it on the tape, you were angry at Joe because you were in the process of getting ready to leave Florida to travel to Arizona to go to a conference, right?

A    Yes.

Q    Okay.  And so, did you open the account on your way to the airport; is that what happened?

A    I don't -- I don't recall.

Q    Okay.  But you remember you flew from Florida to Arizona sometime shortly after you opened this account, right?

A    Right.

Q    Okay.  And what we heard on the tape was that a bank called FineMark had rejected Mr. Ritter's wire transfer and, therefore, Joe had asked you to open a different account so Mr. Ritter's money could be transferred into it; is that correct?

A    Yes.

Q    Okay.  So you knew the purpose of this account was to take in this wire transfer of the $12 million from Tom Ritter, right?

A    Yes.

Q    Okay.  And so, you knew when you opened the account, it had a zero balance unless you put some money in it, right?

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   And if we take a look at Exhibit Number 5, it's the statement for this account.  Actually, if we can go back to Exhibit 4 and you see there's the account number that's at the top of the page; you see that?

A   Yes.

Q   So you wouldn't have had that account number until you went in to the bank and opened the account and then the bank would have given you the account number at that time, right?

A   Yes.

Q   Okay.  And it ends with 0585 are the last four digits, correct?

A   Yes.

Q   All right.  And so, then if we go to Exhibit 5, we see there are statements for -- and if you look at the account number, it's on the right side of the page, that matches the account number for that signature card on Exhibit 4 that ends in 0585, correct?

A   Yes.

Q   And at the time you opened this account, you were in Florida and Joe was in Michigan, right?

A   Yes.

Q   And Joe had told you that FineMark had rejected Mr. Ritter's wire transfer, needed a new account opened to get Mr. Ritter's $12 million deposited, right?

A   Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  So if you go to -- it would be the third page of Exhibit 5, you'll see under deposits and credits that on the 5th, there is a counter credit for $500.  Do you see that?

A    Yes.

Q    So you must have had $500 with you that you put into this account to open it up, right?

A    I assume.

Q    Was it cash, was it check; do you know?

A    Well, if it's -- I don't know.

Q    You don't remember.

A    No.

Q    Okay.  So Joe was not with you, right; he's in Michigan, correct?

A    He was in Michigan.

Q    Okay.  And so, after the bank account was opened, you had to call Joe and tell him that you'd been successful and the account was opened, right?

A     I don't know that I called Joe.  He may have called me or texted me.  I don't recall.

Q    Okay.  But Joe could have only found out the account was opened through you, right?

A     No.  He could have found it out from the bank.  He could have called the Sanibel Bank of America.  He didn't have to do it through me.  I don't recall.

Q    Okay.  Well, you had the account number for the bank

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

because you had just opened the account, right?

A    Yes.

Q    Okay.  He wasn't on the account on the 5th of February, right?

A    I don't know what he was doing up there.  I know he was communicating with a Bank of America up there as well.  I don't recall and I don't remember exactly --

Q    Okay.

A    -- how he did what he did on his end up there.

Q    You don't recall calling him and telling him --

A    I don't.

Q    -- that the account had been opened?

A    It was a long time ago.

Q    You don't.  But you may have, you just don't remember.

A    I may have; I don't remember.

Q    Did you give Mr. -- I'm sorry -- your husband, did you tell him the account number?

A    I don't -- it was a long time ago.  I don't recall, but I would assume.  I don't recall.  I mean, I would assume I would have.

Q    How about the bank routing number; did you give him that information too?

A    I don't remember those details.  He could have gotten that from the bank.  From what I remember, he had already worked with a Bank of America up in Michigan and I don't

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 111 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

know why he had me go to Sanibel.  I don't recall or remember.  But I don't know if I gave him those numbers or he got those from them.  I don't recall that.

Q    But you could have gotten it yourself; obviously, you had the account number.

A    Yes, yes, yes.  The routing number, you could get a routing number online.

Q    You get a routing number

A    Online, you can go online and look for a bank and get the routing number.

Q    Just all you needed was -- all he would need to get wire transfer instructions to Mr. Ritter, he would have just needed the account number, right?

A    Correct, yes.

Q    Right.  And he could have got that from you, right?

A    Possibly, but he could have gotten it from the Bank of America up there as well.

Q    But you knew that the whole purpose for this account was to accept the wire transfer that was going to be made by Tom Ritter for the $12 million; you told us that a minute ago, right?

A    Yes.

Q    Okay.  So if we could bring up J15, if you could take a look at that.

A    I don't have a J15, or I guess I do.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 112 of 252
Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400

Q    You have a Number 15.

A    I do, yes.

Q    So J15, you can see the bottom of it purports to be a email from a Richard Drucker to Joseph DuMouchelle, your husband, on the 4th of February, which purports to be confirming wire transfer information on a Bank of America account which ends in 0585.  And, unfortunately, the full number is redacted from this document, but those four digits match up with the account you opened up, correct?

A    Yes.

Q    We would agree that on the 4th of February, you didn't have that account because you hadn't opened it up yet, so he wouldn't have known that number, right?

A    I'm confused.

Q    Yeah.  So…

A    You mean I wouldn't have opened -- Joe wouldn't have had the number or I wouldn't have had the number?

Q    No one would have.  You hadn't even gone in and opened the account yet on the 4th.

A    On this…

Q    Right?  You didn't go in until the 5th.

A    What date did -- until the 5th.  I'm -- well, then that means that Joe started the account opening.

Q    Or it means he made up this email, one of those two things, right?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 113 of 252
Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

A     But it came from Richard Drucker.  I didn't structure -- I did not structure what they had going on.

Q     Ms. Adducci, the bank statement --

A     And I was acting -- I --

Q     I'm not asking you that.  I'm just saying that the account number couldn't have existed until the 5th when you went in and signed the signature card, right?

A     No, that's not true.  Joe spoke to people, I believe from what I recall but it's been a long time, he had already been up to the Bank of America in Michigan.  I don't know if he got it from them.  I don't know.

Q     Well, if we look at the statement, we go back to Exhibit 5, the statement doesn't show the account even existing until February 5th, right?

A     This is not my email.  It did not come to me, so I don't know what you're asking.

Q     What I'm asking you is based on what's in the bank statement, Exhibit 5, this account didn't even exist until February 5th, right?

A     What do the signature cards say?

Q     Can you just answer my question?  Then we'll look at the signature card.  According to the bank statement, this account --

THE COURT:  Mr. Cataldo, I think that she needs to look at the signature card to answer that question.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

BY MR. CATALDO:

Q    Let's take a look, let's go back to Exhibit 4 --

A    Where is the signature card?

Q    -- which is your signature card dated February 5th, correct?

A    Yes.

Q    So going back then to J5, the bank statement, the account didn't even exist until the 5th of February, right?

A    Yes.  It appears that way, yes.

Q    Okay.  So when Mr. -- when your husband sent or forwarded this supposed email to Mr. Ritter, he may have gotten the account number for the account from you, right; we agree on that?

A    I guess, but how could he have gotten it if it wasn't opened yet?

Q    Or maybe this email isn't accurately dated; that's another possibility, right?

A    I don't know.

Q    Okay.  So we do agree, though -- I just want to be clear -- that on the 5th, you were the only signatory on the Bank of America account that ends 0585.

A    I assumed so.  I assume so.  I don't know what Joe was doing up there, but he asked me to -- I assume so, yes.

         MR. CATALDO:  Your Honor, this would be a good spot if we could break here for lunch.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Yup. All right.

MR. CATALDO: And I presume we're coming back at 2:30?

THE COURT: I think 2:35 because the Court expects it will take half an hour for the Chapter 13 docket, which will be telephonic, and then the Court will take -- the Court will be in chambers for that and then we'll take the bench at 2:35. Will the five minutes make a big difference?

MR. CATALDO: It will not.

THE COURT: All right. The Court will be back here at 2:35.

(Recess)

CLERK: All rise. Court is back in session for the Honorable Lisa S. Gretchko.

THE COURT: Please be seated.

CLERK: Recalling Case Number 20-4381, Thomas T. Ritter v. Melinda J. Adducci.

MR. CATALDO: Good afternoon, Your Honor. Christopher Cataldo, Kim Clayson for the Plaintiff.

THE COURT: Good afternoon, Mr. Cataldo, Ms. Clayson, and Mr. Ritter.

MR. FOLEY: Good afternoon, Your Honor. Patrick Foley and Mr. Ryan Glavin on behalf of the Defendant.

THE COURT: Good afternoon, gentlemen. Good afternoon, Ms. Adducci.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 116 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. CATALDO: May I proceed, Your Honor?

THE COURT: You may, but you need a witness in the witness box.

MR. CATALDO: I do.

THE COURT: Ms. Ritter, please re-take the witness stand. Excuse me? I called you Ms. Ritter. Ms. Adducci, it's been a long day for the Court. Ms. Adducci, please -- you're already sworn and you're still under oath -- please be seated and my apologies. It's really been a long day.

BY MR. CATALDO:

Q  Ms. Adducci, before we broke, we were talking about Exhibit 5, which is the bank statement for the account you opened up that day in Sanibel to accept Mr. Ritter's wire transfer. And what's the name that you put on the account when you opened it?

A  Joseph DuMouchelle Fine and Estate Jewelers, LLC.

Q  Now, earlier before lunch, we looked at the contract that was signed between Mr. Ritter and your husband that you read to your son Joey. Do you recall doing that?

A  Yes.

Q  Okay. That contract said that the account that the money was supposed to go in to was going to be in the name of the seller; remember that?

A  Yes.

Q  Okay. So why did you put the name of Joseph

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 117 of 252
Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400

DuMouchelle on the account and not the name of the seller?

A    I don't know.  I didn't know.  I didn't set up the details of the arrangement of this contract.

Q    Okay.  But you had read the contract; you read it to your son, right?

A    But I didn't set up the details of how things were -- I didn't set up the details.

Q    Okay.  So then why did you pick the name Joseph DuMouchelle and Sons to put on the bank account for Mr. Ritter's money to go in to?

MR. FOLEY:  Objection, Your Honor.  That's a mischaracterization of what the exhibit shows.

THE COURT:  The exhibit shows Joseph DuMouchelle Fine and Estate Jewelers, LLC as the name on the account and the witness just testified that's the name on the account.  Where's the mischaracterization?

MR. FOLEY:  Not to be overly emphatic about accurate reading, but Mr. Cataldo said that it says Joseph DuMouchelle and Sons.

MR. CATALDO:  Oh, I'm sorry, I did.  I will rephrase the question.

MR. FOLEY:  Is my objection sustained then?

MR. CATALDO:  I'll withdraw the question and redo it.

THE COURT:  He's going to -- I didn't even catch

that part of your objection.  I just heard you were objecting to something the witness had agreed to.  So have a seat, Mr. Foley, your objection -- we're going to rephrase the question and it will take care of your objection.

MR. FOLEY:  Thank you, Your Honor.

BY MR. CATALDO:

Q    To be clear, you went into the branch on Sanibel Island in Florida to open up this account, correct?

A    Yes.

Q    Your husband was in Michigan; he was not in Florida.

A    No.

Q    You were the one who filled out the signature card for how the name was going to be designated on this account, right?

A    Yes, it was our business account name.

Q    Okay.  And my question is why did you put it in the business account name for Mr. Ritter's money and not that of what was required under the contract, which would be in the name of the seller.

A    Because we were having -- we were having banking issues and I was going --

MR. FOLEY:  Objection, Your Honor.  Mr. Cataldo's recitation of what the contract calls for is inaccurate, and I would ask him to go back to the language.

MR. CATALDO:  Your Honor.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Okay, hang on a second. Ms. Adams-Williams, can you read back Mr. Cataldo's question more or less? As the Court understands it, the question was, why did the witness when she opened the account with Bank of America put it in the name of the business, DuMouchelle Fine and Estate Jewelers, LLC. Is that your question, Mr. Cataldo?

MR. CATALDO: That's exactly my question.

THE COURT: And your question had a second part, which is when the contract that the witness had seen and read to her son Joey stated that the money from Mr. Ritter was to go to the seller. Is that your point, Mr. Cataldo?

MR. CATALDO: Yes.

THE COURT: What exhibit are you looking to for that?

MR. CATALDO: I'm looking at Exhibit 10. And I'll actually -- I'll see if I can redo the question to help out.

THE COURT: Mr. Foley, that's not Mr. Cataldo's --

MR. FOLEY: Your Honor, just to be clear, it's not helping out counsel here. When he asked the question, he said why didn't you put it in the name of the seller as the agreement calls for it to be, which is not what Exhibit J10 says, so Mr. Cataldo isn't helpfully helping me. He's correcting his own misstatement of what the contract says; that's my objection. If there's --

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 120 of 252
Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

MR. CATALDO: Let me try it again.

THE COURT: Can we go off the record. I need to have counsel approach, Ms. Adams-Williams. Can we go off the record, please?

(Recess)

BY MR. CATALDO:

Q   Ms. Adducci, I'm going to ask you a new question. Let's go back to Exhibit 10, please. We looked at this before lunch, and if you read the paragraph that says, "I will establish." Do you see the paragraph?

A   Yes.

Q   Okay. It says: "I will establish an escrow account at JPMorgan Chase, the fees for which shall be split equally between the seller and the buyer. I will wire the funds from my bank into this account and, subject to the terms of the escrow agreement between the parties being met, the funds will be released to the seller upon receipt of the diamond by you on my behalf." Do you see that?

A   Yes.

Q   Okay. Now, you understood this was the contract between your husband and Mr. Ritter, right?

A   Yes.

Q   And you had read this contract to your son, right?

A   Yes.

Q   So given this language, my question to you is why, when

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 121 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

you opened up this account at Bank of America, did you put the account in the name of the business, Joseph DuMouchelle Fine and Estate Jewelers, LLC?

A    Because FineMark Bank was aware the money was being wired prior and, I believe, that account was in that name and that is the business name that we used for a business account.  And it was my -- I was asked to open this at the last minute and we were having banking issues and it was a business banking situation and the normal -- the normal course of banking of anything that we did for banking was through our business.  And so, I was opening this because of FineMark.

Q    Okay.

A    And I did ask Joe why did you not go into escrow.

Q    And what did he say?

A    That Tom didn't want it to go into escrow.

Q    Did you call Tom and ask Tom if he was in agreement with that?

A    No.  I believed Joe.

Q    So on February 5th, 2019, where was the diamond?

A    I don't know.

Q    You don't know?

A    I wasn't asked to know that.

Q    Okay.  Was it still at the Birmingham location of the business?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    I don't know.  I was not in Michigan, so I don't know where it was at.

Q    Who was the seller of the stone?

A    Who did I believe was the seller?

Q    Yes.

A    William Noble.

Q    And who told you that William Noble was the seller?

A    Joe, and that's who it came from into our office the first time.  The girls in the office had memorandums from William Noble with the diamond.

Q    And did you later learn that William Noble was not the seller?

A    I've learned that.  I've learned many things since.  I don't know at what point I learned that, but do I know it now?  Yes.

Q    Okay.

THE COURT:  Excuse me.  For clarity, Ms. Adducci, what is it that you know now?

THE WITNESS:  About who owns the diamond?

THE COURT:  Yes.

THE WITNESS:  Well, I was told it was William Noble because William Noble sent it to us.  And I believe he -- I believe because I wasn't there to receive it when it came in but the girls were in the office, and I believe it went -- it came in, like, late August under William Noble.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 123 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

He had been sending a lot of jewelry to the office and they had been working since, I think, 20-, maybe '17 or '16. And then it came back in -- I think he wanted it back once to show somebody in Texas, and then I think it came back again; that would be a question for the staff.

And I didn't keep track of it, but I did see it. You know, I did -- I was not in Michigan, so I wasn't keeping track of it; that was what they were doing. But I had no reason -- I didn't ask because I trusted my husband. I trusted -- I trusted William Noble. I didn't know William Noble, but at the time he was supposedly a trustworthy person.

BY MR. CATALDO:

Q   But today, you know that William Noble was not the seller of this.

A   Yeah.

Q   Is that correct?

A   Yes, I guess. I guess, yes. I don't know who was the seller. I don't know who actually -- I think there were a lot of people that owned this diamond and I think he had some scams going from what I understand.

Q   Now, in February of 2019, did the business owe money to Mr. Noble?

A   I don't know that either because I didn't deal with -- I've never met Mr. Noble; that would be something Joe -- we

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

had jewelry in our office.  They had a lot of jewelry that came in on memorandum from Mr. Noble.  I would say for at least two years, I would travel back and I would see pieces that were there, diamond rings that were there, a lot of big pieces from William Noble.  And I know that because I would say -- the girls would be working on packing it and I'd say, wow, where did this come from and it would be on their desks and I'd be, like, okay, wow.  So, I mean, this is -- I didn't -- I wasn't there.  That office was not an office I was working.  But I never met Mr. Noble and I never spoke to him.

Q    Well, let's go back to Exhibit 5, we were talking about that.  And you can see on the first page that it says there are the month of February -- well, actually, not the full month.  But from February 5th to February 28th, there are deposits and other credits that total $12,855,000, withdrawals and other debits of $8,054,905, service fees --

THE COURT:  Wait.  Mr. Cataldo, I think you misread withdrawals and other debits.  Did you mean to say $12,855,000?

MR. CATALDO:  $12,854,905.

THE COURT:  Okay.

BY MR. CATALDO:

Q    Service fees of $155, and an ending balance of negative $60, right?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Yes.

Q     Okay.  And we know The Yellow Rose was not purchased by Joseph DuMouchelle Fine and Estate Jewelers, LLC for Mr. Ritter during February, correct?

A     I did not know that at the time.

Q     Okay.  You know that today, right?

A     I know that today.

Q     All right.  Well, let's take a look at some of the details --

A     But I didn't know the structure.  I didn't know the structure of the partners --

Q     There's no question.

A     -- were.  I didn't know any of that.  That was not something that I set up.

Q     Well, if you could turn to Page 3, please, of the document.  So the deposits and other credits, there's a counter credit on the 5th, which is the day you opened the account.

A     Right.

Q     Correct?

A     Yes.

Q     And we talked about that earlier, that you must have had $500 with you to open this account --

A     Yes.

Q     -- when you went into the branch at Sanibel, right?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A     Yes.

Q     Then we see on the 6th, the next day, there is a wire transfer from Thomas T. Ritter and Carol for $12 million, correct?

A     Yes.

Q     And that's the $12 million from Mr. Ritter that we've been talking about that's referenced in the contract that was Exhibit 10 we looked at earlier.

A     Yes.

Q     Okay.  Then we looked -- I'm sorry -- then on the 8th, there is a counter credit for $854,500.  Do you see that?

A     No.  Oh, right there, yeah.

Q     Right there, you see the counter credit?

A     Yes.  Yes, I see it.

Q     Do you know what that is?

A     No.

Q     But there's no other money then that is deposited into the Bank of America account in February of 2019, other than the three items that are listed here, according to this statement, correct?

A     Yes.

Q     Okay.  So then the next section down, there are withdrawals and other debits in February.  Actually, you have to go to the next page to see the total, and the total of all of these adds up to the negative $12,854,905.  Do you

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

see that?

A    Yes.

Q    Okay.  So then let's go back to the first pager and you'll see the first three items on this account and they're all dated the 6th, which is the same day as Mr. Ritter's wire transfer hits the account, there are three things called legal order.  Do you see that?

A    Yes.

Q    Do you know what those are?

A    No.

Q    Okay.  So then the next three items -- and these are now on the 7th and let's look at what happens on this account on the 7th.  There's actually six transactions that are on this account on the 7th, correct?  There are three that say AZTLR transfer to CHK; then there are three that are under customer withdrawal image.  Do you see that?

A    Yes.

Q    Okay.  So let's look at these six transactions and figure out what happened on the 7th of February.  Now, we talked about when you opened, you were in Florida and at Sanibel Island?

A    Yes.

Q    Okay.  And you formerly had a home there; is that correct?

A    Yes.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Okay.  So Sanibel Island, Florida, it's just outside of

--

A    Fort Myers.

Q    Fort Myers, okay.  So when did you get to Tucson?

A    I don't remember.

Q    But do you remember you were in Tucson on the 7th,

right, because you were supposed to be going to that

conference, right?

A    Yes.

Q    So sometime between the 5th and the 7th, you got on an

airplane and you flew, I'm guessing, from --

A    Probably the 6th.

Q    Probably the 6th, okay.  So on the 7th, you're in

Tucson, Arizona.

A    Yes.

Q    We agree on that.

A    Yes.

Q    Okay.  And you're there for this industry conference,

right?

A    Yes.

Q    Now, do you know the first three -- AZTLR transfer to

CHK 9238, and the next one is the number is 4272, and then

the third one is also that same number, 9238.  Do you see

that?  Do you know what those are?

A    No.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q   Okay.  So I'm going to the following, let's see if we can figure out what those numbers are, okay?  I'm going to write down 9238 and 4272.  All right.  Now if I told you what these are is that these are actually interbank transfers between the Bank of America account and other accounts at Bank of America, does that help you in any way?

A   No.

Q   Doesn't help you, okay.  Well, we'll see if we can figure out what is 9238 and 4272.  All right.  So do you recall, on the 7th, you actually went to the branch of Bank of America in Tucson twice?

A   I don't remember that.

Q   You don't remember that, okay.  Do you remember you went there, you left, and you came back later that same day, and that's why you were so mad at your husband.

A   No.  I was mad at him before I even went.  I was at him that I was going.

Q   Okay.  Well, let's take a look.  Do you remember also in your -- on the tape, you said there was a problem with Joe's signature card.  He was trying to get added on to the Bank of America account on the 7th, but there was a problem with his signature card.  Do you remember that?

A   I remember what he told me.

Q   Okay.  What did he tell you?

A   From my recollection, but haven't I already told you

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

this?  From my recollection --

Q    It was on your tape.  I want to hear you say it.

A    From my memory, it's been a long time and my memory -- from what I remember from what he told me, his excuse was that he couldn't get to the bank the night before or something or he wasn't at a place where -- I don't know why he had me go, but something about the signature card, he needed to have me -- I don't know.  That his signature wasn't uploaded; it would take a day to upload or something?

Q    So do you recall what happened was he was not a signatory on the account because of this problem with his signature card on the 7th?

A    It was the only reason that he convinced me to go.

Q    Okay.  That's what happened, he wasn't the signatory on the 7th?

A    That's what he told me.

Q    Okay.

A    I didn't confirm it, but that's what he told me because why else would I be the one to go and do this for him.

Q    So let's take a look -- there's an exhibit that actually explains everything that happened on the 7th, okay?  It's Exhibit 42.  Do you have that in your book?  Let me know when you've got it.  Ms. Adducci, have you been able to find Exhibit 42?

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   Okay.  And Exhibit 42, it is an email, it is from your husband, it is dated February 7, 2019 at 6:16 p.m., and it is to a Nancy DeMille at Bank of America with a cc to Hector C. Aguilar at Bank of America.com, and Melinda Adducci at Lindy@josephdumouchelle.com.  Do you see that?

A   Yes.

Q   And that's the same email address we looked at before lunch that's on your signature block as your business email address, correct?

A   Yes.

Q   Okay.  And the subject of this is, Melinda "Lindy" Adducci cashier's check and deposits needed today, correct?  That's the subject.

A   Yes.

Q   And this is at 6:16 p.m., right?

A   His time.

Q   His time.  He's in Michigan.

A   Yeah.

Q   You're in Arizona.

A   Right.

Q   And this is the winter, so in the winter because Arizona is not on daylight savings time ever, it's a two-hour time difference.

A   Right.

Q   Okay?  So 6:16 p.m. in Michigan is 4:16 p.m. in

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Arizona, right?

A    Right.

Q    Okay.  So let's read this email.  "Hi, Nancy.  My wife Melinda, 'Lindy", met with you today regarding our Bank of America account," correct?  That's what it says.

A    Yes.

Q    So does this refresh your recollection that you had had a prior meeting that day with Nancy?

A    Yes.

Q    Okay.  So how did Joseph know Nancy's name unless you had talked to him and given it to him, right?

A    No.  He had all -- he had their names before he ever…

Q    Okay.  So here's what -- the email goes on, "She is on her way back to your branch now as we need to make an important transfer and have a few bank checks made."  So according to what your husband wrote, you had met with Nancy earlier in the day, left the bank, and were now on your way back to the bank, right?

A    He wrecked my entire day and he was wrecking my evening.

Q    Okay.

A    And I had to auctioneer that night at the dinner for the conference that I missed and he was supposed to auctioneer.

Q    But you had gone to the bank twice.

A   Yeah, because I guess he must have asked me to go.  I went -- when I went earlier, it wrecked the day.  I don't know if I went back.  And then I had to go change because it was a black tie event and the dinner started, like, at 6:00.  I was doing what -- I was doing what was normal in our business.  I was going to a bank when my trusted husband/partner asked me to go.  I had gone a million times in our business; for 25 years, I had gone to a bank.  But I had no reason to not trust him, and I also thought I was helping.

But I didn't know -- I had not -- I don't believe read this beforehand because downloading email onto your phone or wherever you are, if you're not in your office or whatever. I don't know that I read this beforehand.  But I trusted Joe and I did what -- I thought I was helping with business banking that we did in our business.

Q   So, Ms. Adducci, that really wasn't my question.

A   Well, it's my -- but it's my answer.

Q   Please just answer my questions.  Your counsel will be able to ask you questions during his case and you'll be able to explain.

A   I want him to know the answer then.  I want him to understand, as I remember it.

Q   I'm just trying to find out what happened on the 7th.

A   Well, I'm remembering it now and I'm telling you what

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

happened.

Q    Okay.  So you went to the bank twice on the 7th and it wrecked your whole day.

A    It wrecked my whole day, yes.

Q    Okay.  So what happened the first time you went to Bank of America?

A    I don't remember.  I don't remember the details of it. I don't remember.  Joe had already contacted the bank, he already had the names of the bankers, he already had -- he set all of it up and he sent me in to go do this because he convinced me that he, as it says here, didn't have a signature card or whatever.

Q    Okay.  So you don't really --

A    And he was supposed to fly in and be there.

Q    Ms. Adducci, I fully understand.  He's still in Michigan for whatever reason.

A    Which is why I was angry at him.

Q    You're in Tucson.  It's in Tucson, though, right; is that where it is?

A    Yes.  It was Tucson, yes.

Q    So did you have a rental car?

A    I don't remember.  Of course, I must have.

Q    So you had actually driven to the bank at some point in the day, got in your car.  Did you drive back to your conference

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    I stayed.  I don't remember that part.  No, probably not because I couldn't register for it.  I was going to miss parts of it.  But I don't really remember the details, but I know that -- I know that we were staying -- like, a few years later, we were staying further out.  We used to stay right at the conference down at the university and we weren't staying there because it was rundown, so we were staying a little bit further out.  So I think just the going back and forth was -- you know, Tucson traffic is very -- it's a big city now; it's not like it used to be, so…

Q    Okay.  Well, you don't remember then what happened the first time --

A    No, I don't.  No, I don't remember what happened the first time.

Q    Okay.  So let's keep reading the email because there's more information here.  "I was hoping to do this myself, but my signature card that was signed early today is not uploaded yet."  Do you see that?

A    Yes.

Q    And this is what you said on your tape, there was a problem with Mr. DuMouchelle's signature card.

A    Yes.

Q    You were still the only signatory on this account on the 7th, right?

A    Sure.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Yes; is that yes?

A    Yes.

Q    Okay.  And then it says --

A    Well, being the only signatory, but his card wasn't uploaded.

Q    Right.  You were the only authorized signatory --

A    Yes, which is why he was having me do this.

Q    -- on the account on the 7th, correct?

A    Yeah.

Q    Is that yes?

A    Yes.

Q    Okay.

         MR. FOLEY:  Your Honor, a small objection just as a clarification.  I believe counsel's question when he says that you were the only authorized signature calls for a legal conclusion.  As she did just testify that he had signed a card that day as well, I don't think she can testify as to whether or not Bank of America had authorized that, and that's --

         THE COURT:  Mr. Cataldo, perhaps you ought to rephrase that as to what the witness' understanding is.

BY MR. CATALDO:

Q    Was it your understanding, to be clear, because of whatever the problem was with your husband's signature card --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    Yes.

Q    -- that on the 7th, you were the only person that the bank would accept a signature from to do a withdrawal or transfer from the account.

A    Why did the bank accept his email?  If he wasn't --

Q    Ms. Adducci --

A    -- part of the business, why did they accept him -- to talk to him about this account?

Q    Ms. Adducci, can you just answer my question?  If you want to ask questions --

A    Please restate it.

Q    -- you can talk to your attorney and you'll have all the time you want.  You're just here to answer my questions, okay?  Can we have that understanding?  I get to ask questions, you answer my questions; how about that.  Can we do that?

A    Yes.

Q    All right, let's try that.  So my question to you is, isn't it true that the reason you needed to go back to the bank a second time was because you understood from your husband that there was some problem with the signature card he was trying to sign to get his name on the Bank of America account, such that you were the only person who was authorized by the bank to do a withdrawal or a transfer out of that account.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

THE COURT: As of February 7th, 2019.

BY MR. CATALDO:

Q    As of February 7th, 2019.

A    Yes.

Q    Yes. Okay, great. He says, "She will be at your location by 4:20 p.m." Now, he is sending it at what would be Arizona time at 4:16 p.m., right?

A    Yes.

Q    So he's telling them you'll be there in four minutes.

A    Yes.

Q    Now how did he know that if you weren't talking with your husband during this interim period? How did your husband know you were four minutes away from the bank if you didn't him that?

A    Because he would have called me.

Q    Okay. What did your husband tell you when he called you at just about 4:16?

A    That he needed me to go to the bank for him to do these -- to do banking for our business.

Q    To do banking for the business -- I'm sorry. To do banking from the account where he knew Tom Ritter's money had been deposited, right?

A    He didn't say that specifically.

Q    But you knew that. You told us earlier you knew that this account had Tom Ritter's money in it; you already said

212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

it.

A    I didn't know what I was going to the bank for.

