# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re: Joseph G. DuMouchelle and
Melinda J. Adducci,

                Debtors.

_____/

Thomas T. Ritter,

                Plaintiff,

v.

Melinda J. Adducci,

                Defendant.

_____/

Chapter 7 Bankruptcy
Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

Adversary Pro. No. 20-04381

## PLAINTIFF'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... vi

    *CASES* ..................................................................................................... vi

    *STATUTES AND OTHER AUTHORITIES* ......................................... ix

STATEMENT OF ISSUES ............................................................................x

BRIEF.............................................................................................................1

INTRODUCTION..........................................................................................1

STATEMENT OF FACTS .............................................................................2

    A.   Plaintiff and Defendant have a long-established relationship that pre-dates The Yellow Rose. ..........................................................................................2

    B.   The Set-Up of the sham Yellow Rose Transaction...................................3

    C.   Defendant's representations induced Plaintiff to enter into the sham Yellow Rose Transaction. .....................................................................................4

    D.   Defendant knew the material terms of the Yellow Rose Purchase Agreement.. ............................................................................................5

    E.   The Yellow Rose was never available for sale and the transaction was a sham........................................................................................................7

    F.   Defendant and Joseph act on the fraudulent scheme – the wire transfer attempts and Defendant's opening of the BofA Account. .................................7

    G.   Defendant loots the account and disburses Plaintiff's $12 million to purposes other than purchasing The Yellow Rose.............................................9

    H.   Plaintiff attempts to recover his money and Defendant never speaks to Plaintiff again. ......................................................................................11

    I.   Defendant runs a phone call with another victim of the DuMouchelle Parties' fraud, Ted Gelov, demonstrating her full-throated involvement in the fraud.......................................................................................................12

i

J. Defendant's acts result in Joseph's criminal conviction and sentencing enhancement. ...................................................................................................12

ARGUMENT ...................................................................................................................14

I. DEFENDANT PERSONALLY PARTICIPATED IN EVERY STAGE OF THE FRAUD AGAINST PLAINTIFF AND THE TRIAL RECORD ESTABLISHES NONDISCHARGEABILITY UNDER §§ 523(a)(2)(A), 523(a)(4), AND 523(a)(6). ....................................................................................14

A. Defendant's personal representations, reckless disregard for the truth, and knowing participation in the fraudulent scheme each independently satisfy § 523(a)(2)(A) – and Plaintiff's reliance was justifiable as a matter of law.........14

1. Defendant's cumulative course of conduct without any post-transaction communication with Plaintiff – was designed to and did create a false impression that The Yellow Rose Transaction was legitimate. ...........................................15

2. Defendant's representations about the purchase and resale value of The Yellow Rose were false and/or made with gross recklessness for the truth because they were made without taking any steps to confirm the viability of a transaction. ..................................................................................................16

3. Independent of any affirmative misrepresentation, Defendant knowingly participated in a fraudulent scheme by opening the BofA Account one day before Plaintiff's $12 million wire arrived and immediately permitting $10.7 million in disbursements for purposes unrelated to the Yellow Rose……………………17

4. Defendant's misuse of Plaintiff's money was knowing and intentional because of the totality of the circumstances here.............................................18

5. Plaintiff's reliance was justifiable as a matter of law because he sought verification from Defendant, a credentialed expert that he had known for decades through shared family ties, and he would not have entered the transaction without Defendant's blessing. ...............................................................................20

B. Defendant's conduct establishes embezzlement under § 523(a)(4) because she opened and solely controlled the account that received Plaintiff's money, admitted that she knew the purpose of the BofA Account, and personally executed every unrelated material disbursement. ............................................21

C. Defendant's deliberate disbursement of $10.7 million of Plaintiff's funds to purposes unrelated to The Yellow Rose Transaction without inquiry, disclosure, or justification, was willful, malicious, and the direct cause of Plaintiff's $12 million loss under § 523(a)(6)..................................................................2

II. DEFENDANT'S NUMEROUS INCONSISTENT STATEMENTS, SELECTIVE MEMORY LAPSES ON MATERIAL FACTS, AND IMPLAUSIBLE TRIAL TESTIMONY DEMONSTRATE FRAUDULENT INTENT AND WARRANT ADVERSE INFERENCES ON EVERY CONTESTED ISSUE. ..................................................................26

III. THE ACTS UNDERLYING JOSEPH'S FEDERAL WIRE FRAUD CONVICTION AND SOPHISTICATED-MEANS SENTENCING ENHANCEMENT WERE COMMITTED BY DEFENDANT – HER CLAIM OF INNOCENT RELIANCE IS IRRECONCILABLE WITH HER OWN CONDUCT..................................................................30

IV. THE COURT'S POST-TRIAL QUESTIONS ARE EACH RESOLVED IN PLAINTIFF'S FAVOR..................................................................31

1. Does anything in the record show that Defendant took out the roughly $2.4 million difference between the approximately $9.6 million disbursed on February 7, 2019 and the $12 million wired into the BofA Account? ..............31

2. For the purposes of §523(a)(2)(A), what is the meaning of "obtained by" and does it include both Defendant's inbound and outbound conduct? ............32

3. Does "entrusted" mean that Plaintiff's funds have to be received by Defendant "in trust" to meet the "entrusted" element of embezzlement? .........34

4. Were the January 25, 2019 telephone call and Defendant's sending of the data package the only contacts between Plaintiff and Defendant regarding the Yellow Rose or the Yellow Rose Transaction? What is the impact of any such contacts on the claims asserted. ..................................................................35

5. a. Were Defendant's statements to Plaintiff during the January 25, 2019 call or in her email attaching the data package were false or misleading, and if so, what statements were false or misleading and how, and what evidence was presented to demonstrate that Defendant's statements were false or misleading; b. If Plaintiff is not alleging that Defendant made a false or misleading statement during the contacts with Plaintiff, whether false pretenses and false

representation fall away, leaving only actual fraud as the grounds under § 523(a)(2)(A), and if so, what is the fraud, and if not, why not. ..........................36

6.    Is Defendant's silence grounds for a false representation, and if so, whether there must first be a duty to disclose, what duty Defendant had, and what silence or failure to disclose Plaintiff relies upon. ........................................................37

7.    Whether there is a duty to correct what would otherwise be a false impression, and if so, what is the false impression that Plaintiff relies upon as giving rise to Defendant's duty to correct..........................................................39

8.    Whether false pretenses requires proof of a misrepresentation or conduct on Defendant's part that was intended to create or foster a false impression, and if so, what is the misrepresentation or false impression that Plaintiff relies upon, and whether false pretenses can stand if Defendant did not say or email anything false to Plaintiff. .........................................................................................39

9.    Whether Plaintiff is asserting that there was a misrepresentation as to whether DuMouchelle Jewellers had The Yellow Rose Diamond to sell, and if so, the impact of Exhibit J10, which contemplates that there would be work to purchase the diamond on behalf of Plaintiff. ......................................................40

10.    Whether there is any dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call regarding a transaction with the person she grew up with from North Dakota. ...................41

11.    How vicarious liability operates on the facts of this case, including whether it impacts or deals with intent, what subsection or subsections of § 523(a) vicarious liability applies to, whether it applies to § 523(a)(2)(A), (a)(4), and/or (a)(6), and whether vicarious liability supervenes the elements of those provisions. Additionally, whether Plaintiff seeks both direct liability and vicarious liability, and how that operates in terms of recovery. ........................41

12.    Whether there is a need to establish Defendant's fraudulent intent for actual fraud under § 523(a)(2)(A), and what role moral turpitude or intentional wrong plays under the Husky framework, including as set forth in paragraph F on page eleven of the Joint Final Pretrial Order. ...............................................44

13.    Whether, if Defendant is not justified in relying on Joseph, Plaintiff can still be justified in relying on Defendant, and whether those are connected or separate concepts. Additionally, where the totality of circumstances analysis

iv

applies – whether to § 523(a)(2)(A), (a)(4), (a)(6), or all of them – and whether it is limited to intent or extends to other elements. ..............................................45

14. Intent versus knowledge: Whether intent is synonymous with knowledge, and what distinct intent standards apply under §§ 523(a)(2)(A), (a)(4), and (a)(6)...................................................................................................................47

V. REQUESTED FINDINGS AND CONCLUSIONS …………………….49

# TABLE OF AUTHORITIES

***CASES***

*Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321 (Bankr. D. Colo. 2013) p. 48

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) p. 26

*Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm)*, 175 B.R. 349 (B.A.P. 9th Cir. 1994) p. 37

*Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12 (Bankr. D. Mass. 2014) pp. 15, 39

*Bd. of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838 (Bankr. N.D. Ill. 2018) p. 48

*Bold City VII, Ltd. v. Radcliffe*, 141 B.R. 1015 (Bankr. E.D. Ark. 1992) p. 28

*Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496 (Bankr. N.D. Ill. 2002), p. 24

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165 (6th Cir. 1996) pp. 20, 21, 35

*Buzzard v. Ratliff (In re Ratliff)*, 673 B.R. 719 (Bankr. S.D. Ohio 2025) p. 24

*Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285 (8th Cir. 1987) p. 18

*Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851 (Bankr. N.D. Ohio 2002) p. 18

*Cohen v. De La Cruz*, 523 U.S. 213 (1998) p. 33

*Contemporary Imps., Inc. v. Morrow (In re Morrow)*, 563 B.R. 272 (Bankr. E.D. Tenn. 2017) p. 22

20-04381-lsg    Doc 334    Filed 06/15/26    Entered 06/15/26 19:22:56    Page 7 of 62

*Driggs v. Black (In re Black)*, 787 F.2d 503 (10th Cir. 1986) p. 48

*Evans v. Dunston (In re Dunston)*, 117 B.R. 632 (Bankr. D. Colo. 1990) p. 15

*Ewers v. Cottingham (In re Cottingham),* 473 B.R. 703 (B.A.P. 6th Cir. 2012) p. 42

*Farmers & Merchs. State Bank v. Perry (In re Perry)*, 448 B.R. 219 (Bankr. N.D. Ohio 2011) p. 46

*Field v. Mans*, 516 U.S. 59 (1995) pp. 14, 20, 21

*Fleming v. Gordon (In re Gordon)*, 491 B.R. 691 (Bankr. D. Md. 2013) pp. 16, 37

*FTC v. Ettus (In re Ettus)*, 596 B.R. 405 (Bankr. S.D. Fla. 2018) p. 26

*Gidelski v. Anton (In re Anton)*, Nos. 08-64144, 09-04344, 2013 Bankr. LEXIS 1715 (Bankr. E.D. Mich. Apr. 12, 2013) p. 42

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) p. 47

*Grogan v. Garner*, 498 U.S. 279 (1991) pp. 15, 22, 24

*Hord v. Envtl. Research Inst.*, 463 Mich. 399 (2000) p. 39

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016) pp. 14, 18, 43, 44, 45

*In re Holly Diane Bolling*, 600 B.R. 838 (Bankr. D. Colo. 2019) p. 42

*In re Kane*, 755 F.3d 1285 (11th Cir. 2014) p. 27

*Initial Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710 (Bankr. E.D. Mich. 2016) , p. 24

*Islamov v. Ungar (In re Ungar)*, 429 B.R. 668 (B.A.P. 8th Cir. 2010) p. 47

20-04381-lsg   Doc 334   Filed 06/15/26   Entered 06/15/26 19:22:56   Page 8 of 62

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) pp. 24, 48

*Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576 (6th Cir. 2001) p. 24

*Kim v. Sun (In re Sun)*, 535 B.R. 358 (B.A.P. 10th Cir. 2015) p. 42

*Lansden v. Jones (In re Jones)*, 585 B.R. 465 (Bankr. E.D. Tenn. 2018) p. 15

*Lenchner v. Korn (In re Korn)*, 567 B.R. 280 (Bankr. E.D. Mich. 2017) pp. 14, 37, 39

*Long v. Piercy (In re Piercy)*, 21 F.4th 909 (6th Cir. 2021) p. 35

*Love v. Smith (In re Smith)*, 98 B.R. 423 (Bankr. C.D. Ill. 1989) p. 43

*MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42 (Bankr. D. Colo. 2014) p. 46

