# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

IN THE MATTER OF:
JOSEPH G. DUMOUCHELLE, and
MELINDA J. ADDUCCI,
*Debtors*.

Bank. Case No. 19-54531-lsg
Chapter 7
Hon. Lisa S. Gretchko

THOMAS T. RITTER,
*Plaintiff,*
v.
MELINDA J. ADDUCCI,
*Defendant.*

Adv. Pro. No. 20-04381-lsg
Hon. Lisa S. Gretchko

## DEFENDANT'S POST-TRIAL BRIEF

**NOW COMES** the Defendant, Melinda J. Adducci ("Melinda") by and through her counsel, JOHN R. FOLEY, P.C., who, for her Post-Trial Brief, states as follows:

## INTRODUCTION

Joseph DuMouchelle defrauded Thomas Ritter out of $12 million. He admitted to doing so in federal court, pled guilty to wire fraud, and is serving 151 months in federal prison. None of that is in dispute.

The question before this Court is narrower and different: has Plaintiff proven, by a preponderance of the evidence, that Melinda, individually, committed the fraudulent and intentional conduct required to except a debt from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), or (a)(6)? The answer is no.

Plaintiff asks this Court to now adjudicate Melinda's actions as though she

had knowledge and insights only possible through the benefit of hindsight. No recognized legal theory requires prescience. If that were the standard, seldom if ever would a debt be found dischargeable under 11 U.S.C. § 523. Melinda asks the Court, simply, to apply the statute as written. § 523 excepts from discharge debts obtained by the debtor's fraudulent and/or intentional conduct. It requires proof of Melinda's knowledge and intent, measured at the moment the relevant conduct occurred, and proven by a preponderance of the evidence. The real question before this Court is this: what does the trial record show that Plaintiff proved about what Defendant knew and intended on February 5, 6, and 7, 2019. After five years of litigation, exhaustive ESI review, and every defense-asserted privilege overruled, the trial record proves nothing of the kind.

Plaintiff's case rests on two contacts Melinda had with Plaintiff regarding the Yellow Rose: a brief telephone call in January 2019 in which Plaintiff claims Melinda expressed confidence in the diamond's value, and an email she sent the same day forwarding not her own work product, but photographs and a report by the Gemological Institute of America. Everything else came from Joseph: the purchase agreement, the emails, the multiple wiring instructions, the fictitious receipt, the bank communications directing the disbursements. Melinda was not a party to the written agreement. She did not send wire instructions, did not transmit the receipt, did not direct the February 7 disbursements. She did not receive a single dollar of

Plaintiff's $12 million.

At closing argument, the Court itself drew the line that defines this case: it asked Plaintiff's counsel whether a § 523 action would exist against Melinda on the outbound piece (the wiring out of the money in the BOA account), if she had refused Joseph's instructions and walked away from the bank. Plaintiff's counsel responded that the case on the outbound piece would be "absolutely not" the same, because, in his view, "it is her signature taking the money out." (Tr. Day 4, 161: 1-2, March 26, 2026, ECF No. 330)

The outbound disbursements were executed by a person who signed instruments presented by bank personnel pursuant to her husband's pre-arranged instructions, under the reasonable belief that she was executing legitimate post-closing disbursements for a transaction she believed had closed. The question is not whether her signature appeared on the instruments. It did. The question is whether Plaintiff proved she signed them with the subjective fraudulent intent §§ 523(a)(2)(A), (a)(4) and (a)(6) require. Plaintiff failed to prove this point.

The conclusion of this brief does not depend on resolution of any subsidiary evidentiary dispute. Under the controlling authority, and this Court's own decision in *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D. Mich. 2023), Plaintiff fails on every count under the corrected record. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Field v. Mans*, 516 U.S. 59, 70-

71 (1995); *Grogan*, 498 U.S. at 291; *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703, 710-11 (B.A.P. 6th Cir. 2012); *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999); *Rembert v. AT&T,* 141 F.3d 277, 281 (6th Cir. 1998).

## PROCEDURAL HISTORY

This adversary proceeding arises from the February 2019 Yellow Rose diamond transaction, in which Plaintiff wired $12 million to a Bank of America business checking account belonging to Joseph DuMouchelle Fine & Estate Jewellers, LLC (the "BofA Account"). Joseph DuMouchelle negotiated the transaction, provided all three sets of wiring instructions, transmitted a fictitious purchase receipt to Plaintiff, directed the February 7, 2019 disbursements from Michigan via email, and pled guilty to wire fraud. (J12; J13; J15; J17; J22; J42-J44.)

Plaintiff commenced this proceeding on September 22, 2020, against both Joseph and Melinda. Joseph was dismissed on July 17, 2023, after waiving his Chapter 7 discharge. Plaintiff withdrew his claims against Melinda under § 523(a)(2)(B), Plaintiff withdrew the fiduciary capacity prong of § 523(a)(4), any partnership theory, and explicitly disavowed any collateral estoppel argument based on the North Dakota default judgment. (ECF No. 299, at 2-3.) Plaintiff proceeds solely on the Yellow Rose transaction under §§ 523(a)(2)(A), (a)(4) (embezzlement and larceny only), and (a)(6), and on a vicarious liability theory predicated on agency

and civil conspiracy.

The case was tried over four days from March 23-26, 2026. Melinda moved for judgment on partial findings under Fed. R. Civ. P. 52(c) at the close of Plaintiff's case-in-chief; the Court denied that motion under the light-most-favorable-to-Plaintiff standard. (ECF No. 311.) The record is closed.

**STATEMENT OF FACTS**

## A. The Parties

Melinda held a ten percent membership interest in Joseph DuMouchelle Fine & Estate Jewellers, LLC, and the title of vice president. Joseph held the ninety percent interest and served as president. (Tr. Day 2, 62: 20-25; 63:1-9, March 24, 2026, ECF No. 332) Melinda is a credentialed gemologist and appraiser. (Tr. Day 2, 20: 21-25, March 24, 2026, ECF No. 332) The company operated for over twenty years without a prior lawsuit, fraud allegation, or regulatory action.

Plaintiff is a North Dakota landman who had known Melinda's family since childhood; Melinda's brother is married to Plaintiff's sister, and Plaintiff was a longtime business associate of Melinda's late father. (Tr. Day 1, 83: 12-25; 84:1-3, March 23, 2026, ECF No. 327) Between 2008 and the Yellow Rose transaction in 2019, Plaintiff did not see Melinda in person regularly or speak with her regularly by telephone. (Tr. Day 1, 209:18-25; 210:1-2, March 23, 2026, ECF No. 327) In all prior note transactions with the DuMouchelle parties, including a 2017 renewal note,

Plaintiff dealt and contracted exclusively with Joseph. (Id.; J8.)

**B. The Yellow Rose Transaction**

In late 2018, Joseph told Plaintiff that a Texas estate was selling a 77.12-carat fancy yellow diamond that could be purchased for approximately $12 million and resold for $16-20 million. (Tr. Day 1, 99: 11-25, March 23, 2026, ECF No. 327) Joseph pitched the deal, set the financial terms, and told Plaintiff he would manage the transaction. (Id.; J10.) Joseph told Melinda that Plaintiff would call and to send him a data package. (Tr. Day 1, 99: 22-25; 100:1-3, March 23, 2026, ECF No. 327) Those two acts, the call and the email, constitute the entirety of Melinda's pre-transfer contact with Plaintiff regarding the Yellow Rose.

On January 25, 2019, Melinda and Plaintiff spoke on the phone and Plaintiff alleges that Melinda answered yes when he asked if the transaction would be a good investment. (Tr. Day 1, 105:12-21, March 23, 2026, ECF No. 327) Melinda, however, disputed this account at trial on two fronts. On direct examination, she acknowledged speaking with Ritter by phone in January 2019, but denied that the call encompassed any discussion of investment values, resale prospects, or the economics of the transaction, testifying that she spoke only to the quality and authenticity of the diamond itself, told him "it was an amazing piece," and did not discuss whether it could be bought at $12 million and resold for $16 to $20 million. (Tr. Day 4, 39:6–41:12, March 26, 2026, ECF No. 330.). Plaintiff acknowledged on

cross-examination that he could not locate any phone record or text message documenting the call and could not recall the precise wording of Melinda's response. (Tr. Day 1, 162:18-21; 163:3, March 23, 2026, ECF No. 327) The same day, Melinda emailed Plaintiff a data package containing photographs, a GIA scientific monograph, and a January 2011 insurance replacement value document for The Yellow Rose, which was eight (8) years old at the time, plainly and on its face. (J9.) The email said 'great talking with you' and closed with 'Hi to Carol.' (J9.) It contained no current market appraisal, no wiring instructions, no representation that Melinda owned the diamond or controlled the transaction structure, and no direction to transfer funds. (J9.) Ritter admitted on cross-examination that Melinda did not provide him with an appraisal: "Lindy didn't do an appraisal for me, no." (Tr. Day 1, March 23, 2026, 172:22–23, ECF No. 327) He further acknowledged that the 2011 insurance replacement value document in J9 was not Lindy's own appraisal work. (Tr. Day 1, March 23, 2026, 163:24–164:18, ECF No. 327).

