# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

**IN THE MATTER OF:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, *Debtors.* | Bank. Case No. 19-54531-lsg<br>Chapter 7<br>Hon. Lisa S. Gretchko |
| THOMAS T. RITTER, *Plaintiff,*<br>v.<br>MELINDA J. ADDUCCI, *Defendant.* | Adv. Pro. No. 20-04381-lsg<br>Hon. Lisa S. Gretchko |

## <u>DEFENDANT'S POST-TRIAL BRIEF</u>

**i**

# Table of Contents

Table of Authorities ................................................................................................... v

INTRODUCTION ....................................................................................................... 1

PROCEDURAL HISTORY........................................................................................ 3

STATEMENT OF FACTS .......................................................................................... 4

    I. The Parties ........................................................................................................ 4

    II. The Yellow Rose Transaction ......................................................................... 5

    III. The BofA Account and February 7, 2019 Disbursements ............................. 8

    IV. Lindy's State of Mind ................................................................................... 10

APPLICABLE LAW AND LEGAL STANDARD...................................................... 10

ARGUMENT ............................................................................................................. 11

    I. Plaintiff Failed to Prove That Lindy Made Any False Representation or Engaged in False Pretenses Under § 523(a)(2)(A) ................................................................ 11

        A. Lindy's January 25 Call Contained No False Statement of Existing Fact ....................... 12

        B. The Data-Package Email Contained No False Representation by Lindy......................... 14

        C. Actual Fraud Under Husky Requires Wrongful Intent Lindy Did Not Have ................. 15

        D. Plaintiff Cannot Aggregate Innocent Acts Into "False Pretenses"................................. 16

    II. Silence Cannot Substitute for a False Statement, and No Duty to Disclose Existed .......... 17

    III. Post-Transfer Conduct Cannot Satisfy the "Obtained By" Requirement, and the Full $12 Million Is Accounted For................................................................................ 20

    IV. Plaintiff's Alleged Reliance Was Not Justifiable ............................................... 25

    V. The Symmetry of Justifiable Reliance and Lindy's State of Mind..................... 27

    VI. Vicarious Liability Cannot Supply What the Record Lacks: *Bartenwerfer* Requires A Pre-Existing Basis For Liability That Does Not Exist Here........................................... 30

        A. *Bartenwerfer* Bars Discharge of a Debt the Debtor Already Owes; It Does Not Create Liability............................................................................................... 31

        B. There Is No Pre-Existing Liability for § 523(a)(2)(A) to Preserve ................................ 32

        C. *Cottingham* Confirms That Relationship Alone Is Not a Substitute.............................. 34

        D. Joseph's Guilty Plea and Forfeiture Judgment Bind Joseph, Not Lindy......................... 35

        E. Conclusion on Imputation ................................................................. 36

    VII. Section 523(a)(4) Fails: The Funds Were Not Entrusted to Lindy, and This Court's *Stevenson* Analysis Forecloses Both Embezzlement and Larceny .......................... 36

        A. Embezzlement Requires That the Funds Lawfully Come Into Lindy's Hands, Which Did Not Occur................................................................................... 36

**ii**

B. Lindy Acted Without the Fraudulent Intent Embezzlement Requires ............................ 38

C. Larceny Is Foreclosed Because This Court Has Already Held That This Transaction Was False Pretenses, Not Larceny ........................................................................................ 40

D. Neither Theory Survives This Court's Prior Analysis........................................................ 41

VIII. Plaintiff Failed to Prove a Willful and Malicious Injury Under § 523(a)(6) ................... 42

A. The Willfulness Standard Is Subjective and Focuses on This Defendant's State of Mind ................................................................................................................................ 42

B. Malice Requires a Conscious Disregard of a Known Duty, Which the Record Does Not Show ................................................................................................................................ 43

C. The Movement of Funds Was Consistent With Ordinary Practice in High-Value Gem Transactions and Does Not Evidence Intent to Injure ........................................................ 44

D. The Court Should Weigh Lindy's Credible, Unrebutted Testimony ................................ 45

IX. *Stevenson* Controls the Property and Transfer-Characterization Issues and Requires a Consistent Result ........................................................................................................ 46

X. The Court's Post-Trial Questions, Answered ........................................................... 47

A. Whether the record shows Lindy took the roughly $2.4 million difference between the amounts disbursed on February 7 and the $12 million wire. ............................................... 47

B. Whether the LLC actually received Plaintiff's money "in trust," and what "entrusted" means for purposes of § 523(a)(4). ........................................................................... 48

C. Whether the January 25 telephone call and the data-package email are the only contacts between Lindy and Plaintiff regarding the Yellow Rose. ..................................................... 48

D. Whether Plaintiff alleges that Lindy's statements on the January 25 call or in the data-package email were false or misleading, and if so, which statements and how. ................. 49

E. If Plaintiff alleges no false or misleading statement, whether false pretenses and false representation "fall away," and if not, why not. ............................................................... 49

F. Whether silence can be a ground for false representation, whether a duty to disclose must first exist, and what duty and what silence Plaintiff relies on. ........................................... 50

G. What "false impression" gives rise to the claimed "duty to correct," given that the diamond and the brokering capacity were real. ............................................................... 50

H. Whether false pretenses requires a misrepresentation or conduct intended to create a false impression, and if so, what Lindy's was. ............................................................... 51

I. Whether Plaintiff asserts a misrepresentation that the LLC itself had the Yellow Rose, given that J10 contemplated work to acquire the diamond on Plaintiff's behalf. ................. 51

J. Whether there is any dispute that Lindy was referencing Plaintiff in the March 7, 2019 recorded call (the "person she grew up with from North Dakota"). ..................................... 52

K. How the vicarious-liability theory works on these facts, whether it affects intent, and which subsections of § 523(a) it is said to reach. ............................................................... 52

L. Whether, per page 9 of Plaintiff's prior brief, fraudulent intent must be established for actual fraud under § 523(a)(2)(A), and the treatment of moral turpitude / intentional wrong under *Husky*. ................................................................................................................... 53

M. The issue of intent, generally, on which the Court asked both sides to be clear. ............. 53

N. Whether the appraisal referenced in J9 is in evidence, and who prepared it. ................... 54

O. The "justifiable reliance" proposition raised in Lindy's closing, and where the totality of the circumstances comes in. ................................................................................................ 54

CONCLUSION ............................................................................................................................. 55

# Table of Authorities

**Cases**

*Abdel-Hak v. Saad (In re Saad)*, 319 B.R. 147 (Bankr. E.D. Mich. 2004).................................. 45

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)............................................................ 45

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ...................................................................... passim

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165 (6th Cir. 1996)................................................ 37

*Cash America Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104 (B.A.P. 6th Cir. 2007)............ 39

*Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703 (B.A.P. 6th Cir. 2012)................... passim

*Field v. Mans*, 516 U.S. 59 (1995)........................................................................................ passim

*Grogan v. Garner*, 498 U.S. 279 (1991)........................................................................... 3, 11, 12

*Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016) ................................ 15, 17, 53

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998)........................................................................... passim

*Lechner v. Korn (In re Korn)*, 567 B.R. 280 (Bankr. E.D. Mich. 2017) ................................ 16, 18

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999).................... 3, 28, 42, 43

*Morganroth &Morganroth, P.L.L.C. v. Stollman (In re Stollman)*, 404 B.R. 244 (Bankr. E.D.
    Mich. 2009).......................................................................................................................... 21

*Newpower v. Cliff (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) ............................... 37, 40, 46

*Palmacci v.Umpierrez*, 121 F.3d 781 (1st Cir. 1997).................................................................. 13

*People v. Malach*, 202 Mich. App. 266, 507 N.W. 2d 834 (1993)......................................... 40, 46

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir. 1998)
    ............................................................................................................................................. passim

*Rembert v. Citibank (S.D.), N.A. (In re Rembert)*, 219 B.R. 763 (E.D. Mich 1998) .............. 11, 30

*Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831 (Bankr. E.D. Mich. 2001) ............................ 18

*Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D.
    Mich. 2023)........................................................................................................................ passim

*Synod of South Atlantic Presbyterian Church v. Magpusao (In re Magpusao)*, 265 B.R. 492
    (Bankr. M.D. Fla. 2001)............................................................................................................ 44

**Statutes**

11 U.S.C. §§ 523.................................................................................................................... passim

Mich. Comp. Laws § 450.4501...................................................................................................... 33

Mich. Comp. Laws § 600.2919...................................................................................................... 33

**Rules**

Fed. R. Civ. P. 52 ............................................................................................................................. 4

<u>**DEFENDANT'S POST-TRIAL BRIEF**</u>

**NOW COMES** the Defendant, Melinda J. Adducci ("Lindy") by and through her counsel, JOHN R. FOLEY, P.C., who, for her Post-Trial Brief, states as follows:

<u>**INTRODUCTION**</u>

Joseph DuMouchelle defrauded Thomas Ritter out of $12 million. He admitted to doing so in federal court, pled guilty to wire fraud, and is serving 151 months in federal prison. None of that is in dispute.

The question before this Court is narrower and different: has Plaintiff proven, by a preponderance of the evidence, that Lindy *individually* committed the fraudulent and intentional conduct required to except a debt from discharge under 11 U.S.C. §§ 523 (a)(2)(A), (a)(4), or (a)(6)? The answer is no.

Plaintiff asks this Court to now adjudicate Lindy's actions as though she had knowledge and insights only possible through the benefit of hindsight. No recognized legal theory requires prescience. If that were the standard, seldom if ever would a debt be found dischargeable under 11 U.S.C. § 523. Lindy asks the Court, simply, to apply the statute as written. § 523 excepts from discharge debts obtained by the debtor's fraudulent and/or intentional conduct. It requires proof of Lindy's knowledge and intent, measured at the moment the relevant conduct occurred, and proven by a preponderance of the evidence. The real question before this Court is this: what does the trial record show that Plaintiff proved about what Defendant

knew and intended on February 5, 6, and 7, 2019. After five years of litigation, exhaustive ESI review, and every defense-asserted privilege overruled, the trial record proves nothing of the kind.

Plaintiff's case rests on two contacts Lindy had with Plaintiff regarding the Yellow Rose: a brief telephone call in January 2019 in which Plaintiff claims Lindy expressed confidence in the diamond's value, and an email she sent the same day forwarding not her own work product, but photographs and a report by the Gemological Institute of America. Everything else came from Joseph: the purchase agreement, the emails, the multiple wiring instructions, the fictitious receipt, and the bank communications directing the disbursements. Lindy was not a party to the written agreement. She did not send wire instructions, did not transmit the receipt, did not direct the February 7 disbursements. She did not receive a single dollar of Plaintiff's $12 million.

