# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

                                  Chapter 7

Joseph G. DuMouchelle and
Melinda J. Adducci,                         Case No. 19-54531-lsg

                                  Hon. Lisa S. Gretchko

         Debtors.

_____/

Thomas T. Ritter,

        Plaintiff,

v.

Melinda J. Adducci,                       Adversary Pro. No. 20-04381

        Defendant.

_____/

## <u>PLAINTIFF'S POST-TRIAL BRIEF</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................v

    CASES...........................................................................................................v

    STATUTES AND OTHER AUTHORITIES ........................................ viii

INTRODUCTION ..............................................................................................1

STATEMENT OF FACTS ..................................................................................2

    A.  Background of the Parties' Relationship...............................................2

    B.  Pre-Transaction Communications Regarding The Yellow Rose...............4

    C.  The Yellow Rose Purchase Agreement. ......................................................6

    D.  Who had Possession of The Yellow Rose in January-February 2019?.....7

    E.  Wire Transfer Attempts and Funding of the BofA Account......................8

    F.  February 2019 Disbursements from the BofA Account...........................10

    G.  Plaintiff's Post-Transaction Efforts to Recover Funds...........................14

    H.  The Recorded Telephone Call with Ted Gelov. ......................................16

    I.  Joseph's Criminal Conviction and Sentencing Enhancement.................16

    J.  Entry of Default Judgment against Defendant in North Dakota.............17

    K.  Summary of BofA Account Disbursements............................................17

I.   NONDISCHARGEABILITY UNDER §§ 523(a)(2)(A), (a)(4), AND (a)(6). ...........................................................................................20

    A. Section 523(a)(2)(A): False Pretenses, False Representation, and Actual Fraud. 20

        1. False Pretenses. ...........................................................................21

        2. False Representation. ....................................................................22

        3. Actual Fraud. ...............................................................................24

        4. Fraudulent Intent and Totality of the Circumstances. .............................24

        5. Justifiable Reliance. ......................................................................26

    B.  Section 523(a)(4): Embezzlement. ....................................................27

    C.  Section 523(a)(6): Willful and Malicious Injury .................................29

II.  DEFENDANT'S INCONSISTENT STATEMENTS AND CREDIBILITY. ...........................................................................................32

III. JOSEPH'S FEDERAL CONVICTION AND DEFENDANT'S CORRESPONDING CONDUCT. ...........................................................35

IV.  RESPONSES TO THE COURT'S POST-TRIAL QUESTIONS. ...............36

    1.  Does anything in the record show that Defendant took out the roughly $2.4 million difference between the approximately $9.6 million disbursed on February 7, 2019 and the $12 million wired into the BofA Account?...............36

    2.  For the purposes of §523(a)(2)(A), what is the meaning of "obtained by" and does it include both Defendant's inbound and outbound conduct?............37

    3.  Does "entrusted" mean that Plaintiff's funds have to be received by Defendant "in trust" to meet the "entrusted" element of embezzlement? .........39

4.  Were the January 25, 2019 telephone call and Defendant's sending of the data package the only contacts between Plaintiff and Defendant regarding The Yellow Rose or the Yellow Rose Transaction? What is the impact of any such contacts on the claims asserted. ...................................................................39

5.  a. Whether Defendant's statements during the January 25, 2019 call or Data Package Email were false or misleading, and b. if so, how; and if not, whether false pretenses and false representation fall away, leaving only actual fraud under § 523(a)(2)(A)..................................................................................41

6.  Is Defendant's silence grounds for a false representation, and if so, whether there must first be a duty to disclose, what duty Defendant had, and what silence or failure to disclose Plaintiff relies upon. ...................................42

7.  Whether there is a duty to correct what would otherwise be a false impression, and if so, what is the false impression that Plaintiff relies upon as giving rise to Defendant's duty to correct..........................................................44

8.  Whether false pretenses requires proof of a misrepresentation or conduct intended to create a false impression; what misrepresentation or false impression Plaintiff relies upon; and whether false pretenses can stand absent any false statement by Defendant. ...................................................................44

9.  Whether Plaintiff is asserting that there was a misrepresentation as to whether DuMouchelle Jewellers had The Yellow Rose diamond to sell, and if so, the impact of Exhibit J10, which contemplates that there would be work to purchase the diamond on behalf of Plaintiff. ...................................................45

10. Whether there is any dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call regarding a transaction with the person she grew up with from North Dakota. ...................46

11. How vicarious liability operates on these facts, which subsections of § 523(a) it applies to, whether it supervenes the elements of those provisions, and whether Plaintiff seeks both direct and vicarious liability................................47

12. Whether there is a need to establish Defendant's fraudulent intent for actual fraud under § 523(a)(2)(A), and what role moral turpitude or intentional wrong plays under the *Husky* framework. .......................................................49

13. Whether Defendant's reliance on Joseph and Plaintiff's justified reliance on Defendant are connected or separate concepts, and whether the totality of circumstances analysis applies to § 523(a)(2)(A), (a)(4), (a)(6), or all, and whether it extends beyond intent........................................................................49

14. Intent versus knowledge: Whether intent is synonymous with knowledge, and what distinct intent standards apply under §§ 523(a)(2)(A), (a)(4), and (a)(6)........................................................................51

V.    REQUESTED FINDINGS AND CONCLUSIONS ....................................53

iv

# TABLE OF AUTHORITIES

*CASES*

*Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321 (Bankr. D. Colo. 2013) p. 52

*Anderson v. Bessemer City*, 470 U.S. 564 p. 32

*Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm)*, 175 B.R. 349 (B.A.P. 9th Cir. 1994) p. 41

*Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12 (Bankr. D. Mass. 2014) pp. 22, 45

*Bd. of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838 (Bankr. N.D. Ill. 2018) p. 52

*Bold City VII, Ltd. v. Radcliffe*, 141 B.R. 1015 (Bankr. E.D. Ark. 1992) p. 33

*Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496 (Bankr. N.D. Ill. 2002) p. 30

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165 (6th Cir. 1996) pp. 26, 28, 39

*Buzzard v. Ratliff (In re Ratliff)*, 673 B.R. 719 (Bankr. S.D. Ohio 2025) p. 30

*Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851 (Bankr. N.D. Ohio 2002) p. 25

*Cohen v. De La Cruz*, 523 U.S. 213 (1998) p. 37

*Contemporary Imps., Inc. v. Morrow (In re Morrow)*, 563 B.R. 272 (Bankr. E.D. Tenn. 2017) p. 28

*Driggs v. Black (In re Black)*, 787 F.2d 503 (10th Cir. 1986) p. 52

*Evans v. Dunston (In re Dunston)*, 117 B.R. 632 (Bankr. D. Colo. 1990) p. 22

*Ewers v. Cottingham (In re Cottingham),* 473 B.R. 703 (B.A.P. 6th Cir. 2012) p. 47

*Farmers & Merchs. State Bank v. Perry (In re Perry)*, 448 B.R. 219 (Bankr. N.D. Ohio 2011) p. 50

*Field v. Mans*, 516 U.S. 59 (1995) pp. 21, 27

*Fleming v. Gordon (In re Gordon)*, 491 B.R. 691 (Bankr. D. Md. 2013) p. 23

*FTC v. Ettus (In re Ettus)*, 596 B.R. 405 (Bankr. S.D. Fla. 2018) p. 41

*Gidelski v. Anton (In re Anton)*, Nos. 08-64144, 09-04344, 2013 Bankr. LEXIS 1715 (Bankr. E.D. Mich. Apr. 12, 2013) p. 47

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) p. 50

*Grogan v. Garner*, 498 U.S. 279 (1991) pp. 21, 28, 31

*Hord v. Envtl. Research Inst.*, 463 Mich. 399 (2000) p. 44

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016) pp. 21, 24, 47, 49

*In re Holly Diane Bolling*, 600 B.R. 838 (Bankr. D. Colo. 2019) p. 47

*Initial Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710 (Bankr. E.D. Mich. 2016) p. 30

*Islamov v. Ungar (In re Ungar)*, 429 B.R. 668 (B.A.P. 8th Cir. 2010) p. 51

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) pp. 30, 52

*Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576 (6th Cir. 2001) p. 30

*Kim v. Sun (In re Sun)*, 535 B.R. 358 (B.A.P. 10th Cir. 2015) p. 47

*Lansden v. Jones (In re Jones)*, 585 B.R. 465 (Bankr. E.D. Tenn. 2018) p. 22

*Lenchner v. Korn (In re Korn)*, 567 B.R. 280 (Bankr. E.D. Mich. 2017) pp. 21, 41, 44

*Long v. Piercy (In re Piercy)*, 21 F.4th 909 (6th Cir. 2021) p. 39

*Love v. Smith (In re Smith)*, 98 B.R. 423 (Bankr. C.D. Ill. 1989) p. 47

*MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42 (Bankr. D. Colo. 2014) p. 50

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999) p. 30

*McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000) p. 24

*Me. Cir. Breaker, Inc. v. Burnham (In re Burnham)*, 2021 Bankr. LEXIS 3497 (Bankr. D. Me. Dec. 23, 2021) p. 52

*Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873 (B.A.P. 6th Cir. 2001) p. 24

*Muhammad v. Reed (In re Reed)*, 542 B.R. 808 (Bankr. N.D. Ill. 2015) p. 42

*Pa. Emples. Ben. Tr. Fund v. Brown (In re Brown)*, 591 B.R. 587 (Bankr. M.D. Pa. 2018) p. 41

*Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630 (Bankr. E.D.N.Y. 2020) p. 28

*Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997) p. 25

*Redmond v. Finch (In re Finch)*, 289 B.R. 638 (Bankr. S.D. Ohio 2003) p. 42

20-04381-lsg    Doc 351    Filed 07/17/26    Entered 07/17/26 16:52:25    Page 8 of 64

*Rembert v. AT&T Universal Card Servs., Inc.*, 141 F.3d 277 (6th Cir. 1998) p. 21

*Rensin v. FTC*, 604 B.R. 917 (S.D. Fla. 2019) p. 32

*Reyes v. Ranciato (In re Ranciato)*, 638 B.R. 275 (Bankr. D. Conn. 2022) p. 28

*Rice v. Morse (In re Morse)*, 524 B.R. 774 (Bankr. E.D. Tenn. 2015) p. 28

*Rimal v. Gunawan Kuntho Wibisono (In re Gunawan Kuntho Wibisono)*, 412 B.R. 747 (Bankr. D. Md. 2009) p. 26

*Sherman v. Potapov (In re Sherman)*, 603 F.3d 11 (1st Cir. 2010) p. 39

*United Bank of Southgate v. Nelson*, 35 B.R. 766 (N.D. Ill. 1983) p. 30

*U.S. v. Young*, 955 F.2d 99 (1st Cir. 1992) p. 39

*Velde v. Thiel (In re Thiel)*, 587 B.R. 92 (B.A.P. 8th Cir. 2018) p. 32

*W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305 (Bankr. S.D. Fla. 1982) p. 47

*Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431 (B.A.P. 1st Cir. 2017) p. 24

***STATUTES AND OTHER AUTHORITIES***

11 U.S.C. § 523(a)(2)(A) pp. 20, 23-24, 27, 37, 41-42, 44-45, 47, 49-51, 53

11 U.S.C. § 523(a)(2)(B) p. 48

11 U.S.C. § 523(a)(4) pp. 27-28, 39, 47-49, 51-54

11 U.S.C. § 523(a)(6) pp. 29-30, 32, 47-49, 51-54

Restatement (Second) of Torts § 551(2) pp. 42, 44

## PLAINTIFF'S POST-TRIAL BRIEF

Plaintiff Thomas T. Ritter ("**Plaintiff**"), through counsel, submits the following:

## INTRODUCTION

This Adversary Proceeding arises from a fraudulent scheme in which Plaintiff lost $12 million in connection with a sham purchase of a 77.12 carat diamond coined "The Yellow Rose." Defendant[1] and her husband Joseph orchestrated the fraud through their business, DuMouchelle Jewellers. Plaintiff relied on Defendant's expertise and his trust in her arising from their long-established familial ties. Defendant not only induced Plaintiff to enter into the sham purchase, she opened the BofA Account to receive Plaintiff's funds, was the sole authorized signer when Plaintiff's $12 million wire arrived, and authorized or initiated $9,869,694.44[2] in disbursements of Plaintiff's money for improper purposes, without Plaintiff's knowledge or consent. None of Plaintiff's money went to purchase The Yellow Rose, and Defendant submitted no evidence showing that she, her husband, or their business had any prospect of purchasing The Yellow Rose. But for Defendant's

---

[1] Capitalized terms herein conform to the Joint Final Pretrial Order [ECF No. 299] ("**JFPTO**")

[2] Defendant affirmatively authorized transfers out of the BofA Account totaling $9,869,694.44 between February 6 and February 12, 2019; in total, $10,524,661.41 was transferred out of the BofA Account while Defendant was the sole authorized account signer between February 6 and February 10, 2019. The remaining difference of $654,966.97 exited the account through "Legal Orders" while Defendant was the sole signatory.

active participation, the sham would never have been perpetrated and Plaintiff would still have his $12 million today. Plaintiff submits that the evidence adduced at trial meets the preponderance standard required to find that his $12 million claim is nondischargeable pursuant to various provisions of the Bankruptcy Code, to be discussed in greater detail below.

Defendant's credibility on contested issues of knowledge and intent is fatally undermined by multiple inconsistent statements as outlined below. Her credibility was further undermined by her inability to recall material facts throughout trial and total failure to submit even a scintilla of evidence to show that The Yellow Rose purchase was anything but a sham. Defendant's contention that she solely relied on her husband regarding every key element of her defense, without exercising a modicum of independent thought or verification, is not credible and is designed to conceal her enthusiastic participation in the fraud.

## STATEMENT OF FACTS

### A. Background of the Parties' Relationship.

Plaintiff and Defendant have known each other since the 1970s, when Plaintiff's sister married Defendant's brother. Plaintiff became a close friend of Defendant's father, Reuben Hegge ("**Mr. Hegge**"), a trusted friend and partner whose integrity Plaintiff assumed flowed to his daughter, the Defendant. ECF No.

2

327/83:11–83:17, 85:25-88:5; 106:9–16 and 132:23–133:5; ECF No. 332/7:11–16; ECF No. 332/15:9–16:3.

Defendant began in the jewelry business working in Plaintiff's twin brothers' jewelry store and subsequently obtained accreditation as a master gemologist, appraiser, and auctioneer – titles reflected in her DuMouchelle Jewellers email signature block. Defendant was vice president of DuMouchelle Jewellers and held a ten percent membership interest. Exhibit J9; ECF No. 327/82:14–83:5; ECF No. 332/88:1-16; 89:15–91:18; 94:13–95:11; ECF No. 329/14:1–15:7; JFPTO, Stipulated Facts ¶¶ 4(a)–(b).

Joseph and Defendant borrowed money from Plaintiff to purchase jewelry to resell at a profit through DuMouchelle Jewellers. ECF No. 327/88:20–90:22; 94:6–95:8. In 2018, Plaintiff was owed money from a loan made to Defendant and Joseph and Plaintiff wanted it repaid. ECF No. 327/98:18–99:10. In response, in late January 2019, Joseph identified a potential investment in The Yellow Rose, which he represented could be purchased for $12.5 million and resold at a profit. ECF No. 327/98:14–99:22. At the time, The Yellow Rose was owned by Bill Noble and/or his business, which had *previously* terminated its consignment relationship with DuMouchelle Jewelers on January 7, 2019 and filed suit against DuMouchelle Jewelers in Texas on January 9, 2019, seeking a judgment in excess of $7 million in damages. ECF No. 329/77:6–77:24; ECF No. 329/144:2–144:6. Defendant

3

introduced no evidence that Defendant, her husband, or DuMouchelle Jewelers had the right to buy or sell The Yellow Rose at any time or even attempted to obtain such rights.

Without knowledge that the proposed purchase and resale was a sham, Plaintiff was interested in the concept of buying and reselling The Yellow Rose because he viewed the potential profit from such a buy/sell as a means of repayment on the loan debt and also to share in the potential profit. ECF No. 327/ 99:11–100:20; 106:13–22.

### B. Pre-Transaction Communications Regarding The Yellow Rose.

Plaintiff asked Joseph to have Defendant call him to discuss the details of The Yellow Rose and whether there was support for the proposed resale value. ECF No. 327/99:11–100:25. Plaintiff made this request because he trusted Defendant and wanted her input and opinion on whether the transaction was *bona fide*. ECF No. 327/106:6–106:24. In response, on or about January 25, 2019, Defendant called Plaintiff to discuss The Yellow Rose, to confirm that it could be purchased for $12 million and resold for between $16 million and $20 million. ECF No. 327/99:23–101:20; ECF No. 332/8:8–22; 105:1–106:9. These statements were intended to and did lead Plaintiff to believe that the opportunity to purchase The Yellow Rose actually existed and that Defendant would use Plaintiff's $12 million solely for that purpose. ECF No. 332/102:12–20; ECF No. 329/128:8–130:1.

4

As follow up to this call, on January 25, 2019, Defendant sent the Data Package Email to Plaintiff with attachments including a 2011 appraisal reflecting an insurance value of $30 million for The Yellow Rose and a scanned copy of the GIA Monograph, sent from her lindy@josephdumouchelle.com email account containing her credentialed signature block. JFPTO, Stipulated Facts ¶ 4(c); ECF No. 327/91:16–92:10; ECF No. 332/8:11–9:5; 47:1–48:5, 53:10–21; 88:1–91:7, 96:5–14; Exhibit J9. The Data Package Email was an additional representation by Defendant to induce Plaintiff to believe that the opportunity to acquire The Yellow Rose actually existed and that Plaintiff's $12 million would be used solely to purchase it. ECF No. 327/91:16–92:10; ECF No. 329/128:1–129:5.

Plaintiff later left a telephone or text message with Defendant asking for confirmation that the resale value of $16 million to $20 million was supportable. Defendant responded to Plaintiff either by a return voicemail or text message affirming the accuracy of Plaintiff's request. ECF No. 327/105:10–20. This response was a further representation that the opportunity to acquire The Yellow Rose for $12 million actually existed and that his $12 million would be used solely to purchase The Yellow Rose, and that the potential profit from the buy/sell was between $4 million and $8 million (that is the difference between the $12 million buy and the $16-20 million sale).

Based upon the express and implied representations made by Defendant, Plaintiff decided to participate in what he believed was The Yellow Rose Transaction. Without Defendant's representations, blessing and involvement, Plaintiff would not have entered into The Yellow Rose Transaction. ECF No. 327/105:22–106:24; ECF No. 332/12:11–13; 106:1–24; 112:12–16. Plaintiff relied on Defendant's expertise, her credentials, the telephone call, the Data Package Email, the subsequent message exchange, and the family history and inherent trust between them. ECF No. 327/93:1–10; 166:1–167:5; 198:24–199:6.

## C. The Yellow Rose Purchase Agreement.

Subsequent to Defendant's confirmation about the prospects of the Yellow Rose Transaction, and without knowledge that the "Transaction" was a sham, Plaintiff drafted the Yellow Rose Purchase Agreement and Plaintiff and Joseph signed it on January 30, 2019. JFPTO, Stipulated Facts ¶ 4(e); ECF No. 327/108:17–112:11; Exhibit J10. The document acknowledged that Plaintiff was not experienced in this type of transaction and was relying on Joseph's guidance. ECF No. 327/132:18–133:5; Exhibit J10.

The Yellow Rose Purchase Agreement provided that Joseph would purchase The Yellow Rose for $12 million. JFPTO, Stipulated Facts ¶ 4(e). The Agreement contemplated that Plaintiff would wire his money to an escrow account at JPMorgan Chase, but the escrow was never established because Joseph represented that an

6

escrow would hinder showings to prospective buyers. Instead, Plaintiff agreed to transmit his $12 million to the account of the seller or the seller's representative. ECF No. 327/114:15–115:13; 119:2–15.

Plaintiff sent Defendant and Joseph an email with the Yellow Rose Purchase Agreement attached, offering to include Defendant as a party to the Agreement because he trusted her and wanted to ensure she had the opportunity to participate in the claimed financial rewards (that is, her share of the claimed $4 million to $8 million profit), as she had played an important role in persuading Plaintiff to move forward. The existence of this email indicates her central role in what later would be revealed as a sham. ECF No. 332/10:1–11:9; Exhibit J11.

Defendant acknowledged that she received a copy of the Yellow Rose Purchase Agreement and read its terms aloud to her son, Joey Adducci ("**Joey**"), yet did not sign it. JFPTO, Stipulated Facts ¶ 4(f); ECF No. 332/99:3–6; ECF No. 332/101:22–23. Plaintiff believes Defendant's refusal to sign – when the agreement on its face presented her with the opportunity to receive a share of the supposedly substantial, multi-million dollar profit to be realized from a legitimate sale – was because she knew the sale to be a sham.

**D. Who had Possession of The Yellow Rose in January-February 2019?**

Although Defendant physically held The Yellow Rose and took photographs of herself wearing it around Labor Day 2018, she could not testify whether it was in

the possession of DuMouchelle Jewellers in January to February 2019. ECF No. 332/97:5–98:20 ECF No. 328/99:9–21; 105:1–106:10; ECF No. 329/26:24–27:4, 35:16–25, 98:2–21. In fact, The Yellow Rose would not have been in the possession of any of the DuMouchelle Parties in January 2019 because Bill Noble had already terminated the consignment relationship and initiated a lawsuit claiming to be owed $7 million on January 9, 2019.

