**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

JOSEPH DuMOUCHELLE and
MELINDA J. ADDUCCI,
Debtors.

Case No. 19-54531
Chapter 7
Hon. Lisa S. Gretchko

_______________________________/

THOMAS RITTER,
Plaintiff,

Adv. Pro. No. 20-04381-lsg
Hon. Lisa S. Gretchko

v.

MELINDA J. ADDUCCI,
Defendant.

_____________________________________/

# **OPINION**

## ***Introduction***

Melinda Adducci ("Adducci") and Joseph DuMouchelle ("DuMouchelle") are the Debtors in this Chapter 7 bankruptcy case. Thomas Ritter ("Ritter") filed this adversary proceeding against them in 2020, seeking a determination of non-dischargeability under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

Adducci is the sole remaining defendant in this adversary proceeding. [1]

[1] On May 12, 2023, a stipulation among Adducci, DuMouchelle, and the United States Trustee was filed in the Debtors' lead bankruptcy case (Case No. 19-54531, ECF No. 454) waiving DuMouchelle's Chapter 7 discharge. On May 15, 2023, the Court entered a stipulated order in the Debtors' lead bankruptcy case (Case No. 19-

After a four-day trial, Ritter and Adducci each filed a post-trial brief and a reply brief. The Court has reviewed the Joint Final Pretrial Order,[2] the pretrial briefs, the trial testimony, the transcript of the four-day trial, the exhibits admitted during the trial, and the parties' post-trial briefs. After carefully reviewing and weighing all of the evidence in the record, the Court concludes that Ritter is entitled to a judgment against Adducci determining that $12 million of the $17,140,031.62 North Dakota Judgment (defined below in this Opinion) is nondischargeable under 11 U.S.C. § 523(a)(2)(A), and that $5,322,694.44 of that $12 million is also nondischargeable under 11 U.S.C. § 523(a)(6). The Court also concludes that Adducci is entitled to a judgment of no cause of action against Ritter under 11 U.S.C. § 523(a)(4). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## ***Jurisdiction***

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), and E.D. Mich. LR 83.50(a). This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

---

54531, ECF No. 455) denying DuMouchelle's Chapter 7 discharge. On July 17, 2023, the Court issued an opinion and order in this adversary proceeding determining that it is moot as to DuMouchelle due to his waiver of his Chapter 7 discharge, and dismissing him from this adversary proceeding due to lack of subject matter jurisdiction.

[2] ECF No. 299.

## ***Background Facts***

Adducci and DuMouchelle have been married since 1999. At all times pertinent to this adversary proceeding: (i) they were the only members of Joseph DuMouchelle Fine & Estate Jewellers, L.L.C. ("LLC"), (ii) DuMouchelle held a ninety percent interest in the LLC and the title of president, (iii) Adducci held a ten percent interest in the LLC and the title of vice president, and (iv) Adducci held herself out as a "Graduate Gemologist Appraiser-Auctioneer." Indeed, those words appeared on her email signature block.

Ritter is from Williston, North Dakota. He has college degrees in natural sciences and pharmacy and has worked as a "landman"/businessman. Adducci grew up in Williston, North Dakota; her father and Ritter were close friends from the 1970s until 2008 when Adducci's father died. Adducci worked at the jewelry business of Ritter's two brothers when she was a teenager. Ritter's sister is married to Adducci's brother; Adducci maintains a close relationship with this sister-in-law.

Ritter and Adducci acknowledge these family connections. However, since the 2008 death of Adducci's father, Ritter and Adducci have not often seen or spoken to one another.

***Ritter's Prior Loans***

In approximately 2014, DuMouchelle and Adducci approached Ritter about some "jewelry flipping" investment transactions (i.e., purchasing jewelry to resell,

then splitting the profits). Ritter lent money to DuMouchelle and Adducci to fund the jewelry acquisitions for some of those "jewelry flipping" transactions. Some of those loans were repaid; however, others were not.

***The Yellow Rose***

In approximately September 2018, the LLC received (in its Birmingham, Michigan office) a 77.12-carat yellow diamond ring coined "The Yellow Rose." The Yellow Rose was sent to the LLC by William Noble or his company, William Noble Rare Jewels, L.P. (collectively, "Noble"). Adducci was not present at the LLC's office when The Yellow Rose arrived. However, she came to the LLC's Birmingham, Michigan office in approximately November 2018, and photos were taken (in the LLC's office) of Adducci holding and modeling The Yellow Rose. The parties stipulated to the admission of Exhibit J-29; it shows photos of The Yellow Rose in Adducci's hand and on Adducci's finger in an office setting. Adducci testified that The Yellow Rose was a rare, large stone and it was beautiful.

In late 2018, DuMouchelle "pitched" a deal to Ritter for the "purchase and resale" of The Yellow Rose. DuMouchelle told him that: (i) The Yellow Rose could be purchased for approximately $12 million and sold for $16-$20 million, and (ii) this proposed transaction would pay the outstanding loan(s) owed to Ritter and generate a significant profit for both Ritter and DuMouchelle.

In December 2018, the LLC sent The Yellow Rose back to Noble, because Noble wanted to show it to someone.

***Ritter's January 25, 2019 Telephone Call with Adducci Regarding The Yellow Rose***

Knowing that DuMouchelle's wife, Adducci, was an expert gemologist and appraiser, Ritter wanted to know what Adducci thought of The Yellow Rose and its value as an investment opportunity before he agreed to participate in DuMouchelle's "pitch" to purchase The Yellow Rose for $12 million and sell it for $16-$20 million. Ritter wanted her to verify that The Yellow Rose was the "real deal." Adducci testified that she was an expert in the valuation of diamonds and that she held herself out professionally as such, and that she knew that Ritter wanted her opinion of The Yellow Rose.

Although Adducci held herself out as a Graduate Gemologist and Appraiser, she refused DuMouchelle's request that she appraise The Yellow Rose, and testified that it would be a conflict of interest for her to do so because "she was too close to the scenario." [3]

On January 25, 2019, Adducci and Ritter had a telephone conversation about The Yellow Rose. Adducci testified that she knew Ritter wanted to ask her questions about The Yellow Rose and that she told him it was nice, but did not discuss its

[3] Trial Tr., ECF No. 332, at 27-28.

value. However, Adducci's post-trial brief admits that, during this call, she "described a genuine 77.12-carat fancy vivid yellow diamond she had personally examined and expressed the view that it was a good investment."[4]

Ritter testified that during this telephone conversation: (i) Adducci said that she had seen The Yellow Rose in the LLC's office, and she described it in detail and confirmed that it was a substantial gemstone, and (ii) Ritter asked Adducci to confirm what DuMouchelle had proposed, namely that The Yellow Rose could be purchased for $12 million and sold for $16-$20 million.

Ritter testified that Adducci confirmed those figures; had she declined to do so, he would not have proceeded with a transaction regarding The Yellow Rose ("Yellow Rose Transaction") because he didn't know DuMouchelle very well.

***Adducci Sends the Data Package to Ritter***

After Ritter and Adducci spoke on January 25, 2019, Adducci sent Ritter an email that same day attaching a data package with information regarding The Yellow Rose ("Data Package Email"; Exhibit J-9). Adducci's email stated:

> Hi Tom,
>
> Great talking with you. Attached are the photos and GIA monograph and comparables on Fancy vivid yellow diamonds.
> Hi to Carol!
>
> Lindy

[4] Def.'s Post-Trial Br., ECF No. 350, document page 12.

One page of the Data Package Email (ending in Bates No. 198) is dated January 31, 2011 (i.e., 8 years prior). It is unsigned and its author is not identified, but it contains a description of The Yellow Rose and recites an "Insurance Replacement Value" of $30,045,000.00. Adducci testified that she did not prepare that page and, in fact, that she did not appraise The Yellow Rose. Ritter testified that he thought this paper (dated 8 years prior) was an appraisal. Another page of the Data Package Email (ending in Bates No. 199) is titled "The Yellow Rose Addendum." Its author is not identified, and the page is undated (although the last full line mentions an auction of a different diamond in 2010). This page describes The Yellow Rose as "the second largest natural fancy vivid yellow Asscher cut diamond known to mankind," then recites the auction prices of other colored diamonds.

Most of the remaining pages within the Data Package Email are labeled "GIA MONOGRAPH/THE YELLOW ROSE" ("GIA Monograph") and the page ending in Bates No. 227 states, at the bottom, "©2011 Gemological Institute of America, Inc. All rights reserved." The GIA Monograph describes the color grading of The Yellow Rose, and its physical qualities as a diamond (inclusions, crystals, extra facets, etc.). The GIA Monograph does not state (or even estimate) the value of The Yellow Rose.