Q    Okay.

A    He didn't tell me what I was going to the bank for.  He asked me to go to the bank.

Q    Okay.  But when you got to the bank, you found out what you were there for, right?

A    Well, he was on the phone with the banker and he was doing emails with the banker and I was sitting there while they were side-by-side on the phone with each other and I was not part of that.

Q    All right.  Well --

A    I was just there because he needed me to sign for his transactions.

Q    So we looked at earlier -- well, actually, we didn't look at earlier.  But what we looked at during at least -- it was actually opening statements, we looked at J2.  Can you look at that, please?

A    Can I get a Kleenex?  I'm sorry, my nose.

Q    Before I get to J2.

A    Yes.

         THE COURT:  Ms. Adducci, do you need to take a minute?

         THE WITNESS:  No, I'm okay.  I'll keep going.

         THE COURT:  All right.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 140 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

BY MR. CATALDO:

Q    So according to the email we just saw from your husband, you were getting to the bank at 4:20 p.m.

A    Okay.

Q    Okay.  Do you know how late that branch was open that day?

A    No.

Q    Okay.  But for a bank, that's fairly late in the day, correct?

A    I don't know.

Q    Was there some rush that you were trying to, like, get there before the bank closed; do you remember that?

A    I was rushing to get to my event.

Q    Okay.

A    I was rushing -- maybe he was rushing me.  He found the bank.  I didn't find the bank.  He found the bank, he told me where to go.  Joe, he was asking me to do this.

Q    Okay.

A    He set everything up.  I didn't -- I didn't set any of this up and I didn't know ahead of time that I was going to be going to do this.

Q    But when you got there, right, one of the documents you signed was -- take a look at Exhibit Number 2, and you'll see that this is an out-of-state counter withdrawal.  Is your signature on this document?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Yes.

Q    Okay.  Is any of the handwriting on this document?

A    Yes.

Q    What is your handwriting on this document?

A    My signature.

Q    Okay.  What about where the name of the business is written, there's an address, phone number?

A    Right.  We had a -- at that time, we had a small office in Naples that we had set up.

Q    Is any of that your handwriting?

A    Yes.

Q    Which part?

A    The signature and it looks like the rest of it.

Q    Okay.  And so, you filled out this withdrawal when you got to the bank, correct?

A    Yes.

THE COURT:  I need to clarify the record.  Is this when she got to the bank -- I'm sorry, Ms. Adducci.  I don't mean to talk about you like you're not here.  Is this when Ms. Adducci went to the bank the first time on February 7th or the second time?

MR. CATALDO:  That's a good question.

THE COURT:  How do we know?

MR. CATALDO:  I'll ask the witness.

BY MR. CATALDO:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Ms. Adducci, was -- did you fill this out on the first trip to the bank or was this the second trip to the bank?

A    I don't have a recollection of these transactions.  I really don't.  I didn't -- I didn't organize them and I didn't -- I don't remember them.

THE COURT:  I have another clarifying question.  I'm trying to get a time sequence.  In light of your rushing to the black tie event that night, were you all dressed up when you went back to the bank at 4:20 in the afternoon for a formal event?

THE WITNESS:  I don't remember that.  I would have either had to have -- yeah, I would have had to be dressed up either before or after.  And I remember when I went the first time, there's like an hour of where we were staying, the traffic in Tucson is tremendous, which is why we used to stay right at the university, but we weren't staying there.  And just the back and forth and I think I threw in the towel at some point and maybe -- I don't know -- maybe went to the spa or something or had my nails done.  I don't remember because I really was mad at him and I missed the conference and I knew there wasn't time, but I may have gone down to that area because there were shows all over Tucson.  I don't remember.  I really don't.

THE COURT:  Another question.  What time in the day was the first trip to the bank?  We know what time in

the day the second trip occurred, but when was the first?

THE WITNESS: 11:00 or something.

BY MR. CATALDO:

Q    Okay.  So 11:00 in the morning?

A    Yeah, or something like that.

Q    So it was probably four or five hours in between the first trip and the second trip?

A    Yeah.

THE COURT:  I apologize, a couple more clarifying questions.  So is it your testimony that you don't recall being dressed up on formalwear when you went back at 4:20 in the afternoon?

THE WITNESS:  I would have had to have been.

THE COURT:  You were dressed up.

THE WITNESS:  I believe so.

THE COURT:  But you got angry and you're not sure if you went to the event afterwards.

THE WITNESS:  Well, no, I did go to the event.

THE COURT:  You did go to the event, okay.

THE WITNESS:  It was an event.  It was called the Accredited Gemologist's Association and it was a group of -- a very big group of gemologists around the world, and also all of the lab, the top lab people, like all the research scientists from GIA, from -- I mean, Great Britain, from France, from all over the world, and they lecture to each

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 144 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

other during the day. And then at night, they have a sit-down dinner and then there's an auction and they had asked Joe to auction items, which he had been the president of this group 20 years earlier, 15 years or 10 years earlier, and he was supposed to auctioneer and I had to do it.

THE COURT: So you were all dressed up --

THE WITNESS: I stood up.

THE COURT: -- and you went to the bank at 4:20 in the afternoon.

THE WITNESS: Yes, and I stood up -- and I stood up and I auctioneered at that event also, and also one on Friday night when he was supposed to do on Friday night.

THE COURT: We're talking about the 7th.

THE WITNESS: Yes, on the 7th, I auctioneered that night.

THE COURT: So you went to the bank all dressed up on in formalwear.

THE WITNESS: Yes, it was formal, it was a dinner. All these colleagues --

THE COURT: And then you attended the formal dinner.

THE WITNESS: Yes.

BY MR. CATALDO:

Q    So, Ms. Adducci, when you went the first time, did you know that the purpose was for you to make withdrawals from

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

the Bank of America account?

A    He didn't tell me what it was for.  He said I need you to go to the bank and --

Q    You're saying you went the first time without knowing why you were going?

A    Joe didn't -- no, Joe did not tell me.  He was communicating with the banker and he said when I got there -- he was communicating with the banker, with the person at the bank.  He already had -- they already knew him.  They already knew when I walked in my name.  Joe had done all the communication with them.

Q    So I'm still not clear why --

A    I remember this -- I remember the Hector name and for some reason, I remember that name.

        THE COURT:  You remember which name?

        THE WITNESS:  Hector.  I remember Hector's name.

BY MR. CATALDO:

Q    Ms. Adducci, then why did you leave the first -- when you went the first time; why did you leave?

A    The bank?

Q    Yes.

A    I guess I was finished with what he wanted to --

Q    And what happened the first --

A    I don't remember those.  I don't remember.  I don't remember that day because it was a day that was disrupted

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

from my normal plans.  I wasn't there to do any of this.

Q    Okay.  Well, you remember --

A    He wrecked my -- he wrecked -- it's something in my life, it's the one day -- forget everything else -- that one day for me was for me to go and my education, you learn things that you don't get to learn anywhere else.

Q    Okay.  But, Ms. Adducci, you signed this document, right?

A    Yes.

Q    You understand what a bank withdrawal is, right?

A    Yes.

Q    Okay.  Which means you knew you were taking money out of this account.

A    Yes.

Q    Okay.  Now, let's flip two pages ahead, if we could, and there's another out-of-state counter withdrawal.  And what's the date on this document?

A    The 7th.

Q    It's the 7th.

A    Yes.

Q    Okay.  And the amount is $1,091,769.44, correct?

A    That's not my handwriting of that amount.

Q    Okay.  Well, what on this document is your handwriting?

A    The signature.

THE COURT:  What exhibit number is this?

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 147 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: This is start part of Exhibit 2.

THE COURT: Okay.

BY MR. CATALDO:

Q Okay.

A So I didn't fill out that amount.

Q Well, what about the date and then the name of the account and the address?

A Yes, that's my handwriting.

Q It is. So you filled out this -- you filled out the first withdrawal slip that we looked at for the $39,000.

A Yes.

Q You filled out this one for the $1,091,769.44, correct?

A Yes.

Q Okay. And you understood when you did this, you were taking a million dollars out of the Bank of America account, right? That's what a withdrawal is.

A I don't know, but I don't know where it went. It would have gone into something at the bank because I didn't walk out the door with that money. I did not go out the door with money.

Q Okay. So then let's flip ahead to the document we're looking at right now; it's the second-to-last page of Exhibit Number 2. And there's another out-of-state counter withdrawal document and what handwriting on this document is yours.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A     Just the signature.

Q     Just the signature.  So you didn't fill in the address --

A     No.

Q     -- or the name?

A     No.

Q     Okay.  But you did sign this, right?

A     Yes.

Q     And this was to withdraw $4,041,925 out of the Bank of America account, right?

A     Yes.

Q     Okay.  And you understood that's what you were doing when you were there; you were taking out -- if you add the three withdrawal slips up together, it's just north of $5 million, correct?

A     Yes.

Q     And you understood this is the account where Tom Ritter's money had been deposited, correct?

A     Yes.

Q     Okay.  So let's go back to Exhibit 5, if we could, and we looked at -- we were looking at the six transactions on the 7th of February.  And the bank statement ties to these three, the customer withdrawal image: $4,041,925, $1,091,769.44, and $39,000; those tie to the exact amounts on the withdrawal slips that you signed that day when you

were at the Bank of America branch in Tucson, right?

A     Okay, yes.

Q     Yes?

A     Yes.

Q     Okay, so let's figure out what happened.  What are these other three that are there and then we'll figure out what happened to that $5 million, okay?  And to do that, let's go back to Exhibit 42 because there's more information in there that we haven't talked about yet.  42 is the email that your husband sent.  Let me know when you're there.

A     I'm here.

Q     Okay.  So we read the first paragraph a few minutes ago.  Let's take a look at the second paragraph.  According to what your husband wrote:  "Two of our business clients are Bank of America business clients as well.  Their information is below.  Also below that is a few cashier checks Lindy needs as well."  You see that?

          THE COURT:  What exhibit number are we in?

          MR. CATALDO:  This is 42.

BY MR. CATALDO:

Q     Okay.  So then Joe writes, "Thank you so much for taking care of us.  We appreciate the great help and assistance you and Hector have provided to us."  Did I read that correctly?

A     Yes.

Q    Okay.  And then, "Sincerely, Joe."  And then it says, "To Bank of America business clients for deposits," and then there's a reference to a Bank of America account, William Noble Rare Jewels.  Do you see that?

A    Yes.

Q    Okay.  And then below that, there's a Bank of America account and the beneficiary of that one is Ryan & Rodney Diamonds, Inc., correct?

A    Yes.

Q    Okay.  And remember earlier when we were looking at Exhibit 5 and I wrote down those two numbers, 9238 and 4272; remember we did that?

A    Yes.

Q    Okay.  So let's look at, for the William Noble Rare Jewels bank account number.  What are the four digits of the account number?

A    9238.

Q    Okay.  And then for Rodney -- I'm sorry, Ryan & Rodney Diamonds, Inc., the last --

A    4272.

Q    That ties out to what we looked at earlier.  Do you remember that when we looked at Exhibit 5?

A    Were there two that William Noble?

Q    Correct.

THE COURT:  Were there what, Mr. Noble?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE WITNESS:  Two.

BY MR. CATALDO:

Q    Two that went to --

A    Two checks to William, two.

Q    Well, these are actually interbank account transfers; does that sound right?  So let's go back to Exhibit 5 and let's take another look at that.  So the three transactions that are the AZ teller transfer to CHK 9238, 4272 and 9238, that would mean there were two interbank transfers out of -- first of all, out of the account of DuMouchelle that you had set up, two that went to William Noble, one for $4,250,000, one for $117,000, correct?

A    Yes.

Q    And then, the third transaction is actually going to transfer out of the Bank of America account that you had set up, $150,000 that went to the account ending in 4272 that we looked at earlier, correct?

A    Yes.

Q    Okay.  So on the 7th, if we add up all of these withdrawals from the Bank of America account, right: $4,250,000; $150,000; $117,000; $4,041,925; $1,091,769; plus $39,000 --

THE COURT:  Can you give me that math again, please?

MR. CATALDO:  Okay.  So those numbers are:

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 152 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

$4,250,000; $150,000; $117,000; $4,041,925; $1,091,769.44; and $39,000.

BY MR. CATALDO:

Q    Now, Ms. Adducci, I don't expect you to add these up to a penny -- to the penny, but if we add them together, would you agree that that's a total deductions from this account of about $9.5 million?

A    Yes.

THE COURT:  How much?

MR. CATALDO:  It's approximately $9.5.  We can add them up, we can get a calculator and come to the penny.

THE COURT:  It is what it is.  I have one here.

BY MR. CATALDO:

Q    All right.  So $9.5 million is coming out of this account and this is the day after Mr. Ritter wired his $12 million into this account, right?

A    Yes.

Q    Okay.  So we know exactly where these first three went in terms of where that money went because we see it went to transfer -- most of it went to William Noble.  And you don't know what that money is for, right?  Is that no?

A    It's a no.  I didn't -- I didn't stop to ask.

Q    Okay.  Well, let's see if we can figure out where the other $5 million went for the customer withdrawal images, those three withdrawals.  Let's see where that money went.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

And to do that, we need to flip back, unfortunately, to Exhibit 42. And Exhibit 42 says, if we go back to that second paragraph, "Also below that is a few cashier's checks Lindy needs as well." You see that?

A    Yes.

Q    And then at the very bottom, it says, "Cashier's checks to be printed. I will send this under a separate email."

A    He was very detailed.

Q    Okay. So the whole idea here is there's going to be some cashier's checks printed out and you're there at the bank and you're going to take those cashier's checks with you, right?

A    Apparently, yes.

Q    Okay. So if we go to the next exhibit, 43 --

A    And that was sent at 6:16 p.m.

Q    6:15 p.m. Detroit time.

A    It would have meant I was on the way to the bank.

Q    Yup. And so, the next -- the next email, if we look at 43, our next exhibit. Go ahead and take a minute to find that document. Now this is an email that Joseph sent to Hector C. Aguilar at Bank of America.com, and then to you, Melinda Adducci at that same email address, Lindy@josephdumouchelle.com, correct?

A    Yes.

Q    Now this one is sent at 7:00 p.m. Detroit time, which

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

would have been 5:00 in Arizona, right?  Does that sound right?

A    Yes.

Q    So you'd been there at the bank about 40 minutes by the time -- before this email got there?  Does that sound right?

A    Yes.

Q    And then, according to this, there's a list of cashier's checks to be printed and then you see below, there are five listed: one, Abbott Corporation, $1,104,750; David Tennenbaum, Inc.; Kwiat -- I'm not sure I'm pronouncing that one right.

A    Kwiat.

Q    Kwiat Diamond Opportunities, and then John Ragard?

A    Ragard.

Q    Ragard, okay.  And is any of that money going to Tom Ritter?

A    No.

Q    Is any of that money to buy The Yellow Rose?

A    I don't know because I don't -- I didn't -- I didn't know the structure.  I didn't understand what Joe had -- how he had structured The Yellow Rose with how he -- I didn't understand what he was doing with William Noble.  I didn't know what their…

Q    Well, you didn't think --

A    What I believed was William Noble.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 155 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  So, Ms. Adducci, you didn't think that Mr. Ritter was buying The Yellow Rose from five different people, did you?

A    But I didn't know --

Q    Can you just answer my question?

A    No.

Q    Okay, thank you.  You've just answered.

THE COURT:  You can't answer the question?

THE WITNESS:  I don't know.

THE COURT:  Wait.  I need a clear record on that.

THE WITNESS:  I don't know.

MR. CATALDO:  Okay.

BY MR. CATALDO:

Q    Did you think he was buying The Yellow Rose from five different people?

A    No.

Q    All right.

A    But what I did think was our bank account was having issues and some of these names -- I mean, these are names of people that I recognize and, I guess I was thinking it was the normal course of business.

Q    Okay.

A    We had auctions that were -- and if our FineMark Bank was having problems, I didn't think of…

Q    All right.  But we -- you know that other than that

212-267-6868          Veritext Legal Solutions     www.veritext.com          516-608-2400

$500, you know from the bank statements that we've looked

at, the only money in this account on the 7th was Tom

Ritter's.

A    But I didn't know that there wasn't money anywhere

else.  I didn't know that FineMark Bank didn't have any

money.  I didn't know --

Q    Ms. Adducci, okay, you knew that $12 million of Mr.

Ritter's money went into this account, correct?

A    I didn't -- yes.

Q    Okay.  And when you got to the bank, I mean, you were a

signatory.  You could have asked the teller, hey, how much

money is in --

A    I remember when I was at the bank, I remember they had

trouble.  I think Joe was going to wire first, now that I

think back.

Q    Can you just answer my question?

A    Yeah.

Q    You could have asked the teller, how much money is in

this Bank of America account before you took out $9.5

million; you could have asked her that, right?

A    Yes.

Q    Okay.  And if the bank had answered your question if

you had asked and had been told, you would have known there

was $12,000,500 in the account, right?

A    Yes.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 157 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q   So you said you recognized these other names.  These were other creditors of your jewelry business?

A   Kwiat was a buyer for 25 years from us.

Q   Okay.  So who is John Ragard?

A   A neighbor.

Q   A neighbor?  What do you mean a neighbor?

A   He was a neighbor on Sanibel.

Q   Why was he getting $2.5 million?

A   I don't know.  I didn't know that.  Again, I didn't know what Joe -- I didn't know Joe's business dealings.  I didn't understand the structure of -- he didn't warn me or prepare me for this.

Q   But is it --

A   Could I have -- yes.  Could I have not if I wasn't under duress to go?  I would have stopped and said what are these for, but I didn't that time.

Q   And what was the duress, that you had to get to this formal event?

A   Yes, that I had to get to this event where I was being relied on to show up and auctioneer and, yeah.

Q   Okay.

A   I pretty much just wanted to get in and out of there and I didn't really think these through.

Q   So --

A   I didn't question Joe.  I didn't have any -- I

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

understand now.

Q    So you understand now what?

A    I didn't question him.

Q    That he was --

A    I don't know what he was doing exactly, but he wasn't -- I don't really understand what all of these were for at the time.

Q    But Ms. Adducci, you could have said to Joe --

A    Yes.

Q    -- could you not, I'm not doing this.  You could have said that.

A    Yes.  Yes, I could have, but I believed --

Q    You could have done that.  You could have also when you went into the bank --

A    -- by giving him the checks --

THE COURT:  Okay.  Mr. Cataldo, you need to ask a question and wait for the answer; otherwise, we're going to have a record where it's not clear what the Defendant is answering.  Okay?  Wait for the answer.

BY MR. CATALDO:

Q    Ms. Adducci.

A    Yes.

Q    You could have said no to Joe.

A    Yes.

Q    But you didn't.

Veritext Legal Solutions
212-267-6868                                    www.veritext.com                                    516-608-2400

A    I had no reason in the 25 years --

Q    Can you just answer my question?

A    -- he had never done anything like this to me in 25 years.

Q    Okay.  But the other thing you could have done when you got to the bank is say, Joe this is Tom Ritter's money, it's not right for us to pay these other people; you could have done that, right?

A    Yes.

Q    But you didn't do that, did you?

A    I didn't do that.

Q    Okay.  When you got to the bank, you could have said I'm going to have a $12 million check cut in the name of Tom Ritter and I'm sending him his money back; you could have done that too, right?

A    Yes.

Q    And you didn't do that either, did you?

A    No.

Q    All right, so let's kind of close the loop on what happened then on the 7th.  And to do that, we need to look at another exhibit, Exhibit 5 -- oh, I'm sorry, my bad -- Exhibit 3.  So Exhibit 3, which has been admitted into evidence, is the actual list of the cashier's checks that were cut on the 7th from the Bank of America account.  Okay?

A    Yes.

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

Q   And the actual -- I mean, some of them are the same. But, for example, the John Ragard amount is different on Exhibit 3 than it was on Exhibit 43, some of the amounts are different.  The total is the same, it's the same $4,041,925, and then $1,091,000, but the amounts of the checks are different than what was on the email.

A   Yes.

Q   Do you have any explanation for that?

A   No.

Q   But according to this exhibit, there would have been 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 cashier's checks cut on the 7th that added up to this $4,041,925, and then the $1,091,769.  Does that look right that there were 13 cashier's checks cut that day?

A   I don't remember.  I don't remember.

Q   Okay.  Well, do you remember -- I mean, we looked at this, it was in your testimony there were FedEx checks cut and then -- I'm sorry -- there were cashier's checks.  You then FedExed those to Joe, correct?

A   Yes.

Q   Okay.  So do you recall getting a stack of 13 cashier's checks when you left the Tucson office totaling over $5 million?

A   Possibly, yes.  I don't -- I remember I had a lot of checks.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 161 of 252
Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    You had a lot of checks.

A    And I had to put them -- and I put them in a FedEx envelope, which we have preprinted FedEx -- at that time we carried with us in a briefcase preprinted FedEx…

THE COURT:  Labels.

THE WITNESS:  Labels and…

THE COURT:  Envelopes.

THE WITNESS:  Yeah.  And I -- I didn't question because in the auction world of our business of 25 years, we had large sums of money come in and large sums of money go out and large numbers of checks went out often; that was the normal course of business.  And I didn't add it up and I didn't question it, again, because of the circumstances I was under.  I didn't know that there wasn't money in FineMark; that account, I believe, was still open.

Joe was directing this.  Yes, I could have stopped it, but if he sent the checks out, I didn't distribute the checks to them, so…

BY MR. CATALDO:

Q    But you walked out of the bank with $5 million of cashier's checks.

A    Because he instructed me to do FedEx them for him for the reason that he said he couldn't sign up the account.

THE COURT:  I have a clarifying question.  Because J43 indicates there would be five checks; that's Mr.

Veritext Legal Solutions
212-267-6868                              www.veritext.com                              516-608-2400

DuMouchelle's email.

MR. CATALDO:  Yes.

THE COURT:  And then this is, whatever -- J3 shows significantly more than five checks.

MR. CATALDO:  Correct.

THE COURT:  And the witness has said she walked out with a lot of checks.

MR. CATALDO:  Yes.

THE COURT:  So the Court has a clarifying question and I'd like to ask it now, if that's okay.

THE WITNESS:  Yeah.

THE COURT:  And the question is, did you walk out of the bank with more than five checks?

THE WITNESS:  I walked out with a lot and I remember -- and I don't remember the details.  But I remember also being really -- he was -- and you have the emails because you went through his emails, so I don't have those, but I do remember that he was on the phone.  I was sitting next to this -- at the -- in an office and I was sitting next to one of these people and he kept on the phone, like, he had me go back to the bank.  And for some reason, I think that he originally told me he was going to wire people or something.  Can you imagine that?  I was going to do a wire.  But somehow that didn't work or something with the bank.

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400

THE COURT: That late in the day, a wire generally doesn't --

THE WITNESS: No, early in the day; that was at 11:00.

THE COURT: Okay, earlier.

THE WITNESS: Because I remember when I first got there, there was a change of what he had originally told me that I was going to do, like, sign for a wire and then something with the bank -- and you can confirm this with the bank -- something with the bank where, like, he couldn't do wires. I don't know, like, if I would have signed for the wires or what I would have done.

But then I had to sit there and wait, I believe -- I might be wrong, my memory at this point -- for checks for him to tell them what to do. Like, I might have gotten to the bank sooner -- I don't know -- and then he added on. He was at the bank and he got on the phone with the person while I was sitting there. I do remember there was something going on back and forth and I -- but he would have had to have emailed them and told them -- tell them. It was not me.

THE COURT: Well, you just said he was at the bank. You mean he was on the phone with them.

THE WITNESS: Yes, he was on the phone with them.

THE COURT: And this is at the second visit late

in the afternoon.

THE WITNESS: Yes. I think he was on the phone both times. Joe was on the phone and they wouldn't have been talking to him unless they acknowledged him as one of the participants of the account. Why else would they talk to him?

BY MR. CATALDO:

Q But, Ms. Adducci, you were the -- you told me earlier you were the only signatory on the account on the 7th.

A I guess because that's what happened with the banking. Unfortunately, I was and it was a very unfortunate situation that I was.

Q Ms. Adducci, let's go back to Exhibit 5. I just want to clear something up, which is the bank statement because we've talked about the checks -- well, maybe before I get to that. So you leave, you've got a stack of $5 million worth of cashier's checks. You said you had a preprinted envelope to do a FedEx?

A I'm assuming. I didn't have to have it. I'm assuming that I -- I was used to -- we were used to FedExing documents in the auction world and we had, at that time, it was possible in my briefcase. Because at the conference, I would have carried a portfolio that had everything and I would have had in the preprinted Fine and Estate, Joseph DuMouchelle. I can see them in my head. We had them

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

forever.  Or if I didn't, I would have filled out a thing,

but back then, I had the account number.  But I did not

distribute these; he did, I believe.

Q    Okay.  But you obviously went either to a FedEx drop

off or a FedEx store --

A    Yeah.

Q    -- and sent --

A    To Joe.

Q    -- these checks to Joe.

A    Yeah.

Q    And so, you got in your -- you took these checks, you

got in your car and you drove somewhere, right, so you had

time to think about what you were doing --

A    On the way to the --

Q    -- on your way to your formal event.

A    Yes, yeah.

Q    Okay.  So do you remember which it was; did you go to a

FedEx store, was it a drop off box?

A    I don't remember.

Q    Do you know?

A    I don't remember.

Q    Was it the same day or the next day?

A    I don't remember that.

Q    Okay.  So you may have even just kept these checks in

your car while you went to your formal event.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

A    No.  I think he -- no, he was pushing me.  He was pushing me.  I'm sure he --

Q    What was the rush to get these checks, if you know.

A    Well, he hadn't told me at that time that he wasn't coming for the Friday auction.  He was an auctioneer for the GIA alumni, the report, where I went to school, the report, the whole -- that was a really big auction and they are, like, 400 to 700 people there and every year, he did this. The president of GIA was there from Carlsbad; it was a really big deal.  And that was on Friday night and he was supposed to fly in and auctioneer for that.  So it was my belief that he was going to get on a plane and come and he was trying to take care of business before he got on a plane and came.  And then on, like, Thursday or something, he told me he wasn't coming.

Q    So, Ms. Adducci, going back to Exhibit 5, I just want to clear something up.  If you could bring up that list of the transactions on the 7th we looked at, the three that are the transfer to the 9238 and 4272 accounts, okay?  And just to be clear, those transfers couldn't have gotten done without your sign off because, as you said, you were the only signatory on this account on the 7th, correct?

A    Yes.

Q    Is that yes?

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    Okay.  Now, we've looked at this and it's about $9.5 million of Tom Ritter's $12 comes out of the account on the 7th, right?

A    Yes.

Q    Okay.  Did you say to Joe, hey, how are we going to buy that Yellow Rose for Tom when we just spent all his money sending it off to a whole list of 14 other creditors?

A    I probably did ask him what the hell was going on afterwards, but I didn't -- whatever he gave me would have been some bullshit explanation.  Sorry for the record.

Q    Okay.  So did you ask -- did you ask him?

A    I'm sure I did.  I'm sure I got -- that I reprimanded him afterwards because I was really -- but I didn't -- I never -- I didn't know.  I had my own customers and I had my own business dealings of people and I stated -- you know, I'm going to say something.

Q    Ms. Adducci, there's no question.

A    Okay.

Q    You'll have your chance when your counsel is asking you questions.  Because you testified in that deposition probably three or four times you didn't know that Tom Ritter didn't get his money until they took Joe away in handcuffs, right?

A    And that is because I didn't know.  Joe had structured -- there's partnerships that go on in the jewelry industry

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

and they go on all the time, and I have since found out about William Noble and people have told me that Joe should have asked him before he did business with him because obviously he's in bankruptcy right now. I've heard that he's in Chapter 7 in Dallas and there's like a $50 million bankruptcy going on now with him and they're finally -- I feel like they finally caught him.

Q   So --

A   But I -- but there were partnerships that went on on buying diamonds and doing different things and that was not my normal course of business. My normal course of business was selling a diamond engagement ring, going into New York to the auctions. I would stay there to make sure that before the jewelry from an auction was delivered after an auction, it would be kept in -- we had a vault down below an office that we had there, a small office that we kept. It had been a bigger office, but we kept it and we kept it just -- I stayed there just so that it was a courtesy to the people that were buying in New York. Because most of our big buyers, like Kwiat, like these names were in New York and they didn't -- going back to Michigan here to Detroit, the only option was either (indiscernible) or Brink's and Brink's was hard and it was really expensive because Brink's -- so I stayed there as a courtesy.

We started doing that when we opened that office and I

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

stayed there as a courtesy, that when the girls or someone would tell me that the funds had been given, I would release the merchandise or they gave a check and I would release it. And then I would go down to Brink's in the same building, I would go down and I would pack everything up and it would be shipped back to Michigan. And the girls would continue collecting the funds before they disbursed the merchandise out, and then I would fly back to Florida and I was not going to Michigan. Only was I coming here because, at that time, Joe's dad had cancer and we kept coming back to see his family.

MR. CATALDO: Your Honor, move to strike as non-responsive. It was not responsive to my question.

THE COURT: Mr. Foley?

MR. FOLEY: Your Honor, I believe it was responsive. It may have gone slightly into narrative, but I don't think it's worthy of a strike since her intent was to answer the question, even if it got a bit wordy.

THE COURT: The good news here, Mr. Cataldo, is that the Court is not a jury. The Court is able to distinguish between what is responsive and what isn't. And the witness was attempting to answer in her own way, so the Court is going to allow the answer.

But, Mr. Cataldo and Ms. Adducci, the Court has a clarifying question. Ms. Adducci, you acknowledge that you

asked Joe afterwards what was going on.  When is afterwards?

THE WITNESS:  I would have asked him -- I would have probably --

THE COURT:  On February 7th?

THE WITNESS:  No, no, because he wasn't there February 7th.

THE COURT:  No, on the phone.  I mean, did this happen in person?

THE WITNESS:  No.  I went to the -- no, I went to the event.

THE COURT:  Okay.