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999) 98 B.R. 423 p. 24

*McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000) p. 18

*Me. Cir. Breaker, Inc. v. Burnham (In re Burnham)*, 2021 Bankr. LEXIS 3497 (Bankr. D. Me. Dec. 23, 2021) p. 48

*Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873 (B.A.P. 6th Cir. 2001) p. 18

*Muhammad v. Reed (In re Reed)*, 542 B.R. 808 (Bankr. N.D. Ill. 2015) p. 37

*Pa. Emples. Ben. Tr. Fund v. Brown (In re Brown)*, 591 B.R. 587 (Bankr. M.D. Pa. 2018) p. 37

*Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630 (Bankr. E.D.N.Y. 2020) p. 21

*Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997) p. 18

*Redmond v. Finch (In re Finch)*, 289 B.R. 638 (Bankr. S.D. Ohio 2003) p. 37

*Rembert v. AT&T Universal Card Servs., Inc.*, 141 F.3d 277 (6th Cir. 1998) p. 14

*Rensin v. FTC*, 604 B.R. 917 (S.D. Fla. 2019) p. 27

*Reyes v. Ranciato (In re Ranciato)*, 638 B.R. 275 (Bankr. D. Conn. 2022) p. 22

*Rice v. Morse (In re Morse)*, 524 B.R. 774 (Bankr. E.D. Tenn. 2015) p. 22

*Rimal v. Gunawan Kuntho Wibisono (In re Gunawan Kuntho Wibisono)*, 412 B.R. 747 (Bankr. D. Md. 2009) p. 19

*Sherman v. Potapov (In re Sherman)*, 603 F.3d 11 (1st Cir. 2010) p. 35

*United Bank of Southgate v. Nelson*, 35 B.R. 766 (N.D. Ill. 1983) p. 24

*U.S. v. Young*, 955 F.2d 99 (1st Cir. 1992) p. 35

*Velde v. Thiel (In re Thiel)*, 587 B.R. 92 (B.A.P. 8th Cir. 2018) p. 27

*W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305 (Bankr. S.D. Fla. 1982) p. 43

*Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431 (B.A.P. 1st Cir. 2017) p. 18

## *STATUTES AND OTHER AUTHORITIES*

11 U.S.C. § 523(a)(2)(A) pp. 14, 17, 18, 20, 29, 32, 37, 40, 41, 42, 44, 45, 47, 49

11 U.S.C. § 523(a)(4) pp. 21, 22, 34, 43, 48

11 U.S.C. § 523(a)(6) pp. 23, 26, 44, 48, 49

Restatement (Second) of Torts § 551(2) pp. 37, 39

# STATEMENT OF ISSUES

Whether Defendant's $12 million debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(2)(A) where Defendant, a credentialed master gemologist, appraiser, and auctioneer upon whom Plaintiff specifically and justifiably relied, personally represented that The Yellow Rose could be purchased for $12 million and resold for $16 to $20 million, transmitted professional valuation materials from her credentialed email address to induce Plaintiff's reliance, opened the bank account that received Plaintiff's $12 million wire, and then authorized or permitted the immediate disbursement of over $10.7 million of Plaintiff's funds for purposes wholly unrelated to The Yellow Rose, a transaction that never existed, where such disbursements were unknown to Plaintiff and not authorized?

PLAINTIFF SAYS: **Yes**

Whether Defendant's $12 million debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(4) where Plaintiff entrusted $12 million to an account over which Defendant was the sole authorized signer, Defendant admitted she knew the account's purpose was to receive Plaintiff's funds for the purchase of The Yellow Rose, and Defendant nonetheless personally authorized or permitted the disbursement of over $10.7 million of those funds to thirteen unrelated payees within one day, none of whom had any connection to the purported transaction, where the disbursements were not disclosed to or approved by Plaintiff?

PLAINTIFF SAYS: **Yes**

Whether Defendant's $12 million debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(6) where Defendant knew the purpose of the $12 million she controlled, disbursed those funds to unrelated parties without inquiry or disclosure and without Plaintiff's knowledge or consent, never contacted Plaintiff after his wire arrived, never responded to his repeated demands for the return of his money, and acted in conscious disregard of her duty to Plaintiff, conduct that was intentional, wrongful, without justification or excuse, and substantially certain to cause Plaintiff injury?

PLAINTIFF SAYS: **Yes**

## BRIEF

Plaintiff Thomas T. Ritter ("**Plaintiff**"), by his undersigned counsel, submits as follows for his Post-Trial Brief:

## INTRODUCTION

This Adversary Proceeding arises from a fraudulent scheme in which Plaintiff lost $12 million in connection with a sham transaction involving a 77.12 carat fancy diamond ring coined "The Yellow Rose." Defendant[1] and her husband Joseph orchestrated the fraud through their business, DuMouchelle Jewellers. Plaintiff relied on Defendant's expertise and his trust in her arising from their familial ties. Defendant opened the BofA Account to receive Plaintiff's funds, was the sole authorized signer when Plaintiff's $12 million wire arrived, and authorized or allowed more than $10,703,971.41 in disbursements of Plaintiff's money for improper purposes while she was the sole authorized account signer without Plaintiff's knowledge or consent. None of Plaintiff's money went to purchase The Yellow Rose, and Defendant submitted no evidence at trial showing that she, her husband, or their business ever had any prospect of using Plaintiff's money to purchase The Yellow Rose. The Yellow Rose was simply a lure used by Defendant and her husband to separate Plaintiff from his $12 million. Plaintiff submits that the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Joint Final Pretrial Order [ECF No. 299]

evidence adduced at trial meets the preponderance standard required to find that his $12 million claim is nondischargeable.

Defendant's credibility on contested issues of knowledge and intent is fatally undermined by multiple prior inconsistent statements as outlined in detail in this Post-Trial Brief. Defendant's credibility was further undermined by her inability to recall material facts regarding the Yellow Rose Transaction throughout trial and her total failure to submit even a scintilla of evidence to substantiate the claim that any opportunity existed to purchase The Yellow Rose with Plaintiff's money. Defendant's contention that she solely relied on and trusted her husband regarding every key element of her defense without exercising even a modicum of independent verification or common sense is not credible and is designed to conceal the fact that Defendant was an enthusiastic participant in the fraud.

## STATEMENT OF FACTS

**A. Plaintiff and Defendant have a long-established relationship that pre-dates The Yellow Rose.**

1. Plaintiff and Defendant have known each other since the 1970s, when Plaintiff's sister married Defendant's brother. During this same period, Plaintiff became a close, long-time friend of Defendant's father, Reuben Hegge ("**Mr. Hegge**"), with whom he spent significant time traveling throughout North Dakota and Montana. Mr. Hegge was a trusted friend and business partner of Plaintiff, and Plaintiff assumed that Mr. Hegge's loyalty and integrity carried through to his children, including Defendant. Trial Tr. Mar. 23, 2026 (Plaintiff) at 83:11–83:17, 85:25-88:5; 106:9–16 and 132:23–133:5; Trial Tr. Mar. 24, 2026 (Plaintiff) 7:11–16; Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) 15:9–16:3.

2.      Defendant began her career in the jewelry business working in a jewelry store owned by Plaintiff's twin brothers and subsequently obtained accreditation as a master gemologist, appraiser, and auctioneer – titles she held at the time of the Yellow Rose Transaction. Defendant's signature block for her DuMouchelle Jewellers email address contained these titles and accreditation initials, and Defendant was the vice president of DuMouchelle Jewellers and held a ten percent membership interest therein. Exhibit J9; Trial Tr. Mar. 23, 2026 (Plaintiff) at 82:14–83:5; Trial Tr. Mar. 24, 2026 (Defendant) at 88:1-16; 89:15–91:18; 94:13–95:11; Trial Tr. Mar. 26, 2026 (Defendant) at 14:1–15:7; JFPTO, Stipulated Facts ¶¶ 4(a)–(b).

3.      At all times relevant to this Adversary Proceeding, Defendant was the vice president of DuMouchelle Jewellers and held a ten percent membership interest therein. JFPTO, Stipulated Facts ¶¶ 4(a)–(b); Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) 61:17–21.

4.      Sometime after Mr. Hegge passed away in 2008, Defendant and Joseph initiated a business relationship with Plaintiff in which they borrowed money from Plaintiff to make purchases of jewelry to resell at a profit through DuMouchelle Jewellers. Trial Tr. Mar. 23, 2026 (Plaintiff) at 88:20–90:22; 94:6–95:8.

5.      Plaintiff never purchased any jewelry from the DuMouchelle Parties for personal use, though on at least one occasion Defendant sent a piece to Plaintiff and his wife for consideration; Mrs. Ritter was not interested in purchasing the piece so Plaintiff returned it to the DuMouchelle Parties. Trial Tr. Mar. 23, 2026 (Plaintiff) at 88:20–90:25.

**B. The Set-Up of the sham Yellow Rose Transaction.**

6.      In 2018, Plaintiff was owed an outstanding balance on one of the notes he had issued to Defendant and Joseph and was interested in resolving it as part of his personal estate planning. To that end, Plaintiff contacted Joseph to resolve the outstanding debt. Trial Tr. Mar. 23, 2026 (Plaintiff) at 98:18–99:10.

7.      In response, in late January 2019, Joseph identified a potential investment in The Yellow Rose, which he represented could be purchased for $12.5 million and resold at a profit. Trial Tr. Mar. 23, 2026 (Plaintiff) at 98:14–99:22.

8.      At the time, The Yellow Rose was owned by Bill Noble and/or his business, which had terminated its consignment relationship with DuMouchelle Jewellers on January 7, 2019 when it filed a lawsuit against DuMouchelle Jewelers

3

in Texas on January 9, 2019, claiming to be owed $7 million. Trial Tr. Mar. 26, 2026 at 77:6–77:24; Trial Tr. Mar. 26, 2026 (Defendant) at 144:2–144:6. Defendant introduced no evidence at trial to show that Defendant, her husband or DuMouchelle Jewellers had the right to sell The Yellow Rose at any time, ever acquired such a right or even negotiated to obtain the rights or buy or sell the Yellow Rose. The "Yellow Rose Transaction" is a misnomer, as there never was a legitimate transaction to buy or sell the Yellow Rose – The Yellow Rose was at all times a ruse to separate Plaintiff from his money.

9.    Plaintiff was interested in the concept of buying and then reselling the Yellow Rose because he viewed the potential profit to be realized from such a transaction as a means by which he could resolve the outstanding balance on his prior $430,000 promissory note and also share in the profits with Defendant and Joseph. Trial Tr. Mar. 23, 2026 (Plaintiff) at 99:11–100:20; 106:13–22.

### C. Defendant's representations induced Plaintiff to enter into the sham Yellow Rose Transaction.

10.    Although Plaintiff was interested in the proposed transaction, he asked Joseph to have Defendant call him to discuss the details of The Yellow Rose and whether there was support for the proposed resale value. Trial Tr. Mar. 23, 2026 (Plaintiff) at 99:11–100:25. Plaintiff made this request because he trusted the Defendant and wanted her input on whether the transaction was bona fide. Trial Tr. Mar. 23, 2026 (Plaintiff) at 106:6–106:24.

11.    In response to Plaintiff's request, on or about January 25, 2019, Defendant called Plaintiff to discuss The Yellow Rose, including the amount for which it could be purchased and its potential resale value. Trial Tr. Mar. 24, 2026 (Plaintiff) at 8:8–22. Defendant confirmed for Plaintiff that it would be possible to garner between $16 million and $20 million on the resale of The Yellow Rose. Trial Tr. Mar. 23, 2026 (Plaintiff) at 99:23–101:20; Trial Tr. Mar. 24, 2026 (Plaintiff) at 105:1–106:9. These statements were intended to and did lead Plaintiff to believe that the opportunity to purchase the Yellow Rose for $12 million actually existed and that Defendant would use Plaintiff's $12 million solely for that purpose. Trial Tr. Mar. 24, 2026 (Defendant) at 102:12–20; Trial Tr. Mar. 26, 2026 (Plaintiff) at 128:8–130:1.