On January 30, 2019, Plaintiff drafted and signed a Letter Agreement "by and between Thomas T. Ritter and Joseph DuMouchelle." (J10.) Melinda was **not** a party. (J10.) The agreement assigned to Joseph all substantive responsibilities and stated Plaintiff would "rely heavily on [Joseph's] guidance and advice." (J10.) On January 31, 2019, Plaintiff emailed Joseph and Melinda asking whether Melinda should be added as a party. (J11.) After consulting with her son about the contract,

Melinda did not join and was not a signatory. (Tr. Day 2, 47:21-25; p. 48:1-18, 49:1-14, March 24, 2026, ECF No. 332)

Joseph provided three sets of wiring instructions. The first directed Plaintiff to MB Financial Bank in the name of "Highland Wealth Management"; that wire was rejected. (J12.) The second directed Plaintiff to FineMark Bank & Trust; that wire was also rejected. (J13.) The third, sent on February 6, 2019, directed Plaintiff to wire $12 million to the BofA Account. (J15.) All three sets were authored and transmitted by Joseph. (J12; J13; J15.) Plaintiff confirmed on cross-examination that Melinda did not send wiring instructions, did not identify the seller or the receiving account, and did not transmit the purported purchase receipt. (Tr. Day 1, 172: 24-25, 173:1-4, March 23, 2026, ECF No. 327) Plaintiff wired $12 million on February 6, 2019. (J5.)

## C. The BofA Account and February 7, 2019 Disbursements

After the FineMark wire was rejected, Joseph asked Melinda, who was preparing to leave for the annual Accredited Gemologist Association conference in Tucson, to open a new account capable of receiving the wire. (Tr. Day 2, 30: 13-21, March 24, 2026, ECF No. 332) She suggested escrow, consistent with the structure originally proposed in Plaintiff's Letter Agreement. (Id. at 30:22-25; J10.)  Joseph told her Plaintiff did not want escrow. (Id. at 30:25–31:1.) Melinda opened the BofA Account on February 5, 2019, in Sanibel, Florida, in the company's name. (J4.) She

did not have online access to the account at any time. (Tr. Day 2, 35:13-14, March 24, 2026, ECF No. 332)

On February 7, 2019, Joseph emailed Bank of America representatives Nancy DeMille and Hector Aguilar from Michigan, copying Melinda, with the subject line "Melinda Lindy Adducci Cashier's Checks and Deposits Needed Today." (J42.) The email directed the bank to process interbank deposits to two of Joseph's BofA business clients, William Noble Rare Jewels and Ryan & Rodney Diamonds, and instructed that a separate list of cashier's checks for Melinda to sign would follow. (J42; J43; J44.) All three emails originated from Joseph in Michigan; all recipients, amounts, and payees were pre-specified by Joseph before Melinda arrived at the branch. (J42; J43; J44.) Joseph had attempted to add his own signature card to the account that same day, but the card had not yet been uploaded into the bank's system. (J42.) Melinda made two trips to the Tucson branch, signed the counter withdrawal slips presented to her at the teller's direction, and left. (Tr. Day 4, 213:8-13, March 26, 2026, ECF No. 330.)

Plaintiff's own exhibits, the bank's account statements, draw the relevant distinction. The interbank transfers to William Noble Rare Jewels and Ryan & Rodney Diamonds appear on the February statement as "AZ TLR transfer" entries, Arizona teller transfers executed by branch personnel in direct response to Joseph's emailed instructions. (J5.) The cashier's checks Melinda signed appear as separate

"Customer Withdrawal Image" entries. (J5; J2; J3.) Every dollar disbursed from the account flowed to Joseph's business creditors and counterparties, not one cent to Melinda personally. (J3; J5.) Joseph's federal guilty plea confirms he "withdrew the majority of money and used it to pay his personal and business debts and expenses." (J22.)

The trial record reflects that Plaintiff offered no documentary evidence, neither exhibits nor testimony, establishing that Defendant received any portion of the funds disbursed from the account, let alone the approximately $2.4 million gap between the amounts disbursed on February 7 and the $12 million wire. (J3; J5.) Plaintiff's own counsel acknowledged at trial that Bank of America did not provide backup documentation for the Arizona teller transfer entries despite subpoena. Plaintiff bears the burden of proof on each element, and that burden is not met by inference alone.

**D. Melinda's State of Mind**

Despite full and complete access granted to the Plaintiff to both Joesph's and Melinda's personal computers, which were deep-reviewed by Plaintiff's chosen ESI expert; the litigation process produced _zero_ documentary evidence establishing Melinda's contemporaneous knowledge of or participation in any fraud. (ECF No. 267, at 13.) Melinda testified by deposition video, admitted over objection at trial as P-1, that when the FBI informed her Plaintiff had not received his money, she cried.

(Tr. Day 2, 35:11-16, March 24, 2026, ECF No. 332) She testified that she had known Joseph for over twenty years, that the business had operated without prior fraud or legal trouble, and that she had no reason to doubt him. (Id.)

**APPLICABLE LAW AND LEGAL STANDARD**

In a § 523 action, Plaintiff bears the burden of proof on every element by a preponderance of the evidence. *Grogan*, 498 U.S. at 291. This includes the intent element, which the controlling authority establishes is governed by a subjective standard viewed in the totality of the circumstances. *See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281-82. Plaintiff must prove by a preponderance of the evidence that Melinda subjectively intended to obtain the funds that constitute her debt to Plaintiff by false pretenses, a false representation, actual fraud, embezzlement, larceny, or a willful and malicious injury. *See id.*; 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6).

*Rembert v. AT&T* ruled that "exceptions to discharge are strictly construed against the creditor," 141 F.3d at 281, and *Rembert v. Citibank S.D. (In re Rembert)* ruled that "where room exists to infer honest intent, dischargeability must be decided in favor of the debtor." 219 B.R. 763, 767 (W.D. Mich. 1996).

Further, nondischargeability under § 523 is an individualized determination. It may not be imposed by association, proximity to a wrongdoer, or marriage to a person who committed fraud. *See Bartenwerfer v. Buckley*, 143 S.Ct. 665, 669, 676

(2023); *In re Cottingham*, 473 B.R. at 711. Each count requires proof of Melinda's own knowledge and intent, measured at the time the relevant conduct occurred.

**ARGUMENT**

**I. THE TWO JANUARY 25 CONTACTS CONTAINED NO FALSE STATEMENT OF EXISTING FACT, AND THE FALSE REPRESENTATION, FALSE PRETENSES, AND ACTUAL FRAUD THEORIES THEREFORE FAIL**

11 U.S.C. § 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud." False pretenses require conduct intended to create a false impression on which the plaintiff relied. *Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300 (Bankr. E.D. Mich. 2017). False representation requires a knowingly false statement of existing fact made with intent to deceive, on which the plaintiff justifiably relied as the proximate cause of his loss. *Rembert v. AT&T*, 141 F.3d at 280-81. Actual fraud is "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

Plaintiff identifies only two pre-transfer contacts between Melinda and Plaintiff: the alleged January 25, 2019 telephone call and the January 25, 2019 data-package email. (Tr. Day 1, 99: 22-25, 100: 1-3, March 23, 2026, ECF No. 327) Neither contained a false statement of existing fact. The call conveyed a forward-looking opinion about a genuine diamond transaction (since Plaintiff has no

contemporaneous documentary proof of the call, relying entirely on his own recollection for said call's substance). The email forwarded accurate information about a real stone and contained no representation concerning ownership, escrow structure, or the destination of Plaintiff's funds. Because neither contact contained a materially false representation or misleading omission attributable to Melinda, both theories fail at the threshold.