At closing argument, the Court itself drew the line that defines this case: it asked Plaintiff's counsel whether a § 523 action would exist against Lindy on the outbound piece (the wiring out of the money in the BOA account), if she had refused Joseph's instructions and walked away from the bank. Plaintiff's counsel responded that the case on the outbound piece would be "absolutely not" the same, because, in his view, "it is her signature taking the money out." (Tr. Day 4, 161: 1-2, March 26, 2026, ECF No. 330)

The outbound disbursements were executed by a person who signed instruments presented by bank personnel pursuant to her husband's pre-arranged instructions, under the reasonable belief that she was executing legitimate post-closing disbursements for a transaction she believed had closed. The question is not whether her signature appeared on the instruments. It did. The question is whether Plaintiff proved she signed them with the subjective fraudulent intent §§ 523(a)(2)(A), (a)(4) and (a)(6) require. Plaintiff failed to prove this point.

The conclusion of this brief does not depend on resolution of any subsidiary evidentiary dispute. Under the controlling authority, and this Court's own decision in *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D. Mich. 2023), Plaintiff fails on every count under the corrected record. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Field v. Mans*, 516 U.S. 59, 70-71 (1995); *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703, 710-11 (B.A.P. 6th Cir. 2012); *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

## PROCEDURAL HISTORY

This adversary proceeding arises from the February 2019 Yellow Rose diamond transaction, in which Plaintiff wired $12 million to a Bank of America business checking account belonging to Joseph DuMouchelle Fine & Estate

Jewellers, LLC (the "BofA Account"). Joseph DuMouchelle negotiated the transaction, provided all three sets of wiring instructions, transmitted a fictitious purchase receipt to Plaintiff, directed the February 7, 2019 disbursements from Michigan via email, and pled guilty to wire fraud. (J12; J13; J15; J17; J22; J42-J44.)

Plaintiff commenced this proceeding on September 22, 2020, against both Joseph and Lindy. Joseph was dismissed on July 17, 2023, after waiving his Chapter 7 discharge. Plaintiff withdrew his claims against Lindy under § 523(a)(2)(B), Plaintiff withdrew the fiduciary capacity prong of § 523(a)(4), any partnership theory, and explicitly disavowed any collateral estoppel argument based on the North Dakota default judgment. (ECF No. 299, at 2-3.) Plaintiff proceeds solely on the Yellow Rose transaction under §§ 523(a)(2)(A), (a)(4) (embezzlement and larceny only), and (a)(6), and on a vicarious liability theory predicated on agency and civil conspiracy.

The case was tried over four days from March 23-26, 2026. Lindy moved for judgment on partial findings under Fed. R. Civ. P. 52(c) at the close of Plaintiff's case-in-chief; the Court denied that motion under the light-most-favorable-to-Plaintiff standard. (ECF No. 311.) The record is closed.

## STATEMENT OF FACTS

### I. The Parties

Lindy held a ten percent membership interest in Joseph DuMouchelle Fine & Estate Jewellers, LLC, and the title of vice president. Joseph held the ninety percent interest and served as president. (Tr. Day 2, 61:15-25; 62:1, March 24, 2026, ECF No. 332); (Tr. Day 3, 135:19-21, March 25, 2026, ECF No. 328) Lindy is a credentialed gemologist and appraiser. (Tr. Day 2, 20: 21-25, March 24, 2026, ECF No. 332) The company operated for over twenty years without a prior lawsuit, fraud allegation, or regulatory action.

Plaintiff is a North Dakota landman who had known Lindy's family since childhood; Lindy's brother is married to Plaintiff's sister, and Plaintiff was a longtime business associate of Lindy's late father. (Tr. Day 1, 83: 12-25; 84:1-3, March 23, 2026, ECF No. 327) Between 2008 and the Yellow Rose transaction in 2019, Plaintiff did not see Lindy in person regularly or speak with her regularly by telephone. (Tr. Day 1, 209:18-25; 210:1-2, March 23, 2026, ECF No. 327) In all prior note transactions with the DuMouchelle parties, including a 2017 renewal note, Plaintiff dealt and contracted exclusively with Joseph. (Tr. Day 1, 209:18-25; 210:1-2, March 23, 2026, ECF No. 327; J8.)

## II. The Yellow Rose Transaction

In late 2018, Joseph told Plaintiff that a Texas estate was selling a 77.12-carat fancy yellow diamond that could be purchased for approximately $12 million and resold for $16-20 million. (Tr. Day 1, 99: 11-25, March 23, 2026, ECF No. 327)

Joseph pitched the deal, set the financial terms, and told Plaintiff he would manage the transaction. (Id.; J10.) Joseph told Lindy that Plaintiff would call and to send him a data package. (Tr. Day 1, 99: 22-25; 100:1-3, March 23, 2026, ECF No. 327) Those two acts, the call and the email, constitute the entirety of Lindy's pre-transfer contact with Plaintiff regarding the Yellow Rose.

On January 25, 2019, Lindy and Plaintiff spoke on the phone and Plaintiff alleges that Lindy answered yes when he asked if the transaction would be a good investment. (Tr. Day 1, 105:12-21, March 23, 2026, ECF No. 327) Lindy, however, disputed this account at trial on two fronts. On direct examination, she acknowledged speaking with Plaintiff by phone in January 2019, but denied that the call encompassed any discussion of investment values, resale prospects, or the economics of the transaction, testifying that she spoke only to the quality and authenticity of the diamond itself, told him "it was an amazing piece," and did not discuss whether it could be bought at $12 million and resold for $16 to $20 million. (Tr. Day 4, 39:6–41:12, March 26, 2026, ECF No. 330.). Plaintiff acknowledged on cross-examination that he could not locate any phone record or text message documenting the call and could not recall the precise wording of Lindy's response. (Tr. Day 1, 162:18-21; 163:3, March 23, 2026, ECF No. 327) The same day, Lindy emailed Plaintiff a data package containing photographs, a GIA scientific monograph, and a January 2011 insurance replacement value document for The

Yellow Rose, which was eight (8) years old at the time, plainly and on its face. (J9.) The email said 'great talking with you' and closed with 'Hi to Carol.' (J9.) It contained no current market appraisal, no wiring instructions, no representation that Lindy owned the diamond or controlled the transaction structure, and no direction to transfer funds. (J9.) Plaintiff admitted on cross-examination that Lindy did not provide him with an appraisal: "Lindy didn't do an appraisal for me, no." (Tr. Day 1, March 23, 2026, 172:22–23, ECF No. 327) He further acknowledged that the 2011 insurance replacement value document in J9 was not Lindy's own appraisal work. (Tr. Day 1, March 23, 2026, 163:24–164:18, ECF No. 327).

On January 30, 2019, Plaintiff drafted and signed a Letter Agreement "by and between Thomas T. Ritter and Joseph DuMouchelle." (J10.) Lindy was *not* a party. (J10.) The agreement assigned to Joseph all substantive responsibilities and stated Plaintiff would "rely heavily on [Joseph's] guidance and advice." (J10.) On January 31, 2019, Plaintiff emailed Joseph and Lindy asking whether Lindy should be added as a party. (J11.) After consulting with her son about the contract, Lindy did not join and was not a signatory. (Tr. Day 2, 47:21-25; p. 48:1-18, 49:1-14, March 24, 2026, ECF No. 332)

Joseph provided three sets of wiring instructions. The first directed Plaintiff to MB Financial Bank in the name of "Highland Wealth Management"; that wire was rejected. (J12.) The second directed Plaintiff to FineMark Bank & Trust; that

wire was also rejected. (J13.) The third, sent on February 6, 2019, directed Plaintiff to wire $12 million to the BofA Account. (J15.) All three sets were authored and transmitted by Joseph. (J12; J13; J15.) Plaintiff confirmed on cross-examination that Lindy did not send wiring instructions, did not identify the seller or the receiving account, and did not transmit the purported purchase receipt. (Tr. Day 1, 172: 24-25, 173:1-4, March 23, 2026, ECF No. 327) Plaintiff wired $12 million on February 6, 2019. (J5.)

### III. The BofA Account and February 7, 2019 Disbursements

After the FineMark wire was rejected, Joseph asked Lindy, who was preparing to leave for the annual Accredited Gemologist Association conference in Tucson, to open a new account capable of receiving the wire. (Tr. Day 2, 30: 13-21, March 24, 2026, ECF No. 332) She suggested escrow, consistent with the structure originally proposed in Plaintiff's Letter Agreement. (Id. at 30:22-25; J10.) Joseph told her Plaintiff did not want escrow. (Id. at 30:25–31:1.) Lindy opened the BofA Account on February 5, 2019, in Sanibel, Florida, in the company's name. (J4.) She did not have online access to the account at any time. (Tr. Day 2, 35:3-5, March 24, 2026, ECF No. 332)

On February 7, 2019, Joseph emailed Bank of America representatives Nancy DeMille and Hector Aguilar from Michigan, copying Lindy, with the subject line "Lindy Lindy Adducci Cashier's Checks and Deposits Needed Today." (J42.) The

email directed the bank to process interbank deposits to two of Joseph's BofA business clients, William Noble Rare Jewels and Ryan & Rodney Diamonds, and instructed that a separate list of cashier's checks for Lindy to sign would follow. (J42; J43; J44.) All three emails originated from Joseph in Michigan; all recipients, amounts, and payees were pre-specified by Joseph before Lindy arrived at the branch. (J42; J43; J44.) Joseph had attempted to add his own signature card to the account that same day, but the card had not yet been uploaded into the bank's system. (J42.) Lindy made two trips to the Tucson branch, signed the counter withdrawal slips presented to her at the teller's direction, and left. (Tr. Day 4, 213:8-13, March 26, 2026, ECF No. 330.)

Plaintiff's own exhibits, the bank's account statements, draw the relevant distinction. The interbank transfers to William Noble Rare Jewels and Ryan & Rodney Diamonds appear on the February statement as "AZ TLR transfer" entries, Arizona teller transfers executed by branch personnel in direct response to Joseph's emailed instructions. (J5.) The cashier's checks Lindy signed appear as separate "Customer Withdrawal Image" entries. (J5; J2; J3.) Every dollar disbursed from the account flowed to Joseph's business creditors and counterparties, not one cent to Lindy personally. (J3; J5.) Joseph's federal guilty plea confirms he "withdrew the majority of money and used it to pay his personal and business debts and expenses." (J22.)

The trial record reflects that Plaintiff offered no documentary evidence, neither exhibits nor testimony, establishing that Defendant received any portion of the funds disbursed from the account, let alone the approximately $2.4 million gap between the amounts disbursed on February 7 and the $12 million wire. (J3; J5.) Plaintiff's own counsel acknowledged at trial that Bank of America did not provide backup documentation for the Arizona teller transfer entries despite subpoena. Plaintiff bears the burden of proof on each element, and that burden is not met by inference alone.