### E. Wire Transfer Attempts and Funding of the BofA Account.

After the execution of the Purchase Agreement, Joseph sent Plaintiff wiring instructions for an account at MB Financial Bank in the name of Highland Wealth Management, purporting to be the seller's account. JFPTO, Stipulated Facts ¶¶ 4(h)–(i); ECF No. 327/115:2–5. Plaintiff's attempted wire of $12 million to that account was rejected. JFPTO, Stipulated Facts ¶¶ 4(j)–(k); ECF No. 327/115:2–20. Joseph then sent wiring instructions for an account at FineMark Bank, claiming these were new instructions for the seller. JFPTO, Stipulated Facts ¶¶ 4(l), (o); ECF No. 327/116:14–22. That wire was also rejected. JFPTO, Stipulated Facts ¶¶ 4(m)–(n); ECF No. 327/116:20–117:1. Plaintiff often sent large wire transfers as part of his work in the oil industry and did not view the banks' wire rejections as "red flags" because he had experienced similar banking issues in the past when sending large wire transfers. ECF No. 327/115:21–116:5; 117:2–8.

After the two prior wire attempts were rejected, on February 6, 2019, Joseph directed Plaintiff to wire $12 million to a Bank of America account described as belonging to Fine & Estate Appraisers, LLC, with an account number ending in 0585 – the BofA Account. The wire was accepted that day. JFPTO, Stipulated Facts ¶¶ 4(q), (s)–(t); ECF No. 327/119:11–25.

The BofA Account belonged to DuMouchelle Jewellers – not any seller. Exhibit J2; JFPTO, Stipulated Facts ¶¶ 4(q)-(r); Exhibit J4; ECF No. 332/44:3–20. Critically, Defendant opened the BofA Account on February 5, 2019 – one day before Plaintiff's $12 million wire arrived. ECF No. 332/107:2–22; Exhibit J5. As the person who opened the account in person at a Bank of America branch in Florida and who was its only authorized signer at the time of the wire, Defendant had to have had access to the account number and routing number that were provided to Plaintiff as wire instructions. No other source of that information was identified at trial other than the Defendant—that is, on February 6, 2019 Joseph was not an authorized signer on the BofA Account—only the Defendant was. Defendant therefore necessarily supplied Joseph with the account credentials he used for wire transfer instructions to direct Plaintiff's $12 million into an account she opened and exclusively controlled. Exhibit J4; ECF No. 332/42:14–45:25; 107:2–25; 149:1–10.

Critically, Defendant admitted she knew the purpose of the BofA Account was to receive Plaintiff's $12 million wire. ECF No. 332/36:6–11; 121:25–122:16;

9

ECF No. 328/45:20–46:2. Defendant offered no evidence that the opportunity to purchase The Yellow Rose ever existed or that she could have ever reasonably believed the proposed transaction to be legitimate. The BofA Account balance before the $12 million wire was $500. Exhibit J5; ECF No. 332/110:1–7; ECF No. 328/38:19–22.

### F. February 2019 Disbursements from the BofA Account.

Once Plaintiff's $12 million reached the BofA Account, his money was not used to purchase The Yellow Rose. Instead, the first disbursements occurred on February 6, 2019 – the same day Plaintiff's wire arrived – in the form of three "legal order" debits that totaled $178,777.71. J5; ECF No. 332/151:1–155:25.

On February 7, 2019, the day after Plaintiff's wire arrived, Defendant made two trips to a Bank of America branch in Tucson, Arizona. JFPTO, Stipulated Facts ¶ 4(y). Defendant authorized and signed three counter withdrawals totaling approximately $5.1 million and authorized three interbank transfers – two of which were directed to William Noble Rare Jewels ($4,250,000 and $117,000), and one was directed to Ryan & Rodney Diamonds, Inc. ($150,000). Exhibits J2; J3; J42; J43; J44; JFPTO, Stipulated Facts ¶¶ 4(v)–(x); ECF No. 332/141:22–142:5; 147:7–21, 149:7–150:4, 151:1–155:25. Defendant offered no evidence that she reasonably believed any of these expenditures were to purchase The Yellow Rose. Plaintiff did not authorize or approve these disbursements – which he did not know about.

10

Defendant testified that on February 7, 2019, she was angry at Joseph because he interrupted her day at the GIA Conference and interfered with her evening plans to attend the GIA formal gala because of her two trips to the BofA branch in Tucson that day. During her testimony, the Defendant emphasized that the trip to the BofA branch disrupted her plans to attend the GIA formal gala to such an extent that the Court asked Defendant if she was dressed in her formalwear during her trip to the bank:

> THE COURT: So you were all dressed up in formalwear.
>
> DEFENDANT: Yes, it was formal, it was a dinner. All these colleagues --
>
> THE COURT: And then you attended the formal dinner.
>
> THE WITNESS: Yes.

ECF No. 332/144:11–145:22. In reality, the conference and gala/dinner occurred the day prior(!), on February 6, 2019. Exhibit J30; ECF No. 328/6:4–8:9. When confronted with this discrepancy, Defendant claimed she misremembered and that there were other events on February 7, 2019 that were interrupted by her trip to the bank – events she never adequately explained. ECF No. 328/8:10–13.

Defendant testified that when she authorized the banking transactions on February 7, 2019, she did not have online access to the BofA Account and believed, based on her trust in Joseph, that there were sufficient funds in the account to justify the disbursements. However, Defendant knew that Plaintiff's $12 million had been

wired into the BofA Account the day before, and could have learned of the account balance during either of her two trips to the BofA branch, and never explained what other funds she expected to be in the account besides Plaintiff's $12 million. ECF No. 332/35:1–7; 40:15–17; 134:1–10; ECF No. 328/128:18–25.

Joseph's emails establish that Defendant and Joseph were in regular communication on February 7, 2019 regarding the unauthorized disbursement of Plaintiff's money to multiple creditors. In his 6:16 ET/4:16MST email to a Bank of America banker – with Defendant copied – Joseph informed the banker that Defendant would arrive at 4:20 MST, meaning in ***four minutes***. Exhibit J42; ECF No. 332/140:4–141:4. Joseph could only have known Defendant's immediate proximity to the branch if they were in regular telephone contact as well as email communication. The emails further show that Joseph was openly discussing ***with Defendant*** that Plaintiff's money was being used to pay other creditors – confirming that Defendant was a knowing participant in the fraudulent scheme. Exhibits J42 through J44.

During Defendant's second visit to the BofA Tucson branch on February 7, 2019, she obtained multiple cashier's checks payable to third parties and then made a separate trip to a FedEx office to send the checks to Joseph in Michigan after she left the BofA branch. ECF No. 332/160:19–162:4. In total, 13 different payees

12

received Plaintiff's money on February 7, 2019. ECF No. 328/19:16–20:23, 21:11–20; *See* **Summary of BofA Account Disbursements**, below.

Given that Defendant was the sole signatory on the BofA Account, was copied on the emails, was in regular communication with Joseph, and given the numerous payees receiving disbursements on February 7, 2019, Defendant knew or should have known that she was participating in a fraudulent scheme to use Plaintiff's money other than for its intended purpose. Defendant could have instructed the banker at the BofA branch to return the $12 million to Plaintiff, but she did not do that, instead electing to participate in the fraudulent disbursement of his $12 million for other purposes. ECF No. 332/159:23–24; 180:21–22.

Four days later, on February 11, 2019, Defendant returned to a Bank of America branch in Florida and signed a counter withdrawal slip for the BofA Account – this time for $180,000, resulting in two $90,000 cashier's checks: one payable to Marcella G. Rabinovich, PLLC attorney trust account, and one payable to Joseph DuMouchelle Fine and Estate Jewelers, LLC. ECF No. 328/62:1–12, 63:3–19; Exhibit J3. None of these disbursements were to purchase The Yellow Rose. ECF No. 332/156:14-16. This withdrawal, four days after Defendant directly diverted over $9 million of Plaintiff's money on February 7, 2019, is further confirmation that Defendant was a knowing participant in the scheme to defraud Plaintiff. Between the thirteen (13) payees that received portions of Plaintiff's

13

money on February 7, 2019 and the two (2) additional payees (one (1) being DuMouchelle Jewellers) who received portions of Plaintiff's money on February 11, 2019, Defendant was directly responsible for disbursing Plaintiff's money to fifteen (13 + 2 = 15) different payees, none being the seller of The Yellow Rose.

**G. Plaintiff's Post-Transaction Efforts to Recover Funds.**

Defendant never, at any time after Plaintiff wired his $12 million, followed up with Plaintiff about whether the Yellow Rose Transaction had been completed. ECF No. 327/127:14-16; ECF No. 332/172:8–10. Despite testifying that she always wanted customers to be happy and wanted to be extra careful with Plaintiff's transaction involving The Yellow Rose, Defendant presented no evidence regarding steps she took to assure the success of the Yellow Rose Transaction or even confirm that it had taken place. ECF No. 332/47:1–5; ECF No. 328/27:23–25.

Eventually, Joseph represented to Plaintiff that he had secured a buyer and emailed a proposed resale agreement to Plaintiff. JFPTO, Stipulated Facts ¶¶ 4(aa)–(bb). The resale agreement was fictitious – The Yellow Rose had not been purchased for Plaintiff's benefit and no buyer existed. ECF No. 327/126:7–20; 141:4–10; Exhibit J34, page 3.

Out of concern for the lack of resale, Plaintiff traveled from North Dakota to Michigan in April 2019 to view The Yellow Rose. JFPTO, Stipulated Facts ¶¶ 4(z), (dd) – (ee); ECF No. 327/124:20–125:16. Upon meeting Joseph, Plaintiff was told

14

that his contact at the Brinks Depository (where The Yellow Rose diamond was supposedly being stored) was not available. Plaintiff and Joseph traveled to the DuMouchelle Jewellers office, where Plaintiff reviewed the GIA Monograph Book. Plaintiff asked to see Defendant, but Joseph represented that she was not available. ECF No. 327/125:9–16. Plaintiff returned to North Dakota on the same day he traveled to Detroit. While waiting for his flight, Plaintiff called the Brinks Depository to inquire about The Yellow Rose and whether it was stored under his name or Joseph's name and learned that there was no account. Through this call, Plaintiff realized that the Yellow Rose Transaction was a ruse. ECF No. 327/126:1–20.

Subsequently, Plaintiff transmitted four separate emails to both Joseph and Defendant at the lindy@josephdumouchelle.com email address over two months, pressing for a return of his money. Still believing in Defendant's integrity, Plaintiff included Defendant hoping to appeal to her conscience. ECF No. 327/128:2–129:20; 130:17–133:5, 134:17–136:11; Exhibits J45, J46, J47 and J48. Defendant never responded to any of these emails and testified that she never saw them.