Ritter testified that after reviewing the Data Package Email, he called Adducci and left a message asking her to confirm the value of The Yellow Rose, and that it could be sold for $16-$20 million. Ritter further testified that Adducci replied with a message (voicemail or text) confirming the $16-$20 million resale value of The Yellow Rose. Ritter did not do any further "due diligence," because he trusted Adducci and, based on their family connections, "his guard was down."[5]

***The Yellow Rose Transaction***

Ritter and DuMouchelle worked on drafting the January 30, 2019 contract ("Contract") for the Yellow Rose Transaction. The Contract recited a $12 million purchase price for The Yellow Rose and recited DuMouchelle's estimated resale price "in the range of $16-$20 Million dollars." Ritter was to establish an escrow account at JP Morgan Chase, and then wire the $12 million from his bank into that escrow account. "[S]ubject to the terms of the escrow agreement between the parties being met," the $12 million was to be released to the seller (of The Yellow Rose) upon DuMouchelle's receipt of The Yellow Rose on Ritter's behalf.[6]

Adducci testified that she saw a draft of the Contract and was aware that it recited a $12 million purchase price for The Yellow Rose and that the $12 million was only supposed to be released to the seller of The Yellow Rose.

---

[5] Trial Tr., ECF No. 327, at 106:18-24.
[6] The escrow account was never created.

Adducci telephoned her son, Joey Adducci ("Joey"), and read him the draft of the Contract that she saw. Joey has knowledge of the oil industry and knows Ritter; he advised Adducci that Ritter sues everybody.

On January 31, 2019, Ritter sent an email (Exhibit J-11) to Adducci and DuMouchelle asking if Adducci's name should be added to the Contract; Ritter's email states:

> I was considering adding Lindy's name to the agreement but didn't know if you guys wanted it that way since in the past you chose not to..[sic] If you wish to have me correct that please let me know. It was not my intent to leave you out or lessen your part in this as I know your skill and expertise in the gemology field is at the top.

Adducci was not added as a party to the Contract; only Ritter and DuMouchelle signed the Contract.

***Ritter's Wire Transfers***

On January 31, 2019, DuMouchelle sent Ritter an email requesting funds to purchase The Yellow Rose and providing wiring instructions to the following account:

> MB Financial Bank
> Account Name: Highland Wealth Management
> Routing Number: 071001737
> Account Number: XXXXX79802
> ("MB Financial Bank Account")

The January 31, 2019 email represented that Highland Wealth Management was associated with the seller of The Yellow Rose. On February 1, 2019, Ritter initiated

a $12 million wire transfer to the MB Financial Bank Account. MB Financial Bank did not accept the wire transfer, and the funds were immediately returned to Ritter.

On February 1, 2019, DuMouchelle sent Ritter an email directing him to wire $12 million to the following account:

> FineMark Bank & Trust
> Account Name: Fine & Estate Appraisers, LLC
> Routing Number: 067016231
> Account Number: XXXXX46380
> ("FineMark Account")

On February 4, 2019, Ritter initiated a wire transfer to the FineMark Account. FineMark Bank & Trust did not accept the wire transfer, and the funds were returned to Ritter. The FineMark Account was not the bank account of the seller of The Yellow Rose.

Ritter testified that he was not disturbed by these two rejections of his $12 million wire transfer because he "sees this" in his business.

***Adducci Opens the LLC's Bank of America Account***

On February 5, 2019 (while at the Debtors' home in Sanibel, Florida), Adducci (at DuMouchelle's direction) opened the LLC's Bank of America Account ending in 0585 ("BofA Account") at a Bank of America branch in Sanibel, Florida. Adducci opened the BofA Account with $500.00.

Adducci testified that, when she opened the LLC's BofA Account, she knew that FineMark Bank & Trust had rejected Ritter's $12 million wire transfer

because DuMouchelle had told her. She also testified that, before she opened the BofA Account, she asked DuMouchelle why Ritter's $12 million wasn't being put in escrow. According to Adducci, DuMouchelle responded that Ritter wanted his money to flow to the LLC directly.

Adducci further testified that, when she opened the BofA Account, she knew she was opening it in the name of the LLC: (i) to receive Ritter's $12 million wire transfer to purchase The Yellow Rose, and (ii) because there were difficulties dealing with FineMark Bank & Trust. At trial, Ritter's counsel asked Adducci if she told DuMouchelle the BofA Account number when that account was opened. She testified: "I don't—it was a long time ago. I don't recall, but I would assume. I don't recall. I mean, I would assume I would have."[7]

***DuMouchelle Sends Ritter the LLC's BofA Account Information***

On February 6, 2019, DuMouchelle sent Ritter another email. DuMouchelle's February 6, 2019 email to Ritter purported to forward Richard Drucker's[8] email (allegedly dated February 4, 2019), containing wire transfer instructions. The parties

[7] Trial Tr., ECF No. 332, at 111:16-20.

[8] Adducci testified that Richard Drucker is a highly regarded person in the jewelry industry (and a good friend) who runs a company called Gem World International. Trial Tr., ECF No. 332, at 174-75.

stipulated to the admission of that email string as Exhibit J15. On the top of the page, it contains DuMouchelle's "email cover message" to Ritter:

Hi Tom,
The information is below.
Thank you.
Sincerely,
Joe.

The "information below" is the following email, purportedly from Richard Drucker, and purportedly dated February 4, 2019:

From: Richard Drucker <rdrucker@gemguide.com>
Sent: Monday, February 4, 2019 12:58 PM
To: Joseph DuMouchelle <Joe@JosephDumouchelle.com>
Subject: report

To Confirm the wiring information is below. Please confirm receipt.

**WIRE TRANSFER INFORMATION**
**Bank of America**
Routing # [redacted from trial exhibit J15][9]
Account # [ending in 0585, rest redacted from trial exhibit J15.]

Unbeknownst to Ritter, the foregoing wire transfer instructions were not for Richard Drucker or his company. Instead, they were for the LLC's BofA Account, which Adducci had opened on February 5, 2019.[10]

---

[9] In the Joint Final Pretrial Order, the parties stipulated that the Routing Number was 026009593.
[10] The February 4, 2019 date on Richard Drucker's alleged email to DuMouchelle highlights the fact that it is a complete fabrication, because Adducci did not open the BofA Account recited therein until February 5, 2019.

On February 6, 2019, Ritter wired $12 million to the BofA Account. DuMouchelle provided Ritter with a receipt dated February 6, 2019, purporting to evidence the purchase of The Yellow Rose.

The BofA Account was neither an escrow account nor an account belonging to the seller of The Yellow Rose. Instead, it was a general operating account of the LLC. Adducci opened the BofA Account on February 5, 2019 with $500.00. As of February 6, 2019, the only other money in that account was the $12 million from Ritter, and Adducci was the sole signatory on the account.

***Withdrawals from the LLC's BofA Account***

On February 5 or 6, 2019, Adducci flew from Sanibel, Florida to Tucson, Arizona to attend a gemology conference.

On February 7, 2019, while Adducci was still in Tucson, DuMouchelle directed her to go to a Tucson branch of Bank of America[11] to facilitate various withdrawals from the LLC's BofA Account, because there was a problem with his signature card on that account and, as of February 7, 2019, Adducci was still the sole signatory on that account.

[11] DuMouchelle sent Adducci to the Tucson branch of Bank of America twice on February 7, 2019; once in the morning and once in the afternoon (Arizona time). Adducci testified that, following the second trip, she left the bank branch with a stack of cashier's checks.

Adducci testified that DuMouchelle was on the phone with the banker on February 7, 2019, directing the issuance of funds out of the BofA Account. The parties stipulated to the admission of Exhibits J42-J43 which demonstrate that DuMouchelle copied Adducci on his emails to Bank of America naming some of the parties to be paid out of the $12 million from Ritter. Pursuant to those emails, Adducci saw that some of the $12 million from Ritter was being used to pay LLC creditors.

Joint Exhibits admitted at trial upon the stipulation of the parties show the following transfers out of the BofA Account on February 7, 2019, while Adducci was the only signatory on that account: (i) $4,517,000.00 in "Teller Transfers"[12] to LLC creditors who had accounts at Bank of America, including two Teller Transfers to Noble totaling $4,367,000.00 ($4,250,000.00 + $117,000.00) to Noble's Bank of America account ending in 9238, (ii) $39,000.00 to Paul Haig, and (iii) $5,133,694.44 in separate cashier's checks (in amounts varying from $1,500.00 to $1,091,769.44) to: Gene Kazlow, Aron Resources, Canadian Gemological Association, Abbott's Corporation, KWIAT, Diamond Opportunities, John Ragard, JB International, Peter Indorf, Merrillwood Collection, FEI, Howard Derman, and David Husman.