THE WITNESS:  I don't think I did.  Maybe I did, but I really don't remember.  I really don't remember phone calls that day.  I don't remember the details.  That was a long time ago.  I remember having to go to the bank.  I remember -- you know, it was a long time ago.  The really specific details beyond…

THE COURT:  What I'm trying to understand is a simple chronology.

THE WITNESS:  Yeah.  I didn't --

THE COURT:  Mr. Cataldo, I think you want it in the record as well.  At what point did Ms. Adducci -- at what point, ma'am, did you ask Joe what was going on; was it…

THE WITNESS:  Maybe I asked -- well, either the

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

next day or that night or whatever.  I don't remember.

BY MR. CATALDO:

Q    Okay.  What did you ask Joe?

A    I would have -- he would have -- I would have asked him why are -- you know, where is this going.  But I --

Q    Okay.  And what did he say?

A    I don't remember.

Q    Okay.  Did you pick up the phone and call Tom and tell him what was going on?

A    No.

Q    Why didn't you do that?  You'd known the guy for plus 30 years.

A    Because Joe obviously convinced me whatever answer he gave me was enough, that it convinced me that he had this.  He always would say to me, you know, he'd always gave me an excuse of -- he gave me an excuse, an answer.

THE COURT:  I have a clarifying question again.  The afterwards, you said you talked to Joe that day or that evening.

THE WITNESS:  Joe is my husband, so I would have talked to him.  I would have -- I would have thought I would have.

THE COURT:  That night, okay.

THE WITNESS:  But I don't know that I did.

THE COURT:  Well, hang on one second.

THE WITNESS: Yeah.

THE COURT: You testified that you would have talked to him, you know, the next day or that night.

THE WITNESS: Yeah, the next day.

THE COURT: Here's my question: was it after the checks had been FedExed to Joe?

THE WITNESS: Well, I would have talked to him the next day.

THE COURT: So after the checks were FedExed.

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. CATALDO:

Q    Okay.  You talked to him the next day.  The FedEx takes a day to get there.  Did you ever say to Joe, Joe, we can't cash those checks or send those --

A    He was --

Q    -- this is wrong.  Did you say that to Joe?

A    He --

Q    Can you just answer my question?  Did you say that to him?

A    I don't remember.

Q    Okay.  So do you recall, though, that the balance on this account was negative by the end of the month?

A    No, because I did not -- I never -- I never set myself -- I was never set up to be an online with this account.

212-267-6868                    Veritext Legal Solutions   www.veritext.com                516-608-2400

And I believe the FineMark Bank was still the bank, I believe, we were doing payroll still out of the other account.

Q     But, Ms. Adducci, you were a signatory on this Bank of America account, right?

A     Yes.

Q     At any time you wanted, you could have walked into a Bank of America branch --

A     Yes.

Q     -- and said what's the balance on my account, may I have a copy of my statement, correct?  You could do that any time you wanted.

A     Yes.

Q     So at any point in February then, did you ask Joe who was selling The Yellow Rose?

A     He always told me it was William Noble.  And I believe and I don't know at what time I believe in it, that there were partnerships, that William Noble was partners with this diamond with other people.

Q     Okay.  Well --

A     So I didn't -- you know, it was always William Noble is driving this deal.  William Noble is the one representing this stone.  William Noble sent the diamond to the office.

Q     So who's Richard Drucker?

A     Richard Drucker is a very highly regarded person in the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

industry who runs a company called, it's Gem World International, he's in Chicago. He is at the top of our industry and he's a good friend. We've been friends, Joe and I and his wife, we've been friends probably since -- I don't know -- forever, like the '90s.

Q   So what did he have to do with The Yellow Rose?

A   Well, I was told originally that he was going to be the one that was going to be an intermediary between William Noble and Joe and maybe Tom.

Q   Who told you that?

A   Joe and maybe -- yeah -- and Tom, that he was going to be an intermediary because normally, you don't give out -- normally, you don't give out a seller -- when you have something that you're handling, you don't give out a seller's name. Like, at auction when we took consignments in from Jaffe, we had large estates that we handled for your law firm -- that used to be your law firm. And when those estates came in we -- I worked directly with these attorneys and when the estates came in at auction and you're selling it, unless the person wants their estate name put in the book, you don't do it. You just -- you don't -- you don't give out that name. You stay in the middle and then it's brokered and people are paid after you get paid, then they get paid. And so, this is, in my head, what I thought was going on.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    So, Ms. Adducci, if you could just take a look at Exhibit 17 in your book.  This is the receipt that your husband sent to Mr. Ritter on February 6th of 2019.

A    What exhibit number are we on?

Q    17.  Do you see that?

A    Yes.

Q    And, in fact, you know today that on the 6th of February, Mr. Ritter's $12 million didn't go to buy The Yellow Rose because on the 7th, the next day, you spent $9.5 million of it paying other creditors.

A    I didn't spend it.

Q    But you authorized --

A    I did not spend his money.

Q    You authorized all of the --

A    I didn't know -- I did not know the structure of what Joe had set up --

Q    Ms. Adducci.

A    -- because I did not set up --

THE COURT:  Ms. Adducci, let Mr. Cataldo ask the question.  He's trying to -- your lawyer is going to have the opportunity to get your story out there.

BY MR. CATALDO:

Q    On the 7th of February, you authorized $9.5 million of either transfers or withdrawals from the Bank of America account, correct?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

A    Yes.

Q    And none of that money, to your knowledge, went to pay for The Yellow Rose, correct?

A    No.

Q    No.  Oh, so The Yellow Rose was purchased?

A    I didn't know the structure.  I didn't set up the details of the structure of whatever was happening between William Noble and Tom Ritter and Joe and what I thought was Richard Drucker and I didn't set that up.  And the fact that William Noble got some money would have -- maybe that was a partial of the payment of -- I didn't -- so I can't say that I knew.

Q    Okay.  But you knew that other people having nothing to do -- like your neighbor, he had nothing to do with The Yellow Rose as far as you knew, correct?

A    I don't -- yeah, I don't know.  I don't know if he did or not.

Q    So you think all 15 of the people that were shown on Exhibit Number 3 had something to do with The Yellow Rose; is that what you think?

A    No, I don't think that.

Q    Okay.

A    I don't -- I honestly don't know.  I didn't think it through.  I trusted Joe.  I trusted him for 25 years.  He had never sent me to the bank to do something that I had to

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

question him about.

MR. CATALDO: So, Your Honor, we've been going for quite a while. Could we take a short recess? I know it is getting late in the day. Can we do that?

THE COURT: Of course. How long would you like?

MR. CATALDO: Ten minutes, please.

THE COURT: Mr. Foley, is that a problem?

MR. FOLEY: It's not a problem, but I was going to ask, Your Honor, and I'm sorry to ask so late, but it occurred to me. My father is receiving a small legal award out in Novi at 6:00 p.m. And with the rush-hour traffic, let us out just 15 minutes early today, that would be helpful to get down, get down to my car and get on the Lodge to 696 to 96, which is going to be packed full of traffic. But I just wanted to factor that in if that was okay with counsel that we --

THE COURT: So Mr. Foley is asking to end at 4:45.

MR. CATALDO: No objection, Your Honor.

THE COURT: No objection. So we're going to take a 10-minute break 'til 4:20. Is that what you're asking for?

MR. CATALDO: Yes, Your Honor.

THE COURT: All right, 10 minutes break.

(Recess)

CLERK: Court is back in session for the Honorable

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Lisa S. Gretchko.

THE COURT:  Please be seated.

MR. CATALDO:  May I proceed?

THE COURT:  Please.

BY MR. CATALDO:

Q    Ms. Adducci, I just want to clear something up.  We've talked about the events of February 7th, the day you were in Tucson, and you make the two visits to the bank.  Okay?  You recall those questions that I asked you earlier?

A    Yes.

Q    Okay.  And you said, at least I thought you say you felt you were under duress that day, correct?

A    Yes.

Q    Okay.  As far as I heard, the duress that you felt you were under was because you needed to get to this formal event for your industry conference, right; that was the duress?

A    No, the duress was I wanted to go to a conference.

Q    That was the duress.

A    It was all of it, it was everything.

Q    Well, what was the everything besides getting to the conference; that's what I'm not clear on.

A    The entire reason to go to Tucson were the events that I was going to.

Q    Okay.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 179 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    And Joe messed them up.

Q    And that was the duress, right; that's what you've been talking about, this duress.

A    All the plan -- okay, forget the word duress.  It was unplanned and I was upset with him and I -- yeah, and I felt -- I felt pressured by him to get these things done.  He's very -- I can't control Joe, but he was very pushy to me and I was pissed at him that he was having me do these things that I didn't plan to do and it stressed -- it upset me.  Let's forget duress, I was upset with him.  I was really upset with him.

Q    You were upset.

A    Yes.

Q    All right.  So let's talk about --

A    I didn't want to -- and I didn't want to do them.  I didn't want to do all the things that he was asking me to do.  He should have done them.  This was his --

Q    Ms. Adducci…

A    -- dealing with Tom, not me, and I was doing it because he asked me to do it.

Q    You could have said no.

A    Yes, I could have said no, but I didn't.

Q    If Mr. DuMouchelle had asked you to hold up a liquor store, would you have done that too?

A    In 25 years --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

MR. FOLEY: Objection, Your Honor, to the hypothetical.

THE WITNESS: In 25 years --

THE COURT: Wait, wait, wait. Ms. Ritter -- Ms. Adducci, I've done it twice, I'm sorry. It's the Ritter case, so my apologies. Your objection again?

MR. FOLEY: Your Honor, the question posed was a hypothetical that was if Joe had asked you to hold up a liquor store, would you have.

THE COURT: It wasn't a hypothetical about an opinion. It was a hypothetical question to ask about -- the Court's going to allow it because it's not requiring opinion testimony on the part of a fact witness.

MR. FOLEY: Yes, Your Honor. Thank you.

THE COURT: Mr. Cataldo, repeat the question.

THE WITNESS: No.

BY MR. CATALDO:

Q    You wouldn't have.

A    I didn't think -- I thought I was helping. I thought I was helping.

Q    So you thought you were helping by --

A    I thought -- I thought I --

Q    Just let me ask you question. You thought you were helping by taking $9.5 million --

A    Yes.

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 181 of 252
Veritext Legal Solutions
212-267-6868                         www.veritext.com                         516-608-2400

Q    -- of Tom Ritter's money --

A    No.

Q    -- and disbursing it out?

A    No.  I thought I was going banking because there were other banking issues with FineMark and we were having banking issues and I thought I was helping with that in our business.

Q    Okay.  So let's --

A    I didn't think about --

Q    There's no question pending.

A    -- the rest of it.

Q    So I want to go back to Exhibit Number 5 because let's take a look at what happens to the Bank of America account after the end of February, okay?  Do you recall that you continued to use this Bank of America account until it was closed by Bank of America; does that sound right?

A    I don't remember.

Q    You don't remember.  Did you continue using it up until the bankruptcy or --

A    I don't remember.

Q    You don't remember.

A    No.

Q    Okay.  Well, let's take a look at what happens on this account in March.  We've looked at February and let's flip ahead to March.  Okay?  And in March on this bank account,

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

it starts at the beginning balance of negative $60.  And

that ties -- you remember we looked at the bank statement

that showed at the end of February, the account balance was

negative $60?

A     Yes.

Q     Okay.  So it starts at negative $60 and it ends at

negative $34,493.25, right?

A     What page are you on?

Q     Did you find the page?

A     Yes.

Q     Okay.  And if you flip ahead, you'll see under

withdrawals and other debits…

A     What page?

Q     It's actually Page 4.

THE COURT:  It's Page 4 of the March --

MR. CATALDO:  Of the March.

THE COURT:  -- statement.

MR. CATALDO:  Yup.

THE COURT:  Within Exhibit 5, ma'am.

BY MR. CATALDO:

Q     And do you see that under the debits, there's a number

of transactions that have your name, 780 on Fifth, LLC Sale,

Melinda Adducci, and then a Chase credit card, Melinda

Adducci.  Then there's another Chase credit card, Melinda

Adducci, and then there's a Chase credit card, Melinda

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 183 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

Adducci?

THE COURT: Mr. Cataldo, please approach the witness and help her to find the correct page.

THE WITNESS: I don't see it.

BY MR. CATALDO:

Q   So does this refresh your memory that you started paying all your personal credit cards out of this Bank of America account?

A   No.

Q   No.  But do you see those transactions that are on here; are those your personal credit cards?

A   I don't know.  They could have -- I don't know.  It has my name on it.  I didn't think I had a -- I guess I had a Chase credit card then.  I don't remember that, but I guess I did.

Q   So then I want you to flip ahead to Page 9 and it looks like on Page 9, there's 1, 2, 3, 4, 5 items that are marked NSF.  Do you know what NSF is?

A   Non-sufficient funds.

Q   Those are bounced checks?

A   Yes.

Q   Okay.  And then if we look, there's a number of checks that are printed on Page 11.

A   Yes.

Q   Is your signature on any of these checks?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 184 of 252
212-267-6868                        www.veritext.com                        516-608-2400
Veritext Legal Solutions

A     Yes.

Q     Which ones?

A     The ones that have my signature.

Q     Which ones are those?

A     All of them, except number -- this 13963.

Q     So earlier, I believe you said that Joe was primarily handling this Bank of America account, but you clearly were still writing checks on it, right?

A     I had -- there was a stamp with my signature in our office and they could use the stamp with my signature.  Joe could have used it.

Q     So let's take a look at April, what happens in April on this account.

THE COURT:  The Court has a clarifying question.

MR. CATALDO:  Yes.

THE COURT:  Please look at that page.  Ms. Adducci, it appears that your signature on the checks that contain your name, it's not the same --

THE WITNESS:  It's not the same all the time.

THE COURT:  It's not the same all the time.  It doesn't appear to have been a stamp.

THE WITNESS:  Right.

THE COURT:  So this wasn't a stamp.  These are your signatures.

THE WITNESS:  A couple of them look similar, but

yeah, agree.

BY MR. CATALDO:

Q    Okay.  So let's take a look at April and see what happens in April on this account.  Do you have the April summary page?

A    Yes.

Q    And this starts at negative $34,493 and it ends at negative $22-, so you obviously reduced the negative balance by about $12,000 on this account, right?

A    Well, we were obviously using this for a business account.

Q    Okay.  But would you agree with me that by this time in April, there wasn't $12 million in this account to give Tom Ritter his money back; would you agree with me?

A    Yes.

Q    Okay.  So a couple of items I want you to turn your attention to.  So if you go to, for example, on Page 5, you'll see card member payment, Melinda Adducci, and then there's a Discover Card, Melinda Adducci.  There's $8,000 in credit card payments with your name on it that are made; is that right?

A    Yeah.  My credit cards, most of them were used for business.  They were used for travel.

Q    Okay.

A    And we did our account- -- our accountants took them as

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

draws, so they were -- as an LLC was a draw.

Q    And then --

A    If it was personal, it would have been a draw.

Q    So then if you go to Page 8 --

THE COURT:  Let me ask what page were you on with Melinda Adducci?

MR. CATALDO:  That's on Page 5, Your Honor, of the April statements.

THE COURT:  Where on the page?  I don't see it on the page.

MR. CATALDO:  Your Honor, if the Court looks --

THE COURT:  I see it.  I have a clarifying question on that page.  Were there merchant cash advances?

MR. CATALDO:  There appear to be.

THE COURT:  Okay.  That's what merchant cap?  There's a lot of what appears to be merchant cap withdrawals.

MR. CATALDO:  Correct.

THE COURT:  Is that what those are?

MR. CATALDO:  It's what that appears, Your Honor.

BY MR. CATALDO:

Q    So, Ms. Adducci, if we go to Page 8 of the April statement, you'll see there's a number of NSF checks on this account.

A    Yes.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    I'm counting 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12.
That would be 12 bounced checks on this account in April?

A    Yes.

Q    All right.  And then if we go to the next page, there's
a series of checks and it looks to me like all of them,
except for two, are signed by you, correct?

A    I guess.

Q    Is that yes?

A    Yes.

Q    So let's to go May.  May is a really interesting month
on this account.

THE COURT:  Mr. Cataldo, the Court has a
clarifying question.

MR. CATALDO:  Yes, Your Honor.

THE COURT:  The images of the checks, are those
just the NSF checks?  I mean, is there a connection?
There's eight NSF checks and then there's…

MR. CATALDO:  So, Your Honor, NSF checks are not
itemized, meaning they don't give you the check number on
the NSF items, so it's not possible to determine that from
this statement.

THE COURT:  It's also not possible to determine
what date is which, whether it's the check date, the return
date or what have you.

MR. CATALDO:  That's correct.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

THE COURT: Okay.

MR. CATALDO: The statement doesn't tell you that.

BY MR. CATALDO:

Q    So I want to turn to May.  Have you flipped up to May now?

A    Yes.

Q    Okay.  So am I correct, so the beginning balance is negative $22,301, ending balance is negative $52,179, right?

A    Right.

Q    Okay.  So that means in May, the overdraw -- the overdraft on the account would have increased by $30,000, right?  Is that a yes?

A    Yes.

Q    Okay.  So I want to turn your attention to Page 13 of the account.

THE COURT:  Of the May statement.

BY MR. CATALDO:

Q    Of the May.  Are you there on Page 13?  Are you with me?

A    Yes.

Q    Okay.  And you'll see that, like, about two-thirds down, there's -- it starts listing NSF checks.  Do you see that?

A    Yes.

Q    Okay.  So on this page, I count 1, 2, 3, 4, 5, 6, 7, 8,

Veritext Legal Solutions
212-267-6868                        www.veritext.com                        516-608-2400

9, 10, 11, 12, 13 on this page of bounced checks, right?

MR. FOLEY: Your Honor --

BY MR. CATALDO:

Q    Is that a yes?

A    Yes.

Q    Okay.

MR. FOLEY: I have an objection, Your Honor.

THE COURT: Oh, excuse me. Mr. Foley is objecting.

MR. FOLEY: Your Honor, I have indulged through March and through April. But at this point getting into May, I would ask about the relevancy of these questions on a transaction that occurred between February 6th and February 7th of that year, as it relates to the Debtor's mindset or intent. So my objection that these are irrelevant questions.

THE COURT: Mr. Cataldo, I think I know your answer, but let's hear it for the record.

MR. CATALDO: Your Honor, highly relevant because this is explaining the overall situation of what is happening here.

THE COURT: Weren't there communications in May? Didn't Mr. Ritter send emails --

MR. CATALDO: Multiple.

THE COURT: -- around this time?

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

MR. CATALDO: Multiple.

THE COURT: Okay. I hear your objection, Mr. Foley, but I believe that Mr. Cataldo is not just going for the Debtor's intent but is trying to create a whole context, and we heard yesterday from Mr. Ritter about attempts months after February to contact and whatever. So the Court is going to allow the question because it probably fits into that context. But will ask you, Mr. Cataldo, connect it up for us so we're not left guessing.

MR. FOLEY: Thank you, Your Honor.

BY MR. CATALDO:

Q   So, Ms. Adducci, on Page 13, you see there's a series of NSF checks, correct?

A   Yes.

Q   And if we go to Page 14, there's a whole listing of NSF checks, correct; you see those?

A   Yes.

Q   Okay. Page 15.

A   Yes.

Q   Those are more NSF checks. Page 16, those are more NSF checks, correct?

A   Yes.

Q   And then on Page 17, we've got more NSF checks, right?

A   Yes.

Q   So I counted 132 bounced checks in May; does that sound

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 191 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

consistent with this number?

A    It sounds consistent with what's on here, yes.

Q    So was the business in financial trouble in early part of 2019?

A    We were -- I don't know, I guess.  We were sued in March, I think.

Q    You were sued by who?

A    From what I knew, you asked early December or early January?  Leading into that, I was unaware of any financial problems.  I didn't understand.

Q    Okay.  But by May, you knew that the business was in serious financial trouble; is that fair?

A    Joe's dad died in May and --

Q    Can you answer my question, please?  Did you know in May the business --

A    Yes.

Q    -- was in serious financial trouble?

A    Threads, things started to come apart and I couldn't figure out what was going on.  I didn't understand what had happened.  I was -- it was probably the hardest time of my life.

Q    Okay.  And --

A    One of them.

Q    All right.  So you don't deny there was 132 bounced checks in May, right?

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 192 of 252
212-267-6868                    www.veritext.com                    516-608-2400
Veritext Legal Solutions

A    No.  But, you know, I didn't -- again, I didn't go online and look.  I didn't see it.  His dad had died; he was in the hospital all the time constantly going to the emergency room with Joe.

Q    So who sued?  You said there was lawsuit; who sued?

A    Gelov.

Q    So Mr. Gelov sued because he didn't get his money back, right?

A    I guess.  I didn't understand what was going on there either.  I really didn't understand the details, and as they were coming apart, Joe was sick and in the hospital.  He kept going to the hospital and emergency room because he was having, like, stroke, his blood pressure.  They kept telling him if we leave today, you're going to be -- you're going to die of a stroke.  So I went between that and then we would go to Grosse Pointe where his dad was dying of cancer and it was an awful time.

Q    So, Ms. Adducci --

A    It was all falling apart.

Q    It was all falling apart.

A    It was all falling apart.

Q    Okay.  So the business filed bankruptcy.  Actually, it was an involuntary petition was filed against the business, right?  You were shut down by the creditors; is that right?

A    I don't know.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Q    You don't know?

A    No.

Q    You know there was a bankruptcy though, right?

A    Yes.

Q    Okay.  And there was actually a trustee was appointed in the bankruptcy; do you recall that?

A    Yes.  But are you talking about the --

Q    The business bank- -- we're talking about the business.

A    The Chapter 11, the first filing.

Q    Yes, yes.  Okay.  And so, do you remember how much debt was on the schedules --

A    No.

Q    -- of the business?

MR. FOLEY:  Your Honor, I'm going to object to the question, again, on relevancy grounds.  The Chapter 11 petition, I believe, occurred in November of 2019, which at that point, is eight months/nine months after the transfer that occurred.

MR. CATALDO:  Your Honor --

MR. FOLEY:  And the -- I apologize.

MR. CATALDO:  Finish your objection, go ahead.

MR. FOLEY:  I don't want to accidentally feed information.  I'm not trying to play a game, but I think it should be questions who signed the business schedules before my client is asked what is on them.

212-267-6868          www.veritext.com          516-608-2400

Veritext Legal Solutions

THE COURT: Mr. Cataldo.

MR. CATALDO: I'm not sure what the objection is.

THE COURT: I think the objection is --

MR. FOLEY: Is relevancy.

THE COURT: -- foundation is what I hear, is that he wants -- is that the correct objection, Mr. Foley, that you want a question about --

MR. FOLEY: Yes, the foundation.

THE COURT: -- who signed the schedules. The Court recognizes though it was an involuntary bankruptcy and the Court can take notice of its own records and files. It was an involuntary.

MR. CATALDO: It's public information.

THE COURT: It's public information. It was an involuntary and then the United States Trustee filed the motion to convert it to a Chapter 7 liquidation and then a Trustee was appointed. And in the LLC case, it was Mark Shapiro who was appointed as the Trustee.

MR. CATALDO: Correct.

BY MR. CATALDO:

Q    So my question just is, do you know how much debt was on the schedule.

THE COURT: Well, Mr. Foley's objection is well taken. Ask her first if she participated in the preparation of the schedules.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

BY MR. CATALDO:

Q   Did you have any participation in the --

A   I was present.

Q   You were present.

A   I believe I was present.

Q   What does that mean, you were present?

A   I think we went to an office of Shenfield or something.

Q   Do you remember meeting Mr. Shapiro?

A   No.

MR. FOLEY:  Sheinfeld is the personal bankruptcy attorney that filed.

THE WITNESS:  I don't remember Shapiro.

BY MR. CATALDO:

Q   I'm not asking about the personal bankruptcy.  We'll come to that in a minute.

A   Yeah.

Q   I'm talking about the business bankruptcy.

A   No.

Q   Okay.  And you know the business was shut down.

THE COURT:  Wait, let me clarify.  Ms. Adducci, were you present when the bankruptcy schedules for the business --

THE WITNESS:  No.

THE COURT:  -- were put together?  Okay.

BY MR. CATALDO:

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 196 of 252
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Okay.  So you don't know how much debt was shown on the business bankruptcy schedules.

A    No.

Q    Right?  Okay.  You just know the business was closed because of the bankruptcy; is that right?

A    Yes.

Q    All right.  And those schedules -- do you understand what a bankruptcy schedule is?

A    No.

Q    Okay.  You personally filed bankruptcy with your husband, correct?

A    Yes.

Q    Okay.  And that was filed when?

A    Maybe October, September or October.

Q    And your personal schedules, bankruptcy schedules are shown -- they're part of the exhibits, if you could look at Exhibit 50, please.

THE COURT:  Is that 50?

MR. CATALDO:  5-0.

THE COURT:  Mr. Cataldo, this is a five minute warning to get Mr. Foley to his father's award ceremony.

MR. CATALDO:  You are correct.  Tell you what, I'll make this my last question for the day.

THE COURT:  Okay.

BY MR. CATALDO:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Q    Ms. Adducci.

A    Yes.

Q    Do you understand -- well, actually, I'm going to have two questions.  You filed bankruptcy with your husband on October 15, 2019, correct?

A    Yes.

Q    Okay.  And if you turn to the next page, the second page of the document, it has a line that says total liabilities.  How much in total liabilities were shown on your bankruptcy schedules?

A    $23 million.

Q    I'm sorry, how much?

A    $23,441,315.54.

MR. CATALDO:  And, Your Honor, with that, we can end for the day and allow counsel to attend his event.

THE COURT:  All right.  We'll be back at 10:00 tomorrow.  Mr. Foley, please congratulate your father for his award.  It's a legal award?

MR. FOLEY:  It is, Your Honor.  It's from the Catholic Central Bar Association.

THE COURT:  That's wonderful.  Please congratulate him on behalf of the Court.  It's a wonderful thing that you're able to go support him in that and please go, rush.

MR. FOLEY:  Thank you, Judge.

THE COURT:  You can leave everything here that you

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 198 of 252
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions

wish to leave and we'll see everybody back here at 10:00.