12.    In follow up to the telephone call, on January 25, 2019, Defendant sent the Data Package Email to Plaintiff with attachments that included a 2011 appraisal reflecting an insurance value of $30 million for The Yellow Rose and a scanned copy of the GIA Monograph. Defendant sent the Data Package Email from her

4

lindy@josephdumouchelle.com account containing her credentialed signature block. JFPTO, Stipulated Facts ¶ 4(c); Trial Tr. Mar. 23, 2026 (Plaintiff) at 91:16–92:10; Trial Tr. Mar. 24, 2026 (Plaintiff) at 8:11–9:5; Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 47:1–48:5, 53:10–21; Trial Tr. Mar. 24, 2026 (Defendant) at 88:1–91:7, 96:5–14; Exhibit J9.

13. The transmittal of the Data Package Email was an additional representation by Defendant that the opportunity to acquire the Yellow Rose for $12 million actually existed and that his $12 million would be used solely for that purpose—that is, to purchase the Yellow Rose. Trial Tr. Mar. 23, 2026 (Plaintiff) at 91:16–92:10; Trial Tr. Mar. 26, 2026 (Plaintiff) at 128:1–129:5.

14. Thereafter, Plaintiff left a telephone message or text message with Defendant asking for confirmation that the resale value of $16 million to $20 million was supportable. Defendant responded to Plaintiff either by a return voicemail or text message affirming the accuracy of Plaintiff's request. Trial Tr. Mar. 23, 2026 (Plaintiff) at 105:10–20. This response was a further representation that the opportunity to acquire the Yellow Rose for $12 million actually existed and that his $12 million would be used solely for that purpose – that is, to purchase the Yellow Rose.

15. Thereafter, and based upon the express and implied representations made by Defendant, Plaintiff decided to participate in what he believed was the Yellow Rose Transaction. Without Defendant's blessing and involvement, including without limitation the express and implied representations made by Defendant that are described above, Plaintiff would not have entered into The Yellow Rose Transaction. Trial Tr. Mar. 23, 2026 (Plaintiff) at 105:22–106:24; Trial Tr. Mar. 24, 2026 (Plaintiff) at 12:11–13; 106:1–24; 112:12–16. Plaintiff believed the Yellow Rose Transaction to be a real opportunity, relying on Defendant's expertise, her gemology and appraiser credentials, the telephone call, the Data Package Email, the subsequent message exchange, and the family history and inherent trust between Plaintiff and Defendant. Trial Tr. Mar. 23, 2026 (Plaintiff) at 93:1–10; 166:1–167:5; 198:24–199:6.

**D. Defendant knew the material terms of the Yellow Rose Purchase Agreement.**

16. Subsequent to Defendant's confirmation about the prospects of the Yellow Rose Transaction, and without knowledge that the "Transaction" was a sham, Plaintiff worked with Joseph to negotiate the terms by which Joseph would allegedly acquire The Yellow Rose on Plaintiff's behalf. Plaintiff drafted the Yellow

5

Rose Purchase Agreement, which was signed by Joseph and Plaintiff on January 30, 2019. JFPTO, Stipulated Facts ¶ 4(e); Trial Tr. Mar. 23, 2026 (Plaintiff) at 108:17–112:11; Exhibit J10.

17. As stated in the Yellow Rose Purchase Agreement, Plaintiff acknowledged that he was not experienced in this type of transaction and would have to rely heavily on Joseph's guidance and advice. Trial Tr. Mar. 23, 2026 (Plaintiff) at 132:18–133:5; Exhibit J10 ("not doing this every day leaves me a bit out of my comfort zone, so I will have to rely heavily on your guidance and advice'" and further, "[y]ou, your agents, or assigns, or your company will then go to work on reselling the diamond for the best price possible above the purchase price.")

18. The Yellow Rose Purchase Agreement provided that Joseph would purchase The Yellow Rose for $12 million. JFPTO, Stipulated Facts ¶ 4(e). The Agreement initially contemplated that Plaintiff would wire his money to an escrow account at JPMorgan Chase. In practice, the escrow account was never established because Joseph represented to Plaintiff that it would be difficult to show The Yellow Rose to prospective buyers if it were held in escrow. Instead, Plaintiff agreed he would transmit his $12 million wire to the account of the seller of The Yellow Rose or the seller's representative. Trial Tr. Mar. 23, 2026 (Plaintiff) at 114:15–115:13; 119:2–15.

19. Plaintiff included these statements in the document because he wanted to ensure Defendant had the opportunity to participate in the financial rewards of the proposed opportunity as he was unsure of the actual relationship between Defendant and her husband and because she had played an important role in persuading Plaintiff to move forward. The existence of Plaintiff's references to Defendant in this document confirms her central role in what later would be revealed as a sham transaction. Trial Tr. Mar. 24, 2026 (Plaintiff) at 10:1–11:9.

20. Defendant acknowledged that she knew about the Yellow Rose Purchase Agreement and that she read its terms aloud to her son, Joey Adducci ("**Joey**"). Notwithstanding, Defendant did not sign the Yellow Rose Purchase Agreement. JFPTO, Stipulated Facts ¶ 4(f); Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 99:3–6; Trial Tr. Mar. 24, 2026 (Defendant) at 101:22–23. Plaintiff believes that the Defendant's failure to sign the agreement when on its face, it presented her with the opportunity to make money from any legitimate sale, was because she knew the sale to be a sham.

6

**E. The Yellow Rose was never available for sale and the transaction was a sham.**

21. Although Defendant physically held The Yellow Rose and took photographs of herself wearing it around Labor Day weekend of 2018, she could not testify as to whether The Yellow Rose was in the possession of DuMouchelle Jewellers at the time Plaintiff entered into The Yellow Rose Transaction in January to February 2019. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip); Trial Tr. Mar. 25, 2026 (Defendant) at 99:9–21; 105:1–106:10; Trial Tr. Mar. 26, 2026 (Plaintiff) at 26:24–27:4, 35:16–25.

22. In fact, The Yellow Rose would have never been in the possession of any of the DuMouchelle Parties in January 2019 because Bill Noble had already initiated a lawsuit in January 2019.

**F. Defendant and Joseph act on the fraudulent scheme – the wire transfer attempts and Defendant's opening of the BofA Account.**

23. After the execution of the Yellow Rose Purchase Agreement, Joseph sent an email to Plaintiff containing wiring instructions for an account at MB Financial Bank in the name of Highland Wealth Management, which purported to be the account information for The Yellow Rose seller or seller's representative. JFPTO, Stipulated Facts ¶¶ 4(h)–(i); Trial Tr. Mar. 23, 2026 (Plaintiff) at 115:2–5.

24. Plaintiff attempted to wire his $12 million to the MB Financial Bank account but the wire was rejected. JFPTO, Stipulated Facts ¶¶ 4(j)–(k); Trial Tr. Mar. 23, 2026 (Plaintiff) at 115:2–20.

25. In response, Joseph sent an email to Plaintiff containing wiring instructions for an account at FineMark Bank and Trust, which he purported to be new wiring instructions for the seller or the seller's representative. JFPTO, Stipulated Facts ¶¶ 4(l), (o); Trial Tr. Mar. 23, 2026 (Plaintiff) at 116:14–22.

26. For a second time, Plaintiff attempted to wire his $12 million to the FineMark Bank account, and that wire was also rejected. JFPTO, Stipulated Facts ¶¶ 4(m)–(n); Trial Tr. Mar. 23, 2026 (Plaintiff) at 116:20–117:1.

27. Plaintiff did not view the banks' wire rejections as "red flags" because he had experienced similar banking issues in the past when transacting wire transfers for substantial sums of money. Moreover, it was not unusual for Plaintiff to transact

7

business in dollar amounts of this size in his line of work in the oil industry. Trial Tr. Mar. 23, 2026 (Plaintiff) at 115:21–116:5; 117:2–8.

28.     After the two prior wire attempts were rejected, on February 6, 2019, Joseph directed Plaintiff to wire $12 million to a Bank of America account described as belonging to Fine & Estate Appraisers, LLC, with an account number ending in 0585. The wire was accepted that day. JFPTO, Stipulated Facts ¶¶ 4(q), (s)–(t); Trial Tr. Mar. 23, 2026 (Plaintiff) at 119:11–25.

29.     However, the account was not the seller's or the seller representative's account; it was the BofA Account titled to DuMouchelle Jewellers. Exhibit J2; JFPTO, Stipulated Facts ¶¶ 4(q)-(r); Exhibit J4; Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 44:3–20.

30.     Defendant had opened the BofA Account on or about February 5, 2019 – one day before Plaintiff's $12 million wire reached the BofA Account. Trial Tr. Mar. 24, 2026  (Defendant) at 107:2–22; Exhibit J5.  It is unknown whether Defendant provided the account number to Joseph to provide to Plaintiff as part of the wire instructions – but no other source of that information was identified at trial.

31.     At the time of the $12 million wire on February 6, 2019, Defendant was the only authorized signer on the BofA Account. Exhibit J4; Trial Tr. Mar. 24, 2026 (Defendant) at 149:1–10; Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 42:14–45:25; Trial Tr. Mar. 24, 2026 (Defendant) at 107:2–25.

32.     Critically, Defendant admitted she knew the purpose of the BofA Account was to receive Plaintiff's $12 million wire. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 36:6–11; Trial Tr. Mar. 24, 2026 (Defendant) at 121:25–122:16; Trial Tr. Mar. 25, 2026  (Defendant) at 45:20–46:2. Defendant did not offer any evidence to show that the opportunity to purchase the Yellow Rose ever existed or that she could have ever reasonably believed the proposed transaction to be legitimate.

33.     The BofA Account balance immediately before the wire was approximately $500. Exhibit J5; Trial Tr. Mar. 24, 2026 (Defendant) at 110:1–7; Trial Tr. Mar. 25, 2026  (Defendant) at 38:19–22.  Defendant most likely provided the account number to her husband to convey to Plaintiff.

8

**G. Defendant loots the account and disburses Plaintiff's $12 million to purposes other than purchasing The Yellow Rose.**

34. Once Plaintiff's $12 million reached the BofA Account, his money was not used to purchase The Yellow Rose. Instead, the first disbursements occurred on February 6, 2019 – the same day Plaintiff's wire arrived – in the form of three "legal order" debits, while Defendant was the sole signatory on the BofA Account. J5; Trial Tr. Mar. 24, 2026 (Defendant) at 151:1–155:25.

35. On February 7, 2019, the day after Plaintiff's wire arrived, Defendant made two trips to a Bank of America branch in Tucson, Arizona. JFPTO, Stipulated Facts ¶ 4(y). On each trip, Defendant authorized and signed three counter withdrawals totaling approximately $5.1 million–specifically $39,000, $1,091,769.44, and $4,041,925 – and also authorized three interbank transfers to William Noble Rare Jewels (account ending in 9238, receiving two transfers totaling approximately $4,367,000) and Ryan & Rodney Diamonds, Inc. (account ending in 4272, receiving $150,000). Exhibits J2; J3; J42; J43; J44; JFPTO, Stipulated Facts ¶¶ 4(v)–(x); Trial Tr. Mar. 24, 2026 (Defendant) at 141:22–142:5; 147:7–21, 149:7–150:4, 151:1–155:25. Defendant offered no evidence to show that she reasonably believed any of these expenditures were to purchase The Yellow Rose. Plaintiff did not authorize or approve these disbursements – which he did not even know about.

36. Defendant testified that on February 7, 2019, she was very angry at Joseph because he interrupted her day at the GIA Conference and interfered with her evening plans, implying she was in a rush and under duress. Trial Tr. Mar. 24, 2026 (Defendant) 158:14–23. In reality, the conference and awards dinner took place the day prior, on February 6, 2019. Exhibit J30; Trial Tr. Mar. 25, 2026 (Defendant) 6:4–8:9. When confronted with this discrepancy, Defendant claimed she misremembered and that there were other events on February 7, 2019 that were interrupted–events she never adequately explained at trial. Trial Tr. Mar. 25, 2026 (Defendant) at 8:10–13.