## A. The Telephone Call Was an Opinion About a Future Transaction, Not a False Statement of Existing Fact

The entirety of the alleged misrepresentation is that Plaintiff asked Melinda whether the Yellow Rose transaction would be a good investment and Plaintiff claims (contrary to Melinda's testimony) that she answered yes. (Tr. Day 1, 105: 12-21, March 23, 2026, ECF No. 327) Plaintiff could not locate any phone record or text message documenting the exchange and could not recall the precise wording of Melinda's response. (Tr. Day 1, 162: 18-21, 163: 3, March 23, 2026, ECF No. 327)

Even accepting Plaintiff's account, the statement is not actionable for two reasons.

First, an expression of professional confidence in a proposed future transaction is a statement of opinion or expectation, not a statement of existing fact. Statements of opinion or projected future performance do not constitute actionable misrepresentations absent proof the speaker knew them to be false. *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 248 (6th Cir. 2012). Melinda's

forward-looking judgment regarding the future value of the diamond cannot satisfy the false representation element of § 523(a)(2)(A) as a matter of law.

Second, the statement was not false. The Yellow Rose was a genuine 77.12-carat fancy vivid yellow diamond with documented gemological characteristics and significant market value. (J9.) Melinda had examined the stone. (Tr. Day 2, 20:11-20, March 24, 2026, ECF No. 332). The fraud was not that the diamond was valueless. The fraud was that Joseph had no legitimate arrangement to purchase it on Plaintiff's behalf or at a minimum failed to do so.

Even under Plaintiff's version of the conversation, Melinda did not represent that the DuMouchelle parties presently owned the Yellow Rose, had authority to convey title to it, or would route Plaintiff's funds to any seller-controlled account. The representations that actually governed those issues, including the wiring instructions, seller identification, and purported purchase documentation, all came from Joseph.

Finally, Plaintiff asking if the Yellow Rose Diamond was a good investment and Melinda answering affirmatively is not the same as Melinda saying "yes and you should do it through us."

As to the issue of post-transfer telephonic contact, Melinda testified at her deposition, played in full at trial, that Tom Ritter never called her directly, that she never initiated any conversation with him, and that her sole contact occurred when

Joseph placed Ritter on speakerphone and asked her to answer his questions. (Tr. Day 2 [P-1 Video], 57:7-11; 59:12-14, March 24, 2026, ECF No. 332.) Plaintiff's post-trial brief references additional communications, but no testimony at trial established any contact between Melinda and Plaintiff beyond the January 25 call and email.

Plaintiff, as his own witness, testified unequivocally that Defendant did not respond to a single phone call or email after the wire transferred on February 6, 2019, and that he "didn't really hear back from Lindy almost from the date that I wired the money." (Tr. Day 1, 134:4-9, March 23, 2026, ECF No. 327.) Any suggestion that Melinda participated in post-transfer communications affirming the sale finds no support in the trial record.

## B. The Data Package Email Forwarded Accurate Information About a Real Stone

The January 25 email forwarded photographs, GIA monograph information, and comparable market data. (J9.) It said "great talking with you," attached the materials, and closed with "Hi to Carol." (J9.) It did not represent that Melinda owned the diamond, that a purchase agreement had been executed, that Plaintiff's funds would go to a seller-owned account, or anything else about the structure or destination of any funds. It contained no wiring instructions and no direction to transfer money. (J9.)

The attached materials were not Melinda's representations. Forwarding

accurate photographs and publicly available market data not created by Melinda at a business partner's request, in the ordinary course of promoting a transaction, is not a false representation of existing fact. Plaintiff's own Letter Agreement, drafted after both contacts, states he would "rely heavily on [Joseph's] guidance and advice" and assigns all responsibilities to Joseph. (J10.) Melinda is not mentioned. The contract Plaintiff drafted the following week omits Melinda entirely and commits him to reliance on Joseph.

## C. Actual Fraud Under Husky Still Requires Melinda's Own Fraudulent Conduct and Intent

*Husky International Electronics, Inc. v. Ritz*, 578 U.S. 356 (2016), expanded "actual fraud" beyond affirmative misrepresentations to include schemes the debtor personally engineers. *Id*. at 359-60. It did not eliminate the requirement that the debt be "obtained by" the debtor's fraudulent conduct. *See id*. at 365-66. And it did not eliminate the requirement of wrongful intent. *See id*. at 360-61. Even under *Husky*, actual fraud requires "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (quoting *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000)).

Melinda did not engineer the Yellow Rose fraud. The scheme was entirely Joseph's. Her two pre-transfer contacts and her subsequent ministerial role at the bank are not "any deceit, artifice, trick, or design involving direct and active

operation of the mind, used to circumvent and cheat another" required by *Vitanovich*. 259 B.R. at 877. The evidentiary record contains no evidence suggesting Melinda knew the transaction was fraudulent. That absence of evidence is central to the intent analysis under any formulation of § 523(a)(2)(A).

## II. Silence Cannot Substitute for a False Statement, and No Duty to Disclose Existed

Silence or nondisclosure can support § 523(a)(2)(A) liability only where the debtor had a pre-existing duty to speak and intentionally failed to disclose a material fact. *Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr. E.D. Mich. 2001). There is only a breach if Melinda had a legal or equitable duty of disclosure, not if Melinda merely possessed useful information. *In re Korn*, 567 B.R. at 322 n.53.

No such duty existed here. Melinda was not a party to the Letter Agreement. (J10.) She was not a signatory to any transaction document. She held no fiduciary relationship with Plaintiff arising from the Yellow Rose transaction. The parties were at arm's length, connected by a longstanding personal relationship but not by any legal obligation imposing a duty of disclosure. Plaintiff did not retain Melinda in any professional capacity and did not place her in a position of trust with respect to the disposition of his funds. Plaintiff's own Letter Agreement assigns all responsibilities to Joseph and does not mention Melinda. (J10.) A party who places all responsibility on one person cannot claim that another, who is not a party to the

transaction, had a duty to correct misimpressions about it.

The false impression that actually caused Plaintiff's loss was not created by anything Melinda said, withheld, or failed to correct. It was created by Joseph. The wiring instructions identifying Highland Wealth Management, FineMark, and ultimately the BofA Account as the proper destinations for Plaintiff's $12 million all came from Joseph. (J12; J13; J15.) The fictitious Richard Drucker emails identifying a purported seller came from Joseph. (J13; J15.) The forged purchase receipt came from Joseph. (J17.) The pitch that the Yellow Rose was being sold by a Texas estate at a discount came from Joseph. The representation that Plaintiff's funds would be applied to acquire that diamond came from Joseph. Each of those communications, individually and collectively, supplied the false impression on which Plaintiff acted. Melinda authored none of them, transmitted none of them, and on this record was unaware of the falsity of any of them at the time they were made.

A duty to disclose, even if one existed, would require Melinda to have known the impression was false. Plaintiff offered no evidence she did. The doctrine of false pretenses by silence presupposes that the silent party knows of the false impression and is in a position to correct it. On this record, neither premise is established.

Plaintiff's false impression theory requires two premises: that Melinda's January 25 contacts created the misleading impression that the DuMouchelle parties had the capacity and intent to broker the Yellow Rose transaction on Plaintiff's

behalf, and that Melinda had a duty to correct that impression when the transaction went wrong. Both fail. The first fails because the impression was accurate. Joseph DuMouchelle Fine and Estate Jewellers, LLC was a credentialed jewelry business that had operated for over twenty years with the demonstrated capacity to handle a transaction of this size. The fraud was not in any representation of brokering capacity. It was in Joseph's undisclosed, contemporaneous intent to misappropriate Plaintiff's funds rather than complete the purchase, an intent Melinda did not create, share, or know of on January 25, 2019. The second premise fails for the same reason: a duty to correct a false impression presupposes knowledge that the impression is false, and Plaintiff offered no evidence that Melinda possessed that knowledge at any relevant time.

### III. Post-Transfer Conduct Cannot Satisfy the "Obtained By" Requirement, and the Full $12 Million Is Accounted For

This Court drew a distinction at closing argument between the "inbound" conduct that caused Plaintiff to wire the funds and the "outbound" conduct that occurred after the funds arrived. (Tr. Day 4, 160-61, 168-69, March 26, 2026, ECF No. 330) That distinction maps directly onto the statutory "obtained by" requirement. Section 523(a)(2)(A) excepts from discharge debts "obtained by" fraud. The phrase is temporal and causal: the fraudulent conduct must be the mechanism by which the creditor parted with funds. Conduct occurring after the wire cannot be the means by which the debt was obtained.