## IV. Lindy's State of Mind

Despite full and complete access granted to the Plaintiff to both Joesph's and Lindy's personal computers, which were deep-reviewed by Plaintiff's chosen ESI expert; the litigation process produced *zero* documentary evidence establishing Lindy's contemporaneous knowledge of or participation in any fraud. (ECF No. 267, at 13.) Lindy testified by deposition video, admitted over objection at trial as P-1, that when the FBI informed her Plaintiff had not received his money, she cried. (Tr. Day 2, 35:3-7, March 24, 2026, ECF No. 332) She testified that she had known Joseph for over twenty years, that the business had operated without prior fraud or legal trouble, and that she had no reason to doubt him. (Id.)

## APPLICABLE LAW AND LEGAL STANDARD

In a § 523 action, Plaintiff bears the burden of proof on every element by a

preponderance of the evidence. *Grogan*, 498 U.S. at 291. This includes the intent element, which the controlling authority establishes is governed by a subjective standard viewed in the totality of the circumstances. *See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281-82. Plaintiff must prove by a preponderance of the evidence that Lindy subjectively intended to obtain the funds that constitute her debt to Plaintiff by false pretenses, a false representation, actual fraud, embezzlement, larceny, or a willful and malicious injury. *See id.*; 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6).

*Rembert v. AT&T* ruled that "exceptions to discharge are strictly construed against the creditor," 141 F.3d at 281, and *Rembert v. Citibank (S.D.), N.A. (In re Rembert)* ruled that "where room exists to infer honest intent, dischargeability must be decided in favor of the debtor." 219 B.R. 763, 767 (E.D. Mich. 1998).

Further, nondischargeability under § 523 is an individualized determination. It may not be imposed by association, proximity to a wrongdoer, or marriage to a person who committed fraud. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 73, 82 (2023); *In re Cottingham*, 473 B.R. at 711. Each count requires proof of Lindy's own knowledge and intent, measured at the time the relevant conduct occurred.

**ARGUMENT**

### I. Plaintiff Failed to Prove That Lindy Made Any False Representation or Engaged in False Pretenses Under § 523(a)(2)(A)

To except a debt from discharge under § 523(a)(2)(A), Plaintiff must prove,

by a preponderance of the evidence, that Lindy obtained money by (1) a material misrepresentation or misleading conduct, (2) that she knew was false or made with gross recklessness as to its truth, (3) with intent to deceive, and (4) on which Plaintiff justifiably relied. *Rembert v. AT&T*, 141 F.3d at 280-81; *Grogan*, 498 U.S. at 291; *see Field v. Mans*, 516 U.S. 59, 74-75 (1995) (reliance under § 523(a)(2)(A) need only be justifiable, not reasonable). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *See Rembert v. AT&T*, 141 F.3d at 281. Plaintiff proved none of these elements as to Lindy, because the only two communications Lindy ever had with Plaintiff about the Yellow Rose contained no false statement of existing fact, and no misleading conduct of hers.

**A. Lindy's January 25 Call Contained No False Statement of Existing Fact**

Lindy's only spoken communication with Plaintiff regarding the Yellow Rose was a single telephone call on January 25, 2019. The trial record establishes that, on that call, Lindy described a genuine 77.12-carat fancy vivid yellow diamond she had personally examined and expressed the view that it was a good investment. That statement was true when made. The diamond was real, it was as described, and Lindy's assessment of its investment quality was an opinion about future value, not a representation of existing fact. In all events, an honestly held belief, even one later proved mistaken, is not a false representation and cannot supply the scienter § 523(a)(2)(A) requires. Fraudulent intent "requires an actual intent to mislead, which

is more than mere negligence," and "[a]n honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit." *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997) (holding a "'dumb but honest' defendant does not satisfy the test of scienter"). Plaintiff offered no evidence that Lindy's confidence in the diamond as an investment was insincere or that she knew of any fact rendering that assessment false.

Anticipating this, Plaintiff does not principally argue that Lindy knew any statement to be false; he cannot, because the record contains no such proof. He argues instead that her confidence in the transaction was made with "gross recklessness" as to its truth. That theory fails on its own terms. Gross recklessness under *Rembert* relaxes the scienter required for a false representation; it does not eliminate the antecedent requirement that there be a false representation of existing fact. *Rembert v. AT&T*, 141 F.3d at 281 (holding that the representation must be "knowingly false or made so recklessly as to warrant a finding that the debtor acted with an intent to deceive"). A reckless state of mind attached to a true statement about a real stone is not a false representation. The recklessness doctrine reaches a debtor who asserts as fact something she has no reasonable basis to believe; it does not reach a gemologist who accurately describes a genuine gem she has examined. Plaintiff cannot convert Lindy's accurate assessment of the diamond into a false

representation by relabeling her trust in her husband as recklessness.

Nor may Plaintiff supply the missing representation by invention. Plaintiff asserts that Lindy "affirmed the resale value in a follow-up message" after the call and email. No such message is in evidence. Plaintiff identified no exhibit, and no trial testimony established any communication from Lindy concerning resale value beyond the January 25 call and the same-day email. Plaintiff, testifying as his own witness, confirmed he "didn't really hear back from Lindy almost from the date that [he] wired the money." (Tr. Day 1, 134:4-9, March 23, 2026, ECF No. 327.) The Court should disregard a purported representation that appears nowhere in the record.

**B. The Data-Package Email Contained No False Representation by Lindy**

The only other communication was a same-day email in which Lindy forwarded a data package concerning the diamond: photographs, GIA monograph material, and a facially-dated 2011 insurance replacement document. Every item in that package concerned a real stone and was, so far as the record shows, accurate. Lindy did not prepare the 2011 document, did not represent that she had, and Plaintiff admitted at trial that "Lindy didn't do an appraisal for me." (Tr. Day 1, 172:22-23, March 23, 2026, ECF No. 327.) Forwarding a facially-dated, eight-year-old third-party document about a genuine diamond is not a representation by Lindy of any existing fact, let alone a false one. The email made no representation as to

ownership, escrow, the identity of any seller, or the destination of Plaintiff's funds. Those subjects, the subjects on which Plaintiff was actually deceived, were addressed only by Joseph, through the wiring instructions, the seller identification, and the purchase documentation. (J12; J13; J15; J17.)

**C. Actual Fraud Under Husky Requires Wrongful Intent Lindy Did Not Have**

Plaintiff invokes *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016), for the proposition that "actual fraud" under § 523(a)(2)(A) reaches schemes that involve no misrepresentation at all. *Husky* does not rescue his claim, because its holding is expressly cabined by intent and by the "obtained by" requirement.

*Husky* held that a fraudulent-conveyance transferee "who, with the requisite intent, also commits fraud can 'obtai[n] assets by his or her participation in the fraud." *Id*. at 365. Two limitations in that holding defeat Plaintiff's theory. First, *Husky* reaches the transferee of the fraudulent conveyance. Lindy transferred nothing to herself and received nothing; every dollar was disbursed to Joseph's creditors and counterparties. (J3; J5.) Second, and dispositively, liability attaches only to a participant acting "with the requisite intent." *Id*. *Husky* did not dilute the intent element of actual fraud; it confirmed it, grounding actual fraud in conduct "done with wrongful intent." *Id*. at 360. And the Court took care to preserve "obtained by" as a genuine limitation, not a nullity: the debt must still be one the debtor obtained by her own fraudulent conduct. *See id*. at 365-66. Lindy engineered

no scheme and possessed no wrongful intent. The scheme, and the only wrongful intent in this record, was Joseph's. *Husky* therefore does not reach her.

### D. Plaintiff Cannot Aggregate Innocent Acts Into "False Pretenses"

Recognizing that no single statement by Lindy was false, Plaintiff recasts her two contacts and her subsequent conduct at the bank as a "cumulative course of conduct" that created a "shroud of legitimacy" around the transaction. False pretenses does reach implied misrepresentation and conduct intended to foster a false impression, not merely express falsehoods, and may be "the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction." *Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300 (Bankr. E.D. Mich. 2017). But the doctrine still requires that the misleading conduct be the debtor's own and that it be undertaken with the debtor's own intent to create a false impression. *Id*. It is not a device for imputing Joseph's scheme to Lindy by summing her true statements with his false ones.

Two independent defects sink the theory. First, each component Plaintiff aggregates is, standing alone, innocent: an accurate description of a real diamond, the forwarding of a genuine GIA monograph and a facially-dated 2011 document, the opening of a business account at her husband's request, and the execution of instruments presented by bank personnel at Joseph's pre-arranged direction. None of these acts were false, and none was undertaken by Lindy to foster a false impression

about ownership, escrow, or the destination of Plaintiff's funds. The sum of innocent acts is not fraud. The contrivance that deceived Plaintiff, the fictitious seller, the forged receipt, and the false wiring instructions, were Joseph's alone. (J12; J13; J15; J17.) A course-of-conduct theory cannot manufacture the intent to deceive that each individual act lacks.

Second, even were the Court to entertain a "scheme" theory that dispenses with any single misrepresentation, that theory still fails because of a lack of justifiable reliance. Justifiable reliance remains a required element of § 523(a)(2)(A) across all three of its branches, false representation, false pretenses, and actual fraud, whenever the fraud alleged is inducement-based. *Husky* did not eliminate that requirement for inducement-based fraud. *See Korn*, 567 B.R. at 301-303. Plaintiff cannot show justifiable reliance on any conduct of Lindy's, because, by his own testimony, he "didn't really hear back from Lindy almost from the date that [he] wired the money." (Tr. Day 1, 134:4-9, March 23, 2026, ECF No. 327.) A course of conduct on which Plaintiff did not rely cannot sustain a false-pretenses claim against Lindy. Because Plaintiff proved neither a false representation, nor misleading conduct attributable to Lindy, nor justifiable reliance on any conduct of hers, his § 523(a)(2)(A) claim fails at the threshold.

## II. Silence Cannot Substitute for a False Statement, and No Duty to Disclose Existed

Silence or nondisclosure can support § 523(a)(2)(A) liability only where the

debtor had a pre-existing duty to speak and intentionally failed to disclose a material fact. *Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr. E.D. Mich. 2001). There is only a breach if Lindy had a legal or equitable duty of disclosure, not if Lindy merely possessed useful information. *In re Korn*, 567 B.R. at 322 n.53.

No such duty existed here. Lindy was not a party to the Letter Agreement. (J10.) She was not a signatory to any transaction document. She held no fiduciary relationship with Plaintiff arising from the Yellow Rose transaction. The parties were at arm's length, connected by a longstanding personal relationship but not by any legal obligation imposing a duty of disclosure. Plaintiff did not retain Lindy in any professional capacity and did not place her in a position of trust with respect to the disposition of his funds. Plaintiff's own Letter Agreement assigns all responsibilities to Joseph and does not mention Lindy. (J10.) A party who places all responsibility on one person cannot claim that another, who is not a party to the transaction, had a duty to correct misimpressions about it.