Defendant half-heartedly suggested that Joseph may have deleted the emails without any credible explanation for how this would have been possible, but she also testified that she was receiving her lindy@josephdumouchelle.com emails on her mobile phone. ECF No. 328/54:18–25.

**H. The Recorded Telephone Call with Ted Gelov.**

The recorded telephone call between Defendant, Joseph, and Ted Gelov features Defendant as the primary speaker and establishes that she was a fully informed and active participant in the business affairs of DuMouchelle Jewellers. During that call, Defendant made statements to Gelov to suggest that Plaintiff had been the purchaser of Ted Gelov's collateral and that Plaintiff's money was meant to repay Ted Gelov but was tied up with the banks. ECF No. 332/63:1–82:11. During this call, Defendant demonstrated comprehensive, detailed, and current knowledge of DuMouchelle Jewellers' banking relationships and her enthusiastic and active participation in the fraud perpetrated against Gelov.

Defendant testified that she did not do much banking for DuMouchelle Jewelers. However, in the recorded Gelov call, she was the primary speaker and talked at length about her banking experience regarding the affairs of DuMouchelle Jewelers, including ACH processing, wire transfers, and account management. Additionally, Defendant and her husband continued their joint use of the BofA Account for months, and Defendant was the signer on many BofA Account checks well past February 2019 – the BofA Account was overdrawn from February 2019 through at least May 2019, with dozens if not hundreds of NSF checks drawn on the account. ECF No. 328/50:12–51:3.

**I. Joseph's Criminal Conviction and Sentencing Enhancement.**

Joseph's guilty plea, Exhibit J34, states that "DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." Yet the trial record establishes that it was ***Defendant*** who committed many of the criminal acts for which Joseph pled guilty, as Defendant personally signed the counter withdrawal slips authorizing approximately $9.6 million in disbursements on February 7, 2019, and that the sentencing enhancement opinion, Exhibit J25, applied a sophisticated means enhancement based in part on the recorded Gelov call in which Defendant was the primary speaker. Throughout this period, DuMouchelle Jewellers was in serious financial decline, and Plaintiff was never repaid his $12 million. JFPTO, Stipulated Facts ¶ 4(ff); ECF No. 328/45:20–46:6, 48:23–51:20; Exhibit J25.

### J. Entry of Default Judgment against Defendant in North Dakota.

Plaintiff obtained a default judgment in North Dakota against the DuMouchelle Parties, including Defendant, for the $12 million plus other amounts related to the prior promissory notes, the expected $4 million profit from the Yellow Rose Transaction, and judgment interest, totaling $17,140,031.62. JFPTO, Stipulated Facts ¶¶ 4(gg)–(hh). Exhibit J6.

### K. Summary of BofA Account Disbursements.

In sum, the evidence established that between the date the account opened on February 5, 2019 to February 11, 2019 a total of $10,524,031.41 was disbursed from

the BofA Account. Defendant was the sole signatory on this account during this period. Of this amount, Defendant expressly authorized withdrawals, interbank transfers and cashier's checks in a total amount of $9,689,694.44. Joseph was added to the BofA Account signature card on February 11, 2019[3] and on that same day Defendant personally signed for an additional $180,000.00 in withdrawals:

| Transaction Date | Amount | Transaction Type | Exhibit Reference | Defendant's Role |
|---|---|---|---|---|
| 2/6/2019 | $375.00 | Legal Order | **J5**, Feb. Stmt. | Sole Signatory |
| 2/6/2019 | $125.00 | Legal Order Fee | **J5**, Feb. Stmt. | Sole Signatory |
| 2/7/2019 | $178,277.71 | Legal Order | **J5**, Feb. Stmt. | Sole Signatory |
| 2/7/2019 | $4,250,000.00 | AZ TLR transfer to CHK 9238 | **J5**, Feb. Stmt. **J42**, Email indicating BofA account ending 9238 is William Noble Rare Jewelers Account | Authorized by Defendant at BofA Branch |
| 2/7/2019 | $150,000.00 | AZ TLR transfer to CHK 4272 | **J5**, Feb. Stmt. **J42**, Email indicating BofA account ending 4272 is Ryan & Rodney Diamonds, Inc. | Authorized by Defendant at BofA Branch |
| 2/7/2019 | $117,000.00 | AZ TLR transfer to CHK 9238 | **J5**, Feb. Stmt. **J42** | Authorized by Defendant at BofA Branch |
| 2/7/2019 | $4,041,925.00 (see detail below regarding recipients) | Customer Withdrawal | **J5**, Feb. Stmt. **J2**, W/Drawal slips signed by Defendant **J3,** Itemization of cashiers checks of $4,041,925.00 | W/Drawal Slip Signer |

---

[3] The record is not clear as to whether the February 11, 2019 signature card that added Joseph was accepted by Bank of America.

| Transaction Date | Amount | Transaction Type | Exhibit Reference | Role |
|---|---|---|---|---|
| | $1,091,769.44 (see detail below regarding recipients) | Customer Withdrawal | **J5**, Feb. Stmt. **J2**, W/Drawal slips signed by Defendant **J3,** Itemization of cashiers checks of $1,091,769.44 | W/Drawal Slip Signer |
| 2/7/2019 | $39,000.00 | Customer Withdrawal | **J5**, Feb. Stmt. **J2**, W/Drawal slips signed by Defendant **J44,** Email indicating payment of $39,000 to Paul Haig | W/Drawal Slip Signer |
| 2/8/2019 | $651,169.26 | Legal Order | **J5**, Feb. Stmt. | Sole Signatory |
| 2/8/2019 | $4,290.00 | Wire Out | **J5**, Feb. Stmt. | Sole Signatory |
| 2/8/2019 | $100.00 | MI TLR transfer | **J5**, Feb. Stmt. | Sole Signatory |
| 2/11/2019 | | Date of Joseph's Signature Card | **J4**, Signature Cards | |
| 2/11/2019 | $180,000.00 (see detail below regarding recipients) | Check | **J5**, Feb. Stmt. **J3,** Itemization of cashiers checks of $180,000.00 | W/Drawal Slip Signer |

The following charts identify each of the fifteen (15) recipients to whom Defendant authorized payments from the BofA account while she was the sole authorized signer on that Account, none being related in any way to the purchase of The Yellow Rose:

**2/7/2019 $4,041,925.00 Recipients:**

| Payee | Amount | Trial Exhibit |
|---|---|---|
| 1. Gene R. Kazlow dba Kazlow & Kazlow IOLA [sic] Account | $450,000.00 | **J3** |
| 2. Aron Resources | $236,450.00 | **J3** |
| 3. Canadian Gemological Association | $1,500.00 | **J3** |

| Payee | Amount | Trial Exhibit |
|---|---|---|
| 4. Abbott's Corporation | $1,104,750.00 | **J3** |
| 5. KWIAT | $204,225.00 | **J3** |
| 6. Diamond Opportunities | $33,500.00 | **J3** |
| 7. John Ragard | $848,500.00 | **J3** |
| 8. JB International | $678,000.00 | **J3** |
| 9. Peter Indorf | $1,500.00 | **J3** |
| 10. Merrillwood Collection | $6,000.00 | **J3** |
| 11. FEI | $277,500.00 | **J3** |
| 12. Howard S. Derman | $200,000.00 | **J3** |

**2/7/2019 $1,091,769.44 Recipients:**

| Payee | Amount | Trial Exhibit |
|---|---|---|
| 13. David L. Husman | $1,091,769.44 | **J3** |

**2/11/2019 $180,000.00 Recipients:**

| Payee | Amount | Trial Exhibit |
|---|---|---|
| 14. Marcella G. Rabinovich, PLLC Attorney Trust Account | $90,000.00 | **J3** |
| 15. Joseph DuMouchelle Fine & Estate Jewellers, LLC | $90,000.00 | **J3** |

## ARGUMENT

**I.  NONDISCHARGEABILITY UNDER §§ 523(a)(2)(A), (a)(4), AND (a)(6).**

**A. Section 523(a)(2)(A): False Pretenses, False Representation, and Actual Fraud.**

Section 523(a)(2)(A) excepts from discharge any debt for money obtained by false pretenses, a false representation, or actual fraud. JFPTO, Stipulated Law ¶¶ B–C. Plaintiff must prove the debt was obtained through at least one of three alternative theories: (a) false pretenses – an implied misrepresentation or conduct intended to

20

create or foster a false impression, JFPTO, Stipulated Law ¶ D; *Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300 (Bankr. E.D. Mich. 2017); (b) false representation – an express representation the Debtor knew was false or made with gross recklessness, with intent to deceive, upon which the creditor justifiably relied, and which proximately caused the loss, JFPTO, Stipulated Law ¶ E; *Rembert v. AT&T Universal Card Servs., Inc.*, 141 F.3d 277, 280-81 (6th Cir. 1998); or (c) actual fraud – a fraud involving moral turpitude or intentional wrong, JFPTO, Stipulated Law ¶ F; *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Plaintiff must establish justifiable – but not objectively reasonable – reliance. JFPTO, Stipulated Law ¶ G; *Field v. Mans*, 516 U.S. 59, 73-75 (1995). Plaintiff bears the burden of proof by a preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan v. Garner*, 498 U.S. 279 (1991).

### 1. False Pretenses.

Defendant's conduct establishes false pretenses – it was designed to foster Plaintiff's false impression that he was tendering $12 million as part of a legitimate transaction to purchase The Yellow Rose in order to resell it at a profit. However, no real opportunity ever existed – The Yellow Rose was simply a ruse to obtain Plaintiff's money. False pretenses "has also been described as 'usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction.'"

*Lansden v. Jones (In re Jones)*, 585 B.R. 465, 505–06 (Bankr. E.D. Tenn. 2018) (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990)). See also *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 18–19 (Bankr. D. Mass. 2014). Defendant was a critical component in the fraudulent scheme – but for her involvement, the fraud would never have occurred. Defendant called Plaintiff in January 2019 and confirmed that The Yellow Rose could be purchased for $12 million and resold for $16 million to $20 million. She sent the Data Package Email from her credentialed professional email address, attaching a 2011 appraisal reflecting an insurance replacement value of $30 million and the GIA Monograph, and thereafter affirmed the resale value in a follow-up message. These representations, cloaked with the long family history of loyalty and trust between Defendant's father and Plaintiff, created a shroud of legitimacy that induced Plaintiff to wire $12 million. In reality, there was no opportunity to buy and sell The Yellow Rose, it was never purchased, and Defendant participated in and enabled the disbursement of Plaintiff's funds knowing that his money had been wired for a different purpose. This is a textbook example of "false pretenses."