---

[12] Adducci admitted that these Teller Transfers would not have occurred if she had not authorized them. Trial Tr., ECF No. 332, at 167:16-25.

Adducci testified that she did not know why the Teller Transfers were made on February 7, 2019 (including the $4,367,000.00 to Noble), and she "didn't stop to ask."[13] She also testified that, at the time, she believed that Noble was the seller of The Yellow Rose[14] and she did not think that all of the payees on the cashier's checks had something to do with (i) The Yellow Rose, or (ii) the Yellow Rose Transaction. The payees on the cashier's checks were not the seller(s) of The Yellow Rose.

Adducci left the Tucson branch of Bank of America with a stack of cashier's checks and she immediately sent them via Federal Express to DuMouchelle, who was in Michigan.

The joint exhibits that were admitted at trial upon the stipulation of the parties demonstrate that $9,689,694.44 of the $12 million that Ritter wired to the BofA Account was transferred out of that account on February 7, 2019—at DuMouchelle's direction, but while Adducci was the sole signatory on the BofA Account. Adducci testified that she knew she had opened this account to receive $12 million from Ritter for the purchase of The Yellow Rose in connection with the Yellow Rose Transaction yet, the day after that wire transfer arrived (and while Adducci was the sole signatory on the account) she authorized the disbursement of more than $9.6 million of it.

[13] Trial Tr., ECF No. 332, at 153:18-22.
[14] Trial Tr., ECF No. 332, at 123:3-10.

Adducci testified that she didn't ask about the balance in the BofA Account, or whether money from other bank accounts had been moved into the BofA Account at the time she was authorizing the withdrawal of more than $9.6 million therefrom. She also testified that she didn't "think twice"[15] about disbursing more than $9.6 million of the $12 million from Ritter the day after it arrived and that she didn't ask DuMouchelle what was going on until *after* she had authorized the withdrawal of more than $9.6 million from the BofA Account.[16]

Adducci testified that she was very angry at DuMouchelle, her husband, for insisting that she make two unplanned trips to Bank of America in Tucson on February 7, 2019, because she really wanted to attend the high-end trade show, and an invitation-only dinner/event with colleagues. She acknowledged that she was "in a rush" to get out of the bank, and furious with her husband. She admitted that if she had not been "under duress" from DuMouchelle to authorize those withdrawals, and rushing to get to the invitation-only dinner/event, she could have asked questions.[17]

Adducci also testified that she did not call Ritter to explain what had happened to the $12 million because she did not perceive any "red flags." She trusted

---

[15] Trial Tr., ECF No. 330, at 45:21-46:15.
[16] Trial Tr., ECF No. 332, at 168:5-10.
[17] Trial Tr., ECF No. 332, at 158:14-23.

DuMouchelle, her husband of 20 years at that point and long-time business partner, and believed that the LLC was doing well financially at that point in time.

The evidence at trial confirmed that the Yellow Rose Transaction was never consummated and that the $12 million that Ritter had wired was completely spent by the end of February 2019, with more than $9.6 million of it spent within one day.

***DuMouchelle Tells Ritter The Yellow Rose has been Purchased***

DuMouchelle told Ritter that The Yellow Rose had been purchased, and that it was being transferred from a Brinks depository in Texas to a Brinks depository in Michigan. DuMouchelle also told Ritter that he (DuMouchelle) had sold The Yellow Rose on Ritter's behalf for $16.5 million. Yet, as of April 2019, Ritter had not received any money from that alleged sale. Ritter spoke to DuMouchelle several times, asking "where's the money"? According to Ritter, DuMouchelle made all sorts of excuses.

Ritter flew to Detroit on April 22, 2019, to see The Yellow Rose. DuMouchelle picked up Ritter at the airport. When Ritter asked to see Adducci, DuMouchelle replied that she was out on an appraisal. Ritter then asked to see The Yellow Rose. DuMouchelle went into another room, claimed to call the Brinks depository in Michigan, then came back to Ritter and reported that "his contact at the Brinks depository was out of town" so Ritter would not be able to see The Yellow Rose during his trip to Detroit that day. Ritter became increasingly suspicious.

While waiting at the Detroit airport to fly back to North Dakota, Ritter called the Brinks depository in Michigan to inquire whether it was holding a parcel under the name of "DuMouchelle" or "Ritter." The answer was "no."

Ritter called DuMouchelle the next day to report that Brinks did not have The Yellow Rose. DuMouchelle made some excuses, then promised to wire $2 million to Ritter. According to DuMouchelle, that $2 million was an "initial deposit" from the alleged purchaser of The Yellow Rose. Ritter became even more suspicious.

He never received the $2 million that DuMouchelle promised to send.

***DuMouchelle and Adducci Fail to Respond to Ritter's Requests for Information***

Ritter testified that he called and emailed Adducci many times and left messages expressing his anxiety; Adducci did not respond to any of his email or voicemail messages.

Ritter sent four emails to DuMouchelle and Adducci dated May 13, 2019, June 10, 2019, June 21, 2019, and July 2, 2019, asking about the status of The Yellow Rose Transaction, and inquiring as to why he had not received the $2 million that DuMouchelle promised following the April 22, 2019 meeting, or the rest of his money/proceeds from the Yellow Rose Transaction, or even a response to his prior emails. By stipulation of the parties, those emails were admitted as Exhibits J45-J48 at trial. Ritter testified that none of those emails "bounced back" as being undeliverable, yet neither DuMouchelle nor Adducci responded to any of them.

Adducci testified that she didn't recall seeing Ritter's four emails—which were sent to her at the LLC's email address—and that she didn't know when the LLC shut down. She also testified that DuMouchelle could have "done something" to block her from getting emails sent to her at the LLC's email address.

***Ritter Contacts Law Enforcement Authorities***

Ritter contacted the Detroit Police Department, which referred him to the FBI.

***Adducci's March 7, 2019 Telephone Call with Teodor Gelov***

During the same time-period of the Yellow Rose Transaction, the LLC was involved with Teodor Gelov ("Gelov").

On March 7, 2019—one month after Adducci disbursed more than $9.6 million of the $12 million wire transfer from Ritter the day after it arrived—there was a telephone call among DuMouchelle, Adducci, and Gelov ("Gelov Call"). The Gelov Call was recorded, and the recording was played during both Adducci's deposition in this adversary proceeding and during the trial. Adducci authenticated her voice on the recording.[18]

By the time of the Gelov Call, all of the $12 million that Ritter wired to the BofA Account had been spent. Yet, during the Gelov Call, Adducci "blamed the banks" in her attempt to explain to Gelov why the LLC was unable to immediately

[18] Excerpts of Adducci's video deposition were played at trial. The transcript of Adducci's deposition testimony (including the Gelov Call) was also admitted as Plaintiff's Exhibit P1 at trial.

repay sums owed to Gelov. She told Gelov that the banks "got rid of most of the diamond dealers …because they were under scrutiny for the Patriot Act."[19] She acknowledged to Gelov that money had been wired to Bank of America, but claimed that Bank of America was *holding* part of the wired funds. Although she did not mention "Ritter" by name during the Gelov Call, it is undisputed that she was describing to Gelov a transaction with Ritter. She used the word "we" several times in describing the transaction with Ritter, as follows:

> So that was just, like, mind blowing, I'm like--and then when this happened was the end of January, early February, is when they hit us with this. And **we** had worked on this sale for three to four months.[20] So **we** worked so hard on the sale, it went through, there were some other issues that went on with the person that was working with the item, which was also another sort of tangled--nothing to do with us, you know, but--you know, but **as far as the buyer, there was no issue because it's my--it's actually someone that I grew up, so I know very, very well from North Dakota. That was not an issue. It started to kind of get, like, well, who's this person or what are they--and I'm like, well, it's someone that we know, you know. And it was no big deal, he was--I don't know it's--it's someone from North Dakota where I grew up, and it's--he has oil money and it was--I don't know if it's his bank in--he lives in Phoenix part-time, so it was his bank, you know, in Phoenix or whatever, there was literally, it couldn't have been a better transaction as far as who we knew and what we were selling. There was nothing shady[21] about it at all.**

---

[19] Ex. P1, at 151:16-18.

[20] The trial transcript (ECF No. 332, at 68:5-8) recites different language from the deposition transcript (Exhibit P1) in the sentence with the first "we," and states: "because we have not done a sale in three to four months." All versions of Adducci's deposition testimony use the pronoun "we" in that sentence.

[21] Ex. P1, at 154:22. The Court notes Adducci's interesting use of the word "shady" at this spot.