(Whereupon these proceedings were concluded at 4:43 PM)

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

CERTIFICATION

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: June 2, 2026

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

## &

**&** 151:7,18

## 0

**00** 55:14
**000006** 28:11
**000030** 53:23
**0585** 44:19,20
  109:10,17
  113:7 115:21
**09** 32:5 84:13

## 1

**1** 13:11,13,15
  161:11 184:17
  188:1 189:25
**1,091,000**
  161:5
**1,091,769**
  152:21 161:13
**1,091,769.44**
  147:21 148:12
  149:24 153:1
**1,104,750**
  155:9
**10** 32:5 66:24
  84:13 98:22,23
  99:22 100:25
  102:22 103:2
  120:16 121:8
  127:8 145:4
  161:11 178:20
  178:23 188:1
  190:1
**100,000** 67:3
**102** 16:12
**103** 25:20

**10:04** 1:25
**10:39:51** 42:23
**11** 10:18 15:3,6
  15:7 100:2
  105:25 161:11
  184:23 188:1
  190:1 194:9,15
**1112** 15:6
**1113** 15:6
**11501** 200:23
**117,000** 152:12
  152:21 153:1
**11:00** 144:2,4
  164:4
**11:09:25** 44:8
**11:31:28** 44:12
**12** 8:19 11:7,10
  11:22 12:6
  15:6 25:22
  26:6 35:25
  36:1 101:3,4
  102:13,17
  108:20 109:24
  112:20 127:3,6
  153:15 157:7
  160:13 161:11
  168:2 176:8
  186:13 188:1,2
  190:1
**12,000** 186:9
**12,000,500**
  157:24
**12,854,905**
  125:21 127:25
**12,855,000**
  125:16,20

**12.5** 8:19,19
  11:7
**12151** 200:6
**12:15** 85:25
**13** 15:7 85:13
  85:22 116:5
  161:11,13,21
  189:14,18
  190:1 191:12
**132** 191:25
  192:24
**13963** 185:5
**14** 45:23 168:7
  191:15
**15** 15:18 60:22
  113:1 145:4
  177:18 178:12
  191:18 198:5
**150,000** 152:16
  152:21 153:1
**155** 125:24
**16** 8:21 11:7
  101:7 124:2
  191:20
**17** 124:2 176:2
  176:5 191:23
**18572** 4:13
**19-54531** 1:3
**195** 8:4 53:7
**198** 8:24 9:23
  54:3 95:22,24
**1982** 91:22
**1994** 63:20
**1:00** 85:18 86:1

## 2

**2** 28:7,17 34:13
  141:23 148:1
  148:23 161:11
  184:17 188:1
  189:25 200:25
**2.5** 158:8
**2/6/2019** 42:21
**20** 8:21 11:8
  30:1 46:17
  84:15 101:7
  124:2 145:4
**20-04381** 1:4
**20-4381** 6:2
  116:16
**2008** 32:5
  84:13
**2010** 66:4
  84:16
**2011** 9:3 96:21
**2018** 98:16
**2019** 7:19 8:8
  16:11 26:5
  43:22 44:8,12
  44:12 46:11
  51:25 53:11
  62:14 88:1
  90:2 94:19
  95:1 105:11
  106:12 107:11
  122:20 124:22
  127:18 132:2
  139:1,3 176:3
  192:4 194:16
  198:5
**2026** 1:24
  200:25

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400

**2029** 98:24
**21** 62:14
**211** 1:20
**22** 16:12 62:6
  186:8
**22,301** 189:8
**23** 198:11
**23,441,315.54.**
  198:13
**239-673-3008**
  74:9
**24** 1:24
**25** 16:12 46:11
  51:25 53:11
  61:8,10 80:2,5
  84:14 134:8
  158:3 160:1,3
  162:9 177:24
  180:25 181:3
**2500** 4:5
**25th** 7:19 8:2,8
  8:25 88:1 90:2
**27** 62:25
**27777** 4:5
**28th** 125:15
**2:00** 85:13
**2:30** 85:22
  116:3
**2:35** 85:19
  116:4,8,11

**3**

**3** 37:9,13,18,18
  46:4 126:15
  160:22,22
  161:3,11
  177:19 184:17
  188:1 189:25

**30** 9:5 29:14
  172:12
**30,000** 189:11
**30,045,000**
  96:9
**300** 200:22
**30th** 98:24
**31** 96:21
**31st** 9:3 106:12
**330** 200:21
**34,493** 186:7
**34,493.25**
  183:7
**39,000** 148:10
  149:24 152:22
  153:2
**3rd** 16:11 26:5

**4**

**4** 41:21 42:1
  51:24 109:3,16
  115:2 161:11
  183:14,15
  184:17 188:1
  189:25
**4,041,925**
  149:9,23
  152:21 153:1
  161:4,12
**4,250,000**
  152:11,21
  153:1
**40** 155:4
**400** 167:8
**42** 131:22,24
  132:1 150:8,9
  150:19 154:2,2

**4272** 129:22
  130:3,9 151:11
  151:20 152:8
  152:16 167:19
**43** 154:14,19
  161:3
**45** 11:15,16
**46** 11:16
**47** 11:16 62:9
**478034** 4:6
**48** 11:16
**48128** 4:14
**48226** 1:21
**4:16** 132:25
  139:7,17
**4:20** 139:6
  141:3 143:9
  144:11 145:8
  178:20
**4:43** 199:3
**4:45** 178:17
**4th** 113:5,11
  113:19

**5**

**5** 43:22 109:1
  109:13 110:2
  114:13,18
  117:12 125:12
  149:14,20
  150:7 151:11
  151:22 152:6
  153:24 160:21
  161:11,22
  162:20 165:13
  165:16 167:16
  182:12 183:19
  184:17 186:17

  187:7 188:1
  189:25
**5-0** 197:19
**50** 169:5
  197:17,18
**50,000** 67:4,5,6
  67:8
**50/50** 64:12
**500** 110:3,5
  126:23 157:1
**52,179** 189:8
**5:00** 155:1
**5th** 107:11
  110:3 111:3
  113:21,22
  114:6,14,19
  115:4,8,20
  122:20 125:15
  126:17 129:10

**6**

**6** 8:20 15:10
  46:2 161:11
  188:1 189:25
**60** 125:25
  183:1,4,6
**696** 178:14
**6:00** 134:4
  178:11
**6:06** 62:16
**6:15** 154:16
**6:16** 132:2,15
  132:25 154:15
**6th** 127:2
  128:5 129:12
  129:13 176:3,7
  190:13

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 202 of 252
212-267-6868                         www.veritext.com                         516-608-2400
Veritext Legal Solutions

**7**

**7** 5:4 16:3 25:21 44:8,12 44:12 52:8,19 132:2 161:11 169:5 188:1 189:25 195:16
**700** 167:8
**700,000** 37:3
**74323** 6:14
**780** 183:22
**7:00** 154:25
**7th** 45:4 128:12,13,14 128:19 129:6 129:10,13 130:10,21 131:12,15,21 134:24 135:2 136:24 137:8 138:2 139:1,3 142:20 145:13 145:14 147:18 147:19 149:22 152:19 157:2 160:20,24 161:12 165:9 167:18,22 168:3 171:4,6 176:9,23 179:7 190:14

**8**

**8** 161:11 187:4 187:22 188:1 189:25

**8,000** 186:19
**8,054,905** 125:17
**83** 91:22
**839,000** 28:11
**854,500** 127:11
**87** 5:6
**87824** 6:17
**8:30** 31:23
**8th** 127:10

**9**

**9** 7:17 42:19 44:5 51:21 52:8,10 87:5,7 87:20 161:11 184:16,17 188:1 190:1
**9.5** 153:7,14 157:19 168:1 176:9,23 181:24
**9.5.** 153:10
**90s** 175:5
**9238** 129:22,23 130:3,9 151:11 151:17 152:8,8 167:19
**93** 15:22
**96** 178:14
**96,000** 80:10
**9:51** 53:11 90:3

**a**

**a.m.** 1:25 42:23 44:8,12 53:11 90:3

**abbott** 155:9
**able** 30:25 35:10 50:9 64:17 77:12 99:23 131:23 134:20,20 170:20 198:23
**abnormal** 55:19
**above** 90:6 107:13
**absolutely** 76:21
**accept** 36:2 70:21 78:3 112:19 117:13 138:3,5,7
**accepted** 63:5 63:12 80:4
**access** 35:5 40:3,4 54:14
**accessed** 30:24
**accidentally** 194:22
**accompanies** 23:3
**account** 11:11 30:12,17,18,23 30:23 31:4 34:14 35:5,6 36:7 40:2,4,5,6 40:10 41:2,5,7 43:13 44:17,17 44:19,21,23 70:19 77:22 101:14,17 106:25 107:3,5

107:6,17,20,24 108:6,10,15,19 108:23 109:2,3 109:6,7,8,14 109:16,19,23 110:6,15,17,20 110:25 111:1,3 111:12,17 112:5,13,18 113:7,9,12,19 113:23 114:6 114:13,18,23 115:8,12,12,21 117:12,14,21 118:1,9,14,15 119:8,13,15,17 120:4 121:12 121:15 122:1,2 122:5,7 126:18 126:23 127:18 128:4,6,13,14 130:5,21 131:11 133:5 136:23 137:8 138:4,8,23,25 139:21,25 146:1 147:13 148:7,15 149:10,17 151:3,7,15,16 152:5,10,15,16 152:20 153:6 153:15,16 156:18 157:2,8 157:19,24 160:24 162:15 162:23 165:5,9

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 203 of 252
212-267-6868
Veritext Legal Solutions
www.veritext.com
516-608-2400

166:2 167:22 168:2 173:23 173:25 174:3,5 174:10 176:25 182:13,15,24 182:25 183:3 184:8 185:7,13 186:4,9,11,13 186:25 187:24 188:2,11 189:11,15

**accountants** 186:25

**accounts** 41:9 130:6 167:19

**accredited** 29:16,18 144:21

**accurate** 93:9 118:18 200:4

**accurately** 115:16

**accusation** 22:2

**ach** 66:14,19 67:2

**achs** 65:17,17 66:12

**acknowledge** 170:25

**acknowledged** 165:4

**acquire** 23:18 23:20,24 24:1

**act** 66:2 79:21

**acting** 33:20,25 114:4

**actual** 160:23 161:1

**actually** 12:6 20:18 26:15 31:9 32:20,21 36:15,15,18 60:1 68:13 70:18 71:6,6 80:16 94:20 96:8 99:4 100:18,21 109:2 120:17 124:19 125:14 127:23 128:13 130:4,10 131:21 135:23 140:15,17 152:5,14 183:14 193:22 194:5 198:3

**adams** 120:1 121:3

**add** 149:13 152:19 153:4,5 153:10 162:12

**added** 53:6 73:1 90:20 106:1 130:20 161:12 164:16

**adding** 100:4

**address** 62:18 89:16,19 90:1 90:8,23 132:7 132:9 142:7 148:7 149:2 154:22

**addresses** 90:4 90:13

**adds** 127:25

**adducci** 1:8,15 4:12 5:6 6:3,15 6:17,18,20,20 7:14 8:10,11 8:25 10:19 11:11 26:10 43:5 45:16 46:6,9 51:18 53:11 63:3,14 63:17 64:5,12 65:7,15 69:24 70:3,17 71:18 71:24 72:3,6 74:22 75:22 76:14,22 77:5 77:15 78:4,15 78:21 79:20,25 80:6 81:17,23 82:5,8 85:10 86:8,10,14,16 86:18,19 87:9 87:22 89:15,20 90:3 93:19 96:1 97:5 104:23 106:8 107:9 114:3 116:17,25 117:6,7,11 121:7 123:17 131:23 132:4 132:12 134:17 135:15 138:6,9 140:22 142:18 142:20 143:1

145:24 146:18 147:7 153:4 154:22 156:1 157:7 159:8,21 165:8,13 167:16 168:17 170:24,25 171:22 174:4 176:1,17,19 179:6 180:18 181:5 183:23 183:24,25 184:1 185:17 186:18,19 187:6,22 191:12 193:18 196:20 198:1

**administer** 7:3

**admissible** 87:11

**admitted** 160:22

**adore** 76:13,14

**adv** 1:4

**advanced** 29:19,22

**advances** 187:13

**adverse** 89:1,3 89:9

**advice** 26:23 26:25 103:19

**advised** 82:20

**advising** 26:17

**affair** 33:21

**affirm** 10:11

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

**afternoon** 86:18 116:18 116:20,22,24 116:25 143:9 144:12 145:9 165:1

**aga** 31:21 94:21

**ago** 63:16 65:21 78:12 80:20 111:13 111:18 112:21 150:13 171:15 171:16

**agree** 92:10,17 92:18,18 93:11 94:9 113:11 115:13,19 129:16 153:6 186:1,12,14

**agreed** 87:11 119:2

**agreement** 48:6 100:5 101:18 120:22 121:16 122:17

**aguilar** 132:4 154:21

**ahead** 16:14 77:22 141:20 147:15 148:21 154:19 182:25 183:11 184:16 194:21

**ahold** 72:11

**airplane** 129:11

**airport** 108:7

**airtight** 104:2 104:2,3

**alive** 15:21

**allow** 12:18 13:21 38:9 170:23 181:12 191:7 198:15

**allowed** 19:20

**alumni** 29:25 34:3 167:6

**america** 11:11 23:6 31:1 35:6 36:6 40:5 43:12 44:4 69:14,17,19,23 71:22 79:18 80:7 91:21 93:5 106:25 107:3,20 110:23 111:6 111:25 112:17 113:6 114:10 115:21 120:5 122:1 127:18 130:5,6,11,21 132:3 133:5 135:6 137:18 138:22 146:1 148:15 149:10 150:1,15 151:2 151:3,6 152:15 152:20 157:19 160:24 174:5,8 176:24 182:13 182:15,16 184:8 185:7

**america.com** 132:4 154:21

**american** 27:14,16

**amount** 29:1,1 29:2,4,8 37:3 65:7,8,8 67:7 147:21,22 148:5 161:2

**amounts** 149:24 161:3,5

**angie** 83:8

**angry** 26:15,19 30:10 31:3 33:12 34:9 40:21 41:20 108:2 135:17 144:16

**annoyed** 83:17

**answer** 9:9,14 12:1 17:2 21:23 22:3 24:17,20,22 26:7,21 62:4 93:18 98:11 99:12 105:10 106:22 114:21 114:25 134:18 134:19,22 138:9,13,15 156:5,8 157:16 159:17,19 160:2 170:18 170:22,23 172:13,16 173:19 190:18 192:14

**answered** 22:18 24:25 104:20,24 105:2 156:7 157:22

**answering** 26:3 159:19

**answers** 11:24 11:24

**anybody** 12:2 19:8 31:10 35:15 40:19 55:2 77:13

**anymore** 47:14 65:24 67:21

**anyway** 64:16 76:9

**apart** 192:18 193:11,19,20 193:21

**apologies** 117:9 181:6

**apologize** 73:12,19 75:22 144:9 194:20

**apparently** 16:23 18:18 19:21 154:13

**appear** 28:8 43:2 45:12,14 185:21 187:14

**appearances** 6:4

**appears** 43:18 84:2 97:10,11 98:1 115:9 185:17 187:16

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

187:20
**apply** 93:11
**appointed**
194:5 195:17
195:18
**appointment**
74:23,24
**appraisal** 9:5
9:18 10:9 23:2
23:11,13 27:1
27:3,4,9,18
46:10,12 47:7
47:8,15 49:23
54:13 58:9
60:17 91:23
**appraisals**
7:15 57:20
73:18 93:25
**appraiser**
20:21,21 28:5
59:24 91:10,16
92:2,3,10 93:3
93:21 94:14,21
**appraisers**
27:14,17 60:8
**appreciate**
82:9 150:22
**approach**
121:3 184:2
**approval** 47:24
66:15
**approved**
74:17
**approximately**
96:23 153:10
**april** 185:12,12
186:3,4,4,13

187:8,22 188:2
190:11
**area** 20:15
98:6 143:22
**arizona** 29:14
67:25 108:3,10
129:14 132:19
132:22 133:1
139:7 155:1
**arrangement**
72:18 118:3
**arrested** 62:24
**artist** 33:18
**asked** 16:15,16
16:19,23 17:16
20:12,19,22,25
24:25 25:5,21
27:24 30:22
31:5,15 33:6,7
34:15 37:7
38:2,4,13,17
38:19 39:9
40:8,9,16
43:12,13 46:14
47:9,16,16
53:15,17 54:7
55:2,12 56:6,7
58:7 59:3,11
59:12 74:20
83:5 98:4,6,7
98:11 103:8,15
104:6,20,24
105:1 106:18
108:15 115:23
120:20 122:7
122:23 134:1,7
140:5 145:2

157:11,18,20
157:23 169:3
171:1,2,25
172:4 179:9
180:20,23
181:8 192:8
194:25
**asking** 17:14
22:16 30:13
38:7 54:21
58:12,13 90:12
92:16 103:8
106:1 114:5,16
114:17 141:17
168:19 178:17
178:20 180:16
196:14
**asks** 105:25
**assigned** 72:5
**assist** 81:13
**assistance**
101:2 150:23
**associated**
29:21
**association**
29:16,18,21
144:21 198:20
**assume** 22:22
41:8 98:1
110:7 111:19
111:19 115:22
115:23
**assumed**
115:22
**assumes**
105:19

**assuming**
43:20 76:1,3
82:25 165:19
165:19
**attached** 53:12
95:14
**attachments**
9:22
**attempting**
36:7 170:22
**attempts** 191:5
**attend** 198:15
**attended**
145:20
**attending**
27:14
**attention**
186:17 189:14
**attorney** 4:4,12
49:17 61:18
82:20 86:19
138:12 196:11
**attorneys**
175:18
**auction** 29:18
29:25 32:11
34:3,7,9 36:25
66:13 72:25
145:2,3 162:9
165:21 167:5,7
169:14,15
175:15,19
**auctioneer**
29:24 34:2,4,6
91:10,17 92:6
92:6 133:22,24
145:5 158:20

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 206 of 252
212-267-6868 www.veritext.com 516-608-2400
Veritext Legal Solutions

167:5,11
**auctioneered**
145:11,14
**auctions**
156:23 169:13
**audio** 63:1,2
64:2,11 82:11
**august** 123:25
**authored** 10:6
**authorize**
66:16,18
**authorized**
137:6,15,18
138:24 176:12
176:14,23
**auto** 70:13
**automated**
67:22
**automatically**
88:14,15,16
**avenue** 79:7
**awaited** 13:14
**award** 178:10
197:21 198:18
198:18
**aware** 17:13
36:7,10 122:4
**awful** 193:17
**az** 152:8
**aztlr** 128:15
129:21

**b**

**b** 2:1 73:23
**back** 12:10
14:14 15:4
16:21 19:20
26:19,23 27:15

27:16 32:4
34:13 35:17
36:12,23,24
38:7 39:10
53:22 64:7
65:3 66:22
77:2,3 80:8
84:21 85:1,18
86:5 91:22
100:25 103:15
104:4 109:2
114:12 115:2,7
116:2,10,13
119:24 120:2
121:8 124:3,3
124:4 125:3,12
128:3 130:14
133:14,18
134:3 135:24
136:9 138:19
143:9,17
144:11 149:20
150:8 152:6
154:1,2 157:15
160:14 163:21
164:19 165:13
166:2 167:16
169:21 170:6,8
170:10 178:25
182:12 186:14
193:7 198:16
199:1
**backfire** 76:9
**background**
11:1 83:12
**bad** 76:10,15
76:24,24 80:23

160:21
**balance** 41:2
108:24 125:24
173:22 174:10
183:1,3 186:8
189:7,8
**bank** 11:10
17:9 29:9,11
30:6,7,12,15
30:22,23 31:1
31:12,13,21
32:7,10,14,18
32:20,20 33:10
34:16 35:4,6
36:6,24 37:22
38:4,8,9,15,19
40:4,9,25 41:1
41:9 43:12,12
44:4 65:9,10
65:12 66:3,4,5
66:9 67:14,19
67:20,21 68:20
68:21 69:9,11
69:14,17,19,23
71:10,22 72:10
74:23 77:2,22
78:21,25 79:4
79:17,18 80:7
81:1 84:10,11
84:16,22 85:2
101:16 106:25
107:3,3,19
108:13 109:7,7
110:15,22,23
110:25 111:6
111:21,24,25
112:9,16 113:6

114:3,10,17,22
115:7,21
117:12 118:9
120:4 121:15
122:1,4 127:18
130:5,6,10,21
131:5 132:3,4
133:4,15,17,18
133:25 134:6,8
135:2,5,8,23
137:18 138:3,5
138:20,22,24
139:13,18
140:2,4,5,6
141:3,8,12,16
141:16,16
142:15,18,20
143:2,2,9,25
145:8,16 146:1
146:3,9,20
147:10 148:15
148:18 149:9
149:22 150:1
150:15 151:2,3
151:6,15
152:15,20
154:11,17,21
155:4 156:18
156:23 157:1,5
157:10,13,19
157:22 159:14
160:6,12,24
162:20 163:13
163:21,25
164:9,10,10,16
164:17,23
165:14 171:15

174:1,1,4,8
176:24 177:25
179:8 182:13
182:15,16,25
183:2 184:7
185:7 194:8
**banker** 38:20
38:24 39:5
43:21 65:1
70:17 140:8,9
146:7,8
**bankers** 64:22
135:9
**banking** 31:13
32:5 59:15
81:5 84:13,14
84:14 119:20
122:8,9,10,10
134:16 139:19
139:20,21
165:10 182:4,5
182:6
**bankruptcy**
1:1 2:3 88:13
88:18,20 169:4
169:6 182:19
193:22 194:3,6
195:10 196:10
196:14,17,21
197:2,5,8,10
197:15 198:4
198:10
**banks** 31:1
66:8 69:15
79:5 84:25
**bar** 198:20

**barker** 73:23
**base** 78:15,16
81:4
**based** 11:21
114:17
**basically** 8:17
8:22 10:15
33:18 34:11
56:23 71:10
80:8,10 91:24
104:3
**basis** 12:22
105:18
**bates** 53:3,5,7
**bathroom** 34:5
**bcritt000027**
52:24
**beautiful** 35:8
58:11 59:2
**beginning**
52:11 183:1
189:7
**begins** 14:21
15:8 16:13
28:22 37:20
42:5,13 46:3
52:18 53:9
54:4 56:5 61:3
62:10 63:2
64:11 84:7
**behalf** 6:14,17
101:20 116:23
121:18 198:22
**belief** 167:12
**believe** 12:24
21:24 24:21
25:11,13,16

26:2 31:19
32:8 34:21
36:10,11 52:8
60:19 63:6
78:7 83:20
99:21,24
100:20,23
107:4,25 114:8
122:5 123:4,22
123:23,24
134:11 137:14
144:15 162:15
164:13 166:3
170:15 174:1,2
174:16,17
185:6 191:3
194:16 196:5
**believed** 59:19
122:19 155:25
159:12
**bench** 116:8
**beneficiary**
151:7
**best** 64:9 65:22
98:18 100:10
**better** 11:2
14:6 28:2,2
46:25 49:9
68:22 87:10
104:2
**beyond** 87:17
171:17
**big** 28:4 29:25
32:11 59:6,8
65:7,8 68:18
70:10 116:8
125:4 136:10

144:22 167:7
167:10 169:20
**bigger** 67:13
67:20 169:17
**bill** 19:24
22:14,21 23:13
33:18 35:12
46:13 47:23
54:6,13,14,14
55:4,8 56:11
56:11,14,19,22
**binder** 87:2
**birmingham**
18:10,11,25
20:15,15 32:9
98:6 122:24
**bit** 136:8
170:18
**black** 134:4
143:8
**blame** 48:1
**blank** 106:2
**blended** 53:13
**blender** 35:22
**block** 87:25
88:4,5 89:15
91:7 106:3
132:8
**blood** 193:13
**bloomfield**
20:15 32:9
98:6
**blow** 67:5
**blowing** 68:5
**blurry** 7:22
**boa** 28:11

212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

**boa000273**
45:9
**boa000275**
42:14
**book** 20:4
22:11,17,23,23
22:24 55:20
95:20 97:6
98:23 131:22
175:21 176:2
**borrow** 17:8
17:11,16
**borrowed** 17:3
17:7,11,12
**boston** 27:15
79:11
**bottom** 8:3,23
9:19,23 42:14
43:25 44:24
45:14 52:24
53:23 56:21
95:20 113:3
154:6
**bought** 24:4
75:2,4,14 80:2
**bounced**
184:20 188:2
190:1 191:25
192:24
**bounds** 106:6
**box** 117:3
166:18
**branch** 72:15
73:25 74:4
79:2,8 119:7
126:25 130:10
133:14 141:5

150:1 174:8
**break** 71:3
85:18,23,25
86:1 115:25
178:20,23
**brief** 12:19
**briefcase** 162:4
165:22
**bring** 86:24
97:7 112:23
167:17
**bringing**
104:15
**brink's** 169:22
169:23,23
170:4
**britain** 29:22
144:24
**broke** 70:22
117:11
**brokered**
175:23
**brother** 11:2
15:11,12,13,16
15:17 35:24
49:15,18
**brothers** 15:11
**brought** 19:7
**building** 170:4
**bullshit** 168:10
**bunch** 33:15
90:10
**bus** 48:19,20
**business** 16:15
16:16,16,18,20
16:22 17:1,10
31:13 32:4,19

32:19 40:12
42:18 44:4
58:5,6 61:20
63:20 64:17
65:14 67:12
69:16 76:5
78:23 79:13,16
79:17 80:15
81:2 84:21
85:1 91:13
103:13 119:15
119:17 120:5
122:2,6,6,9,11
122:25 124:22
132:8 134:6,8
134:15,16
138:7 139:19
139:20 142:6
150:14,15
151:2 156:21
158:2,10 162:9
162:12 167:13
168:15 169:3
169:11,11
182:7 186:10
186:23 192:3
192:11,15
193:22,23
194:8,8,13,24
196:17,19,22
197:2,4
**businesses**
84:24,25
**busy** 67:11
78:25
**buy** 8:19 11:6
24:2,4 46:18

51:10 75:4
102:17 155:18
168:5 176:8
**buyer** 20:17
66:15 68:12
101:16 121:14
158:3
**buyers** 21:21
63:25 169:20
**buying** 156:2
156:14 169:10
169:19

**c**

**c** 4:1 6:1 51:24
132:4 154:21
200:1,1
**calculator**
153:11
**call** 6:24 13:4
23:2 24:8 27:5
57:7,7,10
59:13 72:12
73:21,22 74:14
78:22 81:3
82:22,24 83:13
83:21 85:25
86:8 102:9
110:16 122:17
172:8
**called** 16:20,23
17:15 31:19
35:19 48:8,9
52:2 57:8,8,10
66:3 69:17
70:18,19,20
77:24 105:21
108:14 110:18

212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

110:18,23
117:6 128:7
139:15,16
144:20 175:1
**calling** 6:2
33:24 35:16
111:10
**calls** 119:23
120:22 137:15
171:14
**calm** 64:19
**cancer** 33:23
170:10 193:16
**cap** 187:15,16
**cape** 74:4
**capitalized**
101:16
**caption** 14:5
**car** 135:21,24
166:12,25
178:13
**carat** 59:8
**card** 39:11
42:18 43:9
44:4 45:1
107:9,19
109:16 114:7
114:22,25
115:3,4 119:12
130:20,22
131:7,12
135:12 136:17
136:21 137:4
137:17,24
138:21 183:23
183:24,25
184:14 186:18

186:19,20
**cards** 114:20
184:7,11
186:22
**care** 31:3 35:2
35:2 64:20
76:22 77:9
103:6,7 104:14
104:14 119:4
150:22 167:13
**career** 35:23
**carlsbad** 167:9
**carol** 16:5
47:21 53:14
127:3
**carried** 162:4
165:23
**case** 1:3,4 6:2
13:1,2,5
107:20 116:16
134:20 181:6
195:17
**cases** 85:13,13
85:15
**cash** 110:8
173:15 187:13
**cashier** 150:16
**cashier's** 37:22
38:9 132:12
154:3,6,10,11
155:8 160:23
161:11,14,18
161:21 162:21
165:17
**cataldo** 4:8 6:6
6:7,24 7:2,4,24
13:10,14,24

14:3,9,16,19
15:2,4 16:11
28:13,20 37:12
37:17 46:1
51:17,21 52:7
52:12,14,16
60:24 85:6,8,9
86:7,8,17 87:7
87:21 89:1,4,6
89:11,14,25
90:16,19,21
91:3,5 92:15
92:22,25 93:1
93:23 94:18
95:16,18,19
96:4 97:4,7,8
99:17 102:1,2
104:23 105:3,5
105:9,24 106:6
106:7,14,21
114:24 115:1
115:24 116:2,9
116:18,19,20
117:1,4,10
118:18,20,23
119:6,25 120:7
120:8,12,13,16
120:23 121:1,6
124:13 125:18
125:21,23
137:20,22
139:2 141:1
142:22,24,25
144:3 145:23
146:17 148:1,3
150:19,20
152:2,25 153:3

153:10,13
156:12,13
159:16,20
162:19 163:2,5
163:8 165:7
170:12,19,24
171:21 172:2
173:12 176:19
176:22 178:2,6
178:18,22
179:3,5 181:15
181:17 183:16
183:18,20
184:2,5 185:15
186:2 187:7,11
187:14,18,20
187:21 188:12
188:14,18,25
189:2,3,17
190:3,17,19,24
191:1,3,8,11
194:19,21
195:1,2,13,19
195:20 196:1
196:13,25
197:19,20,22
197:25 198:14
**cataldo's**
119:22 120:2
120:18
**catalogue**
75:13
**catch** 118:25
**catholic** 198:20
**caught** 169:7
**cc** 132:3

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

**central** 42:25 44:9 198:20
**ceremony** 197:21
**certain** 76:5,8
**certified** 200:3
**chambers** 116:7
**chance** 12:9,10 13:16 168:19
**change** 19:21 82:17 106:24 134:3 164:7
**chapter** 85:13 85:22 116:5 169:5 194:9,15 195:16
**charge** 35:4
**chase** 30:25 31:9,9 32:14 36:24 65:17,18 66:6,23 68:2 79:7 80:8 101:14 121:13 183:23,24,25 184:14
**check** 38:9 66:20 79:10 80:3,4,10,11 110:8 132:12 160:13 170:3 188:19,23
**checks** 34:22 37:22 38:1 39:18 79:24 80:15 133:15 150:17 152:4

154:3,6,10,11 155:8 159:15 160:23 161:5 161:11,14,17 161:18,22,25 162:1,11,17,18 162:21,25 163:4,7,13 164:14 165:15 165:17 166:9 166:11,24 167:3 173:6,9 173:15 184:20 184:22,25 185:8,17 187:23 188:2,5 188:15,16,17 188:18 189:22 190:1 191:13 191:16,20,21 191:23,25 192:25
**chicago** 66:5 71:10 175:2
**chk** 128:15 129:22 152:8
**chose** 100:6,16
**christmas** 15:15
**christopher** 4:8 6:7 116:19
**chronology** 171:19
**circumstances** 162:13
**city** 136:10

**clarification** 51:16 137:14
**clarify** 9:20 12:4 42:9 142:17 196:20
**clarifying** 143:6 144:9 162:24 163:9 170:25 172:17 185:14 187:12 188:13
**clarity** 94:17 123:17
**class** 31:22
**classes** 27:14 29:17
**clayson** 4:9 6:7 6:10 7:8,22 8:1 9:15,20,22,25 10:4 12:14,23 12:24 13:2,17 41:25 42:3,9 46:2 51:15 53:2 54:2,3 55:25 56:3 62:8 64:6 84:5 116:19,21
**clear** 89:13 115:20 119:7 120:19 137:23 146:12 156:10 159:18 165:14 167:17,20 179:6,22
**clearly** 102:12 185:7

**clerk** 6:2 85:20 86:5 116:13,16 178:25
**client** 71:7 75:2 80:2,9 194:25
**clients** 20:7,8 32:21 65:22 73:16 75:3 150:14,15 151:2
**clip** 99:3
**close** 16:3 22:8 27:22 43:11 160:19
**closed** 14:5 141:12 182:16 197:4
**colleagues** 33:15 145:19
**collect** 66:19 67:7
**collecting** 170:7
**college** 91:24
**colored** 93:6
**come** 13:19 18:24 21:22 22:21,21 29:23 35:17 56:13 63:25 64:14 65:22 66:22 67:2,3 74:24 85:18 103:15 106:11 114:15 125:7 153:11 162:10 167:12 192:18 196:15

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

**comes** 24:6
168:2
**comfortable**
78:9 103:14,14
**coming** 34:2
41:15,17,18
78:3,4 98:7
116:2 153:14
167:5,15 170:9
170:10 193:11
**commencing**
85:13
**comment**
67:10
**commitment**
69:11
**commonplace**
66:17
**communicati...**
111:6 146:7,8
**communicati...**
33:9,10 38:14
38:16 146:11
**communicati...**
190:22
**company** 25:22
26:5 79:24
175:1
**comparables**
53:13
**comparison**
27:8
**complete** 33:18
**completely**
71:1 77:1,21
**computer**
47:18 50:3

**con** 33:18
**concerned**
104:25
**concluded**
14:24 16:10
28:12 37:11
41:22 42:8
45:24 51:13
53:1,25 55:23
60:23 62:7
64:2 82:11
84:3 85:5
199:2
**conclusion**
137:16
**conference**
30:7,22 31:20
39:12 40:22
41:14 108:4
129:8,18
133:23 135:25
136:6 143:20
165:22 179:16
179:18,22
**conferences**
29:16 31:23
40:24
**confirm** 131:18
164:9
**confirmation**
27:7
**confirmed** 8:22
10:16 11:5
**confirming**
8:17 113:6
**conflict** 27:2