37. Defendant testified that when she authorized the banking transactions on February 7, 2019, she did not have online access to the BofA Account and believed, on account of her trust in Joseph, that there were sufficient funds to authorize the more than $9.6 million in disbursements. However, Defendant could have learned of the account balance during either of her two trips to the BofA branch on February 7, 2019 and never explained what other funds she expected to be in the BofA Account besides Plaintiff's $12 million. Trial Tr. Mar. 24, 2026 (Exhibit P1,

9

Deposition Clip) at 35:1-7; 40:15:17; Trial Tr. Mar. 24, 2026 (Defendant) at 134:1–10; Trial Tr. Mar. 25, 2026 (Defendant) at 128:18–25.

38.     Joseph's emails establish that Defendant and Joseph were in regular communication on February 7, 2019. For example, in his 6:16 ET email to a Bank of America banker – with Defendant copied – Joseph informed the banker that Defendant would be there at 4:20 MST (thus would be arriving to the branch in 4 minutes), which could only have been known if they were in telephone contact about the transactions. Exhibit J42; Trial Tr. Mar. 24, 2026 (Defendant) at 140:4–141:4. Joseph could only have known Defendants' immediate proximity to the bank branch if they were in telephone contact about the transactions. The emails further show that Joseph was openly discussing with Defendant that Plaintiff's money was being used to pay other creditors and was not being used to purchase the Yellow Rose– confirming that Defendant was a knowing participant in the scheme to defraud Plaintiff. Exhibits J42 through J44.

39.     During Defendant's second visit to the Bank of America Tucson branch on February 7, 2019, she obtained a set of cashier's checks payable to third parties and made a separate trip to a FedEx office in Tucson to send the checks to Joseph in Michigan. Trial Tr. Mar. 24, 2026 (Defendant) at 160:19–162:4.  In total, there were 13 different payees who received Plaintiff's money on February 7, 2019. Trial Tr. Mar. 25, 2026 (Defendant) at 19:16–20:23, 21:11–20; *See* **Attachment A**.

40.     Given that Defendant was the sole signatory on the BofA Account, had full access to the account information, was copied on the emails, and was in regular communication with her husband on February 7, 2019, and given the manner and the numerous payees receiving disbursements on February 7, 2019, Defendant knew or should have known that she was participating in a fraudulent scheme to use Plaintiff's money other than for its intended purpose.

41.     Defendant could have instructed the banker at the BofA branch to return the $12 million to Plaintiff, but she did not do that, instead electing to participate in the disbursement of his $12 million for other than its intended purpose. Trial Tr. Mar. 24, 2026 (Defendant) at 159:23–24; 180:21–22.

42.     On February 11, 2019, Defendant returned to a Bank of America branch–this time in Florida – and signed a counter withdrawal slip for $180,000, which resulted in two $90,000 cashier's checks: one payable to Marcella G. Rabinovich, PLLC attorney trust account, and one payable to Joseph DuMouchelle Fine and Estate Jewelers, LLC. Trial Tr. Mar. 25, 2026 (Defendant) at 62:1–12, 63:3–19; Exhibit J3.  None of these disbursements were to purchase the Yellow

Rose. Trial Tr. Mar. 24, 2026 (Defendant) at 156:14-16. This withdrawal, four days after Defendant diverted over $10 million of Plaintiff's money on February 7, 2019, is further confirmation that Defendant was a knowing participant in the scheme to defraud Plaintiff.

## H. Plaintiff attempts to recover his money and Defendant never speaks to Plaintiff again.

43. Defendant never, at any time after Plaintiff wired his $12 million, followed up with Plaintiff about whether the Yellow Rose Transaction had been completed or to inquire about the outcome for Plaintiff. Trial Tr. Mar. 23, 2026 (Plaintiff) at 127:14-16; Trial Tr. Mar. 24, 2026 (Defendant) at 172:8–10.

44. Defendant testified that she always wanted customers to be happy and wanted to be extra careful with Plaintiff's transaction, yet Defendant presented no testimony or evidence regarding steps she took to assure the success of the Yellow Rose Transaction or even confirm that it had taken place. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 47:1–5; Trial Tr. Mar. 25, 2026 (Defendant) at 27:23–25.

45. Eventually, Joseph represented to Plaintiff that he had secured a buyer and emailed a copy of a proposed resale agreement. JFPTO, Stipulated Facts ¶¶ 4(aa)–(bb). The resale agreement turned out to be fictitious as the Yellow Rose had not been purchased for Plaintiff's benefit and no buyer existed. Trial Tr. Mar. 23, 2026 (Plaintiff) at 126:7–20; 141:4–10; Exhibit J34, page 3.

46. Out of concern for the lack of action on the resale, Plaintiff decided to travel from North Dakota to Michigan in April 2019 to view The Yellow Rose in person and made arrangements with Joseph to meet at the airport in Detroit and travel to the Brinks depository where The Yellow Rose was purportedly held in storage. JFPTO, Stipulated Facts ¶¶ 4(z), (dd)–(ee); Trial Tr. Mar. 23, 2026 (Plaintiff) at 124:20–125:16.

47. When Plaintiff met with Joseph, Joseph told him that his contact at the Brinks Depository was not available that day. Instead, Plaintiff and Joseph traveled to the DuMouchelle Jewellers office, where Plaintiff had the chance to review the GIA Monograph Book. Plaintiff asked to see Defendant, but Joseph represented that Defendant was not available that day. Trial Tr. Mar. 23, 2026 (Plaintiff) at 125:9 – 16.

11

48.     Without further event, Plaintiff returned to North Dakota on the same day he traveled to Detroit. While at the airport waiting for his return flight, Plaintiff called the Brinks Depository to inquire about The Yellow Rose and whether it was stored under his name or Joseph's name. The caller indicated that there was no such account. Plaintiff realized at that point that the Yellow Rose Transaction was a ruse. Trial Tr. Mar. 23, 2026 (Plaintiff) at 126:1–20.

49.     Subsequently, Plaintiff transmitted four separate emails to both Joseph and Defendant at the lindy@josephdumouchelle.com email address over a span of two months, pressing for a return of his money. Still believing in Defendant's integrity, Plaintiff included Defendant in the emails, hoping to appeal to Defendant's conscience. Trial Tr. Mar. 23, 2026 (Plaintiff) at 128:2–129:20; 130:17–133:5, 134:17–136:11; Exhibits J45, J46, J47 and J48.

50.     Defendant never responded to the emails and testified that she never saw them. Id.

51.     Defendant half-heartedly suggested that Joseph may have deleted the emails, but she also testified that she was receiving her lindy@josephdumouchelle.com emails on her mobile phone.

## I.  Defendant runs a conversation with another victim of the DuMouchelle Parties' fraud, Ted Gelov, demonstrating her full-throated involvement in the fraud.

52.     The recorded telephone call between Defendant, Joseph, and Ted Gelov features Defendant as the primary speaker and establishes that Defendant was a fully informed and active participant in the business affairs of DuMouchelle Jewellers. She used Plaintiff's description to imply for Mr. Gelov that it was Plaintiff who purchased Ted Gelov's collateral and that that Plaintiff's money was meant to repay Ted Gelov but was tied up with the banks. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 63:1–82:11. In that call, Defendant demonstrated comprehensive, detailed, and current knowledge of DuMouchelle Jewellers' banking relationships.

## J.  Defendant's acts result in Joseph's criminal conviction and sentencing enhancement.

53.     Defendant also testified that she did not do much banking for DuMouchelle Jewellers. However, in the recorded telephone call with Mr. Teodor Gelov, Defendant was the primary and nearly exclusive speaker and talked at length

12

about her banking experience, including ACH processing, wire transfers, and account management. Additionally, Defendant was the signer on many BofA Account checks well past February 2019, and the BofA Account was overdrawn from February 2019 through at least May 2019, with dozens if not hundreds of NSF checks drawn on the account. Trial Tr. Mar. 25, 2026 (Defendant) at 50:12–51:3.

54. Regarding the use of Plaintiff's $12 million, Joseph's guilty plea, Exhibit J34, states that "DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." However, the trial record establishes that it was Defendant who personally signed the counter withdrawal slips authorizing approximately $9.6 million in disbursements from the BofA Account on February 7, 2019, and that the sentencing enhancement opinion, Exhibit J25, applied a sophisticated means enhancement to Joseph's sentence based in part on the recorded Gelov telephone call in which Defendant was the primary speaker. Defendant confirmed at trial that both the disbursements and the Gelov call formed the basis for Joseph's criminal consequences. Throughout this entire period, DuMouchelle Jewellers was in serious financial decline, and Plaintiff never received repayment of his $12 million. JFPTO, Stipulated Facts ¶ 4(ff); Trial Tr. Mar. 25, 2026 (Defendant) at 45:20–46:6, 48:23–51:20. Exhibit J25.

55. Plaintiff obtained a default judgment in North Dakota against the DuMouchelle Parties, including Defendant, for the $12 million plus other amounts related to the prior promissory notes, the expected $4 million profit from the Yellow Rose Transaction, and judgment interest, totaling $17,140,031.62 (the "North Dakota Judgment"). JFPTO, Stipulated Facts ¶¶ 4(gg)–(hh). Exhibit J6.

56. In sum, Defendant was the sole signatory on the account when a total of **$10,703,971.41** in transactions were authorized by Defendant or occurred while Defendant was sole BofA Account signatory.[2] Exhibits J2, J3, J4, J5.

---

[2] **Attachment A** to this Post-Trial Brief is a summary of 25 transfers of Plaintiff's money that occurred while Defendant was either the sole signatory on the BofA Account or were authorized by Defendant via a signed withdrawal slip. Defendant affirmatively signed for $9.6 million of the transactions and an additional $1.1 million of "legal order" debits occurred while Defendant was the sole signer on the account.

13

<u>**ARGUMENT**</u>

**I. DEFENDANT PERSONALLY PARTICIPATED IN EVERY STAGE OF THE FRAUD AGAINST PLAINTIFF AND THE TRIAL RECORD ESTABLISHES NONDISCHARGEABILITY UNDER §§ 523(a)(2)(A), 523(a)(4), AND 523(a)(6).**

    **A. Defendant's personal representations, reckless disregard for the truth, and knowing participation in the fraudulent scheme each independently satisfy § 523(a)(2)(A) – and Plaintiff's reliance was justifiable as a matter of law.**

Section 523(a)(2)(A) excepts from discharge any debt for money obtained by false pretenses, a false representation, or actual fraud. JFPTO, Stipulated Law ¶¶ B–C. Plaintiff must prove the debt was obtained through at least one of three alternative theories: (a) false pretenses – an implied misrepresentation or conduct intended to create or foster a false impression, JFPTO, Stipulated Law ¶ D; *Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300 (Bankr. E.D. Mich. 2017); (b) false representation – an express representation the Debtor knew was false or made with gross recklessness, with intent to deceive, upon which the creditor justifiably relied, and which proximately caused the loss, JFPTO, Stipulated Law ¶ E; *Rembert v. AT&T Universal Card Servs., Inc.*, 141 F.3d 277, 280-81 (6th Cir. 1998); or (c) actual fraud – a fraud involving moral turpitude or intentional wrong, JFPTO, Stipulated Law ¶ F; *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Plaintiff must establish justifiable – but not objectively reasonable – reliance. JFPTO, Stipulated Law ¶ G; *Field v. Mans*, 516 U.S. 59, 73-75 (1995). Plaintiff bears the burden of proof by a

14

preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan v. Garner*, 498 U.S. 279, 287–288 (1991).

**1. Defendant's cumulative course of conduct without any post-transaction communication with Plaintiff – was designed to and did create a false impression that The Yellow Rose Transaction was legitimate.**

Defendant's conduct establishes false pretenses – it was designed to foster Plaintiff's false impression that he was tendering $12 million as part of a legitimate transaction. No real opportunity ever existed–The Yellow Rose was simply a ruse to obtain Plaintiff's money. False pretenses "has also been described as 'usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction.'" *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 505–06 (Bankr. E.D. Tenn. 2018) (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990)). See also *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 18–19 (Bankr. D. Mass. 2014). Defendant was a critical component in the fraudulent scheme – but for her involvement the fraud would never have occurred. Defendant called Plaintiff in January 2019 and confirmed that The Yellow Rose could be purchased for $12 million and resold for $16 million to $20 million. She sent the Data Package Email from her credentialed professional email address, attaching a 2011 appraisal reflecting an insurance replacement value of $30 million and the GIA Monograph, and thereafter affirmed the resale value in a follow-up

15

message. These representations created a shroud of legitimacy that induced Plaintiff to wire $12 million. In reality, there was no opportunity to buy and sell The Yellow Rose, The Yellow Rose was never purchased, and Defendant participated in and enabled the disbursement of Plaintiff's funds from the BofA Account knowing that his money had been wired there for a different purpose.