The inbound conduct consisted entirely of Joseph's representations: his pitch in late 2018, his three sets of wiring instructions, his fictitious Richard Drucker emails, and his forged receipt. (J12; J13; J15; J17.) Melinda's two contacts on January 25 contained no false statement and were not the mechanism that caused the wire. Plaintiff wired the funds on February 6 based on instructions he received from Joseph that day, pursuant to a written agreement Plaintiff had signed with Joseph on January 30. (J10; J15.)

The outbound conduct, including Melinda's appearance at the bank on February 7, occurred after Plaintiff had voluntarily relinquished control of the funds. Even accepting Plaintiff's most favorable characterization of that conduct, it postdates the obtaining and is legally irrelevant to the "obtained by" element. *Rembert v. AT&T*, 141 F.3d at 281 (explaining that conduct must be intentionally fraudulent in nature to make debts nondischargeable under § 523(a)(2)(A)).

The same temporal principle is reflected in *Morganroth & Morganroth, P.L.L.C. v. Stollman (In re Stollman)*, which distinguished between false statements made after a debt has already been incurred and the creditor's burden to prove reliance and causation as to the specific debt sought to be excepted from discharge. 404 B.R. 244, 258 (Bankr. E.D. Mich. 2009).

The full $12 million is accounted for. The BofA statement reflects the wire arriving on February 6. (J5.) The February 7 outflows fall into three categories: (i)

cashier's checks Melinda executed at the teller's window at Joseph's direction, covering payments to William Noble Rare Jewels, David Husman, Paul Haig, and others as specified in Joseph's pre-arranged emails (J3; J5; J42-J44); (ii) three Arizona teller-initiated transfers, reflected on the BofA statement as "AZTLR" transactions totaling approximately $4.4 million, representing disbursements processed by bank personnel pursuant to Joseph's email instructions for which Bank of America produced no backup documentation in response to subpoena (J5; Tr. Day 1, 38: 17-24, March 23, 2026, ECF No. 327); and (iii) subsequent transactions later in February that drew the account balance to effectively zero. (J5.) No portion of any category is traceable to Melinda. Joseph's plea states he used the funds for his own debts and expenses (J22); the FBI affidavit did not identify Melinda as a recipient; the Chapter 7 Trustee brought no claim against her.

Plaintiff argued at trial that opening the BofA Account satisfies the "obtained by" requirement because the funds could not have been diverted without it. (ECF No. 284, at 16-17.) That argument fails. Opening a business checking account at a spouse's request is not fraud. Joseph's February 6 email providing the account number and wiring instructions caused the transfer. (J15.) Joseph was attempting to add his own signature card to the account on February 7 and was prevented only by an administrative delay in uploading it to the bank's system. (J42.) Under Plaintiff's theory, any person who opens an account later misused by a fraudulent superior

would face nondischargeability. That cannot be the law.

The three "AZTLR" line items on the February 2019 BofA statement, totaling $4,517,000, are Arizona Teller transfers, internal Bank of America system transfers between BofA accounts initiated by branch personnel. The receiving accounts are identified in Joseph's 6:16 PM email to Nancy DeMille and Hector Aguilar: Account 9238 belongs to William Noble Rare Jewels in Dallas, and Account 4272 belongs to Ryan and Rodney Diamonds Inc. in New York. (J42; J5.) Joseph's email directed the bank to process these as direct transfers to other BofA business clients, and the bank's own system processed them accordingly. No counter withdrawal slip bearing Melinda's signature is associated with the AZTLR transfers in the record. Bank of America produced no backup documentation for these transfers in response to subpoena. (Tr. Day 1, 38: 17-24, March 23, 2026, ECF No. 327) The absence of documentation reflects the mechanics of internal BofA account-to-account transfers; there was no instrument for Melinda to sign because these were not counter withdrawals. The record ties Melinda's physical participation exclusively to the counter withdrawal slips she signed at the teller's direction, covering the cashier's checks Joseph had pre-specified by email. (J42; J43; J44.)

Plaintiff's closing argument attributed the AZTLR transfers to Melinda on the theory that, as the sole signatory on the account on February 7, she necessarily "authorized" every outflow. (Tr. Day 4, 159: 8-12, March 26, 2026, ECF No. 330)

That argument conflates legal authority over an account with affirmative participation in specific transactions. The AZTLR transfers were initiated by Joseph's pre-arranged emails to bank personnel, not by any instruction from Melinda, and not by any request Melinda made at the teller window. (J42; J5.)

Plaintiff has provided this Court with absolutely zero evidence that, at the time she was at the bank in Arizona, signing counter checks at her husband's instruction, Melinda possessed any knowledge of Joseph's wrongdoing, or intent to in any way defraud, injure, embezzle from the Plaintiff; nor that she had any reason to distrust or question her husband of over twenty years, who she knew as nothing other than a successful businessman. Conversely, Melinda's unrebutted testimony establishes that she was married to Joseph DuMouchelle for over twenty years (Tr. Day 4, 7:12, March 26, 2026, ECF No. 330); that she had, at the time, no reason whatsoever to suspect that her husband would ask her to do anything inappropriate (Tr. Day 4, 47:6-10, March 26, 2026, ECF No. 330); a husband that she knew as "crossed his t's and dotted his i's," and that she always trusted. (Tr. Day 4, 85:10-15, March 26, 2026, ECF No. 330.)

Plaintiff cannot satisfy the knowledge element of any § 523 subsection as to the AZTLR transfers when his own examination produced an unqualified denial. The absence of backup documentation, the absence of any signed instrument from Melinda, and that denial together confirm that the AZTLR transfers were Joseph's

transactions, not Melinda's.

The post-February 7 transactions that drew the account to effectively zero were processed through Michigan branch infrastructure, designated "MI TLR" on the BofA statement, or as outbound wires bearing no connection to the Tucson branch. (J5.) Joseph's signature card was uploaded to the bank's system on February 11, 2019. (J42.) The February 12 wire of $2,114,765 and the associated transactions on that date postdate Joseph's acquisition of independent signatory access to the account. No document in the trial record places Melinda at any Bank of America branch after February 7, 2019, or connects her signature to any post-February 7 disbursement. (J5.) The full account history, read in sequence with the signature card documentation and Joseph's emails, is consistent with a single day of Melinda's physical participation on February 7, followed by Joseph completing the remaining disbursements independently once his signature card was activated. Joseph's plea agreement confirms he used the funds for his own personal and business debts and expenses. (J22.) The FBI affidavit did not identify Melinda as a recipient. The Chapter 7 Trustee did not pursue Melinda as a transferee.

Plaintiff's counsel at closing suggested that Melinda returned to the bank on February 11 and withdrew an additional $180,000, and that a wire transfer on that date may also be attributable to her. (Tr. Day 4, 161: 3-8, March 26, 2026, ECF No. 330) The Court noted that Joseph was himself a signatory on the account by that

date. (Id. at 161:9-11.) Joseph's signature card was activated on February 11, 2019. (J42.) Any disbursement on or after that date is at least as attributable to Joseph, who originated, structured, and controlled every aspect of this transaction, as to Melinda. No document in the record establishes that Melinda personally appeared at any branch on February 11 or signed any instrument associated with any February 11 transaction. Plaintiff bears the burden of proof. Speculation does not satisfy it.

## IV. Plaintiff's Alleged Reliance Was Not Justifiable

Justifiable reliance under § 523(a)(2)(A) is debtor-specific: Plaintiff must show reliance on this defendant's representations as the proximate cause of his loss. Field v. Mans, 516 U.S. 59, 70–71 (1995). Although "justifiable reliance" is less demanding than objective reasonableness, it still requires the plaintiff to heed obvious red flags, the horse represented to be sound that obviously has only one eye. Id. Plaintiff's own cross-examination testimony and his own contemporaneous contract establish that this element is not met as to Melinda.

Plaintiff admitted he had not seen or spoken to Melinda regularly in the ten years preceding this transaction, yet placed "absolute" faith in her. (Tr. Day 1, 209:21-210:2, March 23, 2026, ECF No. 327.) He admitted he wired $12 million without independently verifying the seller's identity, the seller's ownership of the diamond, or the destination of his funds. (Tr. Day 1, 185:9-21, March 23, 2026, ECF No. 327.) He admitted Melinda provided no appraisal, only a forwarded GIA

monograph and an eight-year-old insurance replacement value document she did not prepare, and that she had declined to do one because it would be a conflict of interest. (Tr. Day 1, 163:8-164:7; 172:22-23, March 23, 2026, ECF No. 327.) He admitted that after receiving Melinda's email he separately asked Joseph for an appraisal, confirming that even Plaintiff did not consider her data package sufficient verification. (Tr. Day 1, 170:24-171:3, March 23, 2026, ECF No. 327.) He admitted he cannot produce a single phone record, text message, or contemporaneous document memorializing the alleged January 25 call. (Tr. Day 1, 162:18-21; 168:16-19, March 23, 2026, ECF No. 327.) Asked whether he had any reason to obtain a separate appraisal, Plaintiff answered, "No, I did not." Q: "Because you trusted Lindy." A: "Absolutely." (Tr. Day 1, 165:25-166:3, March 23, 2026, ECF No. 327.)