The false impression that actually caused Plaintiff's loss was not created by anything Lindy said, withheld, or failed to correct. It was created by Joseph. The wiring instructions identifying Highland Wealth Management, FineMark, and ultimately the BofA Account as the proper destinations for Plaintiff's $12 million all came from Joseph. (J12; J13; J15.) The fictitious Richard Drucker emails identifying a purported seller came from Joseph. (J13; J15.) The forged purchase

receipt came from Joseph. (J17.) The pitch that the Yellow Rose was being sold by a Texas estate at a discount came from Joseph. The representation that Plaintiff's funds would be applied to acquire that diamond came from Joseph. Each of those communications, individually and collectively, supplied the false impression on which Plaintiff acted. Lindy authored none of them, transmitted none of them, and on this record was unaware of the falsity of any of them at the time they were made.

Even if a duty to disclose existed, it would require Lindy to have known the impression was false. Plaintiff offered no evidence she did. The doctrine of false pretenses by silence presupposes that the silent party knows of the false impression and is in a position to correct it. On this record, neither premise is established.

Plaintiff's false impression theory requires two premises: that Lindy's January 25 contacts created the misleading impression that the DuMouchelle parties had the capacity and intent to broker the Yellow Rose transaction on Plaintiff's behalf, and that Lindy had a duty to correct that impression when the transaction went wrong. Both fail. The first fails because the impression was accurate. Joseph DuMouchelle Fine and Estate Jewellers, LLC was a credentialed jewelry business that had operated for over twenty years with the demonstrated capacity to handle a transaction of this size. The fraud was not in any representation of brokering capacity. It was in Joseph's undisclosed, contemporaneous intent to misappropriate Plaintiff's funds rather than complete the purchase, an intent Lindy did not create,

share, or know of on January 25, 2019. The second premise fails for the same reason. A duty to correct a false impression presupposes knowledge that the impression is false, and Plaintiff offered no evidence that Lindy possessed that knowledge at any relevant time.

**III. Post-Transfer Conduct Cannot Satisfy the "Obtained By" Requirement, and the Full $12 Million Is Accounted For**

This Court drew a distinction at closing argument between the "inbound" conduct that caused Plaintiff to wire the funds and the "outbound" conduct that occurred after the funds arrived. (Tr. Day 4, 160-61, 168-69, March 26, 2026, ECF No. 330) That distinction maps directly onto the statutory "obtained by" requirement. Section 523(a)(2)(A) excepts from discharge debts "obtained by" fraud. The phrase is temporal and causal. The fraudulent conduct must be the mechanism by which the creditor parted with funds. Conduct occurring after the wire cannot be the means by which the debt was obtained.

The inbound conduct consisted entirely of Joseph's representations: his pitch in late 2018, his three sets of wiring instructions, his fictitious Richard Drucker emails, and his forged receipt. (J12; J13; J15; J17.) Lindy's two contacts on January 25 contained no false statement and were not the mechanism that caused the wire. Plaintiff wired the funds on February 6 based on instructions he received from Joseph that day, pursuant to a written agreement Plaintiff had signed with Joseph on January 30. (J10; J15.)

The outbound conduct, including Lindy's appearance at the bank on February 7, occurred after Plaintiff had voluntarily relinquished control of the funds. Even accepting Plaintiff's most favorable characterization of that conduct, it postdates the obtaining and is legally irrelevant to the "obtained by" element. *Rembert v. AT&T*, 141 F.3d at 281 (explaining that conduct must be intentionally fraudulent in nature to make debts nondischargeable under § 523(a)(2)(A)).

The same temporal principle is reflected in *Morganroth & Morganroth, P.L.L.C. v. Stollman (In re Stollman)*, which distinguished between false statements made after a debt has already been incurred and the creditor's burden to prove reliance and causation as to the specific debt sought to be excepted from discharge. 404 B.R. 244, 258 (Bankr. E.D. Mich. 2009).

The documentary record forecloses any inference that Defendant Adducci received a single dollar of the funds Plaintiff wired. Joint Exhibit J5 traces the entire $12,000,000.00 from its receipt to its disbursement, and every dollar was moved at the direction of Joseph DuMouchelle or executed by the bank on legal process. None reached Defendant.

The account opened the February 2019 cycle at a zero balance. Plaintiff's $12,000,000.00 wire, the only deposit at issue, posted on February 6, 2019. Within one business day, on February 7, 2019, $9,689,694.44 was moved out of the account in the form of transfers and cashier's checks: $4,517,000.00 in AZ teller-initiated

transfers to affiliated accounts (of which $4,250,000.00 went to William Noble Rare Jewels at account 9238 and the balance to affiliated accounts 9238 and 4272, per J42 and J5), and $5,172,694.44 drawn as three cashier's checks, which appear on J5 as "Customer Withdrawal Image" debits of $4,041,925.00, $1,091,769.44, and $39,000.00. (J5; J42.) None of these instruments was payable to Lindy. J5 identifies no transfer, check, or debit to or for the benefit of Defendant on February 7 or on any other date in the cycle. Plaintiff's suggestion that the AZ transfers should be attributed to Defendant because she was physically present at the branch confuses ministerial presence with beneficial receipt; the beneficiaries named on the face of the transaction (J42) are Joseph DuMouchelle's business counterparties, not Defendant, and no signed instrument in the record makes Defendant a payee.

After the February 7 activity, J5's own daily ledger balance shows $2,132,027.85 remaining in the account on February 7. That balance was disbursed later in the month through further outbound wires and instruments Joseph DuMouchelle directed, together with garnishment debits the bank executed on third-party legal orders and nominal bank fees. (J5.) By February 12, 2019 the account balance had fallen to negative $60.00 (J5), and it remained overdrawn in the months that followed. The wired funds were fully dissipated within days of receipt, and no portion accumulated to, or was withdrawn by, Defendant.

Plaintiff bore the burden of proving that Defendant received some identifiable

portion of these funds. He offered no such proof. J5 contains no transfer, check, or debit payable to or for the benefit of Lindy. The February 2019 disbursements reconcile in full to transfers Joseph DuMouchelle directed, cashier's checks, legal-order garnishments the bank executed, and fees (a complete accounting that leaves no unexplained residue and, critically, no line item to Defendant). Whatever the precise sum of the "gap" Plaintiff invokes (the roughly $2.3 million he characterizes as unaccounted for), it is a gap in Plaintiff's proof against Defendant, not evidence that Defendant obtained anything.

Plaintiff's closing argument attributed the AZTLR transfers to Lindy on the theory that, as the sole signatory on the account on February 7, she necessarily "authorized" every outflow. (Tr. Day 4, 159: 8-12, March 26, 2026, ECF No. 330) That argument conflates legal authority over an account with affirmative participation in specific transactions. The AZTLR transfers were initiated by Joseph's pre-arranged emails to bank personnel, not by any instruction from Lindy, and not by any request Lindy made at the teller window. (J42; J5.)

Plaintiff has provided this Court with absolutely zero evidence that, at the time she was at the bank in Arizona, signing counter checks at her husband's instruction, Lindy possessed any knowledge of Joseph's wrongdoing, or intent to in any way defraud, injure, embezzle from the Plaintiff; nor that she had any reason to distrust or question her husband of over twenty years, who she knew as nothing other than a

successful businessman. Conversely, Lindy's unrebutted testimony establishes that she was married to Joseph DuMouchelle for over twenty years (Tr. Day 4, 7:12, March 26, 2026, ECF No. 330); that she had, at the time, no reason whatsoever to suspect that her husband would ask her to do anything inappropriate (Tr. Day 4, 47:6-10, March 26, 2026, ECF No. 330); a husband that she knew as "crossed his t's and dotted his i's"; and that she always trusted. (Tr. Day 4, 85:10-15, March 26, 2026, ECF No. 330.)

Plaintiff cannot satisfy the knowledge element of any § 523 subsection as to the AZTLR transfers when his own examination produced an unqualified denial. The absence of backup documentation, the absence of any signed instrument from Lindy, and that denial together confirm that the AZTLR transfers were Joseph's transactions, not Lindy's.

The post-February 7 transactions that drew the account to effectively zero were processed through Michigan branch infrastructure, designated "MI TLR" on the BofA statement, or as outbound wires bearing no connection to the Tucson branch. (J5.) Joseph's signature card was uploaded to the bank's system on February 11, 2019. (J42.) Transactions on and after that date postdate Joseph's acquisition of independent signatory access. No document in the trial record places Lindy at any Bank of America branch after February 7, 2019, or connects her signature to any post-February 7 disbursement. (J5.) The full account history, read in sequence with

the signature card documentation and Joseph's emails, is consistent with a single day of Lindy's physical participation on February 7, followed by Joseph completing the remaining disbursements independently once his signature card was activated. Joseph's plea agreement confirms he used the funds for his own personal and business debts and expenses. (J22.) The FBI affidavit did not identify Lindy as a recipient. The Chapter 7 Trustee did not pursue Lindy as a transferee.

Plaintiff's counsel at closing suggested that Lindy returned to the bank on February 11 and withdrew an additional $180,000, and that a wire transfer on that date may also be attributable to her. (Tr. Day 4, 161: 3-8, March 26, 2026, ECF No. 330) The Court noted that Joseph was himself a signatory on the account by that date. (Id. at 161:9-11.) Joseph's signature card was activated on February 11, 2019. (J42.) Any disbursement on or after that date is at least as attributable to Joseph, who originated, structured, and controlled every aspect of this transaction, as to Lindy. No document in the record establishes that Lindy personally appeared at any branch on February 11 or signed any instrument associated with any February 11 transaction. Plaintiff bears the burden of proof. Speculation does not satisfy it.

## IV. Plaintiff's Alleged Reliance Was Not Justifiable

Justifiable reliance under § 523(a)(2)(A) is debtor-specific. Plaintiff must show reliance on this defendant's representations as the proximate cause of his loss. *Field v. Mans*, 516 U.S. 59, 70–71 (1995). Although "justifiable reliance" is less

demanding than objective reasonableness, it still requires the plaintiff to heed obvious red flags, such as the horse represented to be sound that obviously has only one eye. *Id*. Plaintiff's own cross-examination testimony and his own contemporaneous contract establish that this element is not met as to Lindy.