### 2. False Representation.

There is no dispute that the Yellow Rose Transaction was a sham and fraud. Defendant never offered a scintilla of evidence to demonstrate how or why she could have considered it anything other than a sham. A representation is "reckless" if it is

22

made without any knowledge of the truth, or if the person making it knows that she does not have sufficient information or a basis to support it. *Fleming v. Gordon (In re Gordon)*, 491 B.R. 691, 701 (Bankr. D. Md. 2013).

Defendant's representations amount to false representations because they were made with gross recklessness and disregard for the truth. Defendant held herself out as a credentialed gemologist upon whom Plaintiff relied, yet by her own account she took no steps to verify that DuMouchelle Jewellers held or could acquire The Yellow Rose, or that the transaction was legitimate or had any prospect of success. When confronted with the overwhelming evidence of her direct participation in the fraudulent scheme, Defendant's mantra was that she "trusted Joe" – a confession of reckless indifference to the truth of every representation she made. This assertion rang particularly hollow regarding Defendant's conduct on February 7, 2019 and her blind ambivalence to even the most basic inquiry about the incredible events taking place that day – including her multiple trips to the Bank of America branch in Tucson and inaccurate story about the GIA gala that was actually the day before. That reckless disregard, combined with the falsity of the representations and Plaintiff's resulting $12 million loss, satisfies the false representation element of § 523(a)(2)(A).

Defendant's claimed reliance on Joseph is not a defense; it is an aggravating factor. The "trusted Joe" defense, taken to its logical conclusion, would immunize

any debtor who participates in a fraud so long as she can point to a co-conspirator. That is not the law. Defendant's professional credentials, her exclusive control over the BofA Account, and the sheer magnitude of the disbursements she authorized render her claimed reliance on Joseph objectively unreasonable and legally insufficient as a defense.

### 3. Actual Fraud.

Defendant's conduct constitutes actual fraud. Actual fraud encompasses any fraud involving moral turpitude or intentional wrong, including fraudulent schemes that do not require a direct false statement to the creditor. *Husky*, 578 U.S. at 360; JFPTO, Stipulated Law ¶ F. "Actual fraud" within the meaning of § 523(a)(2)(A) "'encompasses 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). The focus is whether the debtor knowingly participated in a scheme to defraud, not whether she made a representation directly to the plaintiff.

### 4. Fraudulent Intent and Totality of the Circumstances.

Defendant's fraudulent intent is established by the totality of the circumstances. "'[T]he court may infer fraudulent intent from the totality of the circumstances.'" *Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431, 445 (B.A.P. 1st Cir.

2017). Moreover, "'[s]ubsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made.'" *Palmacci v. Umpierrez*, 121 F.3d 781, 792 (1st Cir. 1997); see also *Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 855 (Bankr. N.D. Ohio 2002). Defendant knew the material terms of the Yellow Rose Purchase Agreement, having discussed the $12 million purchase directly with Plaintiff and even advising him that the resale at $16 million to $20 million was reasonable. Defendant also admitted to reading the Yellow Rose Purchase Agreement to her son. Defendant knew that she was opening the BofA Account to receive Plaintiff's $12 million which was wired the next day. She was the sole authorized signer on the BofA Account when Plaintiff's money reached the account and, within one day, authorized or permitted $10,524,031.41 in disbursements to parties having nothing to do with The Yellow Rose. *See* Statement of Facts, Sec. I., p. 19-20 *supra*. Defendant never took steps to investigate the success of the transaction and never spoke to Plaintiff after his wire arrived. The Gelov telephone call, read together with Defendant's awareness of DuMouchelle Jewellers' financial distress and the BofA Account balance, reveals her knowing and intentional participation in the fraudulent scheme.

Defendant never took steps to investigate the success of the Yellow Rose Transaction and never spoke to Plaintiff again once his $12 million reached the BofA

25

Account, and she never responded to the four emails Plaintiff sent after he learned he had been defrauded. It is clear from the record that the actual fraud and resulting injury were inflicted upon Plaintiff in February of 2019, and the Defendant's conduct before, during and after that time confirm her knowing participation in the fraud. Reckless disregard for the truth, combined with the magnitude of the resultant misrepresentation, can infer an intent to deceive. *Rimal v. Gunawan Kuntho Wibisono (In re Gunawan Kuntho Wibisono)*, 412 B.R. 747, 756 (Bankr. D. Md. 2009)*; Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996).

### 5. Justifiable Reliance.

Plaintiff's reliance on Defendant's representations was justifiable. Plaintiff testified that he would not have entered into the Yellow Rose Transaction without the confirmatory opinion and blessing from Defendant. Plaintiff had known Defendant for decades – their siblings were married, Plaintiff was best friends with Defendant's father, and she had worked in his brothers' jewelry store. Defendant held herself out as a master gemologist, auctioneer, and appraiser, and it was specifically her expertise and their family ties that led Plaintiff to request Defendant's verification of the sham transaction – which she knowingly gave. Plaintiff testified that without Defendant's blessing he would not have entered into the Yellow Rose Transaction. ECF No. 332/9:6–10:5. Reliance on the professional opinion of a credentialed expert with whom one shares a longstanding family

relationship is justifiable. JFPTO, Stipulated Law ¶ G; *Field v. Mans*, 516 U.S. at 73–75.

Defendant argues that because the Yellow Rose Purchase Agreement (Exhibit J10) was signed only by Plaintiff and Joseph, Plaintiff cannot have justifiably relied on Defendant. This argument fails for several reasons. First, the justifiable reliance inquiry under § 523(a)(2)(A) is not limited to representations made in a formal written agreement; it encompasses all representations made by the debtor that induced the creditor to part with his money. *Field v. Mans*, 516 U.S. at 73–75. Second, Defendant's representations preceded the execution of the Yellow Rose Purchase Agreement. Third, Plaintiff's January 31, 2019 email to both Defendant and Joseph attaching the executed Agreement expressly acknowledged Defendant's "skill and expertise in the gemology field" and offered her the opportunity to be added as a party – confirming that Plaintiff's reliance on Defendant was explicit and known to her at the time Plaintiff entered into the agreement. JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; ECF No. 332/97:6–97:19.

## B. Section 523(a)(4): Embezzlement.

Section 523(a)(4) excepts from discharge any debt for embezzlement or larceny. JFPTO, Stipulated Law ¶ H. To establish embezzlement, Plaintiff must prove (a) he entrusted property to the Debtor, (b) the Debtor appropriated the property for a use other than that for which it was entrusted, and (c) the

circumstances indicate fraud. JFPTO, Stipulated Law ¶ I; *Brady v. McAllister*, 101 F.3d at 1173. To establish larceny, Plaintiff must prove the fraudulent and wrongful taking of Plaintiff's property (a) without the owner's consent and (b) with intent to convert such property to the taker's use. JFPTO, Stipulated Law ¶ J; *Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630, 652 (Bankr. E.D.N.Y. 2020). Plaintiff bears the burden of proof by a preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan*, 498 U.S. 279.

The evidence satisfies each element of embezzlement, which requires establishing that "(1) [a claimant] 'entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Contemporary Imps., Inc. v. Morrow (In re Morrow)*, 563 B.R. 272, 280 (Bankr. E.D. Tenn. 2017); see also *Rice v. Morse (In re Morse)*, 524 B.R. 774, 793 (Bankr. E.D. Tenn. 2015); *Reyes v. Ranciato (In re Ranciato)*, 638 B.R. 275, 287 (Bankr. D. Conn. 2022). Plaintiff voluntarily wired $12 million for the specific purpose of purchasing The Yellow Rose into the BofA Account, which Defendant opened and controlled as sole authorized signer. Defendant admitted she knew the account's purpose was to receive Plaintiff's $12 million and that Plaintiff intended for his money to purchase The Yellow Rose. This knowing receipt of funds for a specific, limited purpose constitutes entrustment within the meaning of § 523(a)(4).

Defendant appropriated Plaintiff's funds for unauthorized uses. On February 7, 2019, Defendant made two trips to the bank to sign counter withdrawal slips totaling approximately $5.1 million and to authorize interbank transfers totaling approximately $4.5 million. None of these disbursements went to the seller of The Yellow Rose. On February 11, 2019, Defendant signed a counter withdrawal slip for $180,000 in Florida, resulting in two $90,000 cashier's checks payable to unrelated parties. No evidence was submitted indicating that the opportunity to purchase The Yellow Rose ever existed.

The circumstances indicate fraud. The transactions have been adjudicated as criminal wire fraud as to Joseph – which included criminal acts that were actually committed by the Defendant. Defendant hastily caused millions of dollars in disbursements within one day of receipt and never explained why she was the one directing the disbursements in the first place, why she was in such a rush, or why she returned to the bank twice in a single day. She was the sole signatory when Plaintiff's money entered and nearly all of it exited the BofA Account, yet she never inquired about the account balance before authorizing the disbursements. After disbursing millions of Plaintiff's money, she never followed up on the status of the Yellow Rose Transaction.

**C. Section 523(a)(6): Willful and Malicious Injury.**

Section 523(a)(6) excepts from discharge any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. JFPTO, Stipulated Law ¶ K. This provision requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); see also *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). To establish willful injury, Plaintiff must prove the Debtor acted (a) with the intent to cause injury or (b) with the belief that injury was substantially certain to result. JFPTO, Stipulated Law ¶ L; *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 583 (6th Cir. 2001); see also *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 511 (Bankr. N.D. Ill. 2002). To establish malice, Plaintiff must prove the Debtor's actions were taken (a) in conscious disregard of one's duties or (b) without just cause or excuse. JFPTO, Stipulated Law ¶ M; *Initial Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710, 721 (Bankr. E.D. Mich. 2016).

A defendant's knowledge may be inferred from experience in business, the concealment of material facts, and having knowledge of the underlying *intended* terms of the transaction. *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (N.D. Ill. 1983). Plaintiff must also prove that the willful and malicious conduct caused the injury. JFPTO, Stipulated Law ¶ N; *Buzzard v. Ratliff (In re Ratliff)*, 673 B.R. 719,

738 (Bankr. S.D. Ohio 2025). Plaintiff bears the burden of proof by a preponderance of the evidence. JFPTO, Stipulated Law ¶ Q; *Grogan*, 498 U.S. at 291.

**Willful Injury.** Defendant acted with subjective belief that injury to Plaintiff was substantially certain. She knew the BofA Account held Plaintiff's $12 million, that the opening balance was approximately $500, and that Plaintiff's funds were intended for the purchase of The Yellow Rose. Notwithstanding, she expressly authorized disbursements of at least $9,869,694.44 and was the sole account signer when disbursements totaling $10,524,031.41 were made to unrelated parties within days of Plaintiff's wire. Any person who authorizes the disbursement of nearly $10 million from an account containing $12 million of another person's money to parties having nothing to do with the stated purpose – without verifying the sufficiency of funds – acts with subjective belief that injury is substantially certain. That is, the "injury" is that Plaintiff will lose his money. Defendant confirmed she never inquired about the available funds while at a Bank of America branch, twice in a single day, as the sole signatory – indicating willful disregard of her basic duties as holder of Plaintiff's money designated for a specific purpose.