(emphasis added). It is undisputed that the "buyer" from North Dakota is Ritter.

During the Gelov Call, Adducci also complained to Gelov that Bank of America's failure to release the wired funds "messed up my payroll, it messed up—it really literally, it messed up everything."[22]

On March 19, 2019,[23] Gelov filed suit against DuMouchelle, Adducci, and the LLC in the Oakland County, Michigan Circuit Court. On June 12, 2019, Gelov obtained a partial summary judgment against them, jointly and severally, for $1.8 million.[24]

***Ritter Sues LLC, DuMouchelle, and Adducci in North Dakota***

Ritter filed suit in the Williams County, North Dakota District Court (Northwest Judicial District), Court File Number 53-2019-CV-01186 ("North Dakota Case") against DuMouchelle, Adducci, and the LLC in connection with the unpaid notes and the Yellow Rose Transaction. On or about September 16, 2019, Ritter obtained a default judgment against DuMouchelle, Adducci and the LLC in

---

[22] Ex. P1, at 156:12-13.

[23] Pursuant to Fed. R. Evid. 201, this Court takes judicial notice of the records of the Oakland County, Michigan Circuit Court in case number 2019-172619-CK as to the date that Gelov filed this lawsuit.

[24] A copy of Gelov's partial summary judgment order in Oakland County, Michigan Circuit Court case number 2019-172619-CK is attached to Gelov's proof of claim (Claim 7-1) filed in the Debtors' lead bankruptcy case. Pursuant to Fed. R. Evid. 201, this Court takes judicial notice of that partial summary judgment order.

the North Dakota Case in the total amount of $17,140,031.62 ("North Dakota Judgment"). The North Dakota Judgment is comprised of (i) $16,414,214.61 in connection with the Yellow Rose Transaction (calculated as $12 million of Ritter's money that was intended for the purchase of The Yellow Rose, plus $4 million for a purported commission that would have been due to Ritter had the Yellow Rose Transaction actually occurred, plus judgment interest), and (ii) $725,817.00 related to promissory notes that predated the Yellow Rose Transaction.

***DuMouchelle and Adducci File Bankruptcy***

On October 11, 2019, the Debtors filed a voluntary Chapter 11 bankruptcy petition; the case was assigned Case No. 19-54531. That bankruptcy case was converted to Chapter 7 on December 3, 2019, after the United States Trustee filed a motion seeking conversion.[25]

Ritter filed this adversary proceeding against Adducci and DuMouchelle on September 22, 2020. After DuMouchelle waived his bankruptcy discharge in the lead bankruptcy case (Case No. 19-54531), he was dismissed from this adversary proceeding due to lack of subject matter jurisdiction, as more fully described in footnote 1, above. Consequently, Adducci is the sole remaining defendant in this adversary proceeding.

[25] An involuntary Chapter 7 bankruptcy case was filed against the LLC on November 17, 2019.

***DuMouchelle's Criminal Proceeding***

On June 16, 2020, approximately three months before this adversary proceeding was filed, the United States of America filed an Information ("Information") against DuMouchelle in the United States District Court for the Eastern District of Michigan, styled as United States of America v. Joseph Gregory DuMouchelle, Case No. 20-20245 ("Criminal Proceeding") in connection with the Yellow Rose Transaction. The Information was admitted at the trial in this adversary proceeding as Exhibit J33 upon the stipulation of the parties, and it refers to Ritter as "TR." Among other things, the Information alleged (in the paragraphs thereof designated below) that DuMouchelle:

(i) with intent to obtain money by means of false and fraudulent material promises and representations instructed TR to wire transfer $12 million for the purchase of The Yellow Rose (¶12);

(ii) falsified documents and emails making it appear that the account the money would be wired to was in fact the seller's (¶13);

(iii) sent the false information to TR with directions to wire the money to the account with a notation that it was for the benefit of the seller represented by RD (¶14);

(iv) sent TR a fraudulent receipt making it appear that The Yellow Rose had been purchased (¶17); and

(v) caused the transmission of wire communications in interstate commerce in the form of an interstate wire transfer of funds in the amount of $12 million from TR's bank account in Chandler, Arizona (sic) DuMouchelle's Bank of America account in Bloomfield Hills, Michigan (¶19).

On September 14, 2020, DuMouchelle appeared in the U.S. District Court for a Guilty Plea Hearing in the Criminal Proceeding. In the Criminal Proceeding, DuMouchelle admitted to causing Ritter $12 million in damages due to his criminally fraudulent conduct; upon the stipulation of the parties the transcript of that Guilty Plea Hearing was admitted at the trial in this adversary proceeding as Exhibit J22. On September 17, 2020, DuMouchelle's Plea Agreement was filed in the Criminal Proceeding; the Plea Agreement was admitted at the trial in this adversary proceeding as Exhibit J34 upon the stipulation of the parties. It recites (on p.4) that DuMouchelle withdrew the majority of Ritter's money and used it to pay his personal and business debts and expenses.

DuMouchelle pled guilty to criminal wire fraud. The July 28, 2022 Criminal Judgment against him was admitted at the trial in this adversary proceeding as Exhibit J27. DuMouchelle was sentenced to 151 months in prison; he is currently incarcerated.

During the trial in this adversary proceeding, Adducci testified that even though she withdrew the majority of the $12 million from the LLC's BofA Account the day after it arrived, she did so at DuMouchelle's direction. Documentary evidence in this adversary proceeding demonstrates that it was Adducci who—in person and as the only signatory on the BofA Account on February 7, 2019—authorized the withdrawal of more than $9.6 million of the $12 million the day after Ritter's wire arrived in the LLC's BofA Account.

***Trial and Credibility of Witnesses***

Trial commenced on March 23, 2026, and concluded on March 26, 2026. During this four-day trial, there were two witnesses: Ritter and Adducci. The parties stipulated to the admission of fifty (50) exhibits for all purposes; they are marked as Exhibits J1-J50. In addition, the transcript of Adducci's September 23, 2024 deposition in this adversary proceeding was admitted into evidence in written format (Ex. P1), and in video format with respect to excerpts of the video version that were played in Court during the trial.

The Court carefully observed the demeanor of both witnesses while they testified.

Ritter was a credible witness. The Court observed him to be stoic, angry, and chagrined at having been "duped" out of $12 million in the Yellow Rose Transaction. But he was reflective too and admitted his own role in his $12 million

loss in that "his guard was down" because he thought he could trust Adducci (the daughter of his deceased close friend, and a relative by marriage).

Adducci was not a credible witness. She had selective memory. She remembered details that suited her narrative, such as the fact that she was angry at DuMouchelle because he pressured her to make two unplanned trips to Bank of America in Tucson, when she really wanted to be at a high-end trade show and an invitation-only dinner/event. However, she claimed *not* to remember important details. For example, she testified that she opened the BofA Account in the name of the LLC, and at DuMouchelle's instruction but, initially, "couldn't remember" if she told DuMouchelle the account number. Ultimately, she said "I would assume I would have."[26]

The lynchpin of Adducci's defense is that DuMouchelle orchestrated the Yellow Rose Transaction and that any actions she took were at DuMouchelle's direction.

However, the Court carefully listened to the recording of the Gelov Call among DuMouchelle, Adducci, and Gelov. The timing of the Gelov Call is important; it occurred on March 7, 2019--just one month after Adducci authorized the withdrawal of more than $9.6 million of the $12 million wire transfer from Ritter the day after it arrived in the LLC's BofA Account, and while Adducci was the sole

[26] Trial Tr., ECF No. 332, at 111:16-20.

signatory on that account. Consequently, the Court was listening to Adducci's voice from a recording made close in time to the events in this adversary proceeding.

From listening to the recording of Adducci's own voice during the Gelov Call, the Court observed her to be confident, assertive, knowledgeable, and "in charge." She spoke quickly, enthusiastically, and glibly, and the Court observed that she (rather than DuMouchelle) did most of the talking. During the Gelov Call, Adducci claimed that Bank of America was "holding" part of the funds that had been wired into the LLC's BofA Account[27] (but that the held funds should be released soon), then she complained to Gelov that Bank of America's failure to release funds "messed up payroll."

However, Adducci's "blame the banks" story during the Gelov Call was a lie and she knew it at that time, because *she* had authorized, in person, the withdrawal of more than $9.6 million of the $12 million wire transfer from Ritter one month prior, on February 7, 2019, while she was the sole signatory on the BofA Account.