**confused**
113:14
**congratulate**
198:17,21
**connect** 191:8
**connection**
188:16
**consider** 94:11
**considered**
93:8
**considering**
100:4
**consignments**
175:15
**consistent**
95:10 192:1,2
**constantly**
193:3
**constitute**
92:14
**contact** 20:18
191:6
**contacted**
135:8
**contain** 185:18
**contained** 40:7
**containing**
52:1
**context** 16:17
26:4 191:4,8
**continue** 170:6
182:18
**continued**
182:15
**continuing**
40:24

**contract** 46:22
48:23,25 49:1
49:4 98:24
99:4,7 100:13
100:19 103:5
105:14,20
106:2,9 117:17
117:21 118:3,4
119:18,23
120:10,24
121:20,23
127:7
**contracts**
103:18
**control** 180:7
**conversation**
8:14 58:15
63:1 103:11
**conversations**
10:16 57:11
103:13
**convert** 195:16
**convinced**
131:13 135:11
172:13,14
**cool** 21:1,16,25
**copy** 56:7 57:3
87:1 99:22
174:11
**coral** 74:4
**corner** 8:3,23
**corporation**
155:9
**correct** 13:3
39:25 43:7,23
44:5,19 52:7
52:14,16 61:16

| | | | |
|---|---|---|---|
| 62:2,19 83:22 | **correctly** 86:19 | 13:4,7,13,15 | 140:22,25 |
| 90:25 91:7,10 | 96:10 100:10 | 13:22 14:1,8,9 | 142:17,23 |
| 91:14 95:7,11 | 101:20 150:24 | 14:12,17,18,20 | 143:6,24 144:9 |
| 96:6,14,18,21 | **correspond** | 14:25 15:3,6 | 144:14,16,19 |
| 99:1,5 100:7 | 42:1 53:6 | 28:19,21 37:13 | 145:6,8,13,16 |
| 100:17 101:11 | **counsel** 56:2 | 37:13,15,19 | 145:20 146:15 |
| 102:14,19 | 120:20 121:3 | 41:23 42:2,4 | 147:25 148:2 |
| 105:7,24 106:8 | 134:19 168:19 | 45:25 51:14,16 | 150:18 151:25 |
| 107:2,7,11,21 | 178:16 198:15 | 51:16,22 52:6 | 152:23 153:9 |
| 108:17 109:11 | **counsel's** | 52:10,13,15,17 | 153:12 156:8 |
| 109:17 110:13 | 137:14 | 53:8 54:1 | 156:10 159:16 |
| 112:14 113:9 | **count** 189:25 | 55:24 56:1,4 | 162:5,7,24 |
| 115:5 119:8 | **counted** | 61:2 64:3,9 | 163:3,6,9,9,12 |
| 124:17 126:4 | 191:25 | 84:4,6 85:8,12 | 164:1,5,22,25 |
| 126:20 127:4 | **counter** 37:23 | 85:12,21,25 | 170:14,19,20 |
| 127:20 128:14 | 110:3 126:17 | 86:5,7,10,15 | 170:20,23,24 |
| 128:24 132:9 | 127:11,13 | 87:4,9,13,16 | 171:4,7,11,18 |
| 132:12 133:5 | 141:24 147:16 | 87:19 89:3,8 | 171:21 172:17 |
| 137:8 141:9 | 148:23 | 89:12,20,23 | 172:23,25 |
| 142:15 147:21 | **counting** 188:1 | 90:14,19 92:24 | 173:2,5,9,11 |
| 148:12 149:15 | **country** 200:21 | 93:18 94:16 | 176:19 178:5,7 |
| 149:18 151:8 | **couple** 31:7 | 95:16 96:1,3 | 178:17,19,23 |
| 151:24 152:12 | 32:11 36:21 | 97:2 99:12,15 | 178:25 179:2,4 |
| 152:17 154:23 | 144:9 185:25 | 101:25 104:22 | 181:4,10,15 |
| 157:8 161:19 | 186:16 | 105:3,7,18,23 | 183:15,17,19 |
| 163:5 167:22 | **course** 76:10 | 106:4,5,13 | 184:2 185:14 |
| 174:11 176:25 | 85:17 91:21 | 114:24 116:1,4 | 185:14,16,20 |
| 177:3,15 | 122:10 135:22 | 116:4,6,7,10 | 185:23 187:5,9 |
| 179:12 184:3 | 156:21 162:12 | 116:10,13,15 | 187:11,12,15 |
| 187:18 188:6 | 169:11,11 | 116:20,24 | 187:19 188:12 |
| 188:25 189:7 | 178:5 | 117:2,5,7 | 188:12,15,22 |
| 191:13,16,21 | **court** 1:1 6:4,4 | 118:13,25 | 189:1,16 190:8 |
| 195:6,19 | 6:9,12,18,21 | 120:1,3,9,14 | 190:17,22,25 |
| 197:11,22 | 7:1,5,20,23 9:8 | 120:18 121:2 | 191:2,6 195:1 |
| 198:5 | 9:13,20,24 | 123:17,20 | 195:3,5,9,10 |
| **correcting** | 10:3 12:16,18 | 125:18,22 | 195:11,14,23 |
| 120:24 | 12:20,22 13:1 | 137:20 139:1 | 196:20,24 |

197:18,20,24
198:16,21,22
198:25
**court's** 37:15
52:9 181:12
**courtesy**
169:18,24
170:1
**courthouse**
1:19
**courtroom**
6:11
**crazy** 47:25
**create** 38:9
191:4
**credentials**
11:3 91:12
93:12 95:11
**credit** 40:24
84:15,17 110:3
126:17 127:11
127:13 183:23
183:24,25
184:7,11,14
186:20,22
**creditors** 158:2
168:7 176:10
193:24
**credits** 110:2
125:16 126:16
**crew** 78:18
**cried** 35:6
**cross** 5:3 12:22
92:15
**crying** 70:22
**cuss** 71:3

**customer** 25:6
66:23 67:2
78:24 128:16
149:23 153:24
**customer's**
32:13
**customers** 25:5
80:21 168:14
**cut** 160:13,24
161:12,14,17

**d**

**d** 5:1 6:1
**dad** 15:16
33:23,23 41:19
170:10 192:13
193:2,16
**dakota** 16:21
84:9
**dallas** 169:5
**dark** 48:2
**darn** 72:13
**data** 10:13
51:20,22 52:1
52:3,13
**date** 7:25 37:23
42:10,10,11,11
43:6,11 44:7
45:4,21 96:24
97:2 105:6,8
106:12 113:22
147:17 148:6
188:23,23,24
200:25
**dated** 7:18 9:3
15:14 43:22
62:14 96:20
98:24 107:11

115:4,16 128:5
132:2
**daughter** 18:7
81:23,24,25
**david** 155:9
**day** 24:21
30:19,19 33:13
57:21 63:12
67:4,8,9 70:17
76:18 77:24
117:7,9,13
126:17 127:2
128:5 130:14
131:9 133:8,17
133:19 134:2
135:3,4,24
137:17 141:6,8
143:25 144:1
145:1 146:25
146:25 147:4,5
149:25 153:15
161:14 164:1,3
166:22,22
171:14 172:1
172:18 173:3,4
173:8,13,14
176:9 178:4
179:7,12
197:23 198:15
**daylight**
132:22
**days** 31:8
36:24 70:22
**dead** 76:20
**deal** 48:5,11
68:18 80:23
84:24 124:24

167:10 174:22
**dealer** 24:8,9
**dealers** 35:16
65:25
**dealing** 22:14
49:18 63:21,23
69:6 180:19
**dealings**
158:10 168:15
**deals** 103:10
**dealt** 19:25
**dearborn** 4:14
**debits** 125:17
125:19 127:23
183:12,21
**debt** 194:10
195:21 197:1
**debtor's**
190:14 191:4
**debtors** 1:10
**deceased** 15:17
**deceitful** 51:12
**december**
67:11 69:10
70:6 80:25
192:8
**december's**
66:13
**decide** 78:2
**decided** 31:8
66:13 67:1
68:24 69:9
73:15 84:25
**decision** 63:19
100:18 105:15
106:9,16

212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

**deductions** 153:6
**deep** 76:15
**defendant** 1:16 6:14 46:6,9 51:25 116:23 159:18
**definition** 92:8 92:9,11,17 93:2,11
**degree** 91:22 91:23,24
**deliberate** 9:12
**delivered** 169:14
**demille** 132:3
**dennis** 26:12 26:22
**dentist** 15:16
**deny** 61:22 192:24
**depending** 27:8,8
**deposit** 25:23 26:6
**deposited** 109:24 127:17 139:22 149:18
**deposition** 13:16,19 14:12 14:15 25:20 26:24 28:14 37:13,18 51:17 82:16 86:23 96:17 99:3 168:20

**depositions** 26:18
**deposits** 110:2 125:16 126:16 132:12 151:2
**described** 11:4 11:7
**describes** 9:19 87:10
**designated** 119:13
**designation** 27:16
**desk** 83:15,16
**desks** 125:7
**detail** 9:19
**detailed** 93:9 154:8
**details** 111:23 118:3,6,7 126:9 135:7 136:3 163:15 171:14,17 177:7 193:10
**determine** 60:6 188:20,22
**detroit** 1:21 154:16,25 169:21
**diamond** 8:15 8:18,18 9:18 11:5 22:20 24:8,14 26:10 35:15 52:2 54:8 55:16 58:9,22,23 59:8,25 65:25

97:10,12,13,22 97:25 101:3,3 101:5,19 102:14,19 121:18 122:20 123:10,19 124:20 125:4 155:13 169:12 174:19,23
**diamonds** 23:7 53:14 59:6,6 93:6 94:25 95:7 98:8 151:8,19 169:10
**didn't** 47:20
**die** 193:15
**died** 192:13 193:2
**diego** 81:22
**difference** 10:9 73:1 116:8 132:23
**different** 30:25 61:24,25 65:10 71:21 72:18 77:22,23,25 90:15 91:18 99:10 108:15 156:2,15 161:2 161:4,6 169:10
**differently** 28:15
**digits** 109:10 113:8 151:15
**diligence** 60:6

**dinner** 15:15 33:14,19 133:22 134:4 145:2,18,21
**diploma** 93:4
**direct** 5:3 12:22 25:1 37:12 39:1 86:16
**directing** 28:7 162:16
**direction** 16:9 38:20,21 77:6 91:4
**directly** 31:15 44:11 175:18
**disbursed** 170:7
**disbursing** 182:3
**discomfort** 77:19
**discover** 186:19
**discuss** 48:18 57:6 85:10
**discussed** 48:21
**discussion** 11:4 41:1 50:19,23 63:18
**discussions** 98:17
**dispute** 50:19 50:22,22
**disrupted** 146:25

dissect 94:7
distinguish 170:21
distribute 162:17 166:3
district 1:2
docket 85:12 116:5
document 27:6 28:15 43:3 44:16 51:5 86:22 87:25 92:13,20 96:13 96:20 103:24 105:22 113:8 126:16 141:25 142:2,4 147:7 147:17,23 148:21,24,24 154:20 198:8
documentation 23:2
documents 8:24 87:3 141:22 165:21
doing 9:13 13:23 17:1 21:16 27:25 33:5 38:17 39:15 40:15,15 42:2 46:17 50:16,17 58:8 69:9 93:25 94:2 111:5 115:23 117:19 124:8 134:5,5 140:9 149:12

155:22 159:5 159:10 166:13 169:10,25 174:2 180:19
dollars 101:4 148:15
donated 34:7
don't 21:5
door 148:19,19
doublecheck 75:19
doubt 10:17
downloading 134:12
downtown 20:17
drag 50:15,18 77:11
draw 187:1,3
draws 187:1
dressed 143:8 143:12 144:11 144:14 145:6 145:16
drive 4:13 135:24
driven 135:23
driving 174:22
drop 166:4,18
drove 166:12
drucker 33:14 60:14,18 113:4 114:1 174:24 174:25 177:9
drug 48:13 50:16

dumb 66:24
dumouchelle 1:8 7:12 16:16 24:18 25:8 36:1,8 61:6,16 61:23 63:11,15 69:22 70:2,13 71:13,20 72:1 72:4,7,16,21 73:4,9,12,14 73:22 74:1,3,6 74:9,19 75:6 75:18 77:17 78:6,17 79:23 80:1,18 81:9 81:12,20,25 83:25 88:11,18 88:20 91:13 99:1 101:6 107:7 113:4 117:16 118:1,9 118:13,19 120:5 122:2 126:3 152:10 165:25 180:23
dumouchelle's 20:17 46:6 136:21 163:1
duress 158:15 158:17 179:12 179:14,17,18 179:19 180:2,3 180:4,10
dying 193:16

**e**

e 2:1,1 4:1,1 5:1 6:1,1 73:23 200:1
eagan 26:12,22
earlier 25:23 26:7 27:16 42:10,11 72:9 117:17 126:22 127:8 133:17 134:2 139:24 140:15,16 145:4,4 151:10 151:21 152:17 164:5 165:8 179:9 185:6
early 36:24 68:6 81:10 136:17 164:3 178:12 192:3,8 192:8
eastern 1:2
easy 65:18 84:14
ecro 2:5
education 29:22 147:5
educational 29:15 30:22 31:20
eight 77:23,25 96:23 188:17 194:17
either 11:25 67:22 124:24 143:12,13 160:17 166:4

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 216 of 252
Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

169:22 171:25
176:24 193:10
**else's** 56:18
**email** 8:8,12,25
9:7,23 10:5,8
10:19 38:23
46:11 47:8,17
51:7,25 52:3
53:4,15 62:11
62:17 66:23
67:15 70:20
71:5 87:25
88:5,14,15,16
88:17 89:16,19
90:1,4,6,7,8,12
90:23 95:13
100:2 106:11
113:4,24
114:15 115:11
115:16 132:1,7
132:8 133:3,13
134:12 136:15
138:5 141:2
150:9 154:7,18
154:20,22
155:5 161:6
163:1
**emailed** 51:4
54:17 164:20
**emailing** 39:6
**emails** 11:17
11:17,22 39:14
66:17 88:8
140:9 163:17
163:17 190:23
**emergency**
193:4,12

**emphatic**
118:17
**employee** 41:1
**employer**
107:14,16
**ended** 53:4
**ends** 109:10,17
113:7 115:21
183:6 186:7
**engagement**
169:12
**enlarge** 64:4
**entered** 12:11
**entering** 58:15
**entire** 35:23
133:19 179:23
**entitled** 62:11
**envelope** 162:3
165:17
**envelopes**
162:7
**equally** 101:15
121:13
**escrow** 30:16
30:17 55:17
101:14,17
121:12,16
122:14,16
**especially**
24:13
**establish**
101:14 121:10
121:12
**estate** 93:7
107:7 117:16
118:14 120:6
122:3 126:3

165:24 175:20
**estates** 175:16
175:18,19
**estimated**
101:6
**eternity** 70:9
**ethical** 93:9
**evaluating**
94:1
**evaluation**
103:2
**evaluations**
93:10
**eve** 15:15
**evening** 133:20
172:19
**event** 134:4
141:13 143:8
143:10 144:17
144:18,19,20
145:11 158:18
158:19 166:15
166:25 171:10
179:16 198:15
**events** 179:7
179:23
**everybody**
17:23 21:10,11
32:24 35:15
47:2,12,17
49:11,14 51:5
53:18 64:21
67:8 103:20
199:1
**everybody's**
47:17,17

**everyone's**
50:18
**everything's**
75:6,9
**evidence**
105:21 160:23
**evolve** 52:6
**exact** 149:24
**exactly** 14:6
78:3 80:18
87:7 111:7
120:8 153:18
159:5
**examination**
7:7 86:16
92:16
**examine** 22:4,6
**example** 161:2
186:17
**except** 17:7
33:7 38:17
68:25 76:8
83:20 185:5
188:6
**excerpts** 13:11
13:15
**excited** 17:23
18:9 21:2,13
35:8
**exclude** 19:6
**excuse** 7:20
99:12 104:22
117:6 123:17
131:4 172:16
172:16 190:8
**exhibit** 7:17
10:18 11:15

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 217 of 252
212-267-6868 www.veritext.com 516-608-2400
Veritext Legal Solutions

28:16,17,17
34:13 37:9,13
37:18,18 41:21
41:24 42:1
45:25 46:2
51:21 52:8,8
52:10,19 60:22
62:6,8,25
86:24 87:11,14
90:20 92:13,21
97:6 98:22,23
99:22 100:2
102:22 103:2
105:25 109:1,3
109:13,16
110:2 114:13
114:18 115:2
117:12 118:12
118:13 120:14
120:16,22
121:8 125:12
127:8 131:20
131:22,24
132:1 141:23
147:25 148:1
148:23 149:20
150:8,18
151:11,22
152:6 154:2,2
154:14,19
160:21,21,22
160:22 161:3,3
161:10 165:13
167:16 176:2,4
177:19 182:12
183:19 197:17

**exhibits** 11:15
11:16 28:14,14
28:18 60:25
106:5 197:16
**exist** 114:18
115:8
**existed** 114:6
**existence**
105:20
**existing** 114:14
**expect** 85:14
153:4
**expecting**
34:24
**expects** 116:4
**expedite** 74:12
78:19
**expensive**
24:14 169:23
**experienced**
79:15
**expert** 7:14
59:10 93:7
94:10,11,13,25
95:5
**expertise** 10:24
95:9 100:9
**experts** 93:8
**explain** 9:16
14:22 20:24
53:3 59:5 75:3
134:21
**explaining**
84:11 190:20
**explains**
131:21

**explanation**
161:8 168:10
**extra** 40:23
46:17 52:10
72:25
**eye** 22:7

**f**

**f** 2:1 200:1
**facebook** 21:21
**fact** 33:13 52:5
87:10 176:7
177:9 181:13
**factor** 178:15
**facts** 51:24
105:19
**fair** 73:6 88:18
102:10 103:1
192:12
**fairly** 141:8
**fake** 59:21
63:22
**falling** 193:19
193:20,21
**family** 15:24
17:25 18:7
35:2,22 49:19
76:15 103:6
104:15,15
170:11
**fancy** 53:13
**far** 41:10 50:5
68:12,22
103:12 177:15
179:14
**fashion** 64:20
**fast** 32:16
65:18

**father** 71:8
84:12 178:10
198:17
**father's** 197:21
**favor** 32:22
**fbi** 19:17 35:3
**feasible** 8:21
**february** 43:22
44:8,12 45:4
68:7 107:11
111:3 113:5,11
114:14,19
115:4,8 122:20
124:22 125:14
125:15,15
126:4 127:18
127:23 128:19
132:2 139:1,3
142:20 149:22
171:4,6 174:14
176:3,8,23
179:7 182:14
182:24 183:3
190:13,13
191:6
**fedex** 38:2,4
161:17 162:2,3
162:4,22
165:18 166:4,5
166:18 173:13
**fedexed** 38:7
161:19 173:6,9
**fedexing**
165:20
**fee** 64:15
**feed** 194:22

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 218 of 252
212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

**feel** 76:10,15 169:7

**fees** 101:14 121:13 125:17 125:24

**felt** 103:14,14 179:12,14 180:5,6

**field** 10:24 100:9

**fifth** 183:22

**figure** 67:22 128:19 130:2,9 150:5,6 153:23 192:19

**filed** 88:13,18 88:20 193:22 193:23 195:15 196:11 197:10 197:13 198:4

**files** 195:11

**filing** 194:9

**fill** 34:4 143:1 148:5 149:2

**filled** 30:3 119:12 142:14 148:9,9,12 166:1

**filling** 43:8

**final** 51:23 52:5

**finally** 169:6,7

**financial** 192:3 192:9,12,17

**find** 9:24 54:8 56:22 60:12 131:24 134:24

141:16 154:19 183:9 184:3

**finding** 45:23

**fine** 7:14 47:5 47:5 49:13 56:1 104:7 106:24 107:7 117:16 118:14 120:5 122:3 126:3 165:24

**finemark** 30:15 31:6,7 32:7,18 34:14 34:22 36:2 40:10,14 65:12 66:9 80:24 108:14 109:22 122:4,12 156:23 157:5 162:15 174:1 182:5

**finger** 19:13,14 21:8,11,14

**finish** 194:21

**finished** 146:22

**fire** 65:3

**firm** 4:3 64:19 175:17,17

**first** 9:3,17,21 9:22 17:20 18:8 21:5 28:7 28:16 30:12 35:11,21 39:7 42:12 55:15 69:18 72:6 76:1 94:4,5

97:12,22 98:1 98:13 123:9 125:13 128:3,4 129:21 135:5 136:12,14 142:20 143:1 143:14,25 144:1,7 145:24 146:4,18,19,23 148:10 150:12 152:10 153:18 157:14 164:6 194:9 195:24

**fits** 191:7

**five** 27:13 67:6 116:8 144:6 155:9 156:2,14 162:25 163:4 163:13 197:20

**flew** 18:1,2,7 27:15,15 108:9 129:11

**flip** 53:22 95:14 147:15 148:21 154:1 182:24 183:11 184:16

**flipped** 66:20 189:4

**flipping** 95:23

**florida** 18:5 30:10,24 43:15 43:17 57:15,16 57:17 65:11 66:8 67:25 69:11,12 74:4 107:2 108:3,9

109:20 119:8 119:10 128:20 129:1 170:8

**fly** 30:8 31:18 135:14 167:11 170:8

**flying** 27:13 81:24 82:1

**focus** 76:19

**folder** 54:18

**foley** 4:11,16 6:13,14 12:18 12:21 13:5,6 17:17 21:23 22:2,18 24:25 36:4 88:24 89:10,12 90:17 92:12,19 104:20,24 105:17,19 106:1,4 116:22 116:23 118:11 118:17,22 119:3,5,22 120:18,19 137:13 170:14 170:15 178:7,8 178:17 181:1,7 181:14 190:2,7 190:8,10 191:3 191:10 194:14 194:20,22 195:4,6,8 196:10 197:21 198:17,19,24

**foley's** 195:23

**follow** 37:13 76:11
**following** 130:1
**forced** 41:12 41:13
**foregoing** 200:3
**forever** 166:1 175:5
**forget** 58:25 72:20 73:8 147:4 180:4,10
**form** 30:3 42:19 44:5
**formal** 143:10 145:18,20 158:18 166:15 166:25 179:15
**formalwear** 144:11 145:17
**format** 61:13
**formerly** 128:23
**fort** 1:20 129:3 129:4
**forth** 136:9 143:17 164:19
**forward** 40:23 66:23 81:15
**forwarded** 115:11
**found** 35:6 84:19 92:9 93:2 110:20,22 140:6 141:15 141:16 169:1

**foundation** 195:5,8
**four** 11:16 19:22 27:13 68:8 72:12,12 109:10 113:8 139:9,13 144:6 151:15 168:21
**fourth** 52:22
**france** 144:25
**franklin** 4:5
**frankly** 92:22
**fraud** 80:7
**free** 13:7
**freeing** 75:8
**fresh** 27:21
**fri** 53:10
**fricking** 80:23
**friday** 7:18 8:8 62:14 90:2 145:12,12 167:5,10
**friend** 65:1 66:8 175:3
**friends** 175:3,4
**front** 34:8 87:2
**frustrated** 31:6 32:24
**frustrating** 69:21
**full** 75:9,10,13 113:7 125:14 178:14
**fully** 135:15
**fun** 21:11,12 24:14

**funds** 75:8 101:5,16,18 121:14,17 170:2,7 184:19
**further** 12:14 136:5,8

**g**

**g** 1:8 6:1
**gal** 72:10,11 74:1,16
**gal's** 73:21
**game** 194:23
**geez** 78:1
**gelov** 39:25 65:5,13 72:14 72:17 73:3,7 73:11,13,20,24 74:2,5,16 75:1 75:10,21 76:12 76:16 77:4,8 78:13 79:14 81:8,11,14,19 82:3,7,10,24 83:4 193:6,7
**gem** 7:15 29:15 175:1
**gemological** 23:6 29:21 91:21 93:4
**gemologist** 20:21,22 22:4 22:6 29:16,18 59:24 91:10,16 91:20 92:10 93:3 94:14,20
**gemologist's** 144:21

**gemologists** 29:19 93:21 144:22
**gemology** 10:24 91:22,25 100:9
**gemstones** 92:1
**generally** 164:1
**gentlemen** 116:24
**geology** 91:24
**getting** 31:20 63:23 65:20 83:8 108:3 141:3 158:8 161:21 178:4 179:21 190:11
**gia** 10:9 15:20 22:9,11,13,20 22:24 23:4,5 29:24 46:13 51:5 53:13 144:24 167:6,9
**girdle** 60:1
**girls** 66:16 123:9,24 125:6 170:1,6
**give** 38:15,16 40:18 54:9,10 55:10 67:6 68:2,3 69:14 69:15 74:17 83:12 86:12 111:16,21 152:23 175:12 175:13,14,22

186:13 188:19
**given** 11:23
55:1 60:13
85:10 109:8
121:25 133:11
170:2
**gives** 9:19
**giving** 27:1
84:20,23
100:12 159:15
**glavin** 4:17
6:16,17 116:23
**go** 7:23,24 10:2
15:4,14 16:14
16:20,25 20:12
20:25 26:16,21
26:21,21 28:2
29:15,17,19
30:6,6,7,20,22
30:25 31:4,16
31:20,25 32:1
33:6,7 34:5,5
34:11,13 35:14
36:12,14 37:6
38:19 39:12
40:8,9,16,20
40:21,22,24
41:11,14,21
42:7 43:11,12
44:3 46:15
47:22 51:9
54:11 56:21,22
57:18 59:3,4
60:22 62:6,25
63:5,8 64:23
66:21 67:17
69:17 74:14

76:5 77:3,5,20
79:7,8,9,12
85:17,25 87:5
87:7 90:6,18
91:4 98:4,6,8
100:24 102:5
108:3 109:2,13
110:1 112:1,9
113:21 114:12
115:2 117:22
118:10 119:24
120:12 121:2,3
121:8 122:14
122:16 125:12
127:24 128:3
131:7,13,19
134:1,3,7
135:10 138:19
139:18 140:5
141:17 144:18
144:19 146:3
147:5 148:19
149:20 150:8
152:6 154:2,14
154:19 158:15
162:10 163:21
165:13 166:17
168:25 169:1
170:4,5 171:15
176:8 179:18
179:23 182:12
186:17 187:4
187:22 188:4
188:10 191:15
193:1,16
194:21 198:23
198:23

**goal** 27:19
**gobbled** 66:5
**god** 47:8 63:14
**goes** 12:22
17:10 26:19
48:10,11,11
49:7,8,9,10,11
55:17 63:7
76:3 79:10
102:7,8 104:10
133:13
**going** 7:17
11:14 13:11
17:25 20:8
23:7 26:13
27:7,9,12,19
29:14 30:9,21
31:11,22 32:6
32:14,17 33:22
34:11 36:14,17
36:18,22 37:4
39:12 45:9
46:19,24 49:21
51:10 52:8
59:18,19 60:22
60:25 63:4
64:3 65:11
67:5,7 69:7
70:25 71:15
74:10 76:18,19
77:8,9,10 78:2
78:10,17 80:3
81:9,13,22
83:8,19 85:4
85:14,16,23
92:9,17 95:22
97:5 102:8,13

103:24 104:17
105:12,15
106:10 112:19
114:2 115:7
117:22 118:25
119:3,13,21
121:7 124:21
129:7 130:1,2
130:17 134:6
136:2,8 140:2
140:4,24
141:20,21
146:5 152:14
154:9,11
155:15 157:14
159:17 160:13
163:22,24
164:8,19
167:12,16
168:5,8,16
169:6,12,21
170:9,23 171:1
171:23 172:5,9
175:7,8,11,25
176:20 178:2,8
178:14,19
179:24 181:12
182:4 191:3,7
192:19 193:3,9
193:12,14,14
194:14 198:3
**good** 6:6,9,12
6:13,16,21 7:9
7:10 11:8
32:23 47:1
48:11 82:3
86:18 115:24

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 221 of 252
212-267-6868                         Veritext Legal Solutions                         516-608-2400
                                         www.veritext.com

116:18,20,22
116:24,24
142:22 170:19
175:3
**goods** 80:10
**gotten** 63:20
71:21 75:13
94:22 111:23
112:4,16
115:12,14
164:15 167:20
**grabbed** 57:4
**grading** 59:9
59:10 93:5
**graduate** 91:9
91:16,20,22
92:9 93:2,20
**granted** 89:8
**great** 9:13
26:22 29:21
33:16,17 39:4
47:5,12,12,13
51:11 53:12
58:8,9 59:18
59:19 75:21
87:4 104:7
139:5 144:24
150:22
**gretchko** 2:2
86:6 116:14
179:1
**grew** 68:13
**grosse** 32:7
193:16
**grounds**
194:15

**group** 29:18
36:16 72:2,4
144:21,22
145:4
**grown** 60:3
**growns** 60:3
**guess** 8:19 9:4
12:8 21:12
25:14 38:13
41:8 53:15
59:12 65:2
71:3 74:12
76:1 77:6,21
81:3,6 112:25
115:14 124:18
124:18 134:1
146:22 156:20
165:10 184:13
184:14 188:7
192:5 193:9
**guessing**
129:11 191:9
**guidance** 12:12
**guy** 84:21
172:11
**guys** 67:12,13
67:23 72:17
73:3 76:13
80:12 100:5

**h**

**hair** 69:14 70:4
71:25 79:3
**half** 78:22,23
80:20 85:14
116:5
**hand** 20:11
86:11 97:13

98:14
**handcuffs**
168:22
**handled** 44:23
175:16
**handling**
175:14 185:7
**handwriting**
28:25 29:10
43:2,4,6,18,21
44:16,17,24
45:12,14,19,21
142:2,4,10
147:22,23
148:8,24
**hang** 37:15
120:1 172:25
**happen** 30:9
36:22 70:25
84:13 171:8
**happened**
17:25 25:11,13
32:5 35:3,11
38:24 84:12
108:7 128:19
131:10,14,21
134:24 135:1,5
136:11,13
146:23 150:5,7
160:20 165:10
192:20
**happening**
80:19 177:7
190:21
**happens** 28:17
68:6 128:12
182:13,23