**2. Defendant's representations about the purchase and resale value of The Yellow Rose were false and/or made with gross recklessness for the truth because they were made without taking any steps to confirm the viability of a transaction.**

Defendant's representations amount to false representations because they were made with gross recklessness and disregard for the truth. There is no dispute that the Yellow Rose transaction was a sham and fraud. Defendant never offered a scintilla of evidence to demonstrate how or why she could have considered it anything other than a sham. A representation is "reckless" if it is made without any knowledge of the truth, or if the person making it knows that she does not have sufficient information or a basis to support it. *Fleming v. Gordon (In re Gordon)*, 491 B.R. 691, 701 (Bankr. D. Md. 2013).

Defendant's representations amount to false representations because they were made with gross recklessness and disregard for the truth. Defendant held herself out as a credentialed gemologist upon whom Plaintiff relied, yet by her own account she took no steps to verify that DuMouchelle Jewellers held or could acquire The Yellow Rose, or that the transaction was legitimate or had any prospect of

16

success. When confronted with the overwhelming evidence of her direct participation in the fraudulent scheme, Defendant's mantra was: she "trusted Joe" – a confession of reckless indifference to the truth of every representation she made. This assertion rang particularly hollow in regard to Defendant's conduct on February 7, 2019 and her blind ambivalence to even the most basic inquiry about the incredible events that were taking place that day. That reckless disregard, combined with the falsity of the representations and Plaintiff's resulting $12 million loss, satisfies the false representation element of § 523(a)(2)(A).

Defendant's claimed reliance on Joseph is not a defense; it is an aggravating factor. The "trusted Joe" defense, taken to its logical conclusion, would immunize any debtor who participates in a fraud so long as she can point to a co-conspirator. That is not the law. Defendant's professional credentials, her exclusive control over the BofA Account, and the sheer magnitude of the disbursements she authorized render her claimed reliance on Joseph objectively unreasonable and legally insufficient as a defense.

3. **Independent of any affirmative misrepresentation, Defendant knowingly participated in a fraudulent scheme by opening the BofA Account one day before Plaintiff's $12 million wire arrived and immediately permitting $10.7 million in disbursements for purposes unrelated to the Yellow Rose.**

Defendant's conduct constitutes actual fraud. Actual fraud encompasses any fraud involving moral turpitude or intentional wrong, including fraudulent schemes

that do not require a direct false statement to the creditor. *Husky*, 578 U.S. at 360; JFPTO, Stipulated Law ¶ F. Actual fraud within the meaning of § 523(a)(2)(A) "encompasses 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)); see also *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987). The focus under the actual fraud prong is whether the debtor knowingly participated in a scheme to defraud, not whether she made a representation directly to the plaintiff.

### 4. Defendant's misuse of Plaintiff's money was knowing and intentional because of the totality of the circumstances here.

Defendant's fraudulent intent is established by the totality of the circumstances. "'[T]he court may infer fraudulent intent from the totality of the circumstances.'" *Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431, 445 (B.A.P. 1st Cir. 2017). Moreover, "'[s]ubsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made.'" *Palmacci v. Umpierrez*, 121 F.3d 781, 792 (1st Cir. 1997); see also *Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 855 (Bankr. N.D. Ohio 2002). Defendant knew the material terms of the Yellow Rose Purchase Agreement, having admitted to reading it to her son. Defendant personally discussed the fraudulent "opportunity" with Plaintiff,

18

confirming that the Yellow Rose could be purchased for $12 million and resold for $16 to $20 million.  Defendant knew the purpose of the BofA Account was to receive Plaintiff's $12 million to purchase The Yellow Rose and opened that account on February 5, 2019 – one day before the wire arrived. She was the sole authorized signer when Plaintiff's money reached the account and, within one day, authorized or permitted $10,703,971.41 in disbursements to parties having nothing to do with The Yellow Rose. *See* **Attachment A**. She never took steps to investigate the success of the transaction and never spoke to Plaintiff after his wire arrived. The Gelov telephone call, read together with Defendant's awareness of DuMouchelle Jewellers' financial distress and the BofA Account balance at the time of her disbursements, reveals her knowing and intentional participation in the fraudulent scheme.

Notwithstanding all of the information that Defendant knew and that was readily accessible to her, Defendant never took steps to investigate the success of the Yellow Rose Transaction and never spoke to Plaintiff again once his $12 million reached the BofA Account.  Defendant never responded to the four emails sent by Plaintiff after he learned he had been defrauded. Reckless disregard for the truth, combined with the magnitude of the resultant misrepresentation, can infer an intent to deceive. *Rimal v. Gunawan Kuntho Wibisono (In re Gunawan Kuntho Wibisono)*,

412 B.R. 747, 756 (Bankr. D. Md. 2009); *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996).

> **5. Plaintiff's reliance was justifiable as a matter of law because he sought verification from Defendant, a credentialed expert that he had known for decades through shared family ties, and he would not have entered the transaction without Defendant's blessing.**

Plaintiff's reliance on Defendant's representations was justifiable. Plaintiff had known Defendant for decades – their siblings were married to each other, Plaintiff was best friends with Defendant's father, and she had worked in his brothers' jewelry store at the start of her career. Defendant held herself out as a master gemologist, auctioneer, and appraiser, and it was specifically her expertise and their family ties that led Plaintiff to request Defendant's – not Joseph's – verification of the transaction. Plaintiff testified that without Defendant's blessing and involvement he would not have entered into The Yellow Rose Transaction. Trial Tr. Mar. 24, 2026 (Plaintiff) at 9:6–10:5. Reliance on the professional opinion of a credentialed expert with whom one shares a longstanding family relationship is justifiable. JFPTO, Stipulated Law ¶ G; *Field v. Mans*, 516 U.S. at 73–75.

Defendant argues that because the Yellow Rose Purchase Agreement (Exhibit cannot have justifiably relied on Defendant. This argument fails for several reasons. First, the justifiable reliance inquiry under § 523(a)(2)(A) is not limited to representations made in a formal written agreement; it encompasses all representations made by the debtor that induced the creditor to part with his money.

*Field v. Mans*, 516 U.S. at 73–75. Second, Defendant's representations preceded the execution of the Yellow Rose Purchase Agreement. Third, Plaintiff's January 31, 2019 email to both Defendant and Joseph attaching the executed Agreement expressly acknowledged Defendant's "skill and expertise in the gemology field" and offered her the opportunity to be added as a party – confirming that Plaintiff's reliance on Defendant was explicit and known to her at the time Plaintiff entered into the agreement. JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; Trial Tr. Mar. 24, 2026 (Defendant) at 97:6–97:19.

**B. Defendant's conduct establishes embezzlement under § 523(a)(4) because she opened and solely controlled the account that received Plaintiff's money, admitted that she knew the purpose of the BofA Account, and personally executed every unrelated material disbursement.**

Section 523(a)(4) excepts from discharge any debt for embezzlement or larceny. JFPTO, Stipulated Law ¶ H. To establish embezzlement, Plaintiff must prove (a) he entrusted property to the Debtor, (b) the Debtor appropriated the property for a use other than that for which it was entrusted, and (c) the circumstances indicate fraud. JFPTO, Stipulated Law ¶ I; *Brady v. McAllister*, 101 F.3d at 1173. To establish larceny, Plaintiff must prove the fraudulent and wrongful taking of Plaintiff's property (a) without the owner's consent and (b) with intent to convert such property to the taker's use. JFPTO, Stipulated Law ¶ J; *Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630, 652 (Bankr. E.D.N.Y. 2020).

21

Plaintiff bears the burden of proof by a preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan*, 498 U.S. at 287-288.

The evidence satisfies each element of embezzlement which requires establishing that "(1) [a claimant] 'entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Contemporary Imps., Inc. v. Morrow (In re Morrow)*, 563 B.R. 272, 280 (Bankr. E.D. Tenn. 2017); see also *Rice v. Morse (In re Morse)*, 524 B.R. 774, 793 (Bankr. E.D. Tenn. 2015); and *Reyes v. Ranciato (In re Ranciato)*, 638 B.R. 275, 287 (Bankr. D. Conn. 2022). Plaintiff voluntarily wired $12 million for the specific purpose of purchasing The Yellow Rose into the BofA Account, which Defendant opened and controlled as sole authorized signer. Defendant admitted she knew the account's purpose was to receive Plaintiff's $12 million. Defendant also knew that Plaintiff intended for his money to be used to purchase The Yellow Rose and admitted to reading the Yellow Rose Purchase Agreement that set out the material terms of the intended transaction. This knowing receipt of funds for a specific, limited purpose constitutes entrustment within the meaning of § 523(a)(4).

Defendant appropriated Plaintiff's funds for uses other than those for which they were entrusted. On February 7, 2019 – the day after the wire arrived – Defendant made two trips to the bank to sign counter withdrawal slips totaling

approximately $5.1 million and to authorize interbank transfers totaling approximately $4.5 million to William Noble Rare Jewels and Ryan & Rodney Diamonds, Inc. None of these disbursements went to the seller of The Yellow Rose. On February 11, 2019, Defendant returned to a Bank of America branch in Florida and signed a counter withdrawal slip for $180,000, resulting in two $90,000 cashier's checks payable to unrelated parties. No evidence was ever submitted that would have indicated that the opportunity to purchase The Yellow Rose ever existed.

The circumstances indicate fraud. The transactions at issue have been adjudicated as criminal wire fraud as to Joseph. Defendant hastily caused millions of dollars in disbursements of Plaintiff's money within one day of receipt and never explained why she was in such a rush or why she had to return to the bank twice in a single day. She was the sole signatory when Plaintiff's money entered the BofA Account and when nearly all of his money had exited the BofA Account, yet she never inquired with Bank of America about the account balance before authorizing the disbursements. Finally, after disbursing millions of Plaintiff's money, she never followed up with Plaintiff or otherwise on the status of the Yellow Rose Transaction.

**C. Defendant's deliberate disbursement of $10.7 million of Plaintiff's funds to purposes unrelated to The Yellow Rose Transaction without inquiry, disclosure, or justification, was willful, malicious, and the direct cause of Plaintiff's $12 million loss under § 523(a)(6).**

Section 523(a)(6) excepts from discharge any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. JFPTO,

23

Stipulated Law ¶ K. This provision requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); see also *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). To establish willful injury, Plaintiff must prove the Debtor acted (a) with the intent to cause injury or (b) with the belief that injury was substantially certain to result. JFPTO, Stipulated Law ¶ L; *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 583 (6th Cir. 2001); see also *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 511 (Bankr. N.D. Ill. 2002). To establish malice, Plaintiff must prove the Debtor's actions were taken (a) in conscious disregard of one's duties or (b) without just cause or excuse. JFPTO, Stipulated Law ¶ M; *Initial Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710, 721 (Bankr. E.D. Mich. 2016).

A defendant's knowledge may be inferred from experience in business, the concealment of material facts, and having knowledge of the underlying *intended* terms of the transaction. *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (N.D. Ill. 1983). Plaintiff must also prove that the willful and malicious conduct caused the injury. JFPTO, Stipulated Law ¶ N; *Buzzard v. Ratliff (In re Ratliff)*, 673 B.R. 719, 738 (Bankr. S.D. Ohio 2025). Plaintiff bears the burden of proof by a preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan*, 498 U.S. at 291.