Plaintiff's own contemporaneous writing tells a different story. The Letter Agreement he drafted on January 30, 2019, before any disbursement, committed him to "rely heavily on [Joseph's] guidance and advice" and does not mention Melinda. (J10; Tr. Day 1, 186:25-187:6, March 23, 2026, ECF No. 327.) Where contemporaneous documents and litigation testimony diverge regarding reliance, the contemporaneous documents are entitled to substantially greater evidentiary weight: the Letter Agreement was drafted by Plaintiff himself, executed before any money moved, and identified Joseph as his sole counterparty; Plaintiff's "I relied on Lindy" testimony was offered seven years later, after counsel, after Joseph's guilty plea, and

after Plaintiff had absorbed the full $12 million loss. The Letter Agreement is precisely the kind of unmistakable signal Field says a plaintiff cannot ignore when later claiming reliance on someone else. 516 U.S. at 70–71. Plaintiff cannot hold Melinda responsible for a transaction he himself placed in Joseph's hands. The § 523(a)(2)(A) element is not established as to Melinda.

## V. The Symmetry of Justifiable Reliance and Melinda's State of Mind

The Court at the April 7, 2026 hearing recognized that Melinda's closing argument raised a legal proposition warranting post-trial development: if the same totality of circumstances Plaintiff invokes to support his own justifiable reliance also explains why Melinda would not have suspected fraud, those two analyses are connected, and the connection runs against Plaintiff.

The proposition is this. Justifiable reliance under § 523(a)(2)(A) is determined in part by "the circumstances of the particular case." *Field*, 516 U.S. at 70-71. Plaintiff argues that those circumstances, a credentialed gemologist, a twenty-year business, a family relationship, a professional data package, made his reliance on Melinda's January 25 contacts justifiable. He drafted and signed a written agreement committing himself to "rely heavily on [Joseph's] guidance and advice" and still claims justifiable reliance on Melinda. (J10.)

The same circumstances cut in the opposite direction on §§ 523(a)(2), (a)(4) and (a)(6). Those provisions require proof of Melinda's subjective intent at the time

of the relevant conduct. *See Geiger*, 523 U.S. at 61; *Markowitz*, 190 F.3d at 464. The circumstances Plaintiff would have the Court weigh in his favor, the twenty-year business relationship, Joseph's role as the transactional lead, Melinda's professional expertise in gemology rather than finance, are the same circumstances that explain why Melinda would not have been scrutinizing Joseph's banking instructions with suspicion on February 7, 2019. If a sophisticated plaintiff who personally drafted a written agreement assigning all responsibilities to Joseph and reciting express reliance on Joseph's guidance can claim justifiable reliance on Melinda's two ancillary contacts, then a fortiori Melinda could justifiably rely on her husband and business partner of more than twenty years to handle the financial mechanics of a transaction he had originated, structured, and managed from the beginning.

The concepts are not symmetrical for Plaintiff, but against him. The same set of circumstances that Plaintiff contends made his reliance on Melinda justifiable equally explain why Melinda's reliance on Joseph was justifiable. Melinda's justifiable reliance on Joseph negates the fraudulent intent §§ 523(a)(4) and (a)(6) require. It is direct evidence that she lacked the subjective purpose to injure that *Geiger* demands. Plaintiff cannot invoke the justifiability of his own reliance on Melinda while simultaneously arguing that Melinda had no basis to rely on Joseph. The two positions are irreconcilable on the same record.

The specific mechanics of the AZTLR transfers confirm this symmetry at the

factual level. When Plaintiff's counsel identified account numbers 9238 and 4272 and asked whether knowing these were interbank transfers helped Melinda's recollection, Melinda answered "No." (Tr. Day 2, 151:7–152:18; 153:18-22, March 24, 2026, ECF No. 332). She did not know what those accounts were, who held them, or how much was being transferred to each. If the circumstances Plaintiff invokes to support his justifiable reliance is sufficient, it is equally sufficient to explain why Melinda, who did not direct those transfers, did not know their destinations, and was physically present in Tucson at Joseph's last-minute direction, lacked the subjective fraudulent intent the statute requires. Plaintiff cannot invoke the justifiability of his own reliance on Melinda while arguing that Melinda, given the same circumstances, was required to scrutinize her husband's banking instructions with a level of suspicion Plaintiff himself did not apply to a $12 million transaction.

The question under *Rembert v. Citibank* is whether the evidence, viewed in its totality, excludes innocent conduct as a reasonable explanation. 219 B.R. at 767. Plaintiff's own theory of the case, his own account of why a sophisticated businessman wired $12 million without independent verification, relying on a twenty-year relationship, professional credentials, and a trusted counterparty, confirms that it does not. If the totality of circumstances surrounding this transaction was consistent with innocent reliance by the victim, the same totality was at least

equally consistent with innocent reliance by a defendant whose entire understanding of the transaction came from the same source. *Rembert v. Citibank* requires no more than that showing to defeat Plaintiff's burden. This record provides it.

**VI. Vicarious Liability Fails Because Michigan Law Supplies No Predicate**

*Bartenwerfer* holds that § 523(a)(2)(A) excepts "any debt" obtained by fraud regardless of which party committed the fraudulent act, where state law independently imposes joint liability on the debtor. *Id*. at 671, 675. The structure is sequential: state law first determines whether the debtor is liable for the fraud-based obligation; § 523 then preserves that liability through discharge. *Bartenwerfer* does not create federal common-law liability for a spouse's fraud. The Court explained: "Section 523(a)(2)(A) does not define the scope of one person's liability for another's fraud. That is the function of the underlying law." *Id.* at 675. The statute "takes the debt as it finds it, so if [state law] did not extend liability to honest [partners], § 523(a)(2)(A) would have no role to play." *Id*. Where state law imposes no liability, there is nothing for *Bartenwerfer* to preserve.

The limits of *Bartenwerfer* are emphasized in Justice Sotomayor's concurrence, joined by Justice Jackson: "The Court here does not confront a situation involving fraud by a person bearing no agency or partnership relationship to the debtor. Instead, the relevant legal context concerns fraud only by agents and partners within the scope of the partnership." *Id*. at 677 (Sotomayor, J., concurring).

That qualification is dispositive here. Plaintiff withdrew the partnership theory in the Joint Final Pretrial Order. (ECF No. 299, at 3.) Plaintiff has not established an agency relationship sufficient to satisfy Michigan law. The case here lies outside the relationships *Bartenwerfer* addressed.

Michigan law supplies no predicate. Membership in a Michigan LLC does not expose members to personal liability for the acts of other members or for the debts of the company. Mich. Comp. Laws § 450.4501(4). Plaintiff did not plead or prove veil-piercing. Marriage does not create a partnership and does not impose joint liability on spouses for each other's torts. Mich. Comp. Laws § 600.2005. *Bartenwerfer* itself is explicit that the scope of one person's liability for another's fraud is a state-law question that varies by jurisdiction. 143 S. Ct. at 675.

This conclusion is reinforced by *Myers v. Ostling (In re Ostling)*, which held that, absent a legal relationship beyond marriage, a creditor seeking to except a debt from discharge must prove the elements of § 523(a)(2)(A) against the debtor herself, and could not establish nondischargeability by virtue of the spousal relationship alone. 266 B.R. 661, 665 (Bankr. E.D. Mich. 2001).

Plaintiff may invoke *Magley v. M & W Inc.*, 325 Mich. App. 307, 313-14, 926 N.W.2d 1, 5-6 (Mich. Ct. App. 2018), for the proposition that exercising dominion over another's property creates strict liability for conversion. As a threshold matter, Melinda did not exercise dominion over Plaintiff's funds in any meaningful sense:

Joseph pre-arranged every transaction with bank personnel by email before Melinda arrived at the branch; Melinda had no online access to the account; and the recipients, amounts, and structure of each payment were determined entirely by Joseph. (J42-J44; Tr. Day 2, 35: 13-14, March 24, 2026, ECF No. 332) The record does not establish the predicate for *Magley* liability.