Plaintiff admitted he had not seen or spoken to Lindy regularly in the ten years preceding this transaction, yet placed "absolute" faith in her. (Tr. Day 1, 209:21-210:2, March 23, 2026, ECF No. 327.) He admitted he wired $12 million without independently verifying the seller's identity, the seller's ownership of the diamond, or the destination of his funds. (Tr. Day 1, 185:9-21, March 23, 2026, ECF No. 327.) He admitted Lindy provided no appraisal, only a forwarded GIA monograph and an eight-year-old insurance replacement value document she did not prepare, and that she had declined to do one because it would be a conflict of interest. (Tr. Day 1, 163:8-164:7; 172:22-23, March 23, 2026, ECF No. 327.) He admitted that after receiving Lindy's email he separately asked Joseph for an appraisal, confirming that even Plaintiff did not consider her data package sufficient verification. (Tr. Day 1, 170:24-171:3, March 23, 2026, ECF No. 327.) He admitted he cannot produce a single phone record, text message, or contemporaneous document memorializing the alleged January 25 call. (Tr. Day 1, 162:18-21; 168:16-19, March 23, 2026, ECF No. 327.) When asked whether he had any reason to obtain a separate appraisal, Plaintiff answered, "No, I did not." "Q: 'Because you trusted Lindy.' A:

'Absolutely.'" (Tr. Day 1, 165:25-166:3, March 23, 2026, ECF No. 327.)

Plaintiff's own contemporaneous writing tells a different story. The Letter Agreement he drafted on January 30, 2019, before any disbursement, committed him to "rely heavily on [Joseph's] guidance and advice" and does not mention Lindy. (J10; Tr. Day 1, 186:25-187:6, March 23, 2026, ECF No. 327.) Where contemporaneous documents and litigation testimony diverge regarding reliance, the contemporaneous documents are entitled to substantially greater evidentiary weight: the Letter Agreement was drafted by Plaintiff himself, executed before any money moved, and identified Joseph as his sole counterparty. Plaintiff's "I relied on Lindy" testimony was offered seven years later, after counsel, after Joseph's guilty plea, and after Plaintiff had absorbed the full $12 million loss. The Letter Agreement is precisely the kind of unmistakable signal *Field* says a plaintiff cannot ignore when later claiming reliance on someone else. 516 U.S. at 70–71. Plaintiff cannot hold Lindy responsible for a transaction he himself placed in Joseph's hands. The § 523(a)(2)(A) element is not established as to Lindy.

## V. The Symmetry of Justifiable Reliance and Lindy's State of Mind

The Court at the April 7, 2026 hearing recognized that Lindy's closing argument raised a legal proposition warranting post-trial development: if the same totality of circumstances Plaintiff invokes to support his own justifiable reliance also explains why Lindy would not have suspected fraud, those two analyses are

connected, and the connection runs against Plaintiff.

The proposition is this. Justifiable reliance under § 523(a)(2)(A) is determined in part by "the circumstances of the particular case." *Field*, 516 U.S. at 70-71. Plaintiff argues that those circumstances, a credentialed gemologist, a twenty-year business, a family relationship, a professional data package, made his reliance on Lindy's January 25 contacts justifiable. He drafted and signed a written agreement committing himself to "rely heavily on [Joseph's] guidance and advice" and still claims justifiable reliance on Lindy. (J10.)

The same circumstances cut in the opposite direction on §§ 523(a)(2), (a)(4) and (a)(6). Those provisions require proof of Lindy's subjective intent at the time of the relevant conduct. *See Geiger*, 523 U.S. at 61; *Markowitz*, 190 F.3d at 464. The circumstances Plaintiff would have the Court weigh in his favor, the twenty-year business relationship, Joseph's role as the transactional lead, Lindy's professional expertise in gemology rather than finance, are the same circumstances that explain why Lindy would not have been scrutinizing Joseph's banking instructions with suspicion on February 7, 2019. If a sophisticated plaintiff who personally drafted a written agreement assigning all responsibilities to Joseph and reciting express reliance on Joseph's guidance can claim justifiable reliance on Lindy's two ancillary contacts, then a fortiori Lindy could justifiably rely on her husband and business partner of more than twenty years to handle the financial mechanics of a transaction

he had originated, structured, and managed from the beginning.

The concepts are not symmetrical for Plaintiff, but against him. The same set of circumstances that Plaintiff contends made his reliance on Lindy justifiable equally explain why Lindy's reliance on Joseph was justifiable. Lindy's justifiable reliance on Joseph negates the fraudulent intent §§ 523(a)(4) and (a)(6) require. It is direct evidence that she lacked the subjective purpose to injure that *Geiger* demands. Plaintiff cannot invoke the justifiability of his own reliance on Lindy while simultaneously arguing that Lindy had no basis to rely on Joseph. The two positions are irreconcilable on the same record.

The specific mechanics of the AZTLR transfers confirm this symmetry at the factual level. When Plaintiff's counsel identified account numbers 9238 and 4272 and asked whether knowing these were interbank transfers helped Lindy's recollection, Lindy answered "No." (Tr. Day 2, 151:7–152:18; 153:18-22, March 24, 2026, ECF No. 332). She did not know what those accounts were, who held them, or how much was being transferred to each. If the circumstances Plaintiff invokes to support his justifiable reliance is sufficient, it is equally sufficient to explain why Lindy, who did not direct those transfers, did not know their destinations, and was physically present in Tucson at Joseph's last-minute direction, lacked the subjective fraudulent intent the statute requires. Plaintiff cannot invoke the justifiability of his own reliance on Lindy while arguing that Lindy, given the

same circumstances, was required to scrutinize her husband's banking instructions with a level of suspicion Plaintiff himself did not apply to a $12 million transaction.

The question under *Rembert v. Citibank* is whether the evidence, viewed in its totality, excludes innocent conduct as a reasonable explanation. 219 B.R. at 767. Plaintiff's own theory of the case, his own account of why a sophisticated businessman wired $12 million without independent verification, relying on a twenty-year relationship, professional credentials, and a trusted counterparty, confirms that it does not. If the totality of circumstances surrounding this transaction was consistent with innocent reliance by the victim, the same totality was at least equally consistent with innocent reliance by a defendant whose entire understanding of the transaction came from the same source. *Rembert v. Citibank* requires no more than that showing to defeat Plaintiff's burden. This record provides it.

## VI. Vicarious Liability Cannot Supply What the Record Lacks: *Bartenwerfer* Requires A Pre-Existing Basis For Liability That Does Not Exist Here

Nondischargeability under § 523 is an individualized determination. It cannot be imposed on a defendant by association, proximity, or marriage. *Bartenwerfer*,598 U.S. at 81 (holding that fraud liability under §523 comes from state law); *Cottingham*, 473 B.R. at 710. Anticipating that he cannot prove Lindy's own fraud, Plaintiff argues that Joseph's fraud renders the debt nondischargeable as to Lindy "regardless of her knowledge." *Bartenwerfer*, which Plaintiff claims as a basis for argument, actually undermines him.

**A. *Bartenwerfer* Bars Discharge of a Debt the Debtor Already Owes; It Does Not Create Liability**

Plaintiff reads *Bartenwerfer* to hold that a debt for fraud is nondischargeable against anyone, regardless of whether she committed or knew of the fraud. That is not what the Supreme Court held. *Bartenwerfer* holds that § 523(a)(2)(A) bars the discharge of a debt for fraud without regard to the debtor's own knowledge only where the debtor is already liable for that fraud under other law.

The distinction is the heart of the opinion. Kate Bartenwerfer was liable for her business partner's fraud before she ever reached bankruptcy court, because California partnership law made her jointly liable for a fraud committed within the scope of the partnership. 598 U.S. at 81. The Supreme Court took that pre-existing liability as a given and addressed only the narrow bankruptcy question: whether § 523(a)(2)(A) discharges such a debt if the particular debtor lacked personal scienter. It does not. But the Court was emphatic that it was not deciding how liability arises in the first place. Section 523(a)(2)(A), the Court explained, "does not define the scope of one person's liability for another's fraud"; that "is the function of the underlying law." *Id*. The statute "takes the debt as it finds it, so if California did not extend liability to honest partners, § 523(a)(2)(A) would have no role to play." *Id* U.S. at 82. The provision governs the maintenance of an existing debt in bankruptcy; it does not create the debt in the first place.

*Bartenwerfer* is therefore a two-step rule, and Plaintiff can satisfy only the

second step. First, some body of non-bankruptcy law must make the defendant liable for the fraud. Second, and only then, § 523(a)(2)(A) declines to discharge that established debt. Plaintiff asks this Court to apply step two while skipping step one, to declare the debt nondischargeable as to Lindy without any antecedent determination that Lindy is liable for it. *Bartenwerfer* forbids exactly that: with no predicate liability, § 523(a)(2)(A) "would have no role to play." *Id*. Two Justices underscored the point in concurrence: the Court "d[id] not confront a situation involving fraud by a person bearing no agency or partnership relationship to the debtor," and its holding reaches "fraud only by 'agents' and 'partners within the scope of the partnership.'" *Id*.598 U.S. at 83 (Sotomayor, J., concurring). Where, as here, no such relationship imposes liability under state law, *Bartenwerfer* supplies no basis for nondischargeability.

### B. There Is No Pre-Existing Liability for § 523(a)(2)(A) to Preserve

Unlike Kate Bartenwerfer, Lindy arrives in this proceeding with no established liability for Joseph's fraud. There is no jury verdict against her, no state-court judgment against her, and no finding by any tribunal that she is liable for the Yellow Rose loss. To the contrary, Plaintiff moved for summary judgment against Lindy on precisely these theories, and this Court denied that motion. (Order, May 10, 2024.) The debt § 523(a)(2)(A) is said to preserve does not yet exist as against Lindy, which means there is no debt arising from liability for the statute to "take as

it finds."

Nor does any body of Michigan law supply the imputation predicate that California partnership law supplied in *Bartenwerfer*. The DuMouchelle business was a limited liability company, not a partnership, and the defining feature of the LLC form is that its members are not liable for the company's acts or obligations. Mich. Comp. Laws § 450.4501(4) ("[A] person that is a member or manager, or both, of a limited liability company is not liable for the acts, debts, or obligations of the limited liability company."). Michigan agency law does not impute a principal's or co-agent's fraudulent intent to an agent who made no misrepresentation and received no benefit. And while Michigan recognizes a statutory-conversion remedy, that statute supplies no imputation predicate either. It permits a victim to recover treble damages for "[a]nother person's stealing or embezzling property or converting property to the other person's own use," or for "[a]nother person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person . . . knew that the property was stolen, embezzled, or converted." Mich. Comp. Laws § 600.2919a(1)(a)-(b). By its terms the statute is a remedy of the victim against the converter; it does not impute one person's conversion to another. And neither branch reaches Lindy. The first requires that the property be converted "to [her] own use," and Lindy converted nothing to her own use, every dollar flowed to Joseph's creditors and counterparties (J22; J3;

J5). The second requires that she "knew that the property was stolen, embezzled, or converted," and Plaintiff proved no such knowledge. In any event, statutory conversion is a property tort; it cannot supply the fraudulent intent that fraud-based nondischargeability requires. There is, in short, no Michigan analogue to the partnership liability that made *Bartenwerfer* come out as it did. The one indispensable ingredient of a *Bartenwerfer* imputation, a non-bankruptcy law that makes the non-defrauding defendant liable, is missing.