**Malicious Injury.** Again, the expected "injury" was that Plaintiff would lose his money if spent for unauthorized purposes. Defendant's conduct was malicious because it was intentional, wrongful, and done without justification or excuse. She personally signed the counter withdrawal slips and authorized the interbank

transfers, diverting funds she knew were intended for a specific purpose to unrelated third parties. Her explanation – that she trusted Joseph and was acting in the ordinary course of business – is not a legal justification for disbursing another person's $12 million to unrelated creditors. Defendant's conscious disregard of her obligation to use Plaintiff's funds only for their intended purpose satisfies the malice requirement. The malice standard under § 523(a)(6) does not require ill will or spite; it requires only that the debtor act in conscious disregard of one's duties without just cause or excuse. Defendant knew the funds were Plaintiff's, knew their purpose, and chose to disburse them to unrelated parties without any legitimate basis.

## II. DEFENDANT'S INCONSISTENT STATEMENTS AND CREDIBILITY.

Defendant's testimony lacks credibility and demonstrates fraudulent intent. The Court may discredit trial testimony where it conflicts with prior sworn statements. *Anderson v. Bessemer City*, 470 U.S. 564*; FTC v. Ettus (In re Ettus)*, 596 B.R. 405, 411 (Bankr. S.D. Fla. 2018)*; Rensin v. FTC*, 604 B.R. 917, 923–24 (S.D. Fla. 2019); *Velde v. Thiel (In re Thiel)*, 587 B.R. 92, 94-95 (B.A.P. 8th Cir. 2018). Defendant's prior inconsistent statements are indicative of her culpability:

- **The Yellow Rose**: Defendant denied knowledge of The Yellow Rose during her September 2019 deposition but acknowledged it in her September 2024 deposition. ECF No. 332/45:1–46:25; 47:1–48:5; ECF No. 328/105:1– 106:10; J29. Defendant initially blamed prior counsel for her false September 2019 testimony but later acknowledged she misunderstood counsel's instruction. ECF No. 329/60:16–19, 61:16–63:4. In other words, Defendant

either followed her prior counsel's advice to lie or chose on her own to lie during the September 2019 deposition.

- **Reading the Purchase Agreement**: Defendant testified at her September 2024 deposition and confirmed at trial that she read the Yellow Rose Purchase Agreement (Exhibit J10) to her son, but later retreated to uncertainty about whether J10 was the document she had actually read. ECF No. 328/99:3–6; ECF No. 329/79:15–80:14; JFPTO, Stipulated Facts ¶ 4(e).

- **GIA Conference Date**: Defendant testified her GIA conference was on February 7, 2019 to justify her hasty dissipation of over $9.6 million that day. Objective evidence established the conference occurred on February 6, 2019. ECF No. 328/112:1–113:14; J30; JFPTO, Stipulated Facts ¶ 4(y). When confronted, she claimed she misremembered. ECF No. 328/3:1–8:12.

- Defendant claimed she was in a rush on February 7, 2019 due to duress, but the only duress she identified was wanting to attend GIA conference events Joseph had "messed up" – events that occurred the prior day. She had no other explanation. ECF No. 332/158:15–159:5.

Defendant's failure to recall material facts further undermines her credibility.

Courts have found that selective memory lapses – particularly where a debtor recalls favorable details fluently but claims ignorance of unfavorable ones – indicate a lack of truthfulness. *Bold City VII, Ltd. v. Radcliffe,* 141 B.R. 1015, 1020 (Bankr. E.D. Ark. 1992). That pattern is precisely what the record reflects here.

Defendant claimed she could not recall the following material aspects of the Yellow Rose Transaction:

- **Opening the BofA Account**. Defendant could not recall why Joseph asked her to open the BofA Account or the details of the account-opening process. ECF No. 332/141:1–142:5.

- **The February 7, 2019 Bank Trips**. Despite traveling to the Bank of America Tucson branch twice in one day and signing counter withdrawal slips authorizing over $9.6 million in disbursements, Defendant could not recall what happened on her first trip, why she returned, or who directed the disbursement amounts. ECF No. 328/112:1–115:5; ECF No. 332/141:13–149:5.

- **Who Filled In the Disbursement Amounts.** When asked who inserted the dollar amounts on the counter withdrawal slips bearing her signature, Defendant testified: "I don't know. I don't remember this." ECF No. 332/29:1–12.

- **The Recipients of the Disbursements.** Defendant could not explain what any payee had to do with the Yellow Rose Transaction, including the $848,500 to her neighbor John Ragard or the transfer to William Noble Rare Jewels. ECF No. 328/68:1–69:10; ECF No. 328/112:1–113:14.

- **The February 11 Transactions.** When asked why she signed a $180,000 withdrawal slip in Florida on February 11, 2019, Defendant testified: "I do not recall" and "I have no recollection." ECF No. 328/62:1–63:13.

- **Whether The Yellow Rose Was Present After January 2019.** When asked whether she saw The Yellow Rose in the Birmingham office in February, March, or April 2019, Defendant answered: "I don't remember." ECF No. 328/79:17–20.

- **Plaintiff's Emails of May–July 2019.** Defendant claimed she did not recall receiving any of the four emails Plaintiff sent seeking information about his $12 million. ECF No. 328/29:1–30:18.

The weight of these claimed memory failures led the Court to ask whether Defendant had a medical condition impairing her memory; none was identified. ECF No. 328/26:11–17. The selective character of Defendant's memory – recall on favorable points, amnesia on unfavorable ones – is a litigation posture, and the Court should weigh it accordingly.

## III. JOSEPH'S FEDERAL CONVICTION AND DEFENDANT'S CORRESPONDING CONDUCT.

Joseph's Criminal Proceeding record provides compelling, independent confirmation of Defendant's knowing and active participation in the fraud.

**Joseph's Guilty Plea Rests on Defendant's Acts.** Joseph's guilty plea, Exhibit J34, states that "DuMouchelle withdrew the majority of the money and used it to pay his personal and business debts and expenses." Yet the trial record makes clear that it was ***Defendant*** who physically withdrew the money from the BofA Account on February 7, 2019 and on February 11, 2019. Joseph was not even an account signer when most of Plaintiff's money left the BofA Account. ECF No. 328/139:16–140:14; ECF No. 332/152:22–153:20. Joseph took the fall for Defendant's conduct.

**The Sophisticated Means Enhancement Was Also Based on Defendant's Conduct.** The sentencing enhancement opinion, Exhibit J25, applied a sophisticated means enhancement to Joseph's sentence. The recorded Gelov telephone call was among the evidence considered. ECF No. 328/147:1–148:5. In that call, Defendant was the primary speaker, discussing banking issues including ACH processing, wire transfers, and account management. ECF No. 332/67:1–71:25. The sophisticated means finding was driven in substantial part by Defendant's own words and conduct, demonstrating her involvement and knowledge of the DuMouchelle Parties' ongoing fraud against multiple victims.

35

## IV.   RESPONSES TO THE COURT'S POST-TRIAL QUESTIONS.

The following responses address the questions posed by the Court:

**1. Does anything in the record show that Defendant took out the roughly $2.4 million difference between the approximately $9.6 million disbursed on February 7, 2019 and the $12 million wired into the BofA Account?**

Between the date the account opened on February 5, 2019 to February 11, 2019 a total of $10,524,031 was disbursed from the BofA Account. Defendant was the sole signatory on this account during this period. Of this amount, Defendant expressly authorized withdrawals, interbank transfers and cashiers checks in a total amount of $9,689,694.44. Joseph was added to the BofA Account signature card on February 11, 2019[4] and on that same day Defendant personally signed for an additional $180,000.00 in withdrawals. *See* Statement of Facts, Sec. I., p. 19-20 *supra*. On February 12, 2019, the remaining balance was dissipated, leaving a balance of negative $60.00.[5] Whether Defendant or Joseph authorized the February 12, 2019 transactions is unknown.

---

[4] The record is not clear as to whether the February 11, 2019 signature card that added Joseph was accepted by Bank of America.

[5] There was an additional $854,500 deposited in the BofA Account from a "Counter Credit" on February 8, 2019 resulting in total deposits of $12,855.00 and by February 12, 2019, a total of $12,855,060 was disbursed from the BofA Account.

36

## 2. For the purposes of §523(a)(2)(A), what is the meaning of "obtained by" and does it include both Defendant's inbound and outbound conduct?

The Supreme Court adopted a broad interpretation of the meaning of "obtained by" that extends to the entire debt: "[t]he phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge." *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998).

**Inbound Conduct**: Defendants' representations to Plaintiff regarding the $12 million purchase and resale between $16 to $20 million induced him to send the $12 million wire that was the cornerstone of the fraud. Defendant opened the BofA Account on February 5, 2019 – to be the depository of that $12 million wire, the BofA Account being the very instrumentality through which the fraud was effectuated. But for Defendant's opening of the BofA Account, Joseph would not have been able to instruct Plaintiff to wire his funds to an account under Defendant's control. Defendant admitted she knew the purpose of the BofA Account was to receive Plaintiff's $12 million wire and knew Plaintiff's intent was to purchase The Yellow Rose. ECF No. 332/41; ECF No. 328/149:11–150:5. Although Joseph communicated the false wiring instructions, Defendant's conduct in inducing Plaintiff to send a $12 million wire and then opening and controlling the false-destination account – with knowledge that it was established to receive Plaintiff's

funds – was integral to the fraudulent scheme. Her inducing Plaintiff to send the $12 million wire and then her knowing creation of that account to receive the wire renders her a direct participant in the inbound-obtaining of Plaintiff's money.

**Outbound Conduct**: Between the date the account opened on February 5, 2019 to February 11, 2019 a total of $10,524,031 was disbursed from the BofA Account. Defendant was the sole signatory on this account during this period. Of this amount, Defendant expressly authorized withdrawals, interbank transfers and cashier's checks in a total amount of $9,689,694.44. Joseph was added to the BofA Account signature card on February 11, 2019,[6] and on that same day Defendant personally signed for an additional $180,000.00 in withdrawals. *See* Statement of Facts, Sec. I., p. 19-20 *supra*. None of these disbursements that Defendant signed for went to the intended seller. But for Defendant's obtaining of Plaintiff's $12 million, none of these outbound transfers could have occurred.