Adducci's dissembly during the Gelov Call was not an isolated occurrence. During her deposition in this adversary proceeding, an excerpt of her September 2019 deposition in Gelov's state court case against her was read into the record. She was asked: "Ms. Adducci, what is the Yellow Rose Diamond?" She replied, "I don't

[27] Exhibit J5 indicates that the $12 million wire from Ritter was the only wire transfer into the BofA Account before the Gelov Call occurred on March 7, 2019.

know."[28] Her September 2019 deposition testimony in Gelov's state court case against her was false at that spot, and Adducci knew it at the time, because Exhibit J29 in this adversary proceeding shows The Yellow Rose on her finger. When questioned about that inconsistency during the trial in this adversary proceeding, Adducci replied that her lawyer in Gelov's state court case told her to say that she didn't know anything about The Yellow Rose, and so she was following a lawyer's instructions. [29]

Adducci was not a credible witness.

***<u>Plaintiff's Claims</u>***

This is an adversary proceeding seeking to determine that $12 million of the North Dakota Judgment is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) (not including fraud or defalcation while acting in a fiduciary capacity), and (a)(6). Plaintiff must prove each of his § 523 claims by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287-88 (1991). The Court will consider each of Plaintiff's claims.

---

[28] Ex. P1, at 30:10-13.
[29] Trial Tr., ECF No. 330, at 64-65.

***Nondischargeability Under 11 U.S.C. § 523(a)(4)***

Section 523(a)(4) of the Bankruptcy Code states that a Chapter 7 discharge does not discharge an individual from any debt—

> for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

The Joint Final Pretrial Order recites that Ritter seeks a determination of nondischargeability under only the embezzlement and larceny portions of 11 U.S.C. § 523(a)(4).

Turning first to larceny, in the Stipulated Law section of the Joint Final Pretrial Order the parties agree (and the Court concurs) that, to establish larceny under 11 U.S.C. § 523(a)(4), Ritter must prove: "the fraudulent and wrongful taking and carrying away of property belonging to Plaintiff (a) without the consent of the owner and (b) with intent to convert such property to the taker's use. *Palisades Tickets, Inc. v. Daffner (In re Daffner),* 612 B.R. 630, 652 (Bankr. E.D.N.Y. 2020)." *Accord Digit. Com., Ltd. v. Sullivan* (*In re Sullivan*)*,* 305 B.R. 809, 825 n. 13 (Bankr. W.D. Mich. 2004), which differentiates "embezzlement" from "larceny" for purposes of 11 U.S.C. § 523(a)(4).

In *Stevenson v. William Noble Rare Jewels, L.P. (In re DuMouchelle),* 667 B.R. 122 (Bankr. E.D. Mich. 2023), *report and recommendation adopted,* 663 B.R. 349 (E.D. Mich. 2024), this Court analyzed Ritter's $12 million wire transfer in the context of that adversary proceeding, which sought to recover the portion of the $12

million wire from Ritter that was paid to Noble. The plaintiff in *Stevenson* was Michael Stevenson, the Chapter 7 Trustee in the Debtors' bankruptcy case. Mr. Stevenson was pursuing both the Trustee's claims and Ritter's claims against Noble, because Ritter had assigned his claims against Noble to Mr. Stevenson as the Chapter 7 Trustee of the Debtors. 667 B.R. at 129. In *Stevenson,* this Court held that: (i) voidable title to the $12 million passed from Ritter to the LLC when he voluntarily transferred the $12 million to the LLC's BofA Account (*Id.* at 133), and (ii) because Ritter ordered the wire transfer of $12 million three separate times, he intended to part with both title and possession of the $12 million and those facts do not constitute larceny (*Id.* at 136).

As this Court held in *Stevenson*, $12 million was not "taken" from Ritter without his consent. Instead, he ordered the wire transfer of $12 million three separate times. Unbeknownst to Ritter, the third time he ordered it delivered to the LLC's BofA Account, but the fact remains that Ritter *voluntarily* transferred the $12 million (albeit due to DuMouchelle's admitted fraud). This situation does not constitute "larceny" because there was no "taking" of the $12 million. Instead, Ritter transferred that money voluntarily.

Turning next to embezzlement, in the Stipulated Law section of the Joint Final Pretrial Order the parties agree (and the Court concurs) that, to establish embezzlement under 11 U.S.C. § 523(a)(4), Ritter must prove that: "(a) he entrusted

property to the Debtor, (b) the Debtor appropriated the property for a use other than that for which it was entrusted, and (c) the circumstances indicate fraud. *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1173 (6th Cir. 1996); *Ball v. McDowell (In re McDowell),* 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)." *Accord Sullivan,* 305 B.R. at 825.

Ritter argues that the facts of this case demonstrate Adducci's embezzlement, because she authorized the withdrawal of approximately $9.6 million of the $12 million out of the LLC's BofA Account on February 7, 2019—at DuMouchelle's direction, but while she was the sole signatory on the BofA Account. Because Adducci testified that she knew she had opened the BofA Account to receive $12 million from Ritter for the purchase of The Yellow Rose, her disbursement of more than $9.6 million from that $12 million within one day appears, at first blush, to support Ritter's argument for embezzlement.

Adducci, however, argues that Ritter transferred $12 million *to the LLC*—not to Adducci—and, consequently, Adducci cannot be found liable for embezzlement under 11 U.S.C. § 523(a)(4) because Ritter's money was not entrusted *to her.*

In *Stevenson,* 667 B.R. at 131-32, this Court addressed the concept of "corporate separateness" and the Trustee's request in that adversary proceeding for this Court to ignore that concept. This Court declined that request, noting that it would be inconsistent with Michigan law to ignore corporate separateness.

In the instant adversary proceeding, Ritter has not asked this Court to "ignore corporate separateness" between the LLC and Adducci. Instead, Ritter appears to have glossed over the fact that he unknowingly transferred $12 million *to the LLC,* rather than to Adducci. However, that's an important detail.

Because Ritter's $12 million was transferred to the LLC, Adducci—who is an individual separate from the LLC—cannot be liable for embezzlement of funds that were not paid to her but, instead, were paid to the LLC. Moreover, the record in this case establishes that Ritter did not know that he was wiring $12 million to the LLC (much less to Adducci). Consequently, the element of "entrustment" to Adducci is lacking.

For all of these reasons, Ritter's nondischargeability action against Adducci under 11 U.S.C. § 523(a)(4) fails.

***Nondischargeability Under 11 U.S.C. § 523(a)(6)***

Section 523(a)(6) of the Bankruptcy Code states that a Chapter 7 discharge does not discharge an individual from any debt—

> for willful and malicious injury by the debtor to another entity
> or to the property of another entity

Section 101(15) of the Bankruptcy Code defines the term "entity" to include "person." Consequently, 11 U.S.C. § 523(a)(6) can apply for willful and malicious injury to Ritter. *Anketell v. Smith (In re Anketell)*, 565 B.R. 11, 24 (Bankr. D. Mass.

2017); *We Sell Rests., Inc. v. Maddox (In re Maddox),* No. 22-03063, 2023 WL 3880467, at *8 (Bankr. N.D. Tex. June 7, 2023).

The statute is phrased conjunctively; in order to prevail under 11 U.S.C. § 523(a)(6) Ritter must prove that the injury that Adducci inflicted was both willful and malicious. In *MarketGraphics Research Group, Inc. v. Berge (In re Berge)*, 953 F.3d 907 (6th Cir. 2020), the Sixth Circuit Court of Appeals held that a debtor "willfully and maliciously injures a creditor if, acting without just cause or excuse, he knows or is substantially certain that his actions will cause injury." *Id.* at 914 (citing *Doe v. Boland* (*In re Boland*), 946 F.3d 335, 338 (6th Cir. 2020)).

In the Stipulated Law section of the Joint Final Pretrial Order the parties agree (and the Court concurs) that: (i) to establish willful injury, Ritter must prove that Adducci acted with intent to cause injury or with the belief that injury was substantially certain to result from her conduct. *Kennedy v. Mustaine (In re Kennedy),* 249 F.3d 576, 583 (6th Cir. 2001), (ii) to establish malicious injury, Ritter must prove that Adducci's actions were taken in conscious disregard of her duties or without just cause or excuse. *Initial Invs., Inc. v. Woodford (In re Woodford),* 560 B.R. 710, 721 (Bankr. E.D. Mich. 2016), and (iii) Ritter must also prove that Adducci's willful and malicious conduct caused the injury. *Buzzard v. Ratliff* (*In re Ratliff),* 673 B.R. 719, 738 (Bankr. S.D. Ohio 2025).