185:12 186:4
**happy** 14:16
63:23,24,24,25
64:13,16 65:10
**hard** 27:20
41:13 68:8
169:23
**hardest** 192:20
**harsh** 103:21
**hated** 31:1
**head** 165:25
175:24
**headache** 81:3
**hear** 9:8,10
17:20 82:12
86:19 99:12
100:22 131:2
190:18 191:2
195:5
**heard** 17:18
72:13 79:19
94:10 96:16
99:3 108:1,13
119:1 169:4
179:14 191:5
**hearing** 3:1
64:25
**hearsay** 92:14
**hector** 132:3
146:13,16
150:23 154:21
**hector's**
146:16
**held** 95:5
**hell** 168:8
**help** 34:6 38:18
53:21 55:1,1

55:11,12,12
72:9 89:5
103:16 120:17
130:6,8 150:22
184:3
**helpful** 8:5
51:10,11
178:13
**helpfully**
120:23
**helping** 78:18
120:20,23
134:10,15
181:19,20,21
181:24 182:6
**hey** 51:7 53:20
56:7 57:2
59:13,16 70:7
157:11 168:5
**hi** 53:11,14
133:3
**high** 15:14,19
20:8 81:7
**higher** 67:7
**highlighted**
90:24
**highly** 93:3
94:1 174:25
190:19
**hills** 20:15
**hit** 68:7
**hits** 128:6
**hmm** 23:6
45:11,11
**hockey** 76:20
**hold** 73:9 80:3
92:4 180:23

181:8
**holding** 69:24
69:25 70:1,5
71:16 97:12,22
**home** 14:5
57:17,18,23
128:23
**hometown**
49:16
**hon** 2:2
**honestly** 12:1
63:7 77:19
79:14 177:23
**honor** 6:6,13
6:16,24 7:4
10:1 12:15,18
12:21,24 13:6
13:10,17,24
15:2,4 28:13
28:20 37:12,17
41:25 42:9
46:1 52:7 53:2
60:24 62:8
64:6 85:6,9
86:8 88:24
89:2,7,10,11
92:12,15,23
105:17,24
115:24 116:18
116:22 117:1
118:11 119:5
119:22,25
120:19 137:13
170:12,15
178:2,9,18,22
181:1,7,14
187:7,11,20

188:14,18
190:2,7,10,19
191:10 194:14
194:19 198:14
198:19
**honorable** 86:6
116:14 178:25
**hope** 35:1
**hoping** 11:25
136:16
**horrible** 26:25
**hospital** 193:3
193:11,12
**hour** 78:22,23
85:15,18 86:2
116:5 132:23
143:14 178:11
**hours** 144:6
**house** 15:15,16
**hundred** 101:4
**hurt** 35:22
37:7 47:21,21
48:16,17
**hurts** 48:3,16
49:20
**husband** 48:4
58:5 102:5,10
102:19 104:19
111:16 113:5
115:10 117:18
119:10 121:21
124:9 130:15
132:2 133:16
134:7 138:21
139:12,13,16
141:3 150:10
150:14 172:20

176:3 197:11
198:4
**husband's**
137:24
**hyde** 3:25
200:3,8
**hydrate** 85:24
**hypothetical**
181:2,8,10,11

**i**

**idea** 26:13 30:8
33:6 35:18
154:9
**identification**
107:14,16
**identify** 91:25
**identifying**
91:23 93:5,21
**image** 128:16
149:23
**images** 153:24
188:15
**imagine** 163:23
**immediately**
12:8 103:25
**important**
133:15
**inaccurate**
119:23
**included** 51:19
**including** 20:3
62:18
**increased**
189:11
**independent**
27:3 28:3 60:6
60:16

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 223 of 252
212-267-6868 Veritext Legal Solutions
www.veritext.com 516-608-2400

**indicated** 46:8 50:11,11,12,24 53:3 92:19
**indicates** 162:25
**indiscernible** 19:20 21:4 27:17 36:4 45:6 58:15 62:2 63:3,11 63:15 65:4,4 65:13 68:14,19 68:20 70:6,22 71:12 72:5 73:17 74:13,19 75:25 77:17 79:24 80:1,2 80:20 169:22
**individually** 24:16
**indulged** 190:10
**industry** 15:19 23:25 24:7,7 31:10 33:16 34:8 35:14 54:10 65:19,20 76:8 79:21,21 104:10 129:18 168:25 175:1,3 179:16
**industry's** 93:8
**information** 38:8 46:10,12 47:7,8 49:23 52:1 55:19 56:17 74:11

104:12 111:22 113:6 136:16 150:8,16 194:23 195:13 195:14
**initially** 73:14
**initiate** 49:24
**insert** 29:11
**inserted** 29:8
**instagram** 21:20
**instagrams** 21:17
**institute** 23:6 91:21 93:4
**instructed** 90:17 162:22
**instructions** 112:12
**insurance** 27:6 69:1 70:14 93:7,25 96:9
**intend** 101:2
**intent** 10:22 24:13 100:8 106:19,19 170:17 190:15 191:4
**intention** 35:14
**interbank** 130:4 152:5,9
**interest** 27:2 73:1 75:12
**interested** 85:3
**interesting** 188:10

**interim** 139:12
**intermediary** 175:8,12
**international** 175:2
**internet** 92:8 92:13,20
**interpretation** 50:12
**intricate** 60:5
**introduced** 7:11
**investment** 46:8 50:6,9 83:25
**investor** 72:18
**involuntary** 193:23 195:10 195:12,15
**involve** 75:25
**involved** 28:1 36:22 47:25 72:9
**irrelevant** 190:15
**island** 119:7 128:21 129:1
**issue** 68:12,14 70:7 73:2 84:10
**issues** 62:23,23 63:21 65:19 66:24 68:9 119:20 122:8 156:19 182:5,6
**it'll** 13:19 14:3 77:10,11

**item** 24:6 68:10
**itemized** 75:14 188:19
**items** 75:17 127:19 128:4 128:11 145:3 184:17 186:16 188:20
**i'm** 56:20

**j**

**j** 1:8,15 4:12 6:3 87:10,16 116:17
**j10** 120:22
**j11** 106:13,14
**j15** 112:23,25 113:3
**j17** 60:25
**j2** 28:19,20 140:17,20
**j29** 97:6,7
**j3** 163:3
**j4** 107:6
**j43** 162:25
**j5** 115:7
**j9** 86:24 87:5 87:19,22 90:20 90:23 95:17
**jaffe** 175:16
**january** 7:19 8:2,8,25 9:3 46:11 51:25 53:11 67:10 68:6 88:1 90:2 94:19,25 96:21 98:24 104:17

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 224 of 252
Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

105:11 106:12
192:9
**jeannie** 73:23
**jeffrey** 4:17
**jess** 75:23
76:12
**jeweler** 24:9
**jewelers** 24:18
25:8 36:1,8
61:7,16,23
83:25 88:11,18
88:20 91:13
107:7 117:16
118:14 120:6
122:3 126:3
**jewelry** 7:15
15:19 31:10
35:12 50:9
65:20 75:2,4
76:8 93:9
124:1 125:1,1
158:2 168:25
169:14
**jewels** 151:4,15
**job** 9:13
**joe** 8:17 12:1
16:18 17:1,11
17:12 19:6
20:1,16 22:15
23:20,21,21,22
23:24 24:3,15
25:3,3,4,13
27:11,22 29:20
30:5 33:11
36:9,10 37:7
38:2,14,24
39:5 40:8,16

44:22,23 46:14
46:15,16,22,25
47:3,9,9,16,16
48:3,11,12,13
49:1,6,6,12,20
49:21,21 50:1
50:2,2,14 51:6
53:15 54:7,14
54:17,25 55:15
55:15,17,21
56:6,19 57:2,8
57:8,12,23
58:4 59:3,11
59:16 60:11,11
62:24 63:22
67:9,15 69:7
70:5,6,21 71:7
71:18 76:25
77:16 82:22
83:5,10,25
84:22 85:2
86:20 98:7
99:24 100:3,4
101:25 102:5
102:10 103:8,8
103:11 104:1,1
104:6,6,7,8,16
106:17,18
108:2,15
109:20,22
110:12,16,18
110:20 113:16
113:23 114:8
115:22 122:14
122:19 123:8
124:25 134:14
135:8 141:17

145:3 146:6,6
146:10 150:21
151:1 155:20
157:14 158:10
158:25 159:8
159:23 160:6
161:19 162:16
165:3 166:8,9
168:5,22,24
169:2 171:1,23
172:3,13,18,20
173:6,14,14,17
174:14 175:3,9
175:11 176:16
177:8,24 180:1
180:7 181:8
185:6,10 193:4
193:11
**joe's** 20:5,16
20:17 33:20
34:6 40:15
43:21 130:20
158:10 170:10
192:13
**joey** 46:25,25
48:9 49:8,8,8
49:13 99:4,7
99:18,23
101:22,25
102:1,1,3,5,7,8
102:9,22 103:1
103:5,14,15,19
103:22,25
104:1,6,9
106:9 117:19
120:11

**john** 4:11 91:3
97:7 155:13
158:4 161:2
**join** 100:13
**joint** 7:17
10:18 11:15
42:1 46:2
51:23 52:5
62:8 87:13
**joseph** 1:8 7:11
16:16 80:18
91:13 99:1
101:6 102:7
107:6 113:4
117:16,25
118:8,13,18
122:2 126:3
133:10 154:20
165:24
**josephdumo...**
90:3,9 154:23
**josephdumo...**
89:24 132:5
**jot** 14:13
**joyful** 35:10
**jpmorgan**
101:14 121:13
**judge** 2:3 13:9
85:20 198:24
**judges** 14:1
**july** 11:18
**june** 11:18
62:14 200:25
**jury** 170:20

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 225 of 252
212-267-6868 Veritext Legal Solutions
www.veritext.com
516-608-2400

**k**

**k** 73:23
**karley** 2:5
**keep** 9:9 18:18
  70:7 76:25
  89:20 95:23
  124:6 136:15
  140:24
**keeper** 18:23
**keeping** 124:8
**kept** 27:17
  48:12 163:20
  166:24 169:15
  169:16,17,17
  170:10 193:12
  193:13
**kevin** 76:4,12
  76:17 78:8
**kidding** 34:3
**kids** 27:15
**kim** 6:7 116:19
**kimberly** 4:9
**kind** 13:18
  31:3 41:11
  59:15 63:6
  65:16 67:9,23
  68:15 71:4
  72:17,19 81:5
  85:15 160:19
**kinds** 55:21
**kleenex** 140:19
**knew** 32:18
  34:10 35:25
  36:23 38:6
  47:22,22 68:23
  71:9 78:3,4
  96:17 104:11

108:19,23
112:18 139:21
139:24,24
143:21 146:9
146:10 147:12
157:7 177:12
177:13,15
192:8,11
**know** 7:14,23
  9:7 10:5,8,23
  11:21,23 12:5
  14:2 18:3,6,7
  19:4,4,7,12,22
  20:6,23 21:6,9
  21:12,18,20
  22:14,16 23:21
  23:22 24:3,3,4
  24:17,20,22
  25:10,12,12
  26:9,11 27:21
  27:24,24,24
  28:4 29:10,10
  29:11,12 30:2
  30:13 31:2,7,9
  31:12,12,17,23
  31:25,25,25
  32:17,23,24
  33:1,2,5,20,22
  33:22,24 34:17
  34:23,23 35:3
  35:7,16,17,17
  36:20,22,25
  37:1 38:5,5,18
  39:8,15,16,16
  40:2,12,13,13
  40:14 41:4,8
  41:20,20,23

43:13,14,18
45:1,7 46:15
46:18 47:2,4,9
47:11,16,22
48:9,10,15
49:3,5,7,9,10
49:19 50:1,1,4
51:3 53:16
54:6,19,25
55:3,4,8,9,10
55:16 56:6,15
56:20,22,25
58:4,14,25,25
59:5,10,11
60:13,17,20
62:22,22 63:5
63:8,10,18,22
64:1,16,18,20
65:2,3,15,18
65:23 66:6,14
66:16,19 67:2
67:13,17,20,21
67:23,24 68:3
68:12,13,17,17
68:25 69:2,3,6
69:10,13,16,20
70:8,17,23
71:2,6,15
72:22,23,24
75:12,13,23,23
76:9,10,23,23
76:25,25 77:2
77:6,10,10,19
78:8,9,25 79:6
79:9,12,18,19
79:22 80:9,17
80:22 81:4,21

82:20,25 83:1
83:19 84:8,15
85:2,15 97:22
98:3,9,12,13
98:14,15 100:5
100:7,9 102:24
103:9,9,15
104:1,3,14
107:15 110:8,9
110:18 111:5,5
112:1,2 114:10
114:11,16
115:18,22
118:2,2 122:21
122:22,23
123:1,1,14,14
123:18 124:7
124:10,14,18
124:19,24
125:5 126:2,5
126:6,7,10,10
126:13 127:15
128:9 129:21
129:24 131:6,8
131:23 133:10
134:3,11,14,22
136:4,4,9
139:11,13
140:2 141:5,10
141:20 142:23
143:18,25
145:25 148:17
148:17 150:10
153:18,21
155:19,20,23
156:4,9,11,25
157:1,4,5,6

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 226 of 252
212-267-6868   Veritext Legal Solutions   516-608-2400
www.veritext.com

158:9,9,10,10 159:5 162:14 164:11,16 166:20 167:3 168:14,15,21 168:24 171:16 172:5,15,24 173:3 174:17 174:21 175:5 176:7,15,15 177:6,16,16,23 178:3 184:12 184:12,18 190:17 192:5 192:14 193:1 193:25 194:1,3 195:21 196:19 197:1,4

**knowing** 12:5 71:16 146:4

**knowledge** 20:23 23:24 24:15 25:1,1 29:23 38:17 39:14 40:6,9 104:9 177:2

**knowledgeable** 20:20 59:10

**known** 14:23 15:10,14 16:2 20:9,13,14 51:19 52:2 59:4 71:9 113:13 157:23 172:11

**kwiat** 155:10 155:12,13

158:3 169:20

**l**

**lab** 60:3,3 144:23,23

**labels** 162:5,6

**labs** 29:23

**land** 79:18

**language** 119:24 121:25

**large** 37:3 58:10 61:17,19 61:25 97:10 162:10,10,11 175:16

**larger** 59:8 65:9 87:4

**late** 31:22 55:18 123:25 141:5,8 164:1 164:25 178:4,9

**lauren** 76:2

**law** 4:3 16:1,8 49:17 51:24 64:19 84:12 175:17,17

**lawsuit** 77:7 193:5

**lawyer** 77:24 176:20

**layers** 67:8

**laying** 46:17

**leading** 88:24 89:5,8 192:9

**learn** 91:25 123:11 147:5,6

**learned** 47:19 123:13,13,14

**leave** 10:22 35:13 100:8 108:3 146:18 146:19 165:16 193:14 198:25 199:1

**leaving** 30:19 40:20 69:4

**lecture** 29:24 32:20,21 144:25

**ledanski** 3:25 200:3,8

**left** 34:11,16 44:11 63:12 72:12 78:10 130:14 133:17 161:22 191:9

**legal** 26:22 104:12 128:7 137:16 178:10 198:18 200:20

**lengthy** 66:21

**lessen** 10:23 100:8

**letter** 67:16 74:14

**levin** 1:19

**liabilities** 198:9,9

**lied** 19:17 20:2

**life** 35:23 63:9 70:24 79:16 147:4 192:21

**light** 143:7

**limit** 67:4

**lindy** 11:25 16:14 17:17 22:2 35:16 36:4,5 53:14 63:12 74:10,19 81:21 82:12 89:24 90:3,9 100:4 132:5,11 133:4 150:17 154:4,23

**lindy's** 12:12 100:4

**line** 13:20 14:4 14:7,13 15:5,6 15:7 25:21 28:17 84:15,16 198:8

**lines** 16:12

**liquidation** 195:16

**liquor** 180:23 181:9

**lisa** 2:2 86:6 116:14 179:1

**list** 75:14 155:7 160:23 167:17 168:7

**listed** 89:16 127:19 155:9

**listen** 73:5

**listing** 189:22 191:15

**literally** 64:23 64:24 68:21 70:11

**litigation** 12:6

| | | | |
|---|---|---|---|
| **little** 27:15 64:15 66:24 67:10 87:4,10 136:8 | 90:1 95:17 98:25 100:1 107:5 109:1,14 112:9,24 | 83:22,24 84:1 87:22 90:22 94:5,6 120:14 120:16 148:22 149:21 151:10 | **made** 17:13 39:18,23,25 48:6 57:9 69:10 79:11 80:5,15 83:25 |
| **live** 16:4 | 114:12,21,25 115:2 126:8 | **looks** 29:7 43:4 44:25 45:15,17 | 92:20 100:18 105:15 106:9 |
| **lives** 16:8 63:20 | 128:12,18 130:18 131:20 | 45:18,19,20,21 61:14 107:14 | 112:19 113:24 133:15 186:20 |
| **living** 18:4 | 140:16,18 141:23 150:13 | 142:13 184:16 187:11 188:5 | **madison** 79:7 |
| **llc** 62:3 107:7 117:16 118:14 120:6 122:3 126:3 183:22 187:1 195:17 | 151:14 152:7 154:18 160:20 161:13 176:1 182:13,23 184:22 185:12 185:16,25 | **loop** 22:7 60:2 160:19 **lot** 20:7 35:10 68:19 81:15 124:1,20 125:1 125:4 161:24 | **main** 34:6 62:1 **maintenance** 81:7 **make** 9:10 11:8 11:9 14:10 35:10 37:5 47:2 49:9 |
| **loans** 17:10 84:23 | 186:3 193:2 197:16 | 162:1 163:7,14 187:16 | 59:21 66:21 69:6 74:23 |
| **location** 32:8 122:24 139:6 | **looked** 9:4 10:13 20:18 | **loud** 101:10 **love** 48:16 | 75:19 80:22 103:7,13 |
| **lodge** 178:13 | 32:22 59:23,23 | **lucky** 42:3,4 | 106:15 116:8 |
| **london** 85:19 85:24 | 92:8 95:13 98:21 104:1 | **lucrative** 46:8 50:6,25 | 133:14 145:25 169:13 179:8 |
| **long** 13:14,20 19:22,23 58:5 65:19 66:25 72:22 77:11 86:2 98:17 111:13,18 114:9 117:7,9 131:3 171:15 171:16 178:5 | 106:19 117:17 121:8 127:8,10 132:7 140:15 140:16,17 148:10 149:21 151:21,22 152:17 157:1 161:16 167:18 168:1 182:24 | **lunch** 86:2,3 115:25 117:17 121:9 132:8 **lynch** 36:16,19 **m** **ma'am** 12:16 171:23 183:19 | 197:23 **making** 12:16 37:16 **manhattan** 80:8 **march** 1:24 182:24,25,25 183:15,16 |
| **longer** 63:7 84:20,23 | 183:2 **looking** 7:18 | **machine** 79:9 79:10 | 190:11 192:6 **mark** 195:17 |
| **look** 8:3 11:14 14:14 15:2 20:23 22:8,10 40:22 45:23 53:23 59:25 64:10 81:15 | 7:25 24:12 30:4,4 52:20 54:2 65:3 | **mad** 26:15 33:12 41:13,14 41:15 130:15 130:16 143:20 | **marked** 52:19 86:24 184:17 |

212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

**market** 27:7
**married** 15:12
15:13,20 63:23
86:20
**master** 20:21
59:24 94:14,20
94:24
**match** 90:4
91:2 113:9
**matches** 91:6
109:15
**math** 152:23
**matter** 1:6
61:19 75:7
**matters** 85:22
**ma'am** 37:21
**mean** 14:1
21:10,25 22:23
24:1 25:10,12
39:20 44:25
46:12,13,13
48:13 49:3
51:7 57:19
61:24 63:10
64:22 65:2
67:11 69:19
71:22 72:21,23
73:1 75:6,25
76:12,15,17,18
76:21 77:8,12
77:12 78:7,11
79:14,16,18,23
81:20 87:5
93:24 99:10
101:25 103:21
104:13 111:19
113:16 125:8

125:19 142:19
144:24 152:9
156:19 157:10
158:6 161:1,16
164:23 171:7
188:16 196:6
**meaning** 87:16
87:17 188:19
**means** 24:10
61:20 92:3
93:21,25 94:1
113:23,24
147:12 189:10
**meant** 104:13
154:17
**media** 21:20
**meet** 30:8
31:19 57:19
73:16
**meeting** 20:19
40:20 133:8
196:8
**melinda** 1:8,15
4:12 5:6 6:3,20
7:13,14 8:10
8:11,25 10:15
10:19 11:11
43:5 45:16
53:11 86:10,16
90:3 107:9
116:17 132:4
132:11 133:4
154:22 183:23
183:23,24,25
186:18,19
187:6

**member** 61:17
61:19,24 94:21
186:18
**members** 62:3
**memorandum**
24:10 125:2
**memorandums**
54:10 123:9
**memory** 18:3
19:23 33:9
36:10 99:21
131:3,3 164:14
184:6
**mention** 48:6
**mentioned**
34:24 71:21
72:20 73:8
**merchandise**
170:3,7
**merchant**
187:13,15,16
**merrill** 36:15
36:19
**messages** 72:12
**messed** 70:10
70:11,11 180:1
**met** 20:1,1
33:18 101:18
121:16 124:25
125:10 133:4
133:16
**mi** 1:21 4:6,14
**michigan** 1:2
17:22 18:6
19:16 30:11,24
39:10 59:3
66:4 84:22

98:4 109:20
110:13,14
111:25 114:10
119:10 123:1
124:7 132:17
132:25 135:16
169:21 170:6,9
**microscope**
19:14
**middle** 27:11
90:24 100:25
175:22
**million** 9:6
11:10,22 12:6
25:23 26:6
32:12 36:1,2
37:4 46:17
59:7 101:3,4,7
102:13,17
108:20 109:24
112:20 127:3,6
134:7 148:15
149:15 150:7
153:7,14,16,24
157:7,20 158:8
160:13 161:23
162:20 165:16
168:2 169:5
176:8,10,23
181:24 186:13
198:11
**mind** 27:22
29:13 68:5
**mindset** 190:14
**mine** 27:19
28:3 87:4
91:20

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 229 of 252
212-267-6868 www.veritext.com 516-608-2400
Veritext Legal Solutions

**mineola** 200:23
**minute** 34:15
55:24 63:5
64:4 83:7
112:20 122:8
140:23 154:19
178:20 196:15
197:20
**minutes** 67:6
116:8 139:9,13
150:12 155:4
178:6,12,23
**mischaracter...**
118:12,16
**misread**
125:19
**missed** 133:23
143:20
**misstatement**
120:24
**mistake** 85:1
**mm** 23:6 45:11
45:11
**mom** 15:22
46:25 49:9
**moment** 70:8
72:8
**money** 11:9
12:2,10 17:3,7
17:8,11,11,12
25:14,17,18
30:14 32:9,12
32:13,13,16
33:2 35:4,11
36:8,14,23
37:1 40:2,10
40:14 41:4,7,9

64:14 66:6,20
67:4 68:19
69:4,8,22
77:13,14 83:22
83:24 108:16
108:24 117:22
118:10 119:17
120:11 122:4
124:22 127:17
139:21,25
147:12 148:19
148:20 149:18
153:19,21,25
155:15,18
157:2,4,6,8,12
157:18 160:6
160:14 162:10
162:10,14
168:6,22
176:13 177:2
177:10 182:1
186:14 193:7
**monograph**
53:13
**month** 37:2
84:17 125:14
125:15 173:23
188:10
**months** 19:22
35:13 68:8
191:5 194:17
194:17
**montreal** 72:24
**morning** 6:6
6:13,16 7:9,10
31:19 34:1
73:15 144:4

**mother** 16:4
17:8 81:22
**motion** 195:16
**mounting** 60:4
60:5
**move** 32:9 37:1
40:11 76:23
170:12
**moved** 32:10
32:14 40:10,13
40:13 66:5
**mtb** 36:24
**multiple**
190:24 191:1
**myers** 129:3,4

**n**

**n** 4:1 5:1 6:1
200:1
**nails** 143:19
**name** 6:19
20:14 23:18,20
27:25 39:22,24
40:1 43:4,5
45:16 54:10,15
55:9,13 56:20
72:10,14 73:7
73:8,21 79:11
80:14,19 100:4
102:7 107:6,10
107:10 117:14
117:22,25
118:1,8,14,15
119:13,15,17
119:19 120:5
120:21 122:2,5
122:6 133:10
138:22 142:6

146:10,13,14
146:15,16
148:6 149:5
160:13 175:15
175:20,22
183:22 184:13
185:18 186:20
**named** 102:1
**names** 20:6,8
20:13 54:9
60:13 71:21
133:12 135:9
156:19,19
158:1 169:20
**nancy** 132:3
133:3,8,16
**nancy's** 133:10
**naples** 142:9
**narrative**
170:16
**nearsighted**
22:7
**need** 9:9 14:25
27:10 30:6
31:24 32:15
38:18 39:4,11
51:14 54:1
66:6 74:14,24
77:10 84:4
89:20 95:16
112:11 117:2
121:2 133:14
140:22 142:17
146:2 154:1
156:10 159:16
160:20

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 230 of 252
212-267-6868                        Veritext Legal Solutions                     516-608-2400
                                       www.veritext.com

**needed** 34:16 40:11 109:23 112:11,13 131:8 132:12 138:19 139:18 140:13 179:15

**needs** 51:16 76:19 78:8 85:23 104:4 114:24 150:17 154:4

**negative** 104:13 105:2 125:24 127:25 173:23 183:1,4 183:6,7 186:7 186:8,8 189:8 189:8

**neighbor** 158:5 158:6,6,7 177:14

**neither** 25:7

**never** 11:13 12:8,9,10 16:20,21 17:3 17:15 19:18,24 19:25,25 20:1 23:19 31:14 35:5,11,21 40:4,17,18 44:22 47:20,21 47:21,22,24,24 50:10 54:9 57:10,10,11 62:17,21 66:23 67:15,15 72:1 73:2 75:24

76:11 79:15 106:16,18,18 124:25 125:10 125:10 160:3 168:14 173:24 173:24,25 177:25

**new** 18:5 30:24 35:16 65:22 79:7 80:15 109:23 121:7 169:12,19,20

**news** 170:19

**nice** 48:13 58:16,18,20,20 58:21,24,25 86:18

**night** 32:21 33:14 57:21 131:5 133:22 143:8 145:1,12 145:12,15 167:10 172:1 172:23 173:3

**nights** 76:16

**nine** 194:17

**noble** 2:5 19:24 22:14,22 23:13 25:6 33:18 35:12 47:23 54:7,13 55:4,9 55:13 56:11,12 56:14,22 123:6 123:7,10,11,22 123:22,25 124:10,11,14 124:23,25

125:2,5,10 151:4,14,23,25 152:11 153:20 155:22,25 169:2 174:16 174:18,21,22 174:23 175:9 177:8,10

**noble's** 46:13 56:19

**non** 170:12 184:19

**normal** 22:10 22:25 122:9,9 134:5 147:1 156:21 162:12 169:11,11

**normally** 66:14 103:18 175:12 175:13

**north** 16:21 84:9 149:14

**nose** 140:19

**note** 71:20

**notes** 12:17 13:23 14:1,2 37:16 77:18

**notice** 195:11

**noticed** 65:21

**november** 194:16

**novi** 178:11

**nsf** 184:18,18 187:23 188:16 188:17,18,20 189:22 191:13 191:15,20,20

191:23

**number** 6:2,14 13:19,20 28:7 44:17,22 45:23 53:7 60:1 74:7 87:7 98:22 100:25 101:4 107:14,16 109:1,3,6,8,15 109:16 110:25 111:17,21 112:5,6,7,8,10 112:13 113:1,8 113:13,17,17 114:6 115:12 116:16 129:22 129:23 141:23 142:7 147:25 148:23 150:18 151:15,16 166:2 176:4 177:19 182:12 183:21 184:22 185:5 187:23 188:19 192:1