24

**Willful Injury.** Defendant acted with subjective belief that injury to Plaintiff was substantially certain. She knew the BofA Account held Plaintiff's $12 million and that the opening balance was approximately $500. She knew Plaintiff's funds were intended for the purchase of The Yellow Rose. Notwithstanding, without verifying the BofA Account balance, she authorized disbursements or was the sole account signer when disbursements totaling $10,703,971.41 were made to unrelated parties within one day after receiving the funds. Any person who authorizes the disbursement of nearly $10 million from an account containing $12 million of another person's money to parties having nothing to do with the stated purpose – without verifying the sufficiency of funds – acts with subjective belief that injury is substantially certain – that is, that the person will suffer a financial loss. Defendant confirmed she never inquired with Bank of America about the available funds in the BofA Account while at a Bank of America branch, twice in a single day, as the sole signatory to the BofA Account – these combined facts indicate that she acted in willful disregard of her basic duties as holder of Plaintiff's money that was designated for a specific purpose.

**Malicious Injury.** Defendant's conduct was malicious because it was intentional, wrongful, and done without justification or excuse. Defendant personally signed the counter withdrawal slips and authorized the interbank transfers. The disbursements were wrongful because they diverted funds she knew

25

were intended for a specific purpose to unrelated third parties. Defendant offered no legitimate justification for the disbursements. Her explanation – that she trusted Joseph and was acting in the ordinary course of business – is not a legal justification for disbursing another person's $12 million to unrelated creditors. Defendant's conscious disregard of her obligation to use Plaintiff's funds only for their intended purpose satisfies the malice requirement. The malice standard under § 523(a)(6) does not require ill will or spite; it requires only that the debtor act in conscious disregard of one's duties without just cause or excuse. Defendant's conduct meets that standard. She knew the funds were Plaintiff's, knew their purpose, and chose to disburse them to unrelated parties without any legitimate basis for doing so.

## II. DEFENDANT'S NUMEROUS INCONSISTENT STATEMENTS, SELECTIVE MEMORY LAPSES ON MATERIAL FACTS, AND IMPLAUSIBLE TRIAL TESTIMONY DEMONSTRATE FRAUDULENT INTENT AND WARRANT ADVERSE INFERENCES ON EVERY CONTESTED ISSUE.

Defendant's testimony throughout trial, paired with her prior testimony, lacks credibility and demonstrates her fraudulent intent. As the trier of fact, the Court has authority to assess witness credibility and accord testimony the weight it deserves. *Anderson v. Bessemer City*, 470 U.S. 564. 575 (1985). Where a witness has made prior inconsistent statements, the Court may discredit trial testimony on contested issues, including the witness's asserted state of mind. *FTC v. Ettus (In re Ettus)*, 596 B.R. 405, 411 (Bankr. S.D. Fla. 2018) (fraudulent intent analysis looks to the overall

26

demeanor and credibility of the debtor). Courts are permitted to disbelieve trial testimony of a debtor as an after-the-fact attempt to explain away bad facts, particularly where trial testimony conflicts with prior sworn testimony. *Rensin v. FTC*, 604 B.R. 917, 923–24 (S.D. Fla. 2019) (citing *In re Kane*, 755 F.3d 1285, 1295 (11th Cir. 2014)); *Velde v. Thiel (In re Thiel)*, 587 B.R. 92, 94-95 (B.A.P. 8th Cir. 2018) (focus is on whether debtor's actions are so inconsistent with her self-serving statement of intent that the proof leads the court to disbelieve her).

Defendant's prior inconsistent statements on the following material issues are indicative of her culpability:

- **Knowledge of The Yellow Rose**: Defendant initially claimed to not know about The Yellow Rose during her September 2019 deposition. At her subsequent deposition in September 2024, Defendant acknowledged she knew what The Yellow Rose was. Defendant admitted at trial that she had even tried on The Yellow Rose around Labor Day 2018. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 45:1–46:25; Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 47:1–48:5; Trial Tr. Mar. 25, 2026 (Defendant) at 105:1–106:10; J29.

- During her September 2024 deposition, Defendant initially blamed prior counsel for her September 2019 testimony regarding her lack of knowledge of The Yellow Rose and testified that she was instructed to deny any knowledge of The Yellow Rose. However, at trial, Defendant acknowledged that explanation was not true, and she just misunderstood her prior counsel's instruction. Trial Tr. Mar. 26, 2026 (Defendant) at 60:16–19, 61:16–63:4. In other words, Defendant either followed her prior counsel's advice to lie about The Yellow Rose or she chose on her own to lie about The Yellow Rose during the September 2019 deposition.

- **Reading the Purchase Agreement**: At her September 2024 deposition, Defendant testified that she read the Yellow Rose Purchase Agreement (Exhibit J10) to her son. She confirmed that she read the Yellow Rose

27

Purchase Agreement during trial. Then later at trial, Defendant retreated to uncertainty about whether the Yellow Rose Purchase Agreement at J10, was the document she had actually read to her son. Trial Tr. Mar. 25, 2026 (Defendant) at 99:3–6; Trial Tr. Mar. 26, 2026 (Defendant) at 79:15–80:14; JFPTO, Stipulated Facts ¶ 4(e).

- **GIA Conference Date**: Defendant testified her GIA conference was on February 7, 2019 in order to justify her hasty dissipation of over $9.6 million of Plaintiff's money in a single day. Yet, objective evidence established the conference took place on February 6, 2019 thereby removing Defendant's razor-thin justification for her February 7, 2019 banking activity. Trial Tr. Mar. 25, 2026 (Defendant) at 112:1–113:14; J30; JFPTO, Stipulated Facts ¶ 4(y). When confronted at trial about the date discrepancy, she claimed she misremembered. Trial Tr. Mar. 25, 2026 (Defendant) at 3:1–8:12. February 7, 2019 was the single most consequential day in the entire sequence of events, Defendant's fogginess as to these details is hard to believe.

- Defendant testified that she was in a rush on February 7, 2019 because she was under duress, but the only source of duress she identified was that she wanted to attend GIA conference events in Tucson and that Joseph had "messed them up." When confronted with the conference date discrepancy she had no other explanation for the duress she was under. Trial Tr. Mar. 24, 2026 (Defendant) at 158:15–159:5.

Defendant's failure to recall material facts about the most consequential day of the fraud further undermines her credibility. Courts have found that selective memory lapses – particularly where a debtor recalls favorable details fluently but claims ignorance of unfavorable ones – indicate a lack of truthfulness. *Bold City VII, Ltd. v. Radcliffe,* 141 B.R. 1015, 1020 (Bankr. E.D. Ark. 1992) (debtor's selective memory lapses, juxtaposed with demonstrated business acumen on other issues, indicated lack of candor with the court). That pattern is precisely what the record reflects here.

28

The trial record confirms Defendant's pattern of failing to recall details pertaining to the operative facts of this Adversary Proceeding. Defendant claimed she could not recall the following material aspects of the Yellow Rose Transaction:

- Opening the BofA Account. Defendant testified she did not know why Joseph asked her to open the BofA Account and that she suggested an escrow account instead. She could not recall the details of the account-opening process or what she was told at the time. Trial Tr. Mar. 24, 2026 at 141:1–142:5.

- The February 7, 2019 Bank Trips. Despite personally traveling to the Bank of America branch twice in a single day and signing counter withdrawal slips authorizing over $9.6 million in disbursements, Defendant repeatedly testified she did not remember the details of those trips. She could not recall what happened on her first trip, what transpired at the bank, why she returned a second time, or who directed the specific disbursement amounts. Trial Tr. Mar. 25, 2026 at 112:1–115:5; Trial Tr. Mar. 24, 2026 at 141:13–149:5.

- Who Filled In the Disbursement Amounts. When presented with the counter withdrawal slips bearing her signature and asked who inserted the dollar amounts, Defendant testified: "I don't know. I don't remember this." Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 29:1–12.

- The Recipients of the Disbursements. When asked what the payees had to do with The Yellow Rose Transaction, Defendant admitted she did not know. She could not explain the basis for any of the disbursements, including the $848,500 to her neighbor John Ragard, the transfer to William Noble Rare Jewels, or the payments to other parties. Trial Tr. Mar. 25, 2026 at 68:1–69:10; Trial Tr. Mar. 25, 2026 at 112:1–113:14.

- The February 11 and 12 Transactions. Defendant signed a $180,000 withdrawal slip on February 11, 2019 while in Florida, resulting in two $90,000 cashier's checks. When asked why she withdrew the $180,000 and what she did with the checks, she testified: "I do not recall" and "I have no recollection." Trial Tr. Mar. 25, 2026 at 62:1–63:13.

- Whether The Yellow Rose Was Present in the Office After January 2019. When asked whether she saw The Yellow Rose in the Birmingham office in February, March, or April of 2019, Defendant answered: "I don't remember." Trial Tr. Mar. 25, 2026 at 79:17–20.

29

- Plaintiff's Emails of May–July 2019. Defendant claimed she did not recall receiving or seeing any of the four emails Plaintiff sent to her and Joseph in May, June, and July 2019 seeking information about his $12 million. She also could not recall when she stopped receiving emails at her business address. Trial Tr. Mar. 25, 2026 at 29:1–30:18.

Notably, the weight of these claimed memory failures led the Court itself to interject during examination and ask whether Defendant had a medical condition impairing her memory. Trial Tr. Mar. 25, 2026 at 26:11–17. No such condition was identified. The selective character of Defendant's memory – recall on points that serve her defense, amnesia on those that do not – is a litigation posture, and the Court should weigh it accordingly.

## III. THE ACTS UNDERLYING JOSEPH'S FEDERAL WIRE FRAUD CONVICTION AND SOPHISTICATED-MEANS SENTENCING ENHANCEMENT WERE COMMITTED BY DEFENDANT – HER CLAIM OF INNOCENT RELIANCE IS IRRECONCILABLE WITH HER OWN CONDUCT

The record of Joseph's Criminal Proceeding provides compelling, independent confirmation of Defendant's knowing and active participation in the fraud. Joseph's Criminal Proceeding record affirmatively establishes Defendant's role as the operative actor in the fraud.

**Joseph's Guilty Plea Rests on Defendant's Acts.** Joseph's guilty plea, Exhibit J34, states that "DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." Yet the trial record makes unmistakably clear who physically withdrew the money: it was Defendant. Joseph

30

was not even an account signer at the time that most of Plaintiff's money left the BofA Account. Trial Tr. Mar. 25, 2026 (Defendant) at 139:16–140:14; Trial Tr. Mar. 24, 2026 (Defendant) at 152:22–153:20.

**The Sophisticated Means Enhancement Was Based on Defendant's Conduct.** The sentencing enhancement opinion, Exhibit J25, reflects that the federal district court applied a sophisticated means enhancement to Joseph's sentence. The enhancement was applied in connection with multiple fraudulent transactions, including the Gelov transaction, and the recorded telephone call between Defendant and Mr. Teodor Gelov was among the evidence considered. Trial Tr. Mar. 25, 2026 (Defendant) at 147:1–148:5. In that call, Defendant was the primary and nearly exclusive speaker, discussing banking issues with FineMark Bank and Bank of America, including ACH processing, wire transfers, and account management. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 67:1–71:25. The Criminal Proceeding finding of sophisticated means was driven in part by Defendant's own words on a recorded call, demonstrating that Defendant was involved and knowledgeable about the DuMouchelle Parties' ongoing fraud.

## IV. THE COURT'S POST-TRIAL QUESTIONS ARE EACH RESOLVED IN PLAINTIFF'S FAVOR.

The following responses address the questions posed by the Court:

31

1. **Does anything in the record show that Defendant took out the roughly $2.4 million difference between the approximately $9.6 million disbursed on February 7, 2019 and the $12 million wired into the BofA Account?**

A total of $10,524,031 was disbursed from the BofA Account while Defendant was the sole account signer. Of this amount, Defendant affirmatively signed for the disbursement of $9,689,694.44; $829,946.97 in disbursements were made under "Legal Order;" $4,290 was wired out; and $100.00 was withdrawn as an MI TLR transfer. Joseph was added to the BofA Account signature card on February 11, 2019[3] and on the same day, Defendant personally signed for an additional $180,000.00 in withdrawals paid to an attorney and to DuMouchelle Jewellers. *See* **Attachment A**. On February 12, 2019, the remaining balance of Plaintiff's money was dissipated, leaving an ending balance of negative $60.00.[4] Whether Defendant or Joseph authorized the February 12, 2019 transactions is unknown.