Even if it did, *Magley* is a strict-liability conversion case requiring no fraudulent intent. § 523(a)(2)(A) requires fraudulent conduct, and §§ 523(a)(4) and (a)(6) require fraudulent appropriation and willful and malicious injury, respectively. A strict-liability state tort cannot supply the scienter federal nondischargeability requires. Accepting the *Magley* theory would mean any person whose innocent conduct satisfies Michigan conversion automatically faces nondischargeability, a result irreconcilable with *Geiger*. *See* 523 U.S. at 61 (1998).

The AZTLR transfers present a discrete structural obstacle to the vicarious liability theory. Approximately $4,517,000 of the February 7 outbound total consisted of bank-initiated account-to-account transfers responding to Joseph's pre-arranged email instructions to bank personnel. (J42; J5.) Melinda was not the author of those instructions. She was not copied as a sender. No signed instrument from her covers those line items. Under any recognized theory of agency, an agent's act must be performed by the agent, not by a third party acting on the principal's separate directions. An agent who is present in a bank branch while the principal

independently directs bank personnel by email to process transfers to the principal's own creditors is not performing those transfers as the principal's agent. Plaintiff cannot establish vicarious liability for transfers Melinda did not make by attributing them to her on the theory that she was present in the same branch at some point that day. Presence is not agency. If Plaintiff cannot establish vicarious liability for nearly half of the outbound total, the theory fails as a coherent basis for attributing the full $12 million loss to Melinda.

Plaintiff stated at the April 7, 2026 hearing that he seeks both direct and vicarious liability across all three § 523 subsections. Those theories are not additive. Under *Bartenwerfer*, vicarious liability is a discharge-preservation mechanism that takes state-law liability "as it finds it"; it does not lower Plaintiff's burden or create a separate federal theory of liability. 143 S.Ct. at 670. Plaintiff must therefore prove either that Melinda directly committed the conduct § 523 requires, or that Michigan law independently imposes joint liability on her for Joseph's fraud. Plaintiff cannot stack both theories to manufacture a lower threshold than either would independently require. Where direct liability fails for want of a false statement, fraudulent intent, or the required scienter, adding a vicarious theory does not cure those deficiencies. It only raises the further question of whether Michigan law imposes joint liability at all, which, as demonstrated above, it does not.

Plaintiff's agency and civil conspiracy theories require, as a threshold, proof

that Melinda knew of Joseph's fraudulent purpose. An agent is not liable for a principal's fraud absent knowledge of and participation in the scheme; civil conspiracy requires a knowing agreement to accomplish an unlawful objective. *Moore v. Auto Club Servs.*, 615 F. Supp. 3d 670, 690 (E.D. Mich. 2022). The record contains no evidence Melinda knew the transaction was fraudulent at any relevant time. The absence of knowledge is fatal to both theories and to the state-law predicate *Bartenwerfer* requires.

What the record shows instead is a person who followed her husband's last-minute instructions without understanding their purpose or consequences. That is not agency within the meaning of *Bartenwerfer*. It is compliance, and compliance without knowledge of the fraudulent purpose is not a basis for nondischargeability under any recognized theory. The Supreme Court in *Bartenwerfer* was explicit that the scope of one person's liability for another's fraud is determined by the underlying state law, not by federal common law. 143 S.Ct. at 676. Agency law requires knowledge of and participation in the principal's wrongful purpose. *Moore*, 615 F. Supp. 3d at 690. That knowledge is not established here, and the theory therefore fails at the threshold under both Michigan law and *Bartenwerfer*.

Throughout trial the Court returned to the question whether Melinda could have refused Joseph's requests on February 7. The factual answer is that Joseph was actively attempting to add his own signature card and would have completed the

disbursements within hours or days regardless. (J42.) The legal answer is more fundamental. The ability to prevent a fraud is not a basis for liability under any recognized theory. Liability requires duty, breach, and causation. Melinda had no legal duty to Plaintiff arising from the transaction. "Could have said no" is a moral judgment, not a legal standard, and § 523 requires proof of what a debtor actually did, knew, and intended, not what she might have done with hindsight. *Geiger*, 523 U.S. at 61; *In re Markowitz*, 190 F.3d at 464.

## VII. Section 523(a)(4) Fails: The Funds Were Not Entrusted, and the Stevenson Voluntary-Transfer Holding Forecloses Both Embezzlement and Larceny

Plaintiff abandoned the fiduciary capacity prong and proceeds on embezzlement and larceny only. (ECF No. 299, at 3.) Both fail.

## A. Embezzlement Requires Entrustment, Which Did Not Occur

Embezzlement under § 523(a)(4) requires (i) entrustment of property to the debtor, (ii) appropriation for an unauthorized use, and (iii) fraudulent intent. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). The entrustment must precede and exist independent of the wrongful conduct that gives rise to the claim. Receipt of property through fraud is not entrustment within the meaning of the statute but rather the predicate for a fraud claim under § 523(a)(2)(A). *Id.*

Plaintiff did not entrust his funds to Melinda. He wired $12 million on February 6 pursuant to instructions from Joseph, believing the BofA Account belonged to the seller's representative. (J15; Tr. Day 1, 173: 17-25, March 23, 2026,

ECF No. 327) He did not know the account was a DuMouchelle Jewellers business account. (Id.) He did not consciously place funds in Melinda's care for a specific purpose. Where a plaintiff wires funds based on fraudulent instructions believing the recipient account belongs to a third party, there is no voluntary placement of property in the debtor's hands.

Embezzlement further requires fraudulent intent, and the record refutes it. Melinda's conduct on February 7 was open, disclosed, and executed at the direction of bank personnel responding to instructions Joseph had pre-arranged by email. (J42-J44.) She did not conceal the transactions, did not divert funds to herself, and executed everything in the company's name with the bank's full knowledge and participation. Conduct undertaken openly, without concealment, and under a reasonable belief in the authority to act defeats the inference of fraudulent intent required for embezzlement. *In re Fox*, 370 B.R. 104, 117 (B.A.P. 6th Cir. 2007). That is the character of Melinda's conduct here.

## B. Stevenson Independently Forecloses Entrustment

This Court's holding in *Stevenson* independently defeats embezzlement. *Stevenson* held that Plaintiff voluntarily transferred the $12 million and that voidable title passed upon receipt. 667 B.R. at 133-34. That holding was not dicta, was not limited to the parties in that proceeding, and was not challenged or distinguished by Plaintiff at trial or in his pretrial submissions. It is this Court's own characterization

of the legal nature of the February 6 transfer, and it controls here.

An entrustment relationship and a voluntary transfer with voidable title are mutually exclusive characterizations of the same transaction. The transferor's remedy is rescission or a fraud claim under § 523(a)(2)(A), not a claim for breach of trust under § 523(a)(4). Applying *Stevenson*, the funds in the BofA Account were not held in trust for Plaintiff at any point after February 6. The entrustment element is not established as a matter of law, and no amount of additional evidence about Melinda's conduct on February 7 can supply an element negated by the legal character of the transfer the day before.

## C. Larceny Requires a Wrongful Taking, Which Did Not Occur

Larceny under § 523(a)(4) requires a wrongful taking from the owner without the owner's consent at the moment of the original taking. *In re Stollman*, 404 B.R. at 271; *In re Magpusao*, 265 B.R. 492, 497 (Bankr. M.D. Fla. 2001). The original taking must be unlawful. *In re Stollman*, 404 B.R. at 297. A transfer that is initially voluntary, even if procured by misrepresentation, is not larceny because the owner consented to part with the property at the time of the transfer. The remedy in such cases is a fraud claim, not a larceny claim.

The larceny theory is independently foreclosed by this Court's holding in *Stevenson* that the Yellow Rose transaction constitutes "obtaining money through false pretenses, not larceny." 667 B.R. at 136. That holding rests on the established

principle, recognized by both the Sixth Circuit and the Michigan Court of Appeals, that where the owner intends to part with both title and possession, the offense is false pretenses rather than larceny. *People v. Long*, 294 N.W.2d 197, 199 (Mich. 1980); *People v. Malach*, 507 N.W.2d 834, 836 (Mich. App. 1993); *Kitchen v. Boyd* (*In re Newpower*), 233 F.3d 922, 929 (6th Cir. 2000). Plaintiff intended to part with title and possession of the $12 million, so there was no larceny. *See Long*, 294 N.W.2d at 199; *Malach*, 507 N.W.2d at 836; *In re Newpower*, 233 F.3d at 929; *Stevenson*, 667 B.R. at 136.