### C. *Cottingham* Confirms That Relationship Alone Is Not a Substitute

The Sixth Circuit's spousal-liability authority points the same direction. *In re Cottingham* holds that fraudulent intent "may not be imputed from one spouse to another based simply on the marital relationship," and that "[e]ven knowledge of a spouse's misconduct is insufficient to confer liability." 473 B.R. at 710. What the BAP required instead was that "knowledge must be concurrent with participation in the use or enjoyment of the . . . property in order for liability to attach." *Id*. Tellingly, the debt in *Cottingham* was held nondischargeable against the non-embezzling spouse, but only because the record established both elements the standard demands: that spouse knew of the conversion and personally participated in spending and enjoying the converted funds. *Id*. Lindy's position is the opposite on both counts. She had no proven knowledge of Joseph's fraud, and she participated in no use or enjoyment of the proceeds, which went to Joseph's creditors and counterparties, not

to her (J22; J3; J5). If knowledge of a spouse's fraud coupled with enjoyment of its fruits is what *Cottingham* required to impose liability, Lindy's position, no proven knowledge and no enjoyment at all, cannot support it. *Bartenwerfer* and *Cottingham* are consistent: each requires an independent, legally recognized basis for liability before a non-actor can be bound, and neither treats the marital or business relationship as that basis.

### D. Joseph's Guilty Plea and Forfeiture Judgment Bind Joseph, Not Lindy

Plaintiff separately argues that Joseph's guilty plea and the $12 million forfeiture judgment establish the fraud, and that because trial testimony showed Lindy was the account signatory who executed the February 7 disbursements, the plea's admissions should attach to her. That theory fails on elementary principles. Lindy was not a party to Joseph's criminal case, did not participate in his plea, and is not bound by a judgment entered against him. A criminal judgment establishes the guilt and intent of the person convicted; it is not evidence of a non-party's state of mind.

If anything, the plea cuts against Plaintiff. Joseph admitted that he "withdrew the majority of the money and used it to pay his personal and business debts and expenses." (J22.) The plea thus attributes the taking, the use, and the benefit of the funds to Joseph, not to Lindy, and confirms that the fraudulent intent and the enjoyment of the proceeds were his. Plaintiff cannot borrow the plea to prove the

fraud occurred and simultaneously rewrite its factual basis to substitute Lindy for the man who admitted committing it. Joseph's conviction establishes Joseph's fraud. It establishes nothing about Lindy's knowledge or intent, which Plaintiff was required to prove independently and did not.

### E. Conclusion on Imputation

Stripped of imputation, Plaintiff's case against Lindy has no evidentiary core, which is precisely why he reaches for *Bartenwerfer* and the criminal judgment. But *Bartenwerfer* preserves debts, it does not create them. And there is no antecedent liability here for it to preserve. Michigan law supplies no basis to impute Joseph's fraud to Lindy, and Joseph's plea binds Joseph alone. Nondischargeability must rest on Lindy's own conduct, knowledge, and intent, and on that question, after five years of discovery, the record is empty.

## VII. Section 523(a)(4) Fails: The Funds Were Not Entrusted to Lindy, and This Court's *Stevenson* Analysis Forecloses Both Embezzlement and Larceny

Plaintiff abandoned the fiduciary-capacity prong of § 523(a)(4) and proceeds on embezzlement and larceny only. (ECF No. 299, at 3.) Both theories fail on the trial record, and both are foreclosed by this Court's own analysis of this transaction in *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D. Mich. 2023).

### A. Embezzlement Requires That the Funds Lawfully Come Into Lindy's Hands, Which Did Not Occur

Embezzlement under § 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). A creditor proves embezzlement by showing (i) that he entrusted his property to the debtor, (ii) that the debtor appropriated the property for a use other than that for which it was entrusted, and (iii) that the circumstances indicate fraud. *Id*. at 1173. The threshold element, on which Plaintiff's claim founders, is entrustment. The property must have been placed in, or lawfully come into, the debtor's hands before the alleged appropriation. That embezzlement turns on entrustment, not on whether title passed, is what distinguishes it from larceny. The two theories fail for independent reasons. *See Newpower v. Cliff (In re Newpower)*, 233 F.3d 922, 929 (6th Cir. 2000).

*In re Brady* itself illustrates the point. The debtor there embezzled because the sale proceeds had lawfully come into his hands, in a bank account he held jointly with the creditor, before he diverted the creditor's share to a company he controlled. *In re Brady* 101 F.3d at 1168, 1173. The funds were lawfully in his possession; his fraud lay in what he did with property already entrusted to him.

Lindy's position is the opposite. Plaintiff did not entrust his funds to her, and they did not lawfully come into her hands. He wired $12 million on February 6 pursuant to Joseph's instructions, believing the receiving account belonged to the

seller's representative. He did not know the account was a DuMouchelle Jewellers business account, and he did not place his funds in Lindy's care for any purpose. (J15; Tr. Day 1, 173:17-25, March 23, 2026, ECF No. 327.) As this Court held in *Stevenson*, voidable title to the funds passed to the LLC. *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D. Mich. 2023). Funds that are the LLC's property, received into an LLC account through Joseph's fraud, were never "entrusted" to Lindy by Plaintiff and never lawfully came into her hands as a bailee. The first element of embezzlement is therefore absent.

Nor did Lindy "appropriate" the funds for her own use in any sense the statute recognizes. While *Brady* holds that a debtor need not personally profit dollar-for-dollar to have appropriated entrusted property, *id*. at 1173, *Brady* presupposes an appropriation that diverts entrusted funds to the debtor's own purpose or an entity she controls for her benefit. Lindy diverted nothing to herself or to any entity for her benefit. She executed disbursements, at Joseph's direction and the bank's instruction, of funds that went entirely to Joseph's creditors and counterparties. (J3; J5; J22.) There was no appropriation to her use because there was no entrustment to her in the first place.

### B. Lindy Acted Without the Fraudulent Intent Embezzlement Requires

Even if the entrustment element could be satisfied, embezzlement requires proof of "the debtor's fraudulent intent in taking the [creditor's] property," Cash

*America Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 115-16 (B.A.P. 6th Cir. 2007) (quoting *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602-03 (5th Cir. 1998)), and that fraud must be "fraud in fact, involving moral turpitude or intentional wrong." *Id*. The Sixth Circuit BAP has held that fraudulent intent is negated by circumstantial evidence showing "that the debtor used [the property] openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use" it, and that it is further negated where the debtor's dominant motivation was something other than harming the owner. *Id*. at 117 (quoting *In re Weber*, 892 F.2d 534, 539 (7th Cir. 1989); citing *In re Littleton*, 942 F.2d 551, 556 (9th Cir. 1991)).

*Fox* is instructive because it denied an embezzlement claim on facts far more damning than these. The *Fox* debtor failed to segregate the creditor's funds as his contract required, commingled more than $351,000 of the creditor's money into a general operating account, personally took three $20,000 draws from that account, and gave testimony the panel described as inconsistent and "suspicious." 370 B.R. at 108-10, 118. The BAP nonetheless affirmed judgment for the debtor, because he acted openly, and his conduct, however careless, did not establish an intent to defraud. *Id*. at 117-18.

Lindy's conduct will not bear even the weight the *Fox* debtor's did. She concealed nothing. Her execution of the February 7 transactions was open, disclosed

to bank personnel, and carried out at Joseph's direction pursuant to instructions he had pre-arranged with the bank by email. (J42-J44.) Unlike the *Fox* debtor, she took not a dollar to herself; every dollar flowed to Joseph's creditors and counterparties, and Joseph's plea confirms that he "withdrew the majority of the money and used it to pay his personal and business debts and expenses." (J22; J3; J5.) And her reasonable belief that a legitimate transaction had closed supplied precisely the "reasonable grounds to believe" that *Fox* holds negates fraudulent intent. If the debtor in *Fox* lacked fraudulent intent, then a fortiori Lindy, who concealed nothing and gained nothing, lacked fraudulent intent as well.

### C. Larceny Is Foreclosed Because This Court Has Already Held That This Transaction Was False Pretenses, Not Larceny

Larceny under § 523(a)(4) requires a felonious taking of another's property without consent and with fraudulent intent. Unlike embezzlement, larceny requires that the debtor's original taking of the property be unlawful, that is, that the owner never intended to part with title. *In re Newpower*, 233 F.3d at 929. Where the owner intends to part with both title and possession, even for fraudulent reasons, the transaction is false pretenses, not larceny. *Id.*; *People v. Malach*, 202 Mich. App. 266, 269-70, 507 N.W.2d 834, 836 (1993).

This Court has already resolved that precise question, on this precise transaction, against Plaintiff's larceny theory. Construing the same $12 million wire in *Stevenson*, this Court held that because Plaintiff "intended to part with both title

Page **40 of 57**

and possession of the $12 million (albeit due to Joseph's fraud) to purchase The Yellow Rose Diamond," the "instant case involves obtaining money through false pretenses, not larceny." *Stevenson*, 667 B.R. 122, 136 (applying *Long*, *Malach*, and *Newpower*). That determination controls here. The transaction cannot be false pretenses for purposes of the Trustee's avoidance action and larceny for purposes of Plaintiff's assigned § 523(a)(4) claim. It is the same wire, the same intent of the same owner, analyzed under the same authorities. Because Plaintiff voluntarily parted with title, the taking was not felonious, and larceny does not lie.

The point is doubly true as to Lindy. Even if the transaction could somehow be recharacterized as larceny, larceny requires a felonious taking by the debtor. Lindy took nothing. Title passed to the LLC, not to her, and she received no portion of the funds. (J3; J5.) A larceny theory that requires an unlawful taking cannot be satisfied by a defendant who neither took title nor received proceeds.

### D. Neither Theory Survives This Court's Prior Analysis

The two § 523(a)(4) theories Plaintiff has left are mutually exclusive on this record and each independently fails. Embezzlement requires a lawful entrustment that never occurred. Larceny requires an unlawful taking that this Court has already held did not occur, because Plaintiff parted with title voluntarily. What remains, at most, is a debt "obtained by" Joseph's false pretenses, which is the domain of § 523(a)(2)(A), not § 523(a)(4), and which fails as to Lindy for the reasons stated in

Sections I through IV. Judgment should enter for Lindy on the § 523(a)(4) count.