Defendant's role in the "obtaining" through fraud cannot be separated from Joseph's: it was the orchestrated coordination between them that allowed the fraud to occur and rendered Plaintiff's loss inevitable. Defendant, as the sole authorized signer on the BofA Account, effectively held the dustpan into which Joseph swept Plaintiff's $12 million. Rather than returning those funds, she disbursed them to

---

[6] The record is not clear as to whether the February 11, 2019 signature card that added Joseph was accepted by Bank of America.

unrelated third parties. The wrongful act from which nondischargeability should be calculated is encompassed in the entire coordinated scheme.

**3. Does "entrusted" mean that Plaintiff's funds have to be received by Defendant "in trust" to meet the "entrusted" element of embezzlement?**

Plaintiff's money did not have to be received in trust for § 523(a)(4) to apply. The statutory text of § 523(a)(4) excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The fiduciary-capacity requirement modifies only the "fraud or defalcation" prong. *Long v. Piercy (In re Piercy)*, 21 F.4th 909, 919; *Brady v. McAllister*, 101 F.3d at 1173.

"Entrustment" requires only that the creditor voluntarily delivered property to the debtor for a specific, limited purpose, and that the debtor received the property with knowledge of that purpose. *U.S. v. Young*, 955 F.2d 99, 103 (1st Cir. 1992); *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010). Defendant knew the purpose of receiving Plaintiff's money was to acquire The Yellow Rose, which constitutes entrustment within the meaning of § 523(a)(4).

**4. Were the January 25, 2019 telephone call and Defendant's sending of the data package the only contacts between Plaintiff and Defendant regarding The Yellow Rose or the Yellow Rose Transaction? What is the impact of any such contacts on the claims asserted.**

The January 25, 2019 telephone call, the Data Package Email, the exchange of messages between Plaintiff and Defendant, and Plaintiff's email to Defendant and Joseph with the Yellow Rose Purchase Agreement were all of the pre-transaction

communications between Plaintiff and Defendant. ECF No. 327/92:11–93:5; ECF No. 327/161:1–161:15; JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; ECF No. 332/97:6–97:19.

Each of these contacts, considered individually and cumulatively, created and fostered the false impression that the Yellow Rose Transaction was a legitimate investment opportunity upon which Plaintiff was entitled to rely. The Data Package Email was sent under Defendant's professional signature block, lending institutional credibility to the materials she transmitted. ECF No. 332/88:1–91:7. Plaintiff testified that he presumed the valuation attached to the Data Package Email was an appraisal confirming the values Defendant had discussed with him on the telephone. ECF No. 332/9:2–10:5. The Data Package Email reinforced the false impression created by the telephone call and provided documentary support for Defendant's representations.

The subsequent message exchange further established Plaintiff's belief that the transaction was possible. Plaintiff's January 31, 2019 email to both Defendant and Joseph attaching the executed Yellow Rose Purchase Agreement expressly acknowledged Defendant's "skill and expertise in the gemology field." JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; ECF No. 332/97:6–97:19. Notwithstanding Plaintiff's reliance, Defendant did not respond to correct any false impression, disclaim her role, or alert Plaintiff to any concerns.

**5. a. Whether Defendant's statements during the January 25, 2019 call or Data Package Email were false or misleading, and b. if so, how; and if not, whether false pretenses and false representation fall away, leaving only actual fraud under § 523(a)(2)(A).**

False pretenses under § 523(a)(2)(A) encompasses implied misrepresentations and conduct intended to create or foster a false impression. JFPTO, Stipulated Law ¶ D; *Lenchner v. Korn*, 567 B.R. at 300. A false representation can also be satisfied by a reckless representation – one made without knowledge of its truth or with reckless disregard for whether the person making it knows that she does not have sufficient information or a basis to support it. *Fleming v. Gordon*, 491 B.R. at 701; *Pa. Emples. Ben. Tr. Fund v. Brown (In re Brown)*, 591 B.R. 587, 595 (Bankr. M.D. Pa. 2018); *b. A. Lindsay Morrison, M.D., Inc. (In re Arm)*, 175 B.R. 349, 354 (B.A.P. 9th Cir. 1994). See Sec. I.A.2 *supra.*

Applying these standards, Defendant's statements during the January 25, 2019 call, Data Package Email and subsequent message exchange were each false and misleading. At the time these representations were made, The Yellow Rose had no prospect of being acquired by the DuMouchelle Parties: Bill Noble had terminated the consignment relationship on January 7, 2019, and filed suit against DuMouchelle Jewelers seeking over $7 million on January 9, 2019. Defendant introduced no evidence that she, Joseph, or DuMouchelle Jewelers had the right to buy or sell The Yellow Rose at any time or even attempted to obtain such rights. Accordingly, Defendant's affirmative representations that the transaction was available and viable

were false when made. Even if Defendant lacked actual knowledge of every detail, her representations were made with reckless disregard for the truth – she knew she lacked an adequate basis to affirm the transaction's legitimacy, yet she lent her professional credibility to it. That reckless indifference independently satisfies false representation standard of § 523(a)(2)(A). Thereafter remaining silent created and fostered the false impression that a legitimate investment opportunity existed, satisfying false pretenses. Thus, false pretenses and false representation do not fall away; both are established on these facts.

**6. Is Defendant's silence grounds for a false representation, and if so, whether there must first be a duty to disclose, what duty Defendant had, and what silence or failure to disclose Plaintiff relies upon.**

Silence can constitute a false representation where the debtor had a duty to disclose material information and failed to do so. *Redmond v. Finch (In re Finch)*, 289 B.R. 638, 643 (Bankr. S.D. Ohio 2003); *Muhammad v. Reed (In re Reed)*, 542 B.R. 808, 813 (Bankr. N.D. Ill. 2015). The duty to disclose and the duty to correct a false impression are both governed by Restatement (Second) of Torts § 551(2), which provides that one party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated:

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him.

Defendant had a duty to disclose arising from three independent sources. First, consistent with subsection (a), Defendant held herself out as a master gemologist, appraiser, and auctioneer, and Plaintiff specifically sought her professional opinion, giving rise to a duty to disclose material facts within her knowledge. Second, consistent with subsection (b), Defendant knew that Plaintiff's money was in the BofA Account to purchase The Yellow Rose and was in the best position to safeguard it, yet remained silent despite Plaintiff's desperate inquiry for answers. Third, consistent with subsection (d), Plaintiff's January 31, 2019 email attaching the executed Yellow Rose Purchase Agreement expressly acknowledged Defendant's "skill and expertise in the gemology field," putting Defendant on notice that Plaintiff was about to act in reliance upon her prior representations,

independently obligating her to correct any false impression. JFPTO, Stipulated Facts ¶ 4(g); Exhibit J11; ECF No. 332/97:6–97:19.

**7. Whether there is a duty to correct what would otherwise be a false impression, and if so, what is the false impression that Plaintiff relies upon as giving rise to Defendant's duty to correct.**

Yes. Under subsections (c) and (d) of the Restatement, § 551(2), a party who has made representations that were true or believed to be true when made has a duty to correct those representations when she subsequently acquires information rendering them untrue or misleading, or when she learns that the other party is about to act in reliance on them. *Hord v. Envtl. Research Inst.*, 463 Mich. 399, 406 (2000). Defendant's failure to correct Plaintiff's false impressions, and her complete failure to contact Plaintiff at any time after the disbursements, gives rise to liability under § 523(a)(2)(A) for false pretenses and false representation, in addition to actual fraud.

**8. Whether false pretenses requires proof of a misrepresentation or conduct intended to create a false impression; what misrepresentation or false impression Plaintiff relies upon; and whether false pretenses can stand absent any false statement by Defendant.**

False pretenses requires proof of an implied misrepresentation or conduct intended to create or foster a false impression. JFPTO, Stipulated Law ¶ D; *Lenchner v. Korn,* 567 B.R. at 300. False pretenses does not require an express false statement; it encompasses conduct that, taken as a whole, creates or fosters a false impression in the mind of the creditor. "'[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to

correct what would otherwise be a false impression. This is the basis of the "false pretenses" provision of Section 523(a)(2)(A).'" *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 18–19 (Bankr. D. Mass. 2014).

Here, even if each individual statement by Defendant were literally true at the time it was made, the totality of her conduct – endorsing the transaction, providing valuation materials under her professional credentials, opening the account to receive the funds, and disbursing the funds to unrelated parties without disclosure – created and fostered the false impression that the transaction was legitimate. Indeed, the Defendant's confirmation of the $12 million purchase price and the resale between $16 to $20 million was intended to, and did, create the false impression that Plaintiff was being offered the opportunity to participate in a lucrative and legitimate purchase and sale transaction. Defendant's intent can be derived from the totality of the circumstances, including her admission that she knew the purpose of the BofA Account was to receive Plaintiff's wire transfer of $12 million to purchase The Yellow Rose, her active role in the disbursement of those funds to multiple creditors having nothing to do with The Yellow Rose, her complete disregard for safeguarding those funds and then her total failure to thereafter communicate with the Plaintiff about this transaction in which she had played a key role.

**9. Whether Plaintiff is asserting that there was a misrepresentation as to whether DuMouchelle Jewellers had The Yellow Rose diamond to sell, and**

20-04381-lsg  Doc 351  Filed 07/17/26  Entered 07/17/26 16:52:25  Page 54 of 64

**if so, the impact of Exhibit J10, which contemplates that there would be work to purchase the diamond on behalf of Plaintiff.**

Defendant participated in creating the false impression that a legitimate transaction was possible. Exhibit J10 contemplated that Plaintiff's $12 million would be used to purchase The Yellow Rose, after which Joseph would resell it. The fraud is that after rendering a false impression of the ability to broker the Yellow Rose Transaction, Plaintiff's $12 million was never used to purchase The Yellow Rose at all. Instead, the funds were diverted into an account Defendant opened and controlled and were immediately disbursed to unrelated third parties.

**10. Whether there is any dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call regarding a transaction with the person she grew up with from North Dakota.**

There is no genuine dispute that Defendant was referencing Plaintiff in her statement during the March 7, 2019 recorded telephone call with Mr. Gelov regarding a transaction with "the person she grew up with from North Dakota." Plaintiff is from North Dakota. ECF No. 327/85:6–88:5. Defendant and Plaintiff have known each other since the 1970s when Defendant was a young girl. ECF No. 327/82:1–83:10. Defendant did not proffer any evidence to establish she was speaking about anybody else. ECF No. 332/67:1–71:25.