In determining whether a debtor acted willfully for purposes of 11 U.S.C. § 523(a)(6), the Sixth Circuit Court of Appeals uses a subjective standard, asking whether the debtor desired to cause the consequences of his/her act, or believed that the consequences were substantially certain to result from it. *Berge,* 953 F.3d at 915. "A debtor need not actually admit his intent; intent may be inferred from the circumstances of the injury." *Id.*

In determining maliciousness for purposes of 11 U.S.C. § 523(a)(6), the Sixth Circuit Court of Appeals does *not* require a showing of specific intent to harm another. *Id.* Instead, maliciousness requires a showing that the actions were taken in conscious disregard of one's duties *or* without just cause or excuse. *Id.* "Just cause" means a legally sufficient reason, and "excuse" means a reason that justifies an act or omission or that relieves a person of a duty. *Id.* (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)).

Although a creditor must prove both elements of § 523(a)(6), willful *and* malicious, "in many cases, the same facts that support a finding of willful conduct under § 523(a)(6) will likewise support a finding that the debtor acted with malice." *Id.* at 916.

Based upon the trial record, the Court finds that Adducci willfully injured Ritter to the extent of $5,322,694.44 (see footnote 30, below). She knew that Ritter was wiring $12 million to purchase The Yellow Rose. She opened the BofA

Account to receive the $12 million wire from Ritter. She knew that she had opened the LLC's BofA Account with only $500.00 on February 5, 2019, the day before Ritter's $12 million wire arrived. Adducci testified that, as of February 7, 2019, she thought Noble was the seller of The Yellow Rose. Based on that testimony and applying the "subjective standard" that Sixth Circuit precedent requires for a determination of "willfulness" under § 523(a)(6), the Court finds that Adducci believed that the $4,367,000.00 in Teller Transfers to Noble were to pay for (or toward) The Yellow Rose. Consequently, as to the $4,367,000.00 in Teller Transfers to Noble, Ritter does not have a § 523(a)(6) claim against Adducci.

However, in addition to the $4,367,000.00 in Teller Transfers to Noble, Adducci authorized withdrawals and cashier's checks totaling $5,322,694.44[30] out of the $12 million that Ritter had wired to the BofA Account. Her authorizing $5,322,694.44 in withdrawals and cashier's checks meant that the $12 million would be substantially dissipated, and would not be available for Ritter's intended purpose of purchasing The Yellow Rose as an investment. Adducci knew that she was authorizing disbursements from the $12 million received from Ritter to LLC creditors, because DuMouchelle copied her on his emails to Bank of America detailing some of the LLC creditors to be paid on February 7, 2019. Adducci

[30] This amount consists of $150,000.00 in Teller Transfers, $39,000.00 to Paul Haig, and $5,133,694.44 in cashier's checks.

testified that, at the time, she believed *Noble* was the seller of The Yellow Rose. Thus, Adducci knew (or was substantially certain) that Ritter would be injured by her conduct of authorizing $5,322,694.44 in withdrawals and cashier's checks to LLC creditors (rather than to the seller of The Yellow Rose) from the BofA Account on February 7, 2019, while she was sole signatory on that account.

The record also establishes that Adducci maliciously injured Ritter. Her conduct was in conscious disregard of her duties, and without just cause or excuse. She admitted that she didn't "think twice," or even ask, about disbursing millions out of the $12 million wire from Ritter the day after it arrived. She didn't ask about the balance in the BofA Account or whether money from other bank accounts had been moved into the BofA Account as of the time that she, in person and as the sole signatory on that account, was authorizing the withdrawal of millions from that account. She admitted that she didn't ask DuMouchelle any questions about the withdrawals until *after* she had authorized them. In other words, while she was authorizing those withdrawals, she didn't ask DuMouchelle why there was such a rush to disburse millions on February 7, 2019. Instead, she was angry with him for insisting that she make two unplanned trips to Bank of America in Tucson on February 7, 2019, because she really wanted to attend the high-end trade show, and an invitation-only dinner/event with colleagues and, consequently, she was in a rush to get out of the bank. She admitted that if she had not been "under duress" from

DuMouchelle to authorize those withdrawals, and rushing to get to an invitation-only dinner/event, she could have asked questions.

The amount of money being withdrawn from the BofA Account on February 7, 2019 (i.e., all in one day, and while she was the sole signatory on the BofA Account) was a red flag, especially because Adducci knew that she, herself, had opened the BofA Account to receive the $12 million wire from Ritter for his intended purchase of The Yellow Rose as an investment. In other words, she had actual knowledge of what the $12 million was supposed to be used for. The pressure from DuMouchelle for her to authorize the withdrawal of more than $9.6 million on February 7, 2019 (the day after it arrived) was also a red flag. Although Adducci may have thought it was appropriate for Noble (whom she then believed to be the seller of The Yellow Rose) to receive Teller Transfers totaling $4,367,000.00, she knew that the remaining $5,322,694.44 in withdrawals and cashier's checks that she authorized on February 7, 2019 was going to LLC creditors; that too was a red flag. Yet, faced with all these red flags, Adducci "didn't think twice" and she authorized millions in withdrawals and cashier's checks from the BofA Account without asking DuMouchelle any questions until *after* she had authorized them, and *after* she had

sent a stack of cashier's checks totaling more than $5 million via Federal Express to DuMouchelle in Michigan. [31]

The Court rejects Adducci's argument that because she trusted DuMouchelle and was following his instructions, that somehow constitutes "just cause or excuse" for her actions. It does not. There were enough "red flags" to alert Adducci to the harm that Ritter would suffer if she simply followed DuMouchelle's instructions. Indeed, her "I trusted DuMouchelle" argument is an aggravating factor; drawn to its logical conclusion, it would immunize any debtor who takes direction from another while engaging in conduct that constitutes willful and malicious injury. That is not the law. Her admissions that she was upset with her husband and "in a rush" to get out of the bank to attend an invitation-only dinner/event do not constitute "just cause or excuse" for her actions either.

Adducci's conduct was willful and malicious and it injured Ritter in the amount of $5,322,694.44 because that amount was not available to purchase The Yellow Rose as she knew he had intended.

For the foregoing reasons, the Court finds that Ritter has established nondischargeability against Adducci under 11 U.S.C. § 523(a)(6) in the amount of

---

[31] After authorizing these withdrawals and cashier's checks, Adducci did not take any remedial action. She did not contact Bank of America to seek cancellation of the cashier's checks, or fly to Michigan that night to try to intercept the Federal Express envelope containing them.

$5,322,694.44 for her conduct of authorizing withdrawals and cashier's checks totaling that amount out of the $12 million wire transfer from Ritter the day after it arrived in the LLC's BofA Account, and while she was the sole signatory on that account.

***Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)***

In order to prevail under 11 U.S.C. § 523(a)(2)(A), Ritter must prove that Adducci obtained his money by false pretenses, a false representation, or actual fraud, other than a statement respecting Adducci's (or an insider's) financial condition. The statute is phrased disjunctively; Ritter only needs to prove that his money was obtained by false pretenses *or* false representation *or* actual fraud in order to prevail under § 523(a)(2)(A).

Ritter argues that Adducci's *disbursement* of funds from the BofA Account triggers her liability for non-dischargeable debt under § 523(a)(2)(A). However, Ritter's argument is inconsistent with the wording of the statute. Adducci correctly asserts that, in order to prevail under § 523(a)(2)(A), Ritter must prove that Adducci "obtained" money from him by false pretenses, a false representation, or actual fraud.

***Actual Fraud Under 11 U.S.C. § 523(a)(2)(A)***

In *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert),* 141 F.3d 277 (6th Cir. 1998), the Sixth Circuit Court of Appeals stated the following elements

that a creditor must prove in order to prevail under 11 U.S.C. § 523(a)(2)(A): "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *Id*. at 280-81 (footnote omitted).

However, "actual fraud" is broader than misrepresentation. Actual fraud includes "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich),* 259 B.R. 873, 877 (B.A.P 6th Cir. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). In *Husky International Electronics, Inc. v. Ritz,* 578 U.S. 355 (2016), the Supreme Court held that the term "actual fraud" encompasses any fraud involving moral turpitude or intentional wrong, and that the term "actual fraud" in § 523(a)(2)(A) "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Id.* at 359-60. Importantly, the Supreme Court in *Husky* held that "a false representation has never been a required element of 'actual fraud,' and we decline to adopt it as one today." *Id.* at 362.

In *Husky,* the Supreme Court also explained the contours of "actual fraud" for purposes of § 523(a)(2)(A):

> This Court has historically construed the terms in § 523(a)(2)(A) to contain the "elements that the common law has defined them to include." *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437,133 L.Ed.2d 351 (1995). "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."
>
> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely.