**numbered** 28:14

**numbering** 53:3,5

**numbers** 15:1 38:16 53:5 112:2 130:2 151:11 152:25 162:11

**ny** 200:23

| **o** | **office** 17:21,22 | 53:7,10 56:4 | 128:3,11,18,23 |
|---|---|---|---|
| **o** 2:1 6:1 200:1 | 18:1,2,10,13 | 64:10,10,13 | 129:1,4,13,18 |
| **oath** 7:2,3,5 | 18:14,16,25 | 65:9 70:2,8 | 130:1,2,8,13 |
| 117:8 | 19:8,16,17 | 74:5,8 75:1,10 | 130:18,24 |
| **object** 194:14 | 20:20 21:10 | 75:21 78:13 | 131:14,17,21 |
| **objecting** | 24:6 32:24 | 81:14,19 82:7 | 132:1,11,25 |
| 119:2 190:9 | 46:20 53:19 | 82:19 83:9,18 | 133:3,10,13,21 |
| **objection** | 57:17,18 73:15 | 84:5,6 87:12 | 135:2,5,13 |
| 24:25 88:24 | 74:15 98:4 | 87:13,15,18 | 136:11,15 |
| 92:12,23,24 | 123:8,9,24 | 88:4,23 89:22 | 137:3,12 |
| 104:20,22,23 | 124:1 125:1,9 | 90:1,6,10,19 | 138:14 139:5 |
| 105:7,17 106:4 | 125:9 134:13 | 91:2,9,16,19 | 139:16 140:3,6 |
| 118:11,22 | 142:8 161:22 | 92:5 93:2 94:8 | 140:24 141:4,5 |
| 119:1,3,4,22 | 163:19 169:16 | 95:16,18,22 | 141:8,14,18 |
| 120:25 137:13 | 169:16,17,25 | 96:5,8,16,20 | 142:2,6,14 |
| 178:18,19 | 174:23 185:10 | 97:1,3 98:12 | 144:4,19 147:2 |
| 181:1,6 190:7 | 196:7 | 98:21 99:7,10 | 147:7,12,15,21 |
| 190:15 191:2 | **oh** 9:25 13:15 | 99:15,20,22 | 147:23 148:2,4 |
| 194:21 195:2,3 | 28:10 34:1 | 100:16,21,24 | 148:14,21 |
| 195:6,23 | 46:21 57:8,9 | 101:13,24 | 149:7,12,20 |
| **objections** | 63:14 79:9 | 102:5,21 103:1 | 150:2,5,7,12 |
| 92:16 | 87:12 94:20 | 103:5,8 104:16 | 150:21 151:1,6 |
| **obtained** 92:20 | 95:22 97:2 | 105:23 106:22 | 151:10,14,18 |
| **obviously** | 118:20 127:12 | 106:24 107:1,5 | 152:19,25 |
| 56:16 58:8 | 160:21 177:5 | 108:6,9,13,19 | 153:18,23 |
| 78:7,8 83:18 | 190:8 | 108:23 109:10 | 154:9,14 |
| 99:22 112:4 | **oil** 104:10 | 110:1,12,15,20 | 155:15 156:1,7 |
| 166:4 169:4 | **okay** 7:5 8:5,6 | 110:25 111:3,8 | 156:12,22 |
| 172:13 186:8 | 9:11,16 10:3 | 112:23 115:10 | 157:7,10,22 |
| 186:10 | 13:7 14:1,25 | 115:19 117:21 | 158:4,21 |
| **occurred** 11:17 | 15:3,7 25:3 | 117:25 118:4,8 | 159:16,19 |
| 144:1 178:10 | 28:10 31:24 | 119:16 120:1 | 160:5,12,24 |
| 190:13 194:16 | 33:7 42:6 | 121:12,20 | 161:16,21 |
| 194:18 | 46:21 47:4,6 | 122:13,24 | 163:10 164:5 |
| **october** 197:14 | 48:20 49:16,17 | 123:16 125:8 | 166:4,17,24 |
| 197:14 198:5 | 49:19 51:1 | 125:22 126:2,6 | 167:19 168:1,5 |
| | 52:6,23,25 | 127:10,22 | 168:11,18 |

212-267-6868                    Veritext Legal Solutions                    516-608-2400
www.veritext.com

171:11 172:3,6 172:8,23 173:11,13,22 174:20 177:13 177:22 178:15 179:8,11,14,25 180:4 182:8,14 182:23,25 183:6,11 184:22 186:3 186:12,16,24 187:15 189:1,7 189:10,14,21 189:25 190:6 191:2,18 192:11,22 193:22 194:5 194:10 196:19 196:24 197:1,4 197:10,13,24 198:7

**old** 15:11,18 200:21

**older** 15:11 67:24

**oldest** 15:11,12 15:12

**once** 69:16 124:3

**ones** 97:18,19 185:2,3,4

**online** 35:5 40:3,4 68:2 112:7,9,9 173:25 193:2

**open** 15:16 30:22 31:4

34:15,17,18,19 34:20 107:17 108:6,15 110:6 119:8 122:7 126:23 141:5 162:15

**opened** 34:14 36:6 61:19 70:18 77:22 107:3,6,19,23 108:10,23 109:7,19,23 110:15,17,21 111:1,12 113:9 113:12,16,18 115:15 117:13 117:15 120:4 122:1 126:17 128:20 169:25

**opening** 30:12 86:20 113:23 122:11 140:17

**opinion** 16:23 27:4 28:3 48:10 50:15 96:18 181:11 181:12

**opinions** 93:7

**opportunities** 155:13

**opportunity** 100:13 176:21

**opposite** 43:25

**option** 169:22

**options** 68:2,3

**order** 51:23 128:7

**orders** 52:5

**organize** 143:4

**originally** 163:22 164:7 175:7

**ought** 137:20

**outer** 4:13

**outside** 28:3 129:1

**overall** 190:20

**overdraft** 189:11

**overdraw** 189:10

**overly** 118:17

**overruled** 92:24 105:7 106:4

**oversaw** 47:17

**owe** 124:22

**own** 25:5 50:17 50:18 120:24 168:14,15 170:22 195:11

**owned** 124:20

**owns** 123:19

**p**

**p** 4:1,1 6:1,14 6:17 13:11,13 13:15

**p.c.** 4:11

**p.m.** 62:16 132:2,15,25,25 139:6,7 141:3 154:15,16,25 178:11

**pack** 170:5

**package** 51:20 51:22 52:1,3 52:13 96:5

**packed** 178:14

**packing** 125:6

**page** 8:3,3 9:3 9:17,21,21,22 9:25 10:6 13:19,20 14:4 14:7,13 15:1,3 15:5,6,7 16:11 25:20 28:7,11 28:16,24 42:7 42:12 44:3 45:9 46:4 52:22 55:13 90:14,16,18,22 90:25 95:14,17 96:13 98:25 100:22,25 109:4,15 110:1 125:13 126:15 127:24 148:22 183:8,9,13,14 183:15 184:3 184:16,17,23 185:16 186:5 186:17 187:4,5 187:7,9,10,13 187:22 188:4 189:14,18,25 190:1 191:12 191:15,18,20 191:23 198:7,8

**pager** 128:3

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

**pages** 8:23
13:16 28:9,10
52:10 53:6,22
53:24 54:2
90:15,20 95:23
97:11 147:15
**paid** 35:7 37:2
60:19,20 75:7
75:9 83:22,24
84:17,17,18
175:23,23,24
**pam** 15:25
**paragraph**
51:24 101:1,13
101:22 102:16
121:9,10
150:12,13
154:3
**paragraphs**
102:22,23
**parathesis**
101:5
**parents** 15:21
**part** 9:8 10:23
10:25 13:5
30:4 50:24
64:16 68:20
69:25 80:25
91:6,12 96:5
100:8,24 103:1
106:16 119:1
120:9 136:1
138:7 140:11
142:12 148:1
181:13 192:3
197:16

**partial** 177:11
**participants**
165:5
**participated**
195:24
**participation**
196:2
**particular**
73:24
**parties** 46:9
87:10 101:18
121:16
**partner** 58:5
134:7
**partners**
126:11 174:18
**partnerships**
168:25 169:9
174:18
**parts** 94:9
136:3
**party** 55:18
100:14 103:3
105:15,25
106:10
**pass** 69:8
**past** 74:20,21
100:6
**patience** 82:8
**patrick** 4:16
6:13 20:14
116:22
**patriot** 66:2
79:21
**pause** 13:20,24
14:10,16,25
41:23 51:14

54:1 55:24
64:3 84:4
**paused** 28:13
**pausing** 60:24
**pay** 37:5 75:8
160:7 177:2
**payable** 39:18
**paying** 176:10
184:7
**payment** 62:11
177:11 186:18
**payments** 68:4
69:6 70:13
186:20
**payroll** 70:11
174:2
**pearls** 93:6
**pending**
182:10
**penny** 153:5,5
153:11
**people** 17:9
19:6 20:6,9
22:9 27:18
28:6 29:23
33:15 34:8
35:12,12,19
36:19 37:2,5
46:21 49:16
57:19 60:15
63:21,22,24
65:20 66:10
67:19,25 68:1
68:4 69:16,20
70:9 71:23
73:17 74:11
79:2,6,18

104:9 114:8
124:20 144:23
156:3,15,20
160:7 163:20
163:23 167:8
168:15 169:2
169:19 174:19
175:23 177:13
177:18
**people's** 81:6
**peoples** 71:21
**perception**
50:12
**perfect** 14:8
80:15
**perfectly** 79:12
**period** 70:3
139:12
**permission**
74:17 89:4,6,8
**permit** 77:25
**person** 22:22
24:7 27:9
48:15 58:8
59:4 62:1 63:3
67:18 68:10,15
69:18 71:8,11
98:5 124:12
138:2,23 146:8
164:17 171:8
174:25 175:20
**personal** 31:2
184:7,11 187:3
196:10,14
197:15
**personally**
16:17,18,25

17:5 24:23
25:3 105:1
197:10

**petition** 193:23
194:16

**phoenix** 68:20

**phone** 10:16
33:11 39:5
47:10 59:13
74:6 83:13
134:12 140:8
140:10 142:7
163:18,21
164:17,23,24
165:2,3 171:7
171:13 172:8

**photo** 64:15
97:19

**photograph**
21:14

**photographed**
21:15

**photographs**
75:13,15,16
97:10 98:15

**photos** 21:19
46:10,14 49:22
51:1,5,18
53:12,17,20

**pick** 75:5 118:8
172:8

**picture** 52:15
64:4 97:12,13
97:23

**pictures** 97:16
97:25 98:3

**piece** 11:6 21:1
21:12 35:8
47:12,12,13

**pieces** 22:8
55:21 75:11,12
125:3,5

**pissed** 33:8
34:12 41:12
180:8

**place** 99:11
131:6

**places** 14:11

**plaintiff** 1:13
6:7 51:25
116:19

**plaintiff's** 13:1
13:2

**plan** 180:4,9

**plane** 64:23
167:12,13

**planned** 31:16
31:16 33:12
34:10 37:7,8
38:6 39:13
59:3 76:11
77:21 78:9

**plans** 147:1

**play** 13:11,11
194:23

**playback**
14:21,24 15:8
16:10,13 28:12
28:22 37:11,20
41:22 42:5,8
42:13 45:24
46:3 51:13
52:18 53:1,9

53:25 54:4
55:23 56:5
60:23 61:3
62:7,10 63:2
64:2,11 82:11
84:3,7 85:5

**please** 6:5 7:1
7:6 14:22
41:21 54:1
55:24 60:22
62:6 86:7,9,10
86:15 91:19
93:15,18 97:7
100:7,25
116:15 117:5,7
117:8 121:4,8
126:15 134:19
138:11 140:18
152:24 178:6
179:2,4 184:2
185:16 192:14
197:17 198:17
198:21,23

**plugging** 21:20

**plus** 152:21
172:11

**plymouth**
36:25

**pm** 199:3

**point** 14:10
120:12 123:14
135:23 143:18
164:14 171:22
171:23 174:14
190:11 194:17

**pointe** 32:8
193:16

**portfolio**
165:23

**portion** 7:18
7:18

**posed** 181:7

**possession**
99:23

**possibility**
115:17

**possible** 56:9
56:10 80:7
101:6 165:22
188:20,22

**possibly** 37:24
54:24,24
112:16 161:24

**post** 21:18,19

**posts** 21:17

**potential** 8:16

**prefer** 14:9

**preparation**
195:24

**prepare** 61:6
96:12 158:12

**prepared**
37:22 85:15

**preprinted**
162:3,4 165:17
165:24

**present** 196:3
196:4,5,6,21

**presented**
105:20,21

**president**
29:20 45:19
61:15,18,22
69:7 145:3

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 235 of 252
212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

167:9
**pressure**
193:13
**pressured**
180:6
**presume** 7:13
116:2
**presumed** 9:4
10:15
**pretrial** 51:23
52:5
**pretty** 10:14
11:3 63:19
65:9 66:10
67:22 158:22
**previous** 25:20
39:14 82:16
**previously**
55:11 98:5
**price** 24:11
27:7 101:7
**primarily**
185:6
**printed** 43:5
45:16 92:13
107:10 154:7
154:10 155:8
184:23
**prior** 27:13
38:6 44:3 45:9
96:23 98:17
105:6 122:5
133:8
**prison** 49:21
**private** 32:7,14
66:4 84:16
85:2

**privy** 20:7
**probably** 11:2
14:23 15:10
20:12 26:12
48:2 55:4
56:16,19 63:8
66:1 77:23
79:13,17 84:11
129:12,13
136:1 144:6
168:8,21 171:3
175:4 191:7
192:20
**problem** 65:5
130:19,21
131:11 136:21
137:24 138:21
178:7,8
**problems**
84:11 156:24
192:10
**proceed** 117:1
179:3
**proceedings**
199:2 200:4
**process** 66:15
66:19,21 108:2
**processing**
68:4
**procure** 22:19
**produced** 53:4
56:22
**product** 64:8
**professional**
91:12 93:3
95:10 96:18

**professionally**
88:8 89:17
**profit** 11:8
36:17
**project** 28:4
**promise** 82:6
**pronouncing**
155:10
**proper** 92:16
106:6
**proposed** 8:17
**provide** 38:8
38:12,13 51:1
93:6
**provided** 46:9
49:22 150:23
**providing**
94:25 95:7
**public** 195:13
195:14
**pull** 18:19,21
77:12 79:2
91:3,3
**pulled** 18:16
19:9 84:15,18
84:19,23
**pulling** 69:14
70:4 71:25
94:2
**purchase** 8:18
24:16,18,23
27:7 46:7
101:2 102:13
**purchased**
12:9 60:7
126:2 177:5

**purports** 113:3
113:5
**purpose**
102:17 108:19
112:18 145:25
**purposes** 93:8
**push** 12:1
**pushing** 11:24
167:1,2
**pushy** 180:7
**put** 19:13,13
19:14 20:4
21:7,11 30:16
33:1 47:14
50:4,5,7 54:16
54:20,21 55:3
55:5,17,20
56:11 57:8
67:15 70:14
79:10 102:13
108:24 110:5
117:14,25
118:9 119:16
120:5,21 122:1
162:2,2 175:20
196:24

**q**

**quarter** 8:2
**question** 21:7
21:23 22:15,18
24:15 26:4
39:20 49:25,25
55:5 56:24,24
93:18 98:11
99:13 103:23
104:24 105:5
105:10 114:21

114:25 118:21
118:23 119:4
119:16 120:2,3
120:6,8,9,17
120:20 121:7
121:25 124:5
126:12 134:17
137:14 138:9
138:18 142:22
143:6,24 156:5
156:8 157:16
157:22 158:25
159:3,17 160:2
162:8,13,24
163:9,12
168:17 170:13
170:18,25
172:17 173:5
173:19 176:20
178:1 181:7,11
181:15,23
182:10 185:14
187:13 188:13
191:7 192:14
194:15 195:7
195:21 197:23
**questioned**
51:18
**questioning**
106:6
**questions**
16:19 22:3
59:2,17 81:15
81:21 82:1
88:25 89:5,9
134:19,20
138:10,13,15

138:15 144:10
168:20 179:9
190:12,16
194:24 198:4
**quick** 32:25
33:4 68:3
85:23
**quiet** 71:1,1
**quite** 178:3
**quoted** 8:20

**r**

**r** 2:1 4:1,8,11
6:1 73:23,23
200:1
**ragard** 155:13
155:14,15
158:4 161:2
**raise** 86:10
**ran** 47:25
**range** 101:7
**rare** 58:10
151:4,14
**reach** 11:11
78:17 81:9
**reached** 73:14
**reaction** 71:12
**read** 7:20
14:12 16:12
48:23,24 49:8
92:9,22 99:4,7
99:23 100:3,10
100:19,24
101:10,20,22
102:12,21,23
102:23,24
103:1,5 105:14
105:14 106:8

117:19 118:4,4
120:2,11 121:9
121:23 133:3
134:11,14
150:12,23
**reading** 92:12
92:19 96:9
118:18 136:15
**ready** 30:20
31:20 76:17
79:2 108:3
**real** 89:13
**really** 10:16
11:23 26:15,19
26:25 27:20
31:3,24,24
33:20,25 34:9
34:9,12 40:21
40:21 41:12
44:7,22 45:17
46:17 48:3,13
49:20 57:18
58:6 61:19
62:23 65:10,18
67:10,19,19
68:1,3 69:20
70:8,11 71:7
73:2 79:22
103:21 117:9
134:17 135:13
136:3 143:4,20
143:23 158:23
159:6 163:16
167:7,10
168:13 169:23
171:13,13,16
180:10 188:10

193:10
**reason** 10:17
21:2 27:9,10
28:5 40:17,18
43:10 47:14
59:17 84:19,22
124:9 131:13
134:9 135:16
138:19 146:14
160:1 162:23
163:22 179:23
**reasonable**
8:21
**recall** 25:22
26:5,24 41:3,6
44:21 55:7,8,8
57:1,1,5 59:1
60:21 83:11
88:19,20 99:16
107:18 108:8
110:19,24
111:7,10,18,19
112:1,3 114:9
117:19 130:10
131:10 144:10
161:21 173:22
179:9 182:14
194:6
**recalling**
116:16
**receipt** 61:6,13
61:14 101:19
102:19 121:17
176:2
**receive** 25:17
25:18 67:4
123:23

**received** 10:5 25:14 26:2 35:4
**receiving** 25:22 26:6 178:10
**recently** 80:3
**recess** 86:4 116:12 121:5 178:3,24
**recitation** 119:23
**recited** 10:14
**recognize** 61:13 156:20
**recognized** 158:1
**recognizes** 195:10
**recollection** 8:15 30:2,10 36:11 37:21 38:22 39:7 57:13 58:4 98:19 130:25 131:1 133:7 143:3
**record** 9:20 53:4 89:12 94:17 121:2,4 142:17 156:10 159:18 168:10 171:22 190:18 200:4
**records** 56:17 195:11
**recross** 5:3 12:19

**redacted** 113:8
**redirect** 5:3 6:23 7:7 12:19 12:23
**redo** 118:23 120:17
**reduced** 186:8
**refer** 60:10,11
**reference** 84:8 151:3
**referenced** 9:6 98:5 127:7
**referred** 27:23 60:9 83:2
**referring** 27:17 61:1 106:13
**refresh** 133:7 184:6
**refused** 68:21
**regarded** 174:25
**regarding** 46:7 46:10 52:1 133:4
**regards** 100:10
**register** 136:2
**reject** 79:11 80:16
**rejected** 30:15 108:14 109:22
**related** 103:6
**relates** 190:14
**relationship** 14:22 15:9,23 15:25 66:7
**relative** 8:16

**release** 71:16 80:9 170:2,3
**released** 70:8 101:19 102:18 121:17
**relevancy** 190:12 194:15 195:4
**relevant** 190:19
**relied** 8:22 11:3 104:7,8 158:20
**relying** 10:11 95:9
**remaining** 102:21
**remarkable** 11:6
**remember** 14:13 18:4 19:4,5 21:18 23:16,17 26:1 26:2,9 29:12 34:18,18 36:13 37:24,25 38:2 38:3 41:19 43:8,10 44:2 45:7 49:5,6 50:1 51:3 54:5 54:5,13,24 55:7,10 56:9,9 56:25 57:4,22 58:14,16,17 59:1 61:5 82:18 83:11,15 83:16 98:20

99:9,14 102:25 103:20 108:9 110:10 111:7 111:14,15,23 111:24 112:2 117:23 129:5,6 130:12,13,13 130:18,22,23 131:4 134:23 135:7,7,8,22 136:1,3,11,13 141:12 143:5 143:11,13,19 143:23 146:13 146:13,14,15 146:16,24,24 146:25 147:2 151:10,12,22 157:13,13 161:15,15,16 161:24 163:15 163:15,16,18 164:6,18 166:17,19,21 166:23 171:13 171:13,14,15 171:16 172:1,7 173:21 182:17 182:18,20,21 183:2 184:14 194:10 196:8 196:12
**remembering** 134:25
**remind** 7:11
**rental** 135:21

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

rep 84:22
repaid 84:1
repeat 181:15
rephrase
  118:21 119:3
  137:21
replacement
  27:6 96:9,20
reply 72:3
report 10:9
  22:9,11,13,24
  23:4,5,6,9
  46:13 47:7
  53:18 56:18,19
  56:23 60:1
  167:6,6
reporter 52:19
reports 22:21
  27:21
representing
  174:22
reprimanded
  168:12
reps 69:19
reputation
  33:17
requested
  105:22
require 81:6
required
  119:18
requiring
  181:12
resale 8:16,18
  10:11 93:7
  101:7

rescheduled
  70:16
research 28:2
  144:23
researches
  104:11
resell 8:20
  101:5
respect 33:16
  76:15
respected
  33:16
respond 33:3
responded
  26:8
response 105:4
responsive
  170:13,13,16
  170:21
rest 142:13
  182:11
restate 138:11
result 12:5
retail 63:24
return 188:23
returns 37:6
reviewed 61:4
  106:5
rhetorical
  39:20
rich 33:14
richard 60:13
  60:18 113:4
  114:1 174:24
  174:25 177:9
rid 65:20,24,25
  80:11

ridiculous
  74:25 80:12
right 6:18,21
  11:19 13:4
  16:14 20:8
  26:12,23 28:15
  29:5 36:12,14
  39:12 41:21
  42:15,17,20,22
  42:24 43:8,22
  44:3,13 48:3
  49:5,13,15
  52:17 53:6
  54:11 56:2
  57:6 59:25
  62:25 69:3,23
  71:2 72:7
  76:20 77:15
  78:13 79:5
  81:14,19 82:4
  82:5,10 83:21
  83:23,23 85:21
  86:11 87:1,8
  88:5,11,13,15
  88:21 90:9,22
  92:3 95:25
  96:24 97:3
  99:23 100:14
  100:16,19,22
  101:22 102:3
  102:22 105:3
  105:16 106:10
  106:25 107:24
  108:1,4,11,12
  108:21,24
  109:8,13,15,20
  109:24 110:6

110:12,17,21
111:1,4 112:13
112:15,15,21
113:13,21,25
114:7,14,19
115:8,12,17
116:1,10 118:5
119:14 121:21
121:23 125:25
126:6,8,19,25
127:12,13
129:7,8,19
130:3,9 132:15
132:20,24
133:1,2,11,18
135:18 136:6
136:24 137:6
138:18 139:7
139:22 140:7
140:12,25
141:22 142:8
143:16 147:8
147:10 148:16
148:22 149:7
149:10 150:1
152:6,20
153:14,16,21
154:12 155:1,2
155:5,11
156:17,25
157:20,24
160:7,8,15,19
161:13 166:12
168:3,23 169:4
174:5 178:23
179:16 180:2
180:14 182:16

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 239 of 252
212-267-6868 www.veritext.com 516-608-2400
Veritext Legal Solutions

183:7 185:8,22 186:9,21 188:4 189:8,9,12 190:1 191:23 192:24,25 193:8,24,24 194:3 197:4,5 197:7 198:16

**ring** 24:14 54:8 58:22,23 59:2 169:12

**rings** 125:4

**rise** 86:5 116:13

**ritter** 1:12 4:4 5:4 6:3,8,10,23 6:24 7:1,7,9 9:9 10:18 12:25 13:5,7,9 14:22 15:9,23 16:5,18 17:4 21:2 25:7,19 30:17 34:25 36:2,7 39:19 39:23 46:7,9 50:20 53:24 56:1 57:6 74:8 88:1 90:7 95:9 95:13 96:6,13 96:17,24 98:17 99:1 100:3 101:2 102:13 105:1 108:21 112:12,20 115:11 116:17 116:21 117:5,6 117:18 120:11

121:21 126:4 127:3,6 153:15 155:16 156:2 160:14 168:21 176:3 177:8 181:4,5 186:14 190:23 191:5

**ritter's** 41:7 108:14,16 109:23,24 117:13 118:10 119:17 128:5 139:21,25 149:18 157:3,8 160:6 168:2 176:8 182:1

**ritters** 25:23 26:6

**road** 4:5 12:8 200:21

**rodney** 151:7 151:18,18

**role** 93:21

**room** 18:17 99:18 193:4,12

**rose** 8:18 10:12 10:25 11:12 12:11 17:18,20 18:24 23:1,11 23:18,20,24 24:16,19,23 25:2,4,9,15,16 26:10 27:1 46:8,10,19 51:2 52:2 55:20 59:21 62:11 96:18

97:25 98:18 101:3 102:14 102:17 126:2 155:18,21 156:2,14 168:6 174:15 175:6 176:9 177:3,5 177:15,19

**ross** 4:9

**roughly** 85:14

**routine** 22:10 53:19

**routing** 111:21 112:6,7,8,10

**run** 14:3,4 32:10 72:22

**rundown** 136:7

**runs** 175:1

**rush** 141:11 167:3 178:11 198:23

**rushing** 141:13 141:15,15 143:7

**rusty** 73:10,11

**ryan** 4:17 6:16 116:23 151:7 151:18

---

**s**

**s** 2:2 4:1 6:1 86:6 116:14 179:1

**safe** 18:15,15 18:16,17,19,21 18:23 19:2

**sale** 11:6 28:1 35:9 47:1,1,4 49:10,13 51:11 53:21 59:18,18 59:19 68:8,9 98:18 183:22

**san** 81:22

**sanibel** 34:21 43:16 107:2 110:23 112:1 117:13 119:7 126:25 128:21 129:1 158:7

**sat** 78:21,22

**saved** 54:18

**savings** 132:22

**saw** 16:21 18:8 20:12 23:1,1 23:12,13 48:6 49:19 62:17 94:21 141:2

**saying** 26:1,14 35:16 48:12 67:23 70:7 76:25 79:15 82:18 103:20 105:11 114:5 146:4

**says** 42:14 43:5 43:24 44:1,2,8 44:11,12 46:6 49:13 51:24 52:24 53:10,23 56:21 90:2 91:9 96:8 100:4 101:1,13 118:18 120:23

120:24 121:9
121:12 125:13
133:5 135:11
137:3,14 139:5
151:1 154:2,6
198:8

**scams** 124:21

**scenario** 27:23

**schedule** 85:11
195:22 197:8

**scheduled**
70:15

**schedules**
194:11,24
195:9,25
196:21 197:2,7
197:15,15
198:10

**school** 15:14
15:19 167:6

**scientists**
144:24

**screamed**
71:10

**screen** 13:19
53:6

**scrutiny** 66:2

**seasons** 79:1

**seat** 6:22 7:6
119:3

**seated** 86:7,15
116:15 117:9
179:2

**second** 7:20
10:21 37:15
45:1 51:14
57:1 67:5 84:4

97:11,20 98:25
102:16 120:1,9
138:20 142:21
143:2 144:1,7
148:22 150:13
154:3 164:25
172:25 198:7

**section** 51:24
95:22 127:22

**security** 75:12

**see** 6:9,12,21
9:25 14:3 15:1
16:20 18:24
22:8,9 23:9,15
25:11,12 28:23
39:22,24 40:1
42:16,19,21
43:1,10 44:9
44:14 45:10
46:4,11 52:23
52:25 53:10
56:21 59:25
60:1 62:11
72:8 74:22,24
78:19 81:10,12
86:18 87:25
88:2,4,5 89:15
90:7 92:10
96:1 97:14
98:25 101:1,8
104:4 107:13
109:3,4,13
110:2,3 113:3
120:17 121:10
121:18 124:6
125:3,13 127:2
127:11,13,14

127:24 128:1,4
128:7,16
129:23 130:1,8
132:5 136:18
141:24 150:17
151:4 153:19
153:23,25
154:4 155:8
165:25 170:10
176:5 183:11
183:21 184:4
184:10 186:3
186:18 187:9
187:12,23
189:21,22
191:12,16
193:2 199:1

**seeing** 61:5

**seems** 79:5

**seen** 37:9 61:21
62:21 72:1
86:22 98:21
100:1 120:10

**segment** 51:17

**sell** 11:7 23:8
24:13 25:2,8
25:14 47:24
49:4 60:7

**seller** 54:8
101:15,19
102:18 117:23
118:1 119:19
120:12,21
121:14,17
123:3,4,7,12
124:15,19
175:13

**seller's** 175:15

**sellers** 63:25

**selling** 35:14
63:22 68:23
169:12 174:15
175:19

**send** 24:9,10
24:13,14 35:12
46:14 50:3
51:18 53:17,20
54:19 56:7,7
57:2 74:14
75:16 96:13
154:7 173:15
190:23

**sender** 65:6

**sending** 24:11
49:24 50:2
69:5 124:1
139:6 160:14
168:7

**sends** 24:12

**senior** 20:21
94:21

**sense** 77:19
80:5

**sent** 8:8,11,25
10:8,19 11:21
22:23 26:23
50:3 51:25
53:24 54:23
57:4 67:15
70:19 71:5
88:1 90:7
95:13 96:5,14
96:24 100:2
115:10 123:22