2. **For the purposes of §523(a)(2)(A), what is the meaning of "obtained by" and does it include both Defendant's inbound and outbound conduct?**

The Supreme Court adopted a broad interpretation of the meaning of "obtained by" that extends to the entire debt: "[t]he phrase thereby makes clear that

---

[3] The record is not clear as to whether the February 11, 2019 signature card that added Joseph was accepted by Bank of America.

[4] There was an additional $854,500 deposited in the BofA Account from a "Counter Credit" on February 8, 2019 resulting in total deposits of $12,855.00 and by February 12, 2019, a total of $12,855,060 was disbursed from the BofA Account.

the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge." *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998).

**Inbound Conduct**: Defendant opened the BofA Account on February 5, 2019 – the very instrumentality through which the fraud was effectuated. But for Defendant's opening of the BofA Account, Joseph would not have been able to instruct Plaintiff to wire his funds to an account under Defendant's control. The wiring instructions, transmitted by Joseph, falsely represented that the destination account was associated with the seller of The Yellow Rose. Defendant admitted that she knew the purpose of the BofA Account was to receive Plaintiff's $12 million wire, and she knew Plaintiff's intent was to use his money to purchase The Yellow Rose. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 41; Trial Tr. Mar. 25, 2026 (Defendant) at 149:11–150:5. Although it was Joseph who communicated the false wiring instructions to Plaintiff, Defendant's conduct in opening and controlling the false-destination account – with knowledge that it was established to receive Plaintiff's funds – was integral to the success of the scheme. Her knowing creation of that account renders her a direct participant in the inbound-obtaining of Plaintiff's money.

**Outbound Conduct**: On February 7, 2019, the very next day, Defendant executed or authorized disbursements totaling approximately $9,689,694.44. An additional $829,946.97 left the account through "Legal Order" between February 7 and 8, 2019, and on February 8, 2019, $4,910.00 was wired out and $100.00 withdrawn – all while Defendant was the sole authorized signer. None of these disbursements went to the intended seller. But for Defendant's obtaining of Plaintiff's $12 million none of these outbound transfers could have occurred.

Defendant's role in the "obtaining" through fraud cannot be separated from Joseph's: it was the orchestrated coordination between the two of them that allowed the fraud to occur and that rendered Plaintiff's loss inevitable. Defendant, as the sole authorized signer on the BofA Account, effectively held the dustpan into which Joseph swept Plaintiff's $12 million. Rather than returning those funds to Plaintiff, she disbursed them to unrelated third parties for the DuMouchelle Parties' own purposes. The wrongful act from which nondischargeability should be calculated is encompassed in the entire coordinated scheme.

**3. Does "entrusted" mean that Plaintiff's funds have to be received by Defendant "in trust" to meet the "entrusted" element of embezzlement?**

Plaintiff's money did not have to be received in trust for § 523(a)(4) to apply. The statutory text of § 523(a)(4) excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The

34

fiduciary-capacity requirement modifies only the "fraud or defalcation" prong. *Long v. Piercy (In re Piercy)*, 21 F.4th 909, 919; *Brady v. McAllister*, 101 F.3d at 1173.

"Entrustment" requires only that the creditor voluntarily delivered property to the debtor for a specific, limited purpose, and that the debtor received the property with knowledge of that purpose and an understanding that the property was to be used only as authorized. *U.S. v. Young*, 955 F.2d 99, 103 (1st Cir. 1992); also see *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010). Defendant knew the purpose of receiving Plaintiff's money was to acquire The Yellow Rose, which constitutes entrustment within the meaning of § 523(a)(4).

**4. Were the January 25, 2019 telephone call and Defendant's sending of the data package the only contacts between Plaintiff and Defendant regarding the Yellow Rose or the Yellow Rose Transaction? What is the impact of any such contacts on the claims asserted.**

The January 25, 2019 telephone call, the Data Package Email, the exchange of messages between Plaintiff and Defendant, and Plaintiff's email to Defendant and Joseph with the Yellow Rose Purchase Agreement were all of the pre-transaction communications between Plaintiff and Defendant. Trial Tr. Mar. 23, 2026 (Plaintiff) at 92:11–93:5; Trial Tr. Mar. 23, 2026 (Plaintiff) at 161:1–161:15; JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; Trial Tr. Mar. 24, 2026 (Defendant) at 97:6–97:19.

Each of these contacts, considered individually and cumulatively, created and fostered the false impression – in other words, the false pretenses – that the Yellow

Rose Transaction was a legitimate investment opportunity upon which Plaintiff was entitled to rely. Both the Data Package Email and the January 25, 2019 phone call created the false impression that the Yellow Rose Transaction was viable. Plaintiff testified that he presumed the valuation attached to the Data Package email was an appraisal confirming the values Defendant had discussed with him on the telephone. Trial Tr. Mar. 24, 2026 (Plaintiff) at 9:2–10:5. The email was sent under Defendant's professional signature block, lending her institutional credibility to the materials she transmitted. Trial Tr. Mar. 24, 2026 (Defendant) at 88:1–91:7. The Data Package Email reinforced the false impression created by the telephone call and provided Plaintiff with documentary support for the representations Defendant had made.

The subsequent message exchange between Plaintiff and Defendant further established Plaintiff's belief that the transaction was possible. Plaintiff's January 31, 2019 email to both Defendant and Joseph attaching the executed Yellow Rose Purchase Agreement expressly acknowledged Defendant's "skill and expertise in the gemology field." JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; Trial Tr. Mar. 24, 2026 (Defendant) at 97:6–97:19. Notwithstanding Plaintiff's reliance, Defendant did not respond to correct any false impression, disclaim her role, or alert Plaintiff to any concerns about the transaction.

5.  **a. Were Defendant's statements to Plaintiff during the January 25, 2019 call or in her email attaching the data package were false or misleading, and if so, what statements were false or misleading and how, and what evidence was presented to demonstrate that Defendant's statements were false or**

**misleading; b. If Plaintiff is not alleging that Defendant made a false or misleading statement during the contacts with Plaintiff, whether false pretenses and false representation fall away, leaving only actual fraud as the grounds under § 523(a)(2)(A), and if so, what is the fraud, and if not, why not.**

False pretenses under § 523(a)(2)(A) encompasses implied misrepresentations and conduct intended to create or foster a false impression. JFPTO, Stipulated Law ¶ D; *Lenchner v. Korn*, 567 B.R. at 300. A false representation can also be satisfied by a reckless representation – one made without knowledge of its truth or with reckless disregard for whether the person making it knows that she does not have sufficient information or a basis to support it. *Fleming v. Gordon*, 491 B.R. at 701; *Pa. Emples. Ben. Tr. Fund v. Brown (In re Brown)*, 591 B.R. 587, 595 (Bankr. M.D. Pa. 2018); *Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm),* 175 B.R. 349, 354 (B.A.P. 9th Cir. 1994). See Sec. I.A.2 *supra.*

**6. Is Defendant's silence grounds for a false representation, and if so, whether there must first be a duty to disclose, what duty Defendant had, and what silence or failure to disclose Plaintiff relies upon.**

Silence can constitute a false representation where the debtor had a duty to disclose material information and failed to do so. *Redmond v. Finch (In re Finch)*, 289 B.R. 638, 643 (Bankr. S.D. Ohio 2003); *Muhammad v. Reed (In re Reed)*, 542 B.R. 808, 813 (Bankr. N.D. Ill. 2015). The duty to disclose and the duty to correct a false impression are both governed by Restatement (Second) of Torts § 551(2),

which provides that one party to a business transaction is under a duty to exercise

reasonable care to disclose to the other before the transaction is consummated:

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him.

Defendant had a duty to disclose arising from three independent sources. First,

consistent with subsection (a), Defendant held herself out as a master gemologist,

appraiser, and auctioneer, and Plaintiff specifically sought her professional opinion

regarding the Yellow Rose Transaction, giving rise to a duty to disclose material

facts within her knowledge. Second, consistent with subsection (b), Defendant knew

that Plaintiff's money was in the BofA Account to purchase The Yellow Rose.

Among all of the parties involved, Defendant was in the best position to safeguard

Plaintiff's money and remained silent despite Plaintiff's desperate inquiry for

answers. Third, consistent with subsection (d), on January 31, 2019, Plaintiff

emailed both Defendant and Joseph attaching the executed Yellow Rose Purchase

38

Agreement and expressly acknowledged Defendant's "skill and expertise in the gemology field," putting Defendant on notice that Plaintiff was about to act in reliance upon her prior representations, which independently obligated Defendant to correct any false impression she had already created. JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; Trial Tr. Mar. 24, 2026 (Defendant) at 97:6–97:19.

7. **Whether there is a duty to correct what would otherwise be a false impression, and if so, what is the false impression that Plaintiff relies upon as giving rise to Defendant's duty to correct.**

Yes. Under subsections (c) and (d) of § 551(2) of the Restatement, a party who has made representations that were true or believed to be true when made has a duty to correct those representations when she subsequently acquires information rendering them untrue or misleading, or when she learns that the other party is about to act in reliance on them. *Hord v. Envtl. Research Inst.*, 463 Mich. 399, 406 (2000). Defendant's failure to correct Plaintiff's false impressions, and her complete failure to contact Plaintiff at any time after the disbursements, gives rise to liability under § 523(a)(2)(A) for false pretenses and false representation, in addition to actual fraud.

8. **Whether false pretenses requires proof of a misrepresentation or conduct on Defendant's part that was intended to create or foster a false impression, and if so, what is the misrepresentation or false impression that Plaintiff relies upon, and whether false pretenses can stand if Defendant did not say or email anything false to Plaintiff.**

False pretenses requires proof of an implied misrepresentation or conduct intended to create or foster a false impression. JFPTO, Stipulated Law ¶ D; *Lenchner*

39

*v. Korn,* 567 B.R. at 300. False pretenses does not require an express false statement; it encompasses conduct that, taken as a whole, creates or fosters a false impression in the mind of the creditor. "'[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the "false pretenses" provision of Section 523(a)(2)(A).'" *Birch Hollow,* 510 B.R. at 12, 18–19.

Here, even if each individual statement by Defendant were literally true at the time it was made, the totality of her conduct – endorsing the transaction, providing valuation materials under her professional credentials, opening the account to receive the funds, and thereafter disbursing the funds to unrelated parties without disclosure – created and fostered the false impression that the transaction was legitimate. Her intent can be derived from the totality of the circumstances, including her notable lack of communication with Plaintiff after he wired his $12 million and her admission that she knew the purpose of the BofA Account was to receive Plaintiff's funds, yet her complete disregard for safeguarding those funds for their intended purpose.

**9. Whether Plaintiff is asserting that there was a misrepresentation as to whether DuMouchelle Jewellers had The Yellow Rose Diamond to sell, and**

40

**if so, the impact of Exhibit J10, which contemplates that there would be work to purchase the diamond on behalf of Plaintiff.**

Defendant participated in creating the false impression that a legitimate transaction was possible. Exhibit J10 contemplated that Plaintiff's $12 million would be used to purchase The Yellow Rose, after which Joseph would resell it. The fraud is that after rendering a false impression of the ability to broker the Yellow Rose Transaction, Plaintiff's $12 million was never used to purchase The Yellow Rose at all. Instead, the funds were diverted into an account Defendant opened and controlled and were immediately disbursed to unrelated third parties.

10. **Whether there is any dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call regarding a transaction with the person she grew up with from North Dakota.**

There is no genuine dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call with Mr. Gelov regarding a transaction with "the person she grew up with from North Dakota." Plaintiff is from North Dakota. Trial Tr. Mar. 23, 2026 (Plaintiff) at 85:6–88:5. Defendant and Plaintiff have known each other since the 1970s when Defendant was a young girl. Trial Tr. Mar. 23, 2026 (Plaintiff) at 82:1–83:10. Defendant did not proffer any evidence to establish she was speaking about anybody else. Trial Tr. Mar. 24, 2026 (Exhibit P1, Deposition Clip) at 67:1–71:25.