## VIII. Section 523(a)(6) Fails Under Cottingham Because There Was No Concurrent Knowledge or Personal Enjoyment of the Proceeds

11 U.S.C. § 523(a)(6) excepts debts arising from "willful and malicious injury." The Supreme Court has held that this language requires a deliberate or intentional injury, not merely a deliberate act that leads to injury. *Geiger*, 523 U.S. at 61 (1998). The Court specifically rejected standards based on reckless disregard or constructive knowledge. *Id*. at 61-62. The Sixth Circuit requires that the debtor either desire to cause the consequences of her act or believe them to be substantially certain. *In re Markowitz*, 190 F.3d at 464.

## A. The Payee-Variety Inference and Why It Does Not Satisfy the Statute

Plaintiff purports a theory of recklessness, claiming that Melinda should have been suspicious of wrongdoing due to her experience and the number of payees with no connection to the sale of the Yellow Rose Diamond. There are two reasons why

20-04381-lsg    Doc 336    Filed 06/15/26    Entered 06/15/26 23:43:59    Page 38 of 51

this theory fails.

First, it is the kind of intuition § 523(a)(6) was designed to discipline. *Geiger* did not reject the recklessness standard because reckless debtors are sympathetic. It rejected it because the statutory text demands deliberate injury, and the line between "should have known" and "did know" is the line Congress drew. *Geiger* 523 U.S. at 61. The Court's discomfort with Melinda's conduct, however justified in hindsight, does not satisfy the statute. A ruling against a debtor because the debtor's conduct was suspicious, without finding by a preponderance of the evidence that the debtor actually knew her conduct was injurious, applies a negligence standard to a deliberate-injury statute. That is precisely what *Geiger* forbids. *Id.* at 61-62.

Second, the record provides a direct and affirmative explanation for why those payments would not have appeared suspicious to Melinda in real time. She testified, in the deposition video played at trial, that after not having done a sale in three to four months, the Yellow Rose transaction was something the business had worked hard on, and it had finally gone through. (Tr. Day 2, 68:6-9, March 24, 2026, ECF No. 332.) In her experience, large jewelry transactions involved multiple simultaneous distributions to dealers, brokers, consignors, and industry participants. (Tr. Day 4, 57:7-13, March 26, 2026, ECF No. 330.) Joseph had pre-arranged every payment with the bank by email before she arrived. She signed what was presented at the teller's direction. The payments did not appear suspicious to her because she

believed she was executing the ordinary financial aftermath of a transaction she believed had legitimately closed.

## B. Melinda's Contemporaneous Understanding

The record reflects that Joseph historically handled the company's banking and transaction structuring. Melinda testified that she did not structure the deal, did not determine the recipients, did not decide the amounts, and did not know why specific payments were being made. (Tr. Day 4, 56: 16-18, 57: 15-20, March 26, 2026, ECF No. 330) She arrived at a Tucson bank branch after Joseph had already communicated with the bank by email from Michigan regarding the specific transactions to be processed. (J42-J44.) In her experience in the jewelry and auction business, large transactions sometimes involved multiple parties and multiple distributions, including dealers, brokers, consignors, and industry participants. (Tr. Day 4, 57: 7-13, March 26, 2026, ECF No. 330) The issue under § 523 is therefore not whether Melinda, with hindsight, should have questioned the transactions more aggressively. The issue is whether Plaintiff proved that Melinda subjectively understood, at the time she signed the instruments, that Joseph was fraudulently diverting Plaintiff's funds. Plaintiff did not make that showing.

The record establishes the opposite of malicious intent. Melinda suggested escrow when Joseph told her a new account was needed, the conduct of someone who believed the transaction was legitimate and wanted proper transactional

structure, and she was visibly frustrated that the conference she had traveled to attend was disrupted by an unexpected banking problem. (Tr. Day 2, 30: 17-25, 32: 16-21, 33: 17-21, March 24, 2026, ECF No. 332) Her own words explain why. Describing the circumstances in which she was asked to open the BofA Account and appear at the Tucson branch, Melinda testified: "And then when this happens with the all [sic] end of January/early February is when they hit us with this because we have not done a sale for three to four months. So we worked so hard on this sale; it went through." (Tr. Day 2, 68:6-9, March 24, 2026, ECF No. 332)

Two discrepancies existed between P-1 (the written deposition transcript, DN 228) and the original court transcript of the March 24, 2026 trial proceedings. As to the first, the original court transcription read "I was excited because I sold the beautiful piece"; the court-ordered corrected re-transcription revised that language to "I was excited because this was a beautiful piece," which is what P-1 has always said. The error was introduced by the first court transcriptionist and corrected back to the P-1 language. As to the second, P-1 reads "we had worked on this sale for three to four months"; both the original court transcript and the court-ordered corrected re-transcription read "we have not done a sale for three to four months." Two independent court transcriptionists reached the same conclusion against P-1 on this point. The corrected court transcript (ECF No. 332) governs as to both discrepancies, as confirmed at the June 3, 2026 status conference, and the analysis

in this Section proceeds on that basis.

Melinda's testimony is significant in two respects. First, it confirms Melinda's contemporaneous belief that the Yellow Rose transaction was legitimate. Second, it provides direct evidentiary context for why Melinda would not have been scrutinizing Joseph's banking instructions with suspicion. She believed the transaction was real, it had closed, and the February 7 disbursements were the normal financial aftermath of a legitimate sale. A person executing what she understood to be routine post-closing bank transactions for a deal the business desperately needed is the antithesis of the subjective, purposeful wrongdoing § 523(a)(6) requires. *See Geiger*, 523 U.S. at 61; *In re Markowitz*, 190 F.3d at 464.

The remaining behavioral evidence confirms the same. She FedExed the cashier's checks back to Joseph in Michigan, the conduct of a conduit rather than a co-conspirator. (Tr. Day 4, 162: 14-16, March 26, 2026, ECF No. 330) Not one dollar of Plaintiff's $12 million was directed to her personally by check, wire, or any other means. (J3; J5.) Joseph's plea confirms he kept the funds for himself. (J22.) She cried when she learned Plaintiff had not been paid. (Tr. Day 2, 35: 11-16, March 24, 2026, ECF No. 332)

Plaintiff's theory requires the Court to stack inference upon inference: that Melinda knew the transaction was fraudulent, that her expressions of confusion were pretextual, and that her deference to Joseph was knowing concealment rather than

genuine ignorance, without a single document anchoring any link in the chain. Under *Rembert*, that is not proof by a preponderance. *See* 141 F.3d at 281.

**C. The March 7, 2019 Gelov Call**

Plaintiff took great care to admit into evidence a March 7, 2019 recorded telephone call among Melinda, Joseph, and Ted Gelov.

First, and obviously, the call is between Joseph, Melinda, and Ted Gelov. The Plaintiff in this case was no part of the call, and the evidence is thus irrelevant to the instant matter. Regardless, the call is dated approximately one month *after* the conduct at issue, *after* Plaintiff had wired the $12 million. Subjective intent is measured at the time of the relevant conduct, not retrospectively. *Geiger*, 523 U.S. at 61; *In re Markowitz*, 190 F.3d at 464. Whatever Melinda knew or believed on March 7, 2019 does not establish what she knew or intended on February 5, 6, or 7, 2019. Post-conduct awareness does not retroactively transform innocent conduct into willful and malicious injury.

The call reflects a person managing a banking problem, not concealing a fraud. Defendant describes FineMark's rejection of the wire, BofA's processing delays, and the frustration of large-dollar transactions through understaffed banks, the language of someone who believed funds were present and temporarily restricted, not stripped. Nothing in the call establishes that Defendant knew, as of March 7, 2019, that Plaintiff would not be repaid. She deferred to Joseph on the

banking details, precisely what one would expect of a person who believed the delay was a banking complication, not a fraud she had orchestrated. Whatever Defendant understood on March 7 does not speak to what she intended on February 7. Section 523 requires proof of subjective, purposeful intent at the time the injury-causing conduct occurred. *Geiger*, 523 U.S. at 61; *In re Markowitz*, 190 F.3d at 464.

Plaintiff's theory requires the Court to infer from a call one month *after* the time period in question, with a third party, that Melinda was concealing her knowledge of the fraud that she had at the time of the transfers. That inference depends on a chain of inference. Plaintiff has established no link in that chain by direct evidence. Under *Rembert v. Citibank*'s standard, a chain of inferences, none of which is anchored in direct evidence, does not constitute proof by a preponderance. *See* 219 B.R. at 767.