## VIII. Plaintiff Failed to Prove a Willful and Malicious Injury Under § 523(a)(6)

To except a debt from discharge under 11 U.S.C. § 523(a)(6), a creditor must prove that the debtor caused a "willful and malicious injury." The Supreme Court has held that the word "willful" in § 523(a)(6) modifies the word "injury," and therefore requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Geiger*, 523 U.S. at 61-62. A debt arising from recklessness or negligence does not fall within the exception. *Id*. at 64. The Sixth Circuit has confirmed that a willful injury requires that the debtor "desire[d] to cause the consequences of his act, or . . . believe[d] that the consequences are substantially certain to result from it." *In re Markowitz*, 190 F.3d at 464 (quoting Restatement (Second) of Torts § 8A, at 15 (1964)).

Plaintiff bore the burden of proving, by a preponderance of the evidence, that Lindy Adducci herself acted with the subjective intent to injure him, or with the subjective belief that injury was substantially certain to result from her own conduct. He did not carry that burden. The record contains no evidence that Lindy desired to harm Plaintiff or believed harm to him was substantially certain.

### A. The Willfulness Standard Is Subjective and Focuses on This Defendant's State of Mind

The willful-injury inquiry is subjective. It asks what this debtor actually

intended or believed, not what a reasonable person in her position should have foreseen. *See In re Markowitz*, 190 F.3d at 464. Objective foreseeability of harm is not enough; *Geiger* forecloses reliance on a "should have known" theory. *See Geiger*, 523 U.S. at 61-62.

The evidence of Lindy's actual state of mind is uncontroverted and points the opposite direction. She testified that when an escrow arrangement was suggested, she raised it with Joseph, who told her Plaintiff did not want the funds held in escrow. Tr. Day 2, 30:14-18, ECF No. 332. She further testified that she did not know Plaintiff had not received his money, and that she cried when she learned that he had not. Tr. Day 2, 35:3-7, ECF No. 332. That testimony is the antithesis of a subjective intent to injure or a belief that injury was substantially certain.

### B. Malice Requires a Conscious Disregard of a Known Duty, Which the Record Does Not Show

A malicious injury is one done "in conscious disregard of one's duties or without just cause or excuse." *In re Cottingham*, 473 B.R. at 709 (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). Malice may not be inferred merely from the fact of injury. The creditor must show that the debtor acted with knowledge that the conduct would cause harm and without justification. *Id*. at 710-11.

Plaintiff offered no evidence that Lindy consciously disregarded a known duty owed to him. The duties at issue in this transaction ran through Joseph DuMouchelle and his entities, and it was Joseph who dealt with Plaintiff, structured the transaction,

and directed the movement of funds. Where a defendant's participation is limited to ministerial acts taken at the direction of another, and where the defendant lacks knowledge of the wrongful character of those acts, malice is not established. *See Synod of South Atlantic Presbyterian Church v. Magpusao (In re Magpusao)*, 265 B.R. 492, 498 (Bankr. M.D. Fla. 2001).

**C. The Movement of Funds Was Consistent With Ordinary Practice in High-Value Gem Transactions and Does Not Evidence Intent to Injure**

Plaintiff has suggested that the movement of funds among various payees is itself evidence of a willful and malicious injury. The record does not support that inference. Lindy testified that high-value gem sales ordinarily involve numerous parties, including dealers, brokers, and consignors, and that funds routinely move among them in the ordinary course of completing such a sale. Tr. Day 4, 45:5-20, ECF No. 330. The Court itself acknowledged this testimony, observing that the witness testified that in these sale transactions, sometimes there are multiple parties involved in the sale. Tr. Day 4, 67:20-23, ECF No. 330.

Plaintiff has also pointed to Lindy's handling of certain cashier's checks. But her unrebutted testimony was that, to the extent she handled such instruments, she did so at Joseph's direction and returned them to him. Tr. Day 2, 38:2-7, ECF No. 332. Conduct undertaken at the direction of another, without knowledge of any wrongful purpose, does not establish the subjective intent to injure that § 523(a)(6) requires.

Even if the movement of funds could be characterized as irregular, discrepancies of that kind do not carry a creditor's burden on intent. As the Bankruptcy Appellate Panel has explained, discrepancies in the testimony do not establish that the debtor acted with the intention of harming the creditor. *Fox*, 370 B.R. at 118.

**D. The Court Should Weigh Lindy's Credible, Unrebutted Testimony**

This Court sits as the finder of fact and is entitled to credit Lindy's testimony regarding her state of mind. Where a witness's account is plausible and unrebutted, the finder of fact's decision to credit it can virtually never be clear error. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). The Bankruptcy Court for the Eastern District of Michigan has applied these principles in the § 523(a)(6) context, declining to find a willful and malicious injury where the creditor failed to prove the debtor's subjective intent to injure. *Abdel-Hak v. Saad (In re Saad)*, 319 B.R. 147, 156-57 (Bankr. E.D. Mich. 2004).

Here, the credible and unrebutted evidence establishes that Lindy did not intend to injure Plaintiff, did not believe injury was substantially certain to result from her conduct, and acted (to the extent she acted at all) at Joseph's direction and without knowledge of any wrongful purpose. Plaintiff has not proved a willful and malicious injury, and the debt is not excepted from discharge under § 523(a)(6) as to Lindy.

## IX. *Stevenson* Controls the Property and Transfer-Characterization Issues and Requires a Consistent Result

This adversary proceeding does not arise in isolation. It arises from the same February 6, 2019 wire transfer, the same BofA Account, and the same DuMouchelle enterprise addressed by this Court in *Stevenson*. On the property and transfer-characterization questions that recur in this proceeding, *Stevenson* provides the governing characterization of the same February 6, 2019 transfer under federal bankruptcy law, and each of the holdings developed below directly constrains the theories Plaintiff advances here.

First, *Stevenson* held that Plaintiff voluntarily transferred the $12 million and that voidable title passed to the DuMouchelle entity upon receipt. 667 B.R. at 134. As established in Section VII, that characterization is legally incompatible with larceny, which requires a wrongful taking at inception. The voluntary-transfer holding also reinforces the "obtained by" analysis: if Plaintiff voluntarily transferred the funds, the obtaining occurred at the moment of the wire through Joseph's inducements, not through any conduct by Lindy before or after.

Second, *Stevenson* expressly characterized the Yellow Rose transaction as "obtaining money through false pretenses, not larceny." *Id*. at 136. That holding rests on the Sixth Circuit's analysis in *In re Newpower*, 233 F.3d 922, 929 (6th Cir. 2000), and the Michigan Court of Appeals' decision in *Malach*, 202 Mich. App. at 270-71: where the owner intends to part with both title and possession, the offense is false

pretenses, not larceny. 202 Mich. App. at 270-71. *Stevenson's* holding that the transaction was false pretenses directly forecloses any larceny theory under § 523(a)(4) on the same record.

Third, *Stevenson* rejected the Trustee's attempt to ignore corporate separateness and treat the LLC's funds as property of the individual debtors. 667 B.R. at 132-33. The Court held that under Michigan law, veil-piercing doctrines pertain to liability and do not transform the alter ego's property into property of the debtor. The same principle continues to apply here. Plaintiff's vicarious liability theories, including agency and civil conspiracy, must succeed on Michigan-law terms. They cannot be sustained by collapsing the legal distinctions between Joseph, Lindy, and the LLC.

## X. The Court's Post-Trial Questions, Answered

At the April 7, 2026 status conference, the Court identified the specific issues it wished to see addressed in post-trial briefing. Lindy answers each below, in the order the Court posed them, and cross-references the section of this Brief containing the full analysis. Where the Court asked whether a fact is disputed, Lindy states her position plainly so the record is clear.

> **A. Whether the record shows Lindy took the roughly $2.4 million difference between the amounts disbursed on February 7 and the $12 million wire.**

No. The record contains no evidence, documentary or testimonial, that Lindy

received the approximately $2.4 million difference, or any portion of the $12 million. Every dollar disbursed from the BofA Account flowed to Joseph's business creditors and counterparties. Plaintiff's own counsel acknowledged at trial that Bank of America produced no backup documentation for the "AZ TLR transfer" entries, despite subpoena. The absence of proof on this point is Plaintiff's burden to bear, not Lindy's to disprove. The full accounting is set out in Section III.

**B. Whether the LLC actually received Plaintiff's money "in trust," and what "entrusted" means for purposes of § 523(a)(4).**

It did not. Plaintiff wired the funds to a company business checking account pursuant to Joseph's wiring instructions, in an ordinary debtor-creditor posture, not in trust. Plaintiff withdrew the fiduciary-capacity prong of § 523(a)(4) and proceeds only on embezzlement and larceny. Neither theory is satisfied on this record: under this Court's decision in *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle)*, 667 B.R. 122 (Bankr. E.D. Mich. 2023), the transfer was voluntary and passed voidable title, which forecloses larceny, and no lawful entrustment to Lindy was shown, which forecloses embezzlement. The full analysis is in Section VII.

**C. Whether the January 25 telephone call and the data-package email are the only contacts between Lindy and Plaintiff regarding the Yellow Rose.**

Yes. Those two acts, the January 25, 2019 call and the same-day data-package email, are the entirety of Lindy's pre-transfer contact with Plaintiff concerning the

Yellow Rose. Plaintiff, testifying as his own witness, confirmed he "didn't really hear back from Lindy almost from the date that I wired the money." (Tr. Day 1, 134:4-9, March 23, 2026, ECF No. 327.) No trial testimony supports any suggestion that Lindy participated in later calls affirming a sale, and the Court correctly recalled that it heard none. Lindy agrees this is not in dispute. See Sections I and III.

**D. Whether Plaintiff alleges that Lindy's statements on the January 25 call or in the data-package email were false or misleading, and if so, which statements and how.**

Plaintiff has identified no false or misleading statement by Lindy. The call conveyed, at most, a forward-looking opinion that a genuine diamond was a good investment, an opinion, not a false statement of existing fact, and not actionable absent proof she knew it to be false. The email forwarded accurate photographs, GIA monograph material, and a facially-dated 2011 insurance replacement document about a real stone; it made no representation as to ownership, escrow, or the destination of any funds. Because no statement of Lindy's was false, the false-representation, false-pretenses, and actual-fraud theories fail at the threshold. See Section I.

**E. If Plaintiff alleges no false or misleading statement, whether false pretenses and false representation "fall away," and if not, why not.**

They fall away. False representation requires a knowingly false statement of existing fact; false pretenses require conduct intended to create a false impression. Both require a representation or misleading conduct attributable to Lindy. Because

the only two contacts contained no false statement and no misleading conduct by her, there is no predicate for either theory. The false impression that caused Plaintiff's loss, the wiring instructions, the fictitious seller, the forged receipt, the pitch of a Texas-estate sale, was created entirely by Joseph. See Sections I and II.