46

**11. How vicarious liability operates on these facts, which subsections of § 523(a) it applies to, whether it supervenes the elements of those provisions, and whether Plaintiff seeks both direct and vicarious liability.**

Plaintiff's primary theory of liability is direct liability based on Defendant's own conduct under §§ 523(a)(2)(A), (a)(4), and (a)(6). To the extent that Defendant's actions, considered in isolation from Joseph's, do not independently establish her participation in the fraud, Plaintiff alternatively seeks a finding of vicarious nondischargeable liability based on the combined acts of Defendant and Joseph. See *In re Holly Diane Bolling*, 600 B.R. 838, 849 (Bankr. D. Colo. 2019); *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703, 711 (B.A.P. 6th Cir. 2012); *Kim v. Sun (In re Sun)*, 535 B.R. 358, 362 (B.A.P. 10th Cir. 2015); *Gidelski v. Anton (In re Anton)*, Nos. 08-64144, 09-04344, 2013 Bankr. LEXIS 1715, at *1, 2013 WL 1747907, at *4 (Bankr. E.D. Mich. Apr. 12, 2013).

Should the Court reach vicarious liability, as vice president and ten-percent owner of DuMouchelle Jewellers, acting at Joseph's direction as the sole signatory on the BofA Account, Defendant was a co-participant in the fraudulent enterprise, and agency principles may impute Joseph's fraudulent intent to her under § 523(a)(2)(A). *Husky,* 578 U.S. 355. See *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989) (husband's fraudulent used-car sale imputable to wife because dealership license was in her name and her signature was required on business checks); *W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305, 307 (Bankr.

S.D. Fla. 1982) (wife had intent to deceive under § 523(a)(2)(B) because of her role as corporate secretary). Defendant's role as vice president and sole signatory is analogous to the corporate officers in *Smith* and *Medow*.

Under §523(a)(4), to the extent Defendant's own conduct does not independently satisfy the embezzlement standard, vicarious liability completes the chain. Defendant opened the BofA Account and, as its sole authorized signatory, possessed the account information necessary for Joseph to convey to Plaintiff in his misleading emails. Thus, Joseph had to have obtained the BofA Account wire information from Defendant. By furnishing Joseph with the BofA Account information, Defendant enabled the deception that induced Plaintiff to entrust his funds to what he reasonably believed was the seller's account.

Under §523(a)(6), without Defendant assisting Joseph by opening the BofA Account, none of Plaintiff's money could have been misappropriated. Joseph and Defendant willfully and maliciously made improper use of Plaintiff's $12 million because they each knew the funds were wired for the sole purpose of purchasing The Yellow Rose, yet proceeded – through their coordinated acts of opening the BofA Account, supplying the fraudulent wiring instructions, and executing disbursements to unrelated third parties – to divert those funds with the subjective certainty that Plaintiff would suffer the resulting loss. Under agency principles, Joseph's willful and malicious injury is imputable to Defendant.

**12.** **Whether there is a need to establish Defendant's fraudulent intent for actual fraud under § 523(a)(2)(A), and what role moral turpitude or intentional wrong plays under the *Husky* framework.**

Fraudulent intent must be established for actual fraud under § 523(a)(2)(A), but under *Husky*, Plaintiff does not have to establish that Defendant intended to make a false statement to the creditor. Rather, the Supreme Court held that "actual fraud" encompasses "any fraud that involves moral turpitude or intentional wrong," including fraudulent conveyance schemes and other forms of fraud that do not require a direct misrepresentation. *Husky,* 578 U.S. at 360; JFPTO, Stipulated Law ¶ F. Under the *actual fraud* prong of §523(a)(2)(A) the intent inquiry focuses on whether the debtor knowingly participated in a scheme to defraud the creditor. The role of "moral turpitude or intentional wrong" is to distinguish actual fraud from constructive fraud: actual fraud requires a showing of wrongful intent, whereas constructive fraud may arise from conduct that is technically wrongful but not intentionally deceptive. *Id.* at 359–60. Here, Defendant's fraudulent intent is established by her inconsistent statements, willful ignorance, and the totality of the circumstances surrounding the Yellow Rose Transaction.

**13.** **Whether Defendant's reliance on Joseph and Plaintiff's justified reliance on Defendant are connected or separate concepts, and whether the totality of circumstances analysis applies to § 523(a)(2)(A), (a)(4), (a)(6), or all, and whether it extends beyond intent.**

Defendant's lack of justification in relying on Joseph and Plaintiff's justification in relying on Defendant are separate and independent concepts. The

49

former goes to Defendant's state of mind and culpability; the latter goes to whether Plaintiff satisfied the reliance element of § 523(a)(2)(A). Defendant's reliance on Joseph is not a defense.

A debtor cannot escape nondischargeability by claiming she blindly followed the instructions of a co-conspirator. Defendant was the sole account signer when 90 percent of Plaintiff's $12 million was disbursed. She had exclusive control over the funds on the most critical days of the fraud. She could have refused to disburse the funds, inquired about the account balance, or contacted Plaintiff. Her choice to follow Joseph's instructions without question, while disbursing millions of dollars of another person's money, constitutes willful blindness, not justifiable reliance.

Defendant's willful ignorance of the account balance further supports fraudulent intent. Willful blindness does not provide a defense under § 523(a)(2)(A); it is instead a factor indicative of fraud. *Farmers & Merchs. State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226–27 (Bankr. N.D. Ohio 2011).

Defendant's willful ignorance of the most basic financial fact within her exclusive control confirms her fraudulent intent. Under the Supreme Court's two-part willful blindness test, a defendant must subjectively believe there is a high probability that a fact exists and must take deliberate actions to avoid learning of that fact. *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 52 (Bankr. D. Colo. 2014) (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

Willful blindness surpasses recklessness: the willfully blind defendant takes deliberate steps to avoid confirming a high probability of wrongdoing. *Id.* Both prongs are satisfied here. Defendant deliberately failed to inquire about the account balance – while physically present at a Bank of America branch, twice in a single day, as the sole authorized signer, with knowledge that the BofA Account existed to receive Plaintiff's $12 million – before directing the disbursement of millions of dollars of Plaintiff's money to unauthorized purposes. Her deliberate inaction in the face of that knowledge satisfies the subjective belief prong, and her failure to inquire despite two opportunities to do so satisfies the deliberate-avoidance prong.

14. **Intent versus knowledge: Whether intent is synonymous with knowledge, and what distinct intent standards apply under §§ 523(a)(2)(A), (a)(4), and (a)(6).**

Intent and knowledge are not synonymous, but they are closely related. Knowledge is a factual predicate from which the requisite intent may be inferred. A debtor who acts with knowledge of facts that make a particular outcome substantially certain may be found to have intended that outcome, even absent direct evidence of subjective desire. The distinct intent standards under each provision are as follows.

Under § 523(a)(2)(A), knowledge and intent are distinct elements requiring that "at the time the representation was made, the debtor knew it was false; [and] the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor." *Islamov v. Ungar (In re Ungar)*, 429 B.R. 668,

673 (B.A.P. 8th Cir. 2010). Since fraudulent intent is typically inferred from the totality of the circumstances, the debtor's knowledge of material facts or recklessness regarding material facts may be considered in determining intent. *Bd. of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838, 862 (Bankr. N.D. Ill. 2018).

Under § 523(a)(4), the intent requirement for embezzlement is fraud in fact – moral turpitude or intentional wrong – rather than implied or constructive fraud. *Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986)). Embezzlement involves the knowing use of entrusted property for an unauthorized purpose; where a debtor uses entrusted funds with knowledge that such use is unauthorized, such knowing misuse is indicative of fraudulent intent. *Me. Cir. Breaker, Inc. v. Burnham (In re Burnham)*, 2021 Bankr. LEXIS 3497, at *20, 2021 Bankr. WL 6101676, at *6 (Bankr. D. Me. Dec. 23, 2021).

Under § 523(a)(6), the intent requirement is the intent to cause injury or the subjective belief that injury is substantially certain to result. JFPTO, Stipulated Law ¶ L. This is the most demanding intent standard of the three provisions because it requires proof that the debtor intended the injury itself, not merely the act that caused the injury. *Kawaauhau*, 523 U.S. at 61. Subjective belief may be gleaned from objective factors and circumstantial evidence establishing what the debtor must have actually known at the time of the wrongful act.

Defendant's knowledge satisfies the intent requirements under all three provisions. She knew the BofA Account's purpose was to receive Plaintiff's $12 million, knew the opening balance was approximately $500, and knew Plaintiff's funds were intended for the purchase of The Yellow Rose. Notwithstanding, she expressly authorized at least $9.6 million in disbursements to non-seller third parties within one day (and an additional $180,000 several days later), without verifying the account balance. Under § 523(a)(2)(A), this knowledge supports an inference of fraudulent intent. Under § 523(a)(4), it establishes the knowing use of entrusted funds for an unauthorized purpose. Under § 523(a)(6), it establishes the subjective belief that injury to Plaintiff was substantially certain.

## V.  REQUESTED FINDINGS AND CONCLUSIONS

Based on the foregoing, Plaintiff respectfully requests that the Court enter the following findings of fact and conclusions of law:

**Section 523(a)(2)(A) — False Pretenses, False Representation, and Actual Fraud:** Defendant's actions constitute false pretenses, false representations and actual fraud within the meaning of Section 523(a)(2)(A). Defendant's conduct created and fostered a false impression of a legitimate transaction through representations made as a credentialed gemologist and family friend upon whom Plaintiff justifiably relied, with at least gross recklessness and/or intentional disregard for the truth, and was a principal factor leading to Plaintiff's loss of his

$12 million. The facts further show that Defendant knowingly and actively participated in a fraudulent scheme perpetrated by the Defendant and her husband to defraud Plaintiff of $12 million, including the express and implied representations made by the Defendant to induce his participation in the sham purchase, and through her actions involving the BofA Account, including opening that account for the purpose of receiving Plaintiff's $12 million wire for a specific purpose, and then her disbursement of the funds in that account to unrelated parties without the knowledge or approval of the Plaintiff, and contrary to the intended purpose of Plaintiff's deposit of those funds. But for Defendant's involvement, Plaintiff would not have lost his $12 million.

**Section 523(a)(4) embezzlement:** Defendant's actions indicate that she committed embezzlement within the meaning of Section 523(a)(4) resulting in the Plaintiff's loss of $12 million. Plaintiff entrusted his $12 million to Defendant for a specific, limited purpose of which she was aware, and Defendant appropriated those funds for unauthorized uses under circumstances indicating fraud.

**Section 523(a)(6) willful and malicious injury:** Defendant acted with subjective belief that injury to Plaintiff through the loss of his $12 million was substantially certain. Defendant's conduct was intentional, wrongful, and without justification. She disbursed funds she knew were designated for a specific purpose

to unrelated parties without inquiry or disclosure, directly causing Plaintiff's injury

through the loss of his funds.

Respectfully submitted,

dated: July 15, 2026

**TAFT STETTINIUS & HOLLISTER, LLP**

/s/Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
R. Christopher Cataldo (P39353)
Jay L. Welford (P34471)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
ccataldo@taftlaw.com
jwelford@taftlaw.com

*Counsel to Plaintiff, Thomas T. Ritter*

55