*Id.* at 360. Further, the Supreme Court distinguished fraud consisting of fraudulent conveyances from what it called "inducement-based fraud"—i.e.*,* fraud that induced some detrimental reliance by a creditor. *Id.* at 361-62. Because Ritter asserts "inducement-based" actual fraud (as opposed to fraudulent conveyances), Ritter must also prove justifiable reliance. *Lenchner v. Korn* (*In re Korn*), 567 B.R. 280, 304 (Bankr. E.D. Mich. 2017).

DuMouchelle is incarcerated for his criminal fraud that caused Ritter to wire $12 million to the LLC's BofA Account. The issue in this adversary proceeding is whether Adducci participated in DuMouchelle's overall fraud scheme and thereby committed actual fraud within the meaning of § 523(a)(2)(A).

Ritter asserts that Adducci has committed actual fraud and that, in fact, she was the "lure"; without her participation in actual fraud with DuMouchelle, Ritter

would not have entered into the Yellow Rose Transaction or wired the $12 million. This "lure" argument is persuasive.

Ritter also argues that Adducci was a co-conspirator with DuMouchelle and, together, they engaged in the actually fraudulent scheme to obtain $12 million from Ritter.

Adducci asserts that she was not involved in obtaining the $12 million from Ritter, and that DuMouchelle orchestrated that by himself. She further asserts that she had no fraudulent intent, and that she was following DuMouchelle's directions as she had in the past. She testified that she trusted him at that point in time.

The Court rejects Adducci's arguments, and finds that she participated in DuMouchelle's actual fraud scheme to obtain the $12 million from Ritter.

***(i) Adducci's Involvement in the Fraud Scheme to Obtain $12 Million from Ritter***

First, Adducci admitted her involvement at least five times during the Gelov Call, when she said: "And **we** had worked on this sale for three to four months,"[32] *and* "**we** worked so hard on the sale" involving "someone that I grew up, so I know very, very well from North Dakota," *and* "it's someone that **we** know," *and* "it couldn't have been a better transaction as far as who **we** knew and what **we** were

[32] The foregoing quote is from Exhibit P1, at 154:3-4. However, the trial transcript from March 24, 2026 (ECF No. 332, at 68:7-8) indicates that she said, at that spot: "because we have not done a sale for three to four months." Nevertheless, all versions use the word "we" as the pronoun at that spot.

selling." It is undisputed that the referenced buyer from North Dakota is Ritter. Thus Adducci herself admitted that DuMouchelle *and she* (or, perhaps the LLC *and she*) worked on the transaction with Ritter.

Although the Gelov Call occurred *after* February 6, 2019, when the $12 million from Ritter was "obtained," Adducci's statements during the Gelov Call provide important context and contrast. If she was truly "uninvolved" in DuMouchelle's fraudulent scheme (as she claims) then she would have told the truth; that a $12 million wire came in and approximately $9.6 million of it was disbursed the next day to pay Noble (whom she then believed to be the seller of The Yellow Rose) and certain creditors of the LLC. Instead, she concocted a complete fabrication about part of the wired funds being "held" by Bank of America, thus demonstrating her participation in DuMouchelle's overall fraud to obtain $12 million from Ritter.[33] Her statements during the Gelov Call were made on March 7, 2019, just one month after her actions that give rise to this adversary proceeding; they constitute subsequent conduct that reflects her state of mind close in time to the facts of this case, and the Court is permitted to consider those statements in determining her state of mind and her participation with DuMouchelle in the overall

---

[33] Given the fact that *Adducci* authorized millions of dollars in withdrawals and cashier's checks the day after the $12 million wire from Ritter arrived, her lament to Gelov about Bank of America "messing up" payroll is disturbing insofar as the $12 million from Ritter was *not* supposed to be used for payroll, and it further demonstrates her *active involvement* in the fraud scheme.

fraud. *See, e.g., Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996)*; Zutrau v. Zutrau* (*In re Zutrau*), 563 B.R. 431, 445 (B.A.P. 1st Cir. 2017); *Siebanoller v. Rahrig (In re Rahrig),* 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007).

Second, Adducci's participation in the January 25, 2019 telephone call with Ritter shows her involvement in obtaining $12 million from Ritter. When she spoke to Ritter that day, Adducci knew that he wanted her opinion of The Yellow Rose. She testified that she told him it was nice, and "expressed the view that it was a good investment."[34] Ritter testified that during that call, Adducci said that she had seen The Yellow Rose in the LLC's office; she described it as a remarkable piece and confirmed that it could be bought for $12 million and sold for $16-$20 million, as DuMouchelle had described to him. In other words, Adducci "parroted" the figures that DuMouchelle had described to Ritter in order to lure him into proceeding with the Yellow Rose Transaction.

Third, Adducci's actions regarding the BofA Account demonstrate that she actually worked with DuMouchelle to obtain Ritter's $12 million. She opened the

[34] Although Adducci testified at trial that she did not discuss "the deal" with Ritter during the January 25, 2019 telephone call, Adducci later admitted (Def.'s Post-Trial Br., ECF No. 350, document page 12) that she stated that it was a good investment. Regardless, the Court believes Ritter's testimony (and does not believe Adducci's testimony) as to whether she discussed "the deal" during the January 25, 2019 telephone call with Ritter.

LLC's BofA Account[35] at DuMouchelle's direction and, when she did so, she knew that FineMark Bank & Trust had rejected Ritter's $12 million wire. She knew that she was opening the BofA Account in the name of the LLC for the purpose of receiving a $12 million wire transfer from Ritter to acquire The Yellow Rose as an investment. Then, Adducci told DuMouchelle the BofA Account number, thereby enabling DuMouchelle to incorporate it into the February 6, 2019 email that he sent Ritter (purporting to forward a bogus email allegedly from Richard Drucker). Although Adducci initially testified that she "couldn't remember" if she told DuMouchelle the BofA Account number, her alleged "memory lapse" lacked credibility. It defies logic that Adducci would have opened the LLC's BofA Account at DuMouchelle's direction, and then *not* told him the account number. Ultimately, Adducci testified "I would assume I would have."[36]

The Court finds that Adducci participated in DuMouchelle's actual fraud scheme and knowingly played an instrumental role in obtaining $12 million from Ritter.

***(ii) Adducci's Intent to Deceive Ritter***

As a debtor will rarely, if ever, admit to acting with intent to deceive, the Court may look to circumstantial evidence and may infer fraudulent intent from the totality

---

[35] The Court notes that Bank of America has branches in Michigan, yet DuMouchelle did not open the LLC's BofA Account; Adducci did.
[36] Trial Tr., ECF No. 332, at 111:16-20.

of circumstances. *Zutrau,* 563 B.R. at 445; *Anketell,* 565 B.R. at 21; *Gold v. Guttman* (*In re Guttman*), 237 B.R. 643, 647 (Bankr. E.D. Mich. 1999).

The Court rejects Adducci's argument that she had no fraudulent intent, and that she was following DuMouchelle's directions.

First, Adducci's "I trusted DuMouchelle" defense is not a defense at all; drawn to its logical conclusion, it would immunize any debtor who participates in a fraud so long as he or she can point to a co-conspirator. That is not the law.

Second, from listening to the recording of Adducci's own voice during the Gelov Call on March 7, 2019, she was not "reliant" on DuMouchelle's directions. The Court observed that Adducci was in charge and that DuMouchelle deferred to her.

Third, her statements to Ritter during the January 25, 2019 telephone call demonstrate her intent to deceive him. She knew she did not appraise The Yellow Rose, and she knew that Ritter wanted *her* opinion of it before he decided to invest in the Yellow Rose Transaction. During the January 25, 2019 telephone call with Ritter she told him that it was nice and "expressed the view that it was a good investment."[37] Yet, without having appraised The Yellow Rose, *how* could Adducci have known whether it was a "good investment"?

[37] Def.'s Post-Trial Br., ECF No. 350, document page 12.

Finally, the Court rejects Adducci's denial of fraudulent intent because she was not a credible witness. She engaged in a pattern of dissembly. Her "blame the banks" story during the Gelov Call was a complete fabrication. As Exhibit P1 demonstrates, during her September 2019 deposition in Gelov's state court case against her, she denied knowing about The Yellow Rose even though she had seen it in person, and photos were taken of The Yellow Rose *on her finger* in 2018.

***(iii) Ritter's Justifiable Reliance***

Ritter must also prove justifiable reliance in order to establish a claim against Adducci under § 523(a)(2)(A). *Korn,* 567 B.R. at 302-304**.** In the Stipulated Law section of the Joint Final Pretrial Order the parties agree to the applicability of *Field v. Mans,* 516 U.S. 59, 73-75 (1995), which holds that justifiable reliance is a lower standard; it does not invoke a "reasonable man" standard of inquiry. In *Field,* the Supreme Court explained the concept of justifiable reliance:

> Although the plaintiff's reliance on the misrepresentation must be justifiable…this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Justifiability is not without some limits, however.…[A] person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation….
>
> …[I]t is only where, under the circumstances, the facts should be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as

> a warning that he is being deceived, that he is required to make an investigation of his own.

*Id.* at 70-71 (internal quotation marks and citations omitted). *Accord Tweedie v. Hermoyian* (*In re Hermoyian*), 466 B.R. 348, 368-69 (Bankr. E.D. Mich. 2012).

The Court finds that Ritter was not justified in relying upon: (i) the one page of the Data Package Email (Bates No. 198) containing a $30 million replacement value for The Yellow Rose as of January 31, 2011—approximately eight years prior to his January 25, 2019 interactions with Adducci, or (ii) the undated "Yellow Rose Addendum" (Bates No. 199) which does not disclose its author or the date of its preparation.

However, the Court finds that Ritter was justified in relying on the GIA Monograph and on Adducci's statements to him during the January 25, 2019 telephone call.

The GIA Monograph appears to be "official." It is approximately 25-pages long and the pages of its text contain the words "GIA MONOGRAPH/THE YELLOW ROSE." It explains that GIA scientists used infrared spectroscopy to identify the chemical and physical characteristics of The Yellow Rose. Although the GIA Monograph bears a 2011 copyright (8 years before the facts at issue in this adversary proceeding), because the GIA Monograph does not state a value (or even

an estimate of value) for The Yellow Rose, the date of the document does not impair the justifiability of Ritter's reliance thereon *as a description of The Yellow Rose*.

With respect to Adducci's statements to Ritter during the January 25, 2019 telephone call, Ritter was justified in relying on them because Adducci held herself out, professionally, as a Graduate Gemologist and Appraiser. It is undisputed that Ritter knew of Adducci's professional expertise. Indeed, that's why he wanted *her* to confirm that The Yellow Rose was the "real deal" and a good investment that could be purchased for $12 million and sold for $16-$20 million. Ritter testified that had Adducci declined to do so, he would not have proceeded with a transaction regarding The Yellow Rose.

The Court finds Ritter's testimony to be credible on the substance of Adducci's statements to him during the January 25, 2019 telephone call, and rejects Adducci's testimony that she never discussed its value with Ritter. Adducci knew that Ritter wanted to speak to her about The Yellow Rose *as an investment.* Thus, it defies logic that "value" would not have been discussed during the January 25, 2019 call. Moreover, Adducci admits that, during the January 25, 2019 telephone call, she "expressed the view that it was a good investment."[38]

Adducci told Ritter that she had seen The Yellow Rose in the LLC's office. Ritter was justified in believing her professionally experienced, eyewitness

---

[38] Def.'s Post-Trial Br., ECF No. 350, document page 12.

description of it. Ritter was justified in thinking he could trust Adducci in light of their longstanding connections; it is undisputed that Ritter has known Adducci since she was a teenager, because she is the daughter of his close friend (now deceased). Indeed, they have a family connection, as Ritter's sister is married to Adducci's brother.

Based on the trial record, the Court finds that Adducci discussed the value of The Yellow Rose with Ritter during the January 25, 2019 telephone call, and that Ritter was justified in relying on Adducci's statements that The Yellow Rose was the "real deal" and a good investment that could be purchased for $12 million and sold for $16-$20 million.

***(iv) Was Ritter's Justifiable Reliance a Proximate Cause of his Loss?***

As Judge Shefferly observed in *Hermoyian,* 466 B.R. at 370-71, bankruptcy courts within the Sixth Circuit have explained the concept of proximate cause differently. In *WebMD Practice Services, Inc. v. Sedlacek (In re Sedlacek),* 327 B.R. 872 (Bankr. E.D. Tenn. 2005), the bankruptcy court stated that a "[p]laintiff must prove that its reliance on the [d]ebtor's representations was the proximate cause of its losses, which depends on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." *Id.* at 888 (internal quotation marks and citations omitted). The *Sedlacek* court also noted that "[t]here must be a direct link between the alleged fraud and the creation of the debt."

*Id.* (internal quotation marks and citations omitted). In *Wings & Rings, Inc. v. Hoover (In re Hoover),* 232 B.R. 695 (Bankr. S.D. Ohio 1999), the bankruptcy court stated that "[p]roximate cause is established where the misrepresentation is a substantial factor in the loss and where the loss may be reasonably expected to result from reliance." *Id*. at 700 (citation omitted).

Judge Shefferly (in *Hermoyian*) further noted that *Gem Ravioli, Inc. v. Creta (In re Creta),* 271 B.R. 214 (B.A.P. 1st Cir. 2002) contains a more comprehensive discussion of the proximate cause element of § 523(a)(2)(A). *Hermoyian*, 466 B.R. at 370. In *Creta*, the court relied on the *Restatement (Second) of Torts* (1976) to explain that proximate causation encompasses two elements, "causation in fact" and "legal causation." 271 B.R. at 218-19. *Accord Espy v. Stevens (In re Stevens),* 647 B.R. 299, 329-30 (Bankr. E.D. Va. 2022).

In *Creta,* the court stated that "[Causation in fact] is concerned with the question of whether the misrepresentation by the defendant has caused the plaintiff's loss at all," and noted the plaintiff must have relied on the misrepresentation in incurring the loss, but his reliance does not have to be the sole or even the predominant or decisive factor in influencing the plaintiff's conduct. *Id.* at 219 (citation omitted). "It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Id.* (citation omitted).

Legal causation requires that the creditor's loss be reasonably expected to result from the reliance. *Id.* (citation omitted).

The issue in the instant adversary proceeding is whether Ritter's justifiable reliance on the GIA Monograph and on Adducci's statements to him during the January 25, 2019 telephone call were the proximate cause of his loss.

With respect to the GIA Monograph, although Adducci sent it to Ritter as part of the Data Package Email, she did not prepare it. Moreover, the GIA Monograph did not contain any valuation (or estimate of value) of The Yellow Rose. Ritter's $12 million loss could not reasonably be expected to result from his justifiable reliance on the GIA Monograph. Consequently, the GIA Monograph was not a proximate cause of his loss.

With respect to Adducci's statements to Ritter during the January 25, 2019 telephone call, Adducci argues that her statements did not cause Ritter's loss and, instead, DuMouchelle's actions caused Ritter's $12 million loss.

However, Ritter argues that Adducci was "the lure" and that he would not have gotten involved in the Yellow Rose Transaction or wired the $12 million without her confirmation during the January 25, 2019 telephone call that The Yellow Rose was the "real deal" and a good investment that could be purchased for $12 million and sold for $16-$20 million. The Court observed Ritter closely during his testimony. He was steadfast, clear, and credible when he testified that if Adducci

had declined to confirm those figures for The Yellow Rose, he would not have proceeded with the Yellow Rose Transaction, and would not have wired the $12 million.

The Court finds Ritter's testimony to be credible and rejects Adducci's arguments. And, as noted above, the Court does not find Adducci's testimony to be credible.

The Court finds that Ritter's reliance on Adducci's statements to him during the January 25, 2019 telephone call caused him to enter into the Yellow Rose Transaction and lured him into sending the $12 million wire transfer. He trusted her and was justified in doing so. Without her statements to Ritter during the January 25, 2019 telephone call, he would not have gotten involved in the Yellow Rose Transaction or wired the $12 million to acquire The Yellow Rose for investment purposes. Her conduct was substantial and important in luring Ritter into the Yellow Rose Transaction and she should be held legally responsible for it. Ritter has established causation in fact and causation in law as to the $12 million; his justifiable reliance on Adducci's statements to him during the January 25, 2019 telephone call were the proximate cause of his loss.

For the foregoing reasons, the Court finds that Ritter has satisfied the elements of § 523(a)(2)(A) and that Adducci is liable to Ritter for $12 million in nondischargeable debt for actual fraud. In light of this ruling, the Court need not

address the false representation or false pretenses subparts of § 523(a)(2)(A), or Ritter's assertions of vicarious liability.

## ***<u>Conclusion</u>***

Ritter is entitled to a judgment against Adducci determining that $12 million of the $17,140,031.62 North Dakota Judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A), and that $5,322,694.44 of that $12 million is also nondischargeable under 11 U.S.C. § 523(a)(6). Ritter is not entitled to a judgment against Adducci under 11 U.S.C. § 523(a)(4) and, instead, Adducci is entitled to a judgment of no cause of action against Ritter under 11 U.S.C. § 523(a)(4). The Court will enter a separate order consistent with this Opinion.

**Signed on November 4, 2026**

**/s/ Lisa S. Gretchko**

**Lisa S. Gretchko**
**United States Bankruptcy Judge**