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 241 of 252
212-267-6868
Veritext Legal Solutions
www.veritext.com
516-608-2400

| | | | |
|---|---|---|---|
| 135:10 150:10 154:15,20,25 162:17 166:7 174:23 176:3 177:25 | **shady** 68:24 | **sic** 98:24 | 136:17,21 |
| **sentence** 10:22 | **shapiro** 195:18 196:8,12 | **sick** 76:21,21 193:11 | 137:15,24 |
| **separate** 91:25 154:7 | **sheinfeld** 196:10 | **side** 63:24 64:17 76:5 79:3 109:15 140:10,10 | 138:3,21 |
| **september** 16:11 26:5 197:14 | **shenfield** 196:7 | **sign** 39:4,9 46:23 100:13 103:2,4 105:15 106:10 138:22 140:13 149:7 162:23 164:8 167:21 | 141:25 142:5 142:13 147:24 149:1,2 184:25 185:3,9,10,17 200:6 |
| **sequence** 143:7 | **shiny** 10:14 | | **signatures** 185:24 |
| **sequenced** 42:10,11 | **shipped** 17:22 170:6 | | **signed** 45:1 103:24 107:9 107:10 114:7 117:18 136:17 137:17 141:23 147:7 149:25 164:11 188:6 194:24 195:9 |
| **series** 37:22 97:9 188:5 191:12 | **short** 178:3 | **signatories** 98:25 | |
| **serious** 192:12 192:17 | **shortly** 108:10 | **signatory** 107:24 115:20 131:11,14 136:23 137:4,6 157:11 165:9 167:22 174:4 | |
| **server** 56:17 | **show** 15:5 18:19 29:15 30:20 38:17,18 40:20,21 41:16 46:19,24 48:8 59:5 98:5 114:13 124:4 158:20 | | **significance** 9:2 |
| **service** 125:17 125:24 | | | **significantly** 163:4 |
| **session** 86:5 116:13 178:25 | **showed** 17:24 19:2,10 38:12 38:12 39:3,9 46:24 48:7 49:6 99:24 183:3 | **signature** 29:6 29:6 39:11 42:18 43:6,9 43:25 44:4 45:1,15 87:24 88:4,5,17 89:15 91:7,9 105:21,22 106:2 107:9,19 109:16 114:7 114:20,22,25 115:3,4 119:12 130:20,22 131:7,8,12 132:8 135:12 | **signing** 43:8 106:2 |
| **set** 20:19 32:13 40:9 43:12,15 47:18 66:17 77:11,11 118:2 118:6,7 126:14 135:10 141:19 141:19 142:9 152:11,15 173:24,25 176:16,18 177:6,9 | | | **similar** 185:25 |
| | **showing** 20:10 46:20,21 | | **simple** 171:19 |
| | **shown** 14:14 19:9 177:18 197:1,16 198:9 | | **sincerely** 151:1 |
| | **shows** 13:20 118:12,13 143:22 163:3 | | **sir** 7:6 |
| | | | **sister** 15:13,13 16:1,1,1,2,2,8 49:15,17 |
| | **shut** 193:24 196:19 | | **sister's** 20:5 |
| | | | **sisters** 20:16 20:17 33:23 |
| **seven** 77:23,25 | **shyster** 47:23 | | **sit** 29:17 36:19 37:4 56:1 145:1 164:13 |

sitting 37:3 140:9 163:19 163:20 164:18
situation 122:9 165:11 190:20
six 19:22 35:13 128:13,18 149:21
size 23:7 60:4
skill 10:23 100:9
skills 59:25
sleepless 76:16
slightly 170:16
slip 148:10
slips 149:14,25
slow 13:18
slowly 65:19
small 31:13 59:8 70:5 81:1 84:24,25,25 137:13 142:8 169:16 178:10
smaller 66:3,7 69:11
social 21:16,20
society 27:14 27:17
sold 25:16 27:5 59:6
sole 62:1
solely 11:3
solemnly 86:11
solutions 200:20
somebody 28:1 33:1 47:15

48:16 50:7,12 51:7 53:20 54:9 56:18 58:7 60:9,12 60:15 63:23 71:9 74:21 78:23 80:17 124:4
somewhat 47:19 50:11 81:7
son 46:24,24 46:25 48:7,8 48:22,23 70:18 99:4 100:19 101:11 102:1,3 102:9 106:9 117:19 118:5 120:11 121:23
son's 102:7
sons 118:9,19
sonya 3:25 200:3,8
soon 101:5
sooner 164:16
sorry 9:11 10:21 11:17 12:19 14:15 52:20 55:18 94:21,24 111:16 118:20 127:10 139:20 140:19 142:18 151:18 160:21 161:18 168:10 178:9 181:5 198:12

sort 68:11
sound 78:1 152:6 155:1,5 182:16 191:25
sounds 70:10 192:2
source 11:25 22:16
southfield 4:6
spa 143:19
speak 8:11 23:21
speakerphone 57:9,12,25
speaking 9:12 83:4
specialist 94:2
specializing 93:5
specific 14:11 66:17 69:18 105:5 171:17
specifically 88:19 94:4 139:23
spend 176:11 176:13
spent 168:6 176:9
split 101:15 121:13
spoke 8:15 19:25 31:14 46:7 50:14 100:21 103:25 114:8 125:10

spoken 19:24 74:20,21
spot 34:7 54:18 115:25
spouse 46:7
stack 161:21 165:16
staff 17:24 20:5 33:4 55:22 66:22 79:6 85:17 86:2 124:5
staffed 68:1
stamp 53:5 185:9,10,21,23
stamps 44:7
stand 6:25 49:21 86:9 89:4 117:6
standard 61:14 93:9
standing 99:24
standpoint 75:7
start 8:24 11:15 31:23 78:20 81:10 148:1
started 35:23 65:21 66:9 67:8 69:5 70:22 80:19 113:23 134:4 169:25 184:6 192:18
starting 6:22 15:18 53:22

212-267-6868 Veritext Legal Solutions www.veritext.com 516-608-2400

55:15 68:15 78:19

**starts** 183:1,6 186:7 189:22

**state** 141:24 147:16 148:23

**stated** 52:4 108:1 120:11 168:15

**statement** 19:21 27:5 109:2 114:3,12 114:13,18,22 115:7 117:12 127:20 149:22 165:14 174:11 183:2,17 187:23 188:21 189:2,16

**statements** 86:20 109:14 140:17 157:1 187:8

**states** 1:1,19 66:11 195:15

**stating** 92:7

**stats** 59:20

**stay** 136:5 143:16 169:13 175:22

**stayed** 136:1 169:18,24 170:1

**staying** 136:4,5 136:7,8 143:14 143:16

**step** 13:7 78:14

**sticker** 90:23

**stipulated** 51:23 52:5

**stipulation** 51:24

**stone** 12:9 22:21 58:10,20 60:2 96:18 123:3 174:23

**stones** 93:6

**stood** 145:7,10 145:10

**stop** 17:17 31:21 153:22

**stopped** 88:17 158:15 162:16

**store** 166:5,18 180:24 181:9

**story** 63:6 70:10 80:21 176:21

**straight** 11:24

**strange** 33:20

**street** 1:20 16:4,8

**streets** 16:6,7

**stressed** 180:9

**strictly** 40:16

**strike** 94:24 170:12,17

**stroke** 193:13 193:15

**structure** 103:10 114:1,2 126:10,11 155:20 158:11

176:15 177:6,7

**structured** 155:21 168:24

**structuring** 103:12,17 106:16

**stuff** 10:14 37:8 38:4 49:24 50:17,18 51:6 59:3 65:17 76:2

**stupid** 64:15 70:10

**subject** 101:17 121:15 132:11 132:13

**subjects** 106:24

**substitute** 42:18 44:5

**successful** 58:6 110:16

**sue** 63:8 103:24 104:18 105:12

**sued** 26:18 49:16 105:1 192:5,7 193:5 193:5,7

**sues** 47:2 49:11 49:13 103:20 104:9

**sufficient** 184:19

**suggest** 85:25

**suing** 49:15

**suite** 4:5 200:22

**summary** 186:5

**sums** 162:10 162:10

**support** 198:23

**suppose** 13:4

**supposed** 30:7 30:8 31:18 41:16 50:8 64:23 74:11 78:18 102:18 115:11 117:22 129:7 133:23 135:14 145:5 145:12 167:11

**supposedly** 124:11

**sure** 9:10 14:10 14:20 37:5 47:2 49:9 51:15 55:25 59:21 75:19 103:7,13 136:25 144:16 155:10 167:2 168:12,12 169:13 195:2

**sustained** 118:22

**swear** 86:11

**switch** 65:11

**sworn** 117:8

**system** 70:23

| t | | | |
|---|---|---|---|
| **t** 6:2 101:2 116:16 127:3 200:1,1 | 71:22 74:17,18 78:8 81:4 82:4 83:6,6,7,8,17 86:22 98:8 102:8,9 106:25 138:8,12 142:19 165:5 180:14 | **ted** 39:25 78:8 81:9 82:6,24 83:2,3,4,5,7,16 83:22 | 139:9 193:13 |

**t** 6:2 101:2
116:16 127:3
200:1,1
**tabbed** 13:16
**tabs** 87:19
**taft** 4:3
**take** 6:4 50:8
54:15 63:4
69:1 78:25
79:1 80:16
85:14,23 100:1
104:4 107:5
108:20 109:1
112:23 115:2
116:5,6,7
117:5 119:4
126:8 130:18
131:9,20
140:22 141:23
150:13 152:7
154:11,19
167:13 176:1
178:3,19
182:13,23
185:12 186:3
195:11
**taken** 76:22
77:9 98:3,12
98:13,15,18
195:24
**takes** 173:13
**talk** 16:24
20:25 35:15
47:10 57:9
59:14 69:20
71:2,14,14,19

71:22 74:17,18
78:8 81:4 82:4
83:6,6,7,8,17
86:22 98:8
102:8,9 106:25
138:8,12
142:19 165:5
180:14
**talked** 36:16
36:18 59:12
70:21 72:10
73:23 74:3
75:23 76:3
77:18,18 86:23
126:22 128:20
133:11 150:9
165:15 172:18
172:21 173:3,7
173:13 179:7
**talking** 28:16
34:1 48:25
53:12 58:19
81:15 94:16
107:20 117:11
125:12 127:7
139:11 145:13
165:4 180:3
194:7,8 196:17
**tangle** 68:11
**tape** 63:1 82:14
85:7 96:16
103:19 108:1
108:13 130:19
131:2 136:20
**team** 74:13
81:10

**ted** 39:25 78:8
81:9 82:6,24
83:2,3,4,5,7,16
83:22
**ted's** 40:1
**telephone**
99:20
**telephonic**
85:14 116:6
**tell** 12:1 13:18
28:6 30:5 32:4
35:1,1,21
41:17,18 45:17
48:4 50:8
53:24 58:10
60:2,2 63:22
65:16 69:7
70:9 71:15
75:22 76:17
80:16 83:10
91:19 93:15
95:16 103:16
110:16 111:17
130:24 139:16
140:4 146:2,6
164:15,20
170:2 172:8
189:2 197:22
**teller** 29:9,11
33:10 38:15
78:21 79:9,10
152:8 157:11
157:18
**telling** 26:12
26:17 32:25
54:7 72:11
111:10 134:25

139:9 193:13
**tells** 20:14
**ten** 178:6
**tennenbaum**
155:10
**terms** 32:23
101:17 121:15
153:19
**testified**
118:15 168:20
173:2
**testify** 137:16
137:18
**testimony**
12:25 25:25
39:3 41:4
86:11 96:17
98:22 144:10
161:17 181:13
**texas** 124:4
**texted** 110:19
**thank** 7:24 8:5
12:14,16,21
13:6,8,9 14:18
15:7 28:21
37:16,19 53:7
53:8 61:2
64:10 82:8
87:18 89:10,11
89:12,23 96:3
119:5 150:21
156:7 181:14
191:10 198:24
**thanks** 82:4
**that'd** 75:21
**theodore** 1:19

20-04381-lsg    Doc 332    Filed 06/02/26    Entered 06/02/26 16:29:08    Page 245 of 252
212-267-6868                     Veritext Legal Solutions                     516-608-2400
www.veritext.com

**thing** 31:12
32:5 35:10
36:13 39:10
53:19 69:17
72:13 77:2
85:4 102:23,24
160:5 166:1
198:22
**things** 32:22
36:21 52:6
61:25 63:12
70:14,15 74:12
76:6,6,9 78:19
83:18 84:12
90:11 91:18,19
93:22 113:25
118:6 123:13
128:6 147:6
169:10 180:6,8
180:16 192:18
**think** 11:2 21:5
21:7,9,9,10,10
21:15,24 23:13
25:10 28:5
30:14 32:6
33:21,23 36:14
38:3,3,7 39:7,7
46:19,23 47:11
47:11 49:7,10
53:21 56:8
57:15,15 58:1
58:10 59:17
60:18,18,19,19
60:20 64:7
65:8 67:11,13
67:14 69:7,18
70:25 71:6

72:9 75:18
77:2,10 80:6
80:17 81:1
83:14,16 85:19
85:21,22 96:16
98:21 103:9
114:24 116:4
124:2,3,4,19
124:20 125:18
136:8 137:17
143:17 155:24
156:1,14,18,24
157:14,15
158:23 163:22
165:2 166:13
167:1 170:17
171:12,21
177:18,20,21
177:23 181:19
182:9 184:13
190:17 192:6
194:23 195:3
196:7
**thinking** 41:10
56:20 85:17
156:20
**third** 9:21
10:21 97:11,13
97:20 110:1
129:23 152:14
**thirds** 189:21
**thomas** 1:12
4:4 5:4 6:2,7
7:7 99:1 101:2
116:16 127:3
**thought** 9:11
9:18 21:1,15

21:25 31:11
36:15,16,17,20
47:12,14 50:5
58:8,9,12 76:1
77:20,20 85:3
103:15 134:9
134:15 172:21
175:24 177:8
179:11 181:19
181:19,21,22
181:22,23
182:4,6
**thousands**
61:12
**threads** 192:18
**three** 8:23
15:11 37:1
52:10 68:8
70:21 79:2
80:4 90:20
91:18 97:9
127:19 128:4,6
128:11,14,15
129:21 149:14
149:23 150:6
152:7 153:18
153:25 167:18
168:21
**threw** 48:19,19
143:17
**throw** 20:13
35:22 76:18,18
76:19
**thursday**
167:14
**tie** 77:13 134:4
143:8 149:24

**ties** 149:22
151:21 183:2
**time** 8:20 9:7
10:5,8 12:4,7
13:24 14:6,16
18:8 19:8,22
20:11 21:16
26:5,7,14,17
29:20,20 31:11
34:7 35:5 36:6
41:13 42:25
47:18 53:18,19
58:5 60:4
61:15 65:19
68:20 77:23
79:1,8 81:6
85:10 86:1,1,2
94:15,16,19,23
107:23 109:8
109:19 111:13
111:18 114:9
123:9 124:11
126:5 131:3
132:16,17,22
132:23 135:5
136:12,14
138:13,20
139:7 141:20
142:8,20,21
143:7,14,21,24
143:25 145:24
146:4,19
154:16,25
155:5 158:16
159:7 162:3
165:21 166:13
167:4 169:1

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 246 of 252
212-267-6868 www.veritext.com 516-608-2400
Veritext Legal Solutions

170:10 171:15
171:16 174:7
174:12,17
185:19,20
186:12 190:25
192:20 193:3
193:17
**times** 66:25
72:12 77:23,25
78:6 86:23
134:7 165:3
168:21
**timestamp**
42:21
**timing** 76:24
76:24
**tip** 32:15
**title** 27:20 43:6
44:17 92:3
94:22,23
**titles** 61:24
**today** 6:22
11:21 76:19
85:11 86:20
124:14 126:6,7
132:12 133:4
136:17 176:7
178:12 193:14
**together** 20:4
54:16,20,21
55:4,6,20
56:11 149:14
153:5 196:24
**told** 19:18
27:11 30:15
31:14 34:2
35:3 36:9,10

46:16 50:14,23
58:12 60:11,15
68:25 78:5,6
80:13 84:22
93:17 109:22
112:20 123:7
123:21 130:3
130:23,25
131:4,16,18
139:24 141:16
157:23 163:22
164:7,20 165:8
167:4,14 169:2
174:16 175:7
175:10
**tom** 12:25
14:22,23 15:9
15:10 16:5,18
16:19,20,20
17:3,12,15
19:23 21:2
25:7,19 27:1
28:2 30:17
34:25 35:1,3
35:21 36:2,7
39:18,23 41:7
46:15,16,16
47:1,6,9,10,21
48:24 49:1,11
49:13,21 50:4
50:14,14,19
51:10 53:12,24
54:6,7,7 55:16
56:7 57:6,9,10
57:12 58:2
59:1,12,13,14
59:16 60:20,20

62:22,23 88:1
96:17 98:17
100:3,10,12
103:6,11,20,23
104:9,14,17,21
105:12 106:17
106:17 108:20
112:20 122:16
122:17,17
139:21,25
149:17 155:15
157:2 160:6,13
168:2,6,21
172:8 175:9,11
177:8 180:19
182:1 186:13
**tom's** 15:12,13
21:5 39:22,24
**tomorrow**
81:16,22,24
82:4 198:17
**took** 19:2
21:19 38:20,21
55:9,13 66:24
72:25 91:22
157:19 166:11
168:22 175:15
186:25
**top** 10:24
33:15 34:8
42:19 43:19
44:8,16 45:12
53:10 90:2,20
90:24 100:10
109:4 144:23
175:2

**topping** 80:21
**total** 125:16
127:24,24
153:6 161:4
198:8,9
**totaling** 161:22
**touch** 78:15,16
81:4
**towards** 94:15
**towel** 143:17
**track** 124:6,8
**trade** 40:20
**traffic** 136:9
143:15 178:11
178:14
**trained** 93:3
**transaction**
10:25 11:12
12:12 58:20,22
59:15 68:22
152:14 190:13
**transactions**
25:11 128:13
128:18 140:14
143:3 149:21
152:7 167:18
183:22 184:10
**transcribed**
3:25
**transcriber**
64:8
**transcript**
14:14 200:4
**transcription**
14:4 64:7
**transfer** 30:14
108:14,20

109:23 112:12
112:19 113:6
117:14 127:3
128:6,15
129:21 133:15
138:4,24 152:8
152:15 153:20
167:19 194:17
**transferred**
108:16
**transfers** 130:5
152:5,9 167:20
176:24
**transmitted**
11:18
**travel** 108:3
125:3 186:23
**tremendous**
143:15
**trial** 3:1 14:1
28:14,16,18
37:18 60:25
**tried** 51:11
72:11,12 84:21
**trip** 143:2,2,25
144:1,7,7
**trouble** 157:14
192:3,12,17
**troy** 32:8,9
**true** 26:7 107:4
114:8 138:19
200:4
**trust** 40:17,18
69:18 134:9
**trusted** 40:16
58:6,7 104:19
124:9,10,10

134:6,14
177:24,24
**trustee** 194:5
195:15,17,18
**trustworthy**
48:14 124:11
**truth** 48:4
80:22 86:12,12
86:13
**try** 9:12 16:21
16:25 20:23
48:1 66:12
69:10,11 72:3
78:22 121:1
138:18
**trying** 30:20
32:18 35:25
36:1 39:8
41:10 50:18
51:9,9 53:21
54:7 55:1,1,11
56:3 70:9 73:5
130:20 134:24
138:22 141:11
143:7 167:13
171:18 176:20
191:4 194:23
**ttritt198** 95:21
**tucson** 29:14
30:20 31:18
34:11,16 43:11
64:24 69:5
129:4,6,14
130:11 135:18
135:18,20
136:9 143:15
143:22 150:1

161:22 179:8
179:23
**turn** 7:17 8:23
10:18 31:8
49:12 80:19
85:16 97:5
98:23 126:15
186:16 189:4
189:14 198:7
**turned** 31:6
57:2,3 103:25
**twice** 53:4,5
130:11 133:25
135:2 181:5
**twin** 15:16
35:24 49:15,18
**two** 11:18 16:6
16:7 28:9,10
30:19 38:21,22
44:7 53:22
62:3 63:15
65:21 67:18
69:20 73:1
78:11 85:13,21
98:25 102:23
113:24 125:3
132:22 147:15
150:14 151:11
151:23 152:1,3
152:4,4,9,11
179:8 188:6
189:21 198:4
**typically** 24:6
24:9

**u**

**u.s.** 2:3
**unable** 9:24
**unaware** 192:9
**unbiased** 93:7
**under** 7:2,5
19:14 32:14
48:19,19 51:23
66:2,4 90:11
91:9 110:2
117:8 119:18
123:25 128:16
154:7 158:15
162:14 179:12
179:15 183:11
183:21
**understaffed**
74:25
**understand**
7:1 33:6 36:18
39:17 48:21,22
55:18 75:11
76:2,5,8,24
77:13,20 80:25
87:9 96:12
124:21 134:23
135:15 147:10
155:20,22
158:11 159:1,2
159:6 171:18
192:10,19
193:9,10 197:7
198:3
**understanding**
7:16 8:14 9:2,5
9:16 11:1
37:17 83:21

212-267-6868 Veritext Legal Solutions 516-608-2400
www.veritext.com

| | | | |
|---|---|---|---|
| 137:21,23 138:14 | used  15:14 22:7 50:2,10 | video  13:11,11 13:14,17,18 | want  12:4 13:22 14:13 |
| **understands** 52:6 120:3 | 61:24 65:9,17 66:10 71:9 | 14:14,21,24 15:8 16:10,13 | 17:24 20:13 28:4 30:17 |
| **understood** 75:3 100:12 | 79:8 84:12 88:8 91:13 | 28:12,22 37:11 37:20 41:22 | 31:10,13 37:12 41:11 47:15 |
| 102:12,16 121:20 138:20 | 122:6 136:5,10 143:15 165:20 | 42:5,8,13 45:24 46:3 | 52:20 53:2 54:15 55:10 |
| 148:14 149:12 149:17 | 165:20 175:17 185:11 186:22 | 51:13 52:4,18 53:1,9,25 54:4 | 61:17 65:3,16 67:13 69:8,12 |
| **unexpectedly** 73:15 | 186:23 **using**  65:23 | 55:23 56:3,5 60:23 61:3 | 74:13,22 75:24 77:5 78:2 79:9 |
| **unfortunate** 165:11 | 67:13 88:17 89:17 182:18 | 62:7,10 64:7 84:3,7 85:5 | 81:1,2,2,3,4,5 81:6,21 82:1 |
| **unfortunately** 113:7 154:1 | 186:10 **usually**  63:21 | **visit**  164:25 **visits**  179:8 | 84:24 86:22 87:24 89:4 |
| 165:11 | 71:3 | **voice**  9:9 83:1 89:21 | 92:10,22 115:19 122:16 |
| **united**  1:1,19 195:15 | **v** | **vp**  43:6 107:9 | 131:2 134:22 134:22 138:10 |
| **university** 136:6 143:16 | **v**  1:14 6:3 116:17 | **w** | 138:13 165:13 167:16 171:21 |
| **unplanned** 180:5 | **vague**  105:19 **valuation**  27:4 | **w**  1:20 4:13 42:19 44:5 | 179:6 180:15 180:15,16 |
| **upload**  131:9 **uploaded** | 96:12,20 **valuations** | **wait**  9:8 63:4 67:5 97:2 | 182:12 184:16 186:16 189:4 |
| 131:9 136:18 137:5 | 94:25 95:7 **value**  8:16,16 | 125:18 156:10 159:17,19 | 189:14 194:22 195:7 |
| **upper**  97:3 **upset**  64:15 | 9:19 10:11,15 11:5 96:9 | 164:13 181:4,4 181:4 196:20 | **wanted**  16:24 27:16 31:25 |
| 180:5,9,10,11 180:12 | **values**  10:14 **valuing**  93:5 | **waiting**  75:8 **walk**  67:18,20 | 32:1,19 40:21 41:14 46:18 |
| **use**  14:5 27:9 50:9 61:17 | **vault**  169:15 **venting**  35:20 | 74:23 78:24 148:18 163:12 | 48:9,10 50:14 51:10 54:5,15 |
| 66:13 69:10,11 87:20 182:15 | 83:18,20 **verify**  59:20 | **walked**  146:10 162:20 163:6 | 55:16 59:1 73:16 85:1 |
| 185:10 | **veritext**  200:20 **vice**  45:19 | 163:14 174:7 **walking**  37:25 | 96:17 100:5,13 |
| | 61:15,18,22 | | |

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com

103:2,4,7,13
124:3 146:22
158:22 174:7
174:12 178:15
179:18
**wants** 28:1
51:8 57:9
59:16,16 63:8
83:5,6,7,16
105:25 175:20
195:6
**warn** 30:5 83:6
83:15,17
158:11
**warning** 31:5
32:1 197:21
**watch** 56:3
**water** 76:20
**way** 8:2 26:3
26:25 36:24
63:19 64:4,6
71:13,14 77:22
80:19 84:2
91:4 93:13
94:4 100:6
103:21 108:6
115:9 130:6
133:14,17
154:17 166:14
166:15 170:22
**we've** 27:5
63:19 64:17,18
68:25 71:12
72:5,21 76:6,7
76:11 80:2
86:22 95:13
107:20 127:6

157:1 165:15
168:1 175:3,4
178:2 179:6
182:24 191:23
**wealthy** 20:16
**wedding** 17:25
18:1,6,7,7
**week** 72:8,25
74:12 78:19
**weeks** 36:21
37:1 63:15
78:12 80:4
**weird** 33:25
77:1,1
**went** 11:12
16:21 19:20
22:12 27:20
30:21 32:20
33:9,10,14,19
34:11 39:17
47:3,6 57:19
66:4 68:9,10
71:1 79:3 80:8
109:7 114:7
119:7 123:25
126:25 130:10
130:14,16
134:2,2,3
135:2,5 142:20
143:9,13,18
144:11,17
145:8,16,24
146:4,19
148:17 152:3
152:11,16
153:18,19,19
153:20,24,25

157:8 159:14
162:11 163:17
166:4,25 167:6
169:9 171:9,9
177:2 193:15
196:7
**white** 73:10,11
**who've** 74:20
**wife** 48:16
70:20 83:8
133:3 175:4
**william** 25:6
123:6,7,10,11
123:21,22,25
124:10,10,14
125:5 151:3,14
151:23 152:4
152:11 153:20
155:22,25
169:2 174:16
174:18,21,22
174:23 175:8
177:8,10
**williams** 120:2
121:3
**willing** 51:8
**winter** 132:21
132:21
**wire** 25:23
26:2,6 31:7
34:25 36:8
70:21 80:12
101:16 108:14
108:20 109:23
112:12,19
113:6 117:13
121:14 127:2

128:6 157:14
163:23,24
164:1,8
**wired** 11:10
33:1 69:23
80:11 122:5
153:15
**wires** 39:8 69:5
80:24 164:11
164:12
**wish** 7:2 100:6
199:1
**withdraw**
118:23 149:9
**withdrawal**
128:16 138:3
138:24 141:24
142:14 147:10
147:16 148:10
148:16,24
149:14,23,25
153:24
**withdrawals**
37:23 125:17
125:19 127:23
145:25 152:20
153:25 176:24
183:12 187:17
**witness** 7:25
9:11 28:15
85:9 87:5,12
87:15,18 89:1
89:3,9,22,24
90:15 92:17
93:20 96:2
99:14,16
104:21 106:15

20-04381-lsg   Doc 332   Filed 06/02/26   Entered 06/02/26 16:29:08   Page 250 of 252
212-267-6868                                         Veritext Legal Solutions
www.veritext.com                                     516-608-2400

117:2,3,5
118:15 119:2
120:4,10
123:19,21
137:21 140:24
142:24 143:11
144:2,13,15,18
144:20 145:7
145:10,14,18
145:22 146:16
152:1 156:9,11
162:6,8 163:6
163:11,14
164:3,6,24
165:2 170:22
171:2,5,9,12
171:20,25
172:20,24
173:1,4,7,10
181:3,13,16
184:3,4 185:19
185:22,25
196:12,23
**witnesses** 5:3
**woman** 97:12
**wonderful**
198:21,22
**word** 24:1 50:9
50:10 58:25
92:2 93:14,15
93:16,20 104:3
180:4
**worded** 93:13
94:4
**wording** 94:3,6
**words** 50:6,7
50:10 100:21

101:10
**wordy** 170:18
**work** 18:5
19:24 25:5
54:16 55:15,22
64:20 66:10
67:24,24,25
69:12 72:19
85:19 163:24
**worked** 15:17
15:19,20 20:6
25:4,4,6,13
35:23 38:15
39:6 44:22
49:18 63:24
68:8 72:21
94:22 111:25
175:18
**working** 19:8
20:2,4,4,5
27:12,20 38:22
38:23 50:17
55:21 66:9
68:10 69:13
74:11 78:20
88:9 94:15
124:2 125:6,10
**world** 20:9
144:22,25
162:9 165:21
175:1
**worried**
103:23 104:17
105:11
**worries** 73:13
73:20

**worth** 165:16
**worthy** 170:17
**wow** 46:21
125:7,8
**wrath** 35:20
**wreck** 35:22
**wrecked**
133:19 134:2
135:3,4 147:3
147:3
**wrecking**
133:19
**write** 13:22
80:18 130:3
**writes** 80:18
150:21
**writing** 66:18
185:8
**written** 22:24
100:22 142:7
**wrong** 33:19
49:10,11 56:8
104:4,5 164:14
173:17
**wrote** 53:11
90:4 107:13
133:16 150:14
151:11

| x |
| --- |
| **x** 1:5,11,17 5:1 |

| y |
| --- |
| **yeah** 18:11,11 |

18:21 21:5,6,6
21:24,24 26:1
26:2 28:9
31:22 35:11

43:16 44:1,10
46:5 47:5,5
48:11 50:21
54:22 55:7
57:20 58:1,23
62:13,15,17,20
65:15 69:24
70:3 71:24
73:11 74:2
75:18 77:4,8
77:17 79:25
81:8,11,14,23
94:1,20,21,22
103:16,21,22
113:15 124:16
127:12 132:18
134:1 137:9
143:12 144:5,8
157:17 158:20
162:8 163:11
166:6,10,16
171:20 173:1,4
175:11 177:16
180:5 186:1,22
196:16
**year** 25:23
26:7 29:17,19
30:21 33:17
40:23 69:21
80:20 98:12,15
167:8 190:14
**years** 15:10,18
20:1 27:13,13
29:15 30:1
61:8,10 65:21
80:2,5 84:14
96:23 125:3

20-04381-lsg Doc 332 Filed 06/02/26 Entered 06/02/26 16:29:08 Page 251 of 252
212-267-6868
Veritext Legal Solutions
www.veritext.com
516-608-2400

134:8 136:5
145:4,4,4
158:3 160:1,4
162:9 172:12
177:24 180:25
181:3

**yelled** 26:20

**yellow** 8:18
10:12,25 11:12
12:11 17:18,20
18:24 23:1,11
23:18,20,24
24:16,18,23
25:2,4,8,15,16
26:10 27:1
46:8,10,19
51:2 52:2
53:13 55:20
59:5,6,21
62:11 96:18
97:10,25 98:18
101:2 102:14
102:17 126:2
155:18,21
156:2,14 168:6
174:15 175:6
176:9 177:3,5
177:15,19

**yesterday** 53:3
71:21 78:22
191:5

**york** 18:5
30:24 35:16
65:22 79:7
80:15 169:12
169:19,20

**young** 75:24
**younger** 70:18
**yup** 18:11 65:4
116:1 154:18
183:18

**z**

**zero** 108:24

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400