11. **How vicarious liability operates on the facts of this case, including whether it impacts or deals with intent, what subsection or subsections of § 523(a) vicarious liability applies to, whether it applies to § 523(a)(2)(A), (a)(4),**

**and/or (a)(6), and whether vicarious liability supervenes the elements of those provisions. Additionally, whether Plaintiff seeks both direct liability and vicarious liability, and how that operates in terms of recovery.**

Plaintiff's primary theory of liability is direct liability based on Defendant's own conduct. Plaintiff asserts that Defendant is directly liable under §§ 523(a)(2)(A), (a)(4), and (a)(6) based on her personal participation in the fraudulent scheme, her personal acts of opening the BofA Account, her personal execution of the disbursements, and her personal representations to Plaintiff. To the extent that Defendant's actions, considered in isolation from Joseph's, do not independently establish her participation in the fraud, Plaintiff alternatively seeks a finding of vicarious nondischargeable liability based on the combined acts of Defendant and Joseph that enabled them to defraud Plaintiff. See *In re Holly Diane Bolling*, 600 B.R. 838, 849 (Bankr. D. Colo. 2019); *In Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703, 711 (B.A.P. 6th Cir. 2012); *Kim v. Sun (In re Sun)*, 535 B.R. 358, 362 (B.A.P. 10th Cir. 2015), *Gidelski v. Anton (In re Anton)*, Nos. 08-64144, 09-04344, 2013 Bankr. LEXIS 1715, at *1, 2013 WL 1747907, at *4 (Bankr. E.D. Mich. Apr. 12, 2013).

Should the Court reach vicarious liability, as vice president and ten-percent owner of DuMouchelle Jewellers, acting at Joseph's direction as the sole signatory on the BofA Account throughout the relevant period, Defendant was a co-participant in the fraudulent enterprise, and agency principles may therefore impute Joseph's

42

fraudulent intent to her under § 523(a)(2)(A). *Husky,* 578 U.S. 355. See *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989), which held that a debtor's husband's fraudulent used-car sale was imputable to her because the dealership license was in her name and her signature was required on business checks; *W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305, 307 (Bankr. S.D. Fla. 1982), a wife had intent to deceive under § 523(a)(2)(B) because of her role as corporate secretary, even though she may have lacked actual knowledge that her husband submitted a false financial statement on behalf of the corporation. Here, Defendant's role as vice president and sole signatory on the BofA Account is analogous to the corporate officers in *Smith* and *Medow* whose positions rendered them liable for the fraudulent acts of their co-participants.

Under § 523(a)(4), embezzlement requires proof that the debtor personally appropriated entrusted property for an unauthorized use under circumstances indicating fraud. To the extent Defendant's own conduct does not independently satisfy the embezzlement standard, vicarious liability completes the chain of fraudulent conduct. Defendant opened the BofA Account and, as its sole authorized signatory, possessed the account information necessary for Joseph to convey to Plaintiff in his misleading emails. Thus, Joseph could not have created the fraudulent wiring instructions that caused Plaintiff to believe he was transmitting his $12 million to the seller of The Yellow Rose without obtaining that information from

43

Defendant. By furnishing Joseph with the BofA Account information, Defendant enabled the very deception that induced Plaintiff to entrust his funds to what he reasonably believed was the seller's account.

Under § 523(a)(6), without Defendant assisting Joseph by opening the BofA Account, $10.7 million of Plaintiff's money could never have been misappropriated. Read together, Joseph and Defendant willfully and maliciously made improper use of Plaintiff's $12 million because they each knew the funds were wired for the sole purpose of purchasing The Yellow Rose, yet proceeded – through their coordinated acts of opening the BofA Account, supplying the fraudulent wiring instructions, and executing disbursements to unrelated third parties – to divert those funds with the subjective certainty that Plaintiff would suffer the resulting loss. Under agency principles governing Defendant's co-ownership and co-operation of DuMouchelle Jewellers, Joseph's willful and malicious injury to Plaintiff is imputable to Defendant.

12. **Whether there is a need to establish Defendant's fraudulent intent for actual fraud under § 523(a)(2)(A), and what role moral turpitude or intentional wrong plays under the Husky framework, including as set forth in paragraph F on page eleven of the Joint Final Pretrial Order.**

Fraudulent intent must be established for actual fraud under § 523(a)(2)(A), but under *Husky*, Plaintiff does not have to establish that Defendant intended to make a false statement to the creditor. Rather, the Supreme Court held that "actual fraud" encompasses "any fraud that involves moral turpitude or intentional wrong,"

44

including fraudulent conveyance schemes and other forms of fraud that do not require a direct misrepresentation. *Husky,* 578 U.S. at 360; JFPTO, Stipulated Law ¶ F. Under the *actual fraud* prong of §523(a)(2)(A) the intent inquiry focuses on whether the debtor knowingly participated in a scheme to defraud the creditor. The role of "moral turpitude or intentional wrong" is to distinguish actual fraud from constructive fraud: actual fraud requires a showing of wrongful intent, whereas constructive fraud may arise from conduct that is technically wrongful but not intentionally deceptive. *Id.* at 359–60. Here, Defendant's fraudulent intent is established by her inconsistent statements, willful ignorance, and the totality of the circumstances surrounding the Yellow Rose Transaction.

13. **Whether, if Defendant is not justified in relying on Joseph, Plaintiff can still be justified in relying on Defendant, and whether those are connected or separate concepts. Additionally, where the totality of circumstances analysis applies – whether to § 523(a)(2)(A), (a)(4), (a)(6), or all of them – and whether it is limited to intent or extends to other elements.**

Defendant's lack of justification in relying on Joseph and Plaintiff's justification in relying on Defendant are separate and independent concepts. The question of whether Defendant was justified in relying on Joseph goes to Defendant's state of mind and culpability – specifically, whether her claimed reliance on Joseph's representations constitutes a defense to the nondischargeability claims. The question of whether Plaintiff was justified in relying on Defendant goes

45

to whether Plaintiff satisfied the reliance element of § 523(a)(2)(A). Defendant's reliance on Joseph is not a defense.

A debtor cannot escape nondischargeability by claiming she blindly followed the instructions of a co-conspirator. Defendant was in the best position to investigate the amount and source of funds in the BofA Account – she was the sole account signer when 90 percent of Plaintiff's $12 million was disbursed. She had exclusive control over the funds on the most critical days of the fraud against Plaintiff. She could have refused to disburse the funds, inquired about the account balance, or contacted Plaintiff. Her choice to follow Joseph's instructions without question, while disbursing millions of dollars of another person's money, does not constitute justifiable reliance; it constitutes willful blindness.

Defendant's willful ignorance of the account balance further supports fraudulent intent. Willful blindness does not provide a defense under § 523(a)(2)(A); it is instead a factor indicative of fraud. *Farmers & Merchs. State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226–27 (Bankr. N.D. Ohio 2011).

Defendant's willful ignorance of the most basic financial fact within her exclusive control confirms her fraudulent intent. Under the Supreme Court's two-part willful blindness test, a defendant must subjectively believe there is a high probability that a fact exists and must take deliberate actions to avoid learning of that fact. *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 52 (Bankr. D. Colo.

2014) (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). Willful blindness surpasses recklessness: the willfully blind defendant takes deliberate steps to avoid confirming a high probability of wrongdoing and can almost be said to have actually known the critical facts, whereas the reckless defendant merely knows of a substantial and unjustified risk. *Id.* Defendant's deliberate failure to inquire about the account balance – while at a Bank of America branch, twice in a single day, as the sole authorized signer – satisfies both prongs.

**14. Intent versus knowledge: Whether intent is synonymous with knowledge, and what distinct intent standards apply under §§ 523(a)(2)(A), (a)(4), and (a)(6).**

Intent and knowledge are not synonymous, but they are closely related. Knowledge is a factual predicate from which the requisite intent may be inferred. A debtor who acts with knowledge of facts that make a particular outcome substantially certain may be found to have intended that outcome, even absent direct evidence of subjective desire. The distinct intent standards under each provision are as follows.

Under § 523(a)(2)(A), knowledge and intent are distinct elements requiring that "at the time the representation was made, the debtor knew it was false; [and] the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor." *Islamov v. Ungar (In re Ungar)*, 429 B.R. 668, 673 (B.A.P. 8th Cir. 2010). Since fraudulent intent is typically inferred from the totality of the circumstances, the debtor's knowledge of material facts or

47

recklessness regarding material facts may be considered in determining intent. *Bd. of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838, 862 (Bankr. N.D. Ill. 2018).

Under § 523(a)(4), the intent requirement for embezzlement is fraud in fact – moral turpitude or intentional wrong – rather than implied or constructive fraud. *Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986)). Embezzlement involves the knowing use of entrusted property for an unauthorized purpose; where a debtor uses entrusted funds with knowledge that such use is unauthorized, such knowing misuse is indicative of fraudulent intent. *Me. Cir. Breaker, Inc. v. Burnham (In re Burnham)*, 2021 Bankr. LEXIS 3497, at *20, 2021 Bankr. WL 6101676, at *6 (Bankr. D. Me. Dec. 23, 2021).

Under § 523(a)(6), the intent requirement is the intent to cause injury or the subjective belief that injury is substantially certain to result. JFPTO, Stipulated Law ¶ L. This is the most demanding intent standard of the three provisions because it requires proof that the debtor intended the injury itself, not merely the act that caused the injury. *Kawaauhau*, 523 U.S. at 61. Subjective belief may be gleaned from objective factors and circumstantial evidence establishing what the debtor must have actually known at the time of the wrongful act.

Drawing from the trial record, Defendant's knowledge satisfies the intent requirements under all three provisions. Defendant knew the BofA Account's

purpose was to receive Plaintiff's $12 million, knew the opening balance was approximately $500, and knew Plaintiff's funds were intended for the purchase of The Yellow Rose. Notwithstanding this knowledge, she authorized at least $9.6 million in disbursements to non-seller third parties within one day, without taking any reasonable precautionary steps to verify the account balance. Under § 523(a)(2)(A), this knowledge supports an inference of fraudulent intent. Under § 523(a)(4), this knowledge establishes the knowing use of entrusted funds for an unauthorized purpose. Under § 523(a)(6), this knowledge establishes the subjective belief that injury to Plaintiff was substantially certain.

## V. REQUESTED FINDINGS AND CONCLUSIONS

Based on the foregoing, Plaintiff respectfully requests that the Court enter the following findings of fact and conclusions of law:

**Section 523(a)(2)(A) — False Pretenses, False Representation, and Actual Fraud:** Defendant's conduct satisfies each theory. She created and fostered a false impression of a legitimate transaction through personal representations made in her capacity as a credentialed gemologist upon whom Plaintiff specifically and justifiably relied. Her representations were made with at least gross recklessness for the truth. She knowingly participated in a fraudulent scheme by opening and controlling the account that received Plaintiff's funds and authorizing their disbursement to unrelated parties, satisfying the "obtained by" requirement through

49

both inbound capture and outbound dissipation of Plaintiff's $12 million. But for Defendant's involvement, Plaintiff would not have lost his $12 million.

**Section 523(a)(4) embezzlement:** Plaintiff entrusted his funds to Defendant for a specific, limited purpose of which Defendant was aware. Defendant appropriated those funds for unauthorized uses under circumstances that indicate fraud.

**Section 523(a)(6) willful and malicious injury:** Defendant acted with subjective belief that injury to Plaintiff was substantially certain, and her conduct was malicious in that it was intentional, wrongful, and without justification or excuse. She knew the purpose of the funds she controlled and disbursed them to unrelated parties without inquiry or disclosure, in conscious disregard of her duty to Plaintiff. Her conduct directly caused Plaintiff's injury.

Respectfully submitted,

Dated: June 15, 2026

**TAFT STETTINIUS & HOLLISTER, LLP**

/s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
R. Christopher Cataldo (P39353)
Jay L. Welford (P34471)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
jwelford@taftlaw.com
ccataldo@taftlaw.com
*Counsel to Plaintiff, Thomas T. Ritter*

50