**D. Cottingham Defines the Outer Boundary, and Plaintiff Cannot Meet It**

The governing authority on spousal liability under § 523(a)(6) in this Circuit is *In re Cottingham*, 473 B.R. 703. *Cottingham* relied on the standard articulated in *In re Magpusao*, 265 B.R. 492, 498 (Bankr. M.D. Fla. 2001): for a non-embezzling spouse to be liable, "knowledge [of the misconduct] must be concurrent with personal participation in the use or enjoyment of the stolen property." To succeed in a spousal liability theory under § 523(a)(6), Plaintiff must prove both knowledge and participation. He does neither.

Plaintiff produced no direct evidence establishing contemporaneous knowledge. Plaintiff produced no communication showing Melinda knew the transaction was fraudulent at any relevant time. There is no evidence of personal enjoyment. Plaintiff identified no asset, expenditure, or lifestyle enhancement traceable to Plaintiff's funds: no vehicle, home improvement, or personal expenditure of any kind. The Trustee did not pursue Melinda as a transferee.

The distinction between *Cottingham*'s record and this one is decisive. *Cottingham* involved a seven-year embezzlement scheme marked by escalating expenditures far exceeding the debtors' legitimate income, repeated use of stolen funds to finance vehicles, home renovations, and a swimming pool, and extensive participation by the debtor spouse in a dramatically inflated lifestyle funded by the embezzlement proceeds. The debtor spouse signed tax returns and loan documents reflecting the financial reality he claimed not to understand, and he possessed prior knowledge that his wife had already pled guilty to embezzlement from another employer. On that record, the court concluded that the debtor's claimed ignorance was not credible and that his knowing participation in the use and enjoyment of the stolen proceeds was established. The required "second conversion," the knowing application of his wife's embezzled funds to finance that escalating lifestyle, is what made Thomas Cottingham liable. *In re Cottingham*, 473 B.R. at 710-11.

None of those facts are present here. This case involves a single transaction,

not a seven-year pattern. Melinda's lifestyle did not change. She did not in any way enjoy Plaintiff's money. Melinda received no benefit whatsoever for Joseph's fraud. Joseph's plea agreement confirms he used the money for his own debts and expenses. (J22.) There is no second conversion here, the very feature that transformed Cottingham's conduct into a willful and malicious injury.

**E. The Theory Reduces to Negligence, Which Geiger Forecloses**

Plaintiff's theory ultimately reduces to the proposition that Melinda should have realized, from the structure of the February 7 transactions, that Joseph was misappropriating Plaintiff's funds. That is a negligence theory, or at best a recklessness theory. *Geiger* foreclosed both. 523 U.S. at 61-62. *Geiger* requires proof of actual, subjective intent. *Id.* Plaintiff has not supplied it.

The Bankruptcy Court for the Eastern District of Michigan reached a parallel result in *Abdel-Hak v. Saad (In re Saad)*, 319 B.R. 147, 154-157 (Bankr. E.D. Mich. 2004), where the court declined to except a debt from discharge under §§ 523(a)(2)(A), (a)(4), and (a)(6) notwithstanding conduct the court found troubling, because the plaintiff failed to prove justifiable reliance, federal fiduciary capacity, and the subjective intent to injure the statutes require. The same is true here. Plaintiff's case is not weak because Joseph's conduct was not wrongful. Joseph's conduct was profoundly wrongful, and he is serving 151 months for it. Plaintiff's case is weak because the statutory elements of § 523 require proof of the debtor's

own knowledge, and intent, and the record lacks any such proof as to Melinda.

**IX. Stevenson Controls the Property and Transfer-Characterization Issues and Requires a Consistent Result**

This adversary proceeding does not arise in isolation. It arises from the same February 6, 2019 wire transfer, the same BofA Account, and the same DuMouchelle enterprise addressed by this Court in *Stevenson*. On the property and transfer-characterization questions that recur in this proceeding, *Stevenson* provides the governing characterization of the same February 6, 2019 transfer under federal bankruptcy law, and each of the holdings developed below directly constrains the theories Plaintiff advances here.

First, *Stevenson* held that Plaintiff voluntarily transferred the $12 million and that voidable title passed to the DuMouchelle entity upon receipt. 667 B.R. at 133-34. As established in Section VII, that characterization is legally incompatible with the entrustment required for embezzlement and forecloses larceny, which requires a wrongful taking at inception. The voluntary-transfer holding also reinforces the "obtained by" analysis: if Plaintiff voluntarily transferred the funds, the obtaining occurred at the moment of the wire through Joseph's inducements, not through any conduct by Melinda before or after.

Second, *Stevenson* expressly characterized the Yellow Rose transaction as "obtaining money through false pretenses, not larceny." *Id*. at 136. That holding rests on the Sixth Circuit's analysis in *In re Newpower*, 233 F.3d 922, 929 (6th Cir. 2000),

and the Michigan Court of Appeals' decision in *Malach*, 507 N.W.2d 834 (1993): where the owner intends to part with both title and possession, the offense is false pretenses, not larceny. 507 N.W.2d at 837. *Stevenson's* holding that the transaction was false pretenses directly forecloses any larceny theory under § 523(a)(4) on the same record.

Third, *Stevenson* rejected the Trustee's attempt to ignore corporate separateness and treat the LLC's funds as property of the individual debtors. 667 B.R. at 132-33. The Court held that under Michigan law, veil-piercing doctrines pertain to liability and do not transform the alter ego's property into property of the debtor. The same principle continues to apply here. Plaintiff's vicarious liability theories, including agency and civil conspiracy, must succeed on Michigan-law terms. They cannot be sustained by collapsing the legal distinctions between Joseph, Melinda, and the LLC.

## CONCLUSION

Joseph DuMouchelle conceived and executed this fraud. He negotiated the transaction, provided the wiring instructions, transmitted the fictitious receipt, directed the disbursements, received the proceeds, and pled guilty to wire fraud. He hid all of this from his wife. Every element of the fraud and bad conduct runs through, and solely through, Joseph. Every dollar traces to him and his actions.

Section 523 requires proof of Melinda's fraudulent conduct. It does not

impose nondischargeability by marriage or association.

Melinda made two contacts with Plaintiff before the wire. Neither contained a false statement. The documentary evidence and unrebutted testimony of Melinda establishes that she opened a bank account at her husband's request, appeared at a Tucson bank branch while annoyed and attending a professional conference out of town, and signed transactions Joseph had already arranged with the Tucson bank, from Michigan. Melinda did not draft the agreement, did not provide the wiring instructions, did not transmit the receipt, and did not receive the proceeds. After five years of litigation, with court-supervised access to every device, every email, and every file, and every privilege assertion overruled, Plaintiff produced no document, no communication, and no evidence of any kind that Melinda knew this transaction was fraudulent or had any intent to injure, embezzle from, steal from, or defraud the Plaintiff in any way. There is no evidence, because there was no such intent.

Plaintiff has not proven any false statement by Melinda. Has not proven she knew the transaction was fraudulent when the debt was incurred. Has not identified a single dollar of personal benefit. Each failure is established by the contemporaneous documentary record, independent of any disputed aspect of Melinda's testimony. The result urged here holds even on the version of events least favorable to her.

Melinda did not defraud Thomas Ritter. She was deceived by the same person

who deceived him, her husband of more than twenty years, on a transaction she had every reason to believe was legitimate. Nondischargeability on this record would not vindicate § 523. It would weaponize it against the person the Bankruptcy Code was designed to protect.

Judgment should enter in Melinda's favor on all counts.

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

By: */s/ Patrick A. Foley*
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
(313) 274-7377
pafoley@jrfpc.net

Dated: June 15, 2026

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, *Debtors*. | Bank. Case No. 19-54531-lsg<br>Chapter 7<br>Hon. Lisa S. Gretchko |
| THOMAS T. RITTER, *Plaintiff,*<br>v.<br>MELINDA J. ADDUCCI, *Defendant.* | Adv. Pro. No. 20-04381-lsg<br>Hon. Lisa S. Gretchko |

## <u>PROOF OF SERVICE</u>

I hereby certify that on June 15, 2026, I caused the foregoing **Defendant's Post-Trial Brief**, and this **Proof of Service,** to be served upon the following parties via the Court's CM/ECF e-Filing system:

- Kimberly Ross Clayson     kclayson@taftlaw.com, ttorni@taftlaw.com
- Jay L. Welford     jwelford@taftlaw.com, ttorni@taftlaw.com

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

By: */s/ Patrick A. Foley*
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
(313) 274-7377
pafoley@jrfpc.net

Dated: June 15, 2026