**F. Whether silence can be a ground for false representation, whether a duty to disclose must first exist, and what duty and what silence Plaintiff relies on.**

Silence supports § 523(a)(2)(A) liability only where the debtor had a pre-existing legal or equitable duty to speak and intentionally withheld a material fact. Lindy had no such duty. She was not a party to the Letter Agreement, held no fiduciary relationship with Plaintiff arising from the transaction, and was not retained by him in any professional capacity. Plaintiff's own Letter Agreement assigns every responsibility to Joseph and does not mention Lindy. A duty to disclose also presupposes that the silent party knew the impression was false; Plaintiff offered no evidence Lindy knew of Joseph's fraud when the two contacts occurred. See Section II.

**G. What "false impression" gives rise to the claimed "duty to correct," given that the diamond and the brokering capacity were real.**

There is none. Plaintiff's duty-to-correct theory assumes Lindy created the impression that the DuMouchelle parties had the capacity to broker the transaction, then failed to correct it. But that impression was accurate: the LLC was a credentialed jewelry business that had operated for over twenty years and was in fact

capable of brokering a transaction of this size. The fraud was not in any representation of capacity. It was in Joseph's undisclosed, contemporaneous intent to misappropriate the funds, an intent Lindy did not create, share, or know of on January 25, 2019. A duty to correct a false impression cannot arise from an impression that was true. See Section II.

**H. Whether false pretenses requires a misrepresentation or conduct intended to create a false impression, and if so, what Lindy's was.**

False pretenses require conduct by the debtor intended to create or foster a false impression on which the plaintiff relied. Lindy engaged in no such conduct. She said nothing false on January 25, emailed nothing false, and undertook no conduct designed to foster a false impression about ownership, escrow, or the destination of Plaintiff's funds. Absent a misrepresentation or misleading conduct of her own, false pretenses cannot stand. See Sections I and II.

**I. Whether Plaintiff asserts a misrepresentation that the LLC itself had the Yellow Rose, given that J10 contemplated work to acquire the diamond on Plaintiff's behalf.**

Lindy made no such representation, and the governing document forecloses the theory. The January 30 Letter Agreement (J10), which Plaintiff drafted, contemplates that the diamond would be acquired on Plaintiff's behalf; it does not state that the LLC or Lindy already owned it. Lindy never represented present ownership or authority to convey title. The wiring instructions, seller identification, and purchase documentation, the materials that spoke to acquisition and ownership,

all came from Joseph. See Sections I.A and I.B.

**J. Whether there is any dispute that Lindy was referencing Plaintiff in the March 7, 2019 recorded call (the "person she grew up with from North Dakota").**

Lindy does not dispute that the reference was to Plaintiff. Lindy was questioned on this point at trial and acknowledged as much. Lindy notes, however, that the March 7, 2019 call is post-transfer conduct. It occurred a month after the February 6 wire and cannot bear on whether the debt was "obtained by" fraud, nor supply the contemporaneous intent § 523 requires as of the transaction. Its evidentiary weight is addressed in Sections III and, as to willfulness, VIII.

**K. How the vicarious-liability theory works on these facts, whether it affects intent, and which subsections of § 523(a) it is said to reach.**

Vicarious liability cannot supply what the trial record lacks. Nondischargeability under § 523 is an individualized determination that may not be imposed by association, proximity, or marriage. *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023), permits imputation of another's fraud only where a valid state-law basis for imputation exists (there, a partnership); it does not create liability by relationship alone. Here there is no such predicate. Michigan's LLC and agency law does not impute Joseph's fraudulent intent to a ten-percent member who made no false statement and received no proceeds, and statutory conversion cannot supply the fraudulent intent § 523 requires. As to the Court's specific concern with *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703 (B.A.P. 6th Cir. 2012), *Cottingham*

does not hold that a non-actor is vicariously liable; it requires the defendant's own concurrent knowledge of the wrongful conduct plus personal appropriation or enjoyment of the proceeds. Both are absent here. Vicarious liability does not "supervene" the elements of § 523(a)(2), (a)(4), or (a)(6); each still requires proof of Lindy's own knowledge and intent, which Plaintiff did not carry. See Section VI.

**L. Whether, per page 9 of Plaintiff's prior brief, fraudulent intent must be established for actual fraud under § 523(a)(2)(A), and the treatment of moral turpitude / intentional wrong under *Husky*.**

Fraudulent intent is required. To the extent Plaintiff argues that only false representation and false pretenses require proof of fraudulent intent, that is incorrect: actual fraud under *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016), independently requires wrongful intent, "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Husky* expanded actual fraud to reach schemes the debtor personally engineers, but it neither eliminated the intent requirement nor the requirement that the debt be "obtained by" the debtor's own fraudulent conduct. Lindy engineered no scheme and possessed no wrongful intent; the scheme was Joseph's. See Section I.C.

**M. The issue of intent, generally, on which the Court asked both sides to be clear.**

Intent is the dispositive issue, and Plaintiff's case fails to establish it. The controlling standard is subjective and is measured at the moment the relevant conduct occurred; the question is what Lindy actually knew and intended on

February 5, 6, and 7, 2019, not what hindsight later revealed. The record produced no evidence of Lindy's contemporaneous fraudulent intent. Where room exists to infer honest intent, dischargeability must be resolved in the debtor's favor. Lindy's post-transfer knowledge, including the March 7 call, does not supply intent as of the transaction, and recklessness or negligence cannot substitute for the intent § 523(a)(6) requires under *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). See the Applicable Law section and Sections IV, VII, and VIII.

### N. Whether the appraisal referenced in J9 is in evidence, and who prepared it.

The appraisal is not in evidence, and Lindy did not prepare it. The parties agree the accreditation of the appraiser is not in the record. Plaintiff does not assert that Lindy prepared the 2011 insurance replacement document, and Plaintiff admitted at trial that "Lindy didn't do an appraisal for me." (Tr. Day 1, 172:22-23, March 23, 2026, ECF No. 327.) J9 forwarded a facially-dated, eight-year-old third-party document. It was not Lindy's representation and cannot support a false-representation theory. See Section I.B.

### O. The "justifiable reliance" proposition raised in Lindy's closing, and where the totality of the circumstances comes in.

At a post-Trial conference, the Court directed the parties to address, amongst other things, Defendant's counsel's argument, raised at closing, that Plaintiff argues his own reliance on Lindy (a person with whom the evidence shows that Plaintiff had had little to no interaction over 20 years) was justifiable, (as required by the

Code), while simultaneously asserting that Lindy's implicit reliance upon Joseph (to whom she was married, and who she had known for 20+ years to be a legitimate and successful business man) was not justifiable. This argument, at its core, relates to the "totality of the circumstances" in this situation. The proposition is a legal one, not merely rhetorical. Justifiable reliance under § 523(a)(2)(A) is assessed from the totality of the circumstances, *Field v. Mans*, 516 U.S. 59 (1995), and it is measured as to the party against whom the debt is asserted, here Lindy, at the time of the representation she is alleged to have made. Plaintiff's reliance ran to Joseph: his own Letter Agreement states he would "rely heavily on [Joseph's] guidance and advice" and assigns all responsibility to Joseph. Plaintiff cannot convert reliance he placed in Joseph into reliance on a statement of Lindy's that was neither false nor directed to the structure or destination of his funds. The totality-of-the-circumstances inquiry therefore reinforces, rather than undermines, Lindy's position: viewed as a whole, the circumstances show Plaintiff relied on Joseph, contracted with Joseph, and lost his money to Joseph. See Sections I, IV, and V.

## <u>CONCLUSION</u>

Joseph DuMouchelle conceived and executed this fraud. He negotiated the transaction, provided the wiring instructions, transmitted the fictitious receipt, directed the disbursements, received the proceeds, and pled guilty to wire fraud. He hid all of this from his wife. Every element of the fraud and bad conduct runs

through, and solely through, Joseph. Every dollar traces to him and his actions.

Section 523 requires proof of Lindy's fraudulent conduct. It does not impose nondischargeability by marriage or association.

Lindy made two contacts with Plaintiff before the wire. Neither contained a false statement. The documentary evidence and unrebutted testimony of Lindy establishes that she opened a bank account at her husband's request, appeared at a Tucson bank branch while annoyed and attending a professional conference out of town, and signed transactions Joseph had already arranged with the Tucson bank, from Michigan. Lindy did not draft the agreement, did not provide the wiring instructions, did not transmit the receipt, and did not receive the proceeds. After five years of litigation, with court-supervised access to every device, every email, and every file, and every privilege assertion overruled, Plaintiff produced no document, no communication, and no evidence of any kind that Lindy knew this transaction was fraudulent or had any intent to injure, embezzle from, steal from, or defraud the Plaintiff in any way. There is no evidence, because there was no such intent.

Plaintiff has not proven any false statement by Lindy. Has not proven she knew the transaction was fraudulent when the debt was incurred. Has not identified a single dollar of personal benefit. Each failure is established by the contemporaneous documentary record, independent of any disputed aspect of Lindy's testimony. The result urged here holds even on the version of events least

favorable to her.

Lindy did not defraud Thomas Ritter. She was deceived by the same person who deceived him, her husband of more than twenty years, on a transaction she had every reason to believe was legitimate. Nondischargeability on this record would not vindicate § 523. It would weaponize it against the person the Bankruptcy Code was designed to protect.

Judgment should enter in Lindy's favor on all counts.

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

By: */s/ Patrick A. Foley*
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
(313) 274-7377
pafoley@jrfpc.net

Dated: July 17, 2026

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| JOSEPH G. DUMOUCHELLE, and MELINDA J. ADDUCCI, | Bank. Case No. 19-54531-lsg |
| *Debtors*. | Chapter 7 |
| | Hon. Lisa S. Gretchko |

| | |
|---|---|
| THOMAS T. RITTER, | Adv. Pro. No. 20-04381-lsg |
| *Plaintiff,* | Hon. Lisa S. Gretchko |
| v. | |
| MELINDA J. ADDUCCI, | |
| *Defendant.* | |

## <u>PROOF OF SERVICE</u>

I hereby certify that on July 17, 2026, I caused the foregoing **Defendant's Post-Trial Brief**, and this **Proof of Service,** to be served upon the following parties via the Court's CM/ECF e-Filing system:

- Kimberly Ross Clayson      kclayson@taftlaw.com, ttorni@taftlaw.com
- Jay L. Welford      jwelford@taftlaw.com, ttorni@taftlaw.com

Respectfully submitted,
**JOHN R. FOLEY, P.C.**
*Counsel for Defendant*

By: */s/ Patrick A. Foley*
Patrick A. Foley (P74323)
18572 W. Outer Drive
Dearborn, MI 48128
(313) 274-7377
pafoley@jrfpc.net

Dated: July 